# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

SHAUNA WILLIAMS, FLOR HERRERA-PICASSO, MINERVA FREEMAN, MAURA ACETO, JAVIER LIMON, ARMENTA EATON, JAMES ADAMS, LUCIANO GONZALEZ-VEGA, CHENITA JOHNSON, PAMLYN STUBBS, EARL JONES, ALLISON SHARI ALLEN, LAURA MCCLETTIE, NELDA LEON, GERMAN DE CASTRO, ALAN RENE OLIVA CHAPELA, VIRGINIA KEOGH, and NATALEE NANETTE NIEVES,

    Plaintiffs,

    v.

REPRESENTATIVE DESTIN HALL, in his official capacity as Chair of the House Standing Committee on Redistricting; SENATOR WARREN DANIEL, in his official capacity as Co-Chair of the Senate Standing Committee on Redistricting and Elections; SENATOR RALPH E. HISE, JR., in his official capacity as Co-Chair of the Senate Standing Committee on Redistricting and Elections; SENATOR PAUL NEWTON, in his official capacity as Co-Chair of the Senate Standing Committee on Redistricting and Elections; REPRESENTATIVE TIMOTHY K. MOORE, in his official capacity as Speaker of the North Carolina House of Representatives; SENATOR PHILIP E. BERGER, in his official capacity as President *Pro Tempore* of the North Carolina Senate; THE NORTH CAROLINA STATE BOARD OF ELECTIONS; ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; JEFF CARMON III, in his official capacity as Secretary of the North Carolina State Board of Elections; STACY EGGERS IV, in his official capacity as Member of the North Carolina State Board of Elections; KEVIN LEWIS, in his official capacity as Member of the North Carolina

Civil Action No. 1:23-cv-01057-TDS-JLW

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## THREE-JUDGE PANEL REQUESTED

State Board of Elections; and SIOBHAN
O'DUFFY MILLEN, in her official capacity as
Member of the North Carolina State Board of
Elections,

Defendants.

## **<u>INTRODUCTION</u>**

1.     Plaintiffs bring this action to challenge North Carolina's 2023 Congressional Plan, which was enacted as Senate Bill 757 on October 25, 2023, and represents the third time in as many years that the North Carolina General Assembly has drawn congressional districts that disadvantage minority voters.

2.     North Carolina gained a congressional district after the 2020 Census, almost entirely due to an increase in the state's minority population. But instead of granting minority voters the benefit of the state's increased representation, the General Assembly majority capitalized on that gain to increase their own power and decrease minority voting power.

3.     By strategically packing and cracking North Carolina's minority voters, the 2023 Congressional Plan entrenches the state's white majority and erases the gains made by voters of color in the 2020 and 2022 election cycles.

4.     The 2023 Congressional Plan is just the most recent enactment in North Carolina's long history of discriminatory voting laws and redistricting plans. North Carolina's minority populations have long suffered from voting discrimination and vote dilution and as a result have endured persistent disparities in political representation.

5.     The state's newly enacted congressional redistricting plan exacerbates these issues by drawing minority voters within and without of districts on the basis of race so as to minimize minority voting strength and dismantle existing minority opportunity districts across the state.

- 2 -

6.     Plaintiffs seek an order declaring that Congressional Districts 1, 6, 12, and 14 are unconstitutional racial gerrymanders; declaring that the 2023 Congressional Plan intentionally discriminates against minority voters in violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution and Section 2 of the Voting Rights Act; enjoining enforcement of the 2023 Congressional Plan; and facilitating the adoption of a lawful congressional plan.

## PARTIES

### A. Plaintiffs

7.     Plaintiff Shauna Williams is a Black Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Warrenton in Warren County. Ms. Williams's residence was located in Congressional District 1 under the map that was in place for the 2022 congressional election (the "2022 Congressional Plan") and is also in Congressional District 1 under the 2023 Congressional Plan.

8.     Plaintiff Flor Herrera-Picasso is a Latina Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Wilson in Wilson County. Ms. Herrera-Picasso's residence was located in Congressional District 1 under the 2022 Congressional Plan and is also in Congressional District 1 under the 2023 Congressional Plan.

9.     Plaintiff Minerva Freeman is a Black Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Fountain in Pitt County. Ms. Freeman's residence was located in Congressional District 1 under the 2022 Congressional Plan and is newly located in Congressional District 3 under the 2023 Congressional Plan.

10.     Plaintiff Maura Aceto is a Latina Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Greenville in Pitt County. Ms. Aceto's residence was located in Congressional District 1 under the 2022 Congressional Plan and is newly located in Congressional District 3 under the 2023 Congressional Plan.

11.     Plaintiff Javier Limon is a Latino Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Winterville in Pitt County, where he is a student at East Carolina University. Mr. Limon's residence was located in Congressional District 1 under the 2022 Congressional Plan and is newly located in Congressional District 3 under the 2023 Congressional Plan.

12.     Plaintiff Armenta Eaton is a Black Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Louisburg in Franklin County. Ms. Eaton's residence was located in Congressional District 1 under the 2022 Congressional Plan and is newly located in Congressional District 13 under the 2023 Congressional Plan.

13.     Plaintiff James Adams is a Black Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of High Point in Guilford County. Mr. Adams's residence was located in Congressional District 6 under the 2022 Congressional Plan and is also in Congressional District 6 under the 2023 Congressional Plan.

14.     Plaintiff Luciano Gonzalez-Vega is a Latinx Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Greensboro in Guilford County. Mx. Gonzalez-Vega's residence was located in Congressional District 6 under the 2022 Congressional Plan and is also in Congressional District 6 under the 2023 Congressional Plan.

15.     Plaintiff Chenita Johnson is a Black Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Winston-Salem in Forsyth County. Ms. Johnson's residence was located in Congressional District 6 under the 2022 Congressional Plan and is newly located in Congressional District 10 under the 2023 Congressional Plan.

