# EXHIBIT A

Excerpts of October 18, 2024, Rule 30(b)(6) Deposition of Common Cause NC Executive Director Bob Phillips

```
 1          IN THE UNITED STATES DISTRICT COURT
 2        FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 3                        * * *
 4
 5   SHAUNA WILLIAMS; et al.,
 6               Plaintiffs,
 7
            vs.             CIVIL ACTION NO. 23-CV-1057
 8
 9   REPRESENTATIVE DESTIN HALL, in
     his Official Capacity as Chair
10   of the House Standing Committee
     on Redistricting; et al.,
11
                 Defendant.
12
                        * * *
13
     NORTH CAROLINA STATE CONFERENCE OF
14   THE NAACP; et al.,
15               Plaintiffs,
16
            vs.             CIVIL ACTION NO. 23-CV-1104
17
18   PHILIP BERGER, in his official
     capacity as the President Pro
19   Tempore of the North Carolina
     Senate; et al.,
20
                 Defendants.
21
22       REMOTE 30(b)(6) DEPOSITION OF BOB PHILLIPS
23                 OCTOBER 18, 2024
24                        * * *
25
```

1          Remote 30(b)(6) Deposition of

2    BOB PHILLIPS, a witness herein, called by the

3    Legislative Defendants for examination pursuant

4    to the Rules of Civil Procedure, taken before

5    me, Patti Stachler, RMR, CRR, a Notary Public

6    within and for the State of Ohio, at the office

7    of Southern Coalition for Social Justice,

8    Durham, North Carolina, on October 18, 2024, at

9    9:38 a.m.

10                        *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  know that Common Cause was filing the lawsuit?

2        A.    Advising them about what was going

3  on, what we were looking at.  It was more of a

4  process of absorbing the maps that had been

5  produced, thinking about what options we might

6  have, talking over the possibilities of

7  litigation, that kind of thing.

8        Q.    But ultimately you did not need

9  their authorization to file this complaint?

10        A.    No.

11        Q.    Okay.  And beyond the advisory

12  board, did you speak with any other members of

13  Common Cause before filing this lawsuit?

14        A.    I mean, there's people that I work

15  with, my colleagues.

16             MS. KLEIN:  Erika, can I clarify?

17  You're asking this question in his role as a

18  30(b)(6) witness and not his personal -- his

19  personal capacity; is that right?

20             MS. PROUTY:  That is correct.

21             MS. KLEIN:  So is it fair to say that

22  your question, when you say did you talk to, that

23  you mean did anybody at Common Cause talk to

24  members before about -- about this -- like the you

25  being did Common Cause talk to members before the

1          Q.   Who was the candidate of choice of
2     the standing member in House District 7 in the
3     2022 US Senate race in North Carolina?
4          A.   Again, that was not a conversation
5     that I had with any of the members that we were
6     contacting.
7          Q.   Okay.  And who was the candidate
8     of choice of the standing member who resides in
9     House District 7 in the 2020 presidential
10    election?
11         A.   Ask me that again.  I'm sorry.
12         Q.   Who was the candidate of choice of
13    the standing member --
14         A.   Oh.
15         Q.   -- who resides in House District 7
16    in the 2020 presidential election?
17         A.   Again, I don't know.
18         Q.   Okay.  And if I asked you the same
19    questions about the other Common Cause members
20    in House District 7, would you give me the same
21    answers?
22         A.   I would.
23         Q.   Okay.  And if I asked you about
24    the standing members in House District 8, would
25    you give me the same answers?

1          A.    Yes.

2          Q.    How many members has Common Cause

3    identified in Congressional District 5?

4          A.    I don't know the number.

5          Q.    And what is the name of one of the

6    standing members who resides in Congressional

7    District 5?

8          A.    I'm not at liberty to share any

9    names of any of the --

10          Q.    And what's the -- what's the basis

11    for your refusal to answer that question?

