# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| SHAUNA WILLIAMS; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 23-CV-1057 |
| REPRESENTATIVE DESTIN HALL, in his official capacity as Chair of the House Standing Committee on Redistricting; *et al.*, | |
| *Defendants.* | |
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 23-CV-1104 |
| PHILIP BERGER, in his official capacity as the President Pro Tempore of the North Carolina Senate; *et al.*, | |
| *Defendants.* | |

## LEGISLATIVE DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

4913-7930-7012 v.1

## NATURE OF MATTER BEFORE THE COURT

This motion affords the Court the opportunity to substantially narrow the issues for trial in these two consolidated redistricting cases, on two grounds. First, the two sets of plaintiffs (Plaintiffs) lack standing to obtain relief against all but a small number of districts they challenge because no Plaintiff or disclosed member of a Plaintiff resides in 143 of the challenged districts. Further, insufficient evidence exists to support assertions of associational standing by the two organizational Plaintiffs (the Entity Plaintiffs), so vote-dilution claims against additional districts (which rest solely on associational standing) also should be dismissed. Second, no evidence supports malapportionment claims against North Carolina's legislative plans. Because deviations from perfect equality of district size in those plans are minor, the plans enjoy a strong presumption of constitutionality, and a challenge may proceed to trial only on evidence that illegitimate factors drove the deviations. No evidence could support a finding after trial in Plaintiffs' favor, so summary judgment on the malapportionment claims is warranted.

## STATEMENT OF FACTS

After each decennial census, "States must redistrict to account for any changes or shifts in population." *Georgia v. Ashcroft*, 539 U.S. 461, 489 n.2 (2003). Accordingly, in 2021, the North Carolina General Assembly reconfigured the State's congressional, House, and Senate redistricting plans. *See Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 206 (4th Cir. 2024). Those plans were challenged in state court under a theory that "partisan gerrymandering" violates various provisions of the North Carolina Constitution. *Id.* The North Carolina Supreme Court initially accepted that theory and enjoined all three plans.

*Harper v. Hall*, 868 S.E.2d 499, 552 (N.C. 2022) (*Harper I*). Remedial legislative plans and an interim congressional plan were used in the 2022 elections, *see Harper v. Hall*, 881 S.E.2d 156, 171 (N.C. 2022) (*Harper II*), but the North Carolina Supreme Court subsequently overruled *Harper I*, concluded that partisan-gerrymandering claims are non-justiciable, and provided the General Assembly "the opportunity to enact a new set of legislative and congressional redistricting plans," *Harper v. Hall*, 886 S.E.2d 393, 448 (N.C. 2023) (*Harper III*).

The General Assembly enacted new House, Senate, and congressional plans in October 2023. *Pierce*, 97 F.4th at 206. These two lawsuits followed in December, brought by some of the same parties and lawyers who prosecuted the *Harper* litigation, and this Court consolidated the actions before one three-judge panel. D.E. 34. The thrust of allegations in both cases is that the General Assembly, which was unconfined in its partisan considerations under both state law, *see Harper III*, 886 S.E.2d at 416, and federal law, *see Rucho v. Common Cause*, 588 U.S. 684, 718 (2019), made the completely irrational decision to configure district lines on the basis of race, rather than politics.

The Plaintiffs in *Williams v. Hall*, 1:23-cv-01057 (the Williams Plaintiffs) are 18 individuals who challenge only the 2023 congressional plan under three counts. The first count asserts that four districts (CD1, CD6, CD12, and CD14) are racially gerrymandered, Williams Am. Compl. ¶¶ 127-37 (Count I), and that the entire plan is the product of intentional racial vote dilution as forbidden by the Constitution, *id.* ¶¶ 138-48 (Count II), and the Voting Rights Act, *id.* ¶¶ 149-55 (Count III). The Plaintiffs in *North Carolina State Conference of the NAACP v. Berger*, 1:23-cv-01104 (the NAACP Plaintiffs) are two

2

entities, the North Carolina NAACP and Common Cause (the Entity Plaintiffs) and seven individuals who wage a broader set of challenges against the 2023 congressional plan, as well as the House and Senate plans. The NAACP Plaintiffs assert various theories of intentional race-based vote dilution, NAACP Compl. ¶¶ 260-265, 275-90 (Counts 4-5, 8-12), racial gerrymandering, *id.* ¶¶ 249-51 (Count 2), discriminatory results, *id.* ¶¶ 240-48, 266-71 (Counts 1 and 6), and malapportionment, *id.* ¶¶ 252-59, 272-74 (Counts 3 and 7). The only claims alleging partisan motivation are the malapportionment counts. *See id.* ¶¶ 258, 273.

None of these claims has a material prospect of success at trial. *See generally Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1 (2024) (reversing as clearly erroneous a finding of racial predominance in materially identical circumstances). This motion, however, challenges Plaintiffs' standing to challenge districts where they do not personally reside and the NAACP Plaintiffs' malapportionment claims.

## STATEMENT OF QUESTIONS PRESENTED

1.      Do Plaintiffs have standing to challenge districts where no Plaintiff or disclosed member of a Plaintiff resides or to press vote dilution claims on behalf of members in the absence of evidence that challenged districts harm those members' ability to elect their preferred candidates?

2.      May the NAACP Plaintiffs' malapportionment claims proceed to trial in the absence of evidence that the minor population deviations resulted from the predominance of illegitimate factors over legitimate factors?

