# EXHIBIT 3

*Excerpts of October 18, 2024,*

*Deposition of Bob Phillips*

1          IN THE UNITED STATES DISTRICT COURT
2        FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
3                        * * *
4
5    SHAUNA WILLIAMS; et al.,
6              Plaintiffs,
7
            vs.          CIVIL ACTION NO. 23-CV-1057
8
9    REPRESENTATIVE DESTIN HALL, in
     his Official Capacity as Chair
10   of the House Standing Committee
     on Redistricting; et al.,
11
              Defendant.
12
                        * * *
13
     NORTH CAROLINA STATE CONFERENCE OF
14   THE NAACP; et al.,
15             Plaintiffs,
16
            vs.          CIVIL ACTION NO. 23-CV-1104
17
18   PHILIP BERGER, in his official
     capacity as the President Pro
19   Tempore of the North Carolina
     Senate; et al.,
20
              Defendants.
21
22      REMOTE 30(b)(6) DEPOSITION OF BOB PHILLIPS
23                 OCTOBER 18, 2024
24                        * * *
25

Case 1:23-cv-01057-TDS-JLW    Document 88-3    Filed 01/24/25    Page 2 of 22

1          Remote 30(b)(6) Deposition of

2     BOB PHILLIPS, a witness herein, called by the

3     Legislative Defendants for examination pursuant

4     to the Rules of Civil Procedure, taken before

5     me, Patti Stachler, RMR, CRR, a Notary Public

6     within and for the State of Ohio, at the office

7     of Southern Coalition for Social Justice,

8     Durham, North Carolina, on October 18, 2024, at

9     9:38 a.m.

10                      *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    I N D E X
2
3    BOB PHILLIPS                              PAGE
4        Examination by Ms. Prouty              6
         Examination by Ms. Klein             258
5        Further Examination by Ms. Prouty    272
6
7

                    INDEX OF EXHIBITS
8
    NO.                 DESCRIPTION           PAGE
9
    Exhibit 1   Amended Notice of Deposition    8
10
    Exhibit 2   Complaint                       38
11
    Exhibit 3   NAACP Plaintiffs' Discovery     48
12              Responses
13   Exhibit 4   Web page - Become a Common     59
                Cause Member
14
    Exhibit 5   Web page - Contact             62
15
    Exhibit 6   Phillips Affidavit            104
16
    Exhibit 7   Allen v Milligan Decision     255
17              Summary
18   Exhibit 8   NAACPPS_0004442               260
                (Highly Confidential)
19
20
                        *  *  *
21
22
23
24
25

Veritext Legal Solutions
www.veritext.com                              888-391-3376
Case 1:23-cv-01057-TDS-JLW    Document 88-3    Filed 01/24/25    Page 4 of 22

1    APPEARANCES:   (All appeared remotely.)

2

3              On behalf of the NAACP Plaintiffs:

4                   Southern Coalition for
                    Social Justice

5

               By:  Hilary Harris Klein, Esq.

6                   Lily Talerman, Esq.
                    Chris Shenton, Esq.

7                   P.O. Box 51280
                    Durham, North Carolina  27717

8                   hilaryhklein@scsj.org

9

10             On behalf of the Williams Plaintiffs:

11                  Elias Law Group

12             By:  Alison (Qizhou) Ge, Esq.
                    250 Massachusetts Avenue NW

13                  Suite 400
                    Washington, DC  20001

14                  age@elias.law

15

16

17

18

19

20

21

22

23

24

25

```
 1   APPEARANCES:   (All appeared remotely.)

 2

 3           On behalf of the Legislative Defendants:

 4                Baker & Hostetler, LLP

 5           By:  Erika D. Prouty, Esq.
                  Katherine McKnight, Esq.

 6                Patrick Lewis, Esq.
                  200 Civic Center Drive

 7                Suite 1200
                  Columbus, Ohio  43215

 8                eprouty@bakerlaw.com
                  kmcknight@bakerlaw.com

 9                plewis@bakerlaw.com

10                and

11                Nelson, Mullins, Riley &
                  Scarborough, LLP

12
            By:  Jordan Koonts, Esq.

13                301 Hillsborough Street
                  Suite 1400

14                Raleigh, North Carolina  27603
                  jordan.koonts@nelsonmullins.com

15

16                        *  *  *

17

18

19

20

21

22

23

24

25
```

1 not ten members -- but the --

2           A.    Standing members.

3           Q.    The standing members.  For each of

4 the standing members, did you verify whether

5 they have donated financially to Common Cause

6 in the last two years?

