IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

SHAUNA WILLIAMS, et al.,

        *Plaintiffs*,

    v.

REPRESENTATIVE DESTIN HALL, in his official capacity as Chair of the House Standing Committee on Redistricting, et al.,

        *Defendants*.

1:23-CV-1057

_____

NORTH CAROLINA STATE CONFERENCE OF THE NAACP, et al.,

        *Plaintiffs*,

    v.

PHILIP BERGER, in his official capacity as the President Pro Tempore of the North Carolina Senate, et al.,

        *Defendants*.

1:23-CV-1104

**MEMORANDUM ORDER**

These cases are before the court on Legislative Defendants' motion for partial summary judgment. (Doc. 78.)[1] Legislative Defendants seek summary judgment on Counts 3 and 7 of the complaint in case number 1:23-cv-1104 and also seek summary judgment on

_____

[1] Pursuant to the court's order consolidating these cases, all citations are to case number 1:23-cv-1057 unless otherwise noted. (Doc. 34.)

1

claims concerning certain districts where they contend Plaintiffs in case number 1:23-cv-1104 and Plaintiffs in case number 1:23-cv-1057 (together, "Consolidated Plaintiffs") lack standing to sue. (Doc. 79.) For the following reasons, the motion is granted in part and denied in part.

## I.  BACKGROUND

In 2023, the North Carolina General Assembly redrew the maps for the State's federal and state legislative districts. This consolidated action involves two challenges to those efforts. In case number 1:23-cv-1057, eighteen individuals contest the State's plan for congressional districts (CDs). (Doc. 30.) Those Plaintiffs allege: racial gerrymandering in violation of the Fourteenth Amendment as to CD 1, 6, 12, and 14 (Count I); intentional discrimination in violation of the Fourteenth and Fifteenth Amendments as to CD 1, 6, and 14 (Count II); and intentional vote dilution in violation of Section 2 of the Voting Rights Act (VRA), 52 U.S.C. § 10301, as to CD 1, 6, 12, and 14 (Count III).

The second action, case number 1:23-cv-1104, presents a broader challenge to state Senate districts (SDs), state House of Representatives districts (HDs), and federal congressional districts. In that case, the North Carolina State Conference of the NAACP and Common Cause (together, "Associational Plaintiffs"), along with seven individuals, bring twelve counts: discriminatory

2

results in violation of Section 2 of the VRA as to SD 1 and 2
(Count 1), and discriminatory effects in violation of the same as
to HD 4, 5, 7, 10, 12, 24, 25, and 32 (Count 6); intentional vote
dilution in violation of Section 2 of the VRA as to SD 1, 2, 7, 8,
38, 39, 40, 41, and 42 (Count 4), as to HD 4, 5, 7, 10, 11, 12,
21, 24, 25, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 49, 66, 71,
72, 74, 75, and 91 (Count 8), and as to CD 1 (Count 10), and CD 5,
6, 9, and 10 (Count 11); malapportionment in violation of the
Fourteenth Amendment as to SD 7, 8, 38, 39, 40, 41, and 42 (Count
3), and as to HD 11, 21, 33, 34, 35, 36, 37, 38, 39, 40, 41, 49,
66, 71, 72, 74, 75, and 91 (Count 7); intentional discrimination
in violation of the Fourteenth and Fifteenth Amendments as to SD
1, 2, 7, 8, 38, 39, 40, 41, and 42 (Count 5), as to HD 4, 5, 7,
10, 11, 12, 21, 24, 25, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41,
49, 66, 71, 72, 74, 75, and 91 (Count 9), and as to CD 1, 5, 6, 9,
and 10 (Count 12); and racial gerrymandering in violation of the
Fourteenth Amendment as to SD 7 and 8 (Count 2).  (Doc. 1, case
no. 1:23-cv-1104; Docs. 57, 63-2 at 11–13.)

During discovery, Legislative Defendants sought proof of
Associational Plaintiffs' standing to sue.  (Doc. 63-1 at 10–11.)
Specifically, Legislative Defendants argued they were entitled to
know whether members of Associational Plaintiffs reside in each
challenged district sufficient to support Associational
Plaintiffs' standing to contest each district.  (Doc. 65 at 11–

13.) Associational Plaintiffs moved for a protective order to shield the identities of their members. (Doc. 61.) This court granted that motion in part and denied it in part. (Doc. 75.) We agreed that, for standing to sue, Associational Plaintiffs must identify at least one allegedly injured member of their organizations in each of the challenged districts. (Id. at 10.) But we allowed Associational Plaintiffs to disclose under seal the names and addresses of their non-party members on whom they predicate standing. (Id. at 14; see Docs. 55, 97.)

