# EXHIBIT 3

```
 1                UNITED STATES DISTRICT COURT
 2              MIDDLE DISTRICT OF NORTH CAROLINA
 3    SHAUNA WILLIAMS, et al.,    )
                                  )
 4            Plaintiffs,         )
                                  )
 5       v.                       ) Civil Action No. 23 CV
                                  ) 1057
 6    REPRESENTATIVE DESTIN HALL,)
      in his official capacity as)
 7    Chair of the House Standing)
      Committee on Redistricting,)
 8    et al.,                     )
                                  )
 9            Defendants.         )
      ------------------------    )
10    NORTH CAROLINA STATE        )
      CONFERENCE OF THE NAACP,    )
11    et al.,                     )
                                  )
12            Plaintiffs,         )
                                  )
13       v.                       ) Civil Action No. 23 CV
                                  ) 1104
14    PHILIP BERGER, in his       )
      official capacity as the   )
15    President Pro Tempore of    )
      the NORTH CAROLINA Senate, )
16    et al.,                     )
                                  )
17            Defendants.         )
      --------------------------)
18
19        Videoconference deposition of MICHAEL BARBER, PhD,
20    taken by counsel for the Plaintiffs, on Wednesday,
21    October 30, 2024, beginning at 8:02 a.m. MDT.
22
23                         - - -
24    Stenographically Reported by Christina Essi Pagano, RPR
                    Utah License:  10536800-7801
25
                         Job SF6973124


                                               Page 1
```

```
1                   A P P E A R A N C E S

2

3        For the Plaintiffs North Carolina State Conference

4        of the NAACP, et al.:

5            Christopher Shenton, Esq.

6            Hilary Harris Klein, Esq.

7            Rachel Allore, Esq.

8            Lily Talerman, Esq.

9            SOUTHERN COALITION FOR SOCIAL JUSTICE

10           5517 Durham Chapel Hill Blvd.

11           Durham, North Carolina 27707

12           chrisshenton@scsj.org

13           hilaryhklein@scsj.org

14           rachel@scsj.org

15           lily@scsj.org

16

17

18       For the Plaintiffs Shauna Williams, et al.:

19           Jyoti Jasrasaria, Esq.

20           ELIAS LAW GROUP

21           250 Massachusetts Avenue NW, Suite 400

22           Washington, DC 20002

23           jjasrasaria@elias.law

24

25   (Appearances continued page 3)
```

(Appearances continued page 3)

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1   (Appearances continued)

