# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| SHAUNA WILLIAMS, et al., | |
| *Plaintiffs*, | |
| v. | Civil Action No. 23 CV 1057 |
| REPRESENTATIVE DESTIN HALL, in his official capacity as Chair of the House Standing Committee on Redistricting, et al., | |
| *Defendants*. | |
| _____ | |
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP, et al., | |
| *Plaintiffs*, | |
| | Civil Action No. 23 CV 1104 |
| v. | |
| PHILIP BERGER, in his official capacity as the President Pro Tempore of the North Carolina Senate, et al., | |
| *Defendants*. | |

## NAACP PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO RECONSIDER IN PART THE COURT'S ORDER ON PARTIAL SUMMARY JUDGMENT

# INTRODUCTION

NAACP Plaintiffs[1] ("Plaintiffs") respectfully request reconsideration of the Court's recent order granting partial summary judgment to dismiss Counts 3 and 7 of their Complaint (Doc. 98 at 16–29, hereafter the "Order"). That decision found that Plaintiffs had failed to create a triable issue of fact on "whether the pursuit of partisan advantage predominated over all traditional districting criteria, resulting in the minor deviations from mathematical equality within the House and Senate maps." Order at 28. However, the decision did not have the benefit of considering supplemental expert disclosures, timely made, after briefing was submitted. Those disclosures are material and relevant to the issues decided in the Order and warrant reconsideration by this Court.

Pursuant to the Court's amended scheduling order, *see* Doc. 90, the parties made supplemental expert disclosures after the close of briefing on Legislative Defendants' Motion for Partial Summary Judgment ("Motion"). The supplemental expert report of Dr. Michael Barber, Legislative Defendants' expert on the challenged apportionments, offers evidence that was unavailable to this Court at the time of briefing. And that new evidence strongly supports Plaintiffs' previously proffered evidence and legal theory with respect to the challenged apportionments (not least because they are offered on behalf of the party-opponent Defendants).

---

[1] "Plaintiffs" include "Associational Plaintiffs" the North Carolina NAACP and Common Cause, their members who reside in challenged districts ("standing members"), and individuals Calvin Jones, Dawn Daly-Mack, Linda Sutton, Corine Mack, Mitzi Reynolds Turner, and Syene Jasmine.

In his March 17, 2025, Supplemental Report, Dr. Barber makes two key arguments—both of which compel reconsideration of the Court's Order. First, Dr. Barber opines that even small changes in each of the challenged clusters would have major impacts on the partisan performance of those clusters, and that accordingly those cluster configurations are explained by adherence to partisan considerations. Second, Dr. Barber reports that the best examination of an individual district's population deviation is made at the county cluster level, rather than on a statewide basis. *See* Ex. A (Barber Supplemental Report excerpts).

In both of these respects, Plaintiffs agree with Dr. Barber. Indeed, Plaintiffs have maintained from the outset of this case, and developed evidence in support, that the population deviations in the four challenged county clusters impermissibly depart from the population equality standards of one-person one-vote for the purpose of partisan advantage. In support of those claims, Plaintiffs have marshaled district-specific evidence which demonstrates that *within* those four challenged clusters, partisan goals served as the overriding purpose for the population deviations in each cluster. In its Order, the Court found that Plaintiffs had not established a triable issue of fact on whether cluster-specific population deviations showed partisan predominance in the construction of the challenged districts. Dr. Barber's supplemental opinions in support of both of Plaintiffs' contentions, as well as the factual analyses underlying them, constitute clear, previously-unavailable evidence that a triable issue of fact exists on Counts 3 and 7. Given Dr. Barber's newly disclosed supplemental report, adding to the previously disclosed evidence, Plaintiffs should be provided the opportunity to present evidence at trial on the extent to which

partisan goals predominated in the configuration of population deviations in the four challenged county groupings across the Senate and House maps.

In its Order, the Court also made legal conclusions as to the standard of proof relevant to malapportionment claims that were not fully briefed in the Motion because they were not specifically asserted by Defendants in initial support of that Motion. It is therefore appropriate for the Court to reconsider these legal issues with the benefit of full briefing.

These issues—the new evidence provided by Dr. Barber's supplemental expert report after submission of the Motion and the lack of complete briefing on the standard of proof—warrant reconsideration of Defendants' motion for summary judgment on these claims and render the denial of Plaintiffs the opportunity to be heard at trial a manifest injustice.

## RELEVANT BACKGROUND

In their December 2023 Complaint, NAACP Plaintiffs alleged the malapportionment of specific districts of the 2023 House and Senate plans. *See* Doc. 1, Case No. 1:23-cv-01104 (hereinafter the "Complaint" or "Compl."); Doc. 37 (Order recognizing scrivener's error in paragraph 273 of the Complaint).

