# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| SHAUNA WILLIAMS; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 23-CV-1057 |
| REPRESENTATIVE DESTIN HALL, in his official capacity as Chair of the House Standing Committee on Redistricting; *et al.*, | |
| *Defendants.* | |
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 23-CV-1104 |
| PHILIP BERGER, in his official capacity as the President Pro Tempore of the North Carolina Senate; *et al.*, | |
| *Defendants.* | |

**LEGISLATIVE DEFENDANTS' RESPONSE IN OPPOSITION TO *NAACP* PLAINTIFFS' MOTION TO RECONSIDER IN PART THE COURT'S ORDER ON PARTIAL SUMMARY JUDGMENT**

## PROCEDURAL BACKGROUND AND STATEMENT OF FACTS

The NAACP Plaintiffs misstate virtually everything relevant to their motion for reconsideration. At issue are their malapportionment claims (Counts 3 and 7 of the first Complaint [D.E.1]), which challenge the minor population variances in the North Carolina House and Senate plans. While the NAACP Plaintiffs contend that partisan motive drove a few of the deviations, they cannot account for the simple fact that—both statewide and in the groupings they selected for challenge—Republican-leaning districts are overpopulated and Democratic-leaning districts are underpopulated. The evidentiary record is even clearer on that dispositive point today than it was when this Court issued summary judgment on the malapportionment claims.

Rather than justify the exceptional step of reconsideration, the NAACP Plaintiffs claim to have been denied the opportunity to advocate against a statewide reapportionment standard in prior briefing. That is both false and irrelevant. An argument against a "statewide" standard appears prominently in a well-marked section of the NAACP Plaintiffs' summary judgment opposition, so their claim of prejudice is difficult to take seriously. And the Court's summary judgment ruling [D.E.98 (the "Order")] did not, and had no need to, address the proper geographic scope of inquiry because the NAACP Plaintiffs have no evidence of systematic and deliberate population equality *at the grouping level*.

The NAACP Plaintiffs *still* have no evidence to that effect. The NAACP Plaintiffs mischaracterize the supplemental expert report of Dr. Michael Barber, which was prepared and served on March 17, 2025, before the Court issued its summary judgment ruling on

April 8, 2025.[1] In planning for the contingency of trial, Dr. Barber presented dispositive evidence from the 2024 general election against the malapportionment claims, vividly demonstrating that there is no systematic population inequality on a partisan basis (or any basis) within the groupings the NAACP Plaintiffs challenge or at the statewide level. Put bluntly, Dr. Barber confirmed what this Court understood to be the case—there was no systematic effort to favor Republican-leaning districts and disfavor Democratic-leaning districts with the tool of underpopulation and overpopulation. In claiming the record shows partisan motive behind district configurations, the NAACP Plaintiffs assert a non-justiciable partisan-gerrymandering claim, not a malapportionment claim.

This Court, if anything, should confirm that the record as it stands today bolsters the Order's malapportionment analysis. Because the high reconsideration standard is not even close to satisfied, the Court should promptly deny the NAACP Plaintiffs' motion for reconsideration.

## ARGUMENT

The NAACP Plaintiffs' motion proves why reconsideration motions are "disfavored." *Smith v. City of Greensboro*, No. 1:19-cv-386, 2021 WL 5772309, at *4 (M.D.N.C. Oct. 18, 2021) (citation omitted), *R. & R. adopted*, 2021 WL 5771544 (M.D.N.C. Dec. 6, 2021). "[W]here litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." *U.S.*

---

[1] Dr. Barber's supplemental deposition in this case was on April 11, 2025. During the deposition, counsel for Legislative Defendants lodged a standing objection to questions relating to the dismissed *Larios* claims. [Supplemental Deposition of Dr. Michael Barber ("Barber Supp. Dep."), excerpts attached as Ex. A, at 16:7-20].

*Tobacco Coop. Inc. v. Big S. Wholesale of Va., LLC*, 899 F.3d 236, 257 (4th Cir. 2018) (citation omitted). Accordingly, "courts have cabined revision pursuant to Rule 54(b) by treating interlocutory rulings as law of the case." *Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017). Reconsideration is an abuse of discretion except in the narrow instance where: (1) "evidence discovered during litigation" is "substantially different" from that available as of the challenged ruling, (2) there is "a change in applicable law," and (3) the prior ruling exhibited "clear error causing manifest injustice." *U.S. Tobacco*, 899 F.3d at 257 (quoting *Carlson*, 856 F.3d at 325).

