# EXHIBIT A

```
 1            IN THE UNITED STATES DISTRICT COURT

 2              MIDDLE DISTRICT OF NORTH CAROLINA

 3   -------------------------------X

 4   SHAUNA WILLIAMS, et al.,       :
                    Plaintiffs     : Civil Action No.
 5            V                     : 23 CV 1057

 6   REPRESENTATIVE DESTIN HALL,    :
     In his official capacity as
 7   Chair of the House Standing    :
     Committee on Redistricting,
 8   et al.,                        :
                    Defendants
 9   -------------------------------X

10   NORTH CAROLINA STATE CONFERENCE:
     OF THE NAACP, et al.,
11                  Plaintiffs      : Civil Action No.
              V                       23 CV 1104
12   PHILIP BERGER, in his official
     Capacity as the President      :
13   Pro Tempore of the North Carolina
     Senate, et al.,                :
14   -------------------------------X

15             Deposition of MICHAEL BARBER, Ph.D.

16                   Conducted virtually

17                 Friday, April 11, 2025

18                      10:05 a.m.

19

20

21

22

23   Job No.:  579524

24   Pages 1 - 211

25   Reported by:  Dianna C. Kilgalen
```

```
1                P R O C E E D I N G S
2              MICHAEL BARBER, Ph.D., having been duly
3    sworn, testified as follows:
4    EXAMINATION BY COUNSEL FOR THE NAACP PLAINTIFFS
5    BY MR. SHENTON:
6       Q.    Doctor Barber, good morning.
7       A.    Good morning.
8       Q.    Good to see you again.
9       A.    Yes.
10      Q.    You may remember, but just for the
11   record, my name is Chris Shenton.  I represent
12   the NAACP plaintiffs in this matter.  I'm looking
13   forward to talking with you a bit this morning.
14            Just so you have a sense of the day, I
15   will limit my questioning to the analysis that
16   you did with respect to Mr. Fairfax's reports and
17   my colleague Ms. Khanna will limit her
18   questioning to the other aspects of your
19   supplemental report.
20            Does that sound good?
21      A.    Yes.
22      Q.    You have done this before.  So I will be
23   quick up top but just a few reminders.  Let's try
24   to wait until we finish talking so we can make a
25   clean transcript.  Just let me know if you need a
```

1           MS. RIGGINS: Objection. Go ahead,
2   Doctor Barber. You can answer.
3       A.   The clusters are -- how do I say this?
4   The clusters, the county groupings, the county
5   clusters are hard boundaries. The districts do
6   not cross over the county groupings.
7           And so aside from the fact that they are
8   all somewhat related to each other because they
9   are coming from the same state, the arrangement
10  of districts in one grouping is -- does not have
11  any relationship to the arrangement of groupings
12  in a different district or in a different
13  grouping.
14      Q.   Got you. Other than the fact that both
15  those groupings would be set by Stevenson and be
16  required to comply with the plus or minus five
17  percent rule, right?
18      A.   Yes. That's correct.
19      Q.   Got it. In order to understand the
20  significance of those within cluster deviations,
21  would you want to compare those deviations to
22  other districts within that cluster or districts
23  in other clusters?
24      A.   I think you could do both. You could
25  learn something from both of those.

```
 1      Q.   But you agree with me the districts,
 2   like you were testifying a moment ago, the
 3   districts in separate clusters are -- do not
 4   impact the population figures in each other?
 5      A.   Yeah.  That's -- from my previous
 6   answer, I think is consistent with that.
 7      Q.   All right.  I want to turn back to
 8   section 5 of your report which I believe starts
 9   on page 32.  So we are still on Exhibit 1.  Let
10   me know when you are there.
11           MS. RIGGINS:  Chris, I'm just going to
12   lodge an objection for the record.  I think
13   section 6 that you were just talking about had
14   some applications outside of the Larius
15   (phonetically spelled) claim.  I will obviously
16   give you any leeway as you want to go through
17   this, but I would like to lodge an objection
18   standing to any questions about section 5 because
19   the Larius claims were dismissed in the court
20   summary judgment order earlier in this week.
21           Is it okay if we do a standing objection
22   to that, Chris?  I don't want to keep
23   interrupting.
24           MR. SHENTON:  I was going to suggest a
25   standing objection.  I will also note for the
```

