IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| SHAUNA WILLIAMS, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> REPRESENTATIVE DESTIN HALL, in his official capacity as Chair of the House Standing Committee on Redistricting, et al., <br><br> *Defendants*. | Civil Action No. 23 CV 1057 |
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> PHILIP BERGER, in his official capacity as the President Pro Tempore of the North Carolina Senate, et al., <br><br> *Defendants*. | Civil Action No. 23 CV 1104 |

**NAACP PLAINTIFFS' REPLY IN SUPPORT OF THEIR
MOTION TO RECONSIDER IN PART THE COURT'S ORDER ON PARTIAL
SUMMARY JUDGMENT**

## INTRODUCTION

This is the rare case in which reconsideration is warranted. Newly submitted expert analysis addresses the precise evidentiary gap identified by the Court in dismissing Plaintiffs' malapportionment claims—whether partisan considerations predominated in driving the population deviations in the challenged districts. In that analysis, Legislative Defendants' own expert – Dr. Barber – opined that even minor apportionment changes within each challenged cluster would cause a "sizable shift" in partisan performance, confirming that those deviations were engineered to maximize Republican advantage. These opinions reinforce summary judgment evidence that (1) the district populations within each challenged cluster were deliberately manipulated to maximize partisan performance; and (2) no legitimate districting considerations informed apportionment within clusters. Dr. Barber also found that the only thing correlated with statewide population deviations was cluster-level deviations—demonstrating that the only way to understand deviation at a statewide level is to understand it cluster by cluster. These findings squarely reinforce Plaintiffs' malapportionment theory, in precisely the evidentiary area this Court previously found lacking.

Defendants' opposition does nothing to alter the consequences of their own Expert's opinions. Rather than confront them head on, they attempt to deflect by (1) erroneously reconfiguring the burden of proof for malapportionment, (2) engaging in post-hoc reinterpretation of Dr. Barber's opinions, and (3) repackaging old summary judgment arguments in lieu of briefing the narrow issue before the court now. None of these tactics rebut their own expert's report, nor the conclusion—supported by additional expert

analysis and witness testimony—that the population deviations in the four challenged clusters are explained by the pursuit of partisan advantage. Plaintiffs' motion for reconsideration should be granted and this Court should resolve the malapportionment claims after the opportunity to consider all evidence at trial.

## ARGUMENT

I. <u>Legislative Defendants Misconstrue Plaintiffs' Burden of Proof.</u>

Plaintiffs' evidentiary burden at summary judgment was to "cite[] evidence from which a rational trier of fact could find" that "the pursuit of partisan advantage predominated over all traditional districting criteria, resulting in the minor deviations from mathematical equality within the House and Senate maps." Doc. 98 ("PSJ Order") at 22, 28. Legislative Defendants contend that only one form of evidence can satisfy that standard: a uniform, linear pattern of overpopulating disfavored (here, Democratic) districts and underpopulating favored (Republican) ones. Doc. 113 ("Opp'n") at 7-8. But that argument misapprehends the *Larios* test, conflating the harm itself—unequal voting power—with the mechanism by which that harm is achieved. This Court should reject Defendants' constrained evidentiary standard.

To be sure, *Larios* held that the systematic over- or underpopulation of districts to secure partisan advantage can constitute evidence of illegitimate political districting considerations. *Larios v. Cox*, 300 F. Supp. 2d 1320, 1325 (N.D. Ga.), *aff'd*, 542 U.S. 947 (2004) (mem.). The constitutional violation *Larios* identified, however, is not systematic manipulations for partisan advantage, but the *unequal voting strength* created by those

3

manipulations. *Larios*, 300 F. Supp. 2d at 1351. The injury is malapportionment; the mechanism is pursuit of partisan advantage.

Neither *Larios* nor its progeny require a rigid one-to-one relationship between over- or underpopulation and party lean in every district; nor do they foreclose the possibility that apportionment manipulation may take more complex forms. Precedent reinforces the need for a holistic, fact-intensive analysis of the challenged population deviations, rather than the reductive test Defendants propose. *See Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333, 342-43 (4th Cir. 2016) (considering a range of factors— including correlation between deviation and partisanship, consistency of deviations, availability of less biased alternatives, and sequence of events leading to the plan's adoption—to determine whether improper motives predominated); *Perez v. Abbott*, 250 F. Supp. 3d 123, 190 (W.D. Tex. 2017) (same). Application of the appropriate burden of proof indicates this fact-intensive analysis must occur at trial and that, in light of new evidence produced, judgment as a matter of law would be clear error.

