# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| SHAUNA WILLIAMS; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 23-CV-1057 |
| REPRESENTATIVE DESTIN HALL, in his official capacity as Chair of the House Standing Committee on Redistricting; *et al.*, | |
| *Defendants*. | |
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 23-CV-1104 |
| PHILIP BERGER, in his official capacity as the President Pro Tempore of the North Carolina Senate; *et al.*, | |
| *Defendants*. | |

## LEGISLATIVE DEFENDANTS' TRIAL BRIEF

## PROCEDURAL BACKGROUND AND STATEMENT OF FACTS

Nearly six years ago, the Supreme Court established that "partisan gerrymandering claims present political questions beyond the reach of the federal courts." *Rucho v. Common Cause*, 588 U.S. 684, 718 (2019). The North Carolina General Assembly's designated legislative officers[1] (the "Legislative Defendants") were parties in that case and advocated that political gerrymandering claims are non-justiciable.

In 2023, the North Carolina Supreme Court reached the same conclusion under State law. In 2019, a State trial court employed a partisan-gerrymandering theory to invalidate the State's house, senate, and congressional plans. *Common Cause v. Lewis*, No. 18 CVS 014001, 2019 WL 4569584 (N.C. Super. Ct. Sept. 3, 2019). After the 2020 census, the General Assembly redrew all three plans assuming the *Common Cause* ruling correctly stated North Carolina law, implementing the most transparent redistricting process in State history, with live-streamed map-drawing. Various plaintiffs—including Common Cause and the North Carolina State Conference of the NAACP—brought partisan-gerrymandering challenges anyway. Initially adopting these arguments, the North Carolina Supreme Court enjoined all three redistricting plans. *Harper v. Hall*, 868 S.E.2d 499 (N.C. 2022) (*Harper I*).

---

[1] *See* N.C. Gen. Stat. § 1-72.2; *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 185 (2022).

The General Assembly conducted a remedial redistricting process, but while the trial court upheld the house and senate plans, it rejected the congressional plan as insufficiently "fair" under *Harper I. See Harper v. Hall*, 881 S.E.2d 156, 169-71 (N.C. 2022) (*Harper II*) (describing the ruling). By consequence, a congressional plan configured by a team of special masters governed the 2022 elections. The North Carolina Supreme Court later adjudicated cross-appeals concerning all three remedy-stage plans. It affirmed the trial court's holding against the congressional plan, but it also enjoined the senate plan under standards different from those of *Harper I. See id.* at 178-79. Observing that *Harper II* and *Harper I* were incompatible, Legislative Defendants petitioned for rehearing in *Harper II* and asked the North Carolina Supreme Court to overrule *Harper I*. This time, the North Carolina Supreme Court held that partisan-gerrymandering claims are non-justiciable under State law. *Harper v. Hall*, 886 S.E.2d 393 (N.C. 2023) (*Harper III*).

This lawsuit arises from the General Assembly's subsequent redistricting. The two sets of Plaintiffs[2]—including Common Cause and the North Carolina State Conference of the NAACP—have raised assorted causes of action, including claims that they have voluntarily dismissed (including vote-dilution and intentional-

---

[2] This memorandum refers to all "Plaintiffs" collectively and to the "NAACP Plaintiffs" as those in 1:23-cv-1104 and the "Williams Plaintiffs" as those in 1:23-cv-1057.

Case 1:23-cv-01057-TDS-JLW   Document 125   Filed 05/27/25   Page 3 of 32

discrimination claims against House districts and the Williams Plaintiffs' racial-gerrymandering claim against the congressional plan) and that this Court dismissed on summary judgment (the malapportionment claims). Plaintiffs' principal remaining theory is that, after persuading both the United States and North Carolina Supreme Courts that its political redistricting choices should not be subject to judicial review, the General Assembly took no advantage of its successes and configured the 2023 senate and congressional plans based not on *politics*, but on *race*.

This argument is implausible. The Supreme Court warned that, after *Rucho*, plaintiffs will attempt to "repackage a partisan-gerrymandering claim as a racial-gerrymandering claim by exploiting the tight link between race and political preference" and thereby "sidestep [the] holding in *Rucho* that partisan-gerrymandering claims are not justiciable." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 21 (2024). To prevent this, the Court held that racial-intent claims will typically require direct evidence of racial motive and that claims based on circumstantial evidence cannot succeed unless the challenger is able "to disentangle race from politics." *Id.* at 8, 24. Here, Plaintiffs will neither present direct evidence of racial motive nor prove that race, rather than politics, explains the district lines. That should be no surprise. The General Assembly "made the laudable effort

3

to disregard race altogether in the redistricting process." *Id.* at 19 n.6. Plaintiffs cannot prove a motive that did not exist.

Trial, this brief, and Legislative Defendants' post-trial filings will show Plaintiffs' remaining claims are unsupported in law and evidence. But the Court can do much of its work by asking a simple question: Is it more likely that the General Assembly chose to use racial data after finally persuading courts of its right to use political data or, instead, that the Plaintiffs are trying to sidestep *Rucho* and *Harper* by dressing partisan-gerrymandering claims in racial garb? The answer to that question is clear.

