# Attachment 3

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**

SHAUNA WILLIAMS, et al.,

      *Plaintiffs*,

   v.

REPRESENTATIVE DESTIN HALL, in his
official capacity as Chair of the House Standing
Committee on Redistricting, et al.,

      *Defendants*.

_____

NORTH CAROLINA STATE CONFERENCE OF
THE NAACP, et al.,

      *Plaintiffs*,

   v.

PHILIP BERGER, in his official capacity as the
President Pro Tempore of the North Carolina
Senate, et al.,

      *Defendants.*

Civil Action No. 23 CV 1057

**EXPERT REPORT OF DR. JONATHAN RODDEN**

August 1, 2024

# I.   INTRODUCTION AND SUMMARY OF FINDINGS

I have been asked to examine the role of race in North Carolina's 2023 Congressional Plan (the 2023 Plan), which was enacted by the General Assembly as Senate Bill 757 on October 25, 2023. First, I have been asked to examine the extent to which the districts were drawn in a way that sorted residents in and out of districts according to race, paying special attention to three regions: the Piedmont Triad area (District 6 in particular), the Charlotte area (Districts 12 and 14 in particular), and the Northeast part of the state (District 1). Second, I have been asked to examine whether the 2023 Plan as a whole treats Black and White North Carolina residents differently from one another in terms of representation.

To complete the first task, I examine the geographic characteristics of the districts, showing that that the 2023 Plan reduced the compactness of the challenged districts and split counties and municipalities in the Piedmont Triad and Charlotte regions more than the previous plan did. I also describe the racial composition of the new districts, demonstrating a pattern of moving significant clusters of Black voters into and out of congressional districts in the 2023 Plan.

Next, I utilize two techniques for analyzing racial sorting. First, using the so-called "envelope" approach that I describe below, I find that:

- In the Piedmont Triad, *White* registered voters are disproportionately placed in District 6.
- In the Charlotte area, *Black* registered voters are far more likely to be placed in District 12, and *White* registered voters are far more likely to be placed in District 14.
- In the Northeast, it is somewhat more likely that *Black* voters are placed in District 1.

Notably, the same patterns hold up among Democrats, Republicans, and unaffiliated voters, indicating that this racial sorting cannot be explained as a mere byproduct of partisan sorting. And the racial differences—including within each partisan category—remain when I control for distance from the median population center of each challenged district and, in Districts 12 and 14, for residence in Charlotte, and in District 6, for residence in High Point or Greensboro.

Second, for each challenged district, I provide basic descriptive statistics about the race of voters in the areas that overlap between the 2022 and 2023 districts (the district "core"), the areas moved into the 2023 district, and the areas moved out of the 2022 district. This approach shows:

- In District 6, the core of the district is small, and *Black* voters were disproportionately moved out of the district, while *White* voters were disproportionately moved in.
- In District 12, the core has a much larger Black population than the 2022 district, and a larger Black population was moved into the district than that which was moved out.
- In District 14, the racial composition of the core is similar to the 2022 district, but *Black* voters were disproportionately moved out of the district, while *White* voters were disproportionately moved in.
- In Districts 6, 12, and 14, these patterns hold up within each partisan group, again indicating that racial sorting cannot be explained away by partisanship.
- In District 1, Black voters in Greenville were moved out of the district, but a very similar number of relatively rural Black voters were moved in. Although the movement of voters

2

counties, and population counts by race at the level of census places. I also accessed city boundary data assembled by the North Carolina Department of Transportation.

## IV. THE ROLE OF RACE IN DRAWING THE 2023 NORTH CAROLINA CONGRESSIONAL REDISTRICTING PLAN

To assess the predominance of race in a redistricting plan using data, U.S. federal courts have relied on a series of analyses presented in an expert report by Dr. Stephen Ansolabehere in *Harris v. McCrory*, No. 1:13-cv-00949-WO-JEP (M.D.N.C. 2013), a case challenging last decade's congressional districts in North Carolina. This analysis was explicitly accepted by the U.S. Supreme Court in *Cooper v. Harris*, 136 S. Ct. 2512 (2017). In *Alexander v. South Carolina State Conference of the NAACP*, 144 S. Ct. 1221 (2024), the Court reaffirmed its support for this approach, while characterizing some of the expert testimony in that case as deviating in important ways from the Ansolabehere approach in *Cooper v. Harris*.

Specifically, in footnote 9 of the majority opinion in *Alexander*, the Court pointed out that "Professor Ansolabehere's analysis operated at the voter level," whereas experts in South Carolina were forced to use precinct-level data. Since this report, like Dr. Ansolabehere's *Harris* report, concerns North Carolina, I am also able to use the same rich individual-level data from the voter registration record on party registration and self-reported race that was used there. Footnote 9 of the *Alexander* majority opinion also stated that in order to disentangle party and race, it is important to examine whether there are racial differences between those kept in and out of specific challenged districts not only among Democrats, but also among Republicans (and presumably among unaffiliated voters). The individual-level data in North Carolina also allow me to examine such differences.

Because of the Court's repeated endorsements of Dr. Ansolabehere's analysis, this section of my report follows the organization of his approach very closely and uses the same format for presenting quantitative information in tables. It begins by discussing the geographic and racial characteristics of the districts, and then discusses two techniques for assessing race as a factor in the composition of the districts.

This analysis will demonstrate that racial sorting worked differently in the Piedmont Triad, the Charlotte area, and in the Northeast part of the state. In the Piedmont Triad, the 2023 Plan disperses Black voters by removing them from their residential context and combining them with distant rural White voters. In the Charlotte area, the 2023 Plan concentrates Black voters into District 12 while removing them from District 14. In the Northeast, the 2023 Plan completely reconfigures District 1 while keeping the Black voting-age population (BVAP) essentially the same.

