# Attachment 11

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

SHAUNA WILLIAMS, et al.,

     *Plaintiffs*,

    v.

REPRESENTATIVE DESTIN HALL, in his official capacity as Chair of the House Standing Committee on Redistricting, et al.,

    *Defendants*.

_____

NORTH CAROLINA STATE CONFERENCE OF THE NAACP, et al.,

     *Plaintiffs*,

    v.

PHILIP BERGER, in his official capacity as the President Pro Tempore of the North Carolina Senate, et al.,

    *Defendants.*

Civil Action No. 23 CV 1057

Civil Action No. 23 CV 1104

**EXPERT REPORT OF DR. JAMES L. LELOUDIS II:**
Race and Voting Rights in North Carolina, 1860-2024

*August 1, 2024*

1

followed the Civil War. Then, as now, democracy was imperiled by divisive racial appeals, violent expressions of white supremacy, and efforts on multiple fronts to limit minority citizens' political voice and participation. In such a moment, history has clarifying power.

## VI. War, Emancipation, and Reconstruction

### A. Civil War to the Black Code

On the eve of the Civil War, North Carolina's government was an oligarchy, not a democracy. The state constitution gave political advantage to a slaveholding elite concentrated in the counties of the eastern coastal plain. Seats in the state Senate were apportioned among fifty districts defined by the value of the taxes that residents paid into state coffers; in the House of Representatives, apportionment was governed by the "federal ratio," which counted slaves as three-fifths of a person. These provisions, together with property requirements for election to high state office, effectively removed a large majority of middling and poor whites from governance of the state and their local communities. Free Black men with property had been entitled to vote under the state constitution of 1776, but that right was rescinded in 1835 by a constitutional amendment. This was the first time in the state's history that the franchise was restricted on the basis of race. Political leaders framed Black disenfranchisement as a necessary response to Nat Turner's rebellion in 1831 and the founding of the American Anti-Slavery Society in 1833. They saw it as protection against the threat of slave insurrections encouraged by white abolitionists and their perceived agents, free Black men exercising the rights of citizenship.[4]

By 1860 more than 85 percent of lawmakers in the North Carolina General Assembly were slaveholders, a higher percentage than in any other southern state. Wealth was closely held by this elite, who constituted roughly seven percent of the state's population of one million and resided mostly in the east. These men also maintained a firm grip on political power. Indeed, the principles of oligarchy were written into the state's constitution. At the local level, voters elected only two county officials: a sheriff and a clerk of court. The power to govern rested in the hands of justices of the peace who were nominated by members of the state House of Representatives and commissioned for life terms by the governor.[5]

North Carolina's antebellum oligarchs did not rule with unchallenged authority. In the 1850s, they faced political revolt by white yeoman farmers in the central Piedmont and the western mountain region who called for removal of property requirements for the right to vote for state senators and demanded an *ad valorem* tax on slaveholders' human property – more than three hundred and thirty thousand Black men, women, and children. Dissenters won the first contest by popular referendum on free suffrage in 1856, and they prevailed in the second when delegates to the state secession convention gave ground on taxation for

---

[4] Escott, *Many Excellent People*, 3-31, and Morris, "Panic and Reprisal," 52.

[5] On antebellum North Carolina's economic and political structure, see Escott, *Many Excellent People*, chapt. 1. The figure on slaveholders in the state legislature is from p. 15.

fear that in war with the North, ordinary whites "would not lift a finger to protect rich men's negroes."[6-7]

Most of North Carolina remained behind Confederate lines until the final days of the Civil War, and for that reason the state bore a Herculean share of hardship and deprivation. By 1863, North Carolina troops were deserting by the thousands. Many did so with support from the Order of the Heroes of America, an underground network of Unionists and Quaker pacifists. Food riots broke out in the state's largest towns, and in the 1864 gubernatorial election, William Woods Holden, a self-made newspaper publisher, ran on a peace platform, arguing that a negotiated return to the Union offered North Carolina's only chance to "save human life" and "prevent the impoverishment and ruin of our people." Holden lost to incumbent governor Zebulon B. Vance by 58,070 to 14,491 votes, but his candidacy exposed a deep rift between the state's wealthy rulers and a significant minority of whites – twenty percent of the electorate – who had "tired of the rich man's war & poor man's fight."[8]

As defeat grew imminent, Calvin H. Wiley, a distinguished educator and writer, warned of the insurrection that collapse of the Confederacy and the end of slavery would unleash. "The negroes [and] the meanest class of white people would constitute a majority," he warned, and those "who were once socially & politically degraded" would make common cause and rise up in rebellion. To forestall this political realignment, self-styled Conservatives took advantage of President Andrew Johnson's desire for a quick reconstruction of the South by acting decisively to retain political power and dominion over Black labor through legislative action.[9]

In the spring of 1866, Conservatives in the General Assembly passed an Act Concerning Negroes and Persons of Color, known informally as the Black Code. The act sought to keep Blacks subjugated and to "fix their status permanently" by attaching to them the same "burthen and disabilities" imposed on free persons of color by antebellum law.[10]

Under the Black Code, freedmen could not vote, carry weapons without a license, migrate into the state, return to the state after more than ninety days' absence, or give testimony against a white person in a court of law, except by consent of the white defendant. The law also gave sheriffs broad authority to prosecute freedmen for vagrancy, a crime punishable by hiring out to "service and labor."[11]

---

[6] Well into the twentieth century, southern white writers rendered the word 'Negro' only in lower case. It was a sign of racial disrespect. Here, and throughout, the word is rendered as in the original.

[7] Ibid., 28-30, and 34.

[8] Escott, *Many Excellent People*, 44 and 49, and Raper, *William W. Holden*, 51. On internal dissent during the Civil War, see also Durrill, *Uncivil War*.

[9] Escott, *Many Excellent People*, 89-90.

[10] Ibid., 130, and *Public Laws of North Carolina, 1865-66*, chapt. 40. For North Carolina law governing slaves and free Blacks before the Civil War, see *Revised Code of North Carolina, 1854*, chapt. 107. See also Browning, "North Carolina Black Code."

[11] *Public Laws of North Carolina, 1865-66*, chapt. 40.

### B. A New State Constitution and Expansion of the Franchise

The Republican majority in the U.S. Congress watched developments in North Carolina and elsewhere in the South with growing concern, particularly for the rights of freedmen. Thaddeus Stevens, congressman from Pennsylvania, warned North Carolina Conservatives that they would "have no peace until a negro is free as a white man . . . and is treated as a white man!" To that end, Congress approved the Fourteenth Amendment to the federal Constitution in June 1866 and tendered it for ratification by the states. The amendment gave citizenship to freedmen and struck directly at the Black Code by guaranteeing all citizens equal protection under the law and forbidding the states to deprive any citizen of life, liberty, or property without due process.[12]

In North Carolina, as in all other southern states except Tennessee, Conservative lawmakers stood firm. They refused to ratify an amendment that, in their view, turned "the slave, master, and the master, slave." Congress answered that defiance by asserting its authority once more, this time through passage of the Military Reconstruction Act of 1867. That legislation ordered the continued military occupation of the South, instructed army commanders to organize conventions that would rewrite the southern states' constitutions, and granted all adult male citizens – "of whatever race, or color, or previous condition" – the right to vote for convention delegates.[13]

This extension of a limited franchise to Black men radically rearranged the political landscape in North Carolina. It was now possible that an alliance between freedmen and dissenting whites could constitute a political majority. With that end in view, opponents of Conservative rule gathered in Raleigh in March 1867 to establish a biracial state Republican Party. William Holden, the Confederate peace candidate who had served briefly as North Carolina's provisional governor after the South's surrender, stood at the party's head and directed efforts to build a statewide organization using networks established during wartime by the Heroes of America and by the Union League in its campaigns to mobilize freedmen.

When voters went to the polls to elect delegates to the constitutional convention, leaders of the old elite were stunned: Republicans won 107 of the convention's 120 seats. Of that majority, fifteen were Black, including religious and political leader James W. Hood, who had presided over the first political convention of Blacks in North Carolina in late 1865. At that gathering, 117 delegates, most of them former slaves, met in Raleigh to petition white leaders for "adequate compensation for our labor . . . education for our children . . . [and abolition of] all the oppressive laws which make unjust discriminations on account of race or color."[14]

---

[12] Raper, *William W. Holden*, 91.

[13] Escott, *Many Excellent People*, 135, and *Statutes at Large, Treaties, and Proclamations*, 429. Tennessee had been readmitted to the Union in 1866.

[14] Escott, *Many Excellent People*, 125 and 142; Bernstein, "Participation of Negro Delegates in the Constitutional Convention of 1868," 391; and Hamilton, *Reconstruction in North Carolina*, 240-46.

10

During the winter of 1867-68, delegates to the constitutional convention crafted a document that defined a thoroughly democratic polity. The proposed constitution guaranteed universal manhood suffrage, removed all property qualifications for election to high state office, and at the county level put local government in the hands of elected commissioners rather than appointed justices of the peace. North Carolina would no longer be "a republic erected on race and property." The constitution of 1868 also expanded the role of the state in advancing the welfare of its citizens by levying a capitation tax to fund education and "support of the poor," mandating for the first time in North Carolina history a state system of free public schools, and establishing a state board of public charities to make "beneficent provision for the poor, the unfortunate and orphan."[15]

Black delegates to the convention knew that the success of these reforms would depend on safeguarding broad access to the franchise and appealed for the forceful defense of voting rights. The convention passed an ordinance to criminalize efforts to intimidate "any qualified elector of this State . . . by violence or bribery, or by threats of violence or injury to his person or property."[16]

In May 1868, voters ratified the constitution, elected William Holden governor, and gave the biracial Republican Party six of North Carolina's seven Congressional seats and control of more than two-thirds of the seats in the state legislature. The scale of the Republicans' victory reflected the fact that in North Carolina the percentage of whites who crossed the color line and made common cause with former bondsmen was larger than in any other southern state.[17]

That alliance and the democratic society it envisioned were startling, even by today's standards. In 1869, twenty Black political leaders from North Carolina traveled to Washington, D.C. to attend the Colored National Labor Convention, where they joined nearly two hundred other delegates from points across the South and throughout the nation. James H. Harris, a Black lawmaker and one of the founders of the North Carolina Republican Party, was elected president of the convention. Over the next five days, the delegates drafted a manifesto for a future built upon racial cooperation, labor solidarity, and respect for the rights of women and immigrants. The document called for unions organized "without regard to color"; extended a "welcome hand to the free immigration of labor of all nationalities"; and implored the states to fund "free school system[s] that know no distinction . . . on account of race, color, sex, creed or previous condition." These things, the manifesto proclaimed, would make the "whole people of this land the wealthiest and happiest on the face of the globe."[18]

---

[15] *Constitution of the State of North Carolina, 1868*, Article V, sec. 2; Article VI, Sec. 1; Article VII, Sec. 1; and Article XI, sec. 7; and Orth, "North Carolina Constitutional History," 1779.

[16] *Constitution of North Carolina, 1868*, Ordinances, chapt. XXXVI.

[17] Raper, *William W. Holden*, 101, and Foner, *Reconstruction*, 332.

[18] *Proceedings of the Colored National Labor Convention*, 4 and 11-12.

11

## C. Klan Violence and "Redemption"

Historian Paul Escott writes that North Carolina's Republican Party "offered a new and vibrant democracy. It seemed inspired with a mission: to open up North Carolina's . . . politics and social system." But as he observes, the party's Conservative rivals were determined to make race, not democracy, the "central question." They described Republicans as a "mongrel mob" spawned by "negro suffrage and social disorder," and they warned non-elite whites of the loss of racial privilege. "IT IS IN THE POOR MAN'S HOUSE," the editor of the *Wilmington Journal* railed, "THAT THE NEGRO WILL ENFORCE HIS EQUALITY."[19]

Such provocations struck deep chords of sentiment in a society that had been organized around racial division for more than two hundred years. But in the new order, words alone could not loosen the Republicans' hold on power. To strike the crippling blow, Conservatives turned to the Ku Klux Klan and vigilante violence. The Klan was first organized in Tennessee in 1868 and subsequently spread across the South. In North Carolina, its leader was one of the Conservatives' own: William L. Saunders, a former Confederate colonel and later a trustee of the state university and secretary of state.

The Klan's masked nightriders committed "every degree of atrocity; burning houses, whipping men and women, beating with clubs, shooting, cutting, and other methods of injuring and insult." In Graham, the seat of Alamance County, they murdered Wyatt Outlaw, a Black town commissioner and constable, and hung his body from a tree in the public square; and in Caswell County, Klansmen lured state senator John W. Stephens, a white Republican, into the basement of the county courthouse, where they beat and stabbed him to death.[20]

Violence occurred in all parts of the state, but as the murders of Outlaw and Stephens attest, backlash against Black political power was especially fierce in the central Piedmont, where the Klan aimed to intimidate not only Black voters, but also the large number of dissenting whites who had crossed the race line. As one Klan leader explained, he and his compatriots aimed not to restore "a white man's government only, but – mark the phrase – an *intelligent* white man's government."[21]

On July 8, 1870, Governor Holden declared Alamance and Caswell Counties to be in open insurrection and ordered the state militia to suppress the Klan and arrest its leaders. That move quelled the worst violence but gave Holden's Conservative opponents the issue they needed to win back control of the General Assembly in the fall election. In 1871, Conservatives successfully impeached and removed Holden from office on charges of unlawfully suspending the prisoners' right of habeas corpus.[22]

---

[19] Escott, *Many Excellent People*, 145-48 and 151.
[20] Raper, *William W. Holden*, 160.
[21] Hamilton, ed., *Papers of Randolph Abbott Shotwell*, vol. 2, 376.
[22] Ibid., chapts. 8-9.

From there, the democratic experiment of Reconstruction rapidly unwound. White northerners, weary of a decade of struggle with the South, had little will to continue a states' rights battle with their neighbors. Slavery had been abolished and secession, punished. That was enough for most whites, who found it perfectly consistent to hate the institution of slavery and to despise the slave with equal passion. For a majority, racial equality had never been a part of the Civil War's purpose. The last federal troops left North Carolina in 1877, a year after Conservatives – now calling themselves Democrats – elected Zebulon B. Vance Governor, a post that he had held for two terms during the Civil War. Across the state, Democrats celebrated "redemption" from what they had long described as the "unwise . . . doctrine of universal equality."[23]

In an effort to secure their victory, white Democrats abolished elected county government, returned authority to appointed justices of the peace, and limited appointed offices to whites only. But continued Black political participation at the state level sustained a competitive two-party system. Between 1876 and 1898, white Democrats never polled more than 54 percent of the gubernatorial vote, and in the same period, forty-three Black Republicans won election to the state House of Representatives, eleven secured seats in the state Senate, and four served in the U.S. House of Representatives.[24]

Most of these lawmakers were elected in North Carolina's eastern Black Belt, a swath of counties where slavery had been most deeply entrenched, and where the state's post-Civil War Black population was concentrated. All four Black Republicans elected to Congress represented the overlapping Second Congressional District – or, as it was known at the time, simply the "Black Second." They included John A. Hyman (1875-1877), James E. O'Hara (1883-1887), Henry P. Cheatham (1889-1893), and George H. White (1897-1901).[25]

---

[23] Escott, *Many Excellent People*, 147.

[24] Crow, "Cracking the Solid South," 335, and Escott, *Many Excellent People*, 181. On North Carolina's Black congressmen, see E. Anderson, *Race and Politics in North Carolina, 1872-1901.*

[25] Reid, "Four in Black," 229-43.

13



Map of the South's enslaved population, from the 1860 Census.
The heavily shaded counties in eastern North Carolina are still
known as the state's Black Belt. Courtesy of Geography and
Map Division, Library of Congress.

Today, much of the Black Second is included in North Carolina's First Congressional District, which the General Assembly, under progressive interracial leadership, created in 1991 as a minority opportunity district. Over the last decade, Republican lawmakers have made the district a focal point in state-level contests over minority voting rights. That they would do so is no surprise – the counties in this region were subjected to the earliest efforts at racial gerrymandering and vote dilution in North Carolina's post-Emancipation history.

14



North Carolina's "Black Second" congressional district, 1872-1883.
Courtesy of Anchor, An Online North Carolina History Resource,
North Carolina Government and Heritage Library, State Library of
North Carolina, Raleigh, N.C.

In 1871, immediately after gaining control of the General Assembly, white conservative Democrats attempted to curtail the political strength of Black citizens in Edgecombe County – a Black majority County, then and now – where voters elected Black Republicans to the state House of Representatives. In neighboring Nash County, a group of men who had ranked among the Black Belt's largest slaveholders proposed clipping that political power by moving the Nash-Edgecombe boundary slightly to the northeast, which would remove as many as 400 Black voters from the Edgecombe County rolls. Democratic voters approved the plan in short order but were ultimately disappointed in their ambitions. Edgecombe remained a center of Black political mobilization until disenfranchisement in 1900-01.[26]

White Democrats maneuvered in similar fashion, and this time with success, in the heavily Black counties along the Virginia border. After the collapse of Reconstruction, Black men in the region continued to vote in large numbers; they made Warren County a Black Republican stronghold and traded victories with conservative white Democrats in Granville and Franklin Counties. In 1881, Democratic lawmakers attempted to weaken, if not break, that political strength. From the three troublesome counties, they carved out a sector of land, 14 by 28 miles in size, and used it to create a new Black-majority county – a political give-away of sorts that improved Democrats' prospects in Warren, Franklin, and Granville. With vindictive political humor, Democratic lawmakers named the new county for Zebulon B. Vance, North Carolina's Confederate governor who returned to office in the late 1870s to oversee the dismantling of Reconstruction. Vance and his compatriots

---

[26] For a succinct account of the 1871 change to the Edgecombe-Nash boundary line, see The Historical Origins of the 1871 Nash-Edgecombe County Line, Digital Rocky Munt Mills: Recovering Voice in the Shadow of Change, < https://unc.live/3zYR3BH>, July 26, 2024.

15

often referred to the new county as "Zeb's Black Baby"– a veiled reference, perhaps, to the sexual exploitation of Black women by the white men who, in the days of slavery, held legal title to their bodies.[27]

As historian Harry Watson has observed, it is hard to imagine a more durable form of race-conscious partisan gerrymandering than the "creation of a new county." That "becomes permanent . . . and hard to roll back." [28]

There are lessons in these stories – lessons about race, the manipulation of elections, and the consolidation of political power – that echo across time into the present day.

### D. New Forms of Economic Subjugation

Economic change swept through rural North Carolina in the decades after Reconstruction as an emerging merchant class pressed freedmen and white yeoman farmers into commercial production. The result was the notorious system of sharecropping that turned once-independent whites into debtors and locked Blacks in virtual peonage. Each spring, sharecroppers took out loans in the form of the seeds, tools, and supplies they needed in order to plant the year's crop. To ensure repayment – often at interest rates as high as 50 percent – merchants demanded that their clients grow cotton or tobacco, which could be sold readily for cash. As farmers produced more of these cash crops, prices fell and rural families spiraled downward into debt. Whites who owned small plots of land sometimes managed to escape this trap, but Blacks – the vast majority of whom were landless and had to pay rent to landlords along with interest to merchants – had no recourse. Black sharecroppers often ended the agricultural year with no profit and were unable to accumulate wealth. This process of immiseration repeated itself from generation to generation and produced enduring poverty. In the eastern Black Belt, where sharecropping dominated the agricultural economy, the effects could still be seen a century later, when Black per capita income in the region was as low as 22 percent of that of whites.[29]

Desperation and resentment over a new economic order that rewarded manipulators of credit more than tillers of the soil led farmers into revolt. Whites joined the Southern Farmers Alliance, first organized in Texas and then spread throughout the South by means of local chapters, and Blacks affiliated with a parallel organization, the Colored Farmers Alliance. In 1892, these groups sought redress through the political process. Blacks remained true to the Republican Party, while dissenting whites, calling themselves Populists, bolted from the Democratic Party – controlled by the state's economic elite – and joined farmers and workmen across the nation in the newly organized People's Party. The results of the 1892 election were disastrous for Republicans and Populists alike. In the governor's race, the Democratic candidate won 48.3 percent of the vote, while the Republican candidate received 33.8 percent, and the Populist candidate trailed far behind

---

[27] How Did Gerrymandering Begin in North Carolina? Consider Vance County, Carolina Public Press, January 4, 2024, <https://bit.ly/3WlkNjQ>, July 26, 2024.

[28] Ibid.

[29] Petty, *Standing Their Ground*, and Goldfield, *Still Fighting the Civil War*, 277-78.

16

with 17.04 percent. These numbers contained a lesson that was obvious to voters who were less than a generation removed from the biracial politics of Reconstruction. Divided, the dissidents were all but certain to lose; united, they could challenge Democrats' hold on power.[30]

## VII. Fusion Politics and a New Campaign for White Supremacy

### A. Biracial Alliance, Electoral Reform, and Investment in Social Provision

In 1894, white Populists and Black Republicans in North Carolina forged a political partnership under the banner of "Fusion" and ran a historic joint slate of candidates. A former slave named Walter A. Pattillo was one of Fusion's chief architects. After Emancipation, he had made a career as a Baptist minister, educator, and reformer. He served as superintendent of schools in Granville County, established North Carolina's only Black orphanage, and edited two newspapers. Most notably, he also led the organization of local chapters of the Colored Farmers Alliance, an organization for Black farmers and agricultural laborers that paralleled the white Southern Farmers Alliance. In all this work, Pattillo devoted himself to "bringing about peace and goodwill between the colored and white races."[31]

In the *Arena*, a national magazine of progressive opinion, Populist congressman Thomas Watson explained Fusion's appeal:

> Now the People's Party says to [the white tenant and the Negro tenant], "You are kept apart that you may be separately fleeced of your earnings. You are made to hate each other because upon that hatred is rested the keystone of the arch of financial despotism which enslaves you both. You are deceived and blinded that you may not see how this race antagonism perpetuates a monetary system which beggars both. . . . The conclusion, then, seems to me to be this: the crushing burdens which now oppress both races in the South will cause each to make an effort to cast them off. They will see a similarity of cause and a similarity of remedy. They will recognize that each should help the other in the work of repealing bad laws and enacting good ones. They will become political allies, and neither can injure the other without weakening both. It will be to the interest of both that each should have justice. And on these broad lines of mutual interest, mutual forbearance, and mutual support the present will be made the stepping-stone to future peace and prosperity.[32]

Fusion's logic was indeed persuasive. In the 1894 election, Populists and Republicans took control of seventy-four of the one hundred and twenty seats in the North Carolina

---

[30] Beckel, *Radical Reform*, 135-77, and North Carolina Governor, 1896, <http://bit.ly/32oHPk>, July 26, 2024.

[31] Ali, *In the Lion's Mouth*, 61.

[32] Watson, "Negro Question in the South," 548 and 550.

legislature. On the local level, in 1894 and 1896, they also elected more than one thousand Black officials, including county commissioners, deputy sheriffs, school committeemen, and magistrates.[33]

A commitment to fair play and democracy animated the Fusion legislature. Lawmakers capped interest rates at 6 percent, a godsend for cash-strapped farmers who relied on credit to survive; shifted the weight of taxation from individuals to corporations; and restored elected local government, a postwar reform that Democrats had reversed after their return to power in the 1870s. In addition, the legislature made new investments in public services that Democrats had starved for resources, including the state penitentiary, state schools for deaf and blind children, a state-supported home for Black orphans, and state mental asylums.[34]

Most important, Fusion legislators also revised state election law with the aim of guaranteeing full and fair access to the franchise:

- The revised law required that the clerk of the superior court in every county lay out compact precincts "so as to provide, as near as may be, one separate place of voting for every three hundred and fifty electors." The clerks were also instructed to publish the details of precinct boundaries and polling places in local newspapers and to post that information in public places. In a rural state in which the population was widely dispersed, these provisions ensured that neither travel nor lack of public notice would be an impediment to voting. Legislators revisited the law in 1897 to provide additional protection for the opportunity as well as the right to cast a ballot. They stipulated that every elector was "entitled," without penalty, "to absent himself from service or employment" for sufficient time to register and to vote.[35]

- To safeguard impartiality in voter registration and the supervision of elections, the law gave clerks of court – who were elected officials, and therefore accountable to voters – the authority to appoint in every precinct one registrar and one election judge from "each political party of the state." Prior to this time, that responsibility had belonged to county officers who owed their appointment and their loyalty to the majority party in the legislature.[36]

- The law also criminalized various forms of physical and economic intimidation. It specified that "no regimental, battalion or company muster shall be called or directed on election day, nor shall armed men assemble on the day of election." In addition, any person who attempted "by force and violence" to "break up or stay

---

[33] Escott, *Many Excellent People*, 247, and Gershenhorn, "Rise and Fall of Fusion Politics in North Carolina," 4.

[34] Kousser, *Shaping of Southern Politics*, 186, and *Public Laws and Resolutions, Session of 1895*, chaps. 69, 73, 116, 135, 174, 183, 219, 275, 348.

[35] *Public Laws and Resolutions, Session of 1895*, chapt. 159, sec. 5, and *Public Laws and Resolutions, Session of 1897*, chapt. 185, sec. 72.

[36] *Public Laws and Resolutions, Session of 1895*, chapt. 159, sec. 7.

any election" was guilty of a misdemeanor, punishable by imprisonment and a fine of up to one hundred dollars. Similar penalties applied to "any person who shall discharge from employment, withdraw patronage from, or otherwise injure, threaten, oppress, or attempt to intimidate, any qualified voter."[37]

- The law sought to limit frivolous and obstructive challenges to voter eligibility and the legality of ballots cast by presuming the truthfulness of citizens' declarations. Challenges were allowed only on a specified day prior to an election, at which time registration books were opened for public review, and challengers were required to present proof that an elector had withheld or provided false information at the time of registration. Otherwise, the law treated "entry of the name, age, residence, and date of registration of any person by the registrar, upon the registration book of a precinct, [as] presumptive evidence of the regularity of such registration, the truth of the facts stated, and the right of such person to register and to vote at such precinct."[38]

- The law accommodated illiterate voters – 23 percent of whites and 60 percent of Blacks – by authorizing political parties to print ballots on colored paper and to mark them with party insignia, an old practice that Democrats had abolished. In this period, before the introduction of official, non-partisan ballots and secret voting, electors received ballots from the party, or parties, they favored, marked through the names of any candidates they did not support, and handed their ballots to an election judge for deposit in boxes labeled with the office or group of offices for which they were voting. The use of color coding and party insignia helped illiterate voters correctly identify and cast the ballot of the party they favored. To protect voters from fraudulent handling of their ballots, the law also specified that "any ballot found in the wrong box shall be presumed to have been deposited there by mistake of the officers of election, and unless such presumption shall be rebutted, the ballot shall be counted." This was important, because there could be as many as six boxes at each polling place, and apart from their labels, they all looked alike.[39]

- Finally, the law required public disclosure of campaign financing. Every candidate had to provide, within ten days after an election, "an itemized statement, showing in detail all the moneys contributed or expended by him, directly or indirectly, by himself or through any other person in aid of his election." Those reports also were to "give the names of the various persons who received the moneys, the specific nature of each item, and the purpose for which it was expended or contributed."[40]

---

[37] Ibid., chapt. 159, secs. 38, 39, and 41.

[38] Ibid., chapt. 159, secs. 10-12 and 14.

[39] *Public Laws and Resolutions, Session of 1895*, chapt. 159, secs. 19 and 20; Trelease, "Fusion Legislatures of 1895 and 1897," 282; and Beeby, *Revolt of the Tar Heels*, 40. On illiteracy, see *Report of Population of the United States at the Eleventh Census: 1890*, part 2, xxxv.

[40] *Public Laws and Resolutions, Session of 1895*, chapt. 159, sec. 72.

