# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

SHAUNA WILLIAMS, et al.,

      *Plaintiffs*,

    v.

REPRESENTATIVE DESTIN HALL, in his
official capacity as Chair of the House Standing
Committee on Redistricting, et al.,

      *Defendants*.

_____

NORTH CAROLINA STATE CONFERENCE OF
THE NAACP, et al.,

      *Plaintiffs*,

    v.

PHILIP BERGER, in his official capacity as the
President Pro Tempore of the North Carolina
Senate, et al.,

      *Defendants.*

Civil Action No. 23 CV 1057

Civil Action No. 23 CV 1104


## NAACP PLAINTIFFS' PRETRIAL BRIEF

# TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................i

TABLE OF AUTHORITIES ............................................................................................ii

INTRODUCTION ..................................................................................................... 1

ARGUMENT............................................................................................................2

I.  Senate Districts 1 and 2 Violate Section 2 of the VRA (Count 1)............................ 2

II.  Intent to Diminish Black Voting Power Was a Motivating Factor in the Design and
Passage of Challenged Senate and Congressional Districts in Violation of the VRA
and the Fourteenth and Fifteenth Amendments (Counts 4, 5, 7, 8, & 9). .............. 11

III.  Challenged Districts in the Senate and House Plans Violate the One-Person, One-
Vote Guarantee of the Equal Protection Clause (Counts 3 & 6). ........................... 21

IV.  If Not a Violation of One-Person, One-Vote, the Only Other Plausible Explanation
for the Configuration of SD8 is Racial Predominance in Violation of the
Fourteenth Amendment (Count 2)........................................................................ 21

CONCLUSION ...................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrego Garcia v. Noem,*
No. 8:25-cv-00951, 348 F.R.D. 594 (2025)................................................................. 18

*Alexander v. S.C. State Conf. of NAACP,*
602 U.S. 1 (2024)............................................................................................... 21, 22

*Allen v. Milligan,*
599 U.S. 1 (2023)....................................................................................*passim*

*Alpha Phi Alpha Fraternity Inc. v. Raffensperger,*
587 F. Supp. 3d 1222 (N.D. Ga. 2022).......................................................... 9

*Alpha Phi Alpha Fraternity Inc. v. Raffensperger,*
700 F. Supp. 3d 1136 (N.D. Ga. 2023)......................................................... 8

*Bartlett v. Strickland,*
556 U.S. 1 (2009)......................................................................................... 3

*Bethune-Hill v. Va. State Bd. of Elections,*
580 U.S. 178 (2017)................................................................................... 21

*Carolin Corp. v. Miller,*
886 F.2d 693 (4th Cir. 1989) ................................................................... 18

*City of Greensboro v. Guilford Cnty. Bd. of Elections,*
251 F. Supp. 3d 935 (M.D.N.C. 2017) ....................................................... 2

*Coal. for TJ v. Fairfax Cnty. Sch. Bd.,*
68 F.4th 864 (4th Cir. 2023) ................................................................... 12

*Cooper v. Harris,*
581 U.S. 285 (2017)............................................................................. 21, 23

*Covington v. North Carolina ("Covington I"),*
316 F.R.D. 117 (M.D.N.C. 2016) ..................................................... 14, 15, 16

*Covington v. North Carolina ("Covington III"),*
267 F. Supp. 3d 664 (M.D.N.C. 2017) ..................................................... 14

*Gomillion v. Lightfoot,*
364 U.S. 339 (1960)................................................................................. 13

Case 1:23-cv-01057-TDS-JLW   Document 127   Filed 05/27/25   Page 3 of 30

*Harper v. Hall ("Harper I"),*
    380 N.C. 317 (2022) ........................................................................ 14

*Harper v. Hall ("Harper III"),*
    384 N.C. 292 (2023) ........................................................................ 17

*Holloway v. City of Va. Beach,*
    No. 2:18-cv-69, 2020 U.S. Dist. LEXIS 148505 (E.D. Va. Aug. 17,
    2020) .................................................................................................. 2

*Hunter v. Underwood,*
    471 U.S. 222 (1985)......................................................................... 12

*League of United Latin Amer. Citizens v. Perry,*
    548 U.S. 399 (2006)........................................................................... 7

*Miller v. Johnson,*
    515 U.S. 900 (1995).................................................................... 21, 22

*Miss. State Conf. of the NAACP v. State Bd. of Election Comm'rs,*
    739 F. Supp. 3d 383 (S.D. Miss. 2024)............................................. 9

*N.C. State Conf. of the NAACP v. McCrory,*
    831 F.3d 204 (4th Cir. 2016) .......................................................... 12

*N.C. State Conf. of the NAACP v. Raymond,*
    981 F.3d 295 (4th Cir. 2020) ..................................................... 12, 13

*North Carolina v. Covington ("Covington VI"),*
    585 U.S. 969 (2018) ........................................................................ 17

*Pierce v. N.C. State Bd. of Elections,*
    97 F.4th 194 (4th Cir. 2024) ............................................................. 9

*Robinson v. Ardoin,*
    86 F.4th 574 (5th Cir. 2023) ............................................................. 8

*Rogers v. Lodge,*
    458 U.S. 613 (1982)......................................................................... 12

*Shaw v. Hunt,*
    517 U.S. 899 (1996)........................................................................... 7

