# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF NORTH CAROLINA

SHAUNA WILLIAMS, et al.,

        *Plaintiffs*,

    v.

REPRESENTATIVE DESTIN HALL, in his official capacity as Chair of the House Standing Committee on Redistricting, et al.,

      *Defendants*.

_____

NORTH CAROLINA STATE CONFERENCE OF THE NAACP, et al.,

        *Plaintiffs*,

    v.

PHILIP BERGER, in his official capacity as the President Pro Tempore of the North Carolina Senate, et al.,

      *Defendants*.

Civil Action No. 23 CV 1057

Civil Action No. 23 CV 1104

## *WILLIAMS* PLAINTIFFS' PRETRIAL BRIEF

# INTRODUCTION

*Williams* Plaintiffs challenge North Carolina's 2023 Congressional Plan—which eliminates two Black opportunity districts by cracking and packing Black voters in the Piedmont Triad and in Mecklenburg County—as intentionally discriminatory under the Fourteenth and Fifteenth Amendments to the United States Constitution and Section 2 of the Voting Rights Act (VRA). *Williams* Plaintiffs will show that race was a motivating factor in creating the 2023 Congressional Plan ("2023 Plan") and in the decisions to move Black voters into and out of former Congressional Districts 6, 12, and 14, which dilutes their voting power and cannot be explained by purely partisan goals.

# BACKGROUND

## I. North Carolina's History of Discrimination in Redistricting

North Carolina has "a long history of race discrimination generally and race-based vote suppression in particular." *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 223 (4th Cir. 2016). This long history includes repeated efforts to deny the state's Black voters an equal opportunity to elect candidates of their choice though discriminatory redistricting. *See, e.g.*, *Gingles v. Edmisten*, 590 F. Supp. 345, 376 (E.D.N.C. 1984) (holding that North Carolina's redistricting plans diluted Black voters' ability to elect their candidates of choice), *aff'd in part, rev'd in part sub nom. Thornburg v. Gingles*, 478 U.S. 30, 80 (1986) (affirming the district court's finding that North Carolina's "legacy of official discrimination in voting matters, education, housing, employment, and health services . . .

- 2 -

acted in concert with the multimember districting scheme to impair the ability" of Black voters to "participate equally in the political process").

Between 1980 and 2013, "private plaintiffs brought fifty-five successful cases under § 2 of the Voting Rights Act" in North Carolina. *McCrory*, 831 F.3d at 224. In the 2000 redistricting cycle, courts struck down state legislative districts three separate times for violating the state constitution and misinterpreting Section 2 of the VRA. *See Stephenson v. Bartlett*, 562 S.E.2d 377 (N.C. 2002); *Stephenson v. Bartlett*, 582 S.E.2d 247 (N.C. 2003); *Bartlett v. Strickland*, 556 U.S. 1 (2009). And in the 2010 cycle, federal courts struck down the state's congressional and state legislative districts for misusing the VRA to engage in race-based redistricting. *See Cooper v. Harris*, 581 U.S. 285, 317 (2017) (affirming district court's conclusion that "racial considerations predominated in" the decision to pack Black voters into North Carolina's Congressional District 12); *Covington v. North Carolina*, 316 F.R.D. 117, 173 (M.D.N.C. 2016) ("Suffice it to say that Defendants knew they were increasing the BVAP in districts where African-American candidates . . . were already consistently winning under the Benchmark Plans."), *aff'd*, 581 U.S. 1015 (2017).[1]

_____

[1] North Carolina's discrimination in voting extended far beyond redistricting. Between 1980 and 2013, "the Department of Justice issued over fifty objection letters to proposed election law changes in North Carolina . . . because the State had failed to prove the proposed changes would have no discriminatory purpose or effect." *McCrory*, 831 F.3d at 224. And once North Carolina was no longer bound by Section 5 of the VRA, it immediately passed several voting restrictions that the Fourth Circuit held were

- 3 -

## II.    Post-2020 Census Redistricting

North Carolina's long history of discriminatory line-drawing has continued into the 2020 redistricting cycle. Following the 2020 Census, North Carolina gained a congressional district, almost entirely due to an increase in the state's minority population. But the General Assembly has assiduously worked to ensure that these gains do not translate into gains in congressional representation for North Carolina's minority voters. After the North Carolina Supreme Court struck down the General Assembly's first congressional map of the decade as an unlawful partisan gerrymander, *see Harper v. Hall*, 868 S.E.2d 499 (N.C. 2022), *aff'd sub nom. Moore v. Harper*, 600 U.S. 1 (2023), the 2022 congressional elections were conducted under a court-ordered map ("2022 Plan"). Shortly thereafter, the General Assembly petitioned for a rehearing of *Harper*, which the newly-reconstituted Supreme Court granted, ultimately vacating the 2022 Plan and allowing the General Assembly to draw a new congressional map. *See Harper v. Hall*, 886 S.E.2d 393 (N.C. 2023).

