# Exhibit 7

**EXPERT REPORT OF DR. CHRIS CLARK**

*Williams, et al.*

*v.*

*Hall, et al.*

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

Case No. 23 CV 1057

August 1, 2024

# TABLE OF CONTENTS

I.     Statement of Purpose and Summary of Opinions ........................................................ 1

II.    Background and Qualifications ................................................................................... 1

III.   Evidence Relied Upon and Methodology ................................................................... 2

IV.    Senate Factor 5: Effects of Discrimination on Minority Groups .............................. 2

       A.    Methodology ..................................................................................................... 3

       B.    Education .......................................................................................................... 4

       C.    Employment ..................................................................................................... 7

       D.    Income .............................................................................................................. 9

       E.    Health ............................................................................................................. 12

       F.    The Combined Effect of these Socioeconomic Variables ............................. 16

       G.    Voter Turnout ................................................................................................. 17

V.     Senate Factor 6: whether political campaigns have been characterized by overt
       or subtle racial appeals ............................................................................................ 18

       A.    Methodology ................................................................................................... 19

       B.    Explicit Racial Appeals ................................................................................. 19

       C.    Implicit Racial Appeals ................................................................................. 22

             1.    Substantive Racial Distancing ............................................................. 23

             2.    Candidate Alignment ........................................................................... 25

VI.    Senate Factor 7: the extent to which members of the minority group have been
       elected to public office in the jurisdiction .............................................................. 31

       A.    Methodology ................................................................................................... 31

       B.    Statewide Office ............................................................................................. 31

       C.    The U.S. House of Representatives ................................................................ 34

       D.    North Carolina General Assembly ................................................................. 37

       E.    Latino Representation in North Carolina ....................................................... 40

VII.   Conclusion ............................................................................................................... 41

i

## I. Statement of Purpose and Summary of Opinions

I have been asked by Plaintiffs' counsel to analyze the extent to which three of the "Senate Factors" detailed in a report that accompanied the 1982 renewal of the Voting Rights Act (the "VRA") by the Senate Committee on the Judiciary and discussed in *Thornburg v. Gingles*, 478 U.S. 30 (1986), as part of the "totality of the circumstances" test for violation of Section 2 of the VRA, are present in North Carolina. Specifically, I analyzed (1) Senate Factor 5: the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas including education, employment, and health, which hinder their ability to participate effectively in the political process, (2) Senate Factor 6: whether political campaigns have been characterized by overt or subtle racial appeals, and (3) Senate Factor 7: the extent to which members of the minority group have been elected to public office in the jurisdiction.

I have enclosed an up-to-date CV which fairly and accurately describes my training, education, and experience, and I have summarized those experiences in Section II of this report. As discussed below, my analyses and opinions in this litigation are based on historical, political, and statistical information gathered and reviewed in my capacity as an expert in race and electoral representation, voting, state politics, and quantitative methods. My analyses and opinions are provided from that perspective and are not intended to provide legal conclusions; rather, they are meant to provide the Court with facts and context relevant to the ultimate legal determinations in this case. My fee in this matter is $300 per hour. No part of my compensation is dependent upon the conclusions that I reach or the opinions that I offer.

Based on my analysis, as discussed below, I have reached the following conclusions:

- North Carolina's history of discrimination is reflected in major socioeconomic disparities between whites on the one hand and Blacks and Latinos on the other, including in educational attainment, employment, income, and health measures;

- North Carolina's recent political campaigns have been marked by both explicit and implicit racial appeals; and

- Over North Carolina's history, Black and Latino candidates at the federal and state level have been relatively unsuccessful in being elected to office in North Carolina.

## II. Background and Qualifications

I earned a PhD. in Political Science from the University of Iowa in 2010. While at Iowa, my two major areas of concentration were American Politics and Methods (quantitative). In January 2011, I started working as a postdoctoral research associate at the University of North Carolina at Chapel Hill (UNC). In the Fall of that year, I accepted a tenure-track position in Political Science at UNC, starting out as an assistant professor in July 2012. Effective July 1, 2019, I have been an Associate Professor (with tenure) in the department.

1

In March 2019, my book, *Gaining Voice: The Causes and Consequences of Black Representation in the American States*, was published by Oxford University Press, one of the world's leading university presses. My book employs quantitative data to consider the factors that explain whether Blacks reach elected office and the impact this has on voting, public policy, and public opinion. It examines all 50 states over time. This book won the 2020 Alan Rosenthal Prize from the Legislative Studies Section of the American Political Science Association ("APSA"). Moreover, in 2022 it was named co-winner of the Virginia Gray Best Book Award from the State Politics and Policy Section of the APSA.

In addition to my book, I have written several articles which have been published in the *Journal of Race, Ethnicity, and Politics*, *Political Behavior*, *Political Research Quarterly*, *Politics and Gender*, *Public Opinion Quarterly*, and *State Politics and Policy Quarterly*. At UNC, I teach classes on minority representation, race and politics, Southern politics, and state politics. In addition, I have guest-edited two special issues of the *Journal of Women, Politics, and Policy*, and I guest-edited a special issue of *PS: Political Science and Politics*. Serving as guest editor demonstrates that I have made a mark in the discipline, and requires engaging with authors, soliciting reviews of articles, reading and providing feedback on articles, and writing an introduction to the special issue.

I submitted an expert report on behalf of the plaintiffs in *The New Georgia Project v. Raffensberger*, No. 1:21-cv-01229 (N.D. Ga. 2021), a voting rights case that included a claim under Section 2 of the VRA and involved analysis of Senate Factors 5, 6, and 7.

## III. Evidence Relied Upon and Methodology

This report draws upon sources standard in historical and social scientific analysis, including scholarly books, articles, and reports; newspaper and other journalistic articles; demographic information; election returns; and scientific surveys. In utilizing these sources, I have followed standard qualitative and quantitative methods used in my scholarship. Specific methodology used to assess each of the Senate Factors is described in more detail below.

## IV. Senate Factor 5: Effects of Discrimination on Minority Groups

The persistent effects of North Carolina's long history of discrimination against Black and Latino citizens are demonstrated in the deficient socioeconomic and sociopolitical position of Black and Latino North Carolinians, as discussed below. The impact of that discrimination extends to virtually every aspect of life, including education, employment, income, and health, resulting in persistent disparities between Black and Latino North Carolinians on the one hand and white North Carolinians on the other. These disparities, independently and cumulatively, make it significantly harder for Black and Latino voters to participate in the political process and thus lead to decreased voter turnout and participation (as compared to whites) on election day.

## A.    Methodology

The American Community Survey ("ACS") provides data on education, employment, income, disability status, and health insurance coverage. The ACS data analyzed in this report begin in 2010 and end in 2022.[1] I downloaded these data for four categories: all North Carolinians, Black North Carolinians, Latino North Carolinians, and white North Carolinians.[2] One can think of the data for all North Carolinians as providing a reference category for the data for racial and ethnic groups. That is, it allows one to assess whether racial and ethnic minorities have outcomes that differ from those of the state population as a whole.

I then focused on specific subsets of the data based on common approaches in this field. For instance, I only looked at educational attainment for those over 25 which is a typical way that this topic is studied.[3] Because of this approach to the data, I extracted only the variables that were of interest, and then performed my calculations of percentages and averages on that information. Finally, data on voter turnout rates come from the North Carolina State Board of Elections. Specifically, I analyzed the percentage of registered voters that voted in elections from November 2010 through November 2022, for a total of seven election cycles. The North Carolina State Board of Elections provides the race and ethnicity of people who voted in elections, and it also provides information on the total number of people of a given race or ethnicity that are registered to vote for a given election. Together, these data allowed me to ascertain the race and ethnicity of registered voters that participated in each election.[4]

Unlike the voter turnout data, however, voter registration data do not distinguish non-Latino whites from whites who identify as Latino. Consequently, when I calculate the voter turnout rate of registered voters, the white voter turnout includes both non-Latino whites and Latinos who identify as white. As a result, any comparison of whites (including those who identify as Latino) and non-white Latinos and Blacks is conservative—meaning that the actual gap in registered voter participation is almost certainly greater than that which I am reporting here. It is also worth noting that I examined voter turnout among a group of people well-positioned to take part in the act of

---

[1] The ACS data from 2010 to 2019 and 2021 to 2022 are based on yearly estimates. Because the ACS only has publicly available data for 2020 that is based on the five-year estimate, it is not comparable to the data used for the other years, and I thus do not include data from 2020 in this analysis.

[2] Because Latinos can be of any race, this means that some identify as Black, some as white, and some identify as another race. Thus, when comparing socioeconomic outcomes, my analysis likely *underestimates* differences between Latinos and non-Latino whites. In other words, I am providing a conservative estimate of socioeconomic disparities between Latinos and non-Latino whites in North Carolina.

[3] Press Release No. CB23-TPS.21, U.S. Census Bureau, Census Bureau Releases New Educational Attainment Data (Feb. 16, 2023), https://www.census.gov/newsroom/press-releases/2023/educational-attainment-data.html; *Spotlight on U.S. Educational Attainment*, U.S. Dep't of Commerce, https://performance.commerce.gov/stories/s/U-S-Population-Spotlight-Educational-Attainment/na47-j74r/ (last visited Aug. 1, 2024).

[4] The state has publicly available data for the November 3, 2020 and the November 8, 2022 elections. For 2020, the data file I downloaded and analyzed has the same number of voters listed on the state's website. However, the data file I downloaded and analyzed for 2022 has one additional voter compared to the number listed on the state's website. Because it is such a small discrepancy—one voter out of 3,786,904—it means little for measuring voter turnout by race.

voting, namely those who are registered. It stands to reason that broadening the analysis to citizens over the age of 18, the voting-age population, might yield even larger racial disparities in voting.

## B.    Education

Historically, racial disparities have existed in the realm of education in North Carolina. At the end of the 19th century, the Fusion movement emerged, and it was comprised of Black North Carolinians aligned with the Republican Party and whites who called themselves Populists.[5] Once in office, "Fusion lawmakers used their political strength to redress two decades of Democrats' underinvestment in education. This was a particularly important issue for black Republicans, whose predecessors had led the campaign to include a mandate for public schools in the 1868 constitution and whose constituents were profoundly disadvantaged in their day-to-day interactions with landlords, merchants, and employers by an inability to read and do basic arithmetic."[6] These disparities continued well into the 20th century. In 1950, Black adults, on average, only completed 5.9 years of school, as compared to white adults, who completed 8.6 years of schooling.[7] This difference of nearly three years made it so that whites were better positioned to participate in politics, as Blacks did not have the same literacy skills as did whites.

Compared to Blacks, Latinos have not lived in North Carolina as long, so the starting point for looking at historical racial disparities is in the late 20th century. A study published in 1999 that focused on Latinos in North Carolina talked about the state facing challenges offering English-as-a-second language courses for newly arrived Latinos.[8] A later study of Latinos in Wake and Durham Counties found that Latinos do not feel welcome in public K-12 schools—in large part due to strained or poor communication between schools and immigrant parents and because of a lack of trained ESL personnel—leading to many Latinos dropping out and pursuing their GED through adult education programs instead.[9]

I collected and analyzed data on educational attainment in North Carolina from 2010 to 2022. Table 1 compares the percentage of North Carolinians from 2010 to 2022 who have at least a high school education.

[5] James L. Leloudis & Robert R. Korstad, *Fragile Democracy: The Struggle over Race and Voting Rights in North Carolina*, 15 (Univ. of N.C. Press, 2020).

[6] *Id.* at 18.

[7] *Id.* at 58–59.

[8] James H. Johnson, Jr., et al., *A Profile of Hispanic Newcomers to North Carolina*, 65 Popular Government 2, 2–12 (1999).

[9] Andrew Wainer, *The New Latino South and the Challenge to American Public Education: Strategies for Educators and Policymakers in Emerging Immigrant Communities*, 44 *International Migration* 129, 129–165 (2006).

**Table 1: Percentage of North Carolinians with a High School Education or More, by Race 2010 to 2022**

| Year | Total Population | Blacks | Latinos | Whites |
|------|------|------|------|------|
| 2010 | 84.7 | 80.5 | 56 | 87.3 |
| 2011 | 84.7 | 81.3 | 53 | 87 |
| 2012 | 85.2 | 82.5 | 53.4 | 87.2 |
| 2013 | 85.7 | 82.6 | 54.9 | 88.1 |
| 2014 | 86.4 | 84.2 | 55.5 | 88.6 |
| 2015 | 86.6 | 84.5 | 56.5 | 88.5 |
| 2016 | 87.3 | 84.7 | 59.5 | 89.3 |
| 2017 | 87.8 | 85.4 | 60 | 89.6 |
| 2018 | 88.2 | 86.4 | 62.5 | 90.1 |
| 2019 | 88.6 | 86.4 | 62.8 | 90.7 |
| 2021 | 89.7 | 88.4 | 64.5 | 92.9 |
| 2022 | 90.2 | 89.1 | 68.3 | 93.1 |
| **Average** | **87.1** | **84.7** | **58.9** | **89.4** |

Note: These data are taken from the ACS and are based on 1-year estimates of the North Carolina population 25 years and older.[10]

The last row of Table 1 provides a clear piece of information: on average, whites earn at least a high school education at a rate greater than Blacks and Latinos and at a rate greater than the state population as a whole. On average, Latinos fare far worse than any other group, with less than 60 percent of group members having at least a high school education, which is about 28 percentage points less than the total state population in that era. Blacks also earn a high school education at a rate lower than the overall state population. While the percentage of Blacks and Latinos earning at least a high school education has increased over time, Blacks and Latinos consistently have lower high school educational attainment than whites and than North Carolinians as a whole.

Table 2 examines another metric of educational attainment, namely the percentage of people in each of these groups who have at least a bachelor's degree.

