# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |
|---|---|
| SHAUNA WILLIAMS; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 23-CV-1057 |
| REPRESENTATIVE DESTIN HALL, in his official capacity as Chair of the House Standing Committee on Redistricting; *et al.*, | |
| *Defendants.* | |
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 23-CV-1104 |
| PHILIP BERGER, in his official capacity as the President Pro Tempore of the North Carolina Senate; *et al.*, | |
| *Defendants.* | |

## LEGISLATIVE DEFENDANTS' PROPOSED POST-TRIAL FINDINGS OF FACT

# TABLE OF CONTENTS

I.    Background and Prior Redistricting Cycles ................................................. 1

      A.    History of political considerations in North Carolina redistricting .............. 1

      B.    North Carolina's Brief Departure from Traditional Political Process ......... 3

II.   2023 Redistricting Cycle ....................................................................... 7

      A.    The 2023 Senate Plan Criteria ................................................. 11

      B.    The 2023 Senate Plan ............................................................. 14

      C.    The 2023 Congressional Plan Criteria ...................................... 20

      D.    The 2023 Congressional Plan.................................................... 21

      E.    2023 Congressional Plan Drafting in the House ......................... 25

III.  This Litigation ..................................................................................... 30

      A.    Dismissal of Claims and Claims Remaining............................... 31

      B.    Williams Plaintiffs.................................................................... 32

      C.    NAACP Plaintiffs..................................................................... 33

IV.   Evidence of racial intent in the drawing of the 2023 plans.................... 35

      A.    Direct Evidence of Intent ......................................................... 36

      B.    Circumstantial Evidence........................................................... 37

            1.    Congressional Districts .................................................... 37

            2.    Senate Districts............................................................... 81

      C.    Alternative plans...................................................................... 84

V.    Evidence the 2023 plans have a dilutive or discriminatory effect ......... 86

      A.    Evidence of Effect in Congressional Districts ........................... 86

      B.    Evidence of Effect in Senate Districts....................................... 89

VI.   Minority opportunity in Northeastern North Carolina ......................... 89

A.     Geography in Northeastern North Carolina ................................................. 89

     1.     Violations of *Stephenson* ................................................. 91

     2.     Prioritizing Race Over Traditional Redistricting Criteria ............... 95

     3.     Racial Predominance ................................................. 108

     4.     Compactness ................................................. 109

B.     Voting Patterns in Northeastern North Carolina ........................................ 111

     1.     Substantial Levels of Crossover Voting Across the State .............. 111

     2.     Fifty-percent BVAP districts are not necessary to secure equal Black electoral opportunity in North Carolina. ............................ 113

     3.     Polarization is Partisan, Not Racial. ................................................. 121

C.     Factors Relevant to Minority Voting Opportunity ..................................... 130

     1.     The Extent of Any History of Voting-Related Discrimination ...... 135

     2.     Degree to Which Voting is Polarized ................................................. 138

     3.     Whether Voting Procedures Enhance Opportunity for Discrimination ................................................. 146

     4.     Effects of Past Discrimination on Minority Group's Ability to Participate in Political Process ................................................. 150

     5.     Extent to Which Campaigns are Characterized by Racial Appeals ................................................. 156

     6.     Success of Black Candidates ................................................. 163

     7.     Responsiveness of Elected Officials ................................................. 169

## I. Background and Prior Redistricting Cycles

### A. History of political considerations in North Carolina redistricting

1. Following each decennial census, the North Carolina General Assembly must redraw the State's legislative and congressional districts. This task is exclusively committed to the General Assembly. N.C. CONST. art. II §§ 3, 5.

2. Under the State's traditional redistricting process, the party in control of the General Assembly exercises unreviewable political discretion under the principle that "elections have consequences." *Dickson v. Rucho*, 2013 WL 3376658, at *1 (N.C. Super. July 8, 2013). State precedent holds that "the political process is [not] enhanced if the power of the courts is consistently invoked to second-guess the General Assembly's redistricting decisions." *Pender County v. Bartlett*, 361 N.C. 491, 506 (2007), *aff'd on other grounds sub nom. Bartlett v. Strickland*, 556 U.S. 1 (2009).

3. This view reflects generations of practice. As early as 1777, the General Assembly "established the boundaries of the counties from which Senators and Representatives were elected," and over subsequent generations, it "created smaller counties in the east and larger ones in the piedmont and west, keeping the distribution of representatives in favor of the east despite population growth trends in other areas." *Harper v. Hall*, 384 N.C. 292, 328 (2023) (*Harper III*). "After the Reconstruction Era and the rejuvenation of the Democratic Party, the practice of gerrymandering again became a favored tactic in gaining partisan control of the congressional delegation." D. Orr, Jr., *The Persistence of the Gerrymander in North Carolina Congressional Redistricting*, 9 SOUTHEASTERN GEOGRAPHER 39, 43 (1969). The paradigmatic example were the "bacon-

strip" districts that ran "horizontally across the state" grouping a "few Republican counties" with "Democratic counties" to facilitate Democratic victories. Leroy C. Hardy, *Considering the Gerrymander*, 4 PEPP. L. REV. 243, 258–59 (1976). "One such district extended from Pender County on the coast, westward along the South Carolina line through seven more counties all the way to Mecklenburg, a total distance of approximately 250 miles." Orr, *supra*, at 43.

4.      In the 1990s, the General Assembly enacted a contorted congressional district with a "'snakelike' shape" that "track[ed] Interstate 85." *Hunt v. Cromartie*, 526 U.S. 541, 544 (1999) (*Cromartie I*). The General Assembly asserted that it "drew its district lines with the intent to make District 12 a strong Democratic district," *id.* at 549, and the Supreme Court accepted this "legitimate political explanation for its districting decision" as a defense to a claim of racial gerrymandering. *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (*Cromartie II*).

5.      At times, the General Assembly has employed racial goals in an effort to comply with the Voting Rights Act (VRA), and these efforts have typically proven unsuccessful. In *Bartlett*, the General Assembly departed from the State Constitution's county-grouping formula to create a legislative crossover district with "an African-American voting-age population of 39.36 percent." 556 U.S. at 8 (plurality opinion). Both the United States and North Carolina Supreme Courts found this departure unjustified by § 2, which does not require "crossover" districts, i.e., those "in which minority voters make up less than a majority of the voting-age population." *Id.* at 13.

2

6.     Following *Bartlett*, the General Assembly understood the VRA to require districts of at least 50% BVAP and configured districts to hit that mark. *See Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 205 (4th Cir. 2024). Federal courts found this to be a misapprehension of law and rejected the State's VRA defense to racial-gerrymandering claims, finding that polarized voting had not been shown to reach legally significant levels. *Id.* (citing *Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016), *aff'd*, 581 U.S. 1015 (2017)); *see also Cooper v. Harris*, 581 U.S. 285 (2017). But these courts did *not* find that "the legislature acted in bad faith or with discriminatory intent in its redistricting" in the 2010 cycle. *Covington*, 316 F.R.D. at 129.

7.     Based on this experience, and heeding federal-court rulings, the General Assembly returned to a redistricting process emphasizing political considerations, as well as traditional districting principles. *See Rucho v. Common Cause*, 588 U.S. 684, 723–24 (2019) (Kagan, J., dissenting) (describing effort after *Covington* to "maintain the 10-3 composition of the State's congressional delegation"). The North Carolina General Assembly's designated legislative officers[1] (the "Legislative Defendants") persuaded the Supreme Court to hold "that partisan gerrymandering claims present political questions beyond the reach of the federal courts." *Id.* at 718 (majority opinion).

**B.     North Carolina's Brief Departure from Traditional Political Process**

8.     On the heels of *Rucho*, North Carolina's state courts briefly charted a different course by attempting to extricate politics from redistricting. This led to an unusual

---

[1] *See* N.C. GEN. STAT. § 1-72.2; *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 184–185 (2022).

set of redistricting processes that did not reflect historic state (or national) practice. *Cf.*

*Vieth v. Jubelirer*, 541 U.S. 267, 285 (2004) (plurality opinion) ("it would be quixotic to

attempt to bar state legislatures from considering politics as they redraw district lines").

9.     In the 2016 remedial congressional redistricting following *Cooper* and the

2017 remedial legislative redistricting following *Covington*, the General Assembly

implemented a policy forbidding consideration of racial data. *See Pierce*, 97 F.4th at 205

(citing *North Carolina v. Covington*, 585 U.S. 969 (2018) (per curiam)); [JX315; JX321].

The General Assembly looked to political data, which led to litigation "now on a partisan

gerrymandering theory." *Pierce*, 97 F.4th at 205. While (as noted) federal courts declared

those claims non-justiciable, a state court in 2019 found the theory justiciable under state

law and enjoined the state's legislative plans. *Id.* at 206; *Common Cause v. Lewis*, 18-cvs-

014001, 2019 WL 4569584 (N.C. Super. Sep. 03, 2019). That court afforded the General

Assembly two weeks to enact remedial plans, forbade it from considering partisan data or

using the enjoined plan as a "starting point," and mandated that it conduct all its work in

full public view. *Lewis*, 2019 WL 4569584, at *133–34. The General Assembly again

adopted a criterion of race neutrality, as the plaintiffs advocated. *See id.* at *131. As Senator

Smith testified, the General Assembly used a lottery machine to select maps to use in that

process—a technique she described euphemistically as "different." [Vol. IV Tr. 813:14-

20, 814:13-16]. This was a departure from North Carolina's traditional districting process.

10.     After the 2020 census, the General Assembly conducted a redistricting

process under the shadow of the *Common Cause* ruling, employing unusual public

proceedings and adopting criteria barring the use of political data. As in 2017 and 2019,

4

the General Assembly eschewed racial data. [JX224; JX315]. During this process, the General Assembly determined there were two permissible county groupings for state senate districts in northeastern North Carolina, and chose one of them (which is the grouping at issue in this case). *N.C. League, of Conservation Voters, Inc. v. Hall*, No. 21 CVS 015426, 2022 WL 124616, at *19 (N.C. Super. Jan. 11, 2022); [*Compare* JX223, *with* JX202]. On November 4, 2021, the General Assembly enacted the 2021 senate and congressional plans. [D.E. 148 at 11 (¶51); JX229; JX230].

11.    Challenges to the 2021 house, senate, and congressional plans (the "2021 Plans") were immediately filed by various plaintiffs—including Common Cause and the North Carolina State Conference of the NAACP—alleging that the 2021 Plans were unconstitutional partisan gerrymanders under the North Carolina Constitution. [D.E. 148 at 11 (¶51)]. Initially adopting these arguments, the North Carolina Supreme Court enjoined all three plans. *Harper v. Hall*, 868 S.E.2d 499 (N.C. 2022) (*Harper I*). The court set standards, such as that plans achieve an "efficiency gap" under 7%, and a mean-median difference of 1% or less, that required affirmative legislative efforts, including the use of political data, to achieve fairness. *See id.* at 548.

12.    This led to another remedial redistricting again under judicial supervision. In the 2022 remedial phase, the General Assembly selected the alternative senate county grouping (i.e., the one not at issue in this case) for northeastern North Carolina at the request of the plaintiff groups to address the alleged partisan gerrymandering. *Harper v. Hall*, No. 21 CVS 015426, at ¶ 36, 2022 WL 2610499, at *5 (N.C. Super. Ct. Feb. 23, 2022). The General Assembly again excluded racial data from its redistricting effort.

5

[JX224]. The General Assembly's remedial plans were submitted to a state-court three-judge panel on February 18, 2022. [D.E. 148 at 11 (¶¶51-52)]; *see also Harper v. Hall*, No. 21 CVS 015426 at ¶ 8, 2022 WL 2610499, at *2 (N.C. Super. Feb. 23, 2022).

13. The three-judge panel hired three special masters, who in turn hired four advisors of their own. *See Harper v. Hall*, 881 S.E.2d 156, 165–166 (N.C. 2022) (*Harper II*). The special masters recommended that the trial court uphold the General Assembly's remedial house and senate plans but reject the congressional plan. *Id*. at 169. The Special Masters submitted an alternative remedial congressional plan (the "2022 court-ordered congressional plan") drafted in consultation with the advisors. *Id*. The 2022 court-ordered congressional plan was configured to satisfy *Harper I*'s partisan-fairness metrics. *See id*. at 176–77 (describing "an efficiency gap of 0.63%, a mean-median difference of 0.69%, seat bias of 0.28%, and vote bias of 0.10%"). The three-judge panel adopted the special masters' findings of the plans. *Id*.

14. All parties appealed the remedial order to the North Carolina Supreme Court. *Id*. at 171-73. In the interim, the remedial house and senate plans and the 2022 court-ordered congressional plan were used in the 2022 elections. [D.E. 148 at 12 (¶53)].

15. Appeals from the three-judge panel's remedial order to the North Carolina Supreme Court proceeded on an expedited schedule. *See Harper v. Hall*, 874 S.E.2d 902 (2022). Ultimately, the North Carolina Supreme Court issued a ruling on December 16, 2022, *Harper II*, 881 S.E.2d 89, that affirmed the three-judge panel's rejection of the remedial congressional plan and its approval of the remedial house plan, but reversed the three-judge panel's approval of the remedial senate plan. *Id*.

16.     On April 28, 2023, in *Harper III*, the North Carolina Supreme Court re-heard the *Harper* cases and withdrew *Harper II*, overruled *Harper I*, and held that partisan gerrymandering claims are nonjusticiable political questions under the North Carolina Constitution. [D.E. 148 at 12 (¶55)]; 886 S.E.2d 393. The *Harper III* court held that "because both the 2021 and 2022 maps were the byproduct of a 'mistaken understanding of the North Carolina Constitution,' the General Assembly 'shall have the opportunity to enact a new set of legislative and congressional redistricting plans' guided by federal and state law." *Pierce*, 97 F.4th at 206 (quoting *Harper III*).

17.     This ended the unusual processes that governed North Carolina redistricting for a time and returned the State to the established tradition of legislative control.

## II.     <u>2023 Redistricting Cycle</u>

18.     During the 2023 long session, which began before *Harper III* was issued, the General Assembly prioritized the State's biannual budget. [Vol. IV Tr. 834:9-24]. Senator Ralph E. Hise, Jr., one of three co-chairs of the 2023 Senate Committee on Elections and Redistricting (the "Senate Committee") [Vol. IV Tr. 833:21-25], testified that it was important that the budget be complete prior to redistricting so that drawing was not tied to budget negotiations, and so that the entire General Assembly could focus on redistricting. [Vol. IV Tr. 834:22-835:12; 869:11-15]. Contrary to Plaintiffs' conjecture, the timing of the redistricting process was not a tactic to "run out the clock" or limit challenges to the plan, but instead the result of prioritizing the budget. [Vol. IV Tr. 835:5-10].

19.     Furthermore, in setting the redistricting timeline, the General Assembly adhered to deadlines provided by the North Carolina State Board of Elections ("NCSBE")

regarding when districts were needed to meet candidate filing and other pre-election deadlines. [Vol. IV Tr. 834:24-835:3, 835:10-12]. Representative Mary Taylor Price ("Pricey") Harrison likewise understood that the maps needed to be ratified before the NCSBE filing deadlines. [D.E. 162-2, Harrison Dep. 135:20-137:2].

20.     The General Assembly did not utilize the types of processes employed from 2019 through 2022 under heavy-handed judicial supervision. No racial intent may fairly be inferred from that choice. The General Assembly persuaded federal and state courts to permit the traditional legislative hegemony over redistricting in North Carolina, including to achieve political goals, and it is no surprise—and not remotely suspect—that the General Assembly rejected the processes courts had imposed or encouraged. Nor is this choice fairly understood as a departure from legislative norms in North Carolina.

21.     The process was as fair and open as one might expect under the circumstances. In addition to the numerous public hearings held after the release of the 2020 decennial census in 2021, [D.E. 148 at 10 (¶¶42-43); Vol. IV Tr. 863:24-864:10; JX241], the General Assembly held three additional public comment sessions from September 25–27, 2023, in Elizabeth City, Hickory, and Raleigh. [Vol. IV Tr. 863:18-22; D.E. 148 at 3 (¶9); JX066; JX068; JX070]. The General Assembly also opened a public comment portal on its website that allowed individuals to submit comments and proposed maps for consideration from any location at any time. [Vol. IV Tr. 862:24-863:13; D.E. 148 at 3 (¶11)]. Rep. Harrison agreed that the public had the opportunity to offer input on the plans via the public comment portal, and that input given at previous public hearings

8

could be used since the census data had not changed since the last set of hearings. [D.E. 162-2, Harrison Dep. 160:6-22].

22. Plaintiff Allison Allen testified that she did not participate in the 2023 Redistricting process because she was unable to. [Vol. II Tr. 343:12-344:2]. But, Plaintiff Allen did not attempt to submit a written comment to the General Assembly regarding redistricting or otherwise attempt to contact her representatives despite testifying that she knows all of her representatives and is able to reach out to them personally. [Vol. II Tr. 346:21-347:20]. Plaintiff Reverend Daly-Mack testified that she did not participate in the 2023 redistricting process despite receiving an email for a meeting to discuss it. [Vol. II Tr. 370:10-371:3; Tr. 373:15-19; LDTX199]. Plaintiff Reverend Daly-Mack has not participated in redistricting processes in the past either. [Vol. II Tr. 371:11-12].

23. Common Cause North Carolina Executive Director Bob Phillips admitted to speaking with several legislators during the 2023 redistricting process on both sides of aisle, Democrats and Republicans. [Vol. III Tr. 633:23-634:5]. Specifically, Common Cause spoke to Representative Harry Warren, and Senators Ralph Hise, Paul Newton, and Warren Daniel, among others, regarding the 2023 redistricting process. [Vol. III Tr. 634:6-9]. Mr. Phillips admitted that Common Cause North Carolina has never initiated litigation when Democrats controlled the redistricting process and drew the maps. [Vol. III Tr. 633:13-16].

24. Members of any party could participate in the redistricting process by submitting amendments or offering suggestions to members of their Chamber's respective Committee. [Vol. IV Tr. 845:17-846:23, 871:7-18; JX003 at 16:14-21]. As Senator Hise

9

testified, every member of the legislature had access to Maptitude and assistance from legislative staff. [Vol. IV Tr. 867:10-14]. Indeed, multiple successful amendments were offered by Democrats. [Vol. IV Tr. 845:17-846:23; JX003 at 16:14-19:2, 20:6-24:24; JX371; JX372; JX013 at 28:12-46:17; JX006 26:24-28:14]. Rep. Harrison admitted that during the 2023 redistricting process, then-Chairman of the House Redistricting Committee, Representative Destin Hall, established a dedicated room for House Democratic Caucus members to use to draft House and Congressional maps starting August 23, 2023. [D.E. 162-2, Harrison Dep.14:10-14, 15:12-16:2]. Likewise, Senator Kandie Smith admitted that if she had any thoughts about the maps, she could have shared those with members of the Senate Committee as they worked on drafting. [Vol. IV Tr. 827:23-828:1]. She also agreed that she could have offered amendments from the floor, but did not. [Vol. IV Tr. 821:9-19].

25.     In August 2023, Speaker Hall retained Blake Springhetti to draw draft House and Congressional plans. [D.E. 148 at 2 (¶6); Vol. VI Tr. 1242:19-1243:5]. Rep. Harrison admitted that Chairman Hall was "very public" about hiring Mr. Springhetti to consult on the maps, and she believed representatives from both parties provided input to Mr. Springhetti, although she did not. [D.E. 162-2, Harrison Dep. 140:14-141:21, 176:5-22]. Mr. Springhetti did not discuss or share draft Congressional plans with any Senators. [Vol. VI Tr. 1251:1-3]. The Senate Committee chose not to engage a third-party map drawer, and instead drafted senate and congressional plans themselves. [D.E. 148 at 2 (¶7); Vol. IV Tr. 866:12-20].

## A. The 2023 Senate Plan Criteria

26. As co-chair of the Senate Committee, Senator Hise participated in drafting the 2023 Senate Plan Criteria ("the 2023 Senate Criteria") [Vol. IV Tr. 835:13-16]. The 2023 Senate Criteria included:

- Equal Population. The Senate Committee chairs will use the 2020 federal decennial census data as the sole basis of population for the establishment of districts in the 2023 Senate Plan. In forming new legislative districts, any deviation from the ideal population for a legislative district shall be at or within plus or minus five percent for purposes of compliance with federal "one-person, one-vote" requirements. *Stephenson v. Bartlett*, 357 N.C. 301 (2003) (*Stephenson II*).

- County Groupings and Traversals. The Senate Committee chairs shall draw legislative districts within county groupings as required by *Stephenson v. Bartlett*, 355 N.C, 354 (2002) (*Stephenson I*), *Stephenson II*, *Dickson v. Rucho*, 367 N.C. 542 (2014) (*Dickson I*) and *Dickson v. Rucho*, 368 N.C. 481 (2015) (*Dickson II*). Within county groupings, county lines shall not be traversed except as authorized by *Stephenson I*, *Stephenson II*, *Dickson I*, and *Dickson II*.

- Traditional Districting Principles. We observe that the State Constitution's limitations upon redistricting and apportionment uphold what the United States Supreme Court has termed "traditional districting principles." These principles include factors such as "compactness, contiguity, and respect for political subdivisions." *Stephenson II* (quoting *Shaw v. Reno*, 509 U.S. 630 (1993)).

- Compactness. Communities of interest should be considered in the formation of compact and contiguous electoral districts. *Stephenson II*.

- Contiguity. Each Senate district shall at all times consist of contiguous territory. N.C. CONST. art. II, § 3. Contiguity by water is sufficient.

- Respect for Existing Political Subdivisions. County lines, VTDs and municipal boundaries may be considered when possible in forming districts that do not split these existing political subdivisions.

11

- <u>Racial Data</u>. Data identifying the race of individuals or voters shall *not* be used in the drafting of districts in the 2023 Senate Plan.

- <u>Political Considerations</u>. Politics and political considerations are inseparable from districting and apportionment. *Gaffney v. Cummings*, 412 U.S. 735 (1973). The General Assembly may consider partisan advantage and incumbency protection in the application of its discretionary redistricting decisions . . . but it must do so in conformity with the State Constitution. *Stephenson II*. To hold that legislators cannot take partisan interests into account when drawing district lines would essentially countermand the Framers' decision to entrust districting to political entities. *Rucho v. Common Cause*, 588 U.S. ____ (2019).

- <u>Incumbent Residence</u>. Incumbent residence may be considered in the formation of Senate districts.

[JX047].

27.     These criteria differed from those of the *Common Cause* and *Harper I* regimes, where a goal of partisan fairness had been imposed. Under the 2023 criteria, the General Assembly—consistent with longstanding tradition—was permitted to draw for "partisan advantage." It is then no surprise, and not suspect, that the resulting plans differed from the 2022 plans. Notably, the criteria forbidding racial considerations were constant across these years, as the General Assembly's 2019, 2021, and 2022 redistricting efforts were all race-blind. Differences from 2022 and 2023 districts cannot fairly be understood to reflect racial goals.

28.     In compliance with the whole county provisions of the North Carolina Constitution, and governing precedents applying it ("*Stephenson*"),[2] the County Groupings

---

[2] *See, e.g.*, *Stephenson v. Bartlett*, 355 N.C. 354, 370, 562 S.E.2d 377, 389 (2002) (*Stephenson I*); *Stephenson v. Bartlett*, 357 N.C. 301, 302, 582 S.E.2d 247, 248 (2003)

and Traversals criterion required a structured method for grouping counties while minimizing unnecessary splits. [JX047; Vol. IV Tr. 836:12-837:2]. Under this pyramid structure, drawing starts first by identifying if any single county could be its own district. [Vol. IV Tr. 836:15-19]. Next, drawers must look for any two whole counties, with a contiguous border, which could be their own district—and so on and so forth, until and unless, the drawer must start splitting counties to form the final districts in compliance with the Equal Population requirement. [JX047; Vol. IV Tr. 836:1-9, 19-23]. Senator Hise testified that he believed the legislature can comply with both *Stephenson* and federal law, but that if the two ever came into conflict, federal law would supersede the *Stephenson* county-grouping system. [Vol. IV Tr. 887:12-19, 974:24-975:1].

29.     Communities of interest included identified political subdivisions, such as areas with by similarities in county government, local municipalities, voter tabulation districts ("VTDs") or areas that have historically voted together, college and university campuses, and military bases. [Vol. IV 837:22-838:2, 838:15-24]. The Senate Committee also considered shared media markets. [Vol. IV 839:4-12]. The Senate Committee solicited feedback from the public and legislative members about what communities of interest they identified in their areas, and considered this feedback as well. [Vol. IV 838:24-839:2]. For example, several commenters identified the "fingerling counties" in northeastern North Carolina as a community of interest. [Vol. IV Tr. 841:20-21]. Senator Smith reported that attendees at the public hearing held at Elizabeth City State University did not want

---

(*Stephenson II*); *Dickson v. Rucho*, 368 N.C. 481, 571, 766 S.E.2d 238, 258 (N.C. 2014), *vacated on other grounds*, 575 U.S. 959 (2015).

communities of interest divided, nor did they want "packing and cracking." [Vol. IV Tr. 809:13-14, 810:15-20].

30.     In compliance with court rulings, the General Assembly did not use race when drawing Senate districts. [JX047; Vol. IV Tr. 839:13-840:1; JX002 at 4:13-16, 12:16-21]. Moreover, the General Assembly concluded that there was insufficient evidence that the *Gingles* criteria could be met to justify using race in drawing districts or departing from the *Stephenson* grouping requirements to achieve racial targets. [Vol. IV Tr. 839:22-840:1, 913:9-12, 914:7-12; JX002 at 4:17-5:17; JX003 at 34:5-10]. Political data, however, was used, in compliance with both United States and North Carolina Supreme Court rulings. [Vol. IV Tr. 840:4-14].

31.     During Senate Committee meetings and hearings, Senator Hise and the other co-chairs asked anyone with evidence of legally significant racially polarized voting to submit that evidence to the Senate Committee. [Vol. IV Tr. 900:9-20; JX002 at 6:22-7:6]. This included during the three public hearings held in September, several weeks before the first draft Senate map was filed. [D.E. 148 at 3 (¶9); Vol. IV  Tr. 900:9-14]. No evidence of legally significant racially polarized voting was presented. [Vol. IV Tr. 864:11-14, 898:2-5, 913:9-12, 914:7-12].

**B.     The 2023 Senate Plan**

32.     The first draft of the 2023 Senate Plan was released to the public on October 18, 2023, as S.B. 758. [D.E.148 at 4 (¶16); Vol. IV Tr. 862:18-22; JX042; JX099].

33.     The Senate Committee co-chairs supervised and directed all drawing of the 2023 Senate Plan. [Vol. IV Tr. 866:12-20]. Legislative staff were responsible for physically

14

implementing changes in the map software, and staff could not, and did not, work on the maps without supervision and direction from a co-chair. [Vol. IV Tr. 867:1-5].

34.     Senator Hise testified that the 2023 senate plan was predominantly drawn to satisfy *Stephenson*. [Vol. IV Tr. 837:6-11]. After implementing the Equal Population and County Groupings and Traversals criterion, the co-chairs were left with eighteen counties in northeastern North Carolina that, following the other 2023 Senate Criteria, could be grouped in two different ways to make an eight-county district and a ten-county district consisting of whole counties. [JX202; Vol. IV Tr. 841:4-12]. Neither grouping option created a majority-Black district. [NAACPPX194; Vol. IV Tr. 865:5-7; JX149]. The co-chairs chose the same configuration chosen in 2021, [JX223], which grouped Northampton, Hertford, Gates, Bertie, Perquimans, Pasquotank, Camden, Currituck, Tyrrell, and Dare counties in Senate District 1 ("SD1") and Warren, Halifax, Martin, Chowan, Washington, Hyde, Pamlico, and Carteret in Senate District 2 ("SD2"). [JX202]. The groupings left no further discretion to alter the borders of SD1 and SD2—the contours are dictated by *Stephenson*. [Vol. IV Tr. 841:4-5]. All other county groupings remained the same as in the 2022 remedial senate plan. [*Compare* JX202, *with* JX221].

35.     The co-chairs preferred the enacted northeastern county grouping configuration of SD1 and SD2 because it maintained four of the five finger counties in northeastern North Carolina, along with parts of the coastal region, together as a recognized community of interest. [JX202; Vol. IV Tr. 841:20-25]. The co-chairs also heard testimony that, of the counties included in enacted SD1, the majority were in the Virginia media

15

market. [Vol. IV Tr. 842:1-3]. And it was determined that of the possible configurations, the chosen configuration for SD1 was the most compact. [Vol. IV Tr. 842:3-5].

36.     SD1 is currently represented by Senator Bobby Hanig, a White Republican. [JX371; Vol. IV Tr. 910:25-911:1; JX368]. SD2 is currently represented by Senator Norman W. Sanderson, a White Republican. [JX371; Vol. IV Tr. 910:25-911:1; JX368]. Senators Hanig and Sanderson have both been elected to the North Carolina Senate under other configurations of the SD1 and SD2. [Vol. IV Tr. 910:25-911:3].

37.     Senate District 5 ("SD5") includes Pitt and Edgecombe counties, and is a single-district county grouping located just below SD2. [Vol. IV Tr. 798:21-22; JX202]. SD5 has been comprised of Pitt and Edgecombe counties since 2021. [Vol. IV Tr. 814:17-24; JX223; JX371]. In 2019, SD5 included Pitt and Greene counties, while Edgecombe was part of then-SD4 with Halifax and Wilson counties. [Vol. IV Tr. 814:17-24; JX305]. SD5 is currently represented by Senator Kandie Smith, a Black Democrat. [Vol. IV Tr. 798:21, 811:18-20]. Senator Smith agreed that Pitt and Edgecombe counties have socioeconomic similarities, especially between rural towns. [Vol. IV Tr. 819:15-21].

38.     Following the Equal Population and the *Stephenson* county groupings provisions, Columbus, Brunswick, and New Hanover counties form a three-county pod that must be split into two districts. [Vol. IV Tr. 842:16-21]. Senate District 8 ("SD8") includes Columbus and Brunswick counties, and part of New Hanover County. [JX202]. Senate District 7 ("SD7") includes most of New Hanover County. [JX202]. The choice to split New Hanover County between SD8 and SD7 was driven by the *Stephenson* grouping requirement. [Vol. IV Tr. 842:16-21]. Of the counties in the pod, New Hanover has the

16

largest population and is above the 5% threshold to be its own district, while Columbus and Brunswick Counties are too small to be a district themselves. [Vol. IV Tr. 843:2-7]. As a result, New Hanover County must be split. [Vol. IV Tr. 843:2-3]. Using the political data that was available in the mapdrawing software, the six precincts in New Hanover County that performed least well for Republicans were moved into SD8 and excluded from SD7. [Vol. IV Tr. 843:8-13]. Racial data was not used when these six precincts were chosen for inclusion in SD8. [Vol. IV Tr. 844:3-6].

39. SD7 is currently represented by Senator Michael Lee, a Republican. [JX368; Vol. IV Tr. 843:15-17]. Senator Lee represented SD7 under the 2022 configuration as well. [Vol. IV Tr. 843:18-20; JX365]. The political data that the General Assembly used in drawing districts shows a nearly 2.7% increase in the vote for President Trump in the 2020 Presidential Election from the 2022 plan (49.02%) to the 2023 plan (51.71%). [JX278 at 3; JX149 at 33]. Senator Lee went from winning SD7 by 1,710 votes in 2022 to winning by over 10,000 in 2024. [JX365; JX368]. Thus, the movement of the six precincts out of SD7 and into SD8 shored up the performance of SD7 for the Republican candidate in a district that Senator Hise testified has historically been "a very close race." [JX365; JX368; Vol. IV Tr. 844:7-16]. SD8 is currently represented by Senator Bill Rabon, a Republican. [JX368]. Senator Rabon represented SD8 under the 2022 configuration as well; he was uncontested in that election. [JX365].

40. On October 22, 2023, members of the Senate Committee and General Assembly leadership received a letter from the Southern Coalition for Social Justice. [Vol. IV Tr. 864:15-18; NAACPPX047]. Based on information from an acknowledged

"preliminary" study, [NAACPPX194], the letter requested that the county grouping governing SD1 and SD2 revert to that chosen in the 2022 senate plan. [Vol. IV Tr. 864:20-865:4; NAACPPX047]. The letter did not claim that Black voters in northeastern North Carolina needed a majority-Black district to elect their candidates of choice, [NAACPPX047], nor did the requested 2022 grouping result in a majority-Black district. [Vol. IV Tr. 865:5-7].

41. Upon reviewing the letter and all other public comments, the co-chairs of the Senate Committee determined that there was no evidence of legally significant racially polarized voting that could justify the use of race in drawing districts (or departure from *Stephenson* to create a majority-Black district). [Vol. IV Tr. 913:9-12, 914:7-12].

42. The Senate Committee continued debating S.B. 758 on October 23, 2023. Democratic Senators Mayfield and Woodard offered an amendment relating to Durham County, and Senator Garrett offered an amendment to Guilford County, which both passed. [D.E. 148 at 7 (¶29); Vol. IV Tr. 845:18-846:23; JX356]. Those amendments were not prepared with racial data. [JX003 at 22:4-6; JX205; JX206; JX356; Vol. IV Tr. 845:25-846:5, 846:23]. S.B. 758's committee substitute was adopted and sent to the Senate Chamber for debate. [D.E. 148 at 7 (¶29); JX042].

43. On October 24, 2023, Democratic Senator Dan Blue, a member of the Senate Committee, offered two amendments to S.B. 758 on the Senate floor, Amendments A-2 and A-3. Both Amendments proposed changes to the Senate districts in northeastern North Carolina. [Vol. IV Tr. 847:1; JX087; JX088; JX004 at 41:23-51:20; D.E. 148 at 8 (¶30)]. Unlike the amendments approved in Committee, Senator Blue's amendments were

18

prepared with racial data in violation of the 2023 Senate Criteria. [JX004 at 47:15-17, 50:8-13].

44.　　To have accepted Senator Blue's amendments would have been legally risky under the Equal Protection Clause. Amendment A-2 split Pitt County into three separate districts, and split Wilson, Lenoir, and Wayne Counties into two districts. [JX087]. In contrast, Pitt, Wilson, Lenoir, and Wayne Counties are kept whole under the enacted 2023 senate plan. [JX202]. Similarly, Amendment A-3 split Pitt County twice, and introduced splits into Nash, Wilson, Wayne, and Lenoir Counties. [JX088]. These county splits contravene *Stephenson*. [Vol. IV Tr. 847:5-10; JX004 at 47:18-20]. Senator Blue's Amendment A-3 had numerous similarities to the 2011 State Senate Plan struck down as a racial gerrymander in *Covington*: it split Pitt and Lenoir Counties in largely the same way as in 2011, and then used Greene County to connect those splits to oddly drawn appendages into the center of Wayne County. [JX327; JX088]. Finally, Amendment A-3 double-bunked all Republican incumbents in the region. [JX045; JX088].

45.　　Both of Senator Blue's Amendments were tabled. [JX087; JX088]. Senator Hise testified that he did not support Senator Blue's amendments because, contrary to the requirements stated in the 2023 Senate Criteria, Senator Blue did not indicate that the Amendments were drawn without using racial data. [Vol. IV Tr. 847:2-10]. The choice against Senator Blue's amendments was founded in a respect for the primacy of the United States Constitution. It is strong evidence against the theory that the General Assembly acted with racial intent in configuring any 2023 districts in any plan.

19

46.     On October 25, 2023, the General Assembly passed and ratified S.L. 2023-146 (S.B. 758) into North Carolina law (the "2023 senate plan"). [D.E. 148 at 9 (¶36); JX042].

## C.     The 2023 Congressional Plan Criteria

47.     As co-chair of the Senate Committee, Senator Hise participated in drafting the 2023 Congressional Plan Criteria ("the 2023 Congressional Criteria") used by the Senate Committee [Vol. IV Tr. 853:13-16]. The 2023 Congressional Criteria published by the Senate Committee included:

- Equal Population. The Senate Committee chairs will use the 2020 federal decennial census data as the sole basis of population for the establishment of districts in the 2023 Senate Plan. The number of persons in each congressional district shall equal be as nearly as is practicable, as determined under the most recent federal decennial census. *Wesberry v. Sanders*, 376 U.S. 1 (1964).

- Traditional Districting Principles. We observe that the State Constitution's limitations upon redistricting and apportionment uphold what the United States Supreme Court has termed "traditional districting principles." These principles include factors such as "compactness, contiguity, and respect for political subdivisions." *Stephenson II* (quoting *Shaw v. Reno*, 509 U.S. 630 (1993)).

- Compactness. The Senate Committee chairs shall make reasonable efforts to draw districts in the 2023 Congressional Plan that are compact.

- Contiguity. Congressional districts shall be comprised of contiguous territory. Contiguity by water is sufficient.

- Respect for Existing Political Subdivisions. County lines, VTDs and municipal boundaries may be considered when possible in forming districts that do not split these existing political subdivisions.

- Racial Data. Data identifying the race of individuals or voters shall *not* be used in the drafting of districts in the 2023 Congressional Plan.

- Political Considerations. Politics and political considerations are inseparable from districting and apportionment. *Gaffney v. Cummings*, 412 U.S. 735 (1973). The General Assembly may consider partisan advantage and incumbency protection in the application of its discretionary redistricting decisions . . . but it must do so in conformity with the State Constitution. *Stephenson II*. To hold that legislators cannot take partisan interests into account when drawing district lines would essentially countermand the Framers' decision to entrust districting to political entities. *Rucho v. Common Cause*, 588 U.S. ____ (2019).

- Incumbent Residence. Candidates for Congress are not required by law to reside in a district they seek to represent. However, incumbent residence may be considered in the formation of Congressional districts.

[JX038].

48.     These criteria, like the Senate criteria, differed from those of the *Common Cause* and *Harper I* regimes by permitting "partisan advantage." It is no surprise, and not suspect, that the resulting plans differed from the 2022 plans. By contrast, the criteria forbidding racial considerations were constant across these years, so differences from 2022 and 2023 districts cannot fairly be understood to reflect racial goals.

**D.     The 2023 Congressional Plan**

49.     The first drafts of the 2023 congressional plan were released to the public on October 18, 2023, as S.B. 756 and S.B. 757. [D.E. 148 at 4 (¶¶17-18); JX100; JX106; JX107; JX040; JX041]. As with the senate plan, the Senate Committee co-chairs

supervised and directed all drawing of the 2023 congressional plan within the Senate. [Vol. IV Tr. 866:12-20, 867:1-5; D.E. 148 at 2 (¶7)].

50.    In compliance with court rulings and the 2023 Congressional Criteria, no drawers used racial data when drawing congressional districts. [JX002 at 4:13-15; 23:23-24, 38:14-15; JX004 at 11:17-18, 13:3-8; JX038; Vol. IV Tr. 854:23-24; JX010 at 2:21-23]. Moreover, the General Assembly concluded that there was insufficient evidence that the *Gingles* criteria could be met to justify using race in drawing districts to achieve racial targets. [JX002 at 12:6-13:8]

51.    After implementing the equal population criterion, the Senate Committee co-chairs were left with eight districts that would have exactly one more person than the other six. [Vol. IV Tr. 855:6-10].

52.    Senator Hise explained that the drafting of the 2023 congressional plan began in the west and then adjusted as they worked eastward towards the middle of the state. [Vol. IV Tr. 855:17-856:1]. The Senate drafters did not begin drafting from the 2022 court-ordered congressional plan, because that plan was not drafted by the General Assembly, and did not achieve its political goals, and because legislators could not verify that it was drafted in compliance with the 2023 criteria. [Vol. IV Tr. 857:16-858:2]. Working to maintain equal population while minimizing the total number of counties split resulted in the decision to split more heavily populated counties. [Vol. IV Tr. 855:19-856:24; JX002 at 43:23-25]. Senator Hise testified that large counties benefit from being split between multiple congressional districts, which provides the county multiple members in Congress

22

who may focus their representation on different communities of the county. [Vol. IV 862:11-17; JX002 at 44:4-8].

53.     Partisan considerations and maintaining communities of interest both factored into drafting decisions for the congressional plan. [Vol. IV Tr. 861:8-21]. The types of communities considered for the senate plan were considered for the congressional plan, but the federal equal population restriction is more stringent for congressional plans, which required more VTD splits that occurred in the legislative plans. [Vol. IV Tr. 861:11-21]. While municipal boundaries were considered, there was no goal of clustering specific municipalities together. [Vol. IV Tr. 861:25-862:3].

54.     On October 23, 2023, the Senate Committee approved amendment CST-3 related to military bases affecting Onslow, Cumberland, Sampson, and Robeson counties in CD3, CD7, and CD8. [D.E. 148 at 7 (¶29); JX215; JX120]. The Committee then reported favorably on the Committee Substitute for S.B. 757, PCS45380-BK-42, which is identical to the 2023 congressional plan. [D.E. 148 at 7 (¶29); *compare* JX104, *with* JX210; JX041].

55.     Located in northeastern North Carolina, Congressional District 1 ("CD1") includes Currituck, Camden, Pasquotank, Perquimans, Chowan, Tyrrell, Washington, Gates, Hertford, Bertie, Martin, Northampton, Halifax, Warren, Nash, Edgecombe, Wilson, Wayne, Greene, Lenoir, Vance counties, and part of Granville County. [JX075]. The co-chairs preferred the enacted CD1 configuration because it grouped all five fingerling counties in northeastern North Carolina, along with parts of the coastal region, together as a recognized community of interest. [Vol. IV Tr. 858:8-10]. The co-chairs also preferred this configuration because it only split one county, Granville. [Vol. IV Tr.

858:10-13]. Whereas Pitt County was split between CD1 and CD3 under the 2022 plan, it was kept whole in CD3 in 2023. [Vol. IV Tr. 816:17-21; *compare* JX218, *with* JX075].

56.     CD3 is currently represented by Greg Murphy and CD1 is represented by Don Davis. [Vol. IV Tr. 816:24-817:2; JX369]. During trial, Senator Smith incorrectly claimed that Rep. Davis was "drawn out of Pitt County" by the 2023 congressional plan. [Vol. IV Tr. 823:8-17]. At the time the 2023 congressional plan was drafted, Congressman Davis lived in Snow Hill, North Carolina which is in Greene County, and Congressman Greg Murphy lived in Pitt County. [JX044; JX056]. Both the House mapdrawer, Mr. Springhetti, and the Senate Committee co-chair drawers knew current incumbent addresses and used them when drafting the 2023 plans with the goal of avoiding double bunking wherever possible, including in CD1 and CD3. [Vol. IV Tr. 925:10-11; Vol. VI Tr. 1246:4-11].

57.     Located in the Piedmont region, Congressional District 5 ("CD5") includes Caldwell, Watauga, Ashe, Alleghany, Wilkes, Alexander, Surry, Stokes, Rockingham counties and part of Guilford County. [JX075]. Congressional District 6 ("CD6") includes Rowan, Davidson, Davie, and parts of Forsyth, Guilford, and Cabarrus counties. [JX075]. Congressional District 9 ("CD9") includes Randolph, Alamance, Moore, Hoke, and parts of Guilford, Chatham, and Cumberland counties. [JX075]. Congressional District 10 ("CD10") includes Lincoln, Catawba, Iredell, Yadkin counties, and part of Forsyth County. [JX075]. Senator Hise also explained that the mapdrawers were trying to draw three districts in the Piedmont Triad—CD5, CD6, and CD10—that that would perform for Republican candidates. [Vol. IV Tr. 860:24-861:10].

24

58.     To achieve equal population, Mecklenburg County must be split between multiple congressional districts; it is too populous to be a whole-county congressional district. [Vol. IV Tr. 856:21-22]. Charlotte, the largest municipality in Mecklenburg County, is itself too populous to be left whole in a single congressional district. [Vol. IV Tr. 859:16-18; JX002 at 24:12-25]. Congressional District 12 ("CD12") includes part of Mecklenburg County. [JX075]. Congressional District 14 ("CD14") includes Rutherford, Burke, Cleveland, Gaston, and parts of Polk and Mecklenburg counties. [JX075]. When drafting CD12 and CD14, the Senate Committee sought to keep as much of Charlotte as possible in one district, adjusting the remaining areas outside the city to balance the population of surrounding congressional districts accordingly. [Vol. IV Tr. 859:18-25]. The 2023 congressional plan preserves much of the "crescent" area in Charlotte (described by Plaintiff Allen as the area wrapping west, north, and east around the city, [Vol. II 328:24-329:8]) in one district, [JX078], whereas it is sliced in half by the 2022 congressional plan. [JX218]. The drafters also expected CD14 to perform as a Republican district as they were drawing the congressional plan. [Vol. IV Tr. 962:1-10; *see also* Vol. IV Tr. 860:1-6].

59.     On October 25, 2023, S.B. 757 was ratified into law as S.L. 2023-145. [JX041; D.E. 148 at 9 (¶36)].

E.      **2023 Congressional Plan Drafting in the House**

60.     The 2023 Congressional Criteria published by the House Committee for Redistricting and Elections ("Guidance for Drawing Congressional Districts"), among other things, forbade the use of racial data, permitted the use of election data for certain

2020 and 2022 elections, and prohibited the double-bunking of incumbents of any party, to the extent feasible. [JX039; JX044].

61. Blake Springhetti was retained by the North Carolina House in the summer of 2023 by then-Chairman Hall to draft Congressional plans for the House. [Vol. VI Tr. 1242:19-1243:5].[1] Mr. Springhetti is the owner and operator of the redistricting services company, Project Decade, located in Columbus, Ohio. [Vol. VI Tr. 1242:16-18].

62. Mr. Springhetti only communicated with Chairman Hall, Representative Stevens, legislative staff, and counsel about the draft Congressional maps. [Vol. VI Tr. 1243:9-10, 1255:8-11]. He did not consult with any other legislators or outside parties regarding the draft Congressional plans. [Vol. VI Tr. 1246:12-15, 1251:1-3].

63. To draft Congressional plans, Mr. Springhetti was provided with the Guidance for Drawing Congressional Plans and a list of incumbent residences. [JX044; Vol. VI Tr. 1243:19-24]. These materials were sent to him by Chairman Hall via email on August 23, 2023. [JX044].

64. Being from Ohio, Mr. Springhetti had no outside knowledge or awareness of the racial demographics of North Carolina, nor did he seek out such information. [Vol. VI Tr. 1245:5-11, 1252:14-17]. Likewise, he did not seek out any other demographic or political geography information. [Vol. VI Tr. 1245:8-11, 1252:21-24].

---

[1] Although Mr. Springhetti was retained to draft both House and Congressional plans for the North Carolina House, the House claims in this matter were dismissed. [D.E. 98; D.E. 104]. Thus, all of Mr. Springhetti's testimony at trial concerned his work on draft Congressional plans only. [Vol. VI Tr. 1244:5-7].

26

65.     Mr. Springhetti complied with federal standards for equal populations when drafting Congressional plans by making sure each district fell within one person in total population. [Vol. VI Tr. 1244:9-13; JX039]. He complied with the contiguity criteria by ensuring each district's boundaries were continuous. [Vol. VI Tr. 1244:14-19; JX039].

66.     In compliance with the criteria, Mr. Springhetti started drawing from a completely blank map. [Vol. VI Tr. 1244:25-1245:1; JX039]. He did not reference any prior maps, including the 2022 special master congressional plan, nor did he consult any previous map drawers or experts about their experiences drafting Congressional maps in North Carolina [Vol. VI Tr. 1245:2-4, 1246:12-15].

67.     Mr. Springhetti did not use racial data in drawing any of his draft Congressional plans. [Vol. VI Tr. 1245:5-7].

68.     To achieve visual compactness and minimize municipality splits in compliance with the provided criteria, Mr. Springhetti worked to keep as many counties whole as possible by not unnecessarily splitting any political subdivisions or VTDs. [Vol. VI Tr. 1245:12-19; JX039].

69.     Because the House drawing criteria provided called for the use of political data, Mr. Springhetti used election data supplied by Chairman Hall to measure partisan metrics on all his proposed plans. [Vol. VI Tr. 1245:20-24; JX039].

70.     Finally, to ensure that he complied with the criteria against double-bunking, Mr. Springhetti used the incumbent residence information supplied by Chairman Hall to verify that no incumbents from either major party were double bunked. [Vol. VI Tr. 1246:4-11; JX044; JX039].

27

71.     Mr. Springhetti explained that for drafting the congressional plans, he started in the major population centers of the State, and then worked his way out from there. [Vol. VI Tr. 1246:16-19].

72.     Mr. Springhetti's first draft congressional map was entitled CDs 003. [JX153; Vol. VI Tr. 1246:23-1247:2]. Mr. Springhetti's second draft congressional map was entitled CDs 003 v2. [JX154; Vol. VI Tr. 1248:25-1249:4]. Mr. Springhetti's third and final draft congressional map was entitled CDs 005. [JX126; Vol. VI Tr. 1250:12-16]. Draft CDs005 was completed sometime in October of 2023. [Vol. VI Tr. 1256:18-20]. There were no major changes between CDs 003 v2 and CDs 005. [JX126; Vol. VI Tr. 1250:117-21; *compare* JX154, *with* JX126]. Adjustments that were made between drafts were done by Mr. Springhetti at the instruction of Chairman Hall or Rep. Stevens. [Vol. VI Tr. 1255:12-14].

73.     In draft CDs 003, CD1 included mostly whole counties, with only Pitt County being split. [Vol. VI Tr. 1247:9-13]. This configuration was similar in CDs 003v2. [Vol. VI Tr. 1249:5-8].

74.     In draft CDs 003, CD5 included mostly whole counties, with only Watauga, Guilford, and Forsyth counties split. [Vol. VI Tr. 1248:11-18]. In draft CDs 003 v2, Forsyth was removed from CD5 and the split in Guilford captured a different part of the County. [Vol. VI Tr. 1249:18-23].

75.     In draft CDs 003, CD6 included mostly whole counties, with only Guilford County split. [Vol. VI Tr. 1248:11-15]. In draft CDs 003 v2, the split in Guilford captured a different part of the County, and it added part of Rowan County. [Vol. VI Tr. 1249:18-

28

23, 1250:9-11]. And in draft CDs 003 v2, Forsyth County was included in CD10 as a whole county and Iredell County was split instead. [Vol. VI Tr. 1249:24-1250:2].

76.     Due to its population, Mecklenburg County always had to be split between multiple Congressional districts. [Vol. VI Tr. 1247:20-21]. In draft CDs 003, CD9 included parts of Mecklenburg and Rowan counties, [Vol. VI Tr. 1247:25-1248:2, 1248:22-24], CD12 included most of the city of Charlotte in Mecklenburg County. [Vol. VI Tr. 1247:21-22], and CD14 held the rest of Mecklenburg County. [Vol. VI Tr. 1247:25-1248:6]. In draft CDs003 v2, part of Iredell county was added to CD9 and the split in Rowan County was adjusted. [Vol. VI Tr. 1249:25-1250:1, 1250:9-11]. In draft CDs 003v2, Mecklenburg County remained split between CD9, CD12, and CD14, with some minor adjustments in the division between the three districts. [Vol. VI Tr. 1249:9-14].

77.     Mr. Springhetti never communicated with anyone in the North Carolina Senate. [Vol. VI Tr. 1251:1-3]. Mr. Springhetti did not draw the final Congressional plan that was enacted as S.L. 2023-145. [Vol. VI Tr. 1251:19-21]. However, Dr. Rodden analyzed Mr. Springhetti's draft Congressional maps. [WX2]. Much of Dr. Rodden's analysis of these maps is based on flawed conjecture totally rebutted by Mr. Springhetti's testimony that he did not use any racial data, and particularly that he tried to avoid double bunking of Congressional incumbents regardless of political party. [*Compare* Vol. VI Tr. 1245:5-7 and 1246:4-11, *with* Vol. I Tr. 92:3-17].

78.     Members of the Democratic Caucus also engaged a map drawer. Representative Harrison admitted that she met with outside attorneys, mapdrawing consultants, and Democratic staffers to draft map amendments adding more VRA districts.

29

[D.E. 162-2, Harrison Dep. 69:25-71:12, 74:20-75:20, 117:23-118:24; *see also* 33:23-34:1]. During the meeting, Rep. Harrison made notes which suggest that the attendees were reviewing a map drawn by mapdrawing consultant Stephen Mallison, including "Steven's map. Lots of county splits" and a quote from an outside attorney that "Steven's map affects Wray and Willingham." [D.E. 162-2, Harrison Dep. 77:5-17, 89:1-11]. Rep. Harrison recalled discussing amendments drawn by Todd Barlow (chief of staff to Minority Leader Representative Robert Reives) that added VRA districts, [D.E. 162-2, Harrison Dep. 78:14-21, 78:14-21], and she admitted that these maps must have been drawn using racial data since Barlow knew the exact BVAPs of his proposed new VRA districts and reported them accordingly. [D.E. 162-2, Harrison Dep. 84:24-87:20]. The House took the exact same approach as the Senate, [*see supra* ¶¶ 43-45], and rejected amendments prepared with racial data in violation of the 2023 criteria. [*See* JX039; JX089].

## III. <u>This Litigation</u>

79.     These two actions were filed in December 2023, and this Court consolidated the actions before one three-judge panel. [D.E. 34].

80.     The Plaintiffs in *Williams v. Hall,* 1:23-cv-01057 (the Williams Plaintiffs) are 18 individuals who challenged only the 2023 congressional plan under three counts. They asserted that four districts (CD1, CD6, CD12, and CD14) are racially gerrymandered, [Williams Am. Compl. (D.E. 30) ¶¶ 127-37 (Count I)], and that the entire plan is the product of intentional racial vote dilution as forbidden by the Constitution, [*id*. ¶¶ 138-48 (Count II)], and the Voting Rights Act, [*id*. ¶¶ 149-55 (Count III)].

81.     The Plaintiffs in *North Carolina State Conference of the NAACP v. Berger*, D.E. 1 in 1:23-cv-01104 (the NAACP Plaintiffs) are two entities, the North Carolina NAACP and Common Cause (the Entity Plaintiffs) and seven individuals who waged a broader set of challenges against the 2023 congressional plan, as well as the House and Senate plans. The NAACP Plaintiffs asserted various theories of intentional race-based vote dilution, [NAACP Compl. ¶¶ 260-265, 275-90 (Counts 4-5, 8-12)], racial gerrymandering, [*id*. ¶¶ 249-51 (Count 2)], discriminatory results, [*id*. ¶¶ 240-48, 266-71 (Counts 1 and 6)], and malapportionment, [*id*. ¶¶ 252-59, 272-74 (Counts 3 and 7)].

A.     **Dismissal of Claims and Claims Remaining**

82.     On April 8, 2025, the Court granted summary judgment for Legislative Defendants on Plaintiffs' claims against districts where no Individual Plaintiff or Standing Member resided for lack of standing, including SD7, SD38, SD39, and SD42, as well as CD9. [D.E. 98 at 29-30]. The Court also granted summary judgment on NAACP Plaintiffs' malapportionment claims against various Senate and House districts and dismissed those claims. [D.E. 98 at 29-30].

83.     NAACP Plaintiffs subsequently voluntarily dismissed all of their remaining claims against the House plan with prejudice, [D.E. 104], and Williams Plaintiffs voluntarily dismissed their racial gerrymandering claim against CD1, CD6, CD12, and CD14 with prejudice. [D.E. 107].

84.     At trial, the Court granted Legislative Defendants' motion for judgment on partial findings as to the remaining claims against SD40 and SD41. [Vol. V Tr. 1025:13-19].

31

85. Plaintiffs' remaining claims are: Racial Gerrymandering as to SD8; Intentional Vote Dilution and Intentional Discrimination as to SD1, SD2, SD8, and as to CD1, CD5, CD6, CD10, CD12, and CD14; and Discriminatory Effects under Section 2 of the Voting Rights Act as to SD1 and SD2.

## B. Williams Plaintiffs

86. Williams Plaintiffs are 18 Black and Hispanic North Carolina voters. [Vol. I Tr. 135:17-136:10; Vol. I Tr. 205:21-206:16; Vol. II Tr. 325:10-326:19; WX57-70]. Williams Plaintiffs reside in CD1, CD3, CD5, CD6, CD10, CD12, CD13, and CD14. [Vol. I Tr. 150:2-3; Vol. I Tr. 211:18-10; Vol. II Tr. 345:15-17; WX55; WX57-70].

    a. Plaintiffs Allison Allen, Flor Herrera-Picasso, German De Castro, Laura McClettie, and Nelda Leon reside in CD12. [Vol. II Tr. 345:15-17; WX57-58; WX60; WX63]. CD12 elected Black Democrat Alma Adams, [JX369; Vol. II Tr. 346:1-6], and Ms. Allen confirmed on the stand that she voted for Congresswoman Adams. [Vol. II Tr. 345:18-346:3].

    b. Plaintiff Shauna Williams lives in CD1. [WX64]. CD1 elected Black Democrat Don Davis. [JX369; *see, e.g.*, Vol. I Tr. 25:9-11].

    c. Plaintiffs Minerva Freeman, Maura Aceto, and Javier Limon live in CD3. [WX66-68]. Williams Plaintiffs do not allege a claim against CD3. [D.E. 108].

    d. Plaintiffs Earl Jones and Pamlyn Stubbs live in CD5. [Vol. I Tr. 150:2-3; Vol. I Tr. 211:18-19]. Williams Plaintiffs do not allege a claim against CD5. [D.E. 108].

e. Plaintiff Armenta Eaton lives in CD13. [WX69]. Williams Plaintiffs do not allege a claim against CD13. [D.E. 108].

## C. NAACP Plaintiffs

87. NAACP plaintiffs are six Black North Carolina voters as well as the North Carolina NAACP and Common Cause.

88. NAACP Individual Plaintiffs reside in SD1, SD2, SD5, SD27, SD32, and SD41, and CD1, CD3, CD6, CD10, and CD12. [NAACPPX363; NAACPPX365; NAACPPX164-166; Vol. II Tr. 349:4-6; Vol. II Tr. 348:25-349:1; Vol. II Tr. 366:10-11; Vol. II Tr. 372:11-13; Vol. III Tr. 532:20-21; Vol. III Tr. 528:1-4; Vol. III Tr. 583:10-11; Vol. III Tr. 588:9-25; Vol. III Tr. 601:4-6].

a. Plaintiff Syene Jasmin resides in Winterville, North Carolina, which is in SD5 in the 2023 senate plan and CD3 in the 2023 congressional plan. [Vol. III. Tr. 517:18-19, 528:1-4, 532:20-21]. Mr. Jasmin admitted that SD5 allows Black voters such as himself the opportunity to elect their candidates of choice, including current state Senator, Kandie Smith. [Vol. III Tr. 532:22-533:7]. Neither SD5 nor CD3 are challenged in this case. [*See* D.E. 105]. Notably, while Winterville is kept whole in the 2023 senate plan, Mr. Fairfax split this small municipality in his Illustrative Plan A. [Vol. VI Tr. 1431:11-1432:9].

b. Plaintiff Calvin Jones lives in Warren County, North Carolina, in SD2 in the 2023 senate plan and CD1 in the 2023 congressional plan. [Vol. II Tr.

348:19-349:1]. Mr. Jones admitted that CD1 elected his candidate of choice, Don Davis, in the 2024 election. [Vol. II Tr. 349:2-13].

c. Plaintiff Mitzi Reynolds Turner lives in High Point, North Carolina, in SD27 in the 2023 senate plan and CD6 in the 2023 congressional plan. [Vol. III Tr. 575:3-4, 588:18-25]. Ms. Turner admitted that her senate district (and her state house district) elects her candidates of choice. [Vol. III Tr. 588:12-589:16]. SD27 is not challenged in this case. [*See* D.E.105].

d. Plaintiff Corine Mack lives in Charlotte, North Carolina, in CD12 in the 2023 congressional plan and in SD41 of the 2023 senate plan. [NAACPPX363]. Both districts regularly elected Black Democrats in the 2024 election. [*See* JX369; *see* 368]. The claim against SD41 was dismissed. [Vol. V Tr. 1025:13-19].

e. Plaintiff Linda Sutton resides in Winston Salem, North Carolina, in SD32 in the 2023 senate plan. [NAACPPX365]. SD32 elected Black Democrat Paul Lowe in the 2024 general election, [JX368], and is not challenged in this case. [*See* D.E.105].

89.     The Organizational Plaintiffs disclosed members on whom they are relying on for standing (the "Standing Members") in CD1, CD3, CD5, CD7, CD12, and CD13, and in SD1, SD2, SD3, SD4, SD5, SD11, SD13, SD28, SD32, and SD40. [NAACPPX164-166; Vol. I Tr. 13:1-4; Vol. III Tr. 606:6-8]. Notably, nine of the fifteen Common Cause Standing Members live in CD1 and CD12, [NAACPPX165], and sixteen of the eighteen

34

North Carolina NAACP Standing Members reside in CD1. [NAACPPX164; NAACPPX166; Vol. I Tr. 25:4-8].

90.    While Common Cause has asserted that its Standing Members are sufficient to establish their standing in this case, the evidence offered at trial about Common Cause's definition of membership was of questionable credibility. According to Common Cause, membership is attained either by making a financial donation or "taking action" with Common Cause by participating in an activity. [Vol. III Tr. 605:2-4]. Some of the Standing Members are members through "taking action," [Vol. III Tr. 643:5-11], and Common Cause did not use a threshold for what type of action a member had to take to be eligible to be a Standing Member. [Vol. III Tr. 643:12-17].

91.    At his deposition, Mr. Phillips had testified that a person may become a Common Cause member simply by opening an email or by signing up for Common Cause North Carolina's email list, [Vol. III Tr. 635:3-5, 641:24-642:8; LDTX222], and that Common Cause considered everyone listed on its email distribution list to be a Common Cause member. [Vol. III Tr. 638:17-639:1]. But on cross-examination at trial, Mr. Phillips stated that all of this deposition testimony was incorrect. [Vol. III Tr. 635:3-22, 640:2-9, 637:5-638:3]. Mr. Phillips acknowledged that this deposition testimony was under oath, and that he had an opportunity to review his deposition transcript but never corrected that testimony. [Vol. III Tr. 635:23-636:10; Vol. III Tr. 643:3-4; Vol. III Tr. 639:1-3].

## IV.    Evidence of racial intent in the drawing of the 2023 plans

92.    The parties disputed whether race motivated the General Assembly in configuring the remaining challenged districts, and this dispute is legally important for

reasons discussed in the accompanying proposed conclusions of law [Proposed Conclusions of Law § I]. A thorough examination of the evidence is therefore necessary.

93.     As explained already, the 2023 redistricting occurred because the North Carolina courts were deemed in *Harper III* to have improperly intruded on the General Assembly's discretion to engage in political redistricting. It is, as a threshold matter, difficult to believe the General Assembly would win the right to engage in political redistricting and immediately turn to racial data, despite the racial-gerrymandering decisions of the past and despite that no court faulted the race-neutral criteria employed in 2019, 2021, and 2022. Departments of state government are not usually presumed to act in completely incoherent ways, so Plaintiffs' allegations to this effect face a threshold plausibility deficiency. As explained below, all evidence indicates that the General Assembly did not act as they allege: it did not use race; it drew for political reasons.

A.     **Direct Evidence of Intent**

94.     Senator Hise testified that racial data was not used in any plans. [Vol. IV Tr. 839:13-15, 973:3-6, 975:6-13]. Instead, both the senate and congressional plans were drawn using race-neutral criteria, [*see supra* § II.A-D]. This testimony was unrebutted. No

36

fact witness testified contrary to Senator Hise, and no witness even indicated why the General Assembly would have wanted to use racial data.[3]

**B.   Circumstantial Evidence**

1.   Congressional Districts

95.   Williams Plaintiffs offered the opinions of Dr. Jonathan Rodden for their claims against the congressional plan, but his analyses are flawed and did not show that race—rather than politics—drove the drawing of any congressional districts.

96.   Dr. Rodden characterized his analysis as proceeding in different steps. The first was what he described as "a relatively qualitative analysis" where he "analyze[d] the distribution of racial groups in the geography of North Carolina" and the "correspondence between the presence of those groups and municipal boundaries and county boundaries and other geographic features." [Vol. I Tr. 29:22-30:3]. In the second, Dr. Rodden claimed to offer "something that's more quantitative that really tries to put some numbers on the things that we can see when we just look at the maps, and this analysis tries to measure the extent to which voters are held in and out of districts according to race." [Vol. I Tr. 30:9-13].

97.   Importantly, Dr. Rodden did not offer an opinion about whether the General Assembly acted with racial intent. He confirmed that his analyses were "descriptive" in nature, [*see* Vol. I. Tr. 41:1-5 42:17-20; 58:2-6], and he concluded only "that race is correlated with the placement of either VTDs or individuals in these [challenged

---

[3] In closing, Plaintiffs' counsel theorized that racial data could be used to create a more "comfortable" political gerrymander, [Vol. VI Tr. 1500:18-1501:2], but no trial evidence supports this view. It is simply a lawyer's assertion.

congressional] districts." [Vol. VI Tr. 1478:4-12; *see also* Vol. I Tr. 1480:1-16]. But correlation and causation are not the same thing, and Dr. Rodden confirmed—in response to a question posed by a member of this Court—that he did not perform "a causal analysis" and that he was not making any "claims that just because [he] ran a regression, … [he] can say that race causes this outcome." [Vol. VI Tr. 1478:4-12]. Rather, Dr. Rodden disclaimed offering *any* conclusion or opinion about racial intent. He testified that he was "not offering any opinion in this case about any specific intent of the General Assembly in configuring the 2023 Congressional Plan," [Vol. I Tr. 94:10-17], and that his methods did not allow a person "to get into the head of the mapmakers[.]" [Vol. I Tr. 94:18-21; *see also* Vol. VI Tr. 1481:8-12 (similar); Vol. VI Tr. 1478:23-1479:1 ("I want to be clear about the relative modesty of what -- of what I'm doing here"); Vol. VI Tr. 1479:12-17 ("And I've been doing this for quite a while, and I've learned that the only way to—the only way to do this is to just lay out the data in a modest way without overclaiming and is why I didn't even use the terms like 'gerrymandering' in the report. I don't use terms like 'predominance.'")]. As such, Dr. Rodden's opinions are insufficient to support any finding that any alleged racial intent *caused* the General Assembly to configure the challenged congressional districts as it did.

98.     Legislative Defendants' experts Dr. Sean Trende and Dr. Michael Barber responded to Dr. Rodden's analyses. Dr. Trende is an expert in American politics with an emphasis on redistricting, including drawing and analyzing redistricting maps, U.S. Census data, and political methodology. [Vol. VI Tr. 1328:8-14; D.E.148 at ¶ 100]. Similarly, Dr. Barber is an expert in American politics, with an emphasis on legislative behavior and

38

politics, statistical analysis and quantitative methods, political geography, U.S. Census Data, and redistricting. [Vol. V Tr. 1029:5-11; D.E. 148 at ¶ 103]. Both Dr. Trende and Dr. Barber are routinely credited and accepted as experts in these respective fields.[4]

### a. Qualitative Analyses

99. In what Dr. Rodden characterizes as the first step, he described in broad terms the district boundaries of CD5, CD6, and CD10 in the Triad Region (centered on the cities of Greensboro, Winston-Salem, and High Point), and CD12 and CD14 in Mecklenburg County. [Vol. I Tr. 31:8-32:14]. In particular, Dr. Rodden compared the configuration of the districts in the Triad Region and Mecklenburg County to the configuration of those areas in the 2022 congressional plan, treating that plan as a "benchmark" for comparison. [Vol. I Tr. 33:9-15]. Although Dr. Rodden's report also included an analysis of northeastern North Carolina and CD1, [WX1 at 24-27], he did not testify about that region or district.

100. He performed this qualitative analysis in part by looking at dot-density maps which depict, at the census block-level, the distribution of Black and white voters in

---

[4] Although counsel for Williams Plaintiffs represented that Dr. Barber had been discredited in the case of *Harper v. Hall*, this is patently false. Expert credibility was not weighed in *Harper*—all experts, including Dr. Barber, were accepted. *North Carolina League, of Conservation Voters, Inc. v. Hall*, No. 21 CVS 015426, 2022 WL 124616, at *39-40 (N.C. Super. Jan. 11, 2022). In fact, all of the cases Williams Plaintiffs' counsel questioned Dr. Barber on were ultimately overturned on appeal. *See N.C. League of Conservation Voters, Inc. v. Hall,* Nos. 21CVS015426, 21CVS500085, 2022 WL 2610499 (N.C. Super. Ct. Feb. 23, 2022), *vacated by*, *Harper v. Hall*, 384 N.C. 292 (2023); *Rose v. Raffensperger*, 619 F. Supp. 3d 1241 (N.D. Ga. 2022), *reversed by*, *Rose v. Sec'y, State of Georgia*, 87 F.4th 469 (11th Cir. 2023), *cert. denied sub nom. Rose v. Raffensperger*, 144 S. Ct. 2686 (2024), *reh'g denied*, 145 S. Ct. 103 (2024); *Jacobson v. Lee*, 411 F. Supp. 3d 1249 (N.D. Fl. 2019), *vacated by*, *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020).

39

relevant regions, [Vol. I Tr. 34:5-15, 72:21-73:18], and also depict the congressional district, county, and municipal boundaries in those regions. [WX1 at 14-15, 19-20, Figs. 4-7]. In addition to a visual inspection of maps, Dr. Rodden also compared the compactness of districts using the Reock and Polsby-Popper measures of compactness, [Vol. I Tr. 35:7-22, 73:19-74:3 & WX1 at 7, Tbl. 1], the number of municipal and county divisions, [Vol. I Tr. 35:23-36:14, 74:4-14 & WX1 at 8], and BVAP of the districts in these regions in both the 2022 plan and 2023 plan. [Vol. I Tr. 37:9-40:13].

102. The chief problem with Dr. Rodden's dot-density analysis is that it does not disentangle race from politics. Dr. Rodden agrees that race and politics are highly correlated in North Carolina, [Vol. I Tr. 51:5-22], a point expanded upon below. But while he produced maps coded by race, he produced no maps coded with political data. [Vol. I Tr. 112:6-9].

102. This shortcoming became apparent on cross-examination, when Dr. Rodden was shown split-screen images of his own racially coded dot-density maps alongside Dr. Trende's politically coded maps. The first split-screen image compares Figure 4 from Dr. Rodden's report, (WX1), with Figure 34 from Dr. Trende's Part I report (LDTX266) in the Triad Region:

**Figure 4: Dot Density Map of Race in the Piedmont Triad Region**



Figure 34: Dot density map of registered Republicans and Democrats, Forsyth and Guilford counties



103. The second split-screen image compares Figure 6 from Dr. Rodden's report (WX1) with Figure 50 from Dr. Trende's Part I report (LDTX266) as follows:

41

**Figure 6: Dot Density Map of Race in the Charlotte Area**



Figure 50: Dot density map of Republican and Democratic votes, using registration, Charlotte area

104.    The top map in each split-screen image depicts Dr. Rodden's dot-density map, which shows red dots for every 30 White voters and black dots for every 30 Black voters. [Vol. I Tr. 111:14-112:1]. The bottom map depicts Dr. Trende's corresponding dot-density maps by political party registration, with red dots referring to 30 Republican voters and blue dots referring to 30 Democratic voters. [Vol. I Tr. 113:6-11].

105.    As Dr. Rodden agreed, a review of his dot-density maps by race would not show how "the lines divided people by partisanship." [Vol. I Tr. 112:14-18]. And he agreed that the dot-density plots by partisanship closely resembled the plots by race—which he attributed to the fact that "these two things are highly correlated in North Carolina." [Vol. I Tr. 113:12-20; *see also* Vol. I Tr. 114:10-19, 115:23-116:9]. This close correspondence from the split-screen images is apparent to the naked eye. In the end, as Dr. Rodden conceded, his "dot density maps would not allow someone to separate out any impact of partisanship and race in a voter's likelihood of inclusion in a district[.]" [Vol. I Tr. 117:2-8]. As explained, the General Assembly explained that it sought political goals, and denied that it achieved racial goals, so Dr. Rodden's opinions are unhelpful when they are admittedly consistent with political goals.

106.    In addition, a visual inspection of district boundaries against racial demographics does not suggest race-based district configurations. For one thing, Dr. Rodden did not fully consider population density. For example, Dr. Rodden alleged a difference in the racial composition of the portion of Winston-Salem in CD6 versus CD10. [Vol. I Tr. 34:6-23 (alleging that "District 10 reaches over and removes a relatively Black neighborhood of Winston-Salem"), and 63:6-8.] But the dot-density map of this region,

43

reproduced from Dr. Rodden's report, [WX1, Fig. 4], does not depict any apparent "racial sorting" in Winston-Salem. There are few black dots (representing 30 Black residents) in Winston-Salem outside CD10's borders, depicted at the southeastern border of CD10 and CD6, reflecting only a small population at issue. Dr. Rodden ultimately agreed, conceding that the population density "falls off" at the border of CD10 and CD6 in Winston-Salem for "parts of the boundary[.]" [Vol. I Tr. 114:20-115:9]. It seems implausible that the General Assembly would attempt to dilute Black voting strength in Winston-Salem through such a fine adjustment, or that any hypothetical inclusion of those Black voters would have impacted the ability of Black voters in Winston-Salem to elect their candidates of choice.

107. The same is true for CD12 and CD14 in Mecklenburg County. Dr. Rodden criticizes the configuration of CD14 as "reach[ing] around Charlotte and kind of extract[ing] almost like a little bit of a claw to the south," [Vol. I Tr. 73:19-74:3], where the population is mostly White, while concentrating Black population in CD12. [Vol. I Tr. 73:2-9]. However, the dot-density map for Mecklenburg County, [WX1 at Fig. 6], does not support this claim. The configuration of CD14 follows the Mecklenburg County line in the southwest of the figure, and in so doing picks up Black population (depicted with black dots) as well as White voters in the portion of CD14 that extends into the southern border of Charlotte (in the figure, one red dot corresponds to 30 White residents). Similarly, the northeastern boundary of CD12 follows the Mecklenburg County line, and the western boundary between CD12 and CD14—including the portion in the vicinity of the Charlotte Douglas International Airport shown on the figure—reasonably tracks the municipal

44

boundary. [*See also* WX1 at 20, Fig. 7 (depicting the district boundaries relative to county and municipal boundaries)]. No meaningful evidence of racial line-drawing is evident in this figure.

108.    Next, Dr. Rodden asserted that congressional districts in the Piedmont Triad region and Mecklenburg County became less compact in the 2023 congressional plan compared to the 2022 congressional plan. [Vol. I Tr. 35:7-22, 73:19-25]. For example, he shows that under the Reock measure of compactness, CD12's compactness reduces from 0.607 in the 2022 plan to 0.571 in the 2023 plan, and its Polsby-Popper score reduces from 0.365 in the 2022 plan to 0.28 in the 2023 plan. [WX1 at 7, Tbl. 1]. But Dr. Rodden only analyzed the *change* in compactness from the 2022 plan to the 2023 plan, and did not compare compactness against any other benchmark. He offered no opinion as to what a reasonable compactness measure would be. The record therefore does not show that any 2023 congressional district is non-compact.

109.    Dr. Rodden also looked at county and municipal splits and found that, in the Triad Region, the 2022 congressional plan involved "one county split" whereas the 2023 plan involved "three," and that the 2022 plan split two municipalities whereas the 2023 plan splits nine. [Vol. I Tr. 36:7-14]. Likewise, in Mecklenburg County, Dr. Rodden found the 2022 congressional plan had "two total [county] splits" and the 2023 plan had "three" due to "an additional split of Mecklenburg County," and the number of municipal splits increased from three in the 2022 plan to seven in the 2023 plan. [Vol. I Tr. 74:4-14]. But on cross-examination, Dr. Rodden did not dispute that the 2023 congressional plan split two fewer counties (11) than the 2022 plan split (13), [Vol. I Tr. 96:22-97:9, 98:2-4; *see*

45

*also* JX219 at 20; JX81 at 43]. These differences do not suggest racial intent, but—at most—that the General Assembly (in 2023) employed different race-neutral priorities than the *Harper* special masters (in 2022). Dr. Rodden exhibited limited familiarity with North Carolina redistricting processes in admitting he was unaware of the General Assembly's long-standing form of district reporting known as the "StatPack," [Vol. I Tr. 96:16-21]. Dr. Rodden was not even aware that the 2023 plan split fewer counties than the 2022 plan, [*see* Vol. I Tr. 97:14-98:4], and was not aware when he authored his report what criteria the General Assembly followed in 2023 plan, as would have been essential to understand their significance. [Vol. I Tr. 94:1-9, 94:22-95:1].

b.      Use of the 2022 Plan As a Comparator

110.    In both Dr. Rodden's qualitative analyses (described above) and his quantitative, county envelope analyses (described below), Dr. Rodden compares the 2023 congressional plan to the 2022 congressional plan. This is not, however, a useful comparison for reasons indicated above: the General Assembly did not use the 2022 plan as a benchmark and pursued markedly different political goals in 2023.

111.    Dr. Rodden claims he used the 2022 congressional plan because "[a]s in all previous cases I've testified in, and also just as an expert in redistricting outside the courtroom, this is really the starting point when looking at a new plan, the plan that was in place before the new plan was administered." [Vol. I Tr. 32:18-23]. But not every redistricting is the same; the 2023 redistricting occurred under unique conditions. Dr. Rodden admitted it was his "understanding" that "a state court actually ordered the adoption of the 2022 Plan." [Vol. I Tr. 109:6-8]. He further admitted that "the legislature

46

did not have the same requirements in drawing the 2023 plan that the Court imposed on the 2022 Plan," [Vol. I Tr. 109:9-13], and when he drafted his report, he was "aware that partisan fairness was … part of what was – what the special master was instructed to achieve," but he "did not have information about the specifics of how that was achieved." [Vol. I Tr. 109:14-21]. Simply put, Dr. Rodden failed to draw inferences that are plausible under the circumstances of *this* case; his assumption that this case must be like other cases does not lend credence to his opinions.

112. In particular, Dr. Rodden was not aware prior to drafting his report that "the 2022 Plan was required to have an efficiency gap of 7 percent or less" and a "mean-median difference of 1 percent or less," [Vol. I Tr. 109:22-110:7]. Dr. Rodden admitted he did not know what the efficiency gap or mean-median scores of the 2022 congressional plan were—those scores were 0.63% efficiency gap and 0.69% mean-median difference—but did not find those values "surprising." [Vol. I Tr. at 110:17-111:2; *see also* LDTX223 at 29 (Feb. 23, 2022, Special Masters Report at 5) (reporting scores)].

113. These differences—driven by the North Carolina state courts' partisan-fairness requirements for the 2022 congressional plan that were inapplicable to the 2023 congressional plan—mattered a great deal. In fact, Dr. Rodden agreed that "a plan drawn to satisfy the 7 percent efficiency gap and 1 percent mean-median score requirements would have different partisan characteristics from the 2023 Plan." [Vol. I Tr. 111:3-7]. That could lead to different racial characteristics, and different characteristics of other types. Despite these significant differences, however, Dr. Rodden admitted he "didn't consider the impact of that partisan fairness requirement used for the 2022 Plan in drafting

47

[his] report." [Vol. I Tr. 111:8-11]. Accordingly, his opinions provide no basis to draw fair inferences of legislative intent.

c.     County Envelope Analysis

114.     Dr. Rodden's principal quantitative analysis was a county envelope method developed by Dr. Stephen Ansolabehere. Dr. Rodden described this as "one descriptive approach to thinking about how we measure the extent to which groups are kind of kept in and out of districts in a way that corresponds to race." [Vol. I Tr. 41:1-5; *see also* Vol. I Tr. 42:17-20]. The envelope method, however, did not permit Dr. Rodden to draw "strong inferences about intent." [Vol. I Tr. 42:21-43:6; *see also* Vol. I Tr. 58:2-6]. In fact, it showed nothing about intent.

115.     Dr. Rodden appears to have had no prior experience with this method. He claimed to have selected it because it "emerged" as a technique from "previous cases related to race and redistricting," [Vol. I Tr. 40:24-41:1], by which he appears to have meant *Cooper v. Harris*. [WX1 at 5]. *Cooper v. Harris* was a racial gerrymandering claim that did not address intentional vote dilution. Moreover, Dr. Rodden overstated the Supreme Court's endorsement of the envelope method. [Vol. VI Tr. 1334:12-1336:16]. First, Dr. Rodden claimed the envelope method was accepted in *Cooper v. Harris*, but he "added" a regression analysis in this case which he admits was not offered or considered in *Cooper*.[5] [Vol. VI Tr. 1473:14-19]. Second, the regressions only tested for race,

---

[5] Notably, the Supreme Court in *Alexander v. South Carolina State Conference of the NAACP*, 602 U.S. 1, 27-28, 32 (2024), criticized statistical analyses offered in that case that suffer from some of the same flaws that affect Dr. Rodden's regressions here, such as the failure to "account for" critical redistricting factors like contiguity and compactness.

excluding partisanship altogether, even though Dr. Rodden admitted he could have included and tested both variables. [Vol. VI Tr. 1473:20-1474:5].

116.    Dr. Rodden's reports cited no peer-reviewed academic literature endorsing the envelope method. [Vol. I Tr. 99:12-20]. Dr. Rodden also admitted he never performed an envelope-style analysis before this case. [Vol. I Tr. 99:21-23]. Dr. Rodden's lack of experience with this method, and its apparent development for litigation, count against its credibility.

117.    In essence, the envelope analysis looks at the counties containing a given congressional district. Dr. Rodden compares the percentage of voters in the counties containing the district (i.e., the "envelope") that are Black and White—and, later, by political party registration—to the percentage of such voters in the district. Hence, for CD6, Dr. Rodden concludes that 51.4% of White voters in the "envelope" of CD6 are assigned to CD6, whereas 38.2% of Black voters in the "envelope" are within CD6. [WX1 at 12, Tbl. 3]. He then looks at three categories of voters—those registered as Republicans, Democrats, and Unaffiliated—and compares the portions of those registered voters who are Black or White who are in the "envelope" to the district. For CD6, for example, he finds that 42.9% of White Democrats in the "envelope" of CD6 are assigned to CD6, compared to 37.7% of Black Democrats; and 55.6% of White Republicans, compared to 43.4% of Black Republicans; and 50.5% of White Unaffiliated voters, compared to 39.4% of Black Unaffiliated voters. [WX1 at 12, Tbl. 4]. Notably, there were only 5,718 Black Republican voters in the "envelope" of CD6—a miniscule number compared to 288,246

49

White Republican voters, 118,229 White Democrats, and 182,418 Black Democrats in the "envelope." [WX1 at 12, Tbl. 4; *see also* Vol. I Tr. 104:2-6].

118.    Dr. Rodden then performed a "Core/In/Out Analysis" where he compared the 2022 congressional plan and 2023 congressional plan and evaluated the percentage of voters in each category moved into the challenged district in the 2023 redistricting, those moved out, and those that were in the district in both 2022 and 2023 (so-called "core" voters). [WX1 at 16, Tbl. 6; *see also* Vol. V Tr. 1043:21-1044:10]. He ended his envelope analysis by running a statistical probit regression model which attempted to estimate the probability of a voter being assigned to a challenged district based on the voter's race, the voter's distance from the center (the "centroid") of the district, and whether the voter lived in specified cities.  [WX1 at 38-39, App'x 1]. This "Core In/Out Analysis" portion of the envelope analysis explicitly relies on a comparison between the 2022 and 2023 plans. This entire analysis is, however, plagued by analytic flaws that render it unreliable and non-probative.

i.    *Unreasonable Use Of 2022 Plan As Benchmark*

119.    First, as set forth above, to the extent Dr. Rodden's envelope analysis depends on a comparison between the 2022 and 2023 congressional plans, that analysis is unreliable and unhelpful because the 2022 congressional plan is not a defensible benchmark.

120.    As previously explained, the General Assembly did not use the 2022 plan as a starting point when it was drawing the 2023 plan. [Vol. IV Tr. 16-858:2; Vol. V Tr. 1044:14-1046:8]. As Figure 12 to Dr. Barber's report illustrates, if one were to instead use

50

the last enacted congressional plan from 2021, the analysis and results of the core-in-out method are entirely different. [Vol. V Tr. 1044:14-1046:8].



Figure 12: Core, In, and Out precincts for 2023 CD-6

Note: Of the 2022 Congressional Districts, CD-10 contains the most overlap with 2023 CD-6. The bottom figure shows the overlap between 2023 CD-6 and 2021 CD-6.

[LDTX253 at 32, Fig. 12].

121.    Even using Dr. Rodden's chosen comparator, the outcome of his analysis is dependent on which district in which year he identifies as the "core." [Vol. V Tr. 1044:14-1046:8]. Dr. Barber pointed out that enacted CD8 actually overlaps better with CD6 from the 2022 congressional plan, as seen in the bottom image in Figure 12. [Vol. V Tr. 1045:23-

51

1046:8]. As a result, Dr. Rodden offers an inapposite comparison focused solely on CD6, while ignoring potentially more probative options nearby. This added arbitrariness and wholesale dependence on independent choices disqualify the core-in-out method as a helpful tool for disentangling race and politics. Dr. Rodden also claimed that when comparing 2023 CD6 to 2022 CD6, "'[t]he percent of self-identified Black voters was larger among those moved out of the district [31.54%] than among those moved into the district [14.66%] by roughly 17 percentage points' (Rodden Report, pg. 15)." [LDTX253 at 30]. But if the 2021 plan is used as the comparator instead, the "results for this district entirely reverse," because "the percent of Black voters is *smaller* among those moved out of the district [14.6%] than among those moved into the district [21.6%] by roughly 7 percentage points." [LDTX253 at 30].

122. Additionally, Dr. Trende explained how factoring in partisanship to Dr. Rodden's core-in-out analysis, rather than solely focusing on demographic changes, shows the substantial political impact of line shifts in the Enacted Congressional Plan. [Vol. VI Tr. 1353:22-1355:15]. An example of this is found in Figure 27 to Dr. Trende's report.

Figure 27: Summary table of changes to District 6

| Change | Total Pop. | Republican %, Index | BVAP | Net R %, Registered | Black %, Registered |
|--------|-----------|---------------------|------|---------------------|---------------------|
| Start | 745,670 | 44.2% | 31.7% | −13.0% | 30.7% |
| To 5 | 355,176 | 41.5% | 34.8% | −17.0% | 32.7% |
| To 9 | 99,570 | 56.5% | 21.7% | 5.5% | 22.4% |
| To 10 | 28,537 | 26.5% | 51.7% | −38.7% | 54.8% |
| To 13 | 22,099 | 59.2% | 31.7% | −15.8% | 32.1% |
| Core | 240,288 | 42.6% | 28.8% | −12.5% | 28.6% |
| From 5 | 88,320 | 63.5% | 12.5% | 21.3% | 11.4% |
| From 8 | 315,805 | 70.7% | 12.8% | 24.1% | 12.6% |
| From 12 | 101,258 | 49.9% | 23.2% | −2.6% | 23.9% |
| Result | 745,671 | 58.3% | 19.3% | 8.3% | 19.1% |

[LDTX266 at 57, Fig. 27].

ii. *Political Geography and Demographic Clustering*

123.   The envelope analysis also fails to control for demographic clustering along both racial and political lines. Dr. Rodden's report states that the envelope method depends on the assumption that "[i]f the [district] lines were drawn without respect to race, one would expect the likelihood of inclusion to be roughly similar for White and Black voters." [WX1 at 11]. Therefore, an envelope analysis would flag a district—as Dr. Rodden did here—where Black voters in the "envelope" of a district are less likely (or more likely) to be included than White voters.

124.   But on cross-examination, Dr. Rodden retreated from this assumption, acknowledging that "this is a sentence that I would probably like to have included something like the phrase 'other things equal.'" [Vol. I Tr. 100:11-12]. He admitted that in fact, Black and White voters in North Carolina are *not* uniformly distributed among the

53

State. [Vol. I Tr. 100:21-23]. Dr. Rodden then testified that "within the regions of these [county] envelopes, we wouldn't necessarily expect that Black and White residents would be uniformly distributed in space." [Vol. I Tr. 102:23-103:3 ("I think we already are quite sure they're not uniformly distributed in space")].

125. Dr. Rodden agreed that "race can be correlated, in terms of locations of voters, with factors like partisanship, geographic location, population density, historical trends in employment and migration, and even transportation." [Vol. I Tr. 100:24-101:5]. As a result, there "can be reasons why we would, without any effort on the part of the district drawer, see that the size of the groups on other sides – on both sides of the line are different. It is something that can emerge from geography alone." [Vol. I Tr. 100:13-18].

126. In particular, Dr. Rodden agreed that partisan and racial clustering—which refers to a phenomenon where people of similar partisan affiliations and/or race may live close to one another—would have an impact on redistricting in North Carolina. [Vol. I Tr. 101:6-102:2]. He agreed that both partisan and racial clustering exist in North Carolina in the Triad, Charlotte, and Northeast North Carolina, i.e., the three areas in dispute in this case. [Vol. I Tr. 102:3-12 (pointing out that "[w]hen we look at some of the dot density maps we looked at earlier, we could see the groups are not evenly distributed in space. They are clustered.")].

127. An example of this can be shown simply from the example above concerning CD6. The numbers produced by Dr. Rodden's envelope analysis showed a lower likelihood among Black Republicans living in the "envelope" of CD6 to be included in CD6. However, on cross-examination, Dr. Rodden conceded that he did not analyze whether

54

"Black Republicans tend to live in the same geographic locations as Black Democrats"; he "did not go into the individual-level data and try to map the Black Republicans and get a sense for how … their geography might have varied from, for instance, White Republicans." [Vol. I Tr. 104:7-14]. This matters because, if Black Republicans and Black Democrats live in similar territory due to racial clustering, and Black Democrats vastly outnumber Black Republicans (as the data show they do), a mapmaker proceeding with political—but not racial—motive might well assign territory containing Black Republicans outside a district simply because of the territory's partisan voting behavior.

128.　　In the end, the county envelope analysis does not control for any of these well-known political geographic and clustering phenomena, as Dr. Barber elaborates on in his testimony. This flaw renders the envelope method unreliable here as a means of detecting the potential improper use of race in redistricting in North Carolina.

129.　　As Dr. Barber explained, North Carolina has a unique partisan geography with both urban and rural pockets of Democrats intermingled with heavily Republican counties. [Vol. V Tr. 1030:12-25; LDTX253 at 7]. As a result, race and politics are highly correlated in North Carolina. [Vol. V Tr. 1031:5-1032:3]. This occurrence is illustrated in Figures 1 and 2 to Dr. Barber's report, providing choropleth breakdowns of racial and partisan distributions across the state.

55

Figure 1: Partisan Lean of North Carolina Counties (top) and Precincts (bottom)



Note: Counties and precincts are colored by their partisan lean - darker red for more Republican and darker blue for more Democratic. The partisan lean of the county is computed by taking the average of 19 statewide election results in the county between 2008 and 2022 and is a common method of measuring the partisan tendencies of a location.

[LDTX253 at 8, Fig. 1].



Figure 2: Racial Distribution of North Carolina Counties (top) and Precincts (bottom)

Note: Counties and precincts are colored by BVAP percentage - darker red for higher BVAP and darker blue for lower BVAP.

[LDTX253 at 9, Fig. 2].

130. Dr. Barber further demonstrates this relationship through Figure 3 to his report, exhibiting the correlation of a precinct's BVAP to its democratic lean, and vice versa. [Vol. V Tr. 1031:4-22]. Plaintiffs do not seriously contest this correlation. In fact, Plaintiffs contend that they are so highly correlated they cannot be disentangled at all.

57

Figure 3: Relationship Between Race and Partisanship in North Carolina Precincts



Note: Each point shows a North Carolina precinct. The vertical axis in both figures shows the partisan lean of the precinct. In the left figure the horizontal axis shows the Black voting age population (BVAP) percentage of the precinct. In the right figure the horizontal axis shows the non-Hispanic White voting age population (WVAP) percentage of the precinct.

[LDTX253 at 10, Fig. 3].

### iii.    *False Positives*

131.    Dr. Rodden's county envelope analysis is prone to report race as statistically significant, even where race unquestionably played no role. Dr. Barber used a computer algorithm to simulate 5,000 plans and then examined them with the envelope method.[6] [Vol. V Tr. 1036:8-1037:24]. Dr. Barber's algorithm produced race-blind plans (i.e., race was not a factor in the algorithm) prioritizing various traditional redistricting criteria

---

[6] In contrast, Dr. Rodden ran no simulations, even though he has for prior expert engagements. [Vol. V Tr. 1040:24-1041:4]. In fact, Dr. Rodden has published peer-reviewed academic work where he ran his own simulations in other states in which accounted for traditional redistricting criteria, much like the ones Dr. Barber ran here. [Vol. VI Tr. 1475:14-1476:22]. That Dr. Rodden presented no such analysis here raises credibility questions, such as whether he ran such an analysis and discarded it because the results did not favor Plaintiffs.

including compactness, contiguity and political subdivision boundaries. [Vol. V Tr. 1036:8-1037:24].

132.    The county envelope method nevertheless identified race as a statistically significant factor in voter sorting for nearly a quarter of the maps and over half of the examined districts. [Vol. V Tr. 1036:8-1037:24, 1039:25-1040:18; LDTX254 at 7-8]. This conclusion is nonsensical since Dr. Barber's algorithm excluded race. [Vol. V Tr. 1036:8-1037:24].

Figure 1: County Envelope Analysis on 5,000 Simulated Maps

(a) Envelope Method on 5,000 simulations (with traditional redistricting criteria), partisanship in regression



(b) Envelope Method on 5,000 simulations (with traditional redistricting criteria), no partisanship in regression



(c) Envelope Method on 5,000 simulations (with no traditional redistricting criteria)



Note: In simulations that consider traditional redistricting criteria but do not consider race (the top two panels), the majority of districts are incorrectly flagged by the county envelope method with race being a significant predictor of the district's shape. The bottom panel shows the result when district shapes are truly random - they do not consider population equality, contiguity, or any other redistricting criteria. The results illustrate how introducing legally required non-racial redistricting criteria that are nevertheless correlated with race will cause districts to be incorrectly flagged as playing a role in the district's shape by the county envelope method when in fact race was not considered at all.

[LDTX254 at 8, Fig.1].

133.    In fact, the last graph on Dr. Barber's Figure 1 illustrates the prominence of these false positives. Specifically, when race and all traditional redistricting criteria are removed from the calculus, Dr. Barber showed how the county envelope was far less likely to flag a district as the product of racial sorting. [Vol. V Tr. 1039:25-1040:18]. This

60

suggests that race and traditional criteria may be highly correlated, and the county envelope method fails to disentangle them.

134. In contrast to Dr. Barber's simulations, which incorporate traditional redistricting criteria, Dr. Rodden exclusively focused on distance from a population centroid, turning a blind eye to criteria like contiguity. [Vol. VI Tr. 1341:24-1342:5]. Dr. Rodden also does not control for county boundaries. [Vol. VI Tr. 1363:6-13]. If he had, the supposed racial effects would disappear. [Vol. VI Tr. 1363:14-17].

135. Dr. Rodden cannot meaningfully separate race from politics. This is especially clear in light of the high correlation between the two variables alongside other traditional redistricting criteria. [*See* Vol. V Tr. 1038:6-1039:24].

iv. *Redistricting Constraints And Treatment of Voters As Individually-Assignable Units*

136. The envelope method is unreliable for the additional reason that it treats each individual voter as a separate unit who can be individually assigned to districts, without regard to constraints like contiguity.

137. Dr. Rodden ran regressions using individual level data from the state voter file. He claimed to have done so because the voter file was "very clean and very easy to use" and included racial and party registration data, [Vol. I Tr. 45:17-46:2], even though he did not opine "that the General Assembly used party registration data when drawing the lines in this case." [Vol. I Tr. 103:23-104:1]. The General Assembly did not draw any maps with voter registration file data—its criteria mandated the use of U.S. Census data. [JX038]. Moreover, the North Carolina General Assembly was more concerned with past

61

election results rather than attempting to predict future voting behavior. [Vol. IV Tr. 959:24-960:25].

138.    Dr. Rodden admitted that the regressions he ran with the envelope method "treat[] each individual voter as an independent unit of study," [Vol. I Tr. 105:7-9], so that two voters who live in the same home in Greensboro would be "two different observations in [Rodden's] regression" even though the General Assembly "could not have assigned these two voters to different congressional districts." [Vol. I Tr. 105:10-18; *see also* Vol. V Tr. 1034:19-1036:7 (Dr. Barber); Vol. VI Tr. 1340:20-1341:23 (Dr. Trende)].

139.    Dr. Rodden asserts that using individual-level data for regressions creates "a lot more data" and, as a result, "the correlation between being a Democrat and being an African-American in that voter file is … high, but it's not overwhelming." [Vol. I Tr. 51:5-11]. By contrast, Dr. Rodden criticized running the analysis using a VTD dataset because, he alleged, it produces "a rather small dataset"—because "we're operating within these envelopes which don't have many VTDs in them in some cases"—and the "measure of race" and "measure of party" in that dataset are "correlated at a level above .8" and are "so similar that it's very hard to disentangle." [Vol. I Tr.  51:12-22].

140.    Additionally, using voter registration file data to look at party registration as a predictor for voter behavior is equally problematic. [Vol. V Tr. 1034:19-1036:7]. As a threshold issue, North Carolina has a large number of unaffiliated voters, all of whom would be reflected as such in the voter registration file data. [Vol. V Tr. 1035:12-21]. In fact, North Carolina does not require a registrant to list a party affiliation or race in order to register to vote. [Vol. VI Tr. 1474:11-24]. Dr. Rodden is aware of these issues but chose

only to report the number of registrants without a noted party affiliation—he declined to report the number who did not list race. [Vol. VI Tr. 1474:25-1475:12].

141.    These results suggest that using party registration as a proxy for partisanship is less reliable than using a measure of voting behavior (i.e., precinct-level voting analysis). In the end, using individual-level data to model the General Assembly's redistricting process, which used VTD-level data, is not reasonable.

142.    The envelope method also ignores the reality of redistricting constraints, including the district contiguity requirement. The method fails to consider all VTDs available to a mapmaker, but only considers "VTDs within the envelope of counties that contain the district you're challenging" and "disregard[s] VTDs that are outside that envelope." [Vol. I Tr. 105:24-106:5]. The analysis also ignores the impact of the district contiguity requirement on redistricting by separately analyzing every voter in the "envelope," whether the voter is near the boundary or not.

143.    These flaws came to light during cross-examination when Dr. Rodden was confronted with Figure 7 in Dr. Trende's Part I report [LDTX266 at 30, Fig. 7], which depicts congressional districts in the envelope of CD6, and includes a precinct in northeastern Guilford County (ending in "SMAD") that is in CD9. [Vol. I Tr. 107:1-10]. That figure is reproduced here:



Figure 7: Guilford County precincts, shaded by Congressional District

144.    The rectangular black box depicts the boundaries of Guilford County, which is in the "envelope" of CD6. The teal-colored district at the southwest of the figure is CD6. Dr. Rodden admitted that for SMAD precinct—a precinct in northeastern Guilford County assigned to CD9 (the yellow-colored district)—to be added to CD6, "District 5 would have to be reconfigured" to satisfy the "district contiguity requirement." [Vol. I Tr. 107:11-20. That is because "District 5, a chunk of it – separates … District 6 from the VTD in question," and SMAD cannot therefore just be added to CD6. [Vol. I Tr.107:22-23]. The envelope method does not take into account whether voters in a VTD are close enough to the district boundary to make including them in the district a realistic possibility.

64

145. By the same token, because the method constrains itself to county envelopes, Dr. Rodden's method disregarded analysis of a VTD closer to the CD6 boundary than SMAD—for example, one just south of the southwest corner of Guilford County, *right next to the CD6 boundary*—simply because it was located in Randolph County. [Vol. I Tr. 107:24-108:5]. And it did so even though that precinct (and many like it) were legally available to the General Assembly and could have more easily been added to CD6 than the SMAD precinct Dr. Rodden considered.

146. Dr. Trende further explained that the county envelope and Dr. Rodden's accompanying regressions would look at a border precinct in Guilford County such as 3708100SMAD and attempt to explain the probability of inclusion or exclusion in Enacted CD6 for individuals living in High Point or Greensboro. [Vol. VI Tr. 1342:6-1343:21]. But this is entirely based on the individual's race, along with the location of the chosen population centroid. [Vol. VI Tr. 1342:6-1343:21; LDTX266 at 30-31].

147. The problems with this approach are twofold: First, a map drawer could not pull a single voter out of that precinct without pulling the entire precinct into the targeted district. [Vol. VI Tr. 1343:22-1344:9]. Second, even if one were to move the entire 3708100SMAD precinct into the targeted district, it would necessarily have widespread effects on other districts in order to maintain various redistricting criteria including population deviations, contiguity, and compactness. [Vol. VI Tr. 1342:15-1343:21]. The county envelope simply fails to account for these realities. *See Alexander v. S.C. State Conference of the NAACP*, 602 U.S. 1, 28-30 (2024). Put simply, legislators could not

65

Case 1:23-cv-01057-TDS-JLW    Document 163    Filed 08/05/25    Page 68 of 178

pluck individual voters from precincts and VTDs and group them in districts, so a method assuming they could do that cannot reliably get at their intent.

148. The method also identifies race as a "significant factor" in a map's creation, while ignoring other goals of the map drawer, such as politics and incumbency protection. [Vol. V Tr. 1033:22-1034:18].

149. The county envelope method is also highly dependent on the expert's choice of the envelope itself. [Vol. V Tr. 1033:25-1034:13]. Put differently, the expert's choice of which district and accompanying counties to analyze turns entirely on which areas the expert chooses to include or exclude from their examination—a potentially limitless number of outcomes and choices. [Vol. VI Tr. 1338:9-17]. This means that the methodology is subject to criticisms of garbage in, garbage out, or cherry picking. [Vol. VI Tr. 1340:20-1341:23].

150. This can lead to highly arbitrary results, as seen in Figure 10 to Dr. Trende's report exemplifying Dr. Rodden's chosen envelope for Enacted CD6, while also identifying other available precincts that are equally as close to the population centroid as many of the precincts Dr. Rodden included. [Vol. VI Tr. 1346:4-1347:5].

Figure 10: Full Available Envelope for District 6



(a) Precincts in the envelope in White. Precincts within the required distance from the envelope but not included because they are in a different county in dark grey. Precincts outside of the required distance from the envelope, but in counties where at least one precinct is within the distance in light grey.

[LDTX266 at 36, Fig. 10].

151.    Rather than acknowledge this arbitrariness, Dr. Rodden simply asserts that one would expect an even distribution of racial groups if a map were drawn without attention to race. [Vol. I Tr. 99:24-100:18]. But this assertion is itself arbitrary and untested. [Vol. VI Tr. 1338:18-1339:5].

152.    These additional methodological shortcomings in the envelope method render it an unreliable means to evaluate any alleged racial intent or effect.

d.     <u>Other Benchmarks</u>

153.    Finally, in his reply and supplemental rebuttal reports (WX2 and WX3, respectively), Dr. Rodden attempts to compare Dr. Barber's 5,000 simulated congressional plans to the 2023 plan, as well as a smattering of early draft plans that the General Assembly had before it during deliberations on the 2023 plan, to make claims that the 2023 plan was unusual in its treatment of Black voters compared to those alternate benchmarks. For the reasons that follow, these two comparisons are not reliable.

*i.*     *Dr. Barber's Simulations*

154.    In an attempt to test the inherent reliability of the county envelope method, Dr. Barber created an ensemble of 5,000 computer-simulated congressional plans that were drawn without racial or political considerations, and evaluated those plans using the envelope method. [Vol. V Tr. 1036:8-1037:24].[7] As Dr. Barber explained, his race-blind simulations were crafted to ignore race and instead prioritize various traditional redistricting criteria including compactness, contiguity and minimizing county splits. [Vol. V Tr. 1037:20-24].

155.    Dr. Rodden looked both at all 5,000 simulated plans as well as a small subset of the plans that Dr. Rodden argued contained 10 "Republican-leaning" districts.

---

[7] In contrast, Dr. Rodden did not run any of his own simulations here, even though he has for prior expert engagements. [Vol. V Tr. 1040:24-1041:4]. In fact, Dr. Rodden has published peer-reviewed academic work where he ran his own simulations in other states in which accounted for traditional redistricting criteria, much like the ones Dr. Barber ran here. [Vol. VI Tr. 1475:14-1476:22]. As a result, Dr. Rodden's criticisms cannot be reconciled with his academic work.

68

156. First, Dr. Rodden analyzed all "5,000 simulated plans" and for each, "rank[ed] the districts, the 14 districts, according to their Black voting-age population." [Vol. I Tr. 80:19-81:2]. He then compared the range (by ranking) against the enacted plan, and he found that "those red dots [i.e., the enacted plan's BVAP per rank] are not somewhere near the middle of the mean of the simulations" but are "in several places completely outside of the range of the simulations." [Vol. I Tr. 82:2-5]. Dr. Rodden asserts the data show a pattern that for the two highest-BVAP ranked districts (which he contends are always CD1 and CD12), the 2023 plan's districts lie outside the distribution of the simulated plans, suggesting those enacted districts have an "unusually high" BVAP. [Vol. I Tr. 82:6-14]. He then goes on to argue that for ranks three and following, "we see something else," namely, a "dramatic falloff in the Black voting-age population" resulting in the enacted plan also allegedly producing "districts that have an unusually low Black voting-age population." [Vol. I Tr. 82:15-23].

157. Second, Dr. Rodden considered a small "subset" of the 5,000 plans produced by simulations that "produced at least ten Republican seats." [Vol. I Tr. 83:17-84:8]. He claimed to have found that a "similar" pattern emerges from this subset. [Vol. I Tr. 84:9]. Based on this subset, Dr. Rodden concludes that "it's not necessary to have a distribution of Black voting-age population that looks like those red dot markers in order to achieve that result [i.e., a strong pro-Republican plan]." [Vol. I Tr. 84:22-85:4].

158. But neither the full set of Dr. Barber's 5,000 simulated plans nor the subset provide the kind of apples-to-apples comparison to the 2023 plan necessary to draw any inferences about race. As Dr. Rodden conceded, the "point of creating an ensemble of

69

simulated plans is to create a neutral baseline against which you can compare a plan," [Vol. I Tr. 126:22-25], and that "it's important to make sure that the simulation model is capturing the neutral redistricting criteria that the mapmaker was supposed to be following." [Vol. I Tr.at 127:1-5].

159. Dr. Barber's simulated plans were not designed to follow all the General Assembly's criteria. As Dr. Rodden conceded, Dr. Barber's 5,000 simulated plans did not "consider[] all of the criteria used by the legislature when drafting the 2023 enacted map," and that Dr. Barber created the ensemble simply to "evaluate the envelope method." [Vol. I Tr. 127:6-13; Vol. V Tr. 1041:5-19]. For example, the simulations did not consider partisanship as one of its criteria even though the General Assembly did. [Vol. V Tr. 1041:20-22; JX038]. Indeed, Dr. Rodden described Dr. Barber's simulations analysis as an effort to "point out … a very simple thing that I agree with," which was "that there are reasons why we might see differences in the racial demographics on either side of a district boundary within a district envelope that have nothing to do with the intention of the map drawers, or at least nothing to do with the intention to sort voters by race." [Vol. I Tr. 56:23-57:12].

160. Dr. Rodden's analysis of the subset of the 5,000 plans containing allegedly 10 Republican-leaning districts does not solve the apples-to-oranges problem. Dr. Rodden admitted that the 2023 plan had, using Dr. Barber's partisan voting index, 10 districts with a 55%+ Republican lean. [Vol. I Tr. 128:20-23]. Dr. Rodden conceded that the difference between a 55% Republican-leaning district and a district with a 50%-plus-one Republican lean is substantial. Specifically, that a 55% Republican district "makes it a lot easier to

70

win" than if the district had a "50 percent plus one" Republican lean. [Vol. I Tr. 129:4-8]. Yet Dr. Rodden, for purposes of his analysis of Dr. Barber's simulated plans, counted a Republican-leaning district as "50 percent plus 1," and he further admitted that not *one* of the 5,000 simulated plans had ten 55%+ Republican districts. [Vol. I Tr.129:9-12, 130:2-8].

161. Dr. Barber exhibited how if one were to take the most Republican-friendly maps from the 5,000 simulated options, none achieved the General Assembly's partisan goals, as seen in Figure 2 to Dr. Barber's supplemental report.



Figure 2: Partisan Lean in 2023 Enacted and Simulated North Carolina Congressional Plans, where Simulated Plans Produce at Least 10 Republican-leaning Seats

Note: Even among simulations that produce at least 10 Republican-leaning seats, the enacted map is a partisan outlier by creating districts that are more safely Republican-leaning. This means that these simulations are not a valid comparison to the enacted map on racial metrics because they are not equally partisan in nature.

[LDTX254 at 11, Fig.2].

162. As Figure 2 reveals, of all the simulations ran, only a small number created as many Republican-leaning districts as the enacted plan. [Vol. V Tr. 1042:4-1043:19]. Yet none of the simulations created districts that were as Republican-leaning as the 2023

71

congressional plan, further indicating that partisanship drove the General Assembly's choices in district lines. [Vol. V Tr. 1042:4-1043:19]. Ultimately, Dr. Rodden's attempted comparisons only buttress the General Assembly's partisan, not racial goals in creating the Enacted Congressional Plan.

163. The failure to compare apples-to-apples dooms Dr. Rodden's attempted use of Dr. Barber's simulations to create an alternate baseline or benchmark to evaluate the racial characteristics of the 2023 pan's congressional districts. None of the 5,000 plans achieved a similar political outcome to the 2023 Plan, and none were drawn using all the General Assembly's neutral criteria. Dr. Rodden cannot therefore show that any alleged differences in the racial composition of the 2023 plan districts versus those in simulated plans are not fully explainable by the failure of those simulated plans to match the non-racial parameters of the 2023 plan. Indeed, when asked on cross-examination, Dr. Rodden did not dispute the statement that by "comparing the enacted plan against the simulated plans, it might not be truly apples to apples if you were trying to match the political performance of the enacted plan." [Vol. I Tr. 129:13-130:1].

ii. *Draft Congressional Plans*

164. Finally, Dr. Rodden contended that when he evaluated early draft congressional plans, including those prepared by the General Assembly in September and October and a few plans prepared by a consultant, Mr. Blake Springhetti, he found that many of those plans achieved a similar political outcome to the 2023 plan but had districts with BVAPs closer to the simulated districts than the 2023 plan. [Vol. I Tr. 88:13-89:9]. Dr. Rodden further claims that as the drafts advanced toward final passage, the BVAPs of

72

districts in the drafts became more like the 2023 Plan. [Vol. I Tr. 90:3-14]. However, this analysis is unpersuasive.

165. First, Dr. Rodden admitted that he "didn't review any of the legislative history around any of those draft plans," claiming he "didn't have access to that information." [Vol. I Tr. 131:9-11]. Dr. Rodden also failed to review the depositions taken in this case of Senator Hise or Mr. Springhetti. [Vol. I Tr.131:12-24]. As a consequence, Dr. Rodden lacked essential foundation to understand the intent behind the draft plans, their ultimate relevance to the final 2023 plan, or what the General Assembly did or did not consider when making alterations to draft plans.

166. Second, as Dr. Barber pointed out in his supplemental report, the 2023 plan paired far fewer incumbents—just two—than prior draft plans. [LDTX254 at 20, Tbl. 2 (September alternate plans), 22 Tbl. 3 (Mr. Springhetti alternative plans), and 25 Tbl. 4 (October alternative plans)]. For example, three alternate plans Dr. Rodden relied upon from Mr. Springhetti—those identified as CDS 003, CDS 003v2, and CDS 005—each paired *four* incumbents. [LDTX254 at 22 Tbl. 3]. Some September draft maps, such as CBP-1 (relied upon by Dr. Rodden), paired *six* incumbents. [LDTX254 at 20, Tbl. 2]. Dr. Rodden disputed that the General Assembly may have wanted to avoid pairing Democratic incumbents, [Vol. I Tr. 92:3-17], but his analysis was necessarily speculative as he had failed to review legislative history, and ignores that the General Assembly expressly sought to avoid double-bunking if possible, regardless of party. [Vol. VI 1246:6-11; JX044]. The reduction in incumbent pairing suggests an alternate motivation for changes made to the districts that Dr. Rodden does not meaningfully rebut.

73

167. Third, Dr. Rodden does not claim that had the General Assembly enacted any of these alternate plans, it would have resulted in the creation of a minority-opportunity district that did not exist in the enacted 2023 plan. Nor does he show that any of these alternate plans have a substantially different racial distribution than the 2023 plan. For instance, most of the draft plans evaluated had a BVAP for CD12 that was within two percentage points of the 2023 plan's. [LDTX254 at 28, Fig. 4]. Similarly, the range of district BVAP in most of the draft plans in the Triad Region were quite similar to that in the enacted 2023 plan, varying for the most part by a few percentage points and with only a few outliers that had districts whose BVAPs varied by 5% or more. [LDTX254 at 31, Fig. 6].

168. For all these reasons, the draft plans Dr. Rodden considered likewise fail to create an appropriate benchmark to judge the racial and political configuration of the 2023 Plan's congressional districts.

169. In response to Dr. Rodden's analysis of draft plans, Dr. Barber provided a consolidated comparison tracking both the partisan lean and black populations of the examined enacted districts, along with their equivalent districts in the applicable portion of the state from the alternative maps Dr. Rodden examined. [Vol. V Tr. 1048:2-1049:1].

170. Figure 3 of Dr. Barber's Supplemental Report demonstrates the results of this exercise for CD1; however this analysis is repeated for all of the districts Dr. Rodden examined. [LDTX254 at 28-31].

74



Figure 3: Congressional District 1 Race and Partisanship

Note: Congressional District 1 in northeastern NC in the Enacted Map has a similar Black population and partisan lean to each of the alternative maps considered by Dr. Rodden.

[LDTX254 at 27, Fig.3].

171. Not only is Dr. Barber's comparative analysis a much more effective and accurate mechanism, but it also shows that in no instance is the 2023 plan an outlier in terms of racial composition across examined districts. [Vol. V Tr. 1048:2-18]. This is true across all the districts of the state Dr. Barber examined. [Vol. V Tr. 1048:19-1049:1].

172. Taken as a whole, these analyses Dr. Rodden offered are easily explainable by non-racial considerations, falling far short of showing racial predominance, let alone disentangling them from politics. [Vol. V Tr. 1033:3-5, 1052:6-13].

e.    Disentangling Race from Politics

173.    Setting aside the above-described deficiencies in Dr. Rodden's analyses, the 2023 congressional plan exhibits clear indicators of partisan line drawing. Using Dr. Rodden's own maps, Figures 12, 13, and 14 to Dr. Trende's report provide a side-by-side comparison of dot density charts for population clusters based on race, registration, and vote total. [Vol. VI Tr. 1349:13-19].

Figure 12: Dotplots of registered Black voters. 1 dot represents 100 Black registered voters



(a) 2022 Lines



(b) 2024 lines

[LDTX266 at 39, Fig.12]

76

Figure 13: Dotplots of Registered Democratic voters. 1 dot represents 175 Democratic registered voters



(a) 2022 Lines



(b) 2024 lines

[LDTX266 at 40, Fig.13].

Figure 14: Dotplots of Democratic votes using the Election Index. 1 dot represents 100 Democratic votes



(a) 2022 Lines



(b) 2024 lines

[LDTX266 at 41, Fig.14]

Case 1:23-cv-01057-TDS-JLW     Document 163     Filed 08/05/25     Page 80 of 178

174. A cursory comparison between the 2022 court-ordered congressional plan and the 2023 plan reveals that the subsequent district line shifts both pack and crack Democratic voters for increased partisan outcomes. [Vol. VI Tr. 1349:13-19].

175. To further emphasize the point, Figures 18 and 20 to Dr. Trende's report employ Dr. Rodden's own backup data to generate plots showing how there is no discernible pattern in racial composition shifts between districts in the two plans. [Vol. VI. Tr. 1349:23-1351:5]. In contrast, there is a clear effort to increase Republican-leaning districts from the 2022 plan to the 2023 plan. [Vol. VI Tr. 1351:6-20].



Figure 18: District BVAPs, 2022 Map in blue, 2023 Map in red

[LDTX266 at 45, Fig. 18].

78



Figure 20: District Dem vote shares, using Election Index, 2022 Map in blue, 2023 Map in red

[LDTX266 at 47, Fig. 20].

176. These findings are buttressed by Figure 21 to Dr. Trende's report, showing how Dr. Rodden's examined districts—CDs 1, 6, 12, and 14—all see larger changes to their partisan makeup than their racial makeup.

Figure 21: Change from 2022 to 2023 NC Congressional district lines, using different metrics

| District | BVAP Change | Black Reg. Change | Dem Reg. Change | Dem % Change |
|---|---|---|---|---|
| 1 | −0.8% | −0.6% | −1.0% | −2.9% |
| 2 | 5.8% | 5.4% | 3.9% | 3.4% |
| 3 | 2.5% | 2.4% | 2.3% | 4.0% |
| 4 | −4.9% | −5.4% | −2.1% | 5.2% |
| 5 | 6.2% | 5.7% | 4.0% | 3.0% |
| 6 | −12.3% | −11.5% | −11.2% | −14.1% |
| 7 | 1.1% | 0.6% | −1.4% | 0.6% |
| 8 | 3.2% | 3.0% | 5.8% | 8.0% |
| 9 | −2.2% | −1.3% | −1.6% | −3.2% |
| 10 | 6.1% | 5.9% | 5.8% | 11.1% |
| 11 | −0.1% | −0.2% | −0.4% | −0.4% |
| 12 | 2.3% | 3.1% | 5.2% | 9.8% |
| 13 | −2.6% | −1.9% | −2.8% | −9.1% |
| 14 | −4.8% | −4.7% | −6.2% | −15.1% |

[LDTX266 at 48, Fig. 21].

177.    In examining the areas Dr. Rodden focused on, Dr. Trende illustrates the interplay between race and politics. Comparing the lines of Enacted CDs 5, 6, and 10 in Forsyth and Guilford Counties reveals that heavily Democratic precincts are pushed into CD10 while others are split between CD5 and 6. [Vol. VI Tr. 1359:2-12].

178.    Figures 36 and 37 to Dr. Trende's report show this occurrence, while Figure 38 shows how almost all Democratic precincts are packed into CD10 and how white Democratic precincts in CD5 and 6 are similarly packed together.

80

Figure 36: Choropleth Map of Forsyth and Guilford counties, by BVAP



[LDTX266 at 70, Fig.36].

Figure 37: Choropleth Map of Forsyth and Guilford counties, by Election Index



[LDTX266 at 71, Fig.37].

Figure 38: Forsyth and Guilford Counties, White majority precincts shaded; Democratic White majority precincts shaded blue



[LDTX266 at 71, Fig.38].

2.    <u>Senate Districts</u>

81

179. In claiming racial motive impacted senate districts, Plaintiffs relied solely on speculative lay opinion testimony from witnesses that they could understand no basis other than race why districts were configured as they were. [*See* Vol. II Tr. 356:9-18 (Plaintiff Calvin Jones testifying that "I can't see another reason for some districts like this, other than just race")]. This said nothing probative, especially where the witnesses reflected remarkable lack of imagination in considering possible partisan motives.

180. Dr. Barber corroborated Senator Hise's testimony that the so-called "notch" in SD8 in New Hanover County was the result of a political goal, ensuring that precincts performing the worst for Republicans be grouped into SD8. Dr. Barber's Figure 18 [LDTX253 at 43], shows precincts colored politically, with the darkest blue representing the highest performance for Democratic candidates. [Vol. V Tr. 1060:12-23]. Dr. Barber confirmed that the six precincts selected for SD8 were very dark blue and thus very Democratic-leaning. [Vol. V Tr. 1060:24-1061:10].

Figure 18: Enacted Senate Brunswick-New Hanover-Columbus Counties Districts and Precinct Partisanship



Note: Precincts are colored by their partisan lean - darker red for more Republican and darker blue for more Democratic. Map source: https://davesredistricting.org/

82

[LDTX253 at 43, Fig.28].

181.    Dr. Barber then compared this map to a map presented by the NAACP Plaintiffs with racially colored precincts, and observed that these six precincts ranged in BVAP—some were in the lowest category of BVAP, and there was one precinct in the 40-50% BVAP range that was not included in SD8. [Vol. V Tr. 1061:11-1062:16].



**Figure 4: 2023 Senate Districts 7 and 8 with Shading by BVAP**

[Figure 4 from NAACP Plaintiffs' First Amended Complaint, D.E.155 at p. 44].

182.    Dr. Barber concluded that these maps showed that SD8 was drawn in an effort to gather Democratic precincts without regard to race. [Vol. V Tr. 1062:17-1063:1].

183.    None of Plaintiffs' experts rebutted this evidence, or offered any other legitimate evidence of racial intent related to the 2023 senate plan.

## C.    Alternative plans

184.    No alternative plans suggested that the 2023 senate plan could be configured to achieve a greater racial balance while achieving the General Assembly's political goals. The NAACP Plaintiffs' only illustrative plans were prepared by Mr. Anthony Fairfax, who reconfigured SD1 and SD2 (and neighboring districts) in an effort to satisfy the first *Gingles* precondition. He applied no political considerations in those plans, [Vol. II Tr. 467:21-23], and as discussed below, they do not comply with the *Stephenson* county-grouping requirements or the legislature's other criteria, [*infra* § VI.A]. Mr. Fairfax did not draw any other senate plans in the relevant challenged areas (New Hanover or Brunswick Counties). [Vol. II Tr. 461:24-462:2]. Mr. Fairfax also did not draw illustrative congressional plans. [Vol. II Tr. 462:7-12].

185.    The 2022 senate plan provides no basis for comparison that might shed light on motive because it does not achieve the General Assembly's legitimate political objectives including in the area of SD7 and SD8. The record shows that the movement of precincts from SD7 to SD8 as Senator Hise described shored up the performance of SD7 for Senator Michael Lee, the current majority leader. [*See* Vol. IV Tr. 843:15-17]. The General Assembly's political data shows a nearly 2.7% increase in the vote for President Trump in the 2020 Presidential Election from the 2022 plan (49.02%) to the 2023 plan (51.71%). [JX278 at 3; JX149 at 33]. Senator Michael Lee went from winning SD7 by 1,710 votes in 2022 to winning by over 10,000 in 2024. [JX365; JX368]. Moreover, there

is no evidence in the record about the racial makeup of the 2022 senate plan and thus no basis to determine whether that plan would achieve a greater racial balance than the 2023 senate plan.

186.    Mr. Fairfax offered some opinions on the 2023 congressional plan as compared to the 2022 court-ordered congressional plan, [Vol. II Tr. 438:16-24], but in doing so, he simply compared certain hand-picked metrics of the 2023 plan with the 2022 court-ordered plan. [Vol. II Tr. 458:2-8]. This is neither probative nor even useful.

187.    To start, Mr. Fairfax's comparison was premised on the faulty notion that the 2022 court-ordered congressional plan was a benchmark for the General Assembly in creating the 2023 congressional plan. [Vol. II Tr. 483:18-484:3]. It was not. [Vol. IV Tr. 857:16-18]. The 2022 congressional plan was implemented via court order and did not accomplish the General Assembly's explicit partisan objectives. [Vol. IV. Tr. 857:16-858:2]. Mr. Fairfax understood that the General Assembly passed a congressional plan in 2021, yet he chose not to analyze it. [Vol. II Tr. 484:4-9]. Instead, he artificially limited his analysis at the instruction of counsel. [Vol. II Tr. 483:18-22].

188.    Mr. Fairfax also did not conduct a statewide comparison; rather, he limited his comparisons to CD1 and targeted areas in Forsyth and Guilford Counties. [Vol. II Tr. 458:4-12].

189.    Despite claiming that the two sets of plans performed "similarly," Mr. Fairfax's analyses ignored partisanship. [Vol. II Tr. 458:13-15; NAACPPX182 at 68-74, ¶¶158-167) (Fairfax Congressional Plan analyses). Thus, Mr. Fairfax's conclusions fail to account for differences in partisan performance—which is exactly what the General

Assembly focused on in creating the 2023 congressional plan. [Vol. IV. Tr. 857:3-11, 860:24-861:11]. The 2022 congressional plan elected just seven Republicans compared to the 10 Republicans elected under the 2023 congressional plan. [LDTX253 at 11; LDTX254 at 10].

## V.    **Evidence the 2023 plans have a dilutive or discriminatory effect**

190.    The parties also disputed whether the 2023 districts at issue result in a discriminatory effect under the legal standards addressed in the accompanying proposed conclusions of law, [*see* Proposed Conclusions of Law § I.B.3). It is therefore necessary to analyze the competing factual contentions and related evidence.

### A.    **Evidence of Effect in Congressional Districts**

191.    No evidence was presented at trial that establishes that any of the remaining challenged congressional districts have a dilutive or discriminatory effect.

192.    Both CD1 and CD12 performed for Democrats whom Plaintiffs identified as the Black-preferred candidates in the 2024 elections, [*see* NAACPPX208 at 29, Tbl. 10; JX369 at 2-3], and various plaintiffs and fact witnesses living in those districts testified the current incumbents represent their interests. Plaintiff Allison Allen voted for Congresswoman Alma Adams, a Black Democrat, in the 2024 General Election in CD12, and Congresswoman Adams won that election. [Vol. II Tr. 345:15-346:6; JX369 at 3]. Plaintiff Calvin Jones, Plaintiff Reverend Dawn Daly-Mack, and fact witness Courtney Patterson voted for Congressman Don Davis in the 2024 General Election in CD1, [Vol. II Tr. 349:2-13; Vol. II Tr. 372:14-18; Vol. III Tr. 601:7-14], and Congressman Davis won that election. [JX369 at 2]. Common Cause Executive Director Bob Phillips testified that

86

Common Cause believes that Congressman Davis and Congresswoman Adams represent the interests of its Standing Members who reside in CD1 and CD12. [Vol. III Tr. 646:8-11, 645:23-646:1; *see also* Vol. II Tr. 372:19-21 (Plaintiff Reverend Daly-Mack confirming that Congressman Davis represents her interests)].

193.    Dr. Oskooii's own analysis stated that Black-preferred candidates win CD1 in the 2023 congressional plan in nearly 72% of the exogenous elections he analyzed from 2016 to 2024. [*See* NAACPPX208 at 29-30]. Dr. Oskooii's opinion that Black-preferred candidates will have "less" opportunity in the 2023 plan's CD1 compared to the 2022 plan's CD1 is not relevant as retrogression is not the measure of vote-dilution.

194.    Dr. Palmer also admitted there was no racially polarized voting in his "Mecklenburg" region (which is the area corresponding to CD12) in several recent election cycles. [Vol. I Tr. 182:2-7; WX4 at 6]. His analysis showed that white voters were not cohesive in the 2024 elections and that he therefore did not find racially polarized voting between Black and white voters in 2024 alone. [Vol. I Tr. 187:5-16; WX6 at ¶ 13, Fig. 2; *see also* WX6 at 9, Tbl. 4]. Dr. Palmer further admitted that white voters in his Mecklenburg region were not cohesive in 2022, [Vol. I Tr. 185:20-23], and were "generally not very cohesive" in 2018. [Vol. I Tr. 185:24-186:7; WX4 at 14, Tbl. 4].

195.    There is no evidence that CD5, CD14, or CD6 in the 2022 plan were crossover districts at just 12.51%, 20.68%, and 31.65% BVAP, respectively. [JX288]. Now they are 18.73%, 15.93% and 19.31%, respectively. [JX81 at 7].

196.    Furthermore, no expert conducted a district-specific analysis of CD14 in the 2023 plan. Dr. Oskooii did not analyze any districts in the Charlotte area, and Dr. Palmer's

87

"CD14" does not represent the actual boundaries of CD14 in the 2023 congressional plan. [Vol. I Tr. 176:13-15, 177:25-178:4].[8] Instead, this area "is defined as counties in CD14 under the 2022 or 2023 plan." [WX4 at ¶ 10]. Dr. Palmer also excluded from this analysis the portions of Mecklenburg County which are in enacted CD14. [*Compare* WX4 at ¶ 10, *with* JX78].

197.    The win rates for the Black-preferred candidates identified by Dr. Oskooii in CD5, CD6, and CD10 also increased in 2024 from 2020 and 2022, [NAACPPX208 at 29-30], refuting the claim that the districts are declining in performance over time. CD6 was also an unusual contest with no Democratic candidate in the 2024 General Election—the Republican defeated a Constitution Party candidate with almost 70% of the vote. [LDTX251 at 5-6].

198.    The evidence shows this is a partisan effect rather than a racial effect. Dr. Palmer admitted that in his performance analysis, the phrase "Black-preferred candidate" could be replaced with "Democrat" and still be accurate. [Vol. I Tr. 191:25-192:11; *see* WX4 at 7, Fig. 4; *see* WX6 at 5, Fig. 3]. Dr. Palmer admitted that his analysis shows that the 2023 plan had, on average, better electoral outcomes for Republican candidates in the 2024 elections. [Vol. I Tr. 192:18-21; *see* WX6 at 5-6]. Dr. Palmer's analysis of the effects of the 2023 plan on voters by demographic group was only conducted at the statewide level, and was not broken down by region on areas where the challenged district exists. [Vol. I Tr. 193:3-15; WX6 at ¶ 18].

_____

[8] Dr. Palmer did not conduct a "district-specific" analysis on the boundaries of any actual district in the 2023 plan. [Vol. I Tr. 178:5-12].

199. The following chart shows how the districts did not change significantly in racial composition but did change in their political performance—notably, CD6 and CD14 changed from majority-Democratic districts to majority-Republican districts based on the political data the General Assembly had when drawing:

| District | 2022 Plan BVAP [JX288] | 2023 Plan BVAP [JX081 at 7] | 2022 Plan Vote for Trump in 2020 Presidential Election [JX219 at 2] | 2023 Plan Vote for Trump in 2020 Presidential Election [JX081 at 17] |
|---|---|---|---|---|
| CD1 | 41.23% | 40.42% | 45.98% | 48.86% |
| CD5 | 12.51% | 18.73% | 59.67% | 56.76% |
| CD6 | 31.65% | 19.31% | 43.10% | 57.34% |
| CD10 | 10.51% | 16.58% | 69.08% | 57.27% |
| CD12 | 35.96% | 38.31% | 34.14% | 24.08% |
| CD14 | 20.68% | 15.93% | 40.95% | 57.36% |

### B. Evidence of Effect in Senate Districts

200. No evidence was presented at trial that establishes that any of the remaining challenged senate districts have a dilutive or discriminatory effect.

201. SD1 and SD2 do not have a dilutive effect because no alternative showing what the right to vote should be was adduced, [*see infra* § VI.A], and there is no evidence of voting patterns in SD8 at all, [*see* NAACPPX189 at 4; NAACPPX208 at 3].

## VI. Minority opportunity in Northeastern North Carolina

202. NAACP Plaintiffs brought a VRA Section 2 results claim against SD1 and SD2. By consequence, it is necessary to analyze facts relevant to those districts, the region, and the State.

### A. Geography in Northeastern North Carolina

89

203.     Plaintiffs failed to show that it is possible to draw a reasonably configured majority-Black district in Northeastern North Carolina.

204.     NAACP Plaintiffs retained Mr. Anthony Fairfax to assess whether the Black population in North Carolina is sufficiently large and geographically compact to allow for the creation of additional majority-Black Senate districts, beyond those enacted in the 2023 senate plan. [Vol. II Tr. 438:16-20]. Mr. Fairfax's inquiry was limited to northeastern North Carolina. [Vol. II Tr. 448:18-449:10].

205.     Ultimately, Mr. Fairfax drew two illustrative Senate plans (the "Illustrative Senate Plans"), both of which purportedly demonstrate that reasonably configured districts can be drawn at or above a 50% + 1 Black Voting Age Population ("BVAP") threshold. [Vol. II Tr. 451:1-16]. These Illustrative Senate Plans only suggest new majority BVAP districts in two specifically targeted areas in northeastern North Carolina.[9] [Vol. II Tr. 461:14-20].

206.     Mr. Fairfax, who holds degrees in electrical engineering and geospatial information science, [NAACPPX182 at ¶2], notably disclaimed any expertise in political science, North Carolina geography, or North Carolina communities of interest, [Vol. II Tr. 459:10-20].

---

[9] In fact, Mr. Fairfax admitted that he did not create new districts in other areas of the state, including those which Plaintiffs challenge such as New Hanover and Brunswick Counties. [Vol. II Tr. 461:24-462:2]. As a result, there is simply no evidence in the record to support *NAACP* Plaintiffs' claims regarding SD7 and 8, especially in their attempts to compare the 2023 senate plan to the 2022 senate plan. [D.E. 105 at ¶¶237-239]; *see also* [Vol. V Tr. 1023:10-1024:14 (counsel for *NAACP* Plaintiffs encouraging the Court "visually confirm" the differences between the 2022 plan and the Enacted Senate Plan, when asked if there is evidence in the record to support their claims)].

207.    In response to Mr. Fairfax's Illustrative Senate Plans, Legislative Defendants retained Dr. Trende and Dr. Barber to analyze, among other things, the viability of Mr. Fairfax's Illustrative Senate Plans under both the first *Gingles* precondition and applicable redistricting criteria. [Vol. VI Tr. 1054:4-1058:15; Vol. V Tr. 1365:15-1369:17].

1.    Violations of *Stephenson*

208.    Mr. Fairfax's Illustrative Senate Plans uniformly violate the *Stephenson* county grouping requirements. [Vol. V Tr. 1054:7-25; LDTX253 at 49, Fig. 21]. Oftentimes, Mr. Fairfax's districts actually dismember several mandatory county clusters, causing widespread downstream effects across the region. [*Id.*].

209.    Mr. Fairfax admitted that he began his map drawing process by trying to implement the 2023 senate plan's *Stephenson* county groupings while pursuing his goal of creating new majority-Black Senate districts. [Vol. II Tr. 450:6-14]. Ultimately, however, Mr. Fairfax conceded that he was unable to draw these intended districts within the 2023 senate plan's *Stephenson* groupings. [Vol. II Tr. 475:11-14].

210.    Mr. Fairfax did not run any algorithm or use accepted alternative grouping options. [Vol. II Tr. 450:15-25, 476:11-22]. Instead, Mr. Fairfax claimed he drew "new districts" and subsequently what he called "groupings … from the districts." [Vol. II Tr. 475:16-17]. When asked if he checked if the "groupings" created from his new districts would have complied with *Stephenson*, Mr. Fairfax could only say that "[w]hat [he] was attempting to do was to use whole counties of the districts that [he] created -- from the districts that [he] created, in essence, creating a new set of county groupings, if you will." [Vol. II Tr. 476:11-22].

91

211.    Rather than test the viability of these new "groupings," Mr. Fairfax argued that it was unnecessary under the VRA. [Vol. II Tr. 469:12-18, 476:5-10]. Mr. Fairfax also admitted that he did not perform any inquiry to determine if what he created was viable under *Stephenson*, the VRA notwithstanding. [Vol. II Tr. 471:13-17]. Mr. Fairfax also disregarded population size of the counties his Illustrative Senate Plans chose to split. [Vol. II Tr. 471:3-9].

212.    As Dr. Barber showed, the region of the state where Mr. Fairfax drew his Illustrative Senate Plans is constrained by mandatory *Stephenson* groupings; groupings which do not permit any variation. [Vol. V Tr. 1053:21-1054:3, 1055:1-20]. In other words, the General Assembly was limited in its ability to alter districts in the region of the state Mr. Fairfax freely overhauls. [Vol. V Tr. 1055:1-20].

213.    In contrast, other regions of the state have optional *Stephenson* groupings, meaning the General Assembly retains some discretion in forming the districts. Figure 20 to Dr. Barber's report identifies the state's applicable county clusters.

Figure 20: Senate County Groupings with One Senate District



Note: County groupings with one Senate district are highlighted in orange.

[LDTX253 at 46, Fig. 20].

214. Figure 21 to Dr. Barber's report illustrates the extent of Mr. Fairfax's dismantling of preexisting *Stephenson* groupings. [Vol. V Tr. 1054:14-25].

Figure 21: Senate County Grouping Violations in Illustrative Senate Maps



[LDTX253 at 49, Fig. 21].

215.    Illustrative SD5 in Mr. Fairfax's Illustrative Senate Plan A introduces an additional *Stephenson* violation by dividing Pitt County into three districts, even though its population is small enough to be contained within a single Senate district. [Vol. V Tr. 1056:12-1057:21]. Senator Smith admitted that splitting Pitt County between three districts could raise concerns about whether communities of interest were being kept whole. [Vol. IV Tr. 822:8-11]. For example, Plaintiff Syene Jasmin resides in Winterville, North Carolina, which is kept whole in SD5 in the 2023 senate plan [Vol. III Tr. 517:18-19, 532:20-21; JX079]. In contrast, Winterville is split in Mr. Anthony Fairfax's Illustrative Senate Plan A. [Vol. VI Tr. 1484:9-22].

216.    Not only do the mandatory groupings in northeastern North Carolina vitiate the feasibility of Mr. Fairfax's Illustrative Senate Plans, but it also renders his attempted compactness comparisons inapposite as, unlike Mr. Fairfax, the General Assembly had no discretion to alter these districts. [Vol. V Tr. 1055:1-20]. For example, the fact that Illustrative SD5 in Illustrative Senate Plan A is less compact than its enacted counterpart is a telling occurrence considering Mr. Fairfax's freedom to change district boundaries. [Vol. V Tr. 1055:1-20; NAACPPX182 at 60, Tbl.33].

217.    By breaking apart preexisting groupings in order to create additional majority-Black districts, Mr. Fairfax's Illustrative Senate Plans create a ripple effect across the entire region, leading to significant portions of the state's population being placed in districts which are noncompliant with required county clusters. [Vol. V Tr. 1054:14-25; LDTX253 at 48].

94

218.  In Illustrative Senate Plan A this number is 11.9% of the entire state's population being placed into districts which do not meet *Stephenson*'s county boundary clustering requirement. [Vol. V Tr. 1054:14-25; LDTX253 at 48]. For Illustrative Senate Plan B, that number is 9.57%. [*Id*.].

### 2.  Prioritizing Race Over Traditional Redistricting Criteria

219.  Mr. Fairfax's Illustrative Senate Plans were conceived upon racial benchmarks, beginning with Illustrative Senate Plan A. [Vol. VI Tr. 1368:25-1369:16].

220.  Illustrative Senate Plan A redraws SD1, 2, 3, 4, 5, and 11, crafting Illustrative SD2 and SD5 as majority-Black districts. [Vol. II Tr. 451:9-16]. Figure 14 to Mr. Fairfax's report shows this construction.



**Figure 14 – Senate Illustrative Plan A for Northeast Districts**

95

[NAACPPX182 at 53 Fig.14].

221.     By introducing splits to Pitt and Nash counties—counties which were kept whole in the 2023 senate plan, [Vol. II Tr. 479:9-11; JX79]—Mr. Fairfax's Illustrative Senate Plan A adds two more county splits than the 2023 plan. [Vol. II Tr. 481:7-11]. In addition to introducing new county splits, Illustrative Senate Plan A performs worse than the 2023 plan on other metrics, including split landmark areas. [Vol. II Tr. 481:20-22].

a.     Illustrative SD2

222.     Illustrative SD2, which is the same across Illustrative Senate Plans A and B, spans Bertie, Chowan, Gates, Halifax, Hertford, Northampton, Vance, Warren, and Washington counties, as seen in Figure 15 to Mr. Fairfax's report. [Vol. II Tr. 482:15-483:9].



Figure 15 – Senate Illustrative Plan A - District 2

[NAACPPX182 at 54 Fig.15].

96

223. Despite spanning nine counties, Illustrative SD2 barely achieves a majority BVAP. [Vol. II Tr. 478:4-20]. Additionally, the district is underpopulated by 3.26%. [LDTX253 at 56].

224. Mr. Fairfax meets this majority-Black target only through breaking apart three different *Stephenson* county clusters for the sole purpose of capturing various Black populations located across the counties. [Vol. II Tr. 450:6-25; Vol. V Tr. 1056:15-19; LDTX253 at 56].

225. Figures 45 and 47 to Dr. Trende's report illustrate this precise targeting of distinct Black populations, while Figure 27 to Dr. Barber's report shows the county clusters Mr. Fairfax breaks apart in order to create Illustrative SD2. [Vol. VI Tr. 1366:7-25].



Figure 45: Fairfax Senate Illustrative Map A District 2 BVAP

© OpenStreetMap contributors

[LDTX276 at 60 Fig.45].

Figure 47: Dot Density Map of Fairfax Senate Illustrative Map A District 2



(a) One black dot = 20 Black residents of voting age. One orange x = 20 non-Black residents of voting age

[LDTX276 at 61, Fig.47].

Illustrative A Senate Map: Senate District 2



Green dashed outlines = county boundaries
Blue outlines = county grouping boundaries

[LDTX253 at 57, Fig.27].

226. However, in pulling these groups together and excluding nearby majority-White counties, Mr. Fairfax subverts traditional redistricting criteria, as even his own data reveals the stark socioeconomic and community differences between the population

concentrations in Illustrative SD2's captured counties. [Vol. VI Tr. 1367:1-15; LDTX276 at 61-62]. Considering this reality, alongside Mr. Fairfax's disclaimer of any expertise in North Carolina communities of interest, [Vol. II Tr. 459:10-20], it is clear that the structure of Illustrative SD2 is explainable solely by racial objectives.

b.    Illustrative SD5

227.    In the 2023 senate plan, SD5 contains all of Pitt and Edgecombe counties. [Vol. II Tr. 479:9-13; JX79]. The result is a 40.3% BVAP district routinely favoring Democratic candidates, including current state Senator Kandie Smith, who won her district in the 2024 general election by a margin of 55.08% to 44.92%, defeating White Republican candidate Alexander Paschall. [Vol. IV. Tr. 820:1-3; JX149 at 13; JX368].

228.    When asked, Mr. Fairfax claimed he was unaware if Enacted SD5 performs for Black-preferred candidates, further revealing his intentional ignorance of partisanship or the General Assembly's undisputed partisan objectives. [Vol. II Tr. 477:24-478:3].

229.    Mr. Fairfax's Illustrative SD5 takes this heavily Democratic district comprised of two whole counties and divides it such that a substantial portion of the affected Black population are no longer in a district electing Black-preferred candidates. [Vol. V Tr. 1056:12-1058:15].

230.    In fact, Mr. Fairfax's Illustrative SD5 overhauls enacted SD5 entirely, introducing several new splits, highlighted by a three-way split of Pitt County.[10] [Vol. II Tr. 471:10-12]. Figure 16 to Mr. Fairfax's report illustrates this redrawing.

_____

[10] In an apparent effort to justify this split, counsel for the NAACP Plaintiffs questioned Dr. Trende about certain districts he and Dr. Bernard Grofman drew as special masters in



**Figure 16 – Senate Illustrative Plan A - District 5**

[NAACPPX182 at 56, Fig. 16].

231.    Although Mr. Fairfax claimed, for the first time at trial, that his three-way split of Pitt County was done to mirror the enacted House plan, he did not offer this rationale in any of his reports. *Compare* [Vol. II Tr. 453:2-455:17] *with* [NAACPPX182 at 55-60 (discussing the creation and features of Illustrative SD5)]. Such a *post-hoc* rationale

---

Virginia; specifically, county splits affecting the city of Richmond, including Senate Districts 14 and 15. [Vol. VI Tr. 1437:1-9, 1442:1-13, 1447:7-15]. However, counsel for NAACP Plaintiffs utilized a draft of Drs. Grofman and Trende's memorandum and then stated that there were no changes to the specific districts between the draft memorandum and its final version. [Vol. VI Tr. 1441:25-1443:10]. This is false. Had counsel introduced the final memorandum, the record would reflect that changes were made to these districts between the draft and final version and the Dr. Trende and Dr. Grofman reported them. *See* https://www.vacourts.gov/static/courts/scv/districting/2021_virginia_redistricting_memo.pdf at 21 (specifically referencing changes to the 14th and 15th Senate Districts from the December 7, 2021 draft memorandum).

is both legally deficient and incapable of legitimizing Mr. Fairfax's choices. *See Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 189–90 (2017).

232.    Mr. Fairfax's claims are easily disproven: the lines Mr. Fairfax claimed to follow in SD5's Pitt County split—specifically, those of enacted House Districts 8 and 9—are not actually similar, let alone identical.[11] [Vol. II Tr. 453:2-455:17; Vol. VI Tr. 1435:6-1436:4]. In fact, Mr. Fairfax's claim that Illustrative SD5 keeps the city of Winterville whole with the exception of one VTD is demonstrably false[12]—several populated, multiple majority white VTD's in both Winterville and Greenville are excluded from Illustrative SD5, as seen in Figure 44 to Dr. Trende's report. [Vol. VI Tr. 1431:11-1432:9, 1484:9-22]. Specifically, the notch in the center of Figure 44 reflects Mr. Fairfax's precise exclusion of heavily white VTDs, including on and around the East Carolina University campus and downtown areas. [Vol. VI Tr. 1431:11-1432:9].

---

[11] Although counsel for the NAACP Plaintiffs first suggested that the lines were identical and then backtracked and suggested that the difference in the two sets was a single VTD, this too is untrue. [Vol. II Tr. 456:16-19; Vol. VI Tr. 1435:6-1436:4; JX195; JX193; JX276 at 59, Fig. 44].

[12] Counsel for the NAACP Plaintiffs also suggested to both Dr. Barber and Dr. Trende, as well as the Court, that Winterville was kept whole. [Vol. V Tr. 1142:11-1143:6; Vol. VI Tr. 1431:11-1432:9]. As NAACP Plaintiffs' counsel later admitted on the record, is not. [Vol. VI Tr. 1484:9-24].



Figure 44: Fairfax Senate Illustrative Map A District 5 BVAP, Greenville zoom

© OpenStreetMap contributors

[LDTX276 at 59, Fig. 44].

  233. As Figure 44 to Dr. Trende's report further illustrates, Mr. Fairfax diverges from the Enacted House Plan lines he claims to follow in order to surgically extract heavily White precincts in Greenville, including those around the ECU campus and certain parts of downtown Greenville. [Vol. VI Tr. 1369:9-16; *cf.* ]; *compare* [JX195 (Enacted House Plan shape files, reflecting exact VTDs contained within or excluded from a district)]. Had Mr. Fairfax included these precincts in Illustrative SD5, its BVAP would drop the district below 50%. [Vol. VI Tr. 1369:9-16].

234. These choices are further evidence of Mr. Fairfax's racialized line drawing, as exhibited by Figure 29 to Dr. Barber's report, revealing the BVAP of areas on the border between Illustrative SD3 and 5. [Vol. V Tr. 1056:25-1057:12].

Figure 29: Division of Greenville by Illustrative Map A SD-5 and SD-3



Boundary between Illustrative Senate District 5 and 3 in Greenville. The red line shows the Senate district boundary. Precincts are shaded and labelled by their Black Voting Age Population percentage. Map source: https://davesredistricting.org/

[LDTX253 at 61, Fig. 29].

235. In reality, Mr. Fairfax's complete restructuring of enacted SD5 was driven by his goal of stitching together spatially distinct Black populations from across the area, a phenomenon shown in Figures 40 and 42 to Dr. Trende's report. [Vol. VI Tr. 1367:17-1369:16].



Figure 40: Fairfax Senate Illustrative Map A District 5 BVAP

BVAP %
30%
35%
40%
45%
50%
55%
60%
65%
70%

© OpenStreetMap contributors

[LDTX276 at 55, Fig. 40].



Figure 42: Dot Density Map of Fairfax Senate Illustrative Map A District 5

(a) One black dot = 20 Black residents of voting age. One orange x = 20 non-Black residents of voting age

[LDTX276 at 56, Fig. 42].

236.    In addition to the racialized line drawing in Greenville and Winterville, shown in Dr. Trende's Figure 44, Figure 43 to Dr. Trende's report further reveals how Mr.

Fairfax's added splits to the city of Rocky Mount are similarly performed along racial lines.
[Vol. VI Tr. 1368:18-1369:5].

Figure 43: Fairfax Senate Illustrative Map A District 5 BVAP, Rocky Mount zoom



[LDTX276 at 58, Fig. 43].

237.    Because of this restructuring, Illustrative SD5 is underpopulated by 3.60%, while dividing three separate *Stephenson* county clusters, illustrated in Figure 28 to Dr. Barber's report. [Vol. V Tr. 1055:24-1056:19; LDTX253 at 57].

105



Illustrative A Senate Map: Senate District 5

Green dashed outlines = county boundaries
Blue outlines = county grouping boundaries

[LDTX253 at 59, Fig. 28].

238.    Illustrative Senate Plan B is the same as Illustrative Senate Plan A, except the former retains the lines of Enacted SD5. [Vol. II Tr. 482:21-23]. In exchange, Illustrative Senate Plan B offers new splits in Wilson and Lenoir counties. [Vol. II Tr. 482:18-20].

239.    As a result, Mr. Fairfax's Illustrative Senate Plan B only suggests a single new majority Black district—Illustrative SD2. [Vol. II Tr. 483:7-9]. Mr. Fairfax claimed that he reverted SD5 to its Enacted Senate Plan boundaries in order to "lock-in" his Illustrative SD2 and adjust surrounding districts in what he called an effort to replicate the Enacted Senate Plan. [Vol. II Tr. 482:24-483:3]. This about-face reversion to Enacted SD5 begs the question of whether Mr. Fairfax believes that Enacted SD5 complies with the VRA. [Vol. II Tr. 483:4-6].

240.    Figure 17 to Mr. Fairfax's report shows this reconfigured map.



**Figure 17 – Senate Illustrative Plan B for Northeast Districts**

[NAACPPX182 at 61, Fig. 17].

241.    Much like in Mr. Fairfax's Illustrative Senate Plan B, Illustrative SD2 ignores the established *Stephenson* county groupings which the General Assembly was confined to in this region. [*See supra* § VI.A.1]. Because of this, Mr. Fairfax's compactness metrics offer little regarding the realities within which the General Assembly was operating in this region of the state. [Vol. V Tr. 1055:1-20].

107

3. Racial Predominance

242. Neither of Mr. Fairfax's Illustrative Senate Plans were constructed in accordance with North Carolina's traditional redistricting criteria. [Vol. V Tr. 1052:22-1054:25; Vol. VI Tr. 1369:9-16].

243. In fact, Mr. Fairfax admittedly ignored nearly all of the Senate's redistricting criteria, including partisan advantage, political considerations, incumbency protection and—most importantly—the prohibition on considerations of racial data. [Vol. II Tr. 466:25-468:17, 471:18-472:2]. Mr. Fairfax repeatedly used racial data to create and guide his Illustrative Senate Plans. [Vol. II Tr. 471:22-472:2]. In contrast, the General Assembly indisputably did not consider any racial data. [Vol. IV Tr. 839:13-15].

244. Tellingly, Mr. Fairfax did not even attempt to draw illustrative plans which preserved the partisan goals of the 2023 senate plan's districts, even though the General Assembly expressly relied on partisan metrics and objectives. *Compare* [Vol. II Tr. 468:2-5] *with* [Vol. IV Tr. 840:2-21].

245. Although Mr. Fairfax claimed he used socioeconomic indicators in crafting his Illustrative Senate Plan boundaries, any such considerations were a superficial afterthought, overshadowed by Mr. Fairfax's repeated reference to and reliance upon racial data. [Vol. II Tr. 471:22-472:13].

246. These claims are further undercut by the fact that the American Community Survey ("ACS") data,[13] which Mr. Fairfax relied upon for these socioeconomic indicators,

---

[13] As Mr. Fairfax recognized, ACS data such as the sets used in his reports, is a collection of extrapolated survey samples, each containing margins of error and potential reliability

is not provided at the Voting Tabulation District level ("VTD"), which is the level at which he drew his Illustrative Senate Plans. [Vol. II Tr. 473:17-474:8]. In other words, the data Mr. Fairfax purportedly relied on is not even available at the level on which he drew his district lines. [Vol. II Tr. 474:4-8].

247.    Ultimately, Mr. Fairfax's Illustrative Senate Plans bear the hallmarks of racial gerrymanders, [Vol. VI Tr. 1368:25-1369:16], a natural result of his reliance on racial data and preset targets. [Vol. II Tr. 462:21-463:4]. These are not districts the General Assembly could have ever drawn, so they do not show what it could have done.

### 4.    Compactness

248.    Mr. Fairfax's claim that his Illustrative Senate Plans are "similarly compact" as compared to their counterparts in the 2023 plan defies reality. [NAACPPX182 at 57, ¶124].

249.    To begin, Mr. Fairfax's compactness comparisons offer the Court little. As Dr. Barber testified, the General Assembly was constrained by mandatory *Stephenson* county groupings in the regions Mr. Fairfax drew his Illustrative Senate Plans, groupings which Mr. Fairfax completely dismantled. [Vol. V Tr. 1055:1-20]. Because of this, Dr. Barber explained, there is little value in comparing the compactness of enacted districts which were constrained by *Stephenson*, and illustrative districts which ignored *Stephenson*'s requirements. [Vol. V Tr. 1055:1-20].

---

issues. [Vol. II Tr. 463:22-464:20, 466:1-6]. Mr. Fairfax knew of these issues but chose not to report them here. [Vol. II Tr. 464:17-23, 466:1-9].

250. Even still, Mr. Fairfax's compactness comparisons reveal additional flaws in his Illustrative Senate Plans. As Dr. Trende's analyses reveal, Mr. Fairfax's chosen compactness metrics—Reock and Polsby-Popper—indicate that the Illustrative Senate Plans' average compactness scores across all redrawn districts are lower than the Enacted Senate Plan. [LDTX276 at 53-54].

251. For example, Illustrative SD2 is less compact than the mean scores across both Illustrative Senate Plan A and the Enacted Senate Plan. [NAACPPX182 at 60, Tbl.33; LDTX253 at 56]. Much like Illustrative SD2, Illustrative SD5 is also less compact than the average district in both the Illustrative Plans and the 2023 plan. [NAACPPX182 at 60, Tbl. 33; LDTX253 at 58].

252. In fact, Figure 38 to Dr. Trende's report reveals that in many instances for Illustrative Plan A, Mr. Fairfax's redrawing of surrounding districts actually drops the average compactness scores below their Enacted Senate Plan counterparts. [LDTX276 at 53-54].

Figure 38: Comparison of Compactness, Senate Illustrative Map A and Enacted Map

| District | Reock, Enacted | Reock, Map A | Polsby-Popper, Enacted | Polsby-Popper, Map A | Map A < Enacted, Reock | Map A < Enacted, PP |
|---|---|---|---|---|---|---|
| 1 | 0.24 | 0.41 | 0.21 | 0.32 | | |
| 2 | 0.21 | 0.27 | 0.10 | 0.26 | | |
| 3 | 0.35 | 0.51 | 0.18 | 0.23 | | |
| 4 | 0.53 | 0.31 | 0.41 | 0.26 | No | No |
| 5 | 0.45 | 0.26 | 0.34 | 0.18 | No | No |
| 11 | 0.49 | 0.28 | 0.38 | 0.24 | No | No |

[LDTX276 at 54, Fig.38].

110

253. As seen in Figure 38, in the rare instances where one illustrative district was marginally more compact than its Enacted Senate Plan comparator, this outcome was achieved by sacrificing the compactness of surrounding districts. [LDTX276 at 53-54].

254. Further, Mr. Fairfax admitted that his chosen compactness metrics only review district boundary compactness, ignoring population compactness. [Vol. II Tr. 482:3-6]. Put differently, many of Mr. Fairfax's illustrative districts offer less-compact alternative district boundaries, stitching together spatially distinct concentrations of Black populations, regardless of county and city boundaries.

255. Choices such as these, Dr. Trende explained, are the hallmarks of racial gerrymanders. [Vol. VI Tr. 1368:4-1369:5].

**B.      Voting Patterns in Northeastern North Carolina**

1.      Substantial Levels of Crossover Voting Across the State

256. Dr. Oskooii and Dr. Palmer's analyses show substantial levels of crossover voting across the state. Dr. Oskooii believes that racially polarized voting can exist when 51% of white voters prefer one candidate and 51% of Black candidates prefer another. [Vol. II Tr. 400:6-21]. That standard practically guarantees a finding of polarization. [*See* LDTX242 at 6].

257. Across the 2016 to 2022 elections, Dr. Palmer's analysis of statewide voting shows an average level of white crossover voting of 28.2% and as high as 35%. [Vol. I Tr. 181:7-24; WX4 at 4-5]. In the 2024 elections, Dr. Palmer's analysis of statewide voting shows an average level of white crossover voting of 29.6% and as high as 41.7%. [Vol. I Tr. 182:17-183:1; WX6 at 3].

258. Other than in his work in Virginia, Dr. Palmer has not encountered white crossover voting at a statewide level as high as 41.7% and on average of 29.6%. [Vol. I Tr. 183:2-20].

259. Dr. Oskooii, however, claimed that his analysis of North Carolina elections showed "some of the most extreme racially polarized voting" that he has seen in his career. [Vol. II Tr. 386:14-16]. This opinion likely reflects Dr. Oskooii's lack of experience in states in the Deep South, such as Mississippi or Alabama, where the polarization is higher than the levels in North Carolina. [Vol. V Tr. 1153:1-6].

260. But more importantly, Dr. Oskooii does not take into account that this polarization is partisan, [Vol. V Tr. 1153:7-18], as discussed below, [see infra § VI.B.3]. Dr. Alford explained that party polarization is "historically high" in the United States today, and that there has been "an enormous shift in public opinion and public behavior around issues of race." [Vol. V Tr. 1153:19-1154:2]. To illustrate this point, Dr. Alford explained that survey results have showed that the majority of Americans in the 1970s answered that they would not vote for a Black candidate for president, but that opinion has virtually disappeared. [Vol. V Tr. 1154:3-7]. Similarly, there have been vast shifts in the public opinions about interracial marriage where it is "widely approved of" in both the North and the South and amongst white individuals and Black individuals. [Vol. V Tr. 1154:7-10, 1155:7-1156:1]. In contrast, surveys indicate an increasing level of concern by parents of their children marrying people of a different political party, with interparty marriage currently at four percent compared to interracial marriage at twenty percent. [Vol. V Tr. 1156:2-7]. Dr. Alford explained that "partisanship has really been injected into

112

almost every aspect of our life" and is "a very strong force now." [Vol. V Tr. 1156:14-15]. To equate the current level of polarization as "simply racial polarization or racial animus" is a "disservice to the American public" and to "the Voting Rights Act." [Vol. V Tr. 1156:16-20].

2.    Fifty-percent BVAP districts are not necessary to secure equal Black electoral opportunity in North Carolina.

261.    The evidence presented at trial established that majority-Black districts are unnecessary to secure equal Black electoral opportunity in North Carolina.

262.    Dr. Oskooii's electoral performance analysis shows that the NAACP Plaintiffs' illustrative districts drawn at just barely above 50% performed at 100% in all elections analyzed. In Plaintiffs' Illustrative Plan A, SD2 has a BVAP of 50.25% and SD5 has a BVAP of 50.37%. [NAACPPX208 at 21, Tbl. 6; Vol. II Tr. 406:12-18]. Dr. Oskooii's performance analysis shows those districts perform in every single one of the sixty-four elections analyzed from 2016 to 2024 with significant win margins. [NAACPPX208 at 21, Tbl. 6; Vol. II Tr. 405:5-406:7]. In the 2024 election, the Black-preferred candidates won with win margins ranging from roughly nine percentage points to twenty-one percentage points in Illustrative SD2 and from over fifteen percentage points to over thirty-two percentage points in Illustrative SD5. [Vol. II Tr. 408:12-409:24; NAACPPX210 at 7, Fig. B-7]. These districts are not equal opportunity districts, but are "guaranteed-performance district[s]." [Vol. V Tr. 1190:12-18].

263.    Dr. Oskooii did not identify any region in North Carolina where districts must be drawn at or above 50% BVAP in order to perform. [Vol. II Tr. 410:12-15]. None

of Dr. Palmer's reports show that districts in North Carolina must be drawn at or above 50% BVAP in order to offer Black voters an equal opportunity to elect their candidates of choice. [Vol. I Tr. 193:25-194:4]. In fact, Dr. Palmer agreed that a district that is not drawn at majority-minority in North Carolina could elect a Black-preferred candidate, and that he has seen evidence of it. [Vol. I Tr. 194:20-195:1]. For example, the Black-preferred candidates won the 2024 elections in CD1 (at 40.42% BVAP) and SD5 (40.35% BVAP), both of which are located in northeastern North Carolina. [NAACPPX208 at ¶¶ 29, 70; NAACPPX189 at ¶ 96].

264.    Dr. Oskooii's own analysis shows that SD5 (at 40% BVAP) performs in 100% of elections and SD11 (at 37% BVAP) performed in 65% of elections analyzed from 2016 to 2022. [LDTX242 at 34; Vol. V Tr. 1190:7-11]. These districts are "more than an equal-opportunity-to-elect" districts. [Vol. V Tr. 1190:10-11]. Adding in the 2024 election results does not change this conclusion. SD5 performed in 100% of elections and SD11 performed in nearly 60% of elections from 2016 to 2024. [NAACPPX208 at 20, Tbl. 5].

265.    Neither Dr. Palmer nor Dr. Oskooii conducted a "BVAP needed to win analysis" or district-effectiveness analysis that determines the BVAP at which a district provides a realistic opportunity for Black voters to elect their candidate of choice. [Vol. I Tr. 193:19-24; Vol. II Tr. 403:24-404:5].

266.    Legislative Defendants' expert Dr. John Alford did conduct such an analysis that confirms majority-Black districts are not necessary to secure equal Black electoral opportunity in North Carolina. [*See* LDTX244 at 13-14].

267. Dr. Alford was asked to analyze racially polarized voting and to respond to Plaintiffs' experts, Dr. Oskooii and Dr. Palmer. [Vol. V Tr. 1150:20-1151:2]. Dr. Alford was accepted by the Court as an expert in the areas of voter cohesion and polarization, as well as voting behavior and redistricting. [Vol. V Tr. 1149:6-9]. Dr. Alford is a full professor at Rice University, where he has taught for 40 years. [Vol. V Tr. 1148:8-14]. Dr. Alford earned a Bachelor of Science in Political Science from the University of Houston, a Master's in Public Administration from the University of Houston, and a Ph.D. from the University of Iowa in Political Science with concentrations in American political behavior, public policy, and social science research methodology. [Vol. V Tr. 1147:23-1148:5]. Dr. Alford has taught about voting behavior in American politics and social science methodology, [Vol V Tr. 1148:15-20], and has served as an expert witness in more than fifty redistricting cases. [Vol. V Tr. 1148:21-1149:3].

268. Dr. Alford first observed that "white crossover voting is substantially higher than Black crossover voting," and that this fact alone indicates majority-Black districts are not necessary for Black voters to elect their candidates of choice in North Carolina. [Vol. V Tr. 1160:19-1161:7].

269. For his BVAP analysis, Dr. Alford followed the procedure set forth in a published article by Dr. Bernard Grofman, Dr. Lisa Handley, and Dr. David Lublin and that was applied by Dr. Handley in a North Carolina redistricting case as recently as 2019. [LDTX244 at 13; JX355; Vol. V Tr. 1161:19-1162:1, 1163:3-15, 1164:22-1165:5; LDTX220]. This analysis is designed to determine the percentage of the minority population that is needed to provide minority voters with an opportunity to elect candidates

of choice. [Vol. V Tr. 1162:6-18, 1163:21-1164:18; *see also* JX355 at 1423 ("A case-specific functional analysis…must be conducted to determine the percentage minority necessary to create an effective minority district.")]. The level of minority turnout and cohesion, and the level of non-minority turnout and crossover support, are used to calculate this percentage of minority population. [Vol. V Tr. 1162:6-18, 1163:21-1164:18; *see also* JX355 at 1408, Tbl. 5].

270. As did Dr. Handley in a 2019 report, [LDTX220 at 7, Vol. V Tr. 1167:21-1168:3], Dr. Alford analyzed the voting behavior of Black voters and non-Black voters in his BVAP analysis. [Vol. V Tr. 1166:14-1168:15; LDTX244 at 13]. Dr. Alford explained that this decision was important because the analysis depends on the level of Black turnout and cohesion as compared to "the remainder of the electorate" and the level of crossover support that all other voters provide to Black-preferred candidates. [Vol. V Tr. 1167:8-10]. This crossover support "comes not just from the crossover White voters; it comes from the crossover of everybody else in the electorate." [Vol. V Tr. 1167:11-13]. The question of whether Black-preferred candidates can be elected in a district therefore depends on the level of support from Black voters and "then the total amount of crossover they get from the other voters in the district, whether those voters are White or something else." [Vol. V Tr. 1167:15-20].

271. Dr. Alford's BVAP analysis shows that majority-Black districts are not necessary to provide Black voters with an equal opportunity to elect. [LDTX244 at 14, Tbl. 6; Vol V. Tr. 1175:23-1176:8]. Across the districts and the various statewide elections analyzed, the BVAP needed is in the high 30% to mid-40% range, with averages ranging

from 36% to 44% (or 37% to 45% excluding the governor's contest). [LDTX244 at 14, Tbl. 6; Vol. V Tr. 1172:24-1174:24]. This variation is to be expected, given that there are different levels of cohesion and crossover voting across specific contests and across districts.

272. Neither of Plaintiffs' experts showed otherwise. Dr. Palmer did not offer any opinions about Dr. Alford's BVAP analysis. [Vol. I Tr. 195:13-18]. Dr. Oskooii did not identify any errors or mistakes in Dr. Alford's BVAP analysis. [Vol. II Tr. 415:1-7]. Instead, Dr. Oskooii's criticisms relate to what he described as "problems with design choices at the modeling stage." [Vol. II Tr. 415:7-8]. None of Dr. Oskooii's criticisms have merit. Prior to his deposition in this case, Dr. Oskooii had never seen the 2001 article by Dr. Grofman, Dr. Handley, and Dr. Lublin setting forth the methodology Dr. Alford used for his BVAP analysis. [Vol. II Tr. 416:4-25; JX355]. Despite not reviewing this article before, Dr. Oskooii claimed that Dr. Alford's use of EI RxC was inconsistent with the method used in the article, but he acknowledged that the RxC method was likely not yet available at the time of the article. [Vol. II Tr. 417:5-19]. Dr. Oskooii claimed that Dr. Alford's use of RxC results, and his reliance on exogenous elections, "underestimate[es]" and "materially lower[s] the BVAP needed to provide equal opportunity. [NAACPPX215 at ¶ 11(c)-(e)]. But this claim is purely speculative—Dr. Oskooii did not conduct his own analysis using exogenous elections or EI 2x2, or otherwise show whether—and by how much—the estimated BVAP would change. Dr. Oskooii also claimed that Dr. Alford's BVAP analysis "relies on the flawed assumption that White crossover voting remains constant across hypothetical districts," [NAACPPX215 at ¶ 11(b)], but that is a criticism

of the methodology itself as published by Dr. Grofman and Dr. Handley rather than a flaw in Dr. Alford's specific analysis. [*See* Vol. V Tr. 1177:4-18].

273. Dr. Oskooii further claimed that Dr. Alford acknowledged his use of Black and non-Black voters was "problematic," [Vol. II Tr. 415:23-416:3], but that is incorrect. [Vol. V Tr. 1168:18-24]. Dr. Alford explained that this decision was correct and was necessary to accurately estimate the total level of crossover support for Black-preferred candidates and therefore accurately estimating the level of Black population necessary for a district to provide equal opportunity to elect. [Vol. V Tr. 1169:1-15]. Dr. Alford's analysis of non-Black voters *does* take into account potential differences in the voting behavior of white voters and voters of other races, [Vol. V Tr. 1171:25-1172:3], despite Dr. Oskooii's suggestion to the contrary. [NAACPPX215 at ¶ 7]. And again, Dr. Oskooii did not conduct his own BVAP analysis that would show the effect of separating out white voters from other non-Black voters as he claims Dr. Alford should have done. [*See* NAACPPX215 at ¶¶ 7-8].

274. Dr. Oskooii further claimed that "actual election outcomes" prove Dr. Alford's BVAP analysis is unreliable. [*See* NAACPPX215 at ¶ 11(f)]. This criticism is based on just two elections, one of which was SD3 in the 2022 plan, which Dr. Oskooii acknowledged is a different district from any of those that Dr. Alford analyzed in the 2023 plan. [*See* NAACPPX215 at ¶ 11(f) (acknowledging that 2022 Senate District 3 "included portions of both Senate Districts 1 and 2")]. The other election Dr. Oskooii identified in HD25 was "very close," [Vol. II Tr. 419:7-22], and decided by less than 500 votes. [*See* JX367 at 5]. Dr. Alford explained that his analysis did not show guaranteed victories—

instead, Dr. Alford explained that the analysis "roughly approximates" an "equal-opportunity-to-elect district," or "a district that in some circumstances would be won by the Black-preferred candidate, in some circumstances lost, but that sits somewhere near that middle point where the district is winnable or losable based on" turnout and the degree of polarization. [Vol. V Tr. 1162:20-1163:2, 1172:6-23, 1174:24-1175:18]. With HD25 specifically, Dr. Alford explained that his analysis showed there were some elections where the district would elect the candidate of choice below 40%, but that there were also some elections where the district would need to be above 40%. [Vol. V Tr. 1178:3-1179:6].

275. Dr. Oskooii also used a concept of "usually win" in his analysis that he claimed was different from "equal opportunity" to elect. [Vol. II Tr. 426:17-21]. His concept of "usually win" means "50 percent or higher, more likely than not," but claimed that "equal opportunity" is a "fact-intensive inquiry" that depends on "what happens in the surrounding districts." [Vol. II Tr. 426:21-427:3]. According to Dr. Oskooii, "if in the surrounding districts White-preferred candidates win by large margins and there's guarantee in safe seats and then when it comes to the Black voters, they just get a coin toss, my opinion is that's not really equal opportunity." [Vol. II Tr. 427:4-7]. Upon questioning from the Court, Dr. Oskooii admitted that "50 percent could be considered equal opportunity," but maintained that it depended on election results in surrounding districts. [Vol. II Tr. 427:11-428:7].

276. Dr. Oskooii failed to mention the elections where Dr. Alford's analysis correctly estimated the necessary BVAP to win. For example, HD24 has a BVAP of 38.5%, [NAACPPX189 at 70, Tbl. 6; Vol. II Tr. 422:25-423:15], and Dr. Alford's analysis

estimated an average of 37% needed to win (or 38% if excluding the governor's contest). [Vol. II Tr. 423:16-424:20; LDTX244 at 14, Tbl. 6]. This estimate was accurate, as the Democratic candidate won the 2024 General Election in HD24. [JX367 at 5]. Similarly, HD32 has a BVAP of 39.64%, [NAACPPX189 at 70, Tbl. 6; Vol. II Tr. 428:16-25], and Dr. Alford's analysis estimated an average of 38% needed to win (or 39% if excluding the governor's contest). [Vol. II Tr. 429:1-6; LDTX244 at 14, Tbl. 6]. This estimate was accurate, as the Democratic candidate won the election in HD32 in the 2024 General Election. [JX367 at 6].

277.    Plaintiffs also criticize Dr. Alford's BVAP analysis for not including third-party candidates or primary elections. But they ignore that the 2025 Supplemental Reports were limited to the 2024 General Election results, and therefore Dr. Alford was only permitted to use those results in his analysis. [*See* D.E. 90 at 2]. Moreover, none of Plaintiffs' experts analyzed any primary elections, and they also excluded third-party and write-in candidates from their analyses in this case. [Vol. I Tr. 178:18-179:3 (Dr. Palmer); Vol. II Tr. 399:25-400:5 (Dr. Oskooii); NAACPPX189 at ¶ 47; NAACPPX208 at ¶ 12].[14]

278.    Ultimately, none of Plaintiffs' experts could rebut Dr. Alford's conclusion that it is not necessary to draw a majority-Black district anywhere in North Carolina to give Black voters an opportunity to elect their candidates of choice. [Vol. V Tr. 1195:3-9].

---

[14] The only exceptions to this were Dr. Oskooii's analysis of the 2018 Appeals Court Judge Seat 2 and 2012 Supreme Court Associate Justice Seat 1 contests where the third-place candidates received over 10% of the statewide vote. [NAACPPX189 at ¶ 47].

### 3. Polarization is Partisan, Not Racial.

279. Differences in racial voting preferences are best explained by political differences, not by racial prejudice. None of Plaintiffs' experts showed otherwise.

280. Dr. Alford concluded that the evidence provided by Dr. Oskooii and Dr. Palmer was "clear evidence of party polarization" rather than racial polarization. [Vol. V Tr. 1151:3-1, 1160:9-13; *see also* LDTX242 at 36]. Voting behavior is not, on the part of either white or Black voters, responsive to the race of the candidates in the way it is strongly responsive to the party affiliation of the candidates. [Vol. V Tr. 1160:13-18].

281. White and Black Democrats are similarly situated with regard to their ability to influence elections—both will be able to elect candidates of choice if they're in majority-Democratic districts, but will be unable to do so in majority-Republican districts. [Vol. V Tr. 1151:13-17].

282. For his initial report, Dr. Alford relied on the data and analyses provided by Dr. Oskooii and Dr. Palmer. [*See* LDTX242 at 6-28]. Dr. Alford focused on Dr. Oskooii's analysis of forty-nine statewide contests between 2016 and 2022 in four state senate districts (SD1, SD2, SD5, SD11) and two demonstrative senate districts (SD2 and SD5), in a "cluster" of twelve house districts, and in five congressional districts (CD1, CD5, CD6, CD9, and CD10), [*see* LDTX242 at 6-26], and on Dr. Palmer's analysis of forty-eight statewide contests between 2016 and 2022 in five separate regions. [LDTX242 at 26].

283. Based on Dr. Oskooii's analysis, Dr. Alford found that these contests were consistent with a polarized response to party affiliation, but not to the race of the candidate. [LDTX242 at 7, 16, 22]. In all of these contests, Black voters are highly supportive of the

121

Democratic candidates, and white voters are typically giving majority support to the Republican candidate. [LDTX242 at 7; *see, e.g.*, Vol. V Tr. 1181:8-19]. This is consistent with a polarized response to party affiliation of the candidate. [LDTX242 at 7; Vol. V Tr. 1182:4-15].

284.    The race of the candidate, however, does not have a polarizing impact on vote choice. If voters were responding to the race of the candidate, Black voters would provide significantly more support to a Black candidate than to a white candidate, and white voters would show increased opposition to a Black candidate over a white candidate. [LDTX242 at 7; Vol. V Tr. 1186:20-1187:3]. But here, Black voters are no more supportive of Black Democrats than they are of white Democrats, and white voters are no more likely to oppose a Black Democrat than they are a white Democrat. [LDTX242 at 7]. Dr. Alford concluded that across all of these years there was a "pattern of clearly polarized voting by party, but no indication of any significant difference in voter behavior based on the racial status of the contest." [LDTX242 at 7; *see also* Vol. V Tr. 1186:5-14].

285.    For example, white voters were on average equally supportive of the Black Democratic candidates in the 2022 elections in SD1 (23%) and SD11 (17%) as they were of the white Democrat candidates. [LDTX242 at 11, Tbl. 4]. In SD2 and in SD5, white voters were actually more supportive of the Black Democratic candidates (at 19% and 26%, respectively) than they were of white Democratic candidates (at 18% and 25%, respectively). [*Id*.]. White crossover voting for Black Democrats was slightly lower in the 2016 contests, but that slight difference does not appear in the 2018, 2020, or 2022 contests. [LDTX242 at 7; Vol. V. Tr. 1185:11-19].

122

286. Of significance is the 2016 Supreme Court race, which is the most recent judicial election that did not have a partisan designation on the ballot (though the candidates could express a partisan preference). [Vol. V Tr. 1183:4-11 LDTX242 at 7]. Without the partisan indication on the ballot, Black support for the Black candidate (Morgan) was significantly lower than the typical level of support (in the 90% range) for either the white or Black Democratic candidates in the partisan elections analyzed. [Vol. V Tr. 1183:17-20; LDTX242 at 8, Tbl. 1]. White voters were nearly evenly splitting their support between the Morgan and the white candidate (Edmunds), with very high levels of white crossover voting for the Black candidate. [Vol. V Tr. 1183:20-25; LDTX242 at 8, Tbl. 1]. In fact, a majority of white voters (52%) in SD1 voted for the Black candidate, as did 44% of voters in SD2. [LDTX242 at 8, Tbl. 1]. Without a party cue, the same levels of cohesion are not present, especially among white voters, as in contests where party affiliation is on the ballot and where voting is more polarized. [Vol. V Tr. 1184:1-8, 1184:16-22].

287. These results show that the race of the candidate has no impact beyond the impact of party, particularly for white voters. If party were not driving voting behavior, then the results of this race should be the same as those in partisan contests. But if party is the driving factor and it is removed, different voting behavior would result, and that is what occurred in the 2016 Supreme Court race. This highly probative election establishes that divergence in candidate preference by race is a partisan phenomenon, not a racial phenomenon.

288.    Dr. Alford's analysis of congressional districts showed the same pattern of partisan polarization rather than racial polarization. [LDTX242 at 22-26; Vol. V Tr. 1186:23-1187:3]. Black voters were highly supportive of the Democratic candidates, and white voters were supportive of the Republican candidate, regardless of the race of the candidate. [LDTX242 at 23-26, Tbls. 15-18]. For example, levels of white crossover voting for Democratic candidates were roughly equal in contests where the Democratic candidate was white as in contests where the Democratic candidate was black. [LDTX242 at 23-26, Tbls. 15-18]. And in 2022, white voters in CD5 and CD6 were more supportive of Black Democratic candidates (at 26% and 22%, respectively) than they were of white Democratic candidates (at 25% and 21%, respectively).  [LDTX242 at 26, Tbl. 18].

289.    Based on Dr. Palmer's analysis, Dr. Alford again found "the same pattern of partisan polarization that was seen above in Dr. Oskooii's estimates." [LDTX242 at 28; *see also* Vol V. Tr. 1188:7-25]. Dr. Alford found that Black voters were highly supportive of the Democratic candidate and white voters were typically giving majority support to the Republican candidate, though he noted that there were substantial levels of white crossover voting for Democratic candidates in some regions examined. [LDTX242 at 28; *see also* LDTX242 at 28-30, Tbls. 19-22]. For example, the average white support in Dr. Palmer's Mecklenburg region in the 2022 elections was 48% for white Democratic candidates and 49% for Black Democratic candidates. [LDTX242 at 30, Tbl. 22].

290.    Dr. Alford's analysis of the 2024 election showed the same results as his prior report. Starting with the state senate districts, Black voters in all fourteen contests consistently gave high levels of support to the Democratic candidate and white voters gave

high levels of support to the Republican candidate. [LDTX244 at 2-3]. This is consistent with a polarized response based on party affiliation of the candidate, whereas the race of the candidates did not appear to have a polarizing impact on voters' behavior. [LDTX244 at 3]. In this report, Dr. Alford added a row for "Difference for White vs Black Democrat" that reported the difference in voters' support for Democratic candidates based on their race. [Vol. V Tr. 1191:19-1192:1; LDTX244 at 3]. The difference in Black voters' support for Black Democratic candidates compared to their support for white Democratic candidates, and in white voters' support for white Democratic candidates compared to their support for Black Democratic candidates, differed by less than one percentage point. [Vol. V Tr. 1192:2-14; LDTX244 at 3, Tbl. 1].

291.   The same is true for Dr. Alford's analysis of the congressional districts analyzed by Dr. Oskooii and by Dr. Palmer. [Vol. V Tr. 1192:16-18; LDTX244 at 7-10]. In fact, the average white support for Black Democrats was higher than the average for white Democrats in four of the five congressional districts analyzed by Dr. Oskooii (CD1, CD5, CD6, and CD10). [LDTX244 at 8, Tbl. 4]. Across all congressional districts, the differences in support were less than a single percentage point with one exception—in Dr. Palmer's CD14 region, Black voters were three percentage points more favorable to white Democratic candidates. [LDTX244 at 9, Tbl. 5].

292.   Because supplemental reports relating to the 2024 election were exchanged simultaneously, Dr. Alford was unable to rely on the data and analyses prepared by Dr. Oskooii and Dr. Palmer and instead relied on his own EI estimates. [Vol. V Tr. 1191:13-19; LDTX251 at 2]. There were, however, slight differences between Dr. Alford's

individual EI estimates in his supplemental report and those reported by Dr. Palmer and Dr. Oskooii in their supplemental reports. [LDTX251 at 3]. These differences were not "substantively meaningful," and it is not uncommon for EI estimates that are run independently of each other to produce different results "just as a matter of the nature of the methodology." [Vol. V Tr. 1194:1-5, 1194:15-20; LDTX251 at 3]. Dr. Palmer agreed that Dr. Alford's EI estimates were "functionally the same, substantively the exact same" as his own. [Vol. I Tr. 165:10-18, 195:19-23]. Dr. Palmer explained that while "there were some small difference" between his and Dr. Alford's estimates that were "due to randomness and minor differences in data and EI implementation," [Vol. I Tr. 196:3-7], "minor numerical differences in running EI are commonplace and not indicative of an error in the analysis." [Vol. I Tr. 196:13-16; *see also* Vol. I Tr. 196:10-12 ("We should expect two different people running the same code to get slightly different results but consistent results."); WX7 at ¶ 3, n.1]. Dr. Oskooii did not identify any causes for the small differences between the EI estimates in his supplemental report and Dr. Alford's supplemental report, [LDTX244; Vol. II Tr. 411:14-21], or identify any errors or mistakes in Dr. Alford's calculations in his supplemental report. [Vol. II Tr. 413:25-414:6].

293. In his supplemental rebuttal report, Dr. Alford reviewed the data and analysis provided by Dr. Palmer and Dr. Oskooii, and confirmed that his results and conclusions did not change. [*See* LDTX251 at 2; Vol. V Tr. 1194:21-24]. To demonstrate this, Dr. Alford provided the average estimated support in the fourteen statewide contests analyzed for the Democratic candidate, broken out to show the difference between the average support for Black and white candidates among Black and white voters as reported by Dr.

126

Alford and Plaintiffs' experts. [LDTX251 at 3-7; Vol. V Tr. 1193:2-16]. These differences were equally small—less than a single percentage point—whether based on Dr. Alford's estimates or the estimates of Plaintiffs' experts. [Vol. V Tr. 1194:15-20; LDTX251 at 3-7, Tbls. 1-3].

294.    Regardless of which experts' estimates are used, the 2024 elections confirmed Dr. Alford's conclusions from his prior reports that these elections demonstrated a broad pattern of partisan polarization rather than racial polarization. Voters were not responding to the race of the candidates but instead were polarized based on the partisan affiliation of the candidates. Across all of the 2024 elections and even with Plaintiffs' experts estimates, Black voters were no more supportive of the Black Democrat than they are of the white Democrat in any areas, and white voters were no more likely to oppose a Black Democrat than they were a white Democrat. [LDTX251 at 7].

295.    Plaintiffs' experts did not rebut Dr. Alford's opinions on this point. Dr. Palmer did not study party affiliation of voters in North Carolina in any of his reports or analyze the impact of party affiliation of candidate on voting behavior. [Vol. I Tr. 199:16-21]. Dr. Oskooii did not conduct any partisan-specific analysis in relating to voting behavior in North Carolina. [Vol. II Tr. 401:3-5]. Other than responding to Dr. Alford's analysis, Dr. Oskooii did not conduct any analysis on the impact of the race of a candidate in North Carolina elections. [Vol. II Tr. 401:6-9]. Dr. Oskooii did not, for example, look at the voting behavior of white Democrats or of white Republicans to determine whether their vote was affected by the race of the candidate. [Vol. II Tr. 401:15-23].

127

296.    Neither Dr. Palmer nor Dr. Oskooii provided any empirical response to Dr. Alford's analysis related to race and politics in voting behavior. [Vol. V Tr. 1152:8-11, 1159:7-11]. Separating race from politics is an empirical question and some effort should be undertaken to separate them, "[a]nd then if that effort proved to be impractical or impossible for measurement or design reasons…that might be [the] conclusion. [Vol. V Tr. 1159:19-23]. But neither Dr. Oskooii nor Dr. Palmer offered any analysis that suggests it is not possible to separate them. [Vol. V Tr. 1159:23-25]. In contrast, Dr. Alford did offer an empirical analysis "based solely on just looking at two cues in the election and using their election analysis, and it does show that they're separated." [Vol. V Tr. 1160:1-3; *see also* Vol. V Tr. 1151:20-1152:7].

297.    Dr. Palmer does not believe that it is possible or feasible to disentangle race from partisan preference when it comes to voters casting their ballots, [Vol. I Tr. 200:21-25], and his reports do not demonstrate the racial polarization, as opposed to partisan polarization, is responsible for voting patterns in North Carolina, [Vol. I Tr. 201:17-202:7]. Dr. Oskooii likewise did not disentangle race from partisanship in voting behavior in North Carolina. [Vol. II Tr. 403:15-22].

298.    Dr. Palmer did not dispute the accuracy of the numbers in Dr. Alford's September 2024 report. [Vol. I Tr. 195:2-7]. Dr. Palmer also did not dispute Dr. Alford's calculations that the average estimated support of white voters was roughly identical whether the candidate was white or Black. [Vol. I Tr. 198:1-14; LDTX244 at 9, Tbl. 5]. He agreed that this analysis "tells us that it doesn't appear that voters are discriminating against

candidates on the basis of race," [Vol. I Tr. 197:22-24], and that the "candidates are performing very similarly," [Vol. I Tr. 198:20-199:2].

299.    Plaintiffs cited some cases where district courts have declined to rely on Dr. Alford's analysis. [Vol. V Tr. 1215:12-1221:10]. But they failed to mention the numerous cases where Dr. Alford's opinions have been credited, *see, e.g.*, *Cisneros v. Pasadena Indep. Sch. Dist.*, No. 4:12-CV-2579, 2014 WL 1668500, at *24 (S.D. Tex. Apr. 25, 2014) (relying on Dr. Alford's expert testimony in opinion finding that plaintiffs had "not proven two of *Gingles*' preconditions"); *Reyes v. City of Farmers Branch, Texas*, No. 3:07-CV-900-O, 2008 WL 4791498, at *6 (N.D. Tex. Nov. 4, 2008), *aff'd sub nom. Reyes v. City of Farmers Branch*, Tex., 586 F.3d 1019 (5th Cir. 2009) ("[t]he Court credit[ed] Dr. Alford's testimony" and dismissed plaintiff's Voting Rights Act claims); *Perez v. Pasadena Indep. Sch. Dist*., 958 F. Supp. 1196 (S.D. Tex. 1997), *aff'd*, 165 F.3d 368 (5th Cir. 1999), and that some of the cases Plaintiffs cited have been vacated or reversed, *see, e.g., Robinson v. Ardoin*, 605 F. Supp. 3d 759 (M.D. La. 2022), *vacated and remanded*, 86 F.4th 574 (5th Cir. 2023).

300.    Plaintiffs' experts simply ask if the Black and white voters vote differently, and claim no further inquiry is necessary. [Vol. V Tr. 1158:19-25]. Dr. Alford examined Plaintiffs' experts' analyses that showed polarization and then asked what those analyses "actually demonstrate with regard to that polarization." [Vol. V Tr. 1157:11-18].

301.    Dr. Alford does not believe that it has been demonstrated that voting in North Carolina is not racially polarized: "[w]hat has been demonstrated very clearly is that voting

129

in North Carolina is partisan polarized. What Dr. Oskooii and Dr. Palmer have not demonstrated [is] that it's racially polarized." [Vol. V Tr. 1205:19-1206:3].

### C. Factors Relevant to Minority Voting Opportunity

302. Plaintiffs offered Dr. Joseph Bagley (NAACP Plaintiffs) and Dr. Chris Clark (Williams Plaintiffs) as their totality of the circumstances experts. Dr. Clark analyzed Senate Factors 5, 6, and 7. [WX8 at 3]. Dr. Bagley analyzed Senate Factors 1, 3, 5, 6, 7, and 8. [NAACPPX181 at 6]. Neither expert met Plaintiffs' burden on these factors.

303. Dr. Bagley's reports were full of errors, misstatements, and overstatements, with specific examples discussed below. He lacks relevant experience in North Carolina and is not an expert in political science. Dr. Bagley's opinions should not be credited.

304. Dr. Bagley submitted his initial report on August 1, 2024, [Vol. III Tr. 676:14-16; NAACPPX180], and then submitted a corrected report on November 4, 2024, after his deposition, [NAACPPX181; Vol. III Tr. 676:19-21], because there were numerous errors in his initial report identified during his deposition, missing or incorrect citations, and errors in the text of the report. [Vol. III Tr. 676:19-677:7; NAACPPX181]. Dr. Bagley also submitted a supplemental report on March 17, 2025, and underwent a supplemental deposition on April 14, 2025. [Vol. III Tr. 677:8-14]. Subsequently, Dr. Bagley submitted an errata to his supplemental report on April 16, 2025, correcting several errors. [Vol. III Tr. 677:15-17; NAACPPX206].

305. Dr. Bagley is a historian, not a political scientist. [Vol. III Tr. 677:18-22]. Dr. Bagley's specific areas of study are the United States Constitution and legal history, and politics and race relations with a focus on the Deep South. [Vol. III Tr. 678:20-24]. Dr.

Bagley considers North Carolina to be a part of the "Deep South." [Vol. III Tr. 678:25-679:7]. Other than his upcoming book, which has one chapter on North Carolina, Dr. Bagley has never undertaken a study specific to North Carolina. [Vol. III Tr. 678:10-19]. Dr. Bagley has never published any book chapters, articles, or papers specific to redistricting or the Voting Rights Act. [Vol. III Tr. 677:23-678:2]. Dr. Bagley has never taught a course specific to redistricting or the Voting Rights Act. [Vol. III Tr. 678:4-9].

306.    Dr. Bagley references racially polarized voting throughout his reports, but Dr. Bagley did not conduct a racially polarized voting analysis for any of his reports. [Vol. III Tr. 679:8-13]. In fact, Dr. Bagley has never conducted a racially polarized voting analysis. [Vol. III Tr. 679:14-16]. Dr. Bagley is not offering any opinions about voting behavior in this case. [Vol. III Tr. 679:17-19]. Dr. Bagley also did not analyze the intent of the General Assembly, nor is Dr. Bagley offering any opinions about the General Assembly's intent in drawing any districts in the 2023 Plans. [Vol. III Tr. 679:20-680:1].

307.    As part of his analysis, Dr. Bagley defined North Carolina's Black Belt as covering thirteen counties in Northeastern North Carolina[15], and the Triad as including "the metropolitan areas of Greensboro, Winston-Salem, and High Point, and the counites of Davidson, Forsyth, Guilford, and Randolph[.]" [NAACPPX181 at 4].

---

[15] Legislative Defendants' expert Dr. Andrew Taylor testified that the "Black Belt" is a "nebulous" term used in political science and political history that "does not have a hard-and-fast meaning." [Vol. VI Tr. 1264:20-1266:15]. Dr. Taylor defines the "Eastern Black Belt" as including twelve counties: Bertie, Chowan, Edgecombe, Gates, Halifax, Hertford, Martin, Northampton, Vance, Warren, Nash, and Washington. [LDTX259 at 5-6]. Unlike Dr. Bagley, Dr. Taylor did not include Pitt County because it has a denser population and is urban when compared to than the other traditionally rural counties of Northeastern North Carolina. [LDTX259 at 6 n.3; Vol. VI Tr. 1266:1-15].

308.    Dr. Clark, on the other hand, performed a statewide analysis that in large part relied on one-year estimates from the Census Bureau's American Community Survey ("ACS"). [WX8 at 5]. Unlike the decennial census, which reports actual numbers, the data in the ACS one-year and five-year surveys are estimates based on responses from nationwide questionnaires that are imputed onto larger populations. [Vol. II Tr. Tr. 237:8-238:22]. The one-year ACS estimates have a higher level of uncertainty than the five-year estimates, which are more precise. [Vol. II Tr. 320:10-15]. While the ACS can serve as a rich source of information on social and economic matters, the ACS user manual cautions users to be aware of its limitations—especially when drawing conclusions about small differences between two ACS estimates. [Vol. II Tr. 236:23-237:7; 320:22-321:7].

309.    At trial, Dr. Clark appeared to have new-found knowledge of ACS data and methods that was not present at the time he authored the majority of his reports in this case. Dr. Clark claimed to have "misspoke" in his deposition and sought to change his previous sworn testimony on ACS sampling methods. [Vol. II Tr. 238:3-22]. For example, Dr. Clark claimed that he "misspoke" in his deposition where he represented that he used ACS data in his peer-reviewed academic work, but he, in fact, had not. [Vol. II Tr. 317:16-23]. Dr. Clark further admitted that he "misspoke" in his deposition about the source for Table 10 in his report, which is based on census population estimates, and not ACS estimates as he previously testified to. [Vol. II Tr. 280:21-281:3]. At base, these corrections of his prior sworn testimony highlight Dr. Clark's lack of familiarity with the data and methods he used to reach the conclusions in his report, making it difficult to credit his methodology and analysis.

310. Other material admissions made by Dr. Clark further call into doubt his credibility and the reliability of the methods and data he used. For example, Dr. Clark admitted that he had not read the ACS user manual prior to drafting his reports in this case, nor did he know that the Census Bureau published an ACS user manual at the time of his deposition, though he claimed to have acquired that knowledge prior to trial. [Vol. II Tr. 317:24-318:6]. Dr. Clark also admitted that one-year ACS estimates used throughout his report have a higher level of uncertainty and that the five-year estimates are more precise. [Vol. II. Tr. 320:10-21] Dr. Clark claimed that he chose the one-year estimates because they were more "current" or recent, despite failing to include any of the most recent 2023 ACS one-year data in any of his four reports in this case. [Vol. II Tr. 315:10-15]. Additionally, Dr. Clark admitted that he did not report the margin of error or confidence interval for any of his ACS estimates, claiming instead that his report was meant to be "descriptive." [Vol. II Tr. 318:16-320:9]. But even if Dr. Clark's reports are meant to be "descriptive," averages of statewide estimates with unknown margins of error are not the "intensely local appraisal" that the totality of the circumstances inquiry requires. *See Allen v. Milligan*, 599 U.S. 1, 18 (2023) (quotation omitted).

311. Legislative Defendants' expert Dr. Andrew Taylor responded to Drs. Bagley and Clark with analyses of Senate Factors 3, 5, 7, and 8, as well as a limited analysis on Senate Factor 6. [Vol. VI Tr. 1263:13-20]. Dr. Taylor is a tenured professor in the Political Sciences department at North Carolina State University, where he has taught for 30 years and served as Department Chair. [LDTX265; Vol VI Tr. 1261:17-21]. His teaching experience includes courses on American politics and government, some of which cover

133

the VRA and redistricting. [LDTX265; Vol VI. Tr. 1262:4-13]. Dr. Taylor has authored and published numerous peer-reviewed articles, books, and chapters in edited books on these subjects. [LDTX265; Vol. VI Tr. 1262:14-17]. Dr. Taylor also served as President of the North Carolina Political Science Association from 2012-2013. [LDTX265; Vol. VI Tr. 1261:24-25]. Dr. Taylor was previously qualified as a testifying expert in the *Harper* and *Pierce* cases. [LDTX265; Vol. VI Tr. 1262:18-24]. Based on this experience, the parties stipulated to Dr. Taylor's expertise in political science with an emphasis on North Carolina politics, voting, and elections; North Carolina political history; and comparative state and national laws, politics, and policies. [D.E. 148 at ¶101; Vol. VI Tr. 1262:25-1263:6].

312.    While Drs. Bagley, Clark, and Taylor used similar methodologies as far as collecting data, their analytical approaches differed greatly. The Bagley-Clark framework was a descriptive and historical approach, while Dr. Taylor used a comparative analysis. [Vol. VI Tr. 1263:21-1264:17; LDTX259 at 6-7]. Specifically, Dr. Taylor compared contemporary statewide indicators with those of other states now and North Carolina in the past and, where possible, Dr. Taylor also compared the counties highlighted by Dr. Bagley in the Eastern Black Belt and/or Triad with the rest of North Carolina. [LDTX259 at 6-8; Vol. VI Tr. 1263:21-1264:18].

313.    Dr. Taylor used a comparative analysis because it is a common approach among social scientists to ask the "so what" question. [Vol. VI Tr.1263:21-1264:4]. Dr. Taylor also testified that he used a comparative analysis because of the language in the Senate Factors requiring an examination of "the extent to which." [Vol. VI Tr. 1288:7-23]. A comparative approach is also consistent with the legislative history of the 1982

Amendments to the Voting Rights Act. Statement of A. C. Sutton, President, Texas State Conference, NAACP, in *Extension of the Voting rights act: hearings before the Subcommittee on Civil and Constitutional Rights of the Committee on the Judiciary, House of Representatives*, 97th Cong., 1st Sess., 2177, 2180–81 (1981). Across the factors he examined, Dr. Taylor found that North Carolina's performance has improved over time and is unremarkable in a national context. [LDTX259 at 43-46].

### 1. The Extent of Any History of Voting-Related Discrimination

314. Plaintiffs' experts largely focus on events prior to 2000 and misconstrue the recent events cited.

315. Dr. Bagley agreed that his analysis of Senate Factors 1 (and 3) in his corrected report largely predated the year 2000. [Vol. III Tr. 680:6-681:6]. Dr. Bagley identified just one example from this century where a court found evidence of discriminatory intent by the General Assembly (in *N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016)). [*See* NAACPPX181 at 25-26]. Dr. Bagley also discussed racial gerrymandering decisions as evidence supporting his Senate Factor 1 opinions, [Vol. III Tr. 656:5-22] but he failed to mention at trial that there were no findings of discriminatory intent in those cases. [*See* NAACPPX181 at 22].

316. Dr. Bagley claimed to focus his analysis on the Black Belt and the Triad, [Vol. III Tr. 680:2-5], yet he included events from areas he acknowledged were outside of the Black Belt and Triad, including events in Fayetteville and in Harnett County. [Vol. III Tr. 681:7-17].

317.    There was minimal fact witness testimony about recent evidence of voting-related discrimination. For example, Plaintiff Pamlyn Stubbs testified about alleged voter suppression in North Carolina but was unable to give specific examples of the election period or geographic area. [Vol. I Tr. 208:19-210:5]. She also testified that she was not a direct recipient of the voter suppression efforts. [Vol. I Tr. 209:14-15]. Plaintiff Earl Jones likewise testified about instances of discrimination in North Carolina between 1967 and 2001, [*see* Vol. I Tr. 136:16-145:25], but his only example of alleged discrimination in a recent election cycle was the lawsuit involving Allison Riggs and Jefferson Griffin, [Vol. I Tr. 146:1-21], which did not bring any racial discrimination claims. *See Griffin v. N.C. State Bd. of Elections*, 915 S.E.2d 212, 217 (N.C. Ct. App.), *review allowed in part, denied in part*, 913 S.E.2d 894 (2025). Plaintiff Calvin Jones testified about the discrimination that he experienced in North Carolina in his youth, [Vol. II Tr. 350:16-351:21], but did not testify about recent examples of racial discrimination that he personally experienced in North Carolina.

318.    Plaintiffs' expert Dr. James Leloudis II provided a report on the history of racial discrimination in North Carolina. [Vol. III Tr. 536:8-15]. Dr. Leloudis is a professor at the University of North Carolina at Chapel Hill, where he specializes in teaching courses on the history of North Carolina in the late 19th and 20th centuries with a particular interest in issues of race, politics, and government policy. [Vol. III Tr. 534:1-18]. Dr. Leloudis's lengthy report recycles the same material he used in *N.C. State Conf. of NAACP v. Cooper* (the H.B. 589 case) and the partisan gerrymandering case of *Harper v. Hall*. [NAACPPX179; Vol. III Tr. 551:4-10, 558:10-12]. In fact, in at least one instance, Dr.

Leloudis changed a reference from "partisan gerrymandering" to "racial gerrymandering" from his *Harper* report to his report in this case. [Vol. III Tr. 550:22-551:10, 553:4-554:24].

319. Much of the recycled material surveys broad swaths of racial history in North Carolina and the United States going back to the Civil War, but cherry picks what is included in that history. For example, Dr. Leloudis included a lengthy discussion of the history of CD1 and CD12, but did not mention *Shaw v. Hunt* or *Easley v. Cromartie*—cases that are integral to the history of CD12. [Vol. III Tr. 559:4-560:4; NAACPPX179 at 64-66].

320. Indeed, Dr. Leloudis's report is of limited value as he disclaimed offering any opinions on the Senate Factors, and offers no relevant evidence concerning the 2023 plans at issue in this case or the redistricting process. [Vol. III Tr. 548:6-549:18]. In preparing his report in this case, Dr. Leloudis did not speak to any current or former members of the General Assembly, nor did he review any of the pertinent legislative history or even the criteria that the legislature used to draft the 2023 plans. [Vol. III Tr. 548:11-14]. Indeed, the only sources Dr. Leloudis cited to for his "analysis" of the 2023 plans were *Harper v. Hall*, the NAACP Plaintiffs' Complaint in this case, and an article by the Brennan Center for Justice called "Anatomy of a North Carolina Gerrymander." [Vol. III Tr. 567:2-568:19; NAACPPX179 at 98-102]. These sources are wholly insufficient evidence to reach the conclusion that the 2023 plans are discriminatory in intent or effect.

321. This Court declines to make the same unfounded leaps as Dr. Leloudis, who cries discrimination despite having no affirmative evidence that racial statistics or data

137

were used to draw any of the enacted plans. *See N.C. State Conf. NAACP v. Raymond,* 831, F.3d 204, 230-31 (4th Cir. 2016); [Vol. III Tr. 548:24-549:19, 572:23-573:3]. While Dr. Leloudis's report gives a lengthy historical context before 1982, his modern findings carry little credibility as they often rely on overturned cases and a cursory citation to the NAACP Plaintiffs' Complaint. [Vol. III Tr. 567:2-568:19; NAACPPX179 at 97].

### 2.    Degree to Which Voting is Polarized

322.    As discussed above, [*see supra* § VI.B], differences in racial voting preferences are not legally significant and are best explained by political differences, not by racial prejudice, and majority-Black districts are not necessary to elect Black-preferred candidates anywhere in North Carolina. Plaintiffs' evidence from their experts and from fact witnesses does not show otherwise.

323.    Plaintiffs offer Dr. Stephens-Dougan's opinions about alleged racial differences in "public policy preferences" or on "issues" as evidence of racially polarized voting, but she conceded there are wide ranges in ideology among Black voters, [Vol. IV Tr. 745:8-14], and this testimony is not relevant to racially polarized voting.

324.    Dr. Stephens-Dougan first concludes that race and racial attitudes are the dominant precursor to partisan affiliations as it pertains to voting behavior in the American South and in North Carolina. [Vol. III Tr. 721:23-25; Vol. IV Tr. 743:16-19; Vol. IV Tr. 753:4-6]. However, Dr. Stephens-Dougan did not consider racial categories other than white and Black. [Vol. IV Tr. 760:15-20]. Additionally, Dr. Stephens-Dougan agreed that racial group membership is not the only categorical membership that informs political party

138

affiliation: religion, gender, and class all inform political party affiliation as well. [Vol. IV Tr. 761:2-762:25].

325. Dr. Stephens-Dougan's own academic work stands in tension with her claim that race is the dominant precursor to party identification and explains Black voters' preference for the Democratic Party. Dr. Stephens-Dougan previously conducted a study where political mailers of fictitious candidates were given to respondents to identify if visual cues would prime racial resentment. [LDTX228; Vol. IV Tr. 782:17-783:12]. Dr. Stephens-Dougan concluded that the study "empirically demonstrates what scholars have long suspected to be true—racially resentful Whites penalize the Democratic Party for their association with African Americans, whereas Republicans are not penalized to the same degree for a visual association with African Americans." [LDTX228 at 16; Vol. IV Tr. 784:2-9]. No subsequent work done by Dr. Stephens-Dougan has shown that determination to be incorrect. [Vol. IV Tr. 784:10-13].

326. Dr. Stephens-Dougan relies on overbroad findings that racism is subtle in North Carolina, hidden behind coded language that activates voters' racial attitudes without their awareness. Dr. Stephens-Dougan's report discusses "racial dog whistles" which is the use of racially coded language to prime or activate voters' racial predispositions. [Vol. IV Tr. 763:22-764:3]. For example, Dr. Stephens-Dougan believes that the use of the term "illegal immigration" is a racial dog whistle. [Vol. IV Tr. 764:4-7]. Dr. Stephens-Dougan agreed that a political campaign ad could function as a racial dog whistle even if the ad sponsor did not intend it to, [Vol. IV Tr. 764:17-20], and that a voter need not be aware of the racial dog whistle for it to work—the ostensibly nonracial nature of the whistle is what

139

makes it effective. [Vol. IV Tr. 765:1-8]. In reaching her conclusions, Dr. Stephens-Dougan did not analyze North Carolina-specific survey samples of racial dog whistles nor whether North Carolina voters are more or less susceptible to racial dog whistles than voters in other states. [Vol. IV Tr. 765:18-766:3].

327.    Dr. Stephens-Dougan concluded that Black North Carolinian support for the Democratic Party is largely driven by the Democratic Party's support of salient racial issues to which the Republican Party is often diametrically opposed. [Vol. III Tr. 722:6-14; Vol. IV Tr. 743:21-744:2]. Dr. Stephens-Dougan identified affirmative action, welfare, crime, illegal immigration, and Medicaid as racial issues. [Vol. IV Tr. 766:24-768:4]. On the other hand, Dr. Stephens-Dougan identified the economy, the environment, and abortion as non-racial issues, [Vol. IV Tr. 768:5-17], and testified that Black and White North Carolinians typically give similar grades to nonracial issues such as the economy or abortion. [Vol. III Tr. 725:4-9].

328.    There is not a close correspondence between "racialized" issues and actual policy views of Black and White voters in North Carolina. Dr. Stephens-Dougan does not dispute that the majority of Black and White voters could agree on racialized issues. [Vol. IV Tr. 771:11-12]. For example, Dr. Stephens-Dougan cited to a September 2024 Elon poll which asks respondents, "If there were a serious crackdown and limitation of immigration to the United States, what kind of an impact do you think that would have on the nation's economy?" [LDTX241 at 22; Vol. IV Tr. 770:13-771:2]. Dr. Stephens-Dougan agreed that

54% of White respondents and 51% of Black respondents similarly answered that it would be favorable. [LDTX241 at 22; Vol. IV Tr. 771:3-12].[16]

329.    Dr. Stephens-Dougan testified that non-racial issues can become racial overtime, such as welfare which has disproportionally represented African Americans as welfare recipients. [Vol. III Tr. 725:21-726:3]. Dr. Stephens-Dougan testified that Medicaid is another example of a non-racial issue that became racial overtime and is often associated as a "Black program." [Vol. III Tr. 727:1-8]. Dr. Stephens-Dougan testified that the Republican Party in North Carolina repeatedly opposed the expansion of Medicaid, [Vol. III Tr. 727:9-12], but she failed to note that it was a Republican General Assembly that passed the Medicaid expansion. [Vol. IV Tr. 789:11-18].

330.    Dr. Stephens-Dougan also relies on "racial resentment score[s]," [Vol. IV Tr. 774:23-775:1], despite scholarly debate on how to interpret those scores. Dr. Stephens-Dougan agreed that "biological racism," or the idea that members of one race are innately inferior to that of another race, has decreased over time. [NAACPPX195 at 5; Vol. IV Tr. 775:5-776:8. The racial resentment scale asks questions that are "less obtrusive" than biological racism and is measured on a scale from 0 to 1, with 1 being highly resentful and .5 being neutral. [Vol. IV Tr. 775:20-776:22]. Dr. Stephens-Dougan's report states a traditional average resentment score of .65 for Whites; however, the most recent survey from 2020 showed a decrease in the average score to .48 for Whites. [Vol. IV Tr. 777:3-

---

[16] In fact, in a recent vote concerning immigration, Representative Carla Cunningham, a Black Democrat, [*see* JX372], voted with Republicans to override the governor's veto of HB 318, "The Criminal Illegal Alien Enforcement Act." *See* https://www.ncleg.gov/Legislation/Votes/RollCallVoteTranscript/2025/H/578.

16]. Dr. Stephens-Dougan agreed that there is an academic debate regarding the usefulness of racial resentment scales. [Vol. IV Tr. 778:5-8]. Dr. Stephens-Dougan is familiar with the debates that the racial resentment scale actually measures principled conservative views rather than racial attitudes. [Vol. IV Tr. 780:5-9]. Dr. Stephens-Dougan agreed that whether a voter is conservative or liberal would help predict their attitudes on what she considers to be "racial issues." [Vol. IV Tr. 781:25-782:3].

331.    Dr. Stephens-Dougan also claimed that there was a racial divide in voters' impressions of Vice President Kamala Harris, indicating that Black candidates are evaluated differently from their white counterparts. [Vol. IV Tr. 784:16-786:6]. But Dr. Stephens-Dougan admitted that polls actually showed that Vice President Harris had higher support from white voters than President Biden—35% of white voters had a favorable view of Kamala Harris compared to just 31% for President Biden. [Vol. IV Tr. 787:3-788:6; LDTX238; LDTX240 at 8].

332.    Dr. Stephens-Dougan's opinions are ultimately of little value to assessing voting behavior in North Carolina. Dr. Stephens-Dougan does not consider herself an expert in North Carolina politics. [Vol. IV Tr. 760:6-9]. Dr. Stephens-Dougan did not conduct any study or survey of North Carolina voters, [Vol. IV Tr. 760:2-5], and she has never studied race and partisanship specific to North Carolina. [Vol. IV Tr. 759:11-18]. Dr. Stephens-Dougan relied on American National Election Study, or ANES, survey data for some of her opinions in this case. [Vol. III Tr. 721:1-12]. But ANES survey data is national data, and is not specific to North Carolina. [Vol. IV Tr. 756:13-16]. Dr. Stephens-Dougan did not specify which ANES survey respondents were from North Carolina because "it's

142

challenging to make a statistical inference at the state level" from the ANES survey data. [Vol. IV Tr. 756:17-21]. Instead, Dr. Stephens-Dougan conducted her analysis and based her conclusions on the ANES survey data of eleven former confederate states, of which North Carolina is one. [Vol. IV Tr. 757:8-25]. Dr. Stephens-Dougan admitted that she would be uncomfortable drawing a conclusion from only the small number of North Carolinian respondents in the ANES survey data. [Vol. IV Tr. 758:1-4]. Dr. Stephens-Dougan agreed that her opinion is that "[d]isaggregating the ANES by state and race … would lack the statistical power to make any meaningful conclusions." [Vol. IV Tr. 758:15-24].

333. Plaintiffs may also rely on the testimony of former Congressman G.K. Butterfield about the existence of racially polarized voting in northeastern North Carolina and the level of BVAP necessary in CD1 to elect a Black-preferred candidate. [D.E. 146-1, *Pierce* Vol. I Tr. 14:25-17:7].[17] But Congressman Butterfield admitted his "methodology was not scientific," was a "back-of-the envelope analysis," [D.E. 146-1, *Pierce* Vol. I Tr. 16:15-19], and was far from the way an expert would conduct an analysis. [D.E. 146-1, *Pierce* Vol. I Tr. 27:15-20, 28:11-13]. Congressman Butterfield has never performed an ecological inference analysis, and did not analyze any of the counties for his testimony in this case. [D.E. 146-1, *Pierce* Vol. I Tr. 28:14-20].

---

[17] The NAACP Plaintiffs and Legislative Defendants jointly moved the Court to permit the designation of the trial testimony of former Representative G.K. Butterfield in the matter of *Pierce, et al. v. N.C. State Board of Elections, et al.*, 4:23-cv-193-DRN (E.D.N.C.). [D.E. 146].

334.    But even Congressman Butterfield agreed that districts above 50% BVAP are not necessary in northeastern North Carolina. [D.E. 146-1, *Pierce* Vol. I Tr. 18:25-19:8; *see also Pierce* Vol. I Tr. 25:20-24]. Congressman Butterfield acknowledged that the level of BVAP needed in a district has decreased over time, [D.E. 146-1, *Pierce* Vol. I Tr. 19:2-8], and agreed that a district drawn at 45% BVAP would "be competitive." [D.E. 146-1, *Pierce* Vol. I Tr. 27:1-4].

335.    The electoral history of CD1 shows majority-Black districts are not necessary in Northeastern North Carolina. Although its specific configurations have changed over time, CD1 has been historically located in northeastern North Carolina. CD1 is currently composed of all of Bertie, Camden, Chowan, Currituck, Edgecombe, Gates, Greene, Halifax, Hertford, Lenoir, Martin, Nash, Northampton, Pasquotank, Perquimans, Tyrrell, Vance, Warren, Washington, Wayne, and Wilson Counties, and part of Granville County. [JX78]. CD1 has a BVAP of 40.42%. [JX81 at 7].

336.    Don Davis, a Black Democrat, currently represents CD1. [Vol. IV Tr. 816:24-817:2; JX369]. Congressman Davis was first elected in 2022, when the district had a BVAP of 41.23%. [JX288; JX366 at 2]. Mr. Davis was successfully re-elected in 2024. [JX369 at 2]. Prior to Congressman Davis, Congressman Butterfield represented CD1 from 2004 to 2022. [D.E. 146-1, *Pierce* Vol. I Tr. 22:6-9]. In fact, CD1 has been represented by an African American since 1992. [Vol. I Tr. 22:13-18, 30:6-12, 31:1-3].

337.    During his tenure, Congressman Butterfield won elections in CD1 by significant margins. When the district was 47.76% BVAP, [JX351 at 4], Congressman

144

Butterfield won nearly 64% of the vote in 2004, 100% in 2006, about 70% in 2008, and about 59% in 2010. [D.E. 146-1, *Pierce* Vol. I Tr. 22:23-23:20].

338.    When the district was redrawn to 52.66% BVAP for the 2012 and 2014 elections, Congressman Butterfield believed this level was "excessive" and unnecessary." [D.E. 146-1, *Pierce* Vol. I Tr. 24:11-25:11] He won about 75% and 73% of the vote in 2012 and 2014, respectively. [D.E. 146-1, *Pierce* Vol. I Tr. 24:3-10]. Even after the district was redrawn to 44.5% BVAP, Congressman Butterfield continued to win by significant margins—about 68% of the vote in 2016, and 69% in 2018. [D.E. 146-1, *Pierce* Vol. I Tr. 29:1-17].

339.    Congressman Butterfield agreed there are multiple factors involved in winning an election, with fundraising being a "major contributor" to electoral success. [D.E. 146-1, *Pierce* Vol. I Tr. 30:13-19]. "[N]ational issues," such as immigration and abortion, were at issue in Congressman Davis's campaign. [D.E. 146-1, *Pierce* Vol. I Tr. 31:18-20]. Congressman Davis was ultimately able to "engage successfully in fundraising" and prevail against a "formidable" opponent. [D.E. 146-1, *Pierce* Vol. I Tr. 30:20-31:6].

340.    Other districts drawn below 50% BVAP have performed for Black-preferred candidates. Senator Kandie Smith, a Black Democrat, represents SD 5 which is not a majority-minority district, and has a BVAP of 40.35% [Vol. IV Tr. 798:21; 811:18-20; 820:1-3; JX149]. Senator Smith identifies as the candidate of choice for Black voters in her district. [Vol. IV Tr. 807:4-6]. Representative Harrison represents House District 61 ("HD61"), a district contained in Guilford County. [D.E. 162-2, Harrison Dep. 8:19-9:2]. Representative Harrison understands HD61 is not a majority BVAP district, and in fact, it

145

has a BVAP of 43.82%. [D.E. 162-2, Harrison Dep. 9:15-10:3; JX082 at 22]. Representative Harrison believes she is the candidate of choice for Black voters. [D.E. 162-2, Harrison Dep. 9:15-10:3].

       3.    <u>Whether Voting Procedures Enhance Opportunity for Discrimination</u>

341.    Plaintiffs did not show that any voting procedures enhance the opportunity for voting-related discrimination in North Carolina. Dr. Bagley omitted relevant facts from his analysis of voting practices and procedures. The Court gives little weight to his opinions.

342.    Dr. Bagley acknowledged that polling places and voting sites fall under the voting practices and procedures terminology of Senate Factor 3, [NAACPPX199 at 5; Vol. III Tr. 682:5-9], and that additional polling places and early voting sites can increase voter turnout. [Vol. III Tr. 682:14-16]. Despite these acknowledgements, Dr. Bagley did not review the number of polling places and early voting sites in North Carolina for any of his reports. [Vol. III Tr. 682:10-13].

343.    Dr. Bagley instead relied solely on a 2018 report claiming that early voting sites in North Carolina were reduced. [NAACPPX199 at 6; Vol. III Tr. 682:17-19]. But Dr. Bagley agreed that the 2018 report does not reflect the current status of early voting sites in North Carolina. [Vol. III Tr. 682:20-23]. Dr. Bagley did not conduct any review of the number of early voting sites in any election after 2018. [Vol. III Tr. 682:24-683:1]. Dr. Bagley also failed to analyze the effect of the availability of early voting or absentee voting on Black voters in North Carolina in any of his reports. [Vol. III Tr. 684:10-13].

344. Dr. Bagley claimed that in the 2024 General Election, Black voters were more likely to have their ballots rejected than White voters because of North Carolina's photo ID requirement. [Vol. III Tr. 684:14-23; NAACPPX205 at 3]. However, Dr. Bagley did not report the number of ballots that were rejected in North Carolina due to the photo ID requirement. [Vol. III Tr. 684:24-685:2, 686:20-22]. An NPR article relied upon by Dr. Bagley reported that 622 White voters had their ballots rejected due to the photo ID requirement compared to 502 Black voters, [Vol. III Tr. 685:3-16; NAACPPX205 at 3 n.3], and Dr. Bagley did not dispute those numbers. [Vol. III Tr. 685:17-18].

345. Dr. Bagley did, however, review turnout data by race and ethnicity from the North Carolina Board of Elections reporting that 1,018,521 Black voters and 3,904,978 White voters voted in the 2024 General Election. [Vol. III Tr. 685:19-686:4; NAACPPX205 at 4 n.7; JX363 at 4]. Taking the number of ballots rejected because of the photo ID requirement (502 for Black voters and 622 for white voters) and dividing them by these voter turnout numbers for Black voters and white voters, respectively, still shows that over 99.9995% of Black voters and over 99.9998% of white voters had their ballots counted in the 2024 General Election. [*See* Vol. III Tr. 686:5-9]. Yet, it is Dr. Bagley's opinion that despite the ballot acceptance rate being over 99.99% for both groups, the "disparate impact" on Black voters was still "significant." [Vol. III Tr. 686:10-19, 688:4-8].

346. Dr. Bagley also agreed that voters had the option to fill out an exception form to the photo ID requirement in the 2024 General Election in North Carolina. [Vol. III Tr. 686:25-687:2], but he did not include any information about that form in his reports. [Vol.

147

III Tr. 687:3-11]. Dr. Bagley also failed to discuss any of the several forms of acceptable photo ID. [Vol. III Tr. 687:12-17].

347.    Dr. Bagley made claims that the photo ID requirement may have dissuaded voters from going to the polls because they were unable to or uncertain about meeting the requirement, [NAACPPX205 at 3], Dr. Bagley admitted at trial, however, that he did not conduct an analysis to determine whether there were any such voters who were dissuaded from voting and that he could not say with certainty whether there were any such voters. [Vol. III Tr. 688:17-24]. Dr. Bagley also claimed the photo ID requirement may have led to lower voter turnout, [NAACPPX205 at 3], but he did not study whether the photo ID requirement actually caused lower Black turnout in North Carolina. [Vol. III Tr. 688:25-689:7].

348.    The NAACP Plaintiffs also offered testimony from fact witness Courtney Patterson about the impact of photo ID requirements on Black voters and the cause of racial turnout gaps, but this testimony was speculative and based on hearsay. [Vol. III Tr. 593:10-596:19]. Plaintiffs have offered no analysis or statistics to validate their claims that North Carolina's photo ID requirement has impacted Black voter turnout or led to Black voters believing they are unable to or uncertain about meeting the requirement. The only expert that examined this issue admitted he conducted no such analysis. [Vol. III Tr. 688:25-689:7].

349.    Dr. Bagley also discussed at-large voting schemes at length in his reports, [*see, e.g.*, NAACPPX199 at 5], but acknowledged that North Carolina does not use at-large voting for the General Assembly. [Vol. III Tr. 681:22-682:3].

148

350.  While Plaintiffs' experts cited outdated and overturned caselaw to suggest that North Carolina elections are riddled with discriminatory practices, when compared to the nation as a whole, Dr. Taylor found that North Carolina has basic election practices typical of the rest of the country. [LDTX259 at 8-13, 44]. For example, he testified that the North Carolina General Assembly does not have cumulative voting or at-large legislative districts. [Vol. VI Tr. 1267:11-25].

351.  Dr. Taylor looked at the Cost of Voting Index ("COVI"), a comprehensive index created by political scientists collecting a wide variety of different rules, practices, etc. to create a "score" for states across the nation. [LDTX259 at 8; Vol. VI Tr. 1268:1-16]. Dr. Taylor found that for 2022, the latest year for which data was available at the time he wrote his opening expert report, North Carolina was scored around the middle of the pack as the twenty-fourth easiest state to vote in, tied with Rhode Island. [LDTX259 at 8-9; Vol. VI Tr. 1268:18-23].  Pertinent to COVI, North Carolina has early voting, N.C. GEN. STAT. § 163-166.40, same-day registration during early voting, N.C. GEN. STAT. § 163-82.6B, pre-registration, N.C. GEN. STAT. § 163-82.6, online voter registration, N.C. GEN. STAT. §§ 163-82.6, 163-82.19, and no excuse absentee voting, N.C. GEN. STAT. § 163-226. [Vol. II Tr. 314:25-315:5]. Nevertheless, Dr. Clark stood by his statement that "registering as a voter is a feat onto itself" in North Carolina because it requires some sort of effort, as opposed to automatic voter registration. [Vol. II Tr. 313:21-314:24]. Dr. Bagley was not even aware of the number of days of early voting or whether same-day registration was available prior to his depositions in this case, [Vol. III Tr. 683:2-14], and

Dr. Bagley did not analyze the effect of the availability of early voting or absentee voting on Black voters in North Carolina in any of his reports. [Vol. III Tr. 684:10-13].

352.    Dr. Taylor also found that Black voter turnout rate as a proportion of white voter turnout rate in North Carolina is always greater than the national equivalent using voting age population data in the 2014-2022 general elections. [LDTX259 at 10, Tbl. 1; Vol. VI Tr. 1270:1-19]. Dr. Clark only used actual registered voters and not the entire voting age population, which only shows part of the picture. [LDTX259 at 9-11].

353.    Lastly, Dr. Taylor analyzed election day polling places for the 2022 general election and early voting locations for the 2022 and 2024 general elections. [LDTX259 at 11-13]. Dr. Taylor's analysis shows that both the Eastern Black Belt and Triad counties had a larger share of polling places in the 2022 general election than their respective voting age populations according to the 2020 census. [LDTX259 at 11-13; Vol. VI Tr. 1270:20-1271:18]. Several of the early voting sites in Guilford and Forsyth counties are at HBCUs and are otherwise close to Black population centers. [LDTX259 at 12-13]. Neither Dr. Clark nor Dr. Bagley criticized Dr. Taylor's analysis of polling places in any of their reports. [Vol. VI 1271:24-1272:3].

4.    Effects of Past Discrimination on Minority Group's Ability to Participate in Political Process

354.    Plaintiffs did not show that any socioeconomic disparities hinder political participation by Black voters. Dr. Bagley's report looked at education, employment, and health, while Dr. Clark looked at the same plus income. Plaintiffs' experts did not reach a causal connection between North Carolina's history of discrimination and certain

socioeconomic disparities. [*See* Vol. II Tr. 302:7-20 (Dr. Clark)]. Though Dr. Clark claimed that he provided political science research supporting causal effect, the single academic reference Dr. Clark made on this topic was an article from 1968. [WX8 at 18; Vol. VI Tr. 1321:2-11].

355.    Dr. Bagley claimed that Black voters are "less likely to be able to take time off to vote, to get to the polls, to contribute to a political campaign, or to run for office." [NAACPPX181 at 31; Vol. III Tr. 689:8-18]. Dr. Bagley did not, however, analyze Black voters' ability to take time off work to vote in North Carolina, their ability to get to the polls in North Carolina, Black voters' ability to contribute to political campaigns in North Carolina, or whether they are less likely to run for office in North Carolina, [Vol. III 690:1-18]. In Dr. Bagley's supplemental report, he similarly concludes that "socioeconomic disparities in areas such as education directly relate to disparities in voter participation." [NAACPPX205 at 5; Vol. III Tr. 693:9-16]. Yet again, Dr. Bagley did not conduct an analysis to determine if educational disparities are, in fact, one of the causes of lower voter turnout, but instead relies on his experience as a historian in drawing that conclusion. [Vol. III Tr. 693:17-23]. Dr. Bagley also did not analyze any of the other socioeconomic factors mentioned in his report to determine if they are one of the causes of the 2024 turnout rates. [Vol. III Tr. 693:24-694:3]. Dr. Bagley agreed that there are a number of potential causes of lower voter turnout rates, including candidate quality. [Vol. III Tr. 694:7-12]. However, Dr. Bagley did not analyze whether candidate quality was one of the causes of lower voter turnout rates in the 2024 North Carolina general election. [Vol. III Tr. 694:13-16].

151

356. In his initial report, Dr. Bagley reported various socioeconomic figures from the 2020 U.S. Census, but he could not identify at his deposition the tables that he pulled the census figures from, or recall whether he used decennial census data or ACS data. [Vol. III Tr. 692:10-12; NAACPPX180 at 32 n.91]. After his deposition, Dr. Bagley altered several of the figures in his corrected report. [Vol. III Tr. 692:20-22]. For example, he reported the percentage of Black-alone households with broadband Internet subscription as 31.8% compared to 37.7% for White-alone households in his initial report, but updated those numbers to 80% for Black-alone compared to 86.7% for White-alone in his corrected report. [NAACPPX181 at 32; Vol. III Tr. 692:20-693:8].

357. Dr. Taylor does not dispute that North Carolina has a history of discrimination in relevant areas through the 1980s or that in some instances, racial disparities continue to exist between Black and white residents of North Carolina. [*See, e.g.*, Vol. VI Tr. 1272:21-1273:6, 1318:1-16]. However, Dr. Taylor's comparative and temporal analyses revealed that, since 1982, North Carolina's racial gaps in the areas of education, employment, and healthcare are no worse than the rest of the nation, and indeed are better based on some metrics. [LDTX259 at 44-45].

358. Dr. Clark criticized Dr. Taylor for conducting a comparative analysis under Senate Factor 5, yet Dr. Clark used a benchmark in his own Senate Factor 7 analysis, admitting it was useful, and further admitted that he utilizes comparative methodology in his academic works. [Vol. II Tr. 270:7-13, 271:9-19]. Therefore, it is difficult to reconcile Dr. Clark's criticisms of Dr. Taylor's approach with his own work in this case and his academic work.

359.     Dr. Taylor analyzed education attainment rates by race using two separate data sources in his September 2024 Expert Report.  [LDTX259 at 18-20]. Dr. Taylor first mirrored Dr. Clark's analysis with his purported ACS data and found that the proportion of Black North Carolinians over 25 with a college degree is growing, and the most recent figures are at or above the national level. [LDTX259 at 18; Vol. VI Tr. 1273:7-11]. Dr. Clark confirmed improvement across all racial groups when comparing 2010 to 2022. [Vol. II Tr. 305:4-14].  Dr. Clark also admitted that educational attainment for those 25 and over is only part of the picture because that population does not necessarily reflect individuals who went to grade school in North Carolina. [Vol. II Tr. 304:13-305:3].

360.     Unlike Dr. Clark, who only used the 25+ data, Dr. Taylor also looked at direct data, adjusted for class size, showing the actual high school graduation rates from the North Carolina Department of Public Instruction (NCDPI) in the Black Belt and Piedmont-Triad regions compared to the state as a whole. [LDTX259 at 19-20; Vol. VI Tr. 1273:17-1274:4]. The NC DPI data shows Black graduation rates in the Triad are generally at or higher than the white rate and tend to be higher than the rest of the state. [LDTX259 at 20, Tbl. 3; Vol. VI Tr. 1273:17-1274:14].

361.     On higher education, North Carolina has seen a steady increase in the portion of Black residents who have obtained a college degree since 2010. [LDTX259 at 21, Tbl. 4; Vol. VI Tr. 1274:21-1275:4]. In fact, Dr. Taylor reported that the proportion of Black North Carolinians with a bachelor's degree or higher in 2022 was 0.6% higher than the national average: 26.9% versus 26.3%. [LDTX259 at 22].

362.     Dr. Taylor also highlighted North Carolina Promise, enacted by the North Carolina General Assembly to reduce tuition to $500 at four UNC System universities. [Vol. VI Tr. 1275:5-18; LDTX259 at 22]. Since 2018, tuition at two of the state's historically Black colleges or universities has been reduced under the law: Elizabeth City State University and Fayetteville State University. [Vol. VI Tr. 1275:5-18].

363.     Dr. Taylor did not dispute any of the numbers Dr. Clark reported in terms of the gaps between Black and white educational achievement in North Carolina; rather, Dr. Taylor contextualized Dr. Clark's report by showing that these gaps in achievement are similar to or less than national averages. [Vol. VI Tr. 1273:12-16, 1296:22-25, 1318:1-5].

364.     To evaluate the other socioeconomic conditions described by Drs. Bagley and Clark, Dr. Taylor analyzed data on unemployment rates, poverty rates, and median household income by race in North Carolina compared to the country as a whole. [Vol. VI Tr. 1275:20-1276:2]. While Black and Latino unemployment rates in North Carolina are always greater than the white rate, when placed in a national context, North Carolina does moderately well. [LDTX259 at 23]. The same is true for poverty rates. [LDTX259 at 24-25]. On median national income, the Black-white median in North Carolina is usually higher than the national figure. [LDTX259 at 23-24].

365.     Dr. Clark specifically looked at income and health, including disability rates by race in his opening report. [WX8 at 14-15]. In 2022, the difference between Black and White disability rates is .7%, which Dr. Clark admitted was derived from a slight decrease in disability rates for Black North Carolinians and a slight increase in disability rates for White North Carolinians from 2010 to 2022. [Vol. II Tr. 308:14-24]. Dr. Clark also

154

admitted that North Carolina offers curbside voting, which has the potential to help people with physical disabilities have better access to voting. [Vol. II Tr. 312:25-313:6].

366.    Dr. Taylor included a discussion of Black migration patterns into and out of North Carolina to round out his socioeconomic factors analysis because "[p]resumably, people move to areas where they think their quality of life will be an improvement upon the status quo[.]" [Vol. VI Tr. 1276:6-13]. According to demographer William Frey, whose work was published in a report by the Brookings Institution, North Carolina has been in the top three states with the greatest Black net migration gains from 1995-2020. [LDTX260; Vol. VI Tr. 1277:25-1278:10]. This is in stark contrast to 1965-1970, when North Carolina was the fourth state with the highest black net migration losses. [Vol. VI Tr. 1278:11-18]

367.    Fact witness testimony also did not establish that Black voters' political participation is hindered. Plaintiff Calvin Jones and Mr. Courtney Patterson testified about participating in voting advocacy efforts. [Vol. II Tr. 352:22-353:6; Vol. III Tr. 590:13-21; Vol. III Tr. 591:21-592:7]. While some witnesses testified about a general apathy among Black voters about voting or challenges other Black voters have faced in voting, no witnesses testified that they were personally unable to vote in recent elections. In fact, the record shows that individual plaintiffs and fact witnesses alike were able to vote in the 2024 General Election. [*See, e.g.*, Vol. II Tr. 372:14-16; Vol. III Tr. 529:25-530:1; Vol. III Tr. 533:3-5; Vol. III Tr. 586:7-8; Vol. III Tr. 601:7-8; NAACPPX363; NAACPPX365; NAACPPX164-166]. Plaintiff Jones confirmed that he has not personally encountered issues affecting his ability to vote. [Vol. II Tr. 352:19-21]. The also evidence shows strong

voting histories amongst these witnesses and plaintiffs, including their history of voting by the various methods of voting that are available in North Carolina. For example, Mr. Patterson testified that he voted early, [Vol. III Tr. 601:9-11], and records for the NAACP and Common Cause standing members showed these members have voted early (both in-person and curbside), voted absentee by mail, and voted in-person on Election Day. [*See* NAACPPX164; NAACPPX165; NAACPPX166].

5.     Extent to Which Campaigns are Characterized by Racial Appeals

368.    None of Plaintiffs' experts showed a prevalence of racial appeals in North Carolina politics.

369.    Dr. Clark's analysis of racial appeal focused on the Cheri Beasley-Ted Budd 2022 U.S. Senate campaign. To conduct his analysis, Dr. Clark searched the News and Observer and videos on the Ted Budd for Senate YouTube page and watched the candidates' debate. [Vol. II Tr. 290:8-22]. But Dr. Clark did not undertake a replicable analysis in that he failed to document his searches, results, or record any time range that he looked at for each candidate. [Vol. II Tr. 290:23-291:17]. Without looking at candidate Beasley's ads whatsoever, Dr. Clark determined that Ted Budd's campaign was characterized by implicit racial appeals because of his advertisements on crime and immigration. [Vol. II Tr. 291:18-19; WX8 at 21]. This determination was made without differentiating between ads that had been funded by the candidate versus ads that had been funded by a PAC. [Vol. II Tr. 291:20-24].

370.    Dr. Clark also determined that Ted Budd purposefully aligning with President Trump was a racial appeal by extension. However, Dr. Clark has a hard time

making up his own mind regarding whether a candidate aligning with President Trump is in and of itself a racial appeal. Dr. Clark testified on direct that he was "not at all" saying that anytime anyone aligns themselves or is endorsed by President Trump that they're making a racial appeal. [Vol. II Tr. 261:18-21]. But Dr. Clark's expert report specifically states that "a candidate in North Carolina purposefully aligning with Trump is, by extension, a racial appeal." [WX8 at 29; Vol. II Tr. 299:10-301:2]. When confronted with the contradiction between the statement in his report and his trial, Dr. Clark declined to retract either statement. [Vol. II Tr. 299:10-301:2]. The court finds Dr. Clark's competing testimony hard to reconcile and gives it no weight.

371.  Dr. Taylor did not opine on whether certain advertisements were racial appeals, but critiqued Clark's theory that candidates aligning with Trump is a racial appeal by proxy. [Vol. VI Tr. 1285:21-1286:10]. Dr. Taylor testified, and Dr. Clark agreed, that it is common practice for candidates of a political party to affiliate with the candidate at the top of the ticket for a particular political party, especially when the top of the ticket is a national figure. [Vol. VI Tr. 1285:21-1286:10; Vol. II Tr. 301:13-19]. Indeed, "[t]he use of Trump and, by [sic] extension, the Republican Party in analyses of 'racial appeals' does not provide evidence of their disproportionate use in North Carolina." [LDTX259 at 46].

372.  Dr. Clark's definitions and identification of implicit and explicit racial appeals fall apart under the slightest scrutiny. Though his report defines explicit racial appeals as those that directly mention race or a particular racial group with racial nouns, Dr. Clark's analysis does not distinguish between positive and negative racial appeals. [Vol. II Tr. 292:6-14]. For example, Dr. Clark testified that when then-Vice President

157

Harris's 2024 presidential campaign ran ads using the racial noun of "Black men," she was making a positive racial appeal to Black voters. [Vol. II Tr. 293:1-11]. However, whether something is a positive or negative ad could depend on a person's lived experiences or their own personal perspectives. [Vol. II Tr. 293:21-294:13]. Such a subjective standard surely cannot be the test. The most recent example of what Dr. Clark defined as an explicit racial appeal was from the 2012 Democratic National Convention in Charlotte, North Carolina. [Vol. II Tr. 292:22-25; WX8 at 24]. Otherwise, the main focus of Dr. Clark's explicit racial appeals analysis was the Jesse Helms "Hands Ad"—which aired approximately 35 years ago. [Vol. II Tr. 292:6-20].

373. To determine whether something is an implicit racial appeal, Dr. Clark looked at the images, words employed, and overall context of the political advertisement. [Vol. II Tr. 294:21-295:2]. Dr. Clark admitted that determining whether something is an implicit racial appeal is not a straightforward process. [Vol. II Tr. 295:3-8]. For example, Dr. Clark identified "immigration" and "welfare" as implicit racial appeals—despite the fact that they reference legitimate conservative party positions. [Vol. II 295:9-24; LDTX259 at 27]. These "tests" fall apart under the lightest scrutiny.

374. Dr. Bagley's analysis of racial appeals suffers from similar flaws. At the outset, Dr. Bagley did not use a reliable methodology to identify racial appeals. Dr. Bagley did not conduct a search that was specific to any one election for his corrected report, [Vol. III Tr. 695:7-10], nor did he include any search parameters that would allow others to replicate his searches used to identify the appeals. [Vol. III Tr. 695:10-22]. Similarly, Dr.

158

Bagley did not apply one consistent set of search terms and parameters across a set of databases to identify racial appeals in his supplemental report. [Vol. III Tr. 695:23-696:5].

375. Dr. Bagley concluded that in the last two decades, North Carolina ads have featured racial appeals. [NAACPPX181 at 39; Vol. III Tr. 696:2-6]. Dr. Bagley denied that "any racial appeal by any person constitutes elections characterized by racial appeals," but he could not answer at what point elections are "characterized by" racial appeals and instead claimed that "a pattern over the years of the use of such appeals would be significant." [Vol. III Tr. 699:13-700:1].

376. Plaintiffs cannot even meet Dr. Bagley's standard of a "pattern over the years." Dr. Bagley purported to identify racial appeals in North Carolina campaigns between 2008 and 2024. [NAACPPX181 at 39; NAACPPX205 at 7]. During this time period, there were over 1500 contests for the General Assembly, over 100 contests for Congress, and 50 contests for the North Carolina Council of State, [Vol. III Tr. 697:10-698:14], in addition to five presidential elections and numerous contests at the local levels. Across his reports, Dr. Bagley identified just over a dozen contests that he claims featured racial appeals. [*See* NAACPPX181 at 38-43; NAACPPX205 at 7-13]. That is just a fraction of the thousands of total contests held in North Carolina during the time period examined. Dr. Bagley did not identify any racial appeals in any contests in the 2012, 2014, or 2016 election cycles, [Vol. III Tr. 696:6-19], and some cycles—such as 2020—featured just one instance of what Dr. Bagley claimed was a racial appeal. [*See* NAACPPX181 at 40]. Notably, Dr. Bagley did not identify any racial appeals in state senate or congressional

159

elections—which are the offices at issue in this case—in North Carolina in any election year. [Vol. III Tr. 696:23-697:4].

377.    Many of the racial appeals Dr. Bagley identified were not successful. For example, the North Carolina Republican Party withdrew its support of candidate Russell Walker in 2018 after he made the comments Dr. Bagley cited in his report, [NAACPPX181 at 40], and candidate Walker lost the election by twenty-five points. [Vol. III Tr. 698:23-700:6]. Dr. Bagley also incorrectly claimed that Republican Party executive Dallas Woodhouse ran for the North Carolina Supreme Court and made racial appeals "[in] his 2018 campaign" against Democratic nominee Justice Anita Earls, [NAACPPX181 at 40], but at trial Dr. Bagley admitted that this was an error—Mr. Woodhouse did not run for the North Carolina Supreme Court. [Vol. III Tr. 700:7-21]. Dr. Bagley acknowledged at trial that Justice Earls won that 2018 election despite Mr. Woodhouse's statements. [Vol. III Tr. 700:22-24]. Dr. Bagley also cited racial appeals allegedly made by Dan Forest in 2019, [NAACPPX181 at 40],[18] and by Michelle Morrow and Mark Robinson in 2024. [NAACPPX205 at 7-9]. None of those candidates won their elections. [Vol. III Tr. 701:11-12, 704:19-20, 706:1-2].

378.    Several racial appeals identified by Dr. Bagley were not made in connection with any campaign or candidate in North Carolina. Dr. Bagley cited to mailers sent to Asian American voters in 2022, [NAACPPX181 at 41; Vol. III Tr. 701:13-15], but acknowledged

---

[18] In his initial report, Dr. Bagley provided the wrong citation for his discussion of statements by Mr. Forest. [*See* NAACPPX180 at 40 n.118; NAACPPX181 at 40 n.125; Vol. III Tr. 700:25-701:10].

at trial that those mailers were not associated with any specific election contest or campaign in North Carolina, and were mailed to voters all over the country. [Vol. III Tr. 701:16-702:8]. Dr. Bagley also cited to tweets in spring 2023 by the North Carolina Republican Party, [NAACPPX181 at 42; Vol. III Tr. 702:22-25], yet Dr. Bagley could not identify a specific campaign in North Carolina to which these tweets were related. [Vol. III Tr. 703:1-3]. Dr. Bagley also cited text messages some individuals reported receiving after the 2024 General Election, [NAACPPX205 at 13; Vol. III Tr. 706:17-20], but he admitted there is no evidence that the messages were sent on behalf of a particular campaign or candidate in North Carolina. [Vol. III Tr. 706:21-24].

379. Other racial appeals identified by Dr. Bagley are of questionable relevance. Dr. Bagley referenced ads run by Republican Bill Ward against opponent Howard Hunter. [NAACPPX181 at 42; Vol. III Tr. 702:9-11]. Yet, Dr. Bagley agreed that the ads did not mention race, and that the ads' connection of Mr. Hunter's wealth to voters' tax dollars could resonate with voters of any race. [Vol. III Tr. 702:12-21]. Dr. Bagley also identified racial appeals made during the 2024 Superintendent of Public Instruction contest, including statements made by candidate Michele Morrow relating to Social and Emotional Learning. [NAACPPX205 at 8]. But Dr. Bagley discovered in his deposition that a citation for these statements was incorrect and corrected the citation in an errata. [NAACPPX206; Vol. III Tr. 703:7-19]. But more troubling was Dr. Bagley's admission at trial that Ms. Morrow did not actually make the statements that Dr. Bagley quoted and attributed to her. [Vol. III Tr. 703:20-23; NAACPPX205 at 8 ("Morrow expressed opposition to Social and Emotional Learning ("S.E.L.") programs as well. She argued that these were a 'soft on crime'

approach to student discipline that took as their point of departure that 'the misbehaving student is merely a victim of circumstance.' She claimed that, in this way of thinking, 'it's not the students fault [sic], but rather society's fault' if a student misbehaves.")]. Dr. Bagley admitted that Ms. Morrow did not actually write the language he quoted as belonging to her, and that his report did not specify that the quoted language was from an op-ed written by someone else that Ms. Morrow had reposted. [Vol. III Tr. 703:24-704:14].

380.    Dr. Bagley also claimed that Mark Robinson made racial appeals during the 2024 Gubernatorial contest, [NAACPPX205 at 9], but Dr. Bagley admitted that these statements were made over a decade ago and were not actually made during the 2024 campaign. [Vol. III Tr. 704:21-705:6]. Mr. Robinson was not the one that "resurfaced" the comments in 2024, [Vol. III Tr. 705:13-15], or made them apart of his campaign. Dr. Bagley also did not study what effect, if any, these racial appeals had on white voters and could not say whether the comments caused any increase or decrease in white support for Mr. Robinson. [Vol. III Tr. 705:16-25]. White support for Mr. Robinson was "notably lower" in the 2024 General Election as compared to other Republican candidates and to Robinson's prior elections before these alleged statements surfaced. [LDTX244 at 10].

381.    Dr. Bagley also cited various statements made by President Trump in the 2024 presidential race. [NAACPP205 at 10-12; Vol. III Tr. 706:3-8]. Dr. Bagley agreed, however, that Black and Hispanic support for President Trump increased between 2016 and 2024 and that this increased support could mean that Black and Hispanic voters were willing to look past his statements in the 2024 election. [Vol. III Tr. 706:9-16].

382.    Dr. Stephens-Dougan also did not show that North Carolina elections are characterized by racial appeals. Dr. Stephens-Dougan identified a political ad targeting Cheri Beasley as a racial appeal due to the ad featuring mug shots of a Black defendant, tying Cheri Beasley with crime, and calling her "dangerously liberal." [Vol. IV Tr. 772:1-16]. Dr. Stephens-Dougan agreed that the ad referred to Cheri Beasley's role as a state Supreme Court Justice, [Vol. IV Tr. 773:16-774:3], and state Supreme Court Justices must deal with matters of crime, which is a legitimate issue of politics. [Vol. IV Tr. 774:6-16].

383.    Finally, Plaintiff Allison Allen testified that the use of Braxton Winston's mugshot on a political mailer was a use of race as a reason to vote for or against a particular candidate. [Vol. II Tr. 342:11-343:1]. However, Plaintiff Allen admitted that the mugshot of Braxton Winston was his authentic mugshot from a 2016 arrest. [Vol. II Tr. 343:2-10].

        6.    <u>Success of Black Candidates</u>

384.    Black candidates have successfully been elected to public office in North Carolina.

385.    In his academic work, Dr. Clark explores collective and dyadic representation for minority voters. Dr. Clark defines collective representation as the overall presence of a group in a collective body. [Vol. II Tr. 285:18-20]. Dr. Clark defines dyadic representation as a 1 to 1 relationship between a constituent and a legislator—for example, Representative Valerie Foushee, who is Black, serving as Dr. Clark's elected congresswoman. [Vol. II Tr. 285:24-286:11]. Dr. Clark testified that his academic research shows that collective representation creates a higher probability that previously disengaged Black voters will turn out and become regular voters. [Vol. II Tr. 286:15-20].

386. In his work in this case, Dr. Clark looked at the Black seat share (proportion of seats held by Black members in the representative body) and Black representation ratio (the Black seat share relative to the Black population in North Carolina) to inform his Senate Factor 7 analysis. [WX8 at 33]. The Black seat share calculations show a form of collective representation, which Dr. Clark has previously found to be the preferred method of representation for Black voters. [Vol. II Tr. 285:14-17, 287:24-289:5]. Dr. Clark admitted that the present-day Black seat share in North Carolina is high compared to other states for both the General Assembly and the state's Congressional delegation. [Vol. II Tr. 286:21-287:19; WX11 at 3, 6].

387. Thirty-eight Black members were elected to the General Assembly in the 2024 General Election, constituting over 22% of the 170-member body in a state with a BVAP of 20.1% (using the Single-Race Black metric) or 21.37% (using the Any-Part Black voting age population metric). [LDTX264 at 2; JX149 at 13; WX11 at 3; Vol. II Tr. 282:6-12]. This was an increase from the prior General Assembly, which had 35 Black members. [NAACPPX181 at 45].[19]

388. Dr. Clark's Black representation ratio for the North Carolina General Assembly after the 2024 election is 1.01—which Dr. Clark admitted is "above parity." [Vol. II Tr. 284:3-18; WX11 at 3]. Dr. Clark claimed that the increase in Black legislators in the General Assembly following the 2024 elections were due to the number of "majority-

---

[19] Dr. Bagley's initial report incorrectly reported the number of Black senators serving in the North Carolina Senate as of August 2024, [NAACPPX180 at 45; Vol. III Tr. 710:19-23], and is one of several errors in the text of his report that was corrected in his corrected report. [NAACPPX181 at 46].

minority" districts, but Dr. Clark admitted that he did not mean "majority-black" and in fact in using that term, just meant not majority white districts. [Vol. II 284:25-285:11; WX 11 at 6]. In fact, only one of the Senate's 50 districts and only four of the House's 120 districts are comprised of majority black voting age population [JX149 at 13-14; JX82 at 21-23].

389. The current seat share and representation ratio exceed proportionality and stand in stark contrast to the four Black state legislators in office in 1981-82, [JX370 at 2], and even a decade later in 1992, when there were only 19 Black state legislators, constituting approximately 11.2% of the seat share. [Vol. II Tr. 283:9-11; WX8 at 40, Tbl. 12].

390. Key members of the North Carolina Democratic Caucus in the General Assembly are Black, including House and Senate democratic caucus leaders Representative Robert Reives and Senator Sydney Batch. [LDTX259 at 30; Vol. IV Tr. 824:2-5].[20] Prior to Batch, Senator Dan Blue, who is also Black, served as the Senate Democratic Caucus Leader. [Vol. IV Tr. 824:6-10].

391. Dr. Bagley did not report this increased number of Black Senators or House members elected across the state in the 2024 General Election in his Supplemental Report, [NAACPPX205 at 13-16; Vol. III Tr. 712:16-18], despite reporting the (lower) number of Black Senators and House members in his initial and corrected reports served prior to the 2024 election and agreeing those numbers would "certainly" be relevant to Senate Factor

---

[20] Dr. Bagley could not identify the current minority leaders of the North Carolina House or the North Carolina Senate at trial. [Vol. III Tr. 713:13-17; 714:5-7].

7. [Vol. III Tr. 712:19-713:2]. Dr. Bagley agreed that Black representation in the Senate is roughly proportional to the statewide Black population, and exceeds proportionality in the House. [Vol. III Tr. 713:3-714:4].

392.    Instead of reporting these statewide figures as he did in his prior reports, Dr. Bagley chose to analyze the success of Black candidates for the General Assembly in the Black Belt and the Triad regions. [Vol. III Tr. 712:10-15; NAACPPX205 at 13-16]. He opined that "Black candidates for the North Carolina General Assembly generally continue to find it difficult to win elections in the Challenged Areas unless the district in which they are running has either a BVAP over 40% or an [Minority Voting Age Population] over 50%." [NAACPPX205 at 16]. But Dr. Bagley does not offer any analysis that shows the level of BVAP or MVAP necessary to elect Black-preferred candidates in these areas or any support for his arbitrary 40% BVAP threshold.

393.    Dr. Bagley's analysis showed numerous instances of Black candidates prevailing in districts that are not majority-Black, including SD5, HD8, and HD24 in the Black Belt, and SD32, HD54, HD60, HD71, and HD72 in the Triad. [NAACPPX205 at 14-16].

394.    Dr. Bagley's Supplemental Report claimed that there were five Black candidates defeated in House elections in the Black Belt. [NAACPPX205 at 15; Vol. III Tr. 715:4-7]. That number is incorrect—only two Black candidates lost House elections in the Black Belt. [Vol. III Tr. 715:4-9]. Dr. Bagley included three white candidates, including a white Republican, in this list, and he subsequently submitted an errata to that report

166

correcting the number from five to two. [NAACPPX206; Vol. III Tr. 714:8-715:17; JX359].

395.    Dr. Bagley also offered opinions about the number of Black officials who have been elected to statewide or local offices, [NAACPPX181 at 43-48; NAACPPX205 at 13-16], but he does not report the number of Black candidates who have actually run for those offices.

396.    Dr. Taylor found Black North Carolinians are reasonably represented in federal, state, and local offices.  [LDTX259 at 30-31, 46; Vol VI Tr. 1279:1-1280:6].

397.    North Carolina has had seven Black representatives in Congress since 1990: Melvin L. Watt; Alma S. Adams; Frank W. Balance, Jr.; G.K. Butterfield, Jr.; Eva Clayton; Valerie Foushee; and Don Davis. [Vol. VI Tr. 1279:5-16; LDTX261; LDTX259 at 30]. Presently, there are three Black members of the North Carolina Congressional delegation— each of whom retained his or her seat after the 2024 general election.  [Vol. II Tr. 275:4-11].  Indeed, since 2022, 21.4% of North Carolina's Congressional delegation has been Black, compared to the 20.5% single-race Black population or 21.37% any-part Black voting age population of the state. [Vol. II. Tr. 278:4-280:20; JX149 at 14]. Dr. Clark's Black representation ratio for North Carolina's congressional delegation after the 2024 election is 0.97, utilizing the single part black number that he reported.[21] [Vol. II Tr. 277:13-19; WX11 at 3].

_____

[21] Notably, the non-decennial census numbers reported by Dr. Clark are estimates and do not match the total single part black reported by the 2020 decennial census. [JX149; Vol. II Tr. 278:20-279:11; 280:21-281:15].  Dr. Clark admitted that using the decennial census numbers, the representation ratio would exceed 1. [Vol. II Tr. 280:15-20]. The failure to

398. Don Davis, a Black Democrat, currently represents CD1, located in northeastern North Carolina. [JX369 at 2; LDTX259 at 30]. Congressman Davis was first elected in 2022, and was successfully re-elected in 2024, even though Donald Trump won statewide. [JX369 at 1-2; LDTX259 at 30]. Prior to Congressman Davis, G.K. Butterfield, Jr. represented CD1 from 2004 to 2022. [LDTX261 at 23]. In fact, CD1 has been represented by an African American since 1992. [LDTX261 at 20, 23, 25].

399. Alma Adams, a Black Democrat, currently represents CD12, located in Mecklenburg County. [JX369 at 3-4; LDTX259 at 30]. Congresswoman Adams was first elected in 2014 and won re-election in the 2024 general election. [LDTX261 at 19; JX369 at 3-4]. Before Congresswoman Adams, Melvin L. Watt, a Black Democrat, served CD12 from 1993 until his resignation on January 6, 2014. [LDTX261 at 52]. He chaired the Congressional Black Caucus for the 109th Congress. [LDTX261 at 52].

400. Valerie Foushee, a Black Democrat, currently represents CD4 after winning re-election in 2024. [JX369 at 2; Vol. II Tr. 275:8-11].

401. Similar levels of Black representation exist at the local level in North Carolina. According to the North Carolina Black Alliance, Mecklenburg and Guilford Counties have some of the highest numbers of local Black elected officials in the state, at 37 and 34 respectively. [JX360 at 2].

402. At the statewide level, Dr. Clark emphasized that five of the seven Black individuals who have served on the North Carolina Supreme Court were appointed to their

---

reconcile the data, shows that Dr. Clark's choices in using estimates versus the hard count census data makes his methodology less reliable than other experts.

positions in the first instance, but admitted that most of those appointees ended up winning elections for the same or other elected office shortly thereafter. [Vol. II Tr. 271:21-274:7]. Indeed, Justice Timmons-Goodson won an election the same year she was appointed to retain her seat on the North Carolina Supreme Court; Justice Beasley won a statewide election to retain her seat in 2013; and G.K. Butterfield went on to represent North Carolina's CD1 for approximately 20 years. [Vol. II Tr. 272:1-274:7].

403. Several plaintiffs and fact witnesses have held or currently hold public office. For example, Mr. Patterson has served on the Board of Elections for Lenoir County for fourteen years is the current chair of the Board. [Vol. III Tr. 592:5-10]. Plaintiff Earl Jones served on the Greensboro City Council for eighteen years and was the North Carolina State House District 60 Representative for eight years. [Vol. I Tr. 135:21-24; Vol. I Tr. 143:16-17]. Plaintiff Calvin Jones served on the Warren County School Board for over fifteen years. [Vol. II Tr. 349:24-350:3].

### 7. Responsiveness of Elected Officials

404. None of Plaintiffs' experts showed elected officials in North Carolina are unresponsive to the particularized needs of members of the Black community. [LDTX259 at 31]. According to Dr. Taylor, "particularized" is a term of art in political science that refers to the direction of government resources to a geographic target. [Vol. VI Tr. 1280:14-1281:11].

405. Dr. Bagley cited, to legislation advanced by the General Assembly that Black voters have opposed, [NAACPPX181 at 48-50; Vol. III Tr. 707:1-7], but admitted that some of the legislation that he referenced were not passed, such as the bill regarding critical

race theory. [Vol. III Tr. 707:8-17]. And despite acknowledging that the General Assembly had passed several bills that were supported by Black voters, Dr. Bagley did not include any examples of such bills in any of his reports. [Vol. III Tr. 707:18-708:8].

406.    Dr. Bagley also discussed the 2023 redistricting process as an example of the General Assembly's lack of responsiveness. Dr. Bagley made no mention in his reports of the General Assembly's public comment portal that was available for public feedback and he did not review any of the comments that were submitted through that portal. [Vol. III Tr. 708:22-709:5]. In Dr. Bagley's initial report, he stated that "there were no new public hearings" as part of the 2023 redistricting process, [NAACPPX180 at 49], but after his deposition, he corrected that statement by adding "after the draft maps were released." [Vol. III Tr. 709:6-710:15; NAACPPX181 at 49].

407.    Dr. Stephens-Dougan did not show elected officials in North Carolina are unresponsive. Dr. Stephens-Dougan testified about representation and outcome disparities in North Carolina and gave the example that where there is Black political empowerment and representation, there are fewer disparities in terms of traffic stops as compared to areas of lower Black political empowerment and representation. [Vol. III Tr. 723:13-724:4; Vol. IV Tr. 747:3-9]. Dr. Stephens-Dougan agreed that North Carolina was the first state in the country to enact legislation requiring police officers to document the demographics of people that were stopped which provided important transparency. [Vol. IV Tr. 790:11-20].

408.    Dr. Taylor confirmed elected officials are responsive to Black voters. To look at how responsive policy has been in North Carolina, Dr. Taylor began his analysis with data from Devin Caughey and Christopher Warshaw's book *Dynamic Democracy* to

correlate scores of a state's policies and the public's attitude towards those policies and develop a ranking of all the states by the strength of the correlation coefficient ("Caughey-Warshaw data"). [LDTX259 at 31-32]. The data is not broken down into sub-analyses by race; it measures the responsiveness of the political body to the general population. [*Id.*]. However, Dr. Taylor included it as the baseline of how to understand North Carolina political responsiveness to the population at large to enable comparison with the Black population and eleven counties specifically. [*Id.*].

409.    Using the Caughey-Warshaw data, Dr. Taylor found that North Carolina was number 28 out of 50 in the size of the positive correlation between opinion on economic policy and economic policy outputs from 1982-2019. [LDTX259 at 32]. On cultural issues—an area where Southern states typically lag—North Carolina has improved rapidly since 2011, resulting in a positive correlation of 25 out of 50. [*Id.*].

410.    Dr. Taylor also analyzed government appropriations. [LDTX259 at 32-33]. Though there is no state-level database to track state government spending at the county level, Dr. Taylor identified numerous projects directly addressing the interests of Black North Carolinians in the Fiscal Year 2023-24 budget. [LDTX259 at 32-33; Vol. VI Tr. 1281:12-1282:2]. Several of North Carolina's public historically Black universities and colleges received over half a billion dollars in appropriations for the biennium. [LDTX259 at 33; Vol. VI Tr. 1281:12-1282:2]. This included approximately $140 million for Winston-Salem State University, which is located in the Triad, and another 100 million dollars in appropriations for Elizabeth City State University. [LDTX259 at 33; Vol. VI Tr. 1281:12-1282:2; Vol. IV Tr. 821:3-8]. Millions of dollars were also allocated to various Black

heritage and advancement organizations across the state, including $1 million for the Washington Street Minority Business Development Program in High Point. [*Id.*]. Dr. Bagley did not dispute these appropriations. [Vol. III Tr. 708:12-21].

411. Senator Smith likewise noted in her testimony that healthcare was one of the two issues she felt were "particular" to the Black community in her, district SD5, and that she worked with leadership to obtain $215 million in funding for the Brody School of Medicine located in Pitt County in the 2021 budget—Brody School of Medicine is located in Pitt County. [Vol. IV Tr. 818:16-819:4]. Senator Smith also noted that in the 2023 budget, her district, SD 5 received $175 million in appropriations. [Vol. IV Tr. 820:5-12]. Senator Smith also acknowledged that there is sometimes a difference in what local and state elected officials can be responsive to, and that she sometimes redirects constituents to their local government for assistance. [Vol. IV Tr. 807:16-23]. For example, the Martin County Commissioners—not the State representatives for the County—are who had the authority to approve a hospital sale to reopen Martin General Hospital and continue servicing patients in that region. [Vol. IV Tr. 823:21-24].

412. Dr. Taylor further looked at school funding statistics and found that traditional public-school districts that receive the most per pupil expenditures in North Carolina tend to have large Black populations. [LDTX259 at 35-36; Vol. VI Tr. 1282:4-1284:8]. According to data published in April of 2024 by the NC DPI, all of the county public schools in the Black Belt received low wealth supplemental funding from the State, as shown by the following figure:

172



# Low Wealth Supplemental Funding
## FY 2023-24 Counties

Percentages represent the percent of the State average (100% = State average). Ineligible counties are those above the State average and are shown in grey.

[LDTX194 at 22].

413.    This is in addition to the supplemental funding that most of these Black Belt counties receive under the small county supplemental funding from the State. [LDTX194 at 26; Vol. VI Tr. 1283:24-1284:8]. Dr. Clark never analyzed whether there were disparities in educational funding between majority-Black and majority-white school districts in North Carolina, even though he admitted that education funding is a way to improve education outcomes. [Vol. II Tr. 305:15-23].

414.    Plaintiff Reverend Daly-Mack testified that Bobby Hanig was never in her community. [Vol. II Tr. 367:4-5]. However, Plaintiff Reverend Daly-Mack admits that she knew Bobby Hanig from "a million postcards" that she received in the mail stating "Vote for Bobby Hanig. He cares for your community." [Vol. II Tr. 367:5-7].

Respectfully submitted, this the 5th day of August, 2025.

**BAKER & HOSTETLER LLP**

By: /s/ Katherine L. McKnight
Richard B. Raile*
DC Bar No. 1015689
Katherine L. McKnight*
DC Bar No. 994456
Trevor Stanley*
DC Bar No. 991207
1050 Connecticut Ave. NW
Suite 1100
Washington, DC 20036
Ph: (202) 861-1500
rraile@bakerlaw.com
kmcknight@bakerlaw.com
tstanley@bakerlaw.com

Patrick T. Lewis*
Ohio State Bar No. 0078314
Key Tower
127 Public Square, Suite 2000
Cleveland, Ohio 44114
Ph: (216) 621-0200
plewis@bakerlaw.com

Erika D. Prouty*
Ohio State Bar No. 0095821
Anna Croyts*
Ohio State Bar No. 0104620
200 Civic Center Drive, Suite 1200
Columbus, Ohio 43215
Ph: (614) 462-4710
eprouty@bakerlaw.com
acroyts@bakerlaw.com

*Appeared via Special Notice*

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By: /s/ Phillip J. Strach
   Phillip J. Strach
   North Carolina State Bar No. 29456
   Alyssa M. Riggins
   North Carolina State Bar No. 52366
   Cassie A. Holt
   North Carolina State Bar No. 56505
   Jordan M. Koonts
   North Carolina State Bar No. 59363
   301 Hillsborough Street, Suite 1400
   Raleigh, North Carolina 27603
   Ph: (919) 329-3800
   phil.strach@nelsonmullins.com
   alyssa.riggins@nelsonmullins.com
   cassie.holt@nelsonmullins.com
   jordan.koonts@nelsonmullins.com

*Attorneys for Legislative Defendants*

174

## CERTIFICATE OF SERVICE

I, Phillip J. Strach, hereby certify that I have this day electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will provide electronic notification to counsel of record.

This the 5th day of August, 2025.

**NELSON MULLINS RILEY &<br>SCARBOROUGH LLP**

/s/ Phillip J. Strach
Phillip J. Strach
N.C. State Bar No. 29456
