# Exhibit 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| SHAUNA WILLIAMS; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 23-CV-1057 |
| REPRESENTATIVE DESTIN HALL, in his official capacity as Chair of the House Standing Committee on Redistricting; *et al.*, | |
| *Defendants*. | |
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 23-CV-1104 |
| PHILIP BERGER, in his official capacity as the President Pro Tempore of the North Carolina Senate; *et al.*, | |
| *Defendants*. | |

## LEGISLATIVE DEFENDANTS' PROPOSED POST-TRIAL <u>CONCLUSIONS OF LAW</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT ..................................................................................................... 2

I.     Plaintiffs Did Not Prove Essential Elements of Their Racial Intent Claims ............ 2

     A.     Racial Gerrymandering ................................................................. 6

     B.     Intentional Vote Dilution and Intentional Discrimination ......................... 12

         1.     All direct evidence militates against a finding of discriminatory intent. ................................................................. 14

         2.     The circumstantial evidence did not establish discriminatory intent. ................................................................. 16

         3.     Plaintiffs did not prove discriminatory effect. ................... 36

II.     The NAACP Plaintiffs Failed To Establish a Section 2 Effects Claim ................. 39

     A.     *Gingles* Preconditions ................................................................. 41

         1.     Plaintiffs failed to establish the first precondition. .......................... 41

         2.     The NAACP Plaintiffs failed to establish the third precondition. ... 49

     B.     Totality of the Circumstances ....................................................... 51

         1.     The Senate Factors weigh against Section 2 liability. .................... 52

         2.     Additional Factors favor Legislative Defendants. ........................... 65

CONCLUSION ................................................................................................. 69

# INTRODUCTION

1.     The Court held trial in this case on claims by the Williams and the NAACP Plaintiffs against SD1, SD2, SD8, CD1, CD5, CD6, CD10, CD12, and CD14. Most of the claims proceeded on allegations of intentional discrimination in the form of vote dilution, which were made against all districts listed. The NAACP Plaintiffs also challenged SD8 under a racial-gerrymandering theory, and brought a Section 2 Voting Rights Act (VRA) results claim against SD1 and SD2.

2.     All but that last claim require proof of racial intent. Although the trial presentations were elaborate, the resolution of these claims is straightforward: there is no evidence of racial intent. The General Assembly redrew congressional and senate districts (as well as house districts) in 2023 because the North Carolina Supreme Court ended the judicial supervision over legislative political discretion, which had dominated redistricting in the State since 2019. Plaintiffs' assertion that the General Assembly declined to avail itself of its litigation success and drew districts based on race—despite losing multiple racial-gerrymandering cases last decade—was unlikely to be borne out by the facts, and has not in fact borne out. That disposes of most remaining claims in this case.

3.     The Section 2 results claim against SD1 and SD2 is unsuccessful because the exacting standards of Section 2 are unmet at most stages of the analysis. The NAACP Plaintiffs have not shown that majority-Black districts are necessary in the northeast part of the senate plan or that one can be configured as part of a plan that complies with the State's neutral redistricting criteria. Nor is this a case where race-based remedies are warranted under the totality of circumstances.

4.      These failures of proof on all claims require that judgment be entered for Legislative Defendants.

## ARGUMENT

## I.      Plaintiffs Did Not Prove Essential Elements of Their Racial Intent Claims

5.      At trial, Plaintiffs presented a racial gerrymandering claim against SD8 and intentional vote dilution and intentional discrimination claims against SD1, SD2, SD8, CD1, CD5, CD6, CD10, CD12, and CD14. Racial-gerrymandering and intentional vote-dilution claims are distinct causes of action, *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 38 (2024), but are founded on common principles under the Fourteenth and Fifteenth Amendments, *see Miller v. Johnson*, 515 U.S. 900, 911 (1995).

6.      The Fourteenth and Fifteenth Amendments are not offended by state action that merely has "a racially disproportionate impact." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) (Fourteenth Amendment); *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 65 (1980) (same for Fifteenth Amendment). Instead, these provisions protect individuals from "racial classifications." *Shaw v. Reno*, 509 U.S. 630, 651 (1993) (*Shaw I*). A racial classification can occur in two ways. A state actor may employ one that is "explicit" in a statute, regulation, or policy, and in such cases, "no inquiry into legislative purpose is necessary." *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) (*Cromartie I*). On the other hand, a "facially neutral law" is subject to strict scrutiny "only if it can be proved that the law was 'motivated by a racial purpose or object,'" *id.* (citation omitted), and that it achieved a discriminatory "effect," *Shaw I*, 509 U.S. at 641.

2

7.     This case clearly does not involve an explicit racial classification. As is typical in redistricting cases, the legislation Plaintiffs challenge "classifies tracts of land, precincts, or census blocks, and is race neutral on its face." *Cromartie I*, 526 U.S. at 547. Accordingly, it is insufficient for Plaintiffs to claim disparate impact alone. "The Fifteenth Amendment does not entail the right" of any racial group to have its preferred "candidates elected," *City of Mobile*, 466 U.S. at 65; *see Rogers v. Lodge*, 458 U.S. 613, 624 (1982), so no claim can lie without proof of "invidious discriminatory purpose." *Arlington Heights*, 429 U.S. at 266. This is a case where "'assessing … motivation" presents "an inherently complex endeavor," *Cromartie I*, 526 U.S. at 546, which begins "with a presumption that the legislature acted in good faith," *Alexander*, 602 U.S. at 6. "[A] court must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus." *Abbott v. Perez*, 585 U.S. 579, 603 (2018) (citation omitted).

8.     Plaintiffs' vote-dilution and intentional-discrimination claims entail the standard elements of discriminatory purpose and effect, *Alexander*, 602 U.S. at 39, which applies also to purposeful discrimination claims under Section 2 of the VRA, *see City of Mobile*, 446 U.S. at 61.[1] Generally speaking, the intent standard of the Fourteenth and Fifteenth Amendments requires proof that race was "a 'but-for' motivation for the enactment." *Hunter v. Underwood*, 471 U.S. 222, 232 (1985); *see N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 235 (4th Cir. 2016) (applying but-for causation

---

[1] In 1982, Congress separately provided for a "results" claim under Section 2, which requires no proof of invidious purpose, *see Brnovich v. DNC*, 594 U.S. 647, 658 (2021), but only SD1 and SD2 are challenged on that basis, [*see infra* § II].

standard); *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 894 (4th Cir. 2023) (Rushing, J., dissenting), *cert. denied*, 218 L. Ed. 2d 71 (2024). *cf. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Hartman v. Moore*, 547 U.S. 250, 260 (2006) ("It is clear … that the causation is understood to be but-for causation, without which the adverse action would not have been taken"). It must be shown that the state action was taken "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). This standard applies to the intentional vote-dilution claims. *See Shaw I*, 509 U.S. at 641.

9.     Additionally, as is generally the case, a redistricting-discrimination case requires proof of discriminatory "effect," and the effect recognized as cognizable is "diluting minority voting strength." *Id.*; *Alexander*, 602 U.S. at 39. For this reason, it makes little sense for Plaintiffs to differentiate intentional discrimination and vote-dilution claims. [D.E.105 ¶¶ 248-53, 257-66; D.E.108 ¶¶ 127-44]. The discrimination claims require effect, i.e., vote dilution, and the vote-dilution claims require invidious intent, i.e., purpose of diluting votes. These claims are therefore analyzed together below. [*See infra* § I.B].

10.     In recognizing the "analytically distinct" racial-gerrymandering claim, the Supreme Court drew from intentional-discrimination precedents, but modified their standards. *See Shaw I*, 509 U.S. at 652; *see also id.* at 643–44 (drawing on foundational intent-based discrimination cases); *Miller*, 515 U.S. at 911 (same). A racial-gerrymandering claim alleges the sorting of voters into districts by race and does not depend on an assertion that votes were diluted, purposefully or otherwise. *See Shaw I*, 509 U.S. at 652; *see also id.* at 668 (White, J., dissenting) (criticizing this development). The

4

invidious effect in such cases is the "impermissible racial stereotypes" presumed when voters are sorted into districts by race, *id.* at 647 (majority opinion), and the Supreme Court has declined to require independent proof of deleterious impact, such as derogation of traditional districting principles. *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 188 (2017). At the same time, the Supreme Court modified the intent bar, requiring that race be proven the "predominant motive for the design of the district as a whole." *Id.* at 192; *see Miller*, 515 U.S. at 916. A claim of racial gerrymandering therefore requires proof "that the State 'subordinated' race-neutral districting criteria … to 'racial considerations,'" i.e., that "race predominated in the drawing of a district." *Alexander*, 602 U.S. at 7, 38 (citation omitted). To show this, Plaintiffs must prove that: (1) "race was the predominant factor motivating the legislature's decision" (2) "to place a significant number of voters within or without a particular district." *Miller*, 515 U.S. at 916. The showing may be made "through some combination of direct and circumstantial evidence." *Alexander*, 602 U.S. at 8 (citing *Cooper v. Harris*, 581 U.S. 285, 291 (2017)).

11.     For both types of claims, the Court must start "with a presumption that the legislature acted in good faith." *Id.* at 6; *see also Abbott*, 585 at 603. "This presumption of legislative good faith directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Alexander*, 602 U.S. at 10.

12.     As discussed in the following sections, Plaintiffs do not meet either the racial-gerrymandering or intentional vote-dilution tests. They failed to prove racial

motivation, or even consideration of race. Unable to show anything beyond (arguably) disparate impact, they cannot establish constitutional offenses.

### A. Racial Gerrymandering

13.    The NAACP Plaintiffs' claim for racial gerrymandering against SD8 presents a clear-cut failure of proof. As noted, the NAACP Plaintiffs had to show that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller*, 515 U.S. at 916. The NAACP Plaintiffs presented no evidence of any (let alone predominant) racial motive concerning SD8.

14.    To begin, no direct evidence suggested racial predominance. It all cut the other way. The Senate redistricting criteria forbade the use of racial data, [JX047], and 2023 Senate Committee on Redistricting and Elections co-chair, Senator Hise, testified that this directive was followed. Racial data was not used for any senate districts (including SD8). [Vol. IV Tr. 839:13-840:1, 844:3-6, 972:17-973:6, 975:6-13; JX002 at 4:13-16, 12:16-21]. Senator Hise had no "heatmaps with racial data" available when drawing any plan. [Vol. IV Tr. 975:6-13]. No evidence was presented even that Senator Hise had awareness of racial demographics in the vicinity of SD8—which would be insufficient in any event. *See Alexander*, 602 U.S. at 23, 37. No witness or exhibit contradicted Senator Hise's testimony. Given the "presumption of good faith," *id.* at 11, the attestations of an elected leader of the General Assembly carry extraordinary weight and cannot be easily overridden.

6

15.     A circumstantial showing provides poor means of rebuttal, but only that avenue was available to the NAACP Plaintiffs. And they barely began down it. A claim based solely on circumstantial evidence is "much more difficult," and the Supreme Court has "never invalidated an electoral map in a case in which the plaintiff failed to adduce any direct evidence." *Id.* at 8. Here, the circumstantial evidence was one-sided against the NAACP Plaintiffs' claim. The basic unit of analysis is "the district as a whole," so a "court faced with a racial gerrymandering claim therefore must consider all of the lines of the district at issue." *Bethune-Hill*, 580 U.S. at 192. But the NAACP Plaintiffs presented no expert analysis even attempting to get at these issues. *Cf. League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 418 (2006) (*LULAC*) ("We should be skeptical … of a claim that seeks to invalidate a statute based on a legislature's unlawful motive but does so without reference to the content of the legislation enacted.").

16.     That alone is a sufficient basis to dispense with the claim, but it bears noting that, as in *Alexander*, the NAACP Plaintiffs' "circumstantial-evidence-only" case failed because they did not "disentangle race from politics." 602 U.S. at 9, 24. "When partisanship and race correlate, it naturally follows that a map that has been gerrymandered to achieve a partisan end can look very similar to a racially gerrymandered map." *Id*. at 9. Legislatures "may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were conscious of that fact." *Id*. (citation omitted). "To prevail, a plaintiff must 'disentangle race from politics' by proving 'that the former drove a district's lines.'" *Id*. (quoting *Cooper*, 581 U.S. at 308). "That means, among other things, ruling out the competing explanation that political

7

considerations dominated the legislature's redistricting efforts. If either politics or race could explain a district's contours, the plaintiff has not cleared its bar." *Id*. at 9–10.

17.    Senator Hise testified that politics informed the contours of SD8. [*See* D.E.82-14 at 457:18-458:12, 471:1-16]. The Senate criteria set forth the race-neutral criteria: equal population, county groupings and traversal requirements from *Stephenson v. Bartlett*, 562 S.E.2d 377 (N.C. 2002) (*Stephenson I*) and its progeny, traditional districting principles, respect for existing political subdivisions, and partisan advantage and incumbency protection, [JX047]. Senator Hise explained how these considerations drove district configurations, and that political data was both available and used. [Vol. IV Tr. 840:4-14]. Specifically as to SD8, the *Stephenson* county-grouping requirements dictate that New Hanover, Brunswick, and Columbus Counties be grouped together, and population-equality constraints compel New Hanover County to be divided between SD7 and SD8. [Vol. IV Tr. 842:14-843:7]. Using political data, mapdrawers placed in SD8 the six New Hanover County precincts that performed weakest for Republicans. [Vol. IV Tr. 843:8-13]. Racial data was not used in that choice. [Vol. IV Tr. 844:3-6].

18.    Legislative Defendants' expert, Dr. Barber, corroborated this testimony with a circumstantial review of the redistricting choices. Comparing maps with precincts shaded by political and racial data, Dr. Barber observed that the six precincts selected for SD8 were very Democratic-leaning but varied in BVAP, and one precinct with a BVAP between 40% and 50% was not drawn into SD8. [Vol. V Tr. 1060:12-1062:16; LDTX253 at 43; Barber Demonstrative 3]. Dr. Barber concluded from this that SD8 was drawn to gather

8

very Democratic precincts, not to achieve any racial purpose. [Vol. V Tr. 1062:17-1063:1]. That conclusion is sound.

19. Despite this showing of political purpose in SD8, the NAACP Plaintiffs did not even attempt to disentangle race from politics. Most notably, the NAACP Plaintiffs presented no alternative plan "show[ing] how the State 'could have achieved its legitimate political objectives'" while producing "'significantly greater racial balance.'" *Alexander*, 602 U.S. at 34 (citation omitted). Mr. Fairfax admitted he drew no illustrative senate districts in the vicinity of SD8 (New Hanover and Brunswick Counties). [Vol. II Tr. 461:24-462:2]. While the NAACP Plaintiffs pointed to the 2022 senate plan, it plainly does not achieve the General Assembly's political goals, because it was configured to meet the partisan fairness requirements of *Harper I*. *See Harper v. Hall*, 886 S.E.2d 393, 406 (N.C. 2023) (*Harper III*). The point of the 2023 redistricting was to chart a different political course. The 2022 senate plan in fact does not meet the General Assembly's political goals.[2] And the record does not even show that the 2022 senate plan would achieve "'significantly greater racial balance,'" *Alexander*, 602 U.S. at 34, because no evidence shows its racial parameters.

---

[2] The record shows that the movement of six precincts into SD8, as Senator Hise described, shored up the performance of SD7 for Senator Michael Lee, the current majority leader. [*See* Vol. IV Tr. 843:15-17]. The political data that the General Assembly used in drawing districts shows a nearly 2.7% increase in the vote for President Trump in the 2020 Presidential Election from the 2022 senate plan (49.02%) to the 2023 senate plan (51.71%) in SD7. [JX278 at 3; JX149 at 33]. Senator Lee won SD7 by over 10,000 votes in 2024, compared to a much narrower victory of 1,710 votes in 2022. [JX365 at 2; JX368 at 2].

9

20. This omission compels an adverse inference against the NAACP Plaintiffs. "Without an alternative map," the NAACP Plaintiffs here cannot "defeat [the] starting presumption that the legislature acted in good faith," which "directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Alexander*, 602 U.S. at 10 (citing *Abbott*, 585 U.S. at 610–12). The NAACP Plaintiffs did not overcome this adverse inference.

21. Rather than attempt to shoulder their legal burden, the NAACP Plaintiffs resorted to tricks, contending that *Alexander*'s partisan gerrymandering defense is unavailable to Legislative Defendants because they successfully moved for summary judgment on the NAACP Plaintiffs' malapportionment claim. [Vol. VI Tr. 1511:10-22; Vol. V Tr. 1019:17-1020:22]. This misconstrues all claims concerned. The Court rejected the malapportionment claim because no evidence showed "a deliberate and systematic policy of overpopulating a disfavored class of districts and underpopulating a favored class of districts," [D.E.98 at 22], not because the senate plan was blind to politics. Quite the opposite, the Court recognized that the summary judgment record proved "what the Supreme Court has repeatedly acknowledged: some amount of politics is 'inescapable,' and 'inseparable' from the apportionment enterprise." [D.E.98 at 28-29 (internal citations omitted)]. Senator Hise testified at his deposition—which was before the Court on summary judgment—that political considerations drove the contours of SD7 and SD8. [*See* D.E.82-14 at 457:18-458:12, 471:1-16].[3]

---

[3] This refutes the NAACP Plaintiffs' inexplicable assertion that they were surprised by his nearly identical trial testimony. [Vol. V Tr. 1019:17-22].

22.     The NAACP Plaintiffs erroneously conflate a malapportionment claim with a non-justiciable partisan-gerrymandering claim. [*See* D.E.140 at 9 ("much of Plaintiffs' argument … is more akin to a partisan gerrymandering claim than a malapportionment claim")]. Motive behind "deviations," *Harris v. Ariz. Indep. Redistricting Comm'n*, 578 U.S. 253, 259 (2016), is not the same as motive behind the "decision to place a significant number of voters within or without a particular district." *Miller*, 515 U.S. at 916. Otherwise, a malapportionment claim would be nothing but the type of partisan-gerrymandering claim rejected in *Rucho v. Common Cause*, 588 U.S. 684 (2019). Moreover, under Plaintiffs' conflation of motive for deviations and motive for movement of people, every showing of racial predominance would also make out a malapportionment claim for a plan exhibiting any deviation from perfect equality, since racial goals will not ordinarily be "legitimate considerations." *Harris*, 578 U.S. at 258. But no case has found these showings intermingled. That is because a legislature can move voters and precincts to obtain a certain goal (such as partisan advantage) without rigging deviations to purposefully under- and over-populate districts on a system-wide basis.

23.     It is, then, a *non-sequitur* for the NAACP Plaintiffs to argue that, because they failed to create a triable fact question that partisanship motivated district deviations, Legislative Defendants are estopped from relying on the General Assembly's undisputed political motivations. With nothing beyond this flawed syllogism, the NAACP Plaintiffs' claim against SD8 failed as an evidentiary matter at trial.

11

## B. Intentional Vote Dilution and Intentional Discrimination

24. Though more elaborate, Plaintiffs' discrimination claims failed along similar lines. No trial evidence proved that race was considered at all, let alone that it was a but-for cause of any district configurations. *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 303 (4th Cir. 2020). Nor did Plaintiffs prove the requisite effect.

25. "Whenever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State," and this rule "takes on special significance in redistricting cases," given that redistricting is "the most vital of local functions." *Abbott*, 585 U.S. at 603 (citation omitted). Plaintiffs' discrimination claims merit additional sensitivity because of their "gravity." *Singleton v. Allen*, -- F.Supp.3d --, No. 2:21-cv-01291, 2025 WL 1342947, at *213 (N.D. Ala. May 8, 2025). Racial-gerrymandering claims require no proof of intent to harm minority voters or of actual harm; a legislature can engage in racial gerrymandering without "bad faith." *Covington v. North Carolina*, 316 F.R.D. 117, 129 (M.D.N.C. 2016), *aff'd*, 581 U.S. 1015 (2017). Indeed, the typical racial-gerrymandering claim (and most all successful ones) involve efforts to comply with the VRA that prove mistaken in hindsight. *See Alexander*, 602 U.S. at 8; *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 205–06 (4th Cir. 2024) (describing the General Assembly's struggles under this standard)).

26. By contrast, Plaintiffs' discrimination claims assert "bad faith," at least in some sense. *See Abbott*, 585 U.S. at 610. The relevant "purpose" is not merely racial, but for "diluting minority voting strength," and that "effect" must be shown as well. *Shaw I*, 509 U.S. at 641. That means the districts must operate as "a purposeful device to minimize

12

or cancel out the voting potential of" Black voters. *Miller*, 515 U.S. at 911. A finding that this standard is met would be "a rare one in the modern era." *Singleton*, 2025 WL 1342947, at *213. The *Singleton* decision—which has been appealed—undercuts Plaintiffs' claims by emphasizing how Alabama was "in unusual territory." *Id.* at *206. The Supreme Court affirmed an injunction requiring a second majority-minority district, and the Alabama legislature enacted a new plan without one, exhibiting in the process the "intention not only to refuse a remedy for the likely vote dilution [the district court] found, but to prevent a remedy altogether." *Id.*; *see id.* at *203 ("Not only did the Legislature enact a plan that refused to provide for an additional opportunity district; what's more, when they embedded their findings in that refusal, they inserted a guardrail designed to prevent a federal court from providing that district."). The district court's voluminous findings—including direct evidence of racial intent, *id.* at *205–06,—reflected "the gravity of the issues." *Id.* at *206.

27.    This case lacks such serious predicates. Instead, it follows the pattern the Supreme Court cautioned would emerge after *Rucho*, as litigants "repackage a partisan-gerrymandering claim as a racial-gerrymandering claim by exploiting the tight link between race and political preference." *Alexander*, 602 U.S. at 21. That is all Plaintiffs have done, except they style most of their claims as purposeful-discrimination claims.

28.    It is therefore backwards for Plaintiffs to assert that *Alexander*, a racial-gerrymandering case, is uninformative on their discrimination claims. Given the stakes, and the incentive to apply a racial label on partisan claims, there are enhanced reasons to demand that plaintiffs bringing discrimination claims with only circumstantial evidence disentangle race from politics, as *Alexander* directs. Otherwise, plaintiffs could plead

13

around *Rucho* without limitation. The same point follows from doctrinal first principles. Because it must be proven that the districts were configured "'because of,' not merely 'in spite of,' [their] adverse effects upon an identifiable group," *Feeney*, 442 U.S. at 279, maps configured to achieve political goals are not unconstitutional, even if they have a racially disparate impact and even if the legislature is aware of that. Given the interplay between race and politics, *Alexander*'s observation about the similar outcomes of racial and political gerrymandering, 602 U.S. at 9, applies equally here. To spurn *Alexander*'s teachings based merely on Plaintiffs' choice of labels would impermissibly open the door for findings of invidious discrimination from the "racially disproportionate impact" of political goals. *Arlington Heights*, 429 U.S. at 265. Because "the primary obstacle" in all redistricting cases is "the presumption of legislative good faith," *Alexander*'s holdings on race and politics provide important guidance here. *See Christian Ministerial All. v. Jester*, No. 4:23-cv-471, 2025 WL 1635282, at *8 (E.D. Ark. June 9, 2025) (three-judge court).

## 1. All direct evidence militates against a finding of discriminatory intent.

29.     As noted, discrimination claims require proof that race was "a 'but-for' motivation for the enactment." *Hunter*, 471 U.S. at 232. The starting point, again, is "the presumption of legislative good faith." *Alexander*, 602 U.S. at 19–24.

30.     The direct evidence creates a high mountain for Plaintiffs to climb. All of it disproves racial intent of any kind. The 2023 congressional and senate criteria prohibited the use of racial data, [JX038; JX047], and Senator Hise testified that racial data was not used, [Vol. IV Tr. 839:13-15, 854:23-24, 973:3-6, 975:6-13]. Senator Hise explained the

14

race-neutral considerations that drove congressional and senate configurations, [JX038; JX047; Vol. IV Tr. 836:1-839:12, 840:2-21, 854:14-855:13], including the three senate districts and six congressional districts remaining in this case.

31.     The senate plan was predominately drawn to adhere to the *Stephenson* county grouping requirements. [Vol. IV Tr. 837:6-11]. SD8 was drawn to satisfy the *Stephenson* requirements and partisan goals. [*See supra* § I.A]. SD1 and SD2 were dictated by *Stephenson*. [Vol. IV Tr. 841:4-12]. While the counties in the northeastern area of the State could be grouped two different ways, the co-chairs of the 2023 Senate Committee on Redistricting and Elections believed the selected configuration was best in terms of the compactness of SD1 and communities of interest. [Vol. IV Tr. 841:10-842:5].

32.     Similarly, Senator Hise explained that race-neutral considerations, including partisan considerations, drove line-drawing in the congressional plan. [Vol. IV Tr. 855:15-862:17]. Districts were drawn by combining whole counties and then, if necessary, dividing counties to achieve population equality. [Vol. IV Tr. 855:19-23]. Senator Hise also explained that, in addition to the other race-neutral considerations in the criteria, the mapdrawers worked to ensure three districts in the Piedmont Triad—CD5, CD6, and CD10—would perform for Republican candidates, [Vol. IV Tr. 860:24-861:10], and that they expected CD14 in the Charlotte area would as well, [Vol. IV Tr. 962:1-10; *see also* Vol. IV Tr. 860:1-6].

33.     Legislative denials of racial motive may be discredited only based on compelling, contrary evidence. *See Alexander*, 602 U.S. at 19–24. Plaintiffs offer none. They suggest only a general awareness of racial demographics in North Carolina, but

15

"'[r]edistricting legislatures will … almost always be aware of racial demographics.'" *Alexander*, 602 U.S. at 22 (quoting *Miller*, 515 U.S. at 916). "There is nothing nefarious about [a mapdrawer's] awareness of the State's racial demographics." *Id*. at 37. Besides, Senator Hise's testimony on cross-examination indicated, at most, a high-level awareness of racial demographics, which would not enable him to make race-based decisions at the VTD or precinct levels. [*See* Vol. IV Tr. 871:24-872:21]. There is no basis to disregard this dispositive testimony.

### 2. The circumstantial evidence did not establish discriminatory intent.

34.     Plaintiffs' effort to overcome direct evidence with circumstantial evidence presented a "difficult" task. *Alexander*, 602 U.S. at 8. They were not up to it. Plaintiffs presented both expert opinion and inferences they proposed from the redistricting process and elsewhere. Neither approach established invidious intent.

### (a)     Expert Opinion

35.     For their claims against congressional districts, Williams Plaintiffs relied principally on the opinions of Dr. Jonathan Rodden, but he did not establish that racial motive was the but-for cause of any district lines—and did not claim to. He testified that he was "not offering any opinion in this case about any specific intent of the General Assembly in configuring the 2023 Congressional Plan," [Vol. I Tr. 94:10-17], and that his methods did not allow a person "to get into the head of the mapmakers[.]" [*Id.* at 94:18-21; *see also* Vol. VI Tr. 1481:8-12 (similar)]. He confirmed that his analyses were "descriptive" in nature, [*see* Vol. I Tr. 41:1-5, 42:17-20, 58:2-6], and disclaimed that he

16

was "not making a causal claim," [Vol. VI Tr. 1479:4-6], or that he could "say that race causes the outcome," [Vol. VI 1478:17-18]. Where the standard is but-for causation, *Hunter*, 471 U.S. at 232, his opinions fall short of legal significance. That is, they failed to establish that any district is "a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities." *Alexander*, 602 U.S. at 38–39 (citation omitted).

36.     Dr. Rodden was wise to advance only this modest position. His analyses provided no reliable means to sort through "the complex interplay of forces that enter a legislature's redistricting calculus." *Abbott*, 585 U.S. at 603. He offered "a relatively qualitative analysis" where he "analyze[d] the distribution of racial groups in the geography of North Carolina" and the "correspondence between the presence of those groups and municipal boundaries and county boundaries and other geographic features." [Vol. I Tr. 29:22-30:3]. He also offered a "more quantitative" analysis attempting to measure "the extent to which voters are held in and out of districts according to race." [Vol. I Tr. 30:9-13].[4] Because these analyses cannot reliably differentiate a racial explanation from race-neutral explanations (like political motive), they do not prove that race was the but-for cause of a single district line.

---

[4] One overarching problem is that Dr. Rodden's analysis on its own terms is geared to the racial-gerrymandering standard—which concerns racial sorting—rather than the discrimination standard—which concerns intent to dilute votes. Indeed, Dr. Rodden's report looks to *Cooper v. Harris* for guidance, [WX1 at 5] but that is a racial-gerrymandering case, 581 U.S. at 291–92. This provides further reasons to look for *Alexander* for guidance in what is a racial-gerrymandering case in all but name.

37.    Comparisons to the 2022 Court-Ordered Plan. Dr. Rodden's qualitative and quantitative analyses both compare the 2023 congressional plan to the 2022 court-ordered plan drawn by a special master. This is both unhelpful and overtly problematic.

38.    It is unhelpful because the 2022 court-ordered plan was not used as a benchmark in line-drawing. While lawmakers do often "begin with the existing map and make alterations to fit various districting goals," *Alexander*, 602 U.S. at 27, that is not legally required or universally true, and it did not occur here, [Vol. IV Tr. 857:16-858:2]. This is the unusual case where the existing map was one the General Assembly wanted to discard, root and branch. The 2022 court-ordered plan was drawn to achieve specific partisan fairness measures—of which Dr. Rodden was unaware, [Vol. I Tr. 109:22-111:2],—that were required by *Harper I* and improperly "forced the General Assembly [and special masters] to draw the 2022 Plans under a mistaken interpretation of [the North Carolina] constitution." *Harper III*, 886 S.E.2d at 448. Having persuaded the North Carolina Supreme Court to overrule those requirements, the General Assembly naturally desired a map so unlike the 2022 court-ordered plan that it would have been wasteful to use it as a starting point. *Cf. LULAC*, 548 U.S. at 419 ("there is nothing inherently suspect about a legislature's decision to replace mid-decade a court-ordered plan with one of its own").

39.    It makes no sense to attempt to reverse-engineer intent by examining changes from 2022 to 2023 when the line-drawing did not unfold as a series of changes from 2022 to 2023. By comparison, where legislators begin with a prior map, their line-by-line adjustments to that map might say something about their thinking. But the 2022 court-

18

ordered plan was not on the screen and had functionally been placed in a far-away wastebasket when lines were built from VTDs into districts. Thus, a difference between a 2022 boundary and a 2023 boundary, understood at a granular level, reflects no intent about anything. Lines drawn on different blank pages can differ simply because they were drawn at different times on different blank pages.

40.     Dr. Rodden's 2022 comparisons go beyond unhelpful to affirmatively problematic because they reinstate *Harper I*'s standards in a back-door manner. Because "a map that has been gerrymandered to achieve a partisan end can look very similar to a racially gerrymandered map," *Alexander*, 602 U.S. at 9, a plan drawn with the General Assembly's partisan goals will have substantially *different* qualities (including along racial lines) than a plan drawn to satisfy the very different partisan goals of *Harper I*. To treat the 2022 court-ordered plan as a baseline revives the *Harper I* political standards by deeming departures from that plan as impermissibly *racial*. To avoid Dr. Rodden's inferences, the General Assembly would have to achieve the political outcomes *Harper I* directed and *Harper III* withdrew. Resolving those inferences would reimpose *Harper I* as a constitutional standard in federal court even though it has no federal basis and was overruled by the highest state court.

41.     *Alexander* warned that partisan-gerrymandering claims would be relabeled in racial terms, and Plaintiffs' heavy emphasis on the 2022 court-ordered plan suggests such an effort is afoot here.

42.     <u>Qualitative Analyses</u>. Dr. Rodden's review of dot-density maps also did not disentangle race from politics. Dr. Rodden agreed that race and politics are highly

19

correlated in North Carolina, [Vol. I Tr. 51:5-22], but his maps excluded political geography, [Vol. I Tr. 112:6-9]. Dr. Rodden admitted his racially coded maps do not show how "the lines divided people by partisanship," [Vol. I Tr. 112:14-18], or differentiate how political and racial goals impact a voter's "likelihood of inclusion in a district[,]" [Vol. I Tr. 117:2-8]. Everything he said about racial correlation was at least as easily explained by political motive as by racial motive. [*See* Vol. VI Tr. 1349:13-1352:9].

43.     Dr. Rodden's analysis of CD6 and CD10 in the Winston-Salem area and CD12 and CD14 in Mecklenburg County did not show racial sorting. [*See* WX1 at Figs. 4, 6, 7]. Dr. Rodden conceded his analysis of C10 and CD6 concerned only a small population, [Vol. I Tr. 114:20-115:9], and the configurations of CD12 and CD14 to which Dr. Rodden objected follow municipal boundaries, [*see* WX1 at Figs. 6, 7].

44.     Dr. Rodden's other qualitative analyses achieved no legal significance. His compactness analysis compared the 2022 and 2023 plans, and no other benchmark. Nor did Dr. Rodden opine on what a reasonable compactness would be. Dr. Rodden offered opinions about county splits, but he did not dispute that the 2023 congressional plan split two fewer counties than the 2022 court-ordered plan split. [Vol. I Tr. 96:22-97:9, 98:2-4; *see also* JX219 at 20; JX081 at 43].

45.     <u>County Envelope Analysis</u>. Dr. Rodden presented a county envelope analysis as his primary quantitative method. Dr. Rodden described this as "one descriptive approach to thinking about how we measure the extent to which groups are kind of kept in and out of districts in a way that corresponds to race." [Vol. I Tr. 41:1-5; *see also id.* at 42:17-20].

20

But this analysis did not permit Dr. Rodden to draw any "strong inferences about intent," [Vol. I Tr. 42:21-43:6; *see also id.* at 58:2-6], and it was poorly used here.

46.     The envelope method says nothing about racial intent; it only confirmed how far afield statistical efforts to infer it can go. Dr. Barber showed that in an ensemble of 5,000 computer-simulated race-blind maps of North Carolina, the envelope method usually finds half of the districts per map to be racial gerrymanders. [Vol. V Tr. 1036:8-1037:24, 1039:25-1040:18]. Simply put, a plan can be created in a purely race-blind manner, but there is a high probability the envelope method will deem it race-based. Dr. Rodden's conclusions about the 2023 congressional plan are likely flawed in this way.

47.     Dr. Rodden's analysis—his "Core In/Out Analysis," in particular—is unreliable and unhelpful to the extent it uses the 2022 court-ordered plan as a benchmark, as discussed above. The General Assembly did not use the 2022 court-ordered plan as a starting point and thus was not intending to move people from 2022 districts into 2023 districts. By comparison, if the measuring stick is the last congressional plan the General Assembly enacted (from 2021), the results of this type of analysis are entirely different. [LDTX253 at 29-32, Fig. 12]. For example, Dr. Rodden claimed that when comparing 2023 CD6 to 2022 CD6, "'[t]he percent of self-identified Black voters was larger among those moved out of the district [31.54%] than among those moved into the district [14.66%] by roughly 17 percentage points' (Rodden Report, pg. 15)." [LDTX253 at 30]. But if the 2021 plan is used as the comparator instead, the "results for this district entirely reverse," because "the percent of Black voters is *smaller* among those moved out of the district

21

[14.6%] than among those moved into the district [21.6%] by roughly 7 percentage points." [*Id.*].

48.     Dr. Rodden's envelope analysis also ignores political geography and demographic clustering. Dr. Rodden admitted that Black and white voters are not evenly distributed in North Carolina, [Vol. I Tr. 100:21-23], and that partisan and racial clustering exist in North Carolina and have an impact on redistricting. [Vol. I Tr. 101:6-102:12]. He admitted at trial that racial differences on either side of a district line "can emerge from geography alone" and "without any effort on the part of the mapdrawer." [Vol. I Tr. 100:7-18, 56:23-57:12]. By consequence, Dr. Rodden's conclusions are as likely to register race-neutral factors as racial intent and fall far short of but-for causation.

49.     Dr. Rodden's envelope analysis is unreliable for the additional reason that it treats each individual as a separate unit who may be assigned to a district without regard to contiguity and other constraints. Dr. Rodden worked from North Carolina's voter file, but redistricting plans are configured with census data and election results reported by precinct. [LDTX253 at 14-18; Vol. V. Tr. 1034:19-1036:7]. Dr. Rodden admitted that the regressions he ran with his county envelope method "treat[] each individual voter as an independent unit of study," [Vol. I Tr. 105:7-9], so that two voters who live in the same home in Greensboro would be "two different observations in [Rodden's] regression" even though the General Assembly "could not have assigned these two voters to different congressional districts," [Vol. I Tr. 105:10-18; *see also* Vol. V Tr. 1034:19-1036:7 (Dr. Barber); Vol. VI Tr. 1340:20-1341:23 (Dr. Trende)]. This is, then, yet another method too far removed from redistricting to reverse engineer anyone's intent.

22

50.     Other Benchmarks. Dr. Rodden's analysis of simulated plans and draft plans likewise do not show racial intent. Dr. Rodden compared the 2023 congressional plan against Dr. Barber's ensemble of computer-simulated plans and claimed that the 2023 plan is an outlier in BVAP distribution as compared to the ensemble, as well as to plans in the ensemble that "occasionally" achieve the same political outcome of the 2023 plan. [WX2 at 19; *see id.* at 19-27]. But Dr. Rodden conceded that the 5,000 simulated plans were not built to satisfy the General Assembly's 2023 criteria, [Vol. I Tr. 127:6-13; Vol. V Tr. 1041:5-19], and are therefore not an apples-to-apples comparison. Dr. Barber ran the simulations to test whether Dr. Rodden's methods produce false positives, and it was sufficient that the plans were race-blind to conduct that test. But the General Assembly sought much more than blindness to race, and Dr. Barber's simulations do not approximate its other goals. Dr. Rodden, then, cannot flip the script by treating Dr. Barber's plans as comparators to the 2023 congressional plan. If he wanted to do that, he should have run his own simulations—but he did not.

51.     Dr. Rodden's claim was flawed for the additional reason that he counted any plan with 10 Republican-leaning seats as accomplishing the General Assembly's political goals, whereas the 2023 congressional plan had 10 districts with a 55%+ Republican lean. [Vol. I Tr. 128:20-23]. None of the 5,000 simulated plans had ten 55%+ Republican districts. [Vol. I Tr. 129:9-12, 130:2-8]. Accordingly, the 2023 congressional plan is a political outlier, and Dr. Rodden's assertion that it is an outlier in BVAP distribution carries no significance. One would *expect* a political outlier to be a racial outlier as well, where race and politics are intertwined. *See Alexander*, 602 U.S. at 9.

23

52.     Dr. Rodden's rebuttal discussion of draft plans within the General Assembly suffered similar deficiencies. Importantly, Dr. Rodden did not claim that any of these alternate plans would have resulted in minority-opportunity districts eliminated in the 2023 congressional plan. By consequence, this comparison does not get at the requisite intent standard, which requires "a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities." *Alexander*, 602 U.S. at 38–39. Changes between drafts and the final 2023 congressional plan could not have been intended to dilute votes for the obvious reasons that no vote dilution is evident by comparing these plans. [*See infra* § I.B.3]. Indeed, Dr. Rodden did not show that any of these alternate plans have a substantially different racial distribution than the 2023 plan. Thus, they shed no light on racial intent of *any* kind.

53.     <u>Disentangling Race and Politics</u>. Dr. Rodden's analyses do not disentangle race from politics. Legislative Defendants' expert, Dr. Trende, examined politically coded maps and showed that political motive can explain all configurations Dr. Rodden views selectively through a racial lens. [LDTX266 at 38-41; Vol. VI Tr. 1347:19-1349:19]. Utilizing Dr. Rodden's own back-up data, Dr. Trende further showed no discernible pattern in racial composition shifts between districts in the two plans, but there was a clear effort to increase Republican-leaning districts from 2022 to 2023. [Vol. VI Tr. 1349:23-1351:20; LDTX266 at 45-47]. And Dr. Trende showed how the four districts of Dr. Rodden's focus—CD1, CD6, CD12, and CD14—all saw larger changes to their partisan makeup than their racial makeup. [LDTX266 at 48; Vol. VI Tr. 1351:21-1352:9].

24

54. As with the senate plan, [*see supra* § I.A], Plaintiffs have no "substitute map that shows how the State 'could have achieved its legitimate political objectives' in" any district "while producing 'significantly greater racial balance.'" *Alexander*, 602 U.S. at 34 (citation omitted). None of Plaintiffs' experts prepared an alternative congressional plan, and the 2022 court-ordered plan is not a proper comparator for reasons explained. Precedent therefore compels an "adverse inference" that is "dispositive."[5] *Alexander*, 602 U.S. at 34–35.

(b)     Circumstantial Inferences

55. Plaintiffs have pointed to *Arlington Heights*, a decision identifying circumstantial evidence that may help show racial intent, such as "a clear pattern, unexplainable on grounds other than race," "[t]he historical background…particularly if it reveals a series of official actions taken for invidious purposes," the "specific sequence of events leading up to the challenged decision," and the "legislative or administrative history." 429 U.S. at 266–68. These factors all cut against Plaintiffs' claim.

56. Pattern Evidence. A pattern of state action along racial lines "may provide an important starting point" for the intent inquiry, but it is sufficient only in "rare" "cases" where state action is "unexplainable on grounds other than race." *Id.* at 266. Here, that inquiry sets Plaintiffs off in the wrong direction.

---

[5] Even if *Alexander* is understood by way of guidance, rather than directly binding, this point goes much of the way to defeating Plaintiffs' case, which fails by any plausible test of but-for causation.

25

57.     Plaintiffs have claimed that the General Assembly "eliminate[d]" and "dismantle[d]" so-called "minority opportunity districts," [*see* D.E.128 at 5-8; D.E.127 at 18-20], pointing to dicta in *Bartlett v. Strickland*, 556 U.S. 1 (2009), that "serious questions" may arise if "a State intentionally drew district lines in order to destroy otherwise effective crossover districts." *Id.* at 24 (plurality opinion). As an initial matter, Plaintiffs' assertion depends on their across-the-board baseline comparison with the 2022 court-ordered plan, which the General Assembly did not take as its starting point. It is a mismatch for Plaintiffs to claim legislators intentionally dismantled districts they were not working with while drawing maps.

58.     That aside, the General Assembly did not dismantle crossover districts. A "crossover district is one in which minority voters make up less than a majority of the voting-age population," but are in a community "large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate." *Id.* at 13 (plurality opinion). That size component—"large enough"—is key. A district is not a crossover district merely because it usually elects Democratic candidates. The Black population must be large enough to control the outcome with *help* from white voters, not the other way around.

59.     Here, the record reflects two congressional districts with sufficiently high BVAPs that they may qualify as crossover districts, CD1 (40.42% BVAP) and CD12 (38.31% BVAP). [JX081 at 7]. Neither one was dismantled. CD1's BVAP fell in the 2023

26

congressional plan by less than 1%, and CD12's BVAP *increased* to 38.31% BVAP.[6] [JX288; JX081 at 7].

60.    By comparison, Plaintiffs criticize the BVAP changes in districts that are plainly *not* crossover districts. The BVAP in CD9 dropped from 24.57% to 22.36%, and BVAP rose in CD5 (12.51% to 18.73%) and in CD10 (10.51% to 16.58%). [JX288; JX081 at 7]. Whatever one might discern from this, it is neither racial nor related to crossover districts. The changes are much better understood in political terms. So are the changes in CD6, which saw a BVAP decline from 31.65% to 19.31%. [JX288; JX081 at 7]. The district became a majority-Republican district, whereas it was a minority-Republican district in the court-ordered 2022 plan. [JX219 at 2; JX081 at 17]. It is doubtful that a BVAP of less than 32% qualifies the district as a crossover district, and besides, no "pattern" can be inferred from *one* district. *Arlington Heights*, 429 U.S. at 266.

61.    Insofar as Plaintiffs stand on the contention that the 2023 congressional plan harms Democratic candidates (who are typically preferred by Black voters) as compared to Republican candidates (who are typically preferred by white voters), this fails to differentiate race from politics. [*See infra* § II.B.2].

62.    <u>Event Sequence</u>.  The event sequence leading to the 2023 redistricting further defeats the allegations of racial intent and confirms the General Assembly's political intent.

---

[6] It is hard to credit Plaintiffs' assertion that the General Assembly "significantly reduce[d] the chances of Black electoral success" in CD1 "compared to its 2022 benchmark," [D.E.127 at 19], by a BVAP reduction of less than 1%. Even if it were true that CD1 is a less Democratic district, a legislature with invidious racial intent would have dismantled the district by substantially reducing its BVAP. This is further evidence of political motive.

27

63.     Politics was the but-for cause of the redistricting itself. It occurred because Legislative Defendants persuaded the North Carolina Supreme Court that the North Carolina Constitution does not limit the General Assembly's discretion to consider political factors when redistricting. *See Harper III*, 886 S.E.2d at 409, 448–449. Having prevailed in that endeavor, it would have been illogical in the extreme for the General Assembly to turn around and draw race-based districts. It is eminently plausible that it employed political goals with political data, as was its declared intent. Why would it do something else? As in *Alexander*, Plaintiffs "provided no answer to this obvious question." 602 U.S. at 23.

64.     Compared against this most salient aspect of the event sequence, Plaintiffs' process-related contentions miss the plot. Plaintiffs err in taking the *Arlington Heights* factors "as a sequence of disparate, unrelated considerations without a common conceptual core," whereas multi-factor tests are meant to "help courts capture the essence of" an underlying inquiry. *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 504 (2023). Here, procedural irregularities matter only if they "suggest[] the decision-makers were willing to deviate from established procedures in order to accomplish a discriminatory goal." *Rollerson v. Brazos River Harbor Navigation Dist. of Brazoria Cnty. Tex.*, 6 F.4th 633, 640 (5th Cir. 2021). Simply put, the process must suggest invidious racial intent to mean anything.

65.     Plaintiffs' procedural critiques do not show this. The General Assembly certainly departed from recent approaches to redistricting, but that does not make the comparison helpful or establish those approaches were the "normal legislative process." *Raymond*, 981 F.3d at 303. They were not. In 2019, a state trial court ordered the General

28

Assembly to conduct a remedial redistricting in view of the public and prohibited the use of political data. *Common Cause v. Lewis*, 18-cvs-014001, 2019 WL 4569584, at *133–34 (N.C. Super. Ct. Sep. 03, 2019). Complying with this novel dictate, the General Assembly used a lottery machine to select maps. [*See* Vol. IV Tr. 813:14-20, 814:13-16]. The 2021 process was likewise conducted under the shadow of the *Common Cause* ruling, and the 2022 plans were again subject to direct supervision. It is clear that a legislature subject to those constraints, and then freed from them (as occurred in *Harper III*), would depart from those processes, and political motive amply explains that choice. That is not the type of departure from procedural norms that is relevant to racial intent under *Arlington Heights*.

66.     Indeed, the 2023 redistricting *returned* the General Assembly to a long tradition of political redistricting. Redistricting has not traditionally been conducted in public, limited in its political consideration, or had maps selected by lottery machines. Redistricting under the North Carolina Constitution is accomplished by the passage of legislation by the General Assembly. N.C. CONST. art. II, §§ 3, 5 (state legislative districts); *Harper III*, 886 S.E.2d at 419 (congressional districts). The General Assembly in 2023 elected to avail itself of its full prerogatives under state law and tradition. That does not remotely imply racial intent.

67.     Everything else about the process was standard. Redistricting bills were introduced and debated in committees in both chambers, amendments were considered and adopted, and then the bills were voted on the floor of both chambers—just as legislation is normally considered in the General Assembly. The timing of the redistricting process resulted from legislative priorities: the budget came first so that the legislature could "focus

29

solely on drawing the maps" and adhere to election deadlines. [Vol. IV Tr. 834:16-835:12]. "[T]he brevity of the legislative process [cannot] give rise to an inference of bad faith—and certainly not an inference that is strong enough to overcome the presumption of legislative good faith." *Abbott*, 585 U.S. at 610.

68.     To solicit public feedback, the General Assembly held additional public hearings—building on the record from the public hearings held in 2021 and 2022—and opened a public comment portal that was available until the plans were completely passed by the General Assembly. [Vol. IV Tr. 862:24-863:13, 863:18-864:10]. Senator Hise also explained that "[e]very member of the legislature had the ability to go in and access Maptitude with central staff," [Vol. IV Tr. 867:6-14], and Democratic members had the opportunity to and did offer amendments to the plans. Amendments from these Democratic members that were drawn consistent with the criteria—namely, without racial data—were successful, while others that did not were ultimately tabled. [Vol. IV Tr. 845:17-846:23].

69.     The Williams Plaintiffs object to the 2023 repeal of N.C. GEN. STAT. § 120-133, which was enacted in 2013. This repeal carries no legal or practical significance. The repealed law provided that certain documents sent to, or prepared by, legislative employees related to redistricting became public records upon the act establishing the relevant district plan becoming law. *Id.* § 120-133(a) (2023). The statute further provided that "[p]resent and former legislative employees may be required to disclose information otherwise protected by G.S. 120-132 concerning redistricting" upon the act establishing the relevant plan becoming law. *Id.* Hence, this statute applied only to legislative employees and documents they prepared, not to legislators, whose redistricting materials and

30

communications have always enjoyed the same protections that govern all their materials and communications. And, repeal of the statute acted to treat redistricting legislation the same as every other class of legislation considered by the General Assembly, for which state law permitted legislators or employees to claim confidentiality. Returning the state to its pre-2013 regime for employees does not reflect intent to thwart transparency as compared to a historical baseline and does not establish racial intent.

70. <u>Series of Official Actions</u>. Plaintiffs can point to no series of recent official actions taken for racial purposes that might suggest racial intent in the 2023 redistricting. The racial-gerrymandering cases of last decade again cut against Plaintiffs' allegations. While the General Assembly was found to have configured districts predominantly based on race, a panel of this Court made clear that it did *not* find that "the legislature acted in bad faith or with discriminatory intent in its redistricting." *Covington*, 316 F.R.D. at 129. The General Assembly believed it needed to use race in redistricting to comply with the VRA, which federal courts found to be a misapprehension of law. *See Pierce*, 97 F.4th at 204–05; [*see infra* § I.B.2.b ¶¶ 74-79 (describing in more depth the competing hazards of liability)]. The General Assembly *learned* from this experience and *excluded* racial considerations here. Given that courts directed it not to engage in racial gerrymandering, and held that political goals are permissible, this history strongly suggests the General Assembly's intent was political, not racial, in 2023.

71. Plaintiffs rely on other historical evidence from decades ago. [*See* NAACPPX179]. But "[a] legislature's past acts do not condemn the acts of a later legislature, which [courts] must presume acts in good faith." *Raymond*, 981 F.3d at 298.

31

The Supreme Court has made clear that "[t]he allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination" and "'past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful.'" *Abbott*, 585 U.S. at 603 (citation omitted).

72.     Supposed Disregard for the VRA. Looking to the recent *Singleton* decision, Plaintiffs supplement their *Arlington Heights* contentions with a theory that the General Assembly acted in "willful disregard of the VRA." [*See* Vol. VI Tr. 1510:5-15]. Plaintiffs ask the Court to infer invidious intent because the General Assembly did not create majority-Black districts in northeastern North Carolina, [*see* D.E.127 at 18], or achieve Plaintiffs' preferred racial goals in congressional districts. [D.E.128 at 5-8].

73.     This is among the contentions that goes beyond unhelpful to affirmatively problematic. Stripped of rhetorical flourish, Plaintiffs are effectively counting as *racial* the General Assembly's choice *not* to draw districts based on race. This is, to put it gently, backwards.

74.     Everything any legislature does related to race and redistricting must be understood against the "competing hazards of liability" arising from the Equal Protection Clause and the VRA. *Abbott*, 585 U.S. at 587 (citation omitted). If a legislature creates a majority-minority district in an attempt to comply with the VRA, its intent will likely be deemed predominantly racial, and it will have to justify its choice under strict scrutiny. *See Cooper*, 581 U.S. at 300. If it chooses not to use race, it risks a VRA Section 2 claim asserting it should have drawn districts "precisely because of race." *Abbott*, 585 U.S. at 586. But no court has held that if the legislature takes the latter path, it also risks a finding

32

of intentional discrimination for its *lack* of racial intent. Quite the opposite, the Supreme Court has warned that "it would be uniquely perverse" to fault a state "simply because it made the laudable effort to disregard race altogether in the redistricting process." *Alexander*, 602 U.S. at 19 n.6.

75.     These difficulties fully explain—and amply justify—the General Assembly's choice to draw race-blind. *Cf. id.* at 64 (Thomas, J., concurring) ("the lack of manageable standards for districting claims and the unfortunate trajectory of the Court's Voting Rights Act precedents combine to make it impossible for States to navigate these hazards"). North Carolina's majority-minority districts that have been subject to litigation have nearly always been subject to strict scrutiny—including all purposefully created to hit a majority-minority mark—and none has survived that onerous standard. *See Pierce*, 97 F.4th at 205–06. In light of that history, the General Assembly's election against race-based redistricting was the obvious choice—and one that demonstrated proper respect for the Constitution. [*See, e.g.*, Vol. IV Tr. 839:22-840:1; JX002 at 4:17-5:17; JX003 at 34:5-10]. This was "laudable." *Alexander*, 602 U.S. at 19 n.6. Indeed, it is perverse for Plaintiffs to contend the General Assembly's past racial-gerrymandering errors are evidence of bad faith in 2023 and to turn around and contend it should have drawn race-based districts in 2023.

76.     To compare this case to *Singleton* is to flip that decision on its head. *Singleton* was explicit that the case did not involve legislative error in "navigating the twin hazards of constitutional and statutory liability." 2025 WL 1342947, at *196. The starting point for the holding on racial intent was that the Supreme Court had already done the navigating. It

33

found in *Milligan* "that a map with only one Black-opportunity district very likely unlawfully diluted the votes of Black Alabamians." *Id.* In that scenario, a legislature's choice is between adhering to the federal-court directive by drawing another majority-minority district or else declining and permitting the court to fashion a remedial map itself—and neither choice reflects invidious intent. *Id.* at *205. The problem in *Singleton* was that the Alabama legislature made extensive efforts to frustrate *any* implementation of the federal rulings by passing a plan without the second majority-minority district and striving to prevent the court from fashioning a remedy. *Id.* at *205–06. The panel in *Singleton* believed this "unusual" approach crossed the line.[7] *Id.* at *206.

77.     The *Singleton* ruling has no conceivable applicability in the absence of prior federal rulings. Plaintiffs' analogizing "is like Hamlet without the prince." *Cooper*, 581 U.S. at 346 (Alito, J., concurring in part and dissenting in part). There is no "willful disregard of the VRA," [*see* Vol. VI Tr. 1510:5-15], where no court—let alone the Supreme Court—has held that the VRA requires any given district in North Carolina. And that is especially clear where federal courts rejected as unconstitutional every purposefully created majority-minority district in North Carolina subject to adjudication last decade. It is clearer still when even Plaintiffs do not believe the General Assembly should have created majority-minority districts, except in one corner of the senate plan. Elsewhere,

---

[7] This raises interesting questions for appeal, as the court effectively used findings of invidious intent as a substitute for a contempt ruling where it implicitly acknowledged contempt would have been unavailable. *See id.* at *203 (explaining that federal courts fashion their own remedies where legislatures are "unwilling" to do so). Such questions will be for the Supreme Court to decide in that case; they are far removed from this case.

34

Plaintiffs demand crossover districts, but Section 2 "does not require crossover districts." *Bartlett*, 556 U.S. at 23 (plurality opinion).

78.     It takes a fair measure of mettle for the NAACP Plaintiffs to compare a letter their counsel sent to the General Assembly to a judgment of the United States Supreme Court. The "preliminary" analysis regarding the region of SD1 and SD2, [Vol. IV Tr. 913:9-15; NAACPPX47 at 3], bears none of the weight the NAACP Plaintiffs assign it. To state the obvious: letters from lawyers are not like Supreme Court rulings. Moreover, the letter did not provide evidence of legally significant racially polarized voting or even request majority-Black districts in any plans. Instead, the letter requested that the committee adopt a different county grouping that resulted in what they identified as a crossover district. *Pierce*, 97 F.4th at 208; [NAACPPX47 at 5]. No law demanded a crossover district.

79.     Furthermore, this letter was self-described as preliminary. Senator Hise considered its contents but determined it did not provide evidence of legally significant racially polarized voting. [Vol. IV Tr. 913:9-12, 914:5-12, 864:11-865:18]. Senator Hise knew from experience, including in *Cooper* and *Covington*, that if the legislature drew districts based on race without this evidence, those districts would be declared illegal racial gerrymanders. [*See* JX002 at 4:17-5:17]. The General Assembly did not act in bad faith or with discriminatory intent in declining to follow a letter carrying no authority or meaningful information whatsoever.[8]

---

[8] Criteria elevating compliance with the VRA over neutral districting principles have been cited in past racial-gerrymandering litigation as evidence of racial predominance. *See Bethune-Hill*, 326 F. Supp. 3d at 144 (three judge court); *Covington*, 316 F.R.D. at 131. The omission of a VRA directive in North Carolina's 2023 redistricting criteria was the

Case 1:23-cv-01057-TDS-JLW    Document 164-1    Filed 08/05/25    Page 38 of 74

### 3. Plaintiffs did not prove discriminatory effect.

80.     Plaintiffs' failure to prove intent is dispositive. In any event, they also failed to establish the requisite effect. As explained, their claims require proof of effect "to minimize or cancel out the voting potential of" Black voters. *Miller*, 515 U.S. at 911. The evidence falls short of that. It establishes, unsurprisingly, that a plan configured by a Republican-controlled legislature benefited Republican electoral interests more than a plan configured by special masters to meet "fairness" goals (that were later deemed unmanageable). But neither the Fifteenth Amendment nor the VRA forbid that outcome.

81.     A threshold difficulty for the effects inquiry is identifying a proper comparator. In "Fifteenth Amendment proceedings" alleging vote dilution, a "comparison must be made with a hypothetical alternative," demonstrating "what the right to vote *ought to be*." *Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 334 (2000) (*Bossier Parish II*) (emphasis in original). Moreover, the comparison must establish a *racially* invidious effect; the Constitution does not condemn a plan merely because, under it, Republican candidates win, and Democratic candidates lose. *See Whitcomb v. Chavis*, 403 U.S. 124, 150 (1971). Under these standards, no comparators Plaintiffs offer establish a discriminatory effect.

82.     As explained, Dr. Rodden analyzed certain draft plans before the General Assembly and claimed that they achieved greater racial balance than the 2023 congressional plan. [*See* WX3 at 11-15]. This exercise in some cases could be probative,

---

product of a reasonable calculation of legal risk that cannot, as Plaintiffs suggest, fairly be construed as bad faith. The record is clear that General Assembly took account of state and federal law, including the VRA, and believed they were satisfied. [*See* JX002 4:17-5:17, 8:24-9:11, 10:20-25].

such as if the legislature had race-blind plans achieving its political goals, and then modified them to dilute *minority* voting strength. But Dr. Barber showed that the minor changes in BVAP across these draft plans did not result in different electoral outcomes for Black voters. For example, none of the districts in the Triad in the three alternative plans, where Dr. Rodden focused his analysis (CMT-1, Springhetti 3, and Springhetti 3v2), has a Republican partisan index much below 54%, making it unlikely they would be competitive for a Democratic candidate (assuming a Democratic candidate is Black-preferred). [LDTX254 at 31, Fig. 6]. It cannot seriously be contended that these plans show "what the right to vote *ought to be*" from Plaintiffs' perspective. *Bossier II*, 528 U.S. at 334. Indeed, these plans are evidence against Plaintiffs because they show that a race-blind draw (especially in the form of the drafts)[9] does not yield a meaningful different result, even if it is assumed—contrary to all evidence—that race-based considerations entered the picture at that point.

83. Comparisons to the 2022 court-ordered plan fare no better. An initial problem, explored above, is the lack of nexus between the 2022 court-ordered plan and legislative intent, where the General Assembly was not drawing from 2022 districts. Accordingly, a showing of effect from a comparison between the 2022 court-ordered plan and the 2023 plan would lack a coherent nexus to any viable intent theory.

84. That aside, no evidence reflects racially discriminatory effect in CD1 and CD12, both of which performed in 2024 for Democrats whom Plaintiffs identified as the

---

[9] Moreover, several of these draft plans were never seen by the drafters of the 2023 congressional plan. [*See* Vol. VI Tr. 1251:1-3 (Springhetti)].

Black-preferred candidates. [*See* JX369; WX6 at 5, Fig. 3 (CD12); NAACPPX208 at ¶ 70 (CD1)]. Plaintiffs cannot credibly claim discriminatory effect where their candidates of choice prevailed. As discussed above, the BVAP of these districts did not meaningfully change between plans. The BVAP of CD1 decreased by less than one percent from the 2022 court-ordered plan (41.23%) to the 2023 plan (40.42%), and increased by over two percent in CD12 from 2022 (35.96%) to 2023 (38.31%). [JX288; JX081 at 7].

85.    The remaining districts do not have sufficiently sizeable Black population to permit an inference of racially discriminatory impact. As explained above, [*see supra* § I.B.2.b], the BVAP in CD9 dropped (24.57% to 22.36%), and BVAP rose in CD5 (12.51% to 18.73%) and CD10 (10.51% to 16.58%). [JX288; JX081 at 7]. CD14 had a BVAP of just 20.68% in the 2022 court-ordered plan and 15.93% in the 2023 plan. [*Id*.]. It is unclear from these figures what this says about Black electoral opportunity as such. Even if Democratic fortunes are diminished, the Fifteenth Amendment does not protect Democrats. And Plaintiffs have presented no evidence teasing out this difference, as might occur by an analysis of Democratic primary elections. *Cf. Agee v. Benson*, No. 1:22-CV-272, 2023 WL 8826692, at *53 (W.D. Mich. Dec. 21, 2023) (three-judge court) (criticizing statistical analysis lacking "primary-election data"). Accordingly, even if a discriminatory effect results from dismantling of crossover districts, *Bartlett*, 556 U.S. at 24, that is not proven here.

86.    Like their intent claim, Plaintiffs' effects claim is problematic because it asserts special constitutional protection for individuals in their capacity as members of a political party. Dr. Palmer admitted that in his performance analysis, the phrase "Black-

preferred candidate" could be replaced with "Democrat" and still be accurate, [Vol. I Tr. 191:25-192:6; *see* WX4 at 7; *see* WX6 at 5], and that his analysis shows that the 2023 congressional plan had, on average, better electoral outcomes for Republican candidates in the 2024 elections, [Vol. I Tr. 192:18-21; WX6 at 5-6]. Proof that the 2023 congressional plan elects fewer Democratic members than the 2022 court-ordered plan does not establish minimization or cancellation of minority voting strength. *See Whitcomb*, 403 U.S. at 150–60.

87.     Finally, the analysis of the senate plan is even more straightforward. There is no evidence of a comparator district and no evidence of voting patterns suggesting dilution for SD8. [*See* NAACPPX189 at 4, ¶ 8(a) (referencing analysis of only SDs 1, 2, 5 and 11), and 19-43; NAACPPX208 at 3, ¶ 6(a) (referencing analysis of only SDs 1, 2, 5 and 11) and 9-21)]. While Plaintiffs compare SD1 and SD2 against illustrative plans prepared by Mr. Fairfax, it is shown below that those plans do not comply with North Carolina law. [*See infra* § II.A.1]. The General Assembly could not have adopted them, so its failure to do so cannot be deemed a discriminatory effect.

## II.     The NAACP Plaintiffs Failed To Establish a Section 2 Effects Claim

88.     The remaining claim is the NAACP Plaintiffs' Section 2 effects claim against SD1 and SD2 in northeastern North Carolina. This claim differs from the claims above, which are grounded in an intent requirement, because Section 2's results-based claim "turns on the presence of discriminatory effects, not discriminatory intent." *Milligan*, 599 U.S. at 25. Section 2's "requirements," however, are "exacting." *Id.* at 30. Claims under this standard "have rarely been successful in recent years," and the Supreme Court has

39

signaled that this is as it should be, as "judicial intervention" must be limited "to 'those instances of intensive racial politics' where the "excessive role of race in the electoral process denies minority voters equal opportunity to participate." *Id.* at 29–30 (cleaned up).

89.     Section 2 provides for liability where, "based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a" protected minority group "in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). In construing this dictate, the Supreme Court has "tak[en] its cue from the Senate Report, [which] provided a non-exhaustive list of factors to be considered in determining whether § 2 had been violated." *Brnovich*, 594 U.S. at 660. Yet, "[w]hile many or all of the factors listed in the Senate Report may be relevant to a claim of vote dilution through submergence in multimember districts, unless there is a conjunction of the following circumstances, the use of multimember districts generally will not impede the ability of minority voters to elect representatives of their choice." *Thornburg v. Gingles*, 478 U.S. 30, 48 (1986). "Stated succinctly, a bloc voting majority must *usually* be able to defeat candidates supported by a politically cohesive, geographically insular minority group." *Id.* at 48–49.

90.     Accordingly, Section 2 challengers must prove "three threshold conditions": (1) that the relevant group is "'sufficiently large and geographically compact to constitute a majority' in some reasonably configured legislative district"; (2) that the group is "politically cohesive"; and (3) that a white majority votes "'sufficiently as a bloc' to usually

40

'defeat the minority's preferred candidate.'" *Cooper*, 581 U.S. at 301–02 (citation omitted). "Unless these points are established, there neither has been a wrong nor can be a remedy." *Growe v. Emison*, 507 U.S. 25, 40–41 (1993). But these showings are insufficient on their own. "If a plaintiff makes that showing, it must then go on to prove that, under the totality of the circumstances, the district lines dilute the votes of the members of the minority group." *Abbott*, 585 U.S. at 614. The NAACP Plaintiffs have failed to make these showings.

### A. *Gingles* Preconditions

#### 1. Plaintiffs failed to establish the first precondition.

91. The NAACP Plaintiffs' trial evidence failed to meet the first precondition, which requires proof that the minority group is "sufficiently large and geographically compact to constitute a majority in a reasonably configured district." *Milligan*, 599 U.S. at 18 (alteration marks omitted). This precondition "specifically contemplates the creation of hypothetical districts." *Magnolia Bar Ass'n, Inc. v. Lee*, 994 F.2d 1143, 1151 n.6 (5th Cir. 1993). These districts must satisfy "traditional districting principles such as compactness, contiguity, and respect for political subdivisions." *Milligan*, 599 U.S. at 27. Moreover, because reconfiguring some districts in a plan will prompt "a cascade of changes" in neighboring districts, *Pierce v. N.C. State Bd. of Elections*, 713 F. Supp. 3d 195, 223 (E.D.N.C.), *aff'd*, 97 F.4th 194 (4th Cir. 2024), the NAACP Plaintiffs must adduce complete illustrative plans that are reasonably configured, not merely alternative districts in isolation, *see Negron v. City of Miami Beach*, 113 F.3d 1563, 1571 (11th Cir. 1997) (explaining that "an incomplete plan" does not satisfy the first precondition); *cf.*

41

*Banerian v. Benson*, 597 F. Supp. 3d 1163, 1169 (W.D. Mich. 2022) ("a districting plan is like a Rubik's Cube: every adjustment requires still more adjustments").

92.     The illustrative districts that the NAACP Plaintiffs sponsor, [NAACPPX182 at 52-68], do not meet this test because they contravene North Carolina's county-grouping requirements, [LDTX253 at 46-49]; *see Pierce*, 97 F.4th at 204. Those rules "prohibit[] any county from being 'divided in the formation of a senate district.'" *Pierce*, 713 F. Supp. 3d at 222 (quoting N.C. CONST. art. II, § 3(3)). "If a county's population is too small to form a district alone, then the North Carolina Constitution (as construed in *Stephenson I*) requires the General Assembly to meet the WCP requirements 'by combining or grouping the <u>minimum</u> number of whole, contiguous counties necessary to comply with the at or within plus or minus five percent one-person, one-vote standard.'" *Pierce*, 713 F. Supp. 3d at 222–23 (quoting *Stephenson I*, 562 S.E.2d at 397) (emphasis in original). "Redistricting plans can 'depart from strict compliance' with the Whole County Provision 'only to the extent necessary to comply with federal law,' like the VRA." *Pierce*, 94 F.4th at 228 (quoting *Stephenson I*, 562 S.E.2d at 397).

93.     To comply with these rules, the General Assembly has used "an algorithm to determine county groupings for each chamber in the General Assembly to minimize the number of counties traversed by district lines." *Pierce*, 713 F. Supp. 3d at 223; [*see also* Vol. II Tr. 449:13-23; NAACPPX200 at ¶ 20 ("The county clusters are 'largely algorithmically determined through an optimization procedure outlined by the NC Supreme Court in *Stephenson v. Bartlett*.'") (quoting Christopher Cooper et al., *NC*

42

*General Assembly County Clusterings from the 2020 Census*, QUANTIFYING GERRYMANDERING, https://sites.duke.edu/quantifyinggerrymandering/files/2021/08/countyclusters2020.pdf)]. After the 2020 census, a group of mathematicians used an algorithm to produce two optimal county groupings for northeast North Carolina, *Pierce*, 713 F. Supp. 3d at 223, and the General Assembly selected the enacted groupings for SD1 and SD2 from those two options, [*see* LDTX253 at 47 n.29; JX051].

94.    Dr. Barber demonstrated that both illustrative plans break those existing county grouping boundaries: six county clusters composing six districts are divided in Illustrative Senate Map A, and five districts were impacted in Illustrative Senate Map B. [LDTX253 at 46-49; Vol. V Tr. 1054:14-25]:

Figure 21: Senate County Grouping Violations in Illustrative Senate Maps



Note: County groupings are outlined in blue. Illustrative districts are shaded and labelled.

[LDTX253 at 49, Fig. 21].

43

95.     Mr. Fairfax did not dispute this fact. [*See* NAACPPX200 at ¶ 22 (acknowledging Dr. Trende and Dr. Barber's statements about Mr. Fairfax's districts crossing county clusters were "accurate")]. At trial, Mr. Fairfax admitted he could not draw a reasonably configured VRA district within the existing county grouping options. [Vol. II Tr. 450:8-25]. Instead, Mr. Fairfax claims to have drawn "new districts" and subsequently what he called "groupings … from the districts." [Vol. II Tr. 475:16-17]. But this approach contravenes North Carolina law, which requires that "legislative districts required by the VRA shall be formed prior to creation of non-VRA districts," *Stephenson I*, 562 S.E.2d at 396–97, and then, the county groupings are to be built around the VRA districts using "non-VRA districts," *id.* Therefore, Mr. Fairfax should have drawn his VRA districts, and then created *Stephenson*-compliant groupings in the remaining area and drawn his non-VRA districts from those groupings.

96.     Mr. Fairfax did not comply with this process. Mr. Fairfax made no attempt to create *Stephenson*-compliant groupings through the use of an algorithm or other technical process. After drawing his VRA districts, Mr. Fairfax simply drew additional districts in the remaining area which resulted in what he referred to as new groupings. [Vol. II Tr. 475:16-17]. When asked if he checked if the groupings created from his new districts would have complied with *Stephenson*, Mr. Fairfax could only say that "[w]hat [he] was attempting to do was to use whole counties of the districts that [he] created -- from the districts that [he] created, in essence, creating a new set of county groupings, if you will." [Vol. II Tr. 476:11-22]. In turn, Mr. Fairfax's districts did not comply with *Stephenson*, [*see* LDTX253 at 48-49], which is not satisfied merely because an expert eyeballs

44

configurations and applies the term "grouping." Mr. Fairfax justified this process based on his belief that his districts needed to comply with the *Stephenson* county traversal rules and counties could be split multiple times because he was "adhering to the Voting Rights Act." [Vol. II Tr. 469:12-470:18, 471:3-17, 476:5-10; *see also* NAACPPX200 at ¶ 22]. However, VRA Section 2 "never requires adoption of districts that violate traditional redistricting principles." *Milligan*, 599 U.S. at 30 (alteration omitted) (citation omitted).

97. In any event, the VRA justification does not work for either of Mr. Fairfax's illustrative plans (Illustrative Plan A and Illustrative Plan B).

98. Illustrative Plan A is not reasonably configured because Mr. Fairfax violated the *Stephenson* requirements to create a majority-Black district that the VRA plainly does not require. Illustrative Plan A divides Pitt County into three districts (Illustrative SD5, SD4, and SD3), even though its population is small enough to be contained within a single senate district. [Vol. V Tr. 1056:12-1057:21; LDTX253 at 49]. These maneuvers change SD5 into a majority-Black district, but the VRA does not require this. SD5 in the 2023 senate plan is a performing minority crossover district with a BVAP of 40.35%. [NAACPPX208 at 20, Tbl. 5].[10] Increasing its BVAP was a plain violation of Supreme Court precedent, which holds that Section 2 does not require that a performing crossover district be raised to a majority-minority district, because Section 2 can "be *satisfied by* crossover districts." *Cooper*, 581 U.S. at 305. Disregarding state law to raise SD5's BVAP

_____

[10] The fact that the General Assembly did not dismantle SD5 in 2023 is further evidence against Plaintiffs' allegation that its purpose was dismantling crossover districts.

Case 1:23-cv-01057-TDS-JLW    Document 164-1    Filed 08/05/25    Page 48 of 74

is not justified by the VRA, so it is not reasonably configured in Illustrative Plan A. That plan fails to carry the NAACP Plaintiffs' burden.

99. In fact, Illustrative Plan A creates problems in terms of minority opportunity by removing Black residents of Pitt County from a performing crossover district (SD5) into illustrative SD3, which would not likely afford them the opportunity they currently have. Simply put, to hit abstract racial goals, Illustrative Plan A harms individual Black voters. The Supreme Court has made clear that Section 2 does not permit government actors to "trade[] off" the "rights of some minority voters…against the rights of other members of the same minority class." *Johnson v. De Grandy*, 512 U.S. 997, 1019 (1994).

100. Illustrative Plan B is also not reasonably configured because its *non*-VRA districts violate state law. Illustrative Plan B splits Wilson and Lenoir counties between SD4 and SD1 and SD3 and SD4, respectively. [Vol. II Tr. 482:18-20; NAACPPX182 at 61, Fig. 17]. These are *not* VRA districts, so Mr. Fairfax's VRA justification falls flat. *See Stephenson I*, 562 S.E.2d at 396–97. Even if illustrative majority-minority districts themselves may contravene the grouping and traversal rules, the *neighboring* non-VRA districts remain subject to them, and, as explained, demonstrating a reasonably configured majority-minority district requires showing that it can be configured as part of a reasonably configured plan. *Negron*, 113 F.3d at 1571. Illustrative Plan B fails in this regard.

101. Illustrative Plan B's failings carry substantive significance insofar as minority opportunity is concerned; they cannot be overlooked. As noted, SD5 in the 2023 senate plan is a crossover district, not a majority-minority district. *See Bartlett*, 556 U.S. at 13. The state-law violations in Illustrative Plan B appear intended to achieve, at least in

46

part, the preservation of SD5 in its 2023 form, where the cascade effect of a new majority-Black district would otherwise dismantle it. But to freeze SD5 in place where the Whole County Provision demands that it be broken up (due to the impact of Mr. Fairfax's changes in surrounding districts) is plainly unlawful because a crossover district cannot "justify a violation of state law, namely the Whole County Provision." *Pierce*, 97 F.4th at 204; *see also id.* at 228 (explaining that breaking the county-grouping rules for a crossover district is "legally forbidden"). That holding restates *Bartlett*, where the Supreme Court held that, because § 2 does not require crossover districts, the Whole County Provision cannot be breached to create one. 556 U.S. at 7–8, 24–25; *see also Pierce*, 97 F.4th at 228 ("federal law did not require North Carolina to 'override' the Whole County Provision in that case to retain a crossover district").

102.    Mr. Fairfax's disregard for state law where it remains applicable leaves no way to tell what a reasonably configured whole plan would do to SD5. It seems probable that, under a proper application of *Stephenson*, SD5 would be broken up—i.e., dismantled—if SD1 or SD2 were reconfigured to hit a 50% BVAP quota. The configuration would give minority opportunity with the one hand and take it away with the other. Because Section 2 liability does not exist "if the alternative to the districting decision at issue would not enhance the ability of minority voters to elect the candidates of their choice," *Abbott*, 585 U.S. at 617, "the first *Gingles* condition requires the possibility of creating *more than the existing number* of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice," *Johnson*, 512 U.S. at 1008 (emphasis added); *LULAC*, 548 U.S. at 435. Plaintiffs have not shown this. They have

47

shown "only that lines could have been drawn elsewhere, nothing more." *Johnson*, 512 U.S. at 1015. As already explained, Supreme Court precedent rejects proposals that would do nothing but "trade[] off" the "rights of some minority voters…against the rights of other members of the same minority class." *Id.* at 1019. Because "a § 2 violation is proved for a particular area," *Shaw v. Hunt*, 517 U.S. 899, 917 (1996) (*Shaw II*), eliminating minority opportunity in some districts to create minority opportunity in another is improper, *see id.* (rejecting as "a misconception of the vote-dilution claim" the view that a majority-Black district may be drawn "anywhere").

103.    Additionally, Mr. Fairfax's proposed majority-Black districts connect "disparate" and "scattered" pockets of Black population that are demographically dissimilar. [*See* LDTX276 at 59-62; Vol. VI Tr. 1366:7-1367:15]. That is not geographically compact. *See LULAC*, 548 U.S. at 433 ("The first *Gingles* condition refers to the compactness of the minority population, not to the compactness of the contested district." (citation omitted)).

104.    Further, race was the predominant purpose in Mr. Fairfax's line-drawing. *See Milligan*, 599 U.S. at 33 (plurality opinion) ("The line that we have long drawn is between consciousness and predominance."). Mr. Fairfax ignored nearly all the Senate's redistricting criteria and repeatedly used racial data to create and guide his illustrative plans. [Vol. II Tr. 466:25-468:17, 471:18-472:2; *see also* LDTX276 at 62-74; LDTX253 at 59-61; Vol. VI Tr. 1368:25-1369:16]. It would be perplexing for the Court, in a case where the General Assembly "made the laudable effort to disregard race altogether in the redistricting process," *Alexander*, 602 U.S. at 19 n.6, to compel it to engage in race-based

48

line drawing, *cf. Pierce*, 97 F.4th at 225 (warning of "real risk of imposing racially gerrymandered districts").

### 2. The NAACP Plaintiffs failed to establish the third precondition.

105. The Section 2 claim fails for the independent reason that trial evidence did not establish the third precondition, which requires proof of a "racial bloc voting that is 'legally significant.'" *Pierce*, 97 F.4th at 212 (citation omitted). The Supreme Court recognized in *Gingles* that "in the absence of significant white bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters." 478 U.S. at 51 n.15. It has since reiterated this point. *See Voinovich v. Quilter*, 507 U.S. 146, 158 (1993). It has also recognized the other side of that coin: "[i]n areas with substantial crossover voting"—i.e., white voting for minority-preferred candidates—"it is unlikely that the plaintiffs would be able to establish the third *Gingles* precondition." *Bartlett*, 556 U.S. at 24 (plurality opinion). Thus, the Fourth Circuit has explained that "[t]he key inquiry under *Gingles'* third factor . . . is whether racial bloc voting is operating at such a level that it would actually minimize or cancel minority voters' ability to elect representatives of their choice, if no remedial district were drawn." *Pierce*, 97 F.4th at 212 (quotation and alteration marks omitted). Because a remedial district is a majority-minority district, *Bartlett*, 556 U.S. at 19, polarization lacks legal significance where a majority-minority district is unnecessary, *id.* at 18; *Pierce*, 97 F.4th at 213 (explaining that a VRA remedy is "a district in which the BVAP exceeds 50% plus one vote" (quotation and alteration marks omitted)); *Pierce*, 713 F. Supp. 3d at 230.

49

106. This standard was not met at trial. Plaintiffs did not show that majority-Black districts are necessary in northeast North Carolina to secure equal Black electoral opportunity, and Legislative Defendants demonstrated that they are unnecessary. [*See* LDTX242 at 31-34; LDTX244 at 13-15; Vol. I Tr. 193:25-194:4 (Palmer); Vol. II Tr. 410:12-15 (Oskooii)]. Neither Dr. Oskooii nor Dr. Palmer conducted a district-effectiveness or "BVAP needed to win" analysis in this case. [Vol. I Tr. 193:19-24; Vol. II Tr. 403:24-404:5]. While "a district effectiveness analysis is [not] required for proving a VRA violation in every Section 2 case," it is "probative." *Pierce*, 97 F.4th at 218. Plaintiffs' experts made no effort to show that majority-Black districts are necessary to secure equal Black opportunity in the region by other means. [Vol. I Tr. 193:25-194:4; Vol. II Tr. 410:12-15].

107. In fact, all expert analyses and opinions—including reports on actual election results—show that majority-Black districts are unnecessary to provide that equal opportunity. [*See* LDTX244 at 13-14; Vol V. Tr. 1175:23-1176:8]. Plaintiffs' illustrative plans drawn at just barely above 50% BVAP perform in 100% of elections analyzed. [NAACPPX 208 at 21, Tbl. 6; Vol. II Tr. 405:5-406:18, 408:12-409:24; NAACPPX210 at 7, Fig. B-7]. Dr. Palmer also agreed there was substantial crossover voting statewide; other than in Virginia, Dr. Palmer has not encountered white crossover voting at a statewide level as high as 41.7% and on average of 29.6%. [Vol. I Tr. 183:2-20].

108. Critically, Plaintiffs' experts did not rebut Legislative Defendants' expert Dr. Alford's finding that "White and Black Democrats are similarly situated with regard to their ability to influence elections. Both will be able to elect candidates of choice if they're

50

in majority-Democratic districts." [Vol. V Tr. 1151:10-1152:11]. This unrebutted finding is dispositive for the third precondition where Plaintiffs must be able to show that "the ability of minority voters to elect their chosen representatives is inferior to that of white voters." *Gingles*, 478 U.S. at 51 n.15.

109.    These findings are consistent with the findings of numerous courts, including the Supreme Court, that polarization in northeast North Carolina falls short of legally significant levels. *See Pierce*, 713 F. Supp. 3d at 232–33; *Pierce*, 97 F.4th at 214. To configure a majority-minority districts under these conditions would be unconstitutional.[11] *See Cooper*, 581 U.S. at 301–06.

## B.    Totality of the Circumstances

110.    Even if the NAACP Plaintiffs are able to satisfy all three *Gingles* preconditions, they have failed to make the "ultimate" showing of vote dilution under "the totality of the circumstances." *Gingles*, 478 U.S. at 78. "The ultimate determination of vote dilution under the Voting Rights Act … must be made on the basis of the 'totality of the circumstances.'" *Lewis v. Alamance County*, 99 F.3d 600, 604 (4th Cir.1996) (alteration marks omitted). "[S]imply clearing the *Gingles* hurdles, while necessary to prove a possible violation of § 2, is not sufficient to establish an actual violation." *United States v. Charleston Cnty., S.C.*, 365 F.3d 341, 348 (4th Cir. 2004). "If these preconditions are met, the court must then determine under the totality of circumstances' whether there has been

---

[11] This is particularly clear for SD5, which (as explained) Mr. Fairfax raises above 50% BVAP in Illustrative Plan A in violation of Supreme Court precedent. *See Cooper* 581 U.S. at 303–06.

a violation of Section 2." *Lewis*, 99 F.3d at 604. These elements are the NAACP Plaintiffs'

"to prove." *Abbott*, 585 U.S. at 614; *see also Pierce*, 97 F.4th at 218. The NAACP Plaintiffs

did not do so.

### 1. The Senate Factors weigh against Section 2 liability.

111. The totality inquiry is "peculiarly dependent upon the facts of each case" and

requires "an intensely local appraisal of the electoral mechanism at issue, as well as a

searching practical evaluation of the present and past reality." *Milligan*, 599 U.S. at 19

(citations omitted). The Supreme Court recently clarified that Section 2 claims "rarely"

succeed because the statute's "exacting requirements … limit judicial intervention to those

instances of intensive racial politics where the excessive role of race in the electoral process

denies minority voters equal opportunity to participate." *Milligan*, 599 U.S. at 29–30

(quotation and alteration marks omitted). Case law has identified many factors that guide

this holistic inquiry, modeled off the Senate Judiciary Committee report accompanying the

1982 amendments to the Voting Rights Act. *See Gingles*, 478 U.S. at 36–37; S.Rep. No.

97-417, 97th Cong., 2d Sess. (1982), 1982 U.S.C.C.A.N. 177, at 29. These factors, often

called the Senate Factors, do not favor the NAACP Plaintiffs' Section 2 case.

### (a) Senate Factor 1

112. The first Senate Factor evaluates the "extent of the state's historical

discrimination concerning the right to vote against plaintiffs' minority group," *Pierce*, 97

F.4th at 219, and "recent history" is more probative than more remote history, *id.* at 219,

221.

113. Plaintiffs' expert Dr. Bagley largely focused on events prior to 2000, [Vol. III Tr. 680:6-681:6], identifying just one event from this century where a court found evidence of discriminatory intent by the General Assembly, [*see* NAACPPX181 at 25]. Fact witnesses likewise identified historical discrimination that is not recent and does not bear on current voting opportunity.

(b)    Senate Factor 2

114. Senate Factor 2 analyzes the "extent to which voting in the elections of the state…is racially polarized." *Gingles*, 478 U.S. at 37. As shown above and at trial, majority-Black districts are unnecessary in North Carolina and in the areas relevant to this case, as the evidence reflects the existence of "substantial crossover voting." *Bartlett*, 556 U.S. at 24. Even assuming for argument's sake that the NAACP Plaintiffs could establish the third precondition, this evidence nevertheless shows that polarization is muted and makes this case a poor candidate for race-based judicial intervention into a race-neutral process.

(c)    Senate Factor 3

115. Senate Factor 3 assesses the extent of "other voting practices or procedures that may enhance the opportunity for discrimination against the minority group," such as "unusually large election districts, majority vote requirements, [or] anti-single shot provisions." *Gingles*, 478 U.S. at 37 (citation omitted). This factor favors Legislative Defendants.

116. As the Fourth Circuit held in *Pierce*, Senate Factor 3 requires an evaluation of "other voting procedures in operation at the time of the suit," 97 F.4th at 220–221, and

53

not past practices. The NAACP Plaintiffs point to past practices they believe were discriminatory, but the question here is whether the challenged districts interact with other mechanisms in the present to enhance the discriminatory impact of the challenged system. *See, e.g.*, *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1296 (11th Cir. 2020) (finding majority-vote requirement enhanced impact of system lacking in majority-minority districts). The NAACP Plaintiffs show nothing like that here.

117.    The NAACP Plaintiffs pointed to North Carolina's photo ID requirement, but Dr. Bagley admitted at trial that he conducted no analysis to test his speculative claim that Black voters may be dissuaded from turning out because of the photo ID requirement and did not study whether the photo ID requirement has caused lower Black turnout in North Carolina. [Vol. III Tr. 688:17-689:7]. Dr. Bagley also provided no numbers supporting his claim that "Black voters were more likely to have their ballots rejected than white voters as a result of the" photo ID requirement in the 2024 election, [NAACPPX205 at 3]. Those numbers showed that over 99.9995% of Black voters and over 99.9998% of white voters had their ballots counted in the 2024 General Election. [Vol. III Tr. 685:3-16; NAACPPX205 at 3 n.3, 4 n.7; JX363 at 4]. Courts have warned against "statistical manipulation" that "'mask[s] the fact that the populations were effectively identical.'" *Brnovich*, 594 U.S. at 680–81 (quoting *Frank v. Walker*, 768 F.3d 744, 752 n.3 (7th Cir. 2014)). "Properly understood, the statistics show only a small disparity that provides little support for concluding that [North Carolina's] political processes are not equally open." *Id.* at 681.

54

118.    Legislative Defendants' expert, Dr. Taylor, found that North Carolina's basic election practices are typical of those in other states. [LDTX259 at 8-13, 44]. For example, the North Carolina General Assembly does not have cumulative voting or at-large legislative districts. [Vol. VI Tr. 1267:11-25]. Dr. Taylor also showed that both the Eastern Black Belt and Triad counties had a larger share of polling places in the 2022 general election than their respective voting age populations according to the 2020 census. [LDTX259 at 11-13; Vol. VI Tr. 1270:20-1271:18]. The NAACP Plaintiffs' expert did not dispute this. [*See* Vol. III Tr. 682:10-13 (Dr. Bagley "did not [even] review the number of polling places [or] early voting sites in North Carolina")].

(d)    Senate Factor 5

119.    The fifth Senate Factor evaluates "the extent to which minority group members 'bear the effects of discrimination' in education, employment, or health, hindering their ability to participate in the political process." *Pierce*, 97 F.4th at 222 (quoting *Gingles*, 478 U.S. at 45). In *Pierce*, the Fourth Circuit affirmed the district court's finding that "Plaintiffs presented no evidence connecting the [socioeconomic racial] disparities they reported between black and white North Carolinians to official race discrimination or unresponsive elected officials." *Id*. Plaintiffs here likewise failed to show such a connection. In fact, Plaintiffs expert, Dr. Clark, specifically disclaimed seeking or

finding causal connections between North Carolina's history of discrimination and socioeconomic disparities. [Vol. II Tr. 302:7-20].

120. While disparities continue to exist between Black and white North Carolinians across certain socioeconomic factors, the NAACP Plaintiffs' showing falls short of legal sufficiency for two principal reasons.

121. First, comparative studies of North Carolina and other states reflect that to the "extent" racial disparities in North Carolina exist, they are not more pronounced (and can be less) than in the nation as a whole. [LDTX259 at 18-25, 44-45; Vol. VI Tr. 1273:7-1275:4, 1275:20-1276:2]. Dr. Taylor showed that the gaps identified by Dr. Clark in educational achievement in North Carolina between Black and white individuals are similar to or less than national averages, and the proportion of Black residents with college degrees has been increasing over time. [LDTX259 at 18-22; Vol. VI Tr. 1273:7-11, 1274:21-1275:4]. When placed in a national context, North Carolina does moderately well on unemployment and poverty rates, and the Black-white median household income in North Carolina is usually higher than the national figure. [LDTX259 at 23-25].

122. This comparison matters: Section 2's "effects" test was only expected to be satisfied in a minority of cases—even in 1982 when race relations were in a worse place than today. *See Brnovich*, 594 U.S. at 658–59 (recounting the legislative history of § 2); S. REP. 97-417, 33, 1982 U.S.C.C.A.N. 177, 211 (The Senate Report expressly states that in "most communities . . . it would be exceedingly difficult for plaintiffs to show that they were effectively excluded from fair access to the political process under the results test."). Objectors to the 1982 amendments creating a "results" claim insisted that the new test

would create liability in "thousands" of localities nationwide, "they specifically list[ed] a number of states and cities [with] election systems they allege[d] would be vulnerable," and they predicted that a results test would be satisfied based on the absence of proportional representation plus "one other 'factor,' usually the existence of previously de jure segregated schools." S. REP. 97-417, 31, 34, 1982 U.S.C.C.A.N. 177, 209, 212; *see also Miss. Republican Exec. Cmte. v. Brooks*, 469 U.S. 1002, 1010 (1984) (Rehnquist, J., dissenting) (describing concern that original drafting of the "results" test would "lead to requirements that minorities have proportional representation, or devolve into essentially standardless and ad hoc judgments").

123. While the amendment's proponents *could* have responded that America's ongoing social woes justified that revolution, they instead denied that naysayers' predictions would come to pass. The Senate Report expressly states that in "most communities . . . it would be exceedingly difficult for plaintiffs to show that they were effectively excluded from fair access to the political process under the results test." S. REP. 97-417, 33, 1982 U.S.C.C.A.N. 177, 211. The Report explained that, under the pre-*Mobile* § 2 standard, "court[s] distinguished between situations in which racial politics play an excessive role in the electoral process, and communities in which they do not"; that, in a sample of 16 court of appeals Section 2 cases, defendants prevailed in 10; and that even localities with "underrepresentation plus a history of dual schools" were not vulnerable to Section 2 liability. S. REP. 97-417, 33–34, 1982 U.S.C.C.A.N. 177, 211–12. Importantly, most of the so-called Senate Factors considered in vote-dilution cases are analyzed in terms of severity, as the question is the "extent" not the existence of factors tending to show

57

excessive racial politics. *See Gingles*, 478 U.S. at 36–37 (quoting factors 1, 2, 3, 5, and 7). That North Carolina stands on par, and often in a comparatively better position, than the United States as a whole is evidence against Section 2 liability.

124.     Second, Plaintiffs failed to put on evidence establishing a diminished ability of Black North Carolinians to participate in the political process, instead relying on more "ipse dixit." *Pierce*, 97 F.4th at 222. For Plaintiffs to prevail on Senate Factor 5, "what must be shown is that the effects of past discrimination impede the ability of blacks in [SD-1 and SD-2] to participate in the political process." *Teague v. Attala Cnty., Miss.*, 92 F.3d 283, 294 (5th Cir. 1996) (citing *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 866 (5th Cir. 1993)); *see also Gingles*, 478 U.S. at 45 (evaluation of whether political processes are "equally open" depends on a "searching practical evaluation of the present and past reality, and on a functional view of the political process") (citations and quotation marks omitted). Dr. Bagley admitted he did not conduct any analyses that actually show Black voters are "less likely to be able to take time off to vote, to get to the polls, to contribute to a political campaign, or to run for office," [NAACPPX181 at 31; Vol. III Tr. 689:8-690:18], or that show any of the disparities he identified are one of the causes of voter turnout rates, [Vol. III Tr. 693:17-694:3].

(e)     Senate Factor 6

125.     Plaintiffs have failed to prove that Senate Factor 6 favors them. That factor analyzes "whether political campaigns have been characterized by overt or subtle racial appeals." *Pierce*, 97 F.4th at 220.

58

126. First, Plaintiffs failed to show the prevalence of racial appeals from which the Court might find that they "characterize" political campaigns in North Carolina (or northeastern North Carolina). Instead, Plaintiffs appear to believe a handful of examples suffice.

127. Precedent rejects that approach. A showing of "evidence of isolated racial appeals" in recent elections is given very little weight as evidence of whether racial appeals "characterize" elections. *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 700 F. Supp. 3d 1136, 1281 (N.D. Ga. 2023) (rejecting showing of six alleged racial appeals as insufficient). Rather, to make that showing, Plaintiffs must provide a way to "meaningfully evaluate whether these appeals 'occur frequently, regularly, occasionally, or rarely'" in election campaigns—specifically, a "systematic or statistical evaluation of the extent to which political campaigns are characterized by racial appeals." *Id.* at 1281–1282 (quoting *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1024 (N.D. Ala. 2022), *aff'd sub nom.*, *Allen v. Milligan*, 599 U.S. 1 (2023)); *see also, e.g.*, *Ala. State Conference of the NAACP v. Alabama*, 612 F. Supp. 3d 1232, 1311 (M.D. Ala. 2020) (finding only a few examples of racial appeals "carries no weight in Plaintiffs' favor" given a lack of evidence "demonstrat[ing] a pattern, practice, or routine of racial appeals across the electoral landscape"); *LULAC, Council No. 4434*, 999 F.2d at 879 ("Nothing in the district court's opinion indicates that these racial appeals were anything more than isolated incidents.").

128. None of Plaintiffs' experts conducted a systematic or statistical study of racial appeals. [*See* Vol. II Tr. 290:23-291:17; Vol. III Tr. 695:7-696:5]. Dr. Clark primarily focused on just two campaigns, [WX8 at 18; WX12], but never logged search

59

terms, time ranges, searched, or reported the search results for these campaigns in any way, [Vol II Tr. 290:23-291:10]. Dr. Bagley identified just over a dozen examples from a "general search" that could not be replicated. [Vol. III Tr. 695:7-22]. It is therefore impossible to know the universe of campaigns that were included in these experts' evaluation, but Dr. Bagley admitted the number of election contests could exceed 1,600 during the years he studied, [*see* Vol. III Tr. 697:10-698:14], meaning the number of candidates running campaigns in those contests could be several thousand. The Court cannot conclude that racial appeals "occur frequently" or "regularly" in North Carolina campaigns, *Alpha Phi Alpha*, 700 F. Supp. 3d at 1363, by anecdotal evidence suggesting that a racial appeal may be made in a campaign in a small fraction of election contests.

129.    It is also significant that Dr. Bagley did not identify any racial appeals in the state senate or congressional elections—which are the offices at issue in this case—in North Carolina in any election year, [Vol. III Tr. 696:23-697:4], and that there were several election cycles where he did not identify any racial appeals, [Vol. III Tr. 696:6-19].

130.    Many of the racial appeals Dr. Bagley identified were not successful, [Vol. III Tr. 698:23-700:6, 700:22-24, 701:11-12, 704:19-20, 706:1-2], were not made in connection with any campaign or candidate in North Carolina, [Vol. III Tr. 701:16-702:8, 703:1-3, 706:21-24], or are of little probative value, [*see, e.g.*, Vol. III Tr. 702:12-21 (Dr. Bagley admitting that connecting a Black candidate's "wealth to voters' tax dollars could resonate with voters of any race")].

131.    For all these reasons, Senate Factor 6 favors Legislative Defendants.

(f)    Senate Factor 7

132.    Senate Factor 7 also favors Legislative Defendants. This factor analyzes "the extent to which members of the minority group have been elected to public office," *Pierce*, 97 F.4th at 220, an inquiry that properly focuses on the "successful election [] of candidates statewide," *id*. at 221 (citing *Gingles*, 478 U.S. at 40, 74–75) (assessing "the extent to which blacks have been elected to office in North Carolina, both statewide and in the challenged districts"). The focus is not whether Black voters are "underrepresented" under a standard of proportional representation, *Pierce*, 713 F. Supp. 3d at 235–236, but is instead focused on whether "no members," or just a "few," "of a minority group have been elected to office over an extended period of time," *id*. (quoting S. REP. 97-417 at 29 n.115 (1982)). "Forcing proportional representation is unlawful and inconsistent with [the Supreme] Court's approach to implementing § 2." *Milligan*, 599 U.S. at 28.

133.    Thirty-eight Black members were elected to the General Assembly in the 2024 General Election, constituting over 22% of the 170-member body. [LDTX264 at 2]. This is a dramatic increase from the four Black state legislators in office in 1981-82, [JX370 at 2], or even from the nineteen Black state legislators serving a decade later in 1992, [Vol. II Tr. 283:9-11; WX8 at 40, Tbl.12]. This shows a durable pattern of Black electoral success in the General Assembly. Notably, the leaders of the House Democratic Caucus and the Senate Democratic caucus are both Black. [LDTX259 at 30; Vol. IV Tr. 824:2-5].

134.    North Carolina's congressional delegation includes three Black members, each of whom won reelection in 2024. [Vol. II Tr. 275:4-11]. And CD1, which embraces

61

territory of SD1 and SD2, has been represented by a Black member of congress since 1992. [LDTX261 at 20, 23, 25].

135.    Plaintiffs' experts dismiss this Black electoral success by claiming that "Black candidates for the North Carolina General Assembly generally continue to find it difficult to win elections in the Challenged Areas unless the district in which they are running has either a BVAP over 40% or an MVAP over 50%." [NAACPPX205 at 16 (Dr. Bagley); *see also* WX11 at 6 (Dr. Clark claiming "majority-minority districts have been crucial to the success of Black state legislators")]. But the racial composition of districts is not germane; Senate Factor 7 evaluates Black electoral success.

136.    Moreover, even if the inquiry were relevant, it would cut against Plaintiffs. Evidence that majority-Black districts are unnecessary to the success of Black candidates is evidence against a federal-court order demanding a majority-Black district. Only 1 of 50 senate districts and 4 of 120 house districts are majority-Black, [JX149; JX82], so 9 of 10 Black senators and 24 of 28 Black house members were elected to districts in 2024 that were not majority-Black, and Black members were elected in districts with a wide range of racial compositions such as HD54 (11.6% BVAP) and HD56 (11.25% BVAP), [*see* JX082 at 22; JX372]. Electoral results prior to 2024 showed the same. [*See* LDTX243 at 2, Amend. Tbl. 23 (showing 23 out of 26 Black House members elected to non-majority-Black districts in 2022, 17 elected in districts below 40% BVAP, and 5 elected in districts below 25% BVAP)]. It is improper for Plaintiffs' experts to lump majority-minority and crossover districts, as they are not interchangeable. *See Bartlett*, 556 U.S. at 23.

Case 1:23-cv-01057-TDS-JLW    Document 164-1    Filed 08/05/25    Page 65 of 74

(g)    Senate Factor 8

137.    Senate Factor 8 evaluates "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." *Gingles*, 478 U.S. at 37. That is not shown here.

138.    Plaintiffs' experts attempted to show a lack of responsiveness in ways that were incomplete and unpersuasive. Dr. Bagley looked to proposed legislation that the General Assembly did not enact into law, which is a poor indicator of anything. [Vol. III Tr. 707:8-17]. Dr. Bagley acknowledged there would have been a number of instances of legislation passing that were supported by Black voters, but failed to include any such examples in his reports. [Vol. III Tr. 707:18-708:8]. Dr. Stephens-Dougan's responsiveness opinions were extremely limited, and she even agreed that North Carolina has enacted legislation responsive to the concerns of Black voters. [*See* Vol. IV Tr. 790:11-20].

139.    The responsiveness inquiry evaluates the extent of "responsiveness" to minority community concerns—and not merely evidence of "unresponsiveness." *NAACP, Inc. v. City of Niagara Falls*, 65 F.3d 1002, 1023 (2d Cir. 1995). Here, Dr. Taylor provided quantitative data showing that North Carolina officials are responsive. [*See* LDTX259 at 31-32]. He also analyzed government appropriations and found numerous projects addressing the interests of Black North Carolinians. [LDTX259 at 32-33; Vol. VI Tr. 1281:12-1282:2]. Dr. Taylor also found that public-school districts that receive the most per pupil expenditures in North Carolina tend to have large Black populations, [LDTX259 at 35-36], and that all of the county public schools in the Black Belt received low wealth

63

supplemental funding from the State in addition to small county supplemental funding from the State, [LDTX194 at 19, 23; Vol. VI Tr. 1283:24-1284:8].

140.    On the basis of this record, it is apparent that North Carolina's General Assembly is responsive to the needs of the minority community. Senate Factor 8 favors Legislative Defendants.

(h)    Senate Factor 9

The ninth Senate Factor examines whether "the policy underlying the state['s] use of" the challenged districts is "tenuous." *Gingles*, 478 U.S. at 37 (citation omitted). SD1 and SD2, as configured, adhere to state law in a race-neutral manner. Those policies are not tenuous. North Carolina's county-grouping and traversal rules represent a sovereign policy recognized at least as of 1776 that is implemented through objective, neutral, and non-arbitrary means. The State's interest in districts that adhere to county lines to the maximum extent possible "lies at the heart of representative government and thus must be treated with great respect." *Fusilier v. Landry*, 963 F.3d 447, 460 (5th Cir. 2020).

The same is true of the State's desire to comply with federal constitutional principles against racial gerrymandering. *See Pierce*, 97 F.4th at 221 n.10 ("Equally baseless is Plaintiffs' assertion, under the ninth factor, that North Carolina's interests in complying with federal constitutional prohibitions against racial gerrymandering and state constitutional prohibitions against splitting counties are illegitimate considerations."). It is difficult to imagine a more compelling justification for state action than a desire to comply with multiple federal-court rulings condemning the exact race-based redistricting choice demanded in this case. This factor strongly favors Legislative Defendants.

64

## 2. Additional Factors favor Legislative Defendants.

141. The Senate Factors are illustrative, not exclusive. *Pierce*, 97 F.4th at 219. Additional factors cut against the NAACP Plaintiffs' claim.

142. <u>Political Polarization</u>. One factor crucial under the totality of circumstances is "whether partisanship, rather than race, drove polarization." *Id.* at 222. Here, "the party affiliation of the candidates is sufficient to fully explain the divergent voting preferences of Black and White voters" in the contests forming Plaintiffs polarization presentation. *Id.* at 223 (citation omitted); [*see* Vol. V Tr. 1151:3-18, 1160:9-13; LDTX242 at 5-15, 35-36; LDTX244 at 2-4, 10-12]. Dr. Alford explained how Black voters support Democratic candidates, and white voters support Republican candidates, and those patterns hold even in contests where it is possible to control for race. [LDTX242 at 7, 16, 22; Vol. V Tr. 1181:8-19, 1186:20-1187:14].

143. If voters were responding to the race of the candidate, Black voters would provide significantly more support to a Black candidate than to a white candidate, and white voters would show increased opposition to a Black candidate over a white candidate. [LDTX242 at 7; Vol. V Tr. 1186:20-1187:3; LDTX251 at 7]. But here, Black voters are no more supportive of Black Democrats than they are of white Democrats, and white voters are no more likely to oppose a Black Democrat than they are a white Democrat. [LDTX242 at 7; LDTX251 at 7]. For example, white voters were on average equally supportive of the Black Democratic candidates in the 2022 elections in SD1 (23%) and SD11 (17%) as they were of the white Democrat candidates. [LDTX242 at 11, Tbl. 4]. In SD2 and in SD5, white voters were actually more supportive of the Black Democratic candidates (at 19%

and 26%, respectively) than they were of white Democratic candidates (at 18% and 25%, respectively). [*Id.*].

144.    The 2024 elections showed further evidence of polarization based on the party of the candidate: the gap between Black voter support for the Democratic candidate and white voter support for the Democratic candidate was approximately 70 to 80% across the relevant Senate geographies, while the impact of the race of the candidate was near zero. [LDTX244 at 3, Tbl. 1; Vol. V Tr. 1192:2-14]. These results clearly show "partisan polarization rather than racial polarization." [LDTX251 at 7; *see also* LDTX242 at 7; Vol. V Tr. 1182:3-15].

145.    "[A] model that accounts for the candidate's race can provide probative evidence about causation," *Pierce*, 97 F.4th at 223, because it enables "the effects of partisanship and race on voting [to be] isolated and measured," *Charleston Cnty.*, 365 F.3d at 352. In this case, the record isolates race and politics in at least two ways.

146.    First, in partisan contests between white candidates, as noted, voting behaviors are polarized along political lines to the same degree as they are polarized in cases the present a racial choice. [LDTX242 at 6-11; LDTX244 at 2-4; LDTX251 at 2-4]. This set of elections controls for race and shows an equal level of polarization regardless of whether a racial choice is present.

147.    Second, the 2016 state supreme court contest presented a racial choice (between Black and white candidates) but not a partisan choice, and polarization disappeared: a majority of white voters in SD1 favored the Black-preferred candidate (who was Black), and crossover voting in the other geographic areas examined (SD2, SD5, and

66

SD11) ranged from 39% to 44%. [LDTX242 at 7-8, Tbl. 1; Vol. V Tr. 1183:20-25]. While Plaintiffs attempted to dismiss the contest as "a single election," [Vol. V Tr. 1199:25-1200:1], it is the only contest on record that presented a racial choice but not a partisan choice that permits these factors to be "isolated and measured," *Charleston Cnty*, 365 F.3d at 352. This evidence is highly probative and uncontradicted by other evidence.

148. Neither of Plaintiffs' experts show that racial polarization, as opposed to partisan polarization, is responsible for voting patterns in North Carolina. [Vol. I Tr. 201:17-202:7 (Palmer); Vol. II Tr. 403:15-22 (Oskooii)].

149. <u>Proportionality</u>. Another key analysis is "the proportionality inquiry, comparing the percentage of total districts that are [minority] opportunity districts with the [minority] share of the" population. *LULAC*, 548 U.S. at 436. Proof of the *Gingles* preconditions, "without more, does not make the result vote dilution when the minority group enjoys substantial proportionality." *Johnson*, 512 U.S. at 1015–16. "One may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast." *Id*. at 1017. Accordingly, the Supreme Court in *Johnson* held that vote dilution will ordinarily not exist where minority voters in the relevant "area would enjoy substantial proportionality." *Id*. at 1014. This factor merits "great weight." *Fairley v. Hattiesburg Mississippi*, 662 F. App'x 291, 300–01 (5th Cir. 2016); *see also Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist*., *No. 1*, 56 F.3d 904, 912 (8th Cir. 1995) (observing that this consideration "has recently been given special importance by the Supreme Court").

67

150. In *Johnson*, the substantial proportionality of Hispanic opportunity districts to Hispanic voting-age population was so decisive that the Supreme Court reversed a finding of Section 2 on that basis alone. *See* 512 U.S. at 1014–15.

151. Here, the State, with a BVAP of 20.1% (or 21.37%, using the Any-Part Black metric) elected 38 Black members to the General Assembly, constituting over 22% of the body. [LDTX264 at 2; JX149 at 13; WX11 at 3; Vol. II. Tr. 282:6-12]. That exceeds proportionality. The congressional delegation likewise meets proportionality with three Black members (21.4%). [Vol. II Tr. 275:4-11].

152. The enacted plans protect Black voters from "political famine," and the NAACP Plaintiffs sued—not to prevent that—but to obtain a court-ordered "political feast." *Johnson*, 512 U.S. at 1017. While the General Assembly did not match the State's BVAP with majority-Black districts, that was because the three-judge court in *Covington* (affirmed by the Supreme Court) rejected that approach, criticizing the General Assembly for having configured a plan "so that African-American voters would have a roughly proportional opportunity statewide to elect their preferred candidates of choice." 316 F.R.D. at 127. There is no colorable basis for the NAACP Plaintiffs to complain that proportionality of majority-Black districts is absent under these circumstances. The proper measure here is "opportunity districts," *see LULAC*, 548 U.S. at 436, and the enacted plans provide them in abundance.

153. The NAACP Plaintiffs' view that the *Gingles* preconditions render a finding of dilution all but inevitable transforms § 2 into an unconstitutional "policy of maximizing majority-black districts." *Miller*, 515 U.S. at 924. "Forcing proportional representation is

68

unlawful and inconsistent with th[e] [Supreme] Court's approach to implementing § 2." *Milligan*, 599 U.S. at 28; *see also id.* at 43 (Kavanaugh, J., concurring) ("*Gingles* does not mandate a proportional number of majority-minority districts."). Compelling more than proportionality is all the more unlawful and unconstitutional. The Supreme Court has rejected as "a legal mistake" the doctrine that "whenever a legislature can draw a majority-minority district, it must do so." *Cooper*, 581 U.S. at 305–06, 309. Plaintiffs' contrary view "may balkanize us into competing racial factions" and "threatens to carry us further from the goal of a political system in which race no longer matters." *Shaw I*, 509 U.S. at 657. The Court is obliged to reject that view.

**CONCLUSION**

For all these reasons, and those stated in the accompanying findings of fact, Plaintiffs' claims fail. The record compels that judgment be entered in favor of Legislative Defendants.

Respectfully submitted, this the 5th day of August, 2025.

**BAKER & HOSTETLER LLP**

By: /s/ Katherine L. McKnight
Richard B. Raile*
DC Bar No. 1015689
Katherine L. McKnight*
DC Bar No. 994456
Trevor Stanley*
DC Bar No. 991207
1050 Connecticut Ave. NW
Suite 1100
Washington, DC 20036
Ph: (202) 861-1500
rraile@bakerlaw.com

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By: /s/ Phillip J. Strach
Phillip J. Strach
North Carolina State Bar No. 29456
Alyssa M. Riggins
North Carolina State Bar No. 52366
Cassie A. Holt
North Carolina State Bar No. 56505
Jordan M. Koonts
North Carolina State Bar No. 59363
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina 27603
Ph: (919) 329-3800

69

kmcknight@bakerlaw.com
tstanley@bakerlaw.com

Patrick T. Lewis*
Ohio State Bar No. 0078314
Key Tower
127 Public Square, Suite 2000
Cleveland, Ohio 44114
Ph: (216) 621-0200
plewis@bakerlaw.com

Erika D. Prouty*
Ohio State Bar No. 0095821
Anna Croyts*
Ohio State Bar No. 0104620
200 Civic Center Drive, Suite 1200
Columbus, Ohio 43215
Ph: (614) 462-4710
eprouty@bakerlaw.com
acroyts@bakerlaw.com


*Appeared via Special Notice

phil.strach@nelsonmullins.com
alyssa.riggins@nelsonmullins.com
cassie.holt@nelsonmullins.com
jordan.koonts@nelsonmullins.com


*Attorneys for Legislative Defendants*

## CERTIFICATE OF SERVICE

I, Phillip J. Strach, hereby certify that I have this day electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will provide electronic notification to counsel of record.

This the 5th day of August, 2025.

NELSON MULLINS RILEY &
SCARBOROUGH LLP

/s/ Phillip J. Strach
Phillip J. Strach
N.C. State Bar No. 29456