# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| SHAUNA WILLIAMS, et al., | |
| *Plaintiffs,* | |
| v. | Civil Action No. 23 CV 1057 |
| REPRESENTATIVE DESTIN HALL, in his official capacity as Chair of the House Standing Committee on Redistricting, et al., | |
| *Defendants.* | |
| _____ | |
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP, et al., | |
| *Plaintiffs,* | |
| v. | Civil Action No. 23 CV 1104 |
| PHILIP BERGER, in his official capacity as the President Pro Tempore of the North Carolina Senate, et al., | |
| *Defendants.* | |

## NAACP PLAINTIFFS' PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. II

INTRODUCTION ........................................................................................................ 1

FINDINGS OF FACT ................................................................................................. 6

   I.    North Carolina Redistricting.............................................................................. 6

      A.    Requirements in North Carolina Redistricting .............................................. 6

      B.    History of Discriminatory Redistricting in North Carolina ............................ 7

      C.    Redistricting After the Release of the 2020 Census....................................... 13

      D.    The 2023 Redraw .......................................................................................... 16

   II.    Procedural History ........................................................................................... 32

      A.    Parties in Consolidated Action No. 23-cv-1104............................................. 36

      B.    Expert Witnesses in Consolidated Action 23-cv-1104 .................................. 43

  III.    The 2023 Senate Plan ...................................................................................... 51

      A.    North Carolina's Black Belt (Senate Districts 1 and 2) ................................. 52

      B.    Senate Districts 7 and 8 ................................................................................ 92

  IV.    The 2023 Congressional Plan ......................................................................... 98

      A.    North Carolina's Black Belt (Congressional District 1) ................................ 99

      B.    The Triad (Congressional Districts 5, 6, 9, and 10) ...................................... 110

   V.    The Senate Factors Findings in Challenged Areas of North Carolina............. 116

      A.    North Carolina Has a Long History of Official Voting-Related Discrimination ...................................................................................................................116

      B.    North Carolina, and Specifically the Areas Challenged by Plaintiffs, Experience Extremely Racially Polarized Elections.................................... 123

      C.    North Carolina Has Contemporary Voting Barriers that Impact Black Vote. ................................................................................................................... 129

      D.    Black and African American Communities in the Challenged Areas Bear Modern Effects of Discrimination ............................................................. 131

      E.    There Is a Longstanding Pattern of Overt and Subtle Racial Appeals in North Carolina and the Challenged Areas, Extending Into Present Day .............. 137

      F.    North Carolina Exhibits Limited Black Electoral Success .......................... 145

      G.    There is a Broad Lack of Responsiveness to the Needs of Black Communities ................................................................................................................... 146

H.     Summary of Factual Findings as to the Senate Factors ................................ 155

VI.     Additional Factual Findings Relevant to the *Arlington Heights* Factors ......... 156

    A.     Procedural Deviations in the 2023 Redistricting Process Compared to Prior Cycles ................................................................................................... 157

    B.     Facts Evidencing a Willful Disregard of the Voting Rights Act ................. 168

    C.     The 2023 Redistricting Criteria Prohibiting Use of Racial Data Do Not Preclude a Finding that Racial Considerations Motivated District Design. 176

CONCLUSIONS OF LAW ........................................................................................ 179

I.     Jurisdiction and Venue ....................................................................................... 179

II.     The 2023 Senate Plan ......................................................................................... 180

    A.     2023 Senate Districts 1 and 2 Violate Section 2 of the Voting Rights Act in Effect. ...................................................................................................... 180

    B.     2023 Senate District 8 Is a Racial Gerrymander in Violation of Fourteenth Amendment ............................................................................................... 231

    C.     [Alternative Conclusions of Law] 2023 Senate District 8 Is Malapportioned in Violation of the Fourteenth Amendment................................................ 237

    D.     The 2023 Senate Plan Violates the Prohibition on Intentional Discrimination under the VRA and the U.S. Constitution .................................................. 247

III.     The 2023 Congressional Plan ............................................................................ 268

    A.     The 2023 Congressional Plan was Designed to Have a Discriminatory Impact on Black Voters in the Black Belt Congressional District 1 and the Triad Districts 5, 6, and 10 ................................................................................. 268

    B.     The Historical Background Supports a Finding of Discriminatory Intent... 271

    C.     Significant Procedural and Substantive Departures in the Redistricting Process and Legislative History of the 2023 Congressional Plan Support a Finding of Discriminatory Intent ................................................................. 272

    D.     The Impact of the 2023 Congressional Plan Bearing More Heavily on Black Voters Supports a Finding of Discriminatory Intent .................................... 272

    E.     The Discriminatory Impact is Not Attributable to Mere Partisanship ......... 275

CONCLUSIONS AND JUDGMENT ......................................................................... 278

## INTRODUCTION

Almost a decade ago, this Court struck down specific state legislative and Congressional districts as unconstitutional racial gerrymanders after finding the North Carolina General Assembly unjustifiably used race as the predominant criteria in configuring those districts. *See Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016), *summarily aff'd*, 581 U.S. 1015 (2017); *Harris v. McCrory,* 159 F. Supp. 3d 600 (M.D.N.C. 2016), *aff'd sub nom Cooper v. Harris*, 581 U.S. 285 (2017). In both cases, Defendants unjustifiably increased the Black Voting Age Population ("BVAP") in districts for the purported reason of complying with Section 2 of the Voting Rights Act, but without first confirming that White voters would vote sufficiently as a bloc to usually defeat candidates preferred by Black voters in those districts, *i.e.*, without properly assessing the third precondition applicable to such claims under *Thornburg v. Gingles*, 478 U.S. 30, 51 (1986). *Covington*, 316 F.R.D. at 124; *Cooper*, 581 U.S. at 302. In other words, legislators increased the BVAP of districts in areas where Black voters were already able to elect their candidates of choice.

Importantly, in the last decade this Court declined to rule that the Voting Rights Act had no application to state legislative districts in North Carolina. *See Covington*, 316 F.R.D. at 178 ("[I]f the General Assembly had demonstrated a strong basis in district-specific evidence that the 'majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate,' *Gingles*, 478 U.S. at 51, and that the other requirements for a Section 2 violation were present in a particular area, the State could have drawn an appropriately tailored remedial district."). Moreover, certain majority-Black state

1

legislative districts went unchallenged. *Covington*, 316 F.R.D. at 178 ("Plaintiffs did not even challenge House Districts 23 and 27, which are reasonably compact majority-black districts . . .").

As particularly relevant here, the Courts in *Covington* and in *Cooper* directly and unambiguously underscored the importance that legislators assess the requirements of the Voting Rights Act when undertaking redistricting. *Cooper*, 581 U.S. at 303-04 ("True enough, a legislature undertaking a redistricting *must assess* whether the new districts it contemplates (not the old ones it sheds) conform to the VRA's requirements." (emphasis added)); *Covington*, 316 F.R.D. at 178 ("Section 2 of the VRA continues to play an important role in redistricting, and legislatures must undertake a district-specific analysis to identify and cure potential Section 2 violations."). This direction to assess the requirements of the Voting Rights Act during any redraw makes sense given the changes that can occur in voting patterns over time, and thus the likelihood that prior assessments based on old election data are too outdated to properly determine whether legally significant racially polarized voting is present in a given area of the state.

To satisfy this requirement, legislators need only meet a "'strong basis' (or 'good reasons') standard" of evidence to proactively draw districts to comply with the Voting Rights Act, a measure of leeway that "gives States 'breathing room' to adopt reasonable compliance measures that may prove, in perfect hindsight, not to have been needed." *Cooper*, 581 U.S. at 293 (quoting *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 195-96 (2017)).

Defendants willfully disregarded these requirements under federal law when they redrew the 2023 state Senate and Congressional plans challenged in this action. This deficient process resulted in challenged districts that severely diminish the voting power and opportunity of North Carolina's Black voters in those areas of the state where they make up a disproportionately high percent of the population: North Carolina's Black Belt in the northeastern area of the state, and the Triad composed of the cities of Greensboro, Winston-Salem, and High Point and their surrounding areas. As the evidence at trial showed, Defendants drafted the challenged districts through a process carefully designed to prevent any genuine consideration or deliberation regarding the requirements of the Voting Rights Act.

Specifically, Defendants not only refused to perform any analysis on the requirements of the Voting Rights Act—a decision purportedly taken in reliance on the aforementioned court decisions that instruct them to do just the opposite—they actively sought to stifle the consideration of the Voting Rights Act by others during the legislative process as well. Defendants waited until mere days before enactment to announce their own refusal to conduct a district-specific Voting Rights Act analysis and to instead request evidence by third parties. Such evidence was presented to them days later in the form of an expert report demonstrating clear evidence of legally significant racially polarized voting in Black Belt Senate Districts 1 and 2. Yet, they summarily dismissed this evidence despite identifying no factual or methodological errors, and without providing any public reason, discussion, debate, or so much as a pause. Further, in designing their 2023 redistricting criteria, which were never subject to public debate or adoption, Defendants cut a provision

3

requiring attention to the Voting Rights Act that was included in 2021, and otherwise weaponized "race-blind" criteria to prevent any public debate of legislative amendments proposed to address the Voting Rights Act.

These decisions cannot be excused by mere partisan considerations or gains, because the protections extended by the Voting Rights Act in these areas of North Carolina are specific to Black—not merely Democratic-leaning—voters. The Court finds that such a clear disregard for the requirements of federal law is sufficient to overcome even the strong presumption of good faith afforded legislators when they engage in redistricting. "Good faith requires presence of honest intention . . . to effectuate the aim . . . ." *Garcia v. Noem*, 348 F.R.D. 594, 600 (D. Md. 2025) (quoting *Carolin Corp v. Miller*, 886 F.2d 693, 700 (4th Cir. 1989)). Here, the evidence supports intention to circumvent, rather than effectuate, the aims of both lawful redistricting and the Voting Rights Act.

To be sure, the presumption of good faith afforded legislators in redistricting "directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 10 (2024). But here, there is no other plausible explanation for the legislature's careful design of a process geared towards circumventing binding federal law mere months after the nation's highest court affirmed its applicability and importance. *See Allen v. Milligan*, 599 U.S. 1, 19, 30 (2023) (applying the standard under *Thornburg v. Gingles*, 478 U.S. 30 (1986) applicable to claims under Section 2 of the Voting Rights Act that "has governed our Voting Rights Act jurisprudence since it was decided 37 years ago" and "reject[ing] Alabama's invitation to change existing law"). The

4

presumption of good faith may be strong, but it cannot grant impunity to legislators who would disregard binding law and thereby relegate voters to one avenue—litigation—to obtain lawful districts in which to cast their ballots.

At base, the evidence here shows that the legislature "knew what federal law required and purposefully refused to provide it"—or, here, even properly consider it—in a "strategic" attempt to diminish Black voting power. *Singleton v. Allen*, No. 2:21-cv-01291-AMM, 2025 WL 1342947, at *6 (N.D. Ala. May 8, 2025). That they may have done so while pursuing partisan objectives does not provide safe harbor for these actions. As the Fourth Circuit has observed, "intentionally targeting a particular race's access to the franchise because its members vote for a particular party, in a predictable manner, constitutes discriminatory purpose . . . even absent any evidence of race-based hatred and despite the obvious political dynamics." *N.C. State. Conf. of the NAACP v. McCrory*, 831 F.3d 204, 222-23 (4th Cir. 2016).

Legislative Defendants' expert evidence fails to rebut the empirical and factual findings presented by Plaintiffs' experts. Instead, Defendants' experts offer opinions premised on new theories of what they think Plaintiffs' evidentiary burden should be, unmoored from current law, in an improper effort to "remake" current jurisprudence "anew." *See Milligan*, 599 U.S. at 23 (rejecting Alabama's "attempt to remake our § 2 jurisprudence anew"). Like the Supreme Court in *Milligan*, we reject that invitation.

After careful consideration of the evidence presented at trial, and for the reasons detailed below, the Court finds that the challenged state Senate and Congressional districts were adopted with intentional discrimination as a motivating factor and that the resulting

5

dilution of Black voting power in those districts constitutes a discriminatory impact. These districts therefore violate Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the Constitution. The Court further finds that the configuration of Senate Districts 1 and 2 presents a clear violation in effect of Section 2 of the Voting Rights Act, and further that Senate District 8 must be struck down as unconstitutional under the Equal Protection Clause of the Fourteenth Amendment.

**FINDINGS OF FACT[1]**

## I.      **North Carolina Redistricting**

### A.  Requirements in North Carolina Redistricting

1.      The North Carolina Constitution requires the North Carolina General Assembly (the "legislature") to revise legislative districts for the state Senate and state House at "the first regular session convening after the return of every decennial census[.]" N.C. Const. art. II, §§ 3, 5. This power is subject to limitations under both state and federal law, including the one-person, one-vote requirements of the United States Constitution and Section 2 of the Voting Rights Act, 52 U.S.C. § 10301. State law recognizes that federal requirements supersede state law requirements, pursuant to the supremacy clauses in Article I, Sections 3 and 5 of the North Carolina Constitution. N.C. Const. art. I, §§ 3, 5.

2.      Under state law, the construction of state legislative districts (but not federal Congressional districts) is governed by the Whole County Provision of the North Carolina

---

[1] [These proposed Findings of Fact and Conclusions of Law focus on evidence adduced by NAACP Plaintiffs' witnesses at trial to conserve judicial resources and in light of Williams Plaintiffs' additional submission, which contains additional evidence offered by Williams' Plaintiffs, much of which further supports a finding in NAACP Plaintiffs' favor here.]

Constitution. The Whole County Provision requires that "[n]o county shall be divided in the formation of a senate district," and that "[n]o county shall be divided in the formation of a representative district." N.C. Const. art. II, §§ 3(3), 5(3). In *Stephenson v. Bartlett*, 562 S.E.2d 377 (N.C. 2002) ("*Stephenson I*") and its progeny, the North Carolina Supreme Court set forth a county clustering system to be used in North Carolina state legislative plans to "harmonize[]" the Whole County Provision with the superseding federal one-person, one-vote requirement. *Harper v. Hall*, 886 S.E.2d 393, 422 (N.C. 2023) ("*Harper III*").

3.      The *Stephenson* line of cases requires that a district or districts be drawn entirely within a county where a county can support a single or multiple districts within its boundaries. Where whole counties cannot, on their own, support the creation of a single state house or senate district, "the requirements of the WCP [Whole County Provision] are met by *combining or grouping the minimum number of whole, contiguous counties* necessary to comply with the at or within plus or minus five-percent 'one-person, one vote' standard." *Id.* at 421 (quoting *Stephenson I*, 562 S.E.2d at 397) (emphasis in original). Importantly, in the *Stephenson* cases the North Carolina Supreme Court made clear that "to ensure full compliance with federal law, legislative districts required by the [Voting Rights Act] shall be formed *prior to* creation of non-VRA districts." *Id.* at 444 (quoting *Stephenson I*, 562 S.E.2d at 396-97) (emphasis added).

B.  *History of Discriminatory Redistricting in North Carolina*

4.      "Unquestionably, North Carolina has a long history of race discrimination generally and race-based vote suppression in particular." *McCrory*, 831 F.3d at 223. As

7

described by Plaintiffs' expert Dr. James Leloudis, efforts by lawmakers in North Carolina to suppress Black votes stretch back to Emancipation, PX179[2] at 3 (Leloudis Report), and have often been "accomplished through legislative actions that have appeared race neutral on their face but have, in fact, targeted minority voters with calculated precision." Trial Tr. vol. III, 536:24-537:4 (Leloudis). That pattern has regrettably continued in the decades since. The hallmark of North Carolina redistricting since the 2010 Census has been the legislature's repeated misinterpretation and circumvention of legal requirements in redrawing state and Congressional districts to diminish the voting power of Black voters.

5.      Following the release of the 2010 Census, the chairs of the House and Senate Redistricting Committees instructed the demographer engaged to redraw district lines (Dr. Thomas Hofeller) to draw 50%+1 BVAP districts wherever a reasonably compact Black population resided, which they then "claimed were necessary for compliance with the VRA." *Covington v. North Carolina*, 316 F.R.D. 117, 127, 168 (M.D.N.C. 2016), *aff'd* 581 U.S. 1015 (2017); *see also Cooper v. Harris*, 581 U.S. 285, 299-300, 310-11 (2017). They claimed to implement this approach to comply with *Gingles*, based upon a general, statewide determination that there was statistically significant racially polarized voting throughout North Carolina. *Covington*, 316 F.R.D. at 171 & n.52. "[T]he Redistricting Chairs testified that they never made any determination whether majority bloc voting existed at such a level that the candidate of choice of African-American voters would usually be defeated without a VRA remedy." *Id.* at 168.

---

[2] NAACP Plaintiffs' exhibits marked NAACPPX are denoted as PX herein.

6.    In the 2015 lawsuit *Covington v. North Carolina*, plaintiffs contested the legislature's configuration of twenty-eight majority-minority legislative districts in predominantly urban areas. 316 F.R.D. at 124. They charged that those districts had been created "through the predominant and unjustified use of race." *Id.* State defendants insisted that "race was not the primary factor used in the redistricting, and that even if it was, their use of race was necessary to serve a compelling state interest – namely, compliance with Section 2 and Section 5 of the Voting Rights Act." *Id.*

7.    In August 2016, the district court rejected both of those arguments. The Court found that Republican lawmakers presented no evidence that they had "a strong basis in evidence" under Section 2 or Section 5 of the VRA to create majority-minority districts in the challenged areas. *Covington*, 316 F.R.D. at 174-76. And while the Court did not reach the issue of whether legislators did so with discriminatory intent, the 2011 redistricting plans concentrated minority voters' influence into a smaller number of districts, with predictable political consequences, by creating majority-minority districts wherever possible and even where Black-preferred candidates already had electoral success. *Covington*, 316 F.R.D. at 139. *See generally id.* at 142-65.

8.    In each case, the legislature's actions "isolated Black voters and limited their political participation[.]" PX179 at 94 (Leloudis Report). Ultimately, the district court ruled that 28 state House and Senate districts drawn after the 2010 Census were unconstitutional racial gerrymanders and ordered the legislature to remedy those districts. *Covington*, 316 F.R.D. at 176-77, *aff'd* 581 U.S. 1015 (2017). In reaching its conclusion, the district court noted that the "[Covington] Plaintiffs, and thousands of other North Carolina citizens, . . .

9

suffered severe constitutional harms stemming from Defendants' creation of twenty-eight districts racially gerrymandered in violation of the Equal Protection Clause." *Id.* at 177.

9.      The legislature drew remedial maps in 2017 under the leadership of Senator Ralph Hise and Representative David Lewis, Chairs of the Senate and House Redistricting Committees, respectively. However, the district court found Black voters were drawn into several new districts that were still racially gerrymandered. This ultimately led the district court to adopt a special master's map for four state House and Senate districts to remedy the racial gerrymandering. *Covington v. North Carolina*, 283 F. Supp. 3d 410, 442 (M.D.N.C. 2018), *aff'd in relevant part* 585 U.S. 969, 977-78 (2018).

10.      Two of North Carolina's Congressional districts were similarly overturned in a decision affirmed by the Supreme Court in *Cooper v. Harris*, where the Court found that the legislature had racially gerrymandered Congressional Districts 1 and 12. 581 U.S. 285, 322-23 (2017). These districts consisted of geographic areas, including portions of North Carolina's northeast, that had been targeted by the legislature for over 20 years. *Id.* at 294-96. The Supreme Court found in *Cooper* that state map-makers set a "racial target" that Black voters should make up more than 50% of the voting age population of Congressional Districts 1 and 12 without performing the requisite analysis to justify this under the Voting Rights Act. *Cooper*, 581 U.S. at 299, 302-06, 311-16. In pursuing this approach, the Court held that the legislature misconstrued the third *Gingles* factor to the detriment of Black voters. *Id.* In defending their voting plan, the defendants in *Cooper* claimed that they performed political gerrymanders. *See Harris v. McCrory*, 159 F. Supp. 3d at 614-15.

10

11.     The *Cooper* Court rejected that claim. In reviewing the trial evidence, the Court concluded that "race, not politics, accounted for [District 12's] reconfiguration." 581 U.S. at 310; *see also id.* at 309-16. This was despite the defendants' argument that the "mapmakers drew their lines . . . to 'pack' District 12 with Democrats, not African-Americans." *Id.* at 307.[3] The Court noted, in particular, the district court's finding that the "denial of race-based districting" by the defendants' mapmaker "r[ang] hollow." *Id.* at 315 (quoting *Harris v. McCrory*, 159 F. Supp. 3d at 620, n.8). And the Court issued a warning with respect to the interplay of the Voting Rights Act and partisanship, admonishing that "if legislators use race as their predominant districting criterion with the end goal of advancing their partisan interests—perhaps thinking that a proposed district is more 'sellable' as a race-based VRA compliance measure than as a political gerrymander and will accomplish much the same thing—their action still triggers strict scrutiny." *Id.* at 308 n.7.

12.     Other challenges were brought to the legislature's redistricting in the aftermath of the *Covington* and *Cooper* decisions. But even after the Supreme Court found the legislature's failure to perform a proper Voting Rights Act analysis unlawful, the legislature did not prioritize analysis of what the Voting Rights Act requires in future redistricting cycles.

---

[3] Defendants had also argued in the district court that District 1 was a partisan gerrymander, but the Court rejected this argument wholesale, finding that defendants had "proffer[ed] no *evidence* to support such a contention" and that there was "nothing in the record that remotely suggest[ed] CD 1 was a political gerrymander[.]" *Harris v. McCrory*, 159 F. Supp. 3d at 615.

11

13.     Instead, the legislature shifted tacks, contending that *Covington* and *Cooper* stood for the proposition that the *Gingles* preconditions could no longer be satisfied *anywhere* in North Carolina. In the 2017 remedial redistricting process following *Covington*, for example, legislative leaders "asserted that the reason they were ignoring racial considerations entirely in drawing the new districts was because they had concluded that the 'third *Gingles* factor' was not 'present' anywhere in the State of North Carolina." *Common Cause v. Lewis*, No. 18CVS014001, 2019 N.C. Super. LEXIS 56, at *313 (Wake Cnty. Sup. Ct. Sept. 3, 2019). But later, they claimed they sought to "satisfy" the Voting Rights Act in constructing the 2017 districts, an explanation the court determined "does not make sense as a legal or factual matter" given their assertions during the redistricting process. *Common Cause v. Lewis*, 2019 N.C. Super. LEXIS 56, at *314.

14.     The *Lewis* court found that the legislature was attempting to manipulate the requirements of the Voting Rights Act. *Id.* at *316 (holding that the Voting Rights Act neither justified the districts drawn by the legislature nor formed the actual motivation for the legislature in drawing them). In rejecting the legislature's efforts to manipulate the Voting Rights Act for partisan gain at the expense of Black voters, the *Lewis* court expressly required that "remedial maps must comply with the VRA." *Id.* at *407-09. Because the legislature had attempted to invoke the VRA after previously contending it did not apply anywhere in North Carolina, the *Lewis* court also ordered that if they "assert[ed] the *Gingles* factors [were] met in any particular district or county grouping, they must not only provide evidentiary support for that assertion, but also must show good cause why they did not compile such evidence during the 2017 redistricting process." *Id.* at *408. The *Lewis*

court also required that in making such a showing, the legislature "must show good cause why they should not be judicially estopped from arguing that the *Gingles* factors are met given their repeated representations to the *Covington* court in 2017 that the third *Gingles* factor was not met anywhere in the State." *Id.*

15.    These decisions from multiple federal and state courts collectively underscore two truths about North Carolina redistricting since the 2010 Census. First, the legislature's process for drawing state legislative districts and federal Congressional districts repeatedly violated both the United States Constitution—including its protections against racial discrimination—and the North Carolina Constitution. And second, the legislature persistently misconstrued the requirements of the Voting Rights Act, often in contradiction of their own previously stated positions, in ways that have disadvantaged Black North Carolinians in the electoral process. As Dr. Leloudis testified, these choices were not isolated missteps but part of a broader "protracted campaign to roll back Black political gains and to limit Black political participation." Trial Tr. vol. III, 542:11-12, 543:5-9 (Leloudis); *see also* PX179 at 88, 93-97 (Leloudis Report).

### C.  *Redistricting After the Release of the 2020 Census*

16.     Due to increases in the state's population reflected in the 2020 Census, North Carolina was apportioned 14 Congressional districts, an increase of one district from the apportionment following the 2010 Census. First Amended Joint Stipulated Facts, Doc. 148 ¶ 37 (hereafter "Stipulated Facts").[4] Data from the 2020 Census was delayed due to the

---

[4] The Joint Stipulation of Facts was initially filed by all parties on June 6, 2025, Doc. 138, and was later amended on June 13, 2025. Doc. 148. All references herein to the "Stipulated Facts" are to Doc. 148.

COVID-19 pandemic and was ultimately released on August 12, 2021. Stipulated Facts ¶ 38.

17.    Before the Census data was released, on August 5, 2021, the legislature's Senate Redistricting and Elections Committee and the House Redistricting Committee convened a Joint Meeting to begin discussing the redistricting process. *Harper v. Hall*, 868 S.E.2d 499, 511 (2022) (*Harper I*); JX244; JX245; Stipulated Facts ¶ 39. Four days later, on August 9, 2021, the chairs of the Joint Redistricting Committee released its "2021 Joint Redistricting Committee Proposed Criteria" for public comment and committee debate. *Harper I*, 868 S.E.2d at 511-12; PX251; Stipulated Facts ¶ 40. The Joint Committee held a public meeting to receive public comment on the proposed redistricting criteria the next day. Stipulated Facts ¶ 41.

18.    On August 12, 2021, the Joint Committee adopted the final redistricting criteria, following amendments to those criteria. JX224; PX248; PX249; PX250; Stipulated Facts ¶ 42. The Joint Committee also debated a public hearing schedule in support of the redistricting process, JX242; Stipulated Facts ¶ 42, which ultimately consisted of thirteen public hearings across ten counties around the state in September 2021. JX241; Stipulated Facts ¶ 43. Several hearings allowed virtual testimony and were held outside of business hours. Stipulated Facts ¶ 44.

19.    On October 5, 2021, the House and Senate redistricting committees convened separately to begin the process of drawing legislative and Congressional district plans, and two days later the legislature released information regarding public access to

14

map-drawing software and submission of public comments, and shared legislator-drawn maps. *See* JX239; Stipulated Facts ¶¶ 45, 49.

20.     Proposed versions of the Congressional and House maps were filed on October 28 and 29, 2021. A proposed version of the Senate map was filed on October 29, 2021. Stipulated Facts ¶ 46. After draft maps were publicly released, four additional public comment sessions were held (two in person in Raleigh, and two online via Webex), and a public comment portal was made available on the legislature's website. JX238 (10/25 In person); JX237 (10/25 Virtual); JX236 (10/26 In person); JX235 (10/26 Virtual); Stipulated Facts ¶¶ 47-48.

21.     The proposed final 2021 state House plan was filed on October 28, 2021, and proposed final state Senate and federal Congressional plans were filed the next day. Stipulated Facts ¶ 50. All three plans were passed on November 4, 2021. *Harper I*, 868 S.E.2d at 513; JX228; JX229; JX230; Stipulated Facts ¶ 51.

22.     The North Carolina Supreme Court subsequently struck down all three 2021 plans as unlawful partisan gerrymanders on February 4, 2022, with the Court issuing its opinion on February 14, 2022. *See Harper I*, 868 S.E.2d 499 (N.C. 2022), *aff'd sub nom. Moore v. Harper*, 600 U.S. 1 (2023). The North Carolina Supreme Court's February 4, 2022, order gave the legislature until February 18, 2022, to enact remedial plans and to submit those plans to the Wake County Superior Court for review. Stipulated Facts ¶ 51.

23.     The legislature submitted proposed remedial plans for the state House, state Senate, and Congress to the Wake County Superior Court. On February 23, 2022, that court issued an order approving the state House and state Senate remedial plans, but rejecting

15

the remedial Congressional districts. *See Harper* I, 868 S.E.2d at 559; Stipulated Facts ¶ 52.

24. The 2022 Congressional elections were conducted under a court-ordered map. The 2022 legislative elections were conducted under remedial plans passed by the legislature. Stipulated Facts ¶ 53.

25. In December 2022, the North Carolina Supreme Court decided *Harper v. Hall*, 881 S.E.2d 156 (N.C. 2022) (*Harper II*). *Harper II* affirmed the Wake County Superior Court's holding against the remedial Congressional plan and its holding approving the remedial state House plan, but reversed that court's holding approving the state Senate plan. 881 S.E.2d at 162; Stipulated Facts ¶ 54. Following the 2022 general election, which resulted in new justices elected to the North Carolina Supreme Court, the legislature petitioned for a rehearing of *Harper*. That request was granted, after which the North Carolina Supreme Court vacated the court-ordered map and allowed the legislature to draw new Congressional, House, and Senate maps. *See Harper v. Hall*, 886 S.E.2d 393 (N.C. 2023) (*Harper III*); Stipulated Facts ¶ 55.

### D. The 2023 Redraw

26. The Co-Chairs of the Senate Redistricting and Elections Committee from January 2023 to December 2024 were Senator Ralph Hise, Senator Warren Daniel, and Senator Paul Newton (hereafter the "Senate Redistricting Chairs"). Stipulated Facts ¶ 1.

27. The North Carolina Supreme Court issued its order allowing for the statewide redrawing of districts in April 2023, and soon after, legislative leadership announced an intent to redraw state Senate and Congressional district lines. *See* PX101; Stipulated Facts

16

¶ 4. On or about April 28, 2023, the Senate Redistricting Chairs understood that they would need to finalize any draft maps by mid-October 2023 to meet the State Board of Elections' deadlines for the primaries the following year. Stipulated Facts ¶ 3. Senator Hise, who led the redistricting process for the Senate and Congressional plans, testified that he assumed the Senate could have started redistricting at any point after April of 2023. Trial Tr. vol. IV, 869:16-24 (Hise).

28.    The Senate Redistricting Chairs began developing redistricting criteria for new Senate and Congressional plans in the summer of 2023. Stipulated Facts ¶ 5. But the legislature did not notify the public that the redistricting process would begin until September 18, 2023, when the Senate Committee on Redistricting and Elections announced three public hearings for the following week: a September 25 meeting at the College of The Albemarle in Elizabeth City; a September 26 meeting at the Hickory Campus of Appalachian State University; and a September 27 meeting at the Legislative Office Building in Raleigh (the "Three September Hearings"). Stipulated Facts ¶ 9.

29.    The time, location, and number of these meetings were agreed upon by the Senate Redistricting Chairs in coordination with the House Elections Committee Chair. Stipulated Facts ¶ 10. Senate leadership scheduled all Three September Hearings during business hours, at 4:00pm. Stipulated Facts ¶ 9. Members of the public expressed that the limited locations offered, short notice, and timing during working hours made it difficult for those who were interested in participating to attend. *See* Trial Tr. vol. II, 370:10-371:10 (Daly-Mack); Trial Tr. vol. IV, 809:10-20 (Smith); JX058 at 34:22-35:7, 83:6-10, 95:23-96:1, 101:24-102:4, JX059 at 29:20-25, 48:22-49:5, 54:16-55:24, 61:14-22, 94:3-14,

17

100:3-6; JX060 at 8:19-9:2, 20:5-8, 27:4-8, 35:12-23. Public notices for all three meetings provided links for members of the public to sign up to speak but specified that "Committee members are not required to attend." JX066-071.

30.     No draft maps were released before the Three September Hearings, Trial Tr. vol. IV, 862:18-22 (Hise), although the Senate Redistricting Chairs had begun drafting plans in September, Trial Tr. vol. IV, 853:22-24 (Hise), and, on or before September 21, 2023, had already drafted in its final form one of the two Congressional district maps that would eventually be proposed publicly. *Compare* JX161 (Draft of CBP-5 timestamped "9/21/2023") *with* JX072 (publicly filed version of S.B.756/CBP-5); Stipulated Facts ¶ 17.[5]

31.     In the notices and public agendas for the Three September Hearings, the only disclosed purpose of the meetings was "to gather public comment for the 2023 redistricting process." *See* JX066-071. No additional information was provided, including no information on what, if any, redistricting criteria were already being used to redraw Congressional or state legislative districts, what criteria the public should use if submitting their own maps, the reasons that the Senate and House Redistricting Committees, legislative leadership, or anyone else felt it was necessary to redraw districts, any anticipated or planned timeline for the redistricting process, or any draft voting plans being considered by the legislature. *See id.*

---

[5] Senator Hise confirmed that the letters associated with a particular map indicate the central staff assisting with drafting, and that timestamps indicate when draft maps were saved. *See* Trial Tr. vol. IV, 920:2-17, 921:16-22 (Hise).

18

32.     On or about September 23, 2023, the legislature also posted a public comment portal for redistricting. Stipulated Facts ¶ 11. This portal stated only that "The House Redistricting Committee and Senate Redistricting and Elections Committee are accepting public comments on House, Senate, and Congressional district plans." JX065 (Public Portal Screen Shot). Like the earlier meeting notices, the portal did not include any deadline by when public comment would have to be submitted in order to be considered by the Redistricting Committees; it also did not include any additional redistricting information, including the criteria being used (but not publicly disclosed) or the anticipated timeline for the redistricting process. *See id.*

33.     On September 25, 2023, a group of more than 50 public interest organizations issued a public letter to the Senate Redistricting Chairs, Chair of the House Standing Committee on Redistricting, and legislative leadership regarding the public redistricting process. Stipulated Facts ¶ 12. The letter requested accessible public hearings to be held after publication of draft maps and at times outside traditional business hours to allow working voters to attend, and that the redistricting committees publicly adopt redistricting criteria. JX046.

34.     Witness testimony reflected a perception that the committee members who attended the public meetings were uninterested in the public's comments, leaving many attendees to conclude that giving testimony was a futile exercise. For example, Plaintiff Syene Jasmin attended both the Elizabeth City and the Raleigh hearings and described feeling like "they just wanted to have the hearing just to have a hearing, just to have it on paper," and after seeing what was done to his area of the state he wondered "what was the

19

point of this." Trial Tr. vol. III, 520:13-23, 525:22-526:6 (Jasmin). Similarly, Senator Kandie Smith testified that attendees were "very disappointed, frustrated, [and] some angry" about the timing of meetings, the lack of draft maps to give comments on, and the lack of interaction with legislators. She observed attendees feeling like "they were not being heard, like we were just sitting and looking at them." Trial Tr. vol. IV, 809:12-810:2 (Smith).

35.     During the September 25 and September 26 hearings, none of the legislative leadership provided additional information about how the redistricting process would unfold or what criteria leadership was using to draw maps. *See generally* JX060 at 2:2-7:2, 37:15-38:6; JX059 at 2:1-6:17, 102:6-12. Nor was this type of information offered in the September 27 hearing until one of the committee members in attendance asked whether any additional hearings would be scheduled in other areas of the state, and Senator Hise confirmed there would be no further hearings. JX058 at 2:1-6:1, 142:23-143:13.

36.     In the public comment provided in each of the Three September Hearings, speakers repeatedly spoke against gerrymandering of any kind and in favor of plans that would provide equal voice to North Carolina's communities. *See, e.g.*, JX058 at 6:2-7:2, 13:14-14:17, 20:15-21:21, 21:24-23:14, 35:20-37:10, 86:1-21, 95:11-97:6, 121:11-122:17, 135:13-137:12; JX059 at 27:4-28:22, 34:13-36:5, 38:9-39:24, 40:2-41:25, 45:6-46:15, 58:25-60:12, 65:1-66:5, 73:14-74:22, 79:22-81:11; JX060 at 10:9-12:11, 27:16-29:2, 29:13-31:3. Speakers also noted the importance of attention to the Voting Rights Act, and protecting minority voters against vote dilution. *See* JX058 at 9:14-10:7 (urging attention to the Voting Rights Act), 34:6-17 (requesting a transparent redistricting process in which

20

"race would be considered within the context of the Voting Rights Act"); JX059 at 23:23-24:2 ("But I can only ask, be fair, be transparent, follow the Voting Rights Act, don't discriminate against minorities, and respect your diverse voting public."), 68:2-11 ("It must be shown that in fact the Voting Rights Act has been complied with."); JX060 at 11:3-6 (requesting criteria that comply with the Voting Rights Act).

37.     In the September 27 hearing, Plaintiff Syene Jasmin asked for a process that "is compliant with Section 2 of the Voting Rights Act" and "to honor our communities of interest and to protect Black voters." JX058 at 95:11-20; JX061 at 1:51:25 (video). Mr. Jasmin specifically addressed the Voting Rights Act in his public comments because he wanted to "make sure the legislators heard that," and he further expressed that he "wanted to prevent" what he saw happening in Alabama with the *Milligan* matter. Trial Tr. vol. III, 522:23-523:19 (Jasmin).

38.     Many other comments came from Triad residents, who requested a district that would unify the Triad as a longstanding community of interest. One High Point resident emphasized that the Triad is "one big community" that "share[s] news, schools, [and] healthcare" and urged the legislature not to divide the Triad across three or four districts. JX059 at 23:5-12. A Greensboro resident asked the legislature not to repeat past redistricting mistakes in the Triad, citing a district that stretched from Greensboro to Boone, and another that split North Carolina A&T's campus; instead, he urged the legislature to "keep the Triad together, that is, Greensboro, High Point and as much of Winston-Salem as is possible within the population constraints." JX059 at 27:4-28:11. Another High Point

21

resident also highlighted past map-drawing that "carved up" his county "all the way to the west border." JX059 at 79:22-81:11.

39.     Many public commenters in the Three September Hearings also expressed concern and frustration at the already-deficient process for redistricting. A common concern was the failure to provide the public with draft maps, thereby preventing members of the public from giving meaningful, informed comments, among other issues. *See* JX058 at 24:5-23, 29:3-23, 81:13-18, 140:8-17; JX059 at 8:19-9:2, 9:20-10:10, 12:14-13:22, 14:1-21, 29:20-25, 52:8-21, 62:12-19, 63:10-21, 74:12-22, 78:12-17, 84:15-85:15, 99:14-100:2; JX060 at 28:14-19, 32:8-12. *See also* JX060 at 15:1-16:15 (requesting public redistricting criteria and public notice of a full timeline for redistricting); JX058 at 97:9-99:14 (noting that little advance notice and no information about redistricting criteria "discourages and prevents meaningful participation" from the public); JX060 at 7:18-8:2 (similar).

40.     At the end of the last redistricting public hearing on September 27, Defendant Hise issued a reminder that the online comment portal was live and stated that comments received would be "emailed as copies to the members of the committee . . . on a weekly basis[.]." JX058 at 142:24-143:10. He then adjourned the meeting without providing any further information on what would occur in the process going forward. *See* JX058 at 143:11-13. At none of the public hearings did the legislature announce that it would forgo conducting a Voting Rights Act analysis or request that third parties provide one. Trial Tr. vol. IV, 901:9-15 (Hise). *See also* JX058; JX059; JX060.

41.     No additional information about the redistricting process, including the criteria being used to draw maps, the anticipated timeline for release of draft maps or

22

enactment, or the opportunity for the public to comment on draft maps, was released to the public in the weeks following the Three September Hearings. Yet, behind closed doors, the Senate Redistricting Chairs were continuing their work to apply the criteria they had privately established before the public meetings to draft Senate and Congressional districts. In addition to the draft Congressional plan, CBP-5, which was completed on or before September 21, 2023 (JX161), the other alternative draft Congressional plan, CCJ-1, was finished on or before October 13, 2023, *see* JX124 (CCJ-1 timestamped "10/13/2023"), as was the draft Senate plan SCJ-1. *See* JX118 (SCJ-1 timestamped "10/13/2023").

42.     On October 18, 2023, the Senate Redistricting Chairs filed S.B. 756 (CBP-5) and S.B. 757 (CCJ-1) as two new proposals to realign Congressional districts, as well as S.B. 758 (SCJ-1) to realign state Senate districts. Stipulated Facts ¶¶ 16-18; *see also* JX040 (S.B. 756 Bill Summary); JX041 (S.B. 757 Bill Summary); JX042 (S.B. 758 Bill Summary). Also on October 18, the Senate Committee on Redistricting and Elections posted district maps, statistical reports (a.k.a. "Statpack" reports), and data files of the proposed maps. Stipulated Facts ¶ 20. They also noticed a meeting for the next day, October 19, 2023, at 2:00 PM to discuss the filed bills. JX048; Stipulated Facts ¶ 19.

43.     After the release of S.B. 758, S.B. 756, and S.B. 757, Statpacks with racial information were released at the direction of the Senate Redistricting Chairs. Stipulated Facts ¶ 21; JX002 at 5:24-6:9; JX388 (SCJ-1 Statpack with Race); JX102 (CBP-5 Statpack with Race); JX387 (CCJ-1 Statpack with Race).

44.     The Senate's proposals for new Congressional and state Senate districts were first discussed in the Senate Redistricting Committee Meeting the next day, October 19, at

23

which time the criteria used to draft the maps was provided to Members of the Senate Committee on Redistricting and Elections. *See* Stipulated Facts ¶ 26; JX038 ("2023 Congressional Plan Criteria"); JX047 ("2023 Senate Plan Criteria"); JX002 at 3:10-16.

45. Senator Hise described Congressional District 1 in S.B. 756 (CBP-5) as containing "all whole municipalities with the exception of Greenville" and "drawn from the northeast into the Triangle to preserve the district in this area of the state that has existed in one form or another since 1992." JX002 at 16:10-17:5.

46. With respect to the Triad in S.B. 756 (CBP-5) Senator Hise described Congressional District 5 as being "based in the northwestern corner of North Carolina," but also containing portions of Forsyth and Guilford Counties and splitting the city of Greensboro. JX002 at 18:23-19:8. Congressional District 6 was designed to "tak[e] in suburban areas between Charlotte and the Triad" and included portions of Guilford County, including a split Voting Tabulation District ("VTD"). JX002 at 19:9-22. Finally, Congressional District 10 was described as "connect[ing] the suburbs outside of Charlotte and Mecklenburg to Winston-Salem" by splitting the city of Winston-Salem and a VTD in Forsyth, and pairing parts of Forsyth with Catawba, Iredell, Lincoln, and Yadkin Counties. JX002 at 21:5-16.

47. As for the draft (CCJ-1) that would eventually be enacted, filed as S.B. 757, Senator Hise described Congressional District 1 as "taking in most of the rural northeast North Carolina," with a goal of keeping "the counties forming the belt along the northern border of the state together" and keeping the "fingerling counties in northeastern North Carolina" together. JX002 at 31:16-32:3.

48.     The Triad was also divided and split across 4 districts in CCJ-1: Congressional Districts 5, 6, 9, and 10. Senator Hise described Congressional District 5 as being "based in the northwest corner of North Carolina" and made up of nine whole counties plus parts of Guilford County, and splitting Greensboro. JX002 at 33:20-34:7. Congressional District 6 contained "the suburban areas between Charlotte and the Triad," and contained split VTDs in Cabarrus, Forsyth, and Guilford counties for the purpose of equalizing population. JX002 at 34:8-18. Congressional District 9 contained four whole counties, plus portions of Chatham, Cumberland, and Guilford, all of which had split VTDs. JX002 at 35:13-22. Finally, Senator Hise described Congressional District 10 as a "district which connects the suburbs outside of the Charlotte area" to Winston-Salem, splitting Forsyth County and a VTD for the purpose of equalizing population. JX002 at 35:23-36:10.

49.     When asked about why Guilford County was split among three districts by Senator Garrett, Senator Hise responded that "larger counties being split multiple times means that we can create maps where the total number of counties divided is lower." JX002 at 43:17-25. He went on to say: "Congratulations to Guilford for having the opportunity of being represented by three members of Congress, something not a lot of municipalities have the strength to be able to accomplish." JX002 at 44:4-8. Senator Garrett noted that "Guilford County would like to have one member of Congress, not three." JX002 at 45:12-15.

50.     In the Senate Plan proposed in S.B. 758 (SCJ-1), Senator Daniel said that Senate District 1 was "created by the county grouping choice in northeastern North

25

Carolina" and left four of the five "finger counties" together. JX002 at 46:12-21. He further stated that many residents of those counties travel to Virginia regularly and that 81% of the population was within the Norfolk, Virginia Media Market. JX002 at 46:22-47:11. Senate District 2 was described as following the Roanoke River from Warren County to the Albemarle Sound, incorporating two additional counties along the Sound, then extending southeast to include Pamlico and Carteret Counties—and split among three media markets. JX002 at 47:12-48:4.

51.     Senator Daniel discussed Senate Districts 7 and 8 in SCJ-1 together, stating that SD 7 was "created by the county grouping choice in southeastern North Carolina," but further noting that six VTDs from New Hanover were removed because the county was too large to be in one single senate district. JX002 at 49:5-22. Senator Blue noted that the six chosen VTDs were the "most densely Black populated precincts" in New Hanover; Senator Hise denied using racial data in making that decision and claimed not to know whether Wilmington could have been kept whole. *See* JX002 at 83:15-85:11.

52.     During the October 19 committee meeting, Senator Hise announced plans for the Senate Redistricting and Elections Committee to meet four days later, on Monday October 23, to consider amendments to the draft Senate and Congressional plans. JX002 at 6:16-21. He also represented that the Senate Redistricting Chairs would

> consider any evidence that a member of this committee or a third party advocating altering plans for racial reasons brings forth that provides a strong basis in evidence that the Gingles preconditions are present in a particular area of the state. Only then will the chairs consider using race in amending the districts to protect the state from liability under Section 2 of the Voting Rights Act.

26

JX002 at 6:22-7:6.

53.     Senator Blue raised concerns about compliance with the Voting Rights Act, noting that *Stephenson* and *Allen v. Milligan* support the need to do a Section 2 analysis and require some consideration of race. JX002 at 7:9-8:22; *see also* JX002 at 96:13-98:9. Senator Marcus also asked whether the map-drawers undertook a racially polarized voting analysis to determine whether the *Gingles* preconditions were met; Senator Hise's response referenced past racial polarization studies. JX002 at 12:1-13:7.

54.     In response to Senator Hise's representation that the Senate Redistricting Chairs would consider third-party evidence of the *Gingles* preconditions, Southern Coalition for Social Justice sent a letter to lawmakers on October 22, 2023, attaching as Appendix A an analysis by Dr. Kassra Oskooii of racially polarized voting. PX047 ("The October 22 Letter"); *see also* Stipulated Facts ¶ 27.

55.     The October 22 Letter informed lawmakers that it was "readily apparent that the State Senate plan contained in Senate Bill 758 would unlawfully dilute the voting strength of Black voters in northeast North Carolina in Senate Districts 1 & 2, in violation of the VRA." PX047 at PDF p. 4 (Letter p. 2).[6] Specifically, the October 22 Letter addressed the three *Gingles* preconditions as invited by Senator Hise:

> As discussed above, it is possible to draw reasonably configured *Gingles* demonstrative districts in several areas of North Carolina, each of which would satisfy the first *Gingles* precondition. This includes the areas covered by Proposed Senate Districts 1 & 2. When combined with the analysis laid out in Appendix A, this shows that all three *Gingles* preconditions are

---

[6] While PX047 was admitted by the Court for notice, Trial Tr. vol. IV, 904:4-23, the analysis by Dr. Oskooii in the October 22, 2023, Letter attached as Appendix A in PX047 was incorporated as Appendix E to his August 2024 Expert Report, and is therefore admitted in substance. *See* PX194; Trial Tr. vol. II, 377:19-378:16.

established in the area covered by Proposed Senate Districts 1 & 2, and when combined with North Carolina's pervasive history of discrimination in voting, makes clear that **_enacting Proposed Senate Districts 1 & 2 would violate the VRA_**.

PX047 at PDF p. 5 (Letter p. 3, emphasis in original).

56.    Dr. Oskooii's analysis in Appendix A of the October 22 Letter set forth his qualifications and applied methods of ecological inference and performance analysis across 27 general elections held in 2020 and 2022. PX047 at PDF pp. 9-15 (Appendix A ¶¶ 1-24). Overall, he concluded there was "definitive evidence" of racially polarized voting in Senate Districts 1 and 3 of the 2022 Senate Plan and Senate Districts 1 and 2 of the proposed 2023 Senate Plan. PX047 at PDF p. 11 (Appendix A ¶ 10(a)). Specifically, he found:

> Black voters in each [Senate District] vote cohesively such that a large majority of them favor the same candidates across 27 general election contests.

> White voters in each [Senate District] engage in bloc voting such that a large majority of the White voters favor their own set of candidates. The candidates favored by a large majority of White voters in each [Senate District] are different than, and ran against, those favored by the Black voters.

PX047 at PDF p. 12 (Appendix A ¶¶ 10(b)-(c)).

57.    Dr. Oskooii's electoral performance analysis confirmed that White voters are able to vote "in sufficient quantity to defeat any of the Black-preferred candidates in [Senate Districts] 1 and 2 of the 2023 proposed map[.]" PX047 at PDF p. 12 (Appendix A ¶ 10(d)). He also noted that the likelihood of defeat for Black-preferred candidates was high in 2022 Senate District 1 but not in 2022 Senate District 3, _id._, thus confirming that the alternative _Stephenson_ county cluster option for these districts utilized in the 2022 map would be less dilutive of Black voting power.

28

58.     Appendix B to the October 22 Letter included another, preliminary racially polarized voting analysis of counties in North Carolina with high percentages of Black voting age population, showing "extreme racially polarized voting in North Carolina's Black Belt." PX047 at PDF pp. 7, 50-51.

59.     Noting the "extraordinary posture in which this limited analysis is offered" given the "remarkably compressed timeline for evaluating" plans afforded by the legislature, the October 22 Letter contextualized the analysis provided for Senate Districts 1 and 2 accordingly, saying that the district-specific information "cannot and should not be read as an indication there are no VRA concerns elsewhere in the maps[.]" PX047 at PDF p. 6 (Letter p. 4).

60.     The Senate Redistricting Chairs reviewed the October 22 Letter and Appendix A, and Senator Hise testified to understanding it to directly address the *Gingles* factors. Trial Tr. vol. IV, 903:9-16, 905:12-13, 906:18-19 (Hise). Senator Hise identified no faults with the expert analysis contained therein. Trial Tr. vol. IV, 912:14-913:8 (Hise). On October 23, 2023, the Senate Redistricting and Elections Committee met to debate S.B. 757 and S.B. 758. Stipulated Facts ¶ 29. The Senate Redistricting Chairs did not substantively mention or discuss the analysis provided in the October 22 Letter during that meeting. *See generally* JX003 at 13-44.

61.     At the October 23, 2023, meeting, the Committee approved an amendment "CST-3" to S.B. 757 related to military bases affecting Onslow, Cumberland, Sampson, and Robeson counties in Congressional Districts 3, 7, and 8. Stipulated Facts ¶ 29(b). The Committee then reported favorably on the Committee Substitute for S.B. 757, PCS45380-

29

BK-42, which is identical to the 2023 Congressional Plan. JX104 (CST-4); Stipulated Facts ¶ 29(c).

62.     The Committee also approved two amendments to S.B. 758 altering Senate Districts in Durham and Guilford counties offered by Senators Mayfield and Garrett, respectively. Stipulated Facts ¶ 29(d). The Committee reported favorably on the Committee Substitute for S.B. 758, PCS45382-ST-57, which is identical to the 2023 Senate Plan. JX103; Stipulated Facts ¶ 29(e).

63.     When asked about the configuration of Senate District 7 and the six precincts moved out of New Hanover County into Senate District 8, Senator Hise stated "it is clear in the process that we used political consideration in drawing these maps, and the districts represent the political decision as they are some of the strongest Democrat voting precincts within . . . New Hanover County." JX003 at 34:19-35:1. At the close of the October 23 meeting, Senator Blue asked that the October 22 Letter be made part of the record and noted that it was "somewhat disturbing" that the Committee did not take time to ensure compliance with the Voting Rights Act. JX003 at 35:20-37:24.

64.     On October 24, 2023, the Senate met to debate S.B. 757 and S.B. 758. Stipulated Facts ¶ 30. Senator Chaudhuri offered an Amendment to the Congressional plan, S.B. 757, that sought to preserve the 2022 Plan. JX085. The Amendment was tabled, and S.B. 757 passed its Second and Third readings in the Senate. Stipulated Facts ¶ 30(b).

65.     An Amendment offered by Senator Mohammed to the Senate plan was also tabled. JX086 (making changes to SDs 37, 38, and 41 to address double bunked incumbents in Mecklenburg County); JX004 at 34:7-36:23; Stipulated Facts ¶ 30(c).

30

66.    During the debate, then-Minority Leader Senator Blue again raised the likelihood that the Senate map violated the Voting Rights Act because analysis showed satisfaction of the three *Gingles* preconditions in the Senate Plan. JX004 at 44:14-46:19. He proposed two amendments. The first proposed amendment (titled "Amendment 2") showed the possibility of drawing three senate districts "that have black population[s] of over 50 percent" east of Raleigh, and which did not affect any districts west of Raleigh. JX004 at 47:5-48:3. Senator Hise immediately moved to table the amendment without explanation and without allowing debate, and it was tabled. JX004 48:4-49:2. The second amendment (titled "Amendment 3") proposed more compact districts with less than majority Black population to comply with the Voting Rights Act. JX004 at 49:3-51:3. Senator Hise also immediately moved to table this amendment without explanation and without allowing debate, and it was tabled. JX004 at 51:4-51:20; *see also* Stipulated Facts ¶ 30(c).

67.    S.B. 758 passed its Second and Third Readings in the Senate. Stipulated Facts ¶ 30(c).

68.    The House Redistricting Committee met to debate S.B. 757 on October 24, 2023, and to debate S.B. 758 on October 25, 2023, and both bills received a favorable report without amendment. Stipulated Facts ¶¶ 31, 35. On October 25, 2023, the House of Representatives met to debate S.B. 757 and S.B. 758, and both bills passed their Second and Third readings without amendment. Stipulated Facts ¶ 36.

69.    Without any delay, the legislature hastily ratified along party lines S.B. 758 (S.L. 2023-146, the "2023 Senate Plan") and S.B. 757 (S.L. 2023-145, the "2023

31

Congressional Plan"), just one week after draft maps were made public and with no opportunity for in-person public comment following the release of draft maps. JX014-19 (Senate and House Roll Call Vote Transcripts).

## II.     Procedural History

70.     On December 4, 2023, Plaintiffs in the lead consolidated case, Shauna Williams, Flor Herrera-Picasso, Minerva Freeman, Maura Aceto, Javier Limon, Armenta Eaton, James Adams, Luciano Gonzalez-Vega, Chenita Johnson, Pamlyn Stubbs, Earl Jones, Allison Shari Allen, Laura Mcclettie, Nelda Leon, German De Castro, Alan Rene Oliva Chapela, Virginia Keogh, and Natalee Nanette Nieve (collectively, "Williams Plaintiffs") filed suit challenging the 2023 Congressional Plan. Doc. 1 at 2-3. Williams Plaintiffs filed their First Amended Complaint on March 4, 2024, Doc. 30, and their Second Amended Complaint on April 28, 2025, Doc. 107.

71.     On December 19, 2023, Plaintiffs North Carolina State Conference of the NAACP ("North Carolina NAACP"), Common Cause, and individuals Mitzi Reynolds Turner, Dawn Daly-Mack, Corine Mack, Calvin Jones, Linda Sutton, Syene Jasmin, Joan Chavis, and Hollis Briggs (collectively, "NAACP Plaintiffs" or "Plaintiffs")[7] filed suit challenging districts in all three 2023 North Carolina redistricting plans—the 2023 Senate Plan, the 2023 House Plan, and the 2023 Congressional Plan—as racially discriminatory, dilutive of Black voting power, racial gerrymanders, and denying equal voting power in violation of Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth

---

[7] Plaintiff Joan Chavis's claims were voluntarily dismissed without prejudice, Doc. 56, and Plaintiff Hollis Briggs passed away during the pendency of this action. Doc. 96.

Amendments. *N.C. State Conf. of the NAACP, et al. v. Berger, et al.*, No. 23-cv-1104 (M.D.N.C. Dec. 19, 2023), Doc. 1.

72.    On January 25, 2024, Legislative Defendants (including the President *Pro Tempore* of the North Carolina Senate, the Speaker of the North Carolina House of Representatives, and the Chairs of the North Carolina House of Representatives Redistricting Committee and the North Carolina Senate Redistricting and Elections Committee) moved to consolidate these cases. Doc. 24. The Court granted that motion and ordered the cases consolidated on March 18, 2024. Doc. 34.[8] The matter proceeded to discovery pursuant to the Court's Rule 26(f) Order, providing for most discovery to close on November 4, 2024, with the exception of supplemental expert reports analyzing the results of the 2024 general election. Doc. 48 at 4. On November 6, 2024, the Court granted in part and denied in part Plaintiffs' motion for a protective order concerning the identities of non-party members of Plaintiffs North Carolina NAACP and Common Cause, upon whom these Plaintiffs have predicated standing (i.e., their "standing members"). Doc. 75. The Court ordered Plaintiffs to provide to Defendants the name and address of each member upon whom they predicate their voting rights claims for each challenged district, but granted the protective order as to the telephone number for each such identified member. Doc. 75 at 15. Identifying information was provided to Defendants on an "Attorneys Eyes Only" basis pursuant to an addendum to the protective order. Doc. 77-1.

---

[8] Pursuant to the Court's order consolidating these cases, all citations to the Docket are to case 1:23-cv-1057 unless otherwise noted. Doc. 34 at 10.

73. On December 6, 2024, Legislative Defendants filed a motion for partial summary judgment on Plaintiffs' claims of malapportionment in violation of the Fourteenth Amendment with respect to the 2023 Senate and House Plans and on all claims where they alleged Plaintiffs lack standing to sue. Doc. 78 at 2; Doc. 79.

74. On April 8, 2025, the Court granted in part and denied in part Legislative Defendants' motion for partial summary judgment. Doc. 98. The Court dismissed Consolidated Plaintiffs' challenges to specific districts in which there was no identified named Plaintiff or standing member of the organizational Plaintiffs, and found that Plaintiffs have standing to challenge 2023 Senate Districts 1, 2, 40, and 41, 2023 House Districts 5, 7, 10, 12, 24, 25, 32, 37, and 71, and 2023 Congressional Districts 1, 5, 6, and 10. Doc. 98 at 29-30.[9] The Court granted the motion with respect to Plaintiffs' claims of malapportionment in violation of the Fourteenth Amendment with respect to the 2023 Senate and House Plans (Counts 3 and 7 of the Complaint), Doc. 98 at 30, and later denied Plaintiffs' motion to reconsider that dismissal. Doc. 140. The Court granted Plaintiffs' consent motion to permanently seal the unredacted voting records of the individual Plaintiffs and the non-party standing members of the organizational Plaintiffs which were filed in opposition to the motion for partial summary judgment. Doc. 97.

---

[9] The Court noted the recent passing of Plaintiff Hollis Briggs in its order. Doc. 98 at 12 n.2. Given that Mr. Briggs was the "only Plaintiff or member of an Associational Plaintiff" residing in Senate District 8 and there was no Plaintiff or member of the same residing in Senate District 7, the Court deferred judgment on whether Count 2 survived summary judgment. *Id.* NAACP Plaintiffs supplemented their discovery disclosures to disclose a replacement standing member of the North Carolina NAACP residing in Senate District 8, Doc. 104 at 3-4, and at trial, offered the voting record of a NAACP standing member in Senate District 8. *See* PX166.

34

75.     On April 22, 2025, Plaintiffs filed their First Amended Complaint, with Defendants' consent, Doc. 104, voluntarily dismissing Counts 6, 8, and 9 with respect to the 2023 House Plan and conforming the remaining allegations of districts in which Plaintiffs have standing members to the voting records produced. Doc. 105.

76.     The Court held a six-day bench trial before a three-judge panel on June 16, 17, 18, and 20 and July 8 and 9, 2025. The Court heard testimony from dozens of witnesses and admitted hundreds of joint exhibits, Doc. 137, as well as many of Plaintiffs', Williams Plaintiffs', and Legislative Defendants' respective exhibits. The Court heard from a number of individual Plaintiffs and fact witnesses, including legislators, as well as eight expert witnesses for the Consolidated Plaintiffs. At the close of Consolidated Plaintiffs' evidence, Legislative Defendants moved for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c) on Plaintiffs' claims regarding Senate Districts 8, 40, and 41. Minute Entry July 8, 2025. The Court granted Legislative Defendants' motion as to Senate Districts 40 and 41 as unopposed, and reserved ruling as to Senate District 8. *Id*. Legislative Defendants then presented testimony from various fact witnesses and from their four experts. After the close of all the evidence, the parties presented closing arguments. Minute Entry July 9, 2025.

77.     At trial, the parties jointly stipulated to the authenticity of information from the North Carolina State Board of Elections, including historical election results, the United States Census Bureau, and the North Carolina General Assembly websites. Stipulated Facts ¶¶ 87-88. The parties also agreed that the reports for each testifying expert would be admitted as an exhibit, subject to any *Daubert* challenges, and that evidence offered by any

35

party is admissible in both consolidated actions, absent an objection at the time the evidence was offered. *Id.* at ¶¶ 89-90.

### A. Parties in Consolidated Action No. 23-cv-1104

1. Plaintiffs

78.     Plaintiff North Carolina NAACP is a federally-registered 501(c)(4) non-profit organization organized and existing under the laws of the State of North Carolina. *Id.* at ¶ 74. The North Carolina NAACP is dedicated to advancing policies and practices that eliminate racial discrimination and racial hatred, and accelerating the well-being, education, and economic security of Black people and all persons of color. Doc. 98 at 7; Trial Tr. vol. I, 11:6-8 (Maxwell). To effectuate that mission, the North Carolina NAACP engages in a wide variety of educational, advocacy, and legal work to ensure that communities of color and other marginalized communities throughout North Carolina are able to exercise their right to vote. Doc. 98 at 7. This work includes engaging in voter registration, voter education, lobbying, and contacting elected officials on relevant issues. Trial Tr. vol. I, 11:11-14 (Maxwell); Doc. 98 at 7.

79.     As relevant to its claims in this matter, the North Carolina NAACP has produced voting records for members who identify as Black or African American and are registered voters in 2023 Senate Plan Districts 1, 2, 8, and 41; 2023 House Plan Districts 5, 9, 10, 12, 23, 24, 25, 27, 32, and 71; and 2023 Congressional Plan Districts 1, 3, 6, and 10. Stipulated Facts ¶ 75; PX164; PX166.[10] The North Carolina NAACP President

---

[10] The Court granted NAACP Plaintiffs' motion to seal PX164 and PX166 at trial. Trial Tr. vol. I, 15:18-16:1. These voting records include those of individuals who are registered voters in the following counties:

Deborah Maxwell confirmed that the individuals in the exhibited voting records are verified members, their voter registration and racial identifying status within these districts was accurate as of the time of trial, and they voted in the 2024 general election. Trial Tr. vol. I, 13:5-15:17 (Maxwell).

80. Plaintiff Common Cause is a federally-registered 501(c)(4) non-profit organization organized and existing under the laws of the State of North Carolina. Stipulated Facts ¶ 76. Common Cause is committed to fair elections and making government at all levels more representative, transparent, and responsive to the interests of ordinary people. Doc. 98 at 7; *see also* Trial Tr. vol. III, 603:11-18 (Phillips). To further that mission, Common Cause engages in activities to encourage the public to become citizen lobbyists and participants in democracy besides just voting, including hosting meetings, educational trainings, and legislative lobby days, as well as training individuals to monitor both county boards of elections and polls during voting. Trial Tr. vol. III, 603:21-604:12 (Phillips).

81. Common Cause also engages in efforts to educate members and the public about the redistricting process, including how to participate, monitor, and hold decision-makers accountable, as well as researching state redistricting processes to identify best practices for creating a legal, transparent, responsive, and equitable redistricting process, among other election-related activities. Doc. 98 at 8. Serving as a Plaintiff in this matter

---

Vance County; Warren County; Northampton County; Hertford County; Gates County; Pasquotank County; Nash County; Wilson County; Edgecombe County; Pitt County; Greene County; Lenoir County; Wayne County; New Hanover County; Mecklenburg County; Guilford County; and Forsyth County. Stipulated Facts ¶ 75.

concerns the principles of "an equal vote and that equal vote carrying the same weight equally and fair maps that are not racially discriminatory[]" which is "fundamental" to Common Cause's mission. Trial Tr. vol. III, 604:13-19 (Phillips). Common Cause has worked with "people from both sides of the aisle if they wanted to have a more transparent process of drawing maps" including Senator Phil Berger. *Id*. at 610:25-611:17. In the past, Common Cause's Executive Director for North Carolina, Bob Phillips, was able to have meetings about redistricting reform with legislative leaders, but despite efforts, presently does not "have those meaningful office meetings anymore." *Id*. at 612:11-613:4.

82.     As relevant to its claims in this matter, Common Cause has produced voting records for members who identify as Black or African American and are registered voters in 2023 Senate Plan Districts 1, 2, and 40; 2023 House Plan Districts 5, 7, 8, 9, 10, 12, 23, 24, 32, and 37; and 2023 Congressional Plan Districts 1, 3, 5, and 6. Stipulated Facts ¶ 77; PX165.[11] Mr. Phillips testified that members include individuals who have either made a donation or taken a proactive action in the past two years (such as phone banking or attending meetings), and that the standing members here were identified by matching affected districts with the membership list, and then confirming the address, racial identity, and voting history in the State Board of Elections voter file. Trial Tr. vol. III, 605:2-606:18, 607:7-608:4, 634:13-17, 636:18-25 (Phillips).

---

[11] The Court granted NAACP Plaintiffs' motion to seal PX165 at trial. Trial Tr. vol. III, 608:5-610:11. These voting records include those of individuals who are registered voters in the following counties: Vance County; Pasquotank County; Edgecombe County; Martin County; Pitt County; Lenoir County; Wayne County; Mecklenburg County; Guilford County; Franklin County; and Wake County. Stipulated Facts ¶ 77.

83.     Plaintiff Calvin Jones is a Black citizen of the United States and of the State of North Carolina, a resident of Norlina in Warren County, and member of the Warren County branch of the North Carolina NAACP. Stipulated Facts ¶ 78; Trial Tr. vol. II, 348:15-22, 350:4-12 (Jones). Mr. Jones's residence since 1984 is within Senate District 2, House District 27, and Congressional District 1 under the 2023 Plans and Senate District 3, House District 27, and Congressional District 1 under the prior plans used in the 2022 election. Stipulated Facts ¶ 78; Trial Tr. vol. II, 348:23-349:1 (Jones). Mr. Jones is a registered voter who has regularly voted in the past and intends to vote in the future. Stipulated Facts ¶ 78; Trial Tr. vol. II, 349:2-18 (Jones). Mr. Jones owns a small farm in Warren County and was a school board member in Warren County for over 15 years. Trial Tr. vol. II, 349:19-350:3 (Jones).

84.     Plaintiff Corine Mack is a Black citizen of the United States and of the State of North Carolina, and a resident of Charlotte in Mecklenburg County and Branch President of the Mecklenburg County branch of the North Carolina NAACP. Stipulated Facts ¶ 79; PX363. Ms. Mack's residence since 2012 is within Senate District 41 in the 2023 Senate Plan and the Senate plan used in the 2022 general election. Stipulated Facts ¶ 79. Ms. Mack is a registered voter who has regularly voted in the past and intends to vote in the future. *Id*.

85.     Plaintiff Reverend Dawn Daly-Mack is a Black citizen of the United States and of the State of North Carolina. Stipulated Facts ¶ 80. She has been a resident of Gaston in Northampton County for 12 years, and a member of the North Carolina NAACP for approximately six years; she is currently a lifetime member and President of the

39

Northampton County branch of the North Carolina NAACP. Stipulated Facts ¶ 80; Trial Tr. vol. II, 360:7-10, 361:2-9 (Daly-Mack). Reverend Daly-Mack's residence since 2013 is within Senate District 1, House District 27, and Congressional District 1 under the 2023 Plans and Senate District 3, House District 27, and Congressional District 1 under the prior plans used in the 2022 election. Stipulated Facts ¶ 80. Reverend Daly-Mack is a registered voter who has regularly voted in the past and intends to vote in the future. *Id*.

86.     Plaintiff Mitzi Reynolds Turner is a Black citizen of the United States and of the State of North Carolina, and a resident of High Point in Guilford County. Stipulated Facts ¶ 81. She has resided in High Point for 17 years. Trial Tr. vol. III, 575:3-8 (Reynolds Turner). Ms. Reynolds Turner's residence since 2007 is within Congressional District 6 under both the 2023 Congressional Plan and the Congressional plan used in the 2022 election. Stipulated Facts ¶ 81. Ms. Reynolds Turner is a registered voter who has regularly voted in the past and intends to vote in the future. *Id*.; Trial Tr. vol. III, 575:9-14 (Reynolds Turner). Ms. Reynolds Turner is a member of Common Cause and the High Point branch of the North Carolina NAACP. Stipulated Facts ¶ 81; Trial Tr. vol. III, 576:15-577:5 (Reynolds Turner).

87.     Plaintiff Linda Sutton is a Black citizen of the United States and of the State of North Carolina, a resident of Winston-Salem in Forsyth County, and member of the NAACP. Stipulated Facts ¶ 82; PX365. Ms. Sutton's residence since 2011 is within House District 71 under both the 2023 House Plan and the House plan used in the 2022 election. Stipulated Facts ¶ 82. Ms. Sutton is a registered voter who has regularly voted in the past and intends to vote in the future. *Id*.

40

88.     Plaintiff Syene Jasmin is a Black citizen of the United States and of the State of North Carolina. Stipulated Facts ¶ 83. Mr. Jasmin is a resident of Winterville in Pitt County and member of the North Carolina NAACP. *Id.*; Trial Tr. vol. III, 517:15-24, 518:6-10 (Jasmin). Mr. Jasmin's residence since 2011 was located in Congressional District 1 under the Congressional plan used in the 2022 election and is now in Congressional District 3 under the 2023 Congressional Plan; his residence is also located within Senate District 5 and House District 9 under both the 2023 Plans and those used in the 2022 election. Stipulated Facts ¶ 83. Mr. Jasmin is a registered voter who has regularly voted in the past and intends to vote in the future. *Id.*; Trial Tr. vol. III, 517:25-518:3 (Jasmin).

2.   Defendants

89.     Defendant Philip Berger is a member of the North Carolina Senate, having been elected to that office by the voters residing in District 26. Mr. Berger serves as the President Pro Tempore of the North Carolina Senate. Mr. Berger is sued in his official capacity. *See* Legislative Defendants' Answer, Doc. 31 ¶ 26, No. 23-cv-1104 (Feb. 12, 2024); Compl., Doc. 1 ¶ 26, No. 23-cv-1104 (Dec. 19, 2023).

90.     In January of 2025, Defendant Destin Hall replaced Defendant Timothy Moore as Speaker of the North Carolina House of Representatives, and Representatives Hugh Blackwell and Sarah Stevens replaced Defendant Hall as Co-Chairs of the House Standing Committee on Election Law. Stipulated Facts ¶ 84. As these Defendants are sued in their official capacities, the current officeholders are automatically substituted pursuant to Federal Rule of Civil Procedure 25(d).

41

91.     Defendant Ralph Hise was chairman of the Senate Elections and Redistricting Committee in 2023, and also Co-Chair of the Joint Elections and Redistricting Committee, in 2023. Trial Tr. vol. IV, 833:19-25 (Hise). He was the primary map-drawer of both the 2023 Senate and Congressional Plans. *Id*.

92.     Defendant Warren Daniel is a member of the North Carolina Senate, having been elected to that office by the voters residing in District 46. Mr. Daniel serves as a Co-Chair of the Senate Redistricting and Elections Committee. Mr. Daniel is sued in his official capacity. *See* Legislative Defendants' Answer, Doc. 31 ¶ 29, No. 23-cv-1104 (Feb. 12, 2024); Compl., Doc. 1 ¶ 29, No. 23-cv-1104 (Dec. 19, 2023).

93.     Defendant Senator Paul Newton was succeeded by Senator Brad Overcash as a current Co-Chair of the Senate Standing Committee on Elections, Stipulated Facts ¶ 85, and automatically substituted for him pursuant to Federal Rule of Civil Procedure 25(d).

94.     In May of 2025, Defendant Members of the State Board of Elections Kevin Lewis and former Chair Alan Hirsch were replaced by now-Chair Francis X. De Luca and Member Robert Rucho. Stipulated Facts ¶ 86. Defendant Executive Director of the State Board of Elections Karen Brinson Bell was replaced in May of 2025 with current Executive Director Sam Hayes. *Id*. As these parties were all named in their official capacities, the successor individuals are automatically substituted for the former officeholders pursuant to Federal Rule of Civil Procedure 25(d). *Id*.

42

## B. Expert Witnesses in Consolidated Action 23-cv-1104

95. Plaintiffs' expert Anthony Fairfax is recognized as an expert in demography, redistricting, and U.S. Census Data. Stipulated Facts ¶ 95. Mr. Fairfax is a demographic and mapping consultant and the CEO/Principal Consultant of CensusChannel LLC who has worked on redistricting issues for the last thirty years, having developed nearly one thousand redistricting plans during the last four decennial redistricting cycles. PX182 ¶ 3. He has been qualified as a testifying expert in these fields in almost a dozen Voting Rights Act and redistricting cases, and has been retained as a mapping expert for numerous jurisdictions to help design and construct their own redistricting plans. *Id.* at ¶¶ 3-8; Trial Tr. vol. II, 437:8-23 (Fairfax). *See generally* PX184.

96. Mr. Fairfax submitted, and the Court received into evidence, illustrative *Gingles* districts for the Senate ("Plaintiffs' Illustrative Senate Districts"), as well as a demographic analysis of the 2023 Senate and Congressional Plans. Trial Tr. vol. II, 437:24-438:13 (Fairfax); PX182-88, 200. This included a corrected initial Expert Report dated October 28, 2024, PX182, with an accompanying errata, PX183, and appendices, PX184-88, as well as an Expert Reply Report dated October 17, 2024, responding to Legislative Defendants' experts Drs. Michael Barber and Sean Trende, PX200.

97. Having observed Mr. Fairfax and reviewed his reports, the Court credits his analysis, opinions, and testimony, and grants them substantial weight.

98. Plaintiffs' expert Dr. Kassra Oskooii is recognized as an expert in political science, redistricting, political and voting behavior, racially polarized voting analysis, and electoral performance analysis. Stipulated Facts ¶ 95. Dr. Oskooii is a tenured associate

43

professor and Provost Teaching Fellow in the department of Political Science and International Relations at the University of Delaware and is a faculty member at the University's Data Science Institute. PX189 ¶ 12. He specializes in racial and ethnic politics, political behavior, political psychology, and political methodology. *Id*. He teaches courses on the Voting Right Act, race and ethnicity in politics, and American political behavior. *Id*. Dr. Oskooii has published peer-reviewed works on racially polarized voting analyses and served as an expert in Voting Rights Act cases nationwide. *Id*. at ¶¶ 13, 15-19; *see generally* Trial Tr. vol. II, 375:2-376:7 (Oskooii); PX190.

99.     Dr. Oskooii submitted, and the Court received into evidence, Dr. Oskooii's initial Expert Report dated August 1, 2024, PX189, with appendices, PX190-94, and a Supplemental Expert Report dated March 17, 2025, PX208, with appendices PX209-11, that updated his initial analysis with the results of the 2024 general election. The Court also received into evidence several reports submitted by Dr. Oskooii responding to Legislative Defendants' experts Drs. John Alford and Michael Barber, including a Reply Expert Report dated October 17, 2024, PX202, a Supplemental Report dated November 3, 2024, PX203, and a Supplemental Rebuttal Expert Report dated March 31, 2025, PX215. Legislative Defendants' expert Dr. John Alford, who responded to Dr. Oskooii's reports, agreed that Dr. Oskooii is qualified to offer opinions on racially polarized voting and that Dr. Oskooii utilized reliable methods of ecological inference to conduct his analysis. Trial Tr. vol. V, 1222:9-23 (Alford). Dr. Alford also did not dispute the numerical accuracy of Dr. Oskooii's results. *Id*. at 1222:20-1223:1 (Alford).

100. Having observed Dr. Oskooii and reviewed his reports, the Court credits his analysis, opinions, and testimony, and grants them substantial weight.

101. Plaintiffs' expert Dr. Joseph Bagley is recognized as an expert in United States constitutional and legal history, American political history, historical methods, and the historical study of southern race relations and southern politics and law. Stipulated Facts ¶ 97. Dr. Bagley is an assistant professor of history at Georgia State University, Perimeter College with a focus on United States constitutional and legal history, politics, and race relations, particularly the Deep South. PX181 at 2. He has authored books and other academic works regarding federal school desegregation litigation as well as political change and voting rights in the South, including in North Carolina. *Id*. He has been a testifying expert in several redistricting cases in the South. *Id*. at 2-3. *See generally* PX181 at PDF p. 52-54 (Bagley Curriculum Vitae).

102. Dr. Bagley submitted, and the Court received into evidence, his corrected Expert Report dated November 4, 2024, PX181; Expert Reply Report dated October 17, 2024, responding to Legislative Defendants' expert Dr. Andrew Taylor, PX199; and Supplemental Expert Report dated March 17, 2025, PX205, related errata dated April 16, 2025, PX206, and supporting pivot table, PX207.

103. Having observed Dr. Bagley and reviewed his reports, the Court credits his analysis, opinions, and testimony, and grants them substantial weight.

104. Plaintiffs' expert Dr. LaFleur Stephens-Dougan is recognized as an expert in racial attitudes, public opinion, Black politics, and race, ethnicity, and American politics. Stipulated Facts ¶ 98. Dr. Stephens-Dougan is an Associate Professor of Politics and the

45

Associate Director of Graduate Studies in the Politics Department at Princeton University. PX195 ¶¶ 1, 9. She received her Ph.D. in Political Science and Public Policy from the University of Michigan in Ann Arbor, Michigan, completed her predoctoral fellowship in the Department of Political Science at the Massachusetts Institute of Technology, and was a Sheila Biddle Ford Foundation Fellow at Harvard University's Hutchins Center for African and African American Research. *Id*. at ¶¶ 9, 12. She has published several peer-reviewed articles in academic journals focused on race and electoral politics and authored an award-winning book regarding racial appeals in elections. *Id*. at ¶¶ 14-15. *See generally* PX214.

105. Dr. Stephens-Dougan submitted, and the Court received into evidence, her initial Expert Report dated August 1, 2024, PX195, and related errata dated October 29, 2024, PX196; Supplemental Expert Report dated March 17, 2025, PX212; and Expert Reply Report dated October 17, 2024, PX204. None of Legislative Defendants' experts rebutted Dr. Stephens-Dougan's reports or testimony.

106. Having observed Dr. Stephens-Dougan and reviewed her reports, the Court credits her analysis, opinions, and testimony, and grants them substantial weight.

107. Consolidated Plaintiffs' expert Dr. James Leloudis is recognized as an expert in Southern and North Carolina history, politics, race relations, and government policy. Stipulated Facts ¶ 99. Dr. Leloudis is a Professor of History at the University of North Carolina at Chapel Hill and has more than forty years of experience researching, writing, and teaching about the history of race and politics in North Carolina and the American South. PX179 at 4; Trial Tr. vol. III, 534:1-18 (Leloudis). He has provided expert reports

46

and testimony in eleven North Carolina voting rights actions and appeals, in state and federal court, including the redistricting matters *Common Cause v. Hall* (N.C. General Court of Justice, Superior Court Division) 21 CVS 015426 (consolidated with *Harper v. Hall and North Carolina League of Women Voters v. Hall*); *Harper v. Hall*, 867 S.E.2d 554 (N.C. 2022); and *Harper v. Hall*, 886 S.E.2d 393 (N.C. 2023). PX179 at 5 (Leloudis Report). *See generally* PX179 at 127-33.

108.    Dr. Leloudis submitted, and the Court received into evidence, a principal Expert Report addressing the intersection of race and politics in North Carolina, specifically with respect to the regulation of elections and legislative redistricting. PX179 at 3; Trial Tr. vol. III, 535:11-23 (Leloudis).

109.    Having observed Dr. Leloudis and reviewed his report, the Court credits his analysis, opinions, and testimony, and grants them substantial weight.

110.    Legislative Defendants' expert Dr. Sean Trende is recognized as an expert in the field of American politics with an emphasis on redistricting, including drawing and analyzing redistricting maps, U.S. Census data, and political methodology. Stipulated Facts ¶ 100. He submitted a report and several exhibits in this action that were admitted into evidence. LDTX266-78. Dr. Trende's opinions included a review of Plaintiffs' Illustrative Senate Districts. For the reasons explained below, the Court finds that Dr. Trende's evaluations of Plaintiffs' Illustrative Senate Districts use methodologies that have been discredited by courts and are not well-calibrated to the *Gingles* analysis nor widely accepted in the academic literature. The Court therefore finds that Dr. Trende's analysis is of limited probative value and entitled to limited weight.

111.    Legislative Defendants' expert Dr. Michael Barber is recognized as an expert in the field of American politics with an emphasis on legislative behavior and politics, statistical analysis and quantitative methods, political geography, U.S. Census Data, and redistricting. Stipulated Facts ¶ 103. He submitted several reports in this action that were admitted into evidence. LDTX253-54. Dr. Barber, like Dr. Trende, offered opinions as to the reasonableness of the configurations of Plaintiffs' Illustrative Senate Districts, focusing on specific parts of each district he examined. He also offered opinions as to the relationship between partisan performance and the Voting Rights Act. For the reasons set forth in more detail below, the Court finds that Dr. Barber's analysis is also of limited value and, further, that Drs. Barber and Trende diverged at crucial points in their analysis in ways that raise questions as to the reliability of their opinions overall.

112.    Legislative Defendants' expert Dr. John Alford is recognized as an expert in voter cohesion and polarization, along with voting behavior and redistricting. Stipulated Facts ¶ 102. Dr. Alford was offered as an expert by Legislative Defendants to respond to the racially polarized voting analysis of Dr. Oskooii and to opine on *Gingles* factors II and III and Senate Factor 2. Trial Tr. vol. V, 1150:20-1151:2 (Alford). He submitted several reports in this action that were admitted into evidence. LDTX242-44, 251-52. Dr. Alford has never published a peer-reviewed paper on racially polarized voting nor conducted any academic research related to racially polarized voting. Trial Tr. vol. V, 1204:16-21, 1214:12-21 (Alford). Dr. Alford did not dispute the qualifications, ecological inference methodologies, or numerical accuracy of Dr. Oskooii's analysis. *Id.* at 1222:9-1223:1. Instead, Dr. Alford opined as to observations on "partisan polarization," LDTX242 at 11,

48

16, 20, 22, 28; *see also* LDTX244 at 3, 4, 6, 7, 9; Trial Tr. vol. V, 1151:3-18, 1160:9-18 (Alford), but he admitted that he did not look at causation. Trial Tr. vol. V, 1221:20-1222:2 (Alford).

113.    Other courts have found that, while "credible," Dr. Alford's conclusions on partisan polarization "were not reached through methodologically sound means and were therefore speculative and unreliable." *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 587 F. Supp. 3d 1222, 1305 (N.D. Ga. 2022); *see also id.* at 1305-1307 (collecting cases discounting Dr. Alford's testimony after finding his analysis of limited relevance or lying outside accepted academic norms among redistricting experts); *accord Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 700 F. Supp. 3d 1136, 1210 (N.D. Ga. 2023) (acknowledging that as it related to "partisan polarization and not racial polarization[,]" the court gave "little weight to Dr. Alford's testimony with respect to the <u>Gingles</u> preconditions because it does not effectively address that inquiry."); *see also Miss. State Conference of the NAACP v. State Bd. of Election Comm'rs*, 739 F. Supp. 3d 383, 454 (S.D. Miss. 2024) ("shar[ing] those concerns" of another court that Dr. Alford's "opinions are unsupported by meaningful substantive analysis" and "border on *ipse dixit*[]" (internal quotations and citation omitted)); Trial Tr. vol. V, 1214:22-1221:10 (Alford) (discussing other courts' criticisms of Dr. Alford's analysis).

114.    The Court similarly finds Dr. Alford's opinions of extremely limited relevance, based on unreliable and unestablished analytical methods, and ultimately speculative, and therefore grants them little weight.

115. At trial, Consolidated Plaintiffs objected to Dr. Alford's testimony regarding public opinion and behavior around issues of race as outside the scope of his report and moved to strike his testimony. Trial Tr. vol. V, 1153:25-1154:24, 1156:21-1157:5 (Alford). The Court agrees that this testimony was not responsive to Dr. Oskooii's reports or testimony and orders that this testimony by Dr. Alford be stricken from the record.

116. Legislative Defendants' expert Dr. Andrew Taylor is recognized as an expert in political science with an emphasis on North Carolina politics, voting and elections, North Carolina political history, and comparative state and national laws, politics, and policies. Stipulated Facts ¶ 101. Dr. Taylor submitted rebuttal and supplemental rebuttal reports to rebut the opinions offered by Plaintiffs' expert Dr. Joseph Bagley and Williams' Plaintiffs' expert Dr. Christopher Clark. LDTX259, 263-65.

117. Dr. Taylor purported to evaluate the challenged plans under some of the "Senate Factors" contained in the U.S. Senate Committee on the Judiciary report accompanying the passage of the 1982 Voting Rights Act amendments, which comprise the "totality of the circumstances" test for VRA compliance under *Thornburg v. Gingles*, 478 U.S. 30 (1986). LDTX259 at 4. His opinions were limited to Senate Factors 3, 5, 6, 7, and 8. *Id.*; Trial Tr. vol. VI, 1287:9-14, 1309:16-19 (Taylor). Dr. Taylor reviewed, and did not rebut, Dr. Bagley's analysis of Senate Factor 1. Trial Tr. vol. VI, 1309:16-19 (Taylor). Notably, Dr. Taylor confirmed that he offered his analysis not to rebut the factual findings or data presented by Drs. Bagley and Clark, but rather to place North Carolina's performance in the 2020s "into comparative and historical context[]" by "contrast[ing] statewide indicators from today with (1) those of the United States at this moment and (2)

50

North Carolina in the past." LDTX259 at 7. For the reasons set forth in more detail below, the Court finds this analysis of limited probative value in evaluating the existence of racial inequities present in North Carolina today, and thus accords them little to no weight.

## III.    The 2023 Senate Plan

118.    Senator Hise testified that the Senate Redistricting Chairs began drawing the 2023 Senate Plan in September or October 2023, Trial Tr. vol. IV, 834:9-14 (Hise), and utilized the 2023 Senate Plan Criteria, JX047. *Id.* at 835:20-22 (Hise). Those criteria included the following:

- <u>Equal Population</u>. The Committee chairs will use the 2020 federal decennial census data as the sole basis of population for the establishment of districts in the 2023 Senate Plan. In forming new legislative districts, any deviation from the ideal population for a legislative district shall be at or within plus or minus five percent for purposes of compliance with federal "one-person, one-vote" requirements. *Stephenson v. Bartlett*, 357 N.C. 301 (2003) (*Stephenson II*).

- <u>County Groupings and Traversals</u>. The Committee chairs shall draw legislative districts within county groupings as required by *Stephenson v. Bartlett*, 355 N.C. 354 (2002) (*Stephenson I*), *Stephenson II, Dickson v. Rucho*, 367 N.C. 542 (2014) (*Dickson I*) and *Dickson v. Rucho*, 368 N.C. 481 (2015) (*Dickson II*). Within county groupings, county lines shall not be traversed except as authorized by *Stephenson I*, *Stephenson II*, *Dickson I*, and *Dickson II*.

- <u>Traditional Districting Principles</u>. We observe that the State Constitution's limitations upon redistricting and apportionment uphold what the United States Supreme Court has termed "traditional districting principles." These principles include factors such as "compactness, contiguity, and respect for political subdivisions." *Stephenson II* (quoting *Shaw v. Reno*, 509 U.S. 630 (1993).

- <u>Compactness</u>. Communities of interest should be considered in the formation of compact and contiguous electoral districts. *Stephenson II.*

- <u>Contiguity</u>. Each Senate district shall at all times consist of contiguous territory. N.C. CONST. art. II, § 3. Contiguity by water is sufficient.

- <u>Respect for Existing Political Subdivisions</u>. County lines, VTDs and municipal boundaries may be considered when possible in forming districts that do not split these existing political subdivisions.

- <u>Racial Data</u>. Data identifying the race of individuals or voters shall *not* be used in the drafting of districts in the 2023 Senate Plan.

- <u>Political Considerations</u>. Politics and political considerations are inseparable from districting and apportionment. *Gaffney v. Cummings*, 412 U.S. 735 (1973). The General Assembly may consider partisan advantage and incumbency protection in the application of its discretionary redistricting decisions…but it must do so in conformity with the State Constitution. *Stephenson II*. To hold that legislators cannot take partisan interests into account when drawing district lines would essentially countermand the Framers' decision to entrust districting to political entities. *Rucho v. Common Cause*, 588 U.S.___(2019).

- <u>Incumbent Residence</u>. Incumbent residence may be considered in the formation of Senate districts.

JX047.

119. Drafts included on the parties' Joint Exhibit List show draft Senate plans dated from September 29 to the completion of the filed draft, SCJ-1, on October 13, 2023. *See* JX118 (SCJ-1 dated 10/13/2023 10:27 AM); JX129 (STU-1 dated 10/5/2023 12:26 PM); JX131 (SST-3 dated 10/5/2021 2:39 PM); JX146 (SCC-1 dated 10/2/2023 12:18 PM); JX150 (SCM-1 dated 09/29/2023 2:10 PM).

### A. North Carolina's Black Belt (Senate Districts 1 and 2)

120. Plaintiffs have challenged 2023 Senate Districts 1 and 2 as denying Black voters an equal opportunity in violation under the effects test of Section 2 of the Voting Rights Act. The Court therefore makes the following factual findings as to these districts and as relevant to the three *Gingles* preconditions required to show a Section 2 violation. *See Milligan*, 599 U.S. at 18-19 (citing *Gingles*, 478 U.S. 30).

1. <u>2023 Senate Districts 1 and 2 Divide North Carolina's Black Belt</u>

121.    Senate Districts 1 and 2 sit in North Carolina's northeast, covering the heart of the state's Black Belt. The Black Belt, or the state's old plantation belt, was historically home to most of North Carolina's enslaved Black population prior to the Civil War. PX181 at 4 (Bagley Report). The Black Belt is comprised of a swath of counties—including Northampton, Halifax, and Bertie—where slavery had been most deeply entrenched, and where the state's post-Civil War Black population was concentrated. PX179 at 13, 101 (Leloudis Report); Trial Tr. vol. III, 545:6-16 (Leloudis); *see also* PX180 at 4 ("Counties typically included in the North Carolina Black Belt include . . . Bertie, Hertford, Edgecombe, Northampton, Halifax, Vance, Warren, Martin, Washington, Nash, Pitt, Gates, and Chowan."). Black communities in the area have a long history of political organization, dating back to the 19th century. Trial Tr. vol. III, 545:6-9 (Leloudis). In particular, Northampton, Halifax, and Bertie counties were part of what was known as the "Black Second" Congressional district, which between 1865 and 1898 elected all four of North Carolina's Black congressmen. PX179 at 13 (Leloudis Report); Trial Tr. vol. III, 545:9-13 (Leloudis)*; see also* Doc. 146-1 at 8:4-22 (Butterfield).

122.    Fact witnesses also testified about the relevance of this area of the state as being part of North Carolina's Black Belt. *See* Trial Tr. vol. II, 355:2-6 (Jones); *id.* at 362:20-363:6 (Plaintiff Daly-Mack testifying that the Black Belt includes counties "around the top portion of the state"); Trial Tr. vol. III, 519:18-520:3 (Plaintiff Jasmin testifying to a general understanding of the Black Belt extending from Pitt County to Pasquotank County and north to Bertie and Herford Counties); *id.* at 592:14-593:1 (Patterson

53

describing the Black Belt as being "called the Black Belt because there are several predominantly Black counties within that area" ranging from "the north and northeastern part of North Carolina . . . as far south as Pitt County," including "Martin, Bertie, Hertford . . . into counties that surround those counties -- as far over as Pasquotank County"); Trial Tr. vol. IV, 829:11-17 (Senator Smith testifying that the Black Belt includes majority-minority counties such as Vance, Warren, Halifax, Northampton, Hertford, Bertie, and Washington counties); *id.* at 978:10-979:17 (Kearney).

123.    As a direct result of this history, today's Black Belt is home to many significant and historic Black communities, including counties with a higher proportion of BVAP than the 21.37% average across the state as a whole. *See* PX182 ¶¶ 29-34 & p. 17 Table 2, p. 18 Table 3 (Fairfax Report).[12] This concentration of high BVAP areas can be seen in Figure 1 from the report of Plaintiffs' expert Mr. Fairfax, PX182 at 19, excerpted below:

---

[12] Legislative Defendants have admitted that the BVAP percentages for counties in this area are a matter of public record. *See* Legislative Defendants' Answer, Doc. 31 ¶ 139, No. 23-cv-1104 (Feb. 12, 2024); Compl., Doc. 1 ¶ 139, No. 23-cv-1104 (Dec. 19, 2023).

54



124.    This area of the state holds historic significance to North Carolina's Black communities. As Reverend William Kearney testified that "when I think about the Black Belt, I think about enslaved people and those counties that had high numbers of enslaved people[.]" Trial Tr. vol. IV, 978:14-16 (Kearney). Former Congressman G.K. Butterfield, who represented Congressional District 1 for 10 years, has testified that a majority-minority Congressional district in the Black Belt originated with the passage of the Fifteenth Amendment in 1870. *See* Doc. 146-1 at 8:4-22.[13] The district regularly elected Black representatives to Congress in the early 1870s. *See id.* at 8:23-9:9. The late 1870s into the

---

[13] The Court granted the joint motion by NAACP Plaintiffs and Legislative Defendants to designate the trial testimony of Congressman G.K. Butterfield in another matter. *See* Joint Mot. to Designate Trial Testimony in Related Case, Doc. 146 (June 13, 2025); Trial Tr. vol. I, 7:9-17.

1880s saw backlash to Black voters gaining power, and the state legislature sought to limit local control over elections. *See id.* at 9:10-18. After White and Black voters began forming coalitions and electing Black candidates to the state legislature, the legislature passed a literacy test in 1900 ending this trend. *See id.* at 9:19-10:1.

125. North Carolinian voters in the Black Belt share many common socioeconomic traits and interests. The counties comprising the Black Belt are consistently ranked below the statewide median on a variety of socioeconomic indicators, including household income, educational attainment, percentage of homeowners, and percentage without health insurance. PX182 at 23-25; Trial Tr. vol. II, 448:25-449:10 (Fairfax). These disparities manifest in persistent ways, forming common social and political interests across the region. *See infra*, FOF Sections V.D & V.G.

126. As shown below in an excerpt of the 2023 Senate Plan, JX079, Senate Districts 1 and 2 starkly divide Black populations in the heart of the Black Belt:



127.    In both Senate Districts 1 and 2, Black Belt counties are paired with coastal communities hundreds of miles away, resulting in an extremely spread out and noncompact Senate District 2. *See* Trial Tr. vol. II, 355:19-21 (Plaintiff Jones noting it would take three or four hours to drive from his residence in Warren County down to Carteret County).

128.    Fact witnesses residing in the Black Belt testified to the perceived harm caused by Senate Districts 1 and 2 on their communities. Reverend William Kearney testified that Senate District 2 looked "contorted" and that he did not believe the Black Belt could get good representation from such a district. Trial Tr. vol. IV, 984:17-985:5 (Kearney). Plaintiff Calvin Jones testified that he "can't see another reason for some districts like [Senate District 2], other than just race and to try and stop Black people from collectively electing someone to help them." Trial Tr. vol. II, 355:10-356:15. Longtime regional organizer Courtney Patterson testified that there's "no commonality in the people

57

who live in Warren, Halifax County, and . . . the people who live in Carteret" and so "it's very hard for a person who lives in Carteret County to represent people in Warren, Halifax, Martin Counties and so forth simply because . . . the issues are entirely different." Trial Tr. vol. III, 598:4-15 (Patterson). Similarly, Plaintiff Reverend Dawn Daly-Mack testified that the configuration of Senate District 1 means that communities would have to "go along with people that don't even understand our plight . . . we can't work to vote for people that represent us . . . ." Trial Tr. vol. II, 368:24-369:9 (Daly-Mack). Senator Kandie Smith testified that "[i]t doesn't make sense just how [Senate District 2] is drawn, period" and that it is "probably one of the most gerrymandered areas" she has seen. Trial Tr. vol. IV, 812:11-21 (Smith). She further noted that this would negatively impact the representation for Black communities in the northeast. *Id.* at 812:22-813:6 (Smith).

129.    The statistical package, or "Statpack Report," generated by legislative staff during the legislative process on October 19, 2023, confirms the precise way in which Senate Districts 1 and 2 divide the Black population in this area of the state, with 28.47% BVAP in Senate District 1 and 28.94% in Senate District 2. JX388 at PDF p. 9.[14]

130.    The Senate Redistricting Chairs chose this configuration for Senate Districts 1 and 2 among two county cluster options. Trial Tr. vol. IV, 841:1-12 (Hise).[15] The

---

[14] This is the Statpack for the first draft made public on October 18, 2023, SCJ-1. *See* Stipulated Facts ¶ 16; JX099. The district configuration for Senate Districts 1 and 2 are identical to the final enacted plan. *Compare* JX109 (Realign NC Senate Districts 2023/SCJ-1) *with* JX079 (S.L. 2023-146 Senate).

[15] Early draft Senate plans reflect the same cluster option for Senate Districts 1 and 2 as in the final enacted plan. *See* JX118 (SCJ-1 dated 10/13/2023 10:27 AM); JX129 (STU-1 dated 10/5/2023 12:26 PM); JX131 (SST-3 dated 10/5/2023 2:39 PM); JX146 (SCC-1 dated 10/2/2023 12:18 PM); JX150 (SCM-1 dated 09/29/2023 2:10 PM).

alternative option, rejected by the Senate Redistricting Chairs during this redistricting process, is reflected in Districts 1 and 3 of the 2022 Senate Plan. JX221.[16]

131.    In his testimony at trial, Senator Hise specified that the enacted configuration was chosen because District 1 would be the "most compact district of the four options for districts that are available[,]" that the selected configuration would keep "four of those fingerling counties considered together" based on "some public comment about what is called the fingerling counties being a community of interest[,]" and due to the reach of the Virginia Media Market into the northern portion of the state. Trial Tr. vol. IV, 841:1-842:5 (Hise). Importantly, Senator Hise did not specify partisanship as a reason for the chosen county cluster in his testimony, nor was it mentioned by Senator Daniel in his explanation of Senate Districts 1 and 2 on the committee floor when these districts were first introduced. *See* Trial Tr. vol. IV, 841:1-842:5 (Hise), JX002 at 46:4-48:2 (Daniel).

132.    While Senator Hise also testified that 2023 Senate Districts 1 and 2 were chosen because they "best represented the criteria of the committee" generally, Trial Tr. vol. IV, 865:12-18 (Hise), this does not support a partisan objective. When asked about the Congressional Plan's "Political Considerations" criteria, he testified that "determin[ing] whether it was likely a Republican could win in a particular district" was "not one of the criteria," just "something we, as chairmen, looked at," *id.* at 857:3-15 (Hise), and separately confirmed that the Senate and Congressional "Political Considerations" criteria were the same, *id.* at 854:12-855:2 (Hise); *see also* JX047; JX038.

---

[16] *See also* JX051 (Duke Cluster options showing alternatives for "Z1" and "Y1" in the northeast).

133.    The purported reasons for selecting Senate Districts 1 and 2 are not consistent with the legislative record or information before the Senate Redistricting Chairs at the time of drafting. First, on the issue of compactness, Senator Hise's testimony as to the desire to maximize compactness of a single district contradicts his testimony about how the criteria of compactness was applied in the redistricting process, where he agreed it was used as a minimum threshold. *Compare* Trial Tr. vol. IV, 841:13-19 (Hise) *with id.* at 881:22-25 (Hise). And in choosing the enacted configuration for Senate District 2, the Senate Redistricting Chairs chose one of the *least compact* Senate districts of all districts in the plan. This is confirmed both visually and in the compactness scores available in the legislative record. Specifically, Senate District 2 has a Reock score of 0.23 and Polsby-Popper score of 0.10. JX203 at 1. This is the lowest Polsby-Popper score of any district in the plan, and Senate District 2 is among the lowest Reock scores with only Senate Districts 21 and 47 having lower scores (with Reock Scores of 0.22 and 0.19, respectively). *Id.* at 1, 2, 4. Senator Hise testified that Reock and Polsby-Popper scores were used in the redistricting process. Trial Tr. vol. IV, 838:4-13 (Hise).

134.    Moreover, a comparison with the compactness scores of the alternative configuration available does not support that the 2023 Senate District 1 is the most compact at all; instead it shows overall higher average compactness scores for *both* districts in the alternative configuration, as can be seen by the legislative Statpack report from the 2022 plan. *Compare* JX279 (alternative configuration showing Senate District 1 with 0.40 Reock and 0.18 Polsby-Popper, and Senate District 3 with 0.30 Reock and 0.17 Polsby-Popper)

60

*with* JX203 (2023 configuration showing Senate District 1 with 0.26 Reock and 0.21 Polsby-Popper and Senate District 2 with 0.23 Reock and 0.10 Polsby-Popper).

135. Likewise, the purported justification of public comment concerning "fingerling county" communities is not substantiated in the legislative record. The terms "finger" or "fingerling" appear nowhere in either the transcripts for the Three September Hearings or in the written public comments submitted during the legislative process.[17] *See generally* JX58-60 (hearing transcripts); PX76-77 (written public comments); PX79 (same); WX93-96 (same). The lack of prior public comment about "fingerling counties" is inconsistent with Senator Hise's testimony that "we looked very much for any additional evidence that would have come from public comments or others about areas being communities of interest that we may not identify with those political subdivisions." Trial Tr. vol. IV, 838:15-839:2 (Hise).

136. Finally, the justification based upon the Virginia Media Market is not listed as a consideration on the Senate or Congressional criteria, and Senator Hise did not testify that it was among the considerations under the "communities of interests" considered by the Senate Redistricting Committee. *See* JX047; JX038; Trial Tr. vol. IV, 838:15-839:2

---

[17] To the extent Legislative Defendants would premise this concern for the "fingerling" counties on the comments given in the 2021 redistricting cycle, that would likewise be unsupported. In a November 1, 2021, Senate Committee Hearing, Senator Daniel testified that Congressional District 1 was constructed to keep the finger counties together and respect the northeast based upon the testimony from a member of the public, Keisha Dobie. *See* JX234 at minutes 1:28-3:00. But in Ms. Dobie's comments in the September 14, 2021, public hearing, she never mentioned the "finger" or "fingerling" counties specifically; instead, she asked that the northeast be kept together as a community of interest. *See* JX240 at minutes 24:35-26:56. Moreover, Ms. Dobie returned in 2023 to give public comment, noting that her prior public comment was misused, and that she had "made it clear that I did not want my district drawn in a way that could harm historically marginalized communities in adjacent counties." JX060 at 27:13-29:3.

61

(Hise). Instead, he testified that it was something the Senate Redistricting Committee looked at. Trial Tr. vol. IV, 839:4-12 (Hise). Even if media markets were formally a consideration in the criteria, it was applied inconsistently across districts in this process. For example, Senator Hise testified to being aware of media markets that service the Triad area containing Greensboro, High Point, and Winston-Salem, *id.* at 952:6-11 (Hise), and yet it was not a relevant factor when the decision was made to divide the Triad in the Congressional Plan, *id.* at 930:16-931:2 (Hise). The failure to identify media markets in the adopted criteria and the inconsistent consideration of the criteria during the redistricting process raise the question of whether this was a post hoc rationalization in an effort to support the design of Senate Districts 1 and 2 as finalized in the 2023 Plan.

137. In sum, the purported justifications for the choice of 2023 Senate Districts 1 and 2 are not consistent with the redistricting criteria purportedly used to draw districts in 2023 and considered during the legislative session.

2. The Black Population in North Carolina's Black Belt is Sufficiently Large and Geographically Compact to Constitute a Majority in Two Reasonably Configured Senate Districts, Satisfying *Gingles* 1

138. North Carolina's Black Belt contains a Black population sufficiently large and geographically compact enough to form a majority in two reasonably configured state Senate districts, satisfying *Gingles* I, and Plaintiffs have shown it is possible to draw two reasonably configured majority-Black state Senate districts in North Carolina's Black Belt, anchored in northeastern North Carolina. PX182 ¶ 112 (Fairfax Report); Trial Tr. vol. II, 451:1-3 (Fairfax).

139. Plaintiffs offered two illustrative (a.k.a. demonstrative) state Senate districts in this area of the state, Plaintiffs' Illustrative Senate District 2 and Plaintiffs' Illustrative Senate District 5. PX182 at 53, Figure 14 (Fairfax Report). These districts do not represent the only possible reasonably configured majority-BVAP districts in this part of the state, but they do satisfy Plaintiffs' burden to demonstrate that it is possible to draw two majority-BVAP districts that are reasonably configured in this area of the state. *Id.* at ¶ 114 & n.31; *e.g.* Trial Tr. vol. II, 453:22-454:10, 476:2-4 (Fairfax).

140. Mr. Fairfax drew his Illustrative Plans using Maptitude, an industry-leading redistricting software program. Trial. Tr. vol. II, 440:1-6 (Fairfax). Mr. Fairfax began with the 2023 Senate Plan, modifying both the Enacted districts and county configurations only to the extent necessary to create his two *Gingles* illustrative districts. PX182 ¶¶ 8-9 (Fairfax Report); *see also* Trial Tr. vol. II, 487:21-488:2 (Fairfax). Mr. Fairfax also utilized the state Senate redistricting criteria when drawing his plans, with "one important exception" of utilizing racial data during the development of the plan, as is necessary when complying with *Gingles*. PX182 ¶ 113; Trial Tr. vol. II, 471:18-472:2 (Fairfax). Mr. Fairfax used every redistricting criterion adopted by the legislature relevant to the *Gingles* inquiry to develop his illustrative districts. PX182 ¶¶ 23-24; Trial. Tr. vol. II, 439:6-10 (Fairfax).

141. Using Maptitude, Mr. Fairfax utilized different visual overlays, or layers, while drawing his illustrative plans in order to ensure that they adhered to the relevant redistricting criteria. Trial Tr. vol. II, 440:7-448:8 (Fairfax). Most of the layers Mr. Fairfax used were preloaded with the Maptitude software and data. *Id.* at 440:7-441:23 (Fairfax).

63

142.    In addition to the preloaded Maptitude layers, Mr. Fairfax created two layers for use in his map-drawing process. *Id.* at 441:24-442:14, 443:7-11 (Fairfax). The first layer Mr. Fairfax created used U.S. Census data to create a demographic layer showing where the minority population in North Carolina lives. *Id.* at 442:1-8, 443:7-444:16 (Fairfax). The second layer Mr. Fairfax created relied on U.S. Census Bureau American Community Survey (ACS) data, which contain various socioeconomic data, such as median household income, percentage of residents with a high school degree, and percentage of residents without health insurance. *Id.* at 442:9-14, 445:3-446:10 (Fairfax); *see also* PX182 ¶ 45 (Fairfax Report).

143.    Using these ACS data, Mr. Fairfax grouped areas with common socioeconomic interests and needs together in the same districts in his illustrative plans. Trial Tr. vol. II, 445:3-448:8 (Fairfax). By drawing with the ACS data visible, Mr. Fairfax was able to identify areas with socioeconomic similarities while drawing his illustrative districts. This enabled him to unify these areas into districts that would share socioeconomic commonalities, and thus have similar socioeconomic needs. *Id.* No expert who testified disputed that the ACS is a reliable data source. *See, e.g.*, Trial Tr. vol. VI, 1429:10-15 (Trende). By cycling through each of the Maptitude layers as he drew, Mr. Fairfax was able to ensure that he balanced the various criteria in his illustrative districts. Trial Tr. vol. II, 442:15-443:6 (Fairfax).

144.    While Mr. Fairfax consulted the racial layer he created during his map-drawing, he relied on it less than the other layers, turning it on only "to orient [himself]" during the drawing process. *Id.* at 472:7-20 (Fairfax). Nor did Mr. Fairfax draw with a

64

racial target. *Id.* at 488:15-489:6, 472:14-473:5 (Fairfax). Using these thematic layers to balance the various criteria, and drawing on his experience as a demographer, Mr. Fairfax ensured that race did not predominate in the construction of his illustrative plans. PX182 ¶ 24; Trial Tr. vol. II, 488:15-489:6 (Fairfax).

145.   As shown in the Fairfax Figure 14 excerpted below (PX182 at 53), Illustrative Senate District 2 is composed of nine whole counties in northeastern North Carolina. The district is majority-BVAP. PX182 ¶ 115; Trial Tr. vol. II, 451:9-12 (Fairfax). It is exceedingly rare for a *Gingles* I demonstrative district to be composed entirely of whole counties. Trial Tr. vol. II, 452:16-453:1 (Fairfax). Plaintiffs' Illustrative Senate District 2 is contiguous and falls within the acceptable population range required by one-person, one-vote and *Stephenson*. PX182 ¶¶ 116-17, 122 & p. 53 Figure 14 (Fairfax Report). Illustrative Senate District 2 has a Reock score of 0.31, and a Polsby-Popper score of 0.26. PX182 at 60 (Fairfax Report). Illustrative Senate District 2 is compact, respects political subdivision boundaries, unifies a community of interest in northeast North Carolina, and incorporates communities of similar socioeconomic status into its boundaries. Trial Tr. vol. II, 451:17-452:15 (Fairfax); PX200 ¶¶ 42-43 (Fairfax Reply). Plaintiff Reverend Dawn Daly-Mack, a longtime resident of Northampton, similarly testified that "Putting Warren, Halifax, Northampton, Hertford, and Bertie back together makes good sense to me. There are communities that have lots of things in common that would want to have the same type of representation and the same amount of responsiveness." Trial Tr. vol. II, 370:1-9 (Daly-Mack). Plaintiffs' Illustrative Senate District 2 is reasonably configured.



**Figure 14 – Senate Illustrative Plan A for Northeast Districts**

146. Plaintiffs' Illustrative Senate District 5, depicted in Fairfax Figure 14 above, is composed of two whole counties and two partial counties in northeastern North Carolina. *See* PX182 ¶ 119 (Fairfax Report). The district is majority-BVAP. *Id.* at ¶ 115; *see also* Trial Tr. vol. II, 451:9-12 (Fairfax). Plaintiffs' Illustrative Senate District 5 is contiguous and falls within the acceptable population range required by one-person, one-vote and *Stephenson*. PX182 ¶¶ 119, 122-23 & p. 56, Table 30. The entire northern border of the district follows the county boundaries of Martin, Edgecombe, and Nash Counties. Trial Tr. vol. II, 456:23-457:8 (Fairfax). Illustrative Senate District 5 has a Reock score of 0.33, and a Polsby-Popper score of 0.18. PX182 at 60 (Fairfax Report). The district is more compact

66

than the least compact district in the 2023 Senate Plan, thus meeting the minimal threshold Senate map-drawers used to measure compactness. Trial Tr. vol. IV, 881:22-25 (Hise); PX200 at 20 (Fairfax Reply).

147. Plaintiffs' Illustrative Senate District 5 incorporates communities of similar socioeconomic status into its boundaries. The district contains over 96% of the municipality of Rocky Mount, unifying the city across the county boundary of Nash-Edgecombe. PX182 ¶ 119 & p. 56, Figure 16 and Table 30 (Fairfax Report); Trial Tr. vol. II, 454:6-8; PX200 ¶ 46 (Fairfax Reply). The district also ensures that the municipal boundaries of Ayden and Winterville are respected, keeping them together in a neighboring district. Trial Tr. vol. II, 455:11-14 (Fairfax); PX200 ¶ 46 & p. 18, Figure 6 (Fairfax Reply). Where Plaintiffs' Illustrative Senate District 5 does split a municipality, the city of Greenville, it does so in a manner substantially similar to the way House Districts 8 and 9 (drawn and enacted by the legislature) split that same city. Trial Tr. vol. II, 454:11-455:17 (Fairfax); *compare* JX193 *with* PX182 ¶ 119 & p. 56, Figure 16 (Fairfax Report).

148. Mr. Fairfax used the House Enacted Plan's line as a guide, making only minor changes to make Plaintiffs' Illustrative Senate District 5 more compact. Trial Tr. vol. II, 454:17-455:5 (Fairfax). This allowed Mr. Fairfax to achieve his goal of keeping areas of common socioeconomic status together, as he had done throughout the Illustrative Plans. *Id.* at 454:11-455:17 (Fairfax). After constructing this district, *Stephenson* considerations required either splitting Pitt County into three different districts or breaking up an additional county cluster grouping. *Id.* at 457:9-458:1 (Fairfax). Mr. Fairfax's Illustrative

67

Plan A chose to split Pitt rather than reconfigure an additional county cluster, but Mr. Fairfax testified that the legislature could easily choose to do the reverse. *Id.*

149. Fact witness testimony confirmed the reasonableness of Plaintiffs' Illustrative Senate District 5, including the split of Greenville, most notably Senator Kandie Smith who has represented the City of Greenville in municipal and state legislative offices for over a decade and testified that the split was similar to that of the House district she represented. Trial Tr. vol. IV, 828:18-830:17 (Smith). Illustrative Senate District 5 is reasonably configured.

150. These two districts—Plaintiffs' Illustrative Senate Districts 2 and 5—are contained in Plaintiffs' Illustrative Senate Plan A. PX182 at 52-56 (Fairfax Report). This plan modifies as few *Stephenson* groupings as possible to comply with both *Stephenson* and the Voting Rights Act. Trial Tr. vol. II, 487:21-488:2 (Fairfax); PX182 at 8-10; PX200 ¶¶ 20-22.

151. Plaintiffs have demonstrated that there is already one Senate district in this area of the state, 2023 Senate District 5, that usually elects Black voters' candidates of choice. *See infra* FOF ¶ 184. Accordingly, there is only a need to draw one additional opportunity Senate district in this area of the state to comply with *Gingles* and the Voting Rights Act.

152. Illustrative Senate Plan B contains an example of such a plan, retaining the performing 2023 Senate District 5 and adding Plaintiffs' Illustrative Senate District 2 that is shown in Plaintiffs' Illustrative Senate Plan A. PX182 at 61-62 (Fairfax Report).

68

153.    Legislative Defendants' attempts to portray these Illustrative Senate Districts as unreasonably configured are unavailing. Plaintiffs' Illustrative Senate District 2 is composed entirely of whole counties. Illustrative Senate District 5 follows county boundaries for a significant portion of its perimeter, respects municipal boundaries both within the district and in neighboring districts, and combines areas of similar socioeconomic status. To the extent that Illustrative Senate District 5 does split the city of Greenville, its perimeter largely traces 2023 House Districts 8 and 9 (drawn by the legislature). As such, both Plaintiffs' Illustrative Senate Districts are not only reasonably configured using traditional criteria, but also satisfy the test the Senate map-drawers used to measure district compactness in the Enacted Plan.

154.    Against these facts, Legislative Defendants seek to challenge the Illustrative Senate Districts by offering critiques against only sub-portions of the districts. Dr. Trende repeatedly opined that the Plaintiffs' Illustrative Senate Districts linked together "disparate" Black populations, even where, as in the case of Plaintiffs' Illustrative Senate District 2, the district was composed entirely of whole counties. LDTX276 at 55, 59-60 (Trende Report). In reaching this conclusion, Dr. Trende utilized a compactness measure called moment of inertia, an out-of-date measure discredited by courts, not widely adopted by either legal or academic practitioners, and not used by Dr. Trende in his own work for independent redistricting commissions in Arizona and Virginia. *See infra* COL ¶ 466; LDTX276 at 9-12; Trial Tr. vol. VI, 1424:1-18 (Trende); *see also* Trial Tr. vol. V, 1129:9-1130:7 (Barber). Further, Dr. Trende testified that this focus on the compactness of the population within the district, rather than the compactness of the district itself, has not been

69

used by courts in Voting Rights Act cases, and is unique to Legislative Defendants' case theory. Trial Tr. vol. VI, 1424:1-5, 1428:11-1429:4 (Trende).

155. Dr. Trende's district-specific analysis focused on specific attributes of portions of the examined districts, rather than their configuration as a whole. As a threshold matter, Dr. Trende conceded that all of Mr. Fairfax's illustrative districts satisfied the *Gingles* numerosity requirement. *Id.* at 1429:19-21 (Trende). Dr. Trende's analysis instead focused on isolated metrics for each district examined, identifying specific sections of each illustrative district where he suggested race was taken into account. LDTX276 at 55-62.

156. Dr. Trende stopped short of concluding that any district was not reasonably configured. Trial Tr. vol. VI, 1420:9-11 (Trende). But Dr. Trende nonetheless suggested Plaintiffs' Illustrative Senate Districts might not be reasonably configured, despite acknowledging that Senate District 2 was composed entirely of whole counties and Senate District 5 followed the county boundary in the north and respected the municipal boundaries of Ayden and Winterville in the south. *Id.* at 1430:5-7, 1431:7-16 (Trende). Dr. Trende also agreed that Illustrative District 5 contained almost all of the city of Rocky Mount. *Id.* at 1432:11-1433:3 (Trende).

157. Despite these concessions, Dr. Trende focused on the configuration of Plaintiffs' Illustrative Senate District 5 in Pitt County. Dr. Trende suggested that there were two factors rendering Plaintiffs' Illustrative Senate District 5 unreasonable: the split of the city of Greenville and the split of Pitt County into three districts. *See* LDTX276 at 55-57 (Trende Report). Specifically, Dr. Trende testified that the split of Greenville demonstrated racial predominance. Trial Tr. vol. VI, 1369:6-16 (Trende). He maintained this conclusion

70

even after comparing the line of Plaintiffs' Illustrative Senate District 5 to the line between 2023 House Districts 8 and 9, which Mr. Fairfax testified that he used as a model to draw his district. *Id.* at 1435:6-1436:4 (Trende); Trial Tr. vol. II, 454:17-456:6 (Fairfax). Dr. Trende said the plans deviated in crucial ways despite only minor changes between Mr. Fairfax's plan and the 2023 House Plan in this area. Trial Tr. vol. VI, 1435:6-1436:4 (Trende).

158.    Dr. Trende also noted that Plaintiffs' Illustrative Senate District 5 split Pitt County into three different districts. LDTX276 at 57 (Trende Report). Dr. Trende noted this as a relevant fact concerning Illustrative District 5 despite having drawn a state Senate plan in Virginia that split a county three ways. Trial Tr. vol. VI, 1444:4-1446:16 (Trende).[18] Dr. Trende believed that Mr. Fairfax's districts were unreasonable and resembled racial gerrymanders because of this split, but did not view his own districts the same way. *Compare id.* at 1446:7-22 (Trende) *with* LDTX276 at 57 (Trende Report). This was Dr. Trende's opinion even though he also drew his own Virginia districts as minority opportunity districts. Trial Tr. vol. VI, 1441:7-1446:22 (Trende).[19] Nor did Dr. Trende account for the fact that recent North Carolina state Senate plans have also split counties three ways. *Id.* at 1447:7-1449:4 (Trende).

---

[18] Notably, the ideal state Senate population size for Virginia and North Carolina is quite similar using 2020 Census data. Trial Tr. vol. VI, 1444:20-1445:5 (Trende).

[19] Dr. Trende resisted conceding that he had configured these districts as minority opportunity districts. Trial Tr. vol. VI 1441:25-1442:16 (Trende). He did so despite confirming that the final district configurations matched the descriptions in the explanatory memo he co-authored, which he was shown at trial and testified that he still agreed with. *Compare id.* at 1441:25-1442:12 *with id.* at 1444:9-16, 1445:9-1446:3 ("Q: Just like you noted in the original memorandum? A: That's right.").

71

159.    While Dr. Trende does opine on specific aspects of the configuration of Plaintiffs' Illustrative Senate Districts, his approach is too focused on specific subparts of the districts and thus misses the overall sweep of each district's configuration.

160.    Dr. Barber's criticisms of Plaintiffs' Illustrative Senate Districts are likewise fundamentally flawed. Dr. Barber offered the opinion that race is "highly correlated with a number of factors that are essential to the redistricting process." LDTX253 at 24; Trial Tr. vol. V, 1120:6-25 (Barber). He opined that this encompassed a wide variety of factors, including geography, and testified that this would include North Carolina's Black Belt. Trial Tr. vol. V, 1121:1-15 (Barber). Dr. Barber also offered the opinion that a district could be constructed using these correlated factors, rather than with race, and it would be difficult to tell whether the district was relying on race or one of the correlated factors. *Id.* at 1121:17-1123:9 (Barber). Dr. Barber then concluded that a district can be drawn using these correlated factors without having race predominate. *Id.* at 1123:10-16 (Barber).

161.    Dr. Barber also opined that Plaintiffs' Illustrative Senate Districts violate the *Stephenson* county grouping requirement. LDTX253 at 47-49. Dr. Barber critiqued Plaintiffs' Illustrative Senate Districts for not adhering to the *Stephenson* criteria, *id.* at 48-49, but when asked whether VRA districts would not be bound by the county grouping requirement, he admitted that federal law would take precedent over state constitutional requirements. Trial Tr. vol. V, 1139:10-16 (Barber). Taken to its logical conclusion, Dr. Barber's implication that *Gingles* I illustrative districts must be drawn within *Stephenson* clusters to be reasonably configured directly contradicts the instruction in *Stephenson* that VRA districts be drawn "prior to" constructing *Stephenson* groupings. *See Stephenson I,*

72

562 S.E. 2d at 396-97. In function, Dr. Barber's view would subordinate the VRA to *Stephenson.* This elevation of state law over federal law cannot be credited.

162.    Dr. Barber also doubted whether it was reasonable for Plaintiffs to employ the same standards used by the legislature to determine what would be reasonable for their own districts. Trial Tr. vol. V, 1126:10-1127:25 (Barber). But when asked to identify an alternative standard that Plaintiffs could use or rely on, he could not do so. *Id.* at 1128:1-19 (Barber). The Court finds this tension to be revealing, and that this is an invitation to subject Plaintiffs' Illustrative Districts to the "beauty contest" that the Supreme Court expressly said was not required in the *Gingles* context in *Milligan.* 599 U.S. at 21. Following the instruction of the Supreme Court, this Court declines to do so.

163.    Resultingly, Dr. Barber suggested that Plaintiffs' Illustrative Senate District 2 might not be reasonably configured despite being composed entirely of whole counties. LDTX253 at 47-48 (Barber Report). Dr. Barber did not identify any district-specific evidence that Plaintiffs' Illustrative Senate District 2 was not reasonably configured. *See id.* at 56. Instead, Dr. Barber suggested, Plaintiffs' Illustrative Senate District 2's impact on the surrounding districts might render its own configuration unreasonable. *Id.* at 48 ("[T]here is a spillover effect[.]").

164.    Dr. Barber also opined that Plaintiffs' Illustrative Senate District 5 was drawn with racial predominance. *See id.* at 59-60. The only support Dr. Barber identified for this contention was the configuration of Plaintiffs' Illustrative Senate District 5's boundary in the city of Greenville; he expressed no affirmative opinion on the rest of the district. *Id.* at 60. Dr. Barber conceded that Plaintiffs' Illustrative Senate District 5 respected municipal

73

boundaries, including unifying the large municipality of Rocky Mount almost entirely within a single district. Trial Tr. vol. V, 1143:7-12 (Barber). Nor did Dr. Barber dispute Mr. Fairfax's reporting concerning the boundaries of Ayden and Winterville. *Id.* at 1142:12-25 (Barber) (relying on Mr. Fairfax's reporting as to municipal splits); *see also* PX200 ¶ 46 & p. 18, Figure 6 (Fairfax Reply). When confronted with the similarity of Plaintiffs' Illustrative Senate District 5 and the legislature's 2023 House Districts 8 and 9, Dr. Barber agreed that he could "certainly see resemblances." Trial Tr. vol. V, 1144:3-7 (Barber). Dr. Barber also declined to state that the legislature drew with racial considerations when they constructed this substantially similar boundary, despite testifying that Mr. Fairfax had done so. *Id.* at 1144:14-17 (Barber). Finally, Dr. Barber questioned whether VRA districts were needed in eastern North Carolina, equating Black candidates of choice with Democrats and suggesting that the partisan performance of the Enacted Plan provided equal minority voting opportunity accordingly. LDTX 253 at 50-51 (Barber Report).

165.   Overall, the sub-district critiques of Plaintiffs' Illustrative Senate Districts offered by Drs. Trende and Barber contradict the Supreme Court's instruction to consider the district as a whole when evaluating the configuration of that district, even when looking at sub-parts of that district. "Concentrating on particular portions in isolation may obscure the significance of relevant districtwide evidence . . . . A holistic analysis is necessary to give that kind of evidence its proper weight." *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 192 (2017); *accord Milligan*, 599 U.S. at 18-19.

166.   Additionally, the Court notes that the fact that Drs. Trende and Barber both analyzed the reasonableness of Mr. Fairfax's illustrative districts is an unusual posture for

two experts on behalf of the same party. Their analyses were consistent in some ways: Like Dr. Trende, Dr. Barber agreed that Plaintiffs' Illustrative Senate Districts all satisfied the numerosity requirement of *Gingles*. LDTX253 at 55. Like Dr. Trende, Dr. Barber also conceded that Plaintiffs' Illustrative Senate Districts scored within the range of compactness that the map-drawers deemed acceptable for the 2023 Senate Plan. LDTX253 at 56, 58 (Barber Report); Trial Tr. vol. V, 1140:16-1141:7 (Barber); Trial Tr. vol. IV, 881:22-25 (Hise). And like Dr. Trende, Dr. Barber admitted that determining whether a district is reasonably configured is fact-specific and amenable to multiple plausible conclusions. Trial Tr. vol. V, 1124:22-1126:1 (Barber).

167. But Drs. Barber and Trende also diverged at crucial points in their analysis. Unlike Dr. Trende, Dr. Barber opined that urban and rural populations could be combined in a reasonably configured district. *Compare* LDTX276 at 25, 31 (Trende Report Part II) (suggesting that districts with both urban and rural populations are unreasonable) *with* Trial Tr. vol. V, 1137:2-20 (Barber). Dr. Barber also opined that the focus of the *Gingles* I inquiry was a demonstrative plan, rather than a demonstrative district, despite not being able to identify any legal support for this contention. Trial Tr. vol. V, 1136:13-1137:1 (Barber). Dr. Trende testified, consistent with established legal precedent, that the focus is on a demonstrative district. Trial Tr. vol. VI, 1425:2-1426:17 (Trende). Unlike Dr. Trende, Dr. Barber declined to offer the opinion that a district's population must be compact, rather than the district itself. Trial Tr. vol. V, 1137:24-1138:2 (Barber); *see also id.* at 1128:20-1129:10 (Barber) ("[C]ompactness refers to kind of how closely does a district resemble a circle[.]").

168.    These differences and contradictions go to the reliability of their testimony, and suggest that the true purpose of Drs. Barber and Trende's dueling analyses is to confuse, rather than clarify, the factual inquiry before this Court with respect to *Gingles*. On *Gingles*, Dr. Barber, like Dr. Trende, offers criticisms that are too narrow and unattuned to the configuration of various districts as a whole. Dr. Barber also offers unsubstantiated theories as to the impact of the *Stephenson* clusters and the relationship between those clusters and individual district configurations. Further, Dr. Barber clashes with Dr. Trende's analysis at various points, but agrees that at the end of the day, "reasonably configured" is a fact-specific inquiry. The Court concludes that this lack of standards in both experts' analyses casts doubt on whether Drs. Barber or Trende would ever have concluded Plaintiffs' Illustrative Senate Districts were reasonably configured. Accordingly, we find Dr. Barber's *Gingles* analysis, like that of Dr. Trende, to be of limited probative value and assign it only limited weight.

169.    Overall, none of the critiques offered by the Legislative Defendants' experts challenge Plaintiffs' Illustrative Senate Districts on a holistic basis. Legislative Defendants' experts do not even concur about what is wrong with those districts. The only thing each of these experts agree upon is that Plaintiffs' Illustrative Senate Districts are unacceptable. This testimony, unable to offer a consistent framework demonstrating that Plaintiffs' Illustrative Senate Districts are unreasonable, is unavailing.

3. <u>Black Voters are Politically Cohesive in the Black Belt</u>

170. Plaintiffs' expert Dr. Oskooii applied ecological-inference methods to find that Black voters are politically cohesive in Plaintiffs' Illustrative Senate Districts, as well as in the challenged Senate Districts 1 and 2 and adjacent Senate Districts 5 and 11.

171. Ecological inference analysis uses aggregate elections and voter data to identify voting patterns through statistical analysis of candidate choice and racial demographics within a precinct. PX189 ¶¶ 29-38 (Oskooii Report). In his analysis, Dr. Oskooii performed ecological inference estimates of Black cohesion using a total of 64 statewide (i.e., exogenous) elections: 49 statewide elections from 2016 through 2022 in his initial report, *id.* at ¶ 3, and 15 exogenous elections from 2024 in his supplemental report, PX208 ¶ 12 & p. 8, Table 1. He also analyzed the specific state Senate elections (i.e., endogenous) that occurred under the challenged districts in 2024. *Id.* at ¶¶ 14-15. Dr. Oskooii's analysis utilized two methods of ecological inference: King's iterative EI and the newer method RxC EI. PX189 ¶¶ 32-38 (Oskooii Report). Dr. Oskooii relied upon a peer-reviewed, open source package to conduct his analysis. *Id.* at ¶ 38. *See generally* Trial Tr. vol. II, 378:24-382:6 (Oskooii).

172. As noted above, Legislative Defendants' expert Dr. Alford does not dispute the reliability of Dr. Oskooii's methodologies, data, or the accuracy of his calculations, and the Court finds these methods, as applied to the robust set of election data utilized, to be reliable.

173. Dr. Oskooii found that average Black cohesion estimates are above 95% across 2023 Senate Districts 1, 2, 5, and 11 as well as in Plaintiffs' two illustrative majority-

77

Black districts. PX208 ¶¶ 6(a)-(b), (e) (Oskooii Supplemental Report); Trial Tr. vol. II, 386:2-16 (Oskooii). Legislative Defendants' expert Dr. Alford does not dispute these ecological inference estimates or the fact that Black cohesion is present in the Plaintiffs' Illustrative Senate Districts or the 2023 Senate Districts analyzed. Trial Tr. vol. V, 1222:9-1223:1, 1226:2-5 (Alford). Accordingly, the Court finds that Black voters are politically cohesive in both the challenged districts and Plaintiffs' illustrative majority-black districts.

174.    Dr. Oskooii also conducted a performance analysis to measure whether Black voters in Plaintiffs' Illustrative Senate Districts would vote sufficiently as a bloc to enable them to successfully elect their candidate of choice. *See* PX189 ¶ 39 (Oskooii Report). He found that both majority-Black Plaintiffs' Illustrative Senate Districts 2 and 5 in Plaintiffs' Senate Illustrative Plan A would consistently perform for Black voters, thus providing Black voters two consistently performing districts in North Carolina's Black Belt. PX208 ¶¶ 42-43 & p. 21, Table 6 (Oskooii Supplemental Report); Trial Tr. vol. II, 390:2-10 (Oskooii).

175.    Dr. Alford did not dispute Dr. Oskooii's performance result calculations. Trial Tr. vol. V, 1222:24-1223:1 (Alford). Accordingly, the Court finds that Plaintiffs have demonstrated that Plaintiffs' two majority-Black Illustrative Senate districts would usually perform for Black voters.

    4.    <u>White Voters Vote Sufficiently as a Bloc to Defeat the Candidates of Choice of Black Voters in the Challenged Senate Districts</u>

176.    Dr. Oskooii applied the same ecological inference methods to analyze White voter cohesion. He found that average estimates of White bloc voting against Black-

preferred candidates range from percentages in the mid-70s to high-80s across the 2023 Senate Districts he analyzed (1, 2, 5, and 11) and across both EI models (RxC and iterative EI) that he applied. PX208 ¶¶ 6(a)-(c), (e) (Oskooii Supplemental Report); Trial Tr. vol. II, 386:2-16 (Oskooii). In 2024 specifically, Dr. Oskooii's RxC EI estimates found averages of 77.77%, 80.23%, 74.80%, and 83.17% in Senate Districts 1, 2, 5, and 11, respectively, and slightly higher levels utilizing his iterative EI method (79.49%, 81.31%, 78.16%, and 86.15%, respectively). PX208 ¶ 18 & p. 10, Table 4 (Oskooii Supplemental Report). Dr. Oskooii also looked at the 2024 election results for contests within the challenged Senate districts, i.e., the endogenous election results. He calculated estimated White bloc voting at 79%, 82.1%, 77.7%, and 85% in Senate Districts 1, 2, 5, and 11, respectively, using the EI RxC methodology, all in opposition to the Black-preferred candidate that had estimated Black voter support above 96% in all of the districts. *Id.* at ¶¶ 27-30.

177.    Dr. Oskooii testified to the importance of providing summary tables showing ecological inference results over time, instead of on aggregate average, because the latter "hides or masks a lot of internal variation or information within a data that could be useful to see," including the impact of "different turnout levels between presidential years and midterm years." Trial Tr. vol. II, 385:11-386:1 (Oskooii).

178.    Overall, Dr. Oskooii testified that his analysis shows that it is "very clear-cut that voting across these districts and within each of these districts is polarized along racial lines" and that these results presented a "clear-cut, textbook example of racially polarized voting[.]" *Id.* at 386:2-16 (Oskooii).

179.    Dr. Alford did not dispute Dr. Oskooii's calculations and agreed that a "substantial majority" of White voters overall voted to oppose the Black-preferred candidates. Trial Tr. vol. V, 1226:12-21 (Alford). Dr. Alford likewise did not dispute these endogenous election results from Dr. Oskooii and did not conduct similar analysis of his own despite acknowledging endogenous elections can be more probative of a district's performance than statewide elections. *Id.* at 1222:24-1223:5, 1224:14-19 (Alford).

180.    Accordingly, the Court finds that White bloc voting in opposition to the Black-preferred candidate is present in Senate Districts 1, 2, 5, and 11.

181.    Dr. Oskooii also conducted an electoral performance analysis to measure whether the White bloc voting he detected is sufficient to defeat Black-preferred candidates in Senate Districts 1, 2, 5, and 11. PX189 ¶¶ 93-96 (Oskooii Report); Trial Tr. vol. II, 386:21-387:16 (Oskooii).

182.    In Senate District 1, Dr. Oskooii found that Black-preferred candidates were unable to overcome White bloc voting in any exogenous or endogenous election held in 2024, 2022, or 2020; in other words, Black-preferred candidates were defeated in 100% of the contests he analyzed in these years. PX208 ¶¶ 36-37 & p. 20, Table 5 (Oskooii Supplemental Report). Although he found that Black-preferred candidates had an estimated 50% success rate using 2018 data, such rates of success would only occur in races with three-candidate contests (i.e., in which White voters split their votes between two candidates). *Id.* at ¶ 37; PX189 ¶¶ 96-98 (Oskooii Report). And in 2016, the estimated win rate was just 33%. PX189 at ¶ 98.

183. Likewise, in Senate District 2, Dr. Oskooii found estimated win rates using exogenous electoral results of 7%, 0%, 0%, 50%, and 28% in 2024, 2022, 2020, 2018, and 2016, respectively. PX208 ¶¶ 38, 36 & p. 20, Table 5 (Oskooii Supplemental Report). Again, the 50%-win rate in 2018 was due to vote-splitting among White voters between two candidates. *Id.* at ¶ 38; PX189 ¶¶ 99, 96 & p. 36, Table 3 (Oskooii Report). Based upon this analysis, Dr. Oskooii testified that "what the results clearly show is that when it comes to the challenged districts, Senate Districts 1 and 2, Black-preferred candidates usually lose[.]" Trial Tr. vol. II, 388:5-8 (Oskooii).

184. In adjacent districts, Dr. Oskooii found that Black-preferred candidates also usually lose in Senate District 11, but would usually win in Senate District 5. Trial Tr. vol. II, 388:8-11 (Oskooii); PX208 ¶¶ 39-41, 36 & p. 20, Table 5 (Oskooii Supplemental Report). In Senate District 11, Dr. Oskooii detected a "rapid decline" in Black-preferred candidates' success over time, coinciding with increasing White bloc voting since 2016. PX208 ¶ 40 (Oskooii Supplemental Report). Dr. Oskooii testified to the importance of showing performance analysis over time to "show the entire data and not hide any temporal variations or time-varying effects." Trial Tr. vol. II, 388:12-389:1 (Oskooii). While Black-preferred candidates had estimated higher success rates in older elections (89%, 100%, and 60% in 2016, 2018, and 2020, respectively), more recent elections showed significantly lower estimated win-rates (0% and 40% in 2022 and 2024, respectively). PX208 at 20, Table 5 (Oskooii Supplemental Report). The endogenous election in this district in 2024 also resulted in a loss for the Black-preferred candidate. *Id.* at ¶¶ 40, 36 & p. 20, Table 5. Placing greater weight on the more recent elections and the outcomes of endogenous

contests, Dr. Oskooii concluded that Black-preferred candidates are usually defeated in Senate District 11. *Id.* at ¶ 41.

185. Dr. Alford did not dispute Dr. Oskooii's performance result calculations or methodologies and acknowledges it can be useful for determining that White bloc voting usually defeats the minority's candidate of choice. Trial Tr. vol. V, 1222:14-1223:1, 1226:24-1227:3 (Alford).

186. Legislative Defendants also offered the testimony of Dr. Barber on the projected partisan performance of specific Senate districts. He utilized a "partisan index" using 2024 statewide exogenous election results and found that Senate District 5 would be the only Senate district in the challenged area of the state to have a Democratic partisan lean which, in this area, equates to a likelihood that a Black-preferred candidate would prevail. LDTX254 at 46-48, Table 11 (Barber Supplemental Report).

187. Dr. Barber argued that 2023 Senate District 11 was "competitive," opining that the "right" candidate with the "right" message in Senate District 11 could prevail. *Id.* at 47. However, as pointed out by Dr. Oskooii, Dr. Barber failed to articulate what the "right" candidate or "right" message would entail and ultimately failed to substantively rebut Dr. Oskooii's expert opinions or analysis as to this district. PX215 ¶ 15 (Oskooii Supplemental Rebuttal). Dr. Oskooii testified that Dr. Barber provided "no analysis that would be acceptable within my discipline," and that Dr. Barber's opinions did not change

Dr. Oskooii's opinions regarding the results of his performance analysis. Trial Tr. vol. II, 389:2-22, 389:19-22.[20]

188. Accordingly, the Court credits Dr. Oskooii's analysis and finds that Black-preferred candidates are usually defeated in Senate Districts 1, 2, and 11 as drawn in the 2023 plans.

5. <u>Dr. Alford's "BVAP to Win" Analysis is of No Material Use and Does Not Change the Court's Finding that White Voters Vote Sufficiently as a Bloc to Usually Defeat Black-Preferred Candidates in the Challenged Senate Districts</u>

189. In his initial report, Legislative Defendants' expert Dr. Alford provided a table of successful Black candidates for state House and the BVAP districts of their corresponding districts. LDTX243 at PDF p. 1-2 (Alford Errata at Amended Table 23); *see also* LDTX242 at 32 (Alford Report). But he admitted it was provided for information about "whether you need a majority district to elect a Black candidate of choice" and that the table is "in no way evidence about the issue of racially polarized voting." Trial Tr. vol. V, 1207:5-1208:13 (Alford). This table includes only *successful* candidates, and omits those Black candidates from districts in the Black Belt who were unsuccessful and identified by Dr. Oskooii. PX202 ¶¶ 30, 33 (Oskooii Reply). It also provides only statewide information, *see* LDTX243 at PDF p. 1-2, where a more appropriate analysis under Section 2 of the

---

[20] In his initial report, Dr. Barber also provided "partisan lean" estimates for the 2023 Senate Districts 1, 2, 5, and 11 based on just 19 elections from the years 2016 to 2022. LDTX 253 at 9 & n.3 (Barber Report). The Court finds these calculations unreliable given that Dr. Barber did not provide a principled rationale for selection of these 19 elections in his initial report out of all the 49 available, and his use of a single index obscures internal variations across elections and time periods, thus not accounting for higher rates of White bloc voting detected by Dr. Oskooii in more recent, and thus more probative, elections. *See* PX202 ¶¶ 44-50 (Oskooii Reply). Dr. Barber also did not update this aggregate "partisan lean" over all elections with his 2024 electoral analysis, and so it does not include all available election years. *See id.* The Court therefore assigns these opinions by Dr. Barber on the partisan performance of 2023 Senate districts no weight.

Voting Rights Act is an "intensely local appraisal." *Milligan*, 599 U.S. at 19. In any event, Dr. Alford did not provide an updated table in his supplemental report analyzing the results of the 2024 election, and so the Court assigns little to no weight to this table provided in his initial report.

190. Dr. Alford also provided a "BVAP to win" analysis in his supplemental report analyzing the 2024 electoral results, addressing "the proportion of BVAP needed for a district to provide an equal opportunity to elect the preferred candidate of Black voters[.]" LDTX244 at 13-14 (Alford Supplemental Report).

191. The Court finds that this analysis by Dr. Alford is of no material use in assessing whether White bloc voting will usually defeat the candidate of choice for Black voters in the Black Belt given the performance analysis provided by Dr. Oskooii. Instead, the Court agrees that given the high levels of Black cohesion, and the demonstrated White bloc voting that usually defeats Black-preferred candidates in the challenged districts, the issue of what BVAP level would be necessary to provide Black voters an equal opportunity to elect their candidate of choice would be most relevant at the remedy stage. *See* Trial Tr. vol. II, 430:20-431:2 (Oskooii).

192. Even if the Court were to accept the methodology pushed by Dr. Alford for "BVAP to win," Dr. Alford's calculated BVAP thresholds are not adequately reliable for several reasons. First, Dr. Alford utilized just one election cycle despite admitting that more years would generally be used. In fact, he admitted that the basic analytical framework he relied on utilizes more than one election cycle and explicitly stated that conclusions should be drawn from as many elections as "applicable and feasible." Trial Tr. vol. V, 1223:6-

1224:24 (Alford). *Compare* LDTX244 at 14, Table 6 (Alford Supplemental Rebuttal) *with* JX355 at PDF p. 27, Table 5. Second, Dr. Alford did not utilize endogenous elections in developing his estimates, Trial Tr. vol. V, 1179:7-22 (Alford), despite admitting that endogenous elections can be more probative of a district's actual performance than the statewide exogenous elections. *Id.* at 1223:2-5 (Alford). Dr. Oskooii also pointed out that Dr. Alford's analysis is "very sensitive" to the circumstances in any particular election, Trial Tr. vol. II, 395:21-396:11 (Oskooii), as evidenced by the large variation in BVAP estimates across different elections in the 2024 election year in Dr. Alford's table. LDTX244 at 14, Table 6.

193. Additionally, the lack of reliability in Dr. Alford's "BVAP to win" calculations is apparent in the comparison of Dr. Alford's estimated BVAP levels to actual election results. As Dr. Oskooii also pointed out, actual election results from electoral districts in the same area did not perform at *higher* BVAP levels than what Dr. Alford would estimate to provide a coin-toss. This includes a Black-preferred candidate loss in 2024 House District 25 at nearly 40% BVAP, despite Dr. Alford's estimate of a 38% (or 39% when excluding the 2024 Governor's race) BVAP to win, and a 2022 loss in Senate District 3—covering areas of 2023 Senate Districts 1 and 2—at 42.33% despite Dr. Alford's estimates of 41% and 42% BVAP, respectively, for those districts. PX215 ¶ 11(f) (Oskooii Supplemental Rebuttal); Trial Tr. vol. II, 397:12-398:2 (Oskooii).

194. Dr. Oskooii identified other reasons Dr. Alford's analysis is unreliable. For example, variation in White crossover voting across precincts causes imprecision in the estimated performance of hypothetical districts with extrapolated BVAP levels. *See* PX215

¶ 11(b) (Oskooii Supplemental Rebuttal); Trial Tr. vol. II, 395:5-17 (Oskooii). This is illustrated by House Districts 12 and 24, which have very similar BVAP levels of 38.48% and 38.5%, respectively, *see* PX189 ¶ 180 & p. 70, Table 6 (Oskooii Report), and yet Dr. Alford's methodology estimates they would require significantly different BVAP levels (44% and 37%, respectively) to provide Black voters a 50+1% chance to elect a candidate of their choice. LDTX244 at 14, Table 6. The Court credits Dr. Oskooii's identification of the flaws in the analysis performed by Dr. Alford and, for that reason, declines to rely upon those conclusions.

195.    Further, even if it were relevant and reliable—recognizing that it is, in fact, neither—Dr. Alford's "BVAP to win" analysis would not alter the Court's conclusions here. This is because Dr. Alford purports to estimate the BVAP levels in districts "needed to provide an equal opportunity for Black voters to elect their preferred candidate," LDTX244 at 13; but the levels for Senate Districts 1 and 2 he estimates—41% and 42%—are far above the actual BVAP levels in Senate Districts 1 and 2 (29.49% and 30.01%, respectively) or even adjacent Senate District 11 (36.65%). LDTX244 at 14 (Alford Supplemental Report); PX208 ¶¶ 36-38, 40 & p. 20, Table 5 (Oskooii Supplemental Report). Accordingly, even under Dr. Alford's analysis, none of the relevant 2023 Senate Districts, as drawn by the Legislative Defendants, have BVAP levels sufficient to provide Black voters with what he would consider an equal opportunity to elect their candidate of choice. As such, Dr. Alford's analysis is ultimately consistent with Dr. Oskooii's conclusion that these districts do not usually perform for Black voters.

86

196.    The Court therefore finds that White voters vote sufficiently as a bloc to defeat Black-preferred candidates in both challenged 2023 Senate Districts 1 and 2, as well as adjacent Senate District 11. The Court also find that under the 2023 Senate Plan, in the Black Belt overall, Black voters only have one district (2023 Senate District 5) in which they will have an opportunity to elect a candidate of their choice, despite Plaintiffs having shown a Black population sufficiently numerous and geographically compact in this area to comprise two majority-minority performing Senate districts.

6. <u>The Strong Racially Divergent Voting Patterns Cannot Be Dismissed as Mere Partisanship Completely Unconnected to Race</u>

197.    In response to the "clear-cut, textbook example of racially polarized voting[]" observed by Dr. Oskooii in the 2023 Senate Districts that he analyzed, Trial Tr. vol. II, 386:2-16 (Oskooii), Legislative Defendants' expert Dr. Alford opined that these patterns indicate "partisan polarization" instead of racially polarized voting. LDTX244 2-4 (Alford Supplemental Report). Putting aside the lack of relevance of these opinions to *Gingles* II and III (discussed in the Conclusions of Law below), the Court finds Dr. Alford's opinions unreliable and therefore assigns them little to no weight for several reasons.

198.    First, as noted above, Dr. Alford does not dispute the Black voter cohesion levels identified by Dr. Oskooii and that those rates of cohesion remain evident in the 2024 election. Trial Tr. vol. V, 1198:3-9, 1199:1-4, 1226:2-5 (Alford). Dr. Alford also agrees that the results analyzed show racial differences in the way voters cast their votes. *Id.* at 1202:14-16. And instead of offering his own, separate definition of racially polarized voting, *id.* at 1202:17-19, 1205:1-2, Dr. Alford merely challenges the definitions applied

87

by Consolidated Plaintiffs' experts. Yet, Dr. Alford's challenge is unmoored from the standards in peer-reviewed literature, and Dr. Alford failed to identify any peer-reviewed literature supporting his position. *Id*. at 1203:24-1204:21 (Alford).

199. Second, Dr. Alford limited his analysis to measuring the impact of the race of the candidate on voter support in various elections. LDTX242 at 28 (Alford Report); LDTX244 at 3-4 (Alford Supplemental Report). Even taking his analysis on the race of a candidate at face value, Dr. Alford does not provide a consistent or reliable analysis of this single factor. As an initial matter, he fails to account for the fact that, over the 64 elections analyzed, White voters only preferred four candidates who were Black in a general election. *See generally* LDTX242 (noting race of candidates in elections analysis); LDTX244 (same). This compares to twenty Black candidates supported by Black voters in these same elections. *Id*. In other words, he never explains how the fact that White voters were overall five times less likely to have a preferred candidate who was Black compared to Black voters over the analyzed statewide elections factored into his overall consideration of the race of the candidates on White and Black voting patterns.

200. Dr. Alford's opinions as to the 2024 gubernatorial race further demonstrate the shortcomings of his analysis. For example, Dr. Alford acknowledged his initial forecasted belief that if Republicans did not support Mark Robinson, the Republican candidate who is Black, in the 2024 gubernatorial election, and voted for his opponent, that would show something about the racial preferences of voters. Trial Tr. vol. V, 1210:15-25 (Alford). He then acknowledged that Mark Robinson in fact had significantly less support from White voters than the other White-preferred (White) Republican candidates running

88

statewide in 2024, *id*. at 1211:1-6 (Alford), but then asserts that the 2024 election results did not alter his original conclusions. *Id*. at 1194:25-1195:2 (Alford). In his supplemental report, Dr. Alford tries to explain away these results, but does so without coming to any conclusion as to whether the lower support was due to extraneous factors in that election or the candidate's race. *See* LDTX244 at 10-12. The Court credits Dr. Oskooii's opinion that Dr. Alford's explanations for this specific contest are anecdotal and have clear shortcomings, PX215 ¶ 10 (Oskooii Supplemental Rebuttal), and do not reflect a "systematic analysis of candidate quality across all sorts of different contexts" that would allow for a "full picture" of how candidate quality impacts elections. Trial Tr. vol. II, 398:7-19 (Oskooii).

201.    While Dr. Alford seeks to offer an opinion on the specific reason that Black and White voters favor different candidates in the challenged areas—opining it is merely a partisan preference rather than issues of race—Dr. Alford simultaneously disclaims having performed any causal analysis to support this opinion. Trial Tr. vol. V, 1221:20-1222:2 (Alford); *see also* Trial Tr. vol. II, 393:1-10 (Dr. Oskooii testimony that "Dr. Alford did not provide any causal evidence that would be acceptable social science analysis of causal evidence."). Given these deficiencies in Dr. Alford's analysis, the Court cannot credit Dr. Alford's opinions as reliable or providing probative value in support of resolving this matter.

202.    Finally, Dr. Alford's opinions regarding the race of the candidate are of further limited value given that he agrees that a showing of racial polarization (even under his unsupported understanding of that concept) does not require the race of the candidate

to entirely explain the difference in voting behaviors between racial groups. Trial Tr vol. V, 1206:4-24 (Alford). For example, he agreed that differences in voting behaviors between racial groups could be racially polarized voting if those differences were based on some racial cues other than the race of the candidate. *Id*. at 1211:7-19 (Alford). But he did not conduct any analysis to determine whether the Republican and Democratic parties have different positions on policy issues such as affirmative action or whether those differences would explain the difference in voting behavior of racial groups. *Id*. at 1211:20-1213:11 (Alford).

203.    Dr. Oskooii explained why Dr. Alford's opinions on partisanship do not rebut the strong showing of racially polarized voting substantiated by Dr. Oskooii's ecological inference analysis:

> So if this is all about partisanship, not race, we wouldn't find Black and White voters sorting themselves into such opposing camps. It's precisely because race plays an essential factor that we have these results, and that's why I say it's textbook racially polarized voting patterns.

Trial Tr. vol. II, 393:17-22 (Oskooii). Dr. Oskooii also testified that, as a political scientist with peer-reviewed publications on racially polarized voting analysis, he was not aware of any published peer-reviewed work that states that partisanship should be controlled for or used as a variable in reaching conclusions about racially polarized voting. *Id*. at 393:23-394:6 (Oskooii).

204.    Further supporting that the voting patterns identified reflect racial, and not mere partisan, polarization, are the opinions of Plaintiffs' expert Dr. LaFleur Stephens-Dougan. Dr. Stephens-Dougan utilized both peer-reviewed academic literature and North

90

Carolina-specific survey data and research to find that race and racial attitudes are the dominant precursors to partisan affiliation in North Carolina, and that the activation of racial attitudes among a non-trivial fraction of White voters makes it more likely that partisan voting behavior is fueled by racial attitudes. PX212 ¶ 3 (Stephens-Dougan Supplemental Report); Trial Tr. vol. IV, 748:23-749:06, 752:18-753:6 (Stephens-Dougan). She concluded that "racial division is the antecedent to much of the partisan polarization" that is observed North Carolina. PX195 ¶ 4 (Stephens-Dougan Report); *see also id.* at ¶ 35. Black North Carolinians' support for the Democratic Party, Dr. Stephens-Dougan concluded, is largely driven by the Democratic Party's support of racial and racialized policies that are salient to Black North Carolinians. PX195 ¶ 5. Conversely, she further concluded that the policies pursued by the Republican Party, particularly on racial and racialized issues, are often diametrically opposed to the policy preferences of the overwhelming majority of Black North Carolinians. *Id.* As a result, according to Dr. Stephens-Dougan, it is "virtually impossible" for Black North Carolinians to receive responsive representation from the Republican Party due to these differences. *Id.*; *see also* Trial Tr. vol. IV, 747:10-22 (Stephens-Dougan). She found that because North Carolina's two major parties are split quite decisively along racial lines, there is evidence these divides align with and are best explained by views on racialized political issues. PX195 ¶ 34.

205.    Dr. Alford also did not review or provide any rebuttal to the analysis of Dr. Stephens-Dougan. Trial Tr. vol. V, 1222:6-8 (Alford). The Court credits Dr. Stephens-Dougan's opinions and finds Dr. Alford's opinions on political polarization unreliable and affords them no weight.

91

206. The Court therefore concludes there is racially polarized voting in this area of the state, such that Black-preferred candidates will usually be defeated in challenged Senate Districts 1 and 2. Because Plaintiffs have shown that Black voters can constitute a majority in at least two Senate Districts in the Black Belt, but are only afforded the opportunity to elect a candidate of their choice in one district in this area (Senate District 5), and this denial is on account of racially polarized voting, Plaintiffs have established all three *Gingles* conditions in this area of the state.

### B. Senate Districts 7 and 8

207. Senate Districts 7 and 8 fall within *Stephenson* cluster "X" comprised of Columbus, Brunswick, and New Hanover counties. *See* JX051 at 5, 6, 9, 10, 13, 14, 17, and 18 (Duke Cluster Options); JX079 (2023 Senate Plan, showing groupings in blue outline). Senate District 8 includes all of Columbus and Brunswick counties, and then dips east into New Hanover County using a "notch" configuration, as shown in the below excerpt of JX079:



208. Senator Hise testified that, within this cluster:

> New Hanover County has to be the county that's divided. New Hanover
> County is too large. It is above the 5 percent threshold to be a district.
> Therefore, population has to come out of New Hanover County. Columbus
> and Brunswick are too small to be a district. Therefore, you have to add
> population to them. . . . So we chose the six precincts in the county that
> performed least for Republicans and moved them into District 8.

Trial Tr. vol. IV, 842:23-843:13 (Hise). When asked whether any other criteria could

explain the "notch" created by the district boundary between Senate Districts 7 and 8 other

than a partisan pursuit, Senator Hise testified: "That was its objective. Was there any

reason? No. That's why we did it." *Id*. at 940:24-941:3 (Hise). When asked to describe the

criteria of equal population, Senator Hise testified that "districts are an equal population if

they are within plus or minus 5 percent of the ideal district . . . this allows some variance[.]"

*Id*. at 835:20-836:9 (Hise). This criteria of "equal population" for drafting Senate Districts

was applied in a "different" manner for drafting Congressional districts, where the map-

drawers used a "zero-variance concept." *Id*. at 835:20-836:5, 855:3-13 (Hise).

93

209.     Deborah Dicks Maxwell, President of Plaintiff North Carolina NAACP, testified that she has resided in New Hanover County most of her life and confirmed that the "notch" was "primarily an inner city area that was just cut out and given to" the district containing rural Brunswick County. Trial Tr. vol. I, 10:6-11, 20:24-21:24 (Maxwell).

210.     The choice of moving the six precincts, constituting the "notch," from New Hanover County into Senate District 8 caused a population deviation of -4.94% in Senate District 7, and 2.76% in Senate District 8. *See* JX388 at 1 (initial draft map, SCJ-1, Statpack); JX149 at 1 (2023 Senate Plan Statpack). Early drafts of the Senate Plan show this same configuration of districts, using a "notch," and the same population deviations, as reflected in black text. *See* JX129 (STU-1 dated 10/05/2023 12:26 PM); JX131 (SST-3 dated 10/05/2023 2:39 PM); JX146 (SCC-1 dated 10/02/2023 12:18 PM); JX150 (SCM-1 dated 09/29/2023 2:10 PM); *see also* JX118 (SCJ-1 dated 10/13/2023 10:27 AM) (same "notch").

211.     Plaintiffs' expert Mr. Fairfax explained how the population deviations in Senate Districts 7 and 8 are beyond what would be expected if the cluster were split equally between two districts; an even split would result in a deviation of -1.09% in each district. PX182 at 67, Table 38 (Fairfax Report). In other words, the county clustering required under *Stephenson* did not require a total deviation as high as 7.70% between these districts. Mr. Fairfax also observed that "[s]imple modification could be made" to this cluster "which would lower the overall population deviation[]" and thus he found "no redistricting criteria

94

justification for the Brunswick, New Hanover, and Columbus cluster to include a population deviation that is as high as 7.70%." *Id.* at ¶ 153.

212.    Mr. Fairfax further concluded that the "notch" of Senate District 8 "cracks a compact Black population in downtown Wilmington between two districts, thus producing two districts with roughly similar populations of Black voters instead of unifying the community in a single district." PX200 ¶ 18 (Fairfax Reply). This is also visually apparent in Figure A-14 of Mr. Fairfax's Reply Report, PX200 at A-14 (PDF p. 49), excerpted below:



213.    Put simply, the configuration of the boundary between Senate Districts 7 and 8—relying upon the "notch"—precisely targeted high-BVAP precincts for inclusion in Senate District 8. By doing this, Legislative Defendants moved significantly more

population from Senate District 7 into Senate District 8 than what one-person, one-vote requires, all while drawing down the number of Black voters in Senate District 7. And this was done with precision to narrowly avoid dropping the district's population below the *Stephenson*-mandated (+/-5%) threshold. PX182 at 67, Table 38; PX200 ¶ 18, A-14 (PDF p. 49). This clearly calculated effort produced a district that is only 0.06% above the absolute population floor for a state Senate district, a result accomplished while cracking Wilmington's Black population and thereby materially diluting the Black vote in District 7.

214.    The 2022 configuration for Senate Districts 7 and 8 in this cluster shows an alternative configuration of precincts for inclusion in Senate District 8, taken from New Hanover County, as illustrated below in the excerpt of JX221 (S.L. 2022-2):



215.    As the corresponding Statpack for this plan shows, the deviation in the 2022 configuration of these two districts is significantly less, at -0.07% in Senate District 7 and -2.11% in Senate District 8, for a total deviation of just -2.04% overall. JX278 at 1.[21]

216.    The Court finds that the decision to move six precincts from New Hanover County (constituting the "notch") into Senate District 8 caused an unnecessary population deviation of 7.70% between these districts that was not otherwise required by the *Stephenson* county clustering requirement. Furthermore, including these high-BVAP precincts within Senate District 8 caused this district to have an unnecessary overpopulation. That decision had the practical effect of diluting the votes of those within those precincts constituting the "notch," in comparison to those voters in Senate District 7. The Court finds that no traditional redistricting criteria explains the chosen configuration of Senate Districts 7 and 8 and the resulting population deviation, and that the only conceivable explanations for this configuration are either the stated partisan goals offered by Senator Hise or the predominant use of race in targeting high-BVAP precincts as supported by the analysis of Mr. Fairfax.

---

[21] Record evidence supports Senator Hise's testimony that no other criteria is served by the notch. The 2022 districts have higher Polsby-Popper (and the same Reock) compactness scores overall. *Compare* JX279 at 1 (S.L. 2022-2 Compactness Report showing Senate Districts 7 and 8 with Polsby-Popper scores of 0.25 and 0.46, respectively) *with* JX203 at 1 (S.L. 2023-146 Compactness Report showing Senate Districts 7 and 8 with Polsby-Popper scores of 0.21 and 0.42, respectively). Further, the 2022 districts result in smaller county and municipal splits in Senate Districts 7 and 8 than the 2023 Senate Plan, keeping 92.44% of New Hanover County and 85.29% of the city of Wilmington whole, *see* JX278 at 30, 52, whereas the 2023 districts keep only 87.94% of New Hanover County and 76.50% of Wilmington whole, *see* JX149 at 74, 96. This shows that the 2023 Senate Plan's configuration of Senate Districts 7 and 8 was not designed to respect political subdivisions. Additionally, the 2022 and 2023 plans both keep the same incumbents in Senate Districts 7 and 8 and do not pair them with any other incumbents. *See* JX149 at 142; JX278 at 97. Therefore, the 2023 Senate Plan's configuration of Senate Districts 7 and 8 cannot be explained by incumbent residences.

97

## IV.    The 2023 Congressional Plan

217.    Senator Hise testified that leadership from the Senate and House determined that the Senate would draw the Congressional Plan, and that drafting began by the Senate Redistricting Chairs in September of 2023. Trial Tr. vol. IV, 853:22-24, 854:2-10 (Hise). The Senate Redistricting Chairs utilized the following criteria for Congressional districts:

- Equal Population. The Committee chairs will use the 2020 federal decennial census data as the sole basis of population for the establishment of districts in the 2023 Congressional Plan. The number of persons in each congressional district shall equal be as nearly as is practicable, as determined under the most recent federal decennial census. *Wesberry v. Sanders*, 376 U.S. 1 (1964).

- Traditional Districting Principles. We observe that the State Constitution's limitations upon redistricting and apportionment uphold what the United States Supreme Court has termed "traditional districting principles." These principles include factors such as "compactness, contiguity, and respect for political subdivisions." *Stephenson v. Bartlett*, 357 N.C. 301 (2003) (*Stephenson II*) (quoting *Shaw v. Reno*, 509 U.S. 630 (1993).

- Compactness. The Committee chairs shall make reasonable efforts to draw districts in the 2023 Congressional Plan that are compact.

- Contiguity. Congressional districts shall be comprised of contiguous territory. Contiguity by water is sufficient.

- Respect for Existing Political Subdivisions. County lines, VTDs and municipal boundaries may be considered when possible in forming districts that do not split these existing political subdivisions.

- Racial Data. Data identifying the race of individuals or voters shall *not* be used in the drafting of districts in the 2023 Congressional Plan.

- Political Considerations. Politics and political considerations are inseparable from districting and apportionment. *Gaffney v. Cummings*, 412 U.S. 735 (1973). The General Assembly may consider partisan advantage and incumbency protection in the application of its discretionary redistricting decisions ... but it must do so in conformity with the State Constitution. *Stephenson II*. To hold that legislators cannot take partisan interests into

98

account when drawing district lines would essentially countermand the Framers' decision to entrust districting to political entities. *Rucho v. Common Cause*, 588 U.S. _ (2019).

- <u>Incumbent Residence</u>. Candidates for Congress are not required by law to reside in a district they seek to represent. However, incumbent residence may be considered in the formation of Congressional districts.

JX038.

218. Draft Congressional plans, included in the parties' Joint Exhibit List, include maps dated from September 20, 2023 through the date of the filed drafts, "CBP-5" and "CCJ-1," on September 21 and October 3, respectively. *See* Stipulated Facts ¶¶ 17-18; JX168 (CBP-2 dated 9/20/2023 6:35 PM); JX160 (CBP-4 dated 9/21/2023 10:12 AM); JX161 (CBP-5 dated 9/21/2023 10:32 AM); JX164 (CBP-6 dated 9/21/2023 12:30PM); JX165 (CBP-1 dated 9/20/2023 11:46 AM); JX159 (CBW-1 dated 9/22/2023 11:37 AM); JX157 (CBK-2 dated 9/22/2023 1:15 PM); JX151 (CCH-1 dated 9/28/2023 11:23 AM); JX152 (CTE-1 dated 9/28/2023 3:05 PM); JX148 (CCM-1 dated 9/29/2023 11:51 AM, *see* Trial Tr. vol. IV, 923:17-924:1); JX142 (CMT-1 dated 10/02/2023 11:29AM); JX144 (CMT-2 dated 10/02/2023 11:54 AM); JX124 (CCJ-1 dated 10/13/2023 10:05 AM).

A. *North Carolina's Black Belt (Congressional District 1)*

219. Plaintiffs allege that the legislature intentionally diluted the voting power of North Carolina's Black voters in the Black Belt by redrawing Congressional District 1 to reduce the opportunity there for Black voters to elect a candidate of their choice in the 2023 Congressional Plan.

220. Congressional District 1 was historically anchored in Pitt County. Both the 2022 Interim Congressional Plan used in the 2022 election and the legislature's (rejected)

99

2022 Remedial Congressional Plan included the northern parts of Pitt County in Congressional District 1. *See* JX218 (2022 Interim Congressional); JX217 (S.L. 2022-3 Congressional Plan). Before that, every single Congressional Plan used for the past *three decades*, in every election since at least 1992, has included at least a portion of Pitt County in Congressional District 1. *See* JX218 (2022 Interim); JX249 (2016); JX252 (2011); JX227 (2001); JX268 (1998); JX269 (1997); JX270 (1992); PX297 (Screenshot of "District Plans Enacted or Ordered by the Court" noting year of plans used in elections).

221.    Witness Courtney Patterson described Congressional District 1's historic place in representing a "heavy African-American voting bloc" going back to the 1960s, and having historically included Pitt County. Trial Tr. vol. III, 598:24-599:13 (Patterson). Plaintiff Syene Jasmin, a longtime Pitt County resident with extensive knowledge of this area of the state, *see* Trial Tr. vol. III, 517:18-24, 518:11-519:17 (Jasmin), also testified about how the inclusion of Pitt County in District 1 respected the "regional flow of people that are maybe from those areas [Edgecombe, Martin, Bertie, Herford, Halifax, Northampton] that come to Pitt for their jobs at the hospital, or work at ECU," and that Greenville in particular acted as the "intellectual capital" of the Black Belt. *Id*. at 528:24-529:7, 529:20-24.

222.    Senator Kandie Smith testified that Black voters would be impacted by the changes to Congressional District 1, noting that "Pitt County has always been in District 1[,]" and that removing Pitt County from the district "changed our representation altogether." Trial Tr. Vol. IV, 815:2-17 (Smith). The change also left voters confused about who their representative was. *Id*. at 815:6-816:7.

100

223. In 2023, Congressional District 1 was drawn to exclude all of Pitt County, carving Greenville (the anchor of the Black Belt) out of the Black Belt-based district, and replacing it with overwhelmingly White Camden and Currituck counties, as shown below in the excerpt of JX078:



224. The reconfiguration of Congressional District 1 also created unprecedented consequences for neighboring Congressional District 3 by breaking up the coastal Congressional district that, also for the past three decades, had united Camden and Currituck with other coastal counties. *See* JX218 (2022 Interim); JX249 (2016); JX252 (2011); JX227 (2001); JX268 (1998); JX269 (1997); JX270 (1992); PX297. It also paired Pitt County with a number of counties—including Sampson, Duplin, and Onslow—that lack the same "regional connections" that Pitt County has with the counties in the heart of the Black Belt. Trial Tr. vol. III, 528:13-529:7 (Jasmin). Further, the inclusion of coastal

101

counties in District 1 created a mismatch with the farmland communities in the Black Belt who have different community concerns. *See* Trial Tr. vol. II, 368:12-19 (Daly-Mack).

225. The change in Congressional District 1, specifically its cracking of the Black Belt, is visible below in an excerpt of Figure 18 from Plaintiffs' expert Mr. Fairfax, PX702:



1. <u>Congressional District 1 Is Not Justified by Adherence to Traditional Redistricting Criteria and Divides a Longstanding Community of Interest</u>

226. Senator Hise testified that the configuration of Congressional District 1 was created based on efforts to leave "as many counties whole as possible," choosing to split Granville County to "balance its population." Trial Tr. vol. IV, 858:4-13 (Hise). Hise testified that Granville was split because doing so "best kept in line with what impact would be on the compactness of the district as well." *Id*. at 858:14-21 (Hise). He also testified that Congressional District 1 was designed to "keep all those fingerling counties in the northeast together in one district." *Id*. at 858:4-13 (Hise). He further noted the residence of incumbent

Don Davis in Greene County and that the residence of Congressional District 3's incumbent, Greg Murphy, was in Pitt County, but when asked if this had any role in determining whether to split Pitt County, testified "no." *Id*. at 859:2-9 (Hise); *see also* JX056. While Senator Hise testified that partisan goals were "part of the considerations for developing congressional plans[]" generally, he also testified that they did not "predominate[]." Trial Tr. vol. IV, 942:20-943:8 (Hise). Yet, in describing the reasons for the configuration of Congressional District 1, he did not identify partisanship as the basis for the decision to exclude Pitt County in exchange for including coastal counties. *See generally id*. at 858:3-859:9.

227.    The explanations provided for the configuration of Congressional District 1, and specifically the decision to exclude the historically included Pitt County in exchange for coastal counties typically outside this district, do not align with the record or information before the legislature at the time that the 2023 redistricting occurred. As noted above with respect to Senate Districts 1 and 2, there is no record in public comments calling for unification of the so-called "fingerling" counties. Additionally, it does not stand to logic that splitting Granville County instead of Pitt County would serve any neutral redistricting criterion. In either case, a single county would need to be split to balance populations, so no minimization of county splits is preserved by choosing to maintain Pitt County intact but instead choosing to split Granville County.

228.    The 2023 Congressional Plan's configuration of District 1 also fails to serve compactness. This is shown by a comparison between the 2023 Congressional Plan and the 2022 Interim Congressional Plan; the latter is significantly more visibly compact while

including Pitt County within District 1 and excluding the counties along the coast. *See* JX218 (2022 Interim Congressional Plan). This information was available to legislators in the form of the legislature's own Compactness reports. *Compare* JX281 at 1 (2022 Interim Compactness Report showing District 1 with 0.46 and 0.39 Reock and Polsby-Popper scores, respectively) *with* JX211 at 1 (2023 Compactness Report showing District 1 with 0.42 and 0.27 Reock and Polsby-Popper scores, respectively).[22] Finally, Senator Hise disclaimed incumbency contributed to the decision not to split Pitt County, and, in any event, including portions of Pitt County would ensure that Representative Murphy remained in District 3.

229.    Instead, evidence from the map-drawing process indicates that Black voters in downtown Greenville were specifically targeted. For example, an early draft map "CBP-5" from September 21, 2023, JX161, shows a dip into Pitt County from the north "that looks like the boot from Italy[,]" Trial Tr. vol. IV, 935:23-25, which Senator Hise acknowledged cuts into downtown Greenville, roughly in the center of the county. Trial Tr. vol. IV, 920:22-921:8 (Hise). A draft from approximately two hours later, "CBP-6," shows Pitt County cut entirely out of Congressional District 1 and replaced by the coastal counties. JX164. A comparison of these areas with the BVAP map provided by Plaintiffs' expert Mr. Fairfax (PX702) shows that these drafts specifically targeted the darkest shaded (and thus

---

[22] The parties' Joint Exhibit List includes descriptions for these exhibits that confirms they were sourced from the legislature's own website, *see* Doc. 137 at 17, 22, and Senator Hise testified to utilizing these scores during the legislative process. *See* Trial Tr. vol. IV, 838:4-13 (Hise).

highest-BVAP) areas, as shown below (with demonstrative circles added to identify the relevant area):

Draft "CBP-5" (9/21/2023) (JX 161)

Fairfax Figure 18 (NAACPPX 702)

 

230.   A later draft from September 28, 2023, "CCH-1," shows Congressional District 3 dipping west into what Senator Hise admitted was the same area of central Pitt County as the Italian boot in JX161. JX151; Trial Tr. vol. IV, 923:1-6 (Hise). A draft from the next day, "CCM-1," JX148, as well as a draft from October 2, 2023, "CMT-2," JX144, show an additional portion of Pitt County, and then the entire portion, respectively, added into Congressional District 3, which together represents the approximate final configuration. Trial Tr. vol. IV, 923:21-925:5 (Hise). Senator Hise testified that he was aware of the racial demographics of Greenville. Specifically, he testified that he had been to the area many times and that he knew it had a high Black population. *Id.* at 872:11-875:13 ("Q: you actually testified that you had that knowledge. Correct? A: I do not believe that is a false statement.").

231.   Senator Hise could not provide an explanation for the various decisions leading to the exclusion of Pitt County entirely from Congressional District 1, other than that the map-drawers "made changes and do our analysis and see which maps best fit our criteria." *Id.* at 922:13-18 (Hise). As noted above, however, the explanations provided for

the configuration of Congressional District 1, and specifically the decision to exclude the historically included Pitt County in exchange for coastal counties typically outside this district, do not align with the record or information before the legislature at the time of the 2023 redistricting.

232. Additional evidence supports that these decisions regarding District 1 in the 2023 Congressional Plan were made based upon racial considerations, and not other criteria, including partisanship. Blake Springhetti, the map-drawer retained by state House leadership, utilized criteria largely consistent with the criteria used by the Senate map-drawers, including the consideration of political data and incumbent addresses. *See* JX044; Trial Tr. vol. VI, 1243:19-1244:4 (Springhetti). He also was prohibited from using racial data but (unlike his map-drawing counterpart Senator Hise in the Senate) did not otherwise have experience utilizing racial data or drawing maps in North Carolina, did not seek information about the state's demographic trends, and did not have knowledge of North Carolina's Black Belt or familiarity with the Triad area. Trial Tr. vol. VI, 1245:5-11, 1246:12-15, 1252:8-24, 1253:3-10, 1253:21-23 (Springhetti). Mr. Springhetti testified that he was provided specific election data to input into the redistricting software that he used for drafting, *id*. at 1245:20-24, and that he followed the directions of Chairman Destin Hall or Representative Stevens with respect to making adjustments to the maps. *Id*. at 1255:12-14.

233. Mr. Springhetti testified at trial about the construction of his draft Congressional plans, each of which included a portion of Pitt County in Congressional

District 1. *See id.* at 1246:25-1250:21 (Springhetti).[23] The Court finds it notable that Mr. Springhetti's maps—all of which were constructed with ostensibly the same partisan goals, political data, and other redistricting objectives as Senator Hise's maps—never drew Pitt County entirely out of Congressional District 1. The salient difference between these two map-drawing processes is that Senator Hise had extensive knowledge of the racial demographics and voting patterns of this area of the state, whereas Mr. Springhetti had no knowledge of the political and demographic geography of the state. Mr. Springhetti's testimony provides further evidence that neither partisan objectives nor traditional criteria can explain the removal of Pitt County from Congressional District 1.

234.    The Court finds that the changes to Congressional District 1 made in the 2023 Congressional Plan cannot be explained by the application of traditional redistricting criteria. Congressional District 1 under the 2023 Congressional Plan is significantly less compact than its 2022 configuration or what is otherwise possible, and, as noted above, it breaks apart two longstanding communities of interest: the Black Belt and the coastal counties.

2.  2023 Congressional District 1 Dilutes Black Voting Power

235.    Plaintiffs offered the testimony of Dr. Kassra Oskooii, who applied the same ecological inference and performance analysis techniques described above with respect to the 2023 Senate Plan to assess the degree of racially polarized voting in Congressional

---

[23] This testimony describes demonstratives WX166-68, which were not formally admitted into evidence during trial.

District 1, and to compare its electoral performance in 2023 with the prior configuration in 2022.

236. Dr. Oskooii found clear racially polarized voting patterns in both the 2022 and 2023 configurations of Congressional District 1, with White voters consistently voting as a bloc against Black-preferred candidates. PX189 ¶¶ 218-21; PX208 ¶ 7(a); Trial Tr. vol. II, 390:20-391:1 (Oskooii). Specifically, in 2022 Congressional District 1, Dr. Oskooii found estimated Black cohesion above 96% across all election years and ecological inference methods, with White bloc voting ranging in the high-70s (in 2016) to the mid-80s. PX208 at 22, Table 7. Racially polarized voting levels were even higher in 2023 Congressional District 1, with Black cohesion rates above 97% across all election years and ecological inference methods, and White bloc voting ranging from approximately 81% (in 2016) to approximately 88% (in 2022 through 2024). *Id*. at 25, Table 9. Dr. Oskooii also detected high levels of racially polarized voting in the endogenous election in 2023 Congressional District 1, with Black voters supporting Representative Don Davis at an estimated rate of 98.3% and White voters supporting his opponent at an estimated rate of 87%. *Id*. at 27, Figure 9. Overall, Dr. Oskooii detected "high levels" that constituted a "clear-cut and textbook example" of racially polarized voting in the prior and current configurations of Congressional District 1. Trial Tr. vol. II, 391:22-392:9 (Oskooii).

237. Dr. Oskooii was able to analyze the specific areas removed from and added to Congressional District 1 when it was redrawn in 2023 to identify the reasons for the increase in racially polarized voting in the 2023 configuration compared to the 2022 configuration. His analysis determined that the added precincts in 2023 Congressional

District 1 consistently exhibit higher White bloc voting rates compared to the removed precincts across election years from 2016 to 2022. PX189 ¶¶ 246-47. In other words, Congressional District 1 was redrawn in 2023 to remove areas with comparatively lower White bloc voting for areas with relatively higher White bloc voting.

238. The impact of this reconfiguration is measured in Dr. Oskooii's performance analysis, which found that 2023 Congressional District 1 had a "significantly lower win rate" for Black-preferred candidates than the prior 2022 configuration, indicating that Black voters will have comparatively less success in overcoming White bloc voting under the 2023 Congressional Plan. PX208 ¶ 70; *see also* Trial Tr. vol. II, 391:22-392:3 (Oskooii).

239. Dr. Oskooii's analysis is consistent with testimony from Plaintiff Syene Jasmin, a Pitt County resident who was moved from Congressional District 1 into Congressional District 3 following the 2023 redraw and testified that he did not have a candidate of choice for Congress on the ballot in 2024. Trial Tr. vol. III, 530:2-12 (Jasmin). Rather, he would have preferred his former Representative Don Davis (who he previously voted for) if Representative Davis had been on his ballot in his new district. *Id*. at 530:13-18.

240. Similarly, longtime organizer Courtney Patterson described how the configuration of District 1 under the 2023 Congressional Plan also means that "even [Representative Don Davis's] representation of African-Americans would be less than what it [was] . . . in the previous district" because of the need to be responsive to predominantly White communities on the coast within his district. Trial Tr. vol. III, 599:14-600:21 (Patterson).

109

241. As noted above, Legislative Defendants' experts did not meaningfully dispute Dr. Oskooii's methodologies or calculations, and for the reasons explained above, the Court does not credit Dr. Alford's opinions that these voting patterns reflect mere partisan polarization. The Court thus credits Dr. Oskooii's analysis and finds that, when the legislature redrew Congressional District 1, they did so in a way that diminished Black voting power and the likelihood that Black voters will successfully elect their candidate of choice.

### B. The Triad (Congressional Districts 5, 6, 9, and 10)

242. Plaintiffs also allege that the 2023 Congressional Plan dilutes the voting power of Black voters in the Triad area in and around the cities of Greensboro, High Point, and Winston-Salem within Guilford, Forsyth, Davidson, and Randolph counties.

243. In the ten Congressional maps enacted since 1992, the Triad has been repeatedly split across multiple districts. From 1992 through the 2014 elections, portions of Greensboro and Guilford County were in a long, winding District 12 that stretched all the way to Charlotte. *See* JX270 (1992); JX269 (1997); JX268 (1998); JX227 (2001); JX252 (2011); *see also* PX297. And in all but a few of the ten maps since 1992, Forsyth County and Winston-Salem were often only connected to the other Triad cities by narrow portions of Congressional District 12. *Id.* These configurations have been repeatedly challenged and, for the 2011 map, found to be unconstitutional. *Cromartie v. Hunt*, 34 F. Supp. 2d 1029, 1029 (E.D.N.C. 1998), *rev'd Easley v. Cromartie*, 532 U.S. 234 (2001); *Harris v. McCrory*, 159 F. Supp. 3d 600, 604 (M.D.N.C. 2016), *aff'd Cooper v. Harris*, 581 U.S. 285 (2017). After several more redraws, including one that split the HBCU

110

campus of North Carolina A&T in Greensboro, the first map to include most of the three major Triad cities in one district was the court-ordered map in 2022. *See* JX218.

244. Despite having one of the most concentrated, longstanding, and historically significant Black populations in the state, the Triad is cracked between four new Districts—5, 6, 9, 10—under the 2023 Congressional Plan, as shown in the excerpt of JX078:



245. The BVAP map provided by Plaintiffs' expert Mr. Fairfax, PX702 excerpted below, shows how precisely the 2023 Congressional Plan cracks the BVAP in this area of the state:



1. 2023 Congressional Districts 5, 6, 9, and 10 Disregard Traditional Redistricting Criteria and Divide Longstanding Communities of Interest

246. Drafts from the 2023 map-drawing process show a consistent split of the Triad areas. *See* JX164 (CBP-6); JX157 (CBK-2); JX127 (CCH-4); JX124 (CCJ-1). Senator Hise testified that the 2023 configuration for the Triad Congressional districts was chosen to prioritize retaining whole counties in rural areas. Trial Tr. vol. IV, 860:8-18 (Hise). Unlike in other challenged districts in this matter, Senator Hise also specifically testified that the configuration of these Congressional Districts 5, 6, 9, and 10 was based upon an effort to draw districts where the Republican candidate would perform. *Id*. at 860:24-861:10. He testified to trying to "minimize[e] the municipalities we divide[]" in this area, stating that "we did what we could to make sure that those municipalities were totally contained within a congressional district, but weren't looking to have certain types

of municipalities paired with other types within a district." *Id*. at 861:11-862:3. He also reiterated comments made during the legislative process regarding the split of Guilford County among three districts: "I think it's a huge benefit to Guilford County to be represented by multiple members within Congress." *Id*. at 862:4-17.

247.     On cross examination, Senator Hise admitted that, unlike in the northeast, media market was "not a determining factor" in why the map-drawers chose to divide the Triad in this way. *Id*. at 930:23-931:2. Yet, he offered no explanation for why media market would be relevant, under the redistricting criteria, in one portion of the state but irrelevant in another portion. He also admitted that Greensboro is split into three Congressional districts even though it does not independently exceed the population of a Congressional district and could therefore fit within a single district. *Id*. at 952:21-953:5; *see also id*. at 955:8-14 ("There was no mathematical reason it would be divided into more" districts than one). He similarly admitted that Forsyth County was split between two Congressional districts without a population-based reason to do so. *Id*. at 953:8-19.

2.     <u>2023 Congressional Districts 5, 6, 9 and 10 Dilute Black Voting Power</u>

248.     Plaintiffs offered the testimony of Dr. Oskooii, who applied the same ecological inference and performance analysis techniques described above to assess the degree of racially polarized voting in 2022 Congressional District 6 and the challenged 2023 Congressional districts containing this former district in 2022, including Districts 5, 6, 9 and 10.

249.     Dr. Oskooii found clear racially polarized voting patterns in 2022 Congressional District 6 with White voters consistently voting as a bloc against Black-

113

preferred candidates. PX189 ¶¶ 225-27; PX208 ¶ 50; Trial Tr. vol. II, 392:4-9 (Oskooii). Specifically, Dr. Oskooii found estimated Black cohesion rates above 96% across all election years and ecological inference methods, and White bloc voting ranging from the high-60s to low-70s. PX208 at 22, Table 7.

250.    Dr. Oskooii also found racially polarized voting in 2023 Congressional Districts 5, 6, 9, and 10, with Black cohesion estimates in the mid- to high-90s percentages across all districts, ecological-inference methods, and election years, and White bloc voting averages against Black-preferred candidates in all districts, ecological-inference methods, and election years at slightly variable levels. PX208 at 25, Table 9. In 2023 Congressional District 5, White bloc voting estimates in all elections ranged from the low to mid-70s percentages, in Districts 6 and District 9 from the high-70s to low-80s percentages, and in District 10 from the low-70s to low-80s percentages. *Id*. His analysis of endogenous elections in these Congressional districts also reflected racially polarized voting. Specifically, he measured Black cohesion estimates of 94.5%, 88.2%, 94%, and 96.1% and White bloc voting estimates against the Black-preferred candidate of 77.8%, 93.1%, 82.6%, and 79% in Congressional Districts 5, 6, 9, and 10, respectively. *Id*. at 27, Figure 9.

251.    For the same reasons articulated above, the Court gives no weight to Legislative Defendants' expert Dr. Alford's testimony that these voting patterns reflect mere partisan polarization. Of note, the 2024 endogenous election in Congressional District 6 is unique in that it features racially polarized voting with slightly lower Black cohesion estimates and higher White voting cohesion, in an election lacking two major party

114

candidates (since no Democratic candidate ran). LDTX251 at 5-6 (Alford Supplemental Rebuttal). In other words, even where there were not two major party candidates, racially polarized voting was still present with a substantial majority of Black and White voters voting cohesively for opposing candidates. This is further evidence that voting patterns are not merely Democrat versus Republican politics, as Dr. Alford opines, and reinforces the lack of reliability in his opinions as to what he terms "partisan polarization" in these areas.

252.    Dr. Oskooii also measured the relative performance of 2022 Congressional District 6 compared to the 2023 Congressional districts superseding it. Dr. Oskooii found that Black-preferred candidates won 100% of contests in 2022 Congressional District 6 using exogenous results from 2024, 2022, 2020, and 2018, and won 94% of contests in 2016. PX208 ¶ 55. By contrast, Dr. Oskooii found Black-preferred candidates would usually be defeated in 2023 Congressional Districts 5, 6, 9, and 10. *Id*. at ¶ 75; Trial Tr. vol. II, 391:9-21 (Oskooii). Specifically, using exogenous elections, he estimated win rates of 0%, 0%, and 7% for the years 2020, 2022, and 2024 in 2023 Congressional Districts 5, 6, 9, and 10. PX208 at 29, Table 10. In older elections, Black-preferred success rates were 6% in each of these districts in 2016, and peaked in 2018 at 50%, 25%, 50%, and 50% in 2023 Congressional Districts 5, 6, 9, and 10, respectively. *Id*. The Court credits Dr. Oskooii's opinions that Black-preferred candidates will usually be defeated in 2023 Congressional Districts 5, 6, 9, and 10, which is consistent with the 2024 endogenous elections in which Black-preferred candidates were defeated in 2023 Congressional District 5, 6, 9, and 10. *Id*.

253. Accordingly, the Court finds that when the legislature redrew Congressional districts in the Triad in 2023 by dismantling 2022 Congressional District 6 into four new districts (5, 6, 9, and 10), it did so in a way that fully diminished Black voting power, denying Black voters the opportunity to successfully elect their candidate of choice in the Triad.

254. The Triad Congressional Districts 5, 6, 9, and 10 under the 2023 Congressional Plan were redrawn in a manner that will deprive Black voters in this area any opportunity to elect a candidate of choice and will completely shut them out of any representation before Congress.

255. The 2023 Congressional Plan thus unlawfully dilutes the voting power of Black Voters in the Triad Districts 5, 6, 9, and 10 in violation of the Voting Rights Act.

## V. The Senate Factors Findings in Challenged Areas of North Carolina

### A. North Carolina Has a Long History of Official Voting-Related Discrimination

256. The racial polarization of voting in North Carolina has grown out of the state's founding and history as a slave society, in which the state's social, economic, political, and cultural institutions were each heavily intertwined with and influenced by chattel, race-based slavery. PX181 at 7-9 (Bagley Report); PX179 at 67 (Leloudis Report) (explaining that the North Carolina's racially polarized, two-party political system grew out of a "society that for most of its history had stood on a foundation of slavery and Jim Crow, [and where] contests over competing [party] ideals were centered, more often than not, on the question of racial equality").

116

257. Racial discrimination in North Carolina not only endured after slavery was abolished but was codified in 1866 in the North Carolina Black Codes ("Black Codes"). The Black Codes severely restricted the rights of Black citizens and sought to recreate conditions of slavery. PX179 at 9 (Leloudis Report); PX181 at 7 (Bagley Report). Even after the legal invalidation of the Black Codes, a pattern of Black disenfranchisement emerged. PX181 at 7-8.

258. The Black Belt, home to many majority-Black counties and large Black populations in others, has been particularly affected by this disenfranchisement. PX181 at 4. In the 1870s, White Democrats gave the legislature control over county governments, redrew city ward lines, implemented new voter registration schemes, and gave wide latitude to local registrars, all in an effort to dilute Black voting power. PX179 at 12-15 (Leloudis Report).

259. At the same time, the Ku Klux Klan, the Red Shirts, and other White supremacist "clubs" functioned as the paramilitary wing of the party and used violence and intimidation against Black citizens and their allies to quash Black voting power. *Id.* at 12, 21-25. This violence has been well documented in the Black Belt and culminated in numerous historic tragedies, including the Wilmington race massacre of 1898. *Id.* at 21-25; PX181 at 8-9 (Bagley Report).

260. Leading up to and following the 1900 elections, state legislators continued to enact measures designed to disenfranchise and dilute the voting power of Black North Carolinians. PX181 at 9. These measures included a poll tax, a literacy test to be administered at the discretion of local White registrars, and a grandfather clause designed

117

to protect voting by illiterate and poor Whites. PX179 at 25-27 (Leloudis Report); Trial Tr. vol. III, 538:5-10 (Leloudis); PX181 at 9. In combination with "Jim Crow" laws enacted around the same time, these measures were largely successful in suppressing Black voting power through the conclusion of World War II. PX179 at 25-39; PX181 at 9 (explaining that from 1920 through World War II, Black North Carolinians were "almost completely removed from politics").

261.    Thereafter, wherever Black voters began accumulating power in North Carolina, the state acted swiftly to quell it by redrawing voting districts, implementing at-large electoral schemes, and enacting anti-single-shot laws designed to protect White candidates and invalidate Black votes. PX179 at 37-44 (Leloudis Report); Trial Tr. vol. III, 539:10-540:6 (Leloudis); PX181 at 9 (Bagley Report). Though facially race-neutral, the combined use of at-large and anti-single-shot voting laws operated to suppress Black votes through simple mathematics: In a society where White voters rarely crossed the race line, at-large elections made it mathematically difficult, if not impossible, for minority candidates to win. Trial Tr. vol. III, 540:2-14 (Leloudis). The only recourse Black voters had was to single-shot vote, and that is why the legislature outlawed the practice. *Id.* at 540:14-16.

262.    After the implementation of the federal Voting Rights Act in 1965, nearly half of North Carolina's counties, and most in the Black Belt, were "covered jurisdictions" for which electoral changes were required to be submitted to the Department of Justice for preclearance. PX181 at 9 (Bagley Report). Nevertheless, the state legislature repeatedly adopted at-large voting systems for various political subdivisions without submitting those

changes to the Department of Justice. *Id.* at 10; *see also* PX195 ¶¶ 58-62 (Stephens-Dougan Report).

263. When at-large voting was adopted for the legislature, it was quickly followed with an increase in multi-member districts and adding a numbered seat requirement (rendering each seat in a multi-member district to be treated as a separate contest) to the districts in the Black Belt, all of which were designed to ensure that Black candidates could not be elected to the legislature. PX179 at 61-62 (Leloudis Report); PX181 at 10.

264. From 1970 to 2013, the Department of Justice entered 60 objections to proposed electoral changes in North Carolina, including the use of at-large schemes, majority requirements for primary elections, staggered terms, racially selective annexations, and polling place changes. PX181 at 11. At least 26 of these objections related specifically to districts in the eastern Black Belt. *Id.* at 13. During this same time period, dozens of private plaintiffs successfully sued to overturn these and other electoral changes as courts found them to be racially discriminatory. PX179 at 64, 86-87, 93-94 (Leloudis Report) (describing examples of successful legal challenges between 1980 and 2015).

265. Former Congressman G.K. Butterfield has testified that, in his role as an attorney in the Black Belt, he represented individuals across the Black Belt in voting rights lawsuits, especially relating to counties' failures to seek preclearance for election law changes under the Voting Rights Act. *See* Doc. 146-1 at 10:17-14:6. One such lawsuit involved the use of at-large elections which prevented a Black candidate from being elected to an all-White Board of County Commissioners in Halifax County. *See id.* at 10:22-11:9. A similar challenge in Wilson County resulted in a settlement modifying the electoral

119

process for the Board of County Commissioners, resulting in the creation of three majority-minority districts. *See id.* at 12:6-13:19.

266.    The Supreme Court's decision in *Shelby County v. Holder* ended preclearance in 2013, triggering a new wave of vote suppression and dilution efforts. PX195 ¶¶ 63-66 (Stephens-Dougan Report); PX179 at 80-81, 83 (Leloudis Report); Trial Tr. vol. III, 542:9-20 (Leloudis). Just one day after the ruling, the legislature introduced House Bill 589—an omnibus measure that dismantled multiple democratic reforms designed to expand and protect minority voting access. PX179 at 80-81; Trial Tr. vol. III, 542:9-24 (Leloudis); PX181 at 25 (Bagley Report) (describing House Bill 589 as a "colormasked piece of legislation that sought to depress minority votes"). Among other changes, the law imposed the state's first photo identification requirement and eliminated same-day registration, the first week of early voting, straight-ticket voting, and pre-registration for teenagers—measures disproportionately used by Black voters. PX179 at 80-83 (Leloudis Report); Trial Tr. vol. III, 541:13-542:25 (Leloudis); *see also* PX181 at 25.

267.    In litigation challenging House Bill 589, the legislature was found to have intentionally discriminated against African American voters by targeting them with "almost surgical precision[.]" *N.C. State Conference of the NAACP v. McCrory*, 831 F.3d 204, 214 (4th Cir. 2016). In its decision, the Fourth Circuit rejected a defense that the legislative majority had mere partisan intent, noting that the legislature had used the discriminatory omnibus election bill to "entrench itself," enacting it with "knowledge that African Americans voting translated into support for one party" and thus "targeting voters who, based on race, were unlikely to vote for the majority party." *Id.* at 233. "Even if done for

120

partisan ends, that constituted racial discrimination." *Id.* House Bill 589 represented "one of the largest restrictions of the franchise" and was enacted "because of race." *Id.* at 242.

268.     The legislature has also sought on numerous occasions since 2016 to suppress the Black vote under the guise of suppressing voter fraud, despite scant evidence of such misconduct. PX179 at 88-89 (Leloudis Report); PX181 at 26-27 (Bagley Report). For instance, in April 2017, the State Board of Elections released an audit of the previous year's general election in which it reported that questionable ballots accounted for just over 0.01% of the 4.8 million total votes cast. PX179 at 88; PX181 at 27. The next year, the legislature enacted a new voter ID requirement, even though of the five hundred and eight cases of fraudulent voting that the Board had identified, only two involved the kind of in-person deception that a photo ID requirement was designed to expose and prevent. PX179 at 88.

269.     Although the legislature offers voter fraud as an ostensible non-discriminatory reason for imposing additional voting restrictions today, there is extraordinarily little evidence of voter fraud in North Carolina. PX181 at 27 (Bagley Report). The absence of such evidence instead supports an inference that these laws are once again racially motivated. *See generally* PX195 ¶ 65 (Stephens-Dougan Report) (discussing study results finding that "lawmakers from the whitest districts in the most racially diverse states were the most likely to sponsor restrictive voting legislation" and "that districts with high levels of racial resentment were more likely to be represented by lawmakers who support measures to restrict voting"). In recent years, there have been instances of racialized voter intimidation in the purported name of combatting voter fraud.

121

For example, in 2022 in Brunswick County, White North Carolinians canvassed Black neighborhoods and questioned residents about the status of voters registered to those addresses. PX181 at 29-30.

270. As discussed more in FOF Section V.C, the effects of North Carolina's long history of voting-related discrimination persist to this day. Legislative Defendant Senator Hise agreed that, as a general matter, Black North Carolinians continue to face discrimination in public and private spheres. Trial Tr. vol. IV, 893:18-894:8 (Hise). Empirical data confirms persistent racial turnout gaps in voter participation throughout the state. *See* PX205 at 4-5 (Bagley Supplemental Report). Fact witness testimony provides evidence that these gaps stem from electoral changes that discourage, and create barriers to, voting including voter ID, gerrymandering, and limiting early access to the polls, coupled with lack of resources in Black communities. *See infra* FOF Section V.C; *see generally* Trial Tr. vol. III, 593:2-596:19 (Patterson); Trial Tr. vol. III, 577:18-578:17, 579:24-583:9 (Reynolds Turner).

271. In sum, the Court finds that North Carolina's history of racially discriminatory voter suppression and dilution is pervasive and persistent, especially in regions with large Black populations, such as the Black Belt and Triad regions. The codification of that discrimination is well-documented, with dozens of state and local electoral laws implementing vote-suppressing mechanisms such as at-large voting systems, and dozens of courts finding these laws racially discriminatory, as explained by Plaintiffs' experts, Drs. Leloudis, Bagley, and Stephens-Dougan, and supported by fact witness testimony.

122

272.     Legislative Defendants offered no rebuttal to Dr. Stephens-Dougan, nor to Dr. Leloudis, whose report provides a detailed account of this official voting-related discrimination. Further, Legislative Defendants' expert Dr. Taylor confirmed at trial that he reviewed and did not rebut Dr. Bagley's analysis of the history of official voting discrimination against minorities. Trial Tr. vol. VI, 1309:16-22 (Taylor).

### B.  *North Carolina, and Specifically the Areas Challenged by Plaintiffs, Experience Extremely Racially Polarized Elections*

273.     As discussed above, the Court finds clear evidence of extreme racially polarized voting in each of the challenged areas of North Carolina, based on the analysis performed by expert Dr. Oskooii. *See supra* FOF Sections III, IV.

274.     In addition, Plaintiffs offered the expert opinions of Dr. Stephens-Dougan regarding the relationship between race, politics, and voting behavior in North Carolina. Dr. Stephens-Dougan concluded that "racial division is the antecedent to much of the partisan polarization that we observe today." PX195 ¶ 4 (Stephens-Dougan Report). As set forth below, the Court finds that Dr. Stephens-Dougan's analysis and conclusions, as supported by witness testimony, further evidences the extent of racially polarized voting in the state.

275.     Dr. Stephens-Dougan explained that peer-reviewed research indicates that "individuals first identify with groups and institutions that are a salient part of their lives, such as their race, class, and religion." *Id.* at ¶ 35. And, "[f]or many white Americans, the more they associate the Democratic party with African Americans and African American interests, the more likely they are to defect from the Democratic Party." *Id.* at ¶ 37 (internal

123

citations omitted). She explained that in the current political environment "the Republican Party is largely White, rural, Christian, and conservative, while the Democratic Party is comprised of more non-Christians, urban liberals, and non-Whites—many of whom are African American." *Id.* at ¶ 39. The composition of these partisan groups "increase[s] the likelihood that people will think of their party affiliation as a social identity in and of itself." *Id.* Dr. Stephens-Dougan concluded that "[s]ince a long line of research indicates that dividing ourselves into an 'us versus them' is associated with in-group favoritism and outgroup hostility . . . , it is then no surprise that much of our partisan division is driven by racial division." *Id.* (internal citations omitted).

276. Utilizing well-established, peer-reviewed academic literature paired with North Carolina-specific survey data and research, Dr. Stephens-Dougan concluded that "[r]acialized politics is evident in North Carolina" based on findings that (1) "exit poll data indicates that race is the biggest division in voting patterns[;]" (2) there are "racial differences in public policy preferences[;]" and (3) "racialized politics is evident in representation and outcome disparities within the state." *Id.* at ¶¶ 130-31.

277. With regards to exit poll data, Dr. Stephens-Dougan concluded that "while Black North Carolinian support for Democratic candidates is routinely upwards of 90 percent, White North Carolinian support for Democratic candidates typically hovers in the mid-thirties . . . ." *Id.* at ¶ 132 (internal citations omitted). This shows that "it is not uncommon for there to be fifty or sixty percentage point differences in the vote choice of Black and white North Carolinians." *Id.* For example, with respect to voting preferences, Dr. Stephens-Dougan opined that "we can see a racial divide in the voting preferences of

Black versus White North Carolinians." Trial Tr. vol. III, 727:18-20 (Stephens-Dougan); *see also* PX195 ¶ 133; PX212 ¶¶ 5-9 (Stephens-Dougan Supplemental Report).

278.    Dr. Stephens-Dougan's analysis further determined that other demographic factors cannot explain the voting preference divide between Black and White North Carolinians. For, example she further found that "these racial divisions in vote choice [between Black and White North Carolinians] are much higher than divisions along economic or gender lines." PX195 ¶ 133; Trial Tr. vol. III, 724:8-725:13 (Stephens-Dougan). Notably, Dr. Stephens-Dougan also concluded that regardless of religious affiliation or ideological diversity among Black Southerners, they still vote overwhelmingly for Democratic candidates. PX195 ¶¶ 133-34. This pattern, particularly when it comes to ideological diversity, does not emerge among White respondents that self-identify as conservatives. *Id.* at ¶ 135. "[D]espite some African Americans having conservative views, they are still more inclined to vote for Democratic candidates, which might be indicative of the responsiveness and representation they expect to receive from the Democratic party as compared to the Republican party." *Id.*

279.    Dr. Stephens-Dougan further concluded that racial differences also emerge with respect to policy preferences on many key issues, including on Confederate monument removal, the impact of the killing of George Floyd, and other events in 2020, on an individual's support for the removal of Confederate monuments. *Id.* at ¶¶ 136-38.

280.    Dr. Stephens-Dougan testified that "peer-reviewed research has shown that support for Confederate monuments is associated or correlated with racial animus." Trial Tr. vol. III, 726:9-12 (Stephens-Dougan). Polls of North Carolinians found that "70 percent

of White North Carolinians believed the monuments should remain on public land compared to 25 percent of Black North Carolinians." PX195 ¶ 137 (Stephens-Dougan Report). The survey also found that "when respondents were asked whether the killing of George Floyd and other events in 2020 made them more likely to support the removal of Confederate monuments, 60 percent of Black respondents answered in the affirmative, as compared to 21 percent of white respondents." *Id.* at ¶ 138. Dr. Stephens-Dougan found that these polls indicated that the "preferences of the majority of Black North Carolinians on this racialized issue are in step with the preferences of the majority of Democrats." *Id.*

281.    However, she found that the racial divide in public opinion does not neatly track every partisan dispute, noting that "a 2023 Elon University poll of 1,268 North Carolinians did not find a racial divide on sports betting and abortion—two issues that are not overtly racial." *Id.*; Trial Tr. vol. III, 724:25-725:13 (Stephens-Dougan); *see also* PX212 ¶¶ 5-9 (Stephens-Dougan Supplemental Report).

282.    Dr. Stephens-Dougan also explained that immigration is a racialized issued "due to its association with race over time[,]" Trial Tr. vol. IV, 767:16-19 (Stephens-Dougan), and that it is an issue on which President Trump campaigned. PX212 at ¶ 10 (Stephens-Dougan Supplemental Report). Dr. Stephens-Dougan found that North Carolina surveys and polls indicated that "on the racialized issue of immigration, there was more evidence of a racial divide" where "49 percent of white North Carolinians . . . ranked immigration as one of their top three issues, as compared to only 18 percent of Black North Carolinians assigning such a high degree of importance to the issue of immigration." *Id.* at 4 ¶ 9. This further demonstrates Dr. Stephens-Dougan's conclusion that the injection of

126

immigration into campaign content "is likely to activate negative racial attitudes among a non-trivial fraction of whites, such that they bring those attitudes to bear on their political decisions, thus making it more likely that partisan voting behavior is fueled by racial attitudes[.]" PX195 ¶ 145.

283.    Dr. Stephens-Dougan also concluded that there is evidence of a racial divide in impressions of the Republican and Democratic presidential nominees and gubernatorial candidates. PX212 ¶¶ 5-6, 8. For example, Dr. Stephens-Dougan noted that when North Carolinians were asked in August 2024 of their impression on Kamala Harris, there was "a wide racial divide, with Harris having a positive impression among 72 percent of Black voters compared to just 35 percent of white voters." *Id.* at ¶ 5. Subsequently, when surveyed in September 2024 and asked "to identify which presidential candidate 'cares about issues that are important to me,' just ten [(10)] percent of Black North Carolinians indicated that President Trump cared about issues important to them as compared to the majority of White North Carolinians (53 percent)." *Id.* at ¶ 8. And when asked about general impression of Josh Stein, the Democratic candidate for governor of North Carolina, roughly 66 percent of Black North Carolinians indicated a favorable impression of Stein whereas White North Carolinians' percentage of a favorable impression was 25 percentage points less. *Id.*; Trial Tr. vol. III, 727:18-728:5 (Stephens-Dougan). Dr. Stephens-Dougan concluded that the polls showed a "racial divide in public opinion between White North Carolinians and Black North Carolinians that tend to reflect racially divergent voting preferences, including

127

candidate preference." PX212 ¶ 4.[24] Overall, she found that it was "racial and racialized issues" driving voter preferences. *Id.* at ¶ 3.

284. Witness testimony also supports Dr. Stephens-Dougan's analysis and her conclusion that racialized issues are driving Black voter preference for certain candidates. Former Congressman G.K. Butterfield testified that he believes partisanship cannot completely explain the differences in voting patterns of Black and White voters: "The attitudes and the opinions of White voters are very—in opposite to some of the views of African American voters, they look at the world differently because their experiences have been different." Doc. 146-1 at 19:14-24. Plaintiff Reverend Dawn Daly-Mack testified that, when it came to her personal voting preferences, she does not "care if you're a Republican or a Democrat. If you say the right things, I am going to vote for you." Trial Tr. vol. II, 367:11-17 (Daly-Mack).

285. Legislative Defendants offer no rebuttal to the analysis by Dr. Stephens-Dougan and, as discussed above, the Court finds the analysis by Legislative Defendants' expert Dr. Alford attributing racially polarized voting to mere partisanship to lack reliability and thus be of no probative value.

---

[24] Dr. Stephens-Dougan confirmed that additional polls that Legislative Defendants presented during Dr. Stephens-Dougan's cross examination, but which she did not cite to in her reports, did not change her conclusions. Trial Tr. vol. IV, 795:5-9 (Stephens-Dougan).

C. *North Carolina Has Contemporary Voting Barriers that Impact Black Voters*

286.   The Court also finds uncontroverted evidence that contemporary barriers to voting have impacted Black voters in North Carolina, based on the analysis by Plaintiffs' expert Dr. Bagley.

287.   Dr. Bagley concluded that the aforementioned history of racial discrimination has included, even very recently, the use of at-large voting systems and vote dilution enhancing devices that have been invalidated by way of Section 2 and Section 5 challenges under the Voting Rights Act. PX181 at 6 (Bagley Report); *see supra* FOF Section V.A.

288.   Most recently, the November 2024 election was the first general election held in North Carolina where a new voter photo ID law was in effect. Dr. Bagley concluded that Black voters were more likely than White voters to have their ballots rejected and votes challenged as a result of the law. PX205 at 3. Dr. Bagley noted that these findings only account for eligible voters who were able to cast a ballot in the 2024 general election and does not capture citizens who may have been dissuaded from attempting to vote at all due to the requirements. *Id.* In addition, Dr. Bagley found that Black voters were also disproportionately challenged in an election protest seeking to invalidate tens of thousands of ballots cast in the 2024 election. *Id.* at 3-4.

289.   Fact witness testimony further displays the persistence of barriers for Black voters to participate in the electoral process. First, Vice President of Plaintiff North Carolina NAACP Courtney Patterson, a longtime organizer working to mobilize voting in

129

the eastern part of North Carolina and also serving on the Lenoir County, North Carolina, Board of Elections, *see* Trial Tr. vol. III, 590:12-24, 592:5-7 (Patterson), explained how he saw various voting restrictions, including gerrymandering, contributing to the racial turnout gap:

> [W]hen we have laws like voter ID, when we have gerrymandering of districts, when -- basically, it makes it difficult for African-Americans to elect a candidate of their choice who cares about their issues and their values. It just makes them feel like there's not a place in this democracy for them and that there's no need to go vote. I've experienced just in conversations with many, many of the people that I've worked with, and what have you, as to the reason why they didn't go vote or why they didn't vote. They tend to lean toward, you know, my vote don't matter.

*Id.* at 594:5-20. Mr. Patterson also described how voting restrictions, such as voter ID, that are "tough to administer" can cause mistakes in which voters are wrongfully turned away. *Id.* at 594:21-595:23. "[V]oter ID just puts this façade out here that you can't vote. And one thing that people hate is when they go to the polls and they can't—you know, they think they're going to be turned away. So, instead, they tend not to go. And this is one big obstacle." *Id.* at 596:15-19.

290. Plaintiff Mitzi Reynolds Turner, who participates in voter outreach and engagement in the Triad and volunteers as a poll worker, testified that registration has become more complicated, that cutbacks to early voting impact working families, and that many in her area lack the resources to be privy to information and education about voting. Trial Tr. vol. III, 575:21-576:14, 579:24-581:7 (Reynolds Turner). She stated that Black voters are particularly affected by those barriers due to the lack of resources, and she has

130

witnessed Black voters turned away from the polls when they should have been given a provisional ballot and exception form. *Id*. at 581:8-582:6.

291. Legislative Defendants' expert, Dr. Taylor, testified that he did not dispute the data showing longstanding disparities between Black and White North Carolinians in voter registration and turnout. Trial Tr. vol. VI, 1270:1-19, 1308:14-24 (Taylor); *see also* LDTX259 at 7-8 (Taylor Report) (conceding that he "often use[d] [Dr. Bagley's] data and methods").

292. In addition, Dr. Taylor testified that he did not dispute North Carolina's history of voting-related legislation as described by Dr. Bagley, including the state's use of at-large voting schemes, anti-single-shot voting laws, and other vote dilution enhancing devices that have been invalidated by way of Section 2 and Section 5 challenges. Trial Tr. vol. VI, 1315:2-1316:4 (Taylor). Nor did he dispute the examples identified by Dr. Bagley of election administration difficulties, voter frustration efforts, and voter intimidation efforts contributing to the Black voting gap in the state. *Id*. at 1316:5-23.

### D. Black and African American Communities in the Challenged Areas Bear Modern Effects of Discrimination

293. The Court finds that Black North Carolinians bear the effects of the above-described history of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process, based on the analysis by Plaintiffs' expert Dr. Bagley and fact witness testimony. PX181 at 30-38 (Bagley Report); PX205 at 4-6 (Bagley Supplemental Report).

131

294.    Black residents of North Carolina are disproportionately more likely to move, be poor, less educated, have less access to transportation, experience poor health, and be incarcerated. PX181 at 30-31 (Bagley Report). These socioeconomic factors hinder their political participation. *Id.* at 30. Former Congressman G.K. Butterfield testified that the differences in economic and educational conditions of Black and White citizens in the Black Belt are "stark. Every indicator that you would look at, whether it's education, employment, wealth, poverty, any indicator that you would choose to look at there is a stark difference between Black and White in each one of the counties in the Black Belt unfortunately, and it doesn't seem to be improving." Doc. 146-1 at 14:16-24.

295.    <u>Poverty and Housing</u>: Dr. Bagley found that the U.S. Census determined that Black North Carolinians are more than twice as likely as White residents to be living below the federal poverty level. PX181 at 32; Trial Tr. vol. III, 660:9-10 (Bagley) ("Black North Carolinians are about twice as likely to live in poverty.").

296.    He also found that Black North Carolinians are three times as likely as White residents to lack access to a vehicle. PX181 at 32-33.

297.    Dr. Bagley analyzed the expert report prepared by Anthony Fairfax and concluded that it demonstrates that North Carolinians living in the eastern Black Belt and the Triad are "more likely to rely on SNAP benefits, to live below the poverty line, and to rent rather than own a home; and if homeowning, to have a lower median home value." *Id.* at 33. He also observed that "Black North Carolinians generally experience all of those same disparities vis-à-vis white residents." *Id.*

298.    Dr. Bagley found, based on data from the U.S. Department of Housing and Urban Development from 2000-2019, that race-based discrimination continues to account for a vast majority of housing discrimination complaints filed in North Carolina, and that counties in the Triad were among the top five counties where complaints were made based on race. *Id.* at 34.

299.    Plaintiff Reverend Dawn Daly-Mack, a registered nurse engaged in advocacy work in Northampton County, testified that "[a]s a member of the African-American community and as a nurse who has been in the community, I have seen it. . . . [I]t is a reality that . . . the non-Black people have better living conditions. Now, in a poor rural community, it's not great for anybody, but there are still definitely differences [between Black and White residents]." Trial Tr. vol. II, 364:2-9 (Daly-Mack). She further testified that "there are people living in houses with holes in their ceilings and in their floor. One of the public health nurses said that she went to a home where they actually still had outdoor plumbing. So there was no bathroom in the house. And so there are conditions that are deplorable." *Id.* at 363:13-17.

300.    Employment: Dr. Bagley concluded that "Black North Carolinians . . . are more likely to be unemployed." Trial Tr. vol. III, 660:7-17 (Bagley). 2023 data from the U.S. Bureau of Labor Statistics confirm that Black North Carolinians are twice as likely as White residents to be unemployed. PX181 at 32 (Bagley Report).

301.    Education: Dr. Bagley concluded that "Black North Carolinians . . . are less likely to obtain a bachelor's degree." Trial Tr. vol. III, 660:10-11 (Bagley). Particularly in

133

the Black Belt and Triad areas, North Carolinians are less likely to have a high school degree. PX181 at 33 (Bagley Report).

302. North Carolina schools and the quality of education in the state continue to suffer the effects of segregation. Thirteen school districts in North Carolina were still under court-ordered desegregation mandates as of 2014 because those schools never legally desegregated, and more than half of those are in the Black Belt. *Id.* at 34. Other school districts desegregated in name only; integration was quickly followed with the attempted implementation of new school districts and private schools intended to preserve segregation. *Id.* at 34-36.

303. Today, charter schools and private schools are used as a means of continuing school segregation, particularly in the eastern Black Belt and Triad areas. *Id.* at 34-35. At the same time, public schools in these areas are drastically underfunded, the effects of which are overwhelmingly born by Black people. *Id.* at 36-37 (discussing finding in *Leandro IV* litigation that $700 million in funding was needed for schools over next two years).

304. The impacts of discrimination in education remain particularly prevalent and are exacerbated by North Carolina's increased funding of school vouchers. Students receiving school vouchers are "using them to attend overwhelmingly White schools, including in the challenged areas," including "segregation academies" that were typically established following desegregation action, initially all White, and remain overwhelmingly White. Trial Tr. vol. III, 660:22-661:14 (Bagley).

134

305.   Health: Dr. Bagley concluded that "Black North Carolinians . . . are more likely to rely on public health insurance and less likely to have private health insurance . . . . And also studies have shown that conditions like living in poverty, lacking access to higher education, and being unemployed negatively impact health, which makes those figures representing a lack of access equitably to health insurance even more significant." *Id*. at 660:9-17; *see also* PX181 at 32. Particularly in the Black Belt and Triad areas, North Carolinians are less likely to have any health insurance. PX181 at 33 (Bagley Report).

306.   Dr. Bagley found that factors like low income, low rates of educational attainment, and unemployment all contribute to higher rates of health problems, which Black North Carolinians also experience in terms, for example, of infant mortality, newly diagnosed HIV and AIDS, and death due to heart disease, cancer, or HIV-related illnesses. *Id.*

307.   Plaintiff Reverend Dawn Daly-Mack testified to the lack of access to public transportation in her area of the state, making it challenging for people to see doctors and contributing to a lack of access to healthy food. Trial Tr. vol. II, 361:17-362:2 (Daly-Mack).

308.   Black North Carolinians are also disproportionately affected by environmental pollution, which causes an array of health problems. PX181 at 37 (Bagley Report). Specifically, Dr. Bagley found that a third of all North Carolinians living within two miles of a toxic coal ash lagoon are people of color, and that confined animal feeding operations (CAFOs) or industrial farming operations are predominantly concentrated in low-income communities and communities of color in the Eastern Coastal plain of the state. *Id.*

135

309. Plaintiff Syene Jasmin, an environmental justice organizer in Pitt County, testified about the harmful impacts of PFAS in the water, air pollution caused by boat manufacturers, sicknesses and diseases caused by living close to industrial areas and gas stations, and the fight against crypto mining farms and data mining centers that cause noise pollution. Trial Tr. vol. III, 524:1-21, 525:1-17 (Jasmin). He noted these issues are particularly important to the Black community in his area because of the likelihood Black residents are in proximity to industrial areas. *Id.* at 525:1-17.

310. All of these factors cause Black residents of North Carolina to be less likely to be able to take time off to vote, to get to the polls, to contribute to a political campaign, or to run for office. *See* PX181 at 31. Dr. Bagley concluded that these and other socioeconomic effects of racial discrimination continue to "impose a burden on the ability of Black North Carolinians to participate in elections and politics." PX205 at 4.

311. Specifically, Dr. Bagley found that the 2024 elections demonstrated these effects on voter turnout. Black voters turned out at a lower rate than White voters in each of the 12 counties in the Black Belt and each of the four counties of the Triad. *Id*. In all but one of those 16 counties, the gap between White and Black voter turnout was greater than 11%. *Id*. In 11 of those counties, the gap exceeded the statewide racial turnout gap of 12.2%. *Id*.

312. Legislative Defendants' expert, Dr. Taylor, testified that he did not dispute that there are longstanding disparities between Black and White North Carolinians in education, employment, household income and poverty rates, and disability and health insurance rates. Trial Tr. vol. VI, 1290:14-18, 1291:2-5, 1291:23-1921:5, 1292:10-13

136

(Taylor). Dr. Taylor also did not dispute the research showing that higher rates of unemployment, poverty, and poor health among Black citizens are linked to lower levels of political participation. *Id.* at 1292:14-20. Nor did he dispute research showing that lower levels of educational attainment among Black citizens today are due, at least in part, to the history of official discrimination against Black people in education dating back to legal school segregation. *Id.* at 1292:24-1293:15.

### E. There Is a Longstanding Pattern of Overt and Subtle Racial Appeals in North Carolina and the Challenged Areas, Extending Into Present Day

313. In tandem with North Carolina's history of racially discriminatory election laws, the Court finds that campaigns have and continue to rely on race as a means of appealing to voters, based on the analysis by Plaintiffs' experts Drs. Bagley and Stephens-Dougan.

314. "As far back as Reconstruction and the early Jim Crow era, white politicians have routinely engaged in race-baiting, or appealing to racial animus in the electorate, to generate political support." PX195 ¶ 68 (Stephens-Dougan Report).

315. "In the late 20th century, whites' racial attitudes underwent a transformation . . . from biological racism to modern racism or racial resentment. Biological racism is the belief that African Americans are genetically and/or socially inferior to whites, whereas racial resentment is 'a moral feeling that blacks violate such traditional values as individualism and self-reliance, the work ethic, obedience, and discipline[.]'" *Id.* at ¶ 69 (internal citation omitted).

137

316. Dr. Stephens-Dougan opined that "a social prohibition exists against espousing ideas that may indicate belief in the biological or inherent inferiority of Black people." *Id*. at ¶ 72. As a result, in the post-civil rights era, "politicians who want to activate some white Americans' negative racial predispositions opt instead to use racially coded language, often called 'dog whistles,' that could be plausibly perceived as unrelated to race but will nonetheless attract support for themselves or diminish support for their opponents among voters with negative racial attitudes." PX196 ¶ 3 (Errata to August 1, 2024 Expert Report of Dr. LaFleur Stephens-Dougan); *see also* PX195 ¶ 72; Trial Tr. vol. IV, 793:24-794:5 (Stephens-Dougan).

317. "Racial priming is when politicians highlight issues associated with racial and ethnic minorities, such as crime or welfare . . . instead of employing direct references to racial and ethnic minorities." PX195 ¶ 3 (Stephens-Dougan Report). "If the message is explicit, with direct references to race or racial groups, the theory of racial priming . . . posits that voters will become aware of the racial content and reject the appeal." *Id.* at ¶ 73. Republican campaign strategist, Lee Atwater, made statements regarding the prohibition against explicitly racist speech which "suggest[ed] that in the post-civil rights era, explicit racism was not socially acceptable, but that discussing 'forced busing' and 'states' rights' could replace explicit racial appeals." *Id*. at ¶ 74.

318. Dr. Stephens-Dougan also opined that there is robust literature demonstrating that racially coded language and negative stereotypical imagery can activate or prime voters' racial predispositions. *Id*. at ¶ 75. "Racially coded language includes terms that invoke racial themes without ever explicitly mentioning race[,]" such as "'law and order,'

138

'tough on crime,' 'inner-city,' and 'illegal immigration[.]'" *Id.* And "[n]egative stereotypical imagery that might activate voters' negative racial attitudes includes depictions of African Americans as criminals or welfare recipients." *Id.*

319. "[R]acial codewords and stereotypical imagery are relevant in many public policy discussions. Policies that have become racialized include welfare, crime, affordable housing, the death penalty, and Medicaid." *Id.* at ¶ 76. For example, "the reason that welfare has traditionally been an unpopular policy among white Americans is because media framings have made it such that many white Americans associate welfare with African Americans." *Id.* at ¶ 77.

320. In a study, "while African Americans made up about 30 percent of the poor, about 60 percent of the poor people shown on network television news and depicted in the major newsweeklies between 1988 and 1992 were Black." *Id.* at ¶ 78. While the "study is now several decades old, there is a long-term association of African Americans with welfare in the American psyche that is still relevant today." *Id.* "[W]hen politicians invoke the issue of welfare, many whites' negative attitudes about African Americans are activated, and white voters subsequently become less supportive of the policy." *Id.*

321. Dr. Stephens-Dougan testified that "racial appeals are used in North Carolina politics essentially to have voters thinking about racial issues when they otherwise would not have done so . . . [which] essentially fuel[s] partisan division, because those racial attitudes . . . become activated and are more consequential as people come to their vote choice ultimately or their policy preferences." Trial Tr. vol. IV, 752:20-25 (Stephens-Dougan).

139

322. "Race, therefore, still plays a significant role in politics, even when it is not explicitly discussed." PX195 ¶ 76 (Stephens-Dougan Report).

323. For example, in 2008, the North Carolina Republican Party targeted candidates in the Democratic primary that had endorsed then-presidential candidate Barack Obama with messaging containing inherently racial appeals referencing vaguely African garb and using coded language to paint the candidates as "extreme." PX181 at 39 (Bagley Report).

324. Similar racially motivated attacks on candidates have sought to exploit white insecurity; for example, ads have insinuated that a Black man and purported criminal could move into neighborhoods, due to policies supported by a candidate, and that immigrants are stealing voters' jobs. *Id.* at 39-40.

325. In the 2018 state Supreme Court campaign, a Republican Party executive repeatedly tweeted attacks on the Democratic nominee with photos of Black defendants and references to race. Although the candidate "had no involvement in defending or adjudicating the cases of the defendants in question," the tweets implied that she "played a role in their commutations by claiming that jurors had been racist or that executing [those defendants] would be racist." *Id.* at 40.

326. The same year, one White legislative candidate published a website with remarks including "What is wrong with being a white supremacist? God is a racist and a white supremacist." *Id.*

327. Also in 2018, Mark Keith Robinson, a prominent Black Republican from North Carolina, delivered "a pro-gun speech at the Greensboro City Council. Robinson

140

said, 'I've heard a whole lot of people in here talking tonight about this group and that group and domestic violence and Blacks,' . . . 'These minorities and that minority. What I want to know is, when are you all going to start standing up for the majority?' He pushed a finger to his chest. 'I'm the majority. I'm a law-abiding citizen who's never shot anybody!'" PX195 ¶ 127 (Stephens-Dougan Report). "[R]esearch indicates that racially resentful attitudes are a strong predictor of opposition to gun control." *Id.* Polling data indicated "that Robinson's stance on gun control is out of step with the overwhelming majority of Black North Carolinians. Moreover, research indicate[d] that Black politicians who take counterstereotypical positions garner more support from people with racially resentful attitudes." *Id.* at ¶ 128.

328.    Robinson's incendiary comments against African Americans "specifically meet the definition of 'racial distancing' because his comments send the message that he is not beholden to African Americans." *Id.* at ¶ 129.

329.    Racial distancing is a "strategy that politicians of color might employ as a means of obtaining significant electoral support from white voters." *Id.* at ¶ 112. "This strategy is characterized by politicians distancing themselves rhetorically, visually, and even substantively from racial and ethnic minorities, often through rhetoric that invokes negative stereotypes about people of color." *Id.* "Racial distancing theory posits that when trying to win elections in majority-white jurisdictions, candidates who signal that they will maintain the racial status quo, which is characterized by white dominance in political, social, and economic institutions, will fare better than candidates who make no such indication." *Id.* at ¶ 113.

330. Deracialization is another strategy that candidates of color might use. *Id.* at ¶ 110. "Central to the theory of deracialization is the idea that white voters will not support a candidate of color who does not deemphasize her racial identity. The conventional wisdom is that if candidates of color can avoid associations with their racial identity, then they can minimize the salience of race in the campaign and assemble a broad, multiracial coalition." *Id.*

331. Robinson also "embraced the birther conspiracy that former President Obama was not born in the United States. Previous research indicates that individuals with anti-Black attitudes were more likely to believe that President Obama was born outside of the United States[.]" *Id.* at ¶ 129.

332. "[L]ike many prominent Black Republicans, North Carolina's most prominent Black Republican has a history of making public statements that invoke negative stereotypes of African Americans and employing a political strategy of racial distancing." *Id.*

333. In the run-up to the 2020 gubernatorial campaign, a candidate remarked that "'no other nation' had survived the 'diversity and multiculturalism that America faces today, because of a lack of assimilation, because of this division, and because of this identity politics.'" PX181 at 40 (Bagley Report).

334. In 2022, political advertisements targeting a Black U.S. Senate candidate highlighted White crime victims while claiming the candidate was "soft on crime." *Id.* at 40-41; PX204 ¶ 14 (Stephens-Dougan Reply). One campaign ad, "Failed Our Children," was a false attack ad that was aired against Cheri Beasley, a Black Democratic candidate.

142

PX204 ¶¶ 14-15. "The ad was sponsored by the National Republican Senatorial Committee and falsely accused Ms. Beasley of freeing an African American man convicted on charges of possessing lewd images of children when she served as chief justice of the North Carolina Supreme Court." *Id.* "The ad was pulled by two Charlotte stations, WAXN and WSOC, when they discovered the claims to be false, while several other stations had paused the ad during a period of investigating the veracity of the claims in the ad." *Id.*

335.    Another campaign ad, "We Won't Know," was an "anti-Beasley advertisement which was run during the campaign, and the ad prominently featured a mugshot of an African American sex offender, while simultaneously depicting Beasley as soft on crime." *Id.* at ¶ 16 (internal quotation marks omitted). Dr. Stephens-Dougan testified that this was a "classic example of a negative racial appeal in which race was injected." Trial Tr. vol. IV, 749:19-750:2 (Stephens-Dougan). "Previous research indicates the pairing of a mugshot of a Black criminal with the issue of crime in the 1988 presidential campaign powerfully activated racial considerations in candidate evaluations." PX204 ¶ 16 (Stephens-Dougan Reply); *see also* Trial Tr. vol. IV, 751:13-21 (Stephens-Dougan). It is also "often found in the peer-reviewed research as well that Black candidates are stereotyped as being more liberal. So this idea that she was dangerously liberal is a part of a well-established body of literature that would classify this particular advertisement as a negative racial appeal." Trial Tr. vol. IV, 751:22-752:1 (Stephens-Dougan).

336.    The campaign ad, "We Won't Know," was featured on the Facebook page of Senator Hise, who admitted to watching the ad before posting it and posting it because he hoped to convince voters not to vote for Cheri Beasley. Trial Tr. vol. IV, 941:4-942:3

143

(Hise); PX340. "This suggests that the ad may have had some traction in Republican circles, including among elected officials." PX204 ¶ 17 (Stephens-Dougan Reply). Dr. Stephens-Dougan further explained that "an elected Republican politician's support of a negative racial appeal would help to provide . . . more legitimacy" to the racial appeal, and "it makes these negative racialized issues more consequential as voters are coming to their decisions." Trial Tr. vol. IV, 752:13-17 (Stephens-Dougan).

337.    Dr. Bagley describes several other examples of political campaigns in North Carolina characterized by racial appeals including, for example, "the infamous 'Hands Ad' run by Jesse Helms' reelection campaign against Harvey Gant in 1990," PX181 at 38; the state Republican Party's targeting of those who voted for the Racial Justice Act in one instance, and targeting of Rep. Christopher Heagarty with a mailer that included "his skin deliberately darkened, with a sombrero atop his head and a dialogue box coming from his mouth with the words 'Mucho Taxo'" in another instance. *Id.* at 39-40.

338.    Legislative Defendants' expert Dr. Taylor did not dispute that these events occurred nor purport to analyze their impact on voters. *See* LDTX259 at 37-42 (discussing Senate Factor 6); Trial Tr. vol. VI, 1300:3-5 (Taylor) ("Q: Now, you didn't opine on any of the racial appeals identified in Dr. Bagley's report; correct? A: Correct."). Nor did he conduct his own analysis of North Carolina political campaigns to determine whether candidates were making racial appeals. Trial Tr. vol. VI, 1300:11-18 (Taylor). His opinions on Senate Factor 6 were limited to the campaigns of Donald Trump and Ted Budd as discussed by Dr. Clark and ignored the many other instances of racial appeals identified in

Drs. Clark and Bagley's reports. *See* LDTX259 at 37-42 (Senate Factor 6 analysis); Trial Tr. vol. VI, 1300:3-18 (Taylor).

### F. North Carolina Exhibits Limited Black Electoral Success

339. The discriminatory election laws in North Carolina have largely been and continue to be successful in suppressing Black votes.

340. Statewide, between the adoption of the Disenfranchisement Act to World War II, no Black candidate was elected to office in North Carolina. PX181 at 43 (Bagley Report).

341. In the Black Belt counties, where White officials historically have used at-large schemes and enhancing devices to dilute the Black vote, Black representation on local bodies often falls considerably short of equitable levels. For example, Black residents constitute 53.1% of the population of Halifax County but hold just 32 of the county's 93 local elected positions. *Id.* at 47. Edgecombe County has a population that is 57.7% Black but only 28 of the 95 local offices are held by Black officials. *Id*. Hyde County has a population that is 30% Black but has only one Black local elected official. *Id.* Tyrrell County is 36.6% Black but has only three Black local elected officials. *Id.*

342. In the Triad, Guilford County is 33.8% Black but has only 35 Black elected officials out of 119 positions. *Id.* Forsyth County is 27.1% Black but has only 14 Black elected officials out of 118 positions. *Id.*

343. Just one Black Senator, Kandie Smith, was elected in the Black Belt under the challenged 2023 Senate Plan following the 2024 election. PX205 at 14 (Bagley Supplemental Report). But between 2013 and 2021, there were consistently two or three

Black or Black-preferred Senators from the northeast in Senate Districts, representing then-numbered Senate Districts 3, 4, and 5. *See* JX358 (2021 demographics); JX374 (2019); JX376 (2017); JX380 (2013); *see also* JX305 (2020 Senate Map), JX310 (2018 Senate Map); JX251 (2011 Senate Map).

344. Legislative Defendants' expert, Dr. Taylor, opined that Black North Carolinians are "reasonably represented in federal, state, and local elected offices." LDTX259 at 46 (Taylor Report); Trial Tr. vol. VI, 1301:20-24 (Taylor). But his opinion is undermined by several key admissions at trial: (1) Black North Carolinians have been consistently underrepresented in the state legislature relative to their share of the population for more than three decades, between 1992 and 2024, Trial Tr. vol. VI, 1303:5-1304:19 (Taylor); (2) Dr. Taylor did not analyze whether Black North Carolinians hold a proportionate share of local elected offices, Trial Tr. vol. VI, 1304:20-1306:22 (Taylor); and (3) he did not dispute Dr. Bagley's findings that Black residents are underrepresented in local office as compared to their population share in numerous counties, including Halifax County, Edgecombe County, Hyde County, Tyrrell County, Guilford County, and Forsyth County, Trial Tr. vol. VI, 1306:23-1307:9 (Taylor).

### G. There is a Broad Lack of Responsiveness to the Needs of Black Communities

345. There is significant evidence in the record that the legislature has largely been unresponsive to the needs and concerns of the Black community, and particularly to those communities in the challenged areas of North Carolina at issue in this matter.

146

346.    Expert reports and testimony provide a broader picture of the lack of responsiveness by elected officials. Dr. Bagley concluded that the legislature, since the establishment of a Republican supermajority, has routinely "advanced legislation that Black voters have roundly opposed. And they have ignored pleas from Black voters to advance other legislation." PX181 at 48. Dr. Bagley's conclusion is supported by several recently enacted or proposed laws, including voter identification requirements, a prohibition on teaching "Critical Race Theory," and decisions regarding Medicaid and education funding. *See id.* at 48-49; *see also infra* FOF ¶¶ 355-56.

347.    Dr. Leloudis opined that where "minority rights have been constrained, North Carolina's state government has been decidedly unresponsive to minority concerns and interests related to social and economic policy. That lack of responsiveness to Blacks and, in recent years, a rapidly growing Hispanic population, has perpetuated minority disadvantages in employment and education, further hindering the ability of minority populations to participate fully and freely in the political process." PX179 at 3 (Leloudis Report).

348.    Fact witness testimony supports the legislature's non-responsiveness in several different issue areas. For example, Plaintiff Mitzi Reynolds Turner testified that, in the Triad, legislators' lack of responsiveness to Black communities is overt: elected representatives fail to attend community events they are invited to. Trial Tr. vol. III, 578:18-579:2, 579:19-23 (Reynolds Turner). Ms. Reynolds Turner further testified that her representatives are not responsive to needs in her community, ranging from food access, to poverty, to affordable housing. Trial Tr. vol. III, 578:7-579:5 (Reynolds Turner). Ms.

Reynolds Turner testified that legislators representing her area in fact push for policies that actively harm the community, including measures to eliminate FEMA, SNAP benefits, and DEI programs. Trial Tr. vol. III, 579:3-18 (Reynolds Turner).

349.    Likewise, Plaintiff Calvin Jones testified about issues in education that affect Black students in the northeast, as well as disparities in USDA funding available to White versus Black farmers with small farms. Trial Tr. vol. II, 352:6-354:23 (Jones). When he approached legislators about issues relevant to agriculture that would negatively impact small farms in the Black Belt, he was told the issue "had already been taken care of," so he may "want to spend [his] time somewhere else." Trial Tr. vol. II, 353:7-23 (Jones). Plaintiff Reverend Dawn Daly-Mack testified that her Senator, Bobby Hanig, was not her candidate of choice and "someone who I have never seen in my community." Trial Tr. vol. II, 366:10-367:10 (Daly-Mack). She also testified to the importance of the "social determinants of health" to the African American communities living in the Black Belt, including access to healthy food, access to housing, and housing conditions. Trial Tr. vol. II, 363:7-18 (Daly-Mack).

350.    Reverend William Kearney testified about the history of environmental hazards in Black communities in Warren County and the ongoing struggle the local Black community faces in accessing funding. He noted that many of these challenges stem from a long history of "injustices all the way down from enslavement to today" which makes it more difficult for his community "to tap into resources." Trial Tr. vol. IV, 979:23-982:3 (Kearney). Similarly, Plaintiff Syene Jasmin felt it was important to mention environmental issues as being important to the Black community in his area when he offered public

148

comment in the 2023 redistricting cycle, citing energy issues for the area north of the river in Pitt County and air quality. Trial Tr. vol. III, 520:13-522:20, 523:22-525:17 (Jasmin).

351. Witness Deborah Dicks Maxwell, the President of Plaintiff North Carolina NAACP, testified to the NAACP's advocacy on a number of issues important to the Black and African American communities in North Carolina overall, including Medicaid expansion, funding for public education, environmental justice, voting rights, and housing issues. Trial Tr. vol. I, 16:4-15 (Maxwell). With respect to voting rights specifically, she described efforts to engage members to contact their local state and federal legislators, Trial Tr. vol. I, 16:16-25 (Maxwell), opposition to voter ID requirements and restrictions on early voting, Trial Tr. vol. I, 17:13-20 (Maxwell), and engaging in advocacy regarding "anything that would negatively impact the voting ability of North Carolinians." Trial Tr. vol. I, 17:23-18:4 (Maxwell). But following the 2023 redistricting, she described a "downturn" in advocacy due to the presence of only one senator of color in the entire Eastern area of the state, which she attributed specifically to the drawing of district lines. Trial Tr. vol. I, 18:23-19:7 (Maxwell).

352. Similarly, Former Congressman G.K. Butterfield stated that the legislature is not responsive with respect to concerns about education and community investment. *See* Doc. 146-1 at 20:22-21:12. With respect to education, he stated that "[o]ur schools in northeastern North Carolina are underfunded. I mean, *Leandro* talked about it for years, the *Leandro* case. And they're still underfunded. If you were to compare the public schools of Halifax County with the public schools of Orange County . . . [there is a] vast difference,

149

and the legislature can do something about that and they have not." Doc. 146-1 at 21:13-19.

353. Senator Kandie Smith testified that the Legislative Black Caucus focuses on issues specific to the Black community, including healthcare, education, housing, criminal justice reform, and voting rights. These issues, she said, are unlikely to be addressed without work by the Legislative Black Caucus, noting that "many [minority individuals] come and tell us that they don't feel like they're represented. And sometimes they try to reach out, but they don't get a response from their legislator. They don't get visits or returned calls. And so when they call us, we try our best to make sure that we respond, answer questions, and assist wherever possible." Trial Tr. vol. IV, 801:13-802:25 (Smith); *see also* Trial Tr. vol. IV, 808:21-24 (Smith).

354. With respect to healthcare concerns in the Black Belt, Senator Smith testified about the closing of Martin General Hospital, which served rural communities in the Black Belt. Notably, Martin County is not within her Senate District, but she attended a meeting to bring information back to the legislature; no state legislator representing Martin County was in attendance. Trial Tr. vol. IV, 805:17-807:3 (Smith).

355. Recent and specific legislative actions supported by legislative leaders who favored the 2023 Senate and Congressional Plans, as well as those elected *under* those district lines, directly contravene the expressed interest of these communities. For example, during the 2023-2024 North Carolina General Assembly Legislative Session, lead map-drawer Senator Ralph Hise proposed—and Senator Norman Sanderson of Senate District 2 cosponsored—Senate Bill 403, which effectuates any federally imposed future Medicaid

work requirements. *See* Docs. 150-6, 150-28 (Appendices 5 and 27 to Plaintiffs' Request for Judicial Notice). Senator Lisa Barnes, representative of Senate District 11, also proposed Senate Bill 406, which would expand a program granting students vouchers or scholarships to *non*-public schools. *See* Docs. 150-14, 150-39 (Appendices 13 and 38 to Plaintiffs' Request for Judicial Notice). The bill's cosponsors included cosponsored by Senator Hise, Senator Sanderson, and Senator Bobby Hanig, who represents Senate District 1. *See id.*

356.     Senator Barnes sponsored Senate Bill 248, which effectuated the de-merger of public schools in Rocky Mount, resulting in both Nash and Edgecombe Counties having to absorb those public school students into their respective school systems. *See* Doc. 150-36 (Appendix 35 to Plaintiffs' Request for Judicial Notice). Senator Kandie Smith testified about the de-merger being an issue of concern to the Black community, particularly to the citizens in Edgecombe County, and her attempt to work with fellow legislators to address those concerns. Trial Tr. vol. IV, 804:1-805:4 (Smith). However, she was verbally attacked for raising them. *Id.* at 805:5-16. Addison McDowell, representative of Congressional District 6 (which includes portions of the Triad), and Dr. Greg Murphy, representative of Congressional District 3 (which now includes all of Pitt County), cosponsored House Resolution 22 in the 2025-2026 Session, otherwise known as the SAVE Act, which would amend the National Voter Registration Act to require proof of citizenship to register to vote in federal elections. *See* Doc. 150-4 (Appendix 3 to Plaintiffs' Request for Judicial

Notice).[25] These examples are in addition to the lack of responsiveness to Black communities in the 2023 redistricting process, including the failure to perform any analysis of what districts might be required by the Voting Rights Act after repeated requests to do so, as described above.

357. Finally, expert testimony submitted by Plaintiffs also demonstrates how a lack of responsiveness by government actors is directly related to the socioeconomic disparities and the effects of discrimination described above. Dr. Stephens-Dougan's testimony supported the link between a lack of responsive representation and the persistent and pervasive socioeconomic disparities experienced by African American communities in the challenged areas: "[I]t is well accepted that representation in government directly impacts outcome disparities as a general matter." PX195 ¶¶ 139-42 (Stephens-Dougan Report); Trial Tr. vol. IV, 746:15-747:9 (Stephens-Dougan). An analysis of traffic stops in North Carolina provided an example of the impact of responsive representation on outcome disparities. PX195 ¶¶ 139-40; Trial Tr. vol. III, 723:13-724:4 (Stephens-Dougan). "Where Black people are politically empowered in North Carolina, racial disparities in traffic stops are low, but where Black people are politically weak, racial disparities in traffic stops are high." PX195 ¶ 141; Trial Tr. vol. III, 723:22-724:4 (Stephens-Dougan). This finding on racial disparities in traffic stops comports with a long line of research indicating that descriptive representation leads to substantive representation for African Americans. PX195 ¶ 142; Trial Tr. vol. IV, 746:23-747:2 (Stephens-Dougan). "Black representation is

---

[25] NAACP Plaintiffs' Request for Judicial Notice was granted as to Appendices 3, 5, 13, 23, 24, 25, 27, 35, and 38. Minute Entry 6/18/2025.

not just about having 'Black faces in high places,' but Black representation is associated with substantive outcomes in public policy." PX195 ¶ 141; *see also* Trial Tr. vol. IV, 746:17-22, 747:10-22 (Stephens-Dougan) (noting that the Republican Party in North Carolina does not have "an incentive to represent Black political interests because . . . their constituents are . . . overwhelmingly White [as well as] a higher percentage of racial conservatives").

358.    As an example of how representation affects policy outcomes, Dr. Stephens-Dougan pointed to Medicaid expansion, explaining that "public support for Medicaid expansion is racialized." PX195 ¶ 143. "[A]s with other public policy issues, there are large differences in support levels by race, with greater support for Medicaid among African Americans." *Id.* "[P]eer-reviewed research has shown that for many voters they associate [Medicaid] as a Black program; and while public opinion indicates that Black voters are generally supportive of Medicaid, the sort of political environment in North Carolina is one in which the Republican Party repeatedly was opposed to Medicaid expansion." Trial Tr. vol. III, 727:7-12 (Stephens-Dougan). Further, "when the size of the Black population increases in a state and white support levels for Medicaid expansion are relatively low, the state is significantly less likely to expand Medicaid." PX195 ¶ 143. "Eventually there was Medicaid expansion in the state of North Carolina, but North Carolina was the fortieth state to do so." Trial Tr. vol. III, 727:12-14 (Stephens-Dougan).

359.    Dr. Stephens-Dougan also cited the retrenchment of diversity, equity, and inclusion ("DEI") in education as another example of racialized politics in North Carolina, PX212 ¶¶ 15-21. Dr. Stephens-Dougan found that there are several indications that the term

"DEI" functions as a dog whistle that politicians use to activate some White Americans' negative predispositions. *Id.* at ¶¶ 17-18. At the time of Dr. Stephens-Dougan's Supplemental Report, six education-related bills had been passed by the legislature (but not yet ratified) during the North Carolina General Assembly's 2025-2026 legislative session. Dr. Stephens-Dougan concluded that five were not racialized and passed with bipartisan support. *Id.* at ¶ 21; Trial Tr. vol. IV, 748:8-14 (Stephens-Dougan). Dr. Stephens-Dougan found it "striking" that one education bill that was related to race, Senate Bill 227 titled "Eliminating DEI in Public Education," was the only such bill that passed along hyper-partisan lines. Trial Tr. vol. IV, 748:15-19 (Stephens-Dougan); PX212 ¶ 21. Dr. Stephens-Dougan found this pattern was consistent with her conclusion that "racial division is the antecedent of much of the partisan polarization that we observe today." PX212 ¶ 21 (citing PX195 ¶¶ 4, 130-43 (Stephens-Dougan Report)).

360. "[T]he aforementioned examples are evidence of how the Republican party pursues policies that are often contrary to the racial policy preferences of the majority of African Americans." PX195 ¶ 143; Trial Tr. vol. IV, 746:5-12 (Stephens-Dougan).

361. Legislative Defendants did not provide any rebuttal to the expert analysis submitted by Dr. Stephens-Dougan.

362. Legislative Defendants' expert, Dr. Taylor, purported to assess the responsiveness of North Carolina elected officials to the needs of Black North Carolinians, LDTX259 at 31-36 (Taylor Report), but he failed to examine data specific to that group, relying instead on studies measuring responsiveness to the general population. Trial Tr. vol. VI, 1310:9-25 (Taylor). As Dr. Taylor conceded at trial, such studies do not measure

responsiveness to Black North Carolinians in particular. Trial Tr. vol. VI, 1311:1-5 (Taylor). Moreover, while Dr. Taylor argued that voter ID laws, redistricting, public education spending, and Medicaid expansion are not "inherently racial issues," LDTX259 at 35, he offered no evidentiary support for that view and did not analyze whether those issues disproportionately affect Black North Carolinians. Trial Tr. vol. VI, 1311:12-1312:16 (Taylor).

363. Overall, the Court finds that compelling expert and fact witness testimony supports the conclusion that there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the Black community, especially in the areas of North Carolina at issue here.

### H. Summary of Factual Findings as to the Senate Factors

364. Based on the foregoing findings of fact, the Court finds that each of the Senate Factors relevant to a finding of vote dilution in violation of Section 2 of the Voting Rights Act is present here, consistent with the findings of Dr. Bagley, *see* PX181 at 7-50 (Bagley Report); PX205 at 2-17 (Bagley Supplemental Report); Trial Tr. vol. III, 655:3-675:4 (Bagley), and as supported by the relevant analysis of Dr. LaFleur Stephens-Dougan and fact witnesses, as summarized above.

365. The Court finds the opinions of Legislative Defendants' expert, Dr. Taylor, with respect to the Senate Factors that he evaluated, including 3, 5, 6, 7, and 8, to be of limited probative value. Dr. Taylor offered his analysis not to rebut the factual findings or data presented by Dr. Bagley, but rather to place North Carolina "into comparative and historical context" by "contrast[ing] statewide indicators from today with (1) those of the

155

United States at this moment and (2) North Carolina in the past." LDTX259 at 7 (Taylor Report). Dr. Taylor's resulting opinions carry little weight for at least two reasons: First, Dr. Taylor failed to adhere to a discernable methodology in drawing his comparisons, calling into question their reliability. *See* Trial Tr. vol. VI, 1317:12-25 (Taylor) (confirming that he did not identify specific metrics to identify numerically meaningful disparities in his national and historical comparisons). Second, as Dr. Taylor acknowledged, the existence of equal or greater racial inequities in other states, or in the past, does not negate the existence of racial inequities present in North Carolina today. Trial Tr. vol. VI, 1318:1-16 (Taylor). Notably, Dr. Taylor conceded that he was unaware of any court or peer-reviewed literature applying a comparative approach, like the one he conducted, to a Senate Factors analysis. Trial Tr. vol. VI, 1287:19-1288-6; 1318:21-24 (Taylor).

## VI. Additional Factual Findings Relevant to the *Arlington Heights* Factors

366.    Courts use the factors outlined in *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977), to determine if the decision-makers acted with illicit intent, including a claim that "racially discriminatory intent motivated a facially neutral government action." *N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 220-21 (4th Cir. 2016). These factors include "the historical background of the challenged decision; the specific sequence of events leading up to the challenged decision; departures from normal procedural sequence; the legislative history of the decision; and the disproportionate impact of the official action -- whether it bears more heavily on one race than another." *Id.* at 220-21 (internal citations omitted). Accordingly, the Court makes additional findings relevant to those factors under *Arlington Heights* not already addressed.

156

### A. Procedural Deviations in the 2023 Redistricting Process Compared to Prior Cycles

367.    The 2023 redistricting process deviated significantly from past redistricting processes in North Carolina with respect to timing, transparency, and opportunity for public input. Legislative leadership in 2023 waited longer than in past redistricting cycles to even begin the legislative process, and then completed the legislative process on a condensed timeline. Map-drawing also occurred behind closed doors, with criteria and draft maps disclosed to the public only after hearings to receive public comments and a mere week before the final plans were ratified. Public input was drastically curtailed, as only three public hearings were held throughout the state.

#### 1.  The Legislature Unnecessarily Delayed the Redistricting Process

368.    The legislature's decision to delay any public notifications about the redistricting process for nearly five months, from the April 2023 *Harper III* decision and announcement that new districts would be drawn to the notices in September 2023 of the Three September Hearings, deviates significantly from past practice.

369.    The most recent 2021 redistricting process began on August 5, 2021, about one week *prior* to the triggering event—i.e., the release of 2020 Census data on August 12, 2021. *Harper I*, 868 S.E.2d at 511; JX244-45 (Aug. 5, 2011 agendas). Proposed redistricting criteria were shared four days later and adopted on the same day that the Census data was released. *Harper I*, 868 S.E.2d at 511; PX246-51 (proposed criteria and amendments); JX224 (finalized criteria). Shortly thereafter, legislators debated the schedule for public hearings in open meetings. JX243 (Aug. 17, 2011 Senate calendar).

370. In 2011, the redistricting process was also timed to coincide with the release of Census data. When Census data was released in early March, a map-drawer was retained and began drawing districts within weeks. *Covington*, 316 F.R.D. at 126. Committee meetings also began within a month. PX263 (Rucho and Lewis press release noting meeting began March 17)[26]; JX253 (Mar. 3, 2011 Senate agenda).

371. There was no reasonable basis offered by state legislators to delay the redistricting process for five months. Senator Hise testified that the Senate Redistricting Chairs could have started at any point, Trial Tr. vol. IV, 869:21-24 (Hise), but chose this timeline to finish the budget process so that the "General Assembly, as a whole, could focus on the drawing of maps." Trial Tr. vol. IV, 834:16-835:12 (Hise). This explanation does not withstand scrutiny for several reasons.

372. First, all odd-year redistricting cycles have occurred during the same legislative term as the budget process without requiring delay. For example, the Appropriations Act of 2001 worked its way through the legislature on a timeline similar to the 2001 Senate redistricting plan, *compare* Doc. 150-26[27] *with* JX265-67, the Appropriations Act of 2011 was similarly filed the same month that the redistricting process began, and was ratified one month earlier, *compare* Doc. 150-25[28] *with* JX262-63, and the 2021 Appropriations Act was filed several months in advance of the redistricting

---

[26] The Court admitted this exhibit, along with PX264-66, to the extent they contain factual information about the redistricting process, such as when meetings were held. *See* Trial Tr. vol. IV, 889:8-25.

[27] NAACP Plaintiffs' Request for Judicial Notice was granted as to this document, Appendix 25. Minute Entry 6/18/2025.

[28] NAACP Plaintiffs' Request for Judicial Notice was granted as to this document, Appendix 24. Minute Entry 6/18/2025.

plans, but the two bills were considered and ratified just two weeks apart. *Compare* Doc. 150-24[29] *with* JX228-230. Accordingly, the Court does not find that the enactment of bills during the long session, including the 2023 Appropriations Bill, can account for this deviation from the legislature's past practice.

373.    Second, the explanation that the "General Assembly, as a whole" could focus on drawing of maps once the budget was complete does not align with the Senate Redistricting Chairs' decision not to disclose the redistricting criteria they used (originally developed in the summer of 2023, Stipulated Facts ¶ 5) before the October 18, 2023, release of proposed drafts. Trial Tr. vol. IV, 868:10-869:1 (Hise). There is no reason that the redistricting criteria could not have been released earlier in 2023. And, since these criteria provided "an outline of what [the Senate Redistricting Chairs] would accept and what [they] wouldn't," Trial Tr. vol. IV, 880:10-22 (Hise), this delay effectively shut out the "General Assembly, as a whole," or at least those not privy to the criteria, from meaningfully drafting anything that would have a chance of being considered for enactment before October 18.

374.    Third, the delay in redistricting in 2023 cannot be accounted for by its occurrence outside the usual post-Census timeline. Prior remedial redistricting sessions, including those in which Senator Hise was involved, show the legislature acting promptly to begin. For example, in 2017, legislators retained a map-drawer for remedial districting (on June 27, 2017) and appointed redistricting committees (on June 30, 2017) within a

---

[29] NAACP Plaintiffs' Request for Judicial Notice was granted as to this document, Appendix 23. Minute Entry 6/18/2025.

month of the June 5, 2017, Supreme Court decision affirming this Court's order striking down state legislative plans. *See Covington*, 316 F.R.D. at 178; Notice of Filing, *Covington v. North Carolina*, 15-CV-00399, at 4 (M.D.N.C. Sept. 7, 2017) (Doc. 184). It was not until July 31, 2017, that this Court gave the legislature a deadline of September 1, 2017, to enact remedial districts. *Covington v. North Carolina*, 267 F. Supp. 3d 664, 665-67 (M.D.N.C. 2017), but the committees had already begun meeting before that, on July 26, 2017. Notice of Filing, *Covington v. North Carolina*, No. 15-CV-00399, at 5 (M.D.N.C. Sept. 7, 2017) (Doc. 184).

375.    Accordingly, the Court finds that the circumstances surrounding the 2023 redistricting do not explain the procedural deviations in the process. Having eliminated the asserted justifications, the only remaining evidence pointing to the cause of the delay is another significant procedural departure: a last-minute change to longstanding North Carolina law—inserted just two days before the budget's passage—that made certain redistricting documents confidential and allowed individual lawmakers to decide whether such records needed to be retained at all. Trial Tr. vol. IV, 943:19-946:22 (Hise).

2.    The Legislature Enacted the Maps on a Condensed Timeline

376.    Once the 2023 redrawing process began, the legislature progressed quickly, from public hearings in late September, to bill introductions on October 18, and bill ratifications on October 25. JX066-071 (hearing notices); JX040-043 (bill histories). Criteria for the maps were not put forward publicly until after draft maps were made public, Trial Tr. vol. IV, 868:22-869:1 (Hise), and were provided to Members of the Senate Committee on Redistricting and Elections for the first time during the October 19, 2023,

160

committee meeting. *See* Stipulated Facts ¶ 26(b). Fourteen committee and legislative meetings on the proposed redistricting plans were then compressed into a single week between October 19 and October 25. In all, the bulk of the process occurred within one month. *See* JX040-043 (bill histories). The Senate Redistricting Chairs controlled the timing of the filing of the draft plans, as well as when these items would appear on the Senate Elections and Redistricting Committee agenda. Trial Tr. vol. IV, 871:4-18 (Hise). The Court concludes that the Senate Redistricting Chairs—despite having the flexibility to adopt a longer timeline—departed from past practice by intentionally designing an abbreviated process for redistricting during the 2023 cycle.

377. The 2011 process, by contrast, progressed over several months, with committee meetings beginning in March 2011, partial maps released in June 2011, and complete maps released in July 2011. *See* PX263-66[30]; JX253; *Covington*, 316 F.R.D. at 127. Public hearings also occurred multiple times throughout the process, with the first hearings occurring in late June following the release of partial maps, PX266, and a second round occurring in July after the release of final maps. PX263; *see also* JX260 (hearing sites map); PX282 (2011 Archive including full and partial maps). And in 2001, the maps were filed in April and ratified in November, with much of the process occurring over the three months of September, October, and November. JX265-67 (bill histories). Public hearings were also held prior to the release of maps in May, again after their release and

---

[30] *See* supra, n.26.

prior to committee meetings in August, and once more prior to ratification in November. JX254-56 (meeting agendas).[31]

378. The Court finds that the compressed timeline between the release and enactment of draft maps departed from prior practice, lacked justification based on any 2023-specific circumstances identified by Legislative Defendants, and was unnecessary in light of testimony that legislators "could have started at any point," Trial Tr. vol. IV, 869:21-24 (Hise), and "always held the option of changing the filing date for Congressional and legislative offices or conducting a separate election for them" to allow more time for the process. Trial Tr. vol. IV, 915:9-14 (Hise).

3. <u>The Legislature Was Unusually Non-Transparent Regarding the Map-Drawing Process</u>

379. The redistricting process in 2023 significantly deviated from recent redistricting cycles in its lack of transparency. While the 2021 process required maps to be drawn publicly, legislators in 2023 drew what would become the first draft of enacted maps entirely behind closed doors. Trial Tr. vol. IV, 866:12-868:21 (Hise). As noted above, the Senate Redistricting Chairs did not allow for committee debate of the redistricting criteria before they were finalized and, after developing the criteria kept them secret over the

---

[31] The condensed timeline in 2023 instead resembles the condensed timeline of the 2021 process, which was complicated by the delayed release in August 2021 of the 2020 Census Data. *See Harper I*, 868 S.E.2d at 511; JX228-30 (redistricting bill histories, demonstrating overview of legislative timeline). The probative value of comparison to 2021 is therefore limited when, in 2023, legislators intended to redraw district lines by April 2023, if not before, and there were no external barriers to starting that process at that time. *See* Stipulated Facts ¶¶ 3-4; PX101. In any event, this resemblance to 2021 is not helpful in justifying the procedural deviations, given that a unanimous three-judge state court panel found that the legislature acted with discriminatory (partisan) intent, *Harper I*, 868 S.E.2d at 552, a finding that was never overturned on appeal.

162

summer until after the maps themselves were released. Stipulated Facts ¶ 5; Trial Tr. vol. IV, 868:22-869:1 (Hise). And just before starting the 2023 redistricting process, the legislature also repealed a longstanding law automatically making certain redistricting records public upon the passage of the map. Trial Tr. vol. IV, 943:19-947:14 (Hise). Upon repeal, individual legislators became the sole custodians of those records. *Id.*

380. By contrast, in 2021, representative-drawn maps would only be considered if they were drawn at computers made available in a committee room at the legislature. *Harper I*, 868 S.E.2d at 512-13. Members of the public were able to observe the map-drawing sessions both in person and by livestream. JX239. Criteria for the maps were first proposed in early August, well in advance of any map-drawing or public hearings, and finalized a few days later after amendments to the criteria were considered. *See* PX246-51 (Aug. 12, 2021 Committee transcript; proposed criteria and amendments); JX224 (finalized criteria).

381. In 2019, a process similar to that in 2021 occurred after a court order required that the remedial redistricting process occur in full public view, with map-drawing conducted at public hearings with computer screens visible to legislators and public observers. *Common Cause v. Lewis*, No. 18-CVS-014001, 2019 N.C. Super. LEXIS 56, at *410 (N.C. Super. Ct., Wake Cnty. Sept. 3, 2019). These hearings were broadcast by audio and video livestreams. *Common Cause v. Lewis*, No. 18-CVS-014001, 2019 N.C. Super. LEXIS 200, at *4 (N.C. Super Ct., Wake Cnty. Oct. 28, 2019). Draft maps were also made available prior to a meeting at which public comments were taken. *See* JX246 at 2.

382.    The Court finds the 2023 map-drawing process deviated significantly from recent practices, and that the circumstances of the 2023 process do not account for this procedural deviation.

4.   The Legislature Provided Only Nominal Opportunity for Public Comment on the Proposed Maps

383.    The 2023 redistricting process also deviated from recent past processes in its minimal opportunity for public comment. Only three public hearings were offered in 2023: one in Elizabeth City, one in Hickory, and one in Raleigh. Each hearing began during typical business hours, and committee members were not required to attend. JX066-71 (hearing notices). As noted above, neither draft maps nor criteria were released to the public before the meetings took place. Attendees who wished to speak could sign up at the hearing or in advance on the legislature's website, but the online sign-up form provided no guidance on the content or length of public comments. *See* JX064 (notice and online form). A public comment portal was also made available, but the portal likewise provided no guidance on content, nor did it link to redistricting resources or indicate when the portal would close. *See* JX065 (public comment portal).

384.    The number of meetings held to receive public comments during the 2023 cycle departed significantly from all recent redistricting cycles—both post-Census and remedial—not only in quantity, but also in the limited information provided to the public in advance of those opportunities to comment. In 2021, thirteen public hearings were held across the state. JX241 (public hearing schedule). These hearings were held prior to the release of maps, but after criteria for the maps had been adopted and made public. *See*

164

JX224 (criteria adopted Aug. 12); JX228-30 (bill histories indicating map filings). Four additional public comment sessions were held *after* maps were released: two in person in Raleigh, and two online via Webex. JX235-38 (agendas). Even that cycle marked a significant departure from other recent cycles, which offered the public even greater opportunities for engagement.

385.    For example, in 2011, dozens of hearings were held across twenty-four counties. JX258, 260 at PDF p. 1 (list of hearing sites; map). The public hearings began with seven hearings in VRA districts, held after the release of partially redrawn maps focusing on those districts. PX266 at 1.[32] Additional public hearings were held after the release of maps redrawing the entire state. PX263 at 1.[33]

386.    Recent remedial redistricting processes also had substantially more opportunities for public input on draft maps. In 2017, seven public hearings were held after the release of draft maps. JX247 (Aug. 22, 2017 sites); JX313-14 (bill histories indicating Aug. 18, 2017 map filing). Seven hearings were also held in 2016 before the release of maps, with an additional public comment session the day after plans were introduced. JX248 (legislative calendar); JX257 (legislative calendar).

387.    Witness testimony confirms that, because the 2023 redistricting process was much shorter than prior cycles—approximately seven days from the release of proposed maps to ratification—it was nearly impossible for legislators to provide meaningful input or propose alternative maps. *See* Doc. 160-2 at 132:19-133:5 (Deposition Transcript, Mary

---

[32] *See supra*, n.26.
[33] *See supra*, n.26.

Price Harrison) ("So we didn't even know the criteria that they considered important for map drawing. That wasn't public until the 19th. So that made it nearly impossible to draw a map . . . if you don't even have the criteria that the majority party is using to draw the maps, then you're sort of at a pretty big loss of drawing something that would be acceptable or would pass any kind of vote in the House."). Public hearing testimony also demonstrated that limiting public hearings to dates before the release of the proposed maps made it nearly impossible for the public to meaningfully engage in the process or allow for their substantive input to be taken into account. *See* JX058 at 24:5-25:5, 29:3-23, 81:13-16, 140:8-17 (Sept. 27 hearing transcript); JX059 at 8:19-9:9, 9:20-10:16, 12:14-13:22, 14:1-21, 29:6-30:3, 52:8-21, 61:14-62:19, 63:10-21, 74:12-22, 78:12-17, 84:15-85:15, 99:14-100:11 (Sept. 26 hearing transcript); JX060 at 7:18-8:2, 28:14-19, 31:22-33:10 (Sept. 25 hearing transcript).

388.    The Court accordingly finds that these deviations from past opportunities for public comment provided only nominal opportunity for public comment on proposed plans and that those deviations are not accounted for by the circumstances of the 2023 redistricting process.

5.    Procedural Deviations Conclusions

389.    These and other choices by legislative leadership—including the non-public map drawing process, the failure to publish comments submitted through the comment portal, and the decision not to retain redistricting records—coupled with the glaring disparities between public input and the maps that were ultimately enacted, support that

166

the legislature did not make a good faith effort to receive or respond to public input about the legislative process or draft maps.

390. House Representative Mary Price ("Pricey") Harrison testified that the legislature "did the bare minimum" to provide any transparency or allow for an inclusive map-drawing process, *see* Doc. 160-2 at 148:24-149:13 (Harrison), despite the availability of numerous reasonable measures that could have enhanced transparency and public participation:

> So what we could have done is we could have started earlier. . . . [W]e could have gotten input from the public before the maps were drawn because it's always helpful to know what people want to see. And then we could have drawn the maps in public and we could have made it more accessible . . . in terms of disability and language limitations and that sort of thing. And then we could have had significant, you know, public debate after the maps were drawn and then maybe reconsidered whether we were going to actually adopt these maps after we got the public input. I just think it makes for a more inclusive transparent process that the public has confidence in.

*Id.* at 186:18-187:10 (Harrison).

391. Common Cause Executive Director Bob Phillips, a lifelong native of North Carolina, Trial Tr. vol. III, 602:15-18 (Phillips), testified to the importance of an open redistricting process:

> You want the public to be able to have an opportunity to look at the maps and to talk to the lawmakers that are making those decisions about what they think and how it is going to affect their community.

Trial Tr. vol. III, 613:14-18 (Phillips). He testified that the legislature in 2011 held a "more meaningful redistricting process" with "dozens of hearings and an opportunity for the public to actually comment on the maps themselves" in a process that extended "over four months." Trial Tr. vol. III, 613:5-14. In contrast, the 2023 process consisted of "[t]hree

hearings, very few lawmakers, no criteria, no real instructions on what these hearings were about other than just to receive public comment, no maps." Trial Tr. vol. III, 613:19-22 (Phillips). One representative from Elizabeth City was not even aware a public hearing was happening in his municipality. Trial Tr. vol. III, 614:3-11 (Phillips). Mr. Phillips also recalled that the redistricting processes in 2019 and 2021 had some transparency in how the maps were drawn, but in 2023 the maps were "drawn behind closed doors" and then "introduced and rushed through in a week and adopted." *Id.* at 614:17-615:2.

392.    Overall, the Court finds the procedural deviations in the 2023 redistricting process were most likely calculated to achieve specific results, including limits on the consideration of whether the proposed and enacted plans in fact complied with federal law such as the Voting Rights Act, and the truncation of the time for judicial review post-enactment. The legislature knew by April 28, 2023, that it would re-draw the state legislative and Congressional redistricting plans for use in the 2024 election, and Legislative Defendants have provided no credible explanation for the procedural deviations and unnecessarily rushed and non-transparent process they designed.

### B.  Facts Evidencing a Willful Disregard of the Voting Rights Act

393.    The criteria used to enact the 2023 Senate and Congressional Plans deviated from past cycles in unjustified ways that can inform on legislative intent and, specifically, indicate an intent to disregard considerations related to the Voting Rights Act required to protect North Carolina's Black voters.

394.    While redistricting criteria have historically been debated and voted upon in Committee, Trial Tr. vol. IV, 877:20-23 (Hise), the Chairs in 2023 chose to develop

redistricting criteria privately and only release them at the time draft maps were made available in mid-October. *Id.* at 868:10-16; *see also* JX002 at 3:10-16 (Oct. 19 Senate Committee transcript). The consequence of this approach was to prevent anyone else wanting to draft maps from benefiting from the use of the approved criteria before their release in mid-October. Trial Tr. vol. IV, 868:22-869:1 (Hise). This is particularly significant because, in every instance, the Senate Redistricting Chairs evaluated proposed amendments by asking whether they complied with the criteria they had adopted—using those criteria as the framework for determining what was acceptable. Trial Tr. vol. IV, 880:10-22 (Hise). Accordingly, by keeping their chosen criteria private, in deviation from prior practice, the Senate Redistricting Chairs greatly limited the ability of other legislators and the public to proposed alternative districts with a realistic chance of being adopted.

395. In developing redistricting criteria for state Senate and Congressional plans in 2023, Senate Redistricting Chairs worked from the criteria used in 2021. Trial Tr. vol. IV, 878:4-12 (Hise). In doing so, they drafted the 2023 criteria to substantively deviate from the 2021 criteria by *omitting* the provision that specifically addresses the Voting Rights Act: "The Committees will draw districts that comply with the Voting Rights Act." *Compare* JX224 (2021 Adopted Criteria at "Racial Data") *with* JX038 (2023 Congressional Criteria at "Racial Data") *and* JX047 (2023 Senate Criteria at "Racial Data"). The result of this decision, also made without any public debate or vote, was to foreclose those seeking to apply these criteria (and thereby have a realistic chance of having their amendment

adopted) from using racial data to ensure compliance with the Voting Rights Act in drafting any alternative proposed plan. Trial Tr. vol. IV, 880:5-9 (Hise).[34]

396.    The legislature's procedural and substantive deviations from past practice with respect to conducting analyses under the Voting Rights Act are also relevant to assessing legislative intent.

397.    In the 2023 redistricting cycle, the Senate Redistricting Chairs who directed the redistricting of Senate and Congressional lines undertook no analysis of the requirements of the Voting Rights Act, including whether any districts were specifically required under this federal law. Trial Tr. vol. IV, 893:3-17 (Hise). As noted above, they made this decision despite repeated requests—from members of the public and fellow legislators alike—to do so. *See, e.g.*, JX058 at 34:6-17, 95:11-97:6 (Sept. 27 Hearing transcript); JX059 at 67:14-69:19 (Sept. 26 Hearing Transcript); PX78 (Oct. 3 Coalition Criteria Letter); Trial Tr. vol. IV, 898:18-900:3 (Hise).

398.    The purported reasons for the Senate Redistricting Chairs' refusal to analyze what was required under the Voting Rights Act when redrawing district lines in 2023 do not withstand scrutiny. Senator Hise, who led the redistricting efforts, agreed it was

_____

[34] Additional changes to the 2023 criteria by the Senate Redistricting Chairs appear intended to create more flexibility regarding application of otherwise traditional criteria, including loosening the requirement that "Voting Districts ('VTDs') should be split only when necessary," JX224 (2021 Adopted Criteria at "VTDs"), to allowing VTDs to "be considered when possible in forming districts that do not split these existing political subdivisions." JX038 (2023 Congressional Criteria at "Respect for Existing Political Subdivisions") and JX047 (2023 Senate Criteria at "Respect for Existing Political Subdivisions"). Likewise, the 2021 Criteria provided that, for the Congressional plan, counties should only be divided "for reasons of equalizing population and consideration of double bunking," and "[i]f a county is of sufficient population size to contain an entire Congressional district within the county's boundaries, the Committees shall construct a district entirely within that county." JX224.

important to stay apprised of what the relevant state and federal redistricting laws are and to ensure that any bill is consistent with state and federal law before voting for it. Trial Tr. vol. IV, 882:15-23 (Hise). He testified that he understood Section 2 of the Voting Rights Act remained in effect in 2023, including in North Carolina, and that he had read the Supreme Court's recent decision in *Allen v. Milligan* confirming this. *Id.* at 886:17-887:11. He also testified to understanding that federal law takes priority over state-specific legal requirements, and thus that a federal law requirement such as the Voting Rights Act would supersede the county groupings required under state law, as set forth in the *Stephenson* line of cases. *Id.* at 887:12-19; 892:6-10.[35] Senator Hise also agreed as a general matter that there is current discrimination in North Carolina against its Black citizens. *Id.* at 893:18-894:8.

399.     Nonetheless, Senator Hise testified that no analysis of what might be required under the Voting Rights Act was conducted during the 2023 redistricting process. *See id.* at 893:3-6, 901:9-15. He testified that the decision not to do such analysis was premised upon a court decision striking down earlier North Carolina districts, drawn in 2011, and the belief that "nothing had changed." *Id.* at 892:11-893:13. This rationale cannot withstand a modicum of scrutiny because it is a gross misrepresentation of the instruction provided by the Court in the *Covington* decision cited by Senator Hise. That instruction stated:

> Section 2 of the VRA continues to play an important role in redistricting, and legislatures must undertake a district-specific analysis to identify and cure potential Section 2 violations. Our decision today should in no way be read to imply that majority-black districts are no longer needed in the state of

---

[35] Senator Hise also testified to understanding there had been no change in the *Stephenson* line of cases since 2011. Trial Tr. vol. IV, 891:14-20.

> North Carolina. Nor do we suggest that majority-black districts could not be drawn—lawfully and constitutionally—in some of the same locations as the districts challenged in this case. Rather, our holding today is attributable primarily to the explicit and undisputed methods that the General Assembly employed in the construction of these districts, and to the inadequacy of the district-specific evidence and arguments put forth by Defendants in this case.

*Covington*, 316 F.R.D. at 178. Far from directing the legislature to abstain from ever again conducting a Voting Rights Act analysis or finding that no evidence of Voting Rights Act violations existed, the Court underscored the importance of undertaking an analysis "to identify and cure potential Section 2 violations," noting that there were majority-minority districts drawn in 2011 that went unchallenged, and that "[e]vidence of a potential Section 2 violation may exist in some part of the state." *Id*. Likewise, the Supreme Court in *Cooper* made clear that "a legislature undertaking a redistricting *must assess* whether the new districts it contemplates (not the old ones it sheds) conform to the VRA's requirements." *Cooper*, 581 U.S. at 303-04 (emphasis added). This directive to assess Voting Rights Act requirements during any redistricting is sensible, given that voting patterns can change over time—making prior assessments based on outdated election data insufficient to determine whether legally significant voting behavior exists in a given area. Legislative Defendants' choice to include the most updated election data in their Statpacks demonstrates that they understood the importance of including up-to-date elections in assessing voting behavior.

400. Putting aside the illogical purported justifications for the Senate Redistricting Chairs' failure to proactively analyze what the Voting Rights Act required in 2023, the Court need not and does not specify what action is necessary to show good faith compliance with the Voting Rights Act under these circumstances. Doing so is unnecessary because

here the Court can simply hold Legislative Defendants to their own representations as to what was required—*i.e.*, good faith consideration of evidence put forth by third parties. Here, the record supports a lack of good faith in meeting even that low bar, constituting a significant substantive deviation.

401.    Senator Hise admitted that the October 22, 2023 letter from Southern Coalition for Social Justice, received by all of the Senate Redistricting Chairs after his October 19, 2023 request for third-party analysis, directly addressed the *Gingles* factors. Trial Tr. vol. IV, 903:9-16 (Hise). He testified that he and the other Senate Redistricting Chairs reviewed the letter and the appended expert analysis of racially polarized voting by Dr. Kassra Oskooii, *id.* at 905:13, 906:18-19, and that he identified no faults with Dr. Oskooii's qualifications, analysis, methodology, or calculations. *Id.* at 912:14-913:3. In fact, he testified that he assumed it was true that Dr. Oskooii's electoral performance assessment showed that White voters were able to vote in sufficient quantity to defeat any of the Black-preferred candidates in Senate Districts 1 and 2 of the 2023 map. *Id.* at 910:4-10. And he admitted that the *Gingles* factors are what are used to determine whether there is legally significant racially polarized voting, *id.* at 906:7-8, going so far as to recognize that the same voting patterns could have been present in other areas of the state too. *Id.* at 913:4-8.[36]

---

[36] Senator Hise's dismissal of Dr. Oskooii's analysis as "preliminary," Trial Tr. vol. IV, 913:11-12, is unsupported and does not reflect a good faith consideration of the public comments transmitted by the October 22, 2023 Letter. Neither the Letter nor Dr. Oskooii's appended report characterize *his* analysis as preliminary; instead, the letter emphasizes in bold that it is "readily apparent that the state Senate plan contained in Senate Bill 758 would unlawfully dilute the voting strength of Black voters in northeast North Carolina in Senate Districts 1 & 2, in violation of the VRA." PX047 at PDF p. 4 (Letter p. 2).

173

402. Following receipt of this letter, and despite finding no disagreement with the analysis provided, the Senate Redistricting Chairs forged ahead as planned, choosing not to so much as acknowledge or raise the letter for debate in committee on October 23, 2024. Trial Tr. vol. 914:5-915:5 (Hise). In fact, it is unclear that the letter would have even made it into the Committee's official record absent Senator Blue's request to add the letter to the record on October 23, 2024. JX003 at 35:20-38:12 (Oct. 23 Committee transcript). There is no reasonable explanation for forging ahead, especially when Senator Hise himself welcomed the submission of analyses and admitted there would be time to make changes had they chosen to, in addition to the option of changing the filing date for Congressional and legislative offices if needed for more time. Trial Tr. vol. IV, 915:6-25 (Hise).

403. A similar approach was chosen when the Senate Redistricting Chairs were confronted with specific evidence in support of the first *Gingles* precondition on October 24, 2023, via the proposed amendment of Senator Blue in which he demonstrated districts above 50% BVAP were possible east of Raleigh. JX004 at 47:5-25 (Oct. 24 Senate Floor transcript). This amendment was immediately tabled without debate upon a motion by Senator Hise. *Id.* at 48:14-49:4.[37] Senator Hise testified that the motion was made to table this amendment because Senator Hise had "no indication from Senator Blue that what was offered on the floor was drawn without racial data" and because the proposals broke the *Stephenson* county cluster requirements, Trial Tr. vol. IV, 846:24-847:10, i.e., because it did not comply with the criteria specifically designed by the Senate Redistricting Chairs.

---

[37] Senator Hise himself had also drawn a majority-Black district in the northeast of North Carolina in 2011. Trial Tr. vol. IV, 895:14-18.

404.    The closest attempt at an explanation for the Senate Redistricting Chairs' failure to consider and act upon the evidence that the *Gingles* preconditions were satisfied in the areas of then-proposed Senate Districts 1 and 2 is Senator Hise's professed belief that a showing of racially polarized voting requires excluding any nonracial reasons for a particular voting pattern. Trial Tr. vol. IV, 916:1-5 (Hise). But he could not identify any such exclusionary analysis in relation to the Voting Rights Act to support this interpretation, *id.* at 916:25-918:3, and provided no notice to the public that this was the evidence that would be required to show legally significant racially polarized voting. *Id.* at 919:4-10. At best, even a genuine misunderstanding of racially polarized voting cannot account for the Senate Redistricting Chairs' decisions to remove criteria requiring adherence to the Voting Rights Act, to first request that third parties provide evidence of the *Gingles* preconditions just days before enactment in lieu of having done their own analysis, and to fail to alert the public that this alternative standard of evidence was required.

405.    In sum, deliberate choices made by the Senate Redistricting Chairs indicate a process designed to disregard and suppress consideration of the Voting Rights Act during the 2023 redistricting process. This includes: the choice to specifically omit reference to the Voting Rights Act in redistricting criteria, rendering any proactive consideration by other members of the committee in designing district lines essentially impossible; the choice to table and therefore eliminate debate on amendments put forward to address the Voting Rights Act; the choice to wait until the eve of enactment to announce their own decision not to proactively look at the requirements of the Voting Rights Act and instead request that evidence from others; and the failure to actually consider, in good faith,

175

evidence that was requested when it was presented to them. Together, these decisions, and the broader procedural deviations summarized above, indicate a process designed to ensure that the diminishment of Black voting power during the 2023 redraw could proceed without hindrance.

### C. The 2023 Redistricting Criteria Prohibiting Use of Racial Data Do Not Preclude a Finding that Racial Considerations Motivated District Design

406.    Legislative Defendants' primary defense is that the criteria adopted by the Senate Redistricting Chairs in 2023 prohibited the use of racial data in the drafting of districts and that racial data was not loaded onto the map-drawing platform utilized by the Senate Redistricting Chairs. Yet, even assuming these facts are true does not overcome Plaintiffs' contentions that the Senate and Congressional plans were enacted with racially discriminatory intent.

407.    In 2023, as one of the more senior chairs of the Committee, Senator Hise felt it was his responsibility to direct the drawing of district lines. Trial Tr. vol. IV, 871:19-23.

408.    The evidence supports that it was not necessary to "see" detailed racial data when drafting specific plans in order for the legislature to consider or intend specific racial outcomes in those draft plans. This is because the primary drawer of both the Senate and Congressional districts in 2023, Senator Ralph Hise, had gained an intimate knowledge of drafting Senate and Congressional plans over the course of his time on the Senate Elections and Redistricting Committee, starting in 2010, via his extensive experience drawing plans in seven different redistricting cycles. *Id.* at 833:21-25, 870:2-22. Senator Hise's experience included personally drawing dozens of district maps in that time and, in 2011,

participating in the identification and drawing of majority-minority Senate and Congressional districts. *Id.* at 870:14-22, 872:22-873:9.

409.    As a result of this extensive experience with drawing districts, Senator Hise had knowledge of racial geography in the state, including knowledge that minority populations are higher in the northeast and in urban areas elsewhere in the state, such as Greenville and Pitt and Guilford Counties. *Id.* at 871:24-872:5, 872:19-21, 948:9-11, 949:6-9. He testified that, once he could see municipal boundaries or the size of VTDs, he could assume that populations in more dense areas of the state had to be more heavily minority, and that he was able to see municipal boundaries (and therefore urban centers) as well as population numbers by VTD in the data used to draw the maps during the 2023 redistricting process. *Id.* at 948:17-24, 949:10-23. Senator Hise testified that he was aware of the racial demographics of Greenville. Specifically, he testified that he had been to the area many times and that he knew it had a high Black population. *Id.* at 872:11-875:13 ("Q: you actually testified that you had that knowledge. Correct? A: I do not believe that is a false statement.").

410.    In addition to demographics, Senator Hise testified to an understanding of the voting patterns of Black voters in the state, including that they regularly support Democratic candidates at extremely high rates, up to 95% or greater, and that, as a result, areas with higher BVAP tend to perform better for Democrats. *Id.* at 875:1-11, 875:20-876:6, 876:25-877:3. Likewise, he had an understanding that White voters are less likely to support Democratic candidates and that there was a lot more variability in that support for different areas of the state. *Id.* at 876:7-14 (Hise). Overall, he agreed there was more

177

variability among White voters than Black voters in who they might support overall, and that, as a result, Black voters are more predictable than White voters, with variations region to region. *Id.* at 958:5-14, 959:11-18.

411. Additionally, Senator Hise similarly testified that partisan data was not used in the 2021 redistricting process that he also oversaw, a fact he maintained in his testimony in this case, *id.* at 969:20-971:11, pursuant to criteria that prohibited the use of "election results data." JX224 (Adopted 2021 Criteria at "Election Data"). And yet, despite this testimony, a unanimous three-judge state court panel found that the 2021 Senate and Congressional Plans were the result of "intentional, pro-Republican redistricting," *Harper I*, 868 S.E.2d at 515, a fact not overturned on appeal to the North Carolina Supreme Court. *See generally Harper III*, 384 N.C. at 336. In addition to calling into question Senator Hise's credibility, this prior testimony, together with his knowledge of demographics and voting behavior in the state, demonstrates that Senator Hise did not need to "see" racial data during the map-drawing process to intend a racial outcome in designing specific districts.

412. Overall, the Court concludes that the factors relevant to a finding of discriminatory intent, as set forth in *Arlington Heights*, 429 U.S. at 265-68, support a finding of discriminatory intent here, consistent with the individual factual findings above addressing each of these factors.

178

## CONCLUSIONS OF LAW

### I.     Jurisdiction and Venue

413.    Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988, and 52 U.S.C. §§ 10101(d), 10301 to redress the deprivation under color of state law of rights secured by the United States Constitution and the Voting Rights Act of 1965.

414.    This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331, 1343, 1357 because this case arises under the U.S. Constitution and the laws of the United States and seeks equitable and other relief for the deprivation of constitutional and federal statutory rights under color of state law. Plaintiffs' action for declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202. Jurisdiction for Plaintiffs' claim for attorneys' fees and costs is based upon 42 U.S.C. § 1988 and 28 U.S.C. § 1920.

415.    This Court sitting as a three-judge panel is appropriate pursuant to 28 U.S.C. § 2284(a) because Plaintiffs' action challenges "the constitutionality of the apportionment of congressional districts" and the "constitutionality of the apportionment of a statewide legislative body."

416.    Venue is proper in this Court under 28 U.S.C. § 1391(b).

417.    Plaintiffs have standing to bring this action consistent with the Court's Order on Summary Judgment, Doc. 98 at 6-15, with respect to their claims concerning Senate Districts 1 and 2 (Counts 1, 4, and 5), Senate District 8 (Counts 2, 4, and 5), Congressional District 1 (Counts 7 and 9), and Congressional Districts 5, 6, and 10 (Counts 8 and 9) set forth in their First Amended Complaint. Doc. 105. Specifically, Plaintiffs have established evidence that at least one named Plaintiff and/or a member of one of organizational

Plaintiffs North Carolina NAACP and Common Cause identifies as Black or African-American and is a registered voter residing within these challenged districts, and that the interests the organizational Plaintiffs seek to protect are germane to their purpose and relief does not require participation of those standing members. *See Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 198 (2023); *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 187 (4th Cir. 2007); FOF ¶¶ 78-88; Stipulated Facts ¶¶ 74-83. By demonstrating that either a Plaintiff or standing member resides in the challenged districts, Plaintiffs have established requisite Article III harm to challenge those districts. *See* Doc. 98 at 9 (citing *Gill v. Whitford*, 585 U.S. 48, 66 (2018)).[38]

## II.     The 2023 Senate Plan

### A. *2023 Senate Districts 1 and 2 Violate Section 2 of the Voting Rights Act in Effect*

#### 1.  Section 2 of the Voting Rights Act

418.    The Voting Rights Act, passed by Congress in 1965, "was aimed at preventing 'an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.'" *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 229 (4th Cir. 2014) (quoting *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986)).

419.    When first enacted, the original text of Section 2 of the Voting Rights Act ("Section 2") "tracked, in part, the text of the Fifteenth Amendment." *Bartlett v. Strickland*,

---

[38] To the extent Legislative Defendants relied on prior discovery responses by NAACP Plaintiffs to challenge standing at trial, those responses are evidence that at least one individual Plaintiff or standing member resided in each challenged district at that earlier stage in litigation. *See* LDTX213 at 12-15. Voting records produced at trial support standing in these districts at the time of trial. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.").

556 U.S. 1, 10 (2009). The Supreme Court later held that Section 2 prohibited only discriminatory *intent* to dilute the voting strength of a minority group, and it was "intended to have an effect no different from that of the Fifteenth Amendment itself." *Mobile v. Bolden*, 446 U.S. 55, 60-61 (1980). In response to *Bolden*, Congress amended Section 2 in 1982 to reflect its current language. *See Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 658 (2021). In explaining the basis for the amendment, the "oft-cited Report of the Senate Judiciary Committee . . . stated that the amendment's purpose was to repudiate *Bolden* and establish a new vote-dilution test." *Id.*

420. The amended Section 2 provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or [membership in a language minority group], as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301.

421. As amended, Section 2 prohibits, *inter alia*, the use of redistricting plans that "minimize or cancel out the voting strength of racial [minorities in] the voting population." *Gingles*, 478 U.S. at 47 (internal citations and quotation marks omitted). In this way,

181

Section 2 imposes a "permanent, nationwide ban on racial discrimination in voting." *Shelby Cnty. v. Holder*, 570 U.S. 529, 557 (2013).

422. A violation of Section 2 can be established by proving (i) the challenged voting standard, practice, or procedure was adopted, at least in part, with a discriminatory intent, or (ii) "by proof of discriminatory results alone." *Chisom v. Roemer*, 501 U.S. 380, 404 (1991); *see also id.* at 394 n.21.

423. In *Gingles*, the Supreme Court construed Section 2 to prohibit the "dispersal of a [minority] group's members into districts in which they constitute an ineffective minority of voters." *Cooper v. Harris*, 581 U.S. 285, 292 (2017) (alteration adopted) (quoting *Gingles*, 478 U.S. at 46 n.11). When "minority and majority voters consistently prefer different candidates" in such districts, "the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters[,]" thus depriving minorities of an equal opportunity to elect representatives of their choice. *Gingles*, 478 U.S. at 48.

424. "To succeed in proving a § 2 violation under *Gingles*, plaintiffs must satisfy three 'preconditions.'" *Allen v. Milligan*, 599 U.S. 1, 18 (2023) (quoting *Gingles*, 478 U.S. at 50); *see also Wis. Leg. v. Wisc. Elections Comm'n*, 595 U.S. 398, 402 (2022). First, the minority group must be sufficiently large and geographically compact to constitute a majority in a reasonably configured district that comports with traditional redistricting criteria. *Milligan*, 599 U.S. at 18. "Second, the minority group must be able to show that it is politically cohesive." *Id*. (quoting *Gingles*, 478 U.S. at 51). "And third, 'the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it

182

. . . to defeat the minority's preferred candidate.'" *Id.* (quoting *Gingles*, 478 U.S. at 51). Each precondition must be met for the claim to succeed. *Cooper*, 581 U.S. at 306. Having met these three preconditions, the plaintiff must show that, under the "totality of circumstances," the "political process is [not] equally open to minority voters" in the challenged districts. *Wis. Leg.*, 595 U.S. at 402 (quoting *Gingles*, 478 U.S. at 79).

425. As explained below, the Court finds that Plaintiffs have proven that all three of the *Gingles* preconditions are satisfied in North Carolina's Black Belt, where Senate Districts 1 and 2 are located. The Court further finds that the 2023 Senate Plan's Senate Districts 1 and 2 violate Section 2 of the Voting Rights Act because, in light of the totality of the circumstances, these districts as drawn by the legislature deny Black voters in North Carolina's Black Belt an equal opportunity to participate in the political process and elect representatives of their choice.

### 2. Section 2 Provides a Private Right of Action

426. Legislative Defendants contend that Section 2 does not provide a private right of action for parties other than the U.S. Department of Justice to assert claims. *See* Doc. 125 at 21.

427. This argument contravenes direction from the Supreme Court speaking to the private enforcement of the Voting Rights Act, including Sections 2, 5, and 10. *See Morse v. Republican Party of Va.*, 517 U.S. 186, 231-34 (1996) (Opinion of Stevens, J., joined by Ginsburg, J.) (stating private right of action exists under VRA Sections 2, 5, and 10), 240 (Breyer, J., concurring in the judgment, joined by O'Connor & Souter, JJ.) (same); *Allen v. State Bd. of Elections*, 393 U.S. 544, 557 (1969) ("The guarantee of [VRA] § 5 that no

person shall be denied the right to vote for failure to comply with an unapproved new enactment subject to § 5, might well prove an empty promise unless the private citizen were allowed to seek judicial enforcement of the prohibition."). It also contravenes the stated intent of Congress when it amended Section 2 in 1982: "[T]he Committee reiterates the existence of the private right of action under Section 2, as has been clearly intended by Congress since 1965." S. Rep. No. 97-417, at 30 (1982) (citing *Allen*, 393 U.S. 544).

428.    Several other courts, including the Fifth, Sixth, and Eleventh Circuits, have directly held that Section 2 is privately enforceable. *See Robinson v. Ardoin*, 86 F.4th 574, 587-88 (5th Cir. 2023); *Ala. State Conf. of NAACP v. Alabama*, 949 F.3d 647, 651-54 (11th Cir. 2020), *vacated as moot*, 141 S. Ct. 2618 (2021); *Mixon v. Ohio*, 193 F.3d 389, 406 (6th Cir. 1999). Additionally, courts in this Circuit have for decades asserted jurisdiction over claims brought by private plaintiffs under Section 2. *See, e.g.*, *Cane v. Worcester Cnty.*, 35 F.3d 921 (4th Cir. 1994), *cert. denied*, 513 U.S. 1148 (1995); *Gingles v. Edmisten*, 590 F. Supp. 345, 355-56 (E.D.N.C. 1984) (noting that, in amending Section 2, "Congress has exercised its enforcement powers under section 5 of the fourteenth and section 2 of the fifteenth amendments to create a new judicial remedy *by private action* that is broader in scope than were existing private rights of action for constitutional violations of minority race voting rights." (emphasis added)) *aff'd in part*, *Thornburg v. Gingles*, 478 U.S. 30 (1986).

429.    Plaintiffs have also pled jurisdiction under 42 U.S.C. § 1983. *See* Doc. 105 at 2 & ¶¶ 8, 236, 251, 260, 264. The Supreme Court has recently made clear that a statute confers a private right "where the provision in question is phrased in terms of the persons

benefited and contains rights-creating, individual-centric language with an unmistakable focus on the benefited class." *Health & Hosp. Corp. v. Talevski*, 599 U.S. 166, 183 (2023) (citation and internal quotation marks omitted). Applying this standard, the Court finds that Section 2 establishes a private right of action by focusing on individuals protected, explicitly protecting the right to vote of "any citizen of the United States" and providing that violations may be shown against specific "members of a protected class," 52 U.S.C. § 10301. This intent is further supported by specific language in Section 14(e) of the Voting Rights Act allowing an award of attorneys' fees and other costs to any "prevailing party, other than the United States." 52 U.S.C. § 10310(e). *See Singleton v. Allen*, No. 2:21-cv-01291-AMM, 2025 WL 1342947, at *171-81 (N.D. Ala. May 8, 2025) (discussing in depth cases and authorities).

430.    Legislative Defendants rely on recent decisions by the Eighth Circuit Court of Appeals, *Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204 (8th Cir. 2023) and *Turtle Mountain Band of Chippewa Indians v. Howe*, 137 F.4th 710 (8th Cir. 2025), which found no private right of action under Section 2 or 42 U.S.C. § 1983, respectively. *See* Doc. 125 at 21. These decisions from the Eighth Circuit are not binding, and they also have been recently stayed by the Supreme Court. *See* Text Order, *Turtle Mountain Band of Chippewa Indians*, No. 25A62 (July 24, 2025).[39] Further, Chief Judge Smith's dissent from the Eighth Circuit's opinion makes a serious argument that the Supreme Court has already resolved this issue. *See Ark. State Conf. NAACP*, 86 F.4th at

---

[39] Docket available at https://www.supremecourt.gov/docket/docketfiles/html/public/25a62.html.

1223 ("The simple fact is that a majority of the justices explicitly recognized a private right of action under Section 2 in *Morse*.") (cleaned up).

431.     We reject Legislative Defendants' arguments and find that private plaintiffs, including the Consolidated Plaintiffs here, may bring action to enforce the guarantees Section 2 affords all citizens. In confirming Consolidated Plaintiffs' right to bring these claims, we join several other federal three-judge panels that have similarly rejected challenges to the private right of action under VRA Section 2. *See Singleton*, 2025 WL 1342947, at *177 (three-judge court); *League of United Latin Am. Citizens v. Abbott*, No. EP-21CV-00529-DCG-JES-JVB, 2021 WL 5762035, at *1 (W.D. Tex. Dec. 3, 2021) (three-judge court); *Ga. State Conf. of NAACP v. Georgia*, No. 1:21-CV-5338-ELB-SCJ-SDG, 2022 WL 18780945, at *7 (N.D. Ga. Sept. 26, 2022) (three-judge court).

### 3.   *Gingles* I: Black Voters are Sufficiently Large and Geographically Compact to Constitute Two State Senate Districts in North Carolina's Black Belt

432.     The first *Gingles* precondition ("*Gingles* I") requires that the minority group be "sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50; *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 425 (2006) ("*LULAC*") (citation omitted); *see also Milligan*, 599 U.S. at 18 ("First, the minority group must be sufficiently large and geographically compact to constitute a majority in a reasonably configured district.") (cleaned up).

433.     Plaintiffs typically satisfy *Gingles* I by drawing illustrative majority-minority districts "to establish that the minority has the potential to elect a representative of its own choice in some single-member district." *Milligan*, 599 U.S. at 18 (quoting *Growe v.*

186

*Emison*, 507 U.S. 25, 40 (1993)); *see also id.* at 19-20 (applying *Gingles* I to the "illustrative maps" adduced by plaintiffs). The sole doctrinal purpose of these districts is to establish that the potential for a legally compliant plan exists. They are not presented as a proposed plan that the jurisdiction must adopt as a remedy. While plaintiffs' illustrative plans are sometimes adopted as a remedy for an established violation, nothing in the Voting Rights Act or the *Gingles* framework requires this result. *See Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 587 F. Supp. 3d 1222, 1250 (N.D. Ga. 2022) (citations omitted) ("Although '[p]laintiffs typically attempt to satisfy [the first *Gingles* precondition] by drawing hypothetical majority-minority districts . . . such illustrative plans are 'not cast in stone' and are offered only 'to demonstrate that a majority-[B]lack district is feasible[.]'").

434.    The *Gingles* I criterion has two prongs: whether the illustrative district is "sufficiently large" and whether that district is "geographically compact." *E.g.*, *Milligan*, 599 U.S. at 18 (collecting authorities). The "sufficiently large" prong is a question of pure numerosity. "Only when a geographically compact group of minority voters could form a majority in a single-member district has the first *Gingles* requirement been met." *Bartlett v. Strickland*, 556 U.S. 1, 26 (2009); *see also Milligan*, 599 U.S. at 18 (quoting *Growe*, 507 U.S. at 40).

435.    The touchstone of the "geographically compact" inquiry is whether a plaintiff's illustrative district is "reasonably configured." *Milligan*, 599 U.S. at 18 (citing *Wis. Elections Comm'n*, 595 U.S. at 402). The Supreme Court explained the reasonably configured inquiry in *Milligan*: "A district will be reasonably configured, our cases explain, if it comports with traditional districting criteria, such as being contiguous and reasonably

187

compact." 599 U.S. at 18; *see also Miller v. Johnson*, 515 U.S. 900, 916 (1995) (identifying traditional districting criteria such as "compactness, contiguity, [and] respect for political subdivisions or communities defined by actual shared interests").

436. The Court finds that Plaintiffs' expert Anthony Fairfax presented two reasonably configured majority-BVAP Senate Districts in the northeastern part of North Carolina: Illustrative Senate District 2 and Illustrative Senate District 5. As set forth below, these Illustrative Senate Districts adhere to traditional redistricting criteria.

437. Plaintiffs' Illustrative Senate Districts meet the criterion for compactness. Plaintiffs' Illustrative Senate Districts are contiguous and satisfy the equal population criterion. FOF ¶ 145-46.[40] And Mr. Fairfax credibly testified as to the compactness of both illustrative districts. FOF ¶¶ 145-50. Both districts also satisfy the minimum compactness standards employed by the Senate map-drawers when they constructed the 2023 Senate Plan. FOF ¶¶ 145-46, 153. The Court finds it meaningful that Plaintiffs' Illustrative Senate Districts pass the same test for compactness utilized by the legislature in constructing the 2023 Senate Plan. After all, "state legislatures have primary jurisdiction over legislative reapportionment." *White v. Weiser*, 412 U.S. 783, 795 (1973). The Court finds that this congruence between the 2023 Senate Plan and Plaintiffs' Illustrative Senate Districts supports a finding that the Illustrative Senate Districts are sufficiently compact. *Accord Milligan*, 599 U.S. at 21 (courts do not conduct a "beauty contest between plaintiffs' maps

---

[40] To the extent that districts in the 2023 Senate Plan had some higher compactness scores or lower population deviation as compared to some of NAACP Plaintiffs' Illustrative Senate Districts, such evidence is not enough to defeat a Section 2 claim. *See Milligan*, 599 U.S. at 20-22 (finding that plaintiffs' illustrative plans were reasonably configured, even where the challenged plan arguably performed better on certain traditional redistricting criteria than the illustrative plans).

188

and the State's") (citation omitted); *see also id.* at 44 n.2 (Kavanaugh, J., concurring) (finding that plaintiffs' illustrative districts were reasonably configured where "at least some" of their proposals performed "at least as well as" the State's maps on traditional redistricting criteria under a "rigorous" application of *Gingles* I).

438.  Plaintiffs' Illustrative Senate Districts also maintain "traditional boundaries" by minimizing political subdivision splits. *LULAC*, 548 U.S. at 433 (citations and internal quotation marks omitted). The fact that Plaintiffs' Illustrative Senate Districts perform similarly to the 2023 Senate Plan in maintaining traditional boundaries supports that they are reasonably configured. PX182 at ¶¶ 125, 138. Illustrative Senate District 2 is comprised entirely of nine whole counties (an exceedingly rare quality for a *Gingles* I illustrative district) encompassing much of the historical Black Belt. FOF ¶ 145. Illustrative Senate District 5 contains the entirety of Edgecombe and Martin counties as well as adjacent sections of Nash and Pitt, and reasonably respects municipal boundaries and political subdivisions. FOF ¶¶ 146-47.[41] Illustrative Senate District 5 also unites Rocky Mount in the same district and respects the municipal boundaries of Ayden and Winterville in the south. FOF ¶ 147. The line between Plaintiffs' Illustrative Senate Districts 3 and 5 is

---

[41] While Plaintiffs' Illustrative Senate Plan A splits Pitt County, the Court declines to find that the Plan's Illustrative Senate Districts are not reasonably configured on that basis for at least two reasons. First, North Carolina's state redistricting requirements expressly instruct that counties may be split where necessary to comply with the Voting Rights Act. *Stephenson I*, 562 S.E.2d at 396-97 ("[L]egislative districts required by the VRA shall be formed *prior to* creation of non-VRA districts. . .") (emphasis added); *see* FOF ¶¶ 3, 161, 398; *infra* COL ¶¶ 455-60, 579. Second, to hold a single split county is enough, standing alone, to render Illustrative Senate District 5 non-compact would violate the Supreme Court's instruction not to subject plaintiffs' districts to a "beauty contest" under Section 2. *Milligan*, 599 U.S. at 21. Whether a district is reasonably configured is a fact-sensitive, context-dependent question. The Court is satisfied that Illustrative Senate District 5 is reasonably configured in light of all the evidence adduced at trial.

substantially similar to the line drawn by the legislature for 2023 House Districts 8 and 9. FOF ¶¶ 147-49, 153.

439. Plaintiffs' Illustrative Senate Districts also unify areas of common socioeconomic and regional interest, as supported by both expert and fact witness testimony of common needs, interests, and issues of ongoing racial socioeconomic disparities and effects of discrimination, including a significant racial turnout gap. *See* FOF ¶¶ 143, 145, 148-49; *see also* FOF Sections V.D & V.G.

440. The Court also concludes that Plaintiffs' Illustrative Senate Districts are not the only possible majority-minority districts in this part of the state. Mr. Fairfax concluded that "[t]he Illustrative Plans are not designed to be the only possible plan, but instead demonstrate that something can be achieved. During my map-drawing, I determined that there are numerous possibilities for constructing reasonably configured majority-Black districts in each of the areas I examined, and different map-drawers may arrive at many of those different possibilities." PX200 at 12-13; *see also* PX182 at 53 n.31 ("[M]any variations of [the Illustrative Plan] could be generated that incorporate additional political and community desires and continue to adhere to federal and state redistricting criteria and contain two majority Black districts[.]"). Further, Mr. Fairfax testified in detail about various decisions in his Illustrative Plan configurations that could have been made differently and thus produced equally acceptable districts. *See* FOF ¶¶ 139, 148; Trial Tr. vol. II, 453:7-454:10 (Fairfax). These opinions were all unrefuted by Legislative Defendants. In light of Mr. Fairfax's extensive map-drawing experience, his knowledge of

the demography in this region of North Carolina, and the lack of evidence or opinion testimony refuting this conclusion, the Court credits this testimony.

441. Mr. Fairfax has also demonstrated that it is relatively straightforward to draw two Black-opportunity districts in this area of the state. And Dr. Oskooii found that 2023 Senate District 5, covering much of the area contained in Plaintiffs' Illustrative Senate District 5, already provides one opportunity for Black voters to elect candidates of their choice. Trial Tr. vol. II, 387:19-388:11 (Oskooii). Accordingly, a fulsome remedy to satisfy the VRA could be achieved by 2023 Senate District 5 and creating only one additional opportunity district. While the choice for drawing such a district in the first instance belongs to the legislature, Plaintiffs' Illustrative Senate Plan B demonstrates the possibility for Illustrative Senate District 2 to coexist without modifying 2023 Senate District 5. Plaintiffs' Illustrative Senate Districts therefore demonstrate that both Black opportunity districts required by Section 2 in this part of the state can be composed of whole counties.

442. Overall, Mr. Fairfax credibly testified that Plaintiffs' Illustrative Senate Districts comport with traditional redistricting principles such that they are reasonably configured. Trial Tr. vol. II, 451:17-458:1 (Fairfax); *see* FOF ¶¶ 139-50; *see also Milligan*, 599 U.S. at 18 (describing *Gingles* I as requiring the minority group to be "sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district" and that a "district will be reasonably configured . . . if it comports with traditional districting criteria, such as being contiguous and reasonably compact" (citations and internal quotation marks omitted)). Mr. Fairfax identified numerous ways in which both Illustrative Senate Districts comply with and balance the legislature's redistricting criteria.

The Court credits Mr. Fairfax's testimony and finds that Plaintiffs' Illustrative Senate Districts are reasonably configured.

443. Finally, Plaintiffs have demonstrated that race did not predominate in the drawing of Plaintiffs' Illustrative Senate Districts. Mr. Fairfax credibly testified that neither race nor any single criterion predominated when he drew Plaintiffs' Illustrative Senate Districts. *See* FOF ¶¶ 141-44. Plaintiffs' Illustrative Senate Districts' compliance with neutral redistricting criteria confirms this, and Legislative Defendants have failed to provide any reliable evidence to the contrary.

444. Legislative Defendants' attempts to undercut Plaintiffs' Illustrative Senate Districts as reasonably configured are unavailing.

445. Legislative Defendants' experts, Drs. Michael Barber and Sean Trende, offer two arguments against Plaintiffs' Illustrative Senate Districts. First, they make subdistrict level critiques that focus on how only certain parts of Plaintiffs' Illustrative Senate Districts are configured, specifically how Illustrative Senate District 5 interacts with the municipalities of Rocky Mount and Greenville. Second, they argue that Plaintiffs' Illustrative Senate Districts failed to consider additional factors that they contend are relevant to whether these districts are reasonably configured. We consider these arguments in turn.

446. Regarding district-specific evidence, Drs. Trende and Barber both focus on different subparts of Plaintiffs' Illustrative Senate Districts for critique, extrapolating from these isolated observations to render opinions concerning the configuration of the districts as a whole. *See* FOF ¶¶ 154-59 (Trende), 163-64 (Barber); *see also* FOF ¶¶ 165-68. Both

192

Drs. Trende and Barber offered opinions concerning the reasonableness of specific portions of Illustrative Senate District 5, opining that making even minor changes to the district might render the district unreasonable. Trial Tr. vol. VI, 1435:25-1436:4 (Trende).

447. But these critiques distort the overall analysis. As the Supreme Court has instructed, "[c]oncentrating on particular portions in isolation may obscure the significance of relevant districtwide evidence . . . A holistic analysis is necessary to give that kind of evidence its proper weight." *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 192 (2017); *accord Milligan*, 599 U.S. at 18.

448. The Supreme Court has also decisively rejected the "beauty contest" that Legislative Defendants' experts seek to conduct between Plaintiffs' Illustrative Senate Districts and the 2023 Senate Plan. *Milligan*, 599 U.S. at 21. Neither Dr. Trende nor Dr. Barber makes any attempt to account for Plaintiffs' Illustrative Senate Districts as a whole, instead arguing that only parts of a district could be drawn with racial predominance, or that even minor differences could render a district unreasonable. Trial Tr. vol. V, 1119:20-24 (Barber); Trial Tr. vol. VI, 1435:25-1436:4 (Trende). Drs. Trende and Barber do not make any attempt to reconcile how their specific critiques factor into the reasonableness of Illustrative Senate District 5 as a whole. Nor do they attempt to show that Mr. Fairfax's decisions in these areas were not appropriately balanced amongst the full suite of criteria, as Mr. Fairfax testified.

449. Legislative Defendants focused nearly all of their district-specific criticisms on one part of one of Plaintiffs' Illustrative Senate Districts: the Pitt County configuration in Illustrative Senate District 5. Legislative Defendants' arguments can be boiled down to

193

two categories. First, they argue that it was *per se* unreasonable for Pitt County to be split three ways. Second, they argue that Illustrative Senate District 5 splits the city of Greenville in a way that suggests a racial gerrymander.

450. The Court is unpersuaded by these criticisms. The undisputed evidence confirms that counties have been split three ways and paired with parts of other counties in North Carolina state legislative plans, including as recently as 2019. *See* FOF ¶ 158. Plaintiffs also adduced evidence that Legislative Defendants' own expert Dr. Trende had split counties three ways in his own map drawing for the Virginia State Senate. *Id.* Further, testimony from Senator Kandie Smith noted that she was elected under a prior state legislative map—drawn in part by Senator Hise—that configured Pitt County similarly to Illustrative Senate District 5. FOF ¶ 149. And again, the Court notes *Stephenson I* itself allows (indeed, requires) the splitting of counties where necessary to comply with the Voting Rights Act. 562 S.E.2d at 396-97. It does not render Illustrative Senate District 5 unreasonable for it to have done so.

451. Nor does Illustrative Senate District 5's configuration of Greenville render the district unreasonable. The line between Plaintiffs' Illustrative Senate Districts 3 and 5 is substantially similar to the line drawn by the legislature for 2023 House Districts 8 and 9. FOF ¶¶ 147-48. This was not an accident, as Mr. Fairfax used the House configuration as a model for his own mapdrawing. *Id.* No party suggests that it was impermissible for the legislature to draw this line in the 2023 House Plan. The Court finds this is highly probative of a finding that Plaintiffs' substantially similar line, drawn using the 2023 House Plan as a model, is reasonably configured. *See* COL ¶ 437. The Court also dismisses Dr. Trende's

194

suggestion that even minor differences between the 2023 House line and Illustrative Senate District 5's line in this one specific area could render Plaintiffs' entire Illustrative Senate District 5 not reasonably configured. FOF ¶¶ 157-58. *Milligan* prohibits such a "beauty contest" between maps, 599 U.S. at 21, and we decline Dr. Trende's invitation accordingly.

452.    These arguments do not rebut Plaintiffs' evidence that Plaintiffs' Illustrative Senate Districts as a whole are reasonably configured and comport with traditional redistricting criteria. The Court finds that Drs. Trende and Barber miss the forest for the trees by focusing only on isolated portions of Illustrative Senate District 5. Accordingly, the Court gives no weight to the isolated sub-district conclusions of Drs. Trende and Barber.

453.    Drs. Barber and Trende also propose new doctrinal requirements, nonexistent under current law, that they contend should apply to the manner in which Plaintiffs' Illustrative Senate Districts are constructed. Dr. Trende argues that Plaintiffs needed to consider the compactness of the population, rather than just the compactness of a district's shape itself. FOF ¶ 154. Dr. Barber argues that Plaintiffs' districts cannot be reasonably configured because they modify the *Stephenson* groupings. FOF ¶ 161. For the reasons stated below, we reject both of these arguments.

454.    We begin with Dr. Barber's innovation. Dr. Barber repeatedly expressed the opinion that because Plaintiffs' Illustrative Senate Districts modified the *Stephenson* county groupings used by the legislature, Plaintiffs' Illustrative Senate Districts "violated" *Stephenson*. LDTX253 at 5, 47-49; Trial Tr. vol. V, 1054:4-25 (Barber). Evaluating this argument requires understanding the *Stephenson* line of cases.

455.    The Whole County Provision ("WCP") of the North Carolina Constitution, as construed by the North Carolina Supreme Court in *Stephenson I*, 562 S.E.2d 377, and its progeny, governs the formation of the county clusters to be used in North Carolina state legislative plans.

456.    *Stephenson* held that the WCP under state law requires that where a county can support a single state house or senate district, or multiple such districts, on its own, that number of districts should be drawn entirely within that county. Where whole counties cannot, on their own, support the creation of a single state house or senate district, "the requirements of the WCP are met by *combining or grouping the minimum number of whole, contiguous counties* necessary to comply with the at or within plus or minus five-percent 'one-person, one vote' standard." *Harper v. Hall*, 886 S.E.2d 393, 421 (N.C. 2023) ("*Harper III*") (quoting *Stephenson I*, 562 S.E.2d at 397) (emphasis in original).

457.    The *Stephenson* cases further "harmonized federal redistricting requirements and the directives of [the] state constitution[.]" *Harper III*, 886 S.E.2d at 422. The cases delineate the interplay between federal law and the WCP by specifying: "to ensure full compliance with federal law, legislative districts required by the VRA shall be formed prior to creation of non-VRA districts." *Id.* at 444 (quoting *Stephenson I*, 562 S.E.2d at 396-97).

458.    The legislature has represented in prior redistricting litigation that they "interpreted [the *Stephenson*] cases to require that VRA districts be drawn before all other districts." *Covington v. North Carolina*, 316 F.R.D. 117, 132 n.12 (M.D.N.C 2016). This understanding of the *Stephenson* cases is consistent with the holding in *Harper III:* "[I]f

Section 2 requires VRA districts, those districts must be drawn first so that the remaining non-VRA districts can be drawn in compliance with the WCP." 886 S.E.2d at 444.

459.    Because the legislature did not draw any VRA districts, it did not modify any of the *Stephenson* county groupings pursuant to the requirements of the Voting Rights Act. *See* Trial Tr. vol. IV, 836:10-837:11, 893:3-17 (Hise). But Dr. Barber takes things a step further, arguing that because the legislature did not modify the *Stephenson* groupings whatsoever, Plaintiffs' Illustrative Senate Districts "violate" *Stephenson* by altering the groupings. LDTX253 at 47-49.

460.    Dr. Barber's argument would turn *Stephenson* on its head. By its own terms, *Stephenson* makes clear that the requirements of state law must be followed only after the mandates of federal law are met; as indeed it must, because the Voting Rights Act preempts state law. But by requiring adherence to the state-law *Stephenson* groupings when determining whether a district is reasonably configured for purposes of the Voting Rights Act, Dr. Barber renders this state constitutional provision as a non-negotiable precondition that must be met before federal law is even considered. This flouts both *Stephenson*'s plain requirement to construct VRA districts "prior to" non-VRA districts, 562 S.E.2d at 396-97, and *Harper III*'s holding that Section 2 districts must be drawn "first[.]" *Harper III*, 886 S.E.2d at 444. The Court declines to adopt a reading of *Stephenson* that would set state law as superior to federal law and accordingly declines Dr. Barber's suggestion that Plaintiffs' Illustrative Senate Districts must retain the legislature's chosen county groupings.

461.    We also decline to hold that Plaintiffs' Illustrative Plans were required to re-configure the *Stephenson* clusters after Plaintiffs' Illustrative Senate Districts were

197

drawn.[42] It was reasonable for Mr. Fairfax to have altered the groupings that were chosen by the legislature in the 2023 Senate Plan only to the extent necessary for his task in demonstrating the possibility of two majority-Black Senate districts. *See Covington v. North Carolina*, No. 1:15-CV-399, 2017 WL 5992358, at *4 (M.D.N.C. Dec. 1, 2017) (instructing the Special Master to redraw remedial districts "within the applicable 2017 county grouping[s]" used by the legislature in its rejected remedial plan, rather than re-run the county grouping algorithm with the newly modified remedial districts).

462.    Overall, Mr. Fairfax appropriately demonstrated that two reasonably configured majority-Black illustrative districts could be drawn in a Senate plan while minimizing disruption to the county clusters, and therefore remaining districts, drawn by the legislature. This comports with the focus of the *Gingles* inquiry on an illustrative *district*, rather than an illustrative *plan*. *See Milligan*, 599 U.S. at 18 (stating that the purpose of the first *Gingles* precondition is "to establish that the minority has the potential to elect a representative of its own choice in some single-member district" (quoting *Growe*, 507 U.S. at 40)); *Miss. State Conf. of the NAACP v. State Bd. of Election Comm'rs*, 739 F. Supp. 3d 383, 433 (S.D. Miss. 2024) (noting that evidence of the first *Gingles* precondition "must prove Mississippi's minority population *in a potential election district* is greater than 50 percent and is compact enough to create another black-majority district that the State did not draw" and finding some of plaintiff's individual illustrative Senate and House districts satisfied the first *Gingles* precondition) (emphasis added); FOF ¶ 167. As the

---

[42] We express no view as to whether NAACP Plaintiffs could have done so. We hold only that NAACP Plaintiffs were not required to do so in order to establish the *Gingles* preconditions.

Supreme Court expressed in *Milligan*, the sole purpose of these illustrative maps is to establish that the potential to draw a majority-minority district exists. 599 U.S. at 18; *see also Magnolia Bar Ass'n v. Lee*, 994 F.2d 1143, 1151 n.6 (5th Cir. 1993) (noting that the first *Gingles* precondition "specifically contemplates the creation of hypothetical districts"). They are not presented as a proposed plan that the jurisdiction must adopt as a remedy. *See Luna v. Cnty. of Kern*, 291 F. Supp. 3d 1088, 1106 (E.D. Cal. 2018) ("However, neither the plaintiff nor the court is bound by the precise lines drawn in these illustrative redistricting maps; at this stage, a plaintiff need only show that a remedy may be feasibly developed." (citing *Fairley v. Hattiesburg*, 584 F.3d 660, 671 n.14 (5th Cir. 2009))).

463. Dr. Trende also argued that Plaintiffs needed to pay attention to the compactness of the population within the district, rather than the compactness of the district itself. FOF ¶ 154. We dismiss this argument in short order. The Supreme Court has made clear that the focus of the compactness inquiry for Section 2 purposes is on the district itself. *See Milligan*, 599 U.S. at 18 (focusing on a "reasonably configured district" for a *Gingles* claim and noting that "[a] *district* will be reasonably configured . . . if it comports with traditional districting criteria, such as being contiguous and reasonably compact") (emphasis added); *see also Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 272 (2015) (listing "compactness" as a "traditional race-neutral districting principle[]"). This holding is not in tension with the Supreme Court's decision in *LULAC*, 548 U.S. 399, as Legislative Defendants suggest. Indeed, in *LULAC*, the Supreme Court held that one of six Latino opportunity districts, CD25, was not "reasonably compact" where it contained "a 300-mile gap between the Latino communities . . . and a similarly large gap between the needs and

199

interests of the two groups." *Id.* at 430-32; *see also id.* at 434 (noting that "the different characteristics, needs, and interests of the Latino community near the Mexican border and the one in and around Austin are well supported and uncontested"). In so holding, the Court noted that "in some cases members of a racial group in different areas—for example, rural and urban communities—could share similar interests and therefore form a compact district if the areas are in reasonably close proximity." *Id.* at 435. At base, the *LULAC* Court held that the *district* at issue was non-compact, not the population within it. *Id.* And where the Court's analysis talked about the dispersal of the population within the district, it went out of its way to "emphasize it is the *enormous geographical distance* separating the Austin and Mexican-border communities, coupled with the disparate needs and interests of these populations—not either factor alone—that renders District 25 noncompact for § 2 purposes." *Id.* (emphasis added).

464.    Here, Black Belt areas joined in Plaintiffs' Illustrative Senate Districts are marked by neither the "enormous geographical distance" nor the "disparate needs and interests" which would render the configurations not reasonably compact. *See id.* To the contrary, there is substantial evidence, supported by lay witness testimony, that the needs and interests of the communities included in Plaintiffs' Illustrative Senate Districts are similar, including ongoing racial disparities in various socioeconomic areas as well as ongoing issues of discrimination. *See* FOF ¶¶ 143, 145, 148-49; *see also* FOF Sections V.D & V.G.

465.    At base, Legislative Defendants' argument regarding the compactness of the Black population draws a distinction without a difference. Even when considering

population compactness in the *Gingles* inquiry, the Fifth Circuit has explained that "the geographic compactness of a district is a reasonable proxy for the geographic compactness of the minority population *within* that district, which is one factor in the compactness inquiry." *Robinson v. Ardoin*, 37 F.4th 208, 221 n.4 (5th Cir. 2022); *cf. Covington*, 2017 WL 5992358 at *55 (evaluating a *district*'s compactness to determine its adherence to traditional redistricting principles). The Court finds that it is sufficient to show that Plaintiffs' illustrative districts are compact for the purpose of *Gingles* I, particularly in light of the Supreme Court's instruction in *Milligan*.

466.    Legislative Defendants propose Dr. Trende's moment of inertia algorithm should be used as a metric of population compactness. But Legislative Defendants have not been able to identify any court utilizing Dr. Trende's moment of inertia algorithm in evaluating *Gingles* demonstrative districts. Rather, courts have found Dr. Trende's moment of inertia algorithm to be "fundamentally flawed and completely useless" because it "fails to consider communities of interest and traditional boundaries," as well as equal population requirements. *Nairne v. Ardoin*, 715 F. Supp. 3d 808, 849-50 (M.D. La. 2024). As Mr. Fairfax also notes, focusing on population compactness would prevent Black communities in rural areas from being included in illustrative districts because of less concentrated populations. PX200 at 10. Indeed, the Supreme Court approved *Gingles* illustrative districts that combined both urban and rural populations in *Milligan*. *See* PX200 at 10-12. One of Legislative Defendants' experts, Dr. Barber, likewise testified that a compact district may include both rural and urban communities, Trial Tr. vol. V, 1137:2-21 (Barber), and he neither included moment of inertia among commonly used measures of compactness, nor

201

identified any court relying on the metric. Trial Tr. vol. V, 1129:11-1130:7 (Barber). And Mr. Trende himself conceded that the moment of inertia measurement has "fall[en] by the wayside" and that he is not aware of any redistricting case where a court relied on moment of inertia to evaluate compactness. Trial Tr. vol. VI, 1422:24-1423:22 (Trende). We will not be the first to adopt Dr. Trende's novel metric here.

467.   Applying controlling Section 2 precedent, the Court concludes that Plaintiffs' Illustrative Senate Districts demonstrate that Black voters are sufficiently large and geographically compact to constitute a majority in two reasonably configured Senate districts in North Carolina's Black Belt, thereby satisfying the first *Gingles* precondition.

4.   *Gingles* II: Black Voters are Politically Cohesive in North Carolina's Black Belt

468.   In order to prevail on a Section 2 vote dilution claim, the second *Gingles* precondition ("*Gingles* II") requires a minority group to "show that it is politically cohesive." *Gingles*, 478 U.S. at 51.

469.   Plaintiffs satisfy this *Gingles* II precondition by showing that "a significant number of minority group members usually vote for the same candidates." *LULAC v. Abbott*, 604 F. Supp. 3d 463, 495 (W.D. Tex. 2022) (quoting *Gingles*, 478 U.S. at 56). "The necessary size of the majority . . . is a district-specific inquiry." *Id*. at 495 n.22. "[T]here is no simple doctrinal test for the existence of legally significant racial bloc voting." *Gingles*, 478 U.S. at 58.

470.   Plaintiffs' expert Dr. Kassra Oskooii found that average Black cohesion estimates are about 95% or more across Plaintiffs' Illustrative Senate Districts as well as in

202

2023 Senate District 1 and Senate District 2 and adjacent Black Belt districts Senate District 5 and Senate District 11. FOF ¶ 173. Legislative Defendants' expert, Dr. John Alford, did not dispute Dr. Oskooii's ecological inference ("EI") estimates or the numerical accuracy of his results. FOF ¶¶ 99, 172; Trial Tr. vol. V, 1222:20-1223:1 (Alford). In fact, Dr. Alford admitted that Dr. Oskooii's calculations were at levels that would typically satisfy *Gingles* II. Trial Tr. vol. V, 1226:6-11 (Alford).

471.    The Court concludes based upon Dr. Oskooii's analysis and findings that Black voters are politically cohesive in Plaintiffs' Illustrative Senate Districts 2 and 5, as well as 2023 Senate Districts 1, 2, 5, and 11, and that this evidence satisfies the second *Gingles* precondition.

5.    *Gingles* III: White Voters Vote as a Bloc to Defeat the Candidate of Choice of Minority Voters in Senate Districts 1 and 2

472.    The third *Gingles* precondition ("*Gingles* III") is "focused on racially polarized voting [and] 'establish[es] that the challenged districting thwarts a distinctive minority vote' at least plausibly on account of race." *Milligan*, 599 U.S. at 19 (quoting *Growe*, 507 U.S. at 40). "[T]he minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed . . . —usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51.

473.    "The relevant consideration under the third *Gingles* precondition is the challenged plan, not some hypothetical crossover district that could have been but was not

drawn. . . . The third *Gingles* precondition's purpose is to establish that the *challenged* district thwarts a distinctive minority vote." *Robinson*, 86 F.4th at 596 (emphasis added).

474. Dr. Oskooii applied the same EI methods to determine White voter cohesion and found that White voters generally vote against Black-preferred candidates from percentages in the mid-70s to high-80s across 2023 Senate Districts 1, 2, 5, and 11 in exogenous elections over time. FOF ¶ 176. Dr. Oskooii also examined 2024 endogenous elections in those districts and found that White voters oppose Black-preferred candidates in the high-70s to mid-80s percentage range. *Id.* Overall, Dr. Oskooii testified that the combination of these results with the undisputed Black cohesion he observed provided a "clear-cut, textbook example of racially polarized voting." FOF ¶ 178. Dr. Alford did not dispute these calculations and agreed that the results represent a "substantial majority" of White voters opposing the Black-preferred candidate. FOF ¶ 179.

475. Dr. Oskooii's performance analysis also confirmed that that Black-preferred candidates are usually defeated in Senate Districts 1 and 2. FOF ¶¶ 182-83. Dr. Oskooii's analysis further confirms that adjacent Senate Districts do not mitigate the denial of Black voters' equal opportunity to elect their candidates of choice in Senate Districts 1 and 2. Specifically, Dr. Oskooii's analysis of 2023 Senate District 11, which includes only a portion of Plaintiffs' Illustrative Senate Districts, showed that the Black-preferred candidate is usually defeated in this district, appropriately giving weight to more recent elections. FOF ¶ 184; *see also United States v. Charleston Cnty.*, 365 F.3d 341, 350 (4th Cir. 2004) ("[R]ecent elections are the most probative in determining vote dilution."); *Shirt v. Hazeltine*, 461 F.3d 1011, 1021 (8th Cir. 2006) ("The more recent an election, the higher

204

its probative value.") (citing *Uno v. City of Holyoke*, 72 F.3d 973, 990 (1st Cir. 1995)); *Ruiz v. City of Santa Maria*, 160 F.3d 543, 555 (9th Cir. 1998) ("Past elections may be less probative of vote dilution than more recent elections."). Dr. Oskooii's performance analysis of these districts showed that only Senate District 5, which overlaps with Plaintiffs' Illustrative Senate District 5 but not Illustrative Senate District 2, *compare* JX079 (2023 Senate Plan) *with* PX182 at 53, Figure 14 (Plaintiffs' Illustrative Senate Districts), provides Black voters with an opportunity to elect their candidate of choice without usually being defeated by White bloc voting. FOF ¶ 184. Legislative Defendants' experts Dr. Alford and Dr. Barber did not meaningfully dispute these performance results. FOF ¶¶ 185-87.

476. Even if Legislative Defendants had presented evidence that Senate District 11 would usually perform for Black voters (they have not), this district has very limited overlap with Plaintiffs' Illustrative Senate Districts. *Compare* JX079 (2023 Senate Plan) *with* PX182 at 53, Figure 14 (Plaintiffs' Illustrative Senate Districts). An adjacent district encompassing only some of the minority voters experiencing vote dilution cannot substantially address the unambiguous Section 2 violation in Senate Districts 1 and 2. *See Shaw v. Hunt*, 517 U.S. 899, 918 (1996) (finding minority-opportunity district containing a portion of the demonstrative area's minority voters did not "substantially address[] the § 2 violation"); *LULAC v. Perry*, 548 U.S. at 431 (applying *Shaw* to find same). Given how definitively Black voters are precluded from successfully electing a candidate of their choice in Senate Districts 1 and 2, an adjacent district that has only some likelihood more of electing a candidate of their choice cannot, in context, provide equal opportunity to the voters in challenged districts. *See Hunt*, 517 U.S. at 918.

205

477.    Legislative Defendants' expert Dr. Alford did not dispute Dr. Oskooii's performance analysis results and acknowledged they are useful for determining that White bloc voting defeats the minority's candidate of choice in most of the examined districts. FOF ¶ 185. So instead of disputing these empirical results of Dr. Oskooii's performance analysis, Legislative Defendants argue that Dr. Alford's opinion that Black voters can win in districts of less than 50 percent BVAP precludes a finding that *Gingles* III is satisfied. As found above, this analysis and the related opinions by Dr. Alford are unreliable for several reasons, including the limited temporal scope of his analysis (which includes only one year of elections), the lack of endogenous elections in his calculations, and the variation in White crossover voting across precincts. FOF ¶¶ 191-95.

478.    Legislative Defendants point out that the Supreme Court has cited twice to the underlying academic paper by Drs. Grofman, Handley, and Lublin on which Dr. Alford based his analysis. Putting aside that Dr. Alford did not conduct his analysis with a range of elections as directed in that authority, *see* FOF ¶ 192; Trial Tr. vol. V, 1223:6-1224:24 (Alford), neither of the Supreme Court's citations to this 2001 authority support that such an analysis could automatically defeat Plaintiffs' claims here. The first citation to the 2001 authority is at the end of a string citation in the Voting Rights Act Section 5 case *Georgia v. Ashcroft*, for the proposition that "various studies have suggested that the most effective way to maximize minority voting strength may be to create more influence or coalitional districts." 539 U.S. 461, 482 (2003). The second citation is in the partial concurrence/dissent by Justice Souter, joined by Justice Ginsburg, in *LULAC v. Perry*, which cites the 2001 authority for the proposition that "electoral success by minorities is

adequately predictable by taking account of primaries as well as elections, among other things." 548 U.S. 399, 488 (2006) (Souter, J., concurring in part and dissenting in part). Neither citation supports Legislative Defendants' use of that analysis here to argue it precludes a finding of legally significant racially polarized voting in the challenged Senate districts at issue.

479.    At base, even if it was based upon reliable analysis, Legislative Defendants' argument that Plaintiffs' claims automatically fail upon a showing that majority-BVAP districts are not required to provide electoral success to Black-preferred candidates is legally wrong. In rejecting the same argument, the Fifth Circuit explained that this argument erroneously focuses on the possibility of creating a new district with crossover voting, whereas *Gingles* III's "purpose is to establish that the *challenged district* thwarts a distinctive minority vote." *Robinson*, 86 F.4th at 596 (emphasis added); *see also id.* ("The relevant consideration under the third *Gingles* precondition is the *challenged* plan, not some *hypothetical* crossover district that could have been but was not drawn by the Legislature.") (emphasis in original).

480.    Legislative Defendants' reliance on *Bartlett v. Strickland*, 556 U.S. 1 (2009), to argue that Plaintiffs must prove majority-Black districts are required to satisfy *Gingles* III, is likewise misplaced. *See* Doc. 125 at 24-25. First, the holding in *Bartlett* they rely on addresses arguments by petitioners regarding *Gingles* I (not II or III), and specifically arguments by petitioners that they could satisfy *Gingles* I by drawing illustrative "effective minority districts" that are not 50%+1 minority. 556 U.S. at 14. The Court rejected this argument and instead held that plaintiffs must satisfy a bright-line "majority-minority rule"

to satisfy *Gingles* I. *Id.* at 19-20; *see also id.* at 18 ("[T]he majority-minority rule relies on an objective, numerical test: Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area?"). As explained above, Plaintiffs here have met this requirement by demonstrating the possibility of two majority-BVAP Senate districts in the Black Belt.

481.    The Court in *Bartlett* did *not* hold that all possible VRA remedial districts must be majority-minority; in fact, it stated the opposite. "Much like § 5, § 2 allows States to choose their own method of complying with the Voting Rights Act, and *we have said that may include drawing crossover districts.*" *Id.* at 23 (emphasis added). This understanding aligns with the recent holding in *Singleton v. Allen*, where the Court ordered a remedial plan, stating that the plan including a district with 48.7% BVAP "completely remedies the vote dilution we found." No. 2:21-cv-1291-AMM, 2023 WL 6567895, at *16 (N.D. Ala. Oct. 5, 2023).[43]

---

[43] For this reason, the district court erred in *Pierce v. N.C. State Board of Elections* when it held that "a proper district effectiveness analysis supporting plaintiffs challenge must show that black voters' candidates of choice cannot win elections unless BVAP in the contested district exceeds 50% plus one vote" to deny a preliminary injunction. 713 F. Supp. 3d 195, 230 (E.D.N.C. 2024) (emphasis omitted), *aff'd on other grounds*, 97 F.4th 194 (4th Cir. 2024). The Fourth Circuit acknowledged the district court's "inaccurate implication that a district effectiveness analysis is required for proving a VRA violation in every Section 2 case," *Pierce*, 97 F.4th at 218, and only affirmed a denial of a preliminary injunction based upon evidentiary issues that are not present here. *See id.* at 214-18. Likewise, the district court in *Pierce* erred in implying that *Covington* mandated all VRA remedial districts be majority-minority. *See* 713 F. Supp. 3d at 230. The Court in *Covington* never held as such, it just evaluated whether the legislature's chosen remedy of majority-minority districts was warranted. *See, e.g.*, *Covington*, 316 F.R.D. at 130 & n.10 (noting defendants interpreted *Strickland* to require VRA remedial districts to be 50%-plus-one BVAP, but holding "we need not decide here whether this interpretation of *Strickland* was proper").

482.    The Court thus concludes that Dr. Oskooii's performance analysis establishes that White majorities vote sufficiently as a bloc in Senate Districts 1 and 2 to usually defeat the Black-preferred candidates, thereby satisfying *Gingles* III.

6.    <u>The Racially Divergent Voting Patterns in the Black Belt Cannot be Dismissed as Mere Partisanship</u>

483.    The Court finds that Legislative Defendants have failed to present any reliable or methodologically sound evidence sufficient to dispute that White bloc voting "thwarts" the cohesive Black voters in the Black Belt for reasons wholly unconnected to race.

484.    Legislative Defendants rely on their expert, Dr. Alford, to argue that racially polarized voting patterns established by Dr. Oskooii are attributable to mere partisanship. This argument fails because it is inapposite to the Court's *Gingles* analysis. *See Charleston Cnty.*, 365 F.3d at 347-49 (rejecting argument that *Gingles* III requires proving "race rather than partisanship is the cause of [] polarized voting" because "'[l]egally significant' white bloc voting thus refers to the frequency with which, and not the reason why, whites vote cohesively for candidates who are not backed by minority voters."). Nothing in the Supreme Court's recent affirmation of the *Gingles* preconditions alters this conclusion. *See generally Milligan*, 599 U.S. 1. *See also Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 700 F. Supp. 3d 1136, 1210 (N.D. Ga. 2023) (affording "little weight to Dr. Alford's testimony with respect to the *Gingles* preconditions because it does not effectively address that inquiry").

485.    Additionally, and as set forth in more detail below in consideration of Senate Factor 2 of the totality of the circumstances, the Court finds that the evidence presented by Plaintiffs overwhelmingly supports that voting in the Black Belt of North Carolina is polarized along racial, and not merely partisan, lines. *See infra* COL ¶¶ 499-505.

486.    In sum, based on the foregoing analysis, the Court concludes that all three *Gingles* preconditions are satisfied.

7.    The Totality of the Circumstances Supports a Finding of Vote Dilution in the 2023 Senate Plan

487.    As Plaintiffs have established all three *Gingles* requirements, the Court then must analyze whether a Section 2 violation has occurred based on "the totality of the circumstances." *Bartlett*, 556 U.S. at 11-12.

488.    Courts "adhere to the Supreme Court's instruction to examine challenged laws and practices in an intensely fact-based and local totality-of-the-circumstances analysis." *Veasey v. Abbott*, 830 F.3d 216, 261 (5th Cir. 2016) (citing *Gingles*, 478 U.S. at 36-38). "[T]he totality of the circumstances inquiry recognizes that application of the *Gingles* factors is 'peculiarly dependent on the facts of each case.' Before courts can find a violation of § 2, therefore, they must conduct 'an intensely local appraisal' of the electoral mechanism at issue, as well as a 'searching practical evaluation of the past and present reality.'" *Milligan*, 599 U.S. at 19 (quoting *Gingles*, 478 U.S. at 79).

489.    The Senate Report that accompanied the 1982 amendments to Section 2 guides that totality of the circumstances inquiry. *See Gingles*, 478 U.S. at 36-37. The Senate Report factors include, but are not limited to:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction;

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group[;]

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Gingles*, 478 U.S. at 36-37 (quoting S. Rep. No. 97-417 at 28-29); *see also Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 219 (4th Cir. 2024) (listing factors).

490.    "[T]his list of typical factors is neither comprehensive nor exclusive. While the enumerated factors will often be pertinent to certain types of § 2 violations, particularly

211

to vote dilution claims, other factors may also be relevant and may be considered. Furthermore, . . . there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Gingles*, 478 U.S. at 45 (internal quotations and citations omitted).

491.    There is no requirement that plaintiffs prove intentional discrimination to establish a Section 2 results violation. *Id.* at 35 ("Congress substantially revised § 2 [in 1982] to make clear that a violation could be proved by showing discriminatory effect alone and to establish as the relevant legal standard the 'results test'"); *id.* at 43-44 ("First and foremost, the [Senate] Report [for the 1982 amendment to Section 2] dispositively rejects the position of the plurality in *Mobile v. Bolden*, 446 U.S. 55 (1980), which required proof that the contested electoral practice or mechanism was adopted or maintained with the intent to discriminate against minority voters.") (footnote omitted); *accord Chisom*, 501 U.S. at 404.

492.    A Section 2 "totality of the circumstances" analysis "depends upon a searching practical evaluation of the 'past and present reality,' [citation omitted] and on a 'functional' view of the political process." *Gingles*, 478 U.S. at 45 (quoting S. Rep. No. 97-417 at 30 (1982)). This is accomplished by a court "assess[ing] the impact of the contested structure or practice on minority electoral opportunities 'on the basis of objective factors'" identified in a non-exhaustive list in the Senate Report. *Id.* at 44 (quoting S. Rep. No. 97-417 at 27).

493.    As set forth below, Plaintiffs have established, by a totality of circumstances, that the "political processes" in the Black Belt "are not equally open to participation" by Black voters. *See* 52 U.S.C. § 10301(b).

494.    <u>Senate Factor 1</u>: "[T]he extent of any history of official discrimination in the state or political subdivision that touched the right of the members of minority group to register, to vote, or otherwise to participate in the democratic process[.]" *Gingles*, 478 U.S. at 36-37. This factor reflects "Congress's concern 'not only with present discrimination, but with the vestiges of discrimination which may interact with present political structures to perpetuate a historical lack of access to the political system.'" *Luna*, 291 F. Supp. 3d at 1133-34 (quoting *Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 778-79 (S.D. Tex. 2013)). Courts evaluating Senate Factor 1 consider a range of evidence, including "long-ago acts of official discrimination" that "give context to the analysis," as well as more recent events. *Veasey*, 830 F.3d at 257. While historical discrimination may carry less "probative value when considering whether the Legislature acted with discriminatory intent," it "cannot be ignored in the discriminatory effect analysis, because even these seemingly remote instances of State-sponsored discrimination continue to produce . . . racial disparities." *Id.* at 257 & n.53. Courts weighing Senate Factor 1 thus examine Reconstruction-era history, *see, e.g.*, *Alpha Phi Alpha*, 700 F. Supp. 3d at 1269, "contemporary" history following the Civil Rights Act, *Veasey*, 830 F.3d at 257, and "more recent evidence," *Singleton*, 582 F. Supp. 3d at 1020.

495.    "Unquestionably, North Carolina has a long history of race discrimination generally and race-based vote suppression in particular." *N.C. State Conf. of the NAACP v.*

*McCrory*, 831 F.3d 204, 223 (4th Cir. 2016). This includes a historical and litigious record "replete with evidence of instances since the 1980s in which the North Carolina legislature has attempted to suppress and dilute the voting rights of African Americans." *Id*.

496.    The Court is aware of the instruction that "[p]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Abbott v. Perez*, 585 U.S. 579, 603 (2018) (internal quotation marks omitted). But the Senate Factors, which expressly include a historical focus, are focused on whether current *conditions* in a jurisdiction render an election system equally open to minority voters. While past intentional discrimination may be of limited value in identifying present intentional discrimination, it is significantly more useful in identifying present conditions, and inequalities within them. Accordingly, we do not conclude that *Abbott* requires us to discount North Carolina's long and abhorrent history of racial discrimination in our totality of the circumstances analysis.

497.    Overall, Plaintiffs have shown that the 2023 Senate Plan "interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47. Fact and expert witnesses testified extensively about the enduring history of racial discrimination in the context of voting rights, including race-based vote suppression and dilution schemes in the Black Belt, several of which involved redistricting efforts. *See* FOF ¶¶ 256-71. Drs. Bagley, Leloudis, and Stephens-Dougan also described the new wave of voter suppression and dilution efforts after preclearance ended in 2013. FOF ¶ 266. This

history includes the legislature specifically targeting Black North Carolinians in enacted laws including House Bill 589/Senate Bill 824. FOF ¶¶ 266-67.

498. Legislative Defendants offer no rebuttal to Dr. Stephens-Dougan, nor to Dr. Leloudis. Further, Legislative Defendants' expert Dr. Taylor confirmed at trial that he reviewed and did not rebut Dr. Bagley's analysis of the history of official voting discrimination against minorities. Trial Tr. vol. VI, 1309:16-22 (Taylor).

499. <u>Senate Factor 2</u>: "[T]he extent to which voting in the elections of the state or political subdivision is racially polarized[.]" *Gingles*, 478 U.S. at 36-37. It is "the degree of racially polarized voting that matters." *Charleston Cnty.*, 365 F.3d at 348. The Fourth Circuit in Charleston concluded that a jurisdiction was "severely and characteristically polarized along racial lines" where it experienced racially polarized voting in at least 75% of its elections. *Id.* at 350. *Milligan* characterized polarization as "intense," "very strong," and "very clear" where the gap in Black and White voting for the same candidate was 75 percentage points—Black voters supported their preferred candidates with 92.3% of the vote, while White voters supported those candidates with 15.4% of the vote. 599 U.S. at 22-23 (cleaned up). Racial bloc voting "allows those elected to ignore [minority] interests without fear of political consequences," *Rogers v. Lodge*, 458 U.S. 613, 623 (1982), and racial bloc voting continues to be a reality in Black Belt elections.

500. As described above, Plaintiffs have shown extensive evidence of extreme racially polarized voting in the Black Belt in the analysis of Dr. Kassra Oskooii, with average Black cohesion estimates of about 95% or more and White bloc voting rates in the

215

mid-70s to high-80s in the relevant area. *See* COL Section II.A.4-5 (describing Dr. Oskooii's analysis on *Gingles* II/III).

501.    Dr. Oskooii confirmed: "[I]f this is all about partisanship, not race, we wouldn't find Black and White voters sorting themselves into such opposing camps. It's precisely because race plays an essential factor that we have these results, and that's why I say it's textbook racially polarized voting patterns." Trial Tr. vol. II, 393:18-22 (Oskooii). Additionally, unrebutted analysis by Dr. Stephens-Dougan shows that these racially divided voting behaviors are not based upon mere partisan divide, but racialized divisions. *See* FOF ¶¶ 274-83, 285.

502.    As described above, Dr. Alford's flawed and limited analysis cannot rebut the definitive evidence of racially polarized voting in the challenged area. *See* FOF ¶¶ 189-95, 197-203. Other jurisdictions have found Dr. Alford's opinions regarding partisan explanation for voting patterns were "not reached through methodologically sound means and were therefore speculative and unreliable." *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 587 F. Supp. 3d 1222, 1305 (N.D. Ga. 2022); *Robinson v. Ardoin*, 605 F. Supp. 3d 759, 840-41 (M.D. La. 2022) ("The Court finds that Dr. Alford's opinions border on *ipse dixit*. His opinions are unsupported by meaningful substantive analysis and are not the result of commonly accepted methodology in the field."), *vacated and remanded on other grounds by* 86 F.4th 574 (5th Cir. 2023); *Miss. State Conf. of the NAACP v. State Bd. of Election Comm'rs*, 739 F. Supp. 3d 383, 454 (S.D. Miss. 2024) (sharing the concerns of

216

the *Robinson* court that Dr. Alford's opinions "border on *ipse dixit*").[44] Here too, the Court gives no weight to Dr. Alford's testimony due to its unreliability. Dr. Alford has never published a paper on racially polarized voting nor any peer-reviewed articles using ecological inference, and disclaims doing any analysis of actual causation here. FOF ¶¶ 112, 201.

503.    Additionally, Dr. Alford's methodology is riddled with inconsistencies as to how he considers race of the candidate, the only factor he looked at with specificity. *See generally* FOF ¶ 199. Dr. Alford's isolated examination on race of the candidate, and his conclusion that there is no difference between White voter support depending upon the race of the candidate, is called into serious question by the results of the 2024 gubernatorial race (the only contest of 64 in which a Black Republican ran against a White Democrat) in which that Black Republican received, by Dr. Alford's admission, significantly less support than his White counterparts. Trial Tr. vol. V, 1210:15-18, 1211:1-6 (Alford). Dr. Alford fails to provide any reliable explanation for this, nor does he provide any accounting for that fact that, out of 64 elections analyzed, Black-preferred candidates were themselves Black five times more than White-preferred candidates. FOF ¶¶ 199-200. Accordingly, there is no "systematic proof to support" arguments that partisanship, rather than race, drives the racially polarized voting patterns identified, *Charleston Cnty.*, 365 F.3d at 352, and

---

[44] Other courts have likewise found Dr. Alford's opinions, even outside the issue of partisanship, unreliable. *See, e.g.*, *Texas v. U.S.*, 887 F. Supp. 2d 133, 146-47 (D.D.C. 2012) (critiquing Dr. Alford's approach because he used an analysis that "lies outside accepted academic norms among redistricting experts"), *vacated on other grounds*, 570 U.S. 928 (2013); *NAACP, Spring Valley Branch v. E. Ramapo Cent. Sch. Dist.*, 462 F. Supp. 3d 368, 381 (S.D.N.Y. 2020) ("[Dr. Alford's] testimony, while sincere, did not reflect current established scholarship and methods of analysis of racially polarized voting and voting estimates."), *aff'd sub nom. Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213 (2d Cir. 2021).

certainly none that could overcome the substantial evidence of racially polarized voting supported by Drs. Oskooii and Stephens-Dougan.

504.    The Court finds that the configurations of Senate Districts 1 and 2 thwart a distinctive minority vote "at least plausibly on account of race." *Milligan*, 599 U.S. at 19.

505.    In reaching this conclusion, the Court gives considerable weight to the following findings of fact: Dr. Oskooii found extreme levels of cohesion in Black voters as well as a substantial majority of White voters opposing the Black-preferred candidate, and these candidates usually lose in Senate Districts 1 and 2. FOF ¶¶ 170-83. Dr. Oskooii concluded that partisanship does not account for the Black Belt's patterns of racially polarized voting, FOF ¶¶ 200, 203; and Plaintiffs' expert Dr. Stephens-Dougan—a political scientist with expertise in race, ethnicity, and politics—contextualized these voting patterns, explaining how peer-reviewed literature and North Carolina-based survey data show that policies regarding racial and racialized issues drive voting behavior in the state, and that Black support for the Democratic Party is in fact fueled by racial attitudes. FOF ¶ 204.

506.    <u>Senate Factor 3</u>: "[T]he extent to which the state or political subdivision has used . . . voting practices or procedures that may enhance the opportunity for discrimination against the minority group[.]" *Gingles*, 478 U.S. at 37. For purposes of this factor, it "is irrelevant" whether the practice is unlawfully discriminatory. *Edmisten,* 590 F. Supp. at 363 & n.24.

507.    Plaintiffs have shown, through largely unrebutted expert and fact witness testimony, that voting practices exist in North Carolina, including in the challenged area, that may enhance the opportunity for discrimination against Black voters.

218

508. Dr. Bagley testified about Black voters being more likely than White voters to have their ballots rejected and votes challenged based on voter ID laws, FOF ¶ 288, and also about the impacts of the discrimination in education exacerbated by the state's increased funding of school vouchers, FOF ¶ 304, which burden the ability of Black North Carolinians to participate in elections and politics. PX181 at 30-38; PX205 at 4; *see also Thomas v. Bryant*, 938 F.3d 134, 162 & n.134 (5th Cir. 2019) ("[T]he Supreme Court [has recognized] that political participation by minorities tends to be depressed where minority group members suffer effects of prior discrimination such as inferior education."). Additionally, Dr. Leloudis's unrebutted historical analysis described the "protracted campaign" to roll back Black political gains and political participation. FOF ¶ 15; *see also* FOF ¶ 265 (describing testimony of Representative Butterfield). Fact witness testimony, including from local organizer Courtney Patterson, described how current voting practices in the Black Belt contribute to the significant and persistent racial turnout gap in this area of the state. FOF ¶ 289.

509. Legislative Defendants' expert Dr. Taylor did not dispute the data showing longstanding disparities between Black and White North Carolinians in voter registration and turnout, FOF ¶ 291, nor did he dispute the examples identified by Dr. Bagley of voter intimidation and other election difficulties contributing to the Black voting gap in the state. FOF ¶ 292.

510. Senate Factor 4: "[I]f there is a candidate slating process, whether the members of the minority group have been denied access to that process[.]" *Gingles*, 478 U.S. at 37.

511. There is no slating process for North Carolina elections, so this factor is not relevant and the Court makes no finding. *See Nairne*, 715 F. Supp. 3d at 872; *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1023 (N.D. Ala. 2022).

512. <u>Senate Factor 5:</u> "[T]he extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process[.]" *Gingles*, 478 U.S. at 37. Because "courts have recognized that disproportionate educational, employment, income levels and living conditions arising from past discrimination tend to depress minority political participation, . . . plaintiffs need not prove any further causal nexus between their disparate socioeconomic status and the depressed level of political participation." S. Rep. No. 97-417 at 29 n.114 (citing *White v. Regester*, 412 U.S. 755, 768 (1973) and *Kirksey v. Bd. of Sup'rs of Hinds Cnty., Miss.*, 554 F.2d 139, 145 (5th Cir. 1977)); *see also Gingles*, 478 U.S. at 69 ("Both this Court and other federal courts have recognized that political party participation by minorities tends to be depressed where minority group members suffer effects of prior discrimination such as inferior education, poor employment opportunities, and low incomes."); *Bryant*, 938 F. 3d at 162.

513. The Fourth Circuit also acknowledged in *McCrory* in 2016 that Black North Carolinians are more likely to "experience socioeconomic factors that may hinder their political participation" and are "disproportionately likely to move, be poor, less educated, have less access to transportation, and experience poor health." 831 F.3d at 233.

220

514.     Plaintiffs have demonstrated, through their expert Dr. Bagley and several fact witnesses, the persistent and current effects of discrimination that the Black community in Senate Districts 1 and 2 bears in the areas of education, employment, and health, which hinder their ability to participate in the political process, as evidenced by Dr. Bagley's analysis of racial voter turnout gaps in the Black Belt. FOF ¶¶ 293-311. Former Congressman G.K. Butterfield, through designated testimony, described the "stark" differences between the economic and educational conditions of Black and White citizens in the Black Belt. FOF ¶ 294. Reverend Dawn Daly-Mack testified to the lack of access in the Black Belt to medical care and healthy foods, which impacts the health of Black citizens. FOF ¶ 307. Dr. Bagley's analyses of Census data and similar socioeconomic statistics confirm significant continuing disparities in the Black Belt, including that Black individuals are more than twice as likely as White individuals to experience poverty or unemployment, and significantly less likely to have private health insurance. FOF ¶¶ 295-97, 300, 305. He also testified that educational disparities are continuing in the Black Belt, particularly due to the effects of segregation. FOF ¶¶ 301-04. Legislative Defendants' expert Dr. Taylor did not dispute that there are longstanding disparities between Black and White North Carolinians in education, employment, household income and poverty rates, and disability and health insurance rates. FOF ¶ 312.

515.     Legislative Defendants' insistence that socioeconomic disparities in North Carolina be compared to those nationwide is unsupported and not required in a Senate Factors analysis. Indeed, as Dr. Bagley noted, the Senate Judiciary specifically rejected national comparisons when adopting the Senate Factors. PX199 at 2-3 (citing S. Rep No.

97-417 at 31-33). Furthermore, Dr. Taylor admitted that he is aware of no courts that have used his comparative approach to the Senate Factors, nor does the text of the Senate Factors compel such an approach. Trial Tr. vol. VI, 1288:2-6, 1288:24-1289:1, 1318:21-24. We will not to be the first to employ such a comparison.

516.     Senate Factor 6: "[W]hether political campaigns have been characterized by overt or subtle racial appeals[.]" *Gingles*, 478 U.S. at 37. When "candidates are making race an issue on the campaign trail—especially in a way that demonizes the minority community and stokes fear and/or anger in the majority—the possibility of inequality in electoral opportunities increases." *Soto Palmer v. Hobbs*, 686 F. Supp. 3d 1213, 1230 (W.D. Wash. 2023), *cert. denied before judgment sub nom. Trevino v. Palmer*, 144 S. Ct. 873 (2024). This factor favored the plaintiffs in *Gingles* when they introduced "specific examples" of racial appeals in recent U.S. Senate and North Carolina Gubernatorial campaigns. *See Edmisten*, 590 F. Supp. at 364.

517.     The Court finds there is unrebutted evidence, including from Drs. Bagley and Stephens-Dougan, that political campaigns in North Carolina have been, historically and more recently, characterized by racial appeals. FOF Section V.E. This includes recent racial appeals posted on social media by the primary map-drawer of the 2023 Senate Plan, Senator Ralph Hise. FOF ¶ 336. Dr. Stephens-Dougan's unrebutted testimony described how an elected official's support of a negative racial appeal makes these negative racialized issues more consequential as voters are coming to their decisions. *Id*.

518.     Senate Factor 7: "[T]he extent to which members of the minority group have been elected to public office in the jurisdiction." *Gingles*, 478 U.S. at 37.

222

519.     The Court finds that Plaintiffs have shown, through the expert opinions of Dr. Bagley and testimony of Senator Kandie Smith, that Black candidates have historically been and continue to be underrepresented in elected roles, even in Black Belt districts with higher BVAPs. FOF ¶¶ 340-43. For instance, Dr. Bagley describes how no Black candidate was elected to the North Carolina legislature from Reconstruction until 1969, and to Congress from North Carolina from 1899 to 1992. PX181 at 43-47 (Bagley Report). Dr. Bagley also reports that the first Black candidate to be elected to the Council of State was in 1993, and that there has still never been a Black Governor or Attorney General; to date there have been only three Black candidates elected to the Council of State. *Id.* at 45; *see also* PX205 at 16 (Bagley Supplemental Report). In the Black Belt, Dr. Bagley notes that Black representation in local bodies also falls considerably short of equitable levels. FOF ¶ 341. Currently, there is one Black Senator in the northeastern part of the state, Senator Kandie Smith, where there have typically been two or three. FOF ¶ 343.

520.     This electoral history is strongly probative of the presence of Senate Factor 7. In *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 700 F. Supp. 3d 1136, 1282-84 (N.D. Ga. 2023), the Court found Senate Factor 7 present in Georgia where Black candidates had experienced even more statewide success than in North Carolina. *See id.* at 1282 (recounting Black candidates' success in seeking Attorney General and U.S. Senate seats in Georgia). *But see id.* at 1282 ("Georgia has never elected a Black governor"), 1283 ("Black candidates had little-to-no success [in state legislative contests] when they did not make up the majority of a district.").

521.    Legislative Defendants have no meaningful rejoinder to these facts. Legislative Defendants' expert, Dr. Taylor, opined that Black North Carolinians are "reasonably represented in federal, state, and local elected offices." LDTX259 at 46 (Taylor Report); Trial Tr. vol. VI, 1301:20-24 (Taylor). But his opinion is undermined by several key admissions at trial: (1) Black North Carolinians have been consistently underrepresented in the state legislature relative to their share of the population for more than three decades, between 1992 and 2024, Trial Tr. vol. VI, 1303:5-1304:19; (2) Dr. Taylor did not analyze whether Black North Carolinians hold a proportionate share of local elected offices, *id*. at 1304:22-1306:22; and (3) he did not dispute Dr. Bagley's findings that Black residents are underrepresented in local office as compared to their population share in numerous counties, including Halifax County, Edgecombe County, Hyde County, Tyrrell County, Guilford County, and Forsyth County. *Id*. at 1306:23-1307:9.

522.    Instead, Legislative Defendants rely largely on statewide measures of Black electoral success, making no accounting of where and under what conditions Black candidates win. *See* LDTX259 at 29-31 (Taylor Report). But this is of limited value to the actual question presented by Senate Factor 7, which is to what extent Black candidates have had electoral success "*in the jurisdiction*." *Gingles*, 478 U.S. at 37 (emphasis added); *see also Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1295 (11th Cir. 2020). The relevant jurisdiction is not North Carolina statewide, but specifically the Black Belt. Accordingly, Dr. Taylor's generalized and state-level analysis does nothing to dispute Dr. Bagley's testimony that state Senate candidates in the Black Belt "tended only to be successful where there was 40 percent Black voting-age population, or BVAP, or a

224

50 percent minority voting-age population, or MVAP." Trial Tr. vol. III, 672:1-14 (Bagley); *accord Singleton v. Merrill*, 582 F. Supp. 3d 924, 1019 (N.D. Ala. 2022) (Senate Factor 7 "weighs heavily in favor of" plaintiffs where "the overwhelming majority of African-American representatives in the [state] Legislature come from majority-minority districts"); *Alpha Phi Alpha*, 700 F. Supp. 3d at 1283.

523. Legislative Defendants' attempts to point to statewide and nationwide statistics fail to rebut this testimony because it does not comport with the "intensely local appraisal" that *Gingles* requires. *Gingles*, 478 U.S. at 79.

524. <u>Senate Factor 8</u>: "Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." *Gingles*, 478 U.S. at 37.

525. The Court finds that Plaintiffs have demonstrated, through multiple expert opinions and the testimony of numerous fact witnesses living in the Black Belt, the significant lack of responsiveness by elected officials responsible for, and elected under, the 2023 Senate Plan to the particularized needs of the members of the Black community. *See* FOF Section V.G. Dr. Bagley concluded that the legislature has routinely advanced legislation that is roundly opposed by Black voters. FOF ¶ 346. Dr. Leloudis concluded this unresponsiveness has further hindered the ability of minority voters to fully and freely participate in the political process. FOF ¶ 347. Drs. Stephens-Dougan and Bagley demonstrated that Black political interests are not represented by the Republican Party in North Carolina. FOF ¶¶ 346, 357-60. This lack of responsiveness is evidenced by numerous proposed bills contrary to the health, education, and voting rights of the Black community

and of particular interest to this community in the Black Belt. FOF ¶¶ 355-56. *See Miss. NAACP*, 739 F. Supp. 3d at 462 (noting that examples of non-responsiveness can include, but are not limited to, persistent failures to address needs disproportionately affecting Black communities, inadequate educational funding, the redistricting plan itself, and the failure of legislators to participate in black-community events).

526.    Fact witness testimony demonstrates the legislature's lack of responsiveness to the Black community. *See* FOF ¶¶ 348-54. Calvin Jones testified about his representative's lack of interest in speaking to him about a bill relevant to agriculture that would negatively impact small farms in the Black Belt. FOF ¶ 349. Reverend Dawn Daly-Mack, Reverend William Kearney, and Deborah Dicks Maxwell similarly testified about health, the environment, and voting rights issues, respectively, that are important to the Black community in the Black Belt, but that, as former Congressman G.K. Butterfield stated, are not addressed by the legislature. FOF ¶¶ 349-52. Given the lack of representation for the Black community in the Black Belt, the region's sole Black Senator, Kandie Smith, testified that she and the Legislative Black Caucus try to fill the gap. FOF ¶¶ 353-54. Dr. Stephens-Dougan concluded this lack of responsiveness is directly related to the socioeconomic disparities and the effects of discrimination against the Black community. FOF ¶ 357.

527.    Legislative Defendants did not rebut the analysis of Dr. Stephens-Dougan, FOF ¶ 361, and their expert Dr. Taylor conceded that the studies he relied upon to assess responsiveness do not measure the responsiveness of elected officials to Black North Carolinians in particular. FOF ¶ 362.

528. Senate Factor 9: "Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." *Gingles*, 478 U.S. at 37. This factor requires a consideration of the policies used by the state "to justify its districting decisions[.]" *Miss. NAACP,* 739 F. Supp. 3d at 463.

529. Substantive departures and irregularities in district configurations support the tenuousness of Legislative Defendants' plans, in addition to a marked lack of responsiveness toward Black voters. Specifically, the legislative record reveals that the purported justifications for the choice of configuration for 2023 Senate Districts 1 and 2—including to maximize compactness of District 1, keep the so-called "fingerling counties" together based upon public commentary, and attention to the Virginia Media Market—are unsubstantiated and unsupported in the legislative record. *See generally* FOF ¶¶ 131-37. Specifically, the evidence supports that the purported justification to maximize compactness of Senate District 1 contravenes how the criterion of "compactness" was applied generally (as a minimum threshold rather than a factor to maximize), that the compactness measures available to legislators do not clearly show the 2023 Senate District 1 as the most compact of all available districts in that configuration, that the 2023 Senate District 2 is among the *least* compact of all districts, and that the alternative configurations for these Senate Districts would have created overall more compact districts. *See* FOF ¶¶ 133-34. Likewise, the purported justification of keeping "fingerling" counties together based upon public comment is not supported in any public comment on record and is also not significantly altered by the choice of *Stephenson* cluster. FOF ¶ 135. The consideration

227

of media markets is not clearly connected to a criterion and, in any event, not consistently applied during the redistricting process. FOF ¶ 136. Importantly, a particular partisan objective was not provided by the primary map-drawer in his testimony at trial, nor by the Senate Redistricting Chairs during the legislative process, to explain this particular choice of configurations, FOF ¶ 132, and so it matters not whether this choice of configuration actually would serve that purpose.

530.    <u>Senate Factors Conclusion</u>. The Court finds that the evidence conclusively demonstrates, by a totality of circumstances, that Black voters in the Black Belt have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Gingles*, 478 U.S. at 63.[45]

531.    Overall, the theme of Legislative Defendants' defense has been to advance novel conceptions of what is required to establish a violation of VRA Section 2 in effect. As to *Gingles* I, they invite the Court to engage in the "beauty contest" discouraged in *Milligan* and to hold that the state-law requirements under *Stephenson* must control whether a district is reasonably configured for the purposes of complying with federal law, turning concepts of federal supremacy on their head. They also invite this Court to be the first Court to rely on an outdated metric (moment of inertia) in the *Gingles* I compactness inquiry. As to *Gingles* II/III, they ask the Court to credit an analysis by Dr. Alford repeatedly discredited by other courts and that seeks to explain away clear patterns of

---

[45] The Court's holding here is made upon a different and much more robust record than the evidence at issue in the preliminary injunction order affirmed in *Pierce*, where the Fourth Circuit acknowledged that a different outcome might result following "discovery and further factual development." 97 F.4th at 229.

racially polarized voting as mere partisanship. And as to the totality of the circumstances, they ask this Court to adopt a novel comparative analysis by Dr. Taylor that would ignore vestiges of discrimination so long as worse discrimination exists somewhere else. The Court notes an irony in these arguments, given Legislative Defendants' representations that the *Gingles* framework is unworkable, impossible to comply with, and constantly changing. *See, e.g.*, Trial Tr. vol. VI, 1545:8-15 (closing arguments); Doc. 125 at 23-24, 28. It is Legislative Defendants themselves who are asking the Court to change these very standards, which were clearly and decisively reaffirmed mere months before the drafting of the 2023 Senate Plan. As the Supreme Court did in *Milligan*, "we find [Legislative Defendants'] new approach to § 2 compelling neither in theory nor in practice. We accordingly decline to recast [] § 2 case law as [Legislative Defendants] request." 599 U.S. at 24.

*     *     *

532.    The Court holds that Plaintiffs have shown, based on a preponderance of the evidence, that Legislative Defendants violated Section 2 of the Voting Rights Act with respect to Senate Districts 1 and 2 in the 2023 Senate Plan. As demonstrated by Plaintiffs' Illustrative Senate Plan B, the Court's finding that Plaintiffs' Illustrative Senate District 2 is reasonably configured, along with legally significant racially polarized voting in these challenged districts, satisfies the *Gingles* preconditions and (together under the totality of the circumstances) demonstrates that the configuration of 2023 Senate Districts 1 and 2

proximately causes the denial of equal voting power to Black voters on account of race in these districts.

533.    Plaintiffs' Illustrative Senate Plan B further demonstrates that it is possible to draw a majority-Black district without disturbing the already-performing 2023 Senate District 5. Additionally, 2023 Senate District 5 is itself necessitated by the existence of racially polarized voting in an area in which Black voters could also constitute a second, majority-Black Senate District, as demonstrated by Illustrative Senate District 5 in Plaintiffs' Illustrative Senate Plan A. In designing a remedy, Legislative Defendants will have to take heed to ensure that Black voters are afforded an equal opportunity to elect a candidate of their choice under any remedial district lines, and remedy the current configurations that act to minimize any reasonable electoral opportunity for Black-preferred candidates in Senate Districts 1 and 2 by drawing an additional opportunity district for Black voters. *See Singleton v. Allen*, No. 2:21-cv-1291-AMM, 2023 WL 6567895, at *3 (N.D. Ala. Oct. 5, 2023) ("Under the Voting Rights Act and binding precedent, the appropriate remedy for racially discriminatory vote dilution is . . . [a new] districting plan that includes either an additional majority-Black district, or an additional

district in which Black voters otherwise have an opportunity to elect a representative of their choice.") (collecting cases).

### B. 2023 Senate District 8 Is a Racial Gerrymander in Violation of Fourteenth Amendment

#### 1. Racial Gerrymandering in Violation of the Fourteenth Amendment

534. The Equal Protection Clause of the Fourteenth Amendment prohibits a governing body, without sufficient justification, from "separat[ing] its citizens into different voting districts on the basis of race." *Miller v. Johnson*, 515 U.S. 900, 911 (1995). Plaintiffs may prove racial gerrymandering by showing, "either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller*, 515 U.S. at 916; *see also Cooper*, 581 U.S. at 291; *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017).

535. While legislatures do enjoy a "presumption of legislative good faith," *Alexander v. S.C. State Conf. of NAACP*, 602 U.S. 1, 10 (2024), that presumption is overcome when plaintiffs can show that district configurations were "unexplainable other than by race." *Miller*, 515 U.S. at 916-20.

536. Once plaintiffs establish race as the predominant factor, the court applies strict scrutiny, and "the State must demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest." *Miller*, 515 U.S. at 920.

231

2.   Legislative Defendants are Judicially Estopped From Claiming That Partisanship Predominated to Cause the Challenged Configuration

537.   "'[J]udicial estoppel or the doctrine of preclusion against inconsistent positions' protects the integrity of the courts by precluding parties from adopting inconsistent positions in the course of a judicial proceeding." *Intercollegiate Women's Lacrosse Coaches Ass'n v. Corrigan Sports Enters., Inc*., 546 F. Supp. 3d 440, 449 (M.D.N.C. 2021) (quoting *Guinness PLC v. Ward*, 955 F.2d 875, 899 (4th Cir. 1992)).

538.   "[T]he Fourth Circuit has identified three elements that must be met before application of this doctrine." *Corrigan Sports*, 546 F. Supp. 3d at 449 (citing *Lowery v. Stovall*, 92 F.3d 219, 223-24 (4th Cir. 1996)). Those are: (1) "the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation"; (2) "the prior inconsistent position must have been accepted by the court"; and (3) "the party sought to be estopped must have intentionally misled the court to gain unfair advantage." *Id.* (quoting *Lowery*, 92 F.3d at 224)*.* "[A] lawyer's statements may constitute a binding [judicial] admission of a party[ ]" if the statements are "'deliberate, clear, and unambiguous[.]'" *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 347 (4th Cir. 2014) (quoting *Fraternal Order of Police Lodge No. 89 v. Prince George's Cnty., Md*., 608 F.3d 183, 190 (4th Cir. 2010)).

539.   The Court heard Senator Hise testify that the configuration of Senate Districts 7 and 8, and specifically the boundary between those districts, was designed to achieve a better partisan performance, and that no other criteria justified the selection of which New Hanover VTDs to assign to Senate District 8. FOF ¶ 208. Legislative

232

Defendants' counsel argued similarly in their closing statement to the Court. *See, e.g.*, Trial Tr. vol. VI, 1525:17-24, 1530:11-1531:6 (closing arguments). The problem with that explanation is that Legislative Defendants argued the exact opposite at the summary judgment stage of this litigation: that there was no evidence that the populations resulting from the configuration of districts challenged as malapportioned (including Senate Districts 7 and 8) resulted from a partisan intent. For example, in their Motion for Summary Judgment, Legislative Defendants argued that "there is no evidence that deviations resulted from either a racial *or a partisan* goal." Doc. 79 at 17 (emphasis added). In their opposition to Plaintiffs' Motion to Reconsider, Legislative Defendants stated that "[b]ecause no evidence even hints that the legislature underpopulated and overpopulated districts along partisan lines, the malapportionment claims fail even if partisan motive is illegitimate." Doc. 113 at 18. And the Court's orders on summary judgment and on reconsideration reflect reliance upon those arguments and representations by rejecting the possibility that "minor deviations from mathematical equality 'reflect the predominance' of [partisan advantage] over legitimate districting considerations." Doc. 98 at 22 (quoting *Harris*, 578 U.S. at 259); *accord* Doc. 140 at 4-5.

540. Senate District 8's overpopulation and Senate District 7's underpopulation result from the portion of Senate District 8 that juts into New Hanover County. By taking the selected VTDs from New Hanover County, Senate District 8 picks up much more population than needed. It simultaneously takes so much population that Senate District 7 is left with a population that is only 0.06% away from the minimum 5% population deviation limit for a North Carolina Senate district. FOF ¶¶ 207, 210-11, 213. Thus,

233

because those New Hanover VTDs cause the overpopulation of Senate District 8 and the underpopulation of Senate District 7, if estoppel precludes a partisanship explanation for the population deviation between the two districts, then it likewise precludes a partisanship explanation for the legislature's selection of all but one of New Hanover's highest BVAP VTDs for inclusion in Senate District 8.

541. The Court finds that judicial estoppel prevents Legislative Defendants from adopting a position that is inconsistent with their position at the Summary Judgment stage of this litigation. As discussed below, the only viable remaining explanation is that race predominated in the configuration of Senate District 8 in violation of the Fourteenth Amendment.

3. Senate District 8 Surgically Captures High-BVAP Precincts To Create a Non-Compact District That Disregards Traditional Redistricting Criteria

542. The Court finds that race was the predominant factor in the drawing of the 2023 Senate Plan, and specifically in the configuration of Senate Districts 7 and 8, subordinating other redistricting criteria to race, without a compelling justification, in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. Members of the Organizational Plaintiffs are among the Black voters impacted by the racial gerrymandering in Senate Districts 7 and 8.

543. In light of this Court denying Plaintiffs' Motion for Reconsideration (Doc. 101) or otherwise rejecting Plaintiffs' malapportionment claim against Senate District 8—ruling out predominance of partisanship as an explanation for its configuration—the only remaining factor that can explain Senate District 8 is race.

544.    Senate District 8 contains the entirety of Columbus and Brunswick counties with an awkward notch, resembling the head of a giraffe, that dips into predominantly Black neighborhoods in the city of Wilmington, swallowing up all but one of Wilmington's VTDs with more than 30 percent BVAP. [46] *See* PX200 at 8, A-14 (PDF p. 49). The effect of this map is to crack a compact Black population in downtown Wilmington between two districts and thereby dilute that population's voting strength. FOF ¶¶ 212-13; *see also* FOF ¶¶ 51, 209.

545.    The evidence shows that no other criteria considered by map-drawers (other than the partisan advantage ruled out by the Court) can explain the "bizarreness" of this district's configuration, FOF ¶¶ 214-16 & n.21, and the absence of any other explanation provides "persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale." *Miller*, 515 U.S. at 913. And the evidence also supports that, given their extensive experience in redistricting and knowledge of demographic patterns in the state, the map-drawers did not need to "see" racial data during the map-drawing in order to achieve race-based objectives. FOF ¶¶ 406-11.

546.    Furthermore, if the explanation of partisan advantage is ruled out by the Court, *Alexander*'s instruction that plaintiffs offer a "substitute map that shows how the State could have achieved its legitimate political objectives . . . while producing

---

[46] Notably, the configuration of the line between Senate Districts 7 and 8 targeted high-BVAP precincts for inclusion in Senate District 8, moving significantly more population than what one-person, one-vote would require, all while minimizing the number of Black voters in Senate District 7 without dropping the district's population below the *Stephenson*-mandated (+/-5%) threshold. PX182 at 66-67; PX200 at 8, A-14 (PDF p. 49).

significantly greater racial balance," does not apply. *Alexander*, 602 U.S. at 34 (internal quotations omitted). We do not ignore *Alexander*'s requirement that we "draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." 602 U.S. at 10. But we also note that *Alexander* characterized the alternative map requirement as coming into play "[a]fter the State asserted a partisan-gerrymandering defense[.]" *Id.* (citing *Easley v. Cromartie*, 532 U.S. 234, 258 (2001)). The Court finds that where the legislature has affirmatively argued partisanship does not explain a challenged district, they are not entitled to a presumption that partisanship nonetheless justifies that district. Taking legislators at their word "reflects the Federal Judiciary's due respect for the judgment of state legislators[.]" *Alexander*, 602 U.S. at 11.

547.    With partisanship off the table, the 2022 Senate Districts 7 and 8 configurations adhere either as well or better than the 2023 configurations to the legislature's professed criteria of equal population, compactness, contiguity, respect for political subdivisions, and incumbency, all without carving up Wilmington's Black population. FOF ¶¶ 212-16 & n.21. *Compare* JX221 (2022 Senate Plan) *with* JX079 (2023 Senate Plan) *and* PX200 at A-14 (PDF p. 49 of Fairfax Reply). This map is "highly persuasive" evidence in proving that the legislature "had the capacity to accomplish all its . . . goals without moving so many members of a minority group[.]" *Cooper*, 581 U.S. at 317.

548.    If partisanship cannot explain Senate District 8's configuration, the district can only be explained by use of racial targeting and thus must be struck down as an unconstitutional racial gerrymander. *Id*. at 330.

4.    Senate District 8 Does Not Withstand Strict Scrutiny

549.    Defendants have not and cannot demonstrate that the design of Senate District 8 is narrowly tailored to achieve a compelling interest. When asked whether the choice of including these specific New Hanover VTDs in Senate District 8 could be explained by any criteria other than partisanship—which this Court has held Legislative Defendants are judicially estopped from maintaining here—Senator Hise testified that it could not. FOF ¶ 208 ("That was its objective. Was there any reason? No. That's why we did it."). And indeed, as concluded above, the inclusion of all but one of New Hanover's highest BVAP VTDs does not serve any traditional redistricting criteria: The 2022 map better served those criteria without cracking the Black community in half. This leaves no compelling state interest that could be served by the use of race in drawing Senate Districts 7 and 8.

C.  *[Alternative Conclusions of Law] 2023 Senate District 8 Is Malapportioned in Violation of the Fourteenth Amendment[47]*

550.    At trial, Legislative Defendants' witness, Senator Hise, testified that no other criteria besides a better partisan performance justified the selection of precincts directing

---

[47] [If the Court does not deem Legislative Defendants to be judicially estopped from arguing that partisan advantage predominated in the selection of New Hanover VTDs to include in Senate District 8, the Court should avail itself of its right to revise its holding as to NAACP Plaintiffs' malapportionment claim against Senate District 8. *See* Fed. R. Civ. P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be

the boundary between Senate Districts 7 and 8. FOF ¶ 208. Legislative Defendants' counsel referred to this testimony and argued similarly in their closing statement to the Court. *See, e.g.*, Trial Tr. vol. VI, 1525:14-24, 1530:11-1531:6. Because the selection of precincts directing the boundary between Senate District 7 and 8 created an unnecessarily large population deviation between those districts, these arguments run contrary to those made at an earlier stage of this litigation, and specifically arguments from Legislative Defendants in support of Summary Judgment that "there is no evidence that [population] deviations resulted from either a racial or a partisan goal." Doc. 79 at 17; *see also* Doc. 113 at 18 ("Because no evidence even hints that the General Assembly underpopulated and overpopulated districts along partisan lines, the malapportionment claims fail even if partisan motive is illegitimate."). Accordingly, the Court deems it appropriate to reconsider its prior order on Summary Judgment, Doc. 98, to find in favor of Plaintiffs on their challenge to Senate District 8 as an unconstitutionally malapportioned district in violation of the Equal Protection Clause of the Fourteenth Amendment. *See AIG Specialty Ins. Co. v. Agee*, No. 24-30245, 2025 WL 655069, at *5 (5th Cir. Feb. 28, 2025) (finding district court appropriately exercised its authority under Fed. R. Civ. P. 54(b) *sua sponte* to revise a prior determination on summary judgment in its post-trial findings).

---

revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."). NAACP Plaintiffs therefore include this set of alternative proposed conclusions of law finding that Senate District 8 was malapportioned in violation of the Fourteenth Amendment, should the Court determine that partisanship, rather than race, predominated in those districts' configurations and resulting population deviations.]

1. Malapportionment in Violation of the Fourteenth Amendment

551. "[A]n individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State." *Reynolds v. Sims*, 377 U.S. 533, 568 (1964).

552. While population deviations of +/-5% and a total deviation of 10% between districts within state legislative plans are prima facie constitutional, *Brown v. Thomson*, 462 U.S. 835, 842-43 (1983); *accord Stephenson I*, 562 S.E.2d at 397, states must make "an honest and good faith effort to construct districts . . . as nearly of equal population as is practicable[.]'" *Thomson*, 462 U.S. at 842 (quoting *Reynolds*, 377 U.S. at 577). This is because "the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis." *Reynolds*, 377 U.S. at 568.

553. Thus, state legislative plans are provided a prima facia presumption of constitutionality within the +/-5% deviation to allow them the leeway needed to achieve only legitimate state interests, such as maintaining political subdivisions and drawing compact districts. *Id.* at 578-79. But this 10% range is not a safe harbor, and states are not free to manipulate deviations within this range without adequate justification. *Larios v. Cox*, 300 F. Supp. 2d 1320, 1341 (N.D. Ga. 2004), *aff'd* 542 U.S. 947 (2004).

554. As this Court has already held, to challenge a plan below this 10 percent threshold,

> a plaintiff "must show that it is more probable than not that a deviation of less than 10% reflects the predominance of illegitimate reapportionment factors rather than the 'legitimate considerations'" incident to "the effectuation of a rational state policy." *Harris*, 578 U.S. at 258-259 (quoting Reynolds, 377 U.S. at 579). Legitimate considerations include "traditional

239

districting principles such as compactness, contiguity, and respect for political subdivisions," *Shaw v. Reno*, 509 U.S. 630, 647 (1993), "maintaining communities of interest," *Bush v. Vera*, 517 U.S. 952, 977 (1996) (plurality op.), allocating seats proportionately "to reflect the relative strength" of the major political parties, *Gaffney*, 412 U.S. at 752, "avoiding contests between incumbent[s]," *Karcher v. Daggett*, 462 U.S. 725, 740 (1983), and VRA compliance, *Vieth v. Jubelirer*, 541 U.S. 267, 284 (2004) (plurality op.).

Doc. 98 at 19-20. Because the maximum population deviation for the Senate District 7 and 8 grouping is below 10%, see FOF ¶¶ 210-11, this standard applies.

555.    This analysis is district specific. As this Court has previously held as to all of Plaintiffs' claims, "the alleged harm to any voter arises from the boundaries and composition of the particular district in which the voter resides." Doc. 98 at 9 (citing *Gill*, 585 U.S. at 66); *see also Gill*, 585 U.S. at 66 ("To the extent the plaintiffs' alleged harm is the dilution of their votes, that injury is district specific.").

### 2.  Partisan Advantage Predominated in the Deviations of Senate Districts 7 and 8

556.    Plaintiffs have shown "'that it is more probable than not' that the deviations" of Senate Districts 7 and 8 "reflect 'the predominance of illegitimate reapportionment factors,'" specifically partisan advantage, "rather than legitimate considerations." Doc. 98 at 20 (quoting *Harris v. Ariz. Indep. Redistricting Comm'n*, 578 U.S. 253, 259 (2016)).

557.    Senate District 8's overpopulation and Senate District 7's underpopulation result from the portion of Senate District 8 that juts into New Hanover County. By taking the selected VTDs from New Hanover County, Senate District 8 picks up much more population than needed. It simultaneously takes so much population that Senate District 7 is left with a population that is only 0.06% away from the absolute population floor for a

North Carolina Senate district. FOF ¶ 207, 210-11, 213. Thus, because those New Hanover VTDs cause the overpopulation of Senate District 8 and the underpopulation of Senate District 7, if partisan advantage is what explains the legislature's selection of those VTDs, then partisan advantage is necessarily what explains the population deviation between the two districts.

558.    Testimony at trial supports that this population deviation was caused by partisan advantage. Senator Hise testified that the legislature "chose the six precincts in the county that performed least for Republicans and moved them into District 8" and denied there being any other criteria or reason explaining why those districts were moved into Senate District 8. Trial Tr. vol. IV, 842:23-843:13, 940:16-941:3 (Hise); *see also* FOF ¶ 208. Legislative Defendants also argued in their closing argument that partisanship predominated in the configuration and resulting malapportionment of Senate Districts 7 and 8. Legislative Defendants' counsel explained how Senate District 8's notch was created: "Using the political data that was available in the map-drawing software, the six precincts in New Hanover County that performed least well for Republicans were moved into SD-8 and excluded from SD-7." Trial Tr. vol. VI, 1525:17-22. Counsel also relied on a heat map from Legislative Defendants' expert Dr. Barber showing that "[t]he precincts with the highest performance for Democrats . . . that could be reached from the border between SD-7 and SD-8 were selected and moved to SD-8." Trial Tr. vol. VI, 1530:11-1531:6. Similarly, counsel argued that "[t]he record shows that the movement of precincts out of SD-7 and into SD-8 shored up the performance of SD-7 for Senator Michael Lee." Trial Tr. vol. VI, 1530:22-24. Legislative Defendants' sole and repeated explanation for the

241

decision of which New Hanover VTDs to include in Senate District 8—and therefore for Senate Districts 7 and 8's deviations—is partisanship.

559.    A comparison to the 2022 Senate Plan demonstrates that the configuration of Senate Districts 7 and 8—and their resulting population deviations—cannot be explained by any traditional redistricting criteria. The 2022 Senate Plan had significantly lower population deviations in the challenged area: Senate District 7's deviation was -0.07%, Senate District 8's deviation was -2.11%, and the overall deviation was -2.04%. FOF ¶¶ 214-15. By contrast, the 2023 Senate Plan had a -4.94% deviation for Senate District 7, 2.76% for Senate District 8, and a 7.70% total deviation. FOF ¶¶ 210-11. Yet this difference in deviations cannot be explained by other legitimate redistricting criteria, as the 2022 Senate Plan showed the same or higher compactness on the two compactness measures used by the legislature, smaller county and municipal splits, and same impact on incumbents as the 2023 Senate Plan. *See* FOF ¶ 215 n.21. This comparison shows that the legislature could have met all these traditional redistricting criteria without creating such stark malapportionment between Senate Districts 7 and 8. *Cooper*, 581 U.S. at 317 ("Such would-have, could-have, and (to round out the set) should-have arguments are a familiar means of undermining a claim that an action was based on a permissible, rather than a prohibited, ground.").

560.    Taking into account the testimony and repeated admissions that Senate District 8's New Hanover VTDs (and resulting population deviations for Senate Districts 7 and 8) were selected solely based on partisan advantage, as well as the 2022 map comparison showing that those VTDs were not selected to further a legitimate districting

242

criteria, the Court concludes "'that it is more probable than not' that the deviations reflect 'the predominance of illegitimate reapportionment factors'"—specifically, partisan advantage—"rather than legitimate considerations." Doc. 98 at 20 (quoting *Harris*, 578 U.S. at 259).

3. Partisan Advantage Is Not a Legitimate Consideration in Furtherance of a Rational State Policy That Can Overcome the One-Person, One-Vote Guarantee of the Fourteenth Amendment

561. This Court concludes that malapportionment arising from the intentional manipulation of district lines to gain partisan advantage is not a legitimate criteria in furtherance of a "rational state policy," *Harris*, 578 U.S. at 258-59, that could overcome the constitutional protection afforded by the Equal Protection Clause's one-person, one-vote guarantee.

562. The Supreme Court's summary affirmance in *Cox v. Larios* illustrates the point. In *Larios*, the district court held that the legislature lacked a legitimate state policy when it intentionally underpopulated districts in urban (Democratic) areas of the state at the expense of overpopulating suburban (Republican) areas. 300 F. Supp. 2d at 1338. Importantly, the district court contrasted this illegitimate objective with the "consistently applied legislative policies" recognized by the Supreme Court that "might justify some variance," i.e., "making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent" representatives. *Id.* at 1331 (internal quotations omitted). Although "legitimate state concerns may justify slight deviations, 'problems created by partisan politics cannot justify an apportionment which

243

does not otherwise pass constitutional muster.'" *Id.* at 1353 (quoting *Kirkpatrick v. Preisler*, 394 U.S. 526, 533 (1969)).

563.    While not squarely deciding whether partisan advantage alone could justify deviations (referring, instead, to "regionalism and incumbent protection," *id.* at 1351-52), the *Larios* Court clearly distinguished a one-person, one-vote violation from partisan gerrymandering: One-person, one-vote is an "individualized and personal" matter in which individuals' right to vote is unconstitutionally impaired whereas partisan gerrymandering considers whether a plan "makes it more difficult for a particular group in a particular district to elect the representatives of its choice." *Id.* at 1351-52 (internal citations omitted). Partisan gerrymandering does not provide a safe harbor against a claim of malapportionment, even when population deviations are below 10%. *See Larios*, 542 U.S. at 949-50 (Stevens, J., concurring).

564.    The Supreme Court's decision in *Rucho v. Common Cause* further reinforces that partisan advantage cannot justify a denial of one-person, one-vote and that such a claim is doctrinally distinguishable from partisan gerrymandering claims. As the Court explained, "Partisan gerrymandering claims rest on an instinct that *groups* with a certain level of political support should enjoy a commensurate level of political power and influence" requiring consideration on issues of "fairness" that "pose[] basic questions that are political" with "no legal standards discernible in the Constitution." *Rucho v. Common Cause,* 588 U.S. 684, 704-07 (2019) (emphasis added). The *Rucho* Court illustrated this holding by expressly contrasting partisan gerrymandering with one-person, one-vote, which the Court noted "is relatively easy to administer as a matter of math" and "refers to

244

the idea that *each vote* must carry equal weight." *Id.* at 708-09 (emphasis added). Accordingly, while holding partisan gerrymandering claims are generally nonjusticiable when looking at where district boundaries are drawn, *Rucho* acknowledged that the Supreme Court has recognized "a role for the courts" in protecting the right to one-person, one-vote. *Id.* at 699.

565.  Importantly, the *Rucho* Court made clear that while partisan gerrymandering claims are nonjusticiable, *id.* at 710, intentionally manipulating district boundaries to gain partisan advantage is nevertheless "'incompatible with democratic principles'" and "leads to results that reasonably seem unjust." *Id.* at 718 (quoting *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 791 (2015)). The issue barring consideration of partisan gerrymandering claims was the inability to discern a legally manageable standard, not the legitimacy of partisan gerrymandering as a democratic practice, much less in furtherance of a "rational state policy." *Harris*, 578 U.S. at 258-59. The Court did "not condone excessive partisan gerrymandering," *Rucho*, 588 U.S. at 719, and thus did not legitimize its practice as justifying a constitutional deprivation of one-person, one-vote.

566.  Consistent with the conclusion that partisan advantage is not a legitimate criteria furthering a rational state policy, the Supreme Court has not included partisan advantage in the list of traditional redistricting criteria that are relevant in evaluating whether a district is reasonably configured under the Voting Rights Act. *See Milligan*, 599 U.S. at 18, 20, 34 (describing "traditional districting criteria"); *id.* at 108 (Alito, J., dissenting) (same). This is because a policy of favoring one set of voters over the other cannot be a legitimate state objective where a state legislature has a "fundamental duty to

245

govern impartially." *Larios*, 542 U.S. at 947 (Stevens, J., concurring) (internal quotations omitted). In North Carolina specifically, partisan advantage is not among the express redistricting objectives in the state Constitution, unlike other requirements including the Whole County Provision. *See* N.C. Const. art. II §§ 3, 5.

567.    Even the North Carolina legislature did not classify this form of partisanship as a legitimate redistricting criterion. It was not included among the "Traditional Districting Principles" criterion, and while the adopted redistricting criteria included a category called "Political Considerations" permitting its consideration, *see* JX038; JX047, Senator Hise testified that "determining whether it was likely a Republican could win in a particular district" was "not one of the criteria," just "something we, as chairmen, looked at." Trial Tr. vol. IV, 857:3-15 (Hise).

568.    North Carolinians have a constitutional right to one-person, one-vote, and Legislative Defendants cannot show the furtherance of any rational state policy that can justify the unnecessary denial of equal voting power between voters in Senate Districts 7 and 8.

569.    Because this Court concludes that partisan advantage is not a legitimate criteria furthering a rational state policy that can justify deviation from the one-person, one-vote standard, and because the Court also concludes that partisan advantage predominated over any other legitimate criteria in the configuration of Senate Districts 7 and 8 (and their resulting population deviations), the Court concludes that Senate District 8 is malapportioned in violation of the Fourteenth Amendment.

## D. The 2023 Senate Plan Violates the Prohibition on Intentional Discrimination under the VRA and the U.S. Constitution

### 1. Intentional Discrimination under Section 2 of the VRA and the Fourteenth and Fifteenth Amendments of the U.S. Constitution

570. The VRA and the U.S. Constitution protect all voters from intentional discrimination and the diminishment of voting power on account of race, even where those voters have been ostensibly targeted for partisan ends. State actors may not "intentionally target[] a particular race's access to the franchise because its members vote for a particular party, in a predictable manner[;]" such conduct "constitutes discriminatory purpose . . . even absent any evidence of race-based hatred and despite the obvious political dynamics." *N.C. State Conf. of the NAACP*, 831 F.3d at 222-23. "A state legislature acting on such a motivation engages in intentional racial discrimination in violation of the Fourteenth Amendment and the Voting Rights Act." *Id.* at 223.

571. "A vote-dilution claim is 'analytically distinct' from a racial-gerrymandering claim and follows a 'different analysis,'" which requires showing "that the State 'enacted a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities.'" *Alexander*, 602 U.S. at 38. "[T]he federal courts have almost uniformly accepted that the first *Gingles* precondition should be relaxed" in the context of an intentional vote dilution claim. *Ga. State Conf. of the NAACP v. Georgia*, 269 F. Supp. 3d 1266, 1278 (N.D. Ga. 2017) (collecting cases). "Unlike a plaintiff pursuing a discriminatory-results claim under section 2 of the VRA, a plaintiff pursuing an intentional vote dilution claim need not satisfy the *Gingles* factors to validly plead a discriminatory effect. Instead, the plaintiff must allege that the defendant's redistricting

247

plan 'bears more heavily on one race than another.'" *League of United Latin Am. Citizens v. Abbott*, No. EP-21-CV-00259-DCG-JES-JVB, 2022 WL 4545757, at *18 (W.D. Tex. Sept 28, 2022) (internal citations and footnote omitted).[48]

572.   A plaintiff may prove intentional discrimination by first showing that racial discrimination was a "'substantial' or 'motivating factor[.]'" *Hunter v. Underwood*, 471 U.S. 222, 228 (1985). A plaintiff alleging discriminatory intent "need not establish that the challenged policy rested solely on discriminatory purposes, or even that a particular purpose was the dominant or primary one." *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 883 (4th Cir. 2023) (internal citations omitted); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) (a plaintiff need not "prove that the challenged action rested solely on racially discriminatory purposes"); *see also McCrory*, 831 F.3d at 220.

573.   Discriminatory intent also "need not be prove[n] by direct evidence" but may "be inferred from the totality of the relevant facts." *Rogers*, 458 U.S. at 618. Courts apply the factors in *Arlington Heights* to determine whether the decision-makers acted with illicit racial intent: "(1) historical background; (2) the specific sequence of events leading to the law's enactment, including any departures from the normal legislative process; (3) the law's

---

[48] Contrary to Legislative Defendants' arguments, the alternative map requirement set forth in *Alexander* for racial gerrymandering claims does not apply to vote-dilution claims, and the Supreme Court specifically found the district court erred in determining that the same findings of fact and reasoning guided both types of claims. *See* 602 U.S. at 38. The alternative map requirement helps substantiate that race was the "dominant and controlling rationale," i.e., the predominant criterion, as required for a showing of racial gerrymandering, *id.* at 10, but intentional discrimination does not require this showing of predominance, only that racial discrimination was a "substantial" or "motivating factor." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985).

legislative history; and (4) whether the law 'bears more heavily on one race than another.'" *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 303 (4th Cir. 2020) (quoting *Arlington Heights*, 429 U.S. at 265-69). "[T]his holistic approach is particularly important, for discrimination today is more subtle than the visible methods used in [the past]." *McCrory*, 831 F.3d at 221 (cleaned up).

574.    Courts undertake a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available" and, where "a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face," the "evidentiary inquiry is then relatively easy." *Arlington Heights*, 429 U.S. at 266. An action designed with the "essential inevitable effect" of discriminating on the basis of race is unconstitutional. *Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960). This framework recognizes that "[r]arely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one." *Arlington Heights*, 429 U.S. at 265.

575.    While courts afford the state legislature a "presumption" of good faith, *Raymond*, 981 F.3d at 303, where "discriminatory purpose has been a motivating factor in the decision, . . . judicial deference is no longer justified." *Arlington Heights*, 429 U.S. at 265-66. At that point, the burden shifts to the legislature to "demonstrate that the law would have been enacted without [racial discrimination]." *McCrory*, 831 F.2d at 221 (citing *Hunter*, 471 U.S. at 228). "When determining if this burden has been met, the courts must be mindful that 'racial discrimination is not just another competing consideration,'" and

249

"courts must scrutinize the legislature's <u>actual</u> non-racial motivations to determine whether they <u>alone</u> can justify the legislature's choices." *Id.* (citing *Arlington Heights*, 429 U.S. at 265-66) (emphasis in original).

576.    Discriminatory purpose "implies more than intent as volition or intent as awareness of consequences," *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979), but the Supreme Court has explained that "the inevitability or foreseeability of consequences . . . bear[s] upon the existence of discriminatory intent." *Id.* at 379 n.25. Where "the adverse consequences of a law upon an identifiable group" are clear, "a strong inference that the adverse effects were desired can reasonably be drawn." *Id.*

577.    Based on the reasoning set forth below, the Court finds that the 2023 Senate Plan was enacted with the intent to discriminate on the basis of race as a motivating factor in violation of Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the U.S. Constitution by intentionally diminishing the voting power of Black voters and with the practical effect that these voters, including individual Plaintiffs Reverend Daly-Mack and Jones and members of the Organizational Plaintiffs, are deprived of an equal opportunity to participate in the political process and to elect candidates of their choice. The Court concludes there is both direct evidence of discriminatory intent, and that discriminatory intent is inferred from the totality of the relevant facts based upon the factors set forth in *Arlington Heights.*

2. <u>The 2023 Senate Plan Has a Discriminatory Impact on Black Voters Proximately Caused by the Legislature's Willful Noncompliance with Section 2 of the Voting Rights Act</u>

578. The evidence shows Legislative Defendants took specific actions to design and implement a redistricting process, including willfully not complying with Section 2 of the Voting Rights Act, that resulted in diminishing Black voting power.

579. The North Carolina Constitution requires the legislature to revise legislative districts for the state senate and state house at "the first regular session convening after the return of every decennial census." N.C. Const. art. II, §§ 3, 5. This power is subject to limitations under both state and federal law, including federal one-person, one-vote requirements and the Voting Rights Act, as recognized in the supremacy clauses in Article I, Sections 3 and 5 of the North Carolina Constitution. As explained above, the State Supreme Court in the *Stephenson* line of cases "harmonized federal redistricting requirements and the directives of [the] state constitution" by specifying that "to ensure full compliance with federal law, legislative districts required by the VRA shall be formed prior to creation of non-VRA districts." *Harper III*, 886 S.E.2d at 422, 444 (quoting *Stephenson I*, 562 S.E.2d at 397) (emphasis added).

580. Subsequently, federal courts in both *Covington* and *Cooper* directly and unambiguously underscored the importance that legislators assess the requirements of the Voting Rights Act when undertaking redistricting. *Cooper*, 581 U.S. at 303-04 ("True enough, a legislature undertaking a redistricting *must assess* whether the new districts it contemplates (not the old ones it sheds) conform to the VRA's requirements." (emphasis added)); *Covington*, 316 F.R.D. at 178 ("Section 2 of the VRA continues to play

251

an important role in redistricting, and legislatures must undertake a district-specific analysis to identify and cure potential Section 2 violations."). Federal courts have also made clear that legislators need only meet a "'strong basis' (or 'good reasons') standard" of evidence to draw districts to comply with the Voting Rights Act, a measure of leeway that "gives States 'breathing room' to adopt reasonable compliance measures that may prove, in perfect hindsight, not to have been needed." *Cooper*, 581 U.S. at 293 (quoting *Bethune-Hill*, 580 U.S. at 195-96).

581.     The North Carolina legislature has represented in prior redistricting litigation that they "interpreted [the *Stephenson*] cases to require that VRA districts be drawn before all other districts." *Covington*, 316 F.R.D. at 132 n.12. This understanding of the *Stephenson* cases is consistent with the holding in *Harper III:* "[I]f Section 2 requires VRA districts, those districts must be drawn first so that the remaining non-VRA districts can be drawn in compliance with the WCP." 886 S.E.2d at 444. However, this Court has previously expressed no view as to whether the *Stephenson* cases require that VRA districts be drawn first in time. *See Covington*, 316 F.R.D. at 132 n.12. We similarly need not make any such determination here since the evidence shows that Legislative Defendants failed to draw any such districts at *any point* in the process at all, and further, that they purposefully designed a redistricting process to willfully disregard and suppress consideration of the requirements of the Voting Rights Act overall. *See generally* FOF Section VI.B.

582.     Specifically, as set forth in the Findings of Fact, Legislative Defendants removed a redistricting criterion explicitly requiring adherence the Voting Rights Act, kept

their criteria secret until a week before enactment instead of (as was typical in the past) publicly debating and adopting those criteria in Committee, required adherence to those criteria for any amendment to the proposed maps to be considered and then weaponized the prohibition on use of racial data in those criteria to prevent debate on any amendments seeking to address requirements of the Voting Rights Act, waited until a week before enactment to announce their own refusal to perform any analysis of what was required under the Voting Rights Act, and failed to consider in good faith evidence of such violations in the draft plans and for which they have identified no error. FOF Section VI.B; *cf. McCrory*, 831 F.3d at 227-28 (finding that the "hurried pace, of course, strongly suggest[ed] an attempt to avoid in-depth scrutiny" and that "a legislature need not break its own rules to engage in unusual procedures").

583.    The Court finds that Legislative Defendants' willful noncompliance with Section 2 of the Voting Rights Act constitutes direct evidence that the legislature "knew what federal law required and purposefully refused to provide it"—or, here, even properly consider it—"in a strategic attempt to" diminish Black voting power in the state. *Singleton*, 2025 WL 1342947, at *6.

584.    The Court rejects Legislative Defendants' attempt to rely upon the *Covington* decision for their refusal to meaningfully engage with the VRA. In *Covington*, Legislative Defendants were not faulted for their consideration of race *per se*; they were faulted for failing to make a proper inquiry into *Gingles* III before increasing the percentage of Black voters in already-performing districts and thereby creating higher-BVAP districts without justification. *See Covington*, 316 F.R.D. at 167-68 ("Defendants never asked whether there

253

was a strong basis in evidence that [the *Gingles* preconditions were met] before they drew the challenged districts."). It is paradoxical that Legislative Defendants, including Senator Hise (who was involved in the 2011 process), would respond to this decision by repeating the same error and refusing to analyze the *Gingles* preconditions again, even after being presented evidence that the preconditions were satisfied.

585.    The Court in *Covington* warned specifically against Legislative Defendants' chosen course of action to disregard the requirements of the VRA going forward when it explicitly held that its decision "should in no way be read to imply that [the legislature's chosen VRA remedy of] majority black districts are no longer needed in the state of North Carolina." *Covington*, 316 F.R.D. at 178. The Court went on: "Nor do we suggest that majority-black districts could not be drawn—lawfully and constitutionally—in some of the same locations as the districts challenged in this case. Rather, our holding today is attributable primarily to the explicit and undisputed methods that the legislature employed in the construction of these districts, and to the inadequacy of the district-specific evidence and arguments put forth by Legislative Defendants in this case." *Id.* The Court in *Covington* further noted that "[e]vidence of a potential Section 2 violation may exist in some parts of the state, and if such evidence is properly examined and demonstrated, it certainly could justify future majority-minority districts." *Id.* (emphasis omitted).

586.    Likewise, Legislative Defendants cannot defend their refusal to assess the requirements of the Voting Rights Act in drafting and adopting the 2023 Senate Plan based on *Cooper*, in light of the Supreme Court's explicit direction that "a legislature undertaking a redistricting *must assess* whether the new districts it contemplates (not the old ones it

254

sheds) conform to the VRA's requirements." 581 U.S. at 303-04 (emphasis added). In sum, there is no good faith reading of these decisions that could have justified Legislative Defendants' course of action here.

587.    We also reject Legislative Defendants' defense that adoption of purported "race-neutral" criteria in 2023 forecloses any possibility of intentional discrimination. Even crediting Legislative Defendants' assertions that racial data was not viewed during the drafting of the challenged districts, the extensive experience and knowledge of the primary map-drawer, Senator Hise, supports that it was not necessary to "see" racial data when drafting specific plans in order for specific racial outcomes to be intended in those plans. *See* FOF Section VI.C.

588.    This Court notes that rejecting this defense here is consistent with prior redistricting holdings concerning the same actors. The same Senate Redistricting Chairs claimed in 2021 to have applied criteria banning use of election data, and yet were still found by a unanimous three-judge panel to have engaged in "intentional, and effective, pro-Republican partisan redistricting," a factual finding undisturbed on appeal. *Harper III*, 886 S.E.2d at 451 (Earls, J., dissenting). The Supreme Court has found that purportedly "race-blind" redistricting can still result in racially discriminatory results. *See North Carolina v. Covington*, 585 U.S. 969, 977 (2018) ("The defendants' insistence that the 2017 legislature did not look at racial data in drawing remedial districts does little to undermine the District Court's conclusion—based on evidence concerning the shape and demographics of those districts—that the districts unconstitutionally sort voters on the basis of race."); *cf. Cooper*, 581 U.S. at 315 (noting the district court's finding that the

"denial of race-based districting" by the defendants' mapmaker "r[ang] hollow") (citing *Harris v. McCrory*, 159 F. Supp. 3d 600, 620, n.8 (M.D.N.C. 2016)).

589.    However, the Court is careful not to improperly impute prior intent findings on the legislature in its consideration of the 2023 redistricting process, nor in any way shift Plaintiffs' burden to rebut the presumption of good faith based on prior practices. Instead, the Court here makes its determination as to intent based upon Legislative Defendants' own conduct during the 2023 redistricting process, including that Legislative Defendants willfully deviated from their own representations during that process as to what was required to comply with the Voting Rights Act. As discussed below, the history of "official actions taken for invidious purposes" is relevant to the *Arlington Heights* factors. 429 U.S. at 267. Taken as a whole, the evidence demonstrates no "presence of honest intention" by Legislative Defendants to meet even their own benchmark for what the Voting Rights Act requires. *Abrego Garcia v. Noem*, 348 F.R.D. 594, 600 (D. Md. 2025) (quoting *Carolin Corp. v. Miller*, 886 F.2d 693, 700 (4th Cir. 1989)). Such evidence is sufficient to rebut even the strong presumption of legislative good faith.

590.    Accordingly, the Court concludes that Legislative Defendants' willful noncompliance with Section 2 of the Voting Rights Act is direct evidence of an intent to cause a discriminatory impact on Black voters, specifically the dilution of Black electoral power in the 2023 Senate Plan.

591.    The Court concludes that this evidence supports a finding that the 2023 Senate Plan was enacted with the intent to discriminate on the basis of race as a motivating

256

factor to deny Black voters equal voting power in the challenged districts, and that this intentional discrimination diluted Black voting power in these districts.

592.    As discussed below, each of the *Arlington Heights* factors also supports a finding of discriminatory intent.

### 3.    The Historical Background Supports a Finding of Discriminatory Intent

593.    Under the first *Arlington Heights* factor, the Court evaluates the "historical background of the [challenged] decision . . . , particularly if it reveals a series of official actions taken for invidious purposes." 429 U.S. at 267. In determining whether a legislative action had discriminatory intent, "[a] historical pattern of laws producing discriminatory results provides important context for determining whether the same decisionmaking body has also enacted a law with discriminatory purpose." *McCrory*, 831 F.3d at 223-24.

594.    As described above, since the 2010 Census, the North Carolina legislature has repeatedly misinterpreted and circumvented legal requirements in redrawing state and Congressional districts in ways that diminished the voting power of Black voters. *See Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016), *aff'd* 581 U.S. 1015 (2017); *Covington v. North Carolina*, 283 F. Supp. 3d 410, 442 (M.D.N.C. 2018), *aff'd in relevant part Covington*, 585 U.S. at 978; *Cooper v. Harris,* 581 U.S. 285 (2017). This includes state court litigation following the decisions in *Covington* and *Cooper* in which the Legislative Defendants tried to defend specific districts challenged as partisan gerrymanders on Voting Rights Act grounds despite no evidence to support their assertions that those districts were "checked" on the "back end" to ensure "the VRA was satisfied." *Common Cause v. Lewis*, No. 18 CVS 014001, 2019 WL 4569584, at *101 (N.C. Super.

257

Ct. Sept. 3, 2019). The state court thus found that "[a]ny assertion by Legislative Defendants now that they sought to 'satisfy' the VRA in adopting the 2017 Plans does not make sense as a legal or factual matter given their assertions at the time." *Id*. at *102.

595.    These decisions from multiple federal and state courts collectively underscore two truths about North Carolina redistricting since the 2010 Census. First, the legislature's process for drawing state legislative districts and federal Congressional districts repeatedly violated both the United States Constitution—including its protections against racial discrimination—and the North Carolina Constitution. And second, the legislature persistently misconstrued the requirements of the Voting Rights Act, often in contradiction of their own previously stated positions, in ways that have disadvantaged Black North Carolinians in the electoral process. As Dr. Leloudis testified, these choices were not isolated missteps but part of a broader "protracted campaign to roll back Black political gains and to limit Black political participation." Trial Tr. vol. III, 542:11-12, 543:5-9 (Leloudis); *see also* PX179 at 88, 93-97 (Leloudis Report). *See generally* FOF Section I.B.

596.    This historical context supports the Court's finding of discriminatory intent here with respect to the 2023 Senate Plan.

597.    While "a legislature's past acts do not condemn the acts of a later legislature, which we must presume acts in good faith[,]" *Raymond*, 981 F.3d at 298, the Court finds the historical background of discriminatory redistricting in North Carolina is still relevant under the first *Arlington Heights* factor. *Abbott*, 585 U.S. at 604 (finding that the historical background leading to the law's enactment is but "'one evidentiary source' relevant to the

258

question of intent") (quoting *Arlington Heights*, 429 U.S. at 267). How the legislature has interpreted the relevant legal authorities, particularly *Stephenson* and *Covington*, as well as the extensive experience of these same map-drawers drawing in the challenged areas of the state, is relevant to the Court's inquiry into how the challenged districts in these same areas of the state were drawn. The Court concludes that this historical evidence supports a finding that the 2023 Senate Plan was enacted with the intent to discriminate on the basis of race as a motivating factor to diminish Black voting power in the challenged Senate districts.

### 4. Significant Procedural Departures in the Redistricting Process and Legislative History of the 2023 Senate Plan Support a Finding of Discriminatory Intent

598.    Under the second and third *Arlington Heights* factors, the Court considers the (ii) "specific sequence of events leading up to the challenged decision," including any "[d]epartures from the normal procedural sequence," and (iii) the "legislative or administrative history" in making the sensitive inquiry into discriminatory intent. *Arlington Heights*, 429 U.S. at 267-68.

599.    The evidence shows that the 2023 redistricting process deviated significantly from past redistricting cycles, post-Census and remedial alike, supporting a finding of discriminatory intent. Specifically, the legislature drastically cut down on transparency and public participation in the 2023 redistricting process by holding only three public hearings, whereas dozens have been held in the past. The hearings were held before the release of any criteria or draft maps, despite hearings in past cycles occurring after the release of at least some redistricting information and despite the fact that criteria had been created by the legislators prior to the public hearings. Criteria in 2023 were also not debated prior to

their release, a deviation from past processes where amendments to criteria were considered and adopted in committee. The legislators also needlessly delayed the start of the redistricting process despite knowing in April 2023 that they intended to redraw the maps, in contrast with past processes where redistricting began close to (or even before) the event triggering a new round of redistricting, i.e., the release of Census data or a court order. *See* FOF Section VI.A.

600.    Overall, the lack of transparency in the 2023 redistricting process most resembles the behind-closed-doors process of 2011, during which only legislative leaders communicated with the map-drawer, blocking committee participation or public input into the plans until draft maps were released publicly. That process resulted in racially gerrymandered maps that were struck down. *Covington*, 316 F.R.D. at 124, 126-27.

601.    The legislative history of the 2023 Senate Plan demonstrates that the Senate Redistricting Chairs orchestrated a process calculated to shield their true intent from the public and avoid the requirements of federal law, which also supports a finding of discriminatory intent. Before any details of the 2023 redistricting process were even shared with the public, the legislature ensured that legislators' redistricting communications and drafts would be shielded from public view by enacting a last-minute change to a public records law in the 2023 Appropriations Bill. FOF ¶ 379. Notably, Senator Hise also presided over the appropriations process in 2023. Trial Tr. vol. IV, 943:19-24 (Hise). When public hearings were announced, no further information about the redistricting process or plans was shared, and Committee members were explicitly told they were not required to attend any public hearings; criteria were also withheld from the public and Committee

members until the day draft maps were released. FOF Section VI.A. Finally, the new maps in 2023 were adopted on a condensed timeline; the plans were passed within one week of their introduction in late October, with fourteen committee meetings squeezed into that short period, limiting the ability of the public and legislators alike to review the plans or mitigate their discriminatory impact. *See* FOF ¶¶ 376, 387.

602. The Court concludes that this evidence of the procedural departures from past practice and the legislative history of the 2023 redistricting process specifically supports a finding of discriminatory intent.

5. <u>Significant Substantive Departures by the Legislature in Drafting the 2023 Senate Plan Support a Finding of Discriminatory Intent</u>

603. In addition, "[s]ubstantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Arlington Heights*, 429 U.S. at 267. As found above, the purported reasons for selecting this configuration of Senate Districts 1 and 2 over the available alternative are not consistent with the redistricting criteria, legislative record, or information before the Senate Redistricting Chairs at the time of drafting, and yet this configuration was chosen over a more-compact alternative. *See* FOF ¶¶ 130-37. Additionally, as described above in detail, legislators substantively deviated from their own representations of what the redistricting process required when they failed to consider evidence of the *Gingles* preconditions that they had previously requested and represented would be considered. *See* FOF ¶¶ 400-05.

604. The Court concludes that this evidence of the substantive departures from prior redistricting cycles supports a finding that the 2023 Senate Plan was enacted with the intent to discriminate on the basis of race as a motivating factor to deny Black voters equal voting power in the challenged Senate districts.

6. The Impact of the 2023 Senate Plan Bearing More Heavily on Black Voters Supports a Finding of Discriminatory Intent

605. Under the fourth *Arlington Heights* factor, the Court considers whether the "impact of the official action . . . bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266.

606. The Court finds that the impact of the 2023 Senate Plan bears more heavily on Black voters than on White voters, and rejects Legislative Defendants' arguments that there are any "mitigating provisions" that result in the 2023 Senate Plan somehow impacting Black voters less than White voters. *Raymond*, 981 F.3d at 309.

607. Dr. Oskooii's performance analysis confirms the devastating effect that the 2023 Senate Plan has on Black electoral power, as compared to White voters. Specifically, Dr. Oskooii's analysis of the Black Belt confirms that 2023 Senate Districts 1 and 2 deny Black voters any realistic opportunity of electing their candidate of choice, in an environment of extreme racially polarized voting, and that overall, Black voters are usually defeated in three out of four Black Belt Senate districts, despite Plaintiffs' Illustrative Senate Districts showing they could constitute a majority in two Senate districts that would otherwise provide them the opportunity to elect candidates of their choice. *See generally* FOF ¶¶ 170-96. The practical impact of this is that one Black or Black-preferred senator

serves in the Black Belt (Senate District 5), where historically there have been two or three. *See* FOF ¶ 343.

608.    The October 2023 analysis of Dr. Oskooii also supports that the 2023 Senate Districts 1 and 2 diminish Black electoral success compared to the alternative configuration available to the legislature and utilized in 2022. *See* FOF ¶¶ 54-60 (discussing PX047; Dr. Oskooii's October 2023 analysis from PX047 was incorporated into his expert analysis for this case as Appendix E to his initial report, PX194).

609.    In addition, the evidence as to the totality of the circumstances, as discussed above, confirms that the configuration of 2023 Senate Districts 1 and 2 weighs more heavily on Black voters by culminating in the denial of equal voting power, and that each of the relevant Senate Factors weighs in favor of a finding of intentional discrimination. *See generally* FOF Section V; COL Section II.A.7.

610.    The Court rejects Legislative Defendants' arguments that Plaintiffs' challenges to Senate Districts 1 and 2 are premised on a failure to "create a second Black-opportunity district" and thus do not provide a "cognizable intentional vote dilution claim." Trial Tr. vol. VI, 1541:20-1542:1 (closing arguments). Plaintiffs have not alleged and did not argue that Legislative Defendants were required to somehow *maximize* Black opportunity. Instead, they have alleged vote dilution, Doc. 105 ¶ 249, and intentional diminishment of voting power, Doc. 105 ¶ 253. At trial, they proved that Legislative Defendants acted with discriminatory purpose to choose a configuration for Senate Districts 1 and 2 that eliminated any reasonable opportunity for Black voters to elect their

263

candidate of choice, resulting in a plan that "minimize[s]" and "cancel[s] out" the voting potential of Black voters in this area of the state. *Alexander*, 602 U.S. at 38-39.

611.    Additionally, the configuration of Senate District 8 also supports that the 2023 Senate Plan has a discriminatory impact on Black voters. Specifically, the placement of high-BVAP precincts from New Hanover County into Senate District 8 created an unnecessary population deviation that places voters from these precincts in an over-populated district, and thereby unnecessarily dilutes the voting power of voters in these high-BVAP precincts. *See* FOF ¶¶ 210-16.

612.    The Court concludes that this evidence of the impact of the 2023 Senate Plan bearing more heavily on Black voters specifically supports a finding that the 2023 Senate Plan was enacted with the intent to discriminate on the basis of race as a motivating factor to deny Black voters equal voting power in Senate Districts 1 and 2 and to dilute the power of Black voters in Senate District 8.

7.    The Discriminatory Impact is Not Attributable to Mere Partisanship

613.    The Court finds Legislative Defendants' argument that their actions stem from a mere partisan intent untenable.

614.    As the *McCrory* Court explained, a "law's purpose cannot be properly understood without [] consider[ing]" historical and factual context in the state. *McCrory*, 831 F.3d at 226. In support of its decision, the Court noted that "whether the [legislature] knew the exact numbers, it certainly knew that African American voters were highly likely, and that white voters were unlikely, to vote for Democrats." *Id.* at 225. "When a legislature dominated by one party has dismantled barriers to African American access to the

franchise, even if done to gain votes, 'politics as usual' does not allow a legislature dominated by the other party to re-erect those barriers." *Id.* at 226. Here, the evidence supports that the primary map-drawer of the 2023 Senate Plan appreciated the demographic location of Black voters in the state, as well as the fact that Black voters are much more likely to vote for Democrats than their White counterparts and maintain that support more consistently than their White counterparts. *See* FOF ¶¶ 229, 408-11.

615.    Legislative Defendants rely heavily on *Alexander*'s holding that plaintiffs there needed to "disentangle race and politics." 602 U.S. at 6. This argument does not absolve Legislative Defendants from liability here, however, for at least two reasons.

616.    First, "[a] vote-dilution claim is 'analytically distinct' from a racial-gerrymandering claim and follows a 'different analysis.'" *Alexander*, 602 U.S. at 38. A plaintiff pressing a vote-dilution claim may prevail by showing "that the State 'enacted a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities.' . . . In other words, the plaintiff must show that the state's districting plan 'has the purpose *and* effect' of diluting the minority vote. *Alexander*, 602 U.S. at 38-39 (internal citations omitted).

617.    Intentional vote-dilution claims do "not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes. Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one." *Arlington Heights*, 429 U.S. at 265. The relevant question for the Court, as described above, is whether "a discriminatory purpose has been a *motivating* factor in

the decision." *Id.* at 265-66 (emphasis added); *accord Alexander*, 602 U.S. at 38 ("A plaintiff pressing a vote-dilution claim cannot prevail simply by showing that race played a predominant role in the districting process."). "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. Here, the historical background of redistricting in North Carolina, the rushed and non-transparent redistricting process in 2023 (and its departure from past practice), the willful disregard of the Voting Rights Act, and the impact of the maps on Black voters in challenged districts all support a finding that race was a motivating factor in enacting the 2023 plans. *See id.* at 265-69.

618.    This finding is bolstered by deviations from what the legislators themselves said they would do during this redistricting cycle and then failed to follow through on. This includes the failure to consider evidence of racially polarized voting despite asking for that very evidence during a committee hearing just days prior. Senator Hise also testified inconsistently about the use of redistricting criteria, such as preserving media markets (which he claimed was done in the northeast but not considered in the Triad) and measuring the compactness of districts (which he employed as a pass/fail measure but then invoked to justify the choice of one district over another, even though both districts surpassed the minimum threshold he used). Taken together, this evidence rebuts the presumption of legislative good faith and, as such, "judicial deference [to the legislature] is no longer justified." *Arlington Heights*, 429 U.S. at 265-66. Accordingly, applying the relevant portion of *Alexander* and the standard set forth in *Arlington Heights* relevant to Plaintiffs'

266

intentional vote-dilution claims, the Court finds, as stated above, that Plaintiffs have proven that the 2023 Senate Plan was drawn with the purpose and effect of diluting the Black vote.

619.    Second, even if the requirement to "disentangle race from politics" in *Alexander* is applicable to the vote-dilution claims here, there is ample evidence that cannot be explained by mere partisanship. This includes the challenged configurations of 2023 Senate Districts 1 and 2, where partisanship was not the stated explanation for their configuration either during the legislative process or trial. *See* FOF ¶¶ 130-37.[49] Likewise, the redistricting process in 2023 differed significantly from past years in ways that cannot be accounted for based on mere partisanship, *see* FOF Section VI.A, including removing a specific redistricting criteria that guaranteed adherence to the Voting Rights Act. There is no evidence nor any practical reason why the legislature took so many purposeful steps to deviate from recent past practice and conceal the 2023 redistricting process to achieve what courts have held to be permissible goals.

620.    Finally, mere partisanship cannot explain the harm to Black voters through racially polarized voting patterns, which deny them equal electoral power. The analysis by Dr. Kassra Oskooii confirming that in the Black Belt's Senate Districts 1 and 2 there is "clear-cut, textbook" racially polarized voting and that Black-preferred candidates are usually defeated by White-preferred candidates, paired with his and Dr. Stephens-

---

[49] For this reason, even if the alternative-map requirement applicable to racial gerrymandering claims under *Alexander* applied here (which it does not), the 2022 configuration which better satisfies the criteria of compactness would provide such an example.

Dougan's analysis that these voting patterns are driven by racial, and not mere partisan, divides, prove vote dilution based upon race and not partisanship. *See* FOF ¶¶ 197-205.

621.    In sum, Plaintiffs have proven by a preponderance of the evidence that the 2023 Senate Plan was purposefully designed to minimize and cancel out the voting potential of Black voters in the challenged districts, and that this motivating factor was a but-for cause of the dilution of voting power of Black voters in violation of Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments. *See Alexander*, 602 U.S. at 39; *McCrory*, 831 F.3d at 238.

### III.        The 2023 Congressional Plan

622.    The Court analyzes Plaintiffs' intentional vote-dilution claim with respect to the 2023 Congressional Plan, and specifically Congressional Districts 1, 5, 6, and 10, under the same legal standard as set forth above in COL Section II.D, by incorporating that same standard, and finds that these districts were drawn with the purpose and effect of diluting the voting power of Black voters in North Carolina's Black Belt and Triad area, thereby depriving Black voters, including individual Plaintiffs Reverend Dawn Daly-Mack, Calvin Jones, Syene Jasmin, Mitzi Reynolds Turner, and members of the Organizational Plaintiffs, an equal opportunity to participate in the political process and elect a candidate of their choice in these areas of the state.

A.  *The 2023 Congressional Plan was Designed to Have a Discriminatory Impact on Black Voters in the Black Belt Congressional District 1 and the Triad Districts 5, 6, and 10*

623.    Because both maps were drawn by the same legislators during the same process, the evidence supporting a finding that the 2023 Senate Plan was enacted with the

intent to discriminate on the basis of race, as described in COL Section II.D, also supports a finding that the 2023 Congressional Plan was enacted with the intent to discriminate on the basis of race as a motivating factor.

624.    In addition, evidence from the map-drawing process shows that Black voters were specifically targeted in the enactment of the 2023 Congressional Plan. Testimony by Senator Ralph Hise confirmed that he is knowledgeable of the large majority-Black population in Greenville, and both his testimony and the sequence of draft Congressional Plans with different configurations of this area indicate that targeting this population was a major goal of the Congressional drawing process. *See* FOF ¶¶ 226-33. This is further significant because the 2023 Congressional Plan removes Pitt County entirely from Congressional District 1, in sharp contrast to the Congressional Plans used in every election since at least 1992. FOF ¶¶ 220-23. In 2023, Pitt County was removed from Congressional District 1 in favor of including the predominantly White counties of Currituck and Camden, and witness testimony emphasized the significance of this change for a district historically based in and representing North Carolina's Black Belt. *See* FOF ¶¶ 221-24.

625.    Analysis by Dr. Kassra Oskooii found high levels of racially polarized voting in Congressional District 1, with White voters consistently voting as a bloc against Black-preferred candidates. Dr. Oskooii further found that racially polarized voting increased from the 2022 to the 2023 Congressional Plan, meaning that Black-preferred candidates have a lower win rate under the 2023 Plan. FOF ¶¶ 235-38; *see also* PX189 ¶¶ 197-251 (Oskooii Report). He further observed that this increase in racially polarized voting occurred despite the BVAP of the district remaining relatively consistent, indicating that

269

the map was drawn with a "focus[] on reducing the performance of the district for Black voters" by "acutely focus[ing] on race and the rates of white cross-over voting." PX202 ¶ 25 (Oskooii Reply). By contrast, at no point during his testimony did Senator Hise state that partisan goals drove the removal of Pitt County from Congressional District 1. *See* FOF ¶ 226.

626.    Instead, the purported other criteria identified for the configuration of Congressional District 1 are largely unsubstantiated by the record, including the purported goal of keeping "fingerling" counties together because of public comments that do not appear on the legislative record, FOF ¶¶ 135, 226-27, and the purported goal of compactness which contravenes the fact that the prior 2022 district is more compact. FOF ¶ 228. But even if Senator Hise had followed his own criteria, draft maps prepared by the House map-drawer using substantially similar criteria, political data, and partisan goals all still included portions of Pitt County in Congressional District 1. This creates a powerful inference that partisan objectives alone cannot explain the county's removal from the district. *See* FOF ¶¶ 232-33.

627.    Likewise, drafting history indicates that the Triad was split throughout the map-drawing process, deviating from the most recent 2022 Congressional Plan that largely kept this area intact. *See* FOF ¶ 246; JX218. In drawing the Triad Congressional Districts (5, 6, 9, and 10), the legislature did not respect media markets even though Senator Hise testified that media markets were respected elsewhere in the state. FOF ¶¶ 131, 247; Trial Tr. vol. IV, 930:23-931:2 (Hise). The Triad districts also needlessly split counties and municipalities: Greensboro is divided into three districts even though it could wholly fit

into one, and Forsyth County is needlessly split into two districts, both despite the adopted criteria including "Respect for Existing Political Subdivisions." FOF ¶¶ 217, 246-47. While, unlike Congressional District 1, partisanship was a purported goal causing the challenged configuration, FOF ¶ 246, it cannot account for the procedural deviations during the redistricting process, including the willful disregard of the Voting Rights Act, that target Black voters specifically. *See* FOF Section VI.B.

628.    The Court concludes that this evidence supports that the 2023 Congressional Plan was enacted with the intent of diminishing Black voters' ability to elect their candidate of choice to Congress.

629.    As discussed below, the *Arlington Heights* factors also support a finding of discriminatory intent.

B.  *The Historical Background Supports a Finding of Discriminatory Intent*

630.    The historical background set forth in COL Section II.D.3 supporting a finding that the 2023 Senate Plan was enacted with the intent to discriminate on the basis of race also supports a finding that the 2023 Congressional Plan was enacted to discriminate on the basis of race as a motivating factor.

631.    In addition to the statewide historical background set forth in COL Section II.D.3 above, the historical background specific to the Triad further supports a finding of discriminatory intent. The Triad has been repeatedly targeted, split between three or four districts in Congressional Plans for over thirty years, with the major cities of Winston-Salem, Greensboro, and High Point divided among districts. *See* FOF ¶¶ 242-44. In one Congressional map, the campus of North Carolina A&T, an HBCU in Greensboro, was

271

cracked into two districts, and in the 2011 map, a winding, narrow district connecting the

Triad cities with Charlotte was struck down as a racial gerrymander. *See Harris*, 159 F.

Supp. 3d at 604, *aff'd* 581 U.S. 285 (2017).

C. *Significant Procedural and Substantive Departures in the Redistricting Process and Legislative History of the 2023 Congressional Plan Support a Finding of Discriminatory Intent*

632. The Court finds that the procedural and substantive departures in the 2023

redistricting process and the legislative history set forth in COL Section II.D.4-5 supporting

a finding that the 2023 Senate Plan was enacted with the intent to discriminate on the basis

of race also support a finding that the 2023 Congressional Plan was enacted to discriminate

on the basis of race, at least as a motivating factor. In short, the Congressional Plan drafting

and legislative history were virtually identical to that of the Senate Plan, including criteria

that were drafted and kept private until a week before enactment and which pointedly

removed a requirement that districts comply with the Voting Rights Act. *See* FOF Section

VI.A; FOF ¶ 395; *see also* JX038 (2023 Congressional Plan Criteria). Likewise, the

challenged Congressional districts deviate from the purported redistricting goals, as

described in detail above.

D. *The Impact of the 2023 Congressional Plan Bearing More Heavily on Black Voters Supports a Finding of Discriminatory Intent*

633. The Court finds that the impact of the 2023 Congressional Plan in the

challenged districts bears more heavily on Black voters than on White voters, and rejects

Legislative Defendants' arguments that there are any "mitigating provisions" that result in

the 2023 Congressional Plan somehow impacting Black voters less than White voters. *Raymond*, 981 F.3d at 309.

634. Specifically, the clear patterns of racially polarized voting identified by Dr. Oskooii, together with the changes to Congressional District 1 in 2023, result in a "significantly lower win rate" for Black-preferred candidates than the prior 2022 configuration, suggesting that Black voters will have comparatively less success in overcoming White bloc voting under the new plan. FOF Section IV.A.2. And because of racially polarized voting, this change disparately impacts Black voters, who support the same candidate at rates of 97% or more, compared to White voters, who support the opposing candidates at rates in the low-to-high-80's in 2023 Congressional District 1. FOF ¶ 236.

635. The Court also finds the following evidence supports a finding that the 2023 Congressional Plan resulted in the discriminatory effect of denying Black voters equal voting power in Congressional Districts 5, 6, and 10 in the Triad.

636. By cracking the Black population in the Triad among four separate Congressional Districts that spindle outward into surrounding rural, predominantly White, areas, Legislative Defendants created Congressional Districts 5, 6, 9, and 10 with 18.73%, 19.31%, 22.36%, and 16.58% BVAP, respectively, all far below the average 30.99% BVAP in the Triad. *See* PX182 at ¶ 42 & p. 72, Table 43 (Fairfax Report). Dr. Oskooii detected significant racially polarized voting in each district, with Black cohesion rates in the mid-to-high-90's and substantive majorities of White voters supporting the opposing candidates across these districts, and his electoral performance analysis confirms that Black-preferred

273

candidates will usually be defeated in each of them. FOF ¶¶ 248-55. The Court finds that this effectively cancels out Black voters' ability to elect a congressperson of their choice anywhere in the Triad, while essentially guaranteeing that the candidate preferred by substantial majorities of White voters will be elected in each district, and thus disparately impacts Black voters and reduces overall electoral power compared to 2022.

637. In addition, the evidence as to the totality of the circumstances, as discussed above, confirms that each of the relevant Senate Factors weighs in favor of a finding of intentional discrimination. Drs. Bagley and Stephens-Dougan testified that the Black Belt and Triad areas are deeply impacted by North Carolina's history of discrimination, racially polarized voting, and socioeconomic disparities between the Black and White populations such that the political process is not equally open to Black voters. *See* FOF ¶¶ 271, 297-98, 301, 303, 305, 311. Mitzi Reynolds Turner testified that voting barriers including cutbacks to early voting and the lack of resources to her community in the Triad particularly impact the Black community, resulting in Black voters being turned away from the polls. FOF ¶ 290. Black elected officials fall considerably short of equitable levels in the Triad. FOF ¶ 342. And the evidence shows a significant lack of responsiveness that elected officials, including those responsible for adopting and elected under the 2023 Congressional Plan, have toward Black voters. *See* FOF ¶¶ 355-56. Mitzi Reynolds Turner testified that elected representatives rarely engage in community outreach in her community and are not responsive to her community's specific needs including food access, poverty, and affordable housing. FOF ¶ 348.

274

638.    The Court concludes that this evidence of the impact of the 2023 Congressional Plan bearing more heavily on Black voters specifically supports a finding that the 2023 Congressional Plan was enacted with the intent to discriminate on the basis of race as a motivating factor to deny Black voters equal voting power in the challenged Congressional districts.

E.  *The Discriminatory Impact is Not Attributable to Mere Partisanship*

639.    Consistent with the Court's conclusions as to the 2023 Senate Plan, the Court finds Legislative Defendants' argument that their actions as to the Congressional Plan stem from a mere partisan intent untenable. As noted above, "[w]hen a legislature dominated by one party has dismantled barriers to African American access to the franchise, even if done to gain votes, 'politics as usual' does not allow a legislature dominated by the other party to re-erect those barriers." *McCrory*, 831 F.3d at 226.

640.    Legislative Defendants again rely heavily on *Alexander*'s holding that plaintiffs there needed to "disentangle race and politics." 602 U.S. at 6. As noted above, this argument does not absolve Legislative Defendants from liability here, however, for at least two reasons.

641.    First, Plaintiffs' intentional vote-dilution claims are "analytically distinct from a racial-gerrymandering claim and follows a different analysis." *Alexander*, 602 U.S. at 38 (internal quotations omitted). Plaintiffs here may prevail by showing "that the State 'enacted a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities.' . . . In other words, the plaintiff must show that the State's districting plan 'has the purpose *and* effect' of diluting the minority vote.

275

*Id.* (internal citations omitted). Intentional vote-dilution claims do "not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes. Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one." *Arlington Heights*, 429 U.S. at 265. The relevant question for the Court, as described above, is whether "a discriminatory purpose has been a *motivating* factor in the decision." *Id.* at 266 (emphasis added).

642. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* Here, the historical background of redistricting in North Carolina, the rushed and non-transparent redistricting process in 2023 (and its departure from past practice), and the impact of the maps on Black voters in challenged districts, *see* FOF Sections IV, V.A, VI.A, support a finding that race was a motivating factor in enacting the 2023 plans. *See Arlington Heights*, 429 U.S. at 265-69. This finding is bolstered by deviations including a willful disregard of the Voting Rights Act, and deviations specific to the challenged Congressional districts. *See* FOF Section VI.B; FOF ¶¶ 227-34, 246-47.

643. Taken together, this evidence rebuts the presumption of legislative good faith and, as such, "judicial deference [to the legislature] is no longer justified." *Arlington Heights*, 429 U.S. at 265-69. Accordingly, applying the relevant portion of *Alexander* and the standard set forth in *Arlington Heights* relevant to Plaintiffs' intentional vote-dilution claims, the Court finds, as stated above, that Plaintiffs have proven that the 2023 Congressional Plan was drawn with the purpose and effect of diluting the Black vote.

644.    Second, even if *Alexander*'s requirement to "disentangle race from politics" applicable to the vote-dilution claims here, there is ample evidence that establishes race, not mere partisanship, drove the district configurations here. This includes the 2023 redistricting process which, as explained above, deviated from prior practice in ways that cannot be explained by a merely partisan objective. *See* COL Section II.D.4-5, 7. Additionally, mere partisanship cannot explain the challenged configurations themselves, especially where partisanship was not offered as an explanation for the configuration of Congressional District 1 and evidence of alternative configurations that do *not* exclude Pitt County from this district are in the record. *See* FOF ¶¶ 226, 232-33.

645.    Finally, mere partisanship cannot explain the harm to Black voters through racially polarized voting patterns, which deny them equal electoral power. The analysis by Dr. Kassra Oskooii confirming racially polarized voting in Congressional District 1 and the Triad Congressional Districts, and that Black-preferred candidates are usually defeated by White-preferred candidates in all Triad Congressional Districts and have a diminished ability to succeed in 2023 Congressional District 1 compared to the 2022 configuration, paired with his and Dr. Stephens-Dougan's analysis that these voting patterns are driven by racial, and not mere partisan, divides, prove vote dilution based upon race and not partisanship. *See* FOF ¶¶ 235-38 (Dr. Oskooii's Congressional District 1 analysis), ¶¶ 248-52 (Dr. Oskooii's Triad analysis), ¶¶ 274-83 (Dr. Stephens-Dougan's analysis).

646.    In sum, Plaintiffs have proven by a preponderance of the evidence that the 2023 Congressional Plan was purposefully designed to minimize and cancel out the voting potential of Black voters in the challenged districts, and that this motivating factor was a

but-for cause of the dilution of voting power of Black voters in violation of Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments. *See Alexander*, 602 U.S. at 39; *McCrory*, 831 F.3d at 238.

## CONCLUSIONS AND JUDGMENT

Based upon the foregoing findings and conclusions, the Court grants the following relief in favor of Plaintiffs and against Defendants:

1. The Court grants a judgment declaring the following:

    a. North Carolina's 2023 Senate Plan (S.L. 2023-146) unlawfully dilutes the voting power of Individual Plaintiffs and members of the Organizational Plaintiffs in Senate Districts 1 and 2 in violation of Section 2 of the Voting Rights Act.

    b. North Carolina's 2023 Senate Plan (S.L. 2023-146) was enacted with a discriminatory purpose in violation of the Fourteenth and Fifteenth Amendments and Section 2 of the Voting Rights Act through the intentional vote dilution of Black voters in Senate Districts 1, 2, and 8.

    c. North Carolina's 2023 Senate Plan (S.L. 2023-146) violates the Fourteenth Amendment in Senate District 8 as an unconstitutional racial gerrymander in which race predominated without being narrowly tailored to serve a compelling state purpose [or, in the alternative: because it denies equal voting power in violation of the one-person, one-vote requirement of the Equal Protection Clause.]

     d.   North Carolina's 2023 Congressional Plan (S.L. 2023-145) was enacted with a discriminatory purpose in violation of the Fourteenth and Fifteenth Amendments and Section 2 of the Voting Rights Act through the intentional vote dilution of Black voters in Congressional Districts 1, 5, 6, and 10.

2.   The Court permanently enjoins Defendants from calling, holding, supervising, or certifying any elections under the 2023 Senate and Congressional Plans. Plaintiffs have no other adequate remedy at law other than the judicial relief sought herein and will be irreparably harmed through violation of their constitutional and statutory rights without this relief.

3.   The Court orders a remedial process requiring the following:

     a.   Remedial redistricting plans for Senate and Congressional districts sufficient to remedy the violations as set forth in the Court's findings herein shall be enacted in time for use no later than the 2026 elections and beyond.

     b.   Defendants and the legislature shall have the first chance to enact the remedial redistricting plans, pursuant to N.C.G.S. § 120-2.4.

4.   Judgment is hereby entered for Plaintiffs as prevailing parties in this action.

5.   Plaintiffs are prevailing parties entitled to attorneys' fees, expenses, and costs pursuant to 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e).

6.   The Court shall retain jurisdiction over this matter until the Defendants, their agents, employees, and those persons acting in concert with them have complied with all orders and mandates of this Court.

Dated: August 5, 2025

Respectfully submitted,

*/s/ Hilary Harris Klein*
Hilary Harris Klein

**HOGAN LOVELLS US LLP**

J. Tom Boer*
Olivia Molodanof*
Madeleine Bech*
4 Embarcadero Center, Suite 3500
San Francisco, CA 94111
Telephone: 415-374-2300
Facsimile: 415-374-2499
tom.boer@hoganlovells.com
olivia.molodanof@hoganlovells.com
madeleine.bech@hoganlovells.com

Jessica L. Ellsworth*
Misty Howell*
Odunayo Durojaye*
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: 202-637-5600
Facsimile: 202-637-5910
jessica.ellsworth@hoganlovells.com
misty.howell@hoganlovells.com
odunayo.durojaye@hoganlovells.com

Harmony Gbe*
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: 310-785-4600
Facsimile: 310-785-4601
harmony.gbe@hoganlovells.com

*Appearing in this matter by Special
Appearance pursuant to L-R 83.1(d)

**SOUTHERN COALITION FOR
SOCIAL JUSTICE**

Jeffrey Loperfido (State Bar #52939)
Hilary Harris Klein (State Bar #53711)
Christopher Shenton (State Bar #60442)
Mitchell D. Brown (State Bar #56122)
Lily Talerman (State Bar #61131)
5517 Durham Chapel Hill Blvd.
Durham, NC 27707
Telephone: 919-794-4213
Facsimile: 919-908-1525
hilaryhklein@scsj.org
jeffloperfido@scsj.org
chrisshenton@scsj.org
mitchellbrown@scsj.org
lily@scsj.org

## CERTIFICATE OF SERVICE

I certify that on August 5, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

   /s/   *Hilary Harris Klein*
Hilary Harris Klein