16.     Plaintiff Pamlyn Stubbs is a Black Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Greensboro in Guilford County. Ms. Stubbs's

residence was located in Congressional District 6 under the 2022 Congressional Plan and is newly located in Congressional District 5 under the 2023 Congressional Plan.

17.     Plaintiff Earl Jones is a Black Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Greensboro in Guilford County. Mr. Jones's residence was located in Congressional District 6 under the 2022 Congressional Plan and is newly located in Congressional District 5 under the 2023 Congressional Plan.

18.     Plaintiff Allison Shari Allen is a Black Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Charlotte in Mecklenburg County. Ms. Allen's residence was located in Congressional District 14 under the 2022 Congressional Plan and is newly located in Congressional District 12 under the 2023 Congressional Plan.

19.     Plaintiff Laura McClettie is a Black Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Charlotte in Mecklenburg County. Ms. McClettie's residence was located in Congressional District 14 under the 2022 Congressional Plan and is newly located in Congressional District 12 under the 2023 Congressional Plan.

20.     Plaintiff Nelda Leon is a Latina Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Charlotte in Mecklenburg County. Ms. Leon's residence was located in Congressional District 14 under the 2022 Congressional Plan and is newly located in Congressional District 12 under the 2023 Congressional Plan.

21.     Plaintiff German De Castro is a Latino Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Charlotte in Mecklenburg County. Mr. De Castro's residence was located in Congressional District 14 under the 2022 Congressional Plan and is newly located in Congressional District 12 under the 2023 Congressional Plan.

22.     Plaintiff Alan Rene Oliva Chapela is a Latino Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Charlotte in Mecklenburg County. Mr. Oliva Chapela's residence was located in Congressional District 14 under the 2022 Congressional Plan and is newly located in Congressional District 12 under the 2023 Congressional Plan.

23.     Plaintiff Virginia Keogh is a Black Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Charlotte in Mecklenburg County. Ms. Keogh's residence was located in Congressional District 14 under the 2022 Congressional Plan and is also in Congressional District 14 under the 2023 Congressional Plan.

24.     Plaintiff Natalee Nanette Nieves is a Latina Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Gastonia in Gaston County. Ms. Nieves's residence was located in Congressional District 14 under the 2022 Congressional Plan and is also in Congressional District 14 under the 2023 Congressional Plan.

**B.  Defendants**

25.     Defendant Destin Hall is a member of the North Carolina House of Representatives and currently serves as the Chair of the House Standing Committee on Redistricting, which oversaw the creation of the 2023 Congressional Plan. Mr. Hall is sued in his official capacity only.

26.     Defendant Warren Daniel is a member of the North Carolina Senate and currently serves as a co-Chair of the Senate Standing Committee on Redistricting and Elections, which oversaw the creation of the 2023 Congressional Plan. Mr. Daniel is sued in his official capacity only.

27.     Defendant Ralph E. Hise, Jr. is a member of the North Carolina Senate and currently serves as a co-Chair of the Senate Standing Committee on Redistricting and Elections,

which oversaw the creation of the 2023 Congressional Plan. Mr. Hise is sued in his official capacity only.

28.    Defendant Paul Newton is a member of the North Carolina Senate and currently serves as a co-Chair of the Senate Standing Committee on Redistricting and Elections, which oversaw the creation of the 2023 Congressional Plan. Mr. Newton is sued in his official capacity only.

29.    Defendant Timothy K. Moore is the Speaker of the North Carolina House of Representatives. Mr. Moore is sued in his official capacity only.

30.    Defendant Philip E. Berger is the President Pro Tempore of the North Carolina Senate. Mr. Berger is sued in his official capacity only.

31.    Defendant North Carolina State Board of Elections is the agency responsible for the regulation and administration of elections in North Carolina. It is tasked with "general supervision over the primaries and elections in the State," N.C. Gen. Stat. § 163-22(a), including elections for the U.S. House of Representatives.

32.    Defendant Alan Hirsch is the Chair of the North Carolina State Board of Elections. Mr. Hirsch is sued in his official capacity only.

33.    Defendant Jeff Carmon III is the Secretary of the North Carolina State Board of Elections. Mr. Carmon is sued in his official capacity only.

34.    Defendant Stacy Eggers IV is a member of the North Carolina State Board of Elections. Mr. Eggers is sued in his official capacity only.

35.    Defendant Kevin Lewis is a member of the North Carolina State Board of Elections. Mr. Lewis is sued in his official capacity only.

36.     Defendant Siobhan O'Duffy Millen is a member of the North Carolina State Board of Elections. Ms. Millen is sued in her official capacity only.

## JURISDICTION AND VENUE

37.     Plaintiffs bring this action under the Fourteenth and Fifteenth Amendments to the U.S. Constitution and Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

38.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1343, and 1357 because the matters in controversy arise under the Constitution and laws of the United States, as well as under 42 U.S.C. §§ 1983 and 1988.

39.     This Court has personal jurisdiction over Defendants, who are sued in their official capacities and reside within this state, pursuant to Fed. R. Civ. P. 4(k)(1)(A).

40.     Venue is proper because a substantial part of the events that give rise to Plaintiffs' claims have occurred, and will occur, in this District. 28 U.S.C. § 1391(b).

41.     A three-judge panel is requested pursuant to 28 U.S.C. § 2284(a), as this action challenges "the constitutionality of the apportionment of congressional districts."

42.     The Court has jurisdiction to grant declaratory and injunctive relief under Federal Rules of Civil Procedure 57 and 65 and 28 U.S.C. §§ 2201 and 2202.

## STATEMENT OF FACTS

**A.  North Carolina's Post-2020 Census Redistricting Process**

43.     Typically, the task of drawing new district maps in North Carolina occurs once every 10 years. *See* U.S. Const. art. I, § 4; N.C. Const. art. II, §§ 3, 5. But due to the General Assembly majority's unflinching commitment to entrenching their party's political power at the expense of voters of color, North Carolina's congressional map has been redrawn no fewer than four times in the past three years.

- 8 -

44. North Carolina gained a congressional district after the 2020 Census, almost entirely due to an increase in its minority population.

45. The North Carolina General Assembly first voted to approve a new congressional map on November 4, 2021, along with state House and state Senate maps.

46. Despite claims from the General Assembly that all map-drawing had occurred publicly, and despite adopting redistricting criteria explicitly banning political considerations and the use of election data, litigation later revealed that secret "concept maps" had been used—and then destroyed—in drawing North Carolina's 2021 maps. The General Assembly had almost entirely ignored recommendations for a fair and open redistricting process that nonpartisan civil rights and voter advocacy organizations shared with the North Carolina General Assembly months earlier.

47. The Supreme Court of North Carolina struck down all three maps as unlawful partisan gerrymanders on February 4, 2022.

48. In its February 4, 2022 order, which provided instructions for the General Assembly to draw remedial maps, the North Carolina Supreme Court directed the legislature to assess the existence of racially polarized voting in order to comply with any requirement under the Voting Rights Act before satisfying other criteria under state law. *Harper v. Hall*, 380 N.C. 317, 401 (2022).

49. The General Assembly passed remedial maps on February 17, 2022. Less than a week later, the remedial congressional map was likewise struck down as an unconstitutional partisan gerrymander. *Harper v. Hall*, File No. 21 CVS 015426, Wake County Superior Court.

50. A special master drew the congressional plan that North Carolina used for the 2022 elections.

51.     Earlier this year, however, a newly-constituted Supreme Court of North Carolina granted legislators' petition to rehear the partisan gerrymandering case and then vacated and reversed the Court's prior opinions. In doing so, the court held that "partisan gerrymandering claims present a political question that is nonjusticiable under the North Carolina Constitution." *Harper v. Hall*, 384 N.C. 292, 300 (2023). It also granted legislators' request to redraw the congressional and state legislative maps. *Id.* at 378.

52.     The General Assembly waited nearly five months to take up the task of redistricting again. In the meantime, it passed a 625-page budget, in which it included a provision to reduce transparency in redistricting by overturning a longstanding state law that made legislators' redistricting communications and drafting documents part of the public record once new district maps became law. This budget was enacted into law, contributing to an even less transparent 2023 redistricting process.

53.     Providing less than one week's notice, the General Assembly announced in late September that the 2023 redistricting process would begin. Although nonpartisan civil rights and voter advocacy organizations again shared recommendations for a fair and open redistricting process with the North Carolina General Assembly, these recommendations were, again, ignored.

54.     As was the case in 2021, there was very limited opportunity for public input and advocacy during the 2023 redistricting process. The General Assembly held only three public hearings, with no virtual option, all during business hours. None of these hearings were in Charlotte, Greensboro, Durham, or Winston-Salem, four of North Carolina's largest and most diverse population centers.

55.     No draft maps or proposed redistricting criteria were shared in advance of any of the public hearings.

- 10 -

56.     At the public hearings, representatives from minority advocacy organizations urged the General Assembly to consult racial data in drawing maps to protect against minority vote dilution in accordance with federal law.

57.     On October 18, 2023, the General Assembly released draft legislative and congressional map proposals.

58.     The following day, *after* releasing draft map proposals, the Senate Standing Committee on Redistricting and Elections released its redistricting criteria for drawing the congressional and Senate maps. The House Standing Committee on Redistricting still has not published its criteria for drawing the House map.

59.     The published plan criteria for congressional redistricting include equal population, compactness, contiguity, and respect for existing political subdivisions. They also state that "Data identifying the race of individuals or voters shall *not* be used in the drafting of districts," and that "[t]he General Assembly may consider partisan advantage and incumbency protection in the application of its discretionary redistricting decisions," as well as "incumbent residence."

60.     On October 19, 2023, Representative Destin Hall, Chair of the House Standing Committee on Redistricting, and Senator Ralph Hise, Co-Chair of the Senate Standing Committee on Redistricting and Elections, also directed legislative staff to publish racial data regarding the legislative and congressional maps. Representative Hall stated that "racial data was not used" in the mapmaking process, while Senator Hise stated that "the chairs did not use racial data when drawing the legislative and congressional maps."

61.     That same day, Senator Natasha Marcus asked Senator Hise whether there would be any opportunity for public comment given that there were finally proposed maps. Senator Hise

- 11 -

responded "[t]here is no scheduled public comment at this time." No further public comment hearings were ever scheduled.

62.    At the unveiling of congressional map CCJ-1, the proposal ultimately enacted into law, Senator Michael Garrett of Guilford plainly asked, "Why would we split Guilford County among three different congressional districts when that is not necessary?" Senator Hise responded by saying larger counties were more likely to be split, even multiple times, so as to minimize splits for other counties. He also offered the following: "Congratulations to Guilford for having the opportunity of being represented by three members of Congress, something not a lot of municipalities have the strengths to be able to accomplish." To which Senator Garrett ultimately responded, "Guilford County would like to have one member of Congress, not three."

63.    On October 25, 2023, the North Carolina legislature enacted the new congressional and legislative maps. These maps were not subject to gubernatorial veto.

## B.  The 2023 Congressional Redistricting Plan

64.    The 2023 Congressional Plan continues North Carolina's long tradition of enacting redistricting plans that pack and crack minority voters into gerrymandered districts designed to minimize their voting strength.

65.    The sections below describe some of the most egregious features of each challenged district.

### Congressional District 1

66.    Under the 2022 Congressional Plan, Congressional District 1 ("CD-1") had a combined Black and Latino citizen voting age population ("CVAP") of 44.8%. In the 2023 Congressional Plan, the Black and Latino CVAP is 44.6%.

- 12 -

67. Although the overall change in minority population is small, CD-1 subordinates traditional districting principles in order to move minority communities in and out of the district with the effect of weakening an existing minority opportunity district.

68. The 2023 Congressional Plan renders CD-1 less compact by carving out reasonably compact minority communities in Pitt County, including by removing the City of Greenville, and extending further south to add Wayne and Lenoir Counties into the district. CD-1 also introduces a new county split in Granville County.



*CD-1 in the 2022 Congressional Plan*

- 13 -



*CD-1 in the 2023 Congressional Plan*

69.     These changes to CD-1 unlawfully dilute the voting strength of the minority voters who lived in CD-1 under the 2022 Congressional Plan, thereby reducing their ability to elect their candidates of choice.

70.     Race was the predominant factor in the creation of CD-1. Minority communities were carved out of the district to the detriment of traditional districting principles in CD-1 and surrounding districts.

71.     CD-1 cannot survive strict scrutiny because the use of race in drawing voters within and without of the district is not justified by a compelling state interest.

72.     Minority voters were not placed in or removed from this district to comply with the Voting Rights Act. To the contrary, minority voters are now *less* able to elect candidates of their choice.

- 14 -

73.     Even if there were a compelling state interest for the race-based redistricting of this congressional district, the district is not narrowly tailored to achieve that interest. Other viable and lawful alternatives to this district exist.

**Congressional District 6**

74.     Under the 2022 Congressional Plan, Congressional District 6 ("CD-6") had a combined Black and Latino CVAP of 35.6%. In the 2023 Congressional Plan, minority voters were carved out of the district and reassigned to surrounding districts. As a result, Black and Latino CVAP of CD-6 was decreased to 23.5%.

75.     Under the 2023 Congressional Plan, the combined Black and Latino CVAP is no higher than 27.8% in any of the five congressional districts across which minority voters were cracked.

76.     The 2023 Congressional Plan's redistribution of minority residents across multiple districts comes at the expense of traditional districting principles, including respect for communities of interest, political subdivision and geographical boundaries, and compactness.

77.     The reduction in Black and Latino CVAP in CD-6 was accomplished primarily by carving up Guilford County, which was entirely contained within a single congressional district under the 2019 and 2022 Congressional Plans, into three separate congressional districts under the 2023 Congressional Plan. Guilford County's population remains small enough to be contained within a single congressional district.

- 15 -



*CD-6 in the 2022 Congressional Plan*



*CD-6 in the 2023 Congressional Plan*

78.     The reduction in Black and Latino CVAP was also accomplished by removing

minority voters in Forsyth County who had been located in CD-6 under the 2022 Congressional

- 16 -

Plan and spreading them across two separate congressional districts under the 2023 Congressional Plan.

79.     The three cities of Greensboro, High Point, and Winston-Salem form a singular, well-established community of interest known as the Piedmont Triad. These three cities are also part of the Greensboro-High Point-Winston-Salem Combined Statistical Area as defined by the U.S. Census Bureau, which constitutes an economic community of interest based on the commuting patterns of residents who travel between the cities for employment purposes.

80.     Although the combined populations of Greensboro, Winston-Salem, and High Point are small enough to be contained within a single congressional district, the 2023 Congressional Plan divides the three cities across four separate congressional districts that collectively span from Ashe County, on North Carolina's borders with Tennessee and Virginia, to Hoke County in North Carolina's Sandhills region, approximately 25 miles from North Carolina's border with South Carolina.

81.     The resulting CD-6 is significantly less compact. The district contains appendages to carve out pockets of minority populations in Winston-Salem, Greensboro, and High Point and unite them with voters in Concord, located near Charlotte. Although the district divides those counties within the district with the largest minority populations, it includes the entirety of three counties within the district with the smallest minority populations—Davie, Davidson, and Rowan—thereby diluting the votes of minority voters in the Piedmont Triad.

82.     The reconfiguration of CD-6 also rendered surrounding districts less compact. Congressional District 5 now runs from Alexander County in the Western North Carolina foothills, to Watauga County on North Carolina's western border with Tennessee, to Alleghany County on North Carolina's northern border with Virginia, and along the Virginia border to Rockingham

- 17 -

County, before jutting south in reptilian fashion to include northwestern Guilford County and downtown Greensboro, including pockets of minority voters.

83.      Congressional District 9 hooks around central Greensboro to include substantial minority populations in northern, eastern, and southern Guilford County with rural communities in Alamance, Randolph, Moore, and Hoke Counties into a single congressional district that spans from Greensboro to Fayetteville but contains only portions of both cities. Congressional District 9 is roughly 25 miles from the Virginia border on its northern end, and the district is roughly 25 miles from the South Carolina border on its southern end.



**Piedmont Triad Region in the 2022 Congressional Plan**

84.      Congressional District 10 begins in Lincoln County near Charlotte before moving north and east through North Carolina's foothills to include most of the city of Winston-Salem, excluding some of its most racially diverse precincts, into a single congressional district. Forsyth County, the only county in the district with a large Black population, is the only county in the district that is split into multiple congressional districts.

Case 1:23-cv-01057-TDS-JLW    Document 30    Filed 03/04/24    Page 18 of 36



*Piedmont Triad Region in the 2023 Congressional Plan*

85.     These districts are not just visually less compact. Under the 2023 Congressional Plan, Congressional Districts 5, 6, 9, and 10 all became objectively less compact on the Reock metric.

86.     Race was the predominant factor in the creation of CD-6. Minority communities were carved up and carved out of the district to the detriment of traditional districting principles in CD-6 and surrounding districts.

87.     The use of race in drawing residents within and without of the district is not justified by a compelling state interest.

88.     Minority voters were not placed in or removed from this district to comply with the Voting Rights Act. To the contrary, CD-6 *eliminates* an existing minority opportunity district.

89.     Even if there were a compelling state interest for the race-based redistricting of this congressional district, the district is not narrowly tailored to achieve that interest. Other viable and lawful alternatives to this district exist.

- 19 -

## Congressional Districts 12 and 14

90.     Under the 2022 Congressional Plan, Congressional District 14 ("CD-14") had a combined Black and Latino CVAP of 27.5%. In the 2023 Congressional Plan, the Black and Latino CVAP was decreased to 19.3%.

91.     Under the 2022 Congressional Plan, Congressional District 12 ("CD-12") had a combined Black and Latino CVAP of 44.2%. In the 2023 Congressional Plan, the Black and Latino CVAP was increased to 48.6%.

92.     These two districts were redrawn in the 2023 Congressional Plan to move reasonably compact minority communities in Mecklenburg County out of CD-14 and into CD-12. The result of this shift is to eliminate a minority-opportunity district in CD-14.

93.     The 2023 Congressional Plan disregards political subdivisions and geographical boundaries and subordinates other traditional districting principles for the purpose of moving minority voters out of CD-14 and into CD-12.

94.     CD-12 wraps around the city of Charlotte, including areas of Mecklenburg County with substantial minority populations in the district while excluding some areas of Charlotte with small minority populations. In so doing, CD-12 is rendered less compact than it was under the 2022 Congressional Plan.

95.     CD-12 includes portions of majority-minority precincts near Interstate 485 that are not located within the city of Charlotte, but it excludes precincts in south Charlotte that are more than 75% white.



*CD-12 and CD-14 in the 2022 Congressional Plan*



*CD-12 and CD-14 in the 2023 Congressional Plan*

96.     The resulting district has a crab-like shape that wraps around the city of Charlotte to include many of Mecklenburg County's most racially diverse precincts while excluding white voters in south Charlotte from the district.

97.     CD-14 is also less compact under the 2023 Congressional Plan. Under the 2022 Congressional Plan, CD-14 consisted of parts of two adjacent counties: Mecklenburg and Gaston. The 2023 Congressional Plan moves nearly 300,000 Mecklenburg County residents out of the district and adds all of Burke, Cleveland, and Gaston Counties, along with Polk County, which was entirely contained within Congressional District 11 under the 2022 Congressional Plan but is split between CD-11 and CD-14 under the 2023 Congressional Plan.

- 21 -

98. As a result of these changes, CD-14 now has an appendage on the eastern end to include mostly white precincts in northern Mecklenburg County and south Charlotte and an appendage on the western end resulting from the split in Polk County.


*CD-12 and CD-14 in the 2022 Congressional Plan*


*CD-12 and CD-14 in the 2023 Congressional Plan*

99. Race was the predominant factor in the creation of CD-12 and CD-14. Minority communities were carved out of CD-14 and placed into CD-12 to the detriment of traditional districting principles in both districts.

100. The use of race in drawing residents within CD-12 and without CD-14 is not justified by a compelling state interest.

101. Minority voters were not placed in or removed from these districts to comply with the Voting Rights Act. To the contrary, by moving minority voters from one district to another, the 2023 Congressional Plan *eliminates* an existing minority opportunity district in CD-14. Minority voters in CD-12, meanwhile, already had the ability to elect their candidate of choice to the U.S. House of Representatives. Thus, compliance with the Voting Rights Act did not require the legislature to move additional minority voters from CD-14 into CD-12.

102. Even if there were a compelling state interest for the race-based redistricting of these congressional districts, the districts are not narrowly tailored to achieve that interest. Other viable and lawful alternatives to these district configurations exist.

## C. Racial Discrimination and Voting in North Carolina

103. The 2023 Congressional Plan is hardly North Carolina's first racially discriminatory redistricting plan or voting practice. North Carolina, "[j]ust as with other states in the South," has "'a long history of race discrimination generally and race-based vote suppression in particular.'" *Holmes v. Moore*, 270 N.C. App. 7, 20-21, 840 S.E.2d 244, 257 (2020) (quoting *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 223 (4th Cir. 2016)); *see also Gingles v. Edmisten*, 590 F. Supp. 345, 359-61 (E.D.N.C. 1984), *aff'd in part, rev'd in part sub nom. Thornburg v. Gingles*, 478 U.S. 30 (1986) (finding that "the State of North Carolina . . . officially and effectively discriminated against black citizens in matters touching their exercise of the voting franchise," which has impeded Black North Carolinians' ability to effectively participate in the

- 23 -

political process); *Johnson v. Halifax Cnty.*, 594 F. Supp. 161, 169 (E.D.N.C. 1984) ("Blacks in Halifax County and North Carolina have been subjected to a long history of official racial discrimination concerning their right to vote and participate in the political process.").

104.    Indeed, when Congress enacted the Voting Rights Act, it looked to "North Carolina's pre-1965 history of pernicious discrimination" and made "[f]orty North Carolina jurisdictions," including several counties that make up and surround the districts challenged here, "covered" jurisdictions under Section 5 of the Voting Rights Act based on their use of "suspect prerequisites to voting, like literacy tests." *McCrory*, 831 F.3d at 215, 223.

105.    This history began shortly after the abolition of slavery. In 1870, Democrats took over the legislature, at least partly through Ku Klux Klan violence, and they redistricted both legislative and congressional seats to pack Black North Carolinians into as few districts as possible in order to minimize the influence of Black voters and the Republican Party, which was Black voters' preferred party at the time. To further strengthen their control, white Democrats also devised what they called the "white supremacy campaign" to break apart the new multiracial coalition by exploiting and inflaming racial tensions and encouraging whites to vote on racial, rather than economic, lines.

106.    "[S]tate officials [have] continued in their efforts to restrict or dilute African American voting strength well after 1980 and up to the present day." *Holmes*, 270 N.C. App. at 23, 840 S.E.2d at 258. On numerous occasions, "the North Carolina legislature has attempted to suppress and dilute the voting rights of African Americans," and "the Department of Justice or federal courts have determined that the North Carolina General Assembly acted with discriminatory intent, reveal[ing] a series of official actions taken for invidious purposes." *McCrory*, 831 F.3d at 223 (quotation marks omitted).

- 24 -

107.    For example, between 1980 and 2013, the Attorney General interposed objections under Section 5 of the Voting Rights Act to at least sixty submissions consisting of some 155 discrete voting changes in North Carolina, finding that either the State or one of the covered political subdivisions within the State had failed to show that the proposed changes would not have the purpose or effect of denying or abridging the right to vote on account of race or color or membership in a language minority group.

108.    And between 1982 and 2006, plaintiffs secured favorable outcomes in fifty-five lawsuits brought against governmental units in North Carolina under Section 2 of the Voting Rights Act. Ten of these lawsuits resulted in reported judicial decisions; forty-five were settled favorably without a reported decision.

109.    In 2013 and 2018, the General Assembly enacted restrictive voter-identification laws that state and federal courts struck down as "targeting voters who, based on race, were unlikely to vote" for the party controlling the General Assembly. *Id.* at 215, 223-33; *see Holmes*, 270 N.C. App. at 23, 34, 36.

110.    And in just the last decade, courts have repeatedly invalidated North Carolina's congressional and legislative maps as impermissibly discriminating against voters based on race to dilute the minority vote or disadvantage minority voters' candidates of choice. *See Harris v. McCrory*, 159 F. Supp. 3d 600 (M.D.N.C. 2016) (three-judge court), *aff'd sub nom. Cooper v. Harris*, 137 S. Ct. 1455 (2017) (invalidating two congressional districts based on the impermissible use of race); *Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016) (three-judge court) (invalidating legislative districts based on the impermissible use of race), *summarily aff'd*, 137 S. Ct. 2211 (2017); *Covington v. North Carolina*, 283 F. Supp. 3d 410 (M.D.N.C. 2018) (three-judge court) (invalidating legislative districts based on the impermissible use of race), *aff'd in part, rev'd*

- 25 -

*in part*, 138 S. Ct. 2548 (2018); *North Carolina v. Covington*, 138 S. Ct. 2548 (2018) (per curiam) (affirming district court's conclusion that legislative districts unconstitutionally sorted voters on the basis of race).

111.    In addition to North Carolina's history of discrimination against minorities in voting and elections, political campaigns in North Carolina have often relied on both explicit and implicit racial appeals.

112.    At the height of segregation in 1950, a circular from the contest for U.S. Senate revealed the stark terms of the statewide debate at the time: "DO YOU WANT Negroes working beside you, your wife and daughters in your mills and factories? Negroes eating beside you in all public eating places? Negroes riding beside you, your wife and your daughters in buses, cabs, and trains? Negroes sleeping in the same hotels and rooming houses? Negroes teaching and disciplining your children in school? . . . Negroes using your toilet facilities?" If you did, the circular argued, "Vote for Frank Graham. But if you don't, vote for and help elect WILLIS SMITH FOR SENATOR."

113.    Sadly, such sentiments were not confined to that era. Forty years later, in 1990, U.S. Senate candidate Jesse Helms's campaign aired a political advertisement on television that criticized his opponent—Mayor of Charlotte Harvey Gantt, who is Black—for supporting racial quotas. It showed the hands of a white man in a plaid shirt reading and then crumpling a job rejection letter while a voiceover said, "You needed that job, and you were the best qualified. But they had to give it to a minority because of a racial quota. Is that really fair?"

114.    Such racial appeals have continued into the present day. For example, in 2010, the North Carolina Republican Party's Executive Committee distributed a campaign mailer in a General Assembly race appealing to anti-immigrant and anti-Latinx sentiments. The mailer

depicted incumbent Rep. John Christopher Heagarty above the title "Señor Heagarty," with a sombrero on top of his head and his skin darkened by photo editing, saying "Mucho taxo."

115.     And just two years ago, ads against the Democratic candidate for U.S. Senate Cheri Beasley, a Black woman, featured the brother of a white state trooper killed a quarter-century ago by a Black man represented by then-public defender Ms. Beasley, as well as images of white crime victims interspersed with images of Ms. Beasley wearing an unfriendly expression.

116.     The ability of North Carolina's minority citizens to participate in the political process has been further hindered by significant and disparate effects of discrimination in housing, education, employment, health, criminal justice, and other areas which persist to this day.

117.     For example, according to the most recent five-year American Community Survey, between 2017 and 2021, 29 percent of Black North Carolinians and 27 percent of Latino North Carolinians were living below the poverty line, more than twice the percentage of impoverished white North Carolinians during the same period.

118.     Moreover, Black and Latino households have substantially lower incomes than those paid to their white counterparts, and Black North Carolinians are unemployed at more than twice the rate of other racial groups. Similar disparities exist in the areas of home ownership and educational attainment, where white North Carolinians lead their Black and Latino counterparts by double-digits.

119.     Low-income voters face a number of hurdles to voter participation including working multiple jobs, working during polling place hours, lack of access to childcare, lack of access to transportation, and higher rates of illness and disability. All of these hurdles make it more difficult for poor and low-income voters to participate effectively in the political process.

- 27 -

120.    As a consequence of North Carolina's history of voter suppression and racial discrimination, as well as its ongoing effects, North Carolinians from minority racial and ethnic groups have struggled to be elected to public office in the state.

121.    From 1901 until 1992, North Carolina did not have a single Black representative in Congress. North Carolina has never elected a Latino member of Congress.

122.    It took the creation of the state's first two majority-Black districts in the early 1990s—CD-1 and CD-12—for Black North Carolinians to win election to federal office in the 20th century. The citizens of CD-1 and CD-12 have elected a Black representative in every election since 1992. And for the first time in 2022, North Carolina had three Black representatives in Congress, from CD-1, CD-12, and CD-4.

123.    Black and Latino North Carolinians have fared no better in statewide elections. A Black Republican currently serves as Lieutenant Governor but was elected with the support of few Black voters and has recently campaigned by saying that he is "not African American," but "only American." Otherwise, a Black official has not held a non-judicial statewide office in nearly 20 years. And North Carolina has never had a Black governor or U.S. senator. Nor has it ever elected a Latino candidate to any statewide office.

124.    Finally, courts have recognized that voting in North Carolina, both historically and today, is racially polarized, which means that "the race of voters correlates with the selection of a certain candidate or candidates." *McCrory*, 831 F.3d at 214 (quoting *Gingles,* 478 U.S. at 62). As one of the State's own experts conceded in testimony last decade, "in North Carolina, African-American race is a better predictor for voting Democratic than party registration." *Id.* at 225. Courts since then have confirmed the same. *N.C. State Conf. of NAACP v. Cooper*, 430 F. Supp. 3d 15, 30 (M.D.N.C. 2019), *rev'd sub nom. N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d

- 28 -

295 (4th Cir. 2020); *Holmes v. Moore*, 2022-NCSC-122, ¶ 5, 383 N.C. 171, 175, 881 S.E.2d 486, 491, *reh'g granted*, 384 N.C. 16, 882 S.E.2d 552 (2023), *and opinion withdrawn and superseded on reh'g*, 384 N.C. 426, 886 S.E.2d 120 (2023).

125.    Recent election results demonstrate that racial polarization persists statewide. Exit polling shows that in the 2022 U.S. Senate race, 93 percent of Black voters preferred the Democratic candidate, whereas 62 percent of white North Carolinians voted for the Republican candidate.

126.    Ultimately, racial polarization in voting in North Carolina "offers a 'political payoff for legislators who seek to dilute or limit the minority vote.'" *Holmes*, 270 N.C. App. at 22, 840 S.E.2d at 258 (quoting *McCrory*, 831 F.3d at 222). "[W]hether the General Assembly knew the exact numbers, it certainly knew that African American voters were highly likely, and that white voters were unlikely, to vote for Democrats. And it knew that, in recent years, African Americans had begun registering and voting in unprecedented numbers." *McCrory*, 831 F.3d at 225-26. The fact that "race and party are inexorably linked in North Carolina" creates an "incentive for intentional discrimination in the regulation of elections." *Id.* at 222.

## CAUSES OF ACTION

### COUNT I
**2023 Congressional Plan's violations of the Fourteenth Amendment to the U.S. Constitution: CDs 1, 6, 12, and 14**
**U.S. Const. amend. XIV; 42 U.S.C. § 1983**
**(Racial Gerrymandering)**

127.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

128.    The Fourteenth Amendment to the U.S. Constitution provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due

- 29 -

process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 2.

129.    Under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, a State may not, in the absence of "sufficient justification," "separat[e] its citizens into different voting districts on the basis of race." *Bethune–Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017).

130.    Accordingly, if "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district," then "the design of the district must withstand strict scrutiny." *Cooper v. Harris*, 581 U.S. 285, 291-92 (2017).

131.    A plaintiff may prove "that the legislature 'subordinated' other factors— compactness, respect for political subdivisions, partisan advantage, what have you—to 'racial considerations' . . . through 'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both." *Id.* at 291 (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). Upon such a showing, the State must "prove that its race-based sorting of voters serves a compelling interest and is narrowly tailored to that end." *Id.* at 292 (internal quotation marks omitted).

132.    Notably, "the sorting of voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics." *Id.* at 308 n.7.

133.    Race was the predominant factor in the creation of CDs 1, 6, 12, and 14.

134.    Specifically, the General Assembly predominantly and impermissibly drew a significant number of voters within or without CDs 1, 6, 12, and 14 on the basis of race. In so doing, the General Assembly subordinated traditional race-neutral districting principles—

- 30 -

including compactness, respect for political subdivisions, and communities defined by actual shared interests—to race.

135.    The predominant use of race in CDs 1, 6, 12, and 14 is not narrowly tailored to serve a compelling state interest, including compliance with the Voting Rights Act.

136.    Thus, CDs 1, 6, 12, and 14 in the 2023 Congressional Plan violate Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

137.    Plaintiffs have no adequate remedy at law other than the judicial relief sought here. The failure to enjoin enforcement of the 2023 Congressional Plan will irreparably harm Plaintiffs' constitutional rights.

**COUNT II**
**2023 Congressional Plan's violations of the Fourteenth and Fifteenth Amendments to the U.S. Constitution**
**U.S. Const. amends. XIV and XV; 42 U.S.C §1983**
**(Intentional Discrimination)**

138.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

139.    The Fourteenth Amendment guarantees racial and ethnic minorities equal protection of the laws. U.S. Const. amend. XIV. And the Fifteenth Amendment guarantees that their votes will not be denied or abridged on account of their race or color. U.S. Const. amend. XV.

140.    The Equal Protection Clause of the Fourteenth Amendment and the Fifteenth Amendment to the U.S. Constitution forbid states from enacting laws for which a racially discriminatory intent or purpose is a motivating factor.

141.    To establish intentional discrimination, a plaintiff need only show that discriminatory purpose was "a" motivating factor in the legislation—not the only, or even the

- 31 -

predominant, factor. "Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one." *Vill. of Arlington Heights v. Metro Housing Dev. Corp.*, 429 U.S. 252, 265 (1977).

142. The Supreme Court has identified the following non-exclusive list of factors that may tend to prove intentional discrimination: (1) "The impact of the official action—whether it bears more heavily on one race than another. . . . Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." (2) "The historical background of the decision . . . , particularly if it reveals a series of official actions taken for invidious purposes." (3) "The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes. Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role." (4) "Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." (5) "The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* at 266-68 (quotations omitted).

143. When "a State intentionally dr[aws] district lines in order to destroy otherwise effective crossover districts, that [] raises[s] serious questions under both the Fourteenth and Fifteenth Amendments." *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (plurality).

144. The 2023 Congressional Plan was adopted, at least in part, with a racially discriminatory intent to discriminate against minority voters in violation of the U.S. Constitution.

145.     The 2023 Congressional Plan will have a discriminatory impact on minority North Carolinians—a fact that was foreseeable when Defendants drafted and passed the Plan. Elected officials in North Carolina have limited minority voters' ability to elect or even influence elections through the purposeful cracking and packing of minority voters.

146.     In particular, the 2023 Congressional Plan intentionally dismantles CD-6 and CD-14, which were effective crossover districts under the previous plan, and weakens CD-1, which was a historically performing minority opportunity district.

147.     Moreover, other circumstantial evidence raises a strong inference of a discriminatory purpose motivating the enactment of the 2023 Congressional Plan, including North Carolina's well-documented history and ongoing record of discrimination against Black North Carolinians in redistricting and other voting practices, the sequence of events and non-transparent process that led up to the enactment of the 2023 Congressional Plan, and the stark disparity between the robust demographic gains for minority populations and decreased electoral opportunities for minority voters.

148.     Plaintiffs have no adequate remedy at law other than the judicial relief sought in this case. The failure to enjoin the conduct of elections under the 2023 Congressional Plan and ordering of remedial maps will irreparably harm Plaintiffs by subjecting them to intentionally racially discriminatory districts until the end of the decade.

## COUNT III
### 2023 Congressional Plan's violations of Section 2 of the Voting Rights Act
### 52 U.S.C. § 10301; 42 U.S.C §1983
### (Intentional Vote Dilution)

149.     Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the count below as though fully set forth herein.

- 33 -

150. Section 2 of the Voting Rights Act of 1965 prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that has the purpose or effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. 52 U.S.C. § 10301(a).

151. In addition to the *Arlington Heights* factors listed above, the Senate Report on the 1982 amendments to the Voting Rights Act identifies several other non-exclusive factors that may be indicative of discriminatory purpose.

152. These Senate factors include: (1) the history of official voting-related discrimination in the state or political subdivision; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority-vote requirements, and prohibitions against bullet-voting; (4) the exclusion of members of the minority group from candidate slating processes; (5) the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; (6) the use of overt or subtle racial appeals in political campaigns; and (7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

153. The Senate Report and the cases interpreting it make clear that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1566 n.33 (11th Cir. 1984) (quoting S. Rep. No. 97-417, at 29 (1982)); *see also id.* at 1566 ("The statute explicitly calls

- 34 -

for a 'totality-of-the circumstances' approach and the Senate Report indicates that no particular factor is an indispensable element of a dilution claim.").

154.    The 2023 Congressional Plan violates Section 2 of the Voting Rights Act because under the totality of the circumstances, it has the purpose and effect of diluting the voting power of Black and Latino voters in CDs 1, 6, 12, and 14.

155.    Plaintiffs seek relief and all available remedies under 42 U.S.C. § 1983 and Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a.    Convene a court of three judges pursuant to 28 U.S.C. § 2284(a);

b.    Declare that Congressional Districts 1, 6, 12, and 14 under the 2023 Congressional Plan are unconstitutional because each constitutes a racial gerrymander in violation of the Equal Protection Clause of the Fourteenth Amendment;

c.    Declare that the 2023 Congressional Plan is unconstitutional because it was passed with discriminatory intent as a motivating factor in violation of the Fourteenth and Fifteenth Amendments;

d.    Declare that the 2023 Congressional Plan was enacted with a discriminatory purpose in violation of Section 2 of the Voting Rights Act;

e.    Enjoin Defendants, as well as their agents and successors in office, from enforcing or giving any effect to the boundaries of the congressional districts in the 2023 Congressional Plan, including an injunction barring Defendants from conducting any further congressional elections under the current map;

f.    Hold hearings, consider briefing and evidence, and otherwise take actions necessary to order the adoption of a valid congressional plan in the State of North Carolina; and

- 35 -

g.    Grant such other or further relief the Court deems appropriate, including but not limited to an award of Plaintiffs' attorneys' fees and reasonable costs.

Dated: March 4, 2024.

**PATTERSON HARKAVY LLP**

By: /s/ Narendra K. Ghosh
Narendra K. Ghosh, NC Bar No. 37649
Burton Craige, NC Bar No. 9180
Paul E. Smith, NC Bar No. 45014
100 Europa Dr., Suite 420
Chapel Hill, NC 27517
(919) 942-5200
bcraige@pathlaw.com
nghosh@pathlaw.com
psmith@pathlaw.com

*Counsel for Plaintiffs*

**ELIAS LAW GROUP LLP**

Abha Khanna*
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
Phone: (206) 656-0177
Facsimile: (206) 656-0180
AKhanna@elias.law

Jyoti Jasrasaria*
Michael Jones*
Mark Haidar*
250 Massachusetts Ave., Suite 400
Washington, D.C. 20001
Phone: (202) 968-4490
Facsimile: (202) 968-4498
JJasrasaria@elias.law
MJones@elias.law
MHaidar@elias.law

*Special Appearance pursuant to Local Rule 83.1(d)*