12          A.    First Amendment.

13          Q.    Okay.  And so you're not willing

14    to provide that name of the Common Cause member

15    who resides in Congressional District 5 based

16    on the First Amendment?

17          A.    That's correct.

18          Q.    Do you recall the name of that

19    standing member in Congressional District 5?

20          A.    Not here, but I have confirmed

21    that we have an active Common Cause North -- or

22    we had active Common Cause North Carolina

23    members who are part of the standing members

24    in this complaint living in Congressional

25    District 1 -- or did you ask Congressional

1    District 5?  I'm sorry.  Was it 1 or 5?

2              Q.    5.

3              A.    5.   Congressional District 5.

4              Q.    Okay.  When you say I confirmed?

5              A.    I've looked at the list.

6              Q.    Okay.  And when did you last look

7    at that list?

8              A.    As we were filing in that

9    discovery.  I don't know that I've looked at it

10   since then.

11             Q.    And if I asked you the same

12   question -- well, strike that.

13                   Let's clarify that.  The last time

14   you looked at that, you said when you were

15   finalizing discovery.  Was that in July of

16   2024?

17             A.    That's correct.

18             Q.    And you've not looked at that list

19   since July of 2024?

20             A.    No, I don't believe I have.

21             Q.    And if I asked you the same

22   questions about Congressional District 1, would

23   you give me the same answers?

24             A.    I would.

25             Q.    Okay.  And if I asked you to

1    identify any of the members in the districts

2    that are listed, the districts and counties

3    that are listed in paragraphs 9 and 10 of your

4    affidavit, would your answer be the same?

5            A.    It would be the same, yes.

6            Q.    And you would refuse to answer and

7    identify the names and addresses of all of the

8    members who live in those districts and

9    counties based on the First Amendment

10   privilege?

11           A.    That's correct.

12                 MS. PROUTY:  Okay.  It might be a

13   good place for a break.

14                 THE WITNESS:  We can.

15                 MS. PROUTY:  We can go off the

16   record.

17                 (Recess taken from 2:21 to 2:38.)

18                 MS. PROUTY:  We're back on the

19   record.

20   BY MS. PROUTY:

21           Q.    Mr. Phillips, if you could go to

22   Exhibit 2.  It's the complaint.

23           A.    Okay.  We have it up.

24           Q.    Okay.  And paragraph 17, it's

25   page 7.

1          A.    We have it.

2          Q.    Okay.  I'm not going to read it to

3   you because I'm sure that you're already tired

4   of my voice, but my count -- it lists that

5   Common Cause has members who identify as Black

6   or African-American, and I count six Senate

7   Districts, I count 14 House Districts, and four

8   Congressional Districts.

9                Does that look right to you?

10         A.    It does.

11         Q.    Okay.  And then I also count --

12  and this isn't a memory test, but I also count

13  20 counties.  Does that sound right to you?

14         A.    That sounds correct.

15         Q.    Okay.  So if we could then go to

16  Exhibit 3 and go to interrogatory number 4 on

17  page 13 specifically, and here I see, Plaintiff

18  Common Cause has as of the date of this

19  disclosure identified members who identify as

20  Black or African-American in at least the

21  following districts, and then I see that three

22  Senate Districts are listed, ten House

23  Districts are listed, and two Congressional

24  Districts are listed.

25                Do you agree with me there, that

1  out what their strategy would be regarding

2  asking the majority party to hold public

3  hearings and to, you know, adopt a criteria

4  that is fair; those kinds of things we talked

5  with them.

6           MS. PROUTY:  I'm going to mark

7  another exhibit.  This will be Exhibit 7.

8           (Exhibit 7 was marked

9           for identification.)

10  BY MS. PROUTY:

11      Q.   Let me know when you have it

12  available on your screen.

13           MS. KLEIN:  I think we might have to

14  like refresh or something --

15           MS. PROUTY:  Yeah.

16           MS. KLEIN:  -- to get it on there.

17  All right.  Yeah.  We have it up.

18  BY MS. PROUTY:

19      Q.   Do you recognize this document?

20  And if you need to scroll through it --

21      A.   Yeah, if I could scroll through

22  it.  You know, I did not produce that document

23  so I can't say that, oh, I remember, you know,

24  it.  There's a lot of things that obviously I'm

25  consuming relating to redistricting and past

1    litigation in other cases.  So, in that sense,

2    I'm familiar with it.

3              Q.   Have you seen this document

4    before?

5              A.   I think I have.  I don't -- I

6    can't say that I have not seen it.  It's a lot

7    of information and, again, when this

8    complicated process is happening, there's lots

9    of things I'm reviewing and absorbing and

10   reading.

11             Q.   Do you know whether it was

12   prepared by Common Cause?

13             A.   It may be something that Ann or

14   someone prepared, but I just don't know if it

15   was us or someone else in the advocacy

16   community and shared with us.  Again, it's not

17   that I am clueless about all this.  It's just

18   with all the things that are happening, again,

19   sometimes I'm -- in my mind, at this moment, I

20   guess I can't say, oh, yes, that was produced

21   by so-and-so.

22             Q.   Are you aware that Representative

23   Harrison recently testified that she believed

24   Common Cause may have prepared this document?

25             A.   I have not -- I was not aware of,

1  you know, that testimony or whatever.

2                   MS. PROUTY:  Okay.  We can go off

3  the record.

4                   (Recess taken from 4:01 to 4:08.)

5                   MS. PROUTY:  I don't have any further

6  questions for the witness at this time, but as

7  indicated earlier, we are holding the deposition

8  open pending the Court's resolution of the NAACP

9  plaintiffs' motion for protective order and the

10  instructions not to answer questions today based

11  on the First Amendment privilege.

12                   I'm also holding the deposition

13  open in light of the fact that documents were

14  produced less than 48 hours before the start of

15  this deposition.  So we reserve the right to

16  review those and ask additional questions.

17                   I'll pass to you, Hilary.

18                   MS. KLEIN:  Thanks.  We'll just make

19  an objection to keeping it open and an objection

20  to keeping it open due to the document disclosure,

21  but I will say that we are willing to meet and

22  confer on both of those issues, Erika.

23                   MS. PROUTY:  Okay.

24                   MS. KLEIN:  But we'll just object for

25  the record.  And I'm going to go forward and ask a

1  few questions.

2  EXAMINATION

3  BY MS. KLEIN:

4  Q.  So you understand that you're

5  still under oath?

6  A.  I do.

7  Q.  Okay.  So you know me, I am your

8  lawyer in this case.  I'm going to go through

9  and ask you a few questions about a couple

10  things you were just asked about.

11  A.  Okay.

12  Q.  So can you describe to me the

13  relationship between members of Common Cause

14  North Carolina and the membership of, you know,

15  Common Cause National?

16  A.  Technically, everyone is a member

17  of Common Cause, and in that we're a chapter of

18  the National branch, we do have, you know,

19  members that we claim as North Carolina members

20  because of their actions and activities with

21  us, but everybody's a member of Common Cause.

22  Q.  And when you say everybody's a

23  member of Common Cause, do you mean everybody

24  in Common Cause North Carolina is a member of

25  National?

1          Q.    Is it fair to say that if somebody

2    has a consistent voting record, they are likely

3    to vote again in the future?

4          A.    Yes.

5                MS. PROUTY:    Objection.

6    BY MS. KLEIN:

7          Q.    Do you have any -- in your work in

8    your 20-plus years with Common Cause, do you

9    have any concept of whether Common Cause

10   members specifically are more likely to vote in

11   a particular election?

12               MS. PROUTY:    Objection.

13         A.    What do I --

14   BY MS. KLEIN:

15         Q.    You can still answer.

16         A.    Yeah.   I would be hard-pressed to

17   say that any Common Cause member that we have

18   engaged with is not on active consistent voter

19   in every election.

20         Q.    Why is that?

21         A.    Because, again, they care about

22   the issues that we are promoting.   And it's all

23   connected, obviously, to who is representing us

24   in the legislature or in congress.   So these

25   are as active as members of a democracy as we

1    have in North Carolina.

2         Q.   When you earlier said you don't

3    provide memberships outside of Common Cause,

4    when you said Common Cause, were you including

5    folks -- were you or were you not including

6    folks like Common Cause's attorneys that you

7    have confidentiality agreements with?

8         A.   Well, of course, that would be an

9    exception, so we would be sharing that with our

10   attorneys where we had that protection.

11        Q.   And without disclosing the content

12   of any discussions with attorneys, is that

13   because, as a general matter, you're relying on

14   your attorneys for the assertions of standing

15   in this?

16        A.   Yes, absolutely.

17        Q.   So you're relying on your

18   attorneys to provide the legal advice regarding

19   standing, correct?

20        A.   We are.

21        Q.   You are not an attorney?

22        A.   I am not an attorney.

23        Q.   So you do not know the legal basis

24   for standing as far as the case law or anything

25   like that?

 1          A.    I do not.  I do not have that
 2   understanding.
 3          Q.    But you do know who your members
 4   are, correct?
 5          A.    I do.
 6          Q.    And you do know where they live,
 7   correct?
 8          A.    That is correct.
 9          Q.    And using public voting records,
10   you can verify that they are active voters in a
11   particular district?
12          A.    Absolutely.  Yes.
13          Q.    Okay.  All right.  We can take --
14   I'll take this down.
15                Going back -- you were asked
16   questions about whether you had talked to
17   specific members about the possibility of being
18   deposed, and you said something like that was
19   not even on the table.  Do you remember that?
20          A.    I do.
21          Q.    What impact do you think it would
22   have to your members by even bringing up the
23   possibility that if Common Cause challenged the
24   law that any one of their members could be then
25   deposed?

1            MS. PROUTY:  Objection.

2       A.   I think it would be very harmful

3  to our organization.  We have a variety of

4  members, and many of these folks are very

5  committed to our issues, but it's different

6  from being someone that -- saying public, has a

7  public persona.  And I have a strong belief

8  that many people would lessen their engagement

9  with Common Cause and the kinds of things we do

10 and perhaps even say we can no longer be a

11 member, we are not going to continue to support

12 you financially because of that.

13      Q.   What kind of impact would it have

14 on perhaps some of your working or young

15 members to be called for a deposition in a

16 litigation like this?

17            MS. PROUTY:  Objection.

18      A.   A lot of -- it's a big burden to

19 carry, particularly for someone working and

20 young who is balancing their lives.  And this

21 is something they believe in, they're a part of

22 us, and they support the litigation, but then

23 to kind of being on the front lines and having

24 to prepare and take the time and just given the

25 fact that doing, you know, all of this would be

1   a tremendous burden on, and particularly young

2   people.

3   BY MS. KLEIN:

4          Q.   And what -- how do you get that

5   sense?

6          A.   Well, just understanding that some

7   of the members that we have are super engaged

8   and super active and they have the time and

9   they have the sort of know-how and they put a

10  lot of commitment of their lives, you know, to

11  be an active member because that's what they

12  are being a, you know, strong provider to

13  improving our democracy.

14            It's not to say that younger folks

15  and working folks are not as committed and

16  dedicated, but they don't have the time and

17  they don't have perhaps the experience of

18  having that kind of exposure.

19         Q.   And how many years have you been

20  working with members in your role at Common

21  Cause?

22         A.   I mean, since I started the job.

23         Q.   So if you had to ballpark guess

24  how many members you have interacted with over

25  that period of time, what would you --