## LEGAL STANDARD

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where, as here, the trial burden rests on the non-moving party, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When that occurs, the non-moving party must respond with evidence "showing that there is a genuine issue for trial." *Id.* at 324 (citation omitted). The issue must be "material," as determined by "the substantive law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And it must be genuine, which is not the case where the evidence "is of insufficient caliber or quantity to allow a rational finder of fact to find" for the plaintiff under the requisite standard. *Id.* at 254.

## ARGUMENT

### I. Plaintiffs Lack Standing To Seek Most of the Relief They Request

Plaintiffs lack standing for most of the relief they seek. Plaintiffs "bear[] the burden" to satisfy the "irreducible constitutional minimum of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). They must prove that they "suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision." *Carney v. Adams*, 592 U.S. 53, 58 (2020) (citation omitted). At the summary-judgment stage, this standard requires "evidence" establishing "specific facts" to show Plaintiffs' burden may be met at trial. *Lujan*, 504 U.S. at 561 (citation omitted). "Standing is not dispensed in gross." *DaimlerChrysler Corp. v.*

4

*Cuno*, 547 U.S. 332, 353 (2006) (citation omitted). Instead, "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (citations omitted).

The Williams and NAACP Plaintiffs raise various challenges to North Carolina's congressional plan, and the NAACP Plaintiffs additionally raise various challenges to the House and Senate plans. But they can create a triable fact question concerning their standing, at most, on small portions of their claims. Accordingly, summary judgment is warranted on the remaining portions.

### A.     Plaintiffs Press Statewide Claims That Do Not Exist

As an initial matter, both sets of Plaintiffs present statewide claims that are not cognizable under governing precedents. The NAACP Plaintiffs assert statewide claims against both legislative plans under the Voting Rights Act and the Fourteenth and Fifteenth Amendments (Counts 4, 5, 8, and 9), and against the congressional plan under the Fourteenth and Fifteenth Amendments (Count 12). NAACP Compl. ¶¶ 260-265, 275-280, 289-290. The Williams Plaintiffs challenge the congressional plan in its entirety under the Fourteenth and Fifteenth Amendments and the Voting Rights Act (Counts II and III). Williams Compl. ¶¶ 138-155. But these claims rest on a "theory of statewide injury" that the Supreme Court has rejected in every redistricting case addressing the subject of standing. *See Gill v. Whitford*, 585 U.S. 48, 69 (2018).

Applying the Article III standing framework to racial-gerrymandering claims, which challenge the predominant use of race in line-drawing, the Supreme Court held in *United States v. Hays* that a plaintiff who "resides in a racially gerrymandered district" has

5

standing to challenge that district, but a plaintiff who "does not live in such a district" generally does not. 515 U.S. 737, 745-46 (1995); *North Carolina v. Covington*, 585 U.S. 969, 976 (2018) (holding that racial-gerrymandering plaintiffs may challenge only "those legislative districts in which they reside"); *Shaw v. Hunt*, 517 U.S. 899, 904 (1996) (same). The Court later explained that "a claim of racial gerrymandering" alleges "that race was improperly used in the drawing of the boundaries of one or more *specific electoral districts*" and that there is no such thing as a "general claim that the legislature racially gerrymandered the State 'as' an undifferentiated 'whole.'" *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 262-63, 267 (2015) (*emphasis in original*).

In *Gill*, the Supreme Court extended the residency doctrine to claims of vote dilution, holding that such a claim concerns only "the particular district in which [each plaintiff] resides." 585 U.S. at 66. A claim of vote dilution rests on voting rights that are "individual and personal in nature," and because an individual votes only in the individual's district, an injury must "arise[] from the particular composition of the voter's own district, which causes his vote … to carry less weight than it would carry in another, hypothetical district." *Id.* at 67. The Court rejected the plaintiffs' assertion of "statewide harm to their interest 'in their collective representation in the legislature,'" deeming that assertion to be "'the kind of undifferentiated, generalized grievance about the conduct of government that'" the Supreme Court has "'refused to countenance in the past.'" *Id.* at 68 (citation omitted). Additionally, the Court explained that its malapportionment precedents, like its racial-gerrymandering precedents, rested on a doctrine of individualized, district-specific

6

harm. *See id.* at 67 (rejecting assertion that one-person, one-vote claims "were 'statewide in nature'" as "a failure to distinguish injury from remedy").

These precedents account for every type of claim that is brought here or could be brought: racial-gerrymandering, vote-dilution, and malapportionment claims. *Gill* holds that each of these claims is district-specific. *See id*. at 66-67. Statewide claims assert non-cognizable generalized grievances that do not support Article III jurisdiction. The statewide claims of both sets of Plaintiffs therefore are non-existent and should be dismissed at this time.

**B.      Plaintiffs Lack Standing to Challenge Districts Where No Plaintiff Resides**

In all events, whether construed as presenting statewide claims or challenges to each individual district, the consolidated suits must be dismissed against dozens of districts where no Plaintiff resides. As explained, every type of redistricting claim "is district specific." *Gill*, 585 U.S. at 66-67. But here, just 25 individual Plaintiffs collectively in these consolidated suits have challenged 184 districts statewide. Even repurposed as individualized challenges to every district, no Plaintiff (or disclosed member of a Plaintiff) resides in the following districts:

- Senate Districts: 6, 7, 9, 10, 12, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 29, 30, 31, 33, 34, 35, 36, 37, 38, 39, 42, 43, 44, 45, 46, 47, 48, 49, 50

- House Districts: 1, 2, 3, 4, 6, 11, 13, 14, 15, 16, 17, 19, 20, 21, 22, 26, 28, 29, 30, 31, 33, 34, 35, 36, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 59, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 102, 103, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120

7

- Congressional Districts: 2, 4, 8, 9, 11

Accordingly, "there is an absence of evidence to support" Plaintiffs' claims against these districts. *Celotex*, 477 U.S. at 325.

Plaintiffs' claims also are deficient insofar as many of their individualized challenges are concerned. The NAACP Plaintiffs identify district-specific challenges against SD1, SD2, HD4, HD5, HD7, HD10, HD12, HD24, HD25, HD32 (Section 2 Results Test), NAACP Compl. ¶¶ 247, 268; D.E. 63-2 at 12; SD7 and SD8 (Racial Gerrymandering), *id.* ¶ 250; SD7, SD8, SD38, SD39, SD40, SD41, SD42, HD11, HD21, HD33, HD34, HD35, HD36, HD37, HD38, HD39, HD40, HD41, HD49, HD66, HD71, HD72, HD74, HD75, and HD91 (Malapportionment), *id.* ¶¶ 259, 273; D.E. 63-2 at 12[1]; and CD1, CD5, CD6, CD9, and CD10 (Section 2 Intentional Discrimination), *id.* ¶¶ 282, 286. The Williams Plaintiffs identify district-specific racial-gerrymandering challenges to CD1, CD6, CD12, and CD14. Williams Compl. ¶¶ 6, 136. Of these districts, Plaintiffs have failed to identify in discovery an individual Plaintiff or member of an Entity Plaintiff that resides in: SD7, SD38, SD39, SD42, HD11, HD21, HD33-HD36, HD38-HD41, HD49, HD66, HD72, HD74, HD75, HD91, and CD9. Accordingly, even assuming the Entity Plaintiffs may assert standing of members, no claim against any of these districts may proceed to trial. *See Lujan*, 504 U.S. at 561.

---

[1] *See* Order at 2, D.E. 57 (taking judicial notice of Plaintiffs' "scrivener's error in which the North Carolina State Conference of the NAACP Plaintiffs intended to reference 'House Districts 11, 21, 33 through 41, 49, and 66'").

**C.**     **The Entity Plaintiffs Cannot Establish Associational Standing For Certain Claims or Districts**

The two Entity Plaintiffs in the NAACP lawsuit invoke standing of members, but they cannot raise a triable fact question under the governing standard. Consequently, where the NAACP Plaintiffs' claims rest solely on associational standing, summary judgment is warranted.

To invoke standing of members, an organization "must demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (*SFFA*) (citation omitted). Where an organization asserts members' standing, it must "make specific allegations establishing that at least one identified member" would have standing in that member's own right. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009); *N.C. All. for Retired Ams. v. Hirsch*, No. 5:24-CV-275, 2024 WL 3507677, at *2 (E.D.N.C. Jul. 19, 2024).

1.     *Districts Addressed Above*.     Associational standing cures none of the deficiencies identified above (§ I.B). To establish associational standing, a plaintiff must begin by "naming the affected members." *Summers*, 555 U.S. at 498. The Entity Plaintiffs originally refused to name any members and sought a protective order from the Court protecting their members from discovery. D.E. 61. After the Court denied that request in part, ruling that discovery concerning members is proper, albeit with confidentiality

9

protection, D.E. 75, the Entity Plaintiffs made limited disclosures of members whose standing they assert (the Standing Members). However, no Standing Members reside in any of the 143 districts listed above (p. 7-8). Thus, the identification of members creates no triable fact question concerning any of those districts.

2. *Vote-Dilution Claims.* The Entity Plaintiffs disclosed the names of 33 Standing Members in response to the Court's order, but they lack the evidence necessary to create a triable fact question concerning their assertion of standing to press vote-dilution claims. At issue are two congressional districts (CD5 and CD13), 13 House districts (HD5, HD7, HD8, HD10, HD12, HD23, HD24, HD25, HD32, HD37, HD58, HD100, and HD104), and six Senate districts (SD3, SD4, SD11, SD13, SD28, and SD40) where only Standing Members (but no Plaintiffs) are alleged to reside.[2]

No admissible evidence establishes that the Standing Members may assert racial vote-dilution claims against these districts. Although disclosure of names is necessary for associational standing, it is not sufficient. The Entity Plaintiffs must also show that the Standing Members "would otherwise have standing to sue in their own right," *SFFA*, 600 U.S. at 199 (citation omitted), which requires the Court "to look to the substantive issues … to determine whether there is a logical nexus between the status asserted and the claim sought to be adjudicated," *Flast v. Cohen*, 392 U.S. 83, 102 (1968). In that analysis,

---

[2] Standing Members reside in additional districts, but because Plaintiffs reside in some of these districts, and independently have standing to challenge them, the issue of member standing matters only in districts where only Standing Members are alleged to reside. Additionally, Plaintiffs must prove standing at trial, and Legislative Defendants will appropriately make additional challenges based on any failings in credibility or sufficiency of evidence at that stage.

10

racial-gerrymandering and racial vote-dilution claims differ in material respects. *See Alexander*, 602 U.S. at 38. In a racial-gerrymandering claim, "the racial classification itself is the relevant harm," *id.*, so residency in a district alleged to be racially gerrymandered is sufficient for standing, *see Shaw v. Reno*, 509 U.S. 630, 638, 648-49 (1993) (permitting white plaintiff to bring racial-gerrymandering claim alleging district predominantly configured to include Black voters). By contrast, a racial vote-dilution claim asserts that a district "'has the purpose *and* effect' of diluting minority vote," *Alexander*, 602 U.S. at 38 (emphasis added) (citation omitted), meaning a plaintiff whose preferred candidates typically prevail in a given district cannot logically possess standing. No evidence establishes the preferred candidates of the Standing Members, so no triable fact arises as to their standing to assert racial vote-dilution claims.[3]

## II.     Summary Judgment Is Warranted on the Malapportionment Claims

Standing aside, the NAACP Plaintiffs' malapportionment claims (Counts 3 and 7) are ripe for dismissal on summary judgment.

The Supreme Court has interpreted the Equal Protection Clause to require "both houses of a bicameral state legislature" to "be apportioned on a population basis" so that "the vote of any citizen is approximately equal in weight to that of any other citizen in the State." *Reynolds v. Sims*, 377 U.S. 533, 568, 579 (1964). This "basic principle" posits that voters in districts above the ideal size (over-populated districts) lack the voting strength

---

[3] The Entity Plaintiffs' corporate representatives did not know the Standing Members' preferred candidates, Ex. 1, Deposition of Bob Phillips 174:17-175:2, 189:10-190:1, 198:1-199:1; Ex. 2, Deposition of Deborah Maxwell (Vol. I) 128:13-129:7. Moreover, any testimony concerning that topic from the representatives would be inadmissible hearsay.

enjoyed by those in districts below the ideal size (under-populated districts). *Id.* at 560-63.

Accordingly, where there is a large difference between the highest-populated district's and the lowest populated district's deviation from the ideal (known as the maximum population deviation, *see Daly v. Hunt*, 93 F.3d 1212, 1215 n.2 (4th Cir. 1996)), the redistricting plan is presumptively unconstitutional and the deviation must be justified by legitimate state objectives, *Brown v. Thomson*, 462 U.S. 835, 843 (1983).

However, because the difference between near equality and perfect equality is marginal at most, the Supreme Court has held that the Constitution "does not demand mathematical perfection." *Harris v. Ariz. Indep. Redistricting Comm'n*, 578 U.S. 253, 258 (2016). The standard leaves states with flexibility "to pursue other legitimate objectives." *Brown*, 462 U.S. at 842. The Supreme Court has "further made clear that 'minor deviations from mathematical equality' do not, by themselves, 'make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State.'" *Harris*, 578 U.S. at 259 (citation omitted). The Supreme Court has adopted a strong presumption that a state legislative "plan with a maximum population deviation under 10%" is constitutional. *Brown*, 462 U.S. at 842; *Harris*, 578 U.S. at 259.

The Supreme Court has declared it "believe[s] that attacks on deviations under 10% will succeed only rarely, in unusual cases." *Harris*, 578 U.S. at 259. At a minimum, "those attacking a state-approved plan must show that it is more probable than not that a deviation of less than 10% reflects the predominance of illegitimate reapportionment factors rather than the 'legitimate considerations' to which" the Court has "referred" in equal-population precedents. *Id.* Legitimate factors include "traditional districting principles," such as

12

compactness, contiguity, and maintaining political subdivisions (such as counties). *Id.* at 258 (citations omitted). In *Harris*, the Supreme Court declined to determine whether "partisanship is an illegitimate redistricting factor." *Id.* at 264. The Court later held "that partisan gerrymandering claims present political questions beyond the reach of the federal courts." *Rucho*, 588 U.S. at 718.

Challenges to deviations under 10% have succeeded only on proof of "a deliberate and systematic policy" of over-populating a disfavored class of districts and under-populating a favored class of districts. *Larios v. Cox*, 300 F. Supp. 2d 1320, 1327 (N.D. Ga.), *aff'd*, 542 U.S. 947 (2004). In *Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, a divided court found a local county-office plan unconstitutionally malapportioned, despite its presumptively constitutional deviation, where the majority believed the legislature "under-populated Republican-leaning districts and over-populated Democratic-leaning districts." 827 F.3d 333, 347 (4th Cir. 2016). Likewise, in *Larios*, "a federal court struck down a Georgia redistricting plan that disproportionately favored Democrats by under-populating districts in the urban Atlanta region and the rural south— both Democratic strongholds—while over-populating suburban districts with Republican-leaning voters." *Id.* at 341 (discussing *Larios*, 300 F. Supp. 2d at 1328-31); *see Larios*, 300 F. Supp. 2d at 1329 (describing policy of "systematically under-populating the districts held by incumbent Democrats, by overpopulating those of Republicans, and by deliberately pairing numerous Republican incumbents against one another"); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 422-23 (2006) (*LULAC*) (plurality opinion) (discussing *Larios*).

13

Similarly, in *Harris*, a triable fact question arose because a pattern of over- and under-population was apparent in the legislative plan of the Arizona Independent Redistricting Commission. *See* 578 U.S. at 263 ("almost all the Democratic-leaning districts are somewhat underpopulated and almost all the Republican-leaning districts are somewhat overpopulated"). A chart in the three-judge court's dissenting opinion showed the pattern:



*Harris v. Ariz. Indep. Redistricting Comm'n*, 993 F. Supp. 2d 1042, 1093 (D. Ariz. 2014) (Wake, J., concurring in part, dissenting in part, and dissenting from the judgment). But a two-judge majority determined that the pattern resulted from an effort to comply with Section 5 of the Voting Rights Act, and the Supreme Court found no clear error in that ruling, reasoning that the attempt "to create districts tailored to achieve preclearance in which minority voters were a larger percentage of the district population" may "have necessitated moving other voters out of those districts, thereby leaving them slightly underpopulated." *Harris*, 578 U.S. at 264. The Court deemed it incumbent on the

14

challengers to identify evidence "in the record to suggest the contrary," which they did not do. *Id.*

## A. No Evidence Supports an Inference That Illegitimate Factors Predominated

The NAACP Plaintiffs presented malapportionment claims against legislative districts. NAACP Compl. ¶¶ 259, 273. But it is "not in dispute" that both plans fall below the 10% total-population-deviation threshold. Ex. 3, Fairfax Reply Rep. ¶ 7. Accordingly, the NAACP Plaintiffs must overcome a strong presumption of constitutionality. *See Harris*, 578 U.S. at 259. The record creates no triable fact question under the requisite standard.

### 1. No Evidence Shows That Illegitimate Factors Predominated Over the County-Grouping Requirement

No evidence accounts for the supremacy of county boundaries in North Carolina redistricting. The North Carolina Constitution commands that "[no] county shall be divided in the formation of" legislative districts, N.C. Const. art. II, §§ 3, 5, and the North Carolina Supreme Court has read that requirement to dictate that the General Assembly minimize county splits to the extent possible "within plus or minus five percent for purposes of compliance with federal 'one-person, one-vote' requirements."[4] *Stephenson v. Bartlett*, 562 S.E.2d 377, 397 (N.C. 2002) (*Stephenson I*). The result is a formula of groupings and traversal rules. *Id.* at 383-84; *see also Stephenson v. Bartlett*, 582 S.E.2d 247, 250 (N.C. 2003) (*Stephenson II*); *Dickson v. Rucho*, 766 S.E.2d 238, 258 (N.C. 2014), *vacated on*

---

[4] The 10% threshold discussed above is often expressed as plus or minus 5% of the ideal, given that a plan where the most populous district exceeded the ideal by 5% and the least populous fell below the ideal by 5% would have a 10% maximum population deviation.

*other grounds*, 575 U.S. 959 (2015). By consequence, while the 2023 House and Senate plans have maximum population deviations close to 10%, *see* Exs. 4 & 5 (Population Deviation Reports for Senate and House plans), that is because precedent commanded the General Assembly to use all federally afforded discretion to maximize adherence to county boundaries. Because "maintaining the integrity of political subdivisions" is a legitimate factor, the NAACP Plaintiffs must present evidence that illegitimate factors predominated *over* the county-grouping rule. *Harris*, 578 U.S. at 258.

The NAACP Plaintiffs do not even attempt that showing. The only evidence concerning the NAACP Plaintiffs' malapportionment claim is the opinion of their expert, Anthony Fairfax, that he could "find no redistricting criteria justification for" the deviations from perfect equality in two House county groupings (the Wake County and Forsyth-Stokes Groupings) and two Senate county groupings (the Brunswick, New Hanover, and Columbus and Iredell-Mecklenburg Groupings). Ex. 6, Fairfax Corrected Rep. ¶¶ 146, 149, 153, and 157. Mr. Fairfax bases this inference on his assertion that he could reduce the population deviations in these groupings through mapping alterations. *Id.* ¶¶ 143-167. But Mr. Fairfax does not even attempt to show that the deviations *within* these groupings had a greater (i.e., predominant) impact on the deviations as compared to the grouping requirement *itself*. For example, while Mr. Fairfax criticizes the population deviation within Wake County for being "as high as 8.29%" and proposes it could be "closer to zero," *id.* ¶ 145, he does not say how much closer to zero it could be. Accordingly, it is a mystery whether the deviation gains he achieves are qualitatively meaningful or sufficient to show that unspecified factors had a greater impact on the deviations than the county-grouping

16

rule itself. The same deficiency plagues his analogous assertions about other groupings. *Id*. ¶¶ 148, 152, and 156.

### 2. No Evidence Shows Predominance of Illegitimate Criteria in Any Possible Respect

Setting aside county-grouping considerations, Mr. Fairfax offers no opinion concerning what factors predominated. As noted, his sole assertion is that he could "find no redistricting criteria justification for" the deviations from perfect equality in four legislative groupings. Ex. 6, Fairfax Corrected Rep. ¶¶ 146, 149, 153, and 157. But slight deviations from perfection do not "require justification by the State." *Harris*, 578 U.S. at 259 (citation omitted). Thus, Mr. Fairfax's opinion creates no "triable issue of material fact." *Celotex*, 477 U.S. at 327. Even if the Court credited Mr. Fairfax's view that no justification exists, the NAACP Plaintiffs would fall short in proving this scenario is among the "unusual cases" where "attacks on deviations under 10% [can] succeed." *Harris*, 578 U.S. at 259.

As explained, the NAACP Plaintiffs must prove "the predominance of illegitimate reapportionment factors" over "'legitimate considerations,'" *id.*, and no evidence supports such a finding, *see Celotex*, 477 U.S. at 325. Mr. Fairfax offers no opinion as to which factors predominated. Ex. 6, Fairfax Corrected Rep. ¶¶ 143-167; Ex. 3, Fairfax Reply Rep. ¶¶ 7-19. Indeed, Mr. Fairfax did not analyze whether population deviations were the result of racial or political motive. Ex. 7, Deposition of Anthony Fairfax 53:20-24, 54:9-12. Accordingly, there is no evidence that deviations resulted from either a racial or a partisan goal. Fact witnesses integral to the mapdrawing process testified that race was not

consulted at all. *See, e.g.*, Ex. 8, Deposition of Blake Springhetti 30:2-7, 31:2-3, 76:20-25; Ex. 9, Deposition of Senator Ralph Hise 387:22-388:9. And, even if political favoritism is illegitimate, no fact witness testified that the General Assembly purposefully "under-populated Republican-leaning districts and over-populated Democratic-leaning districts." *Raleigh Wake Citizens*, 827 F.3d at 347. "Because the maximum population deviation between the largest and the smallest district is less than 10%, the [NAACP Plaintiffs] cannot simply rely upon the numbers to show that the plan violates the Constitution." *Harris*, 578 U.S. at 255-56. At best, the NAACP Plaintiffs have only numbers.

> ### 3. The General Assembly Did Not Systematically Over- or Under-Populate Districts

Even if numbers could sometimes make out a violation, that would not work here because the NAACP Plaintiffs cannot allege that "almost all the [Republican]-leaning districts are somewhat underpopulated and almost all the [Democratic]-leaning districts are somewhat overpopulated." *Harris*, 578 U.S. at 263; *see also Raleigh Wake Citizens*, 827 F.3d at 347. The evidence even in groupings the NAACP Plaintiffs hand-picked shows a random walk, as many Democratic-leaning and high Black Voting Age Population **(**BVAP) districts fall below the ideal (and hence are under-populated), and many Republican-leaning and low-BVAP districts rise above the ideal (and hence are over-populated):

18



Figure 16: Population Deviation and Demographics of Districts

Note: In each figure the horizontal axis shows the district's population deviation. The vertical axis shows the partisan lean (left panels) or the racial composition of the district (right panels). The top figures show House districts and the bottom figures show Senate districts.

Ex. 10, Barber Rep. at 38.[5]

---

[5] While Plaintiffs' expert, Mr. Fairfax, disagrees with Dr. Barber's assertion that there is no pattern along racial or partisan lines, Ex. 3, Fairfax Reply Rep. ¶¶ 14-19, his observations are "of insufficient caliber or quality to" support a judgment in the NAACP Plaintiffs' favor, *Anderson*, 477 U.S. at 254. Mr. Fairfax focuses narrowly on just two county groupings (the Mecklenburg and New Hanover Senate groupings), Ex. 3, Fairfax Reply Rep. ¶¶ 14-19, and does not address the substantial evidence of under-populated Democratic-leaning districts elsewhere, including the seven heavily-Democratic districts underpopulated in the Forsyth and Wake House groupings. Ex. 10, Barber Rep. at 39.

19

Moreover, the NAACP Plaintiffs ignore most districts and cannot establish "a clear pattern, unexplainable on grounds other than" an impermissible criterion, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977), by cherry-picking parts of plans, *contrast Larios*, 300 F. Supp. 2d at 1330 (finding that, due to statewide patterns, "[t]he numbers largely speak for themselves"). The NAACP Plaintiffs cherrypicked for a reason. There is no pattern favoring Republican-leaning districts at the expense of Democratic-leaning districts. In the Senate plan, the following chart ranks districts by deviation and shows the political party of the winner in 2024:

| SENATE DISTRICT # | DEVIATION % | PARTY OF 2024 WINNER |
|---|---|---|
| SD18 | -5.00 | D*[6] |
| SD15 | -4.99 | D |
| SD13 | -4.99 | D |
| SD16 | -4.98 | D |
| SD17 | -4.97 | D |
| SD7 | -4.94 | R |
| SD14 | -4.92 | D |
| SD2 | -4.90 | R |
| SD1 | -4.39 | R |
| SD22 | -4.30 | D |
| SD46 | -4.28 | R |
| SD48 | -4.18 | R |
| SD3 | -3.97 | R |
| SD12 | -3.83 | R |

---

[6] Asterisks in this and the next chart indicate races subject to recounts. However, these recounts do not materially alter the analysis because, like all information related to population deviations, these districts display no pattern connoting improper motive.

| | | |
|---|---|---|
| SD20 | -3.58 | D |
| SD49 | -3.38 | D |
| SD9 | -2.87 | R |
| SD24 | -2.87 | R |
| SD44 | -2.75 | R |
| SD6 | -2.02 | R |
| SD47 | -1.97 | R |
| SD11 | -1.28 | R |
| SD33 | 0.28 | R |
| SD42 | 0.28 | D* |
| SD28 | 0.60 | D |
| SD23 | 0.83 | D |
| SD27 | 0.85 | D |
| SD36 | 1.05 | R |
| SD43 | 1.17 | R |
| SD30 | 1.37 | R |
| SD32 | 1.42 | D |
| SD26 | 1.44 | R |
| SD8 | 2.76 | R |
| SD34 | 2.97 | R |
| SD31 | 3.15 | R |
| SD10 | 3.45 | R |
| SD19 | 3.68 | D |
| SD4 | 3.73 | R |
| SD25 | 4.15 | R |
| SD41 | 4.26 | D |
| SD38 | 4.37 | D |
| SD21 | 4.40 | R |
| SD50 | 4.76 | R |
| SD29 | 4.81 | R |

21

Case 1:23-cv-01057-TDS-JLW    Document 79    Filed 12/06/24    Page 22 of 32


| | | |
|---|---|---|
| SD20 | -3.58 | D |
| SD49 | -3.38 | D |
| SD9 | -2.87 | R |
| SD24 | -2.87 | R |
| SD44 | -2.75 | R |
| SD6 | -2.02 | R |
| SD47 | -1.97 | R |
| SD11 | -1.28 | R |
| SD33 | 0.28 | R |
| SD42 | 0.28 | D* |
| SD28 | 0.60 | D |
| SD23 | 0.83 | D |
| SD27 | 0.85 | D |
| SD36 | 1.05 | R |
| SD43 | 1.17 | R |
| SD30 | 1.37 | R |
| SD32 | 1.42 | D |
| SD26 | 1.44 | R |
| SD8 | 2.76 | R |
| SD34 | 2.97 | R |
| SD31 | 3.15 | R |
| SD10 | 3.45 | R |
| SD19 | 3.68 | D |
| SD4 | 3.73 | R |
| SD25 | 4.15 | R |
| SD41 | 4.26 | D |
| SD38 | 4.37 | D |
| SD21 | 4.40 | R |
| SD50 | 4.76 | R |
| SD29 | 4.81 | R |

21

| | | |
|---|---|---|
| SD40 | 4.83 | D |
| SD45 | 4.89 | R |
| SD39 | 4.95 | D |
| SD5 | 4.96 | D |
| SD35 | 4.96 | R |
| SD37 | 4.99 | R |

Ex. 4 (Population Deviation Report for Senate plan); Ex. 11 (2024 Senate election results). As shown, seven of the ten most under-populated districts were won by Democratic candidates, and six of the ten most over-populated districts were won by Republican candidates.

The story is the same in the House plan:

| HOUSE DISTRICT # | DEVIATION % | PARTY OF 2024 WINNER |
|---|---|---|
| HD44 | -4.96 | D |
| HD98 | -4.83 | D |
| HD1 | -4.81 | R |
| HD55 | -4.68 | R |
| HD91 | -4.68 | R |
| HD5 | -4.65 | R |
| HD42 | -4.63 | D |
| HD10 | -4.58 | R |
| HD4 | -4.55 | R |
| HD51 | -4.51 | R |
| HD35 | -4.48 | R |
| HD118 | -4.27 | R |
| HD80 | -4.26 | R |
| HD53 | -4.23 | R |

22

| | | |
|---|---|---|
| HD24 | -4.22 | D |
| HD47 | -4.07 | R |
| HD54 | -4.05 | D |
| HD13 | -4.02 | R |
| HD7 | -3.97 | R |
| HD74 | -3.97 | R |
| HD104 | -3.96 | D |
| HD8 | -3.95 | D |
| HD46 | -3.79 | R |
| HD45 | -3.74 | D |
| HD63 | -3.62 | R |
| HD102 | -3.21 | D |
| HD49 | -3.15 | D |
| HD101 | -3.02 | D |
| HD52 | -3.00 | R |
| HD99 | -2.98 | D |
| HD72 | -2.93 | D |
| HD88 | -2.86 | D |
| HD111 | -2.86 | R |
| HD79 | -2.66 | R |
| HD27 | -2.60 | D |
| HD12 | -2.59 | R |
| HD3 | -2.40 | R |
| HD120 | -2.40 | R |
| HD33 | -2.29 | D |
| HD87 | -2.28 | R |
| HD16 | -2.18 | R |
| HD56 | -2.13 | D |
| HD43 | -1.91 | R |

23

| | | |
|---|---|---|
| HD39 | -1.87 | D |
| HD95 | -1.87 | R |
| HD28 | -1.85 | R |
| HD94 | -1.64 | R |
| HD89 | -1.63 | R |
| HD81 | -1.56 | R |
| HD105 | -1.52 | R* |
| HD36 | -1.10 | D |
| HD48 | -0.85 | D |
| HD50 | -0.81 | D |
| HD40 | -0.73 | D |
| HD78 | -0.72 | R |
| HD11 | -0.71 | D |
| HD38 | -0.63 | D |
| HD9 | -0.36 | R |
| HD106 | -0.32 | D |
| HD100 | -0.27 | D |
| HD84 | -0.26 | R |
| HD97 | -0.21 | R |
| HD92 | 0.10 | D |
| HD93 | 0.23 | R |
| HD112 | 0.26 | D |
| HD75 | 0.44 | R |
| HD64 | 0.66 | R |
| HD86 | 0.66 | R |
| HD21 | 0.88 | D |
| HD90 | 1.39 | R |
| HD68 | 1.40 | R |
| HD67 | 1.45 | R |

24

| | | |
|---|---|---|
| HD14 | 1.70 | R |
| HD32 | 1.85 | D* |
| HD22 | 1.89 | R |
| HD66 | 1.98 | D |
| HD71 | 2.10 | D |
| HD107 | 2.14 | D |
| HD23 | 2.15 | D |
| HD115 | 2.16 | D |
| HD109 | 2.17 | R |
| HD70 | 2.44 | R |
| HD113 | 2.48 | R |
| HD69 | 2.52 | R |
| HD103 | 2.71 | D |
| HD18 | 2.78 | D |
| HD110 | 2.83 | R |
| HD116 | 2.83 | D |
| HD108 | 2.84 | R |
| HD96 | 2.98 | R |
| HD62 | 3.04 | R |
| HD34 | 3.23 | D |
| HD76 | 3.24 | R |
| HD41 | 3.31 | D |
| HD26 | 3.39 | R |
| HD73 | 3.50 | R |
| HD58 | 3.51 | D |
| HD61 | 3.66 | D |
| HD119 | 3.70 | R |
| HD57 | 3.75 | D |
| HD37 | 3.81 | R |

25

| | | |
|---|---|---|
| HD60 | 3.85 | D |
| HD25 | 3.95 | R |
| HD17 | 4.05 | R |
| HD77 | 4.18 | R |
| HD2 | 4.32 | D |
| HD85 | 4.34 | R |
| HD59 | 4.41 | R |
| HD29 | 4.49 | D |
| HD83 | 4.49 | R |
| HD6 | 4.51 | R |
| HD117 | 4.64 | R |
| HD30 | 4.65 | D |
| HD65 | 4.71 | R |
| HD114 | 4.74 | D |
| HD20 | 4.81 | R |
| HD15 | 4.85 | R |
| HD82 | 4.86 | R |
| HD31 | 4.88 | D |
| HD19 | 4.93 | R |

Ex. F (Population Deviation Report for House plan); Ex. 12 (2024 House of Representatives election results). As shown, seven of the ten most over-populated districts were won by Republican candidates, and three of the ten most under-populated districts (including the two most under-populated districts) were won by Democratic candidates. In both plans, the deviations display no pattern. There is no plausible argument that the General Assembly purposefully and systematically under-populated Republican-leaning districts or over-populated Democratic-leaning districts.

26

### B. Political Factors Are Legitimate Factors

If the Court were to find as a triable fact question whether partisan considerations predominated, it would then need to face the question left open in *Harris*, whether "partisanship is an illegitimate redistricting factor."[7] *Harris*, 578 U.S. at 264. No record evidence disproves that the deviations resulted from political considerations, so only if that factor is illegitimate would Plaintiffs be entitled to trial.

The Supreme Court has since answered that question by holding "that partisan gerrymandering claims present political questions beyond the reach of the federal courts." *Rucho*, 588 U.S. at 718. Relabeling political-gerrymandering claims as "malapportionment" claims does nothing to meaningfully differentiate this case from *Rucho*. In this case, as in *Rucho*, there is no "judicially manageable framework" for assessing "an 'acceptable' level of partisan gerrymandering from 'excessive' partisan gerrymandering." *Id.* at 715. The only plausible response might be that, as in *Larios*, a systematic effort to rig the deviations plan-wide to favor a class of districts supplies a manageable criterion that was not considered in *Rucho*. As shown, such a systematic effort plainly did not happen here, and that argument would not support the NAACP Plaintiffs' position.

Indeed, the Fourth Circuit indicated in its 2016 *Raleigh Wake Citizens* decision that the viability of a malapportionment claim on partisan grounds would rise or fall on whether

---

[7] The district court in *Larios* also did not decide "whether or when partisan advantage alone may justify deviations" and instead grounded its ruling in what it considered "plainly unlawful" goals of "regionalism" and one-sided "incumbent protection." 300 F. Supp. 2d at 1352; *see LULAC*, 548 U.S. at 422-23.

27

partisan-gerrymandering claims are justiciable. After finding that the systematic deviations resulted from "an attempt to guaranty Republican victory through the intentional packing of Democratic districts," the majority opinion (Wynn and Gregory, JJ.) "recognize[d] that the Supreme Court has not yet clarified when exactly partisan considerations cross the line from legitimate to unlawful." 827 F.3d at 346, 348. To justify its decision, it construed the Supreme Court's fractured judgment in *Vieth v. Jubelirer*, 541 U.S. 267 (2004), as "refus[ing] to deem political gerrymandering claims to be per se nonjusticiable" and thus inferred such claims are justiciable. *See* 827 F.3d at 348 n.9. In dissent, Judge Motz read the case law then in existence to conclude that the malapportionment theory resting on alleged illegitimate partisan considerations "rest[s] on shaky ground." *Id.* at 356 (dissenting opinion). A few years later, *Rucho* ended the debate. For the same reason, *Rucho* equally resolves this case.

## CONCLUSION

The Court should enter summary judgment against all claims challenging districts where Plaintiffs do not reside, and it should enter summary judgment on the NAACP Plaintiffs' malapportionment claims.

28

Respectfully submitted, this the 6th day of December, 2024.

**BAKER & HOSTETLER LLP**

Katherine L. McKnight*
DC Bar No. 994456
Richard B. Raile*
DC Bar No. 1015689
Trevor Stanley*
DC Bar No. 991207
1050 Connecticut Ave. NW
Suite 1100
Washington DC 20036
Ph: (202) 861-1500
rraile@bakerlaw.com
kmcknight@bakerlaw.com
tstanley@bakerlaw.com

Patrick T. Lewis*
Ohio State Bar No. 0078314
Key Tower
127 Public Square, Suite 2000
Cleveland, Ohio 44114
Ph: (216) 621-0200
plewis@bakerlaw.com

Erika D. Prouty*
Ohio State Bar No. 0095821
Rebecca Schrote
Ohio State Bar No. 0101051
200 Civic Center Drive, Suite 1200
Columbus, Ohio 43215
Ph: (614) 462-4710
eprouty@bakerlaw.com
rschrote@bakerlaw.com

*\* Appeared via Special Notice*

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By: /s/ Phillip J. Strach
    Phillip J. Strach
    North Carolina State Bar No. 29456
    Alyssa M. Riggins
    North Carolina State Bar No. 52366
    Cassie A. Holt
    North Carolina State Bar No. 56505
    Jordan A. Koonts
    North Carolina State Bar No. 59363
    301 Hillsborough Street, Suite 1400
    Raleigh, North Carolina 27603
    Ph: (919) 329-3800
    phil.strach@nelsonmullins.com
    alyssa.riggins@nelsonmullins.com
    cassie.holt@nelsonmullins.com
    jordan.koonts@nelsonmullins.com

*Attorneys for Legislative Defendants*

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.3(d), I, Phillip J. Strach, hereby certify that the foregoing brief includes 6,151 words as indicated by Microsoft Word, excluding the caption, signature lines, certificate of service, and case caption.

This the 6th day of December, 2024.

<div align="right">

**NELSON MULLINS RILEY &
SCARBOROUGH LLP**
/s/ Phillip J. Strach
Phillip J. Strach
N.C. State Bar No. 29456

</div>

## CERTIFICATE OF SERVICE

I, Phillip J. Strach, hereby certify that I have this day electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will provide electronic notification to counsel of record.

This the 6th day of December, 2024.

NELSON MULLINS RILEY &
SCARBOROUGH LLP

/s/ Phillip J. Strach
Phillip J. Strach
N.C. State Bar No. 29456