7           A.    Yes.

8           Q.    Okay.  And is it your testimony

9 that all of the standing members have donated

10 to Common Cause in the last two years?

11          A.    No.  It is my testimony that there

12 are donors within the standing members, but not

13 all 100 percent of those standing members are

14 Common Cause North Carolina donors.  They are

15 members through those other options that we've

16 talked about.

17          Q.    How many members -- how many of

18 the standing members have donated financially

19 in the last two years?

20          A.    I don't know.  I didn't really

21 take note of that carefully to think, you know,

22 X percent are North Carolina donors.  It was

23 for us probably a member or active member.

24          Q.    So if there were members who

25 have -- standing members who have not donated

1  financially in the last two years, how did you

2  verify that they were otherwise active members

3  of Common Cause?

4       A.   Again, as we had talked about, we

5  do note when people have done something, if

6  they've attended a meeting or if they've done

7  some kind of an action of a take action.

8            So as I had mentioned as well,

9  we've been doing a lot of outreach of

10 communities in these areas, and so we have what

11 I would say would be very current, you know,

12 information about that.  Many people are, you

13 know, both donors and folks -- I say many

14 people.  I don't have a number to quantify

15 that, but there would be standing members who

16 were both donors and folks who are taking

17 action or they attended a meeting or they've

18 done something like that with us in the last

19 two years.

20       Q.   So there are standing members who

21 have not donated financially, but they have

22 taken action with Common Cause in the last two

23 years?

24       A.   Every person that is in that

25 standing member that we were talking about --

1    Q.    Yes.

2    A.    -- is an active member of Common

3  Cause North Carolina, every single one of them.

4    Q.    Did you verify what type of action

5  that they had taken with Common Cause in the

6  last ten years?

7    A.    So we certainly did.  I mean,

8  because that was the way we would know are you

9  an active member.  So, yes, that was verified.

10   Q.    Okay.  Was there a threshold that

11 you applied of number of events that someone

12 had attended or number of phone calls that

13 someone had made or those advocating on behalf

14 of an issue for Common Cause, was there a

15 threshold for those types of actions that you

16 applied to determine that someone was active

17 and could be included as a standing member?

18   A.    No.

19   Q.    So someone could have attended one

20 event and advocated on behalf of Common Cause

21 and they could be a standing member?

22   A.    They could.  As we had talked

23 about, you know, that is a member.  And we

24 don't have a scale of, you know, who's done X

25 number of times or whatever, but, yes.  If they

1          Q.   How did you verify if the
2     potential standing members had regularly voted
3     in the past?
4          A.   You go to the voter file and see,
5     you know, if they cast a ballot.
6          Q.   And when Common Cause spoke to
7     each of these standing members in December of
8     2023, did they verify that the standing members
9     intend to vote in the future?
10         A.   I don't know if that was something
11    that was specifically asked.
12         Q.   In the ten phone calls that you
13    made, was that something you asked?
14         A.   I was covering more about the
15    lawsuit, so it was not something that I had
16    asked.
17         Q.   Okay.  Did Common Cause do
18    anything to verify who was the candidate of
19    choice for each of the standing members?
20         A.   You mean in terms of a specific
21    candidate or specific name?  That was not
22    discussed.
23         Q.   Okay.  And so in the ten phone
24    calls that you made, you didn't ask that
25    question?

1          A.    No, I did not talk candidates or

2     potential -- you know.

3          Q.    Okay.  In that December 2023

4     outreach, did Common Cause verify if the

5     standing members were willing to have their

6     names and addresses disclosed in this lawsuit?

7          A.    We did.  But that was where, as I

8     state in my affidavit, about how

9     confidentiality is very important to us.  So we

10    talked about it in those terms about what that

11    might mean.

12         Q.    You had that conversation in

13    December of 2023 before the lawsuit was filed?

14         A.    Right.

15         Q.    And what exactly did you tell them

16    about confidentiality and whether their names

17    and addresses would be disclosed?

18         A.    Well, just that our position would

19    be that we would never release their names or

20    agree to having their names be released

21    publicly.

22         Q.    Under any circumstances, they

23    would -- you would never agree to release them?

24         A.    Not to the public.  It would be a

25    protected seal if we could possibly agree to,

1    and that's how we were discussing that.

2         Q.   Did any of the standing members

3    express a willingness to have their names and

4    addresses disclosed?

5         A.   No, not to us in terms of -- you

6    know, if you're asking publicly disclosed?

7         Q.   Yeah.

8         A.   No.

9         Q.   Okay.  Did any of them state that

10   they would withdraw from the case if their

11   names and addresses would be publicly

12   disclosed?

13        A.   We did receive that information

14   from some of the members, yes.

15        Q.   Okay.

16        A.   I mean, again, I can't tell you

17   how many, but that was a concern by members,

18   that they would not want their names to be

19   publicly disclosed.

20        Q.   Who specifically shared that

21   concern?

22             MS. KLEIN:  Objection.  To the extent

23   that it would include disclosing the identity of

24   members, we are claiming First Amendment privilege

25   over that.  So I'll instruct the plaintiff not to

1  that's the number of districts listed?

2          A.    I do.

3          Q.    Okay.  Can you explain why the

4  complaint states that Common Cause had members

5  in six districts -- six Senate Districts, but

6  the response to interrogatory number 4 only

7  states that Common Cause had members in three

8  Senate Districts?

9          A.    Yes.  The difference is that in

10 July, when we went back and, again, calling all

11 the members that we had connected with in

12 December, there were simply some folks that we

13 were not able to reach for whatever reason.

14          When I say for whatever reason, we

15 were not able to reach them.  And out of an

16 abundance of caution, we then excluded those

17 folks that we were not reaching in July from

18 this discovery document.

19          Q.    Okay.  Was anyone removed as a

20 standing member in July of 2024 because they

21 said they no longer wanted to have their

22 standing asserted in this case?

23          A.    No, not that I'm aware of.

24          Q.    Okay.  And was anyone removed as a

25 standing member because they did not want to

1    have their name or address publicly identified?

2          A.   We, to my knowledge, did not

3    remove anyone for that purpose, though we have

4    certainly, as I have mentioned earlier to you,

5    that we had heard from members who were not

6    wanting to have their name and address publicly

7    identified.  So we know that going in.  But in

8    July I don't recall or know that there were

9    people that we heard then that, you know, said

10   take me off the list because of that.  We had

11   already had that conversation with folks.

12         Q.   Did any of the standing members

13   say that they would still be willing to have

14   their standing asserted in this case even if it

15   meant their names and addresses would be

16   publicly identified?

17         A.   I'm not aware that that was

18   actually affirmatively stated to any of us.

19         Q.   Okay.  Do you know if it was asked

20   of anyone?

21         A.   If we asked -- you're asking did

22   we ask anyone, hey, if we had to -- we did not

23   ask that, no.

24         Q.   Okay.

25         A.   Because, again, that is -- would

1  concentration of African-American members, and

2  they under this plan are not able to select

3  anyone of their choosing because of the way the

4  map has fallen.

5          Q.    I understood your testimony

6  earlier that you did not ask the standing

7  member in Senate District 1 who their candidate

8  of choice was; isn't that correct?

9          A.    That's correct.

10          Q.    Did you speak with the standing

11  member in Senate District 1 about what their

12  harm is in this case?

13          A.    In terms of talking to them about

14  what we were doing and why, yes, that the maps

15  were not allowing for African-American

16  opportunity districts in that part of the

17  state.  And certainly members are aware of

18  that, and understanding that it is a

19  discriminatory map, that harms them.

20          Q.    Did you talk to the member -- the

21  standing member in Senate District 1

22  personally?

23          A.    I don't recall if the people that

24  I talked with are from -- I mean, which

25  districts.  I would have to look back.

1          But, again, going back to, you
2    know, what I said, every person that we have in
3    this complaint is someone that we had
4    conversations with to explain the complaint and
5    the whys behind it and the harm that they would
6    incur.
7          Q.   But you didn't specifically talk
8    with the member in Senate District 1 about what
9    their harm is; is that correct?
10          A.   If it's personally me, maybe I
11    don't recall.
12          Q.   Yeah.
13          A.   But, you know, again, as an
14    organization, it's not just me.  As we have
15    talked about, we were contacting and having
16    conversations with members that are listed that
17    are a part of this complaint.
18          Q.   Can you tell me which Common Cause
19    staff member spoke to the person in Senate
20    District 1?
21          A.   You know, again, there were, as I
22    mentioned, a half-dozen of us doing those
23    calls, so I don't know that I could, sitting
24    here with no information, tell you that.
25          Q.   Does Common Cause have records of

Veritext Legal Solutions
www.veritext.com                                        888-391-3376
Case 1:23-cv-01057-TDS-JLW    Document 88-3    Filed 01/24/25    Page 16 of 22

1    a tremendous burden on, and particularly young

2    people.

3    BY MS. KLEIN:

4         Q.    And what -- how do you get that

5    sense?

6         A.    Well, just understanding that some

7    of the members that we have are super engaged

8    and super active and they have the time and

9    they have the sort of know-how and they put a

10   lot of commitment of their lives, you know, to

11   be an active member because that's what they

12   are being a, you know, strong provider to

13   improving our democracy.

14         It's not to say that younger folks

15   and working folks are not as committed and

16   dedicated, but they don't have the time and

17   they don't have perhaps the experience of

18   having that kind of exposure.

19         Q.    And how many years have you been

20   working with members in your role at Common

21   Cause?

22         A.    I mean, since I started the job.

23         Q.    So if you had to ballpark guess

24   how many members you have interacted with over

25   that period of time, what would you --

1          A.    It would be hundreds.  I mean,

2    maybe in, you know, thousands.  I guess I could

3    say that it would definitely be thousands

4    because, you know, interactions can be a

5    variety of things, but, sure, that would be

6    accurate.

7          Q.    You were shown disclosures that

8    were made by the individual defendants in this

9    earlier.  Do you remember that?

10         A.    (Nodding head.)

11         Q.    And you were shown specifically

12   individual defendants disclosing that -- Mitzi

13   Reynolds disclosing that she is a member of

14   Common Cause.  Do you remember that?

15         A.    I do.

16         Q.    Did you make that decision for her

17   to disclose her as a member?

18         A.    No.  No.  She, you know, made that

19   decision on her own, and we certainly found out

20   about it after the fact.

21         Q.    And if one member of Common Cause

22   is willing to stand up and self-identify, to

23   you does that indicate that every single other

24   member of Common Cause would do the same thing?

25         A.    Yeah, no, absolutely not.  I think

1    Mitzi is an example.  She's very active and,

2    for her, she has -- able to make that decision

3    on her own based on her activism.  And not

4    everybody, you know, would be able to be able

5    to do that or feel that way.

6         Q.   And what about if people show up

7    to, you know, a public rally or a public lobby

8    day wearing a Common Cause T-shirt, does that

9    tell you that every single member of Common

10   Cause is willing to be self-identified as

11   associated with the organization?

12        A.   No.  I mean, some people certainly

13   are with us, but they're, you know, not

14   necessarily going to be -- well, you know, in

15   this instance -- they're not necessarily going

16   to be willing to be identified publicly that

17   they're a part of us.

18        Q.   All right.  And just going back to

19   the issue of depositions, what if somebody, you

20   know, a member who did not -- strike that.

21             I asked you about the impact of

22   depositions and what that would have on members.

23   Can you tell me, what about being called at trial?

24   If one of your standing members were called at

25   trial, what kind of -- as a possibility of that,

1    evening, October 16th, I believe after

2    7:00 p.m.  So my question to you is, why was

3    this produced on October 16th and not on

4    October 2nd when you submitted your affidavit?

5         A.   Well, you know, again, I'm not

6    involved in all the legal kind of strategies

7    and such.  I know that we were needing to

8    confirm the race of the one individual.  And,

9    again, I'm making -- in terms of talking with

10   staff and attorneys, I would imagine it would

11   be just to, again, be sure.  And that was one

12   last check.

13            I'm sorry, but I wasn't trying to

14   ask a antagonizing question to you, but it took

15   me a while to kind of figure out what you were

16   asking.

17        Q.   Sitting here today just looking at

18   this document, Exhibit 8, can you confirm which

19   of these members that you personally spoke

20   with, if any of them?

21        A.   There are members on that document

22   that I talked with way back in December.

23   Obviously, I'm not able to say who they are and

24   how many there are on that list.

25        Q.   Can you direct me to the page of

1    STATE OF OHIO )

2    COUNTY OF HAMILTON )        SS:   CERTIFICATE

3

4              I, Patti Stachler, RMR, CRR, a

5    Notary Public within and for the State of Ohio,

6    duly commissioned and qualified,

7              DO HEREBY CERTIFY that the

8    above-named BOB PHILLIPS was by me first

9    remotely duly sworn to testify the truth, the

10   whole truth, and nothing but the truth.

11             Said testimony was reduced to

12   writing by me stenographically in the presence

13   of the witness and thereafter reduced to

14   typewriting.

15             I FURTHER CERTIFY that I am not a

16   relative or attorney of either party, in any

17   manner interested in the event of this action,

18   nor am I, or the court reporting firm with

19   which I am affiliated, under a contract as

20   defined in Civil Rule 28(D).

21

22

23

24

25

1        IN WITNESS WHEREOF, I have

2  hereunto set my hand and seal of office at

3  Cincinnati, Ohio, on this 21st day of October

4  2024.

5

6

7

8

PATTI STACHLER, RMR, CRR

9  NOTARY PUBLIC, STATE OF OHIO

My commission expires 10-5-2028

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25