Legislative Defendants now move for summary judgment as to all districts for which they claim Consolidated Plaintiffs have failed to prove standing. (Doc. 79 at 5–12.) Legislative Defendants also seek summary judgment on the malapportionment claims, which are Counts 3 and 7 of the complaint in case number 1:23-cv-1104. (Id. at 12–29.) Consolidated Plaintiffs oppose both requests. (Docs. 81, 82.)

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Trial is unnecessary only if "the facts are

4

undisputed, or if disputed, the dispute is of no consequence to the dispositive question." Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1315-1316 (4th Cir. 1993). In determining a motion for summary judgment, the court views "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

The movant bears the initial burden to show the absence of a genuine dispute of material fact. This burden can be satisfied by pointing out to the court "an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Once that burden has been met, the nonmoving party must demonstrate that a genuine dispute of material fact does actually exist. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-587 (1986). A party asserting that a fact is genuinely disputed must support that assertion by "citing to particular parts of the materials in the record," and the court "need consider only the cited materials." Fed. R. Civ. P. 56(c)(1)(A), (3). "[T]he nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013). Instead, the nonmoving party must convince the court that, upon

5

the record taken as a whole, a rational trier of fact could find for the nonmoving party. <u>Anderson</u>, 477 U.S. at 248-249. The court has an "affirmative obligation . . . to prevent 'factually unsupported claims and defenses' from proceeding to trial." <u>Felty v. Graves-Humphreys Co.</u>, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting <u>Celotex Corp.</u>, 477 U.S. at 323-324).

**III. STANDING**

"Article III of the Constitution restricts the power of federal courts to 'Cases' and 'Controversies.'" <u>Chafin v. Chafin</u>, 568 U.S. 165, 171 (2013); <u>see</u> U.S. Const. art. III, § 2. A case or controversy exists "only when at least one plaintiff establishes that [it] has standing to sue." <u>Murthy v. Missouri</u>, 144 S. Ct. 1972, 1985 (2024) (internal quotation marks and brackets omitted). But "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." <u>TransUnion LLC v. Ramirez</u>, 141 S. Ct. 2190, 2208 (2021).

An organization can establish standing by showing "it suffered an injury in its own right" or "it can 'assert standing solely as the representative of its members.'" <u>Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.</u>, 143 S. Ct. 2141, 2157 (2023) (quoting <u>Warth v. Seldin</u>, 422 U.S. 490, 511 (1975)). Here, Associational Plaintiffs employ the latter approach, known as representational standing. To invoke

6

representational standing, "an organization must demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" Students for Fair Admissions, 143 S. Ct. at 2157 (quoting Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977)).

The parties do not dispute the second and third prongs, and we agree they are satisfied here. Both organizations operate in furtherance of goals that are germane to the interests they seek to protect in this litigation. The NAACP is dedicated to "advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color." (Doc. 63-6 at 3.) To that end, the NAACP "engages in a wide variety of educational, advocacy, and legal work to ensure that communities of color and other marginalized communities throughout North Carolina are able to exercise the right to vote." (Id.) This work includes hosting events to promote "voter registration, election protection, and voter mobilization." (Id. at 3-4.) Common Cause is similarly committed to "fair elections and making government at all levels more representative, open, and responsive to the interests of ordinary people." (Doc. 63-9 at

7

3.) Its efforts include "educat[ing] members and the public about the redistricting process, including how to participate, monitor, and hold decision-makers accountable." (Id. at 4.) Common Cause also "researche[s] state redistricting practices to identify best practices for creating a legal, transparent, responsive, and equitable redistricting process," "assists voters in navigating the elections process" by providing "resources to help voters determine their districts and polling places," and "mobilizes voters to engage in advocacy for government accountability." (Id.) Further, Associational Plaintiffs seek declaratory and injunctive relief, which do not require the participation of individual members. Retail Indus. Leaders Ass'n v. Fielder, 475 F.3d 180, 187 (4th Cir. 2007) (citing Warth v. Seldin, 422 U.S. 490, 515 (1975)).

Turning to the first prong, to demonstrate an individual member's standing, an association must show that (1) the member "suffered an injury in fact" that is "concrete and particularized" and "actual or imminent"; (2) the injury is "fairly traceable to the challenged action of the defendant"; and (3) the injury would "likely" be "redressed by a favorable decision." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992) (internal quotation marks, brackets, and ellipses omitted). These are the same three elements an individual plaintiff must prove to demonstrate standing to sue on his own behalf; they form the "irreducible constitutional

8

minimum of standing" for any plaintiff. Lujan, 504 U.S. at 560; Murthy, 144 S. Ct. at 1986; TransUnion LLC, 141 S. Ct. at 2203.

As we observed in our prior ruling, all the claims asserted in this consolidated action concern Article III injuries that are district specific. (Doc. 75 at 10.) Consolidated Plaintiffs claim that North Carolina's redistricting plans violate Section 2 of the VRA, the Equal Protection Clause of the Fourteenth Amendment, and the Fifteenth Amendment. In each instance, the alleged harm to any voter arises from the boundaries and composition of the particular district in which the voter resides. See Gill v. Whitford, 138 S. Ct. 1916, 1930 (2018). The voter therefore "has standing to assert only that his own district has been" gerrymandered or malapportioned, or his own vote diluted. Id.; see id. ("To the extent the plaintiffs' alleged harm is the dilution of their votes, that injury is district specific. . . . A plaintiff who complains of gerrymandering, but who does not live in a gerrymandered district, 'assert[s] only a generalized grievance against governmental conduct of which he or she does not approve.'" (quoting United States v. Hays, 515 U.S. 737, 745 (1995))). A voter lacks standing to challenge a district where he does not reside. Id. Accordingly, before this court may exercise jurisdiction over a challenge to any given district, Consolidated Plaintiffs must identify at least one allegedly injured individual

9

Plaintiff or member of an Associational Plaintiff who resides in that district.

In their responses to Legislative Defendants' summary judgment motion, Consolidated Plaintiffs acknowledge these principles and disavow reliance on any "theory of statewide injury" to establish standing. (Docs. 81 at 7, 82 at 13–14; see also Doc. 63-2 at 11–13.) That is a wise concession, as a claim of "statewide injury" would be nonjusticiable absent an individual Plaintiff or member of an Associational Plaintiff with standing to sue in every district of the State. Gill, 138 S. Ct. at 1930.

Nonetheless, Associational Plaintiffs attempt to expand their standing to sue beyond the districts where their allegedly injured members reside, based on two erroneous theories. First, Associational Plaintiffs argue they need not identify a member with standing in every challenged district for their vote dilution claims under Section 2 of the VRA so long as they have identified members in other "challenged districts in the same area where vote dilution has occurred." (Doc. 82 at 8.) They contend that standing is established by showing they have members who would reside in their proposed demonstrative districts if a revised map were redrawn along those lines. That does not suffice. In a vote dilution claim, the "disadvantage to the voter as an individual . . . results from the boundaries of the particular district in which he resides." Gill, 138 S. Ct. at 1930 (internal quotation

10

marks and brackets omitted). Associational Plaintiffs must show that the existing map injures one of their members in each district they challenge. Nothing in <u>Shaw v. Hunt</u>, 517 U.S. 899 (1996), on which Associational Plaintiffs rely, suggests otherwise. In <u>Shaw</u>, the Supreme Court explained that when "a § 2 violation is proved for a particular area," the remedial district should be drawn in the same area because the "right to an undiluted vote" belongs not "to the minority as a group" but "to its individual members." 517 U.S. at 917. That discussion of liability and remedy does not loosen the requirements for Article III standing.

Second, without much explanation, Associational Plaintiffs make a similar assertion about their malapportionment claims. They deny an obligation to identify injured members in each allegedly malapportioned district on the ground that they have named one member in "at least one malapportioned district in the area," which they contend "establishes[s] a right to relief." (Doc. 82 at 12.) The Supreme Court has rejected this misinterpretation of its malapportionment decisions, which "rests on a failure to distinguish injury from remedy." <u>Gill</u>, 138 S. Ct. at 1930 (discussing <u>Baker v. Carr</u>, 369 U.S. 186 (1962), and <u>Reynolds v. Sims</u>, 377 U.S. 533 (1964)). In <u>Gill</u>, the Supreme Court explained that "the injuries giving rise to those [malapportionment] claims were individual and personal in nature," even though the ultimate remedy "to vindicate an individual plaintiff's right to an equally

11

weighted vote" required "a wholesale restructuring of the geographical distribution of seats in a state legislature." Id. (internal quotation marks omitted). The individual voter's injury remained district specific. Id.

Applying these standing principles to the evidence before us on summary judgment, we conclude that Consolidated Plaintiffs have presented evidence sufficient to prove constitutional standing to pursue each count in their complaints (with one potential exception), but not as to all districts identified. Plaintiffs in case number 1:23-cv-1057 have identified an allegedly injured Plaintiff in every congressional district challenged in all three counts of their complaint. (Doc. 81 at 3-4.) Plaintiffs in case number 1:23-cv-1104 have identified an individual Plaintiff or member of an Associational Plaintiff allegedly harmed in at least one district for every count of their complaint, save one possible exception.[2] Within those counts, however, Plaintiffs attempt to challenge some districts where they have not identified an individual Plaintiff or member of an Associational Plaintiff with

---

[2] Plaintiffs in case number 1:23-cv-1104 recently reported to the court that Plaintiff Hollis Briggs has passed away. (Doc. 96.) Briggs appears to have been the only Plaintiff or member of an Associational Plaintiff residing in SD 8. (See Docs. 84-2, 84-3, 84-4.) And, as noted above, no Plaintiff or member of an Associational Plaintiff resides in SD 7. Given this recent turn of events, we defer judgment on whether Count 2 of the complaint in case number 1:23-cv-1104 survives summary judgment.

12

standing to sue.  We therefore grant Legislative Defendants' motion for summary judgment as to the following districts:  SD 7, 38, 39, and 42; HD 4, 11, 21, 33, 34, 35, 36, 38, 39, 40, 41, 49, 66, 72, 74, 75, and 91; and CD 9.  Because no allegedly injured Plaintiff or member of an Associational Plaintiff resides in those districts, Consolidated Plaintiffs lack standing as to those districts and cannot challenge them in this litigation.  Our ruling does not preclude Consolidated Plaintiffs from using statewide evidence to prove their claims at trial regarding the districts for which they do have standing.  See, e.g., Alabama Legisl. Black Caucus v. Alabama, 575 U.S. 254, 263 (2015) ("Voters, of course, can present statewide evidence in order to prove racial gerrymandering in a particular district.").  Nor do we resolve potential questions that may arise about the use of statewide evidence or the scope of any potential remedy.

Lastly, we reject Legislative Defendants' arguments in favor of a broader grant of summary judgment on Associational Plaintiffs' claims.  In response to our prior order, Associational Plaintiffs produced North Carolina voter registration records for numerous individuals living throughout the State.  (Docs. 84-3, 84-4.) Those records include the voters' names, addresses, and party affiliation.  To establish the voters' status as members of the NAACP or Common Cause, Associational Plaintiffs provided declarations from Deborah Maxwell, the President of the North

13

Carolina NAACP, and Robert Phillips, the Executive Director of Common Cause North Carolina. (Docs. 82-5, 82-6.) Based on organizational records, Maxwell attests that the voters identified in Doc. 84-3 are NAACP members and Phillips attests that the voters identified in Doc. 84-4 are Common Cause members. Legislative Defendants contend these declarations cannot establish membership status and suggest Associational Plaintiffs needed to produce the organizational records themselves. (Doc. 86 at 5 (citing Fed. R. Evid. 1002).)

We disagree. The proffered testimony concerns "a fact existing independently of the content of any . . . document." United States v. Smith, 566 F.3d 410, 414 (4th Cir. 2009); Catawba Indian Tribe of South Carolina v. South Carolina, 978 F.2d 1334, 1342 (4th Cir. 1992) ("We are of opinion that, ordinarily, officers would have personal knowledge of the acts of their corporations."). Moreover, officers of an entity are competent to testify on the entity's behalf as to their personal knowledge of the contents of the entity's records. F.D.I.C. v. Cashion, 720 F.3d 169, 175 (4th Cir. 2013) (concluding that FDIC employee's affidavit testifying to FDIC's possession of original note, based on personal review of bank and FDIC documents, was based on personal knowledge and thus

14

admissible).[3]  A factfinder could credit the testimony to conclude that the identified voters are indeed members of the NAACP or Common Cause.

We likewise reject Legislative Defendants' argument that Associational Plaintiffs have failed to demonstrate an injury in fact for their vote dilution claims because they have not produced evidence identifying their members' preferred candidates and showing that those candidates have usually lost their elections. (Docs. 79 at 11–12, 86 at 6–7.)  This argument erroneously attempts to shoehorn a ruling on the merits of Associational Plaintiffs' vote dilution claim into the threshold standing inquiry.  See, e.g., Alexander v. S.C. State Conference of the NAACP, 144 S. Ct. 1221, 1252 (2024); Allen v. Milligan, 143 S. Ct. 1487, 1503 (2023). Accordingly, we grant Legislative Defendants' motion for summary judgment for lack of standing only as to the specific districts listed above; we deny the jurisdictional motion as to districts in which an allegedly injured Plaintiff or member of an Associational Plaintiff has been shown to reside.

---

[3] We earlier granted Legislative Defendants' request to compel the Associational Plaintiffs to identify all association members on whom standing was predicated (Doc. 75), and Legislative Defendants have not provided any information to suggest that Maxwell's or Phillips's testimony is untrue.

## IV. MALAPPORTIONMENT

### A. Background

Legislative Defendants also move for summary judgment on Counts 3 and 7 of the complaint in case number 1:23-cv-1104, which allege malapportionment in violation of the Fourteenth Amendment in certain state House and Senate districts. The Fourteenth Amendment's Equal Protection Clause requires States to "make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." Reynolds v. Sims, 377 U.S. 533, 577 (1964). The objective of achieving "substantial equality of population" is to ensure "that the vote of any citizen is approximately equal in weight to that of any other citizen in the State." Id. at 579. In Count 3, Plaintiffs contend that the population of state Senate districts within two "groupings" is insufficiently equal. One grouping consists of New Hanover, Brunswick, and Columbus Counties, and the other consists of Mecklenburg and Iredell Counties. Count 7 likewise challenges state House districts within two groupings: one grouping consists solely of Wake County, and the other of Forsyth and Stokes Counties.

The parties refer to districts within county "groupings" because of a special feature of North Carolina districting law. The State's Constitution commands that "[n]o county shall be divided in the formation" of a legislative district. N.C. Const.

16

art. II, §§ 3(3), 5(3).  Reconciling that dictate with the preeminent demands of the Equal Protection Clause, the North Carolina Supreme Court has instructed the General Assembly to minimize county splits to the extent possible while ensuring that "any deviation from the ideal population for a legislative district shall be at or within plus or minus five percent for purposes of compliance with federal 'one-person, one-vote' requirements."[4] Stephenson v. Bartlett, 562 S.E.2d 377, 397 (N.C. 2002) (Stephenson I).[5]  The result is a formula of county grouping and traversal rules crafted to honor the state constitutional provision to the maximum extent possible under federal law.  See id. at 396-398; Stephenson v. Bartlett, 582 S.E.2d 247, 250-251 (N.C. 2003) (Stephenson II); Harper v. Hall, 886 S.E.2d 393, 421-422 (N.C. 2023).

Plaintiffs contend that, within each of the four groupings they have identified, districts impermissibly deviate from substantial equality of population.  Within the New Hanover-Brunswick-Columbus grouping, the maximum population deviation between the largest and smallest Senate district is 7.70%.  (Doc.

---

[4] This deviation of plus or minus 5% from the ideal population results in an allowable maximum 10% population deviation between the largest and smallest district.

[5] Stephenson I also addressed the interaction between the state constitution and the VRA.  562 S.E.2d at 385.

17

82-9 at 40.)  Within the Mecklenburg-Iredell grouping, the maximum deviation is also 7.70%.  (Id. at 41.)  In Wake County, the maximum population deviation between the largest and smallest House district is 8.29%.  (Id. at 38.)  And within the Forsyth-Stokes grouping, the maximum population deviation is 6.78%.  (Id. at 39.)  Plaintiffs contend that these deviations are not justified by legitimate districting considerations.

**B. Legal Standard**

"[S]tate reapportionment is the task of local legislatures or of those organs of state government selected to perform it."  Gaffney v. Cummings, 412 U.S. 735, 751 (1973).  It is "primarily a political and legislative process."  Id. at 749.  Yet, as mentioned, the Equal Protection Clause of the Fourteenth Amendment requires States to "make an honest and good faith effort to construct districts . . . as nearly of equal population as is practicable."  Reynolds, 377 U.S. at 577.  "The Constitution, however, does not demand mathematical perfection."  Harris v. Arizona Indep. Redistricting Comm'n, 578 U.S. 253, 258 (2016).  And the constitutionality of state legislative redistricting plans is not "judged by the more stringent standards . . . applicable to congressional reapportionment."  Mahan, 410 U.S. at 324; see U.S. Const. art. I, § 2.  Where state legislative apportionment plans are concerned, "minor deviations from mathematical equality" among

18

districts "are insufficient" by themselves to establish a prima facie constitutional violation. Gaffney, 412 U.S. at 745.

Deviations "in 'an apportionment plan with a maximum population deviation under 10%'" are considered minor. Harris, 578 U.S. at 259 (quoting Brown v. Thomson, 462 U.S. 835, 842 (1983)). Such deviations do not require justification by the State. Id. For example, the Supreme Court has "refused to require States to justify deviations of 9.9%," id. (citing White v. Regester, 412 U.S. 755, 764 (1973)), and 8%, see Gaffney, 412 U.S. at 751.

To challenge a plan below this threshold, a plaintiff "must show that it is more probable than not that a deviation of less than 10% reflects the predominance of illegitimate reapportionment factors rather than the 'legitimate considerations'" incident to "the effectuation of a rational state policy." Harris, 578 U.S. at 258-259 (quoting Reynolds, 377 U.S. at 579). Legitimate considerations include "traditional districting principles such as compactness, contiguity, and respect for political subdivisions," Shaw v. Reno, 509 U.S. 630, 647 (1993), "maintaining communities of interest," Bush v. Vera, 517 U.S. 952, 977 (1996) (plurality op.), allocating seats proportionately "to reflect the relative strength" of the major political parties, Gaffney, 412 U.S. at 752, "avoiding contests between incumbent[s]," Karcher v. Daggett, 462 U.S. 725, 740 (1983), and VRA compliance, Vieth v. Jubelirer,

19

541 U.S. 267, 284 (2004) (plurality op.). "Given the inherent difficulty of measuring and comparing factors that may legitimately account for small deviations from strict mathematical equality, . . . attacks on deviations under 10% will succeed only rarely, in unusual cases." Harris, 578 U.S. at 259.

### C. Analysis

The maximum population deviation in North Carolina's House and Senate plans is below 10%, as is the maximum deviation within each of the four county groupings identified in Counts 3 and 7. Accordingly, Plaintiffs bear the burden to "show that it is more probable than not" that the deviations reflect "the predominance of illegitimate reapportionment factors" rather than legitimate considerations. Harris, 578 U.S. at 259. The State is not required to justify the deviations. Id.

The only allegedly illegitimate reapportionment factor that Plaintiffs identify on summary judgment is partisan advantage.[6] (Doc. 82 at 16, 23.) The parties debate whether partisanship can ever be an illegitimate consideration for minor deviations from population equality. Legislative Defendants note that the Supreme Court has declined to resolve this question. In Harris, the Court assumed without deciding that partisanship is an illegitimate redistricting factor and concluded that, although partisanship

_____

[6] Plaintiffs do not claim that race was a factor.

20

played a role in the minor population deviations in that case, the plaintiffs had not carried their burden of proving it predominated. 578 U.S. at 264. In prior decisions, the Supreme Court acknowledged that "partisan districting is a lawful and common practice," Vieth, 541 U.S. at 286 (plurality op.); id. at 307 (Kennedy, J.); id. at 344 (Souter, J.); id. at 355 (Breyer, J.), but may cross a constitutional line if "political groups have been fenced out of the political process and their voting strength invidiously minimized," Gaffney, 412 U.S. at 754. Plaintiffs, on the other hand, point to Raleigh Wake Citizens Association v. Wake County Board of Elections, 827 F.3d 333 (4th Cir. 2016). In that case, the Fourth Circuit determined that "an 'intentional effort' to create 'a significant . . . partisan advantage'" was an illegitimate reapportionment factor. Id. at 345 (quoting Cox v. Larios, 542 U.S. 947, 949 (2004) (Stevens, J., concurring)). The Fourth Circuit acknowledged, however, that "some amount of partisan politics is par for the course in redistricting generally," id. at 347, and that "the Supreme Court has not yet clarified when exactly partisan considerations cross the line from legitimate to unlawful," id. at 348. Subsequently, in Rucho v. Common Cause, 139 S. Ct. 2484 (2019), the Supreme Court clarified that refereeing the line between permissible partisanship and that which goes "too far" is a nonjusticiable question, at least in partisan gerrymandering cases. Id. at 2497 (internal quotation

21

marks omitted). The Court, however, distinguished "one-person, one-vote claims" because "the one-person, one-vote rule is relatively easy to administer as a matter of math." Id. at 2501; see id. ("The same cannot be said of partisan gerrymandering claims, because the Constitution supplies no objective measure for assessing whether a districting map treats a political party fairly.").

We need not resolve this tension today because, assuming without deciding that partisan advantage can be an illegitimate redistricting factor, Plaintiffs have not met their burden on summary judgment. Specifically, they have not cited evidence from which a rational trier of fact could find that the House and Senate plans' minor deviations from mathematical equality "reflect the predominance" of this illegitimate factor over legitimate districting considerations. Harris, 578 U.S. at 259; see Anderson, 477 U.S. at 248-249; Celotex Corp., 477 U.S. at 322 ("Rule 56[] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

Challenges to apportionment plans with a maximum population deviation under 10% have succeeded only on proof of a deliberate and systematic policy of overpopulating a disfavored class of districts and underpopulating a favored class of districts. That

scenario repeats itself in three cases on which Plaintiffs rely. The first is Larios v. Cox, 300 F. Supp. 2d 1320 (N.D. Ga. 2004) (per curiam), summarily aff'd, 542 U.S. 947 (2004). In Larios, a three-judge court found that Georgia's legislative reapportionment plans, which deviated from population equality by a total of 9.98%, violated "the one person, one vote principle embodied in the Equal Protection Clause." Id. at 1322. The deviations did not result from any legitimate, consistently applied state policies. Instead, the deviations resulted from "systematically underpopulating the districts held by incumbent Democrats," "overpopulating those of Republicans," and drawing districts that "deliberately pair[ed] numerous Republican incumbents against one another" but avoided contests between Democratic incumbents. Id. at 1329. The Larios challengers proved that the plan "as a whole" intentionally created "a significant overall partisan advantage for Democrats" at the expense of legitimate districting criteria. Id. at 1331. The Supreme Court summarily affirmed. 542 U.S. 947; but see League of United Latin Am. Citizens v. Perry, 548 U.S. 399, 422–423 (2006) (Kennedy, J.) (explaining that Larios "does not give clear guidance" because the three-judge panel did not resolve "whether or when partisan advantage alone may justify deviations in population," given that partisan motivations were "bound up inextricably" with other "rejected objectives" like

23

"regionalist bias and inconsistent incumbent protection" (internal quotation marks omitted)).

The other two cases fit Larios's mold. In Raleigh Wake Citizens Association, the Fourth Circuit found that the plaintiffs successfully proved malapportionment in a redistricting plan for school board and county commission seats with minor population deviations. 827 F.3d at 338. "[C]opious documentary evidence" demonstrated "extreme" partisanship in that case, id. at 344–345, including "a marked pattern" of systematically overpopulating Democratic districts and underpopulating Republican districts "to gerrymander Republican victories," id. at 346–347. Similarly, in City of Greensboro v. Guilford County Board of Elections, the district court found a city council map with a maximum population deviation below 10% violated the Equal Protection Clause. 251 F. Supp. 3d 935, 937 (M.D.N.C. 2017). The plaintiffs' uncontroverted evidence proved that every Republican-leaning district was underpopulated and every Democratic-leaning district but one was overpopulated. Id. at 942–943. The districts were drawn so that "six of the seven incumbent Democratic" council members were pitted against one another, while the sole Republican incumbent was shielded from running against another incumbent. Id. at 943–944. The evidence further showed that "legitimate considerations did not predominate." Id. at 947.

24

Plaintiffs have not identified comparable evidence of systematically overpopulated or underpopulated districts, or inconsistent incumbent protection, in North Carolina's plans. As Legislative Defendants demonstrate, the state House and Senate plans display no pattern of partisan advantage. (Doc. 79 at 21-27.) Plaintiffs do not dispute Legislative Defendants' evidence on this point. Instead, Plaintiffs respond that evidence of systematic partisan advantage is "unnecessary" to prove their malapportionment claims because "direct evidence of illegitimate criteria is in the record." (Doc. 82 at 23.) Plaintiffs thus have abandoned any effort to prove their claims by showing systematic partisanship, the one type of evidence courts have found sufficient to prove malapportionment in prior cases with only minor deviations from population equality.[7]

Plaintiffs rely on their expert, Anthony Fairfax. Fairfax, however, offers no opinion about what districting factors predominated. (See Doc. 82 at 22 (conceding that "Fairfax 'offers no opinion concerning what factors predominated'" (quoting Doc. 79

---

[7] That is not to say that a pattern of partisan advantage in an apportionment plan always suffices to prove an Equal Protection violation. For example, in Harris, "almost all the Democratic-leaning districts [were] somewhat underpopulated and almost all the Republican-leaning districts [were] somewhat overpopulated." 578 U.S. at 263. The plaintiffs nevertheless failed to prove that partisanship predominated, because the partisan pattern "might have" resulted from efforts to comply with the VRA. Id. at 264.

25

at 18)).)  In the excerpts of his report provided to the court on summary judgment, Fairfax instead opines that alternative configurations could be drawn to reduce population deviations in the four challenged groupings by some unspecified amount, resulting in "slightly more compact" districts, without causing "additional splits of political subdivisions . . . or noticeable communities of interest."  (Doc. 82-9 at 37-41.)  From this, Fairfax concludes that "no redistricting criteria justification" supports the existing deviations from perfect equality.  (Id. at 38-41.)

Fairfax's report cannot shoulder Plaintiffs' burden.  The Supreme Court has instructed that minor "numerical deviations from population equality," even "considered . . . in combination with the additional fact that another plan could be conceived with lower deviations among the State's legislative districts," "fail[] to make out a prima facie violation of the Equal Protection Clause of the Fourteenth Amendment."  Gaffney, 412 U.S. at 740-741.  It is not enough to "produce a plan that is marginally 'better' when measured against a rigid and unyielding population-equality standard."  Id. at 751.  The existence of alternative districts with lesser deviations than the already minor deviations at issue

does not demonstrate that the current deviations resulted from the predominance of impermissible partisanship.[8]

Aside from Fairfax's expert reports, Plaintiffs direct our attention only to excerpts from depositions of Blake Springhetti and Senator Ralph Hise. (Doc. 82 at 22-23.) Springhetti testified about his role in drawing the House map. Regarding Forsyth County, Springhetti recalled changes to the map based on keeping communities and political subdivisions together and avoiding contests between incumbents. (Doc. 82-15 at 19.) He recalled no recommended changes in Forsyth County based on partisan performance. (Id. at 20.) Regarding Wake County, Springhetti testified that changes were made to the map "mostly" to account for municipal boundaries and preserve communities or political subdivisions. (Id. at 18-19.) To the extent partisan performance was considered in adjusting districts within Wake County, it was "secondary . . . , or maybe equal" to those legitimate factors. (Id. at 19.)

Senator Hise testified about the process of drafting the Senate map. He testified that, aside from a strict plus or minus

---

[8] At points in their Opposition, Plaintiffs assert that certain district configurations "serve[] no traditional redistricting criteria." (Doc. 82 at 21; see id. at 20.) Plaintiffs cite Fairfax's report—or nothing—to support these and similar assertions. But the produced portions of Fairfax's report do not support these statements.

27

5% limit, the drafters did not attempt to further minimize deviations from perfect equality. (Doc. 82-14 at 27-28.) Concerning the map as a whole, he explained that drafts were adjusted based on various considerations, including incumbency and updated voting patterns. (Id. at 30-31.) Regarding the New Hanover-Brunswick-Columbus grouping, Hise testified that a portion of New Hanover County on the border with Brunswick County had to be moved from SD 7 to SD 8 to comply with the plus or minus 5% limit, and the drafters selected the precincts that performed comparatively worse for Republicans in the prior presidential election. (Id. at 32-33.) Within the Mecklenburg-Iredell grouping, Hise did not know why an adjustment was made on the border between SD 39 and SD 42 but suggested it "likely" related to "looking at election performance." (Id. at 41-42.)

This testimony, believed and viewed in the light most favorable to Plaintiffs, does not create a genuine issue for trial about whether the pursuit of partisan advantage predominated over all traditional districting criteria, resulting in the minor deviations from mathematical equality within the House and Senate maps. See Harris, 578 U.S. at 259. As discussed, Plaintiffs have no evidence of systematic partisanship or a pattern of partisan advantage in the House or Senate plans. The same legislature that configured the districts they challenge also created districts favoring the opposing political party. The limited testimony

28

produced on summary judgment confirms only what the Supreme Court has repeatedly acknowledged: some amount of politics is "inescapable," Vieth, 541 U.S. at 298, and "inseparable" from the apportionment enterprise, Gaffney, 412 U.S. at 753; see id. at 752 ("It would be idle, we think, to contend that any political consideration taken into account in fashioning a reapportionment plan is sufficient to invalidate it."). Plaintiffs' evidence, considered as a whole, cannot show this is the "rare[]" and "unusual" case in which a challenge to population deviations below 10% can succeed. Harris, 578 U.S. at 259.

At summary judgment, it is incumbent on a nonmovant who will bear the burden of proof at trial to identify for the court evidence from which a rational trier of fact could find in the nonmovant's favor. See Matsushita Elec. Indus., 475 U.S. at 587; Dash, 731 F.3d at 311. Because Plaintiffs have failed to carry their burden, Legislative Defendants are entitled to summary judgment on Counts 3 and 7 in case number 1:23-cv-1104.

**V.   CONCLUSION**

Having carefully considered Legislative Defendants' motion (Doc. 78),

IT IS ORDERED that the motion is GRANTED as to Consolidated Plaintiffs' claims concerning SD 7, 38, 39, and 42; HD 4, 11, 21, 33, 34, 35, 36, 38, 39, 40, 41, 49, 66, 72, 74, 75, and 91; and CD

29

9 (Counts 2, 4, 5, 6, 8, 9, 11, and 12 in Doc. 1, Case No. 1:23-cv-1104).

IT IS FURTHER ORDERED that the motion is DENIED as to Consolidated Plaintiffs' claims concerning SD 1, 2, 8,[9] 40, and 41; HD 5, 7, 10, 12, 24, 25, 32, 37, and 71; and CD 1, 5, 6, 10, 12, and 14 (Counts 1, 2, 4, 5, 6, 8, 9, 10, 11, and 12 in Doc. 1, Case No. 1:23-cv-1104; Counts I, II, and III in Doc. 30, Case No. 1:23-cv-1057).

IT IS FURTHER ORDERED that the motion is GRANTED as to Counts 3 and 7 of the complaint (Doc. 1) in case number 1:23-cv-1104, which are DISMISSED.

/s/ Allison J. Rushing
United States Circuit Judge

/s/ Richard E. Myers II
Chief United States District Judge

/s/ Thomas D. Schroeder
United States District Judge

April 8, 2025

---

[9] But see supra n.2 (reserving judgment as to SD 8 in view of the recent notice of death).