 2

 3       For the Legislative Defendants:

 4           Alyssa Riggins, Esq.

 5           NELSON MULLINS

 6           301 Hillsborough Street, Suite 1400

 7           Raleigh, North Carolina 27603

 8           alyssa.riggins@nelsonmullins.com

 9             -and-

10           Patrick T. Lewis, Esq.

11           BAKER & HOSTETLER, LLP

12           127 Public Square Suite 2000

13           Cleveland, Ohio 44114

14           plewis@bakerlaw.com

15

16

17

18

19

20

21

22

23

24

25

                                          Page 3
```

```
 1                    I N D E X

 2                                          Page

 3        WITNESS:  MICHAEL BARBER, PhD

 4            Examination by Ms. Jasrasaria............5

 5            Examination by Mr. Shenton.............118

 6

 7

 8                   E X H I B I T S

 9                                          Page
```

```
10    EXHIBIT 1 - Expert Report of Michael Barber, PhD   18

11    EXHIBIT 2 - Expert Report of Dr. Jonathan          19

12              Rodden, August 1, 2024

13    EXHIBIT 3 - Expert Reply Report of Dr. Jonathan    19

14              Rodden, October 17, 2024

15    EXHIBIT 4 - Estimating Neighborhood Effects on     61

16              Turnout from Geocoded Voter

17              Registration Records, 1/2/2014 draft

18    EXHIBIT 5 - Corrected Expert Report of            173

19              Anthony E. Fairfax, October 28, 2024

20    EXHIBIT 6 - Expert Reply Report of Anthony E.     192

21              Fairfax, October 17, 2024
```

```
22

23

24

25

                                          Page  4
```

```
 1      A    No, it did not.  That's the main criticism that
 2   I have of his analysis, is that it lacks a measure of
 3   partisanship.
 4      Q    And then you also state that you include a
 5   variable indicating if the precinct is located within the
 6   district's major city, and you say here, as identified by
 7   Dr. Rodden.  So I take it that Dr. Rodden's regression
 8   analysis also included this variable?
 9      A     In some cases, yes, and in other cases, no,
10   but I tried to mirror as closely as possible what he did
11   with regard to that variable.
12      Q    And then you also have a variable measuring the
13   precinct's distance from the district's geographic center
14   of population; was that variable included in Dr. Rodden's
15   analysis?
16      A    Yes.
17      Q    Have you ever published a paper involving a
18   regression model where two of the independent variables
19   are correlated above 0.9?
20      A    I don't, off the top of my head, know if I have
21   or have not.  I would need to go back into the datasets
22   and look.
23      Q    Are you familiar with the term
24   multicollinearity?
25      A    Yes, I am.
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1     Q    What does it mean, in your field?

2     A    It means the presence of correlation between

3 two independent variables in a regression model.

4     Q    Are party and race highly correlated in

5 North Carolina?

6     A    To varying degrees, yes.  It's not constant

7 across the state.  It differs in different regions of

8 the state.

9     Q    Do you know how correlated it is in the areas

10 where the challenged Congressional districts are?

11     A    I could not tell you the numbers off the top of

12 my head.  I believe Dr. Rodden provides those in his

13 reply report.

14     Q    Okay.  So let's look at page 7 of Dr. Rodden's

15 reply report.  So he notes at the top here, in

16 Dr. Barber's VTD level dataset, the correlation between

17 the Democratic vote share and BVAP is 0.85 in the

18 envelope of District 6, 0.88 in the envelope of

19 District 12, 0.82 in the envelope of District 14, and

20 0.96 in the envelope of District 1; did you verify these

21 correlations?

22     A    No, I have not had time or reason, really, to

23 dig into his replication data.

24     Q    And you don't dispute -- or, sorry, do you have

25 any reason to dispute them?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1              MS. RIGGINS:  Objection.
 2              THE WITNESS:  I mean, I don't want to -- I
 3     don't know.  I would need to look to verify them.
 4     I guess I'd have to say I just don't know.
 5         Q    But sitting here today, you don't have any
 6     basis to dispute them?
 7         A    No, I don't have any specific reason to dispute
 8     the numbers in this paragraph.
 9         Q    Would you agree that all of these levels of
10     correlation are above 0.8?
11         A    Yes, they are all above 0.8.
12         Q    And one of them is very close to 1; it's 0.96?
13         A    That is correct.
14         Q    Would you agree that all of these are highly
15     correlated?
16         A    I think correlation is a continuous scale and
17     I think we talked about a correlation a few hours ago
18     that was moderately high.  I think here we can say --
19     maybe we can separate the ones in the 80s from the one
20     that's 0.96 and I think we could all agree that 0.96 is
21     very high.  I think the ones in the 80s, we could say,
22     are high.  I think that it's -- correlation is a
23     continuous measure and there's no definitively agreed
24     upon threshold at which, you know, scholars would agree
25     if something is high or low.  It's a spectrum.
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    Q    Does including two highly correlated variables

2    in the same regression change how the regression works?

3    A    It does not change how the regression works.

4    Regardless of the correlation between the two independent

5    variables, the regression does the same thing.

6    Q    Does including two highly correlated variables

7    in the same regression impact the results of the

8    regression analysis?

9    A    Any time you include an additional variable,

10   it is going to have some correlation with other

11   independent variables included in the model.  Even if

12   that correlation is zero, that is a measure of

13   correlation.  It simply has zero correlation.  Any time

14   an additional variable is included in a model, it will

15   have impacts on the other regression coefficients for

16   exactly the reason that they are correlated.  That's the

17   point of a multivariant regression, is to include

18   additional variables that may be correlated with the

19   original variable or with the other variables, because

20   the researcher is interested in understanding what are

21   called partial correlations.  In other words, the impact

22   of one variable independent of the impact of the other

23   variables included in the model.

24   Q    Is there a point at which collinearity of

25   regression variables becomes an issue such that it --

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    because it makes it hard to interpret the regression

2    analysis?

3         A    If two variables are perfectly correlated at 1,

4    then it is impossible to include both of those variables

5    in the regression.  The regression will simply not work.

6    It will not produce a result.  Beyond that, it's a matter

7    of -- it's a matter of degrees.  It's a matter of -- and

8    it's not simply a measure of how correlated the two

9    variables are.  It's a multidimensional problem and by

10   problem, I don't mean that in a negative way.  I mean,

11   it's a multidimensional question and so there's a variety

12   of factors that go into the results that you get from a

13   regression, not just the correlation between two

14   independent variables that you might be interested in

15   including in your regression model.

16        Q    So it sounds like you will not run a regression

17   model using two independent variables that were perfectly

18   correlated at 1; is that right?

19        A    It can't be done.

20        Q    So let's take the 0.96 correlation between

21   Democratic vote share and BVAP in District 1.  How would

22   including those two -- if we take the 0.96 number as

23   true, how does including those two independent variables

24   in the same regression -- how would that affect the

25   analysis?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1            MS. RIGGINS:  Objection.  Go ahead.

 2            THE WITNESS:  It's very hard to say.  It's

 3      hard to know and the reason it's hard to know is

 4      because it not only depends on the correlation

 5      between those two variables, but it also depends on

 6      the particular values of individual data points.  It

 7      depends on the correlation between those two

 8      variables and the other variables that are included

 9      in the model and it also depends on the correlation

10      of those two variables with the outcome variable, the

11      dependent variable.  So it's a very multidimensional

12      problem and, as a result, researchers don't -- you

13      can't really know with certainty the impact it's

14      having on your regression model.  I guess I should

15      say, you can't know without doing a variety of

16      additional analyses.

17       Q    You said earlier something about it being a

18      matter of degree.  So is it fair to say that if two

19      independent variables are correlated at zero, there's no

20      correlation, then there's no multicollinearity concern

21      with including both in one regression model?

22       A    Those variables could be correlated with other

23      variables in the model, --

24       Q    Right.

25       A    -- but there is no multicollinearity if they're
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Case 1:23-cv-01057-TDS-JLW   Document 99-3   Filed 04/08/25   Page 11 of 22

1    not correlated with one another.  So multicollinearity is
2    a question of correlation between variables.  So those
3    variables could definitely have multicollinearity with
4    other variables in the model, but they're not correlated
5    with one another.
6        Q    Okay.  And as a result, if you were to add an
7    independent variable that was not correlated with any of
8    the other existing independent variables, there would be
9    no risk that adding that variable would introduce noise
10   or variance that would be hard to understand?
11           MS. RIGGINS:  Objection.  Go ahead.
12           THE WITNESS:  If you add in a variable that
13    was completely exogenous, completely uncorrelated
14    with any of the other independent variables, I still
15    think that because that -- insofar as that variable
16    is correlated with the dependent variable, it could
17    also still have impact on the other independent
18    variables in the model.
19       Q    Do you typically, when you are conducting
20   regression analyses, try to minimize the number of
21   independent variables that have high degrees of
22   correlation with one another?
23       A    No.  That's not usually a priority when you
24   build a regression model.
25       Q    Once you kind of have run your regression and

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1   gotten the various coefficients, is there anything that
2   you can do to try to figure out whether multicollinearity
3   affected those coefficients?
4        A    I suppose there are some measures that you can
5   calculate to try and capture the degree to which they're
6   correlated with one another or to capture the potential
7   relationship that exists that you could conduct after
8   running a regression model.
9        Q    What would that kind of like post-regression
10  model analysis tell you?
11       A    It can tell you, one, the degree to which
12  they're correlated.  It could tell you the degree to
13  which they're correlated in the context of all the other
14  variables that are included in the model.  It can give
15  you an estimate of the variation or the variance, the
16  variation that's induced in the model through the
17  correlation.  And then I guess the last thing is, what
18  you're really estimating is the impact of the one
19  variable on the outcome independent of the impact on the
20  other variable on the outcome.
21       Q    Did you undertake that kind of check after
22  running your regressions here?
23       A    I simply produced the regression results.  So
24  the results are telling us the relationship between the
25  one variable independent of the other variable.  These

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1    additional post-regression diagnostics that I'm
 2    describing, I did not -- neither me nor Dr. Rodden
 3    produced those statistics.
 4        Q    Why didn't you produce those statistics here?
 5        A    I don't think that they are of particularly
 6    great value in this case because, regardless of what they
 7    say, we need to include both of those variables in the
 8    model.  There's no value in running the regression with
 9    only a measure of race or only a measure of party.
10    The only value that these regressions produce is when
11    they're both included, because that is the question that
12    we are seeking to answer, the impact of race independent
13    of partisanship.  If both variables are not included in
14    the model, then the model is not getting us any closer to
15    answering that question and at that point, why even
16    bother including the model?  It's not useful.
17        Q    But it's possible that the model is also not
18    useful if two of the variables are so highly correlated
19    that it's basically meaningless?
20             MS. RIGGINS:  Objection.  Go ahead.
21             THE WITNESS:  Well, I think I dispute the
22     characterization of it as meaningless.  No regression
23     model is perfect.  That's the nature of regression
24     models.  And so now it's a matter of which models are
25     more informative or more helpful than others.  And my
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
1      opinion is that a model with partisanship and race
2      both included, even with the correlation that exists
3      between those two variables, is more valuable and is
4      more useful than a regression model that only
5      includes race or only includes partisanship.  I do
6      not think that those models are really useful at all.
7           Q    Let's flip back to your report.  I just have a
8      few more questions and then we can consider whether it
9      makes sense to break for lunch.  But if I go back to
10     page 18 of your report, you also mention at the end, to
11     account for the need to achieve relative population
12     parity, I also include a variable measuring the total
13     population of each precinct?
14          A    Yes.
15          Q    How does this control for population equality
16     in a district?
17          A    What it accounts for is the fact that precincts
18     might -- stepping back, the purpose of the regression is
19     to identify what factors appear to be influential in the
20     selection of a precinct into a Congressional district.
21     One factor that's really important in creating
22     Congressional districts is population parity, and so when
23     a map drawer is deciding whether to move a precinct into
24     a district, one of the factors that they need to consider
25     is the population size of the precinct.  So if you can
```

Page 88

1    correlated.

2         Q    Could you have undertaken your own correlation

3    analysis?

4         A    With sufficient time and resources, yes.

5         Q    You applied the county envelope analysis to a

6    set of simulated maps to test its reliability; is that

7    right?

8         A    Yes, that's correct.

9         Q    And you also applied it to the

10   2022 Special Master Map?

11        A    I believe so, yes.

12        Q    In doing so, did you run -- just to make sure

13   I'm understanding, you ran your regression analysis.  You

14   ran the same regression analysis that you ran earlier in

15   your report and you did not try to replicate Dr. Rodden's

16   regression analysis on these simulated maps; is that

17   correct?

18        A    That's correct.  I ran the same analysis that I

19   conducted earlier in my report.

20        Q    So that analysis includes both race and party

21   as variables?

22        A    Yes, it does.

23        Q    And your opinion on page 27 of your report, at

24   the bottom of this section, is that, given the results,

25   it is my opinion that the envelope method is not a

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    reliable method for determining if race played a
2    significant role in the assignment of precincts to
3    districts; is that right?
4        A    Yes.
5        Q    And then turning to page 5 of your report,
6    where you include a summary of conclusions, the second
7    conclusion you list here is that the county envelope
8    method is not a reliable method for examining the degree
9    to which race played a role in the construction of
10   district boundaries because it incorrectly identifies
11   race as a significant factor when race, in fact, played
12   no role in the process.  What do you mean by the degree
13   to which race played a role?
14       A    So in the simulations, the districts are
15   constructed with no information about the racial
16   composition of individual precincts or the state overall
17   or the districts that are then assembled from those
18   precincts.  So we know ahead of time that race played no
19   role in the development of these districts in the
20   simulation.  It was just not a factor that the computer
21   had access to.  And yet when we do the county envelope
22   analysis, it identifies race as a statistically
23   significant predictor of the district's composition more
24   than a majority of the time, even though we knew ahead of
25   time race played no factor in the composition of those

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    districts.  So, in other words, the county envelope
2    method, when applied to a truly race-neutral map, flags
3    most of the districts as race playing a significant
4    factor in the composition of the district.  They're all
5    false positives.
6         Q    How are you determining whether your regression
7    analysis is flagging race as a significant factor; what
8    is the threshold that you're using there?
9         A    So I'm using the same threshold that Dr. Rodden
10   is using in the identification of the variable measuring
11   race as whether or not it is statistically significant.
12        Q    Just to confirm, when you refer here to the
13   fact that race played no role in the process, you mean in
14   reference to your simulated maps, correct?
15        A    That's correct.
16        Q    So you don't know, sitting here today, if race
17   played any role in the 2023 redistricting, correct, in
18   terms of, you're not speaking to the intent of the
19   legislators?
20        A    I don't have a view into the subjective intent
21   of the people who drew the 2023 map.
22        Q    And you're not opining here on whether the
23   envelope method, used in combination with the other
24   approaches that Dr. Rodden uses, can shed some light on
25   whether racial sorting exists, correct?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    A    Well, I'm opining that the county envelope

2    method, in my opinion, sheds no light on whether race was

3    a significant factor or not; and so I suppose that, in

4    combination with other things, it provides no added value

5    in my opinion.

6    Q    Okay.  And just to make sure, so I'm not asking

7    about whether race was a significant factor, but whether

8    racial sorting exists at all.  So not whether it was

9    significant or what the intent was, but just rather

10   whether there is racial sorting of the districts.

11   A    I suppose I don't fully understand what you

12   mean by racial sorting.

13   Q    Whether voters are disproportionately included

14   in a particular district or not, included based on their

15   race.  Setting aside whether their actual underlying

16   reason might be their party or something like that, but

17   just whether there exists any kind of effect that we can

18   observe with respect to how voters are included or not

19   included in districts based on their race.

20   A    I don't think the county envelope method is

21   necessary to identify if there are differences in the

22   regional composition of the districts.  I think in that

23   case, we can just look and see the summary statistics.

24   The district has X percent of the district.  X percent of

25   the population are Black.  That's something we can

Page 93

```
 1    identify without conducting any sort of county envelope

 2    analysis.

 3              MS. JASRASARIA:  I'm at a good stopping point

 4     if this is a good time to break for lunch.

 5              THE WITNESS:  Wonderful.

 6              MS. JASRASARIA:  Let's go off the record.

 7              (There was a lunch recess taken.)

 8    BY MS. JASRASARIA:

 9        Q    Welcome back, Dr. Barber.

10        A    Thank you.

11        Q    So I'd like to continue our discussion of your

12    report.  I'm going to share my screen again.  So I'd like

13    to turn to page 29 of your report, which is where you

14    discuss the core-in-out analysis that Dr. Rodden

15    conducted.  Were you familiar with the core-in-out

16    analysis before reviewing Dr. Rodden's report?

17        A    Yes, I was familiar with it.

18        Q    Where had you seen it before?

19        A    I've seen it in -- I don't know that I could

20    identify specific cases.  I've been aware of it simply by

21    virtue of being involved in redistricting cases, but more

22    specifically, I'm aware of a similar -- it's not exactly

23    this type of analysis, but a similar analysis that was

24    done in a redistricting case that I am involved in, in

25    Alabama.
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1        A    Okay.  So I think the first problem is you're
 2   making a comparison to a very small set of maps.  100
 3   maps is far outside the norm in terms of comparisons.
 4   Beyond that, this comparison is problematic for the same
 5   reasons that the analysis he does earlier is problematic,
 6   in that it does not disentangle race from partisanship.
 7   So he's suggesting here the plan is a racial outlier, but
 8   there's no analysis showing if this plan -- if the
 9   enacted map is also a partisan outlier, even in
10   comparison to these 104 maps.  Because these -- even
11   though a map might have 10 Republican-leaning seats, if
12   all 10 of those seats are just barely across the line, as
13   we talked about at the very beginning this morning,
14   that's different than if the 10 seats are beef-ly
15   Republican.  The analysis here and the figures here don't
16   show us whether or not that is the case.  It very well
17   could be the case that there are no maps that have the
18   same partisan composition as the enacted map in terms of
19   not only the number of Republican-leaning seats but the
20   relative safety of those seats.
21        Q    Did you review the draft maps that Dr. Rodden
22   included in his reply report analysis?
23        A    I have not.
24        Q    Do you have any reason to dispute the BVAP
25   distribution that he showed in his analysis?
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1       A    I have not -- I have not looked at these draft
 2   maps.  I don't know -- I couldn't say anything about
 3   these draft maps at this point.
 4       Q    Let me stop sharing my screen for a moment.
 5   Dr. Barber, what is your understanding of how a Court
 6   determines whether a district is a racial gerrymander?
 7            MS. RIGGINS:  Objection.  Go ahead.
 8            THE WITNESS:  I don't know that I can answer
 9    that question.  I think that a judge makes that
10    decision and I don't really know how a judge makes
11    that determination.
12       Q    Are you familiar with the concept of racial
13   predominance?
14       A    I'm familiar with the phrase, yes.
15       Q    What is your understanding of what that phrase
16   means?
17       A    I think that it has -- I think that phrase has
18   a kind of special legal standing or kind of legal --
19   lawyers have a very different -- like, a special
20   definition of what that means.  I'm not trying to
21   describe what that is, because I'm not a lawyer and I'm
22   not making any sort of legal determinations.  In my
23   own -- sorry, go ahead.
24       Q    No, go for it.
25       A    In my own non-legal understanding, I think
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127