On December 6, 2024, Legislative Defendants filed a Motion for Partial Summary Judgment ("Motion"), Doc. 78, and a memorandum in support of that motion, Doc. 79. Plaintiffs filed their response in opposition to the Motion on January 7, 2025, and the subsequent briefing of Legislative Defendants' reply and Plaintiffs' surreply concluded on January 24, 2025. *See* Docs. 82, 86, 88. On April 8, 2025, the Court issued its Order granting partial summary judgment to dismiss Counts 3 and 7 of the Complaint. Doc. 98.

4

Relevant to Counts 3 and 7, the Court noted that where population deviations are under 10%, Plaintiffs must demonstrate that it is "more probable than not" that the deviations are attributable to "the predominance of illegitimate reapportionment factors," assuming without deciding that partisanship can be an illegitimate factor. *Id.* at 20, 22. It then held that NAACP Plaintiffs did not identify sufficient evidence of partisanship considerations predominating over legitimate redistricting criteria. *Id.* at 22–25.

On March 17, 2025, pursuant to the operative scheduling order in this case, Legislative Defendants disclosed the Supplemental Expert Report of Michael Barber, PhD. *See* Ex. A (Barber Supplemental Report excerpts). In it, Dr. Barber offered evidence that was unavailable to the Court during the briefing on the Motion. This included a comparison of the illustrative cluster configurations offered by Plaintiffs' expert, Mr. Fairfax, to the Enacted Plan in each of the four challenged clusters, *id.* at 32–39, and Dr. Barber's opinions that those illustrative alternatives "universally reduce the Republican lean of swing districts throughout the state." *Id.* at 32. Dr. Barber goes cluster by cluster, repeatedly opining that even the small shifts made by Mr. Fairfax significantly degrade the Republican partisan performance of each cluster. *Id.* at 32–36. Dr. Barber's supplemental opinions also show that each of the challenged clusters contain at least one district that comes extremely close to the absolute population deviation limit allowed by *Stephenson* of +/- 5%. *id.* at 42–44. Dr. Barber's supplemental deposition on April 11, 2025, also provided additional detail on the new evidence from his supplemental report. *See generally* Ex. D (excerpts of Dr. Barber's supplemental deposition).

## LEGAL STANDARD

Federal Rule of Civil Procedure 54(b) governs a motion to reconsider an interlocutory order, such as the grant of partial summary judgment. *See Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514–15 (4th Cir. 2003). "[C]ourts frequently look to the standards applicable to motions under Rules 59(e) or 60(b) for guidance." *See Sinclair Broad. Grp., Inc. v. Colour Basis, LLC*, No. CCB-14-2614, 2017 U.S. Dist. LEXIS 29352, at *2–3 (D. Md. Mar. 2, 2017). In general, "[c]ourts will reconsider an interlocutory order in the following situations: (1) there has been an intervening change in controlling law; (2) there is additional evidence that was not previously available; or (3) the prior decision was based on clear error or would work manifest injustice." *Akeva L.L.C. v. Adidas Am., Inc.*, 385 F. Supp. 2d 559, 566 (M.D.N.C. 2005).

Summary judgment must be denied unless "it is perfectly clear that there is no dispute about either the facts of the controversy or the inferences to be drawn from such facts." *Morrison v. Nissan Co., Ltd.*, 601 F.2d 139, 141 (4th Cir. 1979) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); Fed. R. Civ. P. 56(a). A court "must usually adopt the nonmovant's version of the facts." *N.C. State Conf. of NAACP v. Hirsch*, 720 F. Supp. 3d 406, 416 (M.D.N.C. 2024) (cleaned up).

## QUESTION PRESENTED

Whether the circumstances of the case, including newly-available expert opinions and evidence in the Supplemental Expert Report of Dr. Michael Barber, warrant reconsideration and reversal in part of the Court's Order, Doc. 98, dismissing Counts 3 and 7 on partial summary judgment.

6

**ARGUMENT**

I.    <u>Dr. Barber's Supplemental Expert Report Offers Additional, Newly Available Evidence Showing that Whether Illegitimate Criteria Caused the Challenged Population Deviations is a Triable Issue of Fact.</u>

In his Supplemental Report, Defendants' expert Dr. Barber offers opinions that bear on two key components of the Court's Order. First, Dr. Barber opined that even minor changes in the population deviations of the challenged county groupings would harm the partisan Republican performance of that cluster. This opinion strongly supports Plaintiffs' contention that partisanship was the overriding goal for the construction of the population deviations in each of the challenged clusters. Second, Dr. Barber offered supplemental opinions that confirm that district-level population deviations need to be compared on the cluster level, not on a statewide level. Plaintiffs will address each of Dr. Barber's opinions in turn.

    A.  *Dr. Barber's Supplemental Report Argues that Partisanship Best Explains the Challenged Population Deviations.*

Dr. Barber opined on the illustrative cluster configurations in each of the four challenged clusters that was offered by Plaintiffs' expert, Mr. Fairfax, in his Reply Expert Report to the Enacted Plan. Ex. A at 32–36 (Barber Supplemental Report (discussing Ex. B at 9–35, A-1–A-14 (Fairfax Reply Report excerpts with Appendices)).[2] Mr. Fairfax offered those illustrative configurations to demonstrate that small changes to the clusters "would bring the district's population closer to the ideal and result in similar or better

---

[2] Portions of Dr. Fairfax's prior reports were filed by the parties at Doc. 78-6 and 82-9 (Fairfax Corrected Report excerpts) and Docs. 78-3 and 82-19 (Fairfax Reply Report excerpts). The entire reports have been appended to this Motion as Exhibits B (Fairfax Reply Report) and E (Fairfax Corrected Report) for the Court's convenience.

redistricting criteria metrics (e.g., compactness or political subdivision splits)." *See* Ex. B at 6, 9–35, A-1–A-14 (Fairfax Reply Report and its Appendix A). In so doing, among other things, Mr. Fairfax's illustrative configurations create more equal populations between the challenged clusters.

In his Supplemental Report, Dr. Barber responds by observing that those illustrative alternatives "universally reduce the Republican lean of swing districts throughout the state." Ex. A at 32 (Barber Supplemental Report). Dr. Barber goes cluster by cluster, repeatedly opining that even the small shifts made by Mr. Fairfax significantly deteriorate the Republican partisan performance of each cluster. *Id.* at 32–35. In three clusters, Dr. Barber even goes so far as to note (in nearly identical language) that while these changes "might seem like a small difference, the [affected] district is already very competitive and will likely be decided by small margins in future elections." *See id.* at 32–33 (Brunswick-New Hanover, Iredell-Mecklenburg, Wake).

Dr. Barber uses the recent 2024 election results to opine that Mr. Fairfax's illustrative configurations (which create more equal populations among districts in challenged clusters) would "universally reduce the Republican lean of swing districts throughout the state." Ex. A at 32. When asked about possibilities other than those proposed by Mr. Fairfax, Dr. Barber confirmed that moving virtually *any* VTD into or out of the challenged districts would either harm the Republican partisan performance in that cluster or cause a district's population deviation to exceed +/-5%, in violation of *Stephenson*. Ex. D (Barber Supplemental Deposition Tr.) 29:1-31:14 (Brunswick-New Hanover), 37:2–24 (Iredell-Mecklenburg), 39:21–40:21 (Wake), 44:24–45:8, 46:1–20 (Forsyth-Stokes).

8

Therefore, Dr. Barber's analysis implicitly recognizes that the challenged clusters are constructed to maximize Republican partisan advantage without crossing the bright-line population deviation thresholds imposed by *Stephenson*. It is therefore also self-evident that any diminution in Republican partisan performance (which, as Dr. Barber testified, would be required to reduce the cluster population deviations) would hinder the General Assembly's goal of attaining partisan advantage in the plans. Mr. Fairfax does not dispute this finding in his Supplemental Rebuttal Report, opining instead that it does not alter his conclusion that the population deviations he observed in the challenged clusters were not explained by any legitimate redistricting criteria. Ex. C at 2 (Fairfax Supplemental Rebuttal Report).

Dr. Barber's newly available opinions also clarify the utility of the opinions Mr. Fairfax offered earlier in this case. Mr. Fairfax concluded that, in each of the challenged clusters, traditional redistricting criteria could not possibly explain the population deviations. Ex. E. at 64–68 (Fairfax Initial Report); *see also id.* at 13–14 (summarizing the criteria Fairfax considered). To state it differently, Mr. Fairfax examined—and ruled out— the kinds of non-partisan redistricting criteria that the General Assembly represented it considered in constructing the state legislative plans, *see* https://webservices.ncleg.gov/ViewDocSiteFile/81635 (2023 Senate criteria); https://webservices.ncleg.gov/ViewDocSiteFile/87692 (2023 House criteria), and which have been recognized by the Supreme Court as providing a legitimate basis for population

9

deviations in the state legislative plans. Order at 19 (listing the rationales that can justify minor deviations).[3]

And to cap it all off, Dr. Barber's supplemental analysis further supports Mr. Fairfax's Reply opinions, which showed that partisan explanations explained intracluster deviations. Ex. B (Fairfax Reply Report) at 7–8. To disregard both Dr. Barber and Dr. Fairfax's opinions on this point would repeat the error of the trial court in *Raleigh Wake Citizens Association v. Wake County Board of Elections*, 827 F. 3d 333 (4th Cir. 2016), in discounting expert Dr. Jowei Chen's analysis: Like Dr. Chen's analysis in *RWCA*, Dr. Barber and Mr. Fairfax's opinions here show both that other redistricting plans were possible *and* that legitimate apportionment considerations could not have explained population deviations. 827 F.3d at 344–35.

Overall, Dr. Barber's supplemental opinions plainly support Plaintiffs' argument that partisan advantage, and not legitimate criteria, explains the population deviations in challenged areas. And it serves to bolster the expert evidence and testimony, proffered at summary judgment, that Legislative Defendants were driven by the consideration of political advantage in drawing districts.

This testimony illustrates the probative nature of witness testimony on these clusters, and specifically:

---

[3] Legislative Defendants have never argued these population deviations are explained by incumbency considerations. In any event, the fact that Mr. Fairfax "was able to create and observe multiple options that would allow [him] to shift one or two VTDs that would bring the district population closer to the ideal population and overall population deviation closer to zero," Ex. B at 6, ¶ 9 (Fairfax Reply Report), disproves any assertion that the challenged population deviations would have been *required* to accommodate any single incumbent's residency. Plaintiffs have appended the location of incumbent addresses in the 2023 Enacted Plans for reference at Exhibits F and G.

➢ That the border between Senate Districts 7 and 8 in the city of Wilmington (and resulting population deviation) was chosen "based on those performances for those political considerations." Doc. 82-14 at 471:8–9.

➢ That the border between Senate Districts 39 and 42 in Mecklenburg County (and its resulting population deviation) was also "likely" chosen by "looking at election performance in those[]" districts. Doc. 82-14 at 474:24–475:8.

➢ That adjustments were made to the House draft map based on "partisan performance" and that no discussion of equal district population ever occurred, just making districts "[p]lus or minus 5 [percent] straightforward." Doc. 82-15 at 143:2–4, 95:5–7.

Dr. Barber's supplemental opinions, disclosed after briefing on the Motion had closed, further support Mr. Fairfax's opinions excluding traditional redistricting as the cause for challenged population deviations. This evidence, when considered with witness testimony admitting that the mapdrawers did not minimize population equality and that partisan advantage was considered and in some instances direct admission that partisanship drove the final configurations (and their population deviations), directly supports Plaintiffs' contention that "it is more probable than not that a deviation of less than 10% reflects the predominance of illegitimate reapportionment factors rather than the 'legitimate considerations'" incident to "the effectuation of a rational state policy." *See Harris v. Ariz. Indep. Redistricting Comm'n*, 578 U.S. 253, 259 (2016) (quoting *Reynolds v. Sims*, 377 U.S. 533, 579 (1964)); Order at 19.

This new evidence alone warrants reconsideration and reversal of the Court's Order and allowing Counts Claims 3 and 7 to proceed to trial.

*B. Dr. Barber's Supplemental Report Confirms that District-Level Population Deviations Need to Be Compared on the Cluster Level, Not the Statewide Level.*

In his Supplemental Report, Dr. Barber continues to offer the opinion that there is no *statewide* correlation between an individual district's population deviation and that district's partisan or racial makeup. Ex. A at 40–41. In support of this conclusion, Dr. Barber offers a statistical regression examining whether partisanship or race "are statistically associated with the population deviation of the district." *Id.* In conducting this analysis, Dr. Barber confirms that district-level population deviations are not correlated with race or partisanship on a statewide basis, but that one variable is extremely well-correlated with district deviations: the average population deviation of that district's *cluster*. *Id.* at 41. As Dr. Barber puts it, "[t]his makes sense given that districts that are drawn from county clusters that start out over (or under) populated are much more likely to themselves also be over (or under) populated." *Id.*

This supplemental analysis from Dr. Barber again offers powerful evidence in support of Plaintiffs' malapportionment argument. By showing that the only variable correlated with *statewide* population deviations is a given district's average *cluster* deviation, Dr. Barber confirms that the most relevant analysis of an individual district's population deviation must take place *within* that district's cluster. *See* Order at 17 (citing *Stephenson v. Bartlett*, 562 S.E.2d 377, 396–98 (N.C. 2002)) (noting that North Carolina state legislative districts utilize "a formula of county grouping and traversal rules crafted to honor the state constitutional provision to the maximum extent possible under federal law."). This is because only the other districts within a specific cluster (i.e., the districts

12

drawn within counties grouped together) share the same ideal population deviation, and thus even in the hypothetical world where district population is perfectly equalized within the county clusters, only districts in the same grouping will share the same population figure. This, in turn, supports Plaintiffs' focus on the apples-to-apples comparison between districts of the same grouping, rather than comparing apples to oranges by looking across districts outside of clusters and instead statewide. And, if this interpretation of Dr. Barber's conclusions were in doubt, Dr. Barber's own deposition testimony confirms this understanding. Ex. D at 15:3–16:6; *see also infra* Section II.

Dr. Barber's supplemental analysis also shows that in each of the challenged clusters, certain district populations are maximized or minimized to the maximum extent possible without directly violating the thresholds imposed by *Stephenson*. Dr. Barber's own reported figures demonstrate that each of the challenged clusters contains at least one district that comes extremely close to the absolute limit allowed by *Stephenson* of +/-5%. Ex. A at 42–44 (deviations of -4.94% (SD 7); 4.26% to 4.99% (SDs 37 through 41); -4.48% (HD 35); and -4.68% (HD 91)). Each of these extreme district-specific deviations is a significant departure from the average deviation among the districts within that district's cluster overall.[4] *Id.* This is deviation *within* clusters, which Dr. Barber testified constrains the possible population deviations within a particular cluster. Ex. D at 12:2–20. And yet, these significant intracluster deviations occur despite those districts all sharing the same

---

[4] In the Mecklenburg Senate cluster, the relationship is reversed – rather than SD 42 being near the absolute limit required by *Stephenson*, the district is almost 4 percent lower than every other district in the cluster, and all those districts (SDs 37 through 41) are very near to the absolute maximum population allowed under *Stephenson*. Ex. A at 42.

ideal population figures. This significant deviation within clusters, as highlighted by Dr. Barber's Supplemental Report, is powerful evidence that manipulation of population deviations is occurring entirely within clusters, and Plaintiffs rightly focus on examining these deviations.

This new analysis provides a separate and independent ground for reconsideration of the Court's Order and allowing these claims to advance to trial.

II.  The Court's Legal Conclusion Regarding the Type of Proof *Required* to Prove a Malapportionment Claim Was Not Fully Briefed and Represents Clear Error, Especially Given the New Evidence Available.

In its Order, the Court implicitly held that the *only way* Plaintiffs may prove a claim of malapportionment for deviations of less than 10% is to show plan-wide systematic malapportionment, as opposed to proving malapportionment within specific challenged districts. *See, e.g.*, Order at 28 ("Plaintiffs have no evidence of systematic partisanship or a pattern of partisan advantage in the House or Senate plans.").[5] This legal standard was not directly advocated by Defendants in their initial Motion, *see* Doc. 79 at 13–26, and thus the Court's legal finding did not benefit from full briefing on this issue. With the benefit of full briefing on this argument here, it becomes clear that requiring Plaintiffs to prove malapportionment on a systematic and statewide basis, even when only challenging specific districts, is a legal error for several reasons.

---

[5] The Court also erroneously found plaintiffs "abandoned" efforts to show systematic partisanship. This is not true—Plaintiffs correctly asserted this evidence is not squarely required where it is otherwise proven that illegitimate criteria predominated—not that they had not shown or could not show it, Doc. 82 at 23. As explained herein, Plaintiffs have shown systemic malapportionment for partisan advantage within clusters.

14

*First*, requiring Plaintiffs to prove statewide systematic harm contradicts the district-specific analysis of malapportionment claims, and particularly the harm alleged in NAACP Plaintiffs' Complaint. As observed by the Court in its Order, "the alleged harm to any voter arises from the boundaries and composition of the *particular district* in which the voter resides." Order at 9 (emphasis added) (citing *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018)); *see also Reynolds*, 377 U.S. at 568 ("Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State."). The standard for malapportionment claims thus appropriately requires showing that, in a particular district, illegitimate factors caused the malapportionment rather than "legitimate considerations" incident to a "rational state policy." Order at 9 (citing *Harris*, 578 U.S. at 258–59). Where that standard is met, a voter in that district will, necessarily, have their vote unconstitutionally impaired as compared to voters located elsewhere in the state where districts have not been illegitimately malapportioned.

Here, the supplemental reports summarized above, the mapdrawers' own admission that they considered partisan advantage in drawing maps, and the undisputed fact that no traditional redistricting criteria can justify the malapportionment in challenged districts, presents more than enough evidence for a triable issue of fact. To hold otherwise would mean defendants could justify denying equal voting power to voters in specific districts by claiming it was not denied to other, different voters, in every comparable area of a plan.

*Second*, the Court's implicit requirement that plaintiffs prove a plan-wide, systematic policy of malapportionment to challenge specific districts is unsupported, and

indeed contradicted by case law—including the decisions cited in the Court's Order. As noted in *Raleigh Wake Citizens Association,* "neither court [in *Larios*] focused on the challenged redistricting plans as a whole[.]" 827 F. 3d 333, 343 (4th Cir. 2016); *see also id.* (noting the courts in *Larios* and *Harris* focused on whether "deviations of less than 10% reflected the predominance of illegitimate reapportionment factors." (internal citations and alterations omitted)). Nor did the *RWCA* court; it held only that "to succeed on the merits, plaintiffs in one person, one vote cases with population deviations below 10% must show by a preponderance of the evidence that improper considerations predominate in explaining the [challenged] deviations." 827 F.3d at 342. Likewise, nowhere in *City of Greensboro v. Guilford County Board of Elections* did the Court hold that plaintiffs must prove plan-wide, systematic harm as a matter of law. 251 F. Supp. 3d 935 (M.D.N.C. 2017). The mere fact that the plaintiffs there challenged every district in the plan at issue, and offered related proof, does not mean that narrower challenges to specific legislative districts, like the one here, must be supported with state-wide evidence.

The localized analysis performed in other one-person, one-vote cases further confirms that the Court erred in requiring plan-wide systematic harm here. For instance, in *Brown v. Thomson*, the Supreme Court observed that it was "not required to decide whether Wyoming's nondiscriminatory adherence to county boundaries justifies the population deviations that exist *throughout* Wyoming's representative districts" because the challengers "deliberatively have limited their challenge to the alleged dilution of their voting power resulting from the one representative given to Niobrara County." 462 U.S. 835, 846 (1983) (emphasis added). The appropriate analysis, the Court held, was whether

the purported policy of preserving county boundaries justified the deviations from population equality "resulting from the provision of representation to Niobrara County" specifically. *Id.* at 846–48.[6]

More recently, a three-judge panel in the Western District of Texas denied a motion to dismiss malapportionment claims for under-10% deviations that were "appropriately framed" to be "location-specific" to regions in Texas. *LULAC v. Abbott*, No. 3:21-CV-259-DCG-JES-JVB, 2023 U.S. Dist. LEXIS 104838, *19–24 (W.D. Tex. June 16, 2023). The court rejected an argument nearly identical to the reasons cited in the Order here—i.e., that those claims failed as a matter of law because other districts in other areas did not follow the same pattern of under- and over-population. *Id.* at *21–24.

In other words, malapportionment challenges "can be plan-wide, location-specific, or both," and "the geographic scope of a one person, one vote claim [] is whatever the plaintiff makes it." *Perez v. Abbott*, 250 F. Supp. 3d 123, 194 (W.D. Tex. 2017). Here, Plaintiffs have alleged unlawful malapportionment within specific county clusters, and thus requiring the proof of a state-wide, systemic harm was clear error.

*Third,* and as noted above, the unique nature of North Carolina redistricting's cluster-based approach renders the proper baseline for NAACP Plaintiffs' malapportionment claims to be the population deviation within each alleged county

---

[6]The Court in *Brown* ultimately found the challenged deviations justified "on the basis of Wyoming's longstanding and legitimate policy of preserving county boundaries," 462 U.S. at 846–48, which is not a viable defense here where challenged deviations exist within specific county groupings.

grouping (as alleged), not as systematic deviations across the plan as a whole (as Legislative Defendants have argued).

This is because, as noted by the Court in its Order, North Carolina utilizes a "county grouping" formula to reconcile the state constitutional provision requiring the minimization of county traversals with the federal law requirement of one person, one vote. Order at 16–17 (citing *Stephenson* line of cases). In practice, this means each *Stephenson*-compliant county cluster has a different ideal population number, applicable only to the districts in that cluster. That number is the total population of that grouping divided by the number of districts *Stephenson* designates for that grouping. *Stephenson* requires that the ideal population number for each grouping's districts be within plus or minus five percent of the ideal population number for that statewide plan as a whole.[7] For the Senate, the statewide ideal population is 208,788 people in a single district. *See* Doc. 82-16 at 2 (Senate Population Deviation Report noting "Ideal Pop"). For the House, the statewide ideal population is 86,995 people in a single district. *See* Doc. 82-17 at 2 (House Population Deviation Report noting "Ideal Pop."). Wherever a grouping of counties can be equally divided by a population number within five percent of that ideal statewide population, that grouping may be eligible for usage under *Stephenson*.[8]

---

[7] This number is calculated by dividing the total population of the state by the number of districts in the plan at issue (50 for State Senate, 120 for State House).

[8] Other *Stephenson* rules may dictate whether a hypothetical county grouping that complies with the numerical population requirements of *Stephenson* is actually available for use as a *Stephenson* county cluster. These include Voting Rights Act compliance (since *Stephenson* requires VRA districts be constructed before choosing clusters), whether a smaller grouping of counties is available (since *Stephenson* requires counties be grouped with as few counties as possible, in order to minimize the number of counties split by district lines), and whether counties are contiguous (since *Stephenson* requires county groupings to be formed of contiguous counties).

18

This system produces different ideal district population sizes for different county groupings across the state. *Compare* Ex. E at 66 (Fairfax Report) (New Hanover Senate Cluster ideal population is 206,509) *with id.* at 67 (Mecklenburg Senate Cluster ideal population is 217,029). While *Stephenson* produces notable population inequality between the groupings, the North Carolina policy of minimizing county splits is precisely the type of legitimate redistricting criteria that can justify population deviations of less than ten percent between districts—as *Stephenson* allows (and indeed, requires). *See Bartlett v. Strickland*, 556 U.S. 1, 6 (2009) (discussing the harmonization between North Carolina's Whole County provision and "the one-person one-vote principle of the Equal Protection Clause").

Importantly, the population deviations between districts in one cluster are entirely unaffected by the population deviations in another cluster; once *Stephenson* and Voting Rights Act-compliant groupings are selected for usage in a plan, districts only interact with the other districts within the same grouping. The mapdrawers' testimony confirmed this application of *Stephenson*, indicating that they began drawing by first uploading cluster configurations, Doc. 82-14 at 73:25–74:11, 457:9–17 (Hise), and drew within each cluster individually, without reference to the population figures in a different cluster. *See* Doc. 82-15 at 96:4–97:22 (Springhetti). *See also* Ex. D at 15:3–13 (Barber Supplemental Deposition) ("[T]he county clusters are hard boundaries. The districts do not cross over the county groupings.").

For purposes of NAACP Plaintiffs' malapportionment claims, this makes the relevant comparator for the population of a specific district the other districts *within the*

19

*same* cluster as that district. Comparing a specific district with other districts across the plan as a whole, i.e., districts in other clusters, is of limited utility given how the clusters are determined.

Plaintiffs challenge the deviations *within* certain clusters, arguing that there are deviations between districts within the same cluster (which, by virtue of being within the same county grouping, share the same ideal population number) that are not explained by any legitimate redistricting criteria and thus are unconstitutional. This has been Plaintiffs' argument from the outset of this case. *See* Complaint ¶ 257 ("While the county clusters required under *Stephenson I* to meet the North Carolina Constitution's Whole County Provision may justify some population deviation *between* county groupings, the Whole County Provision cannot justify unnecessarily large deviations between districts *within* the same *Stephenson*-defined cluster.") (emphases in original). In furtherance of Plaintiffs' claims, Mr. Fairfax analyzed the deviations within clusters, not between them. *See, e.g.,* Ex. E at 67 (Fairfax Report) (finding no legitimate redistricting criteria justification for a population deviation of 7.70% within the New Hanover Senate grouping); *id.* at 65, 66, 68 (finding no such justification for population deviations within other challenged groupings).

As described in detail above in Section I, the supplemental expert opinion by Dr. Barber shows that the only variable correlated with *statewide* population deviations is a given district's average *cluster* deviation, and thus confirms that the most relevant analysis (and therefore proof) of an individual district's population deviation must take place *within* that district's cluster.

Furthermore, if a redistricting plan possesses a legitimate redistricting criteria explanation for some of the deviations present within that plan, but there are still other deviations explicable only by illegitimate criteria, a plaintiff may still successfully challenge the illegitimate deviations within that plan as unconstitutional. Legislative Defendants' theory to the contrary, that plaintiffs must be able to attribute 100% of the deviation in a plan to illegitimate criteria, is specifically foreclosed by precedent. "This specific, deviation-focused inquiry differs markedly from . . . rational-basis review of whether a rational state policy could explain the redistricting generally." *Raleigh Wake Citizens Ass'n*, 827 F.3d at 342–43. As set forth above in Section I, the evidentiary record here (including newly-available supplemental expert opinions) creates at least a triable issue of fact as to whether specific deviations in districts within challenged clusters were caused by the illegitimate criteria of partisan advantage, and thus deny equal voting power to voters within those challenged districts in violation of the Fourteenth Amendment.

III. <u>It Would Be a Manifest Injustice to Deny Plaintiffs the Ability to Present Evidence at Trial on Counts 3 and 7.</u>

The new expert evidence, coupled with the evidence offered at summary judgment, shows there was no "honest and good faith effort" to construct legislative districts of equal population, *Reynolds*, 377 U.S. at 577, and creates a factual dispute over whether the illegitimate criteria of gaining partisan advantage caused the apparent deviations.[9] It would

---

[9] For the reasons explained in Plaintiffs' response, Doc. 82 at 23–26, partisan advantage may be permissible among considerations, but it does not supersede the requirements of one-person, one-vote and is not among the legitimate criteria serving a rational state interest that can justify denial of the fundamental right to equal voting power. *Accord Rucho v. Common Cause*, 588 U.S. 684, 700–01 (2019) ("[W]hile it is illegal for a jurisdiction to depart from the one-person, one-vote rule, . . . a jurisdiction may engage in constitutional political gerrymandering[.]") (citation and internal quotation marks omitted).

thus be a manifest injustice to deny Plaintiffs the opportunity to pursue their related claims at trial. Indeed, the Federal Rules dictate that factual disputes be reserved for the factfinder to afford due process of law. *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 721 F.3d 264, 290–91 (4th Cir. 2013). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *see also Redd v. N.Y. State Div. of Parole,* 678 F.3d 166, 174 (2d Cir. 2012) ("The court's role in deciding a motion for summary judgment is to identify factual issues, not to resolve them." (emphasis and internal quotation marks omitted)); *PHP Healthcare Corp. v. EMSA Ltd. P'ship,* 14 F.3d 941, 944 n. 3 (4th Cir. 1993) ("By definition, no findings of material facts that were in genuine issue are possible in granting summary judgment." (internal quotation marks omitted)).

## CONCLUSIONS

For the reasons set forth above, Plaintiffs respectfully request the Court reconsider and reverse its dismissal on partial summary judgment of their malapportionment claims in Counts 3 and 7 of the NAACP Complaint based upon new evidence available and/or clear error in the court's prior order and/or to avoid a manifest injustice in preventing Plaintiffs from presenting evidence on these claims at trial.

Additionally, Plaintiffs respectfully request that if this motion still remains under consideration by the Court before trial, that the Court allow a proffer of evidence on Counts 3 and 7 at trial to allow for an orderly disposition of the matter.

Dated: April 21, 2025
Corrected: April 22, 2025

Respectfully submitted,

*/s/ Christopher Shenton*

Christopher Shenton

**HOGAN LOVELLS US LLP**

J. Tom Boer*
Olivia Molodanof*
Madeleine Bech*
4 Embarcadero Center, Suite 3500
San Francisco, CA 94111
Telephone: 415-374-2300
Facsimile: 415-374-2499
tom.boer@hoganlovells.com
olivia.molodanof@hoganlovells.com

Jessica L. Ellsworth*
Misty Howell*
Odunayo Durojaye*
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: 202-637-5600
Facsimile: 202-637-5910
jessica.ellsworth@hoganlovells.com

Harmony Gbe*
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: 310-785-4600
Facsimile: 310-785-4601
harmony.gbe@hoganlovells.com

*Appearing in this matter by Special
Appearance pursuant to L-R 83.1(d)

**SOUTHERN COALITION FOR
SOCIAL JUSTICE**

Jeffrey Loperfido (State Bar #52939)
Hilary Harris Klein (State Bar #53711)
Christopher Shenton (State Bar #60442)
Mitchell D. Brown (State Bar #56122)
Lily Talerman (State Bar #61131)
5517 Durham Chapel Hill Blvd.
Durham, NC 27707
Telephone: 919-794-4213
Facsimile: 919-908-1525
hilaryhklein@scsj.org
jeffloperfido@scsj.org
chrisshenton@scsj.org
mitchellbrown@scsj.org
lily@scsj.org

23

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.3(d), I hereby certify that this brief contains 5,849 words

as counted by the word count feature of Microsoft Word.

/s/ *Christopher Shenton*
Christopher Shenton

2

**CERTIFICATE OF SERVICE**

I certify that on April 22, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ *Christopher Shenton*
Christopher Shenton