Here, the NAACP Plaintiffs' malapportionment claims were carefully considered by three federal judges after a lengthy briefing schedule that afforded the NAACP Plaintiffs more than 30 days to respond to Legislative Defendants' motion for partial summary judgment. [*See* D.E.82 at 27]. Finding that insufficient, the NAACP Plaintiffs filed a surreply. [*See* D.E.88]. But they waited until after this Court ruled to announce that the issues were not adequately briefed—which is demonstrably inaccurate—and that Legislative Defendants' expert had somehow proven the claims that the NAACP Plaintiffs' own expert had failed to prove—which is also demonstrably inaccurate. Regardless, even if the Court were to reconsider its Order, trial would be improper because of legal impediments to the malapportionment claims that the Court had no need to address in its Order.

## I.    Reconsideration Is Not Warranted Concerning the Governing Standard

The NAACP Plaintiffs challenge the legal standard the Court applied to their malapportionment claims, claiming "clear error causing manifest injustice." *U.S. Tobacco*,

3

899 F.3d at 257 (citation omitted); [D.E.102 ("Mot.") at 14-21]. But a prior decision does not qualify for this element "by being just maybe or probably wrong; it must strike [the Court] as wrong with the force of a five-week-old, unrefrigerated dead fish. It must be dead wrong." *U.S. Tobacco*, 899 F.3d at 258 (citation omitted). The NAACP Plaintiffs neither acknowledge nor satisfy this arduous test. That alone dooms their motion.

Rather than argue to the governing law, the NAACP Plaintiffs contend that the Court required proof of "plan-wide systematic malapportionment," that this standard "was not directly advocated by Defendants in their initial Motion," and that this omission left the Court without "the benefit of full briefing" to the NAACP Plaintiffs' disadvantage. [Mot. 14; *see also id.* at 4 ("the Court also made legal conclusions … that were not fully briefed … because they were not specifically asserted by Defendants")]. That misstatement is easily disproven. The NAACP Plaintiffs' opposition brief expressly criticized Legislative Defendants' opening memorandum for making a "statewide argument [that] misapprehends the constitutional injury in a malapportionment claim," [D.E.82 at 18], and fulsomely briefed the position that they may "*Appropriately Allege Deviations Within County Clusters*," [*id.* at 16; *see id.* at 16-18].

Citing *Gill v. Whitford*, 585 U.S. 48 (2018), the NAACP Plaintiffs' opposition argued that "malapportionment rests on a 'doctrine of individualized, district-specific harm.'" [D.E.82 at 18]. That same argument is their "*First*" basis for reconsideration now—again citing *Gill*. [*See* Mot. 15]. The opposition also justified a grouping-based approach on the ground that, in North Carolina, "map-drawers create district lines *within* each grouping," [D.E.82 at 17], which is another prominent argument on reconsideration.

4

[*See* Mot. 17]. It is more than puzzling then that the NAACP Plaintiffs pretend not to have had the opportunity to brief issues that appear plainly in their briefing.

The NAACP Plaintiffs also misdescribe the Court's summary judgment ruling, which prudently decided only what was necessary to resolve the malapportionment claims. There was no need for the ruling to dictate a "plan-wide" analysis, [Mot. 14], because the NAACP Plaintiffs have no evidence on *any* geographic basis of "the predominance of illegitimate reapportionment factors," *Harris v. Ariz. Indep. Redistricting Comm'n*, 578 U.S. 253, 259 (2016); [*see* Order 22-29; D.E.79 at 18-19 (demonstrating no basis for trial on the "groupings the NAACP Plaintiffs hand-picked")]. While the Court correctly observed that the NAACP Plaintiffs cannot prove a statewide "pattern of partisan advantage," it did not stop there. [Order 25]. It also examined the report of Anthony Fairfax and found it insufficient, not because of its localized analysis, but because it "offers no opinion about what districting factors predominated" in any county groupings and instead proposes "alternative districts with lesser deviations," which "does not demonstrate that the current deviations resulted from the predominance of impermissible partisanship." [*Id.* at 25-27]. The Court then considered testimony of individuals involved in the redistricting, noting their grouping-specific testimony, and found it insufficient because it shows merely that "some amount of politics" drove line-drawing. [*Id.* at 28-29]. No broad holding concerning the geographical scope of inquiry was necessary because no evidence shows that—at a grouping level—this is among the "unusual cases" where "attacks on deviations under 10% [could] succeed." *Harris*, 578 U.S. 259.

5

In this respect, the NAACP Plaintiffs continue to err, not concerning the geographic scope of inquiry, but rather concerning how any districts with such minor deviations might be deemed malapportioned. The Court correctly observed that such challenges have succeeded only "on proof of a deliberate and systematic policy of overpopulating a disfavored class of districts and underpopulating a favored class of districts." [Order 22]. That statement is true for any claim, whether framed in statewide or local terms, where the maximum deviation is below 10%. Assuming for argument's sake that the geographic analysis "'is whatever the plaintiff makes it,'" [Mot. 17 (quoting *Perez v. Abbott*, 250 F. Supp. 3d 123, 194 (W.D. Tex. 2017))], liability nonetheless depends on proof of "favored" districts that are purposefully underpopulated and "disfavored" districts that are purposefully overpopulated. *Perez*, 250 F. Supp. 3d at 203. In *Perez*, for instance, disfavored districts in certain Texas counties were "significantly more Hispanic in population" and "significantly more overpopulated," as compared to favored districts that were "significantly more Anglo" and "underpopulated." *Id.* at 209. The "underpopulation" and "overpopulation" "was intentional." *Id.* at 210; *see also LULAC v. Abbott*, No. 3:21-cv-259, 2023 WL 4055392, at *8 (W.D. Tex. June 16, 2023) (denying motion to dismiss based on allegations of "systematic over-population of districts in El Paso with Latino voters and systematic under-population of Anglo voting districts in the Texas Panhandle").[2]

---

[2] The NAACP Plaintiffs could have cited these authorities from 2017 and 2023, respectively, in their January 2025 summary judgment opposition, but did not. [*See* D.E.82 at 16-23].

Here, no theory of favored, underpopulated districts and disfavored, overpopulated districts is available to the NAACP Plaintiffs, even at the grouping level. The county groupings they challenge contain overpopulated Republican-leaning districts and underpopulated Democratic-leaning districts. [*See infra* § II.A]. Moreover, "statewide *evidence*" is probative even for district-specific redistricting claims, *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 263 (2015), so the many underpopulated Democratic-leaning districts and overpopulated Republican-leaning districts statewide leave the NAACP Plaintiffs to account for the fact that "[t]he same legislature that configured the districts they challenge also created districts favoring the opposing political party." [Order 28]. Without evidence of purposeful underpopulation and overpopulation, the NAACP Plaintiffs rested on the assertion that "deviations in [each] grouping are not justified by any legitimate criteria." [D.E.82 at 20]. The Court had no choice but to reject that position. [Order 20, 26-27]; *see Harris*, 578 U.S. at 259 ("we have refused to require States to justify deviations" below 10%).

The NAACP Plaintiffs implicitly propose that partisan redistricting goals can support a malapportionment claim even if the legislature did not "intentionally" underpopulate and overpopulate districts along partisan lines. *Perez*, 250 F. Supp. at 210. That is not a *Larios*-type malapportionment claim at all but a partisan-gerrymandering claim that, if recognized, would demand that federal courts determine "when partisan activity goes too far." *Rucho v. Common Cause*, 588 U.S. 684, 714 (2019). Even if courts may properly adjudicate a claim that a legislature purposefully "under-populated Republican-leaning districts and over-populated Democratic-leaning districts," or vice

7

versa, *Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333, 347 (4th Cir. 2016), to extend the *Larios* malapportionment theory beyond that scenario would leave it "no legal standards … that are clear, manageable, and politically neutral." *Rucho*, 588 U.S. at 707. The Supreme Court has held that *Larios* provides no "clear guidance" in the absence of evidence "that the legislature intentionally sought to manipulate population variances." *LULAC v. Perry*, 548 U.S. 399, 422-23 (2006).

Stated differently, the one-person, one-vote doctrine is not offended by redistricting "to maximize Republican [or Democratic] partisan advantage," [Mot. 9], but rather by the fundamentally different harms of "[o]verweighting and overvaluation of the votes of those living here … and undervaluation of the votes of those living there," resulting in "discrimination against those individual voters living in disfavored areas." *Reynolds v. Sims*, 377 U.S. 533, 563 (1964). Where deviations from perfect equality are minor, those harms can be shown—if ever—only where the deviations themselves are rigged through the tool of "systematically underpopulating [favored] districts and overpopulating [disfavored] ones." *Larios v. Cox*, 300 F. Supp. 2d 1320, 1346 (N.D. Ga.), *aff'd sub nom.*, *Cox v. Larios*, 542 U.S. 947 (2004). Because the NAACP Plaintiffs cannot show this—at any geographic level—their reconsideration motion is meritless. The Court need decide no more than that.

## II.   Reconsideration Is Not Warranted Concerning Dr. Barber's Supplemental Report

The NAACP Plaintiffs also contend that the supplemental report of Legislative Defendants' expert, Dr. Barber, provides "substantially different evidence" meriting

8

reconsideration. *U.S. Tobacco*, 899 F.3d at 257 (citation omitted); [*see* Mot. 7-14]. The suggestion that Legislative Defendants effectively made the NAACP Plaintiffs' case for them in a supplemental report on the 2024 elections is not just improbable — it's wrong. The NAACP Plaintiffs ignore Dr. Barber's indisputable proof *defeating* a *Larios*-style claim at the county-grouping level, mischaracterize his opinions, and persist in legal error.

A. **Dr. Barber Confirms There Is No Triable Fact Question at the County Grouping Level**

The NAACP Plaintiffs loudly endorse the malapportionment analysis of Dr. Barber's supplemental report and do not in any respect dispute its analyses or conclusions. That being so, they must accept his irrefutable conclusion *against* any argument that the Republican-controlled North Carolina General Assembly purposefully underpopulated Republican-leaning districts and overpopulated Democratic-leaning districts, even at the grouping level.

The NAACP Plaintiffs inexplicably fail to disclose Dr. Barber's opinion "that the apportionment in each of the clusters is not systematically associated with one party or the other." [D.E.101-2 at 36]. For example, the NAACP Plaintiffs challenge the deviations in the Iredell-Mecklenburg Senate grouping, where the only district electing a Republican in 2024 was the most *overpopulated* district:

9



Figure 9: Apportionment in Iredell-Mecklenburg County Senate Districts and Incumbent Party in Each District

[*Id.* at 38]. This showing refutes any assertion that the General Assembly "under-populated Republican-leaning districts and over-populated Democratic-leaning districts." *Raleigh Wake*, 827 F.3d at 347. So too does Dr. Barber's analysis of the Wake County House grouping, where the most overpopulated district elected a Republican and seven of eight underpopulated districts elected Democrats:



Figure 7: Apportionment in Wake County House Districts and Incumbent Party in Each District

[D.E.101-2 at 36]. Meanwhile, no pattern of party-based overpopulation and underpopulation could be discerned in the Brunswick-New Hanover Senate grouping, where Republicans won both districts:



Figure 10: Apportionment in Brunswick-New Hanover County Senate Districts and Incumbent Party in Each District

[*Id.* at 39]. And the story is the same in the Forsyth-Stokes House grouping, where a Republican-controlled legislature with a partisan policy of systematic inequality would not have left HD72 underpopulated and HD75 overpopulated:

11



Figure 8: Apportionment in Forsyth-Stokes County House Districts and Incumbent Party in Each District

[*Id.* at 37].

In four charts, Dr. Barber confirms the relationship between population deviations and partisan composition is random even within the collection of county groupings the NAACP Plaintiffs selected for their claim. Sometimes the Republican-leaning district in a grouping is overpopulated, as in Figure 9, and sometimes the Republican-leaning districts are both underpopulated and overpopulated, as in Figures 7, 8, and 10. This uncontroverted showing overrides the NAACP Plaintiffs' unsupported, footnote allegation that they "have shown systemic malapportionment for partisan advantage within clusters." [Mot. 14 n.5].

The NAACP Plaintiffs' expert, Mr. Fairfax, does not dispute Dr. Barber's grouping-specific showing. His supplemental rebuttal report opined merely that Dr. Barber's showings "do not alter [Mr. Fairfax's] conclusion that the deviations [he] observed are not justified by any traditional redistricting criteria." [D.E.101-4 at 2]. That opinion creates no material fact dispute where binding precedent has "refused to require States to justify deviations" below 10%. *Harris*, 578 U.S. at 259. Summary judgment was entirely proper—

12

indeed, mandated—given "that there is an absence of evidence to support the nonmoving party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), under "the substantive law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), even if that law looks solely to individual county groupings.

**B.    Plaintiffs Mischaracterize Some of Dr. Barber's Opinions and Misconstrue the Legal Import of Others**

Rather than address the opinions and analyses Dr. Barber actually offered, the NAACP Plaintiffs cherry-pick and mischaracterize his report—in the first instance by ignoring Dr. Barber's opinion that the deviations bear no systematic pattern. The NAACP Plaintiffs inaccurately ascribe to Dr. Barber opinions he never offered and rest on legally insufficient inferences from his report. Their arguments are without foundation.

1.    The NAACP Plaintiffs misread Dr. Barber's opinions by stating that he "reports that the best examination of an individual district's population deviation is made at the county cluster level, rather than on a statewide basis." [Mot. 3; *see also id.* at 7, 12-14]. Dr. Barber never offered this opinion, and the NAACP Plaintiffs' assertion stands in troubling contradiction to the source material.

The NAACP Plaintiffs first cite an observation in Dr. Barber's supplemental report "that districts that are drawn from county clusters that start out over (or under) populated are much more likely to themselves also be over (or under) populated." [D.E.101-2 at 41; Mot. 12]. But that sentence explained a finding in Dr. Barber's *statewide* analysis showing that the only variable of statistical significance in predicting population deviations is the county-grouping variable, not a district's partisan composition. [D.E.101-2 at 41]. It is

13

downright baffling for the NAACP Plaintiffs to read Dr. Barber's finding to "report[] that the best examination … is made at the county cluster level, rather than on a statewide basis," [Mot. 3], when that finding was itself part of a statewide analysis. Dr. Barber did not somehow condemn his own statewide approach, but rather confirmed that the General Assembly's goal of compliance with the county-grouping rule is the predominant factor explaining the deviations. [*See infra* § III.B].

The NAACP Plaintiffs next allege that "Dr. Barber's own deposition testimony confirms [an] understanding" favoring an "apples-to-apples comparison between districts of the same grouping, rather than comparing … districts … statewide." [Mot. 13]. This again is wrong. The cited deposition exchange provides:

```
19      Q.    Got it.  In order to understand the
20   significance of those within cluster deviations,
21   would you want to compare those deviations to
22   other districts within that cluster or districts
23   in other clusters?
24      A.    I think you could do both.  You could
25   learn something from both of those.
```

[Barber Supp. Dep., Ex. A, at 15:19-25]. For starters, because the NAACP Plaintiffs' counsel asked what comparison would be proper "to understand the significance of those [deviations] within cluster[s]," the exchange provided no occasion for Dr. Barber to address what comparison would be proper to understand something else—such as whether the General Assembly purposefully underpopulated and overpopulated classes of districts. [*See id.*]. Moreover, Dr. Barber testified that "both" a statewide and grouping analysis would be

14

proper, [*id.*], which is hardly to *reject* a statewide analysis. Indeed, it is facially apparent that Dr. Barber found both a statewide and grouping-based analysis proper, since he conducted both, and both point in the same direction—"that the apportionment … is not systematically associated with one party or the other." [D.E.101-2 at 36].

2. The NAACP Plaintiffs also note Dr. Barber's comparison of the enacted plans and the plans produced in Mr. Fairfax's first rebuttal report and Dr. Barber's finding that "these alternative district alignments universally reduce the Republican lean of swing districts throughout the state." [D.E.101-2 at 32; *see* Mot. 7-11]. Dr. Barber concluded based on 2024 election results that Mr. Fairfax had fashioned plans that "appear to universally benefit the Democratic Party in districts that will likely be competitive in future elections," [D.E.101-2 at 32], which would be a reason to doubt their purported status "as a neutral baseline" in the event of trial in this case, *cf. Rucho*, 588 U.S. at 715. Simply put, Mr. Fairfax's plans did not show that politically-neutral plans might have lower population deviations; they showed only that districts could be gerrymandered to favor Democratic electoral interests (which is no surprise and is irrelevant to any legal claim).[3]

The NAACP Plaintiffs argue that their malapportionment claim could stand on evidence "that even the small shifts made by Mr. Fairfax significantly deteriorate the Republican partisan performance of each cluster." [Mot. 8]. But that does not establish a

---

[3] Recall that Dr. Barber's supplemental report was prepared and served approximately three weeks before the Court's summary judgment ruling, when it was necessary to prepare for the contingency of trial on the malapportionment claims. Legislative Defendants do not, and need not, contend that this analysis justifies summary judgment, which is amply justified on the grounds the Court identified previously.

15

basis for a judgment in the NAACP Plaintiffs' favor under "the substantive law," *Anderson*, 477 U.S. at 248, which demands "proof of a deliberate and systematic policy of overpopulating a disfavored class of districts and underpopulating a favored class of districts." [Order 22; *see supra* § I]. Evidence that districts favor Republican electoral interests—without purposefully underpopulating Republican-leaning districts—at the expense of Democratic interests—without purposefully overpopulating Democratic-leaning districts—is "of insufficient caliber or quantity" to support a malapportionment claim here. *Anderson*, 477 U.S. at 254.

In any event, the NAACP Plaintiffs again misstate the record, citing Dr. Barber's deposition to claim that, beyond Mr. Fairfax's illustrative plans, Dr. Barber "confirmed that moving virtually *any* VTD into or out of the challenged districts would either harm the Republican partisan performance in that cluster or cause a district's population deviation to exceed +/-5%." [Mot. 8]. That is not a fair representation of the deposition transcript or Dr. Barber's opinions and does not rest on admissible evidence.

In the exchange the NAACP Plaintiffs cite, Dr. Barber was asked to speculate about the partisan and population effects of swapping voting districts (called "VTDs") between districts based on maps the NAACP Plaintiffs' counsel created on a publicly available website called "Dave's Redistricting." [Barber Supp. Dep., Ex. A, at 27:6-28:22]. Dr. Barber objected that the maps, which color-coded VTDs based on partisan metrics, failed to disclose "which group of elections we might be looking at," information he needed to analyze partisan performance. [*Id.* at 28:11-19; *see also id.* at 36:22-37:12, 40:1-6 (similar)]. The exhibits also omitted the population of VTDs, which Dr. Barber needed to

16

assess if a VTD could be swapped between districts. [*See, e.g.*, *id.* at 40:13-18, 44:7-19]. The NAACP Plaintiffs' counsel failed to supply the information Dr. Barber needed to offer accurate answers, compelling him to instead "kind of accept whatever elections [counsel was] using in this [map]." [*Id.* at 28:23-25]. The entire line of questioning is based on speculation, undisclosed assumptions, and inadmissible evidence, and none of the testimony adduced creates a genuine issue of fact for trial. *See, e.g.*, *Stephens v. Union Pac. R.R.,* 935 F.3d 852, 856-57 (9th Cir. 2019) ("A party's own speculation is insufficient to create a genuine issue of material fact, … and a party cannot make it sufficient simply by finding an expert who is willing to assume its correctness.") (internal citation omitted); *Owens v. Ford Motor Co.*, 297 F. Supp. 2d 1099, 1107 (S.D. Ind. 2003) (expert analysis that assumes "the very thing he was to prove" not admissible for summary-judgment purposes).

Moreover, Dr. Barber did not "confirm[]" that VTD swaps would always harm Republican performance, [Mot. 8], but rather testified that "I'm not sure" and "I really couldn't be certain" as to whether precinct swaps would "weaken the Republican partisan performance of" certain districts. [Barber Supp. Dep., Ex. A, at 37:2-13; *see also, e.g.*, *id.* at 44:2-23 (answering "I don't know if that is the case or not" as to whether precinct swaps would reduce Republican performance of HD75); *id.* at 28:25-29:12 (even accepting counsel's assumptions, two of "six or seven perhaps precincts" in SD8 did not fit the pattern)]. This muddled testimony in a fundamentally flawed line of questioning creates no material fact dispute.

## III. Reconsideration Would Require The Court To Address Broader Issues

Everything said so far provides ample reason for the Court to deny the NAACP Plaintiffs' reconsideration motion. If the Court somehow found reconsideration proper, and in some way discerned a basis for trial under the legal standard of its narrow ruling, it would still need to address a broader set of reasons why the NAACP Plaintiffs' claims fail as a matter of law. These points were preserved in prior briefing, but Legislative Defendants restate them here out of an abundance of caution.

A.    The Court correctly determined that it "need not resolve [the] tension" between the NAACP Plaintiffs' view that partisan motive is illegitimate and the Supreme Court's rejection of partisan gerrymandering claims in *Rucho*. [Order 22]. Because no evidence even hints that the General Assembly underpopulated and overpopulated districts along partisan lines, the malapportionment claims fail even if partisan motive is illegitimate. But if the Court were to reverse course, it would be obligated to address this question before directing a trial on the malapportionment claims. Legislative Defendants have explained that the NAACP Plaintiffs' claim is non-justiciable in all events, and they stand on that briefing. [*See* D.E.79 at 27-28; D.E.86 at 10-12]; *see Cox,* 542 U.S. at 952 (Scalia, J., dissenting) ("The problem with [the *Larios*] analysis is that it assumes 'politics as usual' is not *itself* a 'traditional' redistricting criterion.")

B.    Legislative Defendants have also explained that no record evidence establishes that political motive—assuming it is illegitimate—predominated over county lines and the *Stephenson* criteria. [D.E.79 at 15-17; D.E.86 at 8]. The NAACP Plaintiffs unwittingly support Legislative Defendants' position by explaining that "each *Stephenson*-

18

compliant county cluster has a different ideal population number," that "*Stephenson* produces notable population inequality between the groupings," and that "the North Carolina policy of minimizing county splits is precisely the type of legitimate redistricting criteria that can justify population deviations of less than ten percent between districts." [Mot. 18-19].

These observations confirm that a malapportionment claim could succeed only on proof that politics had a greater impact on deviations than county boundaries. For example, SD37—shown above [*supra* § II.A]—stands at 4.99% above the population ideal, on the cusp of the upper 5% boundary. [D.E.101-2 at 38]. The NAACP Plaintiffs ask the Court to infer political predominance (even though SD37 is a Republican-leaning district), but no competent record evidence shows that a political goal drove the deviation to a greater degree than the *Stephenson* formula. For all anyone can tell, 4% of the deviation is explained by the county-grouping rules, and partisan motive accounts for only the remaining 0.99%.[4] Indeed, as discussed [*supra* § II.B], Dr. Barber finds—in a report the NAACP Plaintiffs fulsomely support—that the grouping deviation, and not politics, is the only statistically significant predictor of a district's population deviation. [D.E.101-2 at 41].

When the NAACP Plaintiffs urge the Court to consider each district only in relation to "the other districts *within the same* cluster as that district," [Mot. 19-20], they are asking

---

[4] Mr. Fairfax's illustrative plans do not provide competent evidence for the reasons the Court previously found, [Order 26-27 & n.8], but even if they did, he also configures SD37 with a 4.99% deviation. [D.E.101-3 at A-13].

for an analysis that improperly ignores North Carolina's restrictive county-grouping and traversal rules. Even if a district was driven to a 4% deviation by a goal of satisfying *Stephenson*, and moved to a 4.1% deviation for partisan reasons, the NAACP Plaintiffs' approach would cancel out the *Stephenson* goal and attribute the entire 4.1% deviation to a partisan goal. But where a plaintiff must show "the predominance of illegitimate factors" over "legitimate considerations" like "maintaining the integrity of political subdivisions," *Harris*, 578 U.S. at 258-59 (citation omitted), a properly fashioned test must actually consider the legitimate factors, not zero them out.

The NAACP Plaintiffs' contention that "districts only interact with the other districts within the same grouping," [Mot. 19], overlooks that districts in different groupings begin with different baselines because the groupings themselves start out as overpopulated or underpopulated. In this crucial respect, districts in different groupings *are* related because all groupings are inextricably related. Only by accounting for this factor, and proving that politics predominated over the grouping rules, could a malapportionment claim succeed. This one cannot.

C.      Reconsideration would also require the Court to address what the NAACP Plaintiffs refer to as Legislative Defendants' "statewide argument." [D.E.82 at 18; *see also* D.E.79 at 20-26]. The NAACP Plaintiffs' advocacy for a grouping-based argument misses that the deviations standard compelled in precedent looks to a statewide "maximum population deviation," *Harris*, 578 U.S. at 259, measured by the difference between the two districts in the State with, respectively, the highest and lowest populations. *See Daly v. Hunt*, 93 F.3d 1212, 1215 n.2 (4th Cir. 1996). The law does not view each grouping as

20

having its own ideal population and its own deviation, and thus cannot be construed to view "districts only [by] interact[ion] with the other districts within the same grouping." [Mot. 19]. Instead, as explained, the deviations are measured by a statewide ideal, and the departure caused by the *Stephenson* rules must be (within the presumption of good faith) deemed the consequence of legitimated criteria.

The NAACP Plaintiffs also ignore the critical connection across districts that were drawn by "[t]he same legislature." [Order 28]. Where a court is tasked with inferring motive from circumstantial evidence, a "pattern" of activity must be sufficiently robust as to be "unexplainable on grounds other than race." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). If a motorist claimed to have been ticketed based on race, it would matter if the same police officer (or police department) had ticketed members of the motorist's race almost exclusively or only a small percentage of the time—even though each motorist is ticketed independently of the others. So too here: a sample size must be sufficiently large from which a pattern can display motive, and no grouping is large enough for that. Only a statewide showing, or something of similar breadth, would work. The NAACP Plaintiffs cannot gerrymander their own gerrymandering claim.

The NAACP Plaintiffs erroneously point to the doctrine of standing the Court described and applied in its Order. [Mot. 15]. But the same Order answers this objection by explaining the difference between "a ruling on the merits" and "the threshold standing inquiry." [Order 15]. While each voter experiences injury-in-fact in the voter's own district, there is no claim against the district on the merits unless it is malapportioned, which requires a comparative analysis based on the weight of "the votes of persons in another

21

area."[5] *Reynolds*, 377 U.S. at 562. Indeed, the NAACP Plaintiffs' argument proves too much. *Gill* confines the standing inquiry to the plaintiff's "own district," 585 U.S. at 66, but the NAACP Plaintiffs advocate a grouping-based analysis. *Gill* does not support that position.

## CONCLUSION

The NAACP Plaintiffs' motion for partial reconsideration is meritless and should be denied.

Respectfully submitted, this the 12th day of May, 2025.

**BAKER & HOSTETLER LLP**

By: /s/ Katherine L. McKnight
Richard B. Raile*
DC Bar No. 1015689
Katherine L. McKnight*
DC Bar No. 994456
Trevor Stanley*
DC Bar No. 991207
1050 Connecticut Ave. NW
Suite 1100
Washington DC 20036
Ph: (202) 861-1500
rraile@bakerlaw.com
kmcknight@bakerlaw.com
tstanley@bakerlaw.com

Patrick T. Lewis*
Ohio State Bar No. 0078314

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By: /s/ Phillip J. Strach
Phillip J. Strach
North Carolina State Bar No. 29456
Alyssa M. Riggins
North Carolina State Bar No. 52366
Cassie A. Holt
North Carolina State Bar No. 56505
Jordan A. Koonts
North Carolina State Bar No. 59363
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina 27603
Ph: (919) 329-3800
phil.strach@nelsonmullins.com
alyssa.riggins@nelsonmullins.com
cassie.holt@nelsonmullins.com
jordan.koonts@nelsonmullins.com

---

[5] *Brown v. Thomson*, 462 U.S. 835 (1983), indicates that a malapportionment claim may fail where the plaintiff focuses it too narrowly, not that a plaintiff may prevail with artificially narrow focus. *See id.* at 846-47. It cannot be seriously contended, for example, that a plaintiff alleged to reside in a district of 500,000 residents would have a claim without evidence concerning the plan as a whole—or how would anyone know if the plaintiff's district was even underpopulated?

22

Key Tower
127 Public Square, Suite 2000          *Attorneys for Legislative Defendants*
Cleveland, Ohio 44114
Ph: (216) 621-0200
plewis@bakerlaw.com

Erika D. Prouty*
Ohio State Bar No. 0095821
Rebecca Schrote*
Ohio State Bar No. 0101051
200 Civic Center Drive, Suite 1200
Columbus, Ohio 43215
Ph: (614) 462-4710
eprouty@bakerlaw.com
rschrote@bakerlaw.com


*Appeared via Special Notice*

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.3(d), I, Phillip J. Strach, hereby certify that the foregoing brief includes 5,135 words as indicated by Microsoft Word, excluding the caption, signature lines, certificate of service, and cover page.

This the 12th day of May, 2025.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

/s/ Phillip J. Strach

Phillip J. Strach

N.C. State Bar No. 29456