1   Daves Redistricting app, right, Doctor Barber?
2        A.   I am, yes.
3        Q.   You used it in this case in your opening
4   report?
5        A.   I did, yes.
6        Q.   Okay.  I want to pull up a screen grab
7   from Daves Redistricting app talking about this
8   district that we are talking about here.  I have
9   included the URL in the screen grab so that
10  everyone can go back and find that later.  I just
11  dropped it in the chat.
12            If you want to open that and let me know
13  when you are ready.  I will mark that as Exhibit
14  2.   I'm sorry.
15       A.   Okay.  I have it open here.
16       Q.   Doctor Barber, I will represent to you
17  this is the enacted state 2024 -- 2023 State
18  Senate plan zoomed in on the Senate District 7
19  and Senate District 8 boundary explaining the
20  partisan composite performance by precinct within
21  those districts.
22            Do you see that?
23       A.   I do, yes.
24       Q.   And do you see the district line between
25  Senate District 7 and Senate District 8 in and

1  around the city of Wilmington?
2      A.    Yes, I do.
3      Q.    And would you agree with me that the
4  district line captures the highest performing
5  Democratic precincts in the city of Wilmington
6  for inclusion in Senate District 8?
7      A.    I will offer just a few caveats here.
8            MR. SHENTON:  Okay.
9      A.    So Daves Redistricting has a lot of
10 different partisan metrics that you can select.
11 And so I'm not sure which election or which group
12 of elections we might be looking at here.
13           So it might be the case that these
14 districts or these precincts are very Democratic
15 in whatever elections you have selected here but
16 they might not be quite as Democratic or the
17 partisan landscape might look a little different
18 or might look very different depending on the
19 elections that were selected.
20           And I don't know which elections we are
21 talking about here.  I guess I would want to just
22 kind of offer that caveat before we went forward.
23           Having expressed that caveat, if we kind
24 of accept whatever elections you are using in
25 this figure, then I think it is the case that

1   with perhaps one exception, the precincts that
2   have been moved or not moved, sorry, the
3   precincts in Wilmington that are in District 8
4   appear to be more Democratic than the ones that
5   are adjacent that have not been selected, with
6   maybe one exception.  It looks like there is one
7   that was added that is less Democratic and there
8   is one that was not added that is more
9   Democratic.
10          And it looks like we are really dealing
11  with maybe six, six or seven perhaps precincts in
12  question.
13       Q.   Okay.  Thank you for that explanation,
14  Doctor Barber.  Do you recall what the population
15  of Senate District 8 is in the enacted plan?
16       A.   I do not off the top of my head.  I
17  would need to look in the report.
18       Q.   Okay.  I can represent to you the total
19  population for the district is 214,542 per Daves
20  Redistricting.  Does that sound approximately
21  right?
22       A.   I really have no idea, but I don't doubt
23  your representation.
24       Q.   Do you recall whether or not either of
25  these districts is particularly close to the plus

1     A.    Yes.  That's correct.
2     Q.    Is that a substantially similar
3  conclusion that he made with respect to Senate
4  Districts 7 and 8?
5     A.    I think on the whole, yes, the idea is
6  very similar.
7     Q.    Okay.  Let's look real quick at this
8  area.  I'm going to drop in the chat another
9  screenshot from DRA which I will mark as Exhibit
10 4.  If you want to open that and let me know when
11 you've got it up.
12    A.    Yes.  I have it open.
13    Q.    Does this look like the part of the
14 state that you are discussing in this paragraph,
15 Senate District 42?
16    A.    Yes, it does.
17    Q.    And would you agree with me that Senate
18 District 42 appears to capture the most
19 Republican leaning precincts possible in this
20 part of the state?
21          MS. RIGGINS:  Objection.  Go ahead.
22    A.    Again, just with the caveat that I'm not
23 sure which elections we are looking at here.
24 Conditional on the elections you've chosen to
25 represent in this map, that appears to be the

1  case.
2    Q.   Would you agree with me that changing
3  any of these precincts for another one would
4  serve to weaken the Republican partisan
5  performance of Senate District 42?
6    A.   Again, except conditional on the
7  elections that we are looking at, I guess I would
8  say it's -- I'm not sure.  There could be some of
9  these precincts that have -- it really will
10 depend on the population of the precinct.
11       Some of these adjacent precincts might
12 be extremely similar in their partisan lean.  So
13 I -- I really couldn't be certain.
14   Q.   But no reason to dispute that this is,
15 at a minimum, one of the most Republican leaning
16 districts you could draw in this area of the
17 state?
18       MS. RIGGINS:  Objection.  Go ahead.
19   A.   I think it is -- I think that's probably
20 accurate inside of the, you know, inside of
21 Mecklenburg County.  I mean, this side -- this
22 portion of the county is the more Republican
23 leaning side of the county.  So I think that's an
24 accurate description.
25   Q.   Okay.  I want to turn back to Exhibit 1,

1    A.    So not to be repetitive, but again, I'm
2    not sure which elections we are looking at here.
3    But within the elections that you have displayed
4    on this map, it looks like possibly a precinct on
5    the far eastern edge of the county could maybe be
6    added.  That would probably be your best bet.
7         Q.    Any other precincts you would identify?
8         A.    Not that -- not that, you know, not
9    right now that I'm looking at these maps.  I
10   could -- obviously, I wouldn't make changes just
11   looking at the map because there's a lot of other
12   factors you'd have to consider.
13              Because I also don't know the population
14   of these precincts that we are talking about
15   here.  So it may be that they are not -- it's not
16   possible to move them because they have too many
17   people or they don't have enough people and that
18   sort of thing.
19              But right now as I'm looking at this
20   map, no, I don't have any other precincts that I
21   want to highlight.
22        Q.    Okay.  I want to turn back to your
23   report, Exhibit 1, and move to page 35 where you
24   talk about the fourth cluster which is Forsyth-
25   Stokes House cluster.  Do you see that?

```
 1    rephrase my question.
 2            If any one of those VTDs were to move
 3    from HD 75 to HD 91 it would reduce the
 4    Republican partisan performance of HD 75.  Is
 5    that right?
 6            MS. RIGGINS:  Objection.  Go ahead.
 7      A.    Again, I don't know if that is the case
 8    or not just because I don't know the number of
 9    people, because the shift is going to be a
10    function of the partisan -- how partisan the
11    precinct is and how many people live in the
12    precinct and its partisanship relative to the
13    district.
14            And so it might be the case that moving
15    one of these precincts would have, you know, some
16    impact in making 75 less Republican leaning.  If
17    the precinct that is being removed has -- was
18    kind of similar to the district overall, then it
19    might not have any impact.
20            It -- it would be difficult to know
21    without knowing more about the population of each
22    of the precincts and the overall partisan
23    composition of the district.
24      Q.    Sure.  Let me try one other way.  Is it
25    fair to say that all of the VTDs on the border of
```

```
 1            CERTIFICATE OF SHORTHAND REPORTER
 2                     NOTARY PUBLIC
 3           I, Dianna C. Kilgalen, the officer
 4   before whom the foregoing deposition was taken,
 5   do hereby certify that the foregoing transcript
 6   is a true and correct record of the testimony
 7   given; that said testimony was taken by me
 8   stenographically and thereafter reduced to
 9   typewriting under my direction; that reading and
10   signing was requested; and that I am neither
11   counsel for, related to, nor employed by any of
12   the parties to this case and have no interest,
13   financial or otherwise, in its outcome.
14           IN WITNESS WHEREOF, I have hereunto set
15   my hand and affixed my notarial seal this 14th
16   day of April, 2025.
17           My commission expires June 28th, 2025.
18
19           [signature: Dianna C. Kilgalen]
20
21           _____
22           NOTARY PUBLIC
23           IN AND FOR THE STATE OF MARYLAND
24           COUNTY OF HARFORD
25
```