II. <u>Legislative Defendants' Own Witnesses and Evidence Confirm "No Other Considerations" Were Made Beyond Partisanship in the Challenged Clusters.</u>

Defendants' oversimplified view that malapportionment can only be shown through a uniform, statewide pattern is contradicted by their own expert. Dr. Barber's supplemental report and deposition testimony confirms that systematic partisan advantage can be achieved through multiple methods of district population manipulation—and that the challenged clusters are four such examples. As Dr. Barber explained, each challenged cluster is carefully calibrated to maximize Republican advantage; district deviations are so

4

finely tuned that even minor tweaks—even a single digit or fraction of a percentage point—produce a "sizable shift" in the district's partisan composition. Doc. 101-2 at 32-35.

The charts in Defendants' Opposition illustrate this truth: The stark asymmetries among the districts within each cluster (each of which contain at least one district extremely close to *Stephenson*'s absolute limit of +/-5%) belie any good faith effort to equalize population and instead reveal deliberate malapportionment to produce Republican advantage. Take the **Mecklenburg-Iredell County cluster**:



Opp'n at 10.

Defendant's chart shows that SD42 is nearly 4% underpopulated compared to every other district in the cluster. The remaining districts—SD37 through SD41—are all overpopulated, most by nearly 5%. While SD42 has a slight Democratic lean, it is "very competitive[.]" Doc 101-2 at 33. This illustrates how the northernmost districts were overpopulated to allow southernmost SD42 to remain underpopulated and more favorable

5

to Republicans. Doc. 101-3 at 8. If SD42 took on additional population from its neighbors, moving toward equal population, it would become more Democratic. *Id.;* Doc 101-2 at 33.

Defendants argue this means nothing, because the most overpopulated district in the cluster is Republican. Opp'n at 9-10. But this observation *supports* Plaintiffs' theory. SD37 is a heavily Republican district, configured in a portion of the cluster (containing all of Iredell County) where it is impossible to draw anything but a heavily Republican district. By taking on as much population as possible (one-hundredth of a percent away from the *Stephenson* maximum) without risking partisan performance, SD37 starts a cascade of overpopulation from north to south, leaving the fewest voters in southernmost SD42. Doc. 101-3 at 8. As Dr. Barber opined, including any additional population in SD42 would harm Republican performance. Doc. 101-5 at 37:2-24. Overpopulating SD37 ensures that this never comes to pass. That a Republican district is also overpopulated does not change that SD42 is underpopulated for partisan advantage.

The **New Hanover cluster** graph depicts a different, but equally effective variant of population manipulation for party advantage:

Figure 10: Apportionment in Brunswick-New Hanover County Senate Districts and Incumbent Party in Each District

District Population Deviation and 2024 Party Winner
Brunswick–New Hanover County Cluster Senate Districts

[Bar chart showing District 7 at -4.94 and District 8 at 2.76 population deviation]

Opp'n at 11.

This illustrates that SD7 is underpopulated by nearly 5% (again very near the *Stephenson* limit) and differs from SD8 by 7.7%—no mean feat in a cluster with only two districts. What the chart does *not* show is that SD7's lower population results from carving out the most Democratic (and most Black) population—downtown Wilmington—and assigning it to SD8, where it is subsumed in heavily Republican areas. Doc. 101-3 at 8. This severs the heart of Wilmington from the rest of the municipality, diluting its voting strength across both districts. *Id.* Splitting downtown Wilmington preserves SD7 as a Republican-leaning district while keeping SD8 safely Republican. *Id.*

7

Defendants' counterargument is that there is no partisan advantage created by this deviation simply because "Republicans won both districts[.]" Opp'n at 11. This is contradicted by Dr. Barber's opinion that even small shifts will harm Republican partisan performance in SD7. Doc. 101-2 at 33. And even if a Democrat had won SD7, these deviations ensure that SD7 will be much closer than if the districts were more equally populated.

Defendants' charts for Wake and Forsyth tell a similar story. Opp'n at 10-12. Do these charts evince a "good faith effort to construct districts" "as nearly of equal population as is practicable" in these clusters? *Reynolds v. Sims*, 377 U.S. 533, 577 (1964).[1] To ask the question is to answer it, so Defendants dare not.

The partisan consequences in the challenged clusters are not "random" as Defendants suggest. Opp'n at 12. They are simply more nuanced than uniformly underpopulating Republican districts and uniformly overpopulating Democratic ones—as observed by Dr. Barber, the clusters are so precisely engineered to favor Republicans that even slight changes would cause "sizable shift[s]" towards Democrats. Doc. 101-2 at 32-35.

Dr. Barber's conclusions dovetail with Plaintiffs' expert evidence that no other legitimate districting criteria accounts for population deviations in the challenged clusters. Doc. 101-6 at 64-68; Doc. 101-3 at 5; *see Larios*, 542 U.S. at 949 (weighing heavily findings that population deviations did not result from any attempt to create compact or

---

[1] This remains the standard even for deviations of less than 10%. All that changes in such a case is who bears the burden of proof. *Daly v. Hunt*, 93 F.3d 1212, 1219-20 (4th Cir. 1996).

8

contiguous districts, keep counties whole, or preserve prior district cores). They also confirm the map drawers' testimony that partisan gain was the sole consideration informing intra-cluster deviations. *See* Doc. 102 ("Mot.") at 11. Legislative Defendants' newfound assertion that "no evidence even hints that the General Assembly underpopulated and overpopulated districts along partisan lines," Opp'n at 18, is belied by admissions throughout the record. *See e.g.,*

- Doc. 82-14 (Hise Dep. Tr) at 457:22-458:23 (testimony that Senate map drawers "picked the precincts that in the presidential race had performed least well for Republicans and removed them … from New Hanover County");

- Hise Dep Tr. ("Ex. A") at 458:22-459:13 (testimony that "no other considerations" were made in apportioning the New Hanover County cluster apart from equal population requirements and political considerations);

- 10/23/23 Senate Tr. ("Ex. B") at 34:19-35:1 (Senate floor testimony justifying New Hanover cluster lines based on partisan performance);

- Ex. A at 463:4-9 (testimony that, in configuring the Mecklenburg-Iredell cluster, map drawers "would try to get the political—historic political performance as high as [they] could on the races [they] selected without violating—without splitting a VTD or a municipal boundary.").

- Doc. 82-15 (Springhetti Dep. Tr.) at 95:5-7, 143:2-4 (testifying that adjustments to the House draft map were based on "partisan performance" and that no discussion of equal district population occurred, just making districts "[p]lus or minus 5 [percent] straightforward.")

At minimum, this evidence creates an issue of fact as to whether "the pursuit of partisan advantage predominated" in the apportionment of the challenged clusters. Testimony confirms that the map drawers apportioned each cluster to maximize Republican performance to the fullest extent possible within the minimally compliant +/- 5% population deviation for each district. Dr. Barber confirms that each cluster was

engineered to achieve that outcome. And Mr. Fairfax confirms that no legitimate districting criteria accounts for the population deviations in question.

III. <u>Dr. Barber's Report Provides Powerful Evidence That Plaintiffs' One-Person One-Vote Claims Are Best Evaluated at the Cluster Level, Not the Statewide Level.</u>

Despite Legislative Defendants' attempts to reframe their own expert's opinions, Dr. Barber's newly-available report plainly states that the most relevant analysis of an individual district's population deviation is within that district's cluster:

> The only variable that is statistically significant [to a district's population] is the variable measuring the county cluster average population deviation. This makes sense given that districts that are drawn from county clusters that start out over (or under) populated are much more likely to themselves also be over (or under) populated.

Doc. 101-2 at 41. Defendants' claim that Plaintiffs somehow "misread" Dr. Barber's meaning, Opp'n at 13, cannot change the logical consequence of Dr. Barber's opinions: in North Carolina, cluster-level deviation is the most relevant comparator for individual district deviation.[2]

IV. <u>Dr. Barber's Deposition Testimony Supports Plaintiffs' Arguments.</u>

Legislative Defendants erroneously argue that NAACP Plaintiffs "misread" and "misstate the record," Opp'n at 13, 16, and instead attempt to explain what Dr. Barber himself meant to say by contending that, if he had an opportunity to explain, his answer could have been different. Opp'n at 14-15. But Dr. Barber did have a chance to explain his opinion in the deposition and asked follow-up questions to clarify what he was being asked. *E.g.*, Doc. 101-5 at 12:21-13:16. A plain reading of his testimony confirms Dr. Barber's

---

[2] At most, Defendants offer contrary interpretations of the plain statements in Dr. Barber's reports, signifying that this issue should be resolved at trial.

opinions are clear that any reduction in population deviation would diminish Republican partisan performance in the challenged clusters.

Specifically, Dr. Barber testified that when mapdrawers "go to draw the districts inside of that grouping, those districts are more likely to be overpopulated themselves." Doc. 101-5, at 12:14-16. Dr. Barber agreed that if a mapdrawer "were to try to make every district within a particular cluster have the exact same population figure, that as the ideal, we would take that [] as the ideal population figure for that cluster, [and] that number will change depending on which cluster you are in." *Id.* at 13:1-16. And Dr. Barber testified that "there's a strong relationship[]" between "what cluster a district is in" and "what population that district will have across the plan as a whole[.]" *Id.* at 13:17-22. He added that "the county clusters are hard boundaries[,] and that "[t]he districts do not cross over the county groupings." *Id.* at 15:3-13.

Dr. Barber further testified that comparing deviations between districts within the same cluster is analytically valid. *Id.* at 15:19-25. He agreed that "the districts in separate clusters [] do not impact the population figures in each other[.]" *Id.* at 16:1-6. And with respect to the particular clusters Mr. Fairfax identified, Dr. Barber's testimony confirmed that moving virtually any VTD into or out of the challenged districts would either harm the Republican partisan performance in that cluster or cause a district's population deviation to exceed +/-5%. *Id.* at 29:1-31:14 (Brunswick-New Hanover), 37:2-24 (Iredell-Mecklenburg), 39:21-40:21 (Wake), 44:24-45:8, 46:1-20 (Forsyth-Stokes). Dr. Barber's testimony aligns with his report: the only variable correlated with statewide population

11

deviation is cluster-level population deviation, and this correlation is "strong[.]" *Id.* at 13:17-23. This confirms the best place to assess deviations is at the cluster level.

Legislative Defendants' newfound objection to Dave's Redistricting is also unavailing. Opp'n at 16. Dr. Barber himself repeatedly relied on Dave's Redistricting. Barber Dep. Tr. ("Ex. C") 35:6-18, 137:9-25. It is not suddenly an unmoored, unreliable source because Plaintiffs also rely on it. And further, Dr. Barber was told the exhibits relied on the preset DRA elections and accepted that characterization. Barber Supplemental Tr. 43:1-15 ("Ex. D").

Similarly, Legislative Defendants' contention that "NAACP Plaintiffs' counsel failed to supply the information Dr. Barber needed to offer accurate answers," Opp'n at 17, falls flat in light of the transcript of his testimony. Dr. Barber repeatedly caveated his testimony where he felt necessary, yet none of these caveats prevented Dr. Barber from testifying that the challenged clusters were optimized for Republican partisan performance. For example, despite caveating that he would want to study the elections used and populations of various VTDs, Dr. Barber testified that it's "an accurate description" to recognize that Senate District 42 is "at a minimum, one of the most Republican leaning districts you could draw in this area of the state[.]" Doc. 101-5, at 37:2-24. Dr. Barber came to similar caveats—and conclusions—throughout his deposition. *See generally* Doc. 101-5. Defendants' argument that Dr. Barber needed more information to offer such opinions is undermined by his own testimony, where he offered such opinions regardless. In any event, these qualms about his testimony go to the weight of the evidence and is appropriately reserved for consideration at trial, not summary judgment.

12

Case 1:23-cv-01057-TDS-JLW   Document 124   Filed 05/24/25   Page 12 of 17

Defendants also suggest that these portions of Dr. Barber's deposition are inadmissible. Opp'n at 17. But even assuming these arguments were correct (they are not), inadmissible deposition testimony can demonstrate a triable issue of fact where "it will be possible to put the information . . . into an admissible form." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 538-39 (4th Cir. 2015) (internal quotations and alterations omitted).

V. <u>Defendants Mischaracterize Prior Briefing.</u>

Defendants erroneously contend that the parties "fulsomely briefed" at summary judgment one of the principal questions now before the Court: whether malapportionment claims require plan-wide evidence of systemic partisan advantage as a matter of law. Opp'n at 4. That claim is plainly incorrect. It is telling that Defendants cannot point to any substantive discussion of the issue in their own summary judgment papers. They cannot because they did not brief the issue at summary judgment. Nor did Plaintiffs. Though Defendants cherry-pick from Plaintiffs' opposition, two of the quoted statements—related to the constitutional injury in a malapportionment claim—are fundamental to the issue of standing, not the merits of malapportionment. Doc. 82 at 18. There is a difference between the two, as Defendants readily acknowledge. *See* Opp'n at 21 (citing the Court's observation that a ruling on the merits is distinct from a threshold standing inquiry).

Likewise, the cited position that Plaintiffs "may '*Appropriately Allege Deviations Within County Clusters*,'" *id.* at 4, did not respond to any claim by Defendants that malapportionment challenges require plan-wide evidence of partisan manipulation— because no such claim was made. Instead, it rebutted Defendants' argument that

13

malapportionment can be proven only if illegitimate considerations predominated over the county-grouping requirement. *Id.* at 16-18.

Even now, Defendants stop short of endorsing a plan-wide malapportionment standard in opposing reconsideration—understandably so, given the substantial precedent rejecting that approach. *See* Mot. at 15-16. Defendants instead renew their argument that partisan gerrymandering is insufficient to establish actionable malapportionment under *Rucho*. Opp'n at 7-8. The Court expressly declined to take up that issue (SJ Order at 22), and notably, no other court has ever applied *Rucho* as Defendants urge. Doc. 82 at 24. That is because malapportionment claims are meant to address a constitutional harm not contemplated in the political gerrymandering framework: the "[o]verweighting and overvaluation of the votes of those living here … and undervaluation of the votes of those living there," resulting in "discrimination against those individual voters living in disfavored areas." *See* Opp'n at 8 (quoting *Sims*, 377 U.S. at 563; *see also* Doc. 82 at 23-26). As previously explained, Doc. 82 at 23-26, Defendants cannot justify deviations from the one-person, one-vote guarantee of the Equal Protection Clause without a legitimate state interest. Partisan advantage cannot be such an interest.

## CONCLUSION

Plaintiffs respectfully request the Court reconsider and reverse its dismissal on partial summary judgment of their malapportionment claims in Counts 3 and 7 of the NAACP Complaint based upon new evidence available and/or clear error in the court's prior order and/or to avoid a manifest injustice in preventing Plaintiffs from presenting evidence on these claims at trial.

14

Additionally, Plaintiffs respectfully request that if this motion remains under consideration by the Court before trial, that the Court allow a proffer of evidence on Counts 3 and 7 at trial to allow for an orderly disposition of the matter.

Dated: May 24, 2025

Respectfully submitted,

*/s/ Christopher Shenton*
Christopher Shenton

**HOGAN LOVELLS US LLP**

J. Tom Boer*
Olivia Molodanof*
Madeleine Bech*
4 Embarcadero Center, Suite 3500
San Francisco, CA 94111
Telephone: 415-374-2300
Facsimile: 415-374-2499
tom.boer@hoganlovells.com
olivia.molodanof@hoganlovells.com

Jessica L. Ellsworth*
Misty Howell*
Odunayo Durojaye*
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: 202-637-5600
Facsimile: 202-637-5910
jessica.ellsworth@hoganlovells.com

Harmony Gbe*
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: 310-785-4600
Facsimile: 310-785-4601
harmony.gbe@hoganlovells.com

*Appearing in this matter by Special Appearance pursuant to L-R 83.1(d)

**SOUTHERN COALITION FOR SOCIAL JUSTICE**

Jeffrey Loperfido (State Bar #52939)
Hilary Harris Klein (State Bar #53711)
Christopher Shenton (State Bar #60442)
Mitchell D. Brown (State Bar #56122)
Lily Talerman (State Bar #61131)
5517 Durham Chapel Hill Blvd.
Durham, NC 27707
Telephone: 919-794-4213
Facsimile: 919-908-1525
hilaryhklein@scsj.org
jeffloperfido@scsj.org
chrisshenton@scsj.org
mitchellbrown@scsj.org
lily@scsj.org

15

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.3(d), I hereby certify that this brief contains 3,123 words as counted by the word count feature of Microsoft Word.

/s/ *Christopher Shenton*
Christopher Shenton

## CERTIFICATE OF SERVICE

I certify that on May 24, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ *Christopher Shenton*
Christopher Shenton