## STATEMENT OF THE QUESTION PRESENTED

1. Will the Williams and NAACP Plaintiffs meet their burden to prevail on their remaining claims at trial?

## ARGUMENT

## I. Racial Intent Claims

Most remaining claims require proof of suspect "legislative purpose." *Miller v. Johnson*, 515 U.S. 900, 916 (1995). "Whenever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State." *Abbott v. Perez*, 585 U.S. 579, 603 (2018). "This rule takes on special significance in districting cases," given that "[r]edistricting 'is primarily the duty and responsibility of the State,'" and redistricting litigation "represents a serious intrusion on the most vital of local functions." *Id.* (citation

4

omitted). A robust "presumption of legislative good faith" applies, and courts adjudicating such claims "must 'exercise extraordinary caution.'" *Alexander*, 602 U.S. at 7, 10 (citation omitted).

A claim of racial gerrymandering requires proof "that the State 'subordinated' race-neutral districting criteria … to 'racial considerations,'" i.e., that "race predominated in the drawing of a district." *Id.* at 7, 38 (citation omitted). An even higher standard applies to claims of intentional vote dilution, as "the plaintiff must show that the State's districting plan 'has the purpose *and* effect' of diluting the minority vote." *Id.* at 39 (citation omitted). While racial-gerrymandering claims are agnostic to "'the motivations' for the use of race," *id.* at 38 (quoting *Shaw v. Reno,* 509 U.S. 630, 645 (1993)), an intentional-vote-dilution plaintiff "must show that the State 'enacted a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities.'"[3] *Id.* (citation omitted).

While these showings may be made "through some combination of direct and circumstantial evidence," a claim based solely on the latter is "much more difficult." *Id.* at 8. The Supreme Court has "*never* invalidated an electoral map in a case in which the plaintiff failed to adduce any direct evidence." *Id.* (emphasis added); *see*

---

[3] Plaintiffs' separate counts for "Intentional Discrimination" and "Intentional Vote Dilution" seem duplicative. [D.E.105 ¶¶ 248-53, 257-66; D.E.108 ¶¶ 127-44]. Intent-based constitutional claims generally require proof of invidious purpose and effect, and vote dilution is the legally cognizable effect in the redistricting setting. *Alexander*, 602 U.S. at 38-39.

*Lawyer v. Dep't of Just.*, 521 U.S. 567, 582 (1997); *Easley v. Cromartie*, 532 U.S. 234, 258 (2001).

"A circumstantial-evidence-only case is especially difficult when the State raises a partisan-gerrymandering defense." *Alexander*, 602 U.S. at 9. "When partisanship and race correlate, it naturally follows that a map that has been gerrymandered to achieve a partisan end can look very similar to a racially gerrymandered map." *Id.* Legislatures "may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact." *Id.* (citation omitted). Courts must "be wary of plaintiffs who seek to transform federal courts into 'weapons of political warfare'" by restyling partisan-gerrymandering claims as race-based claims and "sidestep[ping]" the Supreme Court's holding "that partisan gerrymandering claims are not justiciable in federal court." *Id.* at 11, 21 (citation omitted).

A plaintiff therefore "must 'disentangle race from politics.'" *Id.* at 9 (citation omitted). Precedent directs "an adverse inference" against plaintiffs who do not provide a "substitute map that shows how the State 'could have achieved its legitimate political objectives' in [a challenged district] while producing 'significantly greater racial balance.'" *Id.* at 34 (citation omitted). "If either politics

6

or race could explain a district's contours, the plaintiff has not cleared its bar." *Id.* at 10.

### A. Claims Against Senate Districts

The NAACP Plaintiffs present racial-gerrymandering claims against SD7 and SD8, [D.E.105 ¶¶ 237-39], but lack standing to challenge SD7, [D.E.98 at 29]. The NAACP Plaintiffs also bring intentional-vote-dilution and intentional-discrimination claims against the Senate plan, [D.E.105 ¶¶ 248-53], but the Court has permitted claims to proceed only against SD1, SD2, SD8, SD40, and SD41, [D.E.98 at 30]. The analysis must focus on those districts. While Plaintiffs invoke the principle that statewide evidence "is perfectly relevant," there is no racial-intent cause of action "with respect to the State *as an undifferentiated whole*." *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 264, 266 (2015). The "basic unit" of analysis "is the district." *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 191 (2017). Without more, "[a] state-wide analysis cannot show that" any given district "was drawn based on race." *Alexander*, 602 U.S. at 33.

No trial evidence will establish that race predominated in SD8, let alone that the General Assembly had "'the purpose *and* effect' of diluting the minority vote" in SD1, SD2, SD8, SD40, and SD41. *Id.* at 38-39 (citation omitted). A "presumption of legislative good faith" applies, *id.* at 20, and trial will adduce no "direct evidence" of racial motive, *id.* at 18. The Senate's criteria provided that "[d]ata identifying the

7

race of individuals or voters shall *not* be used in the drafting of districts in the 2023 Senate Plan." [Attachment 1, 2023 Senate Plan Criteria]. This directive was followed. Senator Hise, Chairman of the Senate Committee on Redistricting and Elections, will testify that race was not considered and racial data was not available on the redistricting software. This case is like *Alexander*, where all involved in the redistricting "steadfastly denied using race in drawing the Enacted Map," 602 U.S. at 19, and unlike Plaintiffs' preferred authority, *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016), where racial data was requested and used to draft the challenged election law. *Id.* at 230.[4]

Legislative denials of racial motive may be discredited only based on compelling, contrary evidence. *See Alexander*, 602 U.S. at 19-24. None is available. Evidence suggesting a general awareness of racial demographics in North Carolina, [*see* D.E.105 ¶¶ 126-27, 134], does not meet the NAACP Plaintiffs' burden. *See Alexander*, 602 U.S. at 23; *Miller*, 515 U.S. at 22 ("[r]edistricting legislatures will … almost always be aware of racial demographics"). And the record here is even weaker than in *Alexander*, where "flawed" expert reports purportedly showed racial motive. 602 U.S. at 24. The NAACP Plaintiffs have no expert opinion claiming to discern circumstantial evidence of racial intent.

---

[4] Additionally, *McCrory* was not a redistricting case and applied none of the standards of *Alexander*.

The NAACP Plaintiffs cannot account for the General Assembly's political goals. The Senate criteria expressly authorized the General Assembly to consider "partisan advantage," [2023 Senate Plan Criteria], so the NAACP Plaintiffs must "disentangle race from politics," *Alexander*, 602 U.S. at 17. But the NAACP Plaintiffs have no alternative senate map meeting the standard of *Alexander*. This omission compels an "adverse inference." *Id.* at 34.

While those failings are sufficient to dispense with these claims, another bears mention: The NAACP Plaintiffs cannot show discriminatory "effect." *Id.* at 39 (citation omitted). It is unclear how they believe SD1, SD2, SD8, SD40, or SD41 "minimize or cancel out" minority votes. *Id.* at 38 (citation omitted). Under this element, too, the claims against the remaining Senate districts fall short.

## B.    Claims Against Congressional Districts

The NAACP and Williams Plaintiffs present intentional-vote-dilution and intentional-discrimination claims against the congressional plan. [D.E.105 ¶¶ 257-66; D.E.108 ¶¶ 127-144]. The Court has permitted the claims to proceed only against CD1, CD5, CD6, CD10, CD12, and CD14. [D.E.98 at 30]. As noted, each district provides the "basic unit" of analysis. *Bethune-Hill*, 580 U.S. at 191.

The starting point, again, is "the presumption of legislative good faith" followed closely by unrebutted direct evidence that race was not considered. *Alexander*, 602 U.S. at 19-24. The congressional redistricting criteria forbade the

9

use of racial data. [Attachment 2, 2023 Congressional Plan Criteria]. All witnesses involved in the redistricting will testify that racial data was neither considered nor available. Moreover, because the criteria authorize partisan redistricting, [*id.*], Plaintiffs must overcome "a partisan-gerrymandering defense." *Alexander*, 602 U.S. at 9. But their evidence does not "disentangle race from politics." *Id.* (citation omitted).

### 1.    Evidence Supposedly Showing Racial Sorting

The Williams Plaintiffs principally rely on the opinions of Dr. Jonathan Rodden concerning (in his words) "the extent to which the districts were drawn in a way that sorted residents in and out of districts according to race." [Attachment 3, Rodden Rep. 2]. But Dr. Rodden admits he can offer no opinion about the General Assembly's motive and does not establish that any district is "a *purposeful* device to minimize or cancel out the voting potential of racial or ethnic minorities." *Alexander*, 602 U.S. at 38-39 (emphasis added) (citation omitted). Moreover, numerous limitations and deficiencies in Dr. Rodden's methods confirm that his opinions cannot support a finding of invidious racial intent. This brief summarizes some of them.

Comparisons to Court-Ordered Plan.    Many of Dr. Rodden's analyses compare the 2023 congressional plan against the 2022 special-master plan configured to achieve the short-lived partisan-fairness standards of *Harper I. See*

10

*Harper II*, 881 S.E.2d at 175-77. Dr. Rodden observes that "[t]he 2023 Plan deviates very substantially from the court-ordered 2022 Plan." [Rodden Rep. 5]. Among other things, he generally finds differences between the plans in compactness measures, distribution of Black voting-age population ("BVAP"), and movement of voters of different groups in and out of districts. [*See id.* at 5-27]. Dr. Rodden also claims differences in "racial dislocation." [*Id.* at 36].

But it is neither surprising nor probative that the 2022 and 2023 plans have a different racial impact. The 2023 plan rejects the political goals of the special-master-drawn plan because the *Harper I* ruling improperly "forced the General Assembly [and special masters] to draw the 2022 Plans under a mistaken interpretation of [the North Carolina] constitution." *Harper III*, 886 S.E.2d at 448. The whole point of the 2023 redistricting was to jettison the 2022 plan. [*See* Attachment 4, Barber Rep. 11-13 (comparing the 2021, 2022, and 2023 plans)]. Because "a map that has been gerrymandered to achieve a partisan end can look very similar to a racially gerrymandered map," *Alexander*, 602 U.S. at 9, a plan drawn with the General Assembly's partisan goals will have substantially *different* qualities (including along racial lines) than a plan drawn to satisfy the very different partisan goals of *Harper I*. Plaintiffs' use of the 2022 plan confirms their goal of foisting the discredited *Harper I* standards back onto the General Assembly.

Dot-Density Analysis.  Dr. Rodden also provides dot-density maps, which he contends display racial sorting. [*See* Rodden Rep. 9-10, 14-15, 19-20]. This analysis, too, improperly compares the 2023 plan against the 2022 plan. [*See id.* at 9]. In any event, the method cannot disentangle race and politics because it excludes political geography. [*See id.* 9-10, 14-15, 19-20 (analyzing race, not politics)]. Legislative Defendants' expert, Dr. Sean Trende, examines politically coded maps and shows that political motive can explain all configurations Dr. Rodden views selectively through a racial lens. [Attachment 5, Trende Rep. I 38-44]. The "possibility" of political motive "is dispositive." *Alexander*, 602 U.S. at 20.

Envelope Analysis.  Dr. Rodden next examines "envelope[s]" of counties in which districts partially lie and claims to "compute the likelihood that a registered voter of a given race from this population was included in" that district. [Rodden Rep. 11; *see id.* at 11-13, 16-17]. Dr. Rodden claims this analysis "was explicitly accepted by the U.S. Supreme Court" in *Cooper v. Harris*, 581 U.S. 285 (2017). [*Id.* at 5].

This shows why an expert generally should not present a "legal conclusion." *United States v. Campbell*, 963 F.3d 309, 314 (4th Cir. 2020). An envelope analysis "played a minor role in *Cooper*, where the plaintiffs could also point to direct evidence." *Alexander*, 602 U.S. at 31. [*See also* Trende Rep. I 20-27 (describing method as undergoing only modest scrutiny)]. The Supreme Court has held neither

12

that the method proves racial motive nor that district courts must credit it. Applying clear-error review, *Cooper* held that a district court could properly credit an expert report containing an envelope analysis, but it cautioned that the Supreme Court may have "evaluated the testimony differently." 581 U.S. at 316-17. This Court is responsible as fact-finder to evaluate the method in its own judgment.

The envelope analysis is a poor measure of racial intent and was poorly utilized here. To begin, the method produces too many false positives to be credible. Legislative Defendants' expert, Dr. Michael Barber, shows that in an ensemble of 5,000 computer-simulated *race-blind* maps of North Carolina, the envelope method usually finds *half* of the districts per map to be racial gerrymanders. [Barber Rep. 26]. A method so starkly inaccurate is useless.

It is not difficult to see why it fails. The method depends on the assumption that, "[i]f the lines were drawn without respect to race, one would expect the likelihood of inclusion to be roughly similar for White and Black voters." [Rodden Rep. 11]. That premise is faulty. "Race is highly correlated with a number of factors that are essential to the redistricting process," including "partisanship," "geographic location, population density, historical trends in employment, migration, transportation, and even the type of soil in the area." [Barber Rep. 24-25]. It is therefore unlikely that, in a race-blind plan, districts within an "envelope" will have similar racial compositions. Put differently, the envelope approach supplies no "null

13

distribution," i.e., indication of "what a race-free draw would produce in North Carolina." [Trende Rep. I 26]. A race-neutral map certainly would not produce districts of near-even distribution of racial and ethnic groups.

Moreover, Dr. Rodden's version of the envelope method is particularly unsuited to inferring legislative motive because it ignores basic redistricting constraints. Dr. Rodden worked from North Carolina's voter file, but redistricting plans are configured with census data and election results reported by precinct. [Barber Rep. 14-18]. Dr. Rodden's method unrealistically "treat[s] each voter as an independent unit that [North] Carolina could include or exclude from" a given district, regardless of the precinct of voting district where that voter resides. *Alexander*, 602 U.S. at 32. "This flaw renders the Rodden Report's regression coefficients functionally useless for ascertaining intent." [Trende Rep. I 28].

Despite misgivings with the method, Dr. Barber provides an alternative envelope analysis built on precincts—comparing their racial composition and observed voting behavior—in which none of Dr. Rodden's conclusions bear out and politics is shown to have a greater impact than race on district configurations. [Barber Rep. 17-28]. Dr. Rodden objects that race and politics are too "highly correlated" to be compared in a regression analysis (a problem called "multicollinearity"). [D.E.99-2, Rodden Reply Rep. 6]. Dr. Barber disagrees, noting that "[m]ulticollinearity does not bias the estimated relationship between two

14

variables" but "simply causes the standard errors to be bigger than they would be if there were no multicollinearity." [D.E.95-1, Barber Supp. Rep. 12-13 (citation omitted)]. Even if Dr. Rodden were to win this battle, it would doom Plaintiffs in the broader war. They must "disentangle race from politics." *Alexander*, 602 U.S. at 9 (citation omitted). Dr. Rodden's vigorous insistence that the variables are too similar to be statistically differentiated dooms Plaintiffs' case, with its heavy emphasis on statistical analysis.

Simulated Plans. In his rebuttal report, Dr. Rodden tries a different approach of comparing the 2023 plan against Dr. Barber's ensemble of computer-simulated plans. [Rodden Reply Rep. 19-27]. Dr. Rodden claims to have discovered that the 2023 plan is an outlier in BVAP distribution as compared to the ensemble, as well as to plans in the ensemble that "occasionally" achieve the same political outcome of the 2023 plan. [*Id.* at 19; *see id.* at 19-27]. An initial knock against Dr. Rodden's credibility on this point is that he raised it only in rebuttal by examining Dr. Barber's simulated plans. Dr. Rodden has the ability to run mapping simulations, and he has done so in his expert work, but he omitted such an analysis from his opening report.

That aside, Dr. Rodden yet again fails to "disentangle race from politics." *Alexander*, 602 U.S. at 9 (citation omitted). Recall that "a map that has been gerrymandered to achieve a partisan end can look very similar to a racially gerrymandered map." *Id.* Thus, even if the 2023 plan is an outlier in BVAP

15

distribution compared to race-blind plans, that outcome is meaningless if political motive was the cause of that outcome. Given the close connection of race and politics, Dr. Rodden cannot rule out political motive and thus cannot prove racial motive.

While Dr. Rodden claims that a small set of simulated plans matches the political outcome of the 2023 plan but with different racial distributions, this assertion is flawed. Dr. Rodden counts any plan with 10 Republican-leaning seats as accomplishing the General Assembly's political goals, [Rodden Reply Rep. at 19], but erroneously defines Republican-leaning to mean a district with a Republican voting index of more than 50%. [Barber Supp. Rep. 9-11; Attachment 6, Rodden Dep. 259:17-21]. A district with a Republican voting index of just slightly more than 50% is a *competitive* district, not a *safe* Republican district. The 2023 plan does not produce 10 toss-up districts; it creates 10 Republican districts with a 55% or more partisan lean favoring Republicans. [Barber Supp. Rep. 10-11]. No simulated plan in Dr. Barber's ensemble achieves that political outcome. [*Id.*] Accordingly, the 2023 plan is a political outlier, and Dr. Rodden's assertion that it is an outlier in BVAP distribution carries no significance. One would *expect* a political outlier to be

16

a racial outlier as well, where race and politics are intertwined. *See Alexander*, 602 U.S. at 9.[5]

As in *Alexander*, Plaintiffs have no "substitute map that shows how the State 'could have achieved its legitimate political objectives' in" any district "while producing 'significantly greater racial balance.'" *Id.* at 34 (citation omitted). Precedent therefore compels an "adverse inference" that will prove "dispositive" in this case. *Id.* at 34-35.

## 2. Evidence of Events Related to Enactment

Plaintiffs have pointed to *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), a decision identifying circumstantial evidence that may help show racial intent, such as "a clear pattern, unexplainable on grounds other than race," "a series of official actions taken for invidious purposes," the "specific sequence of events leading up to the challenged decision," and the "legislative or administrative history." *Id.* at 266-68. Plaintiffs apparently invoke this test, though their precise assertions are yet unknown. [*See* D.E.108 ¶¶ 52-59, 130; D.E.105 ¶¶ 83-110, 128-130]. Notably, the Williams Plaintiffs served an expert report (of Dr. Adrienne Jones) making assertions under

---

[5] Dr. Rodden's rebuttal discussion of draft plans within the General Assembly suffers the same deficiency. [*Compare* Rodden Reply Rep. 23-27, *with* Barber Supp. Rep. 15-25].

17

the *Arlington Heights* standard but recently disclosed they will not present these opinions at trial. [D.E.116 at 7].

In all events, the *Arlington Heights* factors support Legislative Defendants. First, the sequence of events leading to the redistricting overwhelmingly suggests a political motive, not a racial motive. Legislative Defendants advocated in *Harper* that courts should not review the General Assembly's partisan motives, *see Harper III*, 886 S.E.2d at 409, and the 2023 redistricting followed the North Carolina Supreme Court's ratification of that position. Plaintiffs cannot explain why the General Assembly would "have used racial data—with the associated legal risks— as a proxy for partisan data when [it] had access to refined … political data that accounted for voter turnout and electoral preferences[.]" *Alexander*, 602 U.S. at 22-24. Because Plaintiffs can "provide[] no answer to this obvious question," *id.* at 23, their racial-intent claims fail.

Plaintiffs evidently intend to criticize the timing, transparency, and opportunity for public input in the 2023 redistricting process. [*See* D.E.108, ¶¶ 52-59; D.E.105 ¶¶ 83-110]. As an initial matter, trial will show these criticisms to be taken out of context and overblown. The timing of the redistricting resulted from *bona fide* legislative priorities, and the General Assembly adhered to modern redistricting practices in North Carolina. It held hearings, opened a public comment portal, provided space and an offer of funds to the opposition party, entertained

18

amendments from that party, and so forth. Regardless, even "procedural violations do not demonstrate invidious intent of their own accord. Rather, they must have occurred in a context that suggests the decision-makers were willing to deviate from established procedures in order to accomplish a discriminatory goal." *Rollerson v. Brazos River Harbor Navigation Dist.*, 6 F.4th 633, 640 (5th Cir. 2021). Like any list of factors guiding a factual inquiry, these cannot be taken "as a sequence of disparate, unrelated considerations without a common conceptual core," but they rather "help courts capture the essence of" the underlying inquiry. *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 504 (2023). Plaintiffs cannot show that any departure from practices they would have preferred the General Assembly follow has any connection to race.

Second, Plaintiffs can point to no series of official actions taken for racial purposes. While the General Assembly configured districts with racial data during 2010 redistricting cycle, and these were enjoined as racial gerrymanders, a panel of this Court made clear it did *not* find that "the legislature acted in bad faith or with discriminatory intent in its redistricting." *Covington v. North Carolina*, 316 F.R.D. 117, 129 (M.D.N.C. 2016), *aff'd*, 581 U.S. 1015 (2017). The General Assembly believed it needed to use race in redistricting to comply with the Voting Rights Act ("VRA"), which federal courts found to be a misapprehension of law. *See Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 204-05 (4th Cir. 2024). Trial will show

that the General Assembly *learned* from this experience and *excluded* racial considerations. "The way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007) (plurality opinion). The General Assembly did that. Thus, this factor supports Legislative Defendants.

Third, nothing in the legislative history points to racial motive. It makes clear that the General Assembly "made the laudable effort to disregard race altogether in the redistricting process." *Alexander*, 602 U.S. at 19 n.6. This factor, too, supports Legislative Defendants.

Fourth, Plaintiffs cannot show a clear pattern, unexplainable on grounds other than race. They stand only on the contention that the 2023 plan harms Democratic candidates (who are typically preferred by Black voters) as compared to Republican candidates (who are typically preferred by White voters). But this fails to differentiate race from politics. [*See supra* § I.B.1]. Indeed, their position does not even establish a cognizable effect supporting their vote-dilution and discrimination claims. Proof that the 2023 plan elects fewer Democratic members than the 2022 plan does not establish minimization or cancellation of minority voting strength. *See Whitcomb v. Chavis*, 403 U.S. 124, 150-60 (1971).

## II. Section 2 Results Claims

The NAACP Plaintiffs also present a discriminatory-results claim against SD1 and SD2 under VRA Section 2. [D.E.105 ¶¶ 228-36]. This is identical to the claim the Eastern District of North Carolina found unlikely to succeed in *Pierce v. N.C. State Bd. of Elections*, 713 F. Supp. 3d 195 (E.D.N.C. 2024), *aff'd*, 97 F.4th 194 (4th Cir. 2024).[6]

As a threshold matter, the Eighth Circuit has held that the VRA includes no private right of action to enforce Section 2, *Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204 (8th Cir. 2023), and that it is also not enforceable under 42 U.S.C. § 1983, *Turtle Mountain Band of Chippewa Indians v. Howe*, 2025 WL 1389774, ___ F.4th ___ (8th Cir. May 14, 2025). The Court should follow that persuasive authority, hold that the NAACP Plaintiffs lack a cause of action to enforce Section 2, and enter judgment on that basis.

In all events, the NAACP Plaintiffs will not prove their claim at trial. Section 2 challengers must prove "three threshold conditions": that the relevant group is "'sufficiently large and geographically compact to constitute a majority' in some reasonably configured legislative district"; that the group is "politically cohesive"; and that a White majority votes "'sufficiently as a bloc' to usually 'defeat the minority's preferred candidate.'" *Cooper*, 581 U.S. at 301-02 (citation omitted). "If

---

[6] Trial in that matter ended on February 7, 2025. Judgment has not yet issued.

a plaintiff makes that showing, it must then go on to prove that, under the totality of the circumstances, the district lines dilute the votes of the members of the minority group." *Abbott*, 585 U.S. at 614. The NAACP Plaintiffs fail at multiple steps.

## A.     The First Precondition

The NAACP Plaintiffs fail the first precondition, which requires proof that the minority group is "sufficiently large and geographically compact to constitute a majority in a reasonably configured district." *Allen v. Milligan*, 599 U.S. 1, 18 (2023) (alteration marks omitted). The illustrative districts the NAACP Plaintiffs sponsor, [*see* D.E.101-6, Fairfax Rep. 52-68], do not meet this test because they contravene North Carolina's county-grouping requirements, [Barber Rep. 48-49]; *see Pierce*, 97 F.4th at 204 (discussing North Carolina's "Whole County Provision").

The NAACP Plaintiffs' demographic expert, Anthony Fairfax, does not dispute this fact but justifies the Whole County Provision violations as appropriate "to adhere to the VRA." [D.E.101-3, Fairfax Reply Rep. 9]. However, VRA Section 2 "never requires adoption of districts that violate traditional redistricting principles." *Milligan*, 599 U.S. at 29-30 (alteration omitted) (citation omitted); *see id.* at 43 (Kavanaugh, J., concurring) (warning against applications of Section 2 that would force redistricting "without concern for traditional districting criteria such as county, city, and town lines"). Moreover, Mr. Fairfax's plans contain illustrative districts that are not majority-Black districts and that also depart from the Whole

22

County Provision. North Carolina law requires that that "legislative districts required by the VRA shall be formed prior to creation of non-VRA districts." *Stephenson v. Bartlett*, 562 S.E.2d 377, 396-97 (N.C. 2002) (*Stephenson I*). Then, the county groupings are to be built around the VRA districts using "non-VRA districts." *Id.* Accordingly, non-VRA districts must adhere to grouping and traversal restrictions, even if those restrictions yield for the narrow purpose of creating majority-minority districts. Because not all districts in Mr. Fairfax's plans are reasonably configured, the first precondition is unmet. *See Negron v. City of Miami Beach*, 113 F.3d 1563, 1571 (11th Cir. 1997) (explaining that "an incomplete plan" does not satisfy the first precondition).

Additionally, Mr. Fairfax's proposed majority-minority district groups isolated pockets of Black population that are demographically dissimilar. [Attachment 7, Trende Rep. II 59-62]. That is not geographically compact. *See LULAC v. Perry*, 548 U.S. 399, 433 (2006) ("The first *Gingles* condition refers to the compactness of the minority population, not to the compactness of the contested district." (citation omitted)). And race was the predominant purpose in Mr. Fairfax's line-drawing. [Trende Rep. II 62-74; Barber Rep. 59-61]; *see Milligan*, 599 U.S. at 33 (plurality opinion) ("The line that we have long drawn is between consciousness and predominance."). It would be perplexing for the Court, in a case where the General Assembly "made the laudable effort to disregard race altogether in the

23

redistricting process," *Alexander*, 602 U.S. at 19 n.6, to compel it to engage in race-based line drawing, *cf. Pierce*, 97 F.4th at 225 (warning of "real risk of imposing racially gerrymandered districts").

## B. The Third Precondition

The Section 2 claim also fails the third precondition, which requires proof of a "racial bloc voting that is 'legally significant.'" *Id.* at 212 (citation omitted). The Supreme Court recognized in *Gingles* that "in the absence of significant white bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters." *Thornburg v. Gingles*, 478 U.S. 30, 48 n.15 (1986); *see also Voinovich v. Quilter*, 507 U.S. 146, 158 (1993). It has also recognized the other side of that coin: "In areas with substantial crossover voting"—i.e., White voting for minority-preferred candidates—"it is unlikely that the plaintiffs would be able to establish the third *Gingles* precondition." *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (plurality opinion).

Thus, the Fourth Circuit has explained that "[t]he key inquiry under *Gingles*' third factor ... is whether racial bloc voting is operating at such a level that it would actually minimize or cancel minority voters' ability to elect representatives of their choice, if no remedial district were drawn." *Pierce*, 97 F.4th at 212 (quotation and alteration marks omitted). Because a remedial district is a majority-minority district, *Bartlett*, 556 U.S. at 19, polarization lacks legal significance where a majority-

24

minority district is unnecessary, *id.* at 18; *see Pierce*, 97 F.4th at 213 (explaining that a VRA remedy is "a district in which the BVAP exceeds 50% plus one vote" (quotation and alteration marks omitted)).

The trial evidence will show that majority-minority districts are unnecessary to secure equal Black electoral opportunity. [*See* Attachment 8, Alford Rep. 31-34; Attachment 9, Alford Supp. Rep. 13-15]. This is consistent with the findings of numerous courts, including the Supreme Court, that polarization in northeast North Carolina falls short of legally significant levels. *See Pierce*, 713 F. Supp. 3d at 232-33; *Pierce*, 97 F.4th at 214. To configure a majority-minority districts under these conditions would be unconstitutional.[7] *See Cooper*, 581 U.S. at 301-06.

### C.    Totality of Circumstances

The NAACP Plaintiffs also cannot show inequality of opportunity under the totality of the circumstances. The *Gingles* preconditions are insufficient to establish a Section 2 claim; a plaintiff "must also show, 'based on the totality of circumstances, ... that the political processes leading to nomination or election ... are not equally open to participation by' minority voters." *Pierce*, 97 F.4th at 218 (citation omitted). This inquiry is guided by "factors identified in the Senate Report

---

[7] This is particularly clear for SD5, which is a performing crossover district [Barber Rep. 58 n.35] that Mr. Fairfax raises above 50% BVAP in Plan A [Fairfax Rep. 58]. That is exactly what the Supreme Court condemned in *Cooper*. *See* 581 U.S. at 303-06.

25

on the 1982 amendments to the VRA" and in court decisions. *Id.* at 219. The trial record will establish that this is not among the rare "instances of intensive racial politics where the excessive role of race in the electoral process denies minority voters equal opportunity to participate." *Milligan*, 599 U.S. at 30 (quotation and alteration marks omitted).

One crucial question is whether "partisanship [is] the cause of the racially divergent voting." *Pierce*, 97 F.4th at 223 (quoting *United States v. Charleston County*, 365 F.3d 341, 347 (4th Cir. 2004)). That is the case here, where the divergence is better understood as partisan polarization than racial polarization. [Alford Rep. 5-15, 35-36; Alford Supp. Rep. 2-4, 10-12]. Black voters support Democratic candidates, and White voters support Republican candidates, and those patterns hold even in contests where it is possible to control for race. [Alford Rep. 7].

Another key analysis is "the proportionality inquiry, comparing the percentage of total districts that are [minority] opportunity districts with the [minority] share of the" population. *LULAC*, 548 U.S. at 436. "One may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast." *Johnson v. De Grandy*, 512 U.S. 997, 1017 (1994). Accordingly, the Supreme Court in *Johnson* held that vote dilution will ordinarily not exist where minority voters in the relevant "area would enjoy substantial proportionality." *Id.* at 1014. Here, the State, with a BVAP of

26

approximately 20%, elected ten Black Senators constituting 20% of the body. [Attachment 10, Taylor Supp. Rep. 2]. In demanding more than that, the NAACP Plaintiffs demand a court-ordered political feast.

The NAACP Plaintiffs will stress North Carolina's regrettable history of racial discrimination. [*See, e.g.*, Attachment 11, Leloudis Rep. 8-105]. But "recent history is more persuasive … than history far more removed." *Pierce*, 97 F.4th at 221. Plaintiffs focus on the less probative history pre-dating the twenty-first century. [*See* Leloudis Rep. 8-73]. And they misconstrue recent events they cite, such as the racial-gerrymandering litigation of the 2010 cycle, [*id.* at 78-79, 93-97], where, as noted above, the General Assembly was found not to have "acted in bad faith or with discriminatory intent in its redistricting." *Covington*, 316 F.R.D. at 129. The General Assembly heeded the warning against the use of race in redistricting.

On relevant, current metrics, North Carolina performs well. Its voting procedures are "typical," minority turnout exceeds national figures, and minority groups in the State are as well or better off in socioeconomic terms than minority groups in the nation as a whole. [Attachment 12, Taylor Rep. 8-28]. Black officials are elected without majority-minority districts. [*Id.* at 29-31]. And campaigns are not marred by racial appeals. [*See id.* at 37-42, 46].

Section 2 claims have "rarely been successful" because precedent "limit[s] judicial intervention" to cases of "intensive racial politics." *Milligan*, 599 U.S. at 29-

27

30 (citation omitted). The General Assembly has striven to end racial politics through race-blind redistricting. A Section 2 liability finding would only return the State to the race-based redistricting it has sought to end. The Court should reject that outcome.

## CONCLUSION

The Court should enter judgment for Legislative Defendants on all claims.

Respectfully submitted, this the 27th day of May, 2025.

**BAKER & HOSTETLER LLP**

By: /s/ Katherine L. McKnight
Richard B. Raile*
DC Bar No. 1015689
Katherine L. McKnight*
DC Bar No. 994456
Trevor Stanley*
DC Bar No. 991207
1050 Connecticut Ave. NW
Suite 1100
Washington, DC 20036
Ph: (202) 861-1500
rraile@bakerlaw.com
kmcknight@bakerlaw.com
tstanley@bakerlaw.com

Patrick T. Lewis*
Ohio State Bar No. 0078314
Key Tower
127 Public Square, Suite 2000
Cleveland, Ohio 44114
Ph: (216) 621-0200
plewis@bakerlaw.com

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By: /s/ Phillip J. Strach
Phillip J. Strach
North Carolina State Bar No. 29456
Alyssa M. Riggins
North Carolina State Bar No. 52366
Cassie A. Holt
North Carolina State Bar No. 56505
Jordan A. Koonts
North Carolina State Bar No. 59363
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina 27603
Ph: (919) 329-3800
phil.strach@nelsonmullins.com
alyssa.riggins@nelsonmullins.com
cassie.holt@nelsonmullins.com
jordan.koonts@nelsonmullins.com

*Attorneys for Legislative Defendants*

28

Erika D. Prouty*
Ohio State Bar No. 0095821
Rebecca Schrote*
Ohio State Bar No. 0101051
200 Civic Center Drive, Suite 1200
Columbus, Ohio 43215
Ph: (614) 462-4710
eprouty@bakerlaw.com
rschrote@bakerlaw.com


*Appeared via Special Notice

29

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rules 7.3(d) and 40.1(c), I, Phillip J. Strach, hereby certify that the foregoing brief includes 6,243 words as indicated by Microsoft Word, excluding the caption, signature lines, certificate of service, and cover page.

This the 27th day of May, 2025.

NELSON MULLINS RILEY &
SCARBOROUGH LLP

/s/ Phillip J. Strach
Phillip J. Strach
N.C. State Bar No. 29456

## CERTIFICATE OF SERVICE

I, Phillip J. Strach, hereby certify that I have this day electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will provide electronic notification to counsel of record.

This the 27th day of May, 2025.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

/s/ Phillip J. Strach
Phillip J. Strach
N.C. State Bar No. 29456

31