<u>Geographic Characteristics</u>

The 2023 Plan deviates very substantially from the court-ordered 2022 Plan in several ways, most notably in and around the challenged districts. Figure 1 shows these changes visually, by providing simple maps of both redistricting plans.

**Figure 1: 2022 and 2023 Congressional Plans**



I will now consider the differences across the two plans under the traditional redistricting criteria of compactness and respect for county and municipal boundaries. The Piedmont Triangle, the Charlotte area, and the Northeast were all substantially redrawn, each with an arrangement that was substantially less compact than in the 2022 Plan. In particular, the area included in District 6 under the 2022 Plan is now divided across Districts 5, 6, 9, 10, and 13 in the 2023 Plan.

<u>Compactness</u>

Table 1 presents two of the most commonly used measures of district compactness in federal courts: Reock and Polsby-Popper. For both measures, higher numbers indicate greater compactness.

By both measures, the compactness of District 6 decreased. It is also useful to examine the other districts into which the 2022 District 6 was divided. Relative to their 2022 versions, Districts 9, 10, and 13 also each became substantially less compact in the 2023 Plan.

By both measures, Districts 12 and 14 in the Charlotte area became less compact. The same can be said for two other districts, Districts 8 and 11, that were substantially affected by the redrawing

6

of Districts 12 and 14. In fact, the only district that did not clearly become less compact in the Western half of the state was District 5, which became only slightly less compact on the Reock measure and stayed the same on the Polsby-Popper measure.

In the Northeast, District 1 became slightly less compact according to the Reock measure, and substantially less compact according to the Polsby-Popper measure.

Considering the 2023 Plan as a whole, on the Reock measure, only 3 districts out of 14 have similar or slightly better compactness measures than in the 2022 Plan: Districts 2 and 4 in the Raleigh-Durham area and District 7 in the southern part of the state. And on the Polsby-Popper measure, only District 3 in the Southeast became more compact in the 2023 Plan, while the score for District 5 did not change. Accordingly, the average compactness scores across all districts in the 2023 Plan went down by both measures, as indicated in the penultimate line in Table 1. The last line in Table 1 calculates averages for all the districts West of Raleigh-Durham, showing that the decline in compactness is driven primarily by the districts in the western part of the state, which include Districts 5, 6, 8, 9, 10, 11, 12, and 14.

### Table 1: Compactness Comparisons

| District | Reock | | Polsby-Popper | |
| --- | --- | --- | --- | --- |
| | 2022 Plan | 2023 Plan | 2022 Plan | 2023 Plan |
| 1 | 0.379 | 0.361 | 0.383 | 0.261 |
| 2 | 0.342 | 0.397 | 0.322 | 0.277 |
| 3 | 0.338 | 0.308 | 0.200 | 0.249 |
| 4 | 0.413 | 0.491 | 0.455 | 0.256 |
| 5 | 0.254 | 0.240 | 0.219 | 0.219 |
| 6 | 0.428 | 0.408 | 0.405 | 0.297 |
| 7 | 0.456 | 0.538 | 0.369 | 0.286 |
| 8 | 0.535 | 0.319 | 0.325 | 0.274 |
| 9 | 0.519 | 0.439 | 0.308 | 0.171 |
| 10 | 0.414 | 0.258 | 0.341 | 0.272 |
| 11 | 0.306 | 0.263 | 0.305 | 0.265 |
| 12 | 0.607 | 0.571 | 0.365 | 0.280 |
| 13 | 0.456 | 0.379 | 0.296 | 0.139 |
| 14 | 0.369 | 0.294 | 0.236 | 0.160 |
| NC Average | 0.415 | 0.376 | 0.323 | 0.243 |
| West NC Average | 0.429 | 0.349 | 0.313 | 0.242 |

Case 1:23-cv-01057-TDS-JLW    Document 125-3    Filed 05/27/25    Page 6 of 28

Respect for County and Municipal Boundaries

Let us define the Piedmont Triad according to the census designation of the combined statistical area (CSA): the counties of Alamance, Rockingham, Guilford, Randolph, Stokes, Forsyth, Davidson, Davie, Yadkin, and Surry.[2] Of these counties, the 2022 Plan split only one—Forsyth—once. The 2023 Plan splits Forsyth County once, too, but it also splits Guilford County twice—into three different districts. In other words, the 2022 Plan involved one county split in the Piedmont Triad, whereas the 2023 Plan involves three.

Within Forsyth County, the 2022 Plan split the municipalities of Winston-Salem and Walkertown. The 2023 Plan also split Winston-Salem and Walkertown, and it additionally split Clemmons and Kernersville. In Guilford County, the 2022 Plan did not split any municipalities, whereas the 2023 Plan splits the city of Greensboro into three different districts, while also splitting High Point, Summerfield, and Jamestown. In sum, the 2022 Plan includes only 2 split municipalities in the Piedmont Triangle, while the 2023 Plan included 9 total municipality splits, including of each of the major cities: Winston-Salem, High Point, and Greensboro (twice).

The Charlotte-Concord Gastonia Metropolitan Statistical Area (MSA) includes the counties of Anson, Gaston, Iredell, Lincoln, Mecklenburg, Rowan, Union, and Carrabus. The 2022 Plan only split Gaston and Mecklenburg, once each. The 2023 Plan leaves Gaston County whole but splits Mecklenburg an additional time and also splits Cabarrus, for a total of 2 county splits in the 2022 Plan versus 3 in the 2023 Plan.

In the 2022 Plan, the city of Gastonia in Gaston County was split once, and the cities of Charlotte and Matthews in Mecklenburg County were each split once—for a total of 3 splits in the Charlotte MSA. In the 2023 Plan, the municipalities of Concord and Kannapolis in Carrabus County are each split once; in Mecklenburg County, all three municipalities to the South and East of Charlotte—Mint Hill, Matthews, and Pineville—are split, and Charlotte itself is split into three different districts—for a total of 7 splits in the Charlotte MSA.

Turning to the Northeast, the 2022 Plan included a split of Pitt County, which involved the split of a small fragment of the city of Greenville. The 2023 Plan includes a split of Granville County, which involves the split of a small fragment of the town of Oxford.

In sum, relative to the prior plan, the 2023 Plan involves three times as many county splits and more than four times as many municipal splits in the Piedmont Triangle. And relative to the prior plan, the 2023 Plan involves an extra county split in the Charlotte area, and more than twice as many municipal splits, including an extra split of Charlotte itself. Finally, in the Northeast, the number of county and municipal splits are identical in the 2022 and 2023 Plans.

Racial Composition of Districts

Many of these municipal splits, and the corridors and appendages that reduced the compactness of the districts, are concentrated in areas with relatively large Black populations. These maneuvers led to significant changes in the distribution of racial groups across congressional districts.

---

[2] https://www2.census.gov/geo/maps/econ/ec2012/csa/EC2012_330M200US268M.pdf

8

Figure 2 superimposes a dot density map of the North Carolina Black population from the 2020 census, where each dot corresponds to 100 residents, on the 2022 and 2023 Plans. The top 10 census places with the largest Black populations are labeled. Table 2 displays the data for BVAP by district in the 2022 and 2023 Plans.

In the 2022 Plan, much of the Black population in the Piedmont Triad, including the entire cities of Greensboro and High Point, was included in District 6. As will be shown in further detail below, the 2023 Plan splits each of the cities of the Piedmont Triad and extracts Black voters, placing them in a narrow appendage to districts that are dominated by faraway rural White voters. This had the effect of reducing the BVAP of District 6 from 32 percent to 19 percent.

**Figure 2: Dot Density Map of Black Population and 2022 and 2023 Congressional Plans**





The Black voters removed from District 6 by carving up the cities of the Piedmont Triad were scattered across several districts. Districts 5 and 10, which were and still are overwhelmingly White, were among the largest recipients, and they experienced increases in BVAP. Much of the Black population of Winston-Salem was extracted from the Piedmont Triad districts and placed in District 10, which is dominated by rural White areas to the Southwest. District 5 extracts Black

9

neighborhoods from Greensboro and combines them with distant, rural White populations to the West. District 6 now extracts some Black neighborhoods from High Point and Greensboro and combines them with White, rural areas to their Southwest.

A similar pattern can be seen with other relatively large Black communities. For example, in the 2022 Plan, Gastonia had been combined with other proximate Black communities in District 14, but in the 2023 Plan, it was separated from those communities and placed in a far less compact District 14 that is dominated by rural communities to the West. And Greenville, which had previously been combined with other Black communities to the North in District 1, was placed in the 2023 Plan in an appendage to District 3, which is dominated by rural White voters.

**Table 2: Distribution of Black Voting-Age Population Across Districts**

| District | BVAP 2022 | BVAP 2023 | BVAP Change |
|----------|-----------|-----------|-------------|
| 1 | 41.23% | 40.42% | -0.81% |
| 2 | 18.18% | 24.01% | 5.83% |
| 3 | 18.89% | 21.35% | 2.46% |
| 4 | 26.64% | 21.73% | -4.91% |
| 5 | 12.51% | 18.73% | 6.22% |
| 6 | 31.65% | 19.31% | -12.34% |
| 7 | 19.01% | 20.07% | 1.06% |
| 8 | 14.48% | 17.69% | 3.21% |
| 9 | 24.57% | 22.36% | -2.21% |
| 10 | 10.51% | 16.58% | 6.07% |
| 11 | 4.01% | 3.88% | -0.13% |
| 12 | 35.96% | 38.31% | 2.35% |
| 13 | 22.04% | 19.45% | -2.59% |
| 14 | 20.68% | 15.93% | -4.75% |

In sum, Black communities were newly split from one another and removed from their geographic contexts in 5 of the 10 largest Black concentrations in North Carolina: Greensboro, Winston-Salem, High Point, Greenville, and Gastonia. In Charlotte, the pattern was different. Black voters were removed from District 14 and placed in District 12, which already had a relatively high BVAP, leading to a BVAP increase in District 12 and a BVAP decrease in District 14, from 21 percent to 16 percent.

These maneuvers led to a change in the overall distribution of Black voters across districts, which can be visualized in Figure 3. In the 2022 Plan, district BVAP took on a wide range of values, whereas in the 2023 Plan, BVAPs are more tightly clustered around 20 percent. In the 2022 Plan, there were four districts where the BVAP was below 15 percent. In the 2023 Plan, there is only one such district. In the 2022 Plan, there were four districts with BVAP above 25 percent, whereas in the 2023 Plan, there are two, one of which (District 12) has a higher BVAP than in the 2022 Plan. Of 14 districts, 11 now have BVAP in the range between 15 and 25 percent. The difference

between the wider dispersion of BVAP across districts in the 2022 Plan, and the concentration around 20 percent in the 2023 Plan, is an outgrowth of racial sorting that concentrated Black voters in two districts in the 2023 Plan and broke up geographically contiguous Black communities elsewhere.

**Figure 3: Distribution of Black Voting-Age Population Across Districts in 2022 and 2023**



## Race as a Factor in the Composition of Districts

### Piedmont Triad

In order to gauge the importance of race in the construction of the districts, the first type of analysis introduced in Dr. Ansolabehere's report examines the "envelope" of counties in which a given district under the challenged map (here, the 2023 Plan) is situated—that is, the set of counties that are partially or wholly in the district. These are the counties containing the population from which a district could be drawn without crossing county boundaries or completely reconfiguring the district. This approach gives wide deference to the map-drawer in the basic configuration of a region, focusing on the final decisions about which precincts or vote tabulation districts (VTDs) to include and exclude. If the lines were drawn without respect to race, one would expect the likelihood of inclusion to be roughly similar for White and Black voters. Taking the envelope as the potential population of the district, one can then compute the likelihood that a registered voter of a given race from this population was included in District 6.

11

**Table 3: Envelope Analysis for CD 6**

| Area | Group | Registered Voters of Group in Envelope | Registered Voters of Group in CD 6 | % of Group that is in CD 6 |
|------|-------|----------------------------------------|------------------------------------|----------------------------|
| CD 6 | Total | 1,015,031 | 482,834 | 47.6% |
| | White | 628,751 | 323,081 | 51.4% |
| | Black | 243,006 | 92,825 | 38.2% |

Table 3 presents the results of this analysis for District 6, for which the envelope is Forsyth, Davidson, Davie, Rowan, Cabarrus, and Guilford Counties. About 48 percent of the population from the envelope was included in District 6. Of White registered voters in the envelope, 51.4 percent were included, whereas only 38.2 percent of Black registered voters were included—a difference of 13.2 percentage points.

**Table 4: Envelope Analysis for CD 6, Broken Down by Partisan Group**

| Party of Registration | Group | Registered Voters of Group in Envelope | Registered Voters of Group in CD 6 | % of Group that is in CD 6 |
|-----------------------|-------|----------------------------------------|------------------------------------|----------------------------|
| Democrat | White | 118,229 | 50,667 | 42.9% |
| | Black | 182,418 | 68,738 | 37.7% |
| Republican | White | 288,246 | 160,237 | 55.6% |
| | Black | 5,718 | 2,483 | 43.4% |
| Unaffiliated | White | 217,756 | 109,916 | 50.5% |
| | Black | 54,080 | 21,289 | 39.4% |

One possible explanation for this difference might be partisanship; since race and party are correlated, the apparent effect of race might be driven by party. To examine this possibility, within each major category of partisan registration (Democratic, Republican, and unaffiliated), I have

Case 1:23-cv-01057-TDS-JLW    Document 125-3    Filed 05/27/25    Page 11 of 28

calculated the percent of each racial group placed in the district *within each partisan category*. This analysis is presented in Table 4.

Here, we see that White registered voters were substantially more likely to be placed in District 6 than Black registered voters *within each partisan category*. In footnote 9 of the majority opinion in *Alexander v. South Carolina State Conference of the NAACP*, 144 S. Ct. 1221 (2024), the Court stressed the importance of examining differences among Republicans. In District 6, we see that the racial difference in the likelihood of being placed in District 6 is largest among Republicans, but it is also substantial among unaffiliated and Democratic voters.

One concern, raised by the Supreme Court in *Alexander*, is that some VTDs in the envelope might be more likely to be included in a district because they are more geographically proximate to the district being constructed. Perhaps if those proximate VTDs have larger White population, this will explain the disproportionate selection of White voters into District 6. To examine this, I have located the median population center of District 6, and then calculated the distance from the centroid of each precinct in the envelope to the median population center of the district. I then estimate a probit regression,[3] where the observations are individual registered voters, and the dependent variable is an indicator of whether the individual is placed in District 6. The main independent variable is an indicator for whether the registered voter identifies as Black, but I also include a control variable for the distance (in kilometers) of the individual's VTD to the median population center of District 6. One might also claim that the General Assembly was attempting to keep as much of High Point as possible in District 6, and likewise with Greensboro in District 5, even though as described above, both cities were needlessly split. Nevertheless, in case these city boundaries played some role, I also include control variables that capture whether an individual resides in each of these cities. I calculate standard errors that are clustered at the level of the VTD.[4]

The results are detailed in the appendix. As one would expect, the coefficient on the "distance" variable is negative, indicating that VTDs in the envelope that are further from the median population center of the district are less likely to be included in the district. Likewise, residence in High Point is positively associated with inclusion in District 6, and residence in Greensboro is negatively associated with inclusion in the district. However, controlling for distance and city residence makes little difference for the race estimates. The estimated marginal effect of identifying as Black is -.11, indicating that the likelihood of a Black registered voter being included in District 6 is 11 percentage points lower than for registered voters of any other race, even controlling for distance and city residence. In Table 3 above, the difference was around 13 percentage points. Likewise, the estimates from the models for Democrats alone, Republicans alone, and unaffiliated voters alone, are very similar to the estimates that emerge from Table 4.

Figure 4 is a dot density map of race in the Piedmont Triad Region, along with the boundaries of the 2023 congressional districts. It demonstrates the extent to which Black neighborhoods of Winston-Salem were carved out of Forsyth County, and the correspondence of the district lines to the geography of race around High Point and Greensboro.

---

[3] This is a type of regression model where the dependent variable can take on two values: 0 or 1.

[4] Note that this analysis captures the difference between Black and non-Black voters, not Black and White voters.

**Figure 4: Dot Density Map of Race in the Piedmont Triad Region**



As mentioned above, one might suspect that the correspondence between race and district boundaries emerged from an effort to avoid municipal splits. However, the structure of districts in the Piedmont Triad involved several unnecessary municipal splits. Moreover, as demonstrated in Figure 5, little care was taken to avoid municipal splits. Three separate non-contiguous fragments of Winston-Salem were placed in District 6. Several non-contiguous fragments of Greensboro were placed in District 9, in addition to the split of the city between Districts 5 and 6. In some cases, the boundaries of VTDs do not coincide with district boundaries, and in order to avoid a city split, the General Assembly would have needed to add additional VTD splits, but declined to do so.

14

**Figure 5: Piedmont Triad Major City Boundaries and 2023 District Boundaries**



The second type of analysis pursued by Dr. Ansolabehere was to examine all the voters that were in a given district in *either* the prior map or the new map, differentiating between three types of voters: 1) those that remained in the district across both the 2022 and 2023 Plans—and thus make up the "core" of the district; 2) the voters moved OUT of the district, and 3) the voters moved INTO the district. If the alterations to the district boundaries are unrelated to race, we would not expect the racial composition of the core of the district to differ dramatically from that of the prior district, and we should expect the composition of the voters moved into a district to be similar, on average, to the composition of the voters moved out of the district.

White voters outnumber Black voters in both the 2022 and 2023 versions of the district, so it is not surprising that Whites outnumber Black voters in each of the categories in Table 5. The relevant comparisons are across rows within columns of Table 5. District 6 was radically redrawn, and the racial composition of the (relatively small) core of the district had a slightly higher White share, and smaller Black share, than did the 2022 version of District 6. There was a very substantial difference between those voters moved into and those voters moved out of the district. The percent of self-identified Black voters was larger among those moved out of the district than among those moved into the district by roughly 17 percentage points.

15

**Table 5: Core/In/Out Analysis for CD 6**

| CD 6 | Racial Registration | |
| | Percent Black | Percent White |
| --- | --- | --- |
| 2022 District | 30.66% | 55.15% |
| Core | 28.55% | 55.37% |
| Into District | 14.66% | 72.57% |
| Out of District | 31.54% | 55.10% |

Again, it is useful to examine breakdowns by party registration. This analysis is provided in Table 6:

**Table 6: Core/In/Out Analysis for CD 6, Broken Down by Partisan Group**

| CD 6 | Among Democrats | | Among Republicans | | Among Unaffiliated | |
| | %B | %W | %B | %W | %B | %W |
| --- | --- | --- | --- | --- | --- | --- |
| 2022 District | 58.92% | 30.07% | 2.52% | 88.25% | 19.59% | 58.42% |
| Core | 54.75% | 31.32% | 2.70% | 87.58% | 18.96% | 57.68% |
| Into District | 45.38% | 40.68% | 0.99% | 90.97% | 10.10% | 72.16% |
| Out of District | 60.66% | 29.56% | 2.43% | 88.55% | 19.89% | 58.72% |
| Effects | | | | | | |
| Core v. Out | -5.91% | 1.75% | 0.27% | -0.97% | -0.93% | -1.04% |
| In v. Out | -15.28% | 11.12% | -1.44% | 2.41% | -9.80% | 13.44% |

In Table 6, we can see that the Black share among those moved out of the district is much higher than among those moved into the district for Democrats and unaffiliated voters. At first glance, the raw difference among Republicans appears to be lower, but this is merely because, in the Piedmont Triangle area, Black Republicans are relatively rare. In fact, the Black share among Republicans moved out of the district is more than twice as high as the Black share among Republicans moved into the district.

<u>Charlotte Area</u>

In the Charlotte Area, as set forth in Table 7, the "envelope" analysis reveals that those placed within District 12 are disproportionately Black: 82 percent of Black registered voters in the envelope were included in District 12, while only a little more than half of White registered voters were included.

16

**Table 7: Envelope Analysis for CD 12**

| Area | Group | Registered Voters of Group in Envelope | Registered Voters of Group in CD 12 | % of Group that is in CD 12 |
|------|-------|------|------|------|
| CD 12 | Total | 759,082 | 483,883 | 63.7% |
| | White | 392,065 | 206,227 | 52.6% |
| | Black | 232,318 | 190,597 | 82.0% |

Table 8 reveals that this large disjuncture is not a mere byproduct of partisanship. It is very large within each partisan category, and once again, the difference is somewhat larger among Republicans. This analysis indicates that District 12 was drawn to encompass a large share of the Black population in the envelope, regardless of party.

**Table 8: Envelope Analysis for CD 12, Broken Down by Partisan Group**

| Party of Registration | Group | Registered Voters of Group in Envelope | Registered Voters of Group in CD 12 | % of Group that is in CD 12 |
|------|-------|------|------|------|
| Democrat | White | 97,135 | 58,003 | 59.7% |
| | Black | 173,694 | 144,055 | 82.9% |
| Republican | White | 130,802 | 59,789 | 45.7% |
| | Black | 5,158 | 4,102 | 79.5% |
| Unaffiliated | White | 160,347 | 86,187 | 53.8% |
| | Black | 52,521 | 41,640 | 79.3% |

Again, one might suspect that this is driven in some way by geography. In addition to the concern about geographic proximity to the district, one might suspect that this racial difference is driven by whether a VTD is inside or outside the boundary of Charlotte, since it appears that along parts of the district boundary, the General Assembly was following the Charlotte city boundary to some extent, and the city boundary corresponds in some places with racial segregation. To deal with

17

this, in addition to distance to the median population center of the district, I also include a control variable for whether the individual resides in the city of Charlotte.

The results of the probit model are detailed in the appendix. Again, more distant VTDs within the envelope are significantly less likely to be included in the district, and as expected, Charlotte residents are far more likely to be included in the district. However, even controlling for these two factors, Black voters in the District 12 envelope are far more likely than other voters to be included in the district. The estimated difference from the model including all registered voters and controlling for these two factors in the District 12 envelope is 17 percentage points. The appendix table reveals that the racial difference is also statistically significant in models estimated on Democrats alone, Republicans alone, and unaffiliated voters alone.

Figure 6 provides a dot density map of Black and White residents in the Charlotte area. It demonstrates a close correspondence between the geography of race and the district boundary. Figure 7 allows for a visualization of the correspondence between the district boundary and the Charlotte city boundary. As mentioned above, Charlotte was unnecessarily divided into three congressional districts rather than two. As Figure 7 demonstrates, municipal preservation was not a high priority when choosing the district boundaries. In the Northeast part of District 12, extending the boundary to the county boundary served to avoid municipal splits. However, on the West side of the district, several non-contiguous parts of Charlotte were included in District 14. The southern part of Charlotte is divided into three different districts, and each of the municipalities to the South and East of Charlotte—Mint Hill, Matthews, and Pineville—were also split.

**Figure 6: Dot Density Map of Race in the Charlotte Area**



**Figure 7: Charlotte City Boundary and 2023 Congressional District Boundaries**



Next, Table 9 displays the racial breakdowns for the district core and the VTDs moved in and out of District 12. The most striking feature of Table 9 is the large Black population selected to form the core of the new district. The Black share of the core is much higher than that of the previous district, and much higher than that of the VTDs moved in or out of the district. Next, Table 9 also reveals that the VTDs moved into the district had higher Black population by around 6 percentage points. Table 10 reveals that both patterns hold up within partisan groups.

**Table 9: Core/In/Out Analysis for CD 12**

| CD 12 | Racial Registration | |
| --- | --- | --- |
| | Percent Black | Percent White |
| 2022 District | 36.40% | 45.64% |
| Core | 54.49% | 25.47% |
| Into District | 23.12% | 61.10% |
| Out of District | 17.50% | 66.77% |

**Table 10: Core/In/Out Analysis for CD 12, Broken Down by Partisan Group**

| | Among Democrats | | Among Republicans | | Among Unaffiliated | |
| --- | --- | --- | --- | --- | --- | --- |
| CD 12 | %B | %W | %B | %W | %B | %W |
| 2022 District | 62.93% | 22.38% | 3.86% | 84.69% | 23.16% | 51.24% |
| Core | 73.35% | 12.63% | 10.51% | 71.56% | 35.97% | 32.73% |
| Into District | 42.90% | 43.33% | 2.89% | 87.58% | 13.77% | 65.27% |
| Out of District | 41.87% | 42.10% | 1.49% | 89.30% | 11.92% | 67.41% |
| Effects | | | | | | |
| Core v. Out | 31.48% | -29.47% | 9.02% | -17.73% | 24.06% | -34.69% |
| In v. Out | 1.03% | 1.23% | 1.40% | -1.72% | 1.85% | -2.14% |

District 12 was drawn to concentrate urban Charlotte Black voters into a single district, drawing from District 14. In the 2022 Plan, District 14 was a relatively compact district that focused on the South side of Charlotte, the adjoining suburbs, and Gastonia. The 2023 version of District 14 removes Black Charlotte-area VTDs, placing them in District 12. It features a narrow appendage that reaches around Charlotte to the South, extracting a strip of White exurbs and combining them with White areas to the far West of Charlotte, reaching all the way to the Pisgah National Forest and Chimney Rock State Park.

**Table 11: Envelope Analysis for CD 14**

| Area | Group | Registered Voters of Group in Envelope | Registered Voters of Group in CD 14 | % of Group that is in CD 14 |
|------|-------|------|------|------|
| CD 14 | Total | 1,095,732 | 519,642 | 47.4% |
| | White | 643,532 | 367,790 | 57.2% |
| | Black | 279,015 | 80,162 | 28.7% |

Table 11 provides the basic "envelope" analysis for District 14. As with District 12, there is strong evidence of racial sorting. While 57 percent of Whites in the envelope were included in District 14, only 29 percent of Blacks were included: a difference of around 28 percentage points. Table 12 shows that this is not merely a function of partisanship. There are large racial differences—between 20 and 30 percentage points—within each partisan category.

**Table 12: Envelope Analysis for CD 14, Broken Down by Partisan Group**

| Party of Registration | Group | Registered Voters of Group in Envelope | Registered Voters of Group in CD 14 | % of Group that is in CD 14 |
|------|-------|------|------|------|
| | | | | |
| Democrat | White | 139,966 | 67,925 | 48.5% |
| | Black | 208,784 | 58,956 | 28.2% |
| | | | | |
| Republican | White | 251,223 | 163,139 | 64.9% |
| | Black | 6,620 | 2,281 | 34.5% |
| | | | | |
| Unaffiliated | White | 246,827 | 133,961 | 54.3% |
| | Black | 62,508 | 18,651 | 29.8% |

Again, it is useful to estimate probit models that control for distance to the median population center of the district as well as Charlotte residence. These models, detailed in the appendix, demonstrate that these large differences within partisan categories remain statistically significant when controlling for geographic factors. Even if we account for the possibility that the district-

22

drawers aimed to draw a more Charlotte-focused version of District 12, Black voters were far more likely to be selected for District 12, and not for District 14.

Next, Table 13 presents information about the core VTDs of District 14 as well as those moved in and out of the district. It demonstrates that the self-identified Black voters were a much larger share of those moved out of the district than of those moved into the district, and Whites were a much larger share of those moved into the district. While Whites made up 77 percent of those moved into the district, they made up 64 percent of those moved out of the district: a difference of around 13 percentage points. Table 14 demonstrates that this basic pattern—Whites disproportionately moving into the district and Blacks out of the district—holds up within each partisan group.

**Table 13: Core/In/Out Analysis for CD 14**

| CD 14 | Racial Registration | |
|---|---|---|
| | Percent Black | Percent White |
| 2022 District | 20.07% | 63.59% |
| Core | 20.39% | 62.61% |
| Into District | 11.62% | 77.04% |
| Out of District | 19.82% | 64.34% |

**Table 14: Core/In/Out Analysis for CD 14, Broken Down by Partisan Group**

| CD 14 | Among Democrats | | Among Republicans | | Among Unaffiliated | |
|---|---|---|---|---|---|---|
| | %B | %W | %B | %W | %B | %W |
| 2022 District | 42.47% | 42.36% | 1.95% | 88.27% | 12.83% | 65.21% |
| Core | 47.10% | 36.32% | 1.69% | 87.99% | 14.18% | 62.59% |
| Into District | 33.92% | 55.60% | 0.96% | 90.76% | 6.71% | 78.24% |
| Out of District | 39.44% | 46.32% | 2.23% | 88.57% | 11.89% | 67.05% |
| Effects | | | | | | |
| Core v. Out | 7.66% | -10.00% | -0.53% | -0.58% | 2.29% | -4.46% |
| In v. Out | -5.51% | 9.29% | -1.26% | 2.19% | -5.18% | 11.19% |

<u>The Northeast</u>

While the impact of the 2023 Plan on the representation of Black voters is relatively clear in the Piedmont Triad, where Black voters were removed from District 6 and scattered across rural districts, and in Charlotte, where they were removed from District 14 and concentrated into District 12, District 1 is different: BVAP declined by less than a single percentage point. Nevertheless, the district was very substantially redrawn (see Figure 8). The largest city in the district, Greenville,

23

and indeed a large portion of Pitt County, were removed, and along with them, the largest Black enclave in the district. In the previous version of the district, Greenville had been combined with other proximate Black enclaves to its North. The incumbent representative, Don Davis, is from the Greenville metro area, in Greene County, which remains in District 1, although Greenville itself has been removed.

To make up for the large amount of population lost by removing Greenville, the district was extended Eastward to the Atlantic Ocean, bringing in a small population of rural Whites. Most of the lost population was made up by reaching to the Southwest to include Wayne and Lenoir Counties. To reach population equality, additional population was needed. The final VTDs were selected by splitting Granville County, reaching to the West to pull in the majority-Black town of Oxford.

**Figure 8: Dot Density Map of Race, 2023 District 1 Boundaries, and 2022 District 1 Boundaries, Northeast North Carolina**



Case 1:23-cv-01057-TDS-JLW    Document 125-3    Filed 05/27/25    Page 23 of 28

**Figure 9: Dot Density Map of Race, 2023 District 1 Boundaries, and 2022 District 1 Boundaries, Oxford, NC Area**



Granville is the only split county in District 1, which means that the variation of interest for the "envelope" analysis focuses entirely on one county. In Table 15, note that 94 percent of the registered voters in the envelope are in District 1. Nevertheless, Black voters inside the envelope are somewhat more likely to be placed in District 1 than are White voters (by around 3.5 percentage points). This difference holds up in within partisan groups in Table 16, as well as in the regressions that control for distance to the median population center of the district, reported in the Appendix.

**Table 15: Envelope Analysis for CD 1**

| Area | Group | Registered Voters of Group in Envelope | Registered Voters of Group in CD 1 | % of Group that is in CD 1 |
|------|-------|-------|-------|-------|
| CD 1 | Total | 545,195 | 512,053 | 93.9% |
| | White | 279,947 | 259,382 | 92.7% |
| | Black | 209,588 | 201,688 | 96.2% |

25

**Table 16: Envelope Analysis for CD 1, Broken Down by Partisan Group**

| Party of Registration | Group | Registered Voters of Group in Envelope | Registered Voters of Group in CD 1 | % of Group that is in CD 1 |
|---|---|---|---|---|
| | | | | |
| Democrat | White | 55,364 | 51,263 | 92.6% |
| | Black | 174,282 | 167,653 | 96.2% |
| | | | | |
| Republican | White | 122,984 | 114,389 | 93.0% |
| | Black | 4,737 | 4,598 | 97.1% |
| | | | | |
| Unaffiliated | White | 99,833 | 92,107 | 92.3% |
| | Black | 30,198 | 29,078 | 96.3% |

The "core/in/out" analysis (Tables 17 and 18) reveals that the core of the district had a large Black population relative to the old district and relative, in the aggregate, to the places that were removed and the places that were added. Table 17 shows that whites were around 60 percent of those moved *into* the district, but around 55 percent of those moved *out*. However, Table 18 suggests that this imbalance was found not among Democrats, but among Republicans and above all, unaffiliated voters. Even if political motivations had a role to play in the redrawing of CD 1, which has become somewhat more Republican after dropping Greenville and adding additional rural counties, it appears that care may have been taken to avoid any major change to the district's racial statistics—even at the expense of drawing a more Republican district.

**Table 17: Core/In/Out Analysis for CD 1**

| | Racial Registration | |
|---|---|---|
| CD 1 | Percent Black | Percent White |
| 2022 District | 39.95% | 49.54% |
| Core | 43.59% | 47.01% |
| Into District | 29.07% | 59.59% |
| Out of District | 31.52% | 55.39% |

Case 1:23-cv-01057-TDS-JLW    Document 125-3    Filed 05/27/25    Page 25 of 28

**Table 18: Core/In/Out Analysis for CD 1, Broken Down by Partisan Group**

|  | Among Democrats | | Among Republicans | | Among Unaffiliated | |
|---|---|---|---|---|---|---|
| CD 1 | %B | %W | %B | %W | %B | %W |
| 2022 District | 70.22% | 22.59% | 3.85% | 88.75% | 20.31% | 61.47% |
| Core | 72.55% | 20.81% | 4.37% | 88.53% | 21.99% | 61.79% |
| Into District | 66.07% | 24.99% | 2.28% | 89.59% | 15.70% | 66.84% |
| Out of District | 63.30% | 27.85% | 2.84% | 89.16% | 17.15% | 60.87% |
| Effects | | | | | | |
| Core v. Out | 9.25% | -7.04% | 1.53% | -0.63% | 4.84% | 0.92% |
| In v. Out | 2.77% | -2.86% | -0.56% | 0.43% | -1.45% | 5.97% |

## V.    IMPLICATIONS FOR REPRESENTATION OF RACIAL GROUPS

The foregoing analysis indicates that the 2023 Plan in North Carolina sorted residents according to race, especially in the Piedmont Triad, where Black urban neighborhoods were extracted from their immediate surroundings and combined with faraway rural White areas, and in Charlotte, where Black voters were concentrated into District 12.

One obvious implication of such maneuvers is that Black voters are less likely to elect their candidates of choice, on average, than are White voters. However, there are additional implications for representation. For those who see value in a system of political representation based on geographic districts, much of the value lies in allowing neighbors who live in the same community, and hence share common interests and concerns, to have the same representative. Arguments for this are multifaceted—voters in the same neighborhood are likely to share political interests; voters in the same area are better able to communicate and coordinate with one another; politicians can better maintain connections with voters in the same area; voters in the same area are especially likely to belong to the same social communities—but all suggest the importance of voters being located in districts with their geographic peers.

For many voters, the reality falls far short of this ideal. Instead, efforts to gerrymander districts result in clusters of voters being carved out of their natural communities and pooled with other voters as part of efforts to dilute their political influence. This may not only undermine the political effectiveness of these voters, but it may also deprive them of the benefits associated with belonging to a coherent constituency.[5]  In other words, a perceived danger of "cracking" is that it leads to an abridgment of *local* rights of representation.

This type of injury associated with strategic line-drawing in the 2023 Plan was disproportionately borne by Black voters. Let us begin by examining the extent to which the 2023 districts upended the geography of the 2022 districts. I have calculated the population size of each fragment into which each 2022 district was carved. The largest fragment of the 2022 district ended up in a 2023 district with the same number in every case but two. In (2022) District 6, the largest fragment is now in (2023) District 5. And in (2022) District 14, the largest fragment is now in (2023) District 12. One way to quantify the obliteration of old districts is to take these fragments and generate an

---

[5] See Nicholas Stephanopoulos, 2012, "Spatial Diversity." *Harvard Law Review* 125:1903–2012.

Case 1:23-cv-01057-TDS-JLW     Document 125-3     Filed 05/27/25     Page 26 of 28



Individual-Level Change in Racial Dislocation
for White VAP in Piedmont Triad.
Average Change: -0.04

Distribution of individual-level change in Racial Dislocation for White VAP in Greensboro–Winston-Salem–High Point Combined Statistical Area (CSA). Negative values indicate a person's district has a lower Any Part Black composition than their geographic neighborhood. Average change indicated with red dashed line.

Figure 14 focuses on the *change* in racial dislocation from the 2022 Plan to the 2023 Plan, for Black residents in the top panel and then for Whites in the lower panel. It shows that for most Black residents of the Piedmont Triad, the new map led to a substantial increase in racial dislocation, while for White residents, again due to their different residential geography, the increase was smaller.

In sum, the dislocation analysis provides a useful way of comprehending the implications of "cracking" or "dilution" of geographic communities for representation. When communities are extracted from their geographic context and split from other proximate members of their group, they end up in a district with a demographic composition that is quite different from what they would experience if the district was drawn to keep proximate communities together.

In North Carolina, this means that many Black voters end up in the distant corner of an appendage of a district that is dominated by White voters who live far away, while their neighbors are in the corner of a different district that is dominated by a different set of faraway White voters. This makes it difficult to advocate for common interests in the legislative process.

## VI. CONCLUSION

This report has documented the racial implications of the 2023 Congressional Redistricting Plan in North Carolina. In several of North Carolina's largest agglomerations, urban Black communities were extracted from their residential context and combined with districts dominated by distant rural White communities. This pattern was most evident in Winston-Salem, High Point, and Greensboro in the Piedmont Triad (District 6), as well as Gastonia (District 14) and Greenville (District 1). In the Charlotte area, Black voters were moved from District 14 to District 12. These moves involved the creation of less compact districts and introduced additional county and municipal splits. The 2023 Plan disproportionately moved Black voters to new districts and moved

36

them further from the median population center of their district, while often creating large differences between the demographics of the local community and that of the district. Such dispersion makes it difficult for communities to work together, gain the attention of representatives, and achieve shared policy goals.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 1, 2024.

_____
Jonathan Rodden