19

These changes produced momentous results in the 1896 election. Republican registration overall increased by 25 percent, and turnout among registered Black voters rose from 60 to nearly 90 percent. Fusionists won more than three-fourths of the seats in the legislature and elected a white Republican, Daniel L. Russell Jr., as governor. Fusion insurgencies arose in other southern states, but only in North Carolina did a biracial alliance take control of both the legislative and executive branches of government.[41]

Fusion lawmakers used their political strength to redress two decades of Democrats' underinvestment in education. This was a particularly important issue for Black Republicans, whose predecessors had led the campaign to include a mandate for public schools in the 1868 state constitution and whose constituents were profoundly disadvantaged in their day-to-day interactions with landlords, merchants, and employers by an inability to read and do basic arithmetic. In an Act to Encourage Local Taxation for Public Schools, Fusion lawmakers instructed county commissioners to hold elections in every school district under their supervision on the question of "levying a special district tax" for public education. Districts that voted in favor of taxation were entitled to apply for matching funds from the state. To pressure those that refused, legislators ordered an election every two years until a special tax was approved.[42]

In separate legislation, Black lawmakers used their influence in the Fusion alliance to ensure equitable provision for students in their communities. A revised school law abolished separate white and Black committees appointed at the township level to manage schools for each race and replaced them with consolidated committees made up of five appointees, no more than three of whom could come from the same political party. The law charged the new committees with managing the schools in their districts as a single enterprise. They were to appropriate funds on a strict per capita basis and to apportion "school money . . . so as to give each school in their district, white and colored, the same length of school term." Districts were also required to limit enrollments to no more than 65 students per school, so as to ensure a rough measure of equity in school facilities.[43]

The election and education reforms enacted in 1895 and 1897 affirmed the values that Black and white reformers had written into the state constitution in 1868. That document, the core of which remains in force today, opened by invoking the Declaration of Independence and connecting the ideals of the American republic to the economic and political struggles set in motion by Confederate defeat and the abolition of slavery. Italics highlight language added by the framers of 1868: "We do declare . . . that all men are created equal; that they are endowed by their Creator with certain unalienable rights; that among these are life, liberty, *the enjoyment of the fruits of their own labor*, and the pursuit of happiness. . . . That all political power is vested in, and derived from the people; all government of right originates from the people, is founded upon their will only, and is

---

[41] Escott, *Many Excellent People*, 245-47; Beckel, *Radical Reform*, 179-80; and Kousser, *Shaping of Southern Politics*, 182 and 187.

[42] *Public Laws and Resolutions, Session of 1897*, chapt. 421.

[43] Ibid., chapt. 108.

instituted *solely for the good of the whole*."[44] Fusion lawmakers in North Carolina, historian Morgan Kousser has observed, created "the most democratic" political system "in the late nineteenth-century South."[45]

## B. Resurgent White Supremacy and the Wilmington Coup

As they approached the election of 1898, Democrats once again made white supremacy their rallying cry and vigilante violence their most potent political weapon. Responsibility for orchestrating the campaign fell to party chairman Furnifold M. Simmons. Simmons lived in eastern North Carolina, in the Second Congressional District, which he represented in Congress from 1887 to 1889, until being ousted by Black Republican challenger Henry Cheatham. Now, a decade later, Simmons had an opportunity to settle the score with Black voters and their white Fusion allies. He and his party dodged the economic and class issues that held the Fusion coalition together and appealed instead to the specter of "negro domination."[46]

Democratic newspapers took the lead in whipping up race hatred. None was more influential than the Raleigh *News and Observer*, published by Josephus Daniels. Day after day, in the weeks leading up to the election, Daniels ran political cartoons on the front page of the paper to illustrate the evils unleashed by Black political participation. The cartoons depicted Black men as overlords and sexual predators who were intent on emasculating white men, turning them into supplicants, and ravaging their wives and daughters. Across scores of images, the *News and Observer*'s message was clear: in an inversion of the racial order, Blacks had lifted themselves by pressing white men down.

---

[44] *Constitution of the State of North Carolina, 1868*, Article I, secs. 1-2.

[45] Kousser, *Shaping of Southern Politics*, 183.

[46] Escott, *Many Excellent People*, 253-58, and Korstad and Leloudis, *To Right These Wrongs*, 206. On the Black Second, see E. Anderson, *Race and Politics in North Carolina, 1872-190*, and Justesen, *George Henry White*.



Above, "The Vampire that Hovers Over North Carolina," a Black incubus emerges from the Fusion ballot box to prey on white women, and below, a white Fusion voter, victim of "The New Slavery," Raleigh *News and Observer*, September 27 and October 15, 1898.



Democrats wielded racial appeals as a wrecking ball, much as they had done during Reconstruction. Some white Populists buckled. They gave in to the deeply entrenched ways that race shaped political and social perception and began arguing that they, not Democrats, were the most ardent defenders of white supremacy. Even so, the political battle would not be won by words alone.

In the closing days of the 1898 campaign, leaders of the Democratic Party turned once more to violence. They organized local White Government Unions and encouraged the party faithful to don the paramilitary uniform known as the "red shirt," a symbol of the blood sacrifice of the Confederacy and the late-nineteenth-century equivalent of the hooded robes worn by Klansmen in an earlier era. Democrats engaged in open intimidation of voters at registration and polling places across the state. Former congressman Alfred M. Waddell called white men to war. "You are Anglo-Saxons," he exclaimed. "You are armed and prepared, and you will do your duty. Be ready at a moment's notice. Go to the polls . . . and if you find the negro out voting, tell him to leave the polls, and if he refuses, kill him. Shoot him down in his tracks." The effect was terrifying. In Winston, a Republican newspaper reported that "there were crowds of men who gathered around the polls in each ward and . . . boldly drove a large percent of the colored Republican voters and a good many white voters away from the polls."[47]

 

Armed Red Shirts in Laurinburg and their uniform. Courtesy of the North Carolina State Archives and the North Carolina Museum of History.

Democrats' determination to defeat their challengers at any cost was revealed most starkly in the majority-Black coastal city of Wilmington. Revisions to the city charter made by the Fusion legislatures of 1895 and 1897 had undone Democratic gerrymandering and produced a Republican majority – including three Blacks – on the board of aldermen.

---

[47] "The North Carolina Race Conflict," *Outlook* 60 (November 19, 1898), 708, and Korstad, *Civil Rights Unionism*, 53.

Democrats were enraged by that development and the fact that they would not be able to challenge local Republican rule at the polls until the next municipal election in 1899.[48]

On November 9, the day after the 1898 election, Democratic leaders drew up a declaration of independence that called for the restoration of white rule in Wilmington. They acted on belief "that the Constitution of the United States contemplated a government to be carried on by an enlightened people; [belief] that its framers did not anticipate the enfranchisement of an ignorant population of African origin, and [belief] that those men of the State of North Carolina, who joined in forming the Union, did not contemplate for their descendants a subjection to an inferior race." "The negro [has] antagonized our interest in every way, and especially by his ballot," the Wilmington *Morning Star* exclaimed. "We will no longer be ruled, and will never again be ruled, by men of African origin."[49]

The next day, armed white men under the command of Alfred Waddell staged the only municipal coup d'état in the nation's history. They marauded through Wilmington's Black district, set ablaze the print shop of the city's only Black newspaper, murdered as many as thirty Black citizens in the streets, and drove the sitting board of alderman from office in order to make room for a new, self-appointed city government with Waddell at its head.



A souvenir postcard produced by a local photographer documented destruction of Love and Charity Hall, which housed the *Daily Record*, Wilmington's Black newspaper. Courtesy of the New Hanover County Public Library, Robert M. Fales Collection.

---

[48] For a detailed account of events in Wilmington, see *1898 Wilmington Race Riot Report*. The report was commissioned by the state legislature in 2000. In 2007, lawmakers expressed "'profound regret that violence, intimidation and force' were used to overthrow an elected government, force people from their homes and ruin lives." See "Senate Apologizes for Wilmington Race Riot," Raleigh *News and Observer*, August 2, 2007.

[49] Raleigh *News and Observer,* November 10, 1898; *Wilmington Morning Star*, November 10, 1898; and *Wilmington Messenger*, November 10, 1898.

Case 1:23-cv-01057-TDS-JLW    Document 125-11    Filed 05/27/25    Page 19 of 100

Democrats won the 1898 election statewide by a narrow margin. They claimed only 52.8 percent of the vote, but that was enough to oust most Fusionists from the legislature. The victors moved immediately to "rid themselves . . . of the rule of negroes and the lower classes of whites."[50]

## C. The 1899 Act to Regulate Elections and Black Disenfranchisement

In the 1899 legislative session, Democrats drafted an amendment to the state constitution that aimed to end biracial politics once and for all by stripping Black men of the most fundamental privilege of citizenship: the right to vote. The Fifteenth Amendment to the federal Constitution, adopted during Reconstruction, forbade the states from denying the ballot to citizens on the basis of race. North Carolina Democrats, like their counterparts elsewhere in the South, circumvented that prohibition by adopting a literacy test.

In order to vote, citizens first had to demonstrate to local election officials that they could "read and write any section of the Constitution in the English language." That gave Democratic registrars wide latitude to exclude Black men from the polls. Democrats also included a grandfather clause in the amendment that exempted from the literacy test adult males who had been eligible to vote or were lineal descendants of men who had been eligible to vote on or before January 1, 1867. That was a magic date, because it preceded the limited right to vote given to Black men under the Military Reconstruction Act, passed in March of that year. The literacy test was thus designed to achieve the very thing the federal Fifteenth Amendment expressly outlawed – voter exclusion based on race.[51]

Male citizens could also be denied access to the franchise if they failed to pay the capitation tax (poll tax) levied in accordance with Article V, Section 1, of the 1868 State Constitution.[52] This link between payment of the capitation tax and the right to vote was a new impediment put in place by the disenfranchisement amendment. The amendment required that electors pay the tax before the first day of May, prior to the election in which they intended to vote. At that time of year, before the fall harvest, Black sharecroppers were unlikely to have cash on hand for such a payment.

Democrats rewrote state election law to boost the odds that the amendment would win approval. In the 1899 Act to Regulate Elections, they repealed reforms made by the Fusion legislatures of 1895 and 1897, and they put in place new provisions that were crafted to deliver "a good Democratic majority."[53]

- With the aim of purging as many Fusion voters as possible, lawmakers ordered an "entirely new registration" in advance of the next election. In that process, registrars could, at their discretion, require an applicant to "prove his identity or

---

[50] Kousser, *Shaping of Southern Politics*, 191, and Escott, *Many Excellent People*, 258.

[51] *Laws and Resolutions, 1900,* chapt. 2.

[52] Ibid.

[53] Kousser, *Shaping of Southern Politics*, 190, and *Public Laws and Resolutions, Session of 1899*, chapt. 16.

age and residence by the testimony of at least two electors under oath." The law also gave "any by stander" the right to challenge a registrant's truthfulness and force a lengthy examination.[54]

- In a reversal of provisions made in the 1895 election law, information recorded in a registration book no longer stood as presumptive evidence of an individual's right to vote. On polling day, "any elector [could] challenge the vote of any person" on suspicion of fraud. In such cases, election officials were to question the suspect voter and compel him to swear an oath of truthfulness. But even that might not be proof enough. The law stipulated that after an oath was sworn, "the registrar and judges may, nevertheless, refuse to permit such a person to vote."[55]

- The law loosened safeguards against partisanship in the management of elections. Lawmakers took the authority to appoint local election officials from the county clerks of superior court, who were directly accountable to voters, and gave it to a seven-member state board of elections that was appointed by the Democratic majority in the legislature. That board's power was expansive. For instance, it had the authority to remove county election officials from office "for any satisfactory cause."[56]

- The law also put an end to practices that accommodated illiterate voters. All ballots were now to be "printed upon white paper, without ornament, symbol, or device." And if a voter or election official placed a ballot in the wrong box (there were six), it was declared void and was discarded.[57]

With the new election law in place, Democrats approached the 1900 election confident of victory. Democratic gubernatorial candidate Charles B. Aycock made disenfranchisement the centerpiece of his campaign. On the stump, he offered the white electorate a new "era of good feeling" in exchange for racial loyalty. Aycock argued that the presence of Blacks in politics was the source of bitterness among whites, and that only their removal would heal the white body politic. "We must disenfranchise the negro," he explained to white voters. "Then we shall have . . . peace everywhere. . . . We shall forget the asperities of past years and . . . go forward into the twentieth century a united people."[58]

---

[54] *Public Laws and Resolutions, Session of 1899*, chapt. 507, secs. 11 and 18.
[55] Ibid., chapt. 507, secs. 11, 21, and 22.
[56] Ibid., chapt. 507, secs. 4-5 and 8-9.
[57] Ibid., chapt. 507, secs. 27 and 29.
[58] Connor and Poe, eds., *Life and Speeches of Charles Brantley Aycock*, 82 and 218-19.

26



White supremacy souvenir badge, 1898.
Courtesy of the North Carolina Gallery, Wilson
Library, University of North Carolina at Chapel Hill.

To whites who were unconvinced and Blacks who were determined to resist, Aycock issued veiled threats. "There are three ways in which we may rule," he told a white audience in eastern North Carolina. "We have ruled by force, we can rule by fraud, but we want to rule by law." To reinforce the point, bands of armed Red Shirts again paraded through towns and cities in the Piedmont and the east, cheered Aycock at campaign rallies, and loitered around polling places on Election Day. The beleaguered Populist and Republican opposition could not withstand that Democratic onslaught. With a turnout of 75 percent of the electors allowed to register under the revised election law of 1899, Aycock and disenfranchisement won by a 59 to 41 percent margin.[59]

Democrats cast that result as a victory of white over black, but in truth what they feared most and worked hardest to defeat was the interracial coalition that emerged from the calamity of the Civil War and reappeared in the form of Fusion. In a moment of candor, the *Charlotte Daily Observer* admitted as much. It characterized the 1900 campaign as "the struggle of the [better class of] white people" to cast off the rabble, Black and white alike.

---

[59] "Aycock at Snow Hill," Raleigh *Morning Post*, March 1, 1900; Prather, "Red Shirt Movement,"181–83; and Kousser, *Shaping of Southern Politics*, 193.

27

The fight in 1900 was not only to establish white supremacy but also to settle the question of which white men would rule supreme.[60]

When the legislature convened in 1901, Democrats secured their victory by passing a law to implement the white-supremacy amendment to the state constitution. The legislation stipulated that in order to register to vote, male citizens would be required to demonstrate their ability to read and write "*to the satisfaction*" (emphasis added) of a county registrar. In effect, that provision gave local election officials limitless authority to decide who would pass a literacy test and be granted – or denied – the right to vote.[61]

## VIII. Jim Crow

### A. Racial Segregation and Economic Exploitation

The Democrats' triumph in 1900 cleared the way for a new order characterized by one-party government, segregation, and cheap labor. With the removal of Black men from politics, North Carolina's Republican Party became little more than an expression of differences among whites that set the western mountain region, the party's surviving stronghold, against the central Piedmont and eastern coastal plain.

Leaders of the Democratic Party controlled the selection of candidates through a tightly managed state convention. That arrangement, combined with the fact that no Republican had a realistic chance of winning election to a statewide office, convinced most electors that there was little reason to cast a ballot. Only 50 percent of the newly constrained pool of eligible voters turned out for the 1904 gubernatorial election, and by 1912 the number had declined to less than 30 percent.[62]

Having regained control of the machinery of government, Democrats began implementing public policies that secured what one scholar has termed their "reactionary revolution." Black subjugation was at the head of their agenda. Over time, they developed an elaborate regime of law and custom that they called Jim Crow, a name taken from the blackface characters in nineteenth-century minstrel shows. Most Americans – certainly most white Americans – think of Jim Crow as an expression of prejudice and discrimination. But it was much more than that: Jim Crow was a system of power and plunder that concentrated wealth and opportunity in the hands of the few and mobilized racial animosity in defense of that accumulation.[63]

Lawmakers passed North Carolina's first Jim Crow law in 1899, during the same session in which they crafted the disenfranchisement amendment to the state constitution. The law required separate seating for Blacks and whites on trains and steamboats. The aim

---

[60] Untitled item, *Charlotte Daily Observer*, June 6, 1900, and Woodward, *Origins of the New South*, 328.

[61] *Public Laws, Session of 1901*, chapt. 89.

[62] Escott, *Many Excellent People*, 261, and Kousser, *Shaping of Southern Politics*, 195.

[63] Kousser, *Shaping of Southern Politics*, 261. The account that follows is adapted from Korstad and Leloudis, *To Right These Wrongs*, 16-18, and Korstad, *Civil Rights Unionism*, 54-57.

of that and other such regulations – including the segregation of streetcars in 1907, legislation in 1921 that made miscegenation a felony, and a host of local ordinances that segregated drinking fountains, toilets, and cemeteries – was to mark Blacks as a people apart and make it psychologically difficult for whites to imagine interracial cooperation. Segregation also divided most forms of civic space – courthouses, neighborhoods, and public squares – that might otherwise have been sites for interaction across the color line.[64]

In Charlotte, soon to be North Carolina's largest city and the hub of its new textile economy, neighborhoods in 1870 had been surprisingly undifferentiated. As historian Thomas Hanchett has noted, on any given street "business owners and hired hands, manual laborers and white-collared clerks . . . black people and white people all lived side by side." By 1910, that heterogeneity had been thoroughly "sorted" along lines of race and class. In communities large and small across the state, this process played out a thousand times over. White supremacy denied Blacks access to economic and political power and erected a nearly insurmountable wall between Blacks and poor whites who had risen in the mid 1890s to challenge Democrats' rule by asserting their shared grievances and claim to the franchise.[65]

Hardening racial segregation relegated the majority of Black North Carolinians to the countryside and created, in effect, a bound agricultural labor force. In the 1910s, Clarence Poe, editor of the *Progressive Farmer*, led a movement to perfect that arrangement by proposing "territorial segregation" in rural areas and an amendment to the state constitution that would have allowed white communities to prohibit the sale of land to Blacks. He modeled the idea on policies implemented in the new Union of South Africa that laid the foundation for the system of apartheid established in 1948.

Poe believed that his reforms would lock Blacks into permanent status as tenants and sharecroppers and would make way for a "great rural civilization" to flourish among whites. He understood that the scheme might run afoul of the Fourteenth Amendment but brushed that concern aside. "If our people make up their minds that segregation is a good and necessary thing," Poe argued, "they will find a way to put it into effect – just as they did in the case of negro disenfranchisement despite an iron-bound Amendment specifically designed to prevent it." Poe's proposal ultimately failed in the state legislature, but it had broad backing among small-scale white farmers. It also revealed how tightly Poe and North Carolina were connected to a global movement to assert white dominion over peoples of color.[66]

Black people who lived in cities and small towns had opportunities that were only modestly better than those available in rural areas. Most Black women worked in white households as maids, cooks, and laundresses. In Durham and Winston, both tobacco

---

[64] *Public Laws and Resolutions, Session of 1899*, chapt. 384, and Paschal, *Jim Crow in North Carolina*.

[65] Hanchett, *Sorting Out the New South City*, 187.

[66] Herbin-Triant, "Southern Segregation South African-Style," 171 and 186.

manufacturing centers, and in tobacco market towns in the eastern part of the state, Black women and men labored in stemmeries where they processed the leaf before it was made into cigarettes and chewing plugs. The work was dirty and undesirable – the kind of labor that whites expected Blacks to perform.[67]

Jim Crow held most Black North Carolinians' earnings to near-subsistence levels. That, in turn, depressed the market value of all labor and dragged white wages downward. In textiles – North Carolina's leading industry – men, women, and children worked for some of the lowest wages in the country. Prior to the implementation of a national minimum wage in the 1930s, they earned on average 40 percent less than workers in comparable jobs in the North. Even so, textile manufacturers often boasted that they had built their mills to save poor whites from destitution. That, they said, was also their reason for restricting textile employment, with few exceptions, to whites only. The message to white laborers was clear: mill owners would make up for slim pay envelopes by safeguarding what W.E.B. Du Bois called the "psychological wages" of whiteness.[68]

Such insistence on maintaining the color line denied Black North Carolinians something they had prized since the time of Emancipation: quality education for their children. In the 1880s, the state spent roughly equal amounts per capita on white and Black students in the public schools, but by 1920 spending on white students outpaced that for Blacks by a margin of three-to-one. The state spent ten times as much on white school buildings as it did on Black schools, and Black teachers made only half of the $252 a year paid to whites. The results were predictable: in 1920, 24.5 percent of Blacks over the age of ten were illiterate, as compared to 8.2 percent of whites. Racial disadvantage was also persistent.[69]

Added to all of this, Black North Carolinians were plagued by "sickness, misery, and death." In 1940, the annual mortality rate for Blacks was 11.6 per thousand, compared to 7.6 per thousand for whites. Blacks were one-and-a-half times more likely than whites to die from tuberculosis and malaria, and Black infant mortality exceeded that for whites by the same margin.[70]

### B. World War I and the Great Migration

A casual observer of the Jim Crow South could have been forgiven for concluding that white supremacy's victory was complete, its hold of the region unassailable. Josephus Daniels, one of the regime's architects, suggested as much shortly after the 1900 election. "When Governor Aycock was elected," Daniels explained to a friend, "I said to him that I

---

[67] See Sharpless, *Cooking in Other Women's Kitchens*, and Korstad, *Civil Rights Unionism*.

[68] Hall, Leloudis, Korstad, Murphy, Jones, and Daly, *Like a Family*, 80; Williamson, *Crucible of Race*, 430-32; and Du Bois, *Black Reconstruction*, 700.

[69] Thuesen, *Greater Than Equal*, 31, 86, and 268 n. 48.

[70] Carlton and Coclanis, *Confronting Southern Poverty*, 33, 42, 54-55, and 59; Larkins, *Negro Population of North Carolina*, 29; and Shin, "Black-White Differentials in Infant Mortality in the South, 1940-1970," 17. The infant mortality rate for blacks was 76.6 per 1,000 live births, compared to 50.3 per 1,000 live births for whites.

was very glad that we had settled the Negro question for all times." Aycock replied, "Joe, you are badly mistaken. . . . Every generation will have the problem on their hands, and they will have to settle it for themselves." The governor was more prescient than he might have imagined. Even at the height of Jim Crow's power, Black Americans refused to surrender their claim on equal citizenship and a fair share of social resources and economic opportunities. Over half a century – through two world wars and a global economic crisis – they clawed their way back into politics. Progress was slow and small gains often met fierce white resistance, but by the late 1950s Blacks had built a new freedom movement and prepared the way for a second Reconstruction.[71]

World War I put the first chinks in Jim Crow's armor. When fighting broke out in Europe in 1914, it cut off the supply of European immigrant laborers on which the factories of the Midwest and Northeast relied. Industrial recruiters ventured southward to entice sharecroppers off the land. By 1919, nearly 440,000 Blacks had left the South in what came to be called the Great Migration. They made new homes in Baltimore, Philadelphia, New York, Pittsburgh, Chicago, and Detroit. Another 708,000 migrants followed during the 1920s. In the absence of poll taxes and literacy tests, these refugees gained access to the ballot box and influence in city politics. They also created large enclaves from which a vibrant urban Black culture emerged. Literature, art, and music gave voice to the "New Negro" – a figure dignified and defiant, determined to hold the nation accountable to its democratic promise.[72]

### C. The Great Depression, a New Deal, and Good-Bye to the Party of Lincoln

During the 1930s, newly enfranchised Black voters reshaped national politics by abandoning the party of Lincoln in favor of Franklin D. Roosevelt and his New Deal. Many were at first wary of Roosevelt, a Democrat whose party stood for white supremacy in the South. But Blacks were especially hard hit by the Great Depression, and Roosevelt's New Deal delivered much-needed relief. The largest federal jobs programs employed Blacks in proportion to their representation in the general population and, with mixed results, attempted to prohibit discrimination in job placement and wages. Black appointees in New Deal agencies also served President Roosevelt as a shadow cabinet, and First Lady Eleanor Roosevelt publicly supported the NAACP's civil rights agenda. America remained a Jim Crow nation, but at no time since Reconstruction had the federal government held out such hope for redressing racial injustice. In his 1936 bid for re-election, Roosevelt won 71 percent of the Black vote in a landslide victory over Republican challenger Alf Landon.[73]

The effects were felt in North Carolina. In 1932, newspaperman Louis E. Austin helped to organize a "political conference" in Durham that attracted more than five hundred

---

[71] Josephus Daniels to John T. Graves, December 21, 1942, cited in Ward, *Defending White Democracy*, 2.

[72] Estimates of the scale of the Great Migration vary. The figures cited here are from Gregory, "Second Great Migration," 21. On the New Negro, see Whalan, *The Great War and the Culture of the New Negro*.

[73] Election data are from Ladd Jr., with Hadley, *Transformations of the American Party System*, 59.

31

Black business, civic, and religious leaders from across the state. Austin was editor of the city's *Carolina Times*, a paper widely regarded as an exemplar of "new Negro journalism." Like others at the conference, he believed that southern Blacks needed a new strategy for advancing civil rights.[74]

Since Emancipation, Blacks had cast their lot with the Republican Party, but Republican leaders largely abandoned them in the early 20th century. In North Carolina, the party was controlled by men who rejected its biracial heritage, and at the national level, Republican president Herbert Hoover showed little concern for Blacks' disproportionate suffering in the Great Depression. The times seemed to call for a radical change of direction, one that would challenge white supremacy at its root by mounting a political assault from within the Democratic Party.

That is what participants in the Durham conference had in mind when they made plans for a statewide voter registration drive. Their aim was "to become a factor in the party that has the power" by adding Black voters to the registration rolls as Democrats, not Republicans. Success came slowly, but by the mid-1930s upwards of forty thousand Black men and women had managed to pass the state's literacy test and affiliate themselves with the Democratic Party. In Durham, these new voters elected Louis Austin and Black theater owner Frederick K. Watkins as justices of the peace on the Democratic ticket. The *Pittsburgh Courier*, one of the nation's leading black newspapers, pronounced that win "the beginning of the 'New Deal' in the South."[75]

Incremental Black gains and the temerity of men like Austin angered the keepers of white rule. When Blacks registered as Democrats in Raleigh, Josephus Daniels used the *News and Observer* to warn that they were part of a plot "to destroy the great victory" won in 1900 under his leadership and that of Charles Aycock. "The Democratic Party in North Carolina is a white man's party," he exclaimed. "It came through blood and fire in allegiance to that principle." At his urging, election officials in Raleigh attempted to disqualify every Black registrant – Democrat and Republican alike – but Black citizens sued and won a court order to have the names of two hundred and ten restored to the voter rolls. They also taunted white Democrats. "Why," they wondered, "is it a crime for the Negro to seek to vote the triumphant ticket of the major party of the section in which he lives?"[76]

North Carolina Senator Josiah Bailey shared Daniels' fear of Black claims on the rights of citizenship. In 1937, shortly after President Roosevelt's election to a second term, he threatened a Congressional revolt against the New Deal. Bailey recruited southern

---

[74] "North Carolinians Hold State-wide Political Confab," *Pittsburgh Courier*, April 12, 1932, and "Durham, Thriving Southern Metropolis of 17,000 Negro Inhabitants," *Norfolk Journal and Guide*, April 16, 1932.

[75] "Carolina Whites Horrified as Negro Democrats Vote," *Atlanta Daily World*, June 6, 1932, and "Elect Magistrates on Democratic Ticket in North Carolina," *Pittsburgh Courier*, November 24, 1934.

[76] "Dagger at the Heart," Raleigh *News and Observer*, May 25, 1932; "More Talk About Negro Situation," Raleigh *News and Observer*, June 1, 1932; and Gershenhorn, *Louis Austin*, 49.

Democrats and a number of Republicans to endorse a Conservative Manifesto, which, had it been implemented, would have given local officials control over federal jobs programs for the unemployed. That was key to maintaining the black-white wage differential and Jim Crow's promise to ordinary whites that Blacks would always be beneath them.

The manifesto affirmed the value of small government; called for reduced taxation of private and corporate wealth; and insisted on the primacy of "states' rights, home rule, [and] local self-government." On the Senate floor and in private exchanges, Bailey criticized President Roosevelt for pandering to the "Negro vote," caricatured the New Deal as "a gift enterprise [conducted] at the expense of those who work and earn and save," and warned that he and his allies were prepared to defend white supremacy, whatever the cost. "Keep your nose out of the South's business," he warned, or "be assured that a [new] white man's party [will] arise" to claim the region's loyalty.[77]

That threat was more than empty bluster. From the outset, southern Democrats had worked to blunt the New Deal. In North Carolina, Democratic officials backed tobacco manufacturers who resisted the National Recovery Administration's efforts to raise wages for Black workers. They also managed the Agricultural Adjustment Administration's price support programs in ways that allowed white landlords to dismiss thousands of Black tenants and keep government crop subsidies for themselves. At the national level, southern Democrats led the effort to exclude agricultural and domestic workers – the vast majority of whom were Black – from the old-age pensions established by the Social Security Act of 1935 and the minimum-wage protection afforded by the Fair Labor Standards Act of 1938.[78]

University of North Carolina sociologist Guy Johnson recognized in all of this "a tendency to perpetuate . . . existing inequalities." Blacks had made important gains, but they still lacked the means "to command" an adequate wage and a "decent share of the services and benefits of government." The consequences were tragic – for Blacks, most obviously, and for poor whites in ways that Jim Crow obscured. Johnson urged politicians to confront these truths, surrender white rule, and substitute "fairness and justice" for a "policy of repression." Doing so would make possible "better homes, better health, better living, cultural development, and human adequacy for both races." White southerners had "all to gain and nothing to lose," Johnson declared." "Self-interest, simple justice, and common-sense demand that [they] give the Negro a new deal." That was not going to happen in North Carolina, at least not without a fight.[79]

---

[77] Moore, "Senator Josiah W. Bailey and the 'Conservative Manifesto' of 1937"; Patterson, "Failure of Party Realignment in the South," 603; Bailey to Peter Gerry, October 19, 1937, Senatorial Series, General Correspondence Subseries, Bailey Papers, and "Roosevelt 'Purge' Rapped by Bailey," *The Atlanta Constitution*, September 11, 1938, and Dunn, *Roosevelt's Purge*, 237.

[78] Katznelson, *Fear Itself*, chapt. 5.

[79] Johnson, "Does the South Owe the Negro a New Deal?"

### D. World War II and Civil Rights Unionism

World War II lifted the nation out of economic depression and further eroded white southerners' capacity to hold the line on civil rights. Millions more Blacks left the land. Some moved along familiar paths to work in northern war industries; others found employment in southern cities or on the sprawling military bases that were scattered across the region. They expanded their influence in Democratic Party politics, swelled the national ranks of the NAACP from fifty thousand to four hundred and fifty thousand members, and through the militant unions of the Congress of Industrial Organizations (CIO) gained new bargaining power on the factory floor. The federal government, concerned that racial tensions not impede the war effort, acted to limit employment discrimination and to restrain white violence.[80]

All of this played into what civil rights activists came to call a Double V strategy that encouraged Black mobilization – in the military and on the home front – to defeat the twin evils of fascism and white supremacy.

The potential for making change at home was apparent even before a formal declaration of war. In early 1941, A. Philip Randolph, president of the Brotherhood of Sleeping Car Porters, proposed a march on Washington to pressure President Roosevelt to desegregate the military and guarantee equal employment opportunities in war industries. Noting the strength of grassroots support for the march, some observers predicted that more than one hundred thousand people would participate. In June, months before the Japanese attack on Pearl Harbor, Roosevelt handed the organizers a partial victory. He issued Executive Order 8802, which prohibited racial discrimination in federal job training programs and defense industry employment. With that, Randolph canceled the march.[81]

This positioning of the federal government as a civil rights ally gave courage to the nearly eight thousand Black women and men who labored in the R.J. Reynolds tobacco factories in Winston-Salem. In 1943, they began organizing with assistance from the CIO's Food, Tobacco, and Allied Workers union (FTA). Under ordinary circumstances, Reynolds would have easily crushed the effort, but the war years were anything but ordinary.

When workers staged a sit-down strike, the federal Mediation and Conciliation Service intervened to negotiate a temporary settlement. Months later, the National Labor Relations Board – a New Deal agency established in 1935 by the Wagner Act – set the ground rules for a fair election in which Black workers and a significant minority of whites voted to establish a union local. Despite that result, Reynolds managers refused to sign a contract until forced by the National War Labor Board to pay higher wages and improve working conditions. Stemmery worker Ruby Jones said of that victory, "It was just like being Reconstructed."[82]

---

[80] On the growth of the NAACP and the CIO, see Dalfiume, "'Forgotten Years' of the Negro Revolution," 99-100, and Zieger, *The CIO*.

[81] Jones, *March on Washington*, chap. 1.

[82] Korstad, *Civil Rights Unionism*, 202.

34

Jones and others understood that winning in the workplace was but one step toward equal citizenship. Dethroning Jim Crow required that they also organize politically. "If you are going to defeat these people," union leader Robert Black explained, "not only do you do it across the negotiating table in the R.J. Reynolds Building, but you go to city hall, you elect people down there that's going to be favorable and sympathetic and represent the best interest of the working class." To that end, the union sponsored citizenship and literacy classes and launched a city-wide voter registration drive. Those efforts paid off in 1947, when Black voters elected Reverend Kenneth R. Williams to the Winston-Salem board of aldermen. He was the first Black politician in the South to defeat a white opponent at the state or local level since the Fusion era of the 1890s.[83]

The unionists in Winston-Salem and ten thousand members of a sister FTA local in eastern North Carolina's tobacco warehouses and stemmeries were in the vanguard of a statewide campaign for more inclusive politics. They provided local support for the Progressive Party, formed in 1947 by breakaway Democrats to back the presidential candidacy of Henry A. Wallace.

Wallace had served in Franklin Roosevelt's New Deal administration as vice president, secretary of agriculture, and secretary of commerce. He established a reputation as a full-throated critic of Jim Crow and, during the early years of the Cold War, opposed hardline anticommunism as a threat to democratic values at home and abroad. In 1948, Wallace challenged Roosevelt's successor, Harry S. Truman, with demands for peaceful cooperation with the Soviet Union and an immediate end to racial segregation.[84]

In North Carolina, the Progressive Party nominated a slate of candidates that represented an extraordinary commitment to equal citizenship. Of the nineteen nominees, five were white women, including journalist and civil rights activist Mary Watkins Price, who was the first woman to run for governor in the state. Black candidates included Reverend William T. Brown from Maxton, who opposed former governor J. Melville Broughton for a seat in the U.S. Senate; Robert E. Brown, also from Maxton, who sought election in the Eighth Congressional District; Robert Latham, an FTA organizer in Rocky Mount, who ran in the Second Congressional District; Durham civil rights lawyer Conrad O. Pearson, who stood for state attorney general; Gertrude Green, a tobacco worker from Kinston, and Randolph Blackwell, a student at the Agricultural and Technical College of North Carolina in Greensboro (now the North Carolina Agricultural and Technical State University), who sought election to the state house of representatives; and Leila B. Michael, a teacher and NAACP leader from Buncombe County, who vied for a place on her local board of education. These men and women ran on a platform that demanded repeal of North Carolina's anti-union labor laws and regressive sales tax, "civil rights for all people, improved schools, higher teacher pay, [and] increased aid to needy people." These

---

[83] Ibid., 251-52.
[84] On Wallace's life and career, see Culver and Hyde, *American Dreamer*.

priorities were not so different from those of Reconstruction-era Republicans and the Fusion politicians of the 1890s.[85]

When Wallace stumped the state for the Progressive ticket in August 1948, bands of white hecklers, sometimes numbering in the thousands and waving Confederate flags, followed his entourage from town to town and pelted them with eggs and tomatoes. Shouts of "nigger lover" filled the air and were echoed in more genteel terms by the state's newspapers. The editors of the *Charlotte Observer* suggested that Wallace and his compatriots had brought the trouble upon themselves by announcing in advance that the candidate "would speak to none but unsegregated audiences."[86]

Wallace gave his detractors no quarter. In a 1947 speech, he had declared that "Jim Crow in America has simply got to go." His reasoning echoed a long tradition of dissent within the South: "The cancerous disease of race hate, which bears so heavily upon Negro citizens . . . at the same time drags the masses of southern white citizens into the common quagmire of poverty and ignorance and political servitude . . . Jim Crow divides white and Negro for the profit of the few. It is a very profitable system indeed."



Henry A. Wallace campaign poster. Courtesy of Georgia State University Library Digital Collections, Myron Howard Ross Papers.

---

[85] "Wallace Party Names Picks for N.C. Posts," *Norfolk Journal and Guide*, September 4, 1948, and Report of the Nominating Committee, Progressive Party of North Carolina, box 2, folder 13, Scales Papers. On Blackwell, see Chafe, *Civilities and Civil Rights*, 27-28. For more on the Progressive Party and the Wallace campaign in North Carolina, see Uesugi, "Gender, Race, and the Cold War."

[86] Devine, *Henry Wallace's 1948 Presidential Campaign*, p. 245, and "Deplorable Disorders," *Charlotte Observer*, September 1, 1948.

36

The price exacted by Jim Crow was measured not just in dollars, but in lives as well. Wallace made that point with a "single grim fact": "a Negro child born this day has a life expectancy ten years less than that of a white child born a few miles away." "Those ten years," he explained, "are what we are fighting for. I say that those who stand in the way of the health, education, housing, and social security programs which would erase that gap commit murder. I say that those who perpetuate Jim Crow are criminals. I pledge you that I shall fight them with everything I have."

Wallace understood the fury his words would provoke. "Every uttered truth," he observed, "produces a tremor in those who live by lies."[87]

Wallace's prospects, and those of the Progressive Party in North Carolina, were hamstrung from the start. He faced the problem that has plagued every third-party candidate in American politics: a concern among potential supporters that to cast a ballot for him was to waste a vote. His strong stand against racism and opposition to Cold War anticommunism also meant that he drew most of his support from the Left, including the Communist Party USA, which endorsed his candidacy. On Election Day, Wallace and his North Carolina running mates garnered only a fraction of the vote. But the issues they raised were far from settled. That became evident two years later in the Democratic primary election for the U.S. Senate.

### E. The Senate Campaign of 1950 and Reassertion of White Rule

The story of the 1950 election began a year before, when Senator J. Melville Broughton died in office. Governor W. Kerr Scott appointed University of North Carolina president Frank Porter Graham to fill the post until the next General Election. Graham's liberal views were well known. He was an outspoken supporter of labor unions; he had served as a member of the White House advisory council that helped establish Social Security in 1935; he chaired Roosevelt's Advisory Committee on Economic Conditions in the South, which documented widespread poverty in the region; and in 1938 he was founding president of the Southern Conference for Human Welfare, an interracial organization devoted to "equal and exact justice to all" (a phrase borrowed from President Thomas Jefferson's 1801 inaugural address).[88]

In the 1950 Democratic primary, Graham faced a field of challengers that included Willis Smith, a respected Raleigh attorney and former president of the American Bar Association. On the first ballot, Graham defeated Smith and the other candidates by winning a plurality, but not a majority, of votes. As runner-up, Smith was entitled to call for a runoff, but he hesitated. He was unsure that he could raise the necessary money or that he had the stamina for another contest.

---

[87] Wallace, "Ten Extra Years."

[88] Pleasants and Burns, *Frank Porter Graham and the 1950 Senate Race*, 5–30, and Ashby, *Frank Porter Graham*, 77, 144–45, 151–59.

37

Then, on June 5, just days before the deadline for Smith's decision, the U.S. Supreme Court handed down rulings that affirmed Black students' right to equal access to publicly funded graduate education and banned segregation on railroads. The court's actions galvanized Smith's supporters. On the afternoon of June 6, Jesse Helms, a young news director for WRAL Radio in Raleigh, made arrangements to air at fifteen-minute intervals a plea for Smith backers to rally at his home and urge him to demand a runoff. The crowd that gathered on Smith's lawn was persuasive. The next morning, Smith called for a second primary.[89]

The political battle that followed was the rawest since the white supremacy campaigns of 1898 and 1900. Smith's backers brought race front and center. They focused particularly on Frank Graham's service in 1946-47 on President Harry Truman's Committee on Civil Rights, which issued the first federal report on race relations and laid the groundwork for Truman's desegregation of the military a year later. The report, titled *To Secure These Rights*, a phrase taken from the Declaration of Independence, called unequivocally for "the elimination of segregation, based on race, color, creed, or national origin, from American life."[90]

The Smith campaign directed its harshest criticism at the committee's recommendation that Truman establish a permanent Fair Employment Practices Committee to monitor and eliminate racial discrimination in the workplace. Frank Graham – who preferred moral suasion over government intervention as an instrument of social change – had dissented from that part of the committee report, but Smith and his lieutenants paid no mind. In campaign press releases, they warned that Graham supported reforms that would allow Blacks to steal white jobs. Handbills distributed in rural communities and white working-class neighborhoods raised the alarm even more shrilly. "White People Wake Up Before It's Too Late," one exclaimed. "Frank Graham Favors Mingling of the Races."[91]

---

[89] Pleasants and Burns, *Frank Porter Graham and the 1950 Senate Race*, 196–201.
[90] President's Committee on Civil Rights, *To Secure These Rights*, 166.
[91] Pleasants and Burns, *Frank Porter Graham*, 140 and 223.

38



Smith and Graham campaign handbills. Courtesy of the Southern Historical
Collection, Wilson Library, University of North Carolina at Chapel Hill,
Daniel Augustus Powell Papers.

These attacks were powerful in the simplicity of their message: Graham posed a
threat to white privilege and the racial division of labor from which it was derived.
Graham's campaign countered by warning white working people that Smith would roll
back the hard-won economic gains of the New Deal, but on Election Day race trumped
class. Smith won the second primary by more than nineteen thousand votes. He traveled to
Washington to take his Senate seat in 1951 and carried Jesse Helms with him as a member
of his staff. Twenty-two years later, Helms returned as a Republican Senator and leader of
the conservative movement that came to be known as the New Right.

## IX. Black Advance and White Reaction in the Forgotten 1950s

### A. Challenging Jim Crow at the Ballot Box

In the aftermath of the election, Graham's supporters were distraught. "I weep for
the people of North Carolina," one woman wrote, "because they [were] swayed by
prejudices [and] lies." But Black newspaper editor Louis Austin found cause for hope, even
as he mourned Graham's defeat. He reminded readers of the *Carolina Times* that more than
two hundred and sixty thousand voters – the vast majority of them white – had cast their

ballots for Graham, and in doing so had refused to bow to "race hatred." Despite obvious similarities, Graham's loss was not a calamity on the same scale as the defeat of Fusion half a century before. Appeals to justice and decency had loosened Jim Crow's grasp and created new room for blacks to maneuver. Austin urged his readers to seize that opportunity, to light a "torch of freedom" that would "send bright rays into the dark corners of [a] benighted State."[92]

Leaders and ordinary folk in Black communities across North Carolina took up that challenge. In 1951, a "rush" of thirteen Black candidates stood for election in eleven cities, from Rocky Mount in the east to Winston-Salem in the central Piedmont. Three of them won seats on their municipal councils.[93] Two years later, twenty-four Black candidates ran in nineteen cities, and six bested their white opponents.[94]

The victories in 1953 were, in many respects, predictable. With one exception, they occurred in Piedmont cities with substantial Black populations and active Black civic organizations. In Winston-Salem, unionized tobacco workers had spurred voter registration and created a political movement that continued to elect a Black candidate to the city's board of aldermen. Black business leaders in Durham had similar success. Under the auspices of their Committee on Negro Affairs, they had been registering voters and sponsoring candidates for the better part of two decades. In 1953, they broke through with the election of Rencher N. Harris, a real estate appraiser, to the city council. Harris also had the backing of a short-lived interracial alliance of progressive whites and unionized textile and tobacco workers.[95]

More surprising, and ultimately more threatening to white rule, was the fact that seven Black candidates had the courage to seek office in North Carolina's eastern Black Belt, where Jim Crow held a particularly firm grip on daily life. Against all odds, one of those men, George K. Butterfield Sr., won a seat on the town commission in Wilson, where

---

[92] Ibid., 247-48, and "Victorious in Defeat," *Carolina Times*, July 1, 1950.

[93] Dr. William Hampton won a seat on the Greensboro city council, Reverend William R. Crawford won a run-off and replaced Kenneth Williams on the Winston-Salem board of aldermen, and Dr. W. P. Devane was re-elected to the Fayetteville city council. Later in 1951, Hampton and Crawford were the first Black city officials to attend meetings of the North Carolina League of Municipalities. See "Rush of Negro Candidates for City Posts in N. Carolina," *Atlanta Daily World*, May 8, 1951; "Two Win City Council Seats in No. Carolina," *Atlanta Daily World*, May 17, 1951; and "First Negro to N.C. League of Municipalities," *Atlanta Daily World*, November 10, 1951.

[94] "Negro Candidates Seek Offices in Twenty North Carolina Cities," *Chicago Defender*, May 2, 1953. Despite the title, only nineteen cities are listed in this article. For clarification of the number of city council candidates in Concord, see "Candidates Win Three North Carolina Races," *Atlanta Daily World*, May 7, 1953, and "Primary Vote at Concord Slated Tuesday," *Charlotte Observer*, April 13, 1953. For the successful candidates, see "They Scored," *Chicago Defender*, May 23, 1953. William Crawford and William Hampton won re-election in Winston-Salem and Greensboro, respectively; Rencher N. Harris claimed a seat on the Durham city council; Hubert J. Robinson was elected to the Chapel Hill town council; Nathaniel Barber took a seat on the city council in Gastonia; and Dr. George K. Butterfield Sr. was elected to the city council in Wilson.

[95] Gershenhorn, *Louis Austin*, 114, and "They Scored," *Chicago Defender*, May 23, 1953.

Black workers found employment in the warehouses that were essential to the east's tobacco-growing economy. Through the end of the decade, this spread of civil rights activism beyond the cities of the Piedmont tested white politicians' ability to deflect Black claims on equal citizenship.

The story of George Butterfield's political career in Wilson epitomized the contest between white men in power and their Black challengers in the east. Butterfield was a dentist and a veteran of World War I, born in Bermuda and educated at Meharry Dental College in Nashville, Tennessee. He moved to Wilson in 1928 and quickly established himself as a leader in the city's Black community. George K. Butterfield Jr., who represented North Carolina's First Congressional District from 2004 to 2022, remembers that his father "was always a thorn in the side of the white establishment." In the 1940s, the elder Butterfield and his brother-in-law, Fred Davis Jr., directed a number of voter registration drives. They recruited brave volunteers and "sat up the night with them" to memorize and "rehearse the Constitution." When those aspiring voters took the literacy test, "some would pass and some would not," because the outcome was "just the whim of the registrar." Progress was slow, but over time, the effort paid off. By 1953, more than five hundred of Wilson's Black citizens had qualified to vote.[96]

That figure was large enough to convince Butterfield to stand for election as a town commissioner representing Wilson's third ward. Although Blacks constituted a majority in the ward, whites outnumbered them among registered voters. Butterfield's supporters overcame that disadvantage by turning out at a much higher rate than their white neighbors. When ballots were counted, Butterfield and his opponent each received three hundred and eighty-two votes. As stipulated in Wilson's town charter, election officials decided the winner by drawing lots. A blindfolded child pulled Butterfield's name from a hat.[97]

Butterfield used his political office to press for improved municipal services in Wilson's Black neighborhoods, additional funds for Black schools, and the desegregation of recreational facilities, including the town's minor-league baseball stadium. After he won re-election in 1955, Wilson's white commissioners moved to be rid of him. Shortly before the 1957 election, they approved a surprise resolution to change from a ward system to an at-large form of municipal government in which a full slate of commissioners would be elected in a single, multi-candidate contest. Under that arrangement, a Black candidate would face not one but many white opponents.[98]

The state legislature quickly approved the change and added a provision to Wilson's charter that prohibited single-shot, or as it was sometimes called, bullet voting. That was the practice of marking a ballot for only one candidate in at-large, multi-candidate contests

---

[96] McKinney, *Greater Freedom*, 21-22 and 54, and Butterfield interview, <http://bit.ly/2RMrziw>, July 26, 2024.

[97] McKinney, *Greater Freedom*, 58-59, and Butterfield interview, < http://bit.ly/2RMrziw>, July 26, 2024.

[98] McKinney, *Greater Freedom*, 91-96, and Butterfield interview, < http://bit.ly/2RMrziw>, July 26, 2024.

in which the top vote getters won election to a set number of open seats. In simple mathematical terms, single-shot voting offered Black voters – always a minority – their best chance at electing representatives from their communities. The new prohibition undercut that prospect by requiring that election officials discard single-shot ballots.[99]

These changes in Wilson's town government denied Butterfield a third term. In the 1957 election, he placed eighth in a field of sixteen candidates who vied for six seats on the town commission. Four years later, Reverend Talmadge A. Watkins, Butterfield's pastor and political ally, ran for a place on the town commission and, after losing, challenged the anti-single-shot rule in a lawsuit. North Carolina's Supreme Court ultimately decided the case, *Watkins v. City of Wilson*, in favor of the defendants. The justices wrote: "It is an established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained, or is immediately in danger of sustaining, a direct injury as the result of that action and it is not sufficient that he has merely a general interest common to all members of the public." Watkins did not meet that standard, because "even if credited with all rejected ballots, he would not have enough votes to change the [election] result." In 1962, the U.S. Supreme Court declined to review the case on appeal.[100]

Watkin's defeat in court validated the work of white politicians who had been busy restructuring local governments across eastern North Carolina. Between 1955 and 1961, the state legislature approved a flurry of new laws that mandated at-large voting in a shifting mix of elections for county boards of commissioners and town councils in twenty-three eastern counties. In each of those places, lawmakers also prohibited single-shot voting. As a reporter for the *News and Observer* later noted, the purpose of these measures was "to slow the growth of black political power."[101]

---

[99] *Session Laws and Resolutions, State of North Carolina, Extra Session of 1956, and Regular Session, 1957*, chapt. 13.

[100] McKinney, *Greater Freedom*, 96 and 139-44; Butterfield interview, < http://bit.ly/2RMrziw>, July 26, 2024; *Watkins v. City of Wilson*, 121 S.E.2d 861 (N.C. 1961); and *Watkins v. Wilson*, 370 U.S. 46 (1962).

[101] "Failure of Singleshot Ban May Strengthen Black Vote," Raleigh *News and Observer*, January 17, 1972.

42



Anti-single-shot counties and municipalities, concentrated in the eastern Black Belt, 1955-1961. The highlighted western counties were places where white Republicans exerted some influence in local government.

With no sense of irony, white politicians defended these measures as protection against the corrupting influence of "bloc" interests, particularly those defined by race. That was a well-worn rationale. For instance, a group of Willis Smith's supporters had charged in 1950 that "bloc voting by any group is a menace to democracy." In an advertisement published in the *News and Observer*, they turned to Charles Aycock – one of the original architects of white supremacy – as their authority on the matter. Looking back on his election as governor in 1900, Aycock had justified his party's use of political violence by pointing to heavily Black counties in the east, where, he claimed, "120,000 Negro votes cast as the vote of one man" threatened the "security of life, liberty, and property."[102]

---

[102] Raleigh *News and Observer*, June 20, 1950.

Case 1:23-cv-01057-TDS-JLW     Document 125-11     Filed 05/27/25     Page 38 of 100



Willis Smith campaign advertisement, Raleigh
*News and Observer*, June 20, 1950.

The hypocrisy of such historical claims infuriated *Carolina Times* editor Louis Austin. He noted that since the end of slavery, Blacks had found the "biggest 'bloc' of . . . all . . . arrayed against them." It included "leaders of the Ku Klux Klan," politicians who "continuously fanned the flames of race hatred," and the "mass of white voters" who elected them. Together, these enemies of democracy barred Blacks from political office and denied them both "equal education [and] equal employment opportunities." Such actions left Blacks no alternative but to vote their group interests, or as Austin put it, to "look principally to [their] own tents for whatever advancements" might be made.[103]

### B. Challenging Jim Crow in Court

The guardians of white rule were shrewd adversaries who displayed their resourcefulness not only at polling places but also in courts of law. That was perhaps nowhere more apparent than in the adjudication of a series of lawsuits brought by James

---

[103] "The 'Negro Bloc' and the 'Single Shot,'" *Carolina Times*, May 22, 1965.

R. Walker Jr., a young Black attorney from eastern North Carolina. Walker grew up in Hertford County, located in the historic Second Congressional District, where Black political strength had been concentrated in the decades after Emancipation. His parents, James and Ethel, were teachers who instilled in their son a determination to "fight social injustice." After serving in the U.S. Army during World War II, the younger Walker set out to become a civil rights lawyer.[104]

In 1949, Walker applied for admission to the school of law at the University of North Carolina in Chapel Hill but was rejected on account of his race. With no other option, he enrolled at the North Carolina College for Negroes (now North Carolina Central University), where state lawmakers had established a separate and decidedly unequal law school to protect the white university from desegregation. But within a year, the U.S. Supreme Court changed the game. The court ruled in a Texas case, *Sweatt v. Painter*, that racially segregated programs of graduate and professional education were acceptable only if they exhibited "substantive equality." On the basis of that judgment, Walker and four other Black plaintiffs – Harvey Beech, James Lassiter, J. Kenneth Lee, and Floyd McKissick – sued in federal court and won admission to the law school in Chapel Hill. They began their studies during the summer of 1951. Lee and Walker took their degrees a year later and became the University of North Carolina's first Black graduates.[105]

In 1955, Black community leaders in Halifax County persuaded Walker to return to eastern North Carolina and join their struggle for political rights. When he opened his law office in Weldon, he was the only Black attorney in a six-county area where sharecropping still bound Black families to the land and racial violence was a fearsome fact of life. Walker was unafraid. "I was an Army man," he remembered. "Had been to the front. . . . I wasn't scared of nothing."[106]

Walker drew financial and professional support from a small community of Black lawyers in North Carolina's Piedmont cities. He also built a loose network of Black preachers, teachers, businessmen, and club women from twenty-five eastern counties. He called the group the Eastern Council on Community Affairs. Its members gathered news of voter infringement, mobilized to confront hostile white election officials, and helped Walker identify plaintiffs who were prepared to challenge Jim Crow in court.[107]

Walker began filing lawsuits in 1956. In one of his first cases, he sued on his own behalf to challenge the prohibition of single-shot voting in an at-large election for seats on the Halifax County Board of Education. Officials had discarded his ballot because he cast

---

[104] Wertheimer, *Law and Society in the South*, 131-32.
[105] Ibid., chapt. 7, and Nixon, "Integration of UNC-Chapel Hill – Law School First." The following account of Walker's career and legal challenges to Jim Crow election law draws broadly on Wertheimer (above) and Barksdale, "Indigenous Civil Rights Movement."
[106] Wertheimer, *Law and Society in the South*, 142 and 150.
[107] Ibid., 146 and 148.

45

a single vote for the one Black candidate rather than comply with instructions to choose seven of eight contenders.

The case eventually made its way to the North Carolina Supreme Court, where Walker ran afoul of state lawmakers' efforts to stall school desegregation. In 1955, quick on the heels of the U.S. Supreme Court's *Brown* decision, they extended their influence over policy at the local level by making seats on county school boards appointed rather than elected positions. Under the new arrangement, political parties continued to hold primary elections, but the results were no longer binding. County boards of elections reported the winners to the State Superintendent of Public Instruction, who in turn sent their names to the legislature in the form of nominations. Lawmakers then appointed school board members as they saw fit. By time the high court heard Walker's appeal, lawmakers had already exercised their authority to appoint members of the Halifax County Board of Education. In light of that fact, the court ruled that "questions raised by plaintiff are now moot" and dismissed Walker's case.[108]

While litigating his personal complaint in Halifax County, Walker filed another lawsuit on behalf of Louise Lassiter, a resident of nearby Northampton County who had been denied the right to register after failing to prove that she was literate. At the time, registrars enjoyed broad authority to administer literacy tests in whatever form they imagined. They often framed the tests as civics exams that reached well beyond a simple assessment of an applicant's ability to read and write. Observers documented a "bewildering variety" of questions. Can you "name the signers of the Declaration of Independence?" a registrar might ask. "What is habeas corpus?" "If the NAACP attacked the U.S. government, on which side would you fight?" "Explain how a person [can] be imprisoned for debt in North Carolina, who created the world, and what 'create' mean[s]." Louise Lassiter failed her test because she mispronounced words from the state constitution, including the term 'indictment.'[109]

Lassiter's case set off alarm bells in Raleigh, where state officials worried that she might prevail in federal court. Her complaint coincided with passage of the Civil Rights Act of 1957, the first national legislation of its kind since Reconstruction. That law established the U.S. Civil Rights Commission to investigate allegations of voter suppression and authorized the Department of Justice to institute civil action against any person who interfered with the right of another "to vote or to vote as he may choose."[110]

---

[108] Eure, *Public School Laws of North Carolina*, 13-14; *Session Laws and Resolutions, State of North Carolina, Extra Session of 1956, and Regular Session, 1957,* chapt. 137; and *Walker v. Moss*, 97 S. E.2d 836 (N.C. 1957).

[109] North Carolina Advisory Committee to the United States Commission on Civil Rights, *Equal Protection of the Laws in North Carolina*, 28 and 33, and Wertheimer, *Law and Society*, 141 and 151.

[110] Public Law 85-315: An Act to Provide Means of Further Securing and Protecting the Civil Rights of Persons Within the Jurisdiction of the United States, 637, <http://bit.ly/2UGEvGA>, July 26, 2024, and Winquist, "Civil Rights: Legislation: The Civil Rights Act of 1957."

Just days before Lassiter's case was scheduled to be heard in U.S. district court, legislators revised state election law to make the literacy test less arbitrary. They struck the requirement that literacy be proven "to the satisfaction" of registrars and created an appeal process for citizens who failed the test – though complaints would be heard only if filed "by 5:00 p.m. on the day following denial." These changes were enough to satisfy the federal court, which declined to proceed with Lassiter's case until she had petitioned for a local remedy.[111]

Soon after the court's decision, Lassiter made another attempt to register. But this time, at Walker's instruction, she refused examination on grounds that the literacy test violated her right to vote. That focused Lassiter's legal complaint on the constitutionality of the test itself rather than the method of its administration. When the case reached the North Carolina Supreme Court, lawyers for the Northampton County Board of Elections argued in circles. They denied that the literacy test was discriminatory on account of race and then defended it as a political necessity adopted to correct the "outrages perpetrated upon the people of this State during the Tragic Era of Reconstruction," when the ballot was "placed in the hands of illiterate people" – that is, former slaves – "supported by the armed might of the Federal Government." Convinced by such reasoning, the court rejected Lassiter's constitutional claims. It found no evidence of "discrimination in favor, or against any [person] by reason of race, creed, or color."[112]

On appeal in 1959, the U.S. Supreme Court unanimously affirmed that ruling. Writing for the court, Justice William O. Douglas acknowledged that when arbitrary authority was vested in registrars, a literacy requirement could "make racial discrimination easy." But he found no evidence of that intent in North Carolina's election law as amended in 1957. He instead read literacy tests as an expression of the state's desire "to raise the standards for people of all races who cast the ballot." Ignoring the effects of a century of school discrimination in the South and the core reasoning of the 1954 *Brown* decision, Douglas insisted that "literacy and illiteracy are neutral on race, creed, color, and sex, as reports around the world show."[113]

Blacks certainly had no natural inclination to illiteracy, but the connection between illiteracy and race as a social category and lived experience was undeniable. Had Justice Douglas examined conditions in Northampton County, that harsh reality would have been readily apparent. In 1950, Black adults in the county had completed, on average, 5 years of schooling. That compared to 5.6 years for Black adults and 8.6 years for white adults statewide. These figures meant that a considerable portion of voting-age Blacks, in Northampton County and across the state, had completed fewer than the three years of

---

[111] *Session Laws and Resolutions, State of North Carolina, Extra Session of 1956, and Regular Session, 1957,* chapt. 287, and *Lassiter v. Taylor*, 152 F. Supp. 295 (E.D.N.C. 1957).

[112] "Defendant Appellee's Brief," *Lassiter v. Northampton Board of Elections*, Supreme Court of North Carolina, fall term 1957, no. 172, Sixth District, quoted in Wertheimer, *Law and Society in the South*, 155, and *Lassiter v. Northampton County Board of Elections*, 102 S.E.2d 853 (N.C. 1958).

[113] *Lassiter v. Northampton County Board of Elections*, 360 U.S. 45 (1959).

education that demographers assumed was required to develop basic literacy skills. Jim Crow's shadow remained long and deep.[114]

In 1960, Walker returned to court with a new client. Having failed to win a judgment that the literacy test was unconstitutional per se, he revisited the question of how it was administered. His client, Bertie County resident Nancy Bazemore, had been denied by a registrar who required that she write down passages from the state constitution as he read them aloud. Bazemore failed because of spelling errors. When the case reached the State Supreme Court, the justices ruled in Bazemore's favor and issued guidelines that sharply limited registrars' discretion in determining the form and content of the literacy test. They instructed those officials to evaluate "nothing more" than applicants' ability to "utter aloud" a section of the state constitution and to write it out "in a reasonably legible hand." Furthermore, the test was to be based on a printed copy of the constitution – not dictation – and there were to be no penalties for "the occasional misspelling and mispronouncing of more difficult words."[115]

The *Bazemore* decision represented what many observers came to view as the North Carolina way in managing Black demands for equal rights. It rejected naked discrimination and insisted on "fair and impartial" enforcement of the law, but also left room for sorting citizens into racial categories.[116]

Across North Carolina, most whites registered and voted without a literacy test. They "took it for granted" that they were entitled to do so because of the color of their skin. In Nancy Bazemore's home county, one registrar was forthright. When asked if any whites had failed the literacy test, he replied, "No. I mean I didn't have any to try it." Though the State Supreme Court did not address this issue directly, it validated the underlying assumption by ruling that there was no legal requirement that every registrant be examined. "It would be unrealistic to say that the test *must* be administered to all applicants," the justices wrote. "The statute only requires that the applicant *have* the ability" to read and write (emphasis in original). "If the registrar in good faith knows that [the] applicant has the requisite ability, no test is necessary."[117]

This reading of state election law suggested that registrars still possessed the authority to group citizens into two classes: whites who were assumed to be literate and Blacks who had to prove it. The law did not require that the literacy test be administered to all citizens on an equal basis, but only that it "be administered, where uncertainty of ability exists, to all alike." That was a notably pernicious doctrine in a white man's society

---

[114] North Carolina Advisory Committee to the United States Commission on Civil Rights, *Equal Protection of the Laws in North Carolina*, 144, and Collins and Margo, "Historical Perspectives on Racial Differences in Schooling," <http://bit.ly/2UMbN7e>, July 26, 2024, 4.

[115] *Bazemore v. Bertie County Board of Elections*, 119 S.E.2d 637 (N.C. 1961).

[116] Ibid.

[117] Wertheimer, *Law and Society*, 161; North Carolina Advisory Committee to the U.S. Commission on Civil Rights, "Voting and Voter Registration in North Carolina, 1960," 22; and *Bazemore v. Bertie County Board of Elections*, 119 S.E.2d 637 (1961) 254 N.C. 398.

long habituated to the idea that Blacks, by their very nature, lacked the intellectual and moral capacity to function as citizens.[118]

North Carolina's response to Black demands for political rights was adaptive, not reactionary. It stood apart from what became known as "massive resistance" elsewhere in the South. As one contemporary observed, it was a "subtle strategy" for preventing "the black vote from being effective." White political leaders were willing to tolerate the registration of a limited number of Black voters and even the occasional election of a Black officeholder, but they conceded nothing on the foundational principles of Jim Crow: Black inferiority and second-class citizenship. This was their way of maintaining what Charles Aycock had called "good order" and of warding off federal intervention, an existential threat since the days of slavery.[119]

### C. Challenging Jim Crow at School

A willingness to concede change at the margins shaped not only the battle over the ballot box but also the racial contest at the schoolhouse door. In the early 1930s, Black educators, organized through the North Carolina Teachers Association (NCTA), collaborated with the NAACP in a campaign to equalize Black and white teachers' pay. They were emboldened by the New Deal's support for organized labor and the minimum wage standards set by the National Recovery Administration. In October 1933, more than 2500 teachers filled the streets in Raleigh to press their demands. Weeks later, their representatives issued a bold indictment of Jim Crow:

> We are disenfranchised and told to acquire learning and fitness for citizenship. We undertake the preparation in our inadequate, wretchedly equipped schools. Our children drag through the mud while others ride in busses, we pass the courses required by the state and in most places when we present ourselves for registration, we are denied that right and lose our votes. Our teachers, disadvantaged by disenfranchisement, by lack of the means to prepare themselves, nevertheless do meet the high and exacting standards of the best white institutions of the country, and then armed with the state's highest certificate go into the employment of a commonwealth which reduces their wages to the level of janitors and hod carriers.

The NCTA urged its members to register to vote and to "unite their forces at the polls." "We are informed that it is best for us if we stay out of politics," the Black educators declared, but "we have stayed out and this is what we have."[120]

That effort at political mobilization produced one of the South's earliest lawsuits to challenge the constitutionality of the literacy test. In 1934, two Iredell County teachers, T. E. Allison and Robert W. Dockery, appeared before a white registrar who instructed them

---

[118] *Bazemore v. Bertie County Board of Elections*, 119 S.E.2d 637 (N.C. 1961).
[119] Towe, "Barriers to Black Political Participation in North Carolina," 11-12.
[120] Thuesen, *Greater Than Equal*, 142-48.

to read and write passages from the state constitution. When they were done, he declared his judgment: "You do not satisfy me." Allison and Dockery subsequently sued the registrar and the county and state boards of election.[121]

The North Carolina Supreme Court heard their case on appeal in 1936 and ruled for the defendants. Associate Justice R. Heriot Clarkson – a Confederate veteran and leader of the white supremacy campaigns of 1898 and 1900 – wrote for the court. He affirmed the constitutionality of the literacy test and said of the plaintiffs, they "just do not like the law of their State." Clarkson closed with a history lesson: "It would not be amiss to say that [the] constitutional amendment providing for an educational test . . . brought light out of darkness as to education for all the people of the State. Religious, educational, and material uplift went forward by leaps and bounds. . . . The rich and poor, the white and colored, alike have an equal opportunity for elementary and high school education."[122]

Given the difficulties of voter registration, the NCTA had limited ability to bring direct pressure to bear on state and local politicians, but its continued agitation of the salary equalization issue, the ongoing involvement of the NAACP, and a growing number of lawsuits filed elsewhere across the South convinced the state legislature in 1939 to allocate $250,000 to raise Black teachers' pay. Still, the average Black teacher earned only three-quarters of what the average white teacher was paid.[123]

The U.S. Court of Appeals for the Fourth Circuit put southern lawmakers on notice in 1940, when it ruled in a Norfolk, Virginia case that racial disparities in teacher pay violated the equal protection clause of the Fourteenth Amendment. A three-judge panel affirmed Black teachers' "civil right . . . to pursue their profession without being subjected to discriminatory legislation on account of race or color." America's entry into World War II then provided the final impetus to close the gap. In 1942, James W. Seabrook, president of both the NCTA and Fayetteville State Teachers College, appealed to white politicians' sense of fair play and their not-so-secret fears for Black loyalty in the war effort. He urged them to "give the Negro confidence that the principles of democracy for which he is being called upon to fight in the four corners of the earth will be applied to him here at home." Two years later, the General Assembly appropriated funds to equalize Black and white teachers' salaries.[124]

During the war years, Black educators' demand for equal pay expanded into a call for equal facilities. Children led the way. In October 1946, more than four hundred students, organized in a local NAACP Youth Council, filled the streets in Lumberton, a

---

[121] Ibid., 147.

[122] *Allison v. Sharp*, 184 S.E. 27 (N.C. 1936). On Justice Clarkson, see *Prominent People of North Carolina*, 16-17. In 1896, Clarkson organized one of the state's first "White Supremacy" clubs. Governor Charles Aycock rewarded his political loyalty with an appointment as solicitor of the state's Twelfth Judicial District.

[123] Thuesen, *Greater Than Equal*, 152.

[124] *Alston v. School Board of City of Norfolk*, 112 F.2d 992 (4th Cir. 1940); Douglas, *Reading, Writing, and Race*, 20; and Thuesen, *Greater Than Equal*, 153-55.

small town in southeastern North Carolina. They carried placards that cheered the triumph of democracy in World War II and set that achievement against the wretched condition of Black schools: "inadequate and unhealthy . . . overcrowded . . . and dilapidated." "D-Day," and "V for Victory," the signs exclaimed. "How Can I Learn When I'm Cold?" "It Rains on Me." "Down with Our Schools."[125]

Protests spread across eastern and central North Carolina, accompanied by lawsuits that challenged the constitutionality of unequal school funding. In 1950, plaintiffs in Durham won a breakthrough case in the U.S. District Court for the Middle District of North Carolina. Judge Johnson Jay Hayes ruled that city school officials had a legal obligation to provide "negro school children substantially equal facilities to those furnished white children." He found no "excuse or justification" for failing to meet that standard and ordered an end to discriminatory school spending.[126]

Anyone who read Judge Hayes's ruling closely would have spotted a single sentence that was even more prescient in its implications. "The burdens inherent in segregation," he wrote, "must be met by the state which maintains them." Had Hayes pronounced a death sentence for Jim Crow? In 1951, a group of fifty-five Black parents filed suit in Pamlico County to test that question. They demanded that their children be assigned to white schools unless adequate Black facilities were provided. As historian Sarah Thuesen has noted, this was "the first lawsuit filed in the federal courts from North Carolina – and only the second in the South – to raise the possibility of integration." The plaintiffs dropped their complaint when county officials agreed to build a new Black high school, but they had made their point. As the editor of the *Kinston Free Press* noted, "If we want to keep segregation, we must bend over backward to see that facilities are equal."[127]

To that end, state leaders put a $50 million school bond on the ballot in late 1953, as the U.S. Supreme Court prepared to hear final arguments in *Brown v. Board*. One observer noted that many white voters supported the measure in hope that it "might tend to influence" a judgment favorable to the white South. They could not have been more mistaken. On May 17, 1954, the Court ruled that "in the field of public education, the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal. Therefore, we hold that . . . segregation is a denial of the equal protection of the laws." In the aftermath of that decision, state and local officials scrambled once more to invent means of defending the substance, if not the letter, of Jim Crow statutes.[128]

### D. *Brown v. Board* and the Pearsall Committees

Two gubernatorial advisory committees, popularly known by the name of their chairman, wealthy eastern landowner and Democratic power-broker Thomas J. Pearsall, set the course for opposition to *Brown*. They worked from the principle "that members of

---

[125] Thuesen, *Greater Than Equal*, 169-70.
[126] *Blue v. Durham Public School District*, 95 F. Supp. 441 (M.D.N.C. 1951).
[127] Thuesen, *Greater Than Equal*, 191.
[128] Ibid., 200, and *Brown v. Board of Education of Topeka*, 347 U.S. 483 (1954).

each race prefer to associate with other members of their race *and that they will do so naturally unless they are prodded and inflamed and controlled by outside pressure*." (emphasis in the original).[129] To that end, the committees proposed "the building of a new school system on a new foundation – a foundation of no racial segregation by law, but assignment according to natural racial preferences and the administrative determination of what is best for the child."[130]

The first Pearsall committee recommended that the state cede authority over school assignments to local districts. That proposal informed the Pupil Assignment Act of 1955, passed in the same legislative session as the prohibition of single-shot voting. Lawmakers removed references to race from state school assignment policy and gave parents "freedom of choice" in selecting the schools their children would attend. But there was a catch. The law required that Black parents petition individually to have their children assigned to white schools. Doing so demanded great courage. Parents faced the prospect of retribution by angry employers and landlords, and they had to accept the risk that their children might stand alone to face white resistance. The law also gave local school boards broad discretionary authority in ruling on parents' requests. They could reject an application if they believed that it did not serve a child's "best interests," or that it would compromise "proper administration," "proper instruction," or "health and safety" in a target school.[131]

A year later, the second Pearsall committee proposed an amendment to the state constitution that would authorize the legislature to provide private school vouchers for "any child assigned against the wishes of his parents to a school in which the races are mixed." Local school boards would also be permitted to call for public referenda to close schools in case of "enforced mixing of the races." The committee presented the amendment as a balm for racial conflict stirred up by outsiders, most notably the NAACP and the federal courts. They looked forward to a day "when sanity returns," and to re-establishment of "the harmonious relations which the races have enjoyed in North Carolina for more than fifty years" – that is, from the time of white redemption and Black disenfranchisement. In September 1956, voters approved the amendment by a margin of more than four to one. Though no schools were ever closed and only one private school voucher was issued, the amendment effectively undermined any notion that desegregation might be achieved with more deliberate speed.[132]

These policies won North Carolina praise as a "moderate" southern state but produced one of the lowest desegregation rates in the region. At the beginning of the 1958-

---

[129] Leloudis and Korstad, *Fragile Democracy*, 63.

[130] *Report of the North Carolina Advisory Committee on Education, April 5, 1956,* 7 and 9, <http://bit.ly/2LTNQXw>, July 26, 2024.

[131] *Session Laws and Resolutions, 1955*, chapt. 366, 310.

[132] *Report of the North Carolina Advisory Committee on Education, April 6, 1956,* 8-10; Wettach, "North Carolina School Legislation, 1956," 7; and Batchelor, *Race and Education in North Carolina*, 108-9. The U.S. District Court for the Western District of North Carolina struck down the voucher plan in 1966. See Batchelor, 110.

59 school year, only ten of the state's roughly 322,000 Black students were enrolled in formerly white schools. That result impressed officials in Little Rock, Arkansas, where in 1957 white resistance to desegregation had prompted President Dwight Eisenhower to use federal troops to restore order. They complimented their North Carolina colleagues: "You . . . have devised one of the cleverest techniques of perpetuating segregation that we have seen. . . . If we could be half as successful as you have been, we could keep this thing to a minimum for the next fifty years."[133]

The Little Rock admirer put his finger on a lesson that is as true today as it was in the 1950s. White supremacy, often violent and inflexible, can also be subtle and adaptive. A tobacco worker from eastern North Carolina said it best: "My experience . . . is that if you beat the white man at one trick, he will try another."[134]

### E. Stalled Revolution

When most Americans think about the history of civil rights, they tend to view the past through a rearview mirror. They see a series of struggles that led inevitably to the demise of Jim Crow in the mid-1960s. But for an observer on the ground at the beginning of that decade, the future seemed far less certain. The U.S. Supreme Court had effectively embraced the North Carolina way. In *Lassiter v. Northampton County Board of Elections*, the court affirmed the constitutionality of the literacy test, and in *Brown II*, its ruling on the enforcement of school desegregation, the court embraced the go-slow approach proposed in an amicus curiae brief filed by North Carolina's attorney general.

North Carolina State Assistant Attorney General I. Beverly Lake Sr. drafted the brief and presented it along with oral arguments in April 1955. He urged the court to "allow the greatest possible latitude to . . . District Judges in drafting final [desegregation] decrees." It stood to reason, he explained, that "only a court conversant with local conditions and granted wide discretion [could] tailor [a] decree to fit the local variations." Lake also offered a dire warning against any "attempt to compel the intermixture of the races." Such action would result in "violent opposition" and place the public schools in "grave danger of destruction." In its ruling in *Brown II*, the high Court heeded Lake's advice. The Justices left it to lower courts to determine the pace and process of desegregation, guided by "their proximity to local conditions" and understanding of the need for "practical flexibility in shaping remedies." That was the essence of *Brown II*'s vague directive that desegregation proceed "with all deliberate speed."[135]

Congress was even less inclined to effect sweeping change, thanks in significant measure to the outsized influence wielded by southern lawmakers. In the decades after Black disenfranchisement, national leaders ignored Section 2 of the Fourteenth

---

[133] Batchelor, *Race and Education in North Carolina*, 73, and Chafe, *Civilities and Civil Rights*, 97 and 106.

[134] Korstad, *Civil Rights Unionism*, 384.

[135] Brief of Harry McMullen, Attorney General of North Carolina, Amicus Curiae, 3 and 6, <http://bit.ly/36PHJfd>, and *Brown v. Board of Education of Topeka*, 347 U.S. 483 (1954).

Amendment, which requires a reduction in representation for states that deny voting rights on the basis of race. Political scientist Richard Valelly estimates that had Section 2 been enforced, the Jim Crow South would have lost as many as twenty-five seats in the U.S. House of Representatives between 1903 and 1953. But the disenfranchisers never paid that penalty; instead, they expanded their influence in national politics. "That itself," Valelly writes, "was a major if silent constitutional change, a tacit, extraconstitutional [revision] of the Fourteenth Amendment."[136]

The denial of Black voting rights and the systematic suppression of two-party politics in the South also limited dissent and ensured that Democratic incumbents in Congress would be re-elected term after term. Over time, southern politicians accrued seniority and gained control of key committees in both the House of Representatives and the Senate. Their power was obvious in contests over civil rights issues, but much of it was otherwise out of view. As the chairmen of committees charged with administrative oversight, they permitted unchecked racial discrimination by government agencies, from the Federal Housing Administration's use of red lining to enforce racial segregation in America's cities and suburbs to the Veterans Administration's biased allocation of resources under the G.I. Bill and the U.S. Department of Agriculture's denial of subsidized loans and other resources to Black farmers. Examples abound. In every instance, willful neglect helped to entrench Jim Crow not only in the life of the South, but in that of the nation as well.[137]

## X. Civil Rights at Last

### A. Sit-Ins and Direct Action

By the late 1950s, most white southerners understood that the world they had built over the last half century would not last forever, but they were determined to preserve it as long as they could. They had reason to be confident and optimistic. White opposition to the *Brown* decision had blocked rapid racial integration in the nation's public schools, Martin Luther King Jr.'s Montgomery movement had accomplished little more than the desegregation of city buses, and despite increases in voter registration, Black political power was still negligible. On top of that, most whites outside the South were content with the racial status quo.

Then a civil uprising broke out. It drew strength from Black moral anger and frustration with white recalcitrance, and it was given form and direction by years of preparation and social learning in Black communities across the South. Clear in hindsight, but less so at the time, the signal event took place on February 1, 1960, when four students at the Agricultural and Technical College of North Carolina – Ezell Blair Jr., David Richmond, Franklin McCain, and Joseph McNeil – demanded service at a Woolworth's lunch counter in Greensboro. Sit-ins quickly spread across the state and throughout the

---

[136] Valelly, *Two Reconstructions*, 146-47.

[137] Ibid. See also Katznelson, *When Affirmative Action Was White*, and Daniel, *Dispossession*.

South. Two months later, college students, Black and white, gathered at Shaw University in Raleigh – North Carolina's oldest Black institution of higher learning – to organize the Student Nonviolent Coordinating Committee (SNCC). [138]

Inspired by North Carolina native and Shaw graduate Ella Baker, SNCC embraced a grassroots strategy for mobilizing ordinary citizens as leaders in the struggle for civil rights. Volunteers from every corner of the nation fanned out across the South to register voters, to build alternative schools for Black children, and to press for the desegregation of public facilities. Other civil rights organizations – including King's Southern Christian Leadership Conference, the Congress on Racial Equality (CORE), and the NAACP – adopted similar strategies of direct action. What these groups set in motion was a second Reconstruction in which Black people reached up not to receive but to seize their freedom. [139]

In the years between 1960 and 1965, Black protests forced issues of race and democracy to the center of national attention. As in the first Reconstruction, whites responded with state-sanctioned and extra-legal violence, which were not always distinguishable. The stories that filled columns of newsprint and the images that flooded television screens have become iconic: the firebombing and brutal beating of Freedom Riders; the assassination of Medgar Evers; the death of four little girls in the Klan bombing of the Sixteenth Street Baptist Church in Birmingham; the exhumation of the bodies of James Chaney, Andrew Goodman, and Michael Schwerner, CORE organizers murdered by Klansmen and law offers in Neshoba County, Mississippi; and the police attack on protestors attempting to cross Selma's Edmund Pettis Bridge. These and other outrages ultimately swayed public opinion and shamed majorities in Congress to pass the landmark Civil Rights Act of 1964 and the Voting Rights Act of 1965.

## B. A Second Emancipation

Each state has its own history of dealing with the moral and civic crisis brought on by the mass mobilization for democratic rights and equal citizenship. Though it had the largest Klan organization in the South, North Carolina did not experience the widespread violence that beset the Deep South. In large part, that was because of a critical gubernatorial election in 1960, won by moderate Democrat Terry Sanford. Throughout his administration, Sanford, a protégé of Frank Graham, preached a message of opportunity for all and used the police power of the state to surveil and restrain the Klan. [140]

Sanford won the Democratic gubernatorial nomination in a bitter primary contest with former Assistant Attorney General I. Beverly Lake Sr., a respected jurist who had taught law at Wake Forest College and was widely admired for his defense of Jim Crow. After his appearance before the U.S. Supreme Court in *Brown II*, Lake had proposed an

---

[138] Chafe, *Civilities and Civil Rights*, 98-141.

[139] Hogan, *Many Minds One Heart*.

[140] Covington, *Terry Sanford*, 342-43. Klan membership in North Carolina exceeded that of Alabama and Mississippi combined. See Cunningham, *Klansville, U.S.A.*

amendment to the state constitution that would have made desegregation a moot issue by removing the Reconstruction-era mandate for publicly funded schools. In his campaign for governor, Lake assured supporters that "The PRINCIPLES for which we fight are ETERNAL!"[141]

Sanford was a different breed of politician. He belonged to the generation who had fought in World War II and had seen horrifying reflections of American racism in German concentration camps and in the concepts of common blood and ethnic nationalism that shaped Japan's imperial project in Asia. Veterans like Sanford came home full of confidence in their ability to make the world a better place, and they were convinced that the South had to change – as a matter of what was just and right, and as an economic imperative if the region was to lift itself out of the misery that had long defined it as the most impoverished section of the nation.[142]





"The mixing of our two great races in the classroom and then in the home is not inevitable and is not to be tolerated."

I. Beverly Lake campaign ad, *Perquimans Weekly*, May 27, 1960, and campaign card. Courtesy of the North Carolina Collection, Wilson Library, University of North Carolina at Chapel Hill.

When Lake challenged his allegiance to Jim Crow, Sanford refused to be race baited. He pivoted to the "bright look of the future" and invited voters to join him in building for a "New Day" in North Carolina. That required improving public schools, not excising them from the state constitution. "We are going to continue to go forward," Sanford declared, "to give our children a better chance, to build a better state through better

---

[141] "N.C. Bar Association Award Carries Legacy of Explicit Racism," Raleigh *News and Observer*, June 28, 2016.

[142] See Covington, *Terry Sanford*, chapt. 5.

schools." That appeal was persuasive and reassuring. Sanford bested Lake and went on to win the general election.[143]

Soon after taking office, Sanford embarked on a tour of schools across the state. When he visited students – particularly at Black schools – he began to question his faith in education as a corrective for the damage wrought by Jim Crow. "I had a sickening feeling," he later recalled, "that I was talking about opportunities that I knew, and I feared [the children] knew, didn't exist, no matter how hard they might work in school." The "improvement of schools wasn't enough," he concluded. "Not nearly enough."[144]

By his own account, the governor was learning hard lessons – from school-aged children and from their older siblings who filled the streets with urgent demands for equal rights. He began to comprehend the connections between poverty and racial injustice that tobacco workers in Winston-Salem had exposed in the 1940s, that the biracial Fusion alliance had grasped during the 1890s, and that Black and white Republicans had identified as a central concern of Reconstruction. "We must move forward as one people or we will not move forward at all," Sanford told Black college students in Greensboro. "We cannot move forward as whites or Negroes . . . We can only move forward as North Carolinians."[145]

Sanford's words were a direct refutation of the foundational principle of Jim Crow, which Charles Aycock had explained in 1901 to an audience at the Negro State Fair in Raleigh. "It is absolutely necessary that each race should remain distinct," he said, "and have a society of its own. . . . The law which separates you from the white people of the State . . . always has been and always will be inexorable."[146]

In the winter of 1962-63, as the nation marked the centenary of Abraham Lincoln's Emancipation Proclamation, Sanford shared a "bold dream for the future." He startled white educators at a meeting in Dallas, Texas when he declared, "We need our own . . . emancipation proclamation which will set us free to grow and build, set us free . . . from hate, from demagoguery." Back home, he urged members of the North Carolina Press Association to join him in a campaign to make good on the unfulfilled promise of freedom and equality. "We can do this," Sanford declared. "We should do this. We will do it because we are concerned with the problems and the welfare of our neighbors. We will do it because our economy cannot afford to have so many people fully and partially unproductive. We

---

[143] Drescher, *Triumph of Good Will*, 67, 171, and 175.
[144] Manuscript containing notes for an abandoned book on Terry Sanford's term as governor, subseries 3.1, box 174, Records and Papers of Terry Sanford.
[145] "Fraternity's Award Goes to Sanford," *Greensboro Daily News*, April 28, 1963.
[146] "A Message to the Negro," in Connor and Poe, eds., *Life and Speeches of Charles Brantley Aycock*, 249-50.

57

will do it because it is honest and fair for us to give all men and women their best chance in life."[147]

As he spoke to the journalists, and through them the citizens of North Carolina, Sanford must have been mindful of another southern governor who had been in the headlines just days before. In his inaugural address, delivered from the steps of the state capitol in Montgomery, Alabama, George C. Wallace exclaimed, "Segregation now, segregation tomorrow, segregation forever."[148]

## C. Lifting the Economic Burden of Jim Crow

Six months later, Sanford called on his friends in the press once again, this time to publicize the launch of the North Carolina Fund, a non-governmental organization that would use private resources – from the Ford Foundation and North Carolina's own Z. Smith Reynolds and Mary Reynolds Babcock Foundations – to attack the state's "poverty-segregation complex." That plan was audacious. Nearly 40 percent of North Carolinians lived below the poverty line, and in eastern counties where slavery and later sharecropping dominated the economy, Black poverty was so deep and pervasive that outsiders referred to the region as "North Carolina's 'little Mississippi.'" As the Fund took on this challenge, it became a model for the national war on poverty, which President Lyndon Johnson and Congress launched with the Economic Opportunity Act of 1964, the establishment of Medicare and Medicaid in 1965, and the expansion of multiple programs that sought to educate, feed, clothe, and house the poor. In subsequent years, the Fund was an important conduit for millions of dollars in federal aid that flowed into North Carolina.[149]

From the beginning, the Fund modeled a future built on equal citizenship. Its staff and board of directors were remarkable for the number of women and Blacks who served in leadership roles, and its headquarters was located in Durham's Black business district, an intentional sign of the organization's guiding principles. The Fund also adopted the direct-action techniques of the civil rights movement. Its community partners led boycotts of businesses that refused to hire Black workers, staged rent strikes to demand that landlords repair sub-standard housing, registered voters, and taught poor people how to pressure politicians and government officials for a fair share of social provision: more and better public housing; job training; paved streets, clean water, and sewer lines for neighborhoods that had been denied those services on account of race; and low-interest

---

[147] Address to the Commission on Secondary Schools of the Southern Association of Colleges and Schools, Dallas, Texas, November 28, 1962, in Mitchell, ed., *Messages, Addresses, and Public Papers of Terry Sanford*, 302; "Observations for a Second Century," subseries 3.1, box 174, Records and Papers of Terry Sanford; and film of Sanford's address to the North Carolina Press Association, series 6.2, VT3531/1a, Terry Sanford Papers.

[148] On Wallace's gubernatorial inauguration, see Carter, *Politics of Rage*, 104-9.

[149] Untitled document on the Choanoke Area Development Association, series 4.11, folder 4825, North Carolina Fund Papers, and John Salter to Jim Dombrowski, April 28, 1964, folder 22, Gray (Salter) Papers. On conditions of poverty in North Carolina and the North Carolina Fund's relationship to the national war on poverty, see Korstad and Leloudis, *To Right These Wrongs*, 57-59, and 115-19.

mortgages and community development grants from the U.S. Department of Agriculture and other federal agencies.[150]

Through these efforts, the Fund attempted to create an interracial movement of the poor, but it had only limited success. By the time the organization closed its doors in 1968, national politics had begun to take a sharp conservative turn. For many whites, civil rights victories amplified Jim Crow dogma, which insisted that Blacks could advance only at white expense.

Fund staff often pointed to the resurgence of the Ku Klux Klan in North Carolina as evidence of that tragic worldview. For more than half a century, Jim Crow had all but quashed the possibility of interracial cooperation and one-party government had denied poor and working-class whites a say in politics. Similarly, fierce antiunionism, defended by lawmakers and employers as a means of protecting white jobs, left working-class whites without a collective voice. Throughout the 20th century, North Carolina was one of the least unionized states in the nation and ranked near the bottom for manufacturing wages. These circumstances, in ways that echoed the past, made it easy for firebrands to channel economic grievances into racial animosity.[151]

### D. Rise of a New Republican Party

The North Carolina Fund – and more particularly, the challenge it posed to the economic and political structures of Jim Crow – became the social irritant around which a new conservative movement took shape. Republican Congressman James C. Gardner, who represented eastern North Carolina's Fourth District, pointed the way. His election in 1966 marked the beginning of a party realignment that over the next two decades profoundly altered the state's political landscape.

In the summer of 1967, Gardner launched a public assault on the North Carolina Fund. He charged that it had become "a political action machine" and called for an investigation of its "meddling in the affairs of local communities." Gardner also played on racial fears that dated back to the era of Reconstruction and the white supremacy politics of the late 1890s. In a press release, he shared reports from eastern North Carolina that Fund staff were promoting "revolutionary . . . attitudes" by speaking openly of the need for a "coalition . . . between poor whites and Negroes to give political power to the disadvantaged."[152]

A subsequent audit by federal authorities cleared the Fund of any wrongdoing, but Gardner had achieved his purpose. He positioned himself on the national stage as a leading

---

[150] For a detailed account of the North Carolina Fund's antipoverty work, see Korstad and Leloudis, *To Right These Wrongs*, chaps. 3-5.

[151] See Salter, "The Economically Deprived Southern White," box 2, folder 7, Gray (Salter) Papers. David Cunningham makes a similar argument in *Klansville, U.S.A.*

[152] Gardner press release, July 25, 1967, series 1.2.2, folder 318, North Carolina Fund Records. For more on Gardner's criticisms of the Fund, see Korstad and Leloudis, *To Right These Wrongs*, 290-306.

critic of social welfare programs, and he made the war on poverty and its connections to Black political participation a wedge issue that could draw disaffected white Democrats into an insurgent Republican movement.

Republican Party elders in North Carolina recognized the promise of Gardner's leadership and the shrewdness of his strategy. They had named him party chairman a year before his congressional bid. Sim A. DeLapp, the party's general counsel and himself a former chairman, wrote to encourage Gardner. "From the standpoint of voter sentiment," he advised, "we are in the best shape that we have ever been [in] during my lifetime. People are permanently angry at the so-called Democratic Party. . . . They are mad because [Lyndon] Johnson has become the President of the negro race and of all the left wingers." I. Beverly Lake Sr., who was now a Justice on the North Carolina Supreme Court, expressed the depth of white anger. "The apostles of appeasement . . . must be removed from positions of public trust," he advised Gardner. "We must clean up the whole foul mess and fumigate the premises."[153]

In 1968, Republican presidential candidate Richard Nixon tapped this racial animosity to flip the once solidly Democratic South. He secured an endorsement from Strom Thurmond, U.S. Senator from South Carolina, who had led the 1948 Dixiecrat revolt in defense of states' rights and had left the Democratic Party in 1964 to become a Republican. Nixon also cast his campaign in racially coded language. He offered himself as a spokesman for the "great majority of Americans, the forgotten Americans, the non-shouters, the non-demonstrators" who played by the rules, worked hard, saved, and paid their taxes. This strategy won Nixon the keys to the White House and marked the beginning of the Republican Party's new reliance on the white South as a base of support.[154]

Four years later, Nixon made a clean sweep of the region by winning the states that third-party segregationist candidate George Wallace carried in 1968: Alabama, Arkansas, Georgia, Louisiana, and Mississippi. This was the "white uprising" predicted by one of Congressman Gardner's constituents. Like her, most of the white voters who turned out for Nixon in North Carolina were still registered as Democrats, but they elected James E. Holshouser Jr. governor – the first Republican to win the office since Fusion candidate Daniel Russell in 1896 – and sent Jesse Helms to the U.S. Senate. Helms, who served for six terms, quickly rose to prominence as a national leader of what came to be called the New Right.[155]

### E. Conservative Democrats Hold the Line on Black Voting Rights

Conservatives in the state Democratic Party held on through the 1970s and fought a rearguard battle against civil rights advocates who used the courts to challenge suppression

---

[153] DeLapp to James Gardner, September 1, 1965, box 9, DeLapp Papers, and Lake to Gardner, August 5, 1967, box 23, Gardner Papers.

[154] Perlstein, *Nixonland*, 283-85, and Nixon, Nomination Acceptance Address, August 8, 1968, <http://bit.ly/2HPCoel>, July 26, 2024.

[155] Quotation from Doris Overman to Gardner, undated, box 14, Gardner Papers.

of the Black vote. In late 1965, the U.S. District Court for the Middle District of North Carolina ruled that the system for apportioning seats in both houses of the state legislature on the basis of geography rather than population violated the principle of "one man, one vote." That standard, derived from the Fourteenth Amendment's equal protection clause, holds that all votes cast in an election should carry roughly equal weight.[156]

The state constitution guaranteed each of North Carolina's one hundred counties a seat in the state House of Representatives. That privileged small rural counties, where whites were most firmly in control, and diluted Black votes in urban areas. The largest legislative district had nearly twenty times more residents than the smallest. That meant that a majority in the House "could be assembled from members who represented only 27.09 percent of the state's population." The state Senate was apportioned more evenly. The constitution required that Senate districts contain equal populations, though a separate provision that no county was to be divided created some imbalance. The largest Senate districts had nearly three times more residents than the smallest. The federal district court ordered that both chambers be redistricted immediately, and that the populations of the largest new districts not exceed those of the smallest by more than a factor of 1.3.[157]

Lawmakers convened in special session in 1966 to draw new district maps. They reduced population ratios as the court directed, but did so by creating a large number of multimember districts – fifteen of thirty-three in the Senate, which previously had thirty-six districts, eleven of which were multimember; and forty-one of forty-nine in the House, which previously had one hundred districts, twelve of which were multimember. Initially, seats in all the multimember districts were to be filled through at-large elections. This was a familiar means of disadvantaging Black candidates. Lawmakers had used it effectively in the 1950s when they changed county and municipal governments from ward to at-large systems of representation.[158]

In 1967, conservative Democrats made two additional changes designed to circumvent judicial efforts to protect Black voting rights. First, they approved a constitutional amendment, ratified by voters in the next election, that required that counties be kept whole in the creation of state House as well as Senate districts. This effectively made multimember districts a permanent feature of legislative apportionment, since it was mathematically difficult to base house and senate seats on equal measures of population without resorting to such a solution.[159]

Second, lawmakers stipulated that numbered-seat plans be used in elections in twenty of the forty-one multimember House districts and three of the fifteen multimember districts in the Senate. Taken together, these districts covered nearly all the counties in the eastern Black Belt. The numbered-seat plans required that in affected multimember

---

[156] *Drum v. Seawell*, 249 F. Supp. 877 (M.D.N.C. 1965).

[157] Ibid., and O'Connor, "Reapportionment and Redistricting," 32-33.

[158] *Session Laws and Resolutions, State of North Carolina, Extra Session, 1966*, chaps. 1 and 5, and *Session Laws of the State of North Carolina, Regular Session, 1965*, 9–11.

[159] *Session Laws and Resolutions, State of North Carolina, Regular Session, 1967*, chap. 640.

districts competition for each seat was to be treated as a separate contest. When citizens went to the polls, they would no longer vote for a set number of candidates out of a larger field of contenders – for instance, three out of five. Instead, their ballots would list separate races within the district – one each for the open seats – and they would vote for only one candidate in each race.[160] This enabled election officials to place individual minority candidates in direct, head-to-head competition with the strongest white candidates.

Proponents explained that the numbered-seat scheme was designed to "cure the problem of 'single-shot' voting," which was still legal in legislative elections. With conservative Democrats' critique of Black bloc voting clearly in mind, one lawmaker explained that in a numbered-seat election, "you are running against a man and not a group." Another added that numbered seats all but guaranteed "that no Negro could be elected to the General Assembly." The numbered-seat plan was, indeed, so effective that in 1971 the General Assembly had only two Black members: Henry E. Frye, a lawyer from Guilford County, who was elected to his first term in 1968, and Reverend Joy J. Johnson, a minister from Robeson County, who, in 1970, ran in one of the few eastern districts without numbered seats.[161]

Henry Frye was the first Black lawmaker to serve in the General Assembly since 1898. He owed his election to the organized political engagement of Black voters in Greensboro. Frye was a lawyer by profession. He had earned his J.D. from the University of North Carolina in Chapel Hill in 1959, with the distinction of being the first Black graduate to have entered the university's law school as a first-year student. Soon after receiving his license to practice, Frye opened a solo office in Greensboro and he and his wife, Shirley, purchased a house in the large Black community that was located in the city's southeast quadrant, adjacent to Bennett College, a private institution for Black women, and the Agricultural and Technical College of North Carolina, the state's largest public HBCU. The community was home to Black business owners and Greensboro's Black professional class, along with faculty, staff, and students from the nearby campuses. In 1951, the Greensboro Citizens Association, organized two years earlier by the Fryes' neighbors, had mobilized voters to elect William M. Hampton, a physician, as the first Black member of the city council. In the latter half of the decade, after the Supreme Court's *Brown* decision, they also kept up constant pressure on school officials to move forward with desegregation. And in 1960, they provided encouragement and protection for the Black students who staged sit-ins at downtown lunch counters. This civil rights work inspired Frye and drew him into politics. He ran for a seat in the state House of Representatives in 1966 but failed

---

[160] Ibid., chap. 106.

[161] "Seat Numbering Bill Produced Hot Debate," Raleigh *News and Observer*, July 8, 1967; "Senate Endorses 'Numbered Seats,'" Raleigh *News and Observer*, July 30, 1967; "Numbered Seat Bill Advances," Raleigh *News and Observer*, June 22, 1967; "Numbered Seats Measure Given House Approval," Raleigh *News and Observer*, June 13, 1967; Towe, *Barriers to Black Political Participation*, 28; *National Roster of Black Elected Officials*; "The Negro Vote," *Greensboro Daily News*, November 11, 1968; "Baptist Minister Announces for House," *Robesonian*, February 18, 1970; and "Failure of Singleshot Ban May Strengthen Black Vote," Raleigh *News and Observer*, January 17, 1972.

at the polls. Two years later, the Citizens Association helped to put him over the top by promoting a proven method of contesting white power: single-shot voting. Shortly before Election Day, the group circulated a handbill that endorsed only one candidate – Henry E. Frye. Black voters got the message. In an at-large election, they cast single-shot ballots and elected Frye to one of six open seats in House District 26.[162]

In 1971, unsettled by Frye and Joy Johnson's success in breeching the General Assembly, conservative Democrats attempted to expand the use of numbered seats in legislative elections. They reapportioned the state House to have forty-five districts. Thirty-five were multimember, and of those, twenty-three had numbered seats. In the Senate, there were twenty-seven districts. Eighteen were multimember, and within that group, eleven districts had numbered seats. Had these changes been implemented, the numbered-seat plan would have covered all North Carolina counties with populations that were 30 percent or more Black. But the U.S. Department of Justice blocked the move. It did so under authority of section 5 of the Voting Rights Act, which stipulated that in affected jurisdictions, changes to voting and representation had to be precleared by either the U.S. Attorney General or the U.S. District Court for the District of Columbia to ensure that they would not discriminate against protected minorities. In 1972, the U.S. District Court for the Middle District of North Carolina affirmed the Justice Department's decision. Ruling in *Dunston v. Scott*, the court struck down both the numbered-seat plan and the anti-single-shot laws that regulated elections in certain counties and municipalities. A three-judge panel concluded that "selective and arbitrary application" of both provisions "in some districts and not in others, denies to the voters of North Carolina the equal protection of the laws and is unconstitutional."[163]

Though not a basis for their decision, the judges also suggested that the single-shot prohibition violated the U.S. Constitution by constraining voters' choice in use of the ballot. They wrote, "We are inclined to believe that the right to vote includes the right of the voter to refuse to vote for someone he does not know, may not agree with, or may believe to be a fool, and under the Fourteenth and Fifteenth Amendments, we doubt that the state may constitutionally compel a voter to vote for a candidate of another race or political philosophy in order to get his vote counted."[164]

In subsequent elections, Black representation in the General Assembly grew from two members in 1970 to a high of six in both 1974 and 1976. The number then fell back to

---

[162] Covington, *Henry Frye*, chaps. 1-7, and "GOP Gains in Assembly," Raleigh *News and Observer*, November 7, 1968.

[163] *Session Laws and Resolutions, State of North Carolina, Regular Session, 1971*, chaps. 483, 1177, 1234, and 1237; Towe, *Barriers to Black Political Participation*, 61–62; Manderson, "Review of the Patterns and Practices of Racial Discrimination," 31; Watson, "North Carolina Redistricting Process, 1965–1966," 8; and *Dunston v. Scott*, 336 F. Supp. 206 (E.D.N.C. 1972).

[164] *Dunston v. Scott*, 336 F. Supp. 206 (E.D.N.C. 1972).

five in 1978 and to four in 1980. Numbered seats or not, Black candidates were still hard-pressed to win in multimember districts.[165]

## XI. Judicial Intervention and Battles Over a More Inclusive Democracy

### A. *Gingles* v. *Edmisten* and Black Electoral Gains

In 1981, four Black voters filed suit in *Gingles* v. *Edmisten* to challenge the legislative redistricting plan that the General Assembly had crafted after the 1980 Census and the 1968 constitutional provision that counties not be divided when apportioning state House and Senate seats. Lawmakers had not submitted the plan or the amendment for preclearance by the U.S. Department of Justice; when they did so after the plaintiffs' filing, both were denied approval.[166]

Lawmakers reacted quickly by drafting a new plan that included five majority-Black House districts and one majority-Black Senate district. The creation of those districts aided the election of eight new Black members of the House, raising the total from three to eleven. As the court later noted, however, the legislature's change of heart was in some measure cynical. "The pendency of this very legislation," the court observed, "worked a one-time advantage for Black candidates in the form of unusual organized political support by white leaders concerned to forestall single-member districting." The U.S. District Court for the Eastern District of North Carolina ruled for the plaintiffs in April 1984. Acting in an extra session, the General Assembly subsequently divided a number of multimember districts into new single-member districts that improved the prospects of Black candidates. In November balloting, two additional Black lawmakers were elected to the General Assembly, bringing the total to thirteen.[167]

By 1989, nineteen Black lawmakers served in the General Assembly, more than were elected during either Reconstruction or the Fusion era. Two years later, members elected state Representative Dan Blue Speaker of the House, at that time the highest state office held by a Black politician in North Carolina. Blacks also made substantial gains at the local level, largely as a result of legal challenges to at-large elections and multimember districts that followed the *Gingles* decision. At the end of the decade, more than four hundred Black elected officials served in county and municipal governments across the state.[168]

Growing Black political influence was also evident in 1991, when a much-strengthened interracial alliance in the General Assembly redrew North Carolina's

---

[165] "North Carolina African-American Legislators, 1969–2019," < http://bit.ly/38KWF0u>, July 26, 2024.

[166] Keech and Sistrom, "Implementation of the Voting Rights Act in North Carolina," 14.

[167] Ibid., 13-14, and *Gingles v. Edmisten*, 590 F. Supp. 345 (1984).

[168] Earls, Wynes, and Quatrucci, "Voting Rights in North Carolina," 581; "Two Blacks Join N.C.'s U.S. House Delegation," Raleigh *News and Observer*, November 4, 1992; and Keech and Sistrom, "Implementation of the Voting Rights Act in North Carolina," 14–17.

congressional districts, based on the 1990 federal census. Lawmakers created two opportunity districts – the First and Twelfth – with slim Black majorities. They explained that had they not done so, the state would have been vulnerable to legal challenge for violating the Voting Rights Act of 1965. The issue was dilution of the Black vote. In most parts of the state, the geographical scope of congressional districts submerged Black voters in sizable white majorities. Statewide, whites also had a long, well-documented history of refusing to support Black candidates. As a result, it was nigh on impossible for Black voters to make their voices heard in Congressional elections.[169]

The new First District was located in the heavily Black northeastern corner of the state, where voters had elected four Black Congressmen in the decades after Emancipation. In 1992, those voters' descendants leveraged that legacy. They chose Eva Clayton to represent them in Washington. Clayton had a long record of civil rights activism. In 1968, she had challenged but failed to unseat conservative Democrat Lawrence H. Fountain, the incumbent in North Carolina's Second Congressional District. Clayton subsequently served as executive director of the Soul City Foundation, which managed a Black-owned, federally funded residential community and industrial park in Warren County, one of the poorest places in the eastern Black Belt. Her work there commanded the attention of James B. Hunt (Jim) Jr., a progressive Democrat elected to the first of four terms as governor in 1976. Hunt appointed Clayton to serve as assistant secretary in the North Carolina Department of Natural Resources and Community Development, a post she occupied until 1981. After leaving state government, Clayton began a decade of leadership on Warren County's board of commissioners, which she chaired until 1990. As a member of Congress from 1992 to 2001, she continued to advance a core civil rights agenda: equal access to the ballot box, equitable opportunities for political participation, job development in poor rural communities, and redress of the U.S. Department of Agriculture's long and shameful history of discrimination against Black farmers.[170]

The new Twelfth District, like the First, reflected North Carolina's long history of struggle over race, political participation, and civil rights. The district snaked along a narrow, 160-mile path from Durham to Charlotte. Both of these anchor cities were established centers of Black political strength. During the 1930s and 40s, Durham's Louis Austin had made the case for a profound political realignment in which Black voters abandoned the hollowed-out party of Lincoln and sought new leverage against white

---

[169] For a detailed discussion of these districts and their origins, see Kousser, *Colorblind Injustice*, 243–76. Critics decried the districts as examples of "political apartheid," but as Kousser notes (at 243), they "were in fact the least segregated, most nearly racially balanced congressional districts in the state in the twentieth century."

[170] The Honorable Eva Clayton, Eva Clayton and Associates International, <https://bit.ly/3xZA1mv>; *Present at the Creation, Souvenir Book in Celebration of the Historic Groundbreaking of Soul City, North Carolina, and of the Second Banquet of the Soul City Foundation*, November 9, 1973, 8, box 175, Gerald R. Ford Presidential Papers, 1973-1974, Gerald R. Ford Presidential Library, Ann Arbor, Michigan, <https://bit.ly/3ScPw1l>; and "Rep. Eva Clayton Calls for Relief for Black Farmers," *Carolina Times*, November 1, 1997, <https://bit.ly/3xQYnik>, July 26, 2024.

supremacy within the Democratic Party – the party of Jim Crow. Nearly half a century later, Charlotte architect Harvey B. Gantt reaped the reward of that challenge to entrenched white power. In 1983 and 1985, he won election to consecutive terms as Charlotte's first Black mayor. Gantt's strategy was to build an alliance between Black Charlotteans – roughly 20 percent of the city's voting-age population – and progressive whites with whom they shared many of their priorities for local government. At the top of the list: maintaining the busing plan, ordered by the federal courts in 1969-71, that had transformed Charlotte's once-segregated schools into some of the most racially integrated in the nation.[171]

In 1992, Durham and Charlotte figured decisively in Melvin L. ("Mell") Watts' election to represent the Twelfth District. Watt was a Charlotte native and a lawyer who worked in the pioneering civil rights firm of Chambers, Stein, Ferguson, and Becton. He represented Charlotte and Mecklenburg County in the North Carolina Senate from 1985 to 1987, during which time he served as Harvey Gantt's mayoral campaign manager. Like Gantt, Watt had deep connections to Charlotte's Black community and strong ties to leaders of the regional and national banks that dominated the city's economy. At home and in Congress, he was an outspoken champion of Black-owned businesses and expanded investment in minority neighborhoods that still bore the blight of Jim Crow. That record won Watt re-election in ten consecutive campaigns. He left Congress in 2012; a year later, the U.S. Senate confirmed him as President Barack Obama's nominee to run the Federal Housing Finance Agency, established in 2008 to rein in predatory mortgage lending practices and manage recovery from a catastrophic collapse of the national housing market. Watt served in that office until 2019.[172]

The election of Eva Clayton and Mel Watt in 1992 marked a watershed in North Carolina's civil rights history. They were the first Black lawmakers since George H. White, a Fusion-era Republican, to represent the state in Congress. White served two terms, from 1897 to 1901. Speaking from the floor of the U.S. House of Representatives shortly before his departure, he offered a prophecy that Clayton and Watt ultimately fulfilled:

> This . . . is perhaps the [N]egroes' temporary farewell to the American Congress; but let me say, Phoenix-like he will rise up some day and come again. These parting words are in behalf of an outraged, heartbroken, bruised, and bleeding, but God-fearing people, faithful, industrious, loyal people – rising people, full of potential force.[173]

---

[171] Clemons, "Mayoral Campaigns of Harvey Gantt," 231-36. On Election Day Gantt won with numbers reminiscent of the Reconstruction and Fusion eras: he garnered 98 percent of Black votes and 40 (1983) to 58 (1985) percent of white votes.

[172] "The Honorable Melvin L. Watt," Historymakers: The Digital Repository of the Black Experience, <https://bit.ly/4d7ga3v>; Hanchett, "Developing Opportunity": and "Mel Watt Confirmed," Politico, December 10, 2013, <https://politi.co/3Ws9LdG>, July 26, 2024.

[173] Eva Clayton also claimed distinction as the first black woman in North Carolina to win election to Congress. The quotation is from the *Congressional Record*, 34, 56th Congress, 2nd Session, 2:1638. At

66

### B. Jesse Helms and Racial Polarization

By the mid-1990s, North Carolina once again had a tightly contested two-party political system. A visitor from a similar time a century before would have been confounded by the way that party labels had flipped. Democrats now resembled the party of Lincoln, and Republicans looked like Democrats of old. But the visitor would easily have recognized the competing social visions the parties offered voters. One party stressed the importance of balancing individual rights against social responsibility, contended that government had an indispensable role to play in promoting the general welfare, and viewed the prerogatives of citizenship as the birthright of every American. The other party was wary of government infringement on personal choice and thought of equal citizenship as a privilege to be earned rather than an entitlement. In a society that for most of its history had stood on a foundation of slavery and Jim Crow, contests over these competing ideals were centered, more often than not, on the question of racial equality. Conservatives – whatever their party label – took a narrow view on that issue, partly out of racial animus but also because they understood that Black enfranchisement led to progressive social policies.

The racial polarization that accompanied this realignment was nowhere more obvious than in the 1984, 1990, and 1996 general elections, when U.S. Senator Jesse Helms faced two Democratic challengers: Governor Jim Hunt in the first contest, and, in the second and third, former Charlotte mayor Harvey Gantt.

After his first-term election in 1972, Helms had quickly established himself as a leading spokesman of the new Republican Party that was ascendant in North Carolina and across the nation. He did so by holding true to what I. Beverly Lake Sr. had described as the "eternal principles" of white southern conservatism. Helms championed individualism and free enterprise; he opposed labor unions and attributed inequality to the values and behaviors of people who lived on society's margins; and he characterized social welfare programs as instruments of theft that rewarded the takers rather than the makers of wealth. "A lot of human beings have been born bums," Helms famously declared at the height of the civil rights movement and war on poverty. "Most of them – until fairly recently – were kept from behaving like bums because work was necessary for all who wished to eat. The more we remove penalties for being a bum, the more bumism is going to blossom."[174]

Helms had a talent for capturing the anger of white Americans who felt aggrieved by their fellow citizens' demands for rights and respect. He was also an innovative

---

home in North Carolina, white supremacist Democrat Alston D. Watts mocked White's words. "Geo. H. White, the insolent negro who has so long misrepresented the proud people of North Carolina in the Congress of the United States, has retired from office forever," Watts announced to cheering members of the General Assembly. "We have a white man's government in every part of the old [North] State," he declared, "and from this good hour no negro will again disgrace the old State in the council chambers of the nation. For these mercies, thank God." See "Under the Dome," Raleigh *News and Observer*, March 5, 1901.

[174] Viewpoint, December 5, 1966, Jesse Helms Viewpoint editorial transcripts.

campaigner. His North Carolina Congressional Club, founded in 1978, was a fund-raising juggernaut that pioneered targeted political advertising of the sort that began with mass mailing in Helms's era and today is conducted via the internet and social media. Added to all of that, Helms was unwavering in his convictions. Supporters and adversaries alike knew him as "Senator No." He was, in the words of one sympathetic biographer, "an uncompromising ideologue."[175]

Jim Hunt, Helms's opponent in 1984, was cut from different cloth. Born in 1937, he belonged to a new generation of Democrats whose politics had been shaped by the progressive currents of the post–World War II era. Hunt followed in the footsteps of his parents, who had been devout New Dealers and supporters of Frank Graham. In 1960, while studying at North Carolina State University, he managed Terry Sanford's gubernatorial campaign on campuses statewide. As Sanford's protégé, he also learned to appreciate the ways that Jim Crow blighted North Carolina with illiteracy, hunger, sickness, and want. During two terms as governor – from 1977 to 1985 – Hunt put those lessons to work. He established a reputation as one of the South's most progressive leaders by persuading lawmakers to appropriate $281 million in new spending on public education. He also recruited high-wage industries to shift North Carolina away from its traditional cheap-labor economy, appointed former Chapel Hill mayor Howard Lee as the first Black cabinet secretary in state history, and named pioneering Black lawmaker Henry Frye to the North Carolina Supreme Court.[176]

As Hunt began his campaign to unseat Senator Helms in the 1984 election, he had reason to expect victory. Polls conducted in early 1983 showed him leading Helms by more than twenty percentage points. Hunt enjoyed particularly enthusiastic support among low-income whites earning less than $15,000 a year. They preferred him over Helms by a margin of 64 to 21 percent. That was a testament to the popularity of Hunt's policies on education and economic development.[177]

Events later in the year warned how quickly that lead could be undone. In early October, Helms led a four-day filibuster against legislation that eventually created a national Martin Luther King Jr. holiday. He revived a line of attack on King that he had honed during the 1960s as a nightly editorialist on Raleigh's WRAL-TV. King, he charged, was a communist revolutionary, not a peacemaker, and his actions and ideals were "not compatible with the concepts of this country." When President Ronald Reagan signed the King holiday bill into law a month later, many in the press reported a humiliating defeat for Helms. But the senator knew his audience back home. Even negative headlines helped him solidify his image as an uncompromising defender of conservative values. The effectiveness of that ploy showed in the polls. At the beginning of the race, Hunt had led Helms by 30 percentage points in counties where Blacks made up less than 10 percent of the population and whites were inclined to worry more about economic opportunities than

---

[175] Link, *Righteous Warrior*, 9 and 144–46.
[176] Pearce, *Jim Hunt*, 11–41, 145-46.
[177] Link, *Righteous Warrior*, 268, and Kellam, "Helms, Hunt, and Whiteness," 53.

civil rights. In the months after the filibuster, that deficit turned into a ten-point lead for Helms.[178]

As one senior adviser acknowledged, the Helms campaign knew that they "couldn't beat Jim Hunt on issues," so they came out guns blazing on race. The campaign ran thousands of newspaper and radio ads that linked Hunt to the threat of a "bloc vote" being organized by Black Democratic presidential candidate Jesse Jackson and other civil rights leaders. One print ad showed Hunt and Jackson sitting together in the governor's residence and warned, "Gov. James B. Hunt Jr. wants the State Board of Elections to boost minority voter registration in North Carolina. . . . Ask yourself: Is this a proper use of taxpayer funds?"[179]

As a means of courting evangelical Christian voters, Helms and his allies focused similar attacks on the emerging gay rights movement. The *Landmark*, a right-wing paper supported largely by advertising income from the Helms campaign, charged that Hunt was a closeted homosexual and had accepted contributions from "faggots, perverts, [and] sexual deviates." In a move reminiscent of the 1950 contest between Frank Graham and Willis Smith, Helms distanced himself from the specifics of those charges but reminded voters at every turn that his enemies were "the atheists, the homosexuals, the militant women's groups, the union bosses, the bloc voters, and so on." This enemies list endeared Helms to enough North Carolinians to best Hunt with 52 percent of the vote.[180]

Six years later, race became an issue by default when former Harvey Gantt won the Democratic senatorial nomination. Gantt's very presence on the ticket testified to the gains that Blacks had made in access to the ballot box and political influence. He was born in 1943 in the South Carolina Lowcountry, where cotton and rice barons had built their fortunes from the labor of his enslaved forebears. Gantt's parents moved the family to Charleston when he was still an infant. There his father found a job in the city's shipyard, thanks to Roosevelt's executive order opening war industries to Black workers. Gantt grew up in public housing and was educated in the city's segregated public schools. He traced his fascination with politics to his father's membership in the NAACP and to dinner table conversations about civil rights. As a high school student, Gantt joined his local NAACP Youth Council, and in April 1960, shortly after sit-in demonstrations began in North Carolina, he led similar protests in downtown Charleston.[181]

When Gantt thought about college, an obvious option was to attend a historically Black institution, such as Howard University or the Tuskegee Institute. But he believed that America's future was going to be "all about" integration, so he headed off to Iowa

---

[178] Kellam, "Helms, Hunt, and Whiteness," 53, and Link, *Righteous Warrior*, 262–69.

[179] Link, *Righteous Warrior*, 274 and 284, and Goldsmith, "Thomas Farr, Jesse Helms, and the Return of the Segregationists."

[180] Link, *Righteous Warrior*, 290–91 and 304; "Pro-Helms Newspaper Publishes Rumor That Hunt Had a Gay Lover," Raleigh *News and Observer*, July 6, 1984; and "Article Stirs New Charges in Carolina Senate Race," *New York Times*, July 7, 1984.

[181] Gantt interview.

State University, where he expected to get "an integrated education." Iowa State turned out to be as white as Howard was Black. Disappointed, Gantt returned home to create the future he longed for. He tried three times to gain admission to Clemson Agricultural College (now Clemson University) but was denied. With support from the NAACP Legal Defense Fund, Gantt sued, and in 1963 he won a federal court order that he be admitted as the school's first Black student. He graduated with a degree in architecture and then earned an M.A. in city planning from the Massachusetts Institute of Technology. Gantt made his way to Charlotte in 1971, opened an architectural firm, and quickly became involved in politics. When he challenged Helms in 1990, Gantt was the first Black Democrat in the nation's history to run for the U.S. Senate.[182]

Helms's campaign against Gantt echoed his attacks on Hunt. When Gantt raised issues of education, health, and the environment, Helms pointed to Gantt's financial ties to "militant homosexuals." One newspaper ad asked, why are "homosexuals buying this election?" The answer: "Because Harvey Gantt will support their demands for mandatory gay rights." At a campaign rally, Helms echoed the "White People Wake Up" warning from Willis Smith's campaign against Frank Graham. "Think about it," he said. "Homosexuals and lesbians, disgusting people marching in our streets demanding all sorts of things, including the right to marry each other. How do you like them apples?"[183]

Still, that only got Helms so far. In mid-October, some polls had him trailing Gantt by as many as 8 percentage points. It was time to play what one of Helms's advisers called "the race card." In the run-up to Election Day, the Helms campaign aired a television ad that played on white anxiety over Black access to desegregated workplaces. The ad showed a white man's hands crumpling a rejection letter. He wore a wedding band and presumably had a family to support. And he was dressed in a flannel shirt, not a button-down and tie. He obviously worked with those hands. The voice-over lamented, "You needed that job and you were the best qualified. But they had to give it to a minority because of a racial quota. Is that really fair? Harvey Gantt says it is. Harvey Gantt supports . . . [a] racial quota law that makes the color of your skin more important than your qualifications. You'll vote on this issue next Tuesday. For racial quotas, Harvey Gantt. Against racial quotas, Jesse Helms." The reference to quotas arose from debate over the proposed Civil Rights Act of 1990. Conservatives charged that it included such strict antidiscrimination rules that employers would feel compelled to adopt minority hiring goals in order to preempt potential lawsuits. President George H. W. Bush vetoed the law on October 22, days before the Helms ad ran on television. There was in all of this striking irony for anyone who cared to notice it. The ad attacked the very thing that Helms and his supporters sought to protect – economic privilege based on skin color.[184]

---

[182] Ibid., and *Gantt v. Clemson Agricultural College of South Carolina*, 320 F.2d 611 (4th Cir. 1963).

[183] Link, *Righteous Warrior*, 375.

[184] Goldsmith, "Thomas Farr, Jesse Helms, and the Return of the Segregationists"; Helms, Hands ad; and "President Vetoes Bill on Job Rights, Showdown Is Set," *New York Times*, October 23, 1990.

At the same time, the state Republican Party attempted to suppress Black voter turnout by mailing postcards to one hundred and twenty-five thousand voters in heavily Black precincts, warning recipients incorrectly that they would not be allowed to cast a ballot if they had moved within thirty days, and that if they attempted to vote, they would be subject to prosecution and imprisonment. Helms subsequently won the election with 65 percent of the white vote and 53 percent of the vote overall. When Gantt challenged him again in 1996, the results were the same.[185]

These battles over Helms's seat in the U.S. Senate made it clear that the political realignment that had begun in the mid-1960s was all but complete. White conservatives now identified as Republicans, and a coalition of minority voters and liberal whites constituted the Democratic Party's base. Contests between the two camps were often decided by slim margins. That was evidence of how closely divided North Carolinians were in the ways that they imagined the state's future. It also revealed the profound difference that racially prejudicial appeals could make in the outcome of elections and the character of governance.

### C. Progressive Democrats and Expansion of the Franchise

Despite his loss to Jesse Helms in 1984, Jim Hunt remained popular with North Carolina voters. They knew him as a reformer and modernizer who had improved the public schools and recruited new jobs that offset the loss of employment in the state's traditional manufacturing sector – textiles, tobacco, and furniture. In 1992, Hunt presented himself for an encore in the governor's office. On the campaign trail, Hunt spoke in optimistic terms. He told voters that he wanted "to change North Carolina," to "build a state that would be America's model." Hunt bested his Republican opponent, Lieutenant Governor Jim Gardner, by 10 percentage points. In 1996, he went on to win a fourth term by an even larger margin.[186]

Over the course of eight years, Hunt and fellow Democrats in the General Assembly built on the accomplishments of his first administration. They established Smart Start, a program that pumped $240 million into local communities to provide preschool education and improved health care to young children; raised teacher salaries by a third and increased state spending on public education from 76 to 86 percent of the national average; launched Health Choice, a state program for uninsured children who were ineligible for Medicaid or other forms of federal assistance; and created a new Department of Juvenile Justice to address the underlying causes of youth crime. Hunt also continued to champion inclusive

---

[185] Link, *Righteous Warrior*, 380; Earls, Wynes, and Quatrucci, "Voting Rights in North Carolina," 589; and Christensen, *Paradox of Tar Heel Politics*, 278.

[186] Pearce, *Jim Hunt*, 210, quotations at 217 and 220.

governance. When he left office in 2001, 22 percent of his appointees to state agencies and commissions were minorities, a figure that matched the state's demography.[187]

Between 1992 and 2009, Democratic lawmakers worked to sustain these achievements by expanding minority citizens' access to the franchise. Many of their reforms echoed the Fusion election law of 1895. Key legislation included the following:

- **1992** – N.C.G.S.A. § 163-82.25 required the State Board of Elections to initiate a statewide voter registration drive and adopt rules under which county boards of elections were to conduct the drive (HB 1776).

  N.C.G.S.A. § 163-227.2 created one-stop, in-person absentee voting (early voting) and removed the excuse requirement from absentee voting in general elections (SB 568).

- **2002** – N.C.G.S.A. § 163-227.2 allowed voting not earlier than the third Thursday before an election.

  N.C.G.S.A. § 163-166.11 allowed voters who went to the wrong precinct on election day to vote a provisional ballot (HB 842).

- **2005** – In response to a North Carolina Supreme Court ruling that out-of-precinct voting was not permitted under state election law, Senate Bill 133 reaffirmed the General Assembly's intent that out-of-precinct provisional ballots were to be counted. The bill specifically referred to Black citizens' disproportionate use of out-of-precinct voting: "The General Assembly takes note of the fact that of those registered voters who happened to vote provisional ballots outside their resident precincts on the day of the November 2004 general election, a disproportionately high percentage were African-American."

- **2007** – N.C.G.S.A. § 163-82.6 allowed for same-day registration during early voting (HB 91).

- **2009** – N.C.G.S.A. § 163-82.1 allowed 16- and 17-year-olds to pre-register to vote so their names would be placed on the voter rolls automatically when they turned 18 (HB 908).

The net effect of these reforms was a steady increase in voter participation. In 1996, North Carolina ranked forty-third among the states for voter turnout; it rose to thirty-seventh place by 2000 and to eleventh place in 2012.[188]

Most of the increase was driven by higher rates of Black political participation. Between 2000 and 2012, Black voter registration surged by 51.1 percent, as compared to 15.8 percent among whites. Black turnout followed apace. Between 2000 and 2008, it

---

[187] Ibid., 145-46 and 263-66. In 1977, Hunt appointed Howard Lee, former mayor of Chapel Hill, to serve as Secretary of the Department of Natural Resources and Community Development. Seven years later, he named Henry E. Frye to the State Supreme Court, and in 1999 elevated Frye to chief justice.

[188] Berman, *Give Us the Ballot*, 290–91.

jumped from 41.9 to 71.5 percent. In the 2008 and 2012 elections, Blacks registered and voted at higher rates than whites for the first time in North Carolina's history. That level of participation was critically important in the 2008 presidential contest, when Barack Obama won North Carolina with a slim margin of 14,171 votes out of 4,271,125 ballots cast. He was the first Democrat running for President to carry the state since Jimmy Carter in 1976.[189]

### D. Emergence of a New Multiracial Majority

The history of North Carolina and the South has been marked so profoundly by race that it is tempting to read the politics of the early twenty-first century solely in terms of Black and white. But there is, in fact, a new multiracial majority emerging. It bears resemblance to the biracial alliances of the Reconstruction and Fusion eras but has been shaped by the arrival of a new, rapidly expanding population of Hispanic citizens and immigrants.

Close observers of North Carolina politics noted that Hispanic voters were also "indispensable" to Obama's victory. The state's Hispanic population grew more than tenfold, from just over 75,000 to roughly 800,000, between 1990 and 2010. By 2018, that number exceeded 996,000, just shy of 10 percent of the state's total population. That expansion was driven by the economic boom of the 1990s and early 2000s, when immigrants poured into North Carolina to work jobs in pork and poultry processing, construction, building maintenance, and hospitality. By 2010, Hispanics represented 8.5 percent of the state's total population and 1.3 percent of registered voters. In a tight election, even that small number could change the outcome. North Carolina's Hispanic voters, most of whom favored Democrats, cast 20,468 ballots in 2008, a figure larger than Obama's winning margin.[190]

Hispanic voters' influence in state politics is likely to increase dramatically in the coming decade. Today the population stands at 997,000, roughly 10 percent of the state total, and the annual growth rate, at 24.6 percent, is a third higher than in the United States overall. Moreover, nearly 40 percent of North Carolina's current Hispanic residents are children or young teenagers who – unlike many of their parents' generation – were born in this country. Under the terms of the Fourteenth and Fifteenth Amendments, ratified during Reconstruction, and the Twenty-Sixth, ratified in 1971, they will be entitled to vote when they reach the age of eighteen. Taken together, these figures point to the potential for a new multiracial alliance of Hispanic, Black, and progressive white voters.[191]

---

[189] For increases in Black voter registration and turnout, see *North Carolina State Conference v. McCrory*, No. 16-1468 (4th Cir. 2016), 13, and Berman, *Give Us the Ballot*, 291.

[190] Ross, "Number of Latino Registered Voters Doubles in North Carolina"; "North Carolina's Hispanic Community: 2019 Snapshot"; and "Latinos in the 2016 Election: North Carolina."

[191] "North Carolina's Hispanic Community: 2019 Snapshot," and Tippett, "Potential Voters Are Fastest-Growing Segment of N.C. Hispanic Population."

## XII. Retrenchment

### A. Polarized Politics of Race and Ethnicity

By the early 2000s, North Carolina voters had become as racially polarized as they were at the end of the nineteenth century. Whites, by a wide margin, associated with the party that favored a restricted franchise, limited government, tax cuts, and reduced spending on education and social services. For their part, the majority of Blacks and Hispanics gave their allegiance to the party that advocated for enlarged access to the franchise, education, and healthcare; equal job opportunities; and a broad social safety net that offers protection from poverty and misfortune. National polling data on registered voters' party affiliation, collected by Gallup in 2012, tell the story:

| | White | Black | Hispani | Asian | Other | Undesignate |
|---|---|---|---|---|---|---|
| **Republican** | 89% | 2% | 6% | 1% | 1% | 1% |
| **Democrats** | 60% | 22% | 13% | 2% | 1% | 2% |

Republican and Democratic Party demographics. Newport, "Democrats Racially Diverse; Republicans Mostly White." Gallup, 2012.

In tight elections, this polarization heightened the importance of two related factors: newly enfranchised voter' access to the ballot box and the effectiveness of racial strategies for limiting turnout.[192]

How had this happened? As historian Carol Anderson argues, the 2008 election was the tipping point. At the national level, Barack Obama attracted a larger share of the white vote than Democrat John Kerry in 2004. He also won substantial majorities among Hispanic, Asian, youth, and women voters, along with 95 percent of Blacks. This loose coalition had gone to the polls to voice support for an expansive vision of government that Republicans had opposed since the days of the New Deal. They rallied to Obama's hopeful slogan, "Yes We Can," and his belief that Washington could improve people's lives with achievable reforms, such as raising the minimum wage, expanding the Earned Income Tax Credit, protecting the rights of labor, investing in public education, and guaranteeing universal access to affordable health care. Looking back on the election, Republican U.S. Senator Lindsey Graham identified the problem: his party was "not generating enough angry white guys to stay in business for the long term."[193]

An economy in crisis offered the makings of a solution. When Obama took the oath of office in January 2009, a near collapse of the banking system was threatening to plunge America and the rest of the world into a second Great Depression. North Carolina was one of the states hit hardest. Within a year, the unemployment rate soared to 10.9 percent. That

---

[192] Newport, "Democrats Racially Diverse; Republicans Mostly White."
[193] C. Anderson, *White Rage*, 138–39; 2008 Democratic Party Platform; and "As Republican Convention Emphasizes Diversity, Racial Incidents Intrude," *Washington Post*, August 29, 2012.

caused pain in every corner of the labor market, but the situation in manufacturing and construction became particularly grim. Between 2007 and 2012, those sectors experienced job losses of 18 and 32 percent, respectively. The banking crisis had begun with the implosion of the market for subprime mortgages. As more people lost their jobs, they fell behind on payments that under the best of circumstances had strained their budgets. Between 2006 and 2014, nine million American families lost their homes; in 2008 alone, the number in North Carolina was 53,995.[194]

Voters grew angry, particularly at politicians they felt had let the crisis happen and now sought to fix it with bailouts for financial institutions and corporations that were ostensibly "too big to fail." That fury fueled the Tea Party revolt that erupted in 2009. The movement was overwhelmingly white, and its supporters' grievances echoed principles that had defined a century of conservative thought and politics. Tea Partiers rallied against big government; denounced the 2010 Affordable Care Act as a socialist violation of individual liberty; criticized social welfare programs as a waste of taxpayers' money; and launched a xenophobic attack on immigrants who they claimed were stealing American jobs, dealing in illicit drugs, and perpetrating violent crime. The Tea Party sprang from the grassroots, but soon many of its rallies were financed and orchestrated by Americans for Prosperity, a conservative political action group backed by billionaire brothers Charles G. and David A. Koch and a national network of wealthy donors and like-minded organizations.[195]

Tea Partiers channeled much of their anger through racial invective. They hailed President Obama as "primate in chief"; they donned T-shirts that demanded, "Put the White Back in White House"; and at rallies in Washington, D.C., they carried placards that exclaimed, "We came unarmed [this time]." In North Carolina, a member of the Charlotte-Mecklenburg Board of Education argued against increases in school spending on grounds that costs had been inflated by what he called "Obama Bucks" – a pejorative term initially applied to food stamps but soon attached to a wide variety of federal social welfare programs. Three years later, when Charlotte hosted the Democratic National Convention, V. R. Phipps, a self-styled "patriot" from eastern North Carolina, captured headlines when he parked his truck and a trailer near delegates' downtown hotels. The trailer contained effigies of the president and state political figures, each strung up lynching-style in a hangman's noose. Phipps later took his display on tour in the Midwest and up and down the East Coast.[196]

---

[194] Gitterman, Coclanis, and Quinterno, "Recession and Recovery in North Carolina," 7; Samuels, "Never-Ending Foreclosures"; and "N.C. Foreclosures Jumped 9% in 2008," *Triad Business Journal*, January 5, 2009.

[195] Mayer, "Covert Operations."

[196] Blake, "What Black America Won't Miss about Obama"; "Racial Resentment Adds to GOP Enthusiasm"; Okun, *Emperor Has No Clothes*, 151; Charlotte-Mecklenburg Board of Education, meeting minutes, September 8, 2009; "GOP Mailing Depicts Obama on Food Stamps, Not Dollar Bill"; and "'Hanging Obama' Truck Makes Way into Charlotte."

75

Republican leaders embraced white voters' anger and presented themselves as the party that would defy the Black president and his supporters. Shortly before the 2010 midterm elections, in which Republicans won control of the U.S. House of Representatives, Mitch McConnell, the Republican majority leader in the Senate, pledged to voters, "The single most important thing we want to achieve is for President Obama to be a one-term president. . . . You need to go out and help us finish the job." Writing a year later, Ron Unz, publisher of the *American Conservative*, an influential online political forum, described that racial logic in approving terms: "As whites become a smaller and smaller portion of the local population in more and more regions, they will naturally become ripe for political polarization based on appeals to their interests as whites. And if Republicans focus their campaigning on racially charged issues such as immigration and affirmative action, they will promote this polarization, gradually transforming the two national political parties into crude proxies for direct racial interests, effectively becoming the 'white party' and the 'non-white party.'" Unz predicted that since white voters constituted a majority of the national electorate, "the 'white party' – the Republicans – will end up controlling almost all political power and could enact whatever policies they desired, on both racial and non-racial issues."[197]

Unz's assessment read like a script for the future of North Carolina politics. Voter discontent offered Republicans an opportunity to extend their success in presidential and senatorial elections downward into campaigns for seats in the state legislature.

Racial appeals figured prominently in the 2010 election. Take, for example, the effort to unseat John J. Snow Jr., a state senator from western North Carolina, and L. Hugh Holliman, Democratic majority leader in the state House of Representatives. Both had voted for the 2009 Racial Justice Act, which Democrats passed after decades of effort to reform or abolish capital punishment. The law gave inmates the right to challenge imposition of the death penalty by using statistical evidence to prove that race was a factor in their sentencing. In the closing weeks of the campaign, the executive committee of the state Republican Party produced a mass mailing that attacked the law and its backers. An oversized postcard featured a photograph of Henry L. McCollum, who had been convicted of raping and killing an eleven-year-old girl. It played to the same ugly stereotypes of Black men's bestial sexuality that had been front-and-center in the white supremacy campaigns of 1898 and 1900, warning that "thanks to ultra-liberal lawmakers" like Holliman and Snow, McCollum might "be moving out of jail and into Your *neighborhood* (emphasis in the original) sometime soon." The not-so-subtle message was that recipients who cared for their families' safety would vote to "get rid of criminal coddler[s]" and keep predators like McCollum "where they belong."[198]

---

[197] "GOP's No-Compromise Pledge," and Unz, "Immigration, the Republicans, and the End of White America."

[198] Roth, *Great Suppression*, 96–98, and "GOP Featured McCollum in 2010 Attack Ad."



The executive committee of the state Republican Party
produced this postcard and a similar mailing to target
Democrats Hugh Holliman and John Snow for their support
of the 2009 Racial Justice Act. Courtesy of WRAL.com.

There was a double layer of tragedy in this racial appeal. Holliman, a staunch defender of the death penalty, had lost a sixteen-year-old daughter to murder decades earlier. He and many of the public found the postcard so offensive that they demanded an apology from Tom Fetzer, state chairman of the Republican Party. Fetzer obliged but also took the opportunity to criticize Holliman's vote for the racial justice law. Then, in 2014, McCollum was exonerated and released from prison. The *New York Times* reported that the case against him, "always weak, fell apart after DNA evidence implicated another man" who "lived only a block from where the victim's body was found" and "had admitted to committing a similar rape and murder around the same time."[199]

Conservative activists disparaged North Carolina's growing Hispanic population in comparable ways. In 2009, Jeff Mixon, legislative director in the Raleigh office of Americans for Prosperity, attacked Hispanic immigrants as deadbeats and thugs. He described North Carolina as a "magnet for illegals" who came to America to "take advantage [of a] vast array of benefits . . . from food stamps and free medical care to in-state tuition at our community colleges." He also played on historically familiar prejudices that associate dark skin with criminality. "Poor illegal aliens" deserved no sympathy, he argued, because they provided cover for "wolves among the sheep" – members of Mexican "narco gangs" who threatened to "ruin our communities."[200]

---

[199] "GOP Featured McCollum in 2010 Attack Ad"; Mayer, "State for Sale"; "Flier Opens an Old Wound," *Winston-Salem Journal*, October 21, 2010; and "DNA Evidence Clears Two Men in 1983 Murder," *New York Times*, September 2, 2014.

[200] Mixon, "Just Look at the Results"; "Narco Gangs in North Carolina"; and "Who Benefits from Illegal Immigration?"

A year later, the executive committee of the North Carolina Republican Party played on such anti-immigrant sentiments in a mailer it distributed to support candidate Thomas O. Murray, who was running against sitting Democrat John Christopher Heagarty for the District 41 House seat in the General Assembly. With a sombrero atop his head and his skin darkened by clever photo editing, "Señor" Heagarty exclaims, "Mucho taxo" – a reference to policies that Republicans charged were driving away jobs.[201]



The executive committee of the state Republican Party produced this postcard to insinuate that Democrat Chris Heagarty's stance on tax issues was connected to the interests of Hispanic immigrants. Courtesy of *IndyWeek*.

On Election Day, Snow, Holliman, Heagarty, and fifteen of the other Democrats lost their seats, giving Republicans a majority in both houses of the state legislature. Republican lawmakers subsequently consolidated their hold on power. The timing of Republican gains in North Carolina was fortuitous. The nation's decennial census was complete, and lawmakers would now take up the job of redistricting the state.[202]

## B. 2011 Redistricting

In 2011, Republican lawmakers redrew state legislative districts in a way that exposed the centrality of race in their strategy for extending and securing their partisan advantage. Managers of the process claimed – falsely – that in order to comply with the Voting Rights Act of 1965, the General Assembly was required to create majority-minority legislative districts in equal proportion to North Carolina's Black population. They instructed an outside consultant, Republican Party strategist Thomas Hofeller, to create such districts wherever geographically possible, and to complete that task before drawing

---

[201] "Anti-Heagerty Ads."

[189] *Covington v. the State of North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016), 2, 4-6; *Covington v. North Carolina* (M.D.N.C.) 1:15-cv-00399, 3.

[202] Millhiser, "Cracks in the GOP's Gerrymandering Firewall."

78

other district lines. The plan that Hofeller designed, and the General Assembly ultimately approved, included thirty-six districts – twenty-four in the House and twelve in the Senate – in which Blacks constituted more than fifty percent of the voting age adults. These districts accounted for twenty-one percent of seats in the General Assembly, a figure that matched the percentage of Blacks in the state's population.[203]

Republican leaders presented the redistricting plan as evidence of their commitment to civil rights, but that was a sleight of hand. The new majority-minority districts sprawled across county lines, divided municipalities, and split precincts – all for the purpose of packing Black voters together as tightly as possible. These configurations dismissed "traditional race-neutral districting principles" established by the U.S. Supreme Court, including "compactness, contiguity, and respect for . . . communities defined by actual shared interests." The effect was to separate many Black voters from the interracial alliances that the Democratic Party had been building since the mid 1980s. In the 2012 election, Black candidates gained seven seats in the General Assembly, but nineteen of their white allies suffered defeat.[204] This gave Republicans a super majority in both chambers of the legislature, which, along with the election of Republican governor Patrick L. (Pat) McCrory, sharply diminished Black North Carolinians' ability to influence public policies that mattered to their communities.[205]

### C. *Shelby County v. Holder* and House Bill 589

The severity of that setback quickly became apparent when the new Republican-controlled legislature convened. For more than a year, party leaders had been gathering information that might help them roll back Democratic reforms that had expanded access to the ballot box. As early as January 2012, a member of the Republican legislative staff had asked the State Board of Elections, "Is there any way to get a breakdown of the 2008 voter turnout, by race (white and Black) and type of vote (early and Election Day)?" A year later, a Republican lawmaker wondered, "Is there no category for 'Hispanic' voter?" Another questioned University of North Carolina officials "about the number of Student ID cards that [were] created and the percentage of those who [were] African American," and in April 2013, an aide to the Speaker of the House requested "a breakdown, by race, of those registered voters [who] do not have a driver's license number."[206]

---

[204] *North Carolina General Assembly, 149th Session 2011-2012: House of Representatives*; *North Carolina General Assembly, 150th Session 2013-2014: House of Representatives*; *North Carolina General Assembly 2011 Senate Demographics*; *North Carolina General Assembly 2013 Senate Demographics*.

[205] "North Carolina Election Results 2012: McCrory Wins Governor's Race; Hudson Tops Kissell for House Seat, Romney Gets Narrow Victory," *Washington Post*, November 7, 2012.

[206] "Inside the Republican Creation of the Norther Carolina Voting Bill Dubbed the 'Monster' Law," *Washington Post*, September 2, 2016.

Two months later, the U.S. Supreme Court gave white conservatives an opening to make wholesale changes to state elections law. In *Shelby County v. Holder*, a 5-4 majority of justices struck down Section 5 of the Voting Rights Act, which had required that the U.S. Department of Justice preclear changes in voting procedures in portions of North Carolina and other affected jurisdictions to ensure that they would not disadvantage protected minorities. Within hours of the ruling, Republican leaders in North Carolina announced that they planned to introduce an omnibus bill that would dramatically modify the ways that citizens registered to vote and cast their ballots.[207]

What eventually emerged was House Bill 589, legislation that targeted the electoral clout of the alliance of Black, Hispanic, and progressive white voters within the Democratic Party.[208] Like the Act to Regulate Elections that opponents of Fusion crafted in 1899, House Bill 589 made no explicit reference to race or ethnicity; nevertheless, it threatened to limit political participation by non-white minorities. The law included numerous provisions that would have made voting harder for Black and Hispanic electors.

- House Bill 589 required that in-person voters provide one of eight approved forms of photo identification in order to cast a ballot. Blacks constituted 22 percent of North Carolina's population, but according to an analysis of State Board of Elections data by political science and election scholars Michael Herron and Daniel Smith, they represented more than a third of the registered voters who at the time did not possess the two most common forms of photo identification: a valid driver's license or a state-issued nonoperator's ID card.[209]

- The law also eliminated the first week of early voting, same-day registration, and straight-ticket voting. Statistics from the 2008 election in North Carolina suggested that these changes would have a disproportionately negative effect on Black voter participation. In the run-up to Election Day, 71 percent of Black voters cast their ballots early, including 23 percent who did so within the first week of the early voting period. That compared, respectively, to 51 and 14 percent of whites. Thirty-five percent of same-day voter registrants were Black, a figure 50 percent higher than what might have been predicted on the basis of population statistics, and Democrats voted straight-ticket by a two-to-one ratio over Republicans.[210]

- House Bill 589 targeted young future voters in similar fashion. It ended a program that permitted sixteen and seventeen-year-olds to pre-register at their high schools and other public sites. That opportunity had been particularly popular among Black teenagers. Blacks constituted 27 percent of the pool of pre-registered youth, once

---

[207] Ibid.

[208] House Bill 589, North Carolina General Assembly, 2013-2014 Session, <https://bit.ly/3LLTkTr3>, July 26, 2024.

[209] Herron and Smith, "Race, *Shelby County*, and the Voter Information Verification Act in North Carolina," 497.

[210] Heberling, Francia, and Greene, "Conditional Party Teams," 117.

again a figure that was significantly higher than Black representation in the general population.[211]

Many observers at the time noted this potentially disproportionate effect on Black electors, but most missed something equally important. The elimination of pre-registration for sixteen and seventeen-year-olds was remarkably forward looking: it stood to diminish the impact of rapid growth in the number of Hispanic voters – growth that observers identified as the "future of Progressive strength in America."[212]

A report from the University of North Carolina's Population Center explained the details. In 2012, as illustrated in the graph below, most of the state's Hispanic residents were non-citizens and only one of four was eligible to vote, but just over the horizon, Republicans faced a large population of young Hispanics who had been born in the United States, who would soon cast a ballot, and data showed were inclined to support Democrats. Of the Hispanics who had or would turn eighteen between 2012 and 2015, 72 percent were citizens. That figure rose to 84 percent of those who would turn eighteen between 2015 and 2010, and to 98 percent of those who would do so between 2020 and 2030. For Republicans politically, there was little to be gained and much to be risked by pre-registering these future voters.[213]

---

[211] Herron and Smith, "Race, *Shelby County*, and the Voter Information Verification Act in North Carolina," 505.

[212] Broockman and Roeder, "Hispanics Are the Future of Progressive Strength in America," New Organizing Institute; "Republicans Have a Major Demographic Problem, and It's Only Going to Get Worse," *Washington Post*, April 22, 2014; "The South is Solidly Republican Right Now, It Might Not Be that Way in 10 Years," *Washington Post*, April 29, 2014; and "Immigration is Changing the Political Landscape in Key States."

[213] Tippett, "North Carolina Hispanics and the Electorate."

81



Blue bars represent voting-age Hispanics, with dark shading for citizens and light shading for non-citizens. Green bars represent Hispanics under age eighteen, again with dark shading for citizens and light shading for non- citizens. Courtesy of Carolina Demography, University of North Carolina at Chapel Hill.

- Finally, House Bill 589 changed the rules for challenging voters' eligibility to cast a ballot and, by doing so, heightened the potential for intimidation. Three revisions were important in this regard. First, residents throughout the state were now allowed to inspect and challenge registration records in any of North Carolina's one hundred counties. In the past, challengers were permitted to act only in the counties in which they resided. Second, residents of a county were permitted to challenge voters' eligibility to cast a ballot at polling sites countywide, not just in the precincts where they themselves were registered. Third, the chair of each political party in a county were permitted to appoint ten at-large observers to monitor voting at any polling place they believed warranted close supervision. These poll watchers would be appointed in addition to the election judges assigned to specific voting sites.

Worry that these provisions would encourage frivolous challenges and voter intimidation was based on more than speculation. During the 2012 election, a loose confederation of conservative activists mobilized by True the Vote, state-level Voter Integrity Projects, and the Madison Project launched a campaign they called Code

Red USA. Their aim was to marshal a "cavalry" of volunteer poll watchers to police alleged voter fraud in battleground states, including North Carolina. In one incident, self-appointed watchdogs in Wake County petitioned to have more than five hundred voters, most of them people of color, removed from the registration rolls.

Though the attempt failed, it echoed in disturbing ways a similar episode during Reconstruction, when a group of whites in the same county challenged one hundred and fifty Black voters on grounds that they had registered fraudulently. As a researcher from the Brennan Center for Justice at the New York University School of Law observed, the 1872 challenge was "one of the first organized attempts by private citizens . . . to systematically undermine black political participation in North Carolina – a practice that would continue throughout the Jim Crow era." The mechanism to allow and facilitate this practice was reintroduced by the enactment of House Bill 589.[214]

When pressed on these issues, Republican lawmakers insisted that their intent was not to infringe on voting rights. Thom Tillis, Speaker of the House, encouraged the public to think of House Bill 589 instead as a means of "restoring confidence in government."[215]

### D. Rolling Back Reform, Restricting Social Provision

The new Republican-led North Carolina Legislature wanted to roll back reforms that previous Democratic-led legislatures had fought so hard for, reforms that brought equity back into electoral politics. *Shelby County* and the nullification of the Federal Government's preclearance regime gave the new legislature the impetus to put forth discriminatory laws such as HB 589 and its successor SB 824, but also set up a decade of fights over the suppression of Black voters in various ways and has ultimately led to this lawsuit over the new 2021 district maps.

The Republicans' sweeping revision of state election law was a key element in a broader legislative agenda designed to roll back decades of reform that had made state government more responsive to the economic and social needs of minority populations who had been politically and economically marginalized throughout much of the state's history.

One of Republicans' top priorities was to repeal the 2009 Racial Justice Act. Democrats defended the law by pointing to a simple set of numbers: between 1977 and 2010, North Carolina courts had sent three hundred and ninety-two people to death row, 49 percent of whom were Black – a figure more than double Blacks' representation in the general population. Opponents were not impressed. Thomas Goolsby, a Republican in the state Senate, insisted that the Racial Justice Act was unnecessary because inmates on death row already had "multiple avenues of appeal." Governor Pat McCrory seconded that claim,

---

[214] "Looking, Very Closely, for Voter Fraud," *New York Times*, September 17, 2012; "The Madison Project Launches the Code Red USA Project"; and Riley, "Lesson from North Carolina on Challengers."

[215] Berman, *Give Us the Ballot*, 290.

arguing that the law did nothing more than create a new "judicial loophole to avoid the death penalty and not a path to justice." Timothy K. (Tim) Moore, who later became the state's Speaker of the House, heaped ridicule atop McCrory's scorn. "The Racial Justice Act tries to put a carte blanche solution on the problem," he said. "A white supremacist who murdered an African American could argue he was a victim of racism if blacks were on the jury." There was, of course, no evidence that Blacks had systematically persecuted white supremacists in the past, or that prosecutors were eager to empanel Black jurors. In fact, district attorneys in North Carolina struck eligible Black jurors at roughly 2.5 times the rate they excluded all others. In early June 2013, lawmakers voted largely along party lines to rescind the Racial Justice Act, and Governor McCrory quickly signed the repeal into law.[216]

North Carolina's minority schoolchildren also ran afoul of Republican lawmakers, who mounted a stepwise campaign to weaken public education and expand private alternatives. The starting point was an issue that had been front and center in the 2012 election: a projected $3 billion shortfall in the state budget. There were obvious ways to address that problem – raise taxes, cut spending, or do some of both. The Republican majority in the General Assembly chose austerity, and because expenditures on education accounted for nearly 40 percent of North Carolina's annual budget, public schools were in the bullseye. For fiscal year 2014, the total appropriation for K-12 education, when adjusted for inflation, fell $563 million short of school spending in fiscal year 2008. Included in that figure were deep cuts in funding for pre-K programs, transportation, textbooks, and construction. The reductions hit teachers particularly hard. Their pay effectively stagnated as compensation in North Carolina fell from twenty-second to forty-seventh place in the nation. Soon teachers were fleeing the state's public schools; some dropped out of the profession, and others were lured away by better pay in neighboring states.[217]

Spending cuts and teacher attrition created a public perception of crisis, which was amplified by changes in the way that state officials had begun to report school performance. In 2012, the General Assembly created a simplified system that distilled a variety of measurements into letter grades that ranged from A to F. A year later, seven hundred and seven public schools received a grade of D or F. Parents and educators were shocked, in part because officials failed to tell them that nearly all of the underperforming schools were also high-poverty, majority-minority schools, where children needed more, not less,

---

[216] Kotch and Mosteller, "Racial Justice Act," 2035 and 2088; "North Carolina Repeals Law Allowing Racial Bias Claim in Death Penalty Challenges," *New York Times*, June 5, 2013; Grosso and O'Brien, "Stubborn Legacy," 1533; Florsheim, "Four Inmates Might Return to Death Row"; and "McCrory Signs Repeal of Racial Justice Act," *Winston-Salem Journal*, June 20, 2013.

[217] "North Carolina's Step-by-Step War on Public Education," *Washington Post*, August 7, 2015; Johnson and Ellinwood, *Smart Money*; 2013–2015 North Carolina Budget Short-Changes Students, Teachers, and Public Education; Gerhardt, "Pay Our Teachers or Lose Your Job"; Wagner, "North Carolina Once Again Toward the Bottom in National Rankings on Teacher Pay"; and Brenneman, "Teacher Attrition Continues to Plague North Carolina."

funding for supplemental instruction, pre-K and after-school programs, lower student-teacher ratios, and reduced class size.[218]

Republican lawmakers ignored those needs and instead used the low grades to argue for increased public support for charter schools and implementation of a new freedom-of-choice voucher program for private and religious academies. These policy decisions threatened to accelerate school re-segregation, which had been gathering speed since 2000, when the U.S. Supreme Court overturned its earlier decision in *Swann v. Charlotte-Mecklenburg Board of Education*. The Swann ruling, issued in 1971, had made busing a preferred means of desegregation and, in Charlotte, led to the creation of one of the nation's most integrated school systems. But behind that success lay deep racial anxiety, which led a group of white parents to initiate the court challenge to *Swann* in 1997 and, more broadly, informed the creation of North Carolina's charter school program a year later. A Duke University study of charter schools in the period between 1998 and 2012 offered insight into these developments and their role in re-segregation. The Duke researchers found that white parents preferred schools that were no more than 20 percent Black. Beyond that tipping point, they began to look for alternatives. The results showed in the demography of North Carolina schools. In 2012, only about 30 percent of students in the traditional public education system attended highly segregated schools that were more than 80 percent or less than 20 percent Black. In charter schools, the figures were reversed; more than two-thirds of students were enrolled in schools that were overwhelmingly white or Black. The Duke team concluded from these numbers that "North Carolina's charter schools have become a way for white parents to secede from the public school system, as they once did to escape racial integration orders."[219]

North Carolina's voucher program also undermined confidence in public schools and encouraged re-segregation. The program used public school funds to offer Opportunity Scholarships to low-income families that earned less than 133 percent of the federal poverty line. The State Department of Public Instruction marketed the vouchers, valued at up to $4,200 a year, as assistance for parents who wished to remove their students from high-poverty, under resourced schools – that is, underperforming schools created by state policies. Today, 93 percent of voucher recipients attend religious schools, which, on average, do not serve them particularly well. North Carolina accountability standards for voucher-eligible schools are among the most lenient in the nation. Those schools are not required to seek accreditation, employ licensed teachers, comply with state curriculum standards, or administer end-of-year evaluations of student learning. Given that lax oversight, it is not surprising that in the small number of voucher-eligible schools that do report results from standardized reading and math tests, 54 percent of students score below

---

[218] 2013–14 School Performance Grades (A–F) for North Carolina Public Schools. On the grading scheme, see *Unraveling*.

[219] Ladd, Clotfelter, and Holbein, "Growing Segmentation," 11, 35, and "White Parents in North Carolina Are Using Charter Schools to Secede from the Education System," *Washington Post*, April 15, 2015.

national averages. Enrollment data for voucher-eligible schools is not readily available, but information from disparate sources suggests that they are an increasingly attractive choice for white families who are looking for an alternative to integrated public schools. Between the 2014-15 and 2016-17 academic years, the share of vouchers claimed by Black students fell from 49 to 35 percent, while the share used by whites increased from 27 to 41 percent. One fact provides at least a partial explanation of that shift: in large religious schools with more than eighty voucher students, average enrollment was 89 percent white.[220]

Restoring "blindfolded" justice that dismissed four centuries of racial inequity in American jurisprudence and defaulting on North Carolina's constitutional obligation to provide all children equal opportunities in school – this was the agenda that Republicans enacted after their sweep of the General Assembly and governor's office in 2012. On election night in 2016, as he celebrated Donald J. Trump's presidential victory, Tim Moore, the state Speaker of the House, looked back on his party's handiwork and declared, "We've had a great four years since we took the majority." But even in that moment, Moore and other party leaders surely knew that candidates with different priorities might prevail in future elections and sweep away Republicans' accomplishments. How, then, to make the conservative revolution permanent? One answer – the answer that Charles Aycock and white-rule Democrats had imposed in 1900 – was to disenfranchise dissenting voters. That was the threat posed by House Bill 589, which a federal court would later describe as "the most restrictive voting law North Carolina has seen since the era of Jim Crow."[221]

### E. House Bill 589 in the Federal Courts

In 2016, the North Carolina NAACP, League of Women Voters, and U.S. Department of Justice lost their challenge to House Bill 589 in the U.S. District Court for the Middle District of North Carolina. But on appeal, the Fourth Circuit ruled for the plaintiffs and reversed the district court's decision. A three-judge panel found compelling evidence of discriminatory intent in the Republican election law. Among other considerations, the court pointed to "the inextricable link between race and politics in North Carolina," Republican lawmakers' consideration and use of race-specific data on voting practices, and the bill's timing. In addition to following closely on the heels of the *Shelby County* decision, House Bill 589 was also situated at a critical juncture in North Carolina politics. The appellate court judges noted that "after years of preclearance and expansion of voting access, by 2013 African American registration and turnout rates had finally reached near-parity with white registration and turnout rates. African Americans were poised to act as a major electoral force." Republican lawmakers "took away that

---

[220] *School Vouchers*, 1–2, 7, 11–13, and 21 n2; Opportunity Scholarship Program, 2019–20 School Year; and Private School Minority Statistics in North Carolina.

[221] "North Carolina's 'Racial Justice Act,'" Civitas Institute, November 16, 2010; "Berger and Moore Celebrate Majority Victory in State Legislature," Raleigh *News and Observer*, (updated online, <http://bit.ly/2tJJPjJ>, July 26, 2024); and *North Carolina State Conference of the NAACP v. McCrory*, 831 F.3d 204, 229 (4th Cir. 2016).

opportunity because [blacks] were about to exercise it," and they did so, the judges added, "with almost surgical precision."[222]

From this and other evidence, the Fourth Circuit panel concluded "that, because of race, the legislature enacted one of the largest restrictions of the franchise in modern North Carolina." They did not directly cite North Carolina's 1900 disenfranchisement amendment to the state constitution, but that was the obvious historical reference point. No other change to election law had been so sweeping in its effect. The judges remanded the House Bill 589 case to the district court, with instructions to enjoin the voter ID requirement and changes made to early voting, same-day registration, out-of-precinct voting, and teen preregistration.[223]

Republican leaders quickly regrouped after the Fourth Circuit ruling. They began to prepare an appeal to the Supreme Court and, in the interim, attempted to salvage some of the advantage that House Bill 589 would have given them in the upcoming 2016 general election. In mid-August, Republican governor Pat McCrory petitioned Chief Justice John G. Roberts Jr. to reinstate the law's photo ID requirement, which had been implemented months earlier in the spring primaries. Roberts declined. At the same time, Dallas Woodhouse, executive director of the state Republican Party, encouraged county election boards to press ahead with what he called "party line changes" to early voting. The boards no longer had legal authority to shorten the early-voting period, but they could achieve much the same effect by reducing the number of early-voting sites and cutting the hours the sites would be open.[224]

Seventeen county boards, mostly in the eastern Black Belt, did just that. Had Section 5 of the Voting Rights Act still been in place, the changes would have required preclearance from the U.S. Department of Justice, but that was no longer a hurdle. In the affected counties, Black voter turnout sagged significantly through much of the early voting period and caught up to 2012 levels only after a Herculean get-out-the-vote effort. Tellingly, state Republican Party officials reported that news in explicitly racial terms. The "North Carolina Obama coalition" was "crumbling," they reported in a news release. "As a share of Early Voters, African Americans are down 6.0%, (2012: 28.9%, 2016: 22.9%) and Caucasians are up 4.2%, (2012: 65.8%, 2016: 70.0%)."[225]

---

[222] *North Carolina State Conference of the NAACP v. McCrory*, 831 F.3d 204, 214, 215 (4th Cir. 2016); *see also North Carolina State Conference of the NAACP v. McCrory*, 182 F. Supp. 3d 320 (M.D.N.C. 2016); and *North Carolina State Conference of the NAACP v. McCrory*, 997 F. Supp. 2d 322 (M.D.N.C 2014).

[223] *North Carolina State Conference of the NAACP v. McCrory*, 831 F.3d 204, 239–241 (4th Cir. 2016).

[224] "McCrory Asks Supreme Court to Restore Voter ID Law," Raleigh *News and Observer*, August 16, 2016, and "N.C. Republican Party Seeks 'Party Line Changes' to Limit Early Voting Hours," Raleigh *News and Observer*, August 18, 2016.

[225] Newkirk, "What Early Voting in North Carolina Actually Reveals," and North Carolina Republican Party, "NCGOP Sees Encouraging Early Voting."

On appeal in 2017, the U.S. Supreme Court declined to review the Fourth Circuit's ruling on House Bill 589.[226]

### F. Voter Photo ID and Racial Gerrymandering

After the demise of House Bill 589, the contest over voting rights and responsive government continued on two parallel fronts. Along one battle line, Republican leaders doubled down on their effort to restrict access to the ballot box. Along the other, challengers contested those lawmakers' use of racial gerrymandering to limit minority citizens' representation in legislative policymaking.

### 1. Senate Bill 824 and Voter Photo ID

Republican leaders – including party chairman Robin Hayes, Senate President Pro Tempore Phil Berger, and Speaker of the House Tim Moore – answered defeat in the federal courts with public declarations that they would 'continue to fight.' Having failed to secure a comprehensive revision of election law with House Bill 589, they narrowed their focus to voter ID and shifted the battle to the state constitution, where similar struggles over voting rights, race, and democracy had been waged in 1868 and again in 1900. In 2018, Republican lawmakers drafted a constitutional amendment that would require photographic identification of all electors "offering to vote in person." They placed it on the ballot for ratification in the upcoming November election.[227]

Over the course of the campaign, Republicans argued that voter fraud was rampant, and that the voter ID amendment was necessary to protect the integrity of elections. But hard data, readily to hand, called that claim into question. In April 2017, the State Board of Elections had released an audit of the previous year's general election in which it reported that questionable ballots accounted for just over 0.01 percent of the 4.8 million total votes cast. Of the five hundred and eight cases of fraudulent voting that the board identified, only two involved the kind of in-person deception that a photo ID requirement was designed to expose and prevent. In the first, a voter impersonated her recently deceased mother, whom she described to election officials as "a tremendous Donald Trump fan." In the second, a widow signed an absentee ballot meant for her late husband. Of the remaining ineligible ballots, four hundred and forty-one were cast by people with felony records whose right to vote had not been restored; forty-one were cast by non-citizens; twenty-four were cast by people who double voted; and one was cast by mail.[228]

---

[226] *North Carolina v. North Carolina State Conference of the NAACP*, 137 S. Ct. 1399 (2017).

[227] "Supreme Court Won't Rescue N.C. Voter ID Law; GOP Leaders Say They Will Try Again with New Law," Raleigh *News and Observer*, May 15, 2017; Act to Amend the North Carolina Constitution to Require Photo Identification to Vote in Person, S.L. 2018-128, House Bill 1092, <http://bit.ly/2LRAE5p>, July 26, 2024; and "Voter ID to Go on N.C. Ballots."

[228] "County-by-County Data Reveal Dramatic Impact of Proposed Election Changes on Voters"; and *Postelection Audit Report: General Election 2016*, 2, appendices 4.1 and 4.2. See also "Citizens Without Proof," 3; Atkeson et. al., "New Barriers to Participation."

These facts notwithstanding, voters approved the constitutional amendment in November 2018 by a margin of 55.49 to 44.51 percent. Republicans carried the day, in part, because they had effectively undermined faith in the electoral process by convincing voters that fraud was widespread but remained invisible because there were no laws to expose it. Dallas Woodhouse, former executive director of the state Republican Party, put it this way: "Millions of North Carolinians *believe* that there is voter fraud. Now, somebody can disagree with them, but they believe it. So, adding confidence into the system is a very important thing."[229]

Shortly after Thanksgiving, Republican leaders convened a special session of the General Assembly to pass Senate Bill 824, legislation crafted to implement the photo ID amendment. They were in a hurry, because in the 2018 general election they had lost their super-majority in the state House of Representatives and would soon be unable to counter Democratic Governor Roy Cooper's opposition. When Cooper vetoed the bill, the Republican legislature quickly overrode him and made it into law.[230]

In December 2018, plaintiffs in *Holmes v. Moore* challenged Senate Bill 824 in state Superior Court. They noted that the new law had been shepherded through the legislature by the same Republican leaders who crafted House Bill 589 five years earlier. Thus, there was no surprise that Senate Bill 824 "retain[ed] many of the harmful provisions" from the voter photo ID section of the prior legislation, and, by doing so, "reproduced the . . . racially discriminatory intent" identified by the Fourth Circuit Court of Appeals.[231]

Plaintiffs argued that Senate Bill 824 bears striking resemblance to the 1901 legislation that implemented the literacy test mandated a year earlier by the white supremacy amendment to North Carolina's state constitution. Both laws are silent on the issue of race, and taken at face value, neither appears to disadvantage a particular racial group. But the 1901 law, as applied, had profound racial consequences. For more than half a century, the literacy test functioned as a selective barrier that obstructed Black North Carolinians' constitutional right to cast a ballot in free and fair elections. If allowed to stand, the *Holmes* plaintiffs argued, Senate Bill 824 would, in practice, have a similar effect today.

---

[229] "North Carolina Voter ID Amendment (2018)." Woodhouse's comments are transcribed from a video recording of a press conference he held on July 29, 2016. See "N.C. Voter ID Law Overturned," Raleigh *News and Observer*, February 9, 2018, (updated online, <http://bit.ly/32oS3cm>, July 26, 2024).

[230] Senate Bill 824, North Carolina General Assembly, 2017-2018 Session, <https://bit.ly/3Wp0nqd>, July 26, 2024; "House Enacts Voter ID with Veto Override," and Civitas Statement on Overriding Governor Cooper's Voter ID Veto.

[231] *Holmes v. Moore,* N.C. General Court of Justice, Superior Court Division, 18 CVS 15292, Verified Complaint, December 19, 2018, 3, 20- 15292, and Verified Complaint, December 19, 2018, 3-5.

89



Poverty rates in North Carolina Counties, 2018. Note the concentration of poverty in the rural, heavily Black eastern region known historically as North Carolina's "little Mississippi." Harris, "2020 Poverty Report," North Carolina Justice Center.

Why is that so? The answer, in a word, is poverty – the most malignant and tenacious legacy of North Carolina's Jim Crow past. Racial segregation functioned as a system of power and plunder that robbed Black people of the value of their labor, denied them opportunities to accumulate wealth, and sentenced generations to deprivation and want. We still struggle with the effects of that history, both for Black citizens and other people of color. In North Carolina in 2018, 21 percent of Blacks, 20 percent of Hispanics, and 25 percent of American Indians lived in poverty – figures well above the 10 percent poverty rate for whites. The problem is particularly acute in the eastern Black Belt, but even in the state's booming urban centers, high rates of non-white poverty exert intense downward pressure on intergenerational mobility. In 2014, a widely publicized study of the nation's fifty largest cities assessed the likelihood that children born into poverty would rise to middle-class comfort. By that measure, Raleigh ranked forty-third and Charlotte came in dead last. The primary cause, according to a blue-ribbon Opportunity Task Force assembled by civic leaders in Charlotte, was persistent social, economic, and educational "segregation by race and income." "This cross-cutting factor," the group concluded, "is foundational to everything else."[232]

Senate Bill 824 raises the barriers to political participation even higher in poor rural communities, where public transportation is limited or non-existent and minority citizens who do not own a car find it difficult to travel to the office of a government agency to obtain a photo ID. County level data on car ownership are not readily available, but statewide figures make the problem plain: 12 percent of Black households live without a

---

[232] Sirota, "2019 Poverty Report"; Harris, "2020 Poverty Report"; Chetty, Hendren, Kline, and Saez, "Where is the Land of Opportunity?"; and Charlotte-Mecklenburg Opportunity Task Force, *Opportunity Task Force Report*.

car of their own, as compared to only 4 percent of white households. This disparity is rooted in the twin injuries of poverty and race. A 2015 study conducted by the National Consumer Law Center found that in North Carolina the mark-up on prevailing interest rates that auto dealers charged Black customers, regardless of credit risk, exceeded those charged to white buyers by as much as 236 percent. It also remained commonplace nationwide for insurance companies to inflate the premiums paid by residents of Black neighborhoods.[233]

Another study undertaken in 2015 found that on average, Black drivers with good safety records paid premiums that were 70 percent more expensive than those paid by comparable drivers in white communities. That amounted to an additional annual expense of $438, or roughly 90 percent of a week's pre-tax income for a head of household in a family of four earning poverty-line wages. Contrary to popular assumptions, this disparity bore no relation to relative crime rates in Black and white neighborhoods. It was most closely associated with one single factor: the density of Black population in policy holders' communities.[234]

On top of those disadvantages, state law adds another. Drivers with traffic violations have their licenses suspended indefinitely on account of unpaid fines and court fees. According to available data from 2018, more than a quarter million North Carolinians had lost their licenses for that reason. Statewide, within this group, the suspension rate for Black drivers was four times higher than that for whites, and in the counties depicted below in the darkest shade of red, the rate was five to fourteen times higher. As other observers have noted, Black North Carolinians "bear the heaviest burden of [the state's] driver's license suspension policy," and as a consequence, they are most likely to be disenfranchised by the penalty for poverty.[235]

---

[233] "Car Access, North Carolina," and "Racial Disparities in Auto Loan Mark Ups."

[234] "High Price of Mandatory Auto Insurance." The 2024 poverty threshold for a family of four is $31,200. See Poverty Guidelines, Office of the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services, < https://bit.ly/4c0IBzp >, July 26, 2024.

[235] Rodriguez, "When Debt Takes the Wheel."



Suspension rates for black drivers as compared to those for white drivers.
"When Debt Takes the Wheel," North Carolina Equal Access to Justice
Commission.

Senate Bill 824 permits hardship exceptions for citizens who find it impossible to obtain an approved form of photo ID, but to avail themselves of that provision low-income minority voters must share details of their private lives in formal declarations sworn before election officials at their assigned polling places. That, in itself, is a form of soft intimidation. It stigmatizes poverty, exposes petitioners to public embarrassment, and shrouds the act of voting with fear of prosecution for a Class I felony should election officials determine that a voter "falsely or fraudulently" signed the required exception form.[236] The ultimate effect is to erect a substantial barrier around the ballot box – one that, in practice, is defined by the compounded burden of race and poverty rather than any reasonable suspicion of dishonorable behavior.

A three-judge panel ruled, two to one, for the plaintiffs in September 2021. Senate Bill 824, they wrote, "was enacted in part for a discriminatory purpose and would not have been enacted in its current form but for its tendency to discriminate against African American voters." The legislation therefore violated Article 1, section 19, of the North Carolina State Constitution, which affords all citizens "equal protection of the laws" and specifies that no person "shall . . . be subjected to discrimination by the State because of race, color, religion, or national origin." In reaching this conclusion, authors of the majority opinion pointed to a "totality of circumstances" that included North Carolina's "history of voting and election laws." That history, they observed, "shows a recurring pattern in which the expansion of voting rights and ballot access to African Americans is followed by periods of backlash and retrenchment that roll back those gains for African American

---

[236] Photo ID Exception Form, <https://bit.ly/4ddVeIg>, July 26, 2024. Election officials have already used the hardship exception in intimidating ways, disparaging voters who have attempted to use the exception. See "Voting Rights Groups Find New Photo ID Law Can Cause Trouble," and Southern Coalition for Social Justice, et. al., Comment on Proposed Permanent Rules on Voter Photo Identification.

92

voters." In the judges' view, this "historical context" supported plaintiffs' claims that the Republican majority in the General Assembly "intended to discriminate against African American voters."[237]

The North Carolina Supreme Court upheld the lower court ruling in December 2022, but that judgment did not stand for long. In the general election weeks earlier, Republican candidates had flipped the high court's 4-3 Democratic majority to a 5-2 Republican majority. The newly constituted court, in a highly unusual move, agreed to review its predecessor's findings. In April 2023, Justice Phil Berger Jr., writing for the majority, announced that Senate Bill 824 would be allowed to stand. He characterized the legal battle over the voter ID law as an inappropriate attempt to use the courts to settle a "disagreement" that was "partisan" rather than racial. Justice Berger advised plaintiffs that "there is no legal recourse for vindication of political interests." It was therefore incumbent upon the high court to "follow the law, not the political winds of the day," and to respect the constitutional authority of lawmakers. "It is well settled law," Justice Berger explained, "that the proper exercise of judicial power requires great deference to acts of the General Assembly, as the legislature's enactment of the law is the sacrosanct fulfillment of the people's will."[238]

## 2. Racial Gerrymandering and Race-Conscious Partisan Gerrymandering

As House Bill 589 wound its way through the federal courts, civil rights activists challenged the redistricting plan, enacted in 2011, that had produced a Republican super majority in the General Assembly at the expense of Black voters and cleared a path for discriminatory revision of state election law. In *Covington v. North Carolina*, a lawsuit filed in 2015 in the U.S. District Court for the Middle District of North Carolina, plaintiffs contested the configuration of twenty-eight majority-minority legislative districts. They charged that those districts had been created "through the predominant and unjustified use of race." State defendants answered the complaint by insisting that "race was not the primary factor used in the redistricting, and that even if it was, their use of race was necessary to serve a compelling state interest – namely, compliance with Section 2 and Section 5 of the Voting Rights Act."[239]

That line of argument was not persuasive. In August 2016, the district court rejected the Section 2 claim, noting that Republican lawmakers presented no evidence that they had created majority-minority districts to remedy situations in which "vote dilution" – as in at-large elections, or as a consequence of white bloc voting – restricted minority citizens' "opportunity . . . to participate in the political process and to elect representatives of their choice." In fact, the court observed, Black legislators had a strong record of electoral success in "non-majority-black" districts. It noted that "in three election cycles preceding

---

[237] *Holmes v. Moore,* N.C. General Court of Justice, Superior Court Division, 18 CVS 15292, Judgment and Order, September 17, 2021, 76, 78, and *Constitution of the State of North Carolina, 1868.*

[238] *Holmes v. Moore*, 383 N.C. 171 (2022), and *Holmes v. Moore*, 384 N.C. 426 (2023), 3.

[239] *Covington v. North Carolina*, 1:15 cv 0039 (M.D.N.C. 2015), and *Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016), 2.

the 2011 redistricting, African-American candidates for the North Carolina House won thirty-nine general elections in districts without a majority [black voting age population] . . . and African-American candidates for the North Carolina Senate won twenty-four such elections." The court took a similarly jaundiced view of Republican lawmakers' Section 5 claim. It pointed out that "eleven of the [twenty-eight] challenged districts [did] not include any county, in whole or in part, that was covered by Section 5 in 2011, and therefore those districts could not have been drawn to remedy a Section 5 violation." Worse still, the 2011 redistricting plan was chock full of evidence that Republican mapmakers' intent had been to limit "effective exercise of the electoral franchise" by packing and cracking the Black electorate.[240]

Plaintiffs in a related lawsuit offered a succinct explanation of those practices: "'Packing' involves concentrating one party's backers in a few districts that they will win by overwhelming margins to minimize the party's votes elsewhere. 'Cracking' involves dividing a party's supporters among multiple districts so that they fall comfortably short of a majority in each district."[241] Examples were easy to spot in the 2011 districting plan:

> In Guilford County, the state House map split forty-six voting precincts in order to pack 88.39 percent of Greensboro's Black voting-age residents into three majority-minority districts, leaving the rest in three majority white districts.[242]

> The state Senate map in Charlotte displayed a similar racial pattern. It packed 72.78 percent of the city's Black voting-age population into two majority Black districts that were formed by carving out adjacent white precincts, and split the remaining 27.22 percent among three majority white districts.[243]

> In the eastern Black Belt counties of Greene, Pitt, Wayne, and Lenoir, the state Senate map "divide[d] three counties, six municipalities, and forty precincts" in order to separate Black voters from their white neighbors: 70.6 percent of Black voting-age residents were placed in a new Black majority district, and the remainder were submerged in a majority white district.[244]

In each of these cases, packing and cracking isolated Black voters and limited their political participation by making it difficult to form and mobilize strong alliances with progressive white voters who shared many of their interests and public policy concerns.

Based on this evidence, the court ruled that the 2011 redistricting plan "constitute[d] racial gerrymander[ing] in violation of the [Fourteenth Amendment's] Equal Protection Clause." North Carolina "citizens have the right to vote in districts that accord with the

---

[240] *Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016), 3-4, 58-59.
[241] *Common Cause v. Lewis*, 18 CVs 014001 (N.C. Super. Ct. 2018). 28.
[242] *Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016), 47.
[243] Ibid., 32-33.
[244] Ibid., 23-24.

Constitution," the court declared. "We therefore order that new maps be drawn that comply with the Constitution and the Voting Rights Act."[245]

In 2017, the General Assembly complied with the court order and adopted a new redistricting plan that included 116 revised districts. *Covington* plaintiffs objected that twelve of the new districts failed to remedy original instances of racial gerrymandering, or were otherwise unconstitutional. The district court found that nine of those claims had merit and appointed a Special Master to make additional revisions. On appeal in 2018, the U.S. Supreme Court upheld four of the Special Master's revised maps.[246]

In a related case, *Cooper v. Harris*, the high court also took a jaundiced view of the Republican legislature's efforts to reshape the state's First and Twelfth Congressional districts, which had been strongholds of Black political strength – indeed, in the case of the First District, which included much of the historic "Black Second," that legacy dated all the way back to Reconstruction. The districts were represented by G. K. Butterfield Jr. and Alma Adams, both Black Democrats, and the issues at stake suggested how much North Carolina politics had changed over the course of a quarter century, as the Democratic Party grew increasingly diverse and the Republican Party became overwhelmingly white. Butterfield and Adams, like their party more generally, had built effective interracial alliances in their districts. That achievement was now challenged by Republicans' effort to increase the percentage of Black voting-age population in both districts – from 48.6 to 52.7 percent in District 1 and from 43.8 to 50.7 percent in District 12. Those changes moved Black voters out of surrounding districts, increasing the odds that Republican candidates might win elections there, and, in the eyes of some white voters, the demographic shift had the protentional to mark the First and Twelfth Districts as pejoratively "black." In their defense, Republican mapmakers offered a contradictory explanation of their handiwork. They insisted that they were required by the Voting Rights Act of 1965 to attend to the racial makeup of the two districts, and that they had only intended to pack the districts with Democrats, not Black voters. The Supreme Court rejected both claims and affirmed the prior ruling by the U.S. District Court for the Middle District of North Carolina that "racial considerations predominated in designing both District 1 and District 12."[247]

As the *Covington* and *Cooper* cases came to closure in the federal courts, Common Cause and twenty-three individual plaintiffs sued in state court to block the 2017 state legislative redistricting plan. They charged that despite revisions intended to correct racial gerrymandering, redrawn legislative districts still advantaged Republicans. Proof of that claim was evident in the results of the 2018 general election. In contests for "both the state House and state Senate . . . Democratic candidates won a majority of the statewide vote."

---

[245] Ibid., 2, 63.

[246] Memorandum Order, *Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016) (No. 1:15-cv-399); Memorandum Opinion and Order, *Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C.) (No. 1:15-cv-399); *North Carolina v. Covington*, 137 S. Ct. 1624 (2017); and *North Carolina v. Covington*, 138 S. Ct. 2548, 2550, 2555 (2018).

[247] *Cooper v. Harris*, 137 S. Ct. 1455, 197 L. Ed. 2d 837 (2017), 2.

95

Even so, Republicans secured "a substantial majority of seats in each chamber": 29 of 50 in the Senate and 65 of 120 in the House. "The [electoral] maps," Common Cause and its allies complained, "are impervious to the will of the voters." The same has been true for policy making. "In today's state legislatures – and particularly in North Carolina," the Common Cause plaintiffs observed, "Republican representatives are simply not responsive to the views and interests of Democratic voters. Regardless of whether gerrymandering has caused this increased partisanship, such extreme partisanship magnifies the effects of partisan gerrymandering. When Democratic voters lose the ability to elect representatives of their party as a result of partisan gerrymandering, those voters lose not only electoral power, but also the ability to influence legislative outcomes – because Republican representatives pay no heed to these voters' views and interests once in office." [248]

In September 2019, a three-judge Superior Court panel affirmed these claims. They ruled that the 2017 redistricting plan violated the North Carolina state constitution on three counts: "First, the court wrote that partisan gerrymandering 'strikes at the heart' of the Free Elections Clause, a provision of the North Carolina Constitution stating that 'all elections shall be free.' Second, the court held that partisan gerrymandering violated the North Carolina Equal Protection Clause, which [state] courts have interpreted to include the fundamental 'right to vote on equal terms.' . . . Finally, the court declared that under the North Carolina Constitution, partisan gerrymandering unconstitutionally burdens the free speech and assembly rights of those who vote for the disfavored party by diluting their votes and their ability to effectively organize." Based on these findings, the court ordered that the legislative maps be redrawn once more. The General Assembly complied, and in October 2019, the court approved remedial districts. [249]

In a parallel suit, *Harper v. Lewis*, fourteen individual plaintiffs challenged the revised congressional map on partisan gerrymandering grounds. A three-judge Superior Court panel issued a preliminary injunction on the basis that the map was a Republican partisan gerrymander. The 2020 election proceeded under a new General Assembly-drawn congressional map that the court approved in December 2019. [250]

Republicans lost their super majority in the 2020 election but maintained control of the General Assembly. In 2021, they used the decennial redistricting process to make yet another run at racially discriminatory, partisan gerrymandering. Lawmakers crafted maps

---

[248] Amended complaint, *Common Cause v. Lewis*, N. 2019 N.C. Super. LEXIS 56, 18 CVS 014001 (N.C. Super. Ct. Sept. 3, 2019); and Millhiser, "Cracks in the GOP's Gerrymandering Firewall."

[249] *Common Cause v. Lewis*, N. C. General Court of Justice, Superior Court Division, 18 CVS 014001, Judgment, September 3, 2019, <https://bit.ly/3Wg3L6K>, July 26, 2024; Recent Case: *Common Cause v. Lewis*, Harvard Law Review Blog, October 15, 2019, <https://bit.ly/3zRnaU2>, July 26, 2024; and *Common Cause v. Lewis*, Common Cause blog, December 17, 2019, <https://bit.ly/4bVXmmP>, July 26, 2024.

[250] *Harper v. Lewis,* N. C. General Court of Justice, Superior Court Division, 18 CVS 012667, September 7, 2029; Order enjoining congressional filing period, November 20, 2024; and Order lifting the injunction, December 2, 2019. All documents available at *Harper v. Lewis*, Brennan Center for Justice, New York University Law School, <https://bit.ly/3yxiB0y>, July 26, 2024.

of new legislative and congressional districts that promised to give Republicans a wide advantage over Democratic challengers. Pundits predicted that if the districts were left to stand, Republicans would maintain lopsided control of North Carolina's congressional delegation and re-establish a veto-proof super majority in the state legislature.[251]

In court challenges to the new district maps, plaintiffs alleged that Republican lawmakers had once again manipulated the redistricting process on racially discriminatory and partisan grounds in order to suppress minority political participation and deny political influence to Black and Hispanic voters, who constitute fifty percent of the Democratic electorate. Republican leaders answered that charge by insisting that they "did not look at race" while drawing new district maps.[252]

That claim to colorblindness was cynical and pernicious. It asked the public to believe that history has ended; that in a society deeply scarred by slavery and Jim Crow, race no longer matters; and that politicians vying for public office in the racially polarized America of the twenty-first century lack an intimate knowledge of where people live and how they vote. As historian Morgan Kousser has observed, redistricting will always be informed by race – "formally or informally, precisely or approximately" – because racial divisions "are the single most salient social and political facts in contemporary America, as they have been in much of the nation's past. Redistricting cannot be race-unconscious until the country ceases to be, and pretending that society or politics has become colorblind can only allow discrimination to go unchecked."[253]

That is particularly true in North Carolina, where white conservatives have long relied on discriminatory election laws to secure *both* racial and partisan advantage.

### H. Redistricting Redux

In early 2022, a state Superior Court panel, ruling on three consolidated cases, concluded that the Republican majority in the General Assembly had, with intent, engaged in extreme partisan gerrymandering. But the judges imposed no remedy, holding that challenges to such practices "amounted to political questions that are nonjusticiable under the North Carolina Constitution." On appeal, the North Carolina Supreme Court reversed that ruling and remanded the case to the trial court with instructions to "oversee the redrawing" of the Republican maps.[254]

---

[251] "North Carolina Passes New Maps Giving GOP and Edge in Congress, State Legislature," Raleigh *News and Observer*, November 4, 2021.

[252] "N.C. Redistricting Suits Challenges Lack of Race Data for Maps," and "Map by Map, GOP Chips Away at Black Democrats' Power," *New York Times*, December 18, 2021.

[253] J. Morgan Kousser, *Colorblind Injustice: Minority Voting Rights and the Undoing of the Second Reconstruction* (Chapel Hill: University of North Carolina Press, 1999), 270.

[254] Judgment, *North Carolina League of Conservation Voters and Common Cause v. Hall*, and *Harper v. Hall*, 21 CVS 500085 (N.C. General Court of Justice, Superior Court Division, January 11, 2022); and *Harper v. Hall*, 867 S.E.2d 554 (N.C. 2022).

Lawmakers enacted remedial maps in February. The state House map won bipartisan approval, but the state Senate and congressional maps were approved along strict party lines. The trial court appointed a Special Master to redraw the congressional maps in time for the 2022 election, and in December, the state Supreme Court ordered that the state Senate map be redrawn as well.[255] After the North Carolina Supreme Court ruling, the state appealed to the U. S. Supreme Court, claiming that the General Assembly – under the Independent State Legislature Theory – was the only political body with authority, under the U.S. Constitution, to approve a congressional map. The Supreme Court denied that claim, affirming the state's high court.[256]

Results of the 2022 congressional election demonstrated what fair and nondiscriminatory districting might accomplish. Prior to the election, the state delegation in the U.S. House of Representatives was split eight to five in Republicans' favor. After the election, with a seat added on account of population growth, the delegation was evenly divided – seven Republicans and seven Democrats. This result was a faithful expression of the interests of a population that is closely divided along party lines. As in so much of North Carolina's post-Emancipation history, that polarization is informed by sharply divergent understandings of the interplay of race, citizenship, and democracy.[257]

The 2022 congressional election produced an important victory for inclusive governance, but the larger contest was by no means settled. In April 2023, the new Republican majority on the State Supreme Court – the same justices who had let Senate Bill 824 stand – reversed the prior court's ruling on gerrymandering. They argued that their Democratic predecessors had lacked authority to invalidate electoral maps, because the state constitution "expressly assigns redistricting authority to the General Assembly."[258] This judgment cleared the way, once more, for Republicans in the General Assembly to gerrymander the state to racial-cum-partisan advantage.

The congressional map that Republicans produced in the 2023 legislative session takes racial gerrymandering and vote dilution to new extremes, and the likely effects are easy to spot, especially in historic centers of Black political strength.

The oldest of those centers is in the First District, which includes counties that were once part of the "Black Second." The district sent Eva Clayton to Congress in 1992, and from 2004 to 2022, was represented by George K. Butterfield Jr., whose father, as explained above, had won election to the Wilson town commission in 1953, triggering legislative action to ensure that the white establishment would not be defeated again. Changes to the district's boundaries are likely to make it a toss-up in the 2024 election. On the new Republican map, all of Pitt County is carved out of the district, including a well-

---

[255] Ibid.

[256] *Moore v. Harper*, 600 U.S. 1, 143 S. Ct. 2065 (2023).

[257] United States House of Representatives Elections in North Carolina, 2020, Ballotpedia, <https://bit.ly/4dgow9d>, July 26, 2024; United States House of Representative Election in North Carolina, 2024, Ballotpedia, < https://bit.ly/46nSfe7>, July 26, 2024.

[258] *Harper v. Hall*, 384 N.C. 292 (2023), 9.

98

organized and politically engaged Black community in Greenville and the Democratic-leaning academic community around East Carolina University. As a substitute, legislative mapmakers added predominantly white Camden and Currituck Counties on the First District's eastern border. Those counties have Black voting-age populations of only 5.8 and 11.9 percent, respectively.[259]



2022 Congressional Map, North Carolina General Assembly.



2023 Congressional Map. North Carolina General Assembly.

At the center of the state, Black communities in Greensboro, Winston-Salem, and High Point are cracked across four congressional districts, the Fifth, Sixth, Ninth, and Tenth. In the mid-twentieth century, these communities played a vital role in Black North Carolinians' struggle for equal citizenship – they fought for fair wages in Winston-Salem's tobacco factories, they defied Jim Crow by electing Black candidates to local government,

---

[259] Complaint, *North Carolina State Conference of the NAACP v. Berger*, 23 CV 1104 (M.D.N.C.2024), 62.

and they supported the young people who demanded service at city lunch counters and sparked the sit-in movement that swept across the South. Today, those pioneers' children and grandchildren have little chance of electing a representative of their choice. Winston-Salem's Black neighborhoods, including the community around Winston-Salem State University, one of North Carolina's twelve HBCUs, form an island on the eastern edge of the solidly Republican Tenth District. And even though High Point and Greensboro are both located in Guilford County, their Black communities are separated by the line that divides the Sixth District from the Fifth and Ninth. The placement of Greensboro's Black precincts – including those around the North Carolina Agricultural and Technical State University – is especially noteworthy. They occupy the eastern border of the Fifth District, which stretches more than 100 miles westward through counties that are rural, predominantly white, and Watauga County, reliably Republican or Republican-leaning.[260]

A similar logic of divide and rule is at play in Charlotte and surrounding Mecklenburg County. There, the 2023 congressional map packs Black and Hispanic voters so densely into the Twelfth District that it is now 60 percent non-white. Legislative mapmakers accomplished this, in part, by moving minority voters out of the adjacent Fourteenth District, dropping the non-white portion of its population from just under 40 percent to less than 30 percent.[261] That reshuffling has two consequences: it makes the Fourteenth District more Republican-leaning, and for Charlotte's Black and Hispanic communities, it creates a barrier to a historically proven strategy for enlarging minority political participation: forging "fusion" alliances with progressive whites.

The Brennan Center, a nonpartisan law and policy institute at the New York University Law School, has ranked the North Carolina Republican legislature's 2023 congressional map and its Texas counterpart as the two "most extreme" examples of gerrymandering in the nation.

> Indeed, the Republicans' new North Carolina gerrymander is so durable that even an exceptionally strong Democratic wave year (think 2018) would not dislodge it. Even under the rosiest of foreseeable scenarios, Democrats win at most 4 of 14 seats. Put another way, Democrats could win a solid majority of the ballots cast for Congress, but their candidates would win less than 30 percent of seats thanks to Republican's carefully engineered gerrymander.[262]

If this comes to pass, it will mark a staggering lurch backwards from the evenly divided congressional delegation elected in 2022 using a map drawn under judicial supervision.

---

[260] Specific communities in the Fifth, Sixth, Ninth, and Tenth Districts can be located using the interactive map on the General Assembly's redistricting web page, <https://bit.ly/4fkEGjw>, July 26, 2024.

[261] "Anatomy of a North Carolina Gerrymander."

[262] Ibid.

The map below illustrates the Brennan Center's prediction for the 2024 congressional election. Black-preferred candidates (Democrats) are likely to win only four contests – in Districts Two and Six in the Research Triangle region, which encompass Durham and Orange Counties, along with northern sections of both Chatham and Wake Counties; the Twelfth District in Charlotte and Mecklenburg County; and the First District in the northeast corner of the state.[263]



The depth of shading represents relative Republican (red) and
Democratic (blue) strength.

As the *NAACP* Plaintiffs point out in their complaint, Republicans' 2023 state House and Senate maps crack, pack, and splinter Black communities in ways similar to the congressional map. The most egregious example is in the eastern Black Belt. There, in state Senate Districts One and Two, large contiguous Black populations in Halifax, Northampton, and Bertie Counties are cleaved apart and joined with predominantly white coastal counties to the south and east. The exercise gives District Two a distinctively peculiar shape – it stretches from Warren County on the Virginia border to coastal Carteret County nearly 200 miles away.

The state House map accomplishes something similar in Winston-Salem and nearby Stokes County. There, legislative mapmakers manipulated district population size to diminish Black voting strength. Most of Winston-Salem's Black residents are contained in House Districts 71 and 72, which are surrounded by predominantly white and undersized Districts 74, 75, and 91. That deviation in population size gives white voters' ballots relatively greater weight in determining both the racial and partisan demographics of the General Assembly.

The Plaintiffs detail other examples of racial gerrymandering and vote dilution in their complaint. What is most important here is to draw out the implications for the foundational principle of our democracy – the idea that government must be responsive to

---

[263] Ibid.

the will of the people. Since 2011, Republican lawmakers have drawn legislative and congressional district maps that give their constituents an outsized voice in a decidedly purple state, more or less evenly divided along party and ideological lines. In the case of the 2023 maps, we may never know with absolute certainty what considerations were at play, because a last-minute provision buried in the 2023 state budget purportedly gives lawmakers full discretionary authority to determine which of the records they produce in the course of their official duties should be preserved, and to identify others "to destroy . . . or otherwise dispose of." [264] As a result, much of the legislative archive appears to have been lost. Even so, this we *can* say: examining the 2023 legislative and congressional district maps is like holding history up to a mirror. Doing so reveals a long and tragic story of white conservatives' efforts – determined, inventive, and persistent – to suppress minority voters' political voice, and in the process, to compromise the democratic rights of us all.

## I. Continuing Efforts to Secure Partisan Advantage by Marginalizing Minority Voters

Redistricting dominated the political headlines through much of 2023, but it was only part of Republican lawmakers' continuing efforts to shore up their control of the electoral process and to restrict minority political participation.

In October 2023, Republicans passed Senate Bill 747, An Act to Make Various Changes Regarding Elections Law, which imposes new limitations on who may vote using same-day registration (SDR) during the early voting process. To qualify for SDR, prospective voters must present a valid photo ID and prove their place of residence with an additional document, such as a current bank statement or utility bill. By comparison, voters who register by mail, online, or in a government office are required to supply additional documentation only if they cannot provide a driver's license number, a non-operator's identity number, or the last four digits of their Social Security number. In addition, voters who use SDR cast provisional ballots that are counted only if their county board of elections verifies their identity and home address. Identity verification is to be conducted with use of government databases. Once that process is complete, county boards must mail a non-forwardable postcard to verified same-day registrants. If a postcard is returned as undeliverable before the day of the official canvass, the intended recipient's ballot is not counted. The law does not require election officials to notify individuals when their registration applications have been canceled and ballots discarded. Given the fact that minority voters are twice as likely as their white counterparts to use same-day registration,

---

[264] See the legislative history of House Bill 259, North Carolina General Assembly, 2023-2024 Session, <https://bit.ly/3ygMzpC>, July 26, 2024, and House Bill 259, ratified, North Carolina General Assembly, 2023-2024 Session, 531, <https://bit.ly/3YjLyHW>, July 26, 2024.

this more stringent requirement will likely exclude them disproportionately from the polls.[265]

In addition to this restriction on same-day registration and early voting, Senate Bill 747 makes other significant changes to the electoral process. The law:

- Allows poll observers to "[m]ov[e] about the voting place," listen to conversations between voters and election officials, and take photographs – all abandoning past limits on these intrusive and intimidating behaviors. [266]

- Expands the ability for third-party groups to challenge absentee ballots by allowing any registered voter within an entire county to challenge an absentee voter's ballot in that same county. Previously, mail-in absentee ballots could only be challenged by voters in the same precinct.[267]

- Extends the deadline for challenging mail-in absentee ballots from 5:00 p.m. on Election Day to five business days after Election Day.[268]

- Requires the State Bureau of Investigation – which, due to a change embedded in the 2023-2034 budget bill, is now an independent state agency no longer under the direct authority of the governor – to investigate election-related crimes.[269]

These revisions increase the potential for voter intimidation by third-party and partisan actors who are appointed as election observers or may otherwise challenge voters at the polls. Journalists with WRAL News who reviewed Senate Bill 747 and related public documents found that the legislation "largely matches up with the official legislative agenda of a group run by election lawyer Cleta Mitchell," who now lives in North Carolina and met with Republican legislative leaders prior to the enactment of the law. Notably, Ms. Mitchell was prominently involved with falsely challenging the results of the 2020 election as illegitimate on behalf of then-President Donald Trump and has since become the leader of a national group called the Election Integrity Network. That group is focused on identifying alleged irregularities in North Carolina voting rolls; dismantling laws that increase minority voters' access to the ballot box, creating a "suspicious voters list," and recruiting poll watchers in all the state's 100 counties "to use the list to challenge voters on sight."[270]

In his unsuccessful veto of Senate Bill 747 in August 2023, Governor Roy Cooper emphasized the discriminatory impact of the law, noting that the legislation "has nothing

---

[265] Senate Bill 747, North Carolina General Assembly, 2023-2024 Session, <https://bit.ly/3WfGRMJ>, July 26, 2024.

[266] Ibid., 2-3, revising §163-45.

[267] Ibid., 7-9, revising §163-89.

[268] Ibid., 7, revising §163-89.

[269] Ibid., 33-34, revising §163-22 and §143B-919, and "Thirteen Noteworthy Things in the Newly Released N.C. Budget."

[270] Doran, "How Much Influence Did Trump Attorney Have on N.C. Elections Bill?" and Lee and Wilkie, "Inside the 'Election Integrity' Efforts Targeting North Carolina."

103

to do with election security and everything to do with Republicans keeping and gaining power." It "would erect new barriers for younger and non-white voters, many of whom use early voting and absentee ballots," the Governor explained, and the "bill also hurts older adults, rural voters, and people with disabilities." He further noted the impact of multiple provisions of the law on eligible voters' ability to have their ballots count, explaining: Senate Bill 747 "requires valid votes to be tossed out if the Post Office delivers them even one minute after 7:30 p.m. on Election Day, or if a computer rejects a signature. It encourages voter intimidation at the polls by election deniers and conspiracy believers. North Carolina has conducted fair and secure elections[;] this bill will block voters and their ballots unnecessarily."[271]

In the same legislative session, Republican lawmakers passed Senate Bill 749, which ensures legislative, and therefore partisan, control over state and county boards of election. It reduces the State Board from nine members to eight, and county boards from five members to four; strips the governor of the power to appoint the State Board and one member of every county board; vests that authority solely with the General Assembly; and requires that appointees be evenly divided between minority (Democratic) and majority (Republican) leadership in the two legislative houses. This is a formula for deadlock, which, by way of other new stipulations, all but guarantees a partisan advantage in managing the machinery of elections. Senate Bill 749 requires that members of the State Board of Elections choose an executive director "by June 15 of the year after each even-year election or within 30 days of the occurrence of a vacancy in the position of Executive Director," and, similarly, that county boards choose a chair "within 15 days of [their] first meeting in July or within 30 days of the occurrence of a vacancy." "[I]f for any reason" a board fails to meet these deadlines, authority to fill the leadership positions passes, in rotation, to the President Pro Tempore of the state Senate and the Speaker of the state House of Representatives. In practical effect, these provisions give the current Republican legislative majority a decisive voice in the proceedings of ostensibly independent regulatory boards within the executive branch of state government.[272]

Senate Bills 747 and 749, the new voter photo ID requirement implemented by Senate Bill 824, and the gerrymandered 2023 congressional and legislative district maps are not discrete, unrelated bits of election law. They are instead products of a larger, decade-long project to strengthen Republican advantage on Election Day, consolidate Republican control of the General Assembly, and marginalize minority voters in the policymaking process that profoundly affects their well-being and opportunities in life.

---

[271] Governor Roy Cooper Objections and Veto Message, Senate Bill 747, and Governor Cooper Signs Four Bills, Vetoes Two Bills, N.C. Governor Roy Cooper, August 24, 2023.

[272] Senate Bill 749, North Carolina General Assembly, 2023-2024 Session,1-3, revising §163-19, and 7-9, revising §163-30, <https://bit.ly/3WxVMTQ>, July 26, 2024.

## XIII. Conclusion

As the state Superior Court observed in *Holmes v. Moore*, the "history of restricting African American voting rights . . . is not ancient; it is a twenty-first-century phenomenon."[273] Indeed, today's contests over state election law are but the latest chapters in North Carolina's long and cyclical history of suppressing minority political participation. Over the last century and a half, white conservatives have employed a variety of measures to limit the rights of racial and ethnic minorities. In the process, they have imposed a heavy burden of injustice. Historically, when minority rights have been constrained, North Carolina's government has been decidedly unresponsive to minority concerns and interests related to social and economic policy. This lack of accountability has perpetuated stark racial disparities in education, employment, health, and general well-being. These circumstances undermine the principles enshrined in the United States Constitution and more specifically the principles enshrined in North Carolina's constitution more than a century and a half ago by newly emancipated slaves and their white allies of good conscience. "All political power is vested in, and derived from the people," that document still proclaims, and "all government of right . . . is instituted solely for the good of the whole." The free men who penned those words in 1868 could not have made their purpose clearer. They meant to establish a government that was responsive to all the people, not just those who for so long had enjoyed the interlocking privileges of race, wealth, and power. That project is as yet unfinished.[274]

I declare under penalty of perjury under the laws of North Carolina that the foregoing is true and correct.

_____

James L. Leloudis II, August 1, 2024

---

[273] *Holmes v. Moore,* N. C. General Court of Justice, Superior Court Division, 18 CVS 15292, Judgment and Order, September 17, 2021, 77.

[274] Constitution of North Carolina, Article I, Section 2.

105