*Singleton v. Allen,*
    No. 2:21-cv-1291-AMM, 2023 U.S. Dist. LEXIS 183119 (N.D. Ala.
    Oct. 5, 2023).................................................................................... 3

iii

*Singleton v. Allen,*
    No. 2:21-cv-01291-AMM, 2025 U.S. Dist. LEXIS 89359 (N.D. Ala.
    May 8, 2025) ................................................................................................ 16

*Thornburg v. Gingles,*
    478 U.S. 30 (1986) ................................................................ *passim*

*United States v. Charleston Cnty.,*
    365 F.3d 341 (4th Cir. 2004) ............................................... 7, 8, 11

*United States v. Span,*
    789 F.3d 320 (4th Cir. 2018) ......................................................... 2

*Village of Arlington Heights v. Metropolitan Housing Development Corp.,*
    429 U.S. 252 (1977) .............................................................. 12, 13, 15

*Wis. Legislature v. Wis. Elections Comm'n,*
    595 U.S. 398 (2022) ....................................................................... 3

**Statutes**

Voting Rights Act ("VRA"), 52 U.S.C. § 10301 ....................................... *passim*

**Other Authorities**

U.S. Constitution ............................................................................... 12

# INTRODUCTION

Plaintiffs North Carolina NAACP, Common Cause, Calvin Jones, Dawn Daly-Mack, Linda Sutton, Corine Mack, Mitzi Reynolds Turner, and Syene Jasmine brought nine claims challenging the 2023 Senate, House, and Congressional plans enacted by the North Carolina General Assembly (the "Legislature"). Plaintiffs allege that Defendants:

> ➢ Unlawfully diluted the power of Black voters on account of race in North Carolina's historic Black Belt Senate Districts (SDs) 1 and 2 in violation of Section 2 of the Voting Rights Act (the "VRA"), 52 U.S.C. § 10301(a) (*Count 1*);

> ➢ Unlawfully violated the guarantee of one-person, one-vote in SDs 40 and 41 in Mecklenburg County and SD8 in New Hanover County (*Count 3*) or, in the alternative, unlawfully racially gerrymandered SD8 (*Count 2*), in violation of the Fourteenth Amendment;

> ➢ Intentionally diluted Black voting power in violation of VRA Section 2 (*Count 4*) and the Fourteenth and Fifteenth Amendments (*Count 5*) in challenged Senate Districts;

> ➢ Violated the guarantee of one-person, one-vote in House Districts 37 (Wake County) and 71 (Forsyth County) in violation of the Fourteenth Amendment (*Count 6*);

> ➢ Intentionally diluted Black voting power in violation of VRA Section 2 in specific Congressional Districts (CDs), including CD1 (*Count 7*), and Triad-based CD5, CD6, and CD10 (*Count 8*), and that these intentional acts also constitute intentional discrimination in violation of the Fourteenth and Fifteenth Amendments (*Count 9*).

*See* Doc. 105. In ruling on summary judgment, the Court affirmed Plaintiffs' standing but dismissed Counts 3 and 6. Doc. 98. Plaintiffs filed a Motion to Reconsider those dismissals or, in the alternative, requested permission to offer a proffer of evidence on those claims should that motion remain under consideration at trial. Doc. 101.

1

Plaintiffs may prove these claims with a preponderance of the evidence by showing it is "more probable than not" Defendants have committed the above violations. *See United States v. Span*, 789 F.3d 320, 334 (4th Cir. 2018) (preponderance standard); *Holloway v. City of Va. Beach*, No. 2:18-cv-69, 2020 U.S. Dist. LEXIS 148505, at *6 (E.D. Va. Aug. 17, 2020) (VRA claims); *City of Greensboro v. Guilford Cnty. Bd. of Elections*, 251 F. Supp. 3d 935 (M.D.N.C. 2017) (Constitutional claims). Below, Plaintiffs summarize the applicable legal standards and delineate the testimony and evidence that will warrant a finding on their behalf on all counts.

## ARGUMENT

### I.     Senate Districts 1 and 2 Violate Section 2 of the VRA (Count 1).

Plaintiffs will prove at trial that the configuration of SD1 and SD2 unlawfully dilutes the power of Black voters in violation of VRA Section 2.

Section 2 prohibits, *inter alia*, any voting practice or procedure which "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). A violation is "established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by" minority voters in that those voters "have less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice." 52 U.S.C. § 10301(b). As such, Section 2 prohibits redistricting plans that "minimize or cancel out the voting strength of racial [minorities in] the voting population." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986) (cleaned up).

In *Allen v. Milligan*, 599 U.S. 1 (2023), the Supreme Court reaffirmed the *Gingles* standard as the means to prove a claim of discriminatory effect under Section 2:

> ➢ First, the minority group must be sufficiently large and geographically compact to constitute a majority in a reasonably configured district that comports with traditional redistricting criteria. *Milligan*, 599 U.S. at 18.

> ➢ "Second, the minority group must be able to show that it is politically cohesive." *Id*. (quoting *Gingles*, 478 U.S. at 51).

> ➢ "And third, 'the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate.'" *Id*. (quoting *Gingles*, 478 U.S. at 51).

Importantly, in bringing a Section 2 claim, plaintiffs must demonstrate the *possibility* of a majority-minority district, but need not prove majority-minority districts are *required* for minority-preferred candidates to be elected because VRA remedial districts in challenged areas need not be majority-minority. *See Singleton v. Allen*, No. 2:21-cv-1291-AMM, 2023 U.S. Dist. LEXIS 183119, at *59 (N.D. Ala. Oct. 5, 2023) (ordering Remedial Plan 3 with a remedial district of 48.7 percent Black voting age population ("BVAP")); *Bartlett v. Strickland*, 556 U.S. 1, 23 (2009) (noting a State's chosen VRA remedy "may include drawing crossover districts.") (plurality).

Upon demonstrating the three *Gingles* preconditions are met, a prevailing plaintiff must show that, under the "totality of circumstances," the "political process is [not] equally open to minority voters" under the challenged plan. *Wis. Legislature v. Wis. Elections Comm'n*, 595 U.S. 398, 402 (2022) (quoting *Gingles*, 478 U.S. at 79).

<u>*Gingles* 1</u>

Plaintiffs' expert Anthony Fairfax will testify that two reasonably configured majority-BVAP Senate Districts in the northeastern part of North Carolina can be drawn:

3

the first comprised entirely of nine whole counties encompassing much of the historical Black Belt, splitting no Voting Tabulation Districts ("VTDs" or "precincts") or municipalities; and the second just south containing the entirety of Edgecombe and Martin Counties as well as adjacent sections of Nash and Pitt, splitting no VTDs, and reasonably respecting municipal boundaries. Both are well above the minimum compactness standards employed by the Senate map drawers when constructing the Senate Plan and unify areas of common socioeconomic and regional interest.

The evidence will further show that there are multiple reasonable configurations for two majority-minority districts, and that the Legislature's choice of remedy in providing at least two Black-opportunity districts in this area is easily met. This is because SD5, covering much of the area contained in Plaintiffs' second *Gingles* 1 demonstrative district, already provides one opportunity for Black voters to elect candidates of their choice. Accordingly, if the Legislature preserves SD5 as is, it need only configure one additional opportunity district to satisfy the VRA. While the choice for drawing such a district in the first instance belongs to the Legislature, Plaintiffs' first demonstrative district is readily available and can coexist with SD5 without modification. Such an option would allow both Black opportunity districts required by the VRA in this part of the state to be composed of whole counties.

Attempts to undercut Plaintiffs' demonstrative districts as reasonably configured will prove unavailing because Defendants rely on mapping experts (Drs. Trende and Barber) who alternate between contradicting each other in their criticisms of Plaintiffs' demonstrative plans and erroneously bolting extraneous requirements onto the *Gingles*

4

framework. One opines that a district is reasonably configured; the other opines that the same district is not. One relies on an archaic, obscure measure of compactness to conclude that districts containing both rural and urban populations are noncompact (regardless of any shared interests); the other agrees that urban and rural populations can be in the same, compact district. *Accord Milligan*, 599 U.S. at 18 (describing *Gingles* 1 as requiring the minority group be "sufficiently large and geographically compact to constitute a majority in a reasonably configured district" and that a "district will be reasonably configured . . . if it comports with traditional districting criteria, such as being contiguous and reasonably compact"). They focus on different portions of Plaintiffs' demonstratives for critique, each identifying only specific portions of the districts and yet rendering a judgment on the whole of the district. Beyond conjuring new *Gingles* requirements out of whole cloth, Defendants' experts do little more than challenge Plaintiffs to the "beauty contest" that Supreme Court jurisprudence decisively rejected two years ago. *Milligan*, 599 U.S. at 21. As a result, the evidence will show that *Gingles* 1 is satisfied in this portion of the state Senate map.

### *Gingles* 2 and 3

To address the second and third *Gingles* preconditions, Plaintiffs' expert, Dr. Kassra Oskooii, will testify regarding racially polarized voting and the performance of Plaintiffs' demonstrative districts and enacted Senate Districts. Dr. Oskooii utilized well-established methods to estimate levels of Black and white voter support for different candidates within these districts across a total of 64 statewide (i.e., exogenous) elections from 2016 to 2024, as well as the 2024 district-specific (i.e., endogenous) elections. He will testify that average Black cohesion estimates are about 95 percent or more across Plaintiffs' demonstrative

majority-Black districts as well as in SD1 and SD2 and adjacent Black Belt districts SD5 and SD11. This testimony will establish that Black voters are politically cohesive, satisfying the second *Gingles* precondition.

Dr. Oskooii will also testify that white voters generally oppose Black-preferred candidates at average percentage rates in the 70s to mid-80s in districts across the Black Belt and across a range of exogenous elections as well as the 2024 endogenous elections under these districts, thus establishing white bloc voting.

Finally, Dr. Oskooii's performance analysis of SD1 and SD2 will show how effectively these districts have minimized Black voting power. In SD1, Dr. Oskooii will show that Black-preferred candidates are defeated in *every single* election analyzed from 2024, 2022, and 2020 (and that higher success rates in 2018 are associated with three-candidate contests in which white voters split their votes between two candidates). In SD2, Dr. Oskooii will testify to estimated win rates of 7, 0, and 0 percent, in 2024, 2022, and 2020 (with higher win rates in 2018 due to vote-splitting among white voters between two candidates). This establishes that white majorities vote sufficiently as a bloc in SD1 and SD2 to usually defeat the Black-preferred candidates, satisfying the third *Gingles* precondition.

Dr. Oskooii's testimony will further confirm that adjacent SDs do not remedy the denial of Black voters an equal opportunity to elect their candidates of choice in SD1 and SD2. Specifically, Dr. Oskooii will testify that, within the Black Belt, only SD5 provides an opportunity for Black voters to elect a candidate of choice without being usually defeated by white bloc voting. He will also explain that, while adjacent district SD11

6

(which only includes a portion of Plaintiffs' demonstrative districts) has somewhat higher estimated win rates for Black voters in older elections, the more probative recent elections and the 2024 endogenous elections indicate that Black-preferred candidates will usually be defeated there as well. *See United States v. Charleston Cnty.*, 365 F.3d 341, 350 (4th Cir. 2004) ("[R]ecent elections are the most probative in determining vote dilution."). And, in any event, an adjacent district encompassing only partial areas of minority voters experiencing vote dilution cannot substantially address the unambiguous Section 2 violation in SD1 and SD2. *See Shaw v. Hunt*, 517 U.S. 899, 918 (1996) (minority-opportunity district containing a portion of the demonstrative area's minority voters did not "substantially address[] the § 2 violation"); *LULAC v. Perry*, 548 U.S. 399, 431 (2006) (applying *Shaw* to find same).

Accordingly, Black voters are numerous and geographically compact enough to constitute two majority-Black SDs in North Carolina's Black Belt and yet will be usually defeated in SD1 and SD2, thus proving a white majority votes sufficiently as a bloc to enable it to defeat the minority's preferred candidate in satisfaction of the third *Gingles* precondition. *Milligan*, 599 U.S. at 18.

Defendants cannot meaningfully dispute the qualifications, methodologies, and estimates presented by Dr. Oskooii, so instead they will present opinions of Dr. Alford to argue that racially polarized voting patterns are attributable to mere partisanship. This argument must fail because it is inapposite to the Court's *Gingles* analysis. *See Charleston Cnty.*, 365 F.3d at 347-49 (rejecting argument that third *Gingles* precondition requires proving "race rather than partisanship is the cause of [] polarized voting" because "[l]egally

7

significant' white bloc voting thus refers to the frequency with which, and not the reason why, whites vote cohesively for candidates who are not backed by minority voters."). Nothing in the Supreme Court's recent affirmation of the *Gingles* preconditions alters this conclusion. *See generally Milligan*, 599 U.S. 1; *see also Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 700 F. Supp. 3d 1136, 1210 (N.D. Ga. 2023) (affording "little weight to Dr. Alford's testimony with respect to the *Gingles* preconditions because it does not effectively address that inquiry").

Furthermore, the evidence will show that Dr. Alford's testimony should be afforded little to no weight due to its unreliability. Dr. Alford has never published a paper on racially polarized voting nor any peer-reviewed articles using ecological inference, disclaims doing any analysis of actual causation here, and admits that racial and partisan polarization can indeed exist in a single jurisdiction. His methodology is riddled with inconsistencies as to how he considers race of the candidate, the only factor he looked at with specificity.

Dr. Alford's so-called "BVAP-to-win" analysis, opining that Black voters can win in districts of less than 50 percent BVAP, is similarly unreliable. It is based on just one election cycle (2024) and makes methodological assumptions that render inaccurate results, as shown by *actual* electoral results that contradict them. Further, any argument that Plaintiffs must prove a majority-BVAP district is required to satisfy the *Gingles* preconditions is legally wrong. *See, e.g.*, *Robinson v. Ardoin*, 86 F.4th 574, 596-97 (5th Cir. 2023) ("The relevant consideration under [*Gingles* 3] is the *challenged* plan, not some *hypothetical* crossover district that could have been but was not drawn").

Given the infirmities in his analysis, it is not surprising that other jurisdictions have found Dr. Alford's opinions were "not reached through methodologically sound means and were therefore speculative and unreliable." *Alpha Phi Alpha Fraternity Inc.*, 587 F. Supp. 3d 1222, 1305-07 (N.D. Ga. 2022) (collecting cases on Dr. Alford); *Miss. State Conf. of the NAACP v. State Bd. of Election Comm'rs*, 739 F. Supp. 3d 383 (S.D. Miss. 2024) (concluding Dr. Alford's opinions "border on ipse dixit").

The evidence will show that the configuration of SD1 and SD2 thwart a distinctive minority vote "at least plausibly on account of race." *Milligan*, 599 U.S. at 19.

<u>Totality of the Circumstances</u>

Plaintiffs will establish, by a totality of circumstances, that the "political processes" in the Black Belt "are not equally open to participation" by Black voters. *See* 52 U.S.C. § 10301(b). In addition to fact witness testimony from voters in challenged areas, Plaintiffs will present expert Dr. Joseph Bagley to address several Senate Factors: the extent of historical voting discrimination against Black voters; voting practices that exacerbate discrimination against Black voters; how Black North Carolinians "bear the effects of discrimination" in education, employment, or health, hindering their ability to participate in the political process; overt or subtle racial appeals in political campaigns; diminished Black electoral success in the Black Belt; and lack of responsiveness. *See Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 219 (4th Cir. 2024) (listing relevant factors); *see also Gingles*, 478 U.S. at 36-37 (same). Dr. Bagley will apply historical and contemporary evidence to illustrate how the 2023 redistricting impairs Black voters' ability to participate in the political process and elect their candidates of choice.

9

Dr. Bagley will testify that North Carolina has a long and storied history of racial discrimination in the context of voting rights, including race-based vote suppression and dilution schemes (several involving redistricting efforts) in the Black Belt. Dr. Bagley's analysis of Census data and similar socioeconomic statistics shows significant continuing disparities in the Black Belt, including that Black individuals are more than twice as likely as white individuals to experience poverty or unemployment, and significantly less likely to have private health insurance. He will also testify that educational disparities are *increasing* in the Black Belt. Dr. Bagley will further testify to the voluminous racial appeals used in North Carolina elections in the past two decades, and that Black candidates have historically been and continue to be underrepresented in elected roles, even in Black Belt districts with higher BVAPs. Witness testimony from Plaintiffs and other community members will further illustrate these disparities within the Black Belt. Defendants' attempts to point to statewide and nationwide statistics will not rebut this testimony because it does not comport with the "intensely local appraisal" that *Gingles* requires. *Gingles*, 478 U.S. at 79.

Dr. Oskooii's testimony will demonstrate clear and extreme racial polarization relevant to Senate Factor 2. Fact witness testimony as well as testimony from Plaintiffs' expert Dr. Stephens-Dougan—a political scientist with expertise in race, ethnicity, and politics—will contextualize these voting patterns. Dr. Stephens-Dougan will explain how peer-reviewed literature and North Carolina-based survey data show that policies regarding racial and racialized issues drive voting behavior in the state, and that what appears to be partisan voting is in fact fueled by racial attitudes. Defendants' expert, Dr. Alford, did not

review nor rebut Dr. Stephens-Dougan's report. And while the analysis he purports to offer (considering the race of the candidate and levels of white cross-over voting) may be considered by the Court in reviewing the totality of the circumstances, his analysis is unreliable and the kind of "anecdotal evidence of partisanship" that is "inconclusive" at best. *See Charleston Cnty.*, 365 F.3d at 352 (4th Cir. 2004). Overall, his flawed and limited analysis cannot rebut the definitive evidence of racially polarized voting in the challenged area.

Finally, substantive departures and irregularities in district configurations support the tenuousness of Defendants' plans, in addition to a marked lack of responsiveness toward Black voters described below. The evidence will thus conclusively demonstrate, by a totality of circumstances, that the political process is not equally open to Black individuals in the Black Belt. Alongside the *Gingles* preconditions, this establishes a violation of Section 2.

## II. Intent to Diminish Black Voting Power Was a Motivating Factor in the Design and Passage of Challenged Senate and Congressional Districts in Violation of the VRA and the Fourteenth and Fifteenth Amendments (Counts 4, 5, 7, 8, & 9).

The VRA and the U.S. Constitution protect all voters from intentional discrimination and the diminishment of voting power on account of race, even where those voters have been ostensibly targeted for partisan ends.

State actors may not "intentionally target[] a particular race's access to the franchise because its members vote for a particular party, in a predictable manner[;]" such conduct "constitutes discriminatory purpose . . . even absent any evidence of race-based hatred and

11

despite the obvious political dynamics." *N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 222-23 (4th Cir. 2016). "A state legislature acting on such a motivation engages in intentional racial discrimination in violation of the Fourteenth Amendment and the Voting Rights Act." *Id.* at 223.

A plaintiff may prove intentional discrimination by first showing that racial discrimination was a "substantial or "motivating factor[.]" *Hunter v. Underwood*, 471 U.S. 222, 228 (1985). A plaintiff alleging discriminatory intent "need not establish that the challenged policy rested solely on discriminatory purposes, or even that a particular purpose was the dominant or primary one." *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 883 (4th Cir. 2023) (internal citations omitted).

Discriminatory intent also "need not be prove[n] by direct evidence" but may "be inferred from the totality of the relevant facts." *Rogers v. Lodge*, 458 U.S. 613, 618 (1982). Courts apply the factors outlined in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977) to determine if the decision-makers acted with illicit intent: "(1) historical background; (2) the specific sequence of events leading to the law's enactment, including any departures from the normal legislative process; (3) the law's legislative history; and (4) whether the law 'bears more heavily on one race than another.'" *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 303 (4th Cir. 2020) (quoting *Arlington Heights*, 429 U.S. at 265-69).

Courts undertake a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available," and where "a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation

12

appears neutral on its face," the "evidentiary inquiry is then relatively easy." *Arlington Heights*, 429 U.S. at 266. An action clearly designed with the "essential inevitable effect" of discriminating on the basis of race is unconstitutional. *Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960). While courts afford the state legislature a "presumption" of good faith, *Raymond*, 981 F.3d at 303, "where discriminatory purpose has been a motivating factor in the decision, . . . judicial deference is no longer justified." *Arlington Heights*, 429 U.S. at 265-66.

Plaintiffs will present strong circumstantial and direct evidence that the Legislature acted with an intent to dilute Black voting power in the Senate and Congressional plans. Such action is merely the latest in a long history of redistricting practices resulting in the mistreatment of Black voters in North Carolina.

<u>Legislative History and Sequence of Events</u>

Senators Hise, Daniel, and Newton (the "Senate Redistricting Chairs") orchestrated a process in 2023 calculated to shield their true intent from the public and avoid the requirements of federal law. Despite knowing they would be redrawing state legislative and Congressional districts in April 2023, and despite taking steps in the summer of 2023 to begin drawing those districts, the Senate Redistricting Chairs kept any details of the redistricting process secret from the public until mid-September, when they announced three public meetings of the Joint House and Senate Redistricting Committees. No information regarding criteria, timing, or draft maps accompanied these notices, and Committee members were told that they were not required to attend the hearings, a fact that the public was made aware of as well. Once draft maps were made public on October

13

18, the Senate Redistricting Chairs charted a legislative process to enact plans within one week.

These choices drastically limited opportunity for public comment and, specifically, Black voters' ability to identify and comment on the discriminatory impact of the 2023 Senate and Congressional plans. The evidence will show this process deviated significantly from past redistricting cycles, post-Census and remedial alike, which included significantly more public hearings (dozens in some instances), hearings for public comment after drafts were publicized, and a process beginning on (or even before) the event triggering the new round of redistricting, i.e., release of census information or court order. *See, e.g.*, *Harper v. Hall*, 380 N.C. 317, ¶¶ 13-14 (2022) (*Harper I*); *Covington v. North Carolina*, 316 F.R.D. 117, 126 (M.D.N.C. 2016) (*Covington I*); *see Covington v. North Carolina*, 267 F. Supp. 3d 664, 665-67 (M.D.N.C. 2017) (*Covington III*).

The mapdrawing process also indicates a discriminatory intent as evidenced, in part, by profound shifts away from past practice. For example, in 2019 and 2021, mapdrawers used publicly disclosed and debated criteria and drafted districts on public computers broadcast live online. When redistricting criteria were publicly debated in 2021, an amendment added a criterion calling for adherence to the VRA.

In contrast, the 2023 mapdrawing occurred entirely behind closed doors with criteria kept secret until draft maps were finally made public at the last minute. These decisions prevented Black elected officials, and candidates of choice for Black communities, from meaningfully taking part in drawing districts in the challenged areas of the Senate and Congressional plans. Overall, the 2023 process most resembles the behind-closed-doors

14

process of 2011, during which only legislative leaders communicated with the mapdrawer, blocking committee participation or public input into the plans until draft maps were released publicly. That process resulted in racially gerrymandered maps that were struck down. *Covington I*, 316 F.R.D. at 124, 126-27.

<u>Willful Disregard of the VRA</u>

Defendants' anticipated defense that their actions stem from a mere partisan intent is untenable. Why deviate so markedly from prior practice in favor of haste and secrecy when courts have greenlit the purported objective of mere partisanship? Instead, the evidence will show that they took specific actions in the 2023 redistricting process that resulted in diminishing Black—not merely Democratic—voting power. These actions were substantive departures from recent redistricting practice and stated criteria—particularly relevant where "the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Arlington Heights*, 429 U.S. at 267.

In an October 19 Senate Redistricting and Elections Committee meeting, the day after draft maps were made public, Senator Hise represented that the Senate Redistricting Chairs would, at the next meeting, "consider any evidence a member of this committee or a third party advocating altering plans for racial reasons brings forth that provides a strong basis in evidence that the *Gingles* preconditions are present in a particular area of the state." The record will demonstrate that the Senate Redistricting Chairs failed to follow through on this representation in good faith.

15

Notably:

(i)    the Senate Redistricting Chairs purposefully implemented a timeline to hamstring any consideration of potential VRA issues in the draft plans;

(ii)    when an expert racially polarized voting analysis addressing the *Gingles* preconditions in the Senate plan was submitted on October 22, the Redistricting Chairs dismissed this evidence outright without justification;

(iii)    the Redistricting Chairs purposefully foreclosed any debate on two amendments addressing the first *Gingles* precondition in the October 24 Senate Floor debate; and

(iv)    at no point in the redistricting process did the Senate Redistricting Chairs conduct or commission any analysis of the *Gingles* factors, much less obtain evidence that contradicted analysis submitted during the legislative process showing they were satisfied.

These actions are inexplicable because, just months prior, the Supreme Court unambiguously reaffirmed Section 2 and the applicability of the *Gingles* standard. *See Milligan*, 599 U.S. 1. The evidence will show that the legislature "knew what federal law required and purposefully refused to provide"—or, here, even properly consider—it, in a "strategic" attempt to diminish Black voting power in the state. *Singleton v. Allen*, No. 2:21-cv-01291-AMM, 2025 U.S. Dist. LEXIS 89359, at *26 (N.D. Ala. May 8, 2025).

Defendants may attempt to point to the *Covington I* decision for their refusal to meaningfully engage with the VRA. In *Covington I*, Defendants were not faulted for their consideration of race *per se*; they were faulted for failing to make a proper inquiry into the third *Gingles* precondition before packing Black voters in already-performing districts and thereby creating higher-BVAP districts without justification. *See Covington I*, 316 F.R.D. at 167-68 ("Defendants never asked whether there was a strong basis in evidence that [the *Gingles* preconditions were met] before they drew the challenged districts."). It is

16

paradoxical that Defendants, including Senator Hise who was involved in the 2011 process, would respond to this decision by *repeating* the same error and refusing to analyze the *Gingles* preconditions again, even after being presented definitive evidence they were satisfied. In fact, the Court in *Covington I* warned specifically against Defendants' chosen course of action to disregard the requirements of the VRA going forward, noting that "[e]vidence of a potential Section 2 violation may exist in some parts of the state, and if such evidence is *properly* examined and demonstrated, it certainly could justify future majority-minority districts." *Id.* at 178.

The evidence will also show that Defendants' prime defense—that using purportedly "race-neutral" criteria in 2023 forecloses any possibility of intentional discrimination—rings hollow. The same Senate Redistricting Chairs claimed in 2021 to have applied criteria banning use of election data, and yet were still found by a unanimous three-judge panel to have engaged in "intentional, and effective, pro-Republican partisan redistricting," a factual finding undisturbed on appeal. *Harper v. Hall*, 384 N.C. 292, 382 (2023) (*Harper III*) (Earls, J. dissenting). The Supreme Court has similarly found that purportedly "race-blind" redistricting can still result in racially discriminatory results. *See North Carolina v. Covington*, 585 U.S. 969, 977 (2018) (*Covington VI*) ("The defendants' insistence that the 2017 legislature did not look at racial data in drawing remedial districts does little to undermine the District Court's conclusion—based on evidence concerning the shape and demographics of those districts—that the districts unconstitutionally sort voters on the basis of race.").

Importantly, the Court need not decide nor even agree on the steps necessary for the Legislature to comply with the VRA during the 2023 redistricting process to find discrimination was a motivating factor. It need only find that Defendants willfully deviated from their *own representations* as to what that process required. Taken as a whole, the evidence demonstrates no "presence of honest intention" by Defendants to meet even their own benchmark for what the VRA requires. *Abrego Garcia v. Noem*, No. 8:25-cv-00951, 348 F.R.D. 594, 600 (2025) (quoting *Carolin Corp. v. Miller*, 886 F.2d 693, 700 (4th Cir. 1989)). Such evidence is sufficient to rebut even a high presumption of good faith.

<u>Discriminatory Impact</u>

Defendants designed a process to ensure the dilution of Black electoral power—and it worked. Dr. Oskooii's performance analysis confirms the devastating effect these maps have on Black electoral power. For example, his analysis of the Black Belt confirms that Black voting power is eviscerated in SD1 and SD2, thereby denying Black voters one of the two Black opportunity districts they would otherwise be afforded under Plaintiffs' demonstrative plans. And because of the racially polarized voting patterns in each area, with white voters voting as a bloc to oppose Black voters' candidates of choice, the challenged configurations bear more heavily on Black voters by diminishing electoral opportunity as compared to their white peers.

In the 2023 Congressional Plan, Defendants cracked the Black population in the Triad among four separate CDs that dip into surrounding rural, predominantly white, areas. This created CD5, CD6, CD9, and CD10 with 18.73, 19.31, 22.36, and 16.58 percent BVAP, respectively, all far below the average 30.99 percent BVAP in the Triad. Dr.

Oskooii detected significant racially polarized voting in each district, and his electoral performance analysis confirms that Black-preferred candidates will usually be defeated everywhere. This effectively cancels out Black voters' ability to elect a congressperson of their choice anywhere in the Triad, and reduces overall electoral power compared to 2022.

Dr. Oskooii will also show how Defendants' reconfiguration of CD1 significantly reduces the chances of Black electoral success compared to its 2022 benchmark. To achieve this, Defendants removed Pitt County from CD1, reflecting the first time since at least 1992 that the Black Belt's Congressional District has not included at least part of this county. Defendants replaced Pitt County with the overwhelmingly white coastal counties of Camden and Currituck. These communities have little in common with the rest of the Black Belt but do have much higher levels of white bloc voting in opposition to Black-preferred candidates.

The results of the 2024 elections illustrate the effective and devastating results of Defendants' effort to diminish Black electoral power in the Senate and Congress. Just one Black or Black-preferred senator serves in the Black Belt (SD5), the lowest number of such representatives from the region in a decade. In the Congressional Plan, the Triad is devoid of any Black or Black-preferred Congressional representatives, eliminating representation for Black voters in this area. The Black candidate of choice for Black voters in CD1, Representative Don Davis, won reelection in 2024 by a significantly narrower margin than in 2022.

The evidence as to the totality of the circumstances, relevant to Plaintiffs' intentional claims under the VRA, will confirm that each of the relevant Senate Factors

weigh in Plaintiffs' favor. In addition to the evidence of racially polarized voting offered by Drs. Oskooii and Stephens-Dougan, Drs. Bagley and Stephens-Dougan will testify that the Triad is also deeply impacted by North Carolina's history of discrimination, racially polarized voting, and socioeconomic disparities between the Black and white populations such that the political process is not equally open to Black voters.

<u>Lack of Responsiveness to Black Voters</u>

The dramatic lack of responsiveness that elected officials, and particularly those responsible for adopting the 2023 plans, have toward Black voters demonstrates these plans were enacted with discriminatory intent and deny Black voters equal voting power in the challenged areas. *See Gingles*, 478 U.S. at 37.

In addition to fact witness testimony, Dr. Bagley will testify that the Legislature has failed to address the distinct minority interests of the Black community across several issues, including funding public education, expanding access to healthcare, protecting voting rights, and drawing and adopting the 2023 plans. Dr. Stephens-Dougan will explain how race and racial attitudes are the dominant precursors to partisan affiliation in North Carolina, such that current legislative priorities advance policies contrary to interests of the Black community. Whether any of these policy positions is "correct" (according to the legislators or the Court) is beside the point: the VRA was designed to protect the ability of racial minorities, with a distinctive vote, to have an equal opportunity to advance their interests. *Milligan*, 599 U.S. at 18, 24.

The evidence will show that Defendants' actions reflect a desire to opt out of responding to these communities by drawing them out of the political process entirely. This

is the precise harm of racial vote dilution the VRA was designed to prevent and why remedy is required here.

### III. Challenged Districts in the Senate and House Plans Violate the One-Person, One-Vote Guarantee of the Equal Protection Clause (Counts 3 & 6).

Plaintiffs have alleged that specific districts within the Senate (Count 3) and House Plan (Count 6) deny voters equal voting power by malapportioning districts within county-cluster groupings in pursuit of partisan advantage. Since Plaintiffs' Motion to Reconsider the Court's grant of partial summary judgment dismissing these claims remains under consideration by the Court, Doc. 101, in the interest of conserving judicial resources, Plaintiffs rest on those papers, Docs. 101, 103, and 124, to forecast the evidence that could be presented or proffered at trial if permitted.

### IV. If Not a Violation of One-Person, One-Vote, the Only Other Plausible Explanation for the Configuration of SD8 is Racial Predominance in Violation of the Fourteenth Amendment (Count 2).

The Equal Protection Clause of the Fourteenth Amendment prohibits a governing body, without sufficient justification, from "separat[ing] its citizens into different voting districts on the basis of race." *Miller v. Johnson*, 515 U.S. 900, 911 (1995). Plaintiffs may prove racial gerrymandering by showing, "either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller*, 515 U.S. at 916; *see also Cooper v. Harris*, 581 U.S. 285, 291 (2017); *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017). While legislatures do enjoy a "presumption of

legislative good faith," *Alexander v. S.C. State Conf. of NAACP*, 602 U.S. 1, 10 (2024), that presumption is overcome when plaintiffs can show that district configurations were "unexplainable other than by race." *Miller*, 515 U.S. at 916-20. Once plaintiffs establish race as the predominant factor, the court applies strict scrutiny, and "the State must demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest." *Miller*, 515 U.S. at 920.

If this Court denies Plaintiffs' pending Motion for Reconsideration (Doc. 101) or otherwise rejects Plaintiffs' malapportionment claim against SD8—ruling out predominance of partisanship as an explanation for its configuration—then the only remaining factor that can explain SD8 is race. SD8 contains the entirety of Columbus and Brunswick counties with an awkward notch, resembling the head of a giraffe, that dips into predominantly Black neighborhoods in the city of Wilmington, swallowing up all but one of Wilmington's VTDs with more than 30 percent BVAP.

The effect of this map is to crack a compact Black population in downtown Wilmington between two districts and thereby dilute that population's voting strength. The evidence will show that no other criteria considered by mapdrawers (other than the partisan advantage ruled out by the Court) can explain the "bizarreness" of this district's configuration, and the absence of any other explanation provides "persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale." *Miller*, 515 U.S. at 913.

Furthermore, if the explanation of partisan advantage is ruled out by the Court, *Alexander*'s instruction that plaintiffs offer a "substitute map that shows how the State

22

could have achieved its legitimate political objectives . . . while producing significantly greater racial balance," will not apply. 602 U.S. at 34 (internal quotations omitted). With partisanship off the table, the 2022 Senate map better adheres to the legislature's professed criteria of equal population, compactness, contiguity, respect for political subdivisions, and incumbency, all without carving up Wilmington's Black population. This map is "highly persuasive" evidence in proving that the legislature "had the capacity to accomplish all its . . . goals without moving so many members of a minority group." *Cooper*, 581 U.S. at 317.

If partisanship cannot explain SD8's configuration, the district can only be explained by use of racial targeting and must be struck down as an unconstitutional racial gerrymander. *Id*. at 330.

## CONCLUSION

For the above reasons, the Court should rule for Plaintiffs on all claims, and grant the relief requested in the First Amended Complaint, Doc. 105.

Dated: May 27, 2025                         Respectfully submitted,

                                            */s/ Hilary Harris Klein*
                                            Hilary Harris Klein

**HOGAN LOVELLS US LLP**                    **SOUTHERN COALITION FOR**
                                            **SOCIAL JUSTICE**

J. Tom Boer*
Olivia Molodanof*                           Jeffrey Loperfido (State Bar #52939)
Madeleine Bech*                             Hilary Harris Klein (State Bar #53711)
4 Embarcadero Center, Suite 3500            Christopher Shenton (State Bar #60442)
San Francisco, CA 94111                     Mitchell D. Brown (State Bar #56122)
Telephone: 415-374-2300                     Lily Talerman (State Bar #61131)
Facsimile: 415-374-2499                     5517 Durham Chapel Hill Blvd.

tom.boer@hoganlovells.com
olivia.molodanof@hoganlovells.com
madeleine.bech@hoganlovells.com

Jessica L. Ellsworth*
Misty Howell*
Odunayo Durojaye*
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: 202-637-5600
Facsimile: 202-637-5910
jessica.ellsworth@hoganlovells.com
misty.howell@hoganlovells.com
odunayo.durojaye@hoganlovells.com

Harmony Gbe*
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: 310-785-4600
Facsimile: 310-785-4601
harmony.gbe@hoganlovells.com

*Appearing in this matter by Special
Appearance pursuant to L-R 83.1(d)

Durham, NC 27707
Telephone: 919-794-4213
Facsimile: 919-908-1525
hilaryhklein@scsj.org
jeffloperfido@scsj.org
chrisshenton@scsj.org
mitchellbrown@scsj.org
lily@scsj.org

24

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rules 7.3(d) and 40.1(c), I hereby certify that the foregoing brief includes 6,164 words as calculated by Microsoft Word, excluding the caption, signature lines, certificates, and cover page.

*/s/ Hilary Harris Klein*
Hilary Harris Klein

## CERTIFICATE OF SERVICE

I certify that on May 27, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Hilary Harris Klein*
Hilary Harris Klein