Over the next several months, the General Assembly oversaw a carefully-timed and largely opaque redistricting process, culminating in the discriminatory map at issue in this case. The General Assembly waited five months after *Harper* to hold the first public redistricting hearing. In that time, it enacted a series of measures designed to limit public

---

intentionally discriminatory, targeting Black voters with "surgical precision" who "based on race, were unlikely to vote" for the party controlling the General Assembly. *Id*. at 214, 233.

access to the legislative process, including a bill repealing a state law that had made draft maps and redistricting communications public following the enactment of a map. 2023 Appropriations Act, sec. 27.7(d), § 120-133, 2023 N.C. Sess. Laws 134, 530 (2023). Once the redistricting process got underway, the General Assembly held only three public hearings statewide, and did not release proposed maps or redistricting criteria until after all of the hearings concluded. Thereafter, the General Assembly introduced and passed the 2023 Plan in a single week, truncating any debate that could be had on the bill.

### III.    The 2023 Plan's Dilution of Black Voting Strength

The end result of this redistricting process was the 2023 Plan, which cracks and packs Black communities to minimize their voting strength in the Piedmont Triad and in Mecklenburg.

#### A.  The Piedmont Triad

The 2023 Plan dismantles a Black opportunity district by carving Black voters out of former CD-6 in the Piedmont Triad and pairing those Black voters with far-flung white communities across several districts. Under the 2022 Plan, CD-6 had a Black Voting Age Population (BVAP) of 31.65% and performed as an effective opportunity district where Black voters could elect their preferred candidates. In the 2023 Plan, however, the General Assembly decreased the BVAP of CD-6 by 12%, sufficient to ensure that Black voters in that district (and in the surrounding districts) can no longer elect their candidates of choice.

The 2023 Plan accomplishes this dilution of Black voting strength by cracking Black voters in Greensboro, High Point, and Winston-Salem—three cities with some of

the largest concentration of Black voters in the state that form the community of interest known as the Piedmont Triad—across four separate congressional districts (CDs 5, 6, 9, and 10) that span from Ashe County, which borders Tennessee and Virginia, to Hoke County, near the South Carolina border. This redistribution of Black voters across multiple districts comes at the expense of traditional districting principles, including respect for political subdivision and geographical boundaries, compactness, and communities of interest. For instance, while the 2022 Plan kept Guilford County whole, the 2023 Plan carves it into three separate districts, ensuring that its large Black population no longer has an opportunity to elect its preferred candidates in any of them. All of the resulting districts are significantly less compact, in large part due to the districts' appendages that reach out to divide Black voters in Winston-Salem, Greensboro, and High Point among different districts.

Case 1:23-cv-01057-TDS-JLW    Document 128    Filed 05/27/25    Page 6 of 30



*Piedmont Triad Region in the 2022 Congressional Plan*



*Piedmont Triad Region in the 2023 Congressional Plan*

## B. Mecklenburg

The 2023 Plan eliminates a minority opportunity district in Mecklenburg and Gaston Counties. It does so by removing Black voters from CD-14, which previously performed as an opportunity district that allowed Black voters to elect their candidates of choice, and

packing them into CD-12, a district in which Black voters were already electing their candidates of choice by significant margins. Just as it does in the Piedmont Triad, the 2023 Plan accomplishes this dilution of Black voting strength in Mecklenburg County, home to the state's largest Black population, at the expense of traditional redistricting principles. To pack Black voters into CD-12, the General Assembly split Mecklenburg three ways, rendering CD-12 and its surrounding districts significantly less compact. CD-12 now wraps around the city of Charlotte to include many of Mecklenburg County's most racially diverse precincts while excluding white voters in south Charlotte from the district. And CD-14's eastern borders include appendages that themselves wrap around CD-12 from three sides, while the district stretches west across four additional counties.



*CD-12 and CD-14 in the 2022 Congressional Plan*

Case 1:23-cv-01057-TDS-JLW    Document 128    Filed 05/27/25    Page 8 of 30



*CD-12 and CD-14 in the 2023 Congressional Plan*

## IV. *Williams* Plaintiffs

*Williams* Plaintiffs include Black voters from the Piedmont Triad and Mecklenburg area who vote in districts where their voting power has been intentionally diluted. Although *Williams* Plaintiffs will establish their standing by declaration to streamline proceedings, the Court will hear live testimony from some *Williams* Plaintiffs about their experiences as Black voters in North Carolina and how the 2023 Plan has diluted their voting power.

## CLAIMS AND LEGAL FRAMEWORK

## I. Intentional Discrimination in Violation of the Fourteenth and Fifteenth Amendments to the United States Constitution

*Williams* Plaintiffs challenge the 2023 Plan as having been adopted with discriminatory intent against Black voters in violation of the Fourteenth and Fifteenth Amendments. As the Supreme Court has held, the Equal Protection Clause "prohibits intentional vote dilution" by "minimizing or cancelling out the voting potential of racial or

- 9 -

ethnic minorities." *Abbott v. Perez*, 585 U.S. 579, 585–86 (2018) (cleaned up); *see also Voinovich v. Quilter*, 507 U.S. 146, 154 (1993) ("'Dilution of racial minority group voting strength may be caused' either 'by the dispersal of [minorities] into districts in which they constitute an ineffective minority of voters or from the concentration of [minorities] into districts where they constitute an excessive majority.'") (quoting *Gingles*, 478 U.S. at 46).

Determining whether a statute was enacted with discriminatory intent is a factual inquiry involving a two-step process. *See Hunter v. Underwood*, 471 U.S. 222, 228 (1985). First, plaintiffs must show that "racial discrimination" was a "motivating" factor behind the law. *Id.* Plaintiffs need not show that discriminatory purpose was the "sole[ ]" or even a "primary" motive for the legislation, just that it was "a motivating factor," and may make that showing with any available "circumstantial and direct evidence of intent." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977). Because "[o]utright admissions of impermissible racial motivation are infrequent," the Supreme Court has recognized that "plaintiffs often must rely upon other evidence." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). Thus, "discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact [] that the law bears more heavily on one race than another." *Washington v. Davis*, 426 U.S. 229, 242 (1976).

Once plaintiffs have satisfied this burden, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter*, 471 U.S. at 228. A "court must carefully scrutinize a state's non-racial motivations to determine

whether they alone can explain enactment of the challenged law." *McCrory*, 831 F.3d at 233.

### A. The *Arlington Heights* factors indicate the 2023 Plan was passed with a discriminatory motive.

In *Arlington Heights*, the Supreme Court identified five non-exhaustive factors to help courts evaluate whether a facially neutral law like the 2023 Plan is motivated by discriminatory intent. These factors include: (1) the discriminatory "impact of the official action"; (2) "the historical background" of the law; (3) "the specific sequence of events leading up" to the law; (4) any "departures from normal procedural sequence;" and (5) the "legislative or administrative history" of the law. *Arlington Heights*, 429 U.S. at 266–68 (cleaned up).

*Williams* Plaintiffs will show that each of the *Arlington Heights* factors demonstrates that race was a motivating factor in enacting the 2023 Plan. In support of this claim, *Williams* Plaintiffs will present expert testimony from Drs. Jonathan Rodden, Maxwell Palmer, and James L. Leloudis II; fact testimony from Senator Ralph Hise and Plaintiffs; and evidence from the legislative record.

### i.    Factor 1: The 2023 Plan disparately impacts Black voters.

The first factor considers "[t]he impact of the official action," or "whether it bears more heavily on one race than another." *Id.* at 266 (internal quotation omitted). In addition to several of the *Williams* Plaintiffs, who will explain how the 2023 Plan has substantially affected their ability to elect a representative of their choice, Drs. Maxwell Palmer and

Jonathan Rodden will show that the 2023 Plan dilutes Black voting strength statewide and specifically in the Piedmont Triad and Mecklenburg.

Dr. Palmer will show that Black voters are significantly less able to elect their candidates of choice under the 2023 Plan than under the 2022 Plan. Exhibit 1, Palmer Rep. at 2, 7. Specifically, Dr. Palmer will demonstrate that, while on average, Black-preferred candidates were able to win 6.2 congressional districts under the 2022 Plan, those same candidates would win only 3.8 districts under the 2023 Plan—a decrease of 38.7% that is accomplished by the elimination of Black voters' opportunity to elect their preferred candidates in CDs 6 and 14. Palmer Rep. at 2, 8; *see also* Exhibit 2, Palmer Suppl. Rep. at 6. Dr. Palmer will further demonstrate that the reshuffling of voters in the 2023 Plan traded Black opportunity for white opportunity statewide. While 66.1% of Black voters lived in a district where their preferred candidate won a majority of the vote under the 2022 Plan, the 2023 Plan drops that number down to 43.3%. Palmer Rep. at 9. By contrast, the number of white voters who live in a district where their preferred candidates won increased from 58.6% in the 2022 Plan to 69.5% under the 2023 Plan. *Id*.

None of Legislative Defendants' experts dispute Dr. Palmer's findings that Black-preferred candidates are less successful under the 2023 Plan than under the 2022 Plan, or that the 2023 Plan disproportionately harms Black electoral opportunity to the benefit of white electoral opportunity. In fact, Legislative Defendants' expert Dr. John Alford confirms the numerical findings in Dr. Palmer's reports.

Dr. Rodden will explain how the 2023 Plan accomplishes the dilution of Black voting opportunities by carefully moving Black voters into and out of specific congressional districts. For instance, Dr. Rodden will show that in the Piedmont Triad, Black urban neighborhoods were extracted from their surrounding communities and combined with faraway rural white communities in Davie and Davidson Counties in CD-6, Wautauga and Alleghany Counties in CD-5, Randolph and Hoke Counties in CD-9, and Lincoln County in CD-10. Dr. Rodden's analysis will also demonstrate that Black voters were more likely than white voters to be moved to a new district in the 2023 Plan and that the most dramatic alterations in the 2023 Plan yielded significant changes in BVAP. Exhibit 3, Rodden Rep. at 28.

Using the statistical approach endorsed by the U.S. Supreme Court in *Cooper*, 581 U.S. at 315–16, Dr. Rodden will explain that the 2023 Plan's pattern of racial sorting cannot be explained by partisan politics. Rodden Rep. at 5. For example, Dr. Rodden will demonstrate that Black voters were substantially more likely to be moved out of CD-6 than white voters—a finding that holds true even after accounting for partisanship. Rodden Rep. at 11–14. Dr. Rodden will also demonstrate that Black voters were disproportionately moved out of CD-14 and into CD-12, again even controlling for partisanship. Rodden Rep. at 15–23. Dr. Rodden will also use simulations produced by opposing expert Dr. Michael Barber and draft maps from the General Assembly to demonstrate that the 2023 Plan remains an outlier in its distribution of Black voters, even among plans that achieve the

stated partisan goals of the General Assembly. Exhibit 4, Rodden Reply Rep. at 14–17, 19–27.

None of the opposing experts disputes the accuracy of Dr. Rodden's descriptive statistics, including his measurements of racial differences in voters included and excluded from CDs 6, 12, and 14, and his analyses of the disproportionate impact of the 2023 Plan on Black voters. Rodden Reply Rep. at 2.

### ii. Factor 2: The historical background of the 2023 Plan suggests a discriminatory purpose.

The second *Arlington Heights* factor examines "[t]he historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267. "North Carolina's history of race discrimination and recent patterns of official discrimination, combined with the racial polarization of politics in the state" are "particularly relevant in this inquiry." *McCrory*, 831 F.3d at 223.

As an initial matter, Dr. Palmer will show that North Carolina is dominated by racially polarized voting, *see infra* at § II.A. Dr. James Leloudis and other witnesses, including several *Williams* Plaintiffs, will further explain North Carolina's long and ongoing history of discrimination in redistricting. Just over the last decade, courts have repeatedly invalidated North Carolina's congressional and legislative maps as impermissibly discriminating against voters based on race. *See Cooper*, 581 U.S. at 291 (affirming finding of three-judge court that North Carolina's congressional districts were impermissibly motivated by race); *Covington*, 316 F.R.D. at 177–78 (three-judge court)

(invalidating legislative districts based on the impermissible use of race), *summarily aff'd*, 581 U.S. 1015 (2017); *North Carolina v. Covington*, 585 U.S. 969 (2018) (per curiam) (affirming district court's conclusion that legislative districts unconstitutionally sorted voters on the basis of race). Indeed, just last cycle, the General Assembly tried to pack Black voters into CD-12 under a congressional map that was ultimately struck down as an unconstitutional racial gerrymander. *See Cooper*, 581 U.S. at 309–10 (upholding the district court's finding of racial predominance concerning CD-12, including the lower court's conclusion that "race, not politics, accounted for the district's reconfiguration"); *see also id.* at 312 & n.10 (explaining General Assembly's failed attempts to "convince the African-American community" that this sort of packing "made sense" under the Voting Rights Act).

Dr. Leloudis will also testify to the broader context of North Carolina's discriminatory voting laws over the last 60 years. As he will demonstrate, on numerous occasions, both historically and recently, "the North Carolina legislature has attempted to suppress and dilute the voting rights of African Americans," and "the Department of Justice or federal courts have determined that the North Carolina General Assembly acted with discriminatory intent, reveal[ing] a series of official actions taken for invidious purposes." *McCrory*, 831 F.3d at 223 (quotation marks omitted). The 2023 redistricting process is no exception.

### iii. Factors 3, 4, and 5: The legislative history of the 2023 Plan indicates a discriminatory purpose.

Factors 3, 4, and 5 look to the legislative history behind the law, including the "specific sequence of events leading up to the challenged decision," as well as "substantive" and "procedural" "[d]epartures from the normal . . . sequence." *Arlington Heights*, 429 U.S. at 267. The *Williams* Plaintiffs will present evidence—much of it undisputed—demonstrating that the General Assembly made significant departures from prior redistricting processes in creating the 2023 Map, including delaying the beginning of the redistricting process; severely limiting the public's opportunity to participate; shielding legislators' communications and drafting documents from public review; and holding substantially fewer public hearings than in prior cycles, away from minority population centers.

To start, after the General Assembly was authorized to draw new maps, it took unprecedented steps to eliminate transparency in the legislative process, especially for redistricting. The General Assembly (a) repealed a state law that made redistricting communications and drafting documents part of the public record once new district maps became law, (b) gave custodians of any General Assembly record the unilateral power to determine whether it should be deemed a "public record" or whether to "destroy, sell, loan, or otherwise dispose of" the record, and (c) amended public records law to provide that a legislator "shall not be required to reveal or to consent to reveal any document, supporting

- 16 -

document, drafting request, or information request made or received by that legislator while a legislator."[2]

Not only did the General Assembly legislate away public access to the redistricting process, it also severely limited opportunities for public input. The General Assembly held only three public hearings in the entire state, all of which were limited to in-person testimony during business hours. And while the 2023 Plan made the most dramatic changes to the Piedmont Triad and Mecklenburg County, not a single public hearing took place in these areas. Moreover, the General Assembly failed to provide a redistricting schedule, proposed maps, or redistricting criteria until *after* the conclusion of those hearings. This meant the public never had an opportunity to comment on any of the proposed changes to the map. The General Assembly's conduct stands in stark contrast to the 2021 redistricting process, during which the General Assembly held thirteen public hearings across ten counties around the state—including in Guilford and Mecklenburg Counties. Four of the hearings were held after draft maps were released, several allowed virtual testimony and were held outside of business hours, and the General Assembly published redistricting criteria nearly a month before the first public hearing. *See Harper I*, 868 S.E.2d at 511–

---

[2] *See* 2023 Appropriations Act, sec. 27.7.(d), § 120-133, sec. 27.9.(a), § 121-5, sec. 27.7.(e), § 120-135, 2023 N.C. Sess. Laws 134, 530–531 (2023), https://www.ncleg.gov/Sessions/2023/Bills/House/PDF/H259v7.pdf.

- 17 -

12.[3] The 2010 cycle provided for even more opportunities for public input: 61 public hearings spanning 26 counties provided opportunities to comment on proposed district changes, including in Guilford and Mecklenburg Counties.[4]

Following the truncated public hearing process in 2023, the General Assembly rushed the congressional map through the legislative process, passing the bill within a week from the date it was introduced. Despite the limited timeframe, members of the community and legislators spoke out against the obvious manipulation of district lines to dilute the voting strength of Black communities, in particular in Guilford County in the Piedmont Triad. *See, e.g.*, Exhibit 5, Joint Meeting Tr., Sept. 27, 2023, at 35:20–37:2; Exhibit 6, Sen. Redist. Comm. Tr., Oct. 19, 2023, at 43:17–44:8. Taken together, all of these departures had the effect of limiting Black voters' access to the redistricting process and suggest a discriminatory intent. *See, e.g.*, *McCrory*, 831 F.3d at 228 (finding that where the

---

[3] *See Joint Public Hearing Schedule 2021*,
https://webservices.ncleg.gov/ViewDocSiteFile/38541; *Virtual Public Hearing Before S. Comm. on Redist. & Elections*, https://webservices.ncleg.gov/ViewDocSiteFile/38495; N.C. Gen. Assemb., *Legislative Calendar* (Sept. 2021),
https://www.ncleg.gov/LegislativeCalendar/9/2021.

[4] *See* N.C. Gen. Assemb., *Statement by Senator Bob Rucho and Representative David Lewis Regarding the Proposed 2011 Congressional Plan* (July 1, 2011),
https://www.ncleg.gov/Files/GIS/ReferenceDocs/2011/Joint%20Statement%20by%20Senator%20Bob%20Rucho%20and%20Representative%20David%20Lewis_7.1.11.pdf;
*2011 Redistricting Public Hearing Sites*,
https://www.ncleg.gov/Files/GIS/ReferenceDocs/2011/2011%20Public%20Hearing%20Site%20Map.pdf.

challenged bill was rushed through the legislative process in three days, the "hurried pace . . . strongly suggest[ed] an attempt to avoid in-depth scrutiny" and supported a finding of discriminatory intent).

In addition, Dr. Rodden will show that the Legislative Defendants substantively departed from traditional redistricting considerations in drafting the 2023 Plan. Compared to the 2022 Plan, the 2023 Plan is significantly less compact, both statewide and in particular CD-6, CD-12, and CD-14. The 2023 Plan also includes three times as many county splits and more than four times as many municipality splits in the Piedmont Triad relative to the 2022 Plan, as well as an additional county split and twice as many municipality splits in the Charlotte area. In particular, Guilford County—and the city of Greensboro—as well as Mecklenburg, were split into three districts.

**B. Defendants cannot carry their burden to show that the 2023 Plan would have been enacted without race as a motivating factor.**

"Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Id.* at 221 (quoting *Hunter*, 471 U.S. at 228). At this step, "judicial deference is no longer justified." *Arlington Heights*, 429 U.S. at 265–66. "Instead, courts must scrutinize the legislature's <u>actual</u> non-racial motivations to determine whether they <u>alone</u> can justify the legislature's choices." *McCrory*, 831 F.3d at 221.

Defendants cannot show they would have enacted the 2023 Plan and the specific district lines at issue without this racially discriminatory intent. Indeed, much of the

- 19 -

evidence that *Williams* Plaintiffs will offer discounts other potential explanatory factors for the precise line-drawing decisions made in the 2023 Plan, including partisanship and traditional districting criteria. Dr. Rodden will testify that the patterns of stark racial sorting and impact hold true even after accounting for partisanship, and that draft maps considered and rejected by the General Assembly—as well as simulated maps produced by opposing expert Dr. Michael Barber—demonstrate that there were many ways to achieve the General Assembly's partisan goals without resorting to the extreme racial packing and cracking exhibited in the 2023 Plan. Dr. Rodden will also show that Black Democrats were moved out of former CD-6 and CD-14 at a higher rate than white Democrats. Rodden Rep. at 28–29. Indeed, within each partisan group, Black voters were much less likely than white voters to be included in CD-6 and CD-14 and much more likely to be included in CD-12 than white voters. Rodden Rep. at 12, 17, 22.

In any event, even if Black voters were targeted for political reasons, "intentionally targeting a particular race[] . . . because its members vote for a particular party, in a predictable manner, constitutes discriminatory purpose." *McCrory*, 831 F.3d at 222.

## II.     Intentional Vote Dilution in Violation of Section 2 of the VRA

Section 2 of the VRA prohibits any "standard, practice, or procedure" that has the purpose or effect of denying or abridging the right to vote on account of race. 52 U.S.C. § 10301(a). Plaintiffs establish a violation when "the totality of circumstances" shows that a state's "political processes . . . are not equally open to participation by" members of a

minority group "in that [they] have less opportunity . . . to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b).

In contrast to *effects*-based Section 2 challenges, in which plaintiffs must establish the three *Gingles* preconditions from *Thornburg v. Gingles*, 478 U.S. 130 (1986), *intent*-based Section 2 challenges do not require the plaintiffs to establish the first *Gingles* factor—that the minority group is "sufficiently large and geographically compact to constitute a majority in a single member district," *id.* at 50. *See also Bartlett*, 556 U.S. at 20 (plurality op.) (holding that the first *Gingles* factor "does not apply to cases in which there is intentional discrimination against a racial minority"); *Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 771 (9th Cir. 1990) (holding that, in a claim alleging "intentional discrimination," *Gingles* does not "require[] . . . plaintiffs to demonstrate that they could have constituted a majority in a single-member district").

For Section 2 intent claims, courts typically analyze the remaining two *Gingles* preconditions: (1) whether the minority group is sufficiently "politically cohesive" and (2) whether the "white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51; *see, e.g.*, *Perez v. Abbott*, 253 F. Supp. 3d 864, 944 (W.D. Tex. 2017) (three-judge court) (in analyzing a Section 2 intent claim, considering the second and third *Gingles* preconditions); *see also Rogers v. Lodge*, 458 U.S. 613, 623 (1982) (holding that evidence of racially polarized voting and white bloc voting "bear heavily on the issue of purposeful discrimination").

- 21 -

In addition to demonstrating the relevant *Gingles* preconditions, a plaintiff alleging a Section 2 intent claim must also establish discriminatory effect and intent. *See, e.g.*, *Anne Harding v. Cnty. of Dallas*, 948 F.3d 302, 312–13 (5th Cir. 2020) ("To prove an intentional vote dilution claim, a plaintiff must show a discriminatory purpose and discriminatory effect."). This typically includes an evaluation of both the *Arlington Heights* factors—which *Williams* Plaintiffs discuss above—and the factors set out in the Senate Report accompanying the 1982 amendments to the VRA ("Senate Factors"). *See, e.g.*, *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009) ("The factors set forth in Senate Report No. 97-417 . . . supply a source of circumstantial evidence regarding discriminatory intent."). As with any Section 2 claim, "there is no requirement that any particular number of [Senate] [F]actors be proved, or that a majority of them point one way or the other." *Gingles*, 478 U.S. at 45 (quoting S. Rep. No. 97-417, pt. 1, at 29 (1982)).

As *Williams* Plaintiffs will show, in addition to the *Arlington Heights* factors, the relevant *Gingles* preconditions and Senate Factors support a finding of intentional vote dilution under Section 2 of the VRA.

### A. The relevant *Gingles* preconditions are satisfied because white voters typically vote as a bloc to defeat Black-preferred candidates.

Determining whether minority voters are "politically cohesive" and whether the white majority "votes sufficiently as a bloc to . . . defeat the minority's preferred candidate[s]," *Gingles*, 478 U.S. at 51, involves an assessment of the extent to which voting is racially polarized through "discrete inquiries into minority and white voting practices," *id*. at 56. Demonstrating "that a significant number of minority group members usually

- 22 -

vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim, and, consequently, establishes minority bloc voting within the context of § 2." *Id.* (citation omitted). And showing that in the district there is "a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting." *Id*. (citation omitted).

To establish these factors, *Williams* Plaintiffs will present the (largely undisputed) testimony of Dr. Palmer, who will show that there is strong evidence of racially polarized voting both across North Carolina statewide and specifically in the Piedmont Triad and Mecklenburg region. Looking first statewide, Dr. Palmer will testify that Black voters in North Carolina are extremely politically cohesive, with 97.6% of Black voters preferring the same candidate on average across 48 statewide elections between 2016 and 2022. Palmer Rep. at 4. At the same time, Dr. Palmer will show that white voters are highly cohesive in opposition to the Black-preferred candidates, with only 28.2% of white voters supporting Black-preferred candidates on average across those same elections. Palmer Rep. at 4.

Dr. Palmer will also show these patterns exist in the specific regions at issue. In the Piedmont Triad and CD-14, Black voters supported their preferred candidates at almost identical rates. Palmer Rep. at 4. Dr. Palmer will also show that, in these regions, white voters vote even more cohesively than the statewide averages in opposition to the Black-preferred candidate. For example, in the Piedmont Triad, white voters supported the Black-preferred candidate with, on average, only 23.4% of the vote; that figure is even lower in

- 23 -

CD-14, with white voters supporting Black-preferred candidates with only 19.8% of the vote on average. Palmer Rep. at 4–6. Dr. Palmer will show that these patterns also held firm in the 2024 elections, with Black voters continuing to have clear preferred candidates, and white voters voting cohesively against Black preferred candidates, both statewide and in the Piedmont Triad and CD-14. Palmer Suppl. Rep. at 1–4. The Supreme Court has concluded that a similar showing was sufficient to establish the second and third *Gingles* preconditions. *See, e.g.*, *Allen v. Milligan*, 599 U.S. 1, 22 (2023) (affirming district court's finding that, where "Black voters supported their candidates of choice with 92.3% of the vote while white voters supported Black-preferred candidates with 15.4% of the vote," there "was no serious dispute" that the second and third *Gingles* preconditions were satisfied) (internal quotations and citations omitted).

### B. The Senate Factors bolster *Williams* Plaintiffs' showing of discriminatory intent.

Through both expert and lay testimony, *Williams* Plaintiffs will show the Senate Factors further support an inference that the 2023 Plan was enacted with discriminatory intent. *See, e.g.*, *Brown*, 561 F.3d at 433 (recognizing the Senate Factors "supply a source of circumstantial evidence regarding discriminatory intent").

Because there is significant overlap between the evidence supporting the *Arlington Heights* factors, the *Gingles* preconditions, and the Senate Factors, Williams Plaintiffs discuss only Senate Factors 5, 6, 7, 8, and 9 below. Senate Factor 1—"any history of official discrimination" in the voting process in North Carolina, *see Gingles*, 478 U.S. at 36—is addressed in the discussion of *Arlington Heights* and the Background; Senate Factor

2—the extent to which voting is racially polarized—is addressed in the discussion of *Gingles* above; and Senate Factors 3 and 4 are inapplicable to the challenged districts.

### i. Senate Factor 5: Black voters bear the effects of discrimination in education, employment, and health.

Senate Factor 5 asks courts to examine the extent to which minority group members "bear the effects of discrimination in such areas as education, employment[,] and health, which hinder their ability to participate effectively in the political process." *Gingles*, 478 U.S. at 36. Dr. Christopher Clark will testify that Black North Carolinians, on average, have lower levels of educational attainment, experience greater rates of unemployment, earn less money, are more likely to be disabled, are less likely to be covered by health insurance, and are more likely to suffer from serious disease. Exhibit 7, Clark Rep. at 16. These stark disparities in education, employment, and health between Black and white North Carolina voters are largely undisputed.

Dr. Clark will also show that Black North Carolinians consistently vote at lower rates than white North Carolina voters, and that the turnout gap has grown over time. Clark Rep. at 18. Where, as here, Plaintiffs establish both socioeconomic disparities and lower minority voter participation, "plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation." S. Rep. No. 97-417, at 29 n.114 (1982); *see Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1294 (11th Cir. 2020) (same). Even so, Dr. Clark, along with Plaintiffs, will explain how these disparities, especially combined, make it more difficult for Black North Carolinians to access the franchise and participate in the political process.

### ii. Senate Factor 6: North Carolina campaigns are characterized by racial appeals.

Senate Factor 6 considers "whether political campaigns have been characterized by overt or subtle racial appeals." *Gingles*, 478 U.S. at 37. Dr. Clark and Dr. Leloudis will present evidence of the use of overt and subtle racial appeals in political campaigns in North Carolina, including the infamous Jesse Helms's "Hands" Ad in 1990. Dr. Clark will also present evidence that such appeals continue today, including, for instance, a mailer attacking Hugh Holiman for his support of the 2009 Racial Justice Act, a lynching-style display outside the DNC in 2012, Senator Budd's willful alignment with President Trump's racial politics while campaigning in 2022, and several incendiary racial appeals made by Republican gubernatorial candidate Mark Robinson in 2024.

### iii. Senate Factor 7: Black candidates have experienced disproportionately low electoral success.

Senate Factor 7 considers "the extent to which members of the minority group have been elected to public office in the jurisdiction." *Id.* at 37. Dr. Clark will testify that Black North Carolinians are underrepresented relative to white North Carolinians on virtually every representation metric. Black North Carolinians are underrepresented in North Carolina's congressional delegation, while white North Carolinians are overrepresented. Clark Rep. at 34–36. And only one Black candidate was elected statewide in 2024, with the other three Black candidates, Democrats and Republicans alike, all losing. Exhibit 8, Clark Suppl. Rep. at 3–4.

### iv. Senate Factor 8: Elected representatives inadequately respond to the needs of Black North Carolinians.

Senate Factor 8 asks "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." *Gingles*, 478 U.S. at 37. On this factor, the Court will hear from Dr. Leloudis, who will explain that North Carolina has been unresponsive to minority concerns and interests, perpetuating minority disadvantages in employment and education, and further hindering the ability of minority populations to participate fully and freely in the political process. The Court will also hear from several Plaintiffs who will testify to the stark difference in responsiveness their communities experienced with their elected congressional representatives under the 2023 Plan as compared to the 2022 Plan.

### v. Senate Factor 9: The stated policy behind the 2023 Plan is tenuous.

Senate Factor 9 examines "whether the policy underlying the [state's practice or procedure] is tenuous." *Id.*; *see also Buskey v. Oliver*, 565 F. Supp. 1473, 1483 (M.D. Ala. 1983) (holding political goal to ensure defeat of political rivals was tenuous where such a goal was achieved by "purposefully diluting the voting strength of the black electorate").

Moreover, as described, Dr. Rodden will explain that evidence of racial sorting and disproportionate impact persist even after controlling for partisanship, and the 2023 Plan was an outlier in its distribution of Black voters even among plans that accomplished the General Assembly's partisan objectives. *See supra* §§ I.A.i, I.B. Nor can the 2023 Plan be justified by adherence to traditional redistricting principles. Rather than improve upon

- 27 -

traditional redistricting principles, the 2023 Plan is less compact and splits more counties and municipalities. Rodden Rep. at 6–8. Together, these purported justifications for the 2023 Plan, which *Williams* Plaintiffs will show are tenuous, provide "circumstantial evidence that the system is motivated by discriminatory purposes." *United States v. Marengo Cnty. Comm'n.*, 731 F.2d 1546, 1571 (11th Cir. 1984).

## CONCLUSION

The Court should hold that the 2023 Plan is unconstitutional in violation of the Fourteenth and Fifteenth Amendments and constitutes intentional vote dilution in violation of Section 2 of the VRA. As a remedy, the Court should enjoin Defendants and their agents and successors from implementing, enforcing, or giving any effect to the 2023 Plan, and take all necessary action to ensure the adoption of a lawful congressional plan in the State of North Carolina.

Dated: May 27, 2025

/s/ *Narendra K. Ghosh*

**PATTERSON HARKAVY LLP**

Narendra K. Ghosh, NC Bar No. 37649
100 Europa Drive, Suite 420
Chapel Hill, NC 27517
Phone: (919) 942-5200
nghosh@pathlaw.com

/s/ *Lalitha D. Madduri*

**ELIAS LAW GROUP LLP**

Lalitha D. Madduri*
Christina Ford*
Lucas Lallinger*
Qizhou Ge*
Mark Haidar*
250 Massachusetts Avenue, Suite 400
Washington, D.C. 20001
Phone: (202) 968-4490
Facsimile: (202) 968-4498
LMadduri@elias.law
CFord@elias.law
LLallinger@elias.law
AGe@elias.law
MHaidar@elias.law

Abha Khanna*
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
Phone: (206) 656-0177
Facsimile: (206) 656-0180
AKhanna@elias.law

* *Special Appearance pursuant to Local Rule 83.1(d)*

*Counsel for* Williams *Plaintiffs*

**CERTIFICATE OF WORD COUNT**

I certify that this brief complies with the requirements of Local Rule 7.3. This brief contains 6,241 words, as indicated by the word count feature of Microsoft Word, exclusive of the caption, signature lines, and this certificate.

Dated: May 27, 2025                                    By: /s/ *Lalitha D. Madduri*