**Table 2: Percentage of North Carolinians with a Bachelor's Degree or More, by Race 2010 to 2022**

| Year | Total Population | Blacks | Latinos | Whites |
|------|------|------|------|------|
| 2010 | 26.5 | 17 | 11.5 | 29.1 |
| 2011 | 26.9 | 17 | 11.1 | 29.8 |
| 2012 | 27.4 | 17.2 | 11.3 | 30.2 |
| 2013 | 28.4 | 18.9 | 12.8 | 31.2 |

---

[10] Data from the ACS are of the civilian, non-institutionalized population.

Case 1:23-cv-01057-TDS-JLW    Document 128-7    Filed 05/27/25    Page 8 of 45

| 2014 | 28.7 | 19.6 | 12.6 | 31.4 |
|------|------|------|------|------|
| 2015 | 29.4 | 19.5 | 13.5 | 32.2 |
| 2016 | 30.4 | 20.3 | 14.8 | 33.2 |
| 2017 | 31.3 | 21.2 | 15.1 | 34 |
| 2018 | 31.9 | 21.7 | 15.7 | 34.7 |
| 2019 | 32.3 | 22.4 | 17 | 35.1 |
| 2021 | 34.9 | 24.7 | 18.3 | 38.7 |
| 2022 | 35.9 | 25.6 | 19.9 | 39.8 |
| **Average** | **30.3** | **20.4** | **14.5** | **33.3** |

Note: These data are taken from the ACS and are based on 1-year estimates of the North Carolina population 25 years and older.

On average, in the period examined, about 30 percent of North Carolinians over the age of 25 had at least a bachelor's degree. Blacks and Latinos fall significantly short of that level of educational attainment; less than 15 percent of Latinos achieved at least a bachelor's degree, and a little more than 20 percent of Blacks achieved at least a bachelor's degree. Whites, by contrast, exceeded that level of educational attainment; more than a third of whites earned at least a bachelor's degree.

Notably, a greater percentage of whites earned at least a bachelor's degree in 2010 (29.1%) than did Blacks in 2022 (25.1%). In other words, Blacks in 2022 fail to reach levels of white educational attainment in 2010. If the patterns observed for 2010 through 2022 are any indication of the future, it is highly unlikely these disparities will disappear anytime soon.

These metrics are important for understanding the impact of discrimination on participation of Black and Latino North Carolinians in the democratic process, as social science research has consistently found that education is directly linked to political participation. For instance, researchers have noted of educational attainment that "[a]side from geographical differences between the South and other regions of the country, no other social characteristic commonly employed in our research bears such a strong relationship to turnout in presidential elections." [11] Nearly two decades later, researchers further explained the importance of education and how that translates to political participation, stating that "[s]chooling increases one's capacity for understanding and working with complex, abstract, and intangible subjects, that is, subjects like politics.[12] In addition, research that focuses on Black political behavior finds that among Blacks, education is positively correlated to voting.[13] Similarly, research that examines voter turnout among Cuban Americans, Mexican Americans, and Puerto Ricans finds that those with higher

---

[11] Angus Campbell, et al., *The American Voter: An Abridgement,* 252 (John Wiley and Sons, 1964).
[12] Raymond E. Wolfinger & Steven J. Rosenstone, *Who Votes?,* 18 (Yale University Press, 1980).
[13] Tasha S. Philpot et al., *Winning the Race: Black Voter Turnout in the 2008 Presidential Election*, 73 Pub. Op. Q. 995, 995–1022 (2009).

6

educational attainment have a higher probability of voting than those who have lower levels of educational attainment.[14] All told, education is a consistent and strong predictor of voter turnout.

As reflected in the data, Blacks and Latinos do not attain an education at the same rate as whites, and because education affects political engagement, it means that these groups are less likely to be able to participate in the political process than whites.

## C. Employment

Historically, Black North Carolinians have had limited economic opportunities. In the early part of the 20th century, Blacks in rural areas were often employed as sharecroppers, and in cities and small towns in other parts of the state (e.g. the Piedmont region), Blacks were employed as stemmeries—working with tobacco—or worked as maids, laundresses, and cooks.[15] As the governor of North Carolina in the 1960s Terry Sanford stated in a speech, "reluctance to accept the Negro in employment is the greatest single block to his continued progress and to the full use of the human potential of the nation and its states."[16]

Latinos in North Carolina, like Blacks, have had limited economic opportunities. Latinos in the 1990s were concentrated in service sector jobs, as well as in construction and manufacturing. Contract workers in poultry processing plants—who do not have paid sick leave—are mostly Latino immigrants, so when COVID hit in 2020, they were not only concerned about their physical health, but also their job security.[17]

Well into the 21st century, racial disparities persist in the realm of employment, as shown in Table 3 below.

**Table 3: Unemployment Percentage of North Carolinians, by Race from 2010 to 2022**

| Year | Total State Population | Blacks | Latinos | Whites |
|------|------------------------|--------|---------|--------|
| 2010 | 12.7 | 19.1 | 14.6 | 10.7 |
| 2011 | 11.7 | 18.7 | 10.6 | 9.7 |
| 2012 | 10.8 | 17.3 | 11.2 | 8.9 |
| 2013 | 9.7 | 15.6 | 9.2 | 7.8 |
| 2014 | 8.3 | 13.8 | 8.2 | 6.6 |
| 2015 | 6.9 | 11.5 | 7.3 | 5.4 |
| 2016 | 6.2 | 9.8 | 6.3 | 5 |
| 2017 | 5.3 | 8.4 | 5.6 | 4.2 |
| 2018 | 5 | 7.8 | 5.6 | 4 |
| 2019 | 4.6 | 7.3 | 4.7 | 3.8 |

---

[14] Benjamin Highton & Arthur L. Burris, *New Perspectives on Latino Voter Turnout in the United States*, 30 Am. Pol. Rsch. 285, 285–306 (2002).

[15] Leloudis & Korstad, *supra* note 5*,* at 29.

[16] *Id.* at 72

[17] Aaron Sánchez-Guerra, *Latino Contract Workers in NC Chicken Plants Face Coronavirus Health and Job Fears*, News & Observer (Apr. 23, 2020), https://www.newsobserver.com/news/coronavirus/article242169861.html.

| 2021 | 5.8 | 9 | 5.9 | 4.7 |
| 2022 | 3.8 | 6 | 4 | 2.9 |
| **Average** | **7.6** | **12** | **7.8** | **6.1** |

Note: These data are taken from the ACS and are based on 1-year estimates of the North Carolina population 16 years and older.

As shown in Table 3, whites, on average, experience unemployment at a rate lower than the rest of the state. Blacks, meanwhile, experience unemployment at a higher rate than the rest of the state and at a rate nearly twice that of whites (12% vs. 6.1%). At its apex, Black unemployment was 19.1 percent in 2010, nearly twice the rate it was for whites that same year (10.7%). Even though Latinos experience unemployment at a lower rate than do Blacks, the group experiences unemployment more than whites. Again, looking at 2010, Latinos experienced unemployment at a rate more than 36% higher than did whites.

For decades, researchers have shown the direct relationship between employment status and political participation. For instance, after examining voter turnout in 1972, researchers observed that, "[c]ompared to people working full time, the unemployed are 1 to 3 percent less likely to vote."[18] When looking at voter turnout in presidential elections over time, specifically 1956 through 1988, researchers found that unemployed people are 2.7 percentage points less likely to vote.[19] The same study showed that in midterm elections from 1974 to 1986, unemployed individuals were 8.5 percentage points less likely to vote.[20] And my own research indicates that among Black voters specifically, unemployed people are less likely to vote.[21] Similarly, for Latinos, employment has been linked with increased turnout, and this is true when looking at bivariate[22] and multivariate relationships.[23]

This relationship is unsurprising. As researchers Rosenstone and Hansen have written, "[o]ne of the most influential social involvements is the workplace. People spend almost half their waking hours there. Socially, people are bound to co-workers by friendship, common interests, and financial necessity. In part because of these strong ties and in part because of the ease of reaching people, political leaders often mobilize through the workplace."[24] For these reasons, "[m]obilization through the workplace creates powerful social and professional expectations and, as a consequence, the workplace is a powerful promoter of political activity."[25] Moreover, "the unemployed have been wrenched from social situations that encourage and reward their

---

[18] Wolfinger & Rosenstone, *supra* note 12, at 29.
[19] Steven J. Rosenstone & John Mark Hansen, *Mobilization, Participation, and Democracy in America,* 130 (Pearson Longman, 2003).
[20] *Id.* at 132.
[21] Christopher J. Clark, *Collective Descriptive Representation and Black Voter Mobilization in 2008*, 36 Pol. Behav. 315, 315–33 (2014).
[22] John R. Arvizu & F. Chris Garcia, *Latino Voting Participation: Explaining and Differentiating Latino Voter Turnout*, 18 Hispanic J. of Behav. Sci. 104, 113 (1996).
[23] *Id.* at 116.
[24] Rosenstone & Hansen, *supra* note 19, at 80.
[25] *Id.* at 81.

participation in politics. Without the daily experiences of work, they are cut off from information about opportunities to participate."[26] Thus, unemployed people simply have less incentive to vote, and they do not face the same social expectations to do so, as compared to those who are employed.

In sum, there are significant disparities in employment of Black and Latino North Carolinians vis-à-vis white North Carolinians. These disparities are consequential because being employed positively correlates with an individual's ability and motivation to engage in the political process.

### D.   Income

Historically, income disparities across races have existed in North Carolina. Black earnings in the early part of the 20th century have been described as "near-subsistence levels."[27] Income disparities in one era are strong predictors of income disparities in the future. In eastern North Carolina in particular, "where sharecropping dominated the agricultural economy, the effects could be seen a century later, when blacks' per capita income in the region was as low as 22 percent that of whites."[28] The fact that Black earnings during the time of sharecropping shaped the group's earnings decades later speaks volumes about the persistence of income disparities in the state.

Since they began arriving in greater numbers in the 1990s, Latinos in North Carolina have not been high earners. In the 1990s, they were described as being concentrated in low-paying jobs.[29] A 2012 report on immigrants in North Carolina described Latinos as living in "migrant housing on isolated farms, and in low-income, high-crime parts of cities that many people avoid."[30]

While Senate Factor 5 does not specifically mention income as a factor to consider, it is undoubtedly an important element tied to education and employment, as one's educational attainment directly influences how much money one earns. Researchers find that on average, as educational attainment grows, so do one's lifetime earnings, with hundreds and thousands of dollars separating those with at least a bachelor's degree from those with lower levels of educational attainment.[31] A study in sociology that has been cited over 3,000 times finds that educational attainment is a key predictor of whether a person has a high status occupation.[32] In addition, those who are employed can be expected to earn more money than those who remain

---

[26] *Id.* at 81–82.

[27] Leloudis & Korstad, *supra* note 5, at 29.

[28] *Id.* at 14.

[29] Johnson, Jr., *supra* note 8.

[30] Hannah Gill, *Latinos in North Carolina: A Growing Part of the State's Economic and Social Landscape*, Immigr. Pol. Ctr. (March 2012), https://www.americanimmigrationcouncil.org/sites/default/files/research/gill_-_latinos_in_north_carolina_032112.pdf

[31] Christopher R. Tamborini, et al., *Education and Lifetime Earnings in the United States*, 52 Demography 1383, 1383–1407 (2015).

[32] Nan Lin, et al., *Social Resources and Strength of Ties: Structural Factors in Occupational Status Attainment*, 46 Am. Socio. Rev. 393, 393–405 (1981).

unemployed for long periods of life.[33] Although unemployed people have access to government benefits, these programs are meant for short periods of time, with many states, including North Carolina, allowing for unemployment insurance for no more than 12 weeks.[34] As such, regardless of how generous a state is in terms of its unemployment insurance, receiving such payments is not a pathway to earn more money in one's lifetime, as compared to holding down a steady job for several years. In the end, education, income, and employment are cumulative factors, working together to influence whether a person participates in politics.

To further explore the impact of income in North Carolina, I have summarized income data from the American Community Survey in Table 4.

**Table 4: Median Household Income of North Carolinians, by Race from 2010 to 2022**

| Year | Total State Population | Blacks | Latinos | Whites |
|---|---|---|---|---|
| 2010 | $43,326 | $30,952 | $32,262 | $48,493 |
| 2011 | $43,916 | $30,829 | $32,852 | $49,247 |
| 2012 | $45,150 | $31,650 | $33,940 | $50,476 |
| 2013 | $45,906 | $32,092 | $34,637 | $51,132 |
| 2014 | $46,556 | $33,022 | $32,463 | $51,707 |
| 2015 | $47,830 | $32,884 | $34,935 | $53,273 |
| 2016 | $50,584 | $36,014 | $39,388 | $55,656 |
| 2017 | $52,752 | $38,320 | $40,546 | $58,925 |
| 2018 | $53,855 | $38,597 | $42,231 | $60,701 |
| 2019 | $57,341 | $41,177 | $46,933 | $63,887 |
| 2021 | $61,972 | $42,961 | $53,880 | $69,522 |
| 2022 | $67,481 | $50,059 | $57,348 | $75,197 |
| **Average** | **$51,389.08** | **$36,546.42** | **$40,117.92** | **$57,351.33** |

Note: These data are taken from the ACS and are based on 1-year estimates of the North Carolina population, with the dollar figures adjusted for inflation each year.

The data show that on average, Black and Latino North Carolinians make less in income than North Carolinians as a whole, and significantly less in income than white North Carolinians. Even if the median household income for Blacks increased by 50 percent (or roughly $18,000), it would still be less than what it is for whites.

As with educational attainment, all groups are earning more money over time. But whites had a significant income advantage over Blacks and Latinos at the beginning of period studied,

---

[33] Austin Nichols, et al., *Consequences of Long-Term Unemployment*, Urban Inst. (July 2013), https://www.urban.org/sites/default/files/publication/23921/412887-Consequences-of-Long-Term-Unemployment.PDF.

[34] *Am I Eligible for Unemployment*, N.C. Dep't of Commerce, https://www.des.nc.gov/individuals/apply-unemployment/am-i-eligible-unemployment#:~:text=You%20must%20be%20able%20and,for%20up%20to%2012%20weeks (last accessed Aug. 1, 2024).

10

and saw a higher total increase over that time period (approximately $27,000) than either Blacks or Latinos (approximately $20,000 and $25,000, respectively). Notably, the median household income for Blacks did not reach $50,000 until 2022, a full decade *after* whites reached this mark. The income disparity between racial groups has also grown over time. In 2010, the median household income for whites was $17,000 dollars more than it was for Blacks, but by 2022 that disparity had grown to a little more than $25,000. In 2010, the median household income for whites was about $16,000 more than it was for Latinos, but by 2022, this difference had grown to about $18,000. In brief, whites outearned both Latinos and Blacks in 2010 and in every year since, indicating that income disparities will continue to persist.

Table 5 provides additional data on income, showing how experiencing poverty varies by race and ethnicity in North Carolina.

**Table 5: Percentage of North Carolinians Below Poverty Level, by Race from 2010 to 2022**

| Year | Total State Population | Blacks | Latinos | Whites |
|------|------------------------|--------|---------|--------|
| 2010 | 17.5 | 27.7 | 33.9 | 13.2 |
| 2011 | 17.9 | 28 | 34.9 | 13.6 |
| 2012 | 18 | 28.4 | 33.9 | 13.7 |
| 2013 | 17.9 | 28 | 32.5 | 13.6 |
| 2014 | 17.2 | 26.5 | 33.6 | 13.3 |
| 2015 | 16.4 | 25.3 | 30.8 | 12.7 |
| 2016 | 15.4 | 23.5 | 27.3 | 12 |
| 2017 | 14.7 | 22 | 27.1 | 11.6 |
| 2018 | 14 | 21.1 | 24.8 | 11.1 |
| 2019 | 13.6 | 21.5 | 22.1 | 10.5 |
| 2021 | 13.4 | 20.6 | 22.9 | 9.7 |
| 2022 | 12.8 | 18.7 | 20.7 | 9.6 |
| **Average** | **15.7** | **24.3** | **28.7** | **12.1** |

Note: These data are taken from the ACS and are based on 1-year estimates of the entire North Carolina population, regardless of age. As Table 5 indicates, Blacks and Latinos in North Carolina have experienced poverty at rates more than twice as high as that experienced by white North Carolinians.

Akin to education, income has consistently been shown to be a predictor of political involvement. As researchers Wolfinger and Rosenstone have demonstrated through their work, "[c]ollege graduates vote more than high school graduates; white collar workers vote more than blue-collar workers; and the rich vote more than the poor."[35] My own work shows that higher earners were more likely to vote in 1996, 1998, 2002 and 2006, and this finding emerges when accounting for factors such as education, age, gender, and marital status.[36] In fact, those with

---

[35] Wolfinger & Rosenstone, *supra* note 12, at 13.
[36] Rene R. Rocha, et al., *Race and Turnout: Does Descriptive Representation in State Legislatures Increase Minority Voting?*, 63 Pol. Rsch. Q., 890 890–907 (2010).

greater incomes are not only more likely to vote and but also are more likely to try to persuade others to vote, and these results emerge even when accounting for education, age, interest in politics, and one's partisan attachment.[37] And building on this principle, other studies have shown that wealthier people are not only more likely to vote, but they are also more likely to contribute to campaigns and work for a party or candidate.[38]

Income has been shown to increase voter turnout for Blacks and Latinos in particular. Research finds that earning a higher income increases voting among Blacks, even when accounting for education and age.[39] Higher-earning Latinos were more likely to vote in 2002,[40] and a different study finds higher-earning Latinos in California, Florida, and Texas were more likely to vote in 1996.[41] In one of the earlier studies of Latino voter turnout, it is found that for Cubans, Puerto Ricans, and Mexicans, voter turnout in 1988 was greater among those who earn higher incomes.[42]

The demographic data, when combined with the academic literature, shows that on average, Black and Latino North Carolinians earn less than their white counterparts, and as a result are less likely to be involved in political matters.

### E.    Health

Another important socioeconomic factor to consider is a voter's state of health, and that can be analyzed through several metrics.

Table 6 below shows the rate of disabilities among North Carolinians over 18. On average, just over 16 percent of North Carolinians are disabled. While this number is lower for Latinos, a greater number of Blacks (18 percent) are disabled than are whites (16.3 percent). Table 7 provides information on North Carolinians over the age of 65. At this advanced age, people's bodies are not as strong, and the decades of experiencing physical ailments, a lack of access to health care, and disparate incomes may manifest in poorer health.

**Table 6: Percentage of North Carolinians over 18 who are Disabled,
by Race from 2010 to 2022**

| Year | Total State | Black | Latino | White |
|------|-------------|-------|--------|-------|
| 2010 | 16 | 18 | 5.7 | 16.1 |
| 2011 | 16.1 | 18.7 | 6.7 | 15.9 |
| 2012 | 15.8 | 17.9 | 6.2 | 15.6 |

[37] Christopher J. Clark, *Gaining Voice: The Causes and Consequences of Black Representation in the American States* 110 (Oxford Univ. Press 2019) ("Clark (2019)").

[38] Rosenstone & Hansen, *supra* note 19, at 134.

[39] Katherine Tate, *Black Faces in the Mirror: African Americans and Their Representatives in the U.S. Congress*, 140–41 (Princeton University Press, 2003).

[40] Matt A. Barreto, *Ethnic Cues: The Role of Shared Ethnicity in Latino Political Participation*, 134 (Ann Arbor: University of Michigan Press, 2010).

[41] Daron Shaw, et al., *Examining Latino Voter Turnout in 1996: A Three-State, Validated Survey Approach*, 44 Am. J. of Pol. Sci. 332, 332–340 (2000).

[42] Arvizu & Garcia, *supra* note 22, at 104–28.

| Year | | | | |
|------|------|------|------|------|
| 2013 | 16.6 | 18.4 | 6.9 | 16.6 |
| 2014 | 16.6 | 18.7 | 6.8 | 16.7 |
| 2015 | 16.7 | 18.9 | 8 | 16.7 |
| 2016 | 16.6 | 18.7 | 8.9 | 16.6 |
| 2017 | 16.1 | 17.4 | 7.6 | 16.3 |
| 2018 | 15.8 | 16.8 | 8.6 | 16.1 |
| 2019 | 15.7 | 17 | 7.4 | 16 |
| 2021 | 16.1 | 17.7 | 9.5 | 16.5 |
| 2022 | 16.3 | 17.6 | 9.5 | 16.9 |
| **Average** | **16.2** | **18** | **7.7** | **16.3** |

Note: These data are taken from the ACS and are based on 1-year estimates of the North Carolina population 18 years and older.

**Table 7: Percentage of North Carolinians over 65 who are Disabled, by Race from 2010 to 2022**

| Year | Total State | Black | Latino | White |
|------|-------------|-------|--------|-------|
| 2010 | 38.4 | 46.2 | 29.3 | 36.8 |
| 2011 | 38.1 | 45.8 | 43.7 | 36.6 |
| 2012 | 36.6 | 43.3 | 28.3 | 35.2 |
| 2013 | 38.2 | 43.7 | 39 | 37 |
| 2014 | 37.1 | 44.4 | 34.7 | 35.6 |
| 2015 | 36.5 | 42.5 | 38.6 | 35.3 |
| 2016 | 35.8 | 41.8 | 37.3 | 34.4 |
| 2017 | 35.2 | 38 | 33.1 | 34.7 |
| 2018 | 34.3 | 37.6 | 36.6 | 33.6 |
| 2019 | 33.7 | 38.1 | 32.6 | 32.7 |
| 2021 | 33.2 | 37 | 37.8 | 32.2 |
| 2022 | 33.3 | 35.9 | 33.3 | 32.7 |
| **Average** | **35.9** | **41.2** | **35.4** | **34.7** |

Note: These data are taken from the ACS and are based on 1-year estimates of the North Carolina population 65 years and older.

As shown in Table 7, 41.2 percent of Blacks over the age of 65 are disabled, whereas only 34.7 percent of whites are disabled, a difference of 6.5 percentage points. Latinos are comparable to whites, as 35.4 percent of Latinos over 65 are disabled; this finding may be surprising, but it may be due to underdiagnosis of disabilities for Latinos due to a lack of health insurance coverage. These statistics on disability become particularly striking when contextualized with information about insurance coverage of North Carolinians, illustrated below in Table 8.

**Table 8: Percent Uninsured for North Carolinians, by Race from 2010 to 2022**

| Year | Total State Population | Blacks | Latinos | Whites |
|------|------------------------|--------|---------|--------|
| 2010 | 16.8 | 18.9 | 43.2 | 14.3 |

| | | | | |
|---|---|---|---|---|
| 2011 | 16.3 | 18.3 | 43.1 | 14.3 |
| 2012 | 16.6 | 18.8 | 42.8 | 14.7 |
| 2013 | 15.6 | 18.4 | 39.3 | 13.3 |
| 2014 | 13.1 | 14.3 | 34.7 | 11.4 |
| 2015 | 11.2 | 11.6 | 32.8 | 10 |
| 2016 | 10.4 | 10.9 | 29.6 | 9.2 |
| 2017 | 10.7 | 11 | 30.3 | 9.6 |
| 2018 | 10.7 | 10.7 | 29.7 | 9.8 |
| 2019 | 11.3 | 11.5 | 31.3 | 9.9 |
| 2021 | 10.4 | 10.7 | 28.8 | 7.7 |
| 2022 | 9.3 | 9.1 | 27.3 | 6.6 |
| **Average** | **12.7** | **13.7** | **34.4** | **10.9** |

Note: These data are taken from the ACS and are based on 1-year estimates of the North Carolina population, regardless of age.

Over the period analyzed, on average, more than a third of Latinos lacked health insurance, which is three times the proportion of whites who lacked health insurance. Blacks, too, lack insurance coverage at a higher rate than whites, and importantly, the uninsured rate among Blacks exceeds that of the total state population, while the opposite is true for whites. Even though the percentage of the population without health insurance has decreased since the passage and implementation of the Affordable Care Act, it remains the case that the proportion of the white population without health insurance is much smaller than the proportion of Blacks and Latinos who lack health insurance.

Health insurance coverage does not speak directly about one's health, but it is a proxy for having access to the doctors, and medical resources more broadly, to maintain one's health. The logic here is that people who have insurance can more easily afford to see their primary care providers, and they have coverage (even if partially) for expensive medical procedures. In other words, those who have health insurance coverage are better positioned to maintain, or even attain, a healthy lifestyle relative to those without health insurance coverage. With that in mind, the racial disparities on display in Table 8 show that to the extent health is important for participating in politics, whites are advantaged more than Blacks and Latinos, with the latter being especially disadvantaged. Another metric to consider when looking at health is whether people suffer from diseases that may limit their mobility and thus political participation. In particular, in 2020, Blacks experienced diabetes at a rate greater than whites; for Blacks the rate was 19.3 per 100 adults, but among whites the rate was only 11.8 per 100 adults.[43] People with diabetes may have difficulty walking due to foot ulcers, vision problems, and suffer from kidney problems, and failure to properly manage the disease can result in death. In other words, diabetes is a serious disease that negatively impacts a person's daily life across many facets.

---

[43] *Diabetes State Burden Toolkit: Prevalence of Self-Reported Diagnosed Diabetes in Adults, Aged 18 Years and Older, 2021*, Ctrs. for Disease Control & Prevention, https://nccd.cdc.gov/Toolkit/DiabetesBurden/Prevalence/ (last accessed Aug. 1, 2024) (select "North Carolina" from "Select Location" drop-down menu, then select "Race-Ethnicity" tab).

Although Latinos do not report experiencing diabetes at the same rate as Blacks, this may be due to undersampling and underreporting.[44] In other words, because Latinos do not have access to health insurance and health providers, it leads to them not being diagnosed with diseases and other physical ailments at the same rate as other North Carolinians are. That said, there is evidence that Latinos experience poorer health outcomes. Many Latinos in North Carolina work in manufacturing, construction, and agriculture, and these are dangerous occupations that put individuals at risk of fatalities or serious injury.[45] Farmworkers are exposed to pesticides and may experience heat-related illnesses, respiratory illnesses, or musculoskeletal problems;[46] meanwhile, workers in poultry processing plants experience physically exhausting labor.[47] A 2010 report on health outcomes for Latinos concluded, "This report shows that Hispanics in North Carolina experience worse outcomes across many health measures than do whites."[48]

Recent research points to physical health as a predictor of voter turnout.[49] While academic work in this space is only beginning to explore all of the ways in which a person's health plays in political engagement, researchers in a groundbreaking study recently demonstrated a strong link between the two, especially for older people. The study concluded that:

> As with so many areas of social life, health has the potential to sharply influence participation in politics. This is especially true at an older age when cognitive and physical health becomes a more common concern. Surprisingly, almost no studies of political participation have considered health, even those that emphasize resources, skills, social networks, and motivation as key theoretical mechanisms. Relying on a rich data set that includes objective measures of both the independent and dependent variables, our analysis provides support for the importance of health, even with the use of demanding models that include sibling fixed effects. We find that the significance of health items varies with the type of participation, just as it does with other variables. General functioning and physical health both affect the likelihood of voting in a consistent fashion.[40]

[44] Laura A. Young & Parvati Potru, *Diabetes in North Carolina: Descriptive Epidemiology and Meaningful Use of Electronic Health Records*, 72 N.C. Med. J. 383, 383–86 (2011).

[45] Latino Health Task Force, *NC Latino Health, 2003: A Report from the Latino Health Task Force*, N.C. Inst. of Med. (Feb. 7, 2003), https://digital.ncdcr.gov/documents/detail/3280673?item=3289986.

[46] *Id.*

[47] Michel Martin, *ICE Raids Hit Poultry Processing Plants that Rely on Latino Immigrant Labor*, Nat'l Pub. Radio (Aug. 10, 2019), https://www.npr.org/2019/08/10/750172206/ice-raids-hit-poultry-processing-plants-that-rely-on-latino-immigrant-labor (Anthropologist who studies immigrant labor in the South, Angela Stuesse, stating, "Workers make the same motion on the line up to 30,000 times in a shift, so bodies wear out, quickly, in the poultry plants.")

[48] State Ctr. for Health Stats., *Minority Health Facts: Hispanics/Latinos*, Dep't of Health & Hum. Servs. (July 2010), https://schs.dph.ncdhhs.gov/schs/pdf/Hispanic_FS_WEB_080210.pdf.

[49] Barry C. Burden, et al., *How Different Forms of Health Matter to Political Participation*, 79 J. of Pol. 166, 166–78 (2017).

This research helps to explain that where Black and Latino North Carolinians experience problems with their health at a greater rate, and also are less likely to be covered by healthcare, that community's political participation is likely to be negatively impacted.

## F.    The Combined Effect of these Socioeconomic Variables

These socioeconomic variables, which all independently have been shown to impact voter participation in the political process, are also interrelated and work to exacerbate other aspects of everyday living that create barriers and hinder the ability for Black and Latinos to vote. Compared to their peers, Black and Latino North Carolinians, on average, have lower levels of educational attainment, experience greater rates of unemployment, earn less money, are more likely to be disabled, are less likely to be covered by health insurance, and are more likely to suffer from serious diseases like diabetes and to be hospitalized due to that disease. Although this report relies on descriptive statistics, the aim is the same as research done by political scientists that analyze how factors such as education, employment, income—and more recently health—serve as important variables to uncover why a person or group engages, or fails to engage, in the political process.

These data paint a bleak picture—where Black and Latino North Carolinians are disadvantaged along *every* important socioeconomic factor, a reasonable conclusion is that these external factors, when combined, have an even greater negative impact on such voters' ability to participate in other important aspects of society and civic discourse. In other words, to the extent that education, income, employment, and health encourage political participation, Black and Latino North Carolinians face a deficit along each dimension, which together have an increased cumulative effect in depressing political participation.

And these deficits are important because voting is not a costless act in the United States. In their 1968 paper titled "A Theory of the Calculus of Voting," William Riker and Peter Ordeshook showed that people are more likely to vote when the benefits of doing so outweigh the costs of doing so.[50] That cost manifests in all of the effort required for a voter to figure out how to register to vote, where to register to vote, where to vote, what date to vote, for whom to vote, and what, if any, identification they need to provide to vote.

The socioeconomic disadvantages experienced by Black and Latino voters at a disproportionate rate as compared to white voters, independently and cumulatively, increase the costs of voting and negatively impact turnout on election day. Blacks and Latinos in North Carolina are less educated, make less money, and tend to have more health issues than whites or other citizens across the state, and while independently these factors all increase the costs associated with voting, when considered cumulatively, it means that a person with a high school or less

---

[50] William H. Riker & Peter C. Ordeshook, *A Theory of the Calculus of Voting*, 62 Am. Pol. Sci. Rev. 25, 25–42 (1968). (This article has been cited over 4000 times (as of the time of this report), and it is considered a classic study in the area of voter turnout).

16

education, who lives below the poverty line, and who is not in great health, is significantly less likely to turn out and vote than a person who is college-educated, middle class, and in decent health. Given the clear socioeconomic deficits that Black and Latino North Carolinians face as compared to their white peers, it is no surprise that it becomes much more difficult for Black and Latino voters to participate in the franchise.

### G. Voter Turnout

The previous section provides data and social science research showing that the disparities faced when it comes to education, income, employment, and health means that Blacks and Latinos are less likely to participate in the political process. The actual voter turnout data confirms that is exactly what is happening.

The data presented in Table 9 below are taken from the North Carolina State Board of Elections website and lay out voter turnout among registered voters for seven general elections held in North Carolina from November 2010 to December 2022.

**Table 9: Percentage of Registered North Carolinians who Voted in General Elections from November 2010 to November 2022, by Race**

| Election Date | All Voters | Blacks | Latinos | Whites |
|---|---|---|---|---|
| November 2, 2010 | 43.4% | 40.3% | 19.8% | 45.6% |
| November 6, 2012 | 68.2% | 70% | 54% | 68.5% |
| November 4, 2014 | 44.3% | 42.2% | 20.5% | 46.8% |
| November 8, 2016 | 68.9% | 64.3% | 57.8% | 71.5% |
| November 6, 2018 | 52.9% | 48.3% | 35% | 56.1% |
| November 3, 2020 | 75.3% | 68.4% | 59.1% | 78.7% |
| November 8, 2022 | 51.1% | 41.8% | 25.8% | 58% |
| **Average** | **57.7%** | **53.6%** | **38.9%** | **60.7%** |
| **Average for Presidential Election Years** | **70.8%** | **67.6%** | **57%** | **72.9%** |
| **Average for Non-Presidential Election Years** | **47.9%** | **43.2%** | **25.3%** | **51.6%** |

As the above table illustrates, Black and Latino North Carolinians are consistently voting at a lower rate than both the state average and the average for white North Carolina voters. Of the seven elections, only one, the November 2012 general election, experienced Black or Latino voter turnout that was comparable to the rest of the state, where Black voter turnout actually exceeded White voter turnout by 1.5 percentage points. In no other election did Black or Latino North Carolinian voter participation equal or exceed either white voter participation or total state turnout.

A closer examination of the data reveals that the turnout gap between whites on the one hand, and Blacks and Latinos on the other has grown over time. In November 2016, the gap between Latinos and whites was about 14 percentage points (57.8% vs. 71.5%), but by November 2020 it widened to nearly 20 percentage points (59.1% vs. 78.7%), and by November 2022 it swelled to more than 30 percentage points (25.8% vs. 58%). When looking at the turnout gap between Blacks and whites, a similar pattern exists. In 2016, the gap was seven percentage points (64.3% vs. 71.5%), but by 2020 it jumped to 10 percentage points (68.4% vs. 78.7%), and by 2022 it was up to 16 percentage points (41.8% vs. 58%).

It is important to note that the information in the table above includes only registered voters, and thus provides only a partial picture of the voting situation in North Carolina. Registering as a voter is a feat unto itself—people must register a certain number of days prior to an election to be eligible to vote, and registration in turn requires documentation. Thus, examining voter turnout among registered North Carolinians only provides a conservative measure of differences between racial groups, as even being a registered voter inherently incorporates a certain level of civic engagement.

## V.     Senate Factor 6: whether political campaigns have been characterized by overt or subtle racial appeals

As I describe in the following section, there is substantial evidence that political campaigns in North Carolina have been characterized by overt and subtle racial appeals. The overt appeals speak for themselves—they draw upon long-standing racial stereotypes that have been employed throughout campaigns in North Carolina. The subtle appeals, on the other hand, while sometimes appearing to be non-racial, are, upon closer examination, racial appeals. Although these appeals are made in campaigns for office at all levels of government, this report will primarily focus on the 2022 U.S. Senate election between Democrat Cheri Beasley, a Black candidate, and her opponent Republican Ted Budd, a white candidate.[51] The election was held on November 8, 2022. Because of the retirement of Senator Richard Burr, it was an open seat election.[52] At the time,

---

[51] Libertarian Shannon Bray and Green Party candidate Matthew Hoh also participated in the election but since neither candidate earned more than 1.5% of the vote, they will not be featured in this report.
[52] Aaron Sánchez-Guerra, Trump 'Save America' Rally in Wilmington Today, *News & Observer* (Sept. 23, 2022), https://www.newspapers.com/image/881720515/ (on file with author).

Budd was serving a third term as a U.S. House member, whereas Beasley was coming off a loss in her 2020 bid to remain Chief Justice of the North Carolina State Supreme Court.

In particular, Budd took policy stances that aligned with the preferences of white North Carolinians, and he also took part in substantive racial distancing and thus appealed to white voters in an implicit way. Budd also aligned himself with President Donald Trump, someone that academic research shows won support from voters due in part to animus towards Blacks and Latinos, something that distinguishes the former president from other Republican candidates. So despite being well into the 21st century, political campaigns in North Carolina remain marked by both overt and subtle racial appeals that highlight and employ racial undertones to appeal to voters.

## A.    Methodology

I consulted several sources in the construction of this section. I performed targeted searches in the *News and Observer* (N&O), a prominent newspaper located in Raleigh, to seek information related to candidates and campaigns more broadly. I also relied on academic literature, including a 2020 book written by LaFleur Stephens-Dougan titled *Race to the Bottom: How Racial Appeals Work in American Politics*, and Leloudis and Korstad's 2020 book, *Fragile Democracy: The Struggle over Race and Voting Rights in North Carolina*.

I also watched and took notes on the televised debate between Cheri Beasley and Tedd Budd, which occurred on October 7, 2022. Based on my research, this was the only debate between the candidates.[53] I also watched ads associated with Ted Budd's campaign. These ads were found on the YouTube page, "Ted Budd for Senate."[54] Each ad shows the date it was posted, so I will refer to this date when discussing the content of each ad. As of July 2024, this page has 29 videos.

## B.    Explicit Racial Appeals

Two types of racial appeals exist. In an article published in *Political Behavior* in 2023, Leah Christiani writes:

> Implicit and explicit appeals have largely been studied with regard to race and, specifically, anti-Black racism in America, as racial political appeals have long been a feature in American politics. Implicit racial appeals are subtle references to race, either verbally with coded language such as "welfare" or through the use of race-neutral language combined with racial imagery. Explicit racial appeals are

---

[53] Mary Ramsey, *Here's How to Watch Tonight's NC Senate Debate Between Cheri Beasley and Ted Budd*, Charlotte Observer (Oct. 7, 2022), https://www.charlotteobserver.com/news/politics-government/election/article266954791.html.

[54] Ted Budd for Senate (@tedbuddforsenate1362), YouTube, https://www.youtube.com/@tedbuddforsenate1362 (last accessed Aug. 1, 2024).

references that directly mention race or a particular racial group with racial nouns, like "Black" or "race."[55]

In North Carolina, explicit racial appeals in campaigns trace back to at least the late 19th century. For instance, in the lead up to the 1898 election, a political cartoon in the N&O showed a monster with a Black face, with one wing having the word "negro" and the other wing having the word "rule." The monster's claws appear to be attacking people who are white, and the caption reads, "The Vampire That Hovers Over North Carolina.[56] In October 1898, a political cartoon in the N&O depicts a man with a Black face standing over a white man who is on his knees and appears to be begging. The caption of the cartoon reads, "The New Slavery."[57] Both of these cartoons describe Black political power in North Carolina as a threat to whites and exemplify explicit racial appeals.

These explicit racial appeals continued through the middle of the 20th century. The 1950 U.S. Senate Democratic primary election between Willis Smith and Frank Porter Graham, for example, teemed with racial appeals. There was a poster used in the campaign and at the top it reads, "Did You Know Over 28% of the population of North Carolina is Colored?" The right side of the poster reads, "The Southern Working Man Must Not Be Sacrificed to vote-getting ambitions of political bosses!" The bottom and center part of the poster reads, "A Vote for Willis Smith is a Vote for Your Freedom."[58] Based on the overall content of the poster, it can be inferred that the "you" and the "your" refer to whites—in particular the Southern working white man. The mention of the percentage of the "colored" population, which is how Blacks were referred to at this time, conveys a potentially powerful group of voters who could threaten the status quo. This poster pits the interests of white North Carolinians against the interests of Black North Carolinians.

This same campaign included a poster that read: "DO YOU WANT Negroes working beside you, your wife and daughters in your mills and factories? Negroes eating beside you in all public eating places? Negroes riding beside you, your wife and your daughters in buses, cabs, and trains? Negroes sleeping in the same hotels and rooming houses? Negroes teaching and disciplining your children in school?…Negroes using your toilet facilities?" If you did, the circular argued, "Vote for Frank Graham. But if you don't, vote for and help elect WILLIS SMITH FOR SENATOR." The top of the poster read, "White People Wake Up Before It's Too Late".[59] The Smith campaign was referring to Graham supporting policies that would lead to increased interaction between Blacks and whites, warning whites to act before laws upholding strict segregation were struck down. Yet another poster read at the top, "Bloc Voting By Any Group is a Menace to Democracy." The middle portion of the poster reads, "Bloc Voting by Negroes in North

---

[55] Leah Christiani, *When Are Explicit Racial Appeals Accepted? Examining the Role of Racial Status Threat*, 45 Pol. Behav. 103, 103–23 (2023).
[56] Leloudis & Korstad, *supra* note 5, at 21.
[57] *Id.*
[58] *Id.* at 46.
[59] *Id.*

Carolina," and lists data from six precincts where it shows Graham winning by huge margins. The bottom of the poster says, "Willis Smith Represents All the People."[60] The term "bloc voting" itself is an implicit appeal (something discussed later in the report), but the explicit mention of "negroes" makes this an explicit racial appeal. Blacks voting en masse for Graham is portrayed as a "menace to democracy." Moreover, Smith representing "all the people" is juxtaposed with bloc voting by Black people which only represents that group's interests.

The 1960 Democratic gubernatorial primary pitted I. Beverly Lake against Terry Sanford. Lake issued a campaign ad in which he describes himself as opposed to school desegregation. The poster said, "Dr. Lake is opposed to the mixing of white and Negro children in the schools in North Carolina."[61] Clearly, Lake presented himself as someone who would maintain the rigid social order in which Blacks and whites attended racially segregated schools, despite the *Brown v. Board of Education* ruling from 1954.

These racial appeals continued into the 1980s. In 1984, Democrat Jim Hunt, then governor, ran for the U.S. Senate seat that was held by Republican Jesse Helms. The Helms campaign created an ad that showed Hunt with Jesse Jackson, the civil rights leader and presidential candidate, with the warning, "Gov. James B. Hunt Jr. wants the State Board of Elections to boost minority voter registration in North Carolina… Ask yourself: Is this a proper use of taxpayer funds?"[62] Creating an ad with Hunt alongside arguably the preeminent Black politician of the time, as well as the mention of "minority voter registration," makes this an explicit racial appeal. The Helms campaign linked Gov. Hunt with Black political power and described government efforts to increase minority voter registration with a misuse of government funds, both of which are explicit racial appeals.

Six years later, Senator Helms was involved in another U.S. Senate campaign that involved explicit racial appeals. This time his Democratic opponent was a Black man, Harvey Gantt. In October 1990, with Helms trailing Gantt in polls, Helms decided to stoke the racial fears of some North Carolinians. In the run-up to Election Day, the Helms campaign aired what has come to be known as the "Hands Ad." When describing the ad, Leloudis and Korstad write:

> The ad showed a white man's hands crumpling a rejection letter. He wore a wedding band and presumably had a family to support. And he was dressed in a flannel shirt, not a button-down and tie. He obviously worked with those hands. The voice-over lamented, 'You needed that job and you were the best qualified. But they had to give it to a minority because of a racial quota. Is that really fair? Harvey Gantt says it is. Harvey Gantt supports …[a] racial quota that makes the color of your skin more important than your qualifications. You'll vote on this issue next Tuesday. For racial quotas, Harvey Gantt. Against racial quotas, Jesse Helms.'"[63]

---

[60] *Id.* at 54.
[61] *Id.* at 68.
[62] *Id.* at 91.
[63] *Id.* at 93.

This ad is an explicit racial appeal because it says that efforts to increase employment opportunities for Blacks come at the direct expense of hiring white workers, who the ad describes as "qualified." Like Willis Smith 40 years prior, Helms presents himself as the person who will represent the interests of the southern working white man, whose interests are threatened by Black North Carolinians.

Explicit racial appeals are not just a relic of the past in North Carolina. In the 2010 election cycle, Democrat L. Hugh Holiman was attacked for his support of the 2009 Racial Justice Act, which "gave inmates the right to challenge imposition of the death penalty by using statistical evidence to prove that race was a factor in their sentencing."[64] The state Republican Party mailed a postcard featuring a picture of Henry L. McCollum, a Black man, who had been convicted of committing a heinous crime. The postcard warned, "Thanks to Hugh Holliman, death row inmates could leave prison early and move in next door."[65]

Two years later, when Charlotte hosted the Democratic National Convention, a white man from North Carolina parked his trailer near where delegates were staying and the vehicle "contained effigies of [President Barack Obama] and state political figures, each strung up lynching-style in a hangman's noose."[66] Even though it was not part of a particular campaign, this was part of the 2012 general election cycle that involved a Black presidential candidate seeking reelection, and was done in North Carolina by a North Carolinian. This reprehensible act was meant to induce fear, reminding Blacks of the racial violence that many of them and their ancestors experienced not too long ago.

In recent years, explicit racial appeals have targeted Latinos as well. In 2009, Jeff Mixon, who was then legislative director of Americans for Prosperity, stated that undocumented people were "wolves among the sheep" and provided cover for Mexican "narco gangs" who threatened to "ruin our communities."[67] All these examples demonstrate that explicit racial appeals are still very much a part of the public discourse related to those candidacies and contests in North Carolina.

C.      **Implicit Racial Appeals**

There are also many examples of salient implicit racial appeals that are critical to understanding the political landscape in the state. Unlike explicit appeals, implicit racial appeals can be challenging to pinpoint because the nature of these racial appeals allow more room for deniability. For instance, use of the phrase "inner city" may be described as a reference to a particular section of a metropolitan statistical area, but to others, the term is a veiled reference to

---

[64] *Id.* at 102.
[65] *Id.* at 103.
[66] *Id.* at 100.
[67] *Id.* at 103.

22

Black people.[68] Moreover, racial "implicit verbal cues may also include language that references the purported lack of personal responsibility, work ethic, self-reliance, and individualism among racial and ethnic minorities, most often African Americans."[69] Thus, racial appeals do not need to mention race directly to still be perceived and interpreted as referring to particular racial groups.

Historically, the term "bloc voters" has been used as an implicit racial appeal that refers to Black voters. In the aforementioned 1984 U.S. Senate race between then-Senator Jesse Helms and then-governor Jim Hunt, Helms linked Hunt to the threat of a "bloc vote."[70] In the same campaign, Helms described as enemies "the atheists, the homosexuals, the militant women's groups, the union bosses, the bloc voters, and so on."[71] Note that this list includes identifiable groups, except for bloc voters, and this is because this term is so strongly associated with Blacks that it does not require specifically mentioning the racial group for people to understand who is being described.

Such racial appeals have continued into the present day. For example, in 2010, the North Carolina Republican Party's Executive Committee distributed a campaign mailer in a General Assembly race appealing to anti-immigrant and anti-Latino sentiments. The mailer darkens the skin of Democrat Chris Heagarty and depicts him with a sombrero, including a thought bubble with the words, "Mucho taxo."[72] The bottom of the mailer states, "It's Time to Say Adios to Señor Chris Heagarty and His Job Killing Policies."[73]

Even in the past two years, implicit racial appeals can be found in political campaigns in North Carolina. The two most prominent modes of implicit racial appeals discussed below include (1) appeals through substantive policy stances, and (2) appeals through alignment with other candidates.

### 1. Substantive Racial Distancing

In LaFleur Stephens-Dougan's groundbreaking book, she describes the "racial distancing theory," which she defines as "the process whereby politicians, both Black and white, and Democrat or Republican, either implicitly or explicitly indicate to racially moderate to racially conservative white voters that they will not disrupt the racial status quo," which is "the existing state of affairs that is characterized by racial inequality, with whites at the top of the hierarchy, including white dominance in political, social, and economic institutions."[74]

One component of racial distancing is *substantive* racial distancing, whereby candidates signal to voters their intention to advocate for and implement policies that align with the interests of voters of particular racial groups. When talking about the usefulness of a substantive racial

---

[68] LaFleur Stephens-Dougan, *Race to the Bottom: How Racial Appeals Work in American Politics* 9 (Univ. of Chi. Press, 2020).
[69] *Id.* at 27.
[70] Leloudis & Korstad, *supra* note 5, at 91.
[71] *Id.* at 91
[72] *Id.* at 104.
[73] *Id.* at 104.
[74] *Id.* at 26.

distancing strategy, Stephens-Dougan writes that "most white Americans, who constitute a majority of the electorate, are moderate to conservative on racial issues. Thus, party leaders frame their messages to appeal to these racially conservative voters." [75] At the same time, candidates need to be able to behave in a way that allows them to deny claims of being insensitive towards Blacks, and racial distancing allows for this to occur. In other words:

> A social prohibition exists against espousing ideas that may indicate a belief in the biological or inherent inferiority of blacks, which means that in the post-civil rights era, candidates are incentivized to at least appear as if they have embraced the norm of equality. This also means that in the post-civil rights era, politicians may continue to appeal to negative predispositions about African Americans, but rather than being critiqued for their "'inherent inferiority," blacks are criticized for their lack of work ethic and unwillingness to adhere to American values. [76]

Because substantive racial distancing allows candidates to simultaneously appeal to white voters who are racially moderate and conservative and deny that Blacks are being treated explicitly in a negative manner, it is important to understand how candidates in North Carolina have utilized this strategy to make implicit racial appeals during elections. [77]

Two prominent examples of substantive issues that are often used in such a manner are crime and immigration. Both appeared in the 2022 U.S. Senate election in North Carolina.

Ads against the Democratic candidate for U.S. Senate Cheri Beasley, a Black woman, featured the brother of a white state trooper killed a quarter-century ago by a Black man represented by then-public defender Ms. Beasley, as well as images of white crime victims interspersed with images of Ms. Beasley wearing an unfriendly expression. [78]

And Beasley's opponent, Ted Budd, frequently linked immigration with crime throughout the 2022 election cycle. While trying to win the GOP nomination, Budd said, "We want to continue to bring the best and the brightest here and continue our international generosity but at the same time we can't look the other way when it comes to illegal immigration and the crime that results from that." [79] Budd's "Stop Biden's Open Border" ad was posted to YouTube on March 23, 2022, and it opens saying, "Open borders, crime, drugs," again linking immigration from Mexico with crime. [80] The "Crush the Broken Biden Beasley Agenda" ad was posted to YouTube on July 15,

---

[75] *Id.* at 46.

[76] *Id.* at 47.

[77] It should be noted that although Stephens-Dougan uses examples of Black candidates employing substantive racial distancing, the logic of her argument applies to candidates of all racial backgrounds and partisan identities. *Id.* at 36.

[78] Jonathan Weisman, *With Ads, Imagery and Words, Republicans Inject Race into Campaigns*, N.Y. Times (Oct. 25, 2022), https://www.nytimes.com/2022/10/25/us/politics/crime-ads-racism-republicans.html.

[79] Danielle Battaglia, *Outside Spending Propelled Budd to Congress. Trump Has Him Close to a Senate Seat*, News & Observer (Apr. 24, 2022), https://www.newspapers.com/image/835896275/ (on file with author).

[80] Ted Budd for Senate, *Stop Biden's Open Border*, YouTube (Mar. 23, 2022), https://www.youtube.com/watch?v=juuV2FhwUqg.

2022. Budd opens the ad stating, "It keeps getting worse, wide open border, out of control crime."[81] In late October 2022, Budd posted an ad, "The Checkered Flag is in Sight," and in it he again links open borders with rising crime, positioning himself as someone who will secure the border and restore law and order.[82] In the October debate with Beasley, when answering a question about the 2nd Amendment, Budd links border crossing with drug cartels, asserting that within 72 hours of a border crossing, drugs are in North Carolina neighborhoods.[83] In case there was any uncertainty as to which border he meant, in the "Checkered Flag" ad he is shown at the southern border. Budd's actions, inextricably linking crossings at the southern border with increased crime, is an implicit racial appeal that targets Latinos.

## 2. Candidate Alignment

In November 2021, Lilliana Mason, Julie Wronski, and John Kane published a paper in the *American Political Science Review*, the flagship journal in political science. The paper makes conclusions that are critical for understanding the role that Donald Trump has played in the election studied in this report. In particular, the authors state:

> To examine the nature of Trump support, we identified a unique and powerful predictor of his popularity—animus toward Democratic-linked and traditionally marginalized groups. As the Republican Party grows increasingly white, Christian, and male, it may be tempting to explain Trump's appeal with partisanship alone. However, that is not the case in these panel data. Trump appears to have been uniquely able to attract support based on preexisting animosity toward these groups. The same cannot be said for other Republican Party officials or the Republican Party itself.[84]

For example, Mason and her colleagues found that "[p]eople who felt strong animosity toward Blacks, Hispanics, Muslims, and LGBT people in 2011 were significantly more likely to be fond of Trump once he appeared on the political scene (p<0.001 for all models)."[85] However, those feelings of animosity toward marginalized minority groups "do not predict favorability toward the Republican Party, Paul Ryan, or Mitch McConnell (no effects significant at p<0.10)," and "[t]hus, the relationship between [marginalized minority] group animosity and Trump support is not simply a product of being a Republican."[86] Statistical studies run by these researchers showed that "[a]t low levels of animus towards Blacks, there is little effect on Trump support. But,

---

[81] Ted Budd For Senate, *Crush the Broken Biden Beasley Agenda*, YouTube (July 15, 2022), https://www.youtube.com/watch?v=K4IbK9wTgjk.

[82] Ted Budd for Senate, *The Checkered Flag is in Sight*, YouTube (Oct. 21, 2022), https://www.youtube.com/watch?v=IMbu7nTMYjQ.

[83] *Campaign 2022: North Carolina U.S. Senate Debate*, C-SPAN (Oct. 7, 2022), https://www.c-span.org/video/?522921-1/north-carolina-us-senate-debate.

[84] Lilliana Mason, et al., *Activating Animus: The Uniquely Social Roots of Trump Support*, 115 Am. Pol. Sci. Rev. 1508, 1515–16 (Nov. 2021).

[85] *Id.* at 1510–11.

[86] *Id.* at 1511.

as animus toward African Americans increases…support for Trump grows."[87] Moreover "Trump approval steadily increases as animus towards Hispanics increases."[88] These results emerge when controlling for ideology, party, age, religion, income, and other confounding factors in their model.

The authors of the paper therefore debunk the notion that appealing to Trump is a matter of pure partisan politics. Their analyses conclude that a powerful component of support for Trump is in fact due in part to animus towards Black people and towards Latinos.

Other researchers talk about Trump appealing to white voters. Davin Phoenix, in his 2019 book *The Anger Gap*, writes:

> The racial stereotypes that Ronald Reagan and his acolytes would allude to with knowing winks and nudges would be unabashedly proclaimed by Donald Trump. He routinely castigated black neighborhoods as war zones, asserting '[t]here are places in America that are among the most dangerous in the world. You go to places like Oakland. Or Ferguson. The crime numbers are worse [than in Iraq]. Seriously.' In front of virtually all-white rally audiences, Trump severely overstated the extent of black poverty and joblessness, painting a picture of a group so destitute and hopeless it literally has nothing to lose in voting for him.[89]

Phoenix continued that:

> On the whole, these statements may not have generated as much immense media scrutiny as some of Trump's even more incendiary remarks about Latina/o and Muslim Americans. But nevertheless, they constituted a clear signal to African Americans that the Trump administration would show no hesitation to align firmly against black interests in order to maintain the support of a conservative white base becoming increasingly agitated at perceived minority gains made at the expense of whites.[90]

A few years later, political scientists Darren Davis and David Wilson published *Racial Resentment in the Political Mind,* and they write:

> While Trump was defiant and unapologetic in his expressions of racist and derogatory sentiments—for example, refusing to disavow the Ku Klux Klan and White nationalists—a lot of his racial references were interlaced with beliefs about the threats racial minorities posed to the American way of life.[91]

---

[87] *Id.* at 1514
[88] *Id.*
[89] Davin L. Phoenix, *The Anger Gap: How Race Shapes Emotions in Politics* 91 (Cambridge Univ. Press, 2019).
[90] *Id.* at 92.
[91] Darren Davis & David Wilson, *Racial Resentment in the Political Mind* 14 (Univ. of Chi. Press, 2022)

Later in the book, Davis and Wilson examine whether the slogan, "Make America Great Again" means the same thing to Blacks as it does to whites. They write:

 [W]hile most Americans would like their country to aspire to greatness, 'again' in the *Make America Great Again* slogan seems to drive the consternation. That is, African Americans and Whites have drastically different memories and perceptions about the past. African Americans' recollections of the past likely reflect a more perilous era in which racial prejudice was more pervasive and discrimination worked to the advantage of Whites, while Whites' recollection of the past likely reflects an era in which they were more dominant and benefited more from the social and political hierarchy—when people knew their place and were reluctant to challenge it. Thus, references to the past, using 'again,' trigger different racial reactions.[92]

Former President Trump has made many racially insensitive remarks in recent years. While campaigning in 2015, a Black protestor named Mercutio Southall disrupted Trump's speech, and in response about a half dozen white attendees shoved, tackled, kicked, and punched him. Trump supported the violent response saying, "Maybe he should have been roughed up because it was absolutely disgusting what he was doing."[93] Southall said that attendees who attacked him also called him and fellow protesters "monkeys" and the n-word. Later in the election cycle, Trump pointed to a Black man in the crowd and said "Oh, look at my African American over here. Look at him… Are you the greatest?"[94] The man in question, Gregory Cheadle, was a Trump supporter and the candidate intended the comment to be positive. However, using a possessive to refer to a Black man in a nation where many Blacks are descendants of the enslaved is racially insensitive at the least. In 2018, during a meeting with senators at the White House, then President Trump referred to Haiti and African nations as "shithole countries" and said that the United States should have more people coming from countries like Norway.[95] These are but a few examples of the racially problematic statements made by former President Trump; many more exist, dating back to the 1970s.[96]

These past statements—and the political science research—thus make clear that there is a direct link to be made between Trump, his political platform, and racial politics. Therefore, a candidate in North Carolina purposefully aligning with Trump is, by extension, a racial appeal.

[92] *Id.* at 157.
[93] Jeremy Diamond, *Trump on Protester: Maybe He Should Have Been Roughed Up*, CNN (Nov. 23, 2015), https://www.cnn.com/2015/11/22/politics/donald-trump-black-lives-matter-protester-confrontation/
[94] Jeremy Diamond, *Donald Trump on black supporter: 'Look at my African-American over here'*, CNN (June 6, 2016), https://www.cnn.com/2016/06/03/politics/donald-trump-african-american/index.html.
[95] Ali Vitali, et al., *Trump Referred to Haiti and African Nations as 'Shithole' Countries*, NBC News (Jan. 12, 2018), https://www.nbcnews.com/politics/white-house/trump-referred-haiti-african-countries-shithole-nations-n836946.
[96] German Lopez, *Donald Trump's Long History of Racism, from the 1970s to 2020*, Vox (Aug. 13, 2020), https://www.vox.com/2016/7/25/12270880/donald-trump-racist-racism-history.

Several stories in the N&O indicate that Budd aligned himself with former president Trump. Before deciding to run for the U.S. Senate in 2022, Budd traveled to Mar-a-Lago and five days later announced his bid.[97] A story published in August reminds readers that Trump endorsed Budd.[98] Budd and Trump both attend the "Save America Rally" in Wilmington in September 2022.[99] Post-election commentary on the election linked Budd with Trump. Budd is referred to as a "Trump acolyte who will be a constant counterweight to Democrats and any Republican who proposes compromise."[100] A story published three days after the election states that Trump's endorsement helped Budd win the GOP nomination.[101]

In campaign ads and in the televised debate, Budd aligned himself with Trump. The ad "Trump Endorsed Conservative Champion" was posted to YouTube on April 22, 2022. In this ad, Trump refers to Budd as "by far the best candidate in this race," and Budd refers to himself as an "America First" candidate, with Trump standing beside him."[102] The ad "Budd Kennedy Event," referring to Budd and U.S. Senator John Kennedy of Louisiana, was posted to YouTube on September 21, 2022. In the ad, Budd is shown sitting and smiling inside of a racecar that has the name "Trump" spray painted on it.[103] Underneath the name "Trump" is the phrase, "A Real American Hero."[104] The ad "North Carolina Save America Rally" was posted to YouTube on September 26, 2022. Here, Trump is featured prominently. In fact, Trump states, "Seven weeks from now the people of North Carolina are going to vote to fire the radical left Democrats, you're going to send the great Ted Budd to the U.S. Senate."[105] Trump and Budd are also shown shaking hands in the video.[106] In case North Carolinians did not see these ads, in the October debate, Budd refers to himself as the "America First" candidate and says he is honored to have Trump's endorsement.[107]

Budd's alignment with Trump's racial politics became especially clear during the September 23, 2022 "Save America Rally," which was featured in one of Budd's ads and at which

[97] Bryan Anderson, *Rep. Ted Budd enters North Carolina U.S. Senate race*, Associated Press (Apr. 28, 2021), https://apnews.com/article/joe-biden-donald-trump-senate-elections-north-carolina-elections-7110a31accb16a56f104cd5ceb3cb364.

[98] Ned Barnett, *Where's Ted? Budd's Senate Campaign Takes a Quiet Path*, News & Observer (Aug. 28, 2022), https://www.newspapers.com/image/873112273/ (on file with author).

[99] Ted Budd for Senate, *North Carolina Save America Rally*, YouTube (Sept. 26, 2022), https://www.youtube.com/watch?v=tJ7gr5hGHnk.

[100] Ned Barnett, *Budd Won NC's US Senate Race with Cautious Campaign*, News & Observer (Nov. 10, 2022), https://www.newspapers.com/image/897064817/ (on file with author).

[101] Luciana Perez Uribe Guinassi & Danielle Battaglia, *Why Some Trump-Endorsed Republicans Won, Some Lost in NC*, News & Observer (Nov. 11, 2022), https://www.newspapers.com/image/897132985/ (on file with author).

[102] Ted Budd for Senate, *Trump Endorsed Conservative Champion*, YouTube (Apr. 22, 2022), https://www.youtube.com/watch?v=ufJu1gmM38g.

[103] Ted Budd for Senate, *Budd Kennedy Event*, YouTube (Sept. 21, 2022), https://www.youtube.com/watch?v=fTdAUqRGjXI.

[104] *Id.*

[105] Ted Budd for Senate, *North Carolina Save America Rally*, YouTube (Sept. 26, 2022), https://www.youtube.com/watch?v=tJ7gr5hGHnk.

[106] *Id.*

[107] C-SPAN, *supra* note 83.

Trump was campaigning for Budd and other Trump-endorsed candidates.[108] At the rally, Trump spoke for nearly 90 minutes, and a little after 49 minutes, he bellowed, "You know Putin mentioned the n-word. Do you know what the n-word is?" In response to the crowd's chuckles and shouted answers, he said "no, no, no, it's the nuclear word,' and then went on to talk about the possibility of World War III.[109]

Trump's reference to a well-known and harmful racial epithet in a joking manner in the course of campaigning for Budd in North Carolina, particularly where is opponent was running to be North Carolina's first Black Senator, is an explicit racial appeal in and of itself. Although Budd did not make the statement, he was a prominent figure at the rally and in Trump's remarks, and several officials (and in all likelihood voters) were quick to associate Budd with the obvious racial slur, exemplifying the implicit racial appeals of this campaign through candidate alignment.



[108] Sánchez-Guerra, *supra* note 52.
[109] *Campaign 2022: Former President Trump Rally in Wilmington, North Carolina*, C-SPAN (Sep. 23, 2022), https://www.c-span.org/video/?522967-1/president-trump-rally-wilmington-north-carolina.

 **Bobbie Richardson** @bobbiefornc · Sep 24

It is disgusting and dangerous for @TedBuddNC to stand with this type of poisonous rhetoric — especially as he runs against @CheriBeasleyNC.

> 🫠 **Brennan Murphy** ✔ @brenonade · Sep 23
>
> "The n-word! Do you know what the n-word is? It's-"
>
> *crowd yells*
>
> "No no no, it's the nuclear word."
>
> Show this thread
>
> 
>
> 0:00   4.1M views

 **Eric Swalwell** ✔ @ericswalwell · 19h

🏛 US House candidate, CA-14

Every day they show us who they are. #NCSEN can do better than this. The fact that @TedBuddNC laughed along with this white nationalistic call to arms is disqualifying.

Vote 4 @CheriBeasleyNC

> 🫠 **Brennan Murphy** ✔ @brenonade · Sep 23
>
> "The n-word! Do you know what the n-word is? It's-"
>
> *crowd yells*
>
> "No no no, it's the nuclear word."
>
> Show this thread
>
> 
>
> 0:09   4.1M views

## VI. Senate Factor 7: the extent to which members of the minority group have been elected to public office in the jurisdiction

Overall, there is meaningful evidence that Blacks and Latinos have been limited in their ability to get elected to statewide office.

### A. Methodology

To collect data on Blacks and Latinos seeking statewide office, I relied on election results published on the North Carolina State Board of Elections website and articles published in the N&O. When discussing U.S. Senate and gubernatorial elections in North Carolina, I examine contests from 2008 onwards. In November 2008, then-U.S. Senator Barack Obama won North Carolina's electoral votes, on his way to winning the presidency. Analyzing elections from 2008 onwards therefore allows me to focus on the years following Obama's statewide victory and to test whether this achievement, a Black man winning statewide, ushered in an era of Blacks and other nonwhite candidates successfully running for statewide office in North Carolina.

To ascertain Black and Latino representation in the U.S. House of Representatives, I relied on information made available by the Clerk of the House of Representatives, in particular the Office of History, Art, and Archives. By utilizing the "People Search" function, I could identify Black and Latino representatives who have served in Congress for North Carolina.[110]

To evaluate Black representation in state legislatures, I examine two key measurements. The first is "*Black Seat Share*," which refers to the proportion of seats held by Blacks in the legislature. This is calculated by taking the total number of Blacks in the legislature and dividing that by the total number of seats in the legislature. The second is the "*Black Representation Ratio*," which refers to the ratio of Black Seat Share relative to the Black population share in the state, where the Black population share is measured as the Black population divided by the total state population.

### B. Statewide Office

According to the National Governor's Association, from 1776 to today, North Carolina has had 69 different governors.[111] Not one has been Black, as confirmed by the N&O.[112] According

---

[110] This is the same source I use in my own work, notably in a paper that examines the Black women who have served in Congress. *See* Nadia E. Brown, et al., *Women of Color Political Elites in the US: An Introduction, Personal Reflections, and a Call for Scholarly Engagement*, 43 J. of Women, Pol., & Pol'y 1, 1–7 (2022).

[111] *Former Governors – North Carolina*, Nat'l Governor's Ass'n, https://www.nga.org/former-governors/north-carolina/ (last accessed Aug. 1, 2024).

[112] Dawn Baumgartner Vaughan, *NC Senate Leader Berger Endorses Robinson for Governor*, News & Observer (Dec. 3, 2023) (on file with author).

to the website of the U.S. Senate, in North Carolina's history, 57 different persons have represented the state in the U.S. Senate.[113] Of those 57 individuals, none have been Black.[114]

In the Council of State, a statewide 10-person popularly elected body, only three Blacks have ever served in roles, only two of whom were elected. Ralph Campbell was the first and was elected as State Auditor in 1992. Nearly twenty years later, in 2020, Mark Robinson became the second.[115] And the third, in 2023, Jessica Holmes was appointed State Auditor by Governor Cooper.[116]

Black representation on the North Carolina State Supreme Court, another statewide body that is popularly elected, has not been much better. Only seven Blacks had ever served on the Court.[117] Of the seven members, only two were *elected* to their positions in the first instance; the first five to serve on the Court were appointed to their seats. In 1983, Gov. Jim Hunt appointed Henry Frye[118], and 15 years later Hunt appointed James Wynn Jr.[119] Gov. Michael Easley appointed G.K. Butterfield in 2001[120], and he appointed Patricia Timmons-Goodson in 2006.[121] In 2012, Gov. Bev Perdue appointed Cheri Beasley to North Carolina's highest court.[122] Michael Morgan was elected to the North Carolina State Supreme Court in November 2016.[123]In November 2018, Anita Earls was elected to the body[124] making her only the seventh Black person to serve on the North Carolina State Supreme Court and only the second to be elected without having been appointed first. No other Black people have been elected to the North Carolina State Supreme Court. With Cheri Beasley losing an election for chief justice in 2020,[125] and Michael

---

[113] *States in the Senate | North Carolina Senators*, U.S. Senate, https://www.senate.gov/states/NC/senators.htm (last accessed Aug. 1, 2024).

[114] Dawn Baumgartner Vaughan, *Black Women Candidates in NC Poised to Make History*, News & Observer (May 24, 2022) (on file with author).

[115] Greg Childress, *Election 2020: Gov. Cooper Wins Reelection, Margins Tight in Several Council of State Contests*, NC Newsline (Nov. 4, 2020), https://ncnewsline.com/2020/11/04/election-2020-gov-cooper-wins-reelection-margins-tight-in-several-council-of-state-contests/.

[116] Clayton Henkel, *Governor Cooper Makes History with Appointment of New State Auditor*, NC Newsline (Dec. 1, 2023), https://ncnewsline.com/2023/12/01/governor-cooper-makes-history-with-appointment-of-new-state-auditor/.

[117] *Historic Celebration Honors African-American Justices of the Supreme Court of North Carolina*, N.C. Jud. Branch (Aug. 29, 2017), https://www.nccourts.gov/news/tag/general-news/historic-celebration-honors-african-american-justices-of-the-supreme-court-of-north-carolina.

[118] A.L. May, *Henry Frye, High Court's First Black, is Sworn In*, News & Observer (Feb. 4, 1983) (on file with author)

[119] John Wagner, *Judicial Election Recounts Finished*, News & Observer (Nov. 21, 1998) (on file with author).

[120] Matthew Eisley, *Easley Picks Wilson Judge*, News & Observer (Feb. 6, 2001) (on file with author).

[121] Andrea Weigl, *Supreme Court Gets New Justice*, News & Observer (Feb. 8, 2006) (on file with author).

[122] Craig Jarvis, *Perdue Picks Top Court Judge*, News & Observer (Dec. 13, 2012) (on file with author).

[123] *N.C. Election Results*, News & Observer (Nov. 10, 2016) (on file with author).

[124] Will Doran, *Democrat Earls Claims Win Over 2 GOP Opponents*, News & Observer (Nov. 7, 2018) (on file with author).

[125] Danielle Battaglia & Charlie Innis, *Newby Wins Chief Justice Race; Incumbent Beasley Concedes*, News & Observer (Dec. 13, 2020) (on file with author).

Morgan stepping down in the latter half of 2023,[126] Earls is currently the only Black justice on the seven-member court.

In 2022, Beasley lost the U.S. Senate general election to Ted Budd. Exit poll data showed that she received considerably more support from Black voters than from white voters. Whereas 93 percent of Blacks voted for Beasley, only 37 percent of whites reported voting for her, a difference of 56 percentage points.[127] In such a closely contested election, Beasley would have won the race had she received more support from white North Carolinians.

Black Democratic candidates other than Beasley tried but ultimately failed to successfully attain statewide office. The 2016 election cycle is notable. Chris Rey, a Black candidate, ran for the U.S. Senate but lost in the Democratic primary, earning 16.5 percent of the vote.[128] Ken Spaulding, a Black candidate, participated in the Democratic primary for the governorship that year, and he also lost, earning only 31.3 percent of the vote.[129] Four Black candidates participated in the 2024 Democratic primary for the governorship—Chrelle Booker, Gary Foxx, Michael Morgan, Marcus Williams—and they all lost, earning a combined 30.4 percent of the vote.[130]

In 2024, Black candidate and current Lieutenant Governor Mark Robinson is running for governor, but notably he is not the Black-preferred candidate. Many prominent Black officials from the state publicly came out against Robinson. Prior to the Democratic primary for the governorship, for instance, Michael Morgan, a former justice on the North Carolina State Supreme Court, called Robinson's behavior "despicable and disgusting."[131] Kelly Alexander, chair of the North Carolina Legislative Black Caucus, said Robinson's "ignorance is beyond reproach—we cannot have him represent North Carolina in the governor's office."[132] Public opinion data similarly shows that an overwhelming number of Black North Carolinians view Robinson in a negative light. Notably, two polls conducted after Robinson won the GOP nomination indicate that Black North Carolinians do not intend to vote for him in the upcoming election. In April, when asked who they intended to vote for in the upcoming gubernatorial election, 8 percent of Blacks said they would vote for Robinson, but 49 percent of whites said they would vote for Robinson, a difference of 41 percentage points. By May 2024, only 6 percent of Blacks said they would vote

[126] Dawn Baumgartner Vaughan, *Former NC Justice Challenges AG Stein for Governor*, News & Observer (Sep. 13, 2023) (on file with author).
[127] North Carolina Senate Election Results 2022, *NBC News* (Nov. 8, 2022), https://www.nbcnews.com/politics/2022-elections/north-carolina-senate-results#exit-polls (last updated Feb. 9, 2023).
[128] *Election Results*, N.C. State Bd. of Elections, https://er.ncsbe.gov/ (last accessed Aug. 1, 2024) (choose the following from the dropdown menus: 3/15/2016, STATE, FEDERAL, ALL).
[129] *Id.* (choose the following from the dropdown menus: 3/15/2016, STATE, COUNCIL OF STATE, ALL).
[130] *Id.* (choose the following from the dropdown menus: 3/5/2024, STATE, COUNCIL OF STATE, ALL).
[131] Vaughan, *supra* note 126.
[132] Kendrick Marshall, *Republican Robinson has to Work to Win NC Black Votes*, News & Observer (Feb. 11, 2024) (on file with author).

for Robinson, whereas 50 percent of whites said they would vote for Robinson, a difference of 44 percentage points. [133]

### C.    The U.S. House of Representatives

Table 10 provides information on Black U.S. representatives from North Carolina, from 1991 to 2025, or the 102nd through the 118th Congress. On average, in each Congress, two Black House members represent the state of North Carolina during that time frame. Since the state, on average, has a House delegation of about 12.6 members, this means that in general, Blacks comprise 15.8 percent of the state's House delegation. To put this number into context it is important to consider the Black population share in the state. The fourth column shows that North Carolina has an average Black population share that is a little over 22 percent. The fifth column shows that the average Black Representation Ratio is 0.76. Thus, in general, Blacks fail to achieve parity when it comes to their seat share in the U.S. House of Representatives, the federal entity that is meant to most closely represent the people.

In the era shown in Table 10, North Carolina's House delegation grew from 11 members to 14 members, a sign that it is a place experiencing tremendous population growth relative to other states. In the 102nd Congress, a single Black person served in the U.S. House of Representatives, but upon closer examination this achievement was limited. Eva Clayton only served two months in that Congress, taking the place of a member who passed away. [134] From the 103rd (1993-95) to the 117th (2021-23), two Blacks represented North Carolina in the U.S. House of Representatives, but given the group's population share, at least three Blacks would have needed to serve in the U.S. House to achieve parity. The closest Blacks have come to achieving parity is the current, 118th Congress, where the Black Representation Ratio is 0.97. If Representative Don Davis fails to hold onto his seat, or if the number of Black U.S. House members decreases for other reasons, Black representation will once again fall significantly below parity. If only two Black lawmakers serve North Carolina in the U.S. House of Representatives, then Black Representation would be 0.65, and if only one Black lawmaker represents state in the 119th Congress, the Black Representation Ratio would fall to 0.32—which would be the lowest Black Representation Ratio since *at least* 1993, the 102nd Congress.

---

[133] *May 2024 – Robinson, Stein neck and neck for governor's mansion*, Carolina J. (May 9, 2024), https://www.carolinajournal.com/polls/robinson-stein-neck-and-neck-for-governors-mansion/ (click "See Poll Crosstabs" at bottom of webpage, then choose "Gubernatorial Ballot by Race/Ethnicity" from spreadsheet table of contents).

[134] Elana Varon, *Clayton Says She Will Endure Scrutiny for Women to Come*, News & Observer (Nov. 21, 1992) (on file with author).

**Table 10: Black Representation in the U.S. House in North Carolina, 1991 to 2025**

| Congress (Years) | Black U.S. House Members[135] | U.S. House Member Delegation Size[136] | Percentage of U.S. House Members that is Black | Proportion of State Population that is Black[137] | Black Representation Ratio in the U.S. House |
|---|---|---|---|---|---|
| 102nd (1991-1993) | 1 | 11 | 9.1% | 22.2%[138] | 0.41 |
| 103rd (1993-1995) | 2 | 12 | 16.7% | 22.2% | 0.75 |
| 104th (1995-1997) | 2 | 12 | 16.7% | 22.1% | 0.75 |
| 105th (1997-1999) | 2 | 12 | 16.7% | 22.1% | 0.75 |
| 106th (1999-2001) | 2 | 12 | 16.7% | 21.8% | 0.76 |
| 107th (2001-2003) | 2 | 12 | 16.7% | 21.8% | 0.76 |
| 108th (2003-2005) | 2 | 13 | 15.4% | 21.8% | 0.71 |
| 109th (2005-2007) | 2 | 13 | 15.4% | 21.8% | 0.71 |
| 110th (2007-2009) | 2 | 13 | 15.4% | 21.8% | 0.71 |
| 111th (2009-2011) | 2 | 13 | 15.4% | 21.9% | 0.70 |
| 112th (2011-2013) | 2 | 13 | 15.4% | 22.0%[139] | 0.70 |
| 113th (2013-2015) | 2 | 13 | 15.4% | 22.2% | 0.69 |
| 114th (2015-2017) | 2 | 13 | 15.4% | 22.2% | 0.69 |

---

[135] Note that in some cases more Black people are shown to have served in each Congress than is listed here. This discrepancy exists because in some instances a Black person leaves office in the middle of their term and is replaced by a Black person. I am less interested in the total number of Black U.S. House members each Congress and more interested in the number of districts represented by a Black person at a given time each Congress.

[136] Note that in some cases more members are shown to have served in a session of Congress than is listed here. This discrepancy exists because in some instances a person leaves Congress in the middle of their term and are replaced by someone before the term ends. I am less interested in the total number of people who served in Congress in a given session and more interested in the house delegation size each Congress.

[137] Based on midpoint year of a Congressional term, except for the 118th Congress in which case the data are based on 2023. The data come from multiple sources. See footnotes in table for additional information.

[138] The data for 1992 through 2010 come from Clark (2019).

[139] *State Population by Characteristics: 2010–2019*, U.S. Census Bureau, https://www.census.gov/data/tables/time-series/demo/popest/2010s-state-detail.html (last accessed Aug. 1, 2024).

| | | | | | |
|---|---|---|---|---|---|
| 115th (2017-2019) | 2 | 13 | 15.4% | 22.2% | 0.69 |
| 116th (2019-2021) | 2 | 13 | 15.4% | 22.1%[140] | 0.70 |
| 117th (2021-2023) | 2 | 13 | 15.4% | 22.1% | 0.70 |
| 118th (2023-2025) | 3 | 14 | 21.4% | 22.1% | 0.97 |
| **Average** | **2** | **12.6** | **15.8%** | **22.0%** | **0.72** |

Note: These data are taken the U.S. House of Representatives website, which provides data on the number of Black U.S. House representatives as well as the total number of House members from the state.[141]

Notably, during this same time period, white North Carolinians are overrepresented in the U.S. House of Representatives. In the era studied, the average white representation ratio was 1.16 (see Table 11). Even where white representation was at its lowest (103rd Congress), and even where Black representation was at its highest (118th Congress), white representation is still well above 1.

**Table 11: White Representation in the U.S. House in North Carolina, 1991 to 2025**

| Congress (Years) | White House Members[142] | U.S. House Member Delegation Size[143] | Percentage of U.S. House Members that is White | Proportion of State Population that is White[144] | White Representation Ration in the U.S. House |
|---|---|---|---|---|---|
| 102nd (1991-1993) | 10 | 11 | 90.9% | 75.7%[145] | 1.20 |
| 103rd (1993-1995) | 10 | 12 | 83.3% | 75.5% | 1.10 |
| 104th (1995-1997) | 10 | 12 | 83.3% | 75.4% | 1.11 |

[140] *State Population Characteristics: 2020–2023*, U.S. Census Bureau, https://www.census.gov/data/tables/time-series/demo/popest/2020s-state-detail.html (last accessed Aug. 1, 2024).

[141] *People Search*, U.S. House of Representatives, https://history.house.gov/People/Search/ (last accessed Aug. 1, 2024).

[142] Note that in some cases more white people are shown to have served in each Congress than is listed here. This discrepancy exists because in some instances a white person leaves office in the middle of their term and is replaced by a white person. I am less interested in the total number of white U.S. House members each Congress and more interested in the number of districts represented by a white person at a given time each Congress.

[143] Note that in some cases more members are shown to have served in a session of Congress than is listed here. This discrepancy exists because in some instances a person leaves Congress in the middle of their term and are replaced by someone before the term ends. I am less interested in the total number of people who served in Congress in a given session and more interested in the house delegation size each Congress.

[144] Based on midpoint year of a Congressional term, except for the 118th Congress in which case the data are based on 2023. The data come from multiple sources. See footnotes in table for additional information.

[145] Data for 1992 through 1998 are from this source: *1990s: State Tables*, U.S. Census Bureau, https://www.census.gov/data/tables/time-series/demo/popest/1990s-state.html (last accessed Aug. 1, 2024).

| | | | | | |
|---|---|---|---|---|---|
| 105th (1997-1999) | 10 | 12 | 83.3% | 75.3% | 1.11 |
| 106th (1999-2001) | 10 | 12 | 83.3% | 74.5%[146] | 1.12 |
| 107th (2001-2003) | 10 | 12 | 83.3% | 74.1% | 1.12 |
| 108th (2003-2005) | 11 | 13 | 84.6% | 73.7% | 1.15 |
| 109th (2005-2007) | 11 | 13 | 84.6% | 73.3% | 1.15 |
| 110th (2007-2009) | 11 | 13 | 84.6% | 72.8% | 1.16 |
| 111th (2009-2011) | 11 | 13 | 84.6% | 72.3%[147] | 1.17 |
| 112th (2011-2013) | 11 | 13 | 84.6% | 71.9% | 1.18 |
| 113th (2013-2015) | 11 | 13 | 84.6% | 71.4% | 1.19 |
| 114th (2015-2017) | 11 | 13 | 84.6% | 71.0% | 1.19 |
| 115th (2017-2019) | 11 | 13 | 84.6% | 70.7% | 1.20 |
| 116th (2019-2021) | 11 | 13 | 84.6% | 70.4%[148] | 1.20 |
| 117th (2021-2023) | 11 | 13 | 84.6% | 70.0% | 1.21 |
| 118th (2023-2025) | 11 | 14 | 78.6% | 69.8% | 1.13 |
| **Average** | **10.6** | **12.6** | **84.3%** | **72.8%** | **1.16** |

## D.    North Carolina General Assembly

From 1992 to 2024, Blacks have not generally had parity in representation in the state legislature. As shown in Table 12, on average, the Black Representation Ratio is 0.76. In 1992, the Black Representation Ratio was 0.51, meaning that the Black Seat Share was only about half of the Black population share in the state. In only one session, 2021-22, did the Black Representation

---

[146] Data for 2000 through 2008 come from this source: *State Intercensal Tables: 2000–2010*, U.S. Census Bureau, https://www.census.gov/data/tables/time-series/demo/popest/intercensal-2000-2010-state.html (last accessed Aug. 1, 2024).

[147] Data for 2010 through 2019 come from this source: *State Population by Characteristics: 2010–2019*, U.S. Census Bureau, https://www.census.gov/data/tables/time-series/demo/popest/2010s-state-detail.html (last accessed Aug. 1, 2024).

[148] Data for 2020 onwards come from this source: *State Population by Characteristics: 2020–2023*, U.S. Census Bureau, https://www.census.gov/data/tables/time-series/demo/popest/2020s-state-detail.html (last accessed Aug. 1, 2024).

Ratio meet or exceed one, and by the following session the metric was back below one. This table shows that more Blacks have been elected to the state legislature in North Carolina in recent years, but this trend does not negate the fact that Blacks are still generally underrepresented in the North Carolina state legislature.

As aforementioned, a fuller understanding of Black representation requires not only an analysis of the Black Seat Share, but also consideration of the Black Representation Ratio. Although it is true that both metrics have increased, the Black Representation Ratio has consistently come up short of one, the score needed for Blacks to serve in the state legislature at a rate that reflects the group's population share. The inability of Blacks to consistently get elected at a rate where the Black Representation Ratio exceeds one speaks volumes about the challenges Blacks face to serve in political office in North Carolina. In other words, even looking at an era where Blacks are experiencing more electoral success, Blacks are still failing to get elected to the state legislature at a rate that reflects their population share.

**Table 12: Black Representation in the North Carolina State Legislature, 1992 to 2024**

| Year | Total Black State Legislators | Total Number of State Legislators | Percentage of State Legislators that is Black | Proportion of the State Population that is Black | Black Representation Ratio in the State Legislature |
|---|---|---|---|---|---|
| 1992 | 19 | 170 | 11.2% | 22.2% | 0.51 |
| 1994 | 25 | 170 | 14.7% | 22.2% | 0.66 |
| 1996 | 24 | 170 | 14.1% | 22.1% | 0.64 |
| 1998 | 24 | 170 | 14.1% | 22.1% | 0.64 |
| 2000 | 24 | 170 | 14.1% | 21.8% | 0.65 |
| 2002 | 25 | 170 | 14.7% | 21.8% | 0.67 |
| 2004 | 24 | 170 | 14.1% | 21.8% | 0.65 |
| 2006 | 26 | 170 | 15.3% | 21.8% | 0.70 |
| 2008 | 27 | 170 | 15.9% | 21.8% | 0.73 |
| 2010 | 29 | 170 | 17.1% | 21.9% | 0.78 |
| 2012 | 25 | 170 | 14.7% | 22.0% | 0.67 |
| 2014 | 32 | 170 | 18.8% | 22.2% | 0.85 |
| 2016 | 33 | 170 | 19.4% | 22.2% | 0.87 |
| 2018 | 35 | 170 | 20.6% | 22.2% | 0.93 |
| 2020 | 36 | 170 | 21.2% | 22.1% | 0.96 |
| 2022 | 38 | 170 | 22.4% | 22.1% | 1.01 |
| 2024 | 35 | 170 | 20.6% | 22.1% | 0.93 |
| **Average** | **28.3** | **170** | **16.6%** | **22.0%** | **0.76** |
| **Average from 2008 to 2004** | **32.2** | **170** | **18.9%** | **22.1%** | **0.86** |

Case 1:23-cv-01057-TDS-JLW    Document 128-7    Filed 05/27/25    Page 41 of 45

Note: Data on Black state legislators from 1992 to 2010 come from Appendix A in Clark (2019) at 157–61; data on Black state legislators from 2012 to 2024 are taken from the North Carolina General Assembly.[149] Population data come from the U.S. Census Bureau.[150]

Table 13 provides data on white representation in the North Carolina state legislature from 2008 to 2024. Because the data was unavailable, I was unable to analyze white representation from 1992 to 2008, as I did with Black representation in the North Carolina state legislature.[151] Regardless, the table shows that just as with the U.S. House, whites have historically been overrepresented in the North Carolina state legislature. To allow a direct comparison, the last row of the table examining Black representation in the North Carolina legislature calculates metrics from 2008 to 2024. Even in an era where a Black president had been elected and more Blacks are serving in the state legislature, the Black Representation Ratio remains below one. Conversely, the white representation ratio remains well above one. On average, the white representation ratio in the North Carolina state legislature is 1.12. All told, white North Carolinians are overrepresented in the state legislature, whereas Blacks are underrepresented.

**Table 13: White Representation in the North Carolina State Legislature, 2008 to 2024**

| Year | Total White State Legislators[152] | Total Number of State Legislators | Percentage of State Legislators that is White | Proportion of the State Population that is White | White Representation Ratio in the State Legislature |
|---|---|---|---|---|---|
| 2008 | 140 | 170 | 82.4% | 72.8%[153] | 1.13 |
| 2010 | 139 | 170 | 81.8% | 72.3%[154] | 1.13 |
| 2012 | 144 | 170 | 84.7% | 71.9% | 1.18 |
| 2014 | 137 | 170 | 80.6% | 71.4% | 1.13 |

[149] The North Carolina General Assembly provided data on Black state legislators from 2012 to 2014. Data for Black House members come from this source: *House Documents*, N.C. Gen. Assemb., https://www.ncleg.gov/Documents/9/ (last accessed Aug. 1, 2024). Data for Black Senate members come from this source: *Senate Documents*, N.C. Gen. Assemb., https://www.ncleg.gov/Documents/10/ (last accessed Aug. 1, 2024).

[150] *State Population by Characteristics: 2010–2019*, U.S. Census Bureau, https://www.census.gov/data/tables/time-series/demo/popest/2010s-state-detail.html (last accessed Aug. 1, 2024); *State Population Characteristics: 2020–2023*, U.S. Census Bureau, https://www.census.gov/data/tables/time-series/demo/popest/2020s-state-detail.html (last accessed Aug. 1, 2024)

[151] The North Carolina General Assembly provides data online on the race of house members dating back to the 2001-02 session; however, it only provides data on state senators dating back to the 2007-08 session.

[152] The North Carolina General Assembly provided data on white state legislators. Data for white House members come from this source: *House Documents*, N.C. Gen. Assemb., https://www.ncleg.gov/Documents/9/ (last accessed Aug. 1, 2024). Data for white Senate members come from this source: *Senate Documents*, N.C. Gen. Assemb., https://www.ncleg.gov/Documents/10/ (last accessed Aug. 1, 2024).

[153] Data for 2008 come from this source: *State Intercensal Tables: 2000–2010*, U.S. Census Bureau, https://www.census.gov/data/tables/time-series/demo/popest/intercensal-2000-2010-state.html (last accessed Aug. 1, 2024).

[154] Data for 2010 through 2019 come from this source: *State Population by Characteristics: 2010-2019*, U.S. Census Bureau, https://www.census.gov/data/tables/time-series/demo/popest/2010s-state-detail.html (last accessed Aug. 1, 2024).

Case 1:23-cv-01057-TDS-JLW    Document 128-7    Filed 05/27/25    Page 42 of 45

| | | | | | |
|---|---|---|---|---|---|
| 2016 | 136 | 170 | 80.0% | 71% | 1.13 |
| 2018 | 133 | 170 | 78.2% | 70.7% | 1.11 |
| 2020 | 131 | 170 | 77.1% | 70.4%[155] | 1.10 |
| 2022 | 128 | 170 | 75.3% | 70.0% | 1.08 |
| 2024 | 129 | 170 | 75.9% | 69.8% | 1.09 |
| **Average** | **135.2** | **170** | **79.5%** | **71.1%** | **1.12** |

### E. Latino Representation in North Carolina

Latinos in North Carolina have also had trouble reaching elected office. No Latino has ever served North Carolina in Congress—in the Senate or in the House of Representatives.[156] No Latino has ever been elected Governor. No Latino has ever been elected to *any* statewide office.[157]

When Ricky Hurtado was elected to represent District 63 in the North Carolina House in 2020, he became the third Latino ever to serve in the state legislature.[158] The first Latino ever elected to the state legislature was Danny McComas, who served from 1995 to 2012.[159] Tom Apodaca, described as being on Mexican descent,[160] was elected in 2002 and left office in 2016.[161] Hurtado lost his re-election bid in 2022 after serving only one term, leaving no Latinos in the legislature in the 2023-24 session.[162]

The dearth of Latino representation runs counter to demographic gains made by the group. In 1992, Latinos comprised only 1.3 of North Carolina's population, but by 2010, Latinos made up 8.4 percent of the state's population, an increase of more than sixfold.[163] The Latino population in the state continued to grow in the 2010s. By 2023, Latinos comprised 11.4 percent of the state's population.[164] The Latino population has grown tremendously in the last three decades, yet no

---

[155] Data for 2020 onwards come from this source: *State Population by Characteristics: 2020-2023*, U.S. Census Bureau, https://www.census.gov/data/tables/time-series/demo/popest/2020s-state-detail.html (last accessed Aug. 1, 2024).

[156] *People Search*, U.S. House of Representatives, https://history.house.gov/People/Search/ (last visited Aug. 1, 2024).

[157] Colin Campbell, *Few Latino Candidates on 2024 North Carolina Ballots Despite Population Growth*, WUNC (Apr. 15, 2024), https://www.wunc.org/politics/2024-04-15/2024-election-north-carolina-latino-candidates-population-growth.

[158] Colin Campbell & Chiara Vercellone, *North Carolina Has No Latino Legislators. That's About to Change*, News & Observer (Dec. 21, 2020), https://www.newsobserver.com/news/politics-government/article247948255.html.

[162] *Election Results*, N.C. State Bd. Of Elections, https://er.ncsbe.gov/ (last accessed Aug. 1, 2024) (choose the following from the dropdown menus: 11/08/2022, STATE, NC HOUSE, ALL).

[162] *Election Results*, N.C. State Bd. Of Elections, https://er.ncsbe.gov/ (last accessed Aug. 1, 2024) (choose the following from the dropdown menus: 11/08/2022, STATE, NC HOUSE, ALL).

[162] *Election Results*, N.C. State Bd. Of Elections, https://er.ncsbe.gov/ (last accessed Aug. 1, 2024) (choose the following from the dropdown menus: 11/08/2022, STATE, NC HOUSE, ALL).

[162] *Election Results*, N.C. State Bd. Of Elections, https://er.ncsbe.gov/ (last accessed Aug. 1, 2024) (choose the following from the dropdown menus: 11/08/2022, STATE, NC HOUSE, ALL).

[163] Clark, *supra* note 37, at 157–59.

[164] *State Population Characteristics: 2020–2023*, U.S. Census Bureau, https://www.census.gov/data/tables/time-series/demo/popest/2020s-state-detail.html (last accessed Aug. 1, 2024).

Latino has ever represented North Carolina in Congress, and only three Latinos have ever served in the North Carolina state legislature.

The lack of Latino representation is not due to a lack of effort. In the 2022 election cycle, seven Latinos (including incumbent Ricky Hurtado) ran for seats in the state legislature, but none of the candidates won.[165] In 2024, Luis Toledo ran for state auditor and Gabe Esparza ran for state treasurer, but both candidates lost.[166] Four Latinos are running for the legislature in 2024, and while one is running unopposed, the other three candidates will not have as easy of a path to victory.[167]

Shortly after being elected in 2020, Ricky Hurtado was optimistic that other Latinos would join him in the state legislature, stating, "I think we are seeing a moment here in North Carolina that it's time, in terms of a new generation of folks—the children of immigrants who have seen the struggles of their parents… The barrier has finally been shattered."[168] However, after he lost his first re-election bid, and with no other Latino winning a seat in the state legislature in 2022, it is premature to say all barriers have been shattered. Instead, Latinos continue to face obstacles to reaching elected office in North Carolina.

## VII. Conclusion

This report has looked at the extent to which Senate Factors 5, 6, and 7 are present in North Carolina. Different types of data were brought to bear, and several academic studies were referenced. The analyses show that Blacks and Latinos face disparities in the areas of education, employment, health, and income, which are all factors that influence political engagement. These disparities suggest that Blacks and Latinos will be less likely to vote than their white peers, and analysis of voter turnout among registered voters proves this is the case. This disparity in voter turnout persists over time.

In addition, this report shows that implicit and explicit racial appeals continue to occur in North Carolina's elections. The implicit appeals are not as obvious as the explicit ones, but they still exist. Through substantive racial distancing and through candidates tying themselves to former President Trump, it is undeniable that Republican candidates, notably including Ted Budd, employ implicit racial appeals in elections in North Carolina. These appeals target both Blacks and Latinos.

Finally, Blacks and Latinos have struggled to win statewide office in North Carolina. Although Cheri Beasley participated in a competitive election, she experienced the same fate as every other Black person who previously sought to represent North Carolina in the U.S. Senate: she lost. Meanwhile, Mark Robinson's relative success to date must be viewed in light of how few Black North Carolinians support his candidacy for governor. Overall, Blacks are generally

---

[165] Luciana Perez Uribe Guinassi, *Sole Hispanic Legislator in North Carolina Voted Out*, News & Observer (Nov. 15, 2022) (on file with author).
[166] Campbell, *supra* note 158.
[167] *Id.*
[168] Campbell & Vercellone, *supra* note 159.

underrepresented in both the U.S. House of Representatives and the North Carolina state legislature; and with so few Latinos winning elected office in North Carolina, the group is nowhere near approaching parity in terms of its seat share in either chamber of Congress or in the North Carolina state legislature.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


Executed on October 25, 2024 (as amended)


Christopher Clark