# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

SHAUNA WILLIAMS, et al.,

      *Plaintiffs*,

     v.

REPRESENTATIVE DESTIN HALL, in his official capacity as Chair of the House Standing Committee on Redistricting, et al.,

      *Defendants*.

_____

NORTH CAROLINA STATE CONFERENCE OF THE NAACP, et al.,

      *Plaintiffs*,

     v.

PHILIP BERGER, in his official capacity as the President Pro Tempore of the North Carolina Senate, et al.,

      *Defendants*.

Civil Action No. 23 CV 1057

Civil Action No. 23 CV 1104

## *WILLIAMS* PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

PROPOSED FINDINGS OF FACT............................................................................ 1

I.     The Parties .......................................................................................................... 1

       A.     Plaintiffs ................................................................................................... 1

       B.     Defendants ................................................................................................ 3

II.    Factual Background ............................................................................................ 6

       A.     Overview of North Carolina's Post-2020 Census Redistricting ................. 6

       B.     The 2023 Congressional Plan.................................................................... 10

              i.     Piedmont Triad............................................................................... 10

              ii.    Mecklenburg Area ......................................................................... 12

       C.     Procedural History.................................................................................... 14

III.   Intentional Discrimination in Violation of the Fourteenth and Fifteenth
       Amendments to the United States Constitution ................................................ 15

       A.     The 2023 Plan's Impact on Black Voters in North Carolina (*Arlington
              Heights* 1) ................................................................................................. 15

              i.     Dr. Maxwell Palmer ...................................................................... 17

              ii.    Dr. Jonathan Rodden ..................................................................... 21

                     1.     Piedmont Triad.................................................................... 23

                     2.     Mecklenburg Area............................................................... 39

                     3.     Comparing the 2023 Plan to Alternative Plans.................... 46

              iii.   Legislative Defendants' Witnesses ................................................. 55

                     1.     Dr. Michael Barber.............................................................. 58

                     2.     Dr. Sean Trende ................................................................. 71

iv.   Fact Witness Testimony .................................................. 84

v.   Testimony Regarding Creation of 2023 Plan ................................. 90

B.   The Historical Background of the 2023 Plan (*Arlington Heights* 2) .......... 92

C.   Legislative History of the 2023 Plan (*Arlington Heights* Factors 3, 4, and 5) ................................................................. 96

i.   Passage and Invalidation of 2021 Plan ............................................. 97

ii.   Timing of Passage and Lack of Transparency in 2023 Plan ........... 99

iii.   Use of Consultants in 2023 Plan .................................................... 102

iv.   Lack of Public Hearings and Input in 2023 Plan ........................... 104

v.   Failure to Conduct Racially Polarized Voting Analyses in 2023 Plan ................................................................. 109

IV.   Intentional Vote Dilution in Violation of Section 2 of the VRA ........................ 110

A.   Plaintiffs' Evidence of Racial Polarization (*Gingles* 2 and 3) ................. 110

B.   The Totality of the Circumstances Affecting Black North Carolinians' Ability to Participate in the Political Process ........................................... 121

i.   North Carolina's History of Discrimination in Voting (Senate Factors 1 and 3) .............................................................. 121

ii.   The Extent of Racially Polarized Voting in North Carolina (Senate Factor 2) ............................................................ 129

iii.   North Carolina's Ongoing Effects of Discrimination in Education, Employment, and Health (Senate Factor 5) ................ 132

iv.   Racial Appeals in North Carolina Elections (Senate Factor 6) ...... 140

v.   Lack of Black Electoral Success (Senate Factor 7) ....................... 147

vi.   Unresponsiveness of Elected Officials to Black Voters in North Carolina (Senate Factor 8) ............................................................ 150

vii.   The General Assembly's Justifications for the 2023 Plan (Senate Factor 9) ............................................................ 154

PROPOSED CONCLUSIONS OF LAW ....................................................... 155

V.     Plaintiffs Have Standing..................................................................... 155

VI.    Plaintiffs Have Established that the 2023 Plan Was Intentionally Discriminatory in Violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution. ........................................................................................ 157

       A.    The *Arlington Heights* Factors Demonstrate that Race was a Motivating Factor in the 2023 Plan............................................ 160

             i.     *Arlington Heights* Factor 1: Plaintiffs Definitively Demonstrated that the 2023 Plan Bears More Heavily on Blacks than Whites in North Carolina................................................................. 160

             ii.    *Arlington Heights* Factor 2: The Historical Background of the 2023 Plan Suggests a Discriminatory Purpose.............................. 169

             iii.   *Arlington Heights* Factors 3, 4, and 5: The Legislative History of the 2023 Plan Indicates a Discriminatory Purpose. .................. 172

       B.    Legislative Defendants Failed to Rebut Plaintiffs' Demonstration of Discriminatory Intent Under *Arlington Heights*........................ 177

             i.     Partisanship Does Not Explain the 2023 Plan's District Boundaries.................................................................. 178

             ii.    Traditional Redistricting Criteria Do Not Explain the 2023 Plan's Racial Sorting.................................................... 182

             iii.   Legislative Defendants Failed to Rebut Plaintiffs' Showing that Race Motivated the Drawing of the District Lines. ...................... 184

VII.   Plaintiffs Have Established that the 2023 Plain Intentionally Diluted Black Voting Strength Under Section 2 of the VRA...................................... 185

       A.    Section 2 Legal Background .................................................... 185

       B.    Section 2 Creates a Private Right of Action.............................. 187

       C.    The *Arlington Heights* Intent Analysis Applies Equally to *Williams* Plaintiffs' Section 2 Claim. ......................................................... 190

       D.    *Gingles* Factors 2 & 3 Provide Evidence of the Discriminatory Effect of the Plan................................................................................ 190

- iii -

E.      The Senate Factors Provide Additional Evidence of the 2023 Plan's Discriminatory Effects and Support a Showing of Discriminatory Intent..................................................................................................194

         i.      Senate Factors 1 and 3: Plaintiffs Established North Carolina's Long and Ongoing History of Official Discrimination in Voting Practices. ......................................................................................195

         ii.      Senate Factor 2: Voting is Racially Polarized in North Carolina Both Statewide and in the Challenged Congressional Districts.....198

         iii.      Senate Factor 4: There is No Candidate Slating Process in the Challenged Districts. ......................................................................200

         iv.      Senate Factor 5: Black North Carolinians Bear the Effects of Discrimination in Education, Employment and Health, Which Hinders Their Ability to Participate in the Political Process. ........200

         v.      Senate Factor 6: North Carolina Political Campaigns Are Characterized by Racial Appeals. ...................................................202

         vi.      Senate Factor 7: Blacks candidates in North Carolina Have Had Limited Electoral Success. .............................................................203

         vii.      Senate Factor 8: North Carolina Officials Are Not Responsive to the State's Black Voters. ...........................................................205

         viii.      Senate Factor 9: Plaintiffs Have Shown that the Policy Underlying the Plan is Tenuous. ....................................................206

VIII.   The Supreme Court's Decision in *Alexander* Does Not Apply to *Williams* Plaintiffs' Claims..................................................................................207

     A.      *Alexander* Applies to Racial Gerrymandering Claims, not *Williams* Plaintiffs' Intentional Discrimination and Intentional Vote Dilution Claims..................................................................................................208

     B.      Even if *Alexander* Were to Apply to Intentional Vote Dilution Claims, *Williams* Plaintiffs Have Proven Their Claims Under *Alexander*'s Framework..................................................................................................208

         i.      *Williams* Plaintiffs Presented Sufficient Evidence to Overcome the Legislative Presumption of Good Faith. .......................................209

   ii. *Williams* Plaintiffs Disentangled Race from Politics. .................... 213

IX. Irreparable Harm and the Equities Weigh in Favor of a Permanent Injunction ... 218

X. Remedy ........................................................................................... 221

CONCLUSION ......................................................................................... 223

## INTRODUCTION

*Williams* Plaintiffs respectfully submit the following proposed findings of fact and conclusions of law for their intentional discrimination claim under the Fourteenth and Fifteenth Amendments to the United States Constitution (Count I) and for their intentional vote dilution claim under Section 2 of the Voting Rights Act (VRA) (Count II).

## PROPOSED FINDINGS OF FACT

### I.      The Parties

#### A.      Plaintiffs

1.      Plaintiffs Shauna Williams, Flor Herrera-Picasso, Minerva Freeman, Maura Aceto, Javier Limon, Armenta Eaton, James Adams, Luciano Gonzalez-Vega, Chenita Johnson, Pamlyn Stubbs, Earl Jones, Allison Shari Allen, Laura McClettie, Nelda Leon, German De Castro, Alan Rene Oliva Chapela, Virginia Keogh, and Natalee Nanette Nieves are U.S. citizens who are lawfully registered voters residing in North Carolina, each of whom intends to vote in future congressional elections. WX55, 57–70 (Plaintiff Standing Declarations); Joint Stip. ¶¶ 56–73.

2.      Plaintiffs Shauna Williams, Minerva Freeman, Armenta Eaton, James Adams, Chenita Johnson, Pamlyn Stubbs, Earl Jones, Allison Shari Allen, Laura McClettie, Virginia Keogh are Black voters who reside in North Carolina. WX59–60, WX64–66, WX69–70 (Plaintiff Standing Declarations); Joint Stip. ¶¶ 56, 58, 61–62, 64–68, 72.

3.      Plaintiff Shauna Williams resides and votes in Warrenton in Warren County, North Carolina, located in Congressional District 1 ("CD-1") under both the 2022

Congressional Plan and the 2023 Congressional Plan. WX64 (1/3/25 Declaration of Shauna Williams); Joint Stip. ¶ 56.

4.      Plaintiff Minerva Freeman resides and votes in Fountain in Pitt County, North Carolina, located in CD-1 under the 2022 Congressional Plan and CD-3 under the 2023 Congressional Plan. WX66 (5/13/25 Declaration of Minerva Freeman); Joint Stip. ¶ 58.

5.      Plaintiff Armenta Eaton resides and votes in Louisburg in Franklin County, North Carolina, located in CD-1 under the 2022 Congressional Plan and CD-13 under the 2023 Congressional Plan. WX69 (5/13/25 Declaration of Armenta Eaton); Joint Stip. ¶ 61.

6.      Plaintiff James Adams resides and votes in High Point in Guilford County, North Carolina, located in CD-6 under both the 2022 Congressional Plan and the 2023 Congressional Plan. WX59 (1/3/25 Declaration of James Adams); Joint Stip. ¶ 62.

7.      Plaintiff Chenita Johnson resides and votes in Winston-Salem in Forsyth County, North Carolina, located in CD-6 under the 2022 Congressional Plan and CD-10 under the 2023 Congressional Plan. WX70 (5/13/25 Declaration of Chenita Johnson); Joint Stip. ¶ 64.

8.      Plaintiff Pamlyn Stubbs resides and votes in Greensboro in Guilford County, North Carolina, located in CD-6 under the 2022 Congressional Plan and CD-5 under the 2023 Congressional Plan. Tr. 206:13–14, 211:13–19 (Stubbs); Joint Stip. ¶ 65.

- 2 -

9.      Plaintiff Earl Jones resides and votes in Greensboro in Guilford County, North Carolina, located in CD-6 under the 2022 Congressional Plan and CD-5 under the 2023 Congressional Plan. Tr. 136:8–10, 149:8–150:5 (Jones); Joint Stip. ¶ 66.

10.      Plaintiff Allison Shari Allen resides and votes in Charlotte in Mecklenburg County, North Carolina, located in CD-14 under the 2022 Congressional Plan and CD-12 under the 2023 Congressional Plan. Tr. 326:9–14, 345:15–346:12 (Allen); Joint Stip. ¶ 67.

11.      Plaintiff Laura McClettie resides and votes in Charlotte in Mecklenburg County, North Carolina, located in CD-14 under the 2022 Congressional Plan and CD-12 under the 2023 Congressional Plan. WX60 (1/3/25 Declaration of Laura McClettie); Joint Stip. ¶ 68.

12.      Plaintiff Virginia Keogh resides and votes in Charlotte in Mecklenburg County, North Carolina, located in CD-14 under both the 2022 Congressional Plan and the 2023 Congressional Plan. WX65 (1/3/25 Declaration of Virginia Keogh); Joint Stip. ¶ 72.

**B.      Defendants**

13.      Defendant North Carolina State Board of Elections is the agency responsible for the regulation and administration of elections in North Carolina. It is tasked with "general supervision over the primaries and elections in the State," N.C. Gen. Stat. § 163-22(a), including elections for the U.S. House of Representatives. The Board and its

members, Francis X. De Luca, Robert Rucho, Jeff Carmon III, Stacy "Four" Eggers IV, and Siobhan O'Duffy Millen are sued in their official capacities only.[1]

14.     Legislative Defendants are members of the North Carolina General Assembly, who are all sued in their official capacities only.

15.     Defendant Ralph E. Hise, Jr. is a member of the North Carolina Senate and served as a co-Chair of the Senate Standing Committee on Redistricting and Elections, which oversaw the creation of the 2023 Congressional Plan. Tr. 866:12–16 (Hise). He currently serves as co-chair of the Senate Standing Committee on Elections. Joint Stip. ¶ 85. Senator Hise has been a member of the Senate Redistricting and Elections Committee since 2010, and has personally drawn dozens of draft district maps for North Carolina. Tr. 870:17–22, 947:15–19 (Hise). Senator Hise also served as Chair of the Senate Appropriations Committee during the 2023 redistricting process. Tr. 943:19–21 (Hise). He continues to head both committees. *Id.*

16.     Defendant Phil Berger is the President Pro Tempore of the North Carolina Senate.

17.     Defendant Destin Hall is a member of the North Carolina House of Representatives and served as the Chair of the House Standing Committee on Redistricting during the 2023 redistricting process, which oversaw the creation of the 2023

---

[1] Several original defendants have been replaced by their successors and substituted as defendants since the filing of *Williams* Plaintiffs' complaint. As these parties were all named in their official capacities, the successor individuals are automatically substituted for the former officeholders pursuant to Federal Rule of Civil Procedure 25(d). *See* FRCP 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party."); Joint Stip. ¶ 86.

- 4 -

Congressional Plan. *See generally* JX001 (10/19/2023 House Redistricting Committee Transcript). In January 2025, Defendant Hall replaced former Defendant Timothy Moore as Speaker of the North Carolina House of Representatives, and Representatives Hugh Blackwell and Sarah Stevens replaced Defendant Hall as co-chairs of the House Standing Committee on Election Law. Joint Stip. ¶ 84. Mr. Blackwell and Ms. Stevens were added as defendants following their replacement of Defendant Hall on the House Standing Committee on Election Law. *Id.*

18.     Defendant Warren Daniel is a member of the North Carolina Senate and served as a co-chair of the Senate Standing Committee on Redistricting and Elections, which oversaw the creation of the 2023 Congressional Plan. He currently serves as a co-chair of the Senate Standing Committee on Elections (formerly the Senate Redistricting and Elections Committee). Joint Stip. ¶ 85.

19.     Former Defendant Paul Newton was also a member of the North Carolina Senate and served as a co-chair of the Senate Standing Committee on Redistricting and Elections during the 2023 redistricting process. Newton retired in March 2025, and Senator Brad Overcash succeeded him as a current co-chair of the Senate Standing Committee on Elections along with Defendants Hise and Daniel. Mr. Overcash was substituted as a defendant following his replacement of Senator Newton. *Id.*

## II.     Factual Background

### A.     Overview of North Carolina's Post-2020 Census Redistricting

20.     The task of drawing new congressional district maps in North Carolina occurs once every 10 years, following the decennial census. *See* U.S. Const. art. I, § 2; N.C. Const. art. II, §§ 3, 5.

21.     North Carolina gained a congressional district after the 2020 Census, due in large part to an increase in its minority population. Tr. 967:15–22 (Hise); *see also* LDTX260 (States with Greatest Black Net Migration Gains and Losses) (showing North Carolina had the third largest gain in Black migration from 2010–2020).

22.     Although the North Carolina General Assembly passed a congressional plan in 2021 (the "2021 Plan"), that plan was later invalidated as the product of intentional partisan gerrymandering, which was, at that time, unlawful under the North Carolina Constitution. *See Harper v. Hall* ("*Harper I*"), 2022-NCSC-17, ¶ 194, 380 N.C. 317, 395, 868 S.E.2d 499, 554 (2022), *overruled on alternative grounds in later appeal*, 384 N.C. 292, 886 S.E.2d 393 (2023), *and aff'd sub nom. Moore v. Harper*, 600 U.S. 1 (2023).

23.     The General Assembly passed remedial maps on February 17, 2022. Less than a week later, the remedial congressional map was likewise struck down as an unconstitutional partisan gerrymander. *See Harper v. Hall* ("*Harper II*"), 383 N.C. 89, 94–95, 881 S.E.2d 156, 162 (2022), *withdrawn and superseded on reh'g by Harper v. Hall* ("*Harper III*"), 384 N.C. 292, 886 S.E.2d 393 (2023).

- 6 -

24.     A court-appointed special master drew the congressional plan that North Carolina used for the 2022 elections, based on the General Assembly's remedial map and making changes necessary to bring the map into compliance with law. *Id*. at 181.

25.     On January 20, 2023, Legislative Defendants filed a petition for rehearing of the *Harper II* opinion. *Harper III*, 886 S.E.2d at 409. A newly-constituted North Carolina Supreme Court granted legislators' petition to rehear the partisan gerrymandering case on February 3, 2023. *Id*.

26.     On April 28, 2023, in *Harper III*, the North Carolina Supreme Court overruled *Harper I*, withdrew its decision in *Harper II*, and vacated the trial court's February 23, 2022, order concerning the remedial maps. *Harper III*, 886 S.E.2d at 449. In doing so, the Court held that "partisan gerrymandering claims present a political question that is nonjusticiable under the North Carolina Constitution." *Id.* at 300. That same day, the court also granted legislators' request to redraw the congressional and state legislative maps. *Id*. at 378.

27.     Before beginning work on the 2023 Congressional Plan, the General Assembly passed H.B. 259, a 625-page Appropriations Act, which included several provisions related to redistricting. Tr. 947:4–14 (Hise). In particular, the Appropriations Act repealed a 30-year old law that required redistricting materials to become public record after the passage of a redistricting plan, *see* Tr. 944:11–945:11 (Hise); WX172 at 3 (Excerpts of Enacted H.B. 259), and added a provision permitting the General Assembly to destroy records, *see* Tr. 946:4–22 (Hise); WX172 at 4. In other words, following the

- 7 -

passage of the Appropriations Act, all legislators and their staff members were free to destroy all materials relating to redistricting.

28.     The General Assembly passed the Appropriations Act on September 22, 2023, and it was enacted into law on October 3, 2023, after failing to receive the Governor's signature. Joint Stip. ¶ 8; *see also* NAACPPX107 (H.B. 259 Bill History).

29.     The General Assembly did not begin drawing the 2023 Congressional Plan until after it passed the Appropriations Act, Tr. 947:4–14 (Hise), and consequently, there are very few public records regarding the 2023 redistricting process.

30.     Before the 2023 redistricting process began in earnest, nonpartisan civil rights and voter advocacy organizations expressed their concern that the General Assembly would not have a "robust, transparent, and thoughtful process for receiving vital public input to draw new maps." JX046 at 2 (9/25/2023 Redraw Process Letter to NCGA). These organizations requested "allow[ing] for at least two weeks of public comment and legislative hearings after draft maps are released and prior to a vote in the legislature," "buil[ding] in time to hold public comment hearings in each North Carolina Congressional district and each metropolitan and micropolitan area," and "provid[ing] a public written evaluation of the Congressional, state Senate, and state House plans following their release, explaining why the committees drew the districts in the way they did." *Id.* at 3.

31.     In the end, the General Assembly held only three public hearings during the 2023 redistricting process, and no draft maps or proposed redistricting criteria were shared

in advance of any of the public hearings. *See* JX064 (9/19/2023 Senate Calendar Notice of Committee Meetings and Public Hearings); Tr. 967:25–968:6 (Hise).

32.     Senators Hise, Daniel, and Newton released a draft congressional plan on October 18, 2023, which was filed as Senate Bill 757 (S.B. 757) titled "Realign Congressional Districts 2023/CCJ-1." *See* Joint Stip. ¶ 18; JX106 (SB 757 (Congressional Plan) - First Edition (CCJ-1)); JX107 (Realign Congressional Districts 2023/CCJ-1 - First Edition). S.B. 757 ultimately became the enacted congressional plan with only minor modifications.

33.     The day after the draft map was released, the Senate Standing Committee on Redistricting and Elections released its redistricting criteria for the congressional and Senate maps. *See* Joint Stip. ¶ 26; JX002 at 3:10–16 (10/19/2023 Senate Redistricting and Elections Committee Transcript). The published plan criteria for congressional redistricting identified equal population, compactness, contiguity, and respect for existing political subdivisions as the applicable criteria. JX038 (2023 Congressional Plan Criteria). The criteria also stated that "[d]ata identifying the race of individuals or voters shall not be used in the drafting of districts," and that "[t]he General Assembly may consider partisan advantage and incumbency protection in the application of its discretionary redistricting decisions," as well as "incumbent residence." *Id.*

34.     On October 25, 2023—one week after the draft map was introduced—the General Assembly enacted the 2023 Congressional Plan. *See* Joint Stip. ¶ 36; JX041 (Senate Bill 757 Bill History). The map was not subject to gubernatorial veto.

- 9 -

**B. The 2023 Congressional Plan**

35.     The 2023 Plan disperses Black communities in the Piedmont Triad's former CD-6 across four separate predominantly white and rural congressional districts (CD-5, CD-6, CD-9, and CD-10), and concentrates Black communities in Mecklenburg, pushing them out of CD-14 and into CD-12.

**i. Piedmont Triad**

36.     The Piedmont Triad is a region and community of interest in north-central North Carolina centered around three major cities: Greensboro (in Guilford County), Winston-Salem (in Forsyth County), and High Point (spanning Guilford, Davidson, Randolph, and Forsyth Counties); Tr. 144:6–10 (Jones), Tr. 577:12–15 (Turner). The Piedmont Triad has a substantial Black population, especially in these three cities. Tr. 144:6–13 (Jones).

37.     In the 2022 Plan, CD-6 included much of the Black population in the Piedmont Triad, including the entire cities of Greensboro and High Point. WX1 at 9 (Expert Report of Dr. Jonathan Rodden).

38.     Under the 2022 Plan, CD-6 had a Black Voting Age Population (BVAP) of 31.65% and performed as an effective opportunity district where Black voters could elect their preferred candidates. WX1 at 10; WX4 at 7 (Expert Report of Dr. Maxwell Palmer). In the 2023 Plan, the BVAP of CD-6 decreased by more than 12 percentage points to 19.31%, resulting in a district (and surrounding districts) in which Black voters can no longer elect their candidates of choice. WX1 at 10; WX4 at 7; Tr. 169:15–21 (Palmer).

- 10 -

39.     Under the 2023 Plan, Black voters in former CD-6 who live in the Piedmont Triad—and specifically in Greensboro, High Point, and Winston-Salem—were dispersed across four separate congressional districts (CD-5, CD-6, CD-9, and CD-10) that span from Ashe County, which borders Tennessee and Virginia, to Hoke County, near the South Carolina border. JX078 (S.L. 2023-145, Map of 2023 Congressional Plan); WX1 at 14; Tr. 31:8–32:3, 34:18–23 (Rodden).

40.     The configuration of the Piedmont Triad districts in the 2022 Congressional Plan (JX 218) and the 2023 Congressional Plan (JX078) is shown below:



*Piedmont Triad Region in the 2022 Congressional Plan*

- 11 -



*Piedmont Triad Region in the 2023 Congressional Plan*

ii. **Mecklenburg Area**

41. The Charlotte-Concord-Gastonia Metropolitan Statistical Area includes the counties of Anson, Gaston, Iredell, Lincoln, Mecklenburg, Rowan, Union, and Cabarrus. WX1 at 8. In the 2022 Plan, CD-14 was a relatively compact district that included the south side of Charlotte, adjoining suburbs, and Gastonia, WX1 at 21, and CD-12 was also relatively compact and included the northern part of Charlotte and western part of Cabarrus County, JX218 (2022 Interim Congressional Map).

42. Under the 2022 Plan, CD-14 in Mecklenburg and Gaston Counties performed as an effective minority opportunity district. Under the 2023 Plan, Black voters were moved from CD-14 into CD-12, a district in which Black voters were already electing their candidates of choice by significant margins, and consequently CD-14 no longer performs as a district in which Black voters can elect their candidate of choice. WX4 at 7; Tr. 169:15–21 (Palmer).

- 12 -

43.     Under the 2023 Plan, Mecklenburg County—home to the state's largest Black population—is split three ways, rendering CD-12 and its surrounding districts significantly less compact than they were in the 2022 Plan. WX1 at 6–7; Tr. 35:4–22, 73:19–74:3 (Rodden). CD-12 concentrates urban Charlotte Black voters into a single district and includes many of Mecklenburg County's most racially diverse precincts, while excluding white voters in south Charlotte from the district. WX1 at 21. CD-14's eastern border includes appendages that wrap around CD-12 from three sides, while the district stretches west across four additional counties. The arrangement of Mecklenburg and Gaston Counties in the 2022 Congressional Plan (JX218) and the 2023 Congressional Plan (JX078) is shown below:



*CD-12 and CD-14 in the 2022 Congressional Plan*



*CD-12 and CD-14 in the 2023 Congressional Plan*

### C. Procedural History

44.    *Williams* Plaintiffs filed their Complaint on December 4, 2023. ECF No. 1. They filed their Second Amended Complaint on April 28, 2025. ECF No. 108. The Second Amended Complaint alleges that the 2023 Congressional Plan was passed with discriminatory intent in violation of the Fourteenth and Fifteenth Amendments and that the Plan intentionally diluted the votes of Black voters in violation of Section 2 of the Voting Rights Act. *Id.* at 33. The Complaint seeks to enjoin Defendants from enforcing the 2023 Congressional Plan and requests that the Court take all appropriate action to facilitate the adoption of a lawful congressional plan. *Id.* at 33–34.

45.    The Court held a six-day bench trial on June 16–18, June 20, and July 7–8. *Williams* Plaintiffs presented the testimony of four lay witnesses and four expert witnesses, *NAACP* Plaintiffs offered the testimony of nine lay witnesses and five expert witnesses,

- 14 -

and Legislative Defendants introduced the testimony of two lay witnesses and four expert witnesses. The parties also submitted numerous exhibits, including their experts' reports.

## III. Intentional Discrimination in Violation of the Fourteenth and Fifteenth Amendments to the United States Constitution

46.     *Williams* Plaintiffs presented evidence of intentional discrimination under the *Arlington Heights* factors, which include: (1) the discriminatory "impact of the official action;" (2) "the historical background" of the law; (3) "the specific sequence of events leading up" to the law; (4) any "departures from normal procedural sequence;" and (5) the "legislative or administrative history" of the law. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–68 (1977) (cleaned up).

### A.     The 2023 Plan's Impact on Black Voters in North Carolina (*Arlington Heights* 1)

47.     As the Court recounts in more detail below, the Court finds that the 2023 Plan has a disparate and discriminatory impact on Black voters in North Carolina. In short, the 2023 Plan eliminated at least two congressional seats in which Black voters previously had the opportunity to elect their candidate of choice—eliminations that Senator Hise admits he anticipated when the General Assembly passed the 2023 Plan. *See infra* Section III.A.v. Overall, the changes to the 2023 Plan benefited white voters at the expense of Black voters, a finding that none of Legislative Defendants' experts contested. *See infra* Section III.A.i. These changes resulted in the loss of political representation for Black voters in the Piedmont Triad and the Mecklenburg area. *See infra* Section III.A.

- 15 -

48.     Next, the Court finds that the 2023 Plan does in fact sort voters by race, as Dr. Rodden carefully showed. First, Dr. Rodden showed, through both descriptive and statistical analyses, how Black voters in the Piedmont Triad were broken up and distributed across CD-5, CD-6, CD-9, and CD-10 to dilute their voting strength. *See infra* Section III.A.ii.1. Second, Dr. Rodden showed, again through a descriptive and statistical analysis, how Black voters in Charlotte were excluded from CD-14 and concentrated into CD-12, again with the effect of diluting their voting strength. *See infra* Section III.A.ii.2.

49.     Finally, the Court finds that this racial sorting is not explainable on the basis of partisan goals. As Dr. Rodden showed, and Legislative Defendants' experts did not dispute, in CD-6, CD-12, and CD-14, Black voters were sorted in and out of those districts at much different rates than white voters, even controlling for party. *See infra* Section III.A.ii. Although Legislative Defendants have not contended the 2023 Plan's distribution of Black voters is explainable on the basis of attempted adherence to traditional redistricting criteria, Dr. Rodden's analysis nonetheless controlled for a variety of geographic factors and accounted for the need to keep precincts whole, confirming that the 2023 Plan's racial sorting is similarly not explainable by other constraints in the redistricting process. *See infra* Section III.A.ii. Dr. Rodden confirmed his findings not only with his county envelope analysis, but also with several other analyses and evaluation of Dr. Barber's simulated maps and the General Assembly's draft maps—including heavily pro-Republican plans comparable to the 2023 Plan's partisan composition—none of which

- 16 -

produced the kind of racial sorting Dr. Rodden found in the 2023 Plan. *See infra* Section III.A.ii.3.

### i. Dr. Maxwell Palmer

50. *Williams* Plaintiffs presented expert testimony from Dr. Maxwell Palmer demonstrating that Black voters are significantly less able to elect their preferred candidates under the 2023 Plan than under the 2022 Plan.

51. Dr. Palmer is a tenured associate professor of political science at Boston University. Tr. 154:6–10 (Palmer). He teaches classes on American politics, American political institutions, data science, and political methodology, and his research focuses on redistricting, voting rights, Congress, and local politics. Tr. 154:11–17 (Palmer). Dr. Palmer has been accepted as an expert witness in approximately a dozen redistricting matters and has provided a racially polarized voting analysis in the same number of cases. Tr. 154:18–155:4 (Palmer); WX6 at 20–21 (Supplemental Report of Dr. Maxwell Palmer). Courts have previously credited and relied on his racially polarized voting analyses, and he has never been rejected as an expert by any court. Tr. 154:21–155:7 (Palmer).

52. The parties stipulated and the Court finds that Dr. Palmer is an expert in redistricting, political science, and data analysis. *See* Joint Stip. ¶ 93.

53. Dr. Palmer showed that Black voters are significantly less able to elect their candidates of choice under the 2023 Plan than under the 2022 Plan. Tr. 169:6–12 (Palmer). Using data from every statewide, contested, partisan election from 2016 through 2022, Dr. Palmer found that Black-preferred candidates won a majority of the vote in 6.2

- 17 -

congressional districts on average under the 2022 Plan, but those same candidates would win only 3.8 districts under the 2023 Plan—a 38.7% drop. WX4 at 7–8; Tr. 159:18–24, 169:6–14 (Palmer). This decrease of about 2.4 seats eliminated Black voters' opportunity to elect their candidates of choice in CD-6 and CD-14. *See* WX4 at 7; WX6 at 5; Tr. 169:15–21 (Palmer).

54.     Figure 4 from Dr. Palmer's Expert Report shows the results of his performance analysis comparing the 2022 Plan with the 2023 Plan. *See* WX4 at 7.



**Figure 4:** Performance of Black-Preferred Candidates in Each District Under the 2022 and 2023 Plans

55.     Using 2024 election data, the decrease in Black voters' ability to elect their candidates of choice was even larger. While Black-preferred candidates won the majority

of the vote in 6.8 districts under the 2022 Plan, that figure fell by almost three seats to 3.9 districts under the 2023 Plan. WX6 at 5–6; Tr. 170:3–13 (Palmer).

56.     Dr. Palmer also compared Black and white voters' respective ability to elect their preferred candidates under both 2022 and 2023 Plans. WX4 at 8–9; Tr. 170:19–171:16 (Palmer). Dr. Palmer calculated the percentage of voters in each racial group living in a district where their preferred candidate won under both the 2022 Plan and the 2023 Plan. Tr. 171:17–172:7 (Palmer). This analysis considered the preferences of individual voters; in other words, each voter's ability to elect their preferred candidate is counted individually, regardless of which candidate the racial group prefers collectively. WX4 at 8–9; Tr. 172:8–23 (Palmer).

57.     Dr. Palmer's analysis showed that the movement of voters between the 2022 Plan and the 2023 Plan benefitted white voters at the expense of Black voters. For instance, using the 2020 presidential election results, Dr. Palmer found that under the 2022 Plan, 66% of Black voters lived in a district where they could elect their preferred candidates. That figure fell more than 20 percentage points under the 2023 Plan, with just 43% of Black voters living in a district where their preferred candidate won. WX4 at 9; Tr. 172:24–173:11 (Palmer). By contrast, between the 2022 Plan and the 2023 Plan, the number of white voters who lived in a district where their preferred candidates won jumped from 58.6% to 69.5%. WX4 at 9; Tr. 173:12–15 (Palmer).

58.     Figure 5 from Dr. Palmer's Expert Report below shows these differential effects. *See* WX4 at 9.



**Figure 5:** Differential Effects of Redistricting on Electing Preferred Candidate by Race, 2022 to 2023 Plans, 2020 Election for U.S. President

59.     Expanding this analysis to all 48 statewide elections from 2016–2022, Dr. Palmer found the same pattern. While the percentage of Black voters living in districts where their preferred candidates won dropped by 19.1 percentage points on average, the percentage of white voters living in districts where their preferred candidates won increased by 8.7 percentage points. WX4 at 9–10; Tr. 173:21–174:4 (Palmer). In short, Dr. Palmer found that switching from the 2022 Plan to the 2023 Plan had opposite effects for Black and white voters: a smaller share of Black voters lived in districts where their preferred candidates won, and a greater share of white voters lived in districts where their preferred candidates won, WX4 at 9–10; Tr. 174:5–13 (Palmer), notwithstanding the fact that North Carolina's minority population drove the state's population growth and the addition of a congressional district, *see supra* Section II.A.

- 20 -

60. The effects were again even greater using 2024 election data, where the percentage of Black voters living in districts where their preferred candidates won dropped by 26.7 percentage points; by contrast, the percentage of white voters living in districts where their preferred candidates won increased by 9.6 percentage points. WX6 at 6; Tr. 174:16–175:2 (Palmer). 2024 election data thus provided further support for Dr. Palmer's conclusion that the switch to the 2023 Plan disproportionately harmed Black voters and benefited white voters. Tr. 175:3–7 (Palmer).

61. None of Legislative Defendants' experts—including Dr. Alford, Defendants' only expert to respond to Dr. Palmer's analyses—disputes Dr. Palmer's findings that Black-preferred candidates win far fewer congressional districts under the 2023 Plan than under the 2022 Plan, or that the 2023 Plan disproportionately harms Black electoral opportunity to the benefit of white electoral opportunity. Tr. 1195:22–1196:18 (Alford), 170:14–18 (Palmer), 175:8–11 (Palmer).

62. The Court finds Dr. Palmer credible and his testimony persuasive.

### ii. Dr. Jonathan Rodden

63. While Dr. Palmer examined whether the 2023 Plan disparately impacted Black voters, Dr. Jonathan Rodden analyzed whether and how the 2023 Plan sorted voters by race in the Piedmont Triad and the Mecklenburg area. He found that voters in the Piedmont Triad and the Mecklenburg area were sorted along racial lines and that this racial sorting could not be fully explained by partisan considerations or attempted adherence to traditional redistricting criteria.

- 21 -

64.     Dr. Rodden is a tenured professor of political science at Stanford University. Tr. 26:22–27:1 (Rodden). His academic research focuses on voting, demographics, geography, and aspects of election administration, including registration, the structure of precincts, redistricting, and methods of voting, and he has published several papers and books focusing on the patterns of political representation, geographic location of demographic and partisan groups, and the drawing of electoral districts. WX1 at 3. Dr. Rodden regularly works with large data sets, including survey data, voter files, and other administrative datasets at the individual-level, and census block or precinct level data. Tr. 27:2–6, 28:15–29:1 (Rodden). He has authored 35–40 peer-reviewed articles, as well as several books, and his work has been recognized with numerous awards, including a Guggenheim Fellowship and a Carnegie Foundation Fellowship. Tr. 27:7–18 (Rodden).

65.     Dr. Rodden has extensive experience serving as an expert in redistricting matters, including in Florida, Virginia, Michigan, and Pennsylvania. Tr. 27:19–28:14 (Rodden); *see* WX1 at 48–49. He has testified for both plaintiffs challenging redistricting plans, as well as states defending redistricting plans, and his work in Pennsylvania culminated in the state implementing the congressional plan he drew. Tr. 28:10–14, 29:2–4 (Rodden). No court has ever rejected him as an expert or rejected his analyses. Tr. 29:5–8 (Rodden).

66.     Both Legislative Defendants' experts Dr. Michael Barber and Dr. Sean Trende testified that Dr. Rodden is a well-respected political scientist in their field; both Dr. Barber and Dr. Trende have cited and relied on Dr. Rodden's work and utilized

- 22 -

analytical tools Dr. Rodden has developed in their own work. Tr. 1063:23–1064:16 (Barber); Tr. 1414:24–1415:8 (Trende).

67.     The parties stipulated and the Court finds that Dr. Rodden is qualified to offer expert testimony in the fields of redistricting, including drawing and analyzing redistricting plans, political and racial geography, applied statistics, geographic information systems, political science, and quantitative methods. Joint Stip. ¶ 92.

68.     Dr. Rodden began his analysis with an assessment of the distribution of racial groups in North Carolina and the 2023 Congressional Plan in relation to traditional redistricting criteria like compactness, contiguity, and respect for political subdivisions. WX1 at 6–8; Tr. 29:23–30:8 (Rodden). He also conducted several descriptive and quantitative analyses to further examine whether voters were sorted among districts according to race and whether the racial sorting can be explained by partisan considerations. WX1 at 8–23; WX2 at 4–27 (Reply Report of Dr. Jonathan Rodden); Tr. 30:9–16 (Rodden).

### 1.     Piedmont Triad

69.     Dr. Rodden examined 2022 and 2023 district configurations in the Piedmont Triad. In the 2022 Plan, the Piedmont Triad, including the entire cities of Greensboro and High Point, were kept together in CD-6. WX1 at 9.

70.     By contrast, in the 2023 Congressional Plan, the Triad is divided across four different districts, each of which extracts portions of the cities of the Triad and pairs them with distant, primarily rural-dominated areas. WX1 at 5, 9; Tr. 31:10–15 (Rodden).

- 23 -

71.     CD-5 stretches from the western part of the state and reaches into Guilford County from the north to capture primarily Black areas of Greensboro, pairing them with geographically distant counties reaching the Tennessee and Virginia borders like Watauga, Ashe, and Alleghany Counties. JX078; WX1 at 9–10; Tr. 31:16–18, 34:18–23 (Rodden).

72.     CD-6 is anchored in rural Davie, Davidson, and Rowan Counties to the southwest of the Triad cities and extends towards Mecklenburg, but it reaches up and carves out portions of both Winston-Salem and Greensboro and scoops up most of High Point. JX078; WX1 at 9–10; Tr. 31:19–22, 34:18–23 (Rodden).

73.     CD-9 stretches from Hoke County near the South Carolina border to Alamance County near the Virginia border and combines several non-contiguous fragments of Greensboro with relatively rural Alamance, Randolph, Moore, and Hoke Counties. JX078; WX1 at 14.

74.     CD-10 starts in western North Carolina in a relatively rural set of counties (including Lincoln, Catawba, and Iredell) and then reaches across five counties into Forsyth County to capture a pocket of Winston-Salem. JX078; WX1 at 9–10; Tr. 31:23–32:3, 34:18–23 (Rodden).

75.     WX1 at 15, below, shows the fragmentation of the Piedmont Triad:

- 24 -



Figure 5: Piedmont Triad Major City Boundaries and 2023 District Boundaries

76. As a result of the reconfiguration of the Piedmont Triad—namely the pairing of urban Triad cities with distant rural counties—the compactness of CD-6, CD-9, CD-10, and CD-13 dropped significantly in the 2023 Plan, both as a numerical matter and as a visual matter. WX1 at 6–7; Tr. 35:4–22 (Rodden).

77. The 2023 Congressional Plan also increased the number of political subdivision splits across the region. Although the 2022 Plan had just one county split in the Triad, the 2023 Plan has three (one split in Forsyth County and two splits in Guilford County), which divides Guilford County among three different districts. WX1 at 8; Tr. 35:23–36:8 (Rodden). Municipal splits also increased; the 2022 Plan contained only two municipality splits in the Triad, while the 2023 Plan has nine total municipality splits,

- 25 -

including in each of the major cities of Winston-Salem, High Point, and Greensboro. WX1 at 8, 14; Tr. 36:9–14 (Rodden).

78.     Defendant's expert, Dr. Trende, who in previous cases has examined these factors as evidence of the racial motivation behind a map, did not dispute Plaintiffs' evidence that traditional districting principles were sacrificed in the drawing of the 2023 Plan. Tr. 1371:16–1373:16 (Trende).

79.     The corridors, appendages, and splits described above are largely concentrated in areas with significant Black populations. WX1 at 8–10. The reconfiguration of the Piedmont Triad accordingly led to significant changes in the distribution of racial groups across congressional districts. WX1 at 10.

80.     While the 2022 Plan contained a range of BVAPs across districts, the 2023 Plan produced an unusually tight distribution of BVAP across the state. WX1 at 10–11; Tr. 37:24–40:13 (Rodden). Table 2 from Dr. Rodden's Expert Report compares BVAP per district in the 2022 Plan with the 2023 Plan, as shown below. *See* WX1 at 10, Table 2.

**Table 2: Distribution of Black Voting-Age Population Across Districts**

| District | BVAP 2022 | BVAP 2023 | BVAP Change |
|---|---|---|---|
| 1 | 41.23% | 40.42% | -0.81% |
| 2 | 18.18% | 24.01% | 5.83% |
| 3 | 18.89% | 21.35% | 2.46% |
| 4 | 26.64% | 21.73% | -4.91% |
| 5 | 12.51% | 18.73% | 6.22% |
| 6 | 31.65% | 19.31% | -12.34% |
| 7 | 19.01% | 20.07% | 1.06% |
| 8 | 14.48% | 17.69% | 3.21% |
| 9 | 24.57% | 22.36% | -2.21% |
| 10 | 10.51% | 16.58% | 6.07% |
| 11 | 4.01% | 3.88% | -0.13% |
| 12 | 35.96% | 38.31% | 2.35% |
| 13 | 22.04% | 19.45% | -2.59% |
| 14 | 20.68% | 15.93% | -4.75% |

81.    In 11 of the 14 districts in the 2023 Plan, the BVAP is clustered around 20%. In the Triad region specifically, the BVAP is concentrated within a narrow five-point margin (approximately 17 to 22%). WX1 at 10–11.

82.    Dr. Rodden explained that the concentration of BVAP around 20% in the 2023 Plan is an outgrowth of racial sorting that concentrated Black voters in two districts and broke up geographically proximate Black communities elsewhere. WX1 at 11. Legislative Defendants' expert, Dr. Barber, *see infra* Section III.A.iii.1, has testified in other cases that concentrating BVAP within such a narrow range shows that careful attention was paid to race in drawing the district. Tr. 1097:14–1098:9 (Barber).

- 27 -

83.     Dr. Rodden quantified this movement of Black voters using a "fractionalization" analysis, which calculates the probability that two randomly selected people from the same district under the 2022 Plan will end up in the same district in the 2023 Plan. WX1 at 28; Tr. 64:20–65:21, 66:14–19 (Rodden). Dr. Rodden found that Black voters were much more likely to have been moved into new districts than white voters, and that these movements were concentrated in the Triad and the Mecklenburg areas (discussed further *infra* Section III.A.ii.2).

84.     For instance, in the Triad, voters in CD-5 and CD-6 experienced a high degree of fractionalization from their former districts; voters who resided in CD-5 and CD-6 were more likely to be taken out of their former districts. WX1 at 28; Tr. 66:20–67:6 (Rodden). At the same time, Dr. Rodden found that CD-5 and CD-6 also experienced the largest changes in BVAP. WX1 at 28; Tr. 67:7–14 (Rodden). In other words, districts where BVAP increased or decreased most significantly were the districts that became the most dramatically altered. WX1 at 28.

85.     Figure 10 from Dr. Rodden's Expert Report, shown below, presents the results of this fractionalization analysis. WX1 at 28. It shows that the districts whose populations experienced the most fractionalization were CD-6, CD-12, and CD-14, along with the districts heavily affected by their redrawing, including CD- 5, CD-9, CD-10, and CD-13. WX1 at 28.

**Figure 10: Fractionalization of 2022 Districts and change in BVAP**

86.    Dr. Rodden conducted several other analyses to understand whether and how the 2023 Plan sorted voters by race. One of these was the county envelope analysis, which is a descriptive methodology to quantify the extent to which district boundaries split communities in ways that correspond to racial lines of segregation. Tr. 40:16–41:5 (Rodden). Put differently, the county envelope analysis provides information about whether the lines of a district have the effect of sorting voters by race. Tr. 42:23–24 (Rodden).

87.    In this analysis, the "envelope" of a district is comprised of all the counties that are either fully contained or partially contained in a specific congressional district. Dr.

- 29 -

Rodden then compared the racial characteristics of voters within the district to voters outside of the district within the envelope. Tr. 41:9–19 (Rodden). This is a simple exercise that counts voters in each racial group who are inside and outside the congressional district within the envelope. Tr. 41:15–19, 1461:8–14 (Rodden).

88.     To conduct this analysis, Dr. Rodden used individual-level data from the voter file. Tr. 45:19–46:11 (Rodden). The primary benefit, Dr. Rodden explained, of this individual-level data is that it allows for the direct examination of racial differences within each partisan category to understand whether racial differences persist after controlling for party. Tr. 45:19–46:23 (Rodden).

89.     In the Piedmont Triad, Dr. Rodden found that white voters were more likely to be selected for inclusion into CD-6, while Black voters were more likely to be excluded. In the CD-6 envelope, 51.4% of white voters are placed into CD-6, while 38.2% of Black voters are placed into CD-6. Tr. 43:17–44:15 (Rodden); WX1 at 12. This result tracks the changes in BVAP noted above: in CD-6—the performing Black-opportunity Triad district in the 2022 Plan—BVAP dropped more than 12 points from around 32% to 19% between the 2022 and 2023 Plans. WX1 at 9– 10.

90.     Dr. Rodden further controlled for partisanship to determine whether evidence of racial sorting could be explained by party politics. Tr. 45:17–46:11 (Rodden). Within each partisan group, Dr. Rodden found the same evidence of racial sorting; white Democrats, white Republicans, and white unaffiliated voters were more likely to be placed into CD-6 than their Black counterparts—42.9% of white Democrats compared to 37.7%

- 30 -

of Black Democrats, 55.6% of white Republicans compared to 43.4% of Black Republicans, and 50.5% of white unaffiliated voters compared to 39.4% of Black unaffiliated voters were placed in CD-6. WX1 at 12; Tr. 46:12–23 (Rodden). Table 4 from Dr. Rodden's Expert Report presents the results of the envelope analysis for CD-6 within each partisan group. WX1 at 12.

**Table 4: Envelope Analysis for CD 6, Broken Down by Partisan Group**

| Party of Registration | Group | Registered Voters of Group in Envelope | Registered Voters of Group in CD 6 | % of Group that is in CD 6 |
|---|---|---|---|---|
| Democrat | White | 118,229 | 50,667 | 42.9% |
| | Black | 182,418 | 68,738 | 37.7% |
| Republican | White | 288,246 | 160,237 | 55.6% |
| | Black | 5,718 | 2,483 | 43.4% |
| Unaffiliated | White | 217,756 | 109,916 | 50.5% |
| | Black | 54,080 | 21,289 | 39.4% |

91.     Dr. Rodden also ran regressions as part of his county envelope analysis to control for various geographic factors that may have played a role in which district particular voters were placed in. Specifically, Dr. Rodden's regressions controlled for location of a voter within a district and residence in one of the major Triad cities. Tr. 46:24–47:24 (Rodden). Dr. Rodden also controlled for the fact that voters reside in precincts (in

- 31 -

North Carolina, called voter tabulation districts, or VTDs) and are typically placed into a district with the rest of their VTD. WX1 at 13; Tr. 1466:17–1468:22 (Rodden). Dr. Rodden found that even after controlling for all of these geographic variables and constraints in the redistricting process, the regressions produce the same results as the original envelope analysis: Black voters were more likely to be kept out CD-6, while white voters were more likely to be placed in CD-6. WX1 at 13; Tr. 47:17–48:2 (Rodden).

92.  Dr. Rodden specifically controlled for party in his regressions by separately examining the differences across racial groups within each partisan group. Tr. 48:3–11 (Rodden). Controlling for both geographic variables and party, he again found the same racial differences: Black Democrats, Republicans, and unaffiliated voters were less likely to be placed in CD-6, while white voters in every partisan group were more likely to be placed in CD-6. WX1 at 13; Tr. 48:3–11 (Rodden).

93.  While Dr. Rodden explained that using North Carolina's individual-level data was valuable and reliable—indeed, Defendants' expert Dr. Barber and other political scientists have done work validating the use of individual-level party registration data as a measure of how individuals vote in North Carolina—Dr. Rodden also conducted an additional county envelope analysis in response to Defendants' experts suggestion that the analysis should be done at the VTD-level. The VTD-level analysis showed very similar results to Dr. Rodden's original individual-level analyses, which Legislative Defendants' experts did not dispute. WX2 at 5–6; Tr. 48:12–50:1, 132:11–23 (Rodden); Tr. 1070:21–1071:2 (Barber).

- 32 -

94.     In response to Dr. Trende's critique that it would be more useful to examine only the boundaries of each district—instead of the full envelope—Dr. Rodden conducted a boundary analysis, comparing BVAP for matched VTDs on each side of the district boundary. WX2 at 11–12; Tr. 58:7–60:4 (Rodden). The boundary analysis only reinforced Dr. Rodden's initial findings that there are consistent and large racial differences between voters kept in and out of each district in the Triad. WX2 at 12.

95.     For instance, comparing the racial composition of VTDs on the boundary between CD-6 and CD-10, Dr. Rodden found that the BVAP in CD-10 is higher than that of CD-6 in nearly every VTD pair, with an average difference of 12 percentage points. WX2 at 11–12, 29; Tr. 60:23–61:16 (Rodden). Comparing the racial composition of VTDs in CD-6 and CD-9, Dr. Rodden found that the BVAP in CD-6 is higher than that of CD-9 for nearly every VTD pair, with an average difference of 23 percentage points. WX2 at 11–12, 28; Tr. 61:18–62:5 (Rodden). For CD-6 and CD-8, Dr. Rodden found that the BVAP in CD-6 is higher than that of CD-8 in nearly every VTD pair, with an average difference of 9 percentage points. WX2 at 11–12. And for CD-5 and CD-9, Dr. Rodden found that the BVAP in CD-5 is higher than that of CD-9 in almost every VTD pair, with an average difference of 18 percentage points. WX1 at 11–12.

96.     Dr. Rodden explained that this type of racial sorting, where Black voters are placed in CD-6 in some areas, but kept out in other areas, is consistent with an effort to spread Black voters across several districts. Tr. 44:18–45:15 (Rodden). Doing so keeps the BVAP low enough across all districts, such that Black voters are unable to elect their

preferred candidate in any district. WX1 at 10, 27; Tr. 63:15–64:17 (Rodden). Dr.

Rodden's Figure 4, shown below, illustrates how Black voters were placed in CD-6 in some

areas, while placed in CD-10 and CD-5 in others. WX1 at 14.



Figure 4: Dot Density Map of Race in the Piedmont Triad Region

97.     Dr. Rodden conducted several additional analyses to examine whether the

2023 Plan affected Black and white voters' effective representation differently. For

instance, one aspect of representation depends on voters residing in relatively compact

districts; geographically proximate communities often have similar interests or needs, and

can more effectively collectively lobby for policies to further their shared interests when

placed together in the same district. WX1 at 27; Tr. 63:15–64:17 (Rodden). On the flip

side, voters whose communities are fragmented across different districts and placed with faraway areas can have their representation undermined. Tr. 63:15–64:17 (Rodden).

98. Dr. Rodden found that, in the 2023 Plan, Black voters in particular were significantly more likely to be assigned to non-compact districts and be placed further from the center of their districts. For this analysis, Dr. Rodden examined the distance and racial composition of every census block to the median population center of the district to which it is assigned. WX1 at 29–30; Tr. 67:15–68:3 (Rodden). This analysis demonstrated that, as the Black population of a census block increases, so too does its distance from the center of its district. WX1 at 29–30; Tr. 68:4–14 (Rodden). The effect was especially pronounced for Black voters in the Triad. WX1 at 30; Tr. 68:15–69:3 (Rodden). Figure 11 from Dr. Rodden's Expert Report, shown below, illustrates the stark relationship between the Black population share and distance from the median population center in the Piedmont Triad. *See* WX 1 at 30.

- 35 -



**Figure 11: Change in Distance to Median Population Center of District from 2022 Plan to 2023 Plan, by Race**

99.     To further analyze how Black voters were removed from their surrounding communities, Dr. Rodden conducted a dislocation analysis. Tr. 69:4–11 (Rodden). This analysis helps us understand whether Black voters are located in districts that match the existing racial composition of their surrounding communities. Dr. Rodden considered what the racial composition of a bespoke congressional district built around each voter would look like and then compared the BVAP of that hypothetical district with the actual district in which they were placed. Tr. 69:12–23 (Rodden). Dr. Rodden then calculated a dislocation score to measure the difference between the BVAP of the neighborhood and the district. WX1 at 30–36; Tr. 69:12–23 (Rodden).

- 36 -

100.    In the Piedmont Triad, Black voters were consistently placed in districts with a much higher white population than their surrounding community. WX1 at 33, Tr. 70:15–71:7 (Rodden). The average racial dislocation score peaked at around -.12 or -.13, with an average of -.10, meaning that voters in the Piedmont Triad were placed in districts that on average had a 10% lower proportion of Black voters than a congressional district built around their community. WX1 at 30, 34; Tr. 72:10–14 (Rodden). These negative dislocation scores in the Piedmont Triad region indicate that Black voters were placed in districts that have a much higher white population than their natural neighborhoods. WX1 at 34, Tr. 71:8–72:18 (Rodden). Again, this is consistent with an effort to spread Black voters across several districts, where they are paired with distant white communities. Tr. 71:23–72:9 (Rodden).

101.    Figure 12 from Dr. Rodden's Expert Report, shown below, illustrates Dr. Rodden's racial dislocation analysis of the 2023 Plan. Green shading indicates areas where Black voters were placed into a district where the Black share of the district is larger than that of their neighborhood, which is associated with packing Black voters in a district, while red shading indicates areas where Black were placed into a district where the Black population share is lower than that of their neighborhood, which is associated with cracking or diluting Black voting strength. In the Piedmont Triad, the orange and red shading indicates that Black voters have been placed into a district with a higher white population than their neighborhood, especially for Black voters in Greensboro. *See* WX 1 at 33.



Racial Dislocation, 2024 Map

102.    In sum, the Court finds that the 2023 Plan's districts in the Piedmont Triad were configured to disperse Black communities across several districts, negatively impacting traditional redistricting principles like compactness and county and municipality splits. This dispersal also placed Black voters further away from the center of their districts and paired urban Black communities in the Triad cities with faraway, primarily rural white counties—decreasing their ability to collectively organize with their surrounding communities. Dr. Rodden conducted several analyses to examine the effects of the 2023

- 38 -

Plan on Black and white voters, and they all point to the same conclusion: voters were sorted by race in the Piedmont Triad.

### 2. Mecklenburg Area

103. Turning to Mecklenburg, Dr. Rodden explained that the 2022 Plan created two compact districts in the area, CD-12 and CD-14. WX1 at 6–7. Under the 2022 Plan, CD-14 consisted of two adjacent counties, Mecklenburg and Gaston, combining Black voters in Gastonia with other proximate Black communities. WX1 at 10.

104. Dr. Rodden's Figure 7 below shows the 2023 congressional districts in the Mecklenburg area, including CD-12 and CD-14. WX1 at 20. In the 2023 Plan, CD-14 spans six counties and stretches from rural counties Rutherford, Polk, Burke, and Cleveland to the east, while capturing portions of Mecklenburg and Charlotte with appendages that wrap around three different sides of the city. JX078; WX1 at 18–20; Tr. 32:4–14 (Rodden).

105. CD-12 is comprised of large parts of Charlotte, though the southern part of Charlotte is divided into three different districts, between CD-8, CD-12, and CD-14. JX078; WX1 at 18; Tr. 32:4–14 (Rodden). CD-8 spans nine counties including rural Stanly, Montgomery, Anson, Richmond, Scotland, and Robeson to the east. JX078; Tr. 74:24–75:4.



106.    The reconfiguration of the Mecklenburg area rendered CD-8, CD-12, and CD-14 less compact under the 2023 Plan than they were in the 2022 Plan. WX1 at 8. CD-14 became substantially less compact, reaching around three sides of Charlotte and extracting portions of Mecklenburg in a claw-like configuration. WX1 at 6–7, 18–20; Tr. 73:19–74:3 (Rodden). CD-12 does not track the Charlotte municipal boundary but instead twists and turns in its boundary to capture pockets of Black voters and exclude white neighborhoods. WX1 at 16–18. CD-8 winds through several rural counties to the east before reaching into Mecklenburg to grab portions of Charlotte. JX078; WX1 at 18–20; Tr. 32:4–14 (Rodden).

107.    The 2023 Plan also increased the number of political subdivision splits across the region. The 2022 Plan had two county splits, while the 2023 Plan has three, and municipality splits increased from three under the 2022 Plan to seven under the 2023 Plan. WX1 at 8; Tr. 74:4–74:14 (Rodden). Charlotte is also divided into three different districts under the 2023 Plan. WX1 at 8. While CD-12 contains much of the Black population from Charlotte, the district boundary does not track the municipality boundary. WX1 at 19–20; Tr. 72:21–73:18 (Rodden). These appendages and splits closely correspond with racial lines. WX1 at 18–19.

108.    Dr. Rodden's county envelope analysis showed that Black voters were much more likely to be sorted into CD-12, while white voters were more likely to be taken out. In the CD-12 envelope, 52.6% of white voters were placed into CD-12, compared to 82% of Black voters. WX1 at 17; Tr. 75:12–23 (Rodden).

109.    The same patterns of racial sorting persisted when controlling for party—59.7% of white Democrats compared to 82.9% of Black Democrats, 45.7% of white Republicans compared to 79.5% of Black Republicans, and 53.8% of white unaffiliated voters compared to 79.3% of Black unaffiliated voters were placed in CD-12. WX1 at 17; Tr. 75:25–76:4 (Rodden). Dr. Rodden testified that the magnitude of these differences in CD-12 were "roughly similar" to one of the districts struck down in *Cooper v. Harris*, where the county envelope analysis was used and relied upon by the court to find racial predominance. Tr. 76:5–10 (Rodden); *Cooper v. Harris*, 581 U.S. 285, 315–16 (2017).

- 41 -

110.    Table 8 from Dr. Rodden's Expert Report, shown below, presents the results
of the envelope analysis for CD-12 within each partisan group. WX1 at 17.

**Table 8: Envelope Analysis for CD 12, Broken Down by Partisan Group**

| Party of Registration | Group | Registered Voters of Group in Envelope | Registered Voters of Group in CD 12 | % of Group that is in CD 12 |
|---|---|---|---|---|
| Democrat | White | 97,135 | 58,003 | 59.7% |
| | Black | 173,694 | 144,055 | 82.9% |
| Republican | White | 130,802 | 59,789 | 45.7% |
| | Black | 5,158 | 4,102 | 79.5% |
| Unaffiliated | White | 160,347 | 86,187 | 53.8% |
| | Black | 52,521 | 41,640 | 79.3% |

111.    The opposite pattern emerges in CD-14, where white voters were more likely
and Black voters were less likely to be sorted into CD-14. In the CD-14 envelope, 57.2%
of white voters are placed into CD-14, while 28.7% of Black voters are placed into CD-14.
WX1 at 22; Tr. 76:11–23 (Rodden). These differences again persist when controlling for
party, with 48.5% of white Democrats compared to 28.2% of Black Democrats, 64.9% of
white Republicans compared to 34.5% of Black Republicans, and 54.3% of white
unaffiliated voters compared to 29.8% of Black unaffiliated voters being placed in CD-14.

- 42 -

WX1 at 22; Tr. 76:24–77:3 (Rodden). Table 12 from Dr. Rodden's Expert Report, shown below, presents the results of the envelope analysis for CD-14 within each partisan group. *See* WX 1 at 22.

**Table 12: Envelope Analysis for CD 14, Broken Down by Partisan Group**

| Party of Registration | Group | Registered Voters of Group in Envelope | Registered Voters of Group in CD 14 | % of Group that is in CD 14 |
|---|---|---|---|---|
| Democrat | White | 139,966 | 67,925 | 48.5% |
| | Black | 208,784 | 58,956 | 28.2% |
| Republican | White | 251,223 | 163,139 | 64.9% |
| | Black | 6,620 | 2,281 | 34.5% |
| Unaffiliated | White | 246,827 | 133,961 | 54.3% |
| | Black | 62,508 | 18,651 | 29.8% |

112. Dr. Rodden's regressions in CD-12 and CD-14, which control for various geographic factors and party, *see supra* Section III.A.ii.1, provide very similar results to the results above. Tr. 77:4–10 (Rodden). Even after controlling for geographic variables and party, the regressions produce the same results as the original envelope analysis: Black voters were more likely to be kept out of CD-14 and placed in CD-12, while the opposite was true for white voters. WX1 at 22–23, 38.

- 43 -

113.    Again, Dr. Rodden conducted an additional analysis focusing on the boundaries of each district in response to Dr. Trende's suggestion. Comparing the BVAP for matched VTDs on each side of the district boundary, Dr. Rodden's boundary analysis reinforced his initial findings that there are consistent and large racial differences between voters kept in and out of CD-12. Comparing the racial composition of VTDs in CD-12 and CD-14, Dr. Rodden found that BVAP is higher in CD-12 than CD-14 in nearly all the boundary VTD pairs, with an average difference of around 18 percentage points. WX2 at 11–12, 31; Tr. 77:11–78:4 (Rodden). Dr. Rodden found the same result for the boundary between CD-12 and CD-8; the BVAP is higher in CD-12 than CD-8 in almost all the boundary VTD pairs, with an average difference of 11 percentage points. WX2 at 11–12, 30.

114.    These results were consistent with efforts to concentrate Black voters in CD-12, while keeping BVAP low in CD-14 and CD-8 such that Black voters cannot elect their preferred candidate in those districts. WX2 at 3, 17; Tr. 45:14–15 (Rodden). Dr. Rodden's Figure 6, shown below, depicts the concentration of Black voters in CD-12. WX1 at 19.



115.  Dr. Rodden also conducted a dislocation analysis for the Mecklenburg region using the same methodology described above, *see supra* Section III.A.ii.1. Dr. Rodden's found that the BVAP in CD-12 was significantly higher than in voters' immediate neighborhoods, especially in the southern part of the district. WX1 at 33; Tr. 74:15–23 (Rodden). For voters in CD-8 and CD-14 who live in suburban Black areas of the Charlotte metro area, the BVAP in their districts became much lower than the BVAP in their neighborhoods. WX1 at 33; Tr. 74:24–75:9 (Rodden). Figure 12 from Dr. Rodden's Expert Report below illustrates Dr. Rodden's racial dislocation analysis. WX1 at 33. The green shading in CD-12 indicates that Black voters have been placed in a district where the Black

population share is larger than that of their neighborhood, indicating a pattern of packing Black voters, while the red shading in the suburbs of Charlotte and fanning into CD-14 indicates that Black voters have been placed into a district where the Black population share is lower than that of their neighborhood, indicating a pattern of cracking or diluting Black voters.



### 3. Comparing the 2023 Plan to Alternative Plans

116. To further analyze the extent that race as opposed to party influenced the enacted plan, Dr. Rodden analyzed simulated plans produced by Dr. Barber. Dr. Barber

used a computer algorithm to generate an ensemble of 5,000 race-blind simulations that incorporated traditional redistricting criteria used by the General Assembly. Tr. 79:18–80:11 (Rodden); WX2 at 14. For instance, Dr. Barber instructed the algorithm to generate moderately compact and reasonably whole districts so that the number of county splits and compactness scores in the 2023 Plan are within the range of the simulated plans. WX2 at 20–21. Dr. Rodden explained that these simulations provide a neutral baseline to assess whether the enacted plan is an outlier compared to the race-neutral simulated plans on its racial composition.

117.     Compared to Dr. Barber's full set of 5,000 simulated plans, the distribution of BVAP across districts in the enacted plan were significant outliers—and in some places completely outside the range—of the simulated districts. WX2 at 16; Tr. 80:19–82:5 (Rodden). Figure 4 from Dr. Rodden's Reply Report, shown below, compares the BVAP distribution of the enacted plan with the simulated plans. WX2 at 16. Each district of the enacted plan appears as a red dot, while the range of simulated plans appears in gray. The district with the highest BVAP appears on the right, while the district with the lowest BVAP appears on the left. The 2023 Plan has two districts—CD-1 and CD-12 (at BVAP rank 1 and 2)—with an unusually high BVAP that falls at the tail end or outside the distribution of what the simulations produced, while the 2023 Plan's districts in the Triad (at BVAP rank 3, 4, 5, and 6) have unusually low BVAPs that are almost all complete outliers compared to the simulated districts. WX2 at 16; Tr. 82:6–14 (Rodden). Put

- 47 -

differently, the BVAP of these districts in the 2023 Plan almost never occurs in the race-blind simulations.



Figure 4: The Distribution of Black Voting-Age Population in Simulated Maps Versus 2023 Plan

118.    The same pattern holds when focusing on pro-Republican plans. From the set of 5,000 simulated plans, Dr. Rodden isolated the plans that produced ten Republican-leaning districts, like the 2023 Plan. Tr. 78:11–25 (Rodden). This set of plans allowed Dr. Rodden to consider whether the 2023 Plan's distribution of Black voters emerges in race-neutral plans that have a similar partisan composition to the 2023 Plan.

119.    As shown in Dr. Rodden's Figure 6 below, the 2023 Plan's narrow clustering of BVAPs around 20% never emerges in the pro-Republican simulations. WX2 at 20.

Rather, the two highest-BVAP districts in the 2023 Plan—which includes CD-12—have BVAPs that are well above the range of the simulated districts, while the 2023 Plan's Piedmont Triad districts—the third to sixth highest-BVAP districts—are well below the range of the simulated districts. WX2 at 20, Tr. 83:17–84:14 (Rodden). In short, the 2023 Plan's distribution of Black voters across districts never occurs in race-neutral simulated plans that have a similar partisan breakdown to the 2023 Plan. WX2 at 20; Tr. 84:15–21 (Rodden). Figure 6 compares the 2023 Plan with simulated plans with at least 10 Republican districts, with the enacted districts in red and the simulated districts in gray.



**Figure 6: BVAP and BVAP Rank in 2023 Enacted and Simulated North Carolina Congressional Plans, where Simulated Plans Produce at Least 10 Republican Seats**

120.    The same pattern exists in the Triad and Mecklenburg areas specifically. In Dr. Barber's race-blind simulated plans that produced four Republican seats in the

Piedmont Triad like the 2023 Plan, the racial distribution of the 2023 Plan never occurs: for three out of the four districts in the Piedmont Triad, the BVAP of the 2023 Plan is an extreme outlier compared to the simulated plans. WX2 at 22; Tr. 85:5–86:14 (Rodden). Figure 7 below focuses on the Piedmont Triad area districts and compares the BVAP distribution of the 2023 Plan districts (in red) with simulated plan districts (in gray) that produce four Republican seats in the Piedmont Triad.



Figure 7: BVAP and BVAP Rank in Enacted and Simulated North Carolina Congressional Plans for Districts in the Piedmont Triad Area where Simulated Plans Produce Four Republican Seats

121. Focusing on Dr. Barber's simulated plans that produced only one Democratic-leaning district in the Charlotte area, Dr. Rodden confirmed that the racial distribution in the Charlotte area under the 2023 Plan was highly unusual—the BVAP in

CD-12 in the 2023 Plan was higher than in almost all the of simulated plans, suggesting that Black voters were unnaturally concentrated into CD-12 even compared to simulated maps that packed Democrats in Charlotte and achieved the partisan goal of avoiding a second Democratic district in the Charlotte area. WX2 at 22–23; Tr. 86:15–88:9 (Rodden). Figure 8 below compares the BVAP of CD-12 in the 2023 Plan (the red line) with simulated plans that produce only one Charlotte-area Democratic-leaning district (the gray bars). WX2 at 23.



Figure 8: Distribution of Maximum Charlotte-Area BVAP in Simulations that Produced Only One Charlotte-Area Democratic-Leaning District

122.     Based on this analysis, Dr. Rodden concluded that the 2023 Plan's racial composition could not be attributed to an effort to achieve a strong pro-Republican congressional plan. WX2 at 20; Tr. 84:22–85:4 (Rodden). Because the 2023 Plan was an

- 51 -

outlier compared to race-neutral simulation plans that achieved the same partisan goals in the Piedmont Triad and Mecklenburg, Dr. Rodden concluded that the distribution of BVAP cannot be explained by partisanship. WX2 at 22–23; Tr. 86:9–14, 87:21–88:5 (Rodden).

123.    Dr. Rodden also compared draft maps considered by the General Assembly with the 2023 Plan and the pro-Republican simulated plans. He found that while all of the General Assembly's draft maps created the same number of pro-Republican districts as the 2023 Plan, the racial distribution across districts in the initial versions were more similar to Dr. Barber's simulated plans, but with each subsequent iteration, they became more similar to the 2023 Plan's distribution of race across districts. WX2 at 24, 26; Tr. 88:10–90:14, 1458:5–16 (Rodden). And as the draft maps began to resemble the final plan, the distribution of race across districts became more extreme outliers. *Id*. Figures 9 and 11 from Dr. Rodden's Reply Report, shown below, compare the BVAP distribution of the 2023 Plan with Dr. Barber's simulated plans and the General Assembly's draft maps. *See* WX2 at 24, 26.

- 52 -

**Figure 9: BVAP Arrayed by Rank, Pro-Republican Simulated Plans and Draft Maps from September**



**Figure 11: BVAP Arrayed by Rank, Pro-Republican Simulated Plans and Draft Maps from October**



- 53 -

124.    As the General Assembly refined their draft maps from September to October to the final plan, the maps deviated more and more from the race-neutral pro-Republican simulated plans. In the end, the 2023 Plan deviated the most from the simulated plans. WX2 at 26; Tr. 90:15–91:7 (Rodden).

125.    In sum, Dr. Rodden provided several robust analyses, including both qualitative and quantitative analyses, to examine the racial distribution of voters in the 2023 Plan. Dr. Rodden's methods each gave the General Assembly a different level of deference in evaluating the role of race in their choices. Comparing the simulations to the 2023 Plan gave minimal deference to the choices of the General Assembly by considering all possible alternatives configurations without regard for the county groupings of the General Assembly, while the boundary analysis gave maximum deference to the General Assembly by considering only the VTDs it chose to place along the border of districts. Tr. 1469:10–1472:3 (Rodden). The county envelope analysis took a middle approach, considering only the counties that the General Assembly chose to include in a particular district and considering potential alternative configurations without those counties. *Id.* While each analysis gave a different level of deference to the General Assembly's choices, each analysis led to the same conclusion: the 2023 Plan sorted voters based on race. Tr. 92:18–23 (Rodden).

126.    Ultimately, Dr. Rodden concluded that, based on all of his analyses, the 2023 Plan sorted voters along racial lines in the Piedmont Triad and the Mecklenburg region,

and that partisan considerations were not able to explain the observed racial sorting in the enacted plan. Tr. 92:24–93:6 (Rodden).

127.    The Court finds Dr. Rodden credible and his analyses persuasive.

### iii.    Legislative Defendants' Witnesses

128.    Legislative Defendants' experts fail to dispute the ultimate conclusions that Dr. Rodden reaches, and their own analyses confirm the racial sorting that Dr. Rodden identified in his analyses. Legislative Defendants have not suggested that the dispersion of Black voters in the 2023 Plan can be explained by attempted adherence to traditional redistricting principles. Moreover, Legislative Defendants' experts do not show that partisanship explains the observed racial sorting.

129.    The Court notes that Legislative Defendants have not argued that politics predominated in the drawing of the congressional plan, even though that would be lawful under current North Carolina law. Senator Hise explicitly testified that political goals did not predominate in the drawing of the congressional plan. Tr. 942:20–943:8 (Hise). Senator Hise also disavowed the use of any specific partisan metrics. Tr. 857:3–15 (Hise).

130.    Moreover, the Court notes that neither Dr. Barber nor Dr. Trende opined that race was *not* a motivating factor behind the 2023 Plan. While Defendants' experts Dr. Trende and Dr. Barber speculate about partisanship as a justification for the undisputed racial sorting and disparate impact of the Plan, neither of them had any knowledge of the General Assembly's actual intent, and both backed away from contending that partisan

- 55 -

goals predominated in the drawing of the map or even that any particular partisan objectives were used. Tr. 1115:4–7, 1115:8–10 (Barber); Tr. 1414:18–23 (Trende).

131. In fact, Dr. Barber conceded that: (1) he could not rule out race as a motivating factor behind the map and had no opinion on whether both race and party were at play; (2) he was not offering an opinion that the General Assembly did not consider race in drawing the enacted plan; and (3) he made no claims that partisanship was the predominant factor behind the 2023 Plan. Tr. 1115:8–10 (Barber); Tr. 1115:21–1116:3 (Barber); Tr. 1106:16–21 (Barber).

132. For his part, Dr. Trende's own analysis repeatedly found that, controlling for party, Black voters were treated differently than white voters, in a statistically significant way, and in several cases that the racial effect is even larger than the partisan effect. S*ee* LDTX266 at 74, 95 (Expert Report of Dr. Sean Trende); *see, e.g.,* Tr. 1392:13–1393:16, 1401:22–1402:10, 1405:16–1406:18, 1407:8–17 (Trende). And although Dr. Trende's report contended that politics was the predominant motive in the drawing of the 2023 Plan, *see* LDTX266 at 77–78, on cross examination, Dr. Trende backtracked, declining to offer such an opinion at trial. Tr. 1413:17–21 (Trende).

133. In short, none of Legislative Defendants experts disputed the fact that voters are sorted along racial lines in the 2023 Plan or showed that partisanship could explain the 2023 Plan's racial sorting, and Senator Hise explicitly disavowed that partisanship was the General Assembly's primary motivation or tool behind the 2023 Plan's configuration.

- 56 -

134. The Court next discusses the testimony of Legislative Defendants' experts, Dr. Barber and Dr. Trende in more detail. The Court notes that Defendants' experts did not dispute or respond to several of Dr. Rodden's analyses, including:

    i.    Dr. Rodden's descriptive statistics, including his evaluation of compactness, county and municipal splits, the extent to which the 2023 district boundaries fall along racial lines, the racial distribution across the congressional plan, and dot density maps, at WX1 at 6–11, 14–15, 19–20. Tr. 1065:2–25 (Barber); Tr. 1371:16–21 (Trende); Tr. 1372:7–1374:17 (Trende).

    ii.    Dr. Rodden's dislocation analysis at WX1 at 30–36. Tr. 1067:5–7, 1067:18–22 (Barber); Tr. 1374:19–22 (Trende).

    iii.    Dr. Rodden's findings that Black voters were more likely than white voters to be moved to a new district in the 2023 Plan and that Black voters were more likely than white voters to be moved further away from the median population center of their new district at WX1 at 27–30. Tr. 1067:8–17 (Barber); Tr. 1374:3–22 (Trende).

    iv.    Dr. Rodden's boundary analysis at WX2 at 11–12, 28–31. Tr. 1067:5–7, 1067:18–22 (Barber).

    v.    Moreover, no defense expert disagreed with any of the empirical data or statistics in Dr. Rodden's analyses, including his county envelope

- 57 -

analyses. Tr. 1066:15–1067:4 (Barber); *see, e.g.*, Tr. 1371:16–1374:22 (Trende); Tr. 1389:10–13 (Trende).

### 1.    Dr. Michael Barber

135.    Dr. Barber offers no conclusions as to whether the 2023 Plan has discriminatory effects or imposes a disparate impact on Black voters. Tr. 1064:21–1065:1 (Barber).

136.    Dr. Barber does not respond to, let alone refute, many of the analyses Dr. Rodden presents. As noted above, Dr. Barber does not dispute the accuracy of Dr. Rodden's descriptive statistics, including his evaluation of compactness, county and municipal splits, the extent to which the 2023 district boundaries fall along racial lines, and the racial distribution across the congressional plan. Tr. 1065:2–25 (Barber). Dr. Barber offers no opinions on Dr. Rodden's dislocation analysis or boundary analysis. Tr. 1067:5–7, 1067:18–22 (Barber).

137.    Dr. Barber also does not dispute any of the empirical data or statistics that Dr. Rodden reports. Tr. 1066:15–1067:4 (Barber). He does not dispute Dr. Rodden's findings that Black voters were more likely than white voters to be moved to a new district in the 2023 Plan and that Black voters were more likely than white voters to be moved further away from the median population center of their new district. Tr. 1067:8–17 (Barber). Nor does he dispute the accuracy of Dr. Rodden's analyses demonstrating that the racial composition of the enacted map's districts differs from the racial composition of

- 58 -

Dr. Barber's simulated districts, including the subset of Republican-leaning simulations. Tr. 1091:22–1092:9 (Barber).

138. Dr. Barber's critiques of Dr. Rodden's analysis are limited and offer the Court no basis to discredit or otherwise discount Dr. Rodden's analysis, conclusions, or credibility.

139. First, Dr. Barber takes issue with Dr. Rodden's use of voter file data (including party registration data) in this case. But Dr. Barber admitted that he himself uses voter file data in his own academic work, and he provided no evidence and no reason to believe that there is a discrepancy between self-reported race in the voter file and self-reported race in the census. Tr. 1067:23–1068:14 (Barber). In fact, in his previous academic work, Dr. Barber used party registration data from the North Carolina voter file to conclude that the "correlation between party registration and [precinct-level] election returns is high, suggesting that registration records are a reasonable measure of partisanship" and that "partisanship is closely aligned with candidate choices." Tr. 1068:15–1069:19 (Barber). He also agreed that the correlation between party registration and election returns is fairly high. Tr. 1069:20–24 (Barber). In any event, Dr. Rodden demonstrated—and Dr. Barber does not dispute—that the county envelope regression and descriptive statistics yield almost identical results using VTD-level data or individual-level voter file data. Tr. 1070:17–1071:7 (Barber); WX2 at 5–6; Tr. 48:12–50:1, 132:11–23 (Rodden).

140. Second, Dr. Barber contends that the General Assembly may not have considered the 2022 Plan when they drew the 2023 Plan, so the 2022 Plan is not necessarily

- 59 -

the right comparator. But Dr. Rodden explained that the 2022 Plan is an appropriate starting point when analyzing the 2023 Plan's effect on voters because it was the plan in place immediately before the new plan was administered. This approach is consistent with analyses that Dr. Rodden and other experts have undertaken in other redistricting cases, particularly in an instance of mid-decade redistricting where the 2022 Plan already has the appropriate number of districts and population in each district and there has not been a census reallocation. Tr. 32:15–33:8 (Rodden). Moreover, several of Dr. Rodden's analyses that support his ultimate conclusion—that the 2023 Plan exhibits racial sorting that cannot be explained by partisanship—do not depend on a comparison to the 2022 Plan, including his descriptive analysis of the 2023 Plan, county envelope analysis, dislocation analysis, border analysis, and simulation analysis.

141.    Third, Dr. Barber lodges several critiques of the county envelope analysis. For instance, he contends that running the county envelope regression on his simulations produced what he calls "false positives"—where race is flagged as a potential factor in the drawing of a district—and that therefore the county envelope method *alone* cannot tell us whether those results indicate racial motivations drove the district lines or some other reason did. Tr. 1086:5–11 (Barber). On this point, Dr. Rodden and Dr. Barber agree—the county envelope analysis is one tool that can shed light on whether voters were sorted along racial lines; it is not a standalone test of racial intent. WX3 at 3 (Supplemental Rebuttal Report of Dr. Jonathan Rodden); Tr. 42:21–43:14, 1463:21–1465:12 (Rodden); Tr. 1086:5–11 (Barber).

- 60 -

142. Moreover, this critique does not take into account the variety of analyses Dr. Rodden performed to provide evidence of racial sorting. Dr. Barber agreed that to analyze the role of race, it would be reasonable to gather as much information as possible to evaluate what role race played in the drawing of a map, which includes looking at the demographics and geographic features of the district, compactness, county splits, municipality splits, and redistribution of race—analyses conducted by Dr. Rodden and uncontested by Dr. Barber. Tr. 1086:24–1087:15 (Barber). Notably, Dr. Barber does not dispute or offer any analysis of Dr. Rodden's descriptive statistics, including his evaluation of compactness, county and municipal splits, the extent to which the 2023 district boundaries fall along racial lines, and the racial distribution across the 2023 Plan. Tr. 1065:2–25 (Barber).

143. Moreover, Dr. Barber has no evidence that the "false positives" arose in the Triad or in the Mecklenburg areas. Tr. 1089:18–1090:15 (Barber). Dr. Barber, for instance, undertook no analysis of the configurations of districts in his simulated plans. Tr. 1088:25–1089:17 (Barber). Therefore, Dr. Barber testified that he does not know what the particular district boundaries look like, whether the simulated districts divided counties and municipalities like the 2023 Plan does, or where any of the so-called "false positive" districts arise whatsoever. Tr. 1089:13–20, 1090:16–20 (Barber).

144. Though Dr. Barber claimed that the county envelope analysis is unreliable because race is correlated with other race-neutral factors connected to the redistricting process, like geography, population density, historical trends in employment, migration,

- 61 -

transportation, and even type of soil, he did not measure the correlation of race with any of those factors and testified that he does not actually know how correlated they are. Tr. 1088:4–21 (Barber). Moreover, Dr. Barber's speculations do not refute the observed racial sorting in the 2023 Plan.

145. Similarly, Dr. Barber (and Dr. Trende) suggest that geographic racial clustering of voters can explain the racial sorting exhibited in the 2023 Plan. But several of Dr. Rodden's analyses dispel this notion. As an initial matter, a visual inspection of the Piedmont Triad districts overlaid with race makes clear that the four districts carve up geographically proximate Black communities through noncompact districts that unnecessarily split counties and municipalities; nothing about the Triad districts' configuration reflects the "natural" distribution of racial groups. Tr. 1458:18–1459:17 (Rodden); *see* WX1 at 14. Dr. Rodden's county envelope analysis, as well as his median distance analysis and racial dislocation analysis indicate the same—the racial distribution of voters in the Triad and the Mecklenburg regions show disproportionate placement of Black voters in sprawling districts that do not reflect the racial geography of the state. *See supra* Section III.A.ii.1–2.

146. Dr. Rodden further explained that if the distribution of Black voters in the 2023 Plan was the product of natural racial clustering, then the 2023 Plan's racial composition would also emerge in Dr. Barber's race-neutral simulations. But Dr. Barber's simulations—both in their entirety and the in narrower, pro-Republican set—demonstrated that the distribution of race in the 2023 Plan is nothing like the race-neutral simulations

- 62 -

produce, particularly in the Piedmont Triad and Mecklenburg areas. Tr. 1459:18–1460:15 (Rodden).

147. Next, although Dr. Barber initially contended that the county envelope analysis unrealistically splits up apartment buildings or pulls voters from their households, he ultimately withdrew this claim on cross examination. Tr. 1112:7–17 (Barber). Rather, as Dr. Rodden explained—and Dr. Barber conceded—the county analysis does not move voters at all or make any assumptions that people can be moved outside their VTD; it simply counts voters by racial and partisan group who are included and excluded from a particular district within the envelope. 1461:22–1462:1, 1462:20–1463:2 (Rodden). Dr. Barber agreed, testifying that Dr. Rodden's envelope analysis tables present simple numerical analyses of who is in and out of the district—which does not split precincts or pull people out of their homes. Tr. 1111:12–1112:6 (Barber).

148. The critique about pulling voters out of their households seems to be in reference to a concern that certain geographic constraints were not considered in the envelope analyses in *Alexander v. South Carolina State Conference of the NAACP*, 602 U.S. 1 (2024). Tr. 1467:13–22 (Rodden). In *Alexander*, the Supreme Court found that one of the plaintiffs' expert's county envelope analysis failed to account for the geographic distribution of precincts and the fact that some precincts could not have been moved without sacrificing contiguity or compactness. 602 U.S. at 29. In light of the Court's concerns in *Alexander*, Dr. Rodden conducted several regressions controlling for various geographical constraints. *See supra* Section III.A.ii. Not only did the regressions control

- 63 -

for geography, Dr. Rodden also included specific measures to account for the fact that voters live in VTDs that are typically kept whole for purposes of redistricting. By adding a control for distance from the population center of the VTD, Dr. Rodden treated each voter in a VTD the same. Tr. 1467:18–1468:10 (Rodden); WX1 at 13. Dr. Rodden also clustered the standard errors by VTD when running the regressions, which accounts for the fact that voters are embedded within VTDs and cannot be removed from their VTDs (or their apartment buildings or households). Tr. 1468:14–22 (Rodden); WX1 at 13.

149. Dr. Barber ran his own VTD-level regressions with both party and race variables, but because of the small number of observations in the VTD-level dataset and the high correlation between race and party, his regressions produce unreliable results. Tr. 50:24–51:24 (Rodden); Tr. 1455:24–1456:13 (Rodden).

150. Dr. Barber's regressions are plagued with an issue commonly known in political science as multicollinearity, which occurs when two variables are highly correlated. WX2 at 6–7; WX3 at 5–7. When including two highly correlated variables like race and party in the same regression, it is "difficult to determine the independent effect of each variable" and causes "imprecise estimates of regression coefficients with wrong signs and an implausible magnitude for some regressors." WX3 at 5–6; *see* Tr. 56:8–22 (Rodden). Multicollinearity is especially problematic when the number of observations is relatively small, as is true for the VTD-level dataset in a county envelope. WX3 at 5–6; Tr. 56:8–22 (Rodden).

- 64 -

151. Specifically, Dr. Rodden explained that multicollinearity becomes an issue when two variables are correlated at a level above .8. Tr. 133:24–134:2 (Rodden). Dr. Trende agreed with Dr. Rodden that it would be difficult to draw conclusions about the effect of variables in a regression where the multicollinearity between two variables is above .8. Tr. 1375:3–15 (Trende). Dr. Barber even conceded that correlation between .7 and .8 is "moderately high" and that race and party are highly correlated in North Carolina and above .8 in in CD-6, CD-12, and CD-14. Tr. 1074:22–1075:23 (Barber). All of Dr. Barber's VTD-level regressions, however, exhibited correlation levels above .8, including .85 in CD-6, .88 in CD-12, and .96 in CD-14. WX2 at 7; Tr. 134:8–22 (Rodden).

152. Because Dr. Barber's regressions suffer from multicollinearity, they produce nonsensical results. For example, Dr. Barber does not dispute that 75% of Greensboro residents are in CD-5, and therefore less likely to be in CD-6 than in CD-5. Tr. 1071:8–1072:15 (Barber). But Dr. Barber's regression reached the opposite conclusion—that a VTD in Greensboro is 13% more likely to be in CD-6 than not. Tr. 1072:19–1073:15 (Barber). Dr. Barber himself admitted that he would not put a lot of value in the results produced by his regressions. Tr. 1077:11–18 (Barber). The Court agrees; Dr. Barber's regressions shed no light on whether race played a role in the drawing of the 2023 Plan.

153. Fourth, Dr. Barber takes issue with Dr. Rodden's comparisons between the 2023 Plan and Dr. Barber's simulated plans. Dr. Barber's primary concern—which he walked back on cross examination—was that the simulated plans were not strong enough

pro-Republican gerrymanders to be sufficiently analogous to the 2023 Plan. Tr. 1083:23–

1085:12 (Barber); *see* LDTX254 at 9–10 (Supplemental Report of Dr. Michael Barber).

154.    While Dr. Barber initially suggested that only districts with a 55%

Republican index (what he terms "safe Republican districts") are strong enough to be

comparable to the 2023 Plan's districts, Dr. Barber conceded that 55% was not a magic

number; political scientists, politicians, and incumbents might disagree on what constitutes

a safe district, and he does not dispute that there is no significant difference between a

partisan lean of just over 55% and a partisan lean of just under 55%. Tr. 1078:6–1080:6

(Barber). Dr. Rodden testified to the same, explaining that Dr. Barber's cutoff was

arbitrary. Tr. 91:20–92:2 (Rodden).

155.    The arbitrary nature of Dr. Barber's 55% cutoff was repeatedly confirmed at

trial. To determine which districts were "safe Republican districts" by his measure, Dr.

Barber created an election index, considering just 19 of the 72 statewide contested partisan

races between 2008 and 2022 based only on what evidence was most readily available.

Tr. 1080:12–1081:1 (Barber). As a result, he omitted elections for some offices in some

years but included them for other years. Tr. 1081:16–21 (Barber); Tr. 1081:22–1082:4

(Barber). His partisan index also weighs the 2020 election cycle more heavily than any of

the other cycles, without any principled reasoning. Tr. 1082:8–17 (Barber).

156.    Dr. Barber conceded that including a different set of races in his partisan

index could have resulted in lower partisan lean percentages for each district in the 2023

Plan, with some districts that he had previously identified as "safe" possibly dipping below

- 66 -

55%. Tr. 1083:1–15 (Barber). In fact, Dr. Barber created a second election index based on 2024 election results, which alone changed the number of "safe Republican districts" to nine in the 2023 Plan. Tr. 1083:16–22 (Barber).

157.    Moreover, Dr. Barber did not know if the General Assembly targeted a 55% Republican threshold or if they sought to create a specific number of districts with a 55% Republican lean. Tr. 1084:13–1085:4 (Barber). He also conceded that it was possible any index considered by the General Assembly would produce different partisan leans for the districts. Tr. 1083:23–1084:12 (Barber). And Dr. Barber did not know whether the General Assembly used the same set of elections he considered, or even if the General Assembly used an index at all. Tr. 1083:23–1084:22 (Barber).

158.    Next, while Dr. Barber criticized Dr. Rodden's analysis of his simulations because the simulations may not reflect the complete suite of factors that the General Assembly may have considered, Dr. Barber himself has previously conducted precisely the same type of analysis in other cases. Tr. 1090:21–1091:1 (Barber). For example, in Dr. Barber's prior work in Louisiana, Dr. Barber's simulations did not account for all possible criteria the legislature may have considered, but Dr. Barber nevertheless concluded that the map drawer there made "a careful and intentional effort" to draw districts on the basis of race. Tr. 1092:10–1098:9 (Barber). The same is true in other cases. Tr. 1098:12–23 (Barber).

159.    Though Dr. Barber suggests that factors other than race might have led to the 2023 Plan's configuration, he repeatedly conceded that other possible considerations did

- 67 -

not cause the 2023 Plan to be a complete racial outlier as compared to his simulations. Dr. Barber admitted that his simulations took into account population equality, compactness, contiguity, and county splits, so each of these factors can be ruled out as the reason for the observed racial differences between his simulations and the 2023 Plan. Tr. 1098:24–1100:19 (Barber). And despite his prior claims regarding the correlation between race and other race neutral factors, Dr. Barber also conceded that North Carolina's unique racial geography can be ruled out as causing the differences since the simulations operate with the same geographic distribution as the enacted map. Tr. 1100:22–25 (Barber); *see* Tr. 1087:16–19 (Barber); LDTX253 at 24–25 (Expert Report of Dr. Michael Barber).

160.    Dr. Barber also conceded that he does not claim that respect for municipal boundaries, consideration of incumbent addresses, or consideration of any particular communities of interest account for the observed racial differences between his simulations and the 2023 Plan. Tr. 1101:12–17, 1102:10–14, 1103:5–9 (Barber).

161.    Instead of the General Assembly's criteria, it appears that what drove the racial differences between the simulations and the enacted map were the specific district lines that the General Assembly chose in the 2023 Plan in the Piedmont Triad and Mecklenburg areas. Dr. Barber did not claim that his simulations ever placed the Triad cities of Greensboro, High Point, and Winston-Salem in four different districts or cracked Guilford County three ways. Tr. 1103:10–20, 1103:21–1104:1 (Barber). Nor does Dr. Barber contest the fact that his simulated plans never create the narrow range of BVAP in

the 2023 Plan's Piedmont Triad districts or that the simulations ever concentrated Black voters into CD-12 in the same way the 2023 Plan does. Tr. 1104:2–15 (Barber).

162. Nor does Dr. Barber claim that consideration of any specific partisan metric accounts for the observed racial differences between the simulations and the 2023 Plan or that it was necessary to sort voters along racial lines like in the enacted map to achieve particular partisan metrics. Tr. 1104:22–1105:7 (Barber).

163. Fifth, Dr. Barber critiques Dr. Rodden's analysis of the draft plans, but none of his complaints have merit. Notably, Dr. Barber agreed that the draft plans all achieve a similar partisan goal as the 2023 Plan and produce the same number of districts considered safe under Dr. Barber's own metrics. Tr. 1108:10–14, 1109:6–9 (Barber). While Dr. Barber claimed that the changes between draft maps and the 2023 Plan were made to ensure incumbents were not double-bunked or improve various traditional redistricting criteria, he never suggested that those changes led to the observed changes in racial composition of districts over time. Tr. 1102:10–14, 1114:17–25 (Barber).

164. Ultimately, Dr. Barber's analyses offer little insight into the actions of the General Assembly. Dr. Barber does not know which considerations the General Assembly actually considered in drawing the 2023 Plan, and he offered no opinions about the intent of the legislators who drew the map. Tr. 1105:25–1106:3, 1115:4–7 (Barber). And he testified that he was not offering an opinion that the General Assembly did not consider race in drawing the 2023 Plan. Tr. 1106:16–21 (Barber).

- 69 -

165. Dr. Barber also made no claims that partisanship was the predominant factor behind the 2023 Plan. Tr. 1115:8–10 (Barber). Nor did he know whether it was possible to draw the very strong pro-Republican gerrymander in the 2023 Plan without racial considerations or following the lines of racial segregation. Tr. 1115:11–18 (Barber).

166. Simply put, Dr. Barber's analyses cannot—and do not purport to—rule out race as a motivating factor behind the map. Nor can he rule out the possibility that the General Assembly was motivated by both race and party in drawing the 2023 Plan. Tr. 1115:21–1116:3, 1116:4–8 (Barber).

167. Finally, the Court heard testimony that other courts have rejected Dr. Barber's analyses. In fact, in a voting case in federal court in Florida, *Jacobson v. Lee*, 411 F. Supp. 3d 1249 (N.D. Fla. 2019), the court that found Dr. Rodden's methods were "reasonable, reliable, and credible," while Dr. Barber's criticisms of Dr. Rodden's analysis were "unreasonable." Tr. 1116:11–24 (Barber). The court also found that a separate analysis conducted by Dr. Barber was "speculative," "unsound," "nonsensical," "emphatically not credible" and that his opinions were "unreliable," "unreasonable," and "unpersuasive." Tr. 1116:25–1117:8 (Barber). The court found that Dr. Barber was "null hacking" in that case, or "hunting around for a way to analyze the data to make an effect disappear," which was intended to "muddy the water, not clear it." Tr. 1117:10–16 (Barber).

168. Dr. Barber was similarly criticized in a redistricting case in Georgia, *Rose v. Raffensperger*, 619 F. Supp. 3d 1241 (N.D. Ga. 2022). The court found that Dr. Barber's

analysis was "of limited []utility" and that he "did not consider the impact of race on party affiliation, which was a crucial omission." Tr. 1117:17–1118:8 (Barber).

169.    And in a prior redistricting case in North Carolina, *Harper v. Hall*, 2022-NCSC-17, 868 S.E.2d 499, the court did not adopt Dr. Barber's findings and explicitly rejected his conclusions regarding the impact of political geography on the enacted maps. Tr. 1118:13–24 (Barber).

170.    Although the Court recognizes the parties stipulated that Dr. Barber possesses certain areas of expertise and the Court agrees, the Court declines to credit his criticisms of Dr. Rodden's work in this case.

## 2.    Dr. Sean Trende

171.    Like Dr. Barber, Dr. Trende does not dispute many of Dr. Rodden's empirical findings. Dr. Trende does not dispute Dr. Rodden's conclusions regarding the geographic dispersion of Black and White voters in the 2023 Plan. Tr. 1371:16–21 (Trende). Dr. Trende does not contest Dr. Rodden's finding that, statewide, Black voters were more likely to be moved out of their district to a new district compared to White voters irrespective of their political party. Tr. 1374:3–17 (Trende). And Dr. Trende does not contest any of Dr. Rodden's findings on the fractionalization of districts or on racial dislocation. Tr. 1374:19–22 (Trende).

172.    Moreover, in prior cases, Dr. Trende has relied on several analyses that Dr. Rodden utilized in this case to evaluate whether a map's distribution of Black voters is explainable by traditional redistricting criteria. Tr. 1375:17–1376:15 (Trende). In

- 71 -

particular, Dr. Trende has run race-neutral simulations to determine whether a map's distribution of Black voters show what one would expect if a plan was drawn without regard to race. Tr. 1376:12–15 (Trende). As Dr. Trende testified, he performed no such analysis here, Tr. 1376:16–18 (Trende), and he does not contest Dr. Rodden's findings about the racial sorting of Black voters in the 2023 Plan, Tr. 1373:21–24 (Trende).

173.    Dr. Trende's critiques of Dr. Rodden's analysis are limited and offer the Court no basis to discredit or otherwise discount Dr. Rodden's analysis, conclusions, or credibility.

174.    Dr. Trende does not contest any of Dr. Rodden's findings about compactness in the 2023 Plan, including Dr. Rodden's conclusion that every district touching the Piedmont Triad as well as CD-12 and CD-14 in the Charlotte area became less compact in the 2023 Plan. Tr. 1372:7–21 (Trende). Dr. Trende also does not contest any of Dr. Rodden's findings about the increase in county and city splits in the 2023 Plan, including that many of these splits occur in areas with relatively large Black populations. Tr. 1373:13–16 (Trende).

175.    For instance, where CD-5 (in yellow), CD-9 (in blue), and CD-6 (in pink) divide Guilford County three ways, as shown below, *see* JX078, Dr. Trende agreed that CD-5's appendage that reaches into Guilford County decreases the compactness of the district and does not follow Greensboro's city lines. Tr. 1378:4–24 (Trende).



176.    Indeed, in several instances, Dr. Trende conceded that the unusual
configuration of districts corresponds to racial lines. As Dr. Trende's own choropleth maps
showed, CD-5's appendage reaches into Guilford County to grab Black population in
Greensboro, *see* LDTX266 at p. 70, Figure 36; Tr. 1379:19–21 (Trende) (Q: "And [Figure
36] shows that District 5 reaches into Guilford County, and it grabs Black population in
Greensboro; correct? A: Yes.").

Figure 36: Choropleth Map of Forsyth and Guilford counties, by BVAP

- 73 -

177.    The same is true in Forsyth County, *see* JX078, where Dr. Trende agreed the jaggedness in the line between CD-6 (in pink) and CD-10 (in green) decreases the compactness of the districts, and the boundary does not follow Winston Salem's city lines. Tr. 1381:10–1382:5 (Trende).



178.    Again, as Dr. Trende's own choropleth maps showed, at least part of the boundary between CD-6 and CD-10 "does follow a racial gradient." Tr. 1383:8–9 (Trende); LDTX266 at p. 70, Figure 36.



- 74 -

179.    Likewise, in the Charlotte area, Dr. Trende agreed that the way that CD-12 and CD-14 are drawn in the 2023 Plan, as shown below, *see* JX078, renders those districts less compact than they could have been drawn (and were in fact drawn in the 2022 Plan), and that the boundaries of CD-12 and CD-14 do not follow the city lines of Charlotte. Tr. 1383:24–1384:6 (Trende).



180.    Once again, Dr. Trende agreed that his own choropleth map of CD-12 and CD-14 showed that those boundaries "follow[] racial lines." Tr. 1384:11–21 (Trende); LDTX266 at p. 92, Figure 54:

Figure 54: Choropleth map of Charlotte area, BVAP, 2023 Map



181. Next, although Dr. Trende took issue with the nature of the county envelope analysis like Dr. Barber, Dr. Trende agreed that Dr. Rodden's approach to the county envelope analysis mirrored that of Dr. Ansolabehere's county envelope analysis in *Cooper v. Harris*, Tr. 1395:10–13 (Trende), which the *Alexander* Court explained it "blessed" in *Cooper*, *see Alexander*, 602 U.S. at 31; *see also* Tr. 1387:20–22 (Dr. Trende confirming that the *Alexander* Court did not reject Dr. Ansolabehere's approach).

182. For example, Dr. Trende agreed that Dr. Rodden's approach to defining the envelope, which includes counties wholly or partially within the district, is the same approach that Dr. Ansolabehere took in defining the envelope. Tr. 1395:14–1396:2 (Trende). Dr. Trende also agreed that, like Dr. Ansolabehere's approach in *Cooper*, Dr. Rodden's analysis examined both Democratic and Republican voters. Tr. 1388:16–18 (Trende). And Dr. Trende agreed that, like Dr. Ansolabehere's approach in *Cooper*, that Dr. Rodden was able to conduct his analysis at the voter level, distinguishing it from the kind of analysis that the Court had criticized in *Alexander*. Tr. 1388:19–1389:5 (Trende).

- 76 -

183. Although Dr. Trende suggested Dr. Rodden's definition of the envelope (counties already partially or wholly within the district) was too narrow, Dr. Trende did not conduct any analysis whatsoever to show that Dr. Rodden's conclusions about racial sorting would have been undermined if he used Dr. Trende's proposed envelopes. Tr. 1397:20–1398:1 (Trende). Nor did Dr. Trende did not analyze whether his preferred envelope would have required more county splits than the 2023 Plan. Tr. 1396:3–1397:19 (Trende).

184. Dr. Trende also agreed that although Dr. Rodden's approach to the county envelope method gives deference to the map drawer about what counties to put in a particular district, Dr. Trende's own proposals do not give such deference. Tr. 1398:2–9 (Trende). As Dr. Rodden explained, the county envelope analysis takes a middle ground approach to the simulation analysis (which gives no deference to the map drawer), and a boundary analysis (which gives maximum deference to the map drawer in considering only the final VTDs left in or out of a district). Tr. 1469:10–1472:3 (Rodden).

185. Dr. Trende also criticized Dr. Rodden's county envelope analysis for introducing alleged contiguity problems, but on cross examination he admitted that such problems would emerge only if the other districts in the map were held completely fixed. Tr. 1399:1–6 (Trende). Because the county envelope analysis is meant to examine the ways in which the counties with multiple districts can be re-drawn, the Court declines to credit this critique.

186.    Ultimately, Dr. Trende did not dispute any of Dr. Rodden's empirical findings for the county envelope analysis, Tr. 1389:10–13 (Trende), including that Black voters were more likely to be kept out of CD-6 and CD-14, and more likely to be placed in CD-12, than white voters—even when controlling for party.

187.    For example, Dr. Trende does not dispute Dr. Rodden's finding that, within the county envelope for CD-6, Black voters were less likely to be included within the district than white voters at a difference of about 13 percentage points. Tr. 1389:16–20 (Trende). And Dr. Trende does not dispute Dr. Rodden's finding that within the county envelope for CD-6, across every partisan category—Democrat, Unaffiliated, and Republican—that Black voters are less likely to be included in the district. Tr. 1389:22–1390:3 (Trende).

188.    Similarly, Dr. Trende does not dispute Dr. Rodden's finding that within the county envelope for CD-14, that Black voters were less likely to be included in the district than white voters at a difference of about 28 percentage points. Tr. 1394:11–15 (Trende). And Dr. Trende does not dispute Dr. Rodden's finding that within the county envelope for CD-14, across every partisan category, that Black voters were less likely to be included in CD-14 than white voters. Tr. 1394:19–24 (Trende).

189.    Nor does Dr. Trende dispute Dr. Rodden's finding that within the county envelope for CD-12, that Black voters were more likely to be drawn into the district than white voters at a difference of about 29 percentage points. Tr. 1395:2–6. And Dr. Trende does not dispute Dr. Rodden's finding that within the county envelope for CD-12 across

every partisan category, that Black voters were more likely to be included in CD-12 than white voters. Tr. 1389:10–13 (Trende).

190.    Next, on Dr. Rodden's county envelope regressions, Dr. Trende did not contest Dr. Rodden's empirical findings or that his findings were both statistically significant and persisted when controlling for party.

191.    For instance, Dr. Trende did not dispute that for CD-6, when controlling for city and for a voter's distance from the population center of the district, a Black registered voter was 11% less likely than a registered voter of another race to have been included. Tr. 1400:1–6 (Trende). Dr. Trende did not dispute that this result was statistically significant, or that it remains significantly significant across every partisan group. Tr. 1400:19–25 (Trende). Although Dr. Trende would run his regression slightly differently (introducing a separate control variable for whether a voter is a Democrat) and calculate the marginal effects in a different way (using a different software command), Dr. Trende still found that, for CD-6, that being a Black-registered voter means it is 5.4%less likely that voter is included in the district than a voter of another race. Tr. 1401:13–1402:6 (Trende). In other words, Dr. Trende admitted that even controlling for party in the manner he preferred and using the software command he preferred, that he still found that a voter's race remained statistically significant for whether a voter was included or excluded from CD-6. Tr. 1402:7–14 (Trende).

192.    Dr. Trende does not dispute Dr. Rodden's empirical finding for CD-12 that, controlling for their city and the voters' distance from the population center of the district,

- 79 -

a Black registered voter was 17% more likely than a voter of another race to have been drawn into the district. Tr. 1405:16–21 (Trende). Dr. Trende did not dispute that this result was statistically significant, nor that it remains significantly significant across every partisan group. Tr. 1405:22–1406:3 (Trende). Again, even when Dr. Trende controlled for partisanship in the manner he preferred and using the software commands he preferred, he still found that a Black registered voter was 6.4% more likely to be included in CD-12 than a white voter, that that result was statistically significant, and even that the effect of race was larger than the effect of partisanship. Tr. 1406:4–18 (Trende); LDTX266 at 95.

193.    Next, Dr. Trende does not dispute Dr. Rodden's finding for CD-14 that, controlling for geography, a Black-registered voter was 12% less likely to have been included in the district than a registered voter of another race. Tr. 1406:22–1407:1 (Trende). Dr. Trende did not dispute that this result was statistically significant, nor that it remains significantly significant across every partisan group. Tr. 1407:2–7 (Trende). Even when Dr. Trende controlled for partisanship in the manner he preferred and using the software commands he preferred, he still found that a Black registered voter was 5.1% less likely to be included in CD-14 than a white voter, that that result was statistically significant, and again, even that the effect of race was larger than the effect of partisanship. Tr. 1407:9–17 (Trende); LDTX266 at 95.

194.    Next, although Dr. Trende claimed that his boundary regressions were a better method of determining the effect of party vs. race, as cross examination demonstrated, Dr. Trende's boundary regression for CD-6 resulted in nonsensical results,

suggesting that neither party nor race had anything to do with the drawing of CD-6. Tr. 1408:10–25 (Trende). Because Dr. Trende's own report suggested otherwise, *see* LDTX266 at 50–51, 54–57, the Court finds that Dr. Trende's methodology for his boundary regression for CD-6, and consequently his findings, should be entitled to no weight.

195. As Dr. Rodden testified, and the Court credits, Dr. Trende's boundary regression for CD-6 produces illogical results because Black voters are distributed across districts in the Triad, with a small portion placed in CD-6. That is, because Dr. Trende chose to take all VTDs on CD-6's boundary and run them in the same regression, his analysis fails to capture the difference between what is happening in the CD-6 and CD-9 boundary (where Black voters and Democratic voters are kept *out* of CD-6) and what is happening in the CD-6 and CD-10 boundary (where Black voters and Democratic voters are kept *in* CD-6). Tr. 62:21–63:14 (Rodden). Put differently, a regression that considers CD-6's entire border is not helpful to understand the dispersion of Black voters in and around CD-6 because they are included in the district in some places, and excluded in others; a regression that considers the complete boundary will conceal the effects of such cracking.

196. Although Dr. Trende's initial design was clearly flawed, Dr. Trende nonetheless achieved the results he wanted (to show that party was more important than race in CD-6), but only by dropping two-thirds of the observations from his original border regression, ultimately examining only 1 of 6 counties that make up CD-6, where he was

- 81 -

able to find a small statistically significant effect for party that was larger than the effect than race. Tr. 1408:10–1410:18 (Trende). Although Dr. Trende did not find such an effect when considering CD-6 as a whole or for any other county boundary in CD-6, Dr. Trende used this single regression to reach the conclusion that politics predominated in the drawing of CD-6 (at least, that it predominated over race). *See id*. For the reasons explained, the Court does not credit this conclusion.

197.    For similar reasons, the Court declines to credit Dr. Trende's boundary analysis for CD-14, *see* LDTX266 at 95, which like CD-6, is also a cracked district, and consequently is not well-suited to analyzing the effect of keeping Black and Democratic voters out of a district in some places, and in the district in other places.

198.    Dr. Trende's boundary regressions are better suited to examine a district that is packed with Black voters, like CD-12, for which the mapmaker would consistently select for the same kind of voter, rather than keeping them in or out in certain parts of the district as occurs in a cracked district. Notably, Dr. Trende's own boundary analysis for CD-12 showed that, controlling for party, that race is still a significant predictor of whether a VTD is included or excluded from CD-12. Tr. 1411:10–14 (Trende). The Court credits Dr. Trende's finding for CD-12 but not for CD-6 or CD-14, for the reasons explained.

199.    The Court notes that Dr. Trende is relatively new to the field of political science, and in particular to quantitative methods, especially when compared to Dr. Rodden. Dr. Trende received his PhD only recently, does not have tenure, and is not tenure-

- 82 -

tracked. Tr. 1371:5–12 (Trende). Dr. Trende's primary employment is for RealClearPolitics, a website for political news. Tr. 1371:13–15 (Trende).

200. Dr. Trende has previously been excluded from testifying as an expert. *See Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-CV-5391-SCJ, 2020 WL 13561757 (N.D. Ga. Nov. 16, 2020). In that case, the court found that Mr. Trende was not qualified to offer a statistical analysis because he had "no experience reviewing the research design of others and assessing their methodology more generally." *See id*. at \*8. Although Plaintiffs did not seek to exclude Dr. Trende from testifying in this case, the Court has significant concerns about some of Dr. Trende's methodologies, and in particular, the significant conclusions that he purports to draw from them. In contrast to Dr. Rodden, who was cautious in opining what conclusions could be drawn from the statistical analyses he performed in this case, Dr. Trende was far less measured.

201. The Court's hesitation to credit Dr. Trende's conclusions is consistent with that of other courts, which have found Dr. Trende to make "bald assertions" while providing "no evidentiary basis" for them. *Singleton v. Allen*, No. 2:21-CV-01291-AMM, 2025 WL 1342947, at \*143 (N.D. Ala. May 8, 2025) (three-judge court); *see also Nairne v. Ardoin*, 715 F. Supp. 3d 808, 850 (M.D. La. 2024) (referring to Dr. Trende's analysis as both "fundamentally flawed and completely useless," as well as "oversimplistic and unhelpful").

- 83 -

202.     In sum, while the Court recognizes that the parties stipulated that Dr. Trende has certain areas of expertise and the Court agrees, the Court declines to credit his criticisms of Dr. Rodden's work in this case.

### iv.     Fact Witness Testimony

203.     Several fact witnesses explained how this loss of political representation for Black voters harmed Black communities in the Piedmont Triad and the Mecklenburg area. Plaintiffs Earl Jones, Pamlyn Stubbs, Allison Allen, and other fact witnesses testified to their harms—from losing a representative of their choice who engaged with the Black community, to a lack of shared interests and ability to organize with far-flung, rural white voters with whom they now share a congressional district, to inaccessible district offices, to the splitting up of their communities of interest. Tr. 147:19–151:11 (Jones), 211:10–216:8 (Stubbs), 329:19–331:20 (Allen).

204.     Plaintiff Earl Jones was born in Yanceyville, North Carolina, and was raised in Burlington, North Carolina. Tr. 136:11–13. He graduated from a segregated high school, college, and law school. Tr. 136:16–22 (Jones). He has lived in Greensboro the last 46 years. Tr. 136:8–10 (Jones). A longtime elected official, Mr. Jones served on the Greensboro City Council for 18 years and in the North Carolina General Assembly for eight years. Tr. 135:21–24 (Jones).

205.     Mr. Jones, who lives in Greensboro and was represented in CD-6 by Kathy Manning, his candidate of choice, under the 2022 Plan, explained the tangible difference in representation he experiences after being moved to CD-5 in the 2023 Plan, which

- 84 -

Representative Virginia Foxx won in 2024. As Plaintiff Jones testified, there has been "[a] complete[] lack of outreach" from Representative Foxx to the Black community. Tr. 148:1–149:11, 150:17–20 (Jones).

206.    As a result of the 2023 Plan, Mr. Jones reported that the African American community's ability to organize around common issues has been made more difficult, and that there's no longer an opportunity "to vote in a congressional race for a person who's sensitive and has concerns regarding . . . African-American community priorities." Tr. 150:21–151:11 (Jones).

207.    Plaintiff Pamlyn Stubbs attended North Carolina A&T in Greensboro and has lived in Greensboro the past 50 years. Tr. 206:13–20 (Stubbs). Ms. Stubbs went on to work for Congressman Melvin Watt for 14 years, working ten years as a district aide and four years as district director. Tr. 207:10–21 (Stubbs). Ms. Stubbs "was responsible for overseeing all the district offices, the district operations, and making sure that all of his constituents got good constituent services." Tr. 207:21–24 (Stubbs). She also was the campaign manager for North Carolina Senator Gladys Robinson for three elections and continues to be involved advising campaigns in Guilford County. Tr. 208:2–7 (Stubbs).

208.    Ms. Stubbs, who was similarly located in CD-6 under the 2022 Plan but is now in CD-5 under the 2023 Plan and who similarly lost the ability to elect her candidate of choice in the 2023 Plan, corroborated the lack of outreach and constituent services from Representative Foxx. Tr. 211:24–212:14 (Stubbs) ("No, I have never experienced [any outreach]. Well, most congressional members in the past, they will send you an email or a

newsletter saying, Welcome to our district . . . these are some of the ways I can be of assistance to you. And I've never gotten any literature or any contact from Congressperson Foxx.").

209. Based on Ms. Stubbs's experience working for Congressman Melvin Watt's district office for 14 years, she spoke about the importance of having an accessible district office for delivering effective constituent services: "Having a congressional district office is far more important than a lot of people realize." Tr. 214:2–18 (Stubbs). "I learned in working at the office . . . that when people need help with a federal agency or people need help because, say, a veteran wants to get his medals or somebody felt that Social Security [Administration] is not responding to them . . . Sometimes they have to make a visit; . . . most of the time, they are right; something has been done wrong to them." Tr. 214:2–18 (Stubbs).

210. As Ms. Stubbs testified, under the 2022 Plan, Representative had a district office in Greensboro. Tr. 213:25–214:1. Under the 2023 Plan, however, Ms. Stubbs' congressional representative in new CD-5, Representative Foxx, does not have a district office in Greensboro but instead has district offices in the predominantly white and far more rural towns of Mayodan and Boone. Tr. 212:9–14 (Stubbs); *see also* Tr. 150:14–15 (Jones). While Greensboro has a population of nearly 300,000 and a substantial number of Black voters, Mayodan and Boone have substantially smaller populations. Tr. 213:12–22 (Stubbs). Additionally, Mayodan is over 30 miles away from Greensboro, and Boone is

- 86 -

over 100 miles away from Greensboro. Tr. 212:9–14 (Stubbs). Neither of these locations is reasonably accessible for Representative Foxx's constituents who live in Greensboro. *Id*.

211. Indeed, under the 2023 Plan, there is no evidence that there is any remaining district office in Greensboro for any of the voters who are spread out among the city's three congressional districts (CD-5, CD-6, and CD-9).

212. Ms. Stubbs further testified to her reaction to Senator Hise's comments about the 2023 Congressional Plan's three-way split of Greensboro. Tr. 215:11–14. Although Senator Hise "congratulated" Guilford County for its opportunity to be represented by three congressional representatives, JX002 at 43–44, Ms. Stubbs recognized those comments as sarcasm. As Ms. Stubbs testified, "if it was that great, why didn't he [] spread that luck and that goodness all over the state of North Carolina instead of just Guilford County?" Tr. 215:22–216:8 (Stubbs).

213. Mitzi Turner is a named plaintiff in the *N.C. NAACP v. Berger* case, No. 1:23-cv-1104-TDS-JLW (M.D.N.C.). She has lived in High Point in Guilford County for 17 years. Tr. 575:3–8 (Turner). Although now retired, she previously worked at Guilford County Child Support and at the clerk of the court with the State of North Carolina in Guilford County. Tr. 575:15–20 (Turner). She is highly involved in voter outreach and voter engagement in the Greensboro and High Point communities. Tr. 575:21–576:1 (Turner).

214. Ms. Turner, who lives in High Point in Guilford County and was in CD-6 for both the 2022 and 2023 Plans, discussed how the design of the new CD-6 has "dilut[ed]"

the Black vote by having Guilford County connected to rural areas that do not have much in common. Tr. 583:22–584:14 (Turner). As she explained, Guilford County is primarily concerned with urban issues, such as housing and transportation issues, which are not necessarily issues for rural communities. Tr. 584:16–18 (Turner).

215. Like Plaintiffs Jones and Stubbs, Ms. Turner's candidate of choice under the 2022 Plan was Kathy Manning, and Ms. Turner's candidate of choice did not win the 2024 election in CD-6. Tr. 586:7–19 (Turner). Ms. Turner explained that, due to the newly-constituted CD-6, she's "not able to vote for the person that's going to best represent my community because we don't have the numbers anymore." Tr. 586:2–6 (Turner).

216. Plaintiff Allison Allen was born, raised, and continues to live in majority-Black neighborhoods in Charlotte, North Carolina. Tr. 325:22–326:17 (Allen). She has extensive experience organizing and talking to the Black community at the local, county, and state level. Tr. 326:20—327:3 (Allen). Ms. Allen is involved with the Black Political Caucus of Mecklenburg County, which is a community organization that advocates for members of the Black community in Mecklenburg and neighboring Gaston and Union Counties and that provides resources and opportunities for the Black community to congregate. Tr. 327:4–328:2 (Allen). She is also involved in her church, Little Rock A.M.E. Zion Church, which is a majority Black church that brings together the Black community in Mecklenburg and the surrounding areas, holding space for members and hosting the local chapter of the NAACP and the Democratic Party. Tr. 328:3–19 (Allen).

217.    Ms. Allen testified that the 2023 Plan does not reflect the needs of the Black community in the Mecklenburg area. Tr. 345:2–5 (Allen). Ms. Allen explained that the Black community in the Mecklenburg area is located in the Crescent, which includes parts of West Charlotte, North Charlotte, East Charlotte, as well as surrounding areas like Gastonia and Union County. Tr. 328:24–329:18 (Allen).

218.    The Black community in these areas—which had been united in former CD-14—form a community interest. Black residents in these areas organize and congregate together, including with the Black Political Caucus of Mecklenburg County, share historical and cultural connections, and gather for cultural holidays like Juneteenth, fundraisers, and other activities. Tr. 327:12–328:2, 329:19–330:16 (Allen). People in Central Charlotte and Gastonia also commute between the two areas for work. And as Charlotte grows, Black voters are being priced out of Central Charlotte and moving to Gastonia. Tr. 331:21–332:16 (Allen).

219.    As Ms. Allen testified, the 2023 Plan divided the Black community in these areas and combined the Black community in Gastonia and Belmont with white, rural, conservative communities stretching west to Burke, where a Confederate flag flies off of I-40. Tr. 330:17–331:20 (Allen). Ms. Allen herself was moved from CD-14 to CD-12 between the 2022 Plan and the 2023 Plan. Tr. 331:4–8 (Allen). As a result, her new congressperson has become less accessible. Tr. 337:12–22 (Allen).

220.    The Court finds the testimony of Mr. Jones, Ms. Stubbs, Ms. Allen, and Mr. Turner credible and persuasive.

- 89 -

###### v. Testimony Regarding Creation of 2023 Plan

221.    Senator Hise was the primary drafter for the 2023 Plan. Tr. 866:12–20 (Hise). Although Senator Hise maintains that he did not have racial data in front of him when he drew the 2023 Plan, Tr. 975:10–13 (Hise), this is the same legislator who was able to successfully craft a partisan gerrymander in 2021 without partisan data in front of him.

222.    Specifically, in the 2021 redistricting cycle, Senator Hise was a co-chair of the Senate Redistricting Committee, responsible for the development of redistricting plans, and the sponsor and co-sponsor of the maps that were passed—just as he was during the 2023 redistricting cycle. Tr. 969:20–970:6 (Hise). The 2021 redistricting criteria adopted by the redistricting committees prohibited the use of partisan data to draw the 2021 maps, just as the 2023 criteria prohibited the use of racial data to draw the 2023 Plans, and Senator Hise testified in litigation challenging the 2021 map that he had not used partisan data to draw the 2021 maps. Tr. 970:7–971:13, 972:9–11; 973:3–17 (Hise). Despite the limitations of the 2021 criteria and Senator Hise's disavowal of the use of partisan data, in litigation challenging the 2021 maps, the court found that all the maps enacted by the General Assembly were extreme partisan outliers and the product of intentional pro-Republican partisan redistricting. Tr. 972:12–16 (Hise); *see also infra* Section III.C.iv.

223.    The Court finds that Senator Hise would not have needed to have racial data before him for race to play a role in the drawing of the 2023 Plan. Senator Hise is particularly familiar with redistricting in North Carolina: he has been a member of the Senate Redistricting and Elections Committee since 2010, he has been involved in drawing

- 90 -

district lines in North Carolina about seven different times, and he has drawn dozens of draft maps. Tr. 870:2–22 (Hise). With his extensive experience, he's generally aware of where Black communities reside. Tr. 871:24–872:15 (Hise).

224.    Senator Hise knows, for example, that Guilford County and Forsyth County have a higher percentage of Black voters compared to the state average. Tr. 948:3–16 (Hise). He also understands that Black voters are more concentrated in urban areas and would assume, for example, that the Black population would be more concentrated in Winston-Salem than outside of it. Tr. 948:25–949:9 (Hise). Because Senator Hise had access to municipal boundaries and data like population-per-VTD during the map drawing, he could easily determine where the urban centers on the map are. Tr. 949:10–23 (Hise).

225.    Senator Hise also had access to the locations of historically Black colleges and universities during map drawing, including North Carolina A&T and Bennett College, which were both moved from CD-6 to CD-5 under the 2023 Plan. Tr. 949:24–952:5 (Hise).

226.    The Court also finds that Legislative Defendants had reason to engage in racial sorting. Senator Hise testified that he sought to create Republican districts that would perform for Republican candidate, including specifically in the Triad. Tr. 959:24–960:3 (Hise); Tr. 861:8–10 (Hise). Senator Hise understood that Black voters overwhelmingly prefer Democratic candidates in North Carolina and that areas with higher BVAP tend to perform better for Democrats. Tr. 876:20–877:3, 911:4–10 (Hise).

227.    Senator Hise testified that he's aware that Black voters support the same candidate—typically the Democratic candidate—at extremely high rates; he also agreed

- 91 -

that white voters are more variable in their support for candidates. Tr. 874:23–876:19; 957:11–958:12 (Hise). That is, he understands that Black voters are more predictable than white voters in how they tend to vote. Tr. 959:11–18 (Hise). Legislative Defendants' expert Dr. Alford also agreed that Black voters are more consistent and predictable in their voting behavior than white voters. Tr. 1201:21–1202:9 (Alford).

228.    The testimony suggests that Legislative Defendants would have had reason to target Black voters while drawing the 2023 Plan in order to create reliable Republican districts that would perform for Republicans.

B.    **The Historical Background of the 2023 Plan (*Arlington Heights* 2)**

229.    Plaintiffs offered extensive testimony and significant evidence, including from Plaintiffs' expert Dr. Palmer, that voting in North Carolina is dominated by racial polarization, in which voters of different races vote in blocs for different candidates. *See* Tr. 158:17–21, 159:8–160:3 (Palmer). The Court discusses these findings in more detail *infra* Section IV.B.ii, but the existence of racially polarized voting—and the incentives for race-based redistricting that come along with it—are also relevant to the historical background of the passage of the 2023 Plan.

230.    Beyond the existence (and persistence) of racially polarized voting throughout the state, the Court finds that North Carolina has a long and ongoing history of discrimination in redistricting in particular. The Court makes these findings after reviewing numerous judicial findings regarding North Carolina's recent history of redistricting, as well after reviewing the expert testimony of Dr. James Leloudis and Dr. Joseph Bagley,

- 92 -

both of whom testified to North Carolina's long and ongoing history of discrimination against Black voters, including in the very recent past. *See generally* WX13 at 3–105 (Expert Report of Dr. James Leloudis); NAACPPX181 at 7–30 (Corrected Expert Report of Dr. Joseph Bagley). The substance of this testimony was largely undisputed by Legislative Defendants.

231. Dr. Leloudis is a professor of history at the University of North Carolina at Chapel Hill. Tr. 534:2–4 (Leloudis). He studies and teaches the history of North Carolina in the late 19th and 20th Centuries with a particular interest in issues of race, politics, and government policy. Tr. 534:16–18 (Leloudis). Dr. Leloudis has served as an expert witness in at least five cases involving voting rights and has never been rejected as an expert by any court. Tr. 534:19–535:5 (Leloudis); WX13 at 5.

232. The parties stipulated and the Court finds that Dr. Leloudis is an expert in Southern and North Carolina history, politics, race relations, and government policy. Joint Stip. ¶ 99.

233. Dr. Bagley is an associate professor of history at Georgia State University in Atlanta. Tr. 650:11–13 (Bagley). His areas of research and teaching involve United States constitutional and legal history, politics, and race relations with a focus on the Deep South. Tr. 650:14–22 (Bagley); NAACPPX181 at 2. Dr. Bagley has served as an expert witness in at least five cases involving voting rights and has never been rejected as an expert by any court. Tr. 651:12–652:10 (Bagley); NAACPPX181 at 2–3.

234.    The parties stipulated and the Court finds that Dr. Bagley is an expert in United States constitutional and legal history, American political history, historical methods, and the historical study of southern race relations and southern politics and law. Joint Stip. ¶ 97.

235.    As Dr. Leloudis and Dr. Bagley testified, and other courts have similarly found, North Carolina has an extensive history of official racial discrimination against Black voters. *See* WX13 at 6–105; NAACPPX181 at 7–30; *see also N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 223 (4th Cir. 2016) (noting "North Carolina has a long history of race discrimination generally and race-based vote suppression in particular"). As the *McCrory* Court found, "[t]he record is replete with evidence of instances since the 1980s in which the North Carolina legislature has attempted to suppress and dilute the voting rights of African Americans." *Id*. (citation and quotation marks omitted).

236.    This includes very recent history: Over the last decade, in the domain of redistricting specifically, multiple courts have invalidated North Carolina's congressional and legislative maps as impermissibly discriminating against voters based on race*. See Cooper*, 581 U.S. at 291 (affirming finding of three-judge court that North Carolina's congressional districts were impermissibly motivated by race); *Covington v. North Carolina*, 316 F.R.D. 117, 177–78 (M.D.N.C. 2016) (three-judge court) (invalidating legislative districts based on the impermissible use of race), *summarily aff'd*, 581 U.S. 1015 (2017); *North Carolina v. Covington*, 585 U.S. 969 (2018) (per curiam) (affirming district

court's conclusion that legislative districts unconstitutionally sorted voters on the basis of race).

237.    Indeed, just last cycle, the General Assembly tried to pack Black voters into CD-12 under a congressional map that was ultimately struck down as an unconstitutional racial gerrymander. *See Cooper*, 581 U.S. at 309–10 (upholding the district court's finding of racial predominance concerning CD-12, including the lower court's conclusion that "race, not politics, accounted for the district's reconfiguration"); *see also id.* at 312 & n.10 (explaining General Assembly's failed attempts to "convince the African-American community" that this sort of packing "made sense" under the VRA).

238.    As Dr. Leloudis and Dr. Bagley's testimony demonstrated, on numerous occasions, both historically and recently, "the North Carolina legislature has attempted to suppress and dilute the voting rights of African Americans," and "the Department of Justice or federal courts have determined that the North Carolina General Assembly acted with discriminatory intent, reveal[ing] a series of official actions taken for invidious purposes." *McCrory*, 831 F.3d at 223 (brackets in original) (quotation marks omitted).

239.    As one example, in 2013, the day after the Supreme Court's ruling in *Shelby County v. Holder*, members of the General Assembly introduced House Bill 589, which severely curtailed several voting methods disparately relied on by Black voters. The bill, "as passed, included a photo-ID requirement and eliminated the first week of early voting, same-day registration, and straight-ticket voting. It encouraged voter intimidation by allowing citizens to inspect and challenge registration records anywhere in the state, by

- 95 -

allowing voters in a county to challenge voters casting ballots anywhere in that county, and allowed party chairs to 10-person poll observer teams to be deployed to polling places said to deserving of scrutiny." NAACPPX181 at 25.

240. The Fourth Circuit ultimately found significant evidence of discriminatory intent in House Bill 589's drafting and passage, finding that the General Assembly "target[ed] African Americans with almost surgical precision." *McCrory*, 831 F.3d at 214. Tr. 656:5–14 (Bagley); Tr. 546:13–21 (Leloudis).

241. North Carolina's history of racial discrimination in elections is so pervasive courts have continued to find racial discrimination in North Carolina's election system even during the pendency of this lawsuit. *See N.C. A. Philip Randolph Inst. v. N.C. State Bd. of Elections*, 730 F. Supp. 3d 185, 203 (M.D.N.C. 2024) (invalidating, as intentionally racially discriminatory towards Black voters, a North Carolina law that imposed criminal penalties on residents who voted while on parole, probation, or post-release supervision for a felony conviction, even if the voter lacked knowledge they were ineligible to vote).

242. Defendants offered no testimony—expert or otherwise—to refute this history and this record of discrimination in voting against Black North Carolinians.

**C. Legislative History of the 2023 Plan (*Arlington Heights* Factors 3, 4, and 5)**

243. After considering the Parties' evidence, the Court finds that the passage of the 2023 Plan was remarkably rushed and marked by a notable lack of transparency and lack of public input, both of which are departures from how North Carolina has previously conducted redistricting. This lack of transparency even extended to the General

- 96 -

Assembly's contract map drawer, who drew "concepts" for the state's congressional map, but was kept in the dark about the Legislative Defendants' decision-making, final criteria, and priorities. The Court also finds that the 2023 process was notable in that the General Assembly both refused to attempt to conduct a racially polarized voting analysis, and to meaningfully consider evidence of such racially polarized voting when it was submitted to the General Assembly.

244.    Any discussion of the history of the 2023 Plan must also consider the circumstances surrounding the passage of the 2021 Plan, in which legislators, including Legislative Defendant Senator Hise, swore that legislators did not consider partisan data in a plan that was nonetheless struck down as an intentional partisan gerrymander. The Court thus begins with a brief summary of the 2021 Plan, before turning to the 2023 Plan.

### i.    Passage and Invalidation of 2021 Plan

245.    In advance of drawing the 2021 Plan, the General Assembly released redistricting criteria for the 2021 process stating that partisan data could not be used. JX224 (2021 Criteria Adopted by the House Committee on Redistricting and Senate Committee on Redistricting and Elections). The Guidelines provided that "Partisan considerations and election results data *shall not* be used in the drawing of districts in the 2021 Congressional, House, and Senate plans." Tr. 970:13–17 (Hise).

246.    During the 2021 redistricting process, "[i]n an apparent effort to show transparency and instill public confidence in the redistricting process," Legislative Defendants "requir[ed] legislators to draw and submit maps using software on computer

terminals in the redistricting committee hearing rooms" while the "screens of the station computers would be live-streamed and available for public viewing while the stations were open." *See Harper I*, 2022-NCSC-17, ¶ 15, 868 S.E.2d at 512–13. The redistricting committee represented that the "software did not include political data, and the House and Senate Committees would only consider maps drawn and submitted on the software." *Id.*

247.    Senator Hise, who oversaw the drawing of both the 2021 Congressional Plan and the 2021 Senate Plan, "testified several times under oath that [he] had not used any partisan election data to draw any district lines in either the congressional plan or the Senate plan." Tr. 970:18–971:11 (Hise).

248.    Litigation later revealed that secret "concept maps" had been used in drawing North Carolina's 2021 maps. *See Harper I*, 2022-NCSC-17, ¶ 16, 868 S.E.2d at 513. These concepts maps were ultimately "lost." *Id.* ¶ 16, 868 S.E.2d at 513 n.5 ("[T]he court ordered Legislative Defendants to produce these 'concept maps' and related materials. Legislative Defendants never did so. Instead, Legislative Defendants asserted in verified interrogatory responses that 'the concept maps that were created were not saved, are currently lost[,] and no longer exist.'").

249.    Even though Senator Hise testified several times to not having used any partisan election data in 2021 in drawing any of the plans, the North Carolina Supreme Court concluded that "[t]he General Assembly ha[d] substantially diminished the voting power of voters affiliated with one party on the basis of partisanship" and had "done so intentionally." *Id.* ¶ 194, 868 S.E.2d at 554.

- 98 -

250.    Ultimately, the Supreme Court of North Carolina struck down all three maps as unlawful partisan gerrymanders on February 4, 2022. *Id*.

251.    In its February 4, 2022 order, which provided instructions for the General Assembly to draw remedial maps, the North Carolina Supreme Court directed the legislature to "first assess whether . . . racially polarized voting is legally sufficient in any area of the state such that Section 2 of the Voting Rights Act requires the drawing of a district to avoid diluting the voting strength of African-American voters" before satisfying other criteria under state law. *Id*. ¶ 260, 868 S.E.2d at 575 (Newby, J., dissenting).

252.    The General Assembly passed remedial maps on February 17, 2022. Less than a week later, the remedial congressional map was likewise struck down as an unconstitutional partisan gerrymander. *See Harper II*, 383 N.C. at 94–95, 881 S.E.2d at 162, *withdrawn and superseded on reh'g by Harper III*, 886 S.E.2d 393.

## ii.    Timing of Passage and Lack of Transparency in 2023 Plan

253.    On April 28, 2023, the North Carolina Supreme Court overruled *Harper I*, withdrew its decision in *Harper II*, and authorized the General Assembly to enact new redistricting maps. *Harper III*, 886 S.E.2d at 448–49.

254.    Despite having authorization to start redistricting in April 2023, the Legislative Defendants nonetheless waited nearly five months to start the public redistricting process, *see* JX064 (Senate Calendar Notice of Committee Meetings for Elizabeth City, Hickory, and Raleigh Public Hearings); Tr. 869:16–870:1 (Hise). As the Court describes below, the effect of this delay was that the public had very little opportunity

to provide input or evaluate draft maps, which were not released for the first time until October 18, 2023, or nearly six months after *Harper III*. *See* Joint Stip. ¶ 18; JX106; JX107.

255.    As Senator Hise testified, the Legislature waited to begin drawing the Congressional and Senate plans until after the 2023 Appropriations Act was passed. Tr. 947:4–14 (Hise). Senator Hise, as Chairman of both the Redistricting and Elections Committee and the Appropriations Committee that passed the Appropriations Act, had control over the sequencing of both bills, *see* Tr. 869:16–870:1, 943:22–24 (Hise), something that would ultimately be consequential in the transparency (or lack thereof) in the 2023 redistricting process.

256.    As the evidence at trial showed, the 2023 Appropriations Act—which was passed just before the Legislature began working on new redistricting plans—included a last-minute rider that repealed a longstanding state law that made redistricting communications and drafting documents part of the public record. Tr. 944:4–945:13 (Hise); Joint Stip. ¶ 8.

257.    This rider, buried at page 530 of the 625-page Appropriations Act, was added on October 1, 2023, just two days before bill's passage, even though the Legislature had begun working on the bill in March 2023. Tr. 945:18–23, 945:24–946:3 (Hise).

258.    Once passed, the 2023 Appropriations Act repealed G.S. 120-133, which was entitled "Redistricting Communications," and stated: "Notwithstanding any other provision of law, all drafting and information requests to legislative employees and documents prepared by legislative employees for legislators concerning redistricting the

North Carolina General Assembly or the Congressional Districts are no longer confidential and become public records upon the act establishing the relevant district plan becoming law. Present and former legislative employees may be required to disclose information otherwise protected by G.S. 120-132 concerning redistricting the North Carolina General Assembly or the Congressional Districts upon the act establishing the relevant district plan becoming law." Tr. 944:22–945:11 (Hise).

259.     Prior to its repeal in September 2023, G.S. 120-133 had been law since 1995, *see* Tr. 945:12–945:16 (Hise), making the 2023 redistricting process the first one in nearly 30 years in which redistricting documents did not become part of the public record. Tr. 945:12–945:16 (Hise). In other words, unlike the redistricting processes of 1997, 2001, 2002, 2003, 2009, 2011, 2016, 2019, and 2021, the 2023 redistricting process was not subject to the transparency requirements of G.S. 120-133.

260.     In addition to repealing G.S. 120-133, the 2023 Appropriations Act also gave all legislators the unilateral authority to delete their emails and destroy their records. WX172 at 4; Tr. 946:4–22 (Hise).

261.     Specifically, Section 27.9(a) of the 2023 Appropriations Act added the following provision to North Carolina law: "Notwithstanding any other provision of this section or order, rules, or regulations promulgated or adopted thereunder, the custodian of any General Assembly record shall determine, in the custodian's discretion, whether a record is a public record and whether to turn it over to the Department of Natural and

Cultural Resources, or retain, destroy, sell, loan, or otherwise dispose of, such records."
WX172 at 4; Tr. 946:4–22 (Hise).

262. Finally, Section 27.7(e) of the 2023 Appropriations Act amended public records law to provide that a legislator "shall not be required to reveal or to consent to reveal any document, supporting document, drafting request, or information request made or received by that legislator while a legislator." WX172 at 3.

263. Again, as Senator Hise testified, the Legislature specifically waited until the Appropriations Act had passed to begin drawing maps. Tr. 947:4–14 (Hise). The Court finds that this sequencing was intended to and had the effect of limiting transparency into the redistricting process.

### iii.    Use of Consultants in 2023 Plan

264. The Court finds that a lack of transparency in the redistricting process even carried over to the Legislature's use of consultants.

265. At trial, the Court heard from Blake Springhetti, an independent consultant who was approached by Phil Strach, Legislative Defendants' counsel, in the summer of 2023, to draw "concepts" for a State House map and the congressional map, Tr. 1251:11–25, 1256:14–20 (Springhetti), much like the General Assembly used "concept" maps for the 2021 Plan that was later invalidated.

266. The Legislature's choice in hiring Mr. Springhetti to draw redistricting plans for the state was a surprising one. Mr. Springhetti has very limited experience with drawing redistricting maps and little to no familiarity with North Carolina. Mr. Springhetti testified,

- 102 -

for instance, that he had done no prior work in North Carolina, is not familiar with the different areas of North Carolina, and has no knowledge or understanding of North Carolina's political geography. Tr. 1252:1–1253:14, 1253:3–10, 1253:15–17 (Springhetti).

267. Overall, Mr. Springhetti's testimony demonstrated that even he was largely kept in the dark about the Legislature's redistricting process and decision-making. For instance, although Mr. Springhetti was instructed to make various changes to his maps in meetings with Chairman Hall and Representative Stevens, Mr. Springhetti had no knowledge of the purpose of those changes, who requested the changes, or on what data they were based. Tr. 1254:20–1255:2, 1255:3–1256:25 (Springhetti). He had no knowledge who Chairman Hall and Representative Stevens discussed the maps with or took instructions or input from. Tr. 1254:25–1255:7 (Springhetti). Nonetheless, he made every change requested of him, even if he did not understand the purpose of the change. Tr. 1255:12–1256:13 (Springhetti).

268. After a series of revisions based on unknown criteria, Mr. Springhetti passed new drafts to the Legislature in October 2023; Mr. Springhetti testified that Chairman Hall was pleased with his draft, but he has no idea how his maps were then used or changed. Tr. 1256:18–1257:7 (Springhetti). Mr. Springhetti ultimately testified that he has no idea what criteria were ultimately considered, or prioritized, in the drawing of the 2023 Plan. Tr. 1258:1–16 (Springhetti).

269. In other words, even the original map drawer who provided Legislative Defendants with "concepts of a congressional plan" was kept in the dark on the decisions that went into drawing the final 2023 Plan. Tr. 1256:7–1258:16 (Springhetti).

### iv. Lack of Public Hearings and Input in 2023 Plan

270. The Court also finds that the 2023 redistricting process was notably less open to the public than in previous redistricting cycles, including even the 2021 redistricting cycle. In particular, the Court finds that the General Assembly held significantly fewer public hearings during the 2023 redistricting process compared to prior processes, and that those hearings did not provide true opportunity for public input, in large part because the General Assembly refused to hold any hearings in which the public had an opportunity to comment on draft maps.

271. Before this redistricting cycle, it was common for the General Assembly to hold numerous public hearings all throughout the state, including in the state's most populous counties, and to offer hearings in which the public had an opportunity to comment on draft maps. During the 2021 redistricting process, for example, the General Assembly held 13 public hearings across ten counties, including in Guilford and Mecklenburg Counties. JX241 (2021 Public Hearing Schedule). In the 2017 redistricting process—a mid-decade redistricting just like the 2023 cycle—there were seven public hearings, including opportunities to participate in Guilford and Mecklenburg Counties. Tr. 968:20–969:19 (Hise). And in the 2010 redistricting cycle, the General Assembly held 61 public

hearings across 26 counties, including, again, hearings in Guilford and Mecklenburg Counties. JX258 (2011 Redistricting Public Hearing Sites List).

272.    In prior cycles—including during the 2016, 2017, and 2019 redistricting processes—proposed maps were released prior to hearings being held, ensuring the public had a meaningful opportunity to comment on the maps. Tr. 968:4–19 (Hise). And in the 2021 redistricting process, four of the 13 hearings were held after draft maps were released, and the General Assembly published redistricting criteria nearly a month before the first public hearing, meaning that every citizen who attended a hearing could at least comment on the criteria, if not the maps itself. *See Harper I*, 2022-NCSC-17, ¶¶ 14–15, 868 S.E.2d at 511–12. The 2021 process also provided multiple opportunities for virtual hearings, ensuring that North Carolinians could participate, no matter where they lived, as well as hearings outside of business hours, to allow for maximum participation. *See id.*

273.    The 2023 process was very different. In total, the General Assembly held just three hearings statewide, all of which were limited to in-person testimony during business hours. JX064; Tr. 344:5–18 (Allen); Tr. 967:25–968:3 (Hise). As Senator Smith testified, voters "were very disappointed, frustrated, [and] some angry" about the inaccessibility of the hearing locations and times. Tr. 809:17–20 (Smith).

274.    Although the 2023 Congressional Plan made the most dramatic changes to the Piedmont Triad and Mecklenburg County, no public hearing took place in or near these areas. JX066–71 (showing hearings held in Elizabeth City, Hickory, and Raleigh). For Plaintiffs Pamlyn Stubbs of Guilford County and Allison Allen of Mecklenburg County,

- 105 -

the times and locations of these hearings were inaccessible for them to attend. *See* Tr. 210:10–17 (Stubbs) (testifying to difficulty of attending hearings as Guilford resident, and noting the 2023 process was the first in her memory that there was no hearing in Guilford County); Tr. 343:15–344:8 (Allen) (testifying to difficulty of attending hearings as Mecklenburg resident).

275. Moreover, the General Assembly failed to provide a redistricting schedule, proposed maps, or even proposed redistricting criteria until after the conclusion of those public hearings. *See* JX064; Tr. 967:25–968:6 (Hise). This change meant the public never had an opportunity to comment at a hearing on any redistricting criteria or proposed changes to the map, an understandable point of frustration for voters who wanted to participate in the process. Several witnesses at trial, including Senator Smith, Common Cause North Carolina Executive Director Bob Phillips, and voters Syene Jasmin and Plaintiff Pamlyn Stubbs, testified about the lack of criteria or maps at the hearings and the effect it had on voters' ability to functionally participate in the process. *See* Tr. 809:16–24 (Smith) (testifying to voters' "frustration of not even having the maps in front of them"); Tr. 613:5–614:2 (Phillips) ("Three hearings, very few lawmakers, no criteria, no real instructions on what these hearings were about other than just to receive public comment, no maps. It was almost as if this was an afterthought, in my opinion."); Tr. 525:22–526:6 (Jasmin) ("Honestly, I just felt like they just wanted to have the hearing just to have the hearing, just have it on paper. That's just what I felt like."); Tr. 210:18–211:1 (Stubbs)

(testifying that in prior cycles, "they would share drafts of the plans that we could actually bring back home and sort of review," and that she was unable to do that this time).

276.    Unlike the 2021 cycle, in which legislators drew the maps in public terminals, the drawing of the 2023 process was held entirely behind closed doors, with zero public visibility. The day after draft maps were released, at the Senate Redistricting and Elections Committee hearing, Senator Natasha Marcus asked Senator Hise whether there would be any opportunity for public comment on the draft maps. JX002 at 65–66. Senator Hise responded: "There is no scheduled public comment at this time." *Id*. at 66. No further public comment hearings were ever scheduled.

277.    Following this truncated public hearing process, the General Assembly rushed the congressional map through the legislative process, passing the bill within a week of the date it was introduced. JX041.

278.    Despite the limited timeframe, members of the community and legislators submitted comments opposing the configuration of certain lines in the 2023 Plan, including in particular the lines in Guilford County in the Piedmont Triad. *See, e.g.*, WX94 at 3 ("[W]hen our 3 major cities [of the Piedmont Triad] have been split up in the past, our voices have essentially been silenced. . . . The Piedmont Triad is a distinct community with shared interests and concerns . . . It just makes sense for one person to represent us since our 3 cities are so alike and are so close to each other geographically. Please keep these cities in the same congressional district as much as possible.") (10/23/23 Public Comment Report); WX94 at 8 ("The Triad – including Greensboro, Winston-Salem and High Point

– is a cohesive region that shares varied common interests. We know each other and interact. There should be one congressional district rooted in the Triad. Guilford County should not be split and the cities of Greensboro, Winston-Salem and High Point should be kept together as much as possible."); WX96 at 22 ("The The Triad name indicates that the three cities in the Triad are enough alike that they are mostly referred to in a grouping – Greensboro, Winston Salem, High Point. The Triad is a region that shares common interests in industry, education, entertainment, healthcare, and local news. There should be one congressional district rooted in the Triad . . . We in the Triad have very different needs and concerns than voters in rural NC on the NC/TN line.") (10/25/2023 Public Comment Report); JX059 at 23 ("I live in the Triad: Winston-Salem, Greensboro, High Point. We're one big community. We share news, schools, healthcare. We socialize together. We go to shows, music, restaurants. We should never be divided into three or four districts for the purpose of voting.") (09/26/2023 Hickory Public Hearing Transcript); JX059 at 76 ("[A]s a resident of the Triad, I was appalled to see the Triad split between four congressional districts"); JX058 at 36–37 ("A community split across many districts that have nothing in common with that community has zero representation in this body. Concerning Guilford County and surrounding areas, Guilford County should be kept whole. The Triad area, Greensboro, High Point, Winston-Salem should be kept together.") (9/27/2023 Raleigh Public Hearing Transcript); JX007 at 56 (Representative Harrison remarking in legislative debate, "[I]f you read the comments of the public, continually those from the Triad, they said this in 2021 when it came down here and they repeated it this time around, to keep

- 108 -

Guilford county and the Triad whole.") (10/25/2023 House Floor Transcript); JX002 at 43 (Senator Garret asking, "[W]hy would we split Guilford County among three different congressional districts when that's not necessary?"). These comments, of course, were not reflected in the passage of the 2023 Plan, which split Greensboro, High Point, and Winston-Salem among four different congressional districts (CD-5, CD-6, CD-9, and CD-10). JX075 (Senate Bill 757: Realign Congressional Districts 2023/CST-4).

> v. **Failure to Conduct Racially Polarized Voting Analyses in 2023 Plan.**

279.    Despite receiving comments from citizens and legislators concerned about racial vote dilution, Legislative Defendants also did not conduct a racially polarized voting analysis prior to passing the 2023 Plan. Tr. 901:9–902:17 (Hise).

280.    Instead, on October 19, 2023—a Thursday—Senator Hise announced that the General Assembly would not conduct its own racially polarized voting analysis, and in order for any racially polarized voting analysis to be considered, such analysis would need to be conducted and sent to the chairs of the committee prior to 10:00 am Monday, October 23, 2023. *Id*. There was a single business day between Senator Hise's announcement and the deadline for the submission of racially polarized voting analyses. *Id*.

281.    The Southern Coalition for Social Justice nonetheless submitted such an analysis to Legislative Defendants by the deadline, which included a racially polarized voting analysis conducted by Dr. Oskooii. NAACPPX47 (Oskooii Analysis); Tr. 903:9–905:11 (Hise).

- 109 -

282.     In the submission to the General Assembly, Dr. Oskooii analyzed 27 contested statewide elections in 2020 and 2022 and found definitive evidence of racially polarized voting patterns in North Carolina. The letter urged the General Assembly to "perform additional analysis" to "ensure[] that minority voters in North Carolina have an equal opportunity to elect candidates of their choice" and warned that the "[draft] maps and the process by which they are being considered run an alarming, unjustifiable risk of violating the VRA." NAACPPX47 at 5.

283.     Senator Hise confirmed the committee chairs received and reviewed the letter but took no action in response. The committee chairs did not hire an expert to conduct the General Assembly's own racially polarized voting analysis, nor did they even allow the rest of the committee to vote on whether to conduct their own racially polarized voting analysis or raise the letter for debate. Tr. 914:22–915:5 (Hise).

## IV.     Intentional Vote Dilution in Violation of Section 2 of the VRA

284.     In an intentional vote dilution claim, Plaintiffs must demonstrate that the plan has a discriminatory purpose and effect. *See, e.g.*, *Harding v. Cnty. of Dallas*, 948 F.3d 302, 312–13 (5th Cir. 2020). Plaintiffs may establish a redistricting plan's discriminatory intent through the *Arlington Heights* factors. *See, e.g.*, *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 687 (2021). And *Gingles* factors 2 and 3 along with the Senate Factors provide evidence of a redistricting plan's discriminatory effect. *See, e.g.*, *Thornburg v. Gingles*, 478 U.S. 30, 44 (1986); *Rogers v. Lodge*, 458 U.S. 613, 623 (1982).

### A.     Plaintiffs' Evidence of Racial Polarization (*Gingles* 2 and 3)

- 110 -

285.   *Williams* Plaintiffs presented the (largely undisputed) testimony of Dr. Palmer, who showed that there is racially polarized voting both statewide and specifically in the Piedmont Triad and Mecklenburg regions.

286.   Dr. Palmer found strong evidence of racially polarized voting in North Carolina. In every election he analyzed—which included all 63 statewide contested partisan elections from 2016 through 2024—Black and white voters consistently supported different candidates. Tr. 158:17–21, 159:5–160:3 (Palmer). Figure 2 from Dr. Palmer's Expert Report, shown below, presents the results of Dr. Palmer's racially polarized voting analysis from 2016 through 2022. WX4 at 5.



**Figure 2:** Racially Polarized Voting Estimates by Election — Statewide

287. Dr. Palmer's analysis demonstrated that Black voters are highly cohesive in support of Black-preferred candidates, with an average of 97.6% of the vote, and that white voters are cohesive in opposing the Black-preferred candidate, with only 28.2% supporting the Black-preferred candidate. WX4 at 4–5; Tr. 160:4–161:18 (Palmer). In other words, on

average more than 71% of white voters in North Carolina vote in opposition to Black-preferred candidates.

288. At the regional level, Dr. Palmer found high levels of racially polarized voting in the Piedmont Triad and CD-14. In the Piedmont Triad, Black voters supported their preferred candidates with an average of 97.5% of the vote, while white voters supported the Black-preferred candidate with only an average of 23.4% of the vote. In other words, more than 76% of white voters in the Piedmont Triad voted in opposition to Black-preferred candidates. WX4 at 4, 6; Tr. 162:25–163:21, 164:5–8 (Palmer).

289. Dr. Palmer found similar racial polarization in CD-14. In CD-14, Black voters supported their preferred candidates with an average of 93.2% of the vote, and white voters supported Black-preferred candidates with only 19.8% of the vote. WX4 at 4, 6.

290. In Mecklenburg County, Dr. Palmer found more mixed evidence of racially polarized voting. While Black voters are highly cohesive with an average of 97.7% support for Black-preferred candidates, white voters are somewhat more supportive of Black-preferred candidates, voting on average 40.6% in favor of Black-preferred candidates. WX4 at 4, 6; Tr. 163:22–164:4 (Palmer), 164:17–165:2 (Palmer). Figure 3 from Dr. Palmer's Expert Report, shown below, presents the results of Dr. Palmer's racially polarized voting analysis in each region. WX4 at 6.



**Figure 3:** Racially Polarized Voting Estimates by Region

291.    The confidence intervals for Dr. Palmer's estimates at the regional and statewide level for Black and white voters are narrow, indicating low levels of statistical uncertainty. WX4 at 11–15, WX6 at 8–10; Tr. 204:6–15 (Palmer).

292.    Dr. Palmer confirmed his conclusions at the statewide and regional levels using 2024 election results. WX6 at 2–4; Tr. 162:9–24, 164:17–165:9 (Palmer).

293.    Legislative Defendants' expert Dr. John Alford—who considers Dr. Palmer to be an expert in racially polarized voting and in the application of ecological inference analysis—does not dispute any of Dr. Palmer's methodologies and empirical results. Tr.

1196:21–1197:1 (Alford), 1197:2–10 (Alford), 165:10–18 (Palmer). In fact, Dr. Alford follows the same basic statistical technique and uses the same programming language, the same implementing package, and essentially the same data as Dr. Palmer in conducting his estimates to evaluate racially polarized voting. Tr. 158:10–16 (Palmer).

294.    While Dr. Alford criticized Dr. Palmer's exclusion of the 2016 Supreme Court nonpartisan election in the set of elections he analyzes—a decision that was consistent with Dr. Palmer's focus on all partisan statewide contested races—this election does not change either expert's conclusions in this case. In fact, Dr. Alford agrees that this election, which featured a Black candidate running against a white candidate with no partisan indication on the ballot, indicates that the race of the candidate has explanatory value for the cohesion in Black voter preferences. WX5 at 1–2 (Reply Report of Dr. Maxwell Palmer), Tr. 1197:13–1198:2 (Alford).

295.    Dr. Alford agrees with Dr. Palmer's conclusions that Black voters in North Carolina are extremely cohesive and that white voters in North Carolina are also cohesive. Tr. 1198:3–9, 1200:4–13 (Alford). He agrees that Black voters are highly cohesive in the Piedmont Triad, Northeast, CD-14, and Mecklenburg County and that white voters are cohesive in the Piedmont Triad, the Northeast, and CD-14. Tr. 1198:13–24 (Alford). He similarly agrees that, statewide, more than 70% of white voters support the same candidates and generally oppose the Black-preferred candidate. Tr. 1199:8–25 (Alford).

296.    While Dr. Alford declined to offer a specific definition of "racially polarized voting," he readily agreed that clear racial differences were shown in this case in the way

that voters cast their votes. Tr. 1202:14–19 (Alford). And while he seemed to demand something more than clear evidence that different racial groups cohesively vote for different candidates, his preferred interpretation of racially polarized voting is unsupported by any academic literature. Tr. 1202:20–1203:23, 1204:10–15 (Alford). In fact, he has never conducted any academic research or published any peer-reviewed papers related to racially polarized voting. Tr. 1204:16–21 (Alford).

297.    Dr. Alford does not claim to have disproven the existence of racially polarized voting in North Carolina. Tr. 1205:19–21 (Alford) ("I don't believe it's been demonstrated that voting in North Carolina is not racially polarized.").

298.    Although Dr. Alford argues that party polarization, rather than racial polarization, explains the undisputed racial voting patterns observed in this case, his only analysis on this point, which looks at the level of support for candidates based on the race of the candidate, is deeply flawed. Tr. 165:19–166:11 (Palmer).

299.    As an initial matter, Dr. Alford's preferred focus on the race of the candidates—rather than the race of the voters—does not address the question posed by the racially polarized voting analysis in the second and third *Gingles* factors. While the key question of the racially polarized voting analysis is whether Black and white voters are polarized in their support for different candidates, Dr. Alford asks whether voters appear to be responding to the race of the candidate. Tr. 166:4–16 (Palmer). Dr. Alford's focus on why voters prefer different candidates, rather than whether and to what extent different racial groups prefer different candidates, is inconsistent with how federal courts routinely

- 116 -

approach the racially polarized voting analysis. *See* Tr. 166:17–167:2 (Palmer); *see also*

*Singleton*, 2025 WL 1342947, at *148 ("[T]he State relies on Dr. Hood, who conceded at

trial that Black voters in Alabama are politically cohesive and that he does not dispute Dr.

Liu's or Dr. Palmer's conclusions about voting patterns. These concessions are dispositive

of the second and third *Gingles* factors. Under controlling precedent, those factors do not

require that we fully disentangle party and race. They direct us to assess only whether Black

voters in Alabama are 'politically cohesive,' and whether each challenged district's 'white

majority votes sufficiently as a bloc to enable it … to defeat the [Black-]preferred

candidate. We see those patterns clearly from the evidence, a consensus of experts agrees,

and that concludes our *Gingles* analysis." (quoting *Allen v. Milligan*, 599 U.S. 1, 18

(2023))).

300. Additionally, as Dr. Palmer explained, the political science literature

demonstrates that a voter's background, including their race, is an "essential factor" in

shaping their politics and party preferences. Tr. 167:3–14 (Palmer); WX5 at 3. *NAACP*

Plaintiffs' expert Dr. Kassra Oskooii agreed, citing social science literature, that race plays

a "pivotal role" in influencing political preferences, including partisanship—a relationship

that Dr. Alford does not rebut. Tr. 393:11–22 (Oskooii); NAACPPX202 at 5–7 (Oskooii

Reply Report). Dr. Alford himself does not dispute that it is possible that race influences a

voter's party preference. Tr. 1213:11–13 (Alford).

301. Contrary to his conclusions, Dr. Alford's conceded that recent elections in

North Carolina may show that the race of the candidate could in fact play a role in voter's

- 117 -

selections. In the racially contested election for the 2024 governor's race, Dr. Alford agrees that the Black Republican candidate Mark Robinson's support among white voters was 10–15 percentage points lower than other Republican candidates that year, an outcome that, prior to the 2024 election, Dr. Alford agreed would have shed light on the racial preferences of voters. Tr. 1210:15–1211:6 (Alford).

302. Dr. Alford's analysis also compares support for candidates of different races, but he admits that for voting to be racially polarized, it is not necessary for the difference in voting behavior between racial groups to be entirely or exclusively explained by the race of the candidate. Tr. 1206:7–14 (Alford). For example, Dr. Alford agrees that differences in voting behavior between racial groups could indicate racially polarized voting if those differences were based on racial cues, such as policy differences on racialized issues like affirmative action, but he does not attempt to analyze the impact of those policy differences in his report. Tr. 1211:7–1212:11 (Alford).

303. Although Dr. Alford testified that he sees no evidence that Black voters prefer Black candidates, Dr. Alford admitted he did not consider that the two congressional districts with the highest BVAPs in North Carolina, CD-1 and CD-12, both elected Black representatives, and his own report showed that North Carolina's legislative districts with a substantial Black population all elected Black representatives, including a Black Republican. Tr. 1207:1–1209:4 (Alford); LDTX243 (Errata of Dr. John Alford). He also does not dispute that historically in North Carolina, the congressional districts with the

most Black voters elect Black candidates, while the congressional districts with the most white voters elect white candidates. Tr. 1209:5–9 (Alford).

304. In short, the data, political science, and legal precedent undermine Dr. Alford's insistence that partisanship rather than race explains the high degree of polarization in North Carolina elections.

305. On the whole, the Court cannot credit Dr. Alford's testimony that voting patterns in North Carolina are driven more by party than by race. We do not find his methods or conclusions reliable.

306. Dr. Alford has done no academic work related to racially polarized voting, the VRA, or redistricting, and has never published any work attempting to control partisanship in analyzing racially polarized voting. Tr. 1213:22–1214:7 (Alford). He does not teach courses on racial or ethnic politics or racially polarized voting behavior. Tr. 1214:8–11 (Alford). The vast majority of Dr. Alford's experience in the area of racially polarized voting is in providing expert opinions for litigation. Tr. 1214:22–25 (Alford).

307. Dr. Alford has testified in a large number of redistricting cases, and he has provided very similar opinions as he does here, suggesting that partisanship may explain observed differences in racial groups' voting behavior. Tr. 1215:1–11 (Alford). In several recent cases, courts have concluded that Dr. Alford's analysis was either tangential or entirely unrelated to the legal issue of racially polarized voting. Tr. 1215:12–16 (Alford). For example, in a recent redistricting case in New York, the court concluded that Dr. Alford's "testimony, while sincere, did not reflect current established scholarship and

- 119 -

methods of analysis of racially polarized voting and voting estimates." *NAACP Spring Valley Branch v. E. Ramapo Sch. Dist.*, 462 F. Supp. 3d 368, 381 (S.D.N.Y. 2020); Tr. 1215:17–1216:6 (Alford).

308.    Similarly, in a 2022 congressional redistricting case in Louisiana, the district court credited the analysis and methodology of Dr. Palmer over Dr. Alford's and found that Dr. Alford's opinion was not "helpful as it appears to answer a question that *Gingles II* does not ask and, in fact, squarely rejects, namely, why Black voters in Louisiana are politically cohesive" and "border[s] on ipse dixit." *Robinson v. Ardoin*, 605 F. Supp. 3d 759, 840 (M.D. La. 2022); Tr. 1217:11–16 (Alford). As the court continued, Dr. Alford's "opinions are unsupported by any meaningful substantive analysis and are not the result of commonly accepted methodology in the field. Other courts have found the same." *Robinson* at 840–41.

309.    And in a 2022 redistricting case challenging state legislative and congressional plans in Georgia, the district court concluded that "[i]n fact, there is no evidentiary support in the record for Dr. Alford's treatment of race and partisanship as separate and distinct factors affecting voter behavior, nor is there any evidence, aside from Dr. Alford's speculation, that partisanship is the cause of the racial polarization identified by Dr. Palmer." *Alpha Phi Alpha v. Raffensperger*, 587 F. Supp. 3d 1222, 1306 (N.D. Ga. 2022); Tr. 1220:2–1221:10 (Alford).

310.    Dr. Alford has not changed his methodology in response to any of these opinions. Tr. 1216:7–9, 1218:17–1219:25 (Alford).

311.     Accordingly, this Court finds that nothing about Dr. Alford's testimony disproves, discounts, or otherwise undermines Dr. Palmer's analyses and conclusions regarding racially polarized voting.

B.     **The Totality of the Circumstances Affecting Black North Carolinians' Ability to Participate in the Political Process**

312.     Through a combination of both expert testimony and lay testimony, the Court heard extensive evidence regarding North Carolinians' ability to participate in the political process. The Court recounts that testimony and its findings as to the Senate Factors below.

i.     **North Carolina's History of Discrimination in Voting (Senate Factors 1 and 3)**

313.     North Carolina has a long and sordid history of voting-related discrimination that continues to affect the ability of Black voters to participate in the political process.

314.     As discussed, *supra* Section III.B, in connection with Factor 2 of the *Arlington Heights* analysis, Plaintiffs presented expert testimony from Dr. Leloudis and Dr. Bagley explaining North Carolina's long and ongoing history of official discrimination, including in the very recent past. *See* WX13 at 3–105; NAACPPX181 at 7–30. This testimony was largely undisputed by Legislative Defendants.

315.     North Carolina's history of official discrimination against its Black citizens goes back to its foundation: Black North Carolinians had no right to vote in the state until the adoption of the North Carolina Constitution of 1868 and the ratification of the Fourteenth and Fifteenth Amendments in 1870. *See* Tr. 537:24–538:4 (Leloudis).

- 121 -

316. Three decades later, following a virulent campaign against equal citizenship by white supremacist Democrats, Black North Carolinians' voting rights were effectively eliminated when North Carolina amended its constitution to add a literacy test and poll tax. *See* N.C. Const. of 1868, as amended by the Convention of 1875, and as further amended at the elections of 2 August 1900 ("Every person presenting himself for registration shall be able to read and write any section of the Constitution in the English language; and before he shall be entitled to vote, he shall have paid on or before the first day of May, of the year in which he proposes to vote, his poll tax for the previous year, as prescribed by Article V, Section 1, of the Constitution."); *see also* Tr. 537:22–538:14 (Leloudis); WX13 at 21–28.

317. As Dr. Leloudis explained, both the literacy test and poll tax were emblematic of what would become North Carolina's long pattern of discrimination against Black voters, in which "[l]egislative actions that have appeared race neutral on their face . . . have, in fact, targeted minority voters with calculated precision." Tr. 537:2–4 (Leloudis).

318. Both the literacy test and poll tax were emblematic of another trend in North Carolina's long pattern of discrimination against Black voters, in which electoral gains by minority voters in North Carolina are historically followed by efforts to suppress the effectiveness of those same voters. Tr. 537:13–19 (Leloudis) (testifying to North Carolina's attempts "to target minority voters and to roll back minority political gains" after "the formation of politically effective interracial alliances" and "the advancement of minority political participation").

319.    While race-neutral on their face, North Carolina's literacy test and poll tax did not apply to white voters due to a grandfather clause that exempted anyone who was a lineal descendant of someone eligible to vote prior to January 1, 1867—that is, before the adoption of the North Carolina Constitution of 1868 and ratification of the Fourteenth and Fifteenth Amendments that conferred the right to vote on Black men. *Id.* Dr. Leloudis explained that, as a result, the amendment disenfranchised all but a small handful of Black men in North Carolina. *See* Tr. 539:1–4 (Leloudis). Overall, the disenfranchisement of Black male citizens was devastatingly effective even though "nothing in that amendment . . . referenced race." Tr. 537:25–538:11 (Leloudis).

320.    As previous courts have found, as a "direct consequence of the poll tax and the literacy test, black citizens . . . were either directly denied registration or chilled from making the attempt from the time of imposition of these devices until their removal." *Gingles v. Edmisten*, 590 F. Supp. 345, 360 (E.D.N.C. 1984), *aff'd in relevant part Thornburg v. Gingles*, 478 U.S. 30 (1986). Even after their removal, the poll tax and literacy test's legacies left a "chilling effect on two or more generations of black citizens," resulting in "relatively depressed levels of black voter registration." *Id.*

321.    As Dr. Leloudis testified, in response to effective voter registration drives by Black North Carolinians and growing alliances with progressive whites in the 1940s and 1950s, the General Assembly "introduce[ed] new multimember at-large legislative districts" and "outlawed single-shot voting in local elections . . . in selected parts of the state." Tr. 540:9–13 (Leloudis). These measures, although facially race-neutral, "ma[de] it

- 123 -

mathematically difficult, if not impossible," for Black voters to elect their preferred candidates. Tr. 540:4–15 (Leloudis). Anti-single-shot voting provisions, enacted "with the intended effect of fragmenting a black minority's total vote between two or more candidates in a multi-seat election and preventing its concentration on one candidate," were in effect until the practice was declared unconstitutional in *Dunston v. Scott*, 336 F. Supp. 206 (E.D.N.C. 1972). *Edmisten,* 590 F. Supp at 360; *see also Gingles*, 478 at 38–39, 80.

322. As Dr. Bagley explained, these anti-single-shot provisions and at-large districting systems were pervasive throughout North Carolina in the 1960s, 1970s, and 1980s. *See* NAACPPX181 at 12–27.

323. One of the Plaintiffs in this case, Plaintiff Jones, testified to his lived experience with an at-large districting system. Specifically, Plaintiff Jones testified to how, through the 1981 election, the City of Greensboro used an at-large system to maintain an all-white City Council, despite the city population being approximately 35% Black. Tr. 138:16–18 (Jones). Only after Mr. Jones and other members of the NAACP filed a petition with the Department of Justice under the VRA did the Greensboro City Council switch from the at-large system to a system in which Black candidates, including Mr. Jones, could be elected. Tr. 139:20–140:22 (Jones).

324. By 1986, the U.S. Supreme Court held that North Carolina's "legacy of official discrimination" had "acted in concert" with the use of multimember state legislative districts "to impair the ability of . . . cohesive groups of black voters to

participate equally in the political process and to elect candidates of their choice." *Gingles*, 478 U.S. at 80.

325.    The *Gingles* decision (and its predecessors in federal courts across North Carolina) opened the door for Black plaintiffs in North Carolina to "file[] suits challenging the use of at-large schemes for 12 town or city councils, 20 county commissions, and seven school boards." NAACPPX181 at 12. "Numerous other local bodies" were required to "switch from at-large to single-member systems either under direct threat of litigation or out of fear of such," underscoring the widespread use of at-large schemes throughout North Carolina to dilute Black voting power. *Id.*

326.    Even after *Gingles*, however, at-large voting systems, which had the effect of limiting Black political power, persisted throughout North Carolina through the 1980s and 1990s. *See, e.g.*, NAACPPX181 at 13 (discussing Elizabeth City's forced change to single member districts via consent decree); *Id.* at 19 (discussing Mt. Olive's use of an at-large method of electing its five-seat board of commissioners, which prevented Black voters from electing more than a single Black member of the town despite town's majority Black population, until the town was forced to change from an at-large system to a hybrid system in 1993). As Dr. Bagley explained, "[s]imilar litigation led to changes in the Town of Ahoskie, Beaufort County, Granville County, the City of Statesville, Halifax County, Bladen County, the City of Laurinburg, Tyrell County, Wayne County, Siler City, Sampson County, and the City of Rocky Mount." *Id.*

- 125 -

327.    More recently, in 2007, Dr. Bagley discussed how officials in Fayetteville submitted a change for the election of the city council that would have jettisoned a nine-single-member district plan in favor of a plan with six single-member districts and three at-large seats. *Id.* at 22. Although the Justice Department ultimately objected to the plan, Dr. Bagley explained that this effort was "emblematic of white leaders in the state consistently chafing at the requirements of the Voting Rights Act." *Id.*

328.    Due to this history of discrimination, 40 of North Carolina's counties were subject to preclearance requirements pursuant to Section 5 of the VRA until the preclearance regime was invalidated by the Supreme Court in *Shelby County v. Holder*, 570 U.S. 529 (2013). *See McCrory*, 831 F.3d at 215.

329.    In total, the "Department of Justice issued over fifty objection letters to proposed election law changes in North Carolina" between 1980 and 2013 "because the State had failed to prove the proposed changes would have no discriminatory purpose or effect." *Id.* at 224. "During the same period, private plaintiffs brought 55 successful cases under § 2 of the Voting Rights Act." *Id.* In some cases, "the Department of Justice or federal courts . . . determined that the North Carolina General Assembly acted with discriminatory intent, revealing a series of official actions taken for invidious purposes." *Id.* at 223 (cleaned up) (citation omitted).

330.    In 2013, the day after the Supreme Court's ruling in *Shelby County*, members of the General Assembly introduced House Bill 589, which severely curtailed several voting methods disparately relied on by Black voters. The bill "as passed, included a photo-

- 126 -

ID requirement and eliminated the first week of early voting, same-day registration, and straight-ticket voting. It encouraged voter intimidation by allowing citizens to inspect and challenge registration records anywhere in the state, [] allowing voters in a county to challenge voters casting ballots anywhere in that county, and allow[ing] . . . 10-person poll observer teams to be deployed to polling places said to [be] deserving of scrutiny." NAACPPX181 at 25.

331.    The Fourth Circuit found significant evidence of discriminatory intent in House Bill 589's drafting and passage, finding specifically that General Assembly "target[ed] African Americans with almost surgical precision." *McCrory*, 831 F.3d at 214. Tr. 656:5–16 (Bagley); Tr. 546:13–21 (Leloudis).

332.    Courts have continued to find racial discrimination in North Carolina's election system even during the pendency of this lawsuit. *See N.C. A. Philip Randolph Inst.*, 730 F. Supp. 3d at 203; *see also supra* Section III.B.

333.    North Carolina's attempts to limit the power of Black voters has, of course, extended to its congressional districting plans. During the 1990 cycle, the first post-*Gingles*, the Department of Justice rejected the State's congressional plan under Section 5's preclearance regime. The map failed to create a "second majority-minority district" in the southeastern part of the state "to give effect to black and Native American voting strength in this area by using boundary lines no more irregular than those found elsewhere in the proposed plan, but failed to do so for pretextual reasons." *Shaw v. Reno*, 509 U.S. 630, 635 (1993) (cleaned up). The State acquiesced to the objection but then "enacted a

revised redistricting plan that included a second majority-black district" in a *different* "part of the State." *Id.* (citations omitted). The Supreme Court later invalidated that plan on different grounds, leaving Black voters throughout the decade without the "second majority-minority district in the south-central to southeastern part of the State" that "the Attorney General [had] suggested" and without an additional majority-minority district anywhere else. *Id.* at 657–58; *see Shaw v. Hunt*, 517 U.S. 899, 917 (1996).

334.   Efforts to limit Black political power in the state's congressional plans extend even to the state's most recent decade of redistricting. In the 2010 redistricting cycle alone, the U.S. Supreme Court invalidated North Carolina's redistricting plans in three separate cases as intentional racial gerrymanders. *See supra* Section III.B.

335.   None of Legislative Defendants' expert witnesses offered an opinion rebutting Dr. Bagley or Dr. Leloudis' testimony on these topics, *see* Tr. 1309:20–22, 1314:24–1316:23 (Taylor), or this history of discrimination in North Carolina more broadly.

336.   Instead of rebutting this testimony, Legislative Defendants' expert examined wholly different issues, including comparing the difficulty of voting in North Carolina to the difficulty of voting in other states, the disparity in voter registration and turnout between Blacks and whites in North Carolina, and the locations of certain early polling places in the state. LDTX259 at 8–13 (Expert Report of Dr. Andrew Taylor).

337.   Dr. Taylor's analysis relied on inapposite sources and questionable methods and fails to rebut Plaintiffs' evidence of North Carolina's history (and recent use) of voting

practices that enhance the opportunity for discrimination. For example, Dr. Taylor relied on the "Cost of Voting Index"—which he conceded at trial does not measure discrimination against minority groups, *see* Tr. 1307:13–19 (Taylor)—to conclude that North Carolina does not "disproportionately hamper its general population's capacity to participate in 'voting practices.'" LDTX259 at 8. Additionally, Dr. Taylor reports only North Carolina's comparative rank under the Cost of Voting Index, and so his report provides the Court with very limited information about discriminatory practices within the state.

### ii. The Extent of Racially Polarized Voting in North Carolina (Senate Factor 2)

338.    As the Court has already found, Plaintiffs' expert Dr. Palmer presented overwhelming evidence of racially polarized voting in North Carolina in each of the 63 elections he analyzed from 2016 through 2024, demonstrating that Black and white voters in the state as a whole and in the challenged regions consistently support different candidates. *See supra* Section III.A.i. Once again, even Defendants' expert, Dr. Alford, agreed with that finding. *See supra* Section IV.A. The Court has credited the testimony and conclusions of Dr. Palmer in finding extensive evidence of racially polarized voting throughout North Carolina. *See supra* Section IV.A.

339.    The Court also finds evidence in this case that the racially polarized voting patterns in North Carolina are attributable, in large part, to voters' racial attitudes and responses to racial cues. The Court bases this finding primarily on the testimony of Dr. LaFleur Stephens-Dougan, who testified that race and racial attitudes are the dominant

precursor to partisan affiliation as it pertains to voting behavior in the American South and in North Carolina specifically. Tr. 721:21–25 (Stephens-Dougan).

340.    Dr. LaFleur Stephens-Dougan is an associate professor of politics at Princeton University, focusing on American politics, race and ethnic politics, racial attitudes, public opinion, Black politics, and survey experiments. Tr. 718:7–12 (Stephens-Dougan). Among other publications, she authored the award-winning book *Race to the Bottom: How Racial Appeals Work in American Politics* and published several peer-reviewed articles on racial appeals, including an annual review piece, "The Persistence of Racial Cues and Appeals in American Elections." Tr. 718:19–719:1 (Stephens-Dougan).

341.    The parties stipulated and the Court finds that Dr. Stephens-Dougan is an expert in racial attitudes, public opinion, Black politics, and race, ethnicity and American politics. Joint Stip. ¶ 98.

342.    At trial, Dr. Stephens-Dougan presented unrebutted testimony demonstrating that race is the root cause of the polarization in North Carolina. As Dr. Stephens-Dougan explained, racial attitudes fuel partisan behavior, and Black North Carolinian support for the Democratic Party is largely driven by the Party's support of racial issues salient to Black voters—issues that the Republican Party have consistently opposed. Tr. 722:1–14 (Stephens-Dougan).

343.    Dr. Stephens-Dougan, for example, testified thoroughly and credibly about how, despite the large degree of ideological heterogeneity among African Americans, there is a surprising degree of partisan homogeneity among African Americans, such that even

conservative African Americans tend to overwhelmingly vote for the Democratic Party. Tr. 745:8–21 (Stephens-Dougan). That support, she explained, is largely driven by the Democratic Party's stance on race and racial matters. Tr. 746:2–12 (Stephens-Dougan).

344. Plaintiffs' fact witnesses, some of whom are experienced North Carolina politicians, echoed Dr. Stephens-Dougan's testimony. Plaintiff Earl Jones, for example, a Black elected official who served on Greensboro City Council for 18 years and the state legislature for eight years, Tr. 135:23–24 (Jones), testified that he chose to affiliate with the Democratic Party in part because "the Democratic Party Platform was more in line with the interests and concerns and sensitivities of the African-American community." Tr. 145:17–23 (Jones). As Mr. Jones testified, he has never felt welcome in the North Carolina Republican Party given the state party's racialized appeals to white voters and efforts against Black interests. Tr. 146:1–14 (Jones).

345. As Dr. Stephens-Dougan showed, the racial division in policy preferences is routinely larger than divisions along gender or along income. Tr. 722:18–19, 723:2–15, 724:5–23 (Stephens-Dougan). For issues that do not have to do with racial matters, however, like the economy or abortion, the stark racial division between white and Black North Carolinians disappears. Tr. 724:24–725:13 (Stephens-Dougan).

346. Finally, Dr. Stephens-Dougan explained that racial attitudes are injected into North Carolina politics through campaign advertisements, racial appeals, racial code words, and stereotypical imagery. Tr. 749:12–18 (Stephens-Dougan). The Court credits this testimony, and discusses these findings in greater detail *infra* Section IV.B.iv.

347.   None of Legislative Defendants' experts, including Dr. Alford, dispute or respond to the analyses presented by Dr. Stephens-Dougan. LDTX242 at 2 (Expert Report of Dr. John Alford); LDTX251 at 2 (Supplemental Rebuttal Report of Dr. John Alford); Tr. 1222:3–8 (Alford). While Dr. Alford speculated that the racial voting patterns in North Carolina can be explained by partisanship, he did not dispute that it is possible that race influences a voter's party preferences, and he agreed that differences in voting behavior between racial groups could be based on racial cues. Tr. 1211:7–1212:11, 1213:11–13 (Alford). Dr. Alford, however, offered no analysis on the impact of racial cues or racialized policies on voting behavior, focusing his analysis exclusively on whether voters appear to respond to the race of the candidate. *Id*; *see also generally* LDTX242. The Court finds that the undisputed record in this case does reflect that race and racial attitudes in particular have an effect on voting behavior, and to the extent Dr. Alford attempted to offer a contrary opinion, the Court finds such opinion to be speculative and unsubstantiated.

### iii.   North Carolina's Ongoing Effects of Discrimination in Education, Employment, and Health (Senate Factor 5)

348.   The Court finds evidence in this case that Black North Carolinians continue to bear the effects of discrimination in areas such as education, employment, and health, all of which hinder their ability to participate effectively in the political process. The Court bases these findings in large part on the testimony of *Williams* Plaintiffs' expert, Dr. Christopher Clark, who presented uncontested evidence of stark and persistent racial disparities between Black and white North Carolinians in education, employment, income, health, and voter participation. Even Legislative Defendants' expert, Dr. Taylor, confirmed

the disparities that Dr. Clark identified between Blacks and whites in North Carolina for each socioeconomic factor identified, and opined that the educational disparities were based on North Carolina's official history of racial discrimination against its Black citizens. Tr. 1293:23–1294:7 (Taylor).

349.     Dr. Clark is a tenured associate professor of political science at the University of North Carolina at Chapel Hill. Tr. 232:24–233:9 (Clark). His principal areas of focus are minority representation, state politics, and voting. Tr. 233:10–16 (Clark). Dr. Clark has previously served as an expert witness in a voting rights case, where he undertook a Senate Factors analysis. Tr. 233:22–234:2 (Clark).

350.     The parties stipulated and the Court finds that Dr. Clark is an expert in political science with a focus on race and electoral representation, voting, state politics, Southern politics, and quantitative methods. Joint Stip. ¶ 94.

351.     Overall, Dr. Clark provided unrebutted evidence that, on average, Black North Carolinians have lower levels of educational attainment, experience greater rates of unemployment, earn less money, are more likely to be disabled, are less likely to be covered by health insurance, and are more likely to suffer from serious disease. WX8 at 18 (Export Report of Dr. Chris Clark).

352.     On education in particular, Dr. Clark testified that even recent data (from 2010 to 2022) shows that Black North Carolinians are still less likely to complete high school than white North Carolinians. Tr. 235:5–21 (Clark). The same is true for college: "[W]hereas a third of White North Carolinians have at least" a bachelor's degree, "only

- 133 -

about a fifth of Black North Carolinians have a similar level of educational attainment." Tr. 239:14–19 (Clark).

353.    Dr. Clark also provided unrebutted testimony on the connection between higher levels of education and political participation. As he explained, "for decades" "political scientists have shown the link between educational attainment and political participation" with "those who have higher levels of educational attainment" being "more likely to participate in the political process." Tr. 247:2–4, 239:25–240:4 (Clark). Accordingly, based on worse educational outcomes, Black North Carolinians are "at a disadvantage relative to White North Carolinians" in participating in the political process. Tr. 240:13–17 (Clark).

354.    Legislative Defendants' expert, Dr. Taylor, confirmed that "racial disparities in educational attainment today are owing in part to the history of official discrimination against Black people in education going back to legal school segregation." Tr. 1293:23–1294:7 (Taylor). And he confirmed that was true in North Carolina specifically. Tr. 1294:12–17 (Taylor).

355.    Plaintiff Allison Allen also testified to the persistence of racial disparities in education today, explaining that school funding and quality of education differs between white schools and Black schools in North Carolina. Tr. 340:20–341:3 (Allen). She recounted her own experiences attending a predominantly white middle school in Charlotte that had better funding and a better curriculum, and how the quality of education decreased

after the school district was redistricted and became a predominantly Black school. Tr. 341:3–16 (Allen).

356.    Dr. Clark also offered unrebutted testimony of employment disparities between Black and white North Carolinians. He testified that even recent data (from 2010 to 2022) shows the Black unemployment rate (12%) was on average double that of the white unemployment rate (6%). Tr. 241:3–17 (Clark). As he explained, academic research has connected worse employment outcomes to less participation in the political process, and concluded that given the employment statistics, "Black North Carolinians would be at a disadvantage relative to White North Carolinians when it comes to participating in the political process." Tr. 242:13–16 (Clark).

357.    Legislative Defendants' expert, Dr. Taylor, testified that nothing in his report rebuts or calls into question the research establishing "a connection between higher unemployment" or "higher poverty levels . . . on the one hand and lower political participation on the other." Tr. 1291:14–1291:20 (Taylor).

358.    Dr. Clark also testified to disparities between Black and white North Carolinians on a variety of health metrics including disability rates and uninsured rates. Whereas 41% of Black North Carolinians over 65 are disabled, 35% of white North Carolinians are. Tr. 246:2–7 (Clark). Black North Carolinians are also more likely than white North Carolinians to be uninsured. WX8 at 16. Dr. Clark also testified about his review of research connecting health disparities to political participation. That research concludes that "the more healthy a person is, the more likely they are to participate in the

- 135 -

political process." Tr. 247:8–10 (Clark). Dr. Taylor offered nothing to rebut those conclusions. Tr. 1291:14–1292:20 (Taylor).

359. Dr. Clark also testified to a significant income disparity between Blacks and whites in North Carolina that has grown over time. In 2010, the Black median household income was approximately $31,000, while that for whites was approximately $48,000—a difference of $17,000. In 2022, the difference had grown to $25,000: approximately $50,000 for Blacks, compared to approximately $75,000 for whites. Tr. 244:5–16 (Clark). Dr. Clark also testified that, on average, over the same time period, the Black poverty rate was double that of the white poverty rate. Whereas "a little over 24% of Black North Carolinians live below the poverty level," "that number is a little over 12%" for white North Carolinians. Tr. 245:1–7 (Clark). He also discussed research that has shown that "that people who earn more money are more likely to participate in the political process." Tr. 245:8–14 (Clark).

360. Dr. Taylor testified that nothing in his report refuted or called into question the research finding that "those with greater incomes are more likely to vote and more likely to participate in politics even when accounting for age, education, interest in politics, and partisanship." Tr. 1291:6–13 (Taylor); *see also* Tr. 1291:14–1292:20 (Taylor).

361. Dr. Clark explained that the combined effect of the poorer outcomes that Black North Carolinians face on all of the socioeconomic factors identified exacerbate the barriers Black citizens face to political participation. He concluded that, "to the extent that education, income, employment, and health encourage political participation, Black . . .

- 136 -

North Carolinians face a deficit along each dimension, which together have an increased cumulative effect in depressing political participation." WX8 at 18.

362.    Dr. Clark also testified to "a consistent pattern of Black North Carolinians voting at a rate lower than White North Carolinians." Tr. 249:24–250:1 (Clark). Dr. Clark studied seven elections from 2012 through 2022, and found on average, a greater than 7 percentage point disparity between turnout among registered Black voters and registered white voters in North Carolina. Tr. 250:13–18 (Clark). Dr. Clark explained that the academic literature discussed in his report "would suggest that th[e] differences" in the socioeconomic conditions that he evaluated "would lead to Black North Carolinians being less likely to participate effectively in the political process," and the voter turnout data "shows that that is, in fact, the case; . . . Black North Carolinians vote at a lower rate compared to White North Carolinians." Tr. 251:9–15 (Clark).

363.    Legislative Defendants presented no fact witnesses to dispute these patterns. Even Senator Hise acknowledged that there is current discrimination in North Carolina against Black citizens and that there are discriminatory practices in education and healthcare. Tr. 893:18–894:8 (Hise).

364.    Legislative Defendants' expert, Dr. Taylor, testified that he did not dispute the accuracy of any of the numerical data or data sources in Dr. Clark's reports, *see* Tr. 1296:22–1297:4 (Taylor), nor did he claim that Dr. Clark made any data or calculation errors. Tr. 1297:5–13 (Taylor).

365.    Indeed, instead of disputing the disparities that Dr. Clark's report identifies between Blacks and whites in North Carolina, Dr. Taylor's report and testimony confirmed them. Tr. 1291:17–1292:9 (Taylor). Dr. Taylor explained that Blacks have worse outcomes compared to whites for each socioeconomic factor he measured on a statewide basis, which included education, income, health, and voter turnout. For example, Dr. Taylor testified that tables 2, 4, and 6 of his report confirm that Blacks had a lower median household income, and a lower percentage of high school and college graduates than whites for each year he examined. Tr. 1290:14–1291:5 (Taylor). And Dr. Taylor testified that for each year of statewide data in his report, Blacks in North Carolina had a higher unemployment rate, higher poverty rate, and higher uninsured rate than whites. Tr. 1291:17–1292:9 (Taylor); *see also* e.g., LDTX259 at 23 ("The Black and Latino unemployment rates in North Carolina are always greater than the white rate.").

366.    Dr. Taylor did, however, use questionable methods to dismiss the racial voter registration and turnout disparities in North Carolina. Dr. Taylor recognized that in North Carolina, for example, Black North Carolinians lag behind whites in voter registration. LDTX259 at 9 (Dr. Taylor reporting that in 2022, 58.3% of the Black voting age population ("VAP") and 63.4% of the white VAP was registered to vote in North Carolina). Dr. Taylor also recognized that Black North Carolinians lag behind Blacks nationally in terms of voter registration. *Id.* (reporting 58.3% of the Black VAP as registered in North Carolina as compared with 64.1% of the Black VAP nationally). Dr. Taylor nonetheless concluded that, "[w]hen it comes to statewide racial disparities in voting, North Carolina performs

- 138 -

better than the country as a whole." *Id.* at 8–9. Dr. Taylor reached this conclusion, however, by concentrating on *white* voter registration rates both in North Carolina and nationally, which he found had a larger disparity than for Black voter registration rates. *Id*. at 9. Dr. Taylor's calculation method obscures the more relevant fact that Black North Carolinians lag behind whites in voter registration, and as Dr. Taylor conceded at trial, Black voter turnout, on average, (between 2010 and 2022) lags behind white voter turnout by more than 7%. Tr. 1308:14–24 (Taylor).

367. And rather than call the disparities in education, employment, health, and income between Blacks and whites in North Carolina into question, Dr. Taylor sought to minimize them by comparing those disparities to disparities nationwide. LDTX259 at 14 ("Rather than merely contrast the data on Black North Carolinians with that on white North Carolinians, however, I compare North Carolina to the rest of the United States and to itself in the past."). Despite employing this comparative approach, Dr. Taylor testified that nothing in the text of the Senate Factors directs courts to make a comparison of the socioeconomic disparities faced by minorities in the state at issue with disparities in other states. Tr. 1288:24–1289:1 (Taylor). He also testified that he knew of no court to have ever evaluated the Senate Factors using his comparative approach. Tr. 1288:2–6 (Taylor). And he testified that he knew of no academic literature to have evaluated the Senate Factors using his approach. Tr. 1318:21–24 (Taylor).

368. Moreover, even using Dr. Taylor's comparative approach, Black North Carolinians do not consistently fare better than their Black peers in other states. *See*

LDTX259 at 28 (confirming "Black North Carolinians are sometimes a little worse off than Black Americans in general"). For example, over the years Dr. Clark and Dr. Taylor reviewed, "Black North Carolinians underperform compared to Blacks nationwide, on average" with regard to college educational attainment, and "Black unemployment outcomes in North Carolina are worse than Black unemployment outcomes nationwide" on average. WX10 at 5 (Reply Report of Dr. Chris Clark).

369. Indeed, at trial, Dr. Taylor agreed that the disparities between Blacks and whites in North Carolina exist regardless of the conditions in other states. Tr. 1318:6–9 (Taylor).

### iv. Racial Appeals in North Carolina Elections (Senate Factor 6)

370. The Court finds evidence of the persistent use of racial appeals in campaigns in North Carolina, historically and in recent campaign cycles—including the use of such appeals in the most recent gubernatorial and United States Senate campaigns. The evidence of these racial appeals was presented by Dr. Clark, Dr. Bagley, and Dr. Stephens-Dougan, and was almost entirely unrebutted. Dr. Clark traced the history of the use of racial appeals in North Carolina campaigns beginning in the 1898 election through the 1990s, *see* WX8 at 21–22, and discussed racial appeals in the modern era, *see id*. at 22–32. Dr. Bagley also presented extensive evidence of racial appeals in North Carolina political campaigns historically and in recent election cycles, *see* NAACPPX181 at 38–43, and Dr. Stephens-Dougan explained the function of racial appeals in North Carolina campaigns and offered recent examples of such appeals. Tr. 751:12–752:1, 752:18–25 (Stephens-Dougan).

371. Dr. Clark explained that a racial appeal "brings race into the discourse of politics," often when a political candidate or party uses race as a means by which to discuss campaign issues. Tr. 255:16–17 (Clark); Tr. 252:2–6 (Clark). Whereas explicit racial appeals "directly mention race or a particular racial group," implicit racial appeals "subtl[y] reference[] race, either verbally[,] with coded language[,] . . . or through the use of race-neutral language combined with racial imagery." WX8 at 21–22. Dr. Bagley similarly defined a racial appeal as a communication that uses "race as a means of appealing to certain voters." NAACPPX181 at 38. And Dr. Stephens-Dougan testified that racial appeals are used in North Carolina politics to prime voters to think about racial issues, activate racial attitudes, and fuel partisan division in vote choice and policy preferences. Tr. 752:18–25 (Stephens-Dougan).

372. By contrast, Legislative Defendants' expert, Dr. Taylor, failed to define "racial appeal," and expressed confusion over its definition. *See* LDTX259 at 37. The Court finds Dr. Clark and Dr. Bagley's definitions of racial appeals compelling, and credits Dr. Stephens-Dougan's explanation of the purpose of racial appeals in North Carolina campaigns.

373. Plaintiffs' experts presented numerous unrebutted examples of racial appeals. Dr. Clark, for example, presented the infamous Jesse Helms Hands advertisement, *see* WX177 (Jesse Helms "Hands" Ad), which Dr. Clark identified as a racial appeal in part because Helms uses the advertisement to establish that he "stands up for white North Carolinians" by demonstrating his opposition to a policy—affirmative action—intended to

- 141 -

benefit African Americans. Tr. 254:12–20 (Clark). Dr. Clark explained that this advertisement was an example of "substantive racial distancing," whereby politicians advocate for policies that align with the interests of white voters and thereby "indicate to racially moderate [and] racially conservative white voters that they will not disrupt the racial status quo." WX8 at 25.

374.    The Court finds this explanation of substantive racial distancing consistent with Dr. Stephens-Dougan's explanation of racial priming, which Dr. Stephens-Dougan explained is one of the functions of racial appeals—namely, activating negative racial attitudes in order to bring those negative attitudes to bear on voters' decisions. Tr. 752:2–10 (Stephens-Dougan). Dr. Stephens-Dougan testified that racial imagery and racial code words increase the weight of negative racial dispositions or stereotypes. Tr. 752:2–10 (Stephens-Dougan).

375.    Dr. Clark testified about additional racial appeals that employed substantive racial distancing, including in more recent elections. He identified a racial appeal in a Republican campaign mailer opposing Hugh Holiman's Senate Campaign in 2010, which featured a picture of death-row inmate Henry L. McCollum, a Black man, who had been convicted of committing a heinous crime. The mailer referenced the North Carolina Racial Justice Act, which allowed inmates to challenge their death sentences if they could show, statistically, that their race was a factor in their sentencing. NAACPPX181 at 39. The mailer warned, "Thanks to Hugh Holliman, death row inmates could leave prison early and move in next door." WX178 at 1 (Fuller, *Flier Opens an Old Wound*). Dr. Clark explained

- 142 -

that this advertisement traded on the stereotypical notion of Black criminality and also served as a substantive racial appeal because it attacked Holiman for his support of the Racial Justice Act—a policy widely understood to benefit Black North Carolinians. Tr. 256:4–10 (Clark). Dr. Bagley similarly explained that warning voters that a Black man who was a purported criminal was moving into "[y]our neighborhood" touched on core white flight anxieties and so amounted to a racial appeal. NAACPPX181 at 39 (emphasis removed). He also noted that the Black man depicted in the mailer, Mr. McCollum, was later exonerated by DNA evidence. *Id.*

376.    Dr. Stephens-Dougan testified about a negative racial appeal in a campaign advertisement against Cheri Beasley in her 2022 bid for U.S. Senate: the ad described Beasley as "dangerously liberal" and interspersed images of Beasley with multiple images of mugshots of Black men. Tr. 749:14–750:24 (Stephens-Dougan); NAACPPX490 (CFG Action Ad). Linking Beasley with the issue of crime, Dr. Stephens-Dougan explained, "activates negative racial predispositions and stereotypes about [Blacks] in particular when it's paired with stereotypical imagery." Tr. 751:12–752:1 (Stephens-Dougan); *see also* NAACPPX181 at 41 ("Black candidates being soft on crime is a racial trope.").

377.    Dr. Clark and Dr. Bagley also discussed racial appeals made in advertisements against Cheri Beasley during her Senate campaign. One of those advertisements "featured the brother of a white state trooper killed a quarter-century ago by a Black man represented by then-public defender Ms. Beasley." WX8 at 26. Dr. Clark explained that this advertisement, too, attempted to tie Beasley to Black criminality while

- 143 -

suggesting that her opponent, Ted Budd, would protect white North Carolinians. *Id.* Dr. Taylor offered no opinion on these racial appeals.

378.    Dr. Clark also discussed racial appeals in the context of Mark Robinson's 2024 gubernatorial campaign. He testified about President Trump's endorsement of Robinson, in which President Trump stated, "I think you are better than Martin Luther King. I think you are Martin Luther King times two . . . You should like it." Tr. 257:9–258:4 (Clark). In addition, Dr. Clark discussed Robinson's own statements, including when Robinson referred to former First Lady Michelle Obama as a man, claimed she speaks "ghetto" and "wookie," and called the former First Lady "an angry, anti-American communist Black lady." WX12 at 2 (Supplemental Rebuttal Report of Dr. Chris Clark); Tr. 258:11–259:3 (Clark).

379.    Finally, Dr. Clark testified about Donald Trump's reference to the N-word during the September 23, 2022 "Save America Rally" in Wilmington, North Carolina at which he endorsed Ted Budd for Senator. Dr. Clark explained that President Trump's "jesting about the N-word and its meaning in North Carolina while endorsing Ted Budd, whose opponent was a Black woman" made that campaign event a racial appeal. Tr. 261:11–21 (Clark); *see also* WX8 at 30–32 (discussing the rally and racial epithet). Dr. Taylor offered no opinion on whether a candidate's use of the N-word on the campaign trail constituted a racial appeal. Tr. 1301:12–15 (Taylor).

380.    Dr. Bagley also discussed the prevalence of racial appeals in North Carolina elections and provided numerous examples from the past several years. *See* NAACPPX181

- 144 -

at 38–43. For example, Dr. Bagley identified Republican Party executive Dallas Woodhouse's repeated attacks on the 2018 Democratic nominee for the state Supreme Court, Justice Earls, including photos of Black defendants and references to race. Despite Justice Earls having no involvement defending or adjudicating the case of defendant Tilmon Golphin, a Black man who was convicted of murdering two Cumberland County law enforcement offices, Woodhouse tweeted: "Claiming it was racist to execute this cop killer @AnitaEarls got him off death row." *Id*. at 40.

381.    In addition, Dr. Bagley discussed a North Carolina Republican Party tweet, published in 2023, aimed at state Democrats who were hosting a "Rally to Raise the Wage" in Durham during which Sen. Bernie Sanders and former state NAACP chairman and Moral Monday pioneer Rev. William Barber II would speak. The Republican Party's tweet read, in part, "Socialist Bernie Sanders is teaming up with *poverty pimp* William Barber to hold a rally with NC Democrats in Durham today.".*Id*. at 42 (emphasis added). Dr. Bagley pointed to the use of the word "pimp" in describing Reverend Barber, who is Black: "It's amazing they could reduce all his work to one of the most diminishing terms that could be used for Black men in this country's history." *Id*. (quoting North Carolina House Minority Leader Robert Reives).

382.    The Court finds that Dr. Taylor, on the whole, failed to respond to or rebut Plaintiffs' experts' demonstration of the prevalence of racial appeals in North Carolina, both historically and in recent election cycles. The Court finds that the narrowly

circumscribed focus of Dr. Taylor's analysis and his use of a comparative approach entitle the report to no weight.

383.   First, Dr. Taylor only discussed racial appeals that were identified in Dr. Clark's report and that had to do with President Trump or Ted Budd. Tr. 1300:3–10 (Taylor). But even as to these advertisements, Dr. Taylor failed to offer an opinion as to whether any specific advertisement constituted a racial appeal. He also failed to offer an opinion as to whether racial appeals characterized campaigns in North Carolina.

384.   Second, Dr. Taylor claimed that a comparative approach—comparing the use of racial appeals in North Carolina to the use of racial appeals in other states—was the appropriate means by which to analyze Senate Factor 6, yet he conceded at trial that the text of Senate Factor 6 does not invite courts to compare racial appeals in the state at issue to racial appeals in other states, and that he knew of no court that has conducted a Senate Factor 6 analysis using such an approach. Tr. 1299:4–1300:2 (Taylor).

385.   Even taking Dr. Taylor's comparative approach on its own terms demonstrates the incompleteness of Dr. Taylor's analysis. Dr. Taylor testified to his belief that in order to satisfy Senate Factor 6, Plaintiffs would need to demonstrate that the use of racial appeals in North Carolina is "disproportionate" as compared to the use of racial appeals in other states, Tr. 1299:4–20 (Taylor), but Dr. Taylor failed to define how one would measure the disproportionate use of racial appeals. Moreover, Dr. Taylor failed to conduct any independent analysis of North Carolina political campaigns to determine whether candidates were making racial appeals within the state, and he failed to perform

any comparison to other states or any state-by-state analysis of racial appeals. Tr. 1300:11–18 (Taylor).

### v.   Lack of Black Electoral Success (Senate Factor 7)

386.    The Court finds that Black North Carolinians are underrepresented relative to their population share and relative to white North Carolinians on virtually every representation metric in the state, including in statewide executive office, the North Carolina Supreme Court, as well as the North Carolina General Assembly and North Carolina's United States congressional delegation. *See* WX8 at 33–43.

387.    Both Dr. Clark and Dr. Bagley presented evidence demonstrating Black North Carolinians' historic and current underrepresentation in elected office in North Carolina. *See* WX8 at 33–43; NAACPPX181 at 43–48. This evidence was largely undisputed by Defendants' experts.

388.    Dr. Clark testified that of the 69 governors and 57 United States' Senators in North Carolina state history, zero have been Black. Tr. 262:23–25 (Clark); *see also* WX8 at 33–34. Only four Black people have ever served on the Council of State, a statewide 10-person popularly elected body. Tr. 263:1–6 (Clark). And there have been a total of seven Black people to serve on North Carolina's Supreme Court. Tr. 263:1–6 (Clark).

389.    Dr. Clark testified that Black North Carolinians have consistently been underrepresented in the North Carolina General Assembly, on average, over the last 30 years, Tr. 263:23–264:7 (Clark), a finding that Legislative Defendant's expert, Dr. Taylor, did not dispute, *see* Tr. 1304:10–19 (Taylor). Dr. Clark used two metrics to evaluate Black

- 147 -

legislative representation: the Black seat share, which refers to the percentage of seats held by Black people in the General Assembly; and the Black representation ratio, which refers to the Black seat share divided by North Carolina's Black population share. A Black representation ratio below 1.0 indicates that Blacks are underrepresented in the General Assembly relative to their population share. Tr. 263:7–22 (Clark). Dr. Clark showed that from 1992 to 2024, the Black representation ratio was 0.76, demonstrating that Black North Carolinians have been "consistently . . . underrepresented in the North Carolina state legislature." Tr. 263:23–264:7 (Clark); WX8 at 40 (Table 12). By contrast, white North Carolinians have been consistently overrepresented in the General Assembly over the same time period, with an average representation ratio of 1.12 for white North Carolinians. Tr. 264:16–24 (Clark); WX8 41–42 (Table 13).

390.    The Court also finds that majority-minority districts have been vital for electing Black state legislators. Dr. Clark showed that 78.9% of all of the Black state legislators in North Carolina came from majority-minority districts, including districts created as a result of Section 2 litigation. WX11 at 7 (Table 1) (Supplemental Expert Report of Dr. Chris Clark). Dr. Clark testified that extent to which Black legislators rely on majority-minority districts "points to the limited electoral opportunities that [Blacks] have;" it shows "that race is still playing an important role in their ability to reach elected office" in North Carolina. Tr. 266:6–23 (Clark).

391. Dr. Clark also presented evidence demonstrating persistent Black underrepresentation in North Carolina's United States House of Representatives

- 148 -

delegation, which Dr. Taylor also did not dispute. Tr. 1304:13–19 (Taylor). From 1992 to 2024, the average Black representation ratio in North Carolina's House delegation was 0.72, whereas the white representation ratio was 1.16. *See* Tr. 265:3–16 (Clark); WX8 at 37–39 (Tables 10 and 11).

392.    Dr. Bagley presented evidence that Blacks were underrepresented in local elected office as well. He explained that in North Carolina's Black Belt counties, for example, "where white officials historically have used at-large schemes and enhancing devices to dilute the 'bloc vote,' or the Black vote," Black elected officials represent communities at far lower rates than their population would suggest. NAACPPX181 at 47. Dr. Bagley presented compelling evidence of this trend across North Carolina, from Halifax, Tyrell, and Edgecombe Counties, to Guilford and Forsyth Counties. *See id.*

393.    Although Dr. Taylor attempted to quantify the total number of Black local elected officials in North Carolina statewide (581), Dr. Taylor did not include any means by which to assess the extent to which that number reflected Black electoral success or lack thereof. At trial, Dr. Taylor conceded that he included the total number of Black elected officials statewide in his report because it "sound[ed] like a lot of people" and was "a relatively large number," Tr. 1306:1–22 (Taylor), but he testified that he did not know whether Black North Carolinians hold a share of local offices that is anywhere near their population share. *Id.* By contrast, Dr. Bagley's thorough review of local Black representation in Halifax, Edgecombe, Hyde, Tyrrell, Guilford, and Forsyth Counties, shows that Black local representation lags significantly behind the Black population share

in these counties, *see* NAACPPX181 at 47, and Dr. Taylor offered nothing to dispute Dr.

Bagley's analysis and evidence. Tr. 1307:3–9 (Taylor).

> ### vi. Unresponsiveness of Elected Officials to Black Voters in North Carolina (Senate Factor 8)

394.  The Court finds significant evidence that elected officials in North Carolina have been unresponsive to the needs and concerns of its Black citizens. The Court bases this finding on testimony both from expert witnesses and lay witnesses, who testified to their lived experience as North Carolina voters and elected officials.

395.  As Dr. Bagley testified, North Carolina elected officials, and in particular the Republican supermajority in the General Assembly, have been unresponsive to the interests of Black voters across a range of policy issues. This has included opposition to expanding Medicaid, an issue that Black voters favored; efforts to limit educators from teaching critical race theory; and the institution of voter ID policies that harm Black North Carolinians, just to name a few. NAACPPX181 at 48–49; Tr. 673:25–674:4 (Bagley).

396.  On Medicaid expansion in particular, Dr. Bagley testified how Black North Carolinians fought for years for the expansion of Medicaid, which the General Assembly fiercely resisted "until the expansion was legislatively paired with elements theretofore unfavorable to Black voters." NAACPPX181 at 49. Former Representative G.K. Butterfield testified similarly, explaining how "North Carolina was one of the few states that did not expand the Medicaid program when it was offered under the Affordable Care Act," and how North Carolina's long failure to do so is another example of the legislature's "unresponsive[ness] to issues that disproportionately affect the African American

- 150 -

community." Joint Motion to Designate Trial Testimony, Ex. A at 21:5–8; 21:11–12, ECF No. 146-1 (hereinafter "Butterfield Testimony"); *see also* Tr. 7:12–17 (orally granting motion at trial).

397.    Dr. Bagley also pointed to the socioeconomic gaps that exist today between white and Black North Carolinians, which "to date . . . have not been closed." Tr. 674:5–8 (Bagley). Dr. Bagley opined that the persistent disparities between Black and white North Carolinians are further evidence of the General Assembly's lack of responsiveness to Black North Carolinians; *see also* Butterfield Testimony at 21:2–19 (testifying to how the General Assembly has been unresponsive to issues that are of particular concern to the Black community, including education and community investment).

398.    Legislative Defendants' expert, Dr. Taylor, attempted to offer an analysis of the responsiveness of the General Assembly to Black North Carolinians; however, the Court finds this analysis suffers from numerous flaws. Although Dr. Taylor discussed academic research that "look[ed] at how responsive [state] policy has been in North Carolina to its general population," LDTX259 at 32, his analysis did not consider whether elected representatives respond to *minority* interests. At trial, Dr. Taylor conceded that legislative responsiveness to North Carolina's general population does not necessarily measure legislative responsiveness to Black North Carolinians. Tr. 1311:1–8 (Taylor). Dr. Taylor confirmed that he failed to cite or rely on any data identifying studies of or opinions of Black North Carolinians specifically, *Id.*, or conduct analysis of the effect of particular policies on Black communities, Tr. 1312:9–16 (Taylor).

399.    The Court did hear, however, from several Black North Carolina voters who emphasized the lack of responsiveness they feel from their white representatives. This included testimony from Earl Jones, Pamlyn Stubbs, and Mitzi Turner, each of whom testified at trial that their elected congressional representatives under the 2023 Plan are not responsive to their or their communities' interests. *See supra* Section III.A.iv.

400.    Plaintiffs Earl Jones and Pamlyn Stubbs, for example, who both live in Greensboro in Guilford County, testified to the lack of any outreach whatsoever to the Black community in CD-5 under the 2023 Plan, which is now represented by Congresswoman Virginia Foxx. Tr. 150:12–17 (Jones); Tr. 211:24–212:14 (Stubbs). As both testified, although Greensboro has long had a congressional district office to aid constituents, Congresswoman Foxx chose to locate her district offices in much smaller and much whiter parts of her district, leaving Greensboro's residents (and its substantial Black population) without a district office. Tr. 150:14–15 (Jones); Tr. 212:9–14 (Stubbs).

401.    Mitzi Turner, who lives in High Point in Guilford County and is deeply involved with the community through her activities with NAACP, Common Cause, and volunteering at voter registration drives, discussed the broad voter apathy in the Black community due to the lack of responsiveness of elected officials. Tr. 575:3–576:20, 578:2–579:5 (Turner). She discussed how elected officials have not worked to advance policies that matter to the Black community and instead have pushed for policies that harm the Black community such as rolling back SNAP programs and DEI. Tr. 579:3–14 (Turner).

- 152 -

402.    This lack of responsiveness was also on display during the 2023 redistricting process. Dr. Bagley noted how, during the 2023 redistricting process, Black North Carolinians asked the General Assembly to take a close look at racially polarized voting prior to enacting redistricting plans. Tr. 674:9–14 (Bagley); NAACPPX181 at 49–50. As noted *supra* Section III.C, the General Assembly ignored those concerns and passed redistricting maps without conducting any racially polarized voting analysis. Tr. 893:9–13 (Hise).

403.    In an effort to show responsiveness on the part of elected officials to Black voters, Dr. Taylor attempted to point to funding for schools, but that analysis, too, was based on questionable methods. For example, Dr. Taylor's claim that North Carolina's funding of public education was not "unresponsive to the needs of Black residents" was based on data from only three counties in North Carolina. Tr. 1313:1–24 (Taylor). Dr. Taylor performed no analysis to determine whether funds appropriated to districts in the three counties he identified were distributed to Black schools particularly, Tr. 306:5–8 (Clark), and he failed to examine funding allocated to school voucher programs, or private schools in North Carolina, Tr. 1313:21–24 (Taylor), information that would be crucial to any comparative determination.

404.    Dr. Taylor's attempt to show that certain line items the General Assembly's 2023–24 budget—including line items for three historically Black Universities and assorted other line items that included the words "African American" or "Minority" in the title—indicated responsiveness on the part of the Assembly to Black voters' concerns also

- 153 -

suffered from numerous flaws. Dr. Taylor's analysis did not identify what share of the total appropriations budget these funds represent, examine comparative expenditures at primarily white institutions, or look at more than a single year's budget. Tr. 1314:1–12 (Taylor). The Court is thus left with no context for these line items and no means by which to assess whether they are responsive to the needs of the Black community.

### vii. The General Assembly's Justifications for the 2023 Plan (Senate Factor 9)

405. As the Court finds and explains in much greater detail in *supra* Section III.A, the General Assembly's purported justifications for the Plan—including in particular efforts increase opportunities for the Republican Party—do not fully explain the district lines.

406. Dr. Rodden demonstrated that partisanship could not fully explain the district lines in the 2023 Plan because the patterns of stark racial sorting hold true even after accounting for partisanship. WX1 at 12–13, 17; Tr. 46:12–23, 75:25–76:4 (Rodden). Moreover, Senator Hise disavowed partisanship as the predominate concern of the redistricting committee. Tr. 942:20–943:8 (Hise). Legislative Defendants' experts Dr. Barber and Dr. Trende also declined to opine at trial that partisan goals explained the district lines. Tr. 1413:17–21 (Trende); Tr. 1104:22–1105:7 (Barber).

407. And although the Legislative Defendants did not claim that the 2023 Plan's racial sorting is explainable on the basis of adherence to other traditional redistricting criteria, Plaintiffs confirmed these factors too could not explain the racial sorting in the 2023 Plan. Rather than improve upon traditional redistricting principles, Dr. Rodden

- 154 -

demonstrated that the 2023 Plan performed worse than the 2022 Plan on compactness, core retention, and county and municipal splits. WX1 at 6–7; Tr. 35:4–22, 73:19–74:3 (Rodden). And Legislative Defendants' expert, Dr. Trende, did not dispute Plaintiffs' evidence that traditional districting principles were sacrificed in the drawing of the 2023 Plan. Tr. 1372:7–21, 1373:13–16 (Trende).

## PROPOSED CONCLUSIONS OF LAW

### V.  Plaintiffs Have Standing

408.  To demonstrate standing, a plaintiff must satisfy the familiar three-part standing test: that the plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Gill v. Whitford*, 585 U.S. 48, 65 (2018) (quotation omitted). *Williams* Plaintiffs have demonstrated all three factors.

409.  First, in an intentional vote dilution claim, whether under the Fourteenth Amendment or Section 2 of the VRA, the injury "arises from the particular composition of the voter's own district, which causes his vote—having been packed or cracked—to carry less weight than it would carry in another, hypothetical district." *Id*. at 67. Accordingly, an intentional vote dilution claim requires a plaintiff to show that the voter's own district was packed or cracked under the redistricting plan at issue. *Id*. at 66 ("To the extent [a] plaintiff['s] alleged harm is the dilution of their votes, that injury is district specific.").

410.  *Williams* Plaintiffs have demonstrated that the 2023 Plan dilutes their votes by cracking Black voters from former CD-6 across four districts (CD-5, CD-6, CD-9, and

- 155 -

CD-10), none of which allows Black voters an opportunity to elect their preferred candidates, and by removing Black voters from former CD-14 and packing them into CD-12. Under the 2022 Plan, CD-6 had a Black Voting Age Population (BVAP) of 31.65% and performed as an effective opportunity district in which Black voters could elect their preferred candidates. WX1 at 10; WX4 at 7. In the 2023 Plan, however, the General Assembly decreased the BVAP of CD-6 by 12 percentage points, sufficient to ensure that Black voters in that district (and in the surrounding districts) no longer have the opportunity to elect their candidates of choice. WX1 at 10; WX4 at 7; Tr. 169:15–21 (Palmer). Similarly, under the 2022 Plan, CD-14 performed as an opportunity district that allowed Black voters to elect their candidates of choice. The 2023 Plan moved Black voters out of CD-14 in large enough numbers that Black voters in CD-14 can longer elect their candidates of choice, Tr. 169:15–21 (Palmer), while simultaneously packing Black voters into CD-12, a district in which Black voters were already electing their candidates of choice by significant margins. Tr. 169:15–21 (Palmer).

411.  *Williams* Plaintiffs have suffered an injury-in-fact because they include Black voters in both current and former CD-6, CD-12, and CD-14—each of which was either packed or cracked.

412.  Individual Plaintiffs James Adams, Chenita Johnson, Pamlyn Stubbs, and Earl Jones each have standing to challenge vote dilution in the Piedmont Triad as Black registered voters who previously were able to elect their candidate of choice in former CD-

- 156 -

6 and whose voting power has been diluted in new CD-5, CD-6, and CD-10. *See supra* Section I.A.

413.    Individual Plaintiffs Allison Shari Allen, Laura McClettie, and Virginia Keogh have standing to challenge vote dilution in the Charlotte area as Black registered voters who were either packed (in CD-12) or cracked (in CD-14). *See supra* Section I.A.

414.    *Williams* Plaintiffs' injury is "traceable to" Defendants, *Gill*, 585 U.S. at 65, as Defendants are responsible for creating and implementing the 2023 Plan. *See supra* Section I.B.

415.    A favorable decision—one which enjoins Defendants from qualifying candidates and conducting any forthcoming elections under the 2023 Plan, and orders the adoption of a new redistricting plan under which *Williams* Plaintiffs' challenged districts are not packed or cracked—would redress *Williams* Plaintiffs' injuries. *See Gill*, 585 U.S. at 67 ("Remedying the individual voter's harm" requires the court to revise "such districts as are necessary to reshape the voter's district—so that the voter may be unpacked or uncracked, as the case may be.").

416.    The Court concludes as a matter of law that the *Williams* Plaintiffs have established Article III standing for their constitutional and statutory intent claims.

**VI.    Plaintiffs Have Established that the 2023 Plan Was Intentionally Discriminatory in Violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution.**

417. *Williams* Plaintiffs challenge the 2023 Plan as having been adopted with discriminatory intent against Black voters in violation of the Fourteenth and Fifteenth Amendments.

418. The Fourteenth Amendment's Equal Protection Clause "prohibits intentional vote dilution" by "minimizing or cancelling out the voting potential of racial or ethnic minorities." *Abbott v. Perez*, 585 U.S. 579, 585–86 (2018) (cleaned up). "'Dilution of racial minority group voting strength may be caused' either 'by the dispersal of [minorities] into districts in which they constitute an ineffective minority of voters or from the concentration of [minorities] into districts where they constitute an excessive majority.'" *Voinovich v. Quilter*, 507 U.S. 146, 154 (1993) (quoting *Gingles*, 478 U.S. at 46).

419. Determining whether a statute was enacted with discriminatory intent is a factual inquiry involving a two-step process. *See Hunter v. Underwood*, 471 U.S. 222, 228 (1985). First, plaintiffs must show that "racial discrimination" was a "motivating" factor behind the law. *Id.* "Demonstrating discriminatory intent . . . does not require a plaintiff to prove that the challenged action rested *solely* on racially discriminatory purpose,". *Milligan*, 599 U.S. at 37 (cleaned up), or even that the discriminatory purpose was a "primary" motive for the legislation, *Arlington Heights*, 429 U.S. at 265–66; plaintiffs need only establish that racial discrimination was "*a* motivating factor," and they may make that showing with any available "circumstantial and direct evidence of intent." *Id.* (emphasis added).

- 158 -

420.     Because "[o]utright admissions of impermissible racial motivation are infrequent," the Supreme Court has recognized that "plaintiffs often must rely upon other evidence." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999); *see also Rogers*, 458 U.S. at 618 ("[D]iscriminatory intent need not be proved by direct evidence."). Indeed, "[i]n this day and age[,] we rarely have legislators announcing an intent to discriminate based upon race, whether in public speeches or private correspondence." *Veasey v. Abbott*, 830 F.3d 216, 235 (5th Cir. 2016). "To require direct evidence of intent would essentially give legislatures free rein to racially discriminate so long as they do not overtly state discrimination as their purpose" and would "ignore the reality that neutral reasons can and do mask racial intent." *Id*. at 235–36.

421.     Thus, "discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact . . . that the law bears more heavily on one race than another." *Washington v. Davis*, 426 U.S. 229, 242 (1976). Plaintiffs may show discriminatory intent through the five factors identified by the Supreme Court in *Arlington Heights*. *See, e.g.*, *Brnovich*, 594 U.S. at 687 (approving district court's reliance on "the familiar approach outlined in *Arlington Heights*" for the court's "finding on the question of discriminatory intent").

422.     Once plaintiffs have demonstrated that race was a motivating factor behind the law, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter*, 471 U.S. at 228. A "court must carefully

scrutinize a state's non-racial motivations to determine whether they alone can explain enactment of the challenged law." *McCrory*, 831 F.3d at 233.

**A.** **The *Arlington Heights* Factors Demonstrate that Race was a Motivating Factor in the 2023 Plan.**

423. In *Arlington Heights*, the Supreme Court identified five non-exhaustive factors to help courts evaluate whether a facially neutral law like the 2023 Plan is motivated by discriminatory intent. These factors include: (1) the discriminatory "impact of the official action;" (2) "the historical background" of the law; (3) "the specific sequence of events leading up" to the law; (4) any "departures from normal procedural sequence;" and (5) the "legislative or administrative history" of the law. *Arlington Heights*, 429 U.S. at 266–68 (cleaned up).

424. As set forth below, the Court concludes that *Williams* Plaintiffs have established that all five of the *Arlington Heights* Factors demonstrate that the 2023 Plan was motivated by a racially discriminatory intent.

**i.** ***Arlington Heights* Factor 1: Plaintiffs Definitively Demonstrated that the 2023 Plan Bears More Heavily on Blacks than Whites in North Carolina.**

425. The first factor considers "[t]he impact of the official action," or "whether it bears more heavily on one race than another." *Id.* at 266 (internal quotation omitted).

426. As the Supreme Court has held, "a jurisdiction that enacts a plan having a dilutive impact is more likely to have acted with a discriminatory intent to dilute minority voting strength than a jurisdiction whose plan has no such impact." *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 487 (1997). Evidence that Black voters have been cracked into

districts in which they can no longer elect candidates of their choice supports a finding for Plaintiffs on this factor. *See, e.g.*, *Common Cause Fla. v. Byrd*, 726 F. Supp. 3d 1322, 1369 (N.D. Fla. 2024) (finding *Arlington Heights* factor 1 satisfied "beyond dispute" where redistricting plan cracked Black voters out of a performing district into "into districts in which [Blacks] constitute an ineffective minority of voters."). Through the testimony of Dr. Palmer, Dr. Rodden, and several fact witnesses, *Williams* Plaintiffs demonstrated that the 2023 Plan has a disproportionately negative impact on Black voters as compared to white voters. *See supra* Section III.A.

427. Dr. Palmer explained that Black voters are significantly less able to elect their candidates of choice under the 2023 Plan than under the 2022 Plan and that the reshuffling of voters in the 2023 Plan traded Black opportunity for white opportunity. Tr. 169:6–12 (Palmer); *see also supra* Section III.A.i. Specifically, the Plan eliminated Black voters' ability to elect candidates of their choice in CD-6 and CD-14. *See* WX4 at 7; WX6 at 5; Tr. 169:15–21 (Palmer).

428. None of Legislative Defendants' experts, including Dr. Alford, disputed Dr. Palmer's findings that Black-preferred candidates are less successful under the 2023 Plan or that the 2023 Plan disproportionately harms Black electoral opportunity to the benefit of white electoral opportunity. Tr. 1195:22–1196:18 (Alford), 170:14–18 (Palmer), 175:8–11 (Palmer).

429. Dr. Rodden offered multiple different analyses to further demonstrate how Black voters were disproportionately harmed by the 2023 Plan and how voters were sorted

by race. *Supra* Section III.A.ii. Dr. Rodden's examination of traditional redistricting criteria and racial distribution of the 2023 Plan, county envelope analysis, fractionalization analysis, dislocation analysis, median population analysis, boundary analysis, and simulation analysis all pointed to the same thing: Black voters were disproportionately kept out of CD-6 and spread across four districts in the Triad, and disproportionately excluded from CD-14 and packed into CD-12, relative to white voters. *Supra* Section III.A.ii. Each of these analyses demonstrated that voters were sorted along racial lines.

430.    This consistent pattern of racial sorting cannot be explained by traditional redistricting principles. As Dr. Rodden testified—and Legislative Defendants' experts did not dispute—the 2023 Plan fares worse than the 2022 Plan on nearly every traditional redistricting metric, including compactness, respect for political subdivision boundaries, and communities of interest. *Supra* Section III.A.ii. This is true both statewide and specifically in the Piedmont Triad and Mecklenburg regions. *Supra* Section III.A.ii. Most glaringly, the 2023 Plan split Guilford County into three congressional districts, Tr. 215:11–14 (Stubbs), ensuring that the county's significant Black population is unable to elect their candidates of choice in any of them by placing urban Black communities in districts with large, distant rural white communities with whom they share few commonalities. Tr. 583:22–584:14 (Turner), Tr. 330:24–331:20 (Allen), Tr. 331:21–332:16 (Allen).

431.    Nor can the pattern of racial sorting Dr. Rodden demonstrated be explained by the geographic distribution of voters. Several of Dr. Rodden's analyses—as well as Dr.

Barber and Dr. Trende's evidence—dispel that notion. Dr. Rodden's analysis of the distribution of voters in the 2023 Plan, county envelope regressions, median distance analysis, and dislocation analysis, as well as Dr. Trende's choropleth maps and Dr. Barber's simulations, each demonstrate that North Carolina's racial geography cannot explain the 2023 Plan's sorting of voters by racial group.

432. Additionally, the pattern of racial sorting evinced time and time again by Dr. Rodden's various analyses cannot be explained by partisanship. Dr. Rodden found the same results of his county envelope analysis even when he controlled for party. In other words, Black Democrats, Republicans, and Independents were all more likely to be placed outside of CD-6 and CD-14, and inside CD-12 than their white co-partisans. Dr. Rodden's county envelope regressions, which again controlled for partisanship, showed the same thing. *Supra* Section III.A.ii.

433. That was not all. Dr. Rodden further examined the full set of 5,000 race-blind simulated plans produced by Legislative Defendants' expert Dr. Barber and found that the distribution of BVAPs across districts in the enacted plan were outliers—and in some places completely outside the range—of the simulated districts, even compared to the subset of simulated plans that produced the same number of Republican seats as the 2023 Plan, and even compared to the simulations that produced the same number of Republican seats as the 2023 Plan in the Piedmont Triad and the Mecklenburg areas specifically. *Supra* Section III.A.ii.3.

434. Dr. Rodden also found that the legislature's draft maps—which created the same number of pro-Republican districts as the 2023 Plan—were initially more similar to Dr. Barber's simulated plans but over time became more similar in their distribution of race across districts to the 2023 Plan's highly unusual distribution of race across districts. *Supra* Section III.A.ii.3.

435. These analyses all confirm that the disparate racial effects observed in the 2023 Plan cannot be explained by partisanship and were not necessary to achieve the Legislature's partisan goals.

436. The racial sorting in the 2023 Plan produced a highly unusual distribution of BVAP across the state—concentrating it within a narrow 10-point margin—between 15 and 25%—in 11 of the state's 14 districts, with an even smaller margin (just 17 to 22%) across the four Triad districts. WX1 at 10–11. Concentrating BVAP within such a narrow range, according to Dr. Barber in prior redistricting cases, shows that careful attention was paid to race in drawing the district. Tr. 1097:14–1098:9 (Barber). This Court agrees.

437. In the Piedmont Triad, Dr. Rodden's county envelope analysis demonstrated that white voters were sorted into CD-6 in greater numbers and proportion than Black voters. In the CD-6 envelope, 51.4% of white voters were placed into CD-6, while 38.2% of Black voters are placed into CD-6. Tr. 43:17–44:15 (Rodden); WX1 at 12. The same pattern of racial sorting remained irrespective of whether Dr. Rodden used individual-level data or VTD-level data, WX2 at 5–6; Tr. 48:12–50:1, 132:11–23 (Rodden), and even after Dr. Rodden controlled for party and geography, WX1 at 12; Tr. 46:12–23 (Rodden); Tr.

47:17–48:11 (Rodden). Dr. Rodden's boundary analysis reinforced his initial descriptive conclusions that there is a consistent and large racial difference across district boundaries that cannot be explained away by party or geography. WX2 at 12; Tr. 58:7–60:4 (Rodden). Analysis after analysis all pointed to the same conclusion: Black voters were disproportionately placed out of CD-6 compared to white voters.

438.    In the Charlotte-Mecklenburg area, Dr. Rodden demonstrated that white voters were disproportionately sorted into CD-14 while Black voters were disproportionately sorted (*i.e.*, packed) into CD-12. Dr. Rodden's county envelope analysis showed that only 52.6% of white registered voters in the CD-12 envelope ended up in CD-12, compared to 82% of Black voters. WX1 at 17; Tr. 75:12–23 (Rodden). Again, the same difference between Black and white voters held when controlling for party. WX1 at 17; Tr. 75:25–76:10 (Rodden). And the racial disparities Dr. Rodden observed here were about the same magnitude as one of the districts struck down in *Cooper v. Harris*, where the county envelope analysis was used and relied upon by the court to find racial predominance. 581 U.S. at 315–16. The opposite pattern emerges in CD-14, into which Black voters were far less likely than white voters to be drawn. The share of white registered voters who end up in CD-14 is 57.2%, and the share of Black registered voters in CD-14 is 28.7%. WX1 at 22; Tr. 76:11–23 (Rodden). These differences also hold when controlling for party. WX1 at 22; Tr. 76:24–77:3 (Rodden). Again, all of Dr. Rodden's analyses indicate the same result. WX2 at 11, 31; Tr. 77:4–78:4 (Rodden).

- 165 -

439.    Legislative Defendants' experts, Dr. Barber and Dr. Trende, do not dispute the bulk of Dr. Rodden's analyses or his core findings. *Supra* Section III.A.iii. Where they do offer criticisms, they provide no basis to call into question the evidence of racial sorting; nor do they provide a basis to conclude that partisanship and not race drove the district lines.

440.    For example, Dr. Barber admitted his analysis in no way rules out the possibility that race drove the drawing of the 2023 plan in part. *Supra* Section III.A.iii.1. He also conceded that he did not know whether it was possible to draw the 2023 Plan without considering race. Tr. 1115:11–18 (Barber). And Dr. Barber made no claim that partisanship was the predominant factor behind the 2023 Plan. Tr. 1115:8–10 (Barber).

441.    Where Dr. Barber does contest Dr. Rodden's analyses, his analyses suffer from several flaws. First, Dr. Barber's critique of Dr. Rodden's use of the North Carolina voter file in his analyses is undermined by Dr. Barber's own use of the voter file in his academic work and his work demonstrating that party registration is a good predictor of candidate choices and voting behavior in North Carolina. Tr. 1068:15–1069:19 (Barber). Second, the Court finds that Dr. Barber is wrong in contending that the prior plan is an inappropriate starting point from which to analyze the 2023 Plan, as Dr. Rodden did in many of his analyses. Tr. 32:15–33:8 (Rodden). The Court finds that in fact, "[l]awmakers do not typically start with a blank slate; rather, they usually begin with the existing map and make alterations to fit various districting goals." *Alexander*, 602 U.S. at 27. More importantly, several of Dr. Rodden's analyses do not depend on comparisons to 2022 at

- 166 -

all—his descriptive analysis of the 2023 Plan and its distribution of voters, county envelope analysis, dislocation analysis, border analysis, and simulation analysis are independent of the 2022 Plan.

442.    Dr. Barber's other critiques suffer from additional fatal flaws, including (i) erroneously criticizing Dr. Rodden's county envelope analyses, which Dr. Barber conceded at trial do not unrealistically extract voters from their homes or VTDs and which are but one component of a holistic analysis, meant to be understood along with other descriptive analyses like the ones that are unrebutted in Dr. Rodden's report; (ii) failing to explain why, if the distribution of Black voters in the Plan is a result of natural racial clustering, as he argues, none of the 5,000 simulated maps that he created resemble the 2023 Plan; (iii) engaging in fundamentally flawed analyses plagued with multicollinearity issues and which produce nonsensical results; (iv) ignoring Dr. Rodden's descriptive analyses that provide evidence of racial sorting; (v) cherry-picking elections to include in his partisan index in support of an arbitrary cutoff for what he speculates the General Assembly may have been trying to accomplish; and (vi) failing to explain how avoiding double-bunking or improving various traditional redistricting criteria in the draft maps led to the observed changes in the racial composition of districts over time. *Supra* Section III.A.iii.1.

443.    For these reasons, among others, the Court declines to credit Dr. Barber's critiques of Dr. Rodden's analyses and joins a long list of courts to have similarly done so.

*See supra* Section III.A.iii.1 (citing *Jacobson*, 411 F. Supp. 3d 1249, *Rose*, 619 F. Supp. 3d 1241, and *Harper I*, 2022-NCSC-17, 868 S.E.2d 499).

444.    Dr. Trende also provides no basis to call Dr. Rodden's analyses into question, in part because much of his analysis confirms what Dr. Rodden demonstrated. Dr. Trende does not dispute Dr. Rodden's findings about unnatural distribution of Black voters in the 2023 Plan, Tr. 1373:21–24 (Trende). Dr. Trende also conceded several times that district lines in the challenged districts in the 2023 Plan tracked racial lines. In his own choropleth maps, for example, Dr. Trende conceded that at least part of the boundary between CD-6 and CD-10 in the Triad, and part of the boundary between CD-12 and CD-14 in the Mecklenburg area "follow[ed] a racial gradient," Tr. 1383:8–9 (Trende); LDTX 266 at p. 70, Figure 36, or "follow[ed] racial lines." Tr. 1384:11–21 (Trende); LDTX 266 at p. 92, Figure 54.

445.    Dr. Trende's own analysis also demonstrated that the race of a voter was a statistically significant indicator of whether that voter would be included in CD-6, CD-12, or CD-14, even when controlling for party. *Supra* Section III.A.iii.2.

446.    Where Dr. Trende does contest Dr. Rodden's analyses, his critiques are fundamentally flawed, as other courts have similarly found. *See supra* Section III.A.iii.2. The Court declines to credit Dr. Trende's critiques because, among other things, (i) contrary to his critique of Dr. Rodden's envelope analysis, Dr. Trende failed to show that Dr. Rodden's conclusions about racial sorting would have been undermined with a different unit of analysis, (ii) Dr. Trende's boundary regressions were poorly designed,

sometimes generating nonsensical results, and (iii) Dr. Trende was able to achieve his desired results in CD-6 only after removing two-thirds of the observations from his original border regression, *see supra* Section III.A.iii.2.

447.    In light of the testimony offered by the parties as well as our findings as to the credibility of the various witnesses' testimony, *see supra* Section III.A, the Court concludes that *Williams* Plaintiffs have established that the 2023 Plan bears more heavily on Black North Carolinians than white North Carolinians. Specifically, Black voters are disproportionately burdened by, and white voters are disproportionately benefited by, the configuration of congressional districts in the Piedmont Triad and Mecklenburg regions. "[T]he fact that the law bears more heavily on one race than another" supports an "infer[ence] . . . [of] discriminatory purpose." *Davis*, 426 U.S. at 242.

> ii.    *Arlington Heights* **Factor 2: The Historical Background of the 2023 Plan Suggests a Discriminatory Purpose.**

448.    The second *Arlington Heights* factor examines "[t]he historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267. "North Carolina's history of race discrimination and recent patterns of official discrimination, combined with the racial polarization of politics in the state" are "particularly relevant in this inquiry." *McCrory*, 831 F.3d at 223.

449.    Racial polarization is a "critical" factor for the Court to consider; the higher the degree of polarization, the more that "[u]sing race as a proxy for party" becomes "an effective way to win an election"—even if doing so "constitutes discriminatory purpose."

- 169 -

*Id.* at 222. As the Fourth Circuit in *McCrory* explained, "[i]t is the political cohesiveness of the minority groups that provides the political payoff for legislators who seek to dilute or limit the minority vote." *Id.* Indeed, in reauthorizing the VRA, Congress recognized that "[t]he potential for discrimination in environments characterized by racially polarized voting is great." *Id.* (citing H.R. Rep. No. 109–478, at 35 (2006)).

450.     As the Court has already found, Plaintiffs presented compelling evidence of racially polarized voting in North Carolina both statewide and in the challenged districts, the existence of which Legislative Defendants' experts did not meaningfully contest. *See supra* Section IV.A. The fact that Black and white voters consistently prefer different candidates in North Carolina—and that Black voters are particularly predictable voters, *see supra* Section IV.B.ii—is "an incentive for intentional discrimination." *McCrory*, 831 F.3d at 222.

451.     Although the existence of racially polarized voting "is not, in and of itself, evidence of racial discrimination," *id.*, this Court cannot ignore the incentives it would provide to a Republican legislature seeking to gain partisan advantage, and consequently the Court holds this factor weighs in favor of a finding of intentional discrimination, much as it did in *McCrory*.

452.     Beyond racial polarization, the Court also holds that North Carolina's persistent "history of race discrimination generally and race-based vote suppression in particular," *id.* at 223, is relevant evidence of intentional discrimination. Plaintiffs' evidence of North Carolina's history of discrimination against Black voters, presented

largely by Dr. Leloudis and Dr. Bagley, was entirely unrebutted by Defendants. *See supra* Section III.B.

453. As Plaintiffs showed, this was not ancient history. *See supra* Section III.B (discussing, for example, how between 1980 and 2013, the Department of Justice issued over fifty objection letters under Section 5 of the VRA to proposed election law changes in North Carolina due to their likely discriminatory purpose and effect, and that private plaintiffs successfully brought fifty-five cases under Section 2 of the VRA over the same period); *see also Veasey*, 830 F.3d at 239–41 (considering history of DOJ objections to legislature's proposed voting changes under Section 5 of the VRA and prior enactment of discriminatory Voter ID law relevant to second *Arlington Heights* factor analysis).

454. As the Fourth Circuit has concluded, a "historical pattern of laws producing discriminatory results provides important context for determining whether the same decisionmaking body has also enacted a law with discriminatory purpose." *McCrory*, 831 F.3d at 223–24. As most relevant to this case, Dr. Leloudis and Dr. Bagley recounted recent acts of official discrimination by the General Assembly against Black voters, including how multiple courts over the last decade have invalidated North Carolina's congressional and legislative maps as impermissibly discriminating against voters based on race. *See supra* Section III.B (discussing *Cooper*, 581 U.S. at 291, *Covington*, 316 F.R.D. at 177–78, and *Covington*, 585 U.S. 969). In *North Carolina v. Covington*, for example, the Court affirmed the district court's conclusion that voters were unconstitutionally sorted into districts on the basis of race, 581 U.S. 1015 (2017), and, this last redistricting cycle, in

- 171 -

*Cooper*, the Court upheld the district court's determination that in CD-12, "race, not politics, accounted for the district's reconfiguration," 581 U.S. at 309–10.

455. Again, Legislative Defendants have not rebutted—nor have they attempted to rebut—any of this historical evidence.

456. On the basis of Plaintiffs' unrebutted demonstration of North Carolina's long and recent history of discrimination against Black voters, as well as the Court's finding of continuing racial polarization in North Carolina, the Court concludes *Arlington Heights* Factor 2 weighs in favor of Plaintiffs and supports a finding of discriminatory intent. *See McCrory*, 831 F.3d at 223.

      iii.    ***Arlington Heights* Factors 3, 4, and 5: The Legislative History of the 2023 Plan Indicates a Discriminatory Purpose.**

457. *Arlington Heights* Factors 3, 4, and 5 look to the legislative history behind the law, including the "specific sequence of events leading up to the challenged decision," as well as "substantive" and "procedural" "[d]epartures from the normal . . . sequence." *Arlington Heights*, 429 U.S. at 267.

458. The legislative history and the sequence of events leading to the enactment of the 2023 Plan, including the General Assembly's actions involving the 2021 Plan, demonstrate both significant departures from the normal sequence and particular actions on the part of the General Assembly that are indicative of a discriminatory purpose. These include, but are not limited to, the rushed enactment of the 2023 Plan, the substantially limited opportunities for public input and diminished transparency of the redistricting process, and the failure of the redistricting committee to consider racially polarized voting

- 172 -

analyses. *See supra* Section III.C. Even though such procedures did not themselves violate the law, "a legislature need not break its own rules to engage in unusual procedures." *McCrory*, 831 F.3d at 228.

459. The Court finds the history of the 2021 Plan, the most recently legislatively enacted plan before the one at issue, to be particularly relevant as a point of comparison. Although the General Assembly made a gesture of transparency in 2021 by requiring that maps be drawn on public computer terminals, no such attempt at transparency was made during the 2023 process: maps were not drawn in public and were not even released until after the conclusion of all of the 2023 public hearings, *see supra* Section III.C.ii.

460. The Court is also troubled by certain parallels between the 2021 process and the 2023 one. Despite the 2021 redistricting criteria forbidding the use of partisan data, Tr. 970:13–17 (Hise), and despite Senator Hise's disavowal of the use of partisan data "several times under oath," Tr. 970:18–971:11 (Hise), in litigation over the 2021 plan, the North Carolina Supreme Court concluded that "[t]he General Assembly ha[d] substantially diminished the voting power of voters affiliated with one party on the basis of partisanship" and had "done so intentionally." *Harper I*, 2022-NCSC-17, ¶ 194, 868 S.E.2d at 554. In addition, the court found that secret "concept maps" had been used in drawing North Carolina's 2021 maps despite the General Assembly's nod towards public transparency—maps which Legislative Defendants later asserted had been "lost" and could not be produced in the litigation. *See id.* at 513 & 513 n.5.

- 173 -

461.    Here, the Court finds relevant to its analysis of discriminatory intent analysis that "same decisionmaking body," *McCrory*, 831 F.3d at 223–24—including even the same head of that decisionmaking body, Senator Hise—previously disavowed using prohibited criteria in 2021 but was nonetheless subsequently found to have "intentionally" used that prohibited criteria. *Harper I*, 2022-NCSC-17, ¶ 194, 868 S.E.2d at 554.

462.    The Court is similarly troubled by the General Assembly's use of "concept" maps that were not disclosed to the public in both the 2021 and 2023 Plans. *See supra* Section III.C.i. In particular, in 2023, the General Assembly used an outside consultant who drew several iterations of the map as "concepts" for the General Assembly; even this contract map-drawer was kept in the dark about the General Assembly's decision-making, *see supra* Section III.C.iii. Although the "concept" maps that were "lost" in the 2021 process were not explicitly lost this cycle, the General Assembly's clear attempt to hide redistricting documents from public view in the 2023 process also evinces discriminatory intent.

463.    As the Court found in detail above, *see supra* Section III.C.ii, and summarizes here, Senator Hise was Chairman of both the Senate Redistricting and Elections Committee and the Senate Appropriations Committee, and thus had control over the timing and sequencing of both bills, *see* Tr. 869:16–870:1, 943:22–24 (Hise), and consequently the ability to shield redistricting documents in 2023 from public view by passing the Appropriations Act before drawing any redistricting plans, *see supra* Section III.C.ii. Among other things, the 2023 Appropriations Act repealed G.S. 120-133, a law

- 174 -

enacted in 1995 that made redistricting communications and drafting documents part of the public record, Tr. 944:4–945:13 (Hise). As a result of that repeal, redistricting documents and communication created during the 2023 redistricting process that would have been made public had they been created during the redistricting processes of 1997, 2001, 2002, 2003, 2009, 2011, 2016, 2019, and 2021, were now kept secret.

464.    Notably, the 2023 Appropriations Act also included a provision that gave legislators and custodians of General Assembly records the discretion to determine "whether a [document] is a public record" and whether to destroy such records. Tr. 946:4–22 (Hise); WX170 at 4 (Excerpts of Conference Committee Substitute of H.B. 259). This greatly reduced the transparency of the redistricting process compared with prior processes and had the effect of, among other things, shielding from this Court's review documents that may be relevant to the discriminatory intent analysis. The Court finds the secretive nature of the 2023 redistricting process particularly troubling given the history of 2021 redistricting process recounted above.

465.    Legislative Defendants offer the testimony of Senator Hise, who says that he did not have racial data pulled up in front of him when he drew the 2023 Plan. Tr. 972:23–973:6, 975:10–13 (Hise). The Court concludes that that is not determinative: Senator Hise has extensive experience with drawing redistricting maps in North Carolina, is aware of where Black voters reside, and had municipal and HBCU data in front of him while drawing the map. *See supra* Section III.A.v. Moreover, the Court notes that Senator Hise similarly disclaimed the use of partisan data in 2021, but the Supreme Court of North

Carolina nonetheless found that the General Assembly had intentionally discriminated on the basis of partisanship.

466.    Additionally, as the Court noted previously, the severely limited opportunities for public input, including not providing for any public hearings after the General Assembly released its redistricting criteria and its draft maps, *see supra* Section III.C, is an important procedural departure from prior redistricting cycles and also supports an inference of discriminatory intent.

467.    The General Assembly ultimately enacted the draft maps into law within one week of when they were originally introduced. *See supra* Section III.C.ii . "[R]ush[ing] [a bill] through the legislative process" "strongly suggests an attempt to avoid in-depth scrutiny." *McCrory*, 831 F.3d at 228; *see also Veasey*, 830 F.3d at 238 (finding that "cutting debate short to enable a three-day passage [of the bill at issue] through the Senate" "lend[ed] credence to an inference of discriminatory intent").

468.    In addition to the multiple procedural departures from prior redistricting cycles, Plaintiffs also presented evidence of "substantive" "[d]epartures from the normal . . . sequence," *Arlington Heights*, 429 U.S. at 267. As described comprehensively, *supra* Section III.A, Plaintiffs demonstrated that the 2023 Plan departs from traditional redistricting criteria along multiple metrics, including faring worse than the 2022 Plan on compactness, county and municipal splits and keeping municipalities whole. WX1 at 6–7; Tr. 35:4–22, 73:19–74:3 (Rodden); *see also supra* Section III.IV.B.vii.

469.     Taken together, the Court concludes that the sequence of events leading to the passage of the 2023 Plan, including substantive and procedural departures from the ordinary process, such as Legislative Defendants' efforts rush maps through the legislature with limited public input, substantially limiting the transparency of the process and departing from traditional redistricting principles in the Plan, weigh in favor of Plaintiffs and support a finding of discriminatory intent. Just as in *McCrory*, while these factors are "not dispositive on [their] own, [they] provide[] another compelling piece of the puzzle of the General Assembly's motivation." 831 F.3d at 229.

**B.     Legislative Defendants Failed to Rebut Plaintiffs' Demonstration of Discriminatory Intent Under *Arlington Heights*.**

470.     Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Id.* at 221 (quoting *Hunter*, 471 U.S. at 228). At this step, "judicial deference is no longer justified." *Arlington Heights*, 429 U.S. at 265–66. "Instead, courts must scrutinize the legislature's <u>actual</u> non-racial motivations to determine whether they <u>alone</u> can justify the legislature's choices." *McCrory*, 831 F.3d at 221.

471.     "A court assesses whether a law would have been enacted without a racially discriminatory motive by considering the substantiality of the state's proffered non-racial interest and how well the law furthers that interest." *Id.* at 233–34; *see also Arlington Heights*, 429 U.S. at 265–66 (explaining that because "racial discrimination is not just another competing consideration," a court must do much more than review for

- 177 -

"arbitrariness or irrationality"). Legislative Defendants suggest they had partisan goals, but their own evidence demonstrates that partisanship cannot explain the Plan's contours. And though Legislative Defendants have not argued it, no traditional redistricting criteria can explain the General Assembly's choices in the 2023 Plan.

### i. Partisanship Does Not Explain the 2023 Plan's District Boundaries.

472. As a threshold matter, Senator Hise, chairman of the redistricting committee, testified that partisan goals did not predominate in creating the 2023 Plan. Tr. 942:20–24 (Hise). Indeed, while Senator Hise said the General Assembly was authorized to review partisan data and considered partisan performance to some extent, Senator Hise testified that the General Assembly did not have particular partisan metrics in mind. Tr. 857:3–15 (Hise). Instead, he said that the General Assembly considered "whether or not [] a Republican could win within a particular district" but "did not set percentages or others to establish what would meet that criteria." *Id.* He also claimed that partisanship "d[id] not trump equal population," "contiguous[ness]," "compactness," or "those types of things." Tr. 942:20–943:8 (Hise).

473. Moreover, Legislative Defendants have never taken the position that the General Assembly prioritized partisan goals above all else or that the 2023 Plan's district configurations were necessary to achieve a particular partisan outcome. Instead, they have vaguely suggested that because partisan data *may* be considered under North Carolina law, any irregularities in district boundaries should be assumed to be the product of partisan considerations. *See, e.g.,* Legis. Defs.' Pretrial Br. at 10, ECF No. 125 (arguing that

- 178 -

"because the criteria authorize partisan redistricting . . . Plaintiffs must overcome 'a partisan-gerrymandering defense" (quoting *Alexander*, 602 U.S. at 9)); *but see* Legis. Defs.' Answer to Am. Compl. at 20–21, ECF No. 33 (failing to assert partisan gerrymandering defense).

474.    Nor did any of Legislative Defendants' experts claim that partisanship was the predominant goal behind the 2023 Plan. *See supra* Section III.A.iii. Dr. Barber conceded that he was not opining that partisanship was the predominant factor behind the 2023 Plan. Tr. 1115:8–10 (Barber). And because it was possible that both race and party motivated the General Assembly, he could not rule out race as a motivating factor in drawing the enacted plan. Tr. 1115:21–1116:3, 1106:16–21 (Barber). Indeed, Dr. Barber's own simulations demonstrated that the racial sorting exhibited in the enacted plan was an extreme outlier even among highly partisan race-blind maps, and he admitted that other political considerations like incumbent addresses could not explain the differences between the racial sorting of the enacted plan compared to his race-blind simulations. Tr. 1102:19–25 (Barber). Similarly, Dr. Trende offered did not claim partisanship predominated in the drawing of the plan, and his own analysis repeatedly found that, controlling for party, Black voters were treated differently than white voters, in a statistically significant way. *Supra* Section III.A.iii.2.

475.    *Williams* Plaintiffs also adduced additional evidence showing that partisanship alone cannot explain the district boundaries in CD-6, CD-12, and CD-14. Dr. Rodden's analyses assessed the distribution of racial groups in the 2023 Plan and quantified

- 179 -

the extent to which voters were included and excluded from districts according to race. *Supra* Section III.A.ii. In doing so, he found evidence of racial sorting even when controlling for party affiliation and geographic factors. *Id*.

476. For example, Dr. Rodden's envelope analysis, which quantified the extent to which district boundaries split communities in ways that correspond to racial lines of segregation, Tr. 40:16–41:5 (Rodden), showed that in the Piedmont Triad, white voters were significantly more likely than Black voters to be sorted into CD-6. WX1 at 12. The opposite was true in the Mecklenburg regions—Black voters were more likely to be placed in CD-12 and out of CD-14, and vice versa for white voters. WX1 at 17, 22. While *Williams* Plaintiffs need not prove that race predominated in the drawing of the 2023 Plan to prove their intentional racial discrimination claim, the Supreme Court has affirmed district courts' reliance on the envelope analysis for "evidence of racial predominance." *Cooper*, 581 U.S. at 315–16. Dr. Trende agreed that Dr. Rodden's county envelope methodology mirrored that of Dr. Ansolabehere's county envelope analysis in *Cooper v. Harris*, Tr. 1395:10–13 (Trende), which the Supreme Court "blessed" in *Cooper. See Alexander*, 602 U.S. at 31. Dr. Rodden also analyzed these patterns of racial sorting while controlling for party affiliation. Tr. 45:17–46:11 (Rodden). He found that even within partisan groups, white voters were more likely to be placed into CD-6 and CD-14 than Black voters and Black voters were more likely to kept out of both districts—evidence consistent with cracking Black communities out of those districts. In CD-12, the evidence again showed that within every partisan group Black voters were more likely to be placed within the

- 180 -

district while white voters were kept out—evidence consistent with packing Black voters in that district. Indeed, Dr. Rodden explained that the magnitude of racial differences in CD-12 were "roughly similar" to one of the packed districts considered in *Cooper v. Harris*. Tr. 76:5–10 (Rodden). Dr. Rodden's regressions, which controlled for both partisanship and geography, confirmed the same results. WX1 at 13; Tr. 47:17–48:11 (Rodden).

477.    Dr. Trende did not dispute Dr. Rodden's finding that across all partisan groups, Black voters were less likely to be included in CD-6 and CD-14 and included in CD-12. Tr. 1389:16–1390:3, 1394:11–1395:9 (Trende). Indeed, Dr. Trende conceded that even in his analyses controlling for party, he still found that a voter's race remained statistically significant for inclusion and exclusion in CD-6, CD-12, and CD-14. *See supra* Section III.A.iii.2.

478.    If partisanship alone explained the district's contours, Dr. Rodden explained that we would be unlikely to see such racial sorting within partisan groups. *See, e.g.*, *Cooper*, 581 U.S. at 315–16 (holding where the county envelope analysis showed that "regardless of party, a black voter was . . . more likely than a white voter" to be placed in a district, this "tended to confirm" the plaintiffs' "evidence of racial predominance," a higher standard than the "motivating factor" standard applicable under *Arlington Heights*).

479.    Dr. Barber's simulation analyses confirmed this point—even among highly pro-Republican race-neutral plans, the 2023 Plan's highly unusual racial distribution never

emerged, neither statewide nor in particular in the Triad or Mecklenburg regions. *See supra* Section III.A.ii.3.

480.    Finally, the General Assembly had good reason to engage in racial sorting to accomplish any partisan goals because Senator Hise understood that Black voters vote more consistently and predictably than white voters. Tr. 959:11–960:3 (Hise).

481.    For all of these reasons, the Court finds that partisanship cannot, on its own, explain the 2023 Plan's district boundaries in CD-6, CD-12, and CD-14.

ii.    **Traditional Redistricting Criteria Do Not Explain the 2023 Plan's Racial Sorting.**

482.    Legislative Defendants do not claim that the 2023 Plan's observed racial sorting is a product of traditional redistricting criteria, nor could they. In the Triad, the 2023 Plan is riddled with unnecessary appendages and narrow corridors that consistently extract Black communities from their cities and counties, pairing them with distant and rural white populations. Counties and cities are split unnecessarily—including splitting Guilford three separate ways, along with the three cities of the Triad spread across four different districts. As a result, the districts of the Triad are sprawling across the state with jagged borders that do not adhere to any traditional redistricting criteria.

483.    In fact, Dr. Trende admitted several times that his own choropleth maps confirm that the appendages and jagged boundaries in the Triad decrease the corresponding districts' compactness, do not adhere to political subdivision boundaries, and follow racial lines, pulling Black voters into largely white districts. *See, e.g.,* Tr. 1378:4–24, 1379:19–21, 1381:10–1382:5, 1383:8–9 (Trende).

- 182 -

484.    In the Mecklenburg area, CD-14 is a noncompact, sprawling district that reaches around Charlotte in a claw-like configuration to extract populations from the south of Charlotte. WX1 at 6–7; Tr. 73:19–74:3 (Rodden). CD-12 splits Mecklenburg three ways. And both CD-14 and CD-12 have several unnecessary political subdivision splits. Dr. Trende conceded that CD-12 and CD-14 were less compact than the prior plan, that the district lines fail to follow the Charlotte city lines, Tr. 1383:24–1384:10 (Trende), and that his own choropleth maps showed that the CD-12 and CD-14 boundary lines "follow[] racial lines." Tr. 1384:11–21 (Trende).

485.    Moreover, no defense expert contests any of Dr. Rodden's findings about compactness in the 2023 Plan, including his conclusion that every district touching the Piedmont Triad as well as CD-12 and CD-14 in the Charlotte area became less compact in the 2023 Plan. Tr. 1372:7–21 (Trende). Nor does any expert contest the increase in county and municipality splits both regions as compared to the 2022 Plan, or the fact that these splits occur in areas with significant Black populations. Tr. 1373:13–16 (Trende).

486.    In short, Legislative Defendants have not argued that any traditional redistricting criteria can explain the 2023 Plan's configuration. And for good reason: in the regions of focus, the 2023 Plan is comprised primarily of sprawling districts littered with noncompact appendages, corridors, and jagged borders that include many unnecessary county and municipality splits.

487.    Legislative Defendants' experts also suggest that racial geography and the natural clustering of Black voters could explain the 2023 Plan's racial sorting. However,

- 183 -

both Dr. Rodden and Dr. Barber's testimony put that speculation to rest. Dr. Rodden's dislocation analysis demonstrated the unnatural racial composition of the districts Black voters were placed in; his median distance analysis showed that Black voters were disproportionately placed on the outskirts of sprawling districts; his county envelope regressions controlled for various geographic factors (and partisanship) and found race continued to play a significant role in the placement of voters; and his border analyses demonstrated a clear pattern of sorting voters by race along the borders of every contested district. *Supra* Section III.A.ii.1–2. Finally, Dr. Barber's simulations confirmed that when accounting for North Carolina's geography, including its racial geography, the 2023 Plan's racial sorting never emerges, particularly in the Triad and Mecklenburg areas. *Supra* Section III.A.ii.3. As Dr. Rodden explained, the cracking of Black voters in the Triad and the packing of Black voters in Mecklenburg simply did not occur in the race-blind simulations—even the ones that had a partisan composition similar to the 2023 Plan. *Supra* Section III.A.ii.3.

### iii. Legislative Defendants Failed to Rebut Plaintiffs' Showing that Race Motivated the Drawing of the District Lines.

488. In short, no non-racial justification explains the 2023 Plan's contours. Neither "the legislature's actual non-racial motivations . . . alone" nor any other suggested explanation "justify the legislature's choices," *McCrory*, 831 F.3d at 221, in the configuration of the 2023 Plan. The Court therefore concludes that Legislative Defendants failed to rebut *Williams* Plaintiffs' demonstration of discriminatory intent under *Arlington Heights*.

- 184 -

## VII. Plaintiffs Have Established that the 2023 Plain Intentionally Diluted Black Voting Strength Under Section 2 of the VRA.

### A. Section 2 Legal Background

489.    Section 2 of the VRA prohibits any "standard, practice, or procedure" that has the purpose or effect of denying or abridging the right to vote on account of race. 52 U.S.C. § 10301(a). Plaintiffs establish a violation when "the totality of circumstances" show that a state's "political processes . . . are not equally open to participation by" members of a minority group "in that [they] have less opportunity . . . to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b). A plaintiff alleging an intentional Section 2 vote dilution claim must establish that the plan was enacted with a discriminatory intent and had a discriminatory effect. *See, e.g.*, *Harding*, 948 F.3d at 312–13 ("To prove an intentional vote dilution claim, a plaintiff must show a discriminatory purpose and discriminatory effect.").

490.    "Demonstrating discriminatory intent . . . 'does not require a plaintiff to prove that the challenged action rested *solely* on racially discriminatory purpose[].'" *Milligan*, 599 U.S. at 37 (quoting *Arlington Heights*, 429 U.S. at 265). Plaintiffs may establish a redistricting plan's discriminatory intent through the *Arlington Heights* factors. *See, e.g.*, *Brnovich*, 594 U.S. at 687.

491.    For the purpose of an intentional vote dilution claim, courts have considered a variety of additional factors as evidence of a redistricting plan's discriminatory effect— principal among them *Gingles* factors 2 and 3, and the factors set out in the Senate Report to the 1982 amendments to the VRA ("Senate Factors"). *See, e.g.*, *Perez v. Abbott*, 253 F.

- 185 -

Supp. 3d 864, 944 (W.D. Tex. 2017) (three-judge court) (considering the second and third *Gingles* preconditions and the Senate Factors in the court's discriminatory effects analysis for an intentional Section 2 vote dilution claim).[2]

492.　*Gingles* 2 examines whether minority voters are "politically cohesive," and *Gingles* 3 directs courts to examine whether the "white majority votes sufficiently as a bloc to enable it usually . . . to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51. Together, these factors examine the existence of racially polarized voting in a jurisdiction. The Supreme Court has held that *Gingles* 2 and 3 evidence "bear[s] heavily on the issue of purposeful discrimination," as "[v]oting along racial lines allows those elected to ignore black interests without fear of political consequences." *Rogers*, 458 U.S. at 623.

493.　Courts also look to the Senate Factors for additional evidence of a plan's discriminatory effect. *See, e.g.*, *Gingles*, 478 U.S. at 44 (the Senate Factors allow courts to "assess the impact of the contested structure or practice on minority electoral opportunities") (cleaned up). *Williams* Plaintiffs have demonstrated the 2023 Plan's discriminatory intent through the *Arlington Heights* factors. And *Gingles* 2 and 3, as well as the Senate Factors, demonstrate the discriminatory effects of the plan. As with any

---

[2] Notably, for *intent*-based Section 2 challenges (in contrast to *effects*-based Section 2 challenges), the first *Gingles* factor—that the minority group is "sufficiently large and geographically compact to constitute a majority in a single member district," *Gingles*, 478 U.S. at 50—is not applicable. *See Bartlett v. Strickland*, 556 U.S. 1, 20 (2009) (plurality op.) (holding that the first *Gingles* factor "does not apply to cases in which there is intentional discrimination against a racial minority"); *Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 771 (9th Cir. 1990) (holding that, in a claim alleging "intentional discrimination," *Gingles* does not "require[] . . . plaintiffs to demonstrate that they could have constituted a majority in a single-member district"); *see also Perez*, 253 F. Supp. at 944 ("[W]hen discriminatory purpose (intentional vote dilution) is shown, a plaintiff need not satisfy the first *Gingles* precondition to show discriminatory effects.").

Section 2 claim, "there is no requirement that any particular number of [Senate] [F]actors be proved, or that a majority of them point one way or the other." *Gingles*, 478 U.S. at 45 (quoting S. Rep. No. 97-417, pt. 1, at 29 (1982)). Nevertheless, *Williams* Plaintiffs have demonstrated that all applicable Senate Factors weigh in favor of their claims, *see infra* Section IV.B.

### B.    Section 2 Creates a Private Right of Action

494.    Plaintiffs have a private right of action to bring their Section 2 claim.

495.    The VRA's text and decades of binding precedent foreclose any argument that the VRA lacks a private right of action. *See Morse v. Republican Party of Va.*, 517 U.S. 186, 232 (1996) (plurality op.) (quoting S. Rep. No. 97-417, pt. 1, at 30 (1982)); *see id*. at 240 (Breyer, J., concurring) (same). In *Morse*, the Supreme Court concluded that "the existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965." *Id.* at 232 (plurality op.) (quoting S. Rep. No. 97-417 at 30) (omission in original). The Court explained that in 1975, Congress amended the VRA's general enforcement mechanism in Section 3 to explicitly provide for private rights of action. *See* 52 U.S.C. §§ 10302(a)–(c) (describing procedures "in any proceeding instituted by the Attorney General *or an aggrieved person* under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision") (emphasis added). Justice Stevens's opinion for the Court, Justice Breyer's concurrence, and Justice Thomas's dissent in *Morse* all recognized that the amended Section 3 gives a right of action under the VRA to private parties. *Morse,* 517 U.S. at 233; *see also id.* at 240

- 187 -

(Breyer, J., concurring) (recognizing that, in amending Section 3, Congress gave "a private right of action to enforce § 10 [of the VRA], no less than it did to enforce §§ 2 and 5"); *id.* at 289 (Thomas, J., dissenting) (confirming that Section "3 explicitly recognizes that private individuals can sue under the Act." (cleaned up)).

496.    At issue in *Morse* was whether Section 10 of the VRA provided a private right of action despite "not expressly mention[ing] private actions." *Id.* at 230. In concluding that Section 10 does, the Court relied on its clear and longstanding interpretation that Section 2 provides a private right of action: "Although § 2, like § 5, provides no right to sue on its face, the existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965." *Id*. at 232 (quotation omitted). The Court noted that, for years, it had "entertained cases brought by private litigants to enforce § 2." *Id.* (first citing *Chisom v. Roemer,* 501 U.S. 380 (1991); and then citing *Johnson v. De Grandy,* 512 U.S. 997 (1994)).

497.    Since the Court decided *Morse*, "scores if not hundreds of cases have proceeded under the assumption that Section 2 provides a private right of action. All the while, Congress has consistently reenacted the VRA without making substantive changes, impliedly affirming the previously unanimous interpretation of Section 2 as creating a private right of action." *Coca v. City of Dodge City*, 669 F. Supp. 3d 1131, 1140 (D. Kan. 2023); *see also Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.").

- 188 -

498.    The Supreme Court's recent decisions in *Shelby County* and *Milligan* are also consistent with a private right of action in Section 2. In describing the VRA's statutory scheme, the Court in *Shelby County* explained: "Both the Federal Government *and individuals* have sued to enforce § 2 . . . and injunctive relief is available in appropriate cases to block voting laws from going into effect." 570 U.S. at 537 (emphasis added). Similarly, in *Milligan*, a Section 2 case brought exclusively by private plaintiffs, the Court observed: "For the past forty years, [the Court has] evaluated claims brought under § 2 using the three-part framework developed in [its] decision in *Thornburg v. Gingles*." *Milligan*, 599 U.S. at 17. "That jurisprudence includes legions of Section Two claims asserted by private plaintiffs and adjudicated by the Supreme Court" including, for example, *Gingles*, and *Milligan* itself. *Singleton*, 2025 WL 1342947, at *180 (collecting cases).

499.    Only a single Circuit has held otherwise and concluded that Section 2 lacks a private right of action. *See Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204, 1216 (8th Cir. 2023). Since that time, the Eighth Circuit's position has been almost universally rejected, including by the Fifth Circuit. *See Robinson v. Ardoin*, 86 F.4th 574, 588 (5th Cir. 2023). That is because, in so concluding, the Eighth Circuit ignored a "vast sea of cases recognizing and affirming the private right of action within Section 2, usually without question." *City of Dodge City*, 669 F. Supp. 3d at 1139.

500.    This Court declines to contradict decades of Supreme Court precedent and the overwhelming majority of lower court caselaw that has consistently recognized a

private right of action in the VRA. Plaintiffs' Section 2 claims may proceed because Congress gave litigants "a private right of action . . . to enforce § 2." *Morse*, 517 U.S. at 240 (Breyer, J., concurring) (cleaned up).

**C.** **The *Arlington Heights* Intent Analysis Applies Equally to *Williams* Plaintiffs' Section 2 Claim.**

501. The evidence establishing the 2023 Plan's discriminatory intent through the *Arlington Heights* factors identified in Section VI, *supra*, applies with equal force to the discriminatory intent analysis here.

**D.** **_Gingles_ Factors 2 & 3 Provide Evidence of the Discriminatory Effect of the Plan.**

502. *Gingles* Factor 2 requires courts to determine whether minority voters are "politically cohesive," and *Gingles* Factor 3 inquires into whether the white majority "votes sufficiently as a bloc usually to . . . defeat the minority's preferred candidate[s]." *Gingles*, 478 U.S. at 51. Evaluating these factors involves an assessment of the extent to which voting is racially polarized through "discrete inquiries into minority and white voting practices," *id*. at 56.

503. *Gingles* 2 is used to "show[] that a representative of [the minority group's] choice would in fact be elected" if the votes of the minority group were not being diluted. *Milligan*, 599 U.S. at 18–19. Demonstrating "that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim, and, consequently, establishes minority bloc voting within the context of § 2." *Id.* (citation omitted).

504. Courts have held that minority-group political cohesion of greater than 90% easily satisfies the second *Gingles* Factor. For example, the court in *Gingles* found Black political cohesion "overwhelming" when it was shown to be between 87% and 96%. *Gingles*, 478 U.S. at 59.

505. So, too, in *Milligan*, where "Black voters supported their candidates of choice with 92.3% of the vote." 599 U.S. at 22. Other recent Section 2 cases have found similar percentages more than sufficient to establish the second *Gingles* Factor. *See, e.g.*, *Miss. State Conf. of NAACP v. State Bd. of Election Comm'rs*, 739 F. Supp. 3d 383, 436 (S.D. Miss. 2024) (noting Black voter cohesion averaged 83.3% in Mississippi); *Alpha Phi Alpha Fraternity, Inc. v. Raffensperger*, 700 F. Supp. 3d 1136, 1265 (N.D. Ga. 2023)(noting Black voter cohesion averaged 98.4% in Georgia); *Nairne*, 715 F. Supp. 3d at 861 (noting Black voter cohesion averaged 82.7% to 93.2% in Louisiana).

506. Dr. Palmer presented strong evidence of Black political cohesion in each of the 63 statewide contested partisan elections from 2016 through 2024 that he analyzed. Tr. 158:17–21, 159:7–160:3 (Palmer). Across these elections, Dr. Palmer's analysis demonstrated that Black voters were highly cohesive, supporting the Black-preferred candidate with an average of 97.6% of the vote. WX4 at 4–5; Tr. 160:4–161:18 (Palmer). The same was true in the Piedmont Triad (97.5%), Mecklenburg (97.7%), and CD-14 (93.2%). WX4 at 4, 6; Tr. 163:22–164:4, 164:17–165:2 (Palmer). The Court thus finds *Gingles* 2 easily satisfied in this case.

507.    The third *Gingles* Factor examines whether "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 51. Because the purpose of *Gingles* 3 is to "establish[] that the challenged districting thwarts a distinctive minority vote," the focus of the analysis is whether, under the *challenged* plan, white bloc voting usually will defeat the minority's preferred candidate. *Milligan*, 599 U.S. at 19 (citation omitted). And because the "amount of white bloc voting that can generally 'minimize or cancel' black voters' ability to elect representatives of their choice . . . will vary from district to district," there is no threshold percentage required to demonstrate Factor 3. *Gingles*, 478 U.S. at 56 (citations omitted). In *Gingles*, the court noted that white support for Black candidates ranged between 28–49% in general elections and that, as a result, Black voters "have enjoyed only minimal and sporadic success in electing representatives of their choice." *Id.* at 59–60*; see also Ala. State Conf. of NAACP v. Alabama*, 612 F. Supp. 3d 1232, 1283 (M.D. Ala. 2020) (finding *Gingles* 3 satisfied where white support for Black candidates fell between 26.9%–37.4% for statewide appellate judges and 14.7–17.7% for Lieutenant Governor, Secretary of State, and Auditor).

508.    Dr. Palmer presented unrebutted evidence that under the 2023 Plan, whites consistently voted against Black-preferred candidates across the state and in each of the regions of interest in this case. For example, statewide, in the 63 elections Dr. Palmer examined, only 28.2% of whites supported the Black-preferred candidate. WX4 at 4–5; Tr.

- 192 -

160:4–161:18 (Palmer). Whites supported the Black-preferred candidate with only 23.4% of the vote in the Triad, 19.8% of the vote in CD-14, and 40.6% in Mecklenburg County.

509.    Dr. Palmer also presented unrebutted evidence that switching from the 2022 Plan to the 2023 Plan had the effect of ensuring that Black voters are no longer able to elect their preferred candidates in *any* of the four Piedmont Triad districts or in CD-14. Tr. 169:15–21 (Palmer); WX4 at 7.

510.    Dr. Palmer testified that these facts demonstrated racially polarized voting— that Black voters are highly cohesive in supporting the Black-preferred candidate and that white voters are cohesive in opposing the Black-preferred candidate. WX4 at 4–5; Tr. 160:4–161:18 (Palmer); *see, e.g.*, *Milligan*, 599 U.S. at 22 (affirming district court's finding that where "Black voters supported their candidates of choice with 92.3% of the vote while white voters supported Black-preferred candidates with 15.4% of the vote," there "was no serious dispute" that the second and third *Gingles* preconditions were satisfied) (internal quotations and citations omitted).

511.    Dr. Alford, Legislative Defendants' expert, did not dispute any of Dr. Palmer's quantitative estimates in his racially polarized voting analysis. Tr. 165:10–18 (Palmer). While Dr. Alford claimed that partisanship can explain the racially polarized voting that Dr. Palmer's analysis demonstrated, Dr. Alford's argument misconstrues the *Gingles* 2 and 3 inquiries. *See Singleton*, 2025 WL 1342947, at *148 (holding the existence of political cohesion and racial bloc voting, without consideration of the reason for those voting patterns, is "dispositive of the second and third *Gingles* preconditions").

512.    In other words, under *Gingles* 2 and 3, "plaintiffs do not have to prove that race is the sole or predominant cause of the voting difference between the minority and majority voting blocs, nor must plaintiffs disprove that other race-neutral reasons, such as partisanship, are causing the racial bloc voting." *Alpha Phi Alpha*, 700 F. Supp. 3d at 1264. Rather, the inquiry focuses only on whether Black and white voting is polarized, and "not the causes of the" polarization. *Gingles*, 478 U.S. at 63; *see also id*. at 100 (concluding that defendants may not rebut "evidence of divergent racial voting patterns . . . by offering evidence that the divergent racial voting patterns may be explained in part by causes other than race") (O'Connor, J., concurring).

513.    "'Legally significant' white bloc voting thus refers to the frequency with which, and not the reason why, whites vote cohesively for candidates who are not backed by minority voters." *United States v. Charleston County*, 365 F.3d 341, 348–49 (4th Cir. 2004). Accordingly, the Court credits Dr. Palmer's largely unrebutted demonstration of racially polarized voting in North Carolina. This showing establishes *Gingles* Factors 2 and 3, which provide support for the 2023 Plan's discriminatory effect.

E.    **The Senate Factors Provide Additional Evidence of the 2023 Plan's Discriminatory Effects and Support a Showing of Discriminatory Intent.**

514.    Through both expert and lay testimony, *Williams* Plaintiffs demonstrated that the Senate Factors further support an inference that the 2023 Plan has discriminatory effects, *see Perez*, 253 F. Supp. 3d at 944 (finding that "totality-of-the-circumstances factors" may help demonstrate a redistricting plan's "discriminatory effect"), and was enacted with discriminatory intent, *see, e.g.*, *United States v. Brown*, 561 F.3d 420, 433

- 194 -

(5th Cir. 2009) (recognizing the Senate Factors "supply a source of circumstantial evidence regarding discriminatory intent").

> i. **Senate Factors 1 and 3: Plaintiffs Established North Carolina's Long and Ongoing History of Official Discrimination in Voting Practices.**

515. Senate Factor 1 looks at the state's "history of official discrimination" that "touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process," and Senate Factor 3 similarly looks at "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group." *Gingles*, 478 U.S. at 36–37.

516. The Court analyzes these Senate Factors together because "much of the evidence that is probative of" Senate Factor 1 "is probative of" of Senate Factor 3. *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1020 (N.D. Ala. 2022), *order clarified*, No. 2:21-CV-1291-AMM, 2022 WL 272637 (N.D. Ala. Jan. 26, 2022), *and aff'd sub nom. Milligan*, 599 U.S. at 1; *see also Alpha Phi Alpha*, 700 F. Supp. 3d at 1275 (analyzing Senate Factors 1 and 3 together). In addition, because both of these Senate Factors overlap substantially with *Arlington Heights* Factor 2, which the Court has already concluded weighs heavily in Plaintiffs' favor, the Court only briefly recounts the evidence presented concerning Senate Factors 1 and 3, which was largely undisputed.

517.     As the Fourth Circuit has already found, and this Court agrees, "[u]nquestionably, North Carolina has a long history of race discrimination generally and race-based vote suppression in particular." *McCrory*, 831 F.3d at 223. Plaintiffs' experts Dr. Leloudis and Dr. Bagley documented this long history of official discrimination against Black North Carolinians since the state's founding, from poll taxes to literacy tests, to more subtle and recent forms of voting practices used to suppress Black voting power, including at-large districts and anti-single shot voting mechanisms that persisted throughout the 1980s and 1990s. *See supra* Section III.B.

518.     Although this evidence of past discrimination is less probative than recent evidence, the Senate Factors "expressly include an historical focus," *Singleton*, 582 F. Supp. 3d at 1020, because Congress was concerned "not only with present discrimination, but with the vestiges of discrimination which may interact with present political structures to perpetuate a historical lack of access to the political system." *Luna v. Cnty. of Kern*, 291 F. Supp. 3d 1088, 1133–34 (E.D. Cal. 2018) (internal citation omitted); *see also Veasey*, 830 F.3d at 257 n.53 (noting that "long-ago history of discrimination . . . cannot be ignored in the discriminatory effect analysis, because even these seemingly remote instances of State-sponsored discrimination continue to produce . . . racial disparities").

519.     But the Court also finds substantial evidence of more recent official discrimination against Black voters, from the Department of Justice's dozens of objection letters and successful VRA suits against the state from 1980 to 2013, *see supra* Section III.B, to the General Assembly's passage of a discriminatory voter ID law which the Fourth

Circuit found "target[ed] African Americans with almost surgical precision" in the immediate aftermath of *Shelby County*. *McCrory*, 831 F.3d at 214; *see also Holmes v. Moore*, 2022-NCSC-122, ¶ 84, 881 S.E.2d 486, 510 (finding General Assembly's 2018 voter ID law was "enacted with discriminatory intent to disproportionately disenfranchise and burden African-American voters in North Carolina"), *op. withdrawn and superseded on reh'g*, 384 N.C. 426, 886 S.E.2d 120 (2023).[3] Indeed, courts have struck down other parts of North Carolina's election system as intentionally discriminatory against Black voters even during the pendency of this lawsuit. *See N.C. A. Philip Randolph Inst.*, 730 F. Supp. 3d at 203.

520.    North Carolina's efforts to suppress Black voting strength, of course, were also pervasive in the most recent redistricting cycle. *See supra* Section III.B (discussing three cases in the 2010 redistricting cycle alone in which North Carolina was found to have impermissibly discriminated against voters based on race in redistricting).

521.    As this Court previously found, Legislative Defendants' expert witnesses did not rebut this history of discrimination. *See supra* Section III.B. Although Dr. Taylor attempted to offer a comparative approach with other states, the Court finds Dr. Taylor's comparative approach irrelevant to a Senate Factors analysis, which requires courts to engage in an "intensely local appraisal." *Gingles*, 478 U.S. at 78 (quotation omitted). Nor

---

[3] Although a reconstituted North Carolina Supreme Court subsequently overturned that decision, it did not disturb many of the factual findings that demonstrate that the law "enhances the *opportunity* for discrimination" against Black North Carolinians under Senate Factor 3. *Gingles*, 478 U.S. at 37 (emphasis added).

did Dr. Taylor's analysis focus on practices affecting North Carolina's minority population, rather than the general population, as would be relevant to Senate Factor 3. Nor did Dr. Taylor consider electoral devices commonly understood to be included within Senate Factor 3's ambit, such as the use of at-large districts and anti-single shot provisions. Accordingly, the Court finds that Dr. Taylor's Senate Factor 3 testimony is largely irrelevant.

522. Based on the unrebutted testimony and evidence demonstrating North Carolina's history of official discrimination in voting, as well as the state's use of practices that enhance the opportunity for discrimination both historically and through the present day, the Court concludes Senate Factors 1 and 3 weigh in favor of Plaintiffs.

ii. **Senate Factor 2: Voting is Racially Polarized in North Carolina Both Statewide and in the Challenged Congressional Districts.**

523. The second Senate Factor addresses "the extent to which voting in the elections of the state or political subdivision is racially polarized." *Gingles*, 478 U.S. at 37 (quotation omitted).

524. As this Court has already found, Plaintiffs presented extensive and almost entirely unrebutted evidence of racially polarized voting, both statewide and in the challenged regions. *See supra* Section VII.D (finding that *Gingles* 2 and 3 weigh in favor of Plaintiffs); *see also Miss. State Conf. of NAACP*, 739 F. Supp. 3d at 449 (describing the overlap between Senate Factor 2 and the *Gingles* preconditions).

525. In *Charleston County*, the Fourth Circuit concluded that Senate Factor 2 was not "in any serious dispute" where there was "racially polarized voting in 25 of the 33

(75.8%) contested general elections" over a period of 12 years. *Charleston County,* 365 F.3d at 350. Plaintiffs' showing of racial polarization is even stronger here.

526.    Although this Court did not consider the cause of this polarization at the *Gingles* factors stage, under Fourth Circuit precedent, such analysis may be relevant at the totality of the circumstances stage. *See Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 223 (4th Cir. 2024).

527.    As this Court has discussed, Dr. Stephens-Dougan presented uncontroverted testimony that race and racial attitudes are the dominant factor in determining partisan affiliation as it relates to voting behavior in the American South and in North Carolina. In sum, Dr. Stephens-Dougan showed how in North Carolina, racial attitudes fuel partisan behavior, and Black North Carolinians' support for the Democratic Party is largely driven by the party's support of racial issues salient to Black voters, testimony that was echoed from Black voters and elected officials like Plaintiff Mr. Jones. *See supra* Section IV.B.ii. Dr. Alford did not purport to rebut Dr. Stephens-Dougan's findings, and to the extent he attempted to provide evidence to that partisanship is the cause of any polarization, such testimony was narrowly focused solely on the race of the candidate, and the Court consequently gives that testimony very limited weight. *See supra* Section IV.B.ii.

528.    Further emphasizing the outsized role that race plays in politics in North Carolina is the fact that Black North Carolinians overwhelmingly rely on majority-minority districts for legislative representation. *See* WX11 at 6–7 (demonstrating that approximately 80% of Black State legislators in North Carolina come from majority-minority districts);

*Miss. State Conf. of NAACP*, 739 F. Supp. 3d at 452 (finding limited success from legislative Black candidates "outside majority-black districts" weighed in favor of plaintiffs on Senate Factor 2).

529.  For all of these reasons, the Court concludes that Senate Factor 2 weighs heavily in Plaintiffs' favor. The extent of racial polarization that Dr. Palmer demonstrated in North Carolina elections was in line with or exceeded showings that courts routinely conclude are highly polarized, including the showing made in *Charleston County*. *See, e.g., Charleston County*, 365 F.3d at 350. The Court also credits Dr. Stephens-Dougan's testimony regarding the connection between race and political preferences in North Carolina and concludes that even if partisanship explains some of the polarization, Dr. Stephens-Dougan demonstrated that much of the partisanship is itself driven by race.

### iii.  Senate Factor 4: There is No Candidate Slating Process in the Challenged Districts.

530.  Senate Factor 4, which considers "if there is a candidate slating process, whether the members of the minority group have been denied access to that process" *Gingles*, 478 U.S. at 37 (quotation omitted), is inapplicable here.

### iv.  Senate Factor 5: Black North Carolinians Bear the Effects of Discrimination in Education, Employment and Health, Which Hinders Their Ability to Participate in the Political Process.

531.  Senate Factor 5 examines "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process." *Id*.

- 200 -

532. *Williams* Plaintiffs' expert, Dr. Clark, offered unrebutted testimony demonstrating that Black North Carolinians perform worse than their white peers on each socioeconomic measure identified in Senate Factor 5—education, employment, and health—and that these factors, which are directly linked to political participation, lead to Black North Carolinians' lower levels of political participation. *See supra* Section IV.B.iii.

533. Although Legislative Defendants' expert, Dr. Taylor, confirmed that Black North Carolinians fared worse on each socioeconomic factor measured, including education, employment, health, and income, *see supra* Section IV.B.iii, he nonetheless attempted to minimize the disparities between Black and white North Carolinians by comparing those disparities to disparities nationwide, *see* LDTX259 at 14. The Court places no weight on Dr. Taylor's comparative approach, which "flips the Senate Factor 5 inquiry on its head by focusing on a *comparison of states* rather than a *comparison of the outcomes of the groups within each state*." WX10 at 4. That Black Americans, as a group, experience poorer outcomes than white Americans across the United States does not diminish that they experience poorer outcomes in North Carolina. Dr. Taylor's approach has—correctly—not been employed by any court; it is antithetical to the "intensely local appraisal" that *Gingles* demands, *Gingles*, 478 U.S. at 78 (quoting *Rogers*, 458 U.S. at 622), and the Court declines to employ it here.

534. The Court credits Dr. Clark's testimony, and the testimony of Plaintiffs' historical experts, which clearly establishes that North Carolina has a history of racial discrimination, which has produced significant disparities in education, employment,

health, and income and which have led to decreased Black participation in the political process. Where, as here, Plaintiffs establish both socioeconomic disparities and lower minority voter participation, "plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation." S. Rep. No. 97-417, at 29 n.114 (1982); *see also Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1294 (11th Cir. 2020) (holding same).

### v. Senate Factor 6: North Carolina Political Campaigns Are Characterized by Racial Appeals.

535.    Senate Factor 6 asks "whether political campaigns have been characterized by overt or subtle racial appeals." *Gingles*, 478 U.S. at 37. When "candidates [make] race an issue on the campaign trail . . . the possibility of inequality in electoral opportunities increases." *Soto Palmer v. Hobbs*, 686 F. Supp. 3d 1213, 1230 (W.D. Wash. 2023).

536.    As the Court already found, Dr. Clark, Dr. Bagley, and Dr. Stephens-Dougan each presented evidence of racial appeals in North Carolina political campaigns, including in recent ones, up to and including the 2024 general election for governor and the 2022 general election for U.S. Senate. *See supra* Section IV.B.iv.

537.    Dr. Taylor, on the whole, failed to respond to or rebut Plaintiffs' experts' demonstration of the prevalence of racial appeals in North Carolina. Dr. Taylor struggled to define a racial appeal, did not express an opinion as to whether the specific advertisements identified by Plaintiffs' experts constituted racial appeals, and again attempted to use a comparative approach to other states to contextualize racial appeals in North Carolina's campaigns, *see supra* Section IV.B.iv, which is faulty for the same

reasons described above. The Court accordingly gives Dr. Taylor's testimony regarding racial appeals no weight.

538.    The Court finds that Dr. Clark, Dr. Bagley, and Dr. Stephens-Dougan identified numerous racial appeals in recent campaigns in North Carolina and appropriately referenced academic literature to explain why each identified advertisement or communication constituted a racial appeal. Based on Plaintiffs' experts' comprehensive showing of historical and contemporary racial appeals, the Court finds this factor weighs in Plaintiffs' favor. *See Edmisten*, 590 F. Supp. at 364 (favoring plaintiffs on Senate Factor 6 where they identified "specific examples" of racial appeals in recent U.S. Senate and North Carolina gubernatorial campaigns).

> **vi.    Senate Factor 7: Blacks Candidates in North Carolina Have Had Limited Electoral Success.**

539.    Senate Factor 7 asks courts to consider "the extent to which members of the minority group have been elected to public office in the jurisdiction." *Gingles*, 478 U.S. at 37. "Unlike the second and third *Gingles* preconditions, the Court now must specifically look at the success of *Black* candidates, not just the success of Black preferred candidates." *Alpha Phi Alpha*, 700 F. Supp. 3d at 1282.

540.    As this Court has found, Dr. Clark provided evidence that Black North Carolinians are underrepresented relative to their population share and relative to white North Carolinians on virtually every representation metric in the state, including in statewide executive office, the North Carolina Supreme Court, as well as the North Carolina General Assembly and North Carolina's congressional delegation. *See supra*

- 203 -

Section IV.B.v. In particular, the record demonstrates that in North Carolina, of the 69 governors and 57 United States' Senators in the state's history, zero have been Black. *See supra* Section IV.B.v. Similarly, Dr. Bagley showed how Black North Carolinians are underrepresented in local office in North Carolina. *See supra* Section IV.B.v.

541.    In *Alpha Phi Alpha*, the court concluded that Senate Factor 7 "weigh[ed] heavily in favor" of plaintiffs where only 12 Black officials had ever served in Georgia's congressional delegation, one Black official had ever served as U.S. Senator; no Black candidates had ever been elected as Governor, and Black officials were underrepresented in the Georgia State Legislature. 700 F. Supp. 3d at 1282. This Court concludes that Plaintiffs' showing here is at least as strong as plaintiffs' showing in *Alpha Phi Alpha*.

542.    Although Legislative Defendants attempt to make much of the fact that in the 119th Congress, the percentage of Black members of North Carolina's U.S. House delegation now roughly approximates (although remains slightly lower than) the percentage of Black North Carolinians in the state, courts should not "place much evidentiary weight on any one election." *McCrory*, 831 F.3d at 232. "[A]s the Supreme Court has explained," the aggregate results of multiple elections are more probative than the result of a single election. *See id.* For example, in *Gingles*, the Court approved the district court's decision to "accord greater weight to blacks' relative lack of success over the course of several recent elections" and "view[] with some caution black candidates' success in" a recent election. 478 U.S. at 76. As Dr. Clark demonstrated, the 2024 election is not representative of North Carolina's congressional delegation over the last 30 years,

during which Blacks have been consistently underrepresented. *See* Tr. 265:3–16 (Clark); WX8 at 37–39 (Tables 10 and 11). The Court accordingly finds Senate Factor 7 weighs in favor of Plaintiffs.

### vii. Senate Factor 8: North Carolina Officials Are Not Responsive to the State's Black Voters.

543. Senate Factor 8 asks "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." *Gingles*, 478 U.S. at 37. "If the officials are unresponsive[,] it suggests that they are willing to discriminate against minorities and need not be accountable to minority interests." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1572 (11th Cir. 1984). The Senate Report makes clear, however, that "defendants' proof of some responsiveness would not negate plaintiff's showing . . . that minority voters nevertheless were shut out of equal access to the political process." *Id.* (quoting 1982 S. Rep. at 29 n.116, U.S. Code Cong. & Admin. News 1982, p. 207 n.116).

544. Courts have offered, as "examples of a lack of responsiveness," failing to provide healthcare programs serving the Black community, inadequately funding public education, engaging in racially discriminatory election practices, and failing to attend Black community events. *Miss. State Conf. of NAACP*, 739 F. Supp. 3d at 462–63. Through both expert testimony and lay testimony, including the testimony of former elected officials like Representative Butterfield, Plaintiffs have presented all of this evidence of unresponsiveness and more. *See supra* Section IV.B.vi.

- 205 -

545.    In particular, the Court found compelling the testimony of Black voters Earl Jones, Pamlyn Stubbs, and Mitzi Turner, each of whom testified at trial that their new representatives under the 2023 Plan were unresponsive to their communities' needs. *See supra* Section IV.B.vi.

546.    Dr. Taylor's attempted comparative analysis of the responsiveness of North Carolina's elected officials as compared to officials in other states again falls flat, as his attempt to read into the Senate Factor a comparison to other states is antithetical to the "intensely local appraisal," required here. *Gingles,* 478 U.S. at 78 (quotation omitted). Even if such a comparison were permitted, Dr. Taylor's comparative analysis suffers from numerous methodological and analytical flaws, as the Court as already described in detail. *See supra* Section IV.B.vi.

547.    Considering all of this evidence together, the Court finds that Plaintiffs presented several lay witnesses who each testified to a lack of responsiveness on the part of the General Assembly or their U.S. Representative, and Plaintiffs' expert Dr. Bagley presented evidence of a lack of responsiveness to the specific concerns of Black North Carolinians. The Court credits Plaintiffs' testimony and concludes that Senate Factor 8 weighs in Plaintiffs' favor.

### viii.    Senate Factor 9: Plaintiffs Have Shown that the Policy Underlying the Plan is Tenuous.

548.    Senate Factor 9 looks to "whether the policy underlying the . . . practice or procedure is tenuous." *Gingles*, 478 U.S. at 37 (quotation omitted).

549.     Plaintiffs have demonstrated that the policy underlying the Plan is tenuous in two ways. First, they have done so by casting serious doubt on any possible explanations for the racial sorting in the 2023 Plan. *See supra* Section VI.B. In particular, Plaintiffs have shown the 2023 Plan performs worse than the 2022 Plan on the traditional redistricting factors of compactness, core retention, and county and municipal splits, and that partisan goals do not offer a complete explanation for the district lines. *See supra* Section VI.B.i. Indeed, both Senator Hise and Legislative Defendants' experts disclaimed any notion that achieving certain partisan ends was the primary goal in drawing the 2023 Plan. *See supra* Section VI.B.i.

550.     Moreover, "[t]he Supreme Court has made clear that the policies underlying a districting plan may be tenuous if they entrench racial vote dilution, even if those policies might be legitimate in another context." *Caster v. Allen*, No. 2:21-CV-1536-AMM, 2025 WL 1643532, at *169 (N.D. Ala. May 8, 2025) (citing *LULAC v. Perry*, 548 U.S. 399, 441 (2006)); *see also Buskey v. Oliver*, 565 F. Supp. 1473, 1483 (M.D. Ala. 1983) (holding political goal to ensure defeat of political rivals was tenuous where such a goal was achieved by "purposefully diluting the voting strength of the black electorate"). Here Plaintiffs have presented virtually unrebutted evidence demonstrating the 2023 Plan entrenches racial vote dilution, even if it does so to accomplish political goals.

551.     For these reasons, the Court concludes that Senate Factor 9 weighs in Plaintiffs' favor.

## VIII. The Supreme Court's Decision in *Alexander* Does Not Apply to *Williams* Plaintiffs' Claims.

### A.  *Alexander* **Applies to Racial Gerrymandering Claims, not** *Williams* **Plaintiffs' Intentional Discrimination and Intentional Vote Dilution Claims.**

552.  Legislative Defendants incorrectly argue that *Williams* Plaintiffs' claims are governed by the Supreme Court's decision in *Alexander*, 602 U.S. 1, and that they fail under the standards announced therein. Legislative Defendants err because the focus of the Court's decision in *Alexander* was a racial gerrymandering claim, not an intentional vote dilution claim, and as the Court made clear, "[a] vote-dilution claim is 'analytically distinct' from a racial-gerrymandering claim and follows a 'different analysis.'" *Id.* at 38 (citation omitted). Here, as discussed, *Williams* Plaintiffs' intentional vote dilution claim requires "show[ing] that the State's districting plan 'has the purpose and effect' of diluting the minority vote," *id*. at 38–39 (citation omitted), which plaintiffs have established above. The additional requirements imposed on the *Alexander* plaintiffs' racial gerrymandering claim do not apply here.

### B.  **Even if** *Alexander* **Were to Apply to Intentional Vote Dilution Claims,** *Williams* **Plaintiffs Have Proven Their Claims Under** *Alexander***'s Framework.**

553.  The Court in *Alexander* imposed additional requirements for the racial gerrymandering claim at issue in that case, including requiring racial gerrymandering plaintiffs to overcome a legislative presumption of good faith and disentangle race from politics. *Id*. at 6, 10. While these additional requirements were specific to the racial gerrymandering claim, *Williams* Plaintiffs have established their claim consistent with *Alexander's* requirements as well.

- 208 -

### i. *Williams* Plaintiffs Presented Sufficient Evidence to Overcome the Legislative Presumption of Good Faith.

554.    In *Alexander*, the Court announced that "when race and partisan preference are highly correlated . . . we start with a presumption that the legislature acted in good faith." *Id*. at 6. The Court explained that the presumption applies where race and partisanship could equally explain the contours of the redistricting plan at issue. *Id*. at 10. The legislative presumption of good faith directs courts to draw inferences that cut in the legislature's favor "when confronted with evidence that could plausibly support multiple conclusions" as to what drove the legislature to enact the particular district lines. *Id*. at 10. Plaintiffs may "overcome" the presumption by "rul[ing] out the possibility that politics drove the districting process." *Id*. at 20, 24; *accord Christian Ministerial All. v. Jester*, No. 4:23-CV-471, 2025 WL 1635282, at *2 (E.D. Ark. June 9, 2025).

555.    Even if the presumption applied, *Williams* Plaintiffs have overcome it because they have ruled out the possibility that politics could explain the pattern of racial sorting observed under the 2023 Plan.

556.    First, Legislative Defendants' own witness testimony disavows partisanship as the overriding consideration for the map. Tr. 942:20–943:18 (Hise). As Senator Hise testified, in creating the 2023 Plan, other considerations "were more important than partisan performance of a district." Tr. 943:9–18 (Hise) (emphasis added). Indeed, in response to the question at trial, "is it your testimony that partisan goals predominated in the drawing of the 2023 Congressional Plan," Senator Hise responded, "I didn't say [partisan goals] predominated." Tr. 942:20–24 (Hise). Instead, he explained that partisan

- 209 -

goals "were something [the committee] considered," but partisan advantage "d[id] not trump equal population," "contiguous[ness]," "compactness," or "those types of things." Tr. 942:20–943:8 (Hise).

557. As previously discussed, additional evidence supports the fact that race and partisanship are not in fact two equally plausible explanations for the district lines in CD-6, CD-12, and CD-14 in the 2023 Plan. Dr. Rodden demonstrated that even after accounting for partisanship, the patterns of clear racial sorting hold true. WX1 at 12, 17, 22; Tr. 46:12–23, 75:25–76:4 (Rodden). Within each partisan group, Black voters were much less likely than white voters to be included in CD-6 and CD-14 in the 2023 Plan and much more likely to be included in CD-12 than white voters. WX1 at 12, 17, 22.

558. Indeed, Legislative Defendants' own experts' analysis repeatedly found that even after controlling for party, Black voters were treated differently than white voters in a statistically significant way with racial effects that were larger than the partisan effects. *See, e.g.*, Tr. 1406:4–18 (Trende); LDTX266 at 95. And Dr. Barber, another of Legislative Defendants' experts, made no claims that partisanship was the predominant factor behind the 2023 Plan, Tr. 1115:8–10 (Barber), conceding that he could not rule out race as a motivating factor behind the map. Tr. 1115:21–1116:8 (Barber).

559. This case is therefore unlike *Alexander* in which the district court was found to have erred in citing "no evidence that could not also support the inference that politics drove the mapmaking process." 602 U.S. at 22. To the contrary, the evidence here demonstrates that politics does not explain the district boundaries, and Legislative

- 210 -

Defendants do not even claim politics was their overriding concern in creating the map. This evidence indicates that, even though Plaintiffs here need only prove that race was *a* motivating factor and not the *predominant* factor, race best "explain[s] [the] districts' contours." *Id.*

560.    Even if race was a means through which Legislative Defendants sought to achieve their partisan goals, "intentionally targeting a particular race[] . . . because its members vote for a particular party, in a predictable manner, constitutes discriminatory purpose. This is so even absent any evidence of race-based hatred and despite the obvious political dynamics." *McCrory*, 831 F.3d at 222–23.

561.    Legislative Defendants make much of the fact that Senator Hise testified that racial data was not consulted in drawing the district lines for the 2023 Plan. The Court is not persuaded by Legislative Defendants' disclaimers. The Court finds relevant that in the 2021 redistricting cycle, the North Carolina Supreme Court concluded that Senator Hise and the General Assembly considered redistricting factors that he disavowed considering in testimony under oath. *Supra* Section III.C.i; *cf. McCrory*, 831 F.3d at 223–24 ("A historical pattern of laws producing discriminatory results provides important context for determining whether the same decisionmaking body has also enacted a law with discriminatory purpose.").

562.    Legislative Defendants also argue that Plaintiffs cannot prevail because they provide no direct evidence of discriminatory intent. *See* ECF No. 125 at 3. This claim fails for multiple reasons. First, the *Alexander* Court made clear that it "kept the door open for"

Plaintiffs to prove their claim "with circumstantial evidence alone." 602 U.S. at 8. Put simply, "discriminatory intent need not be proved by direct evidence." *Rogers*, 458 U.S. 618. Second, Legislative Defendants took extraordinary measures to ensure evidence of their redistricting process would never be uncovered. They enacted unprecedented secrecy provisions in the 2023 Appropriations Act immediately before beginning the redistricting process to shield from public view those records most likely to contain direct evidence of discriminatory purpose. The court in *Alexander* offered the quintessential example of such direct evidence—"e-mails from state officials instructing their mapmaker to pack as many black voters as possible into a district," 602 U.S. at 8 (citation omitted)—precisely the type of evidence the General Assembly took pains to shield here.

563.    Specifically, Section 27.9(a) gave custodians of General Assembly records—records such as emails to mapmakers—the unilateral right to destroy such records. WX172 at 4; Tr. 946:4–22 (Hise). *See also supra* Section III.C.ii (discussing Appropriations Act's repeal of G.S. 120-133, which had made redistricting communications public; and its promulgation of Section 27.9(a), which granted legislators authority to refuse to reveal any document "made or received by that legislator while a legislator").

564.    Legislative Defendants' efforts at secrecy went even further. Legislative Defendants hired independent consultant Blake Springhetti to design "concepts" of maps to serve as a basis for the enacted plan, Tr. 1251:11–25, 1256:14–20 (Springhetti), but even Mr. Springhetti was kept in the dark about the bases for the legislature's decisionmaking. He made changes in response to requests from the redistricting chairs but was never

- 212 -

informed of the purpose for the changes, who the changes were coming from, or on what data the changes were based. Tr. 1254:20–1255:2, 1255:3–1256:25 (Springhetti). And at the end of the process, he did not know which criteria, if any, were ultimately used in the drawing of the 2023 Plan. Tr. 1258:1–16 (Springhetti). Nonetheless, Mr. Springhetti made every change that was requested of him and passed off his maps to the General Assembly, at which point he does not know how they were used. Tr. 1255:12–1256:13, 1256:18–1257:7 (Springhetti).

565.    This evidence, taken together with the other evidence presented by *Williams* Plaintiffs, including the 2023 Plan's discriminatory effect on Black voters, the substantial departures Legislative Defendants made from the ordinary redistricting process, and the evidence provided in support of the Senate Factors, demonstrate that race is the more likely explanation for the district lines than partisanship and, considered together, overcomes any presumption that the legislature here acted in good faith.

### ii.    *Williams* Plaintiffs Disentangled Race from Politics.

566.    Legislative Defendants relatedly claim that because race and partisanship are closely intertwined in North Carolina, *Williams* Plaintiffs must disentangle race and politics. The Court finds, however, that the decision in *Alexander* made clear that the requirement to disentangle race and politics arises specifically where defendants "raise[] a partisan gerrymandering" defense (to a claim of racial gerrymandering). 602 U.S. at 9. The Court explained that "[a] state's partisan-gerrymandering defense . . . raises special challenges for plaintiffs. To prevail, a plaintiff must 'disentangle race from politics' by

- 213 -

proving 'that the former drove a district's lines.'" *Id.* (internal citation and quotation marks omitted); *see also id.* at 6 (Plaintiffs "must disentangle race and politics if [they] wish[] to prove that the legislature was motivated by race *as opposed to partisanship*") (emphasis added); *id.* at 19 (requiring disentangling race and politics where "the defense contends that *the* driving force in its critical districting decisions . . . [was] partisanship") (emphasis added).

567. Here, Legislative Defendants do not claim that politics was *the* driving force behind the districts' lines, and they have not raised a partisan gerrymandering defense.[4]

568. Nor would the evidence support a defense that alleged partisanship was the predominant consideration in the legislature's redistricting calculus. As discussed, Senator Hise testified to the contrary, explaining that the General Assembly did not have specific partisan metrics in mind. Tr. 857:3–11 (Hise). Indeed, he left no doubt when he said "when you look at the list of the [redistricting] criteria, there are absolutes that we considered that were more important than partisan performance of a district." Tr. 943:9–18 (Hise) (emphasis added). In other words, partisanship, according to the legislature's redistricting chair, was not the General Assembly's overarching goal. For this reason, even if *Alexander*'s requirement to disentangle race from politics applied to intentional vote dilution claims, it would not apply here.

---

[4] In their pretrial brief, Legislative Defendants write: "because the criteria authorize partisan redistricting, [id.], Plaintiffs must overcome 'a partisan-gerrymandering defense.'" ECF No. 125 at 10 (quoting *Alexander*, 602 U.S. at 9). However, such a statement on its own—that the redistricting criteria *allowed for* partisanship to be considered— does not raise a partisan-gerrymandering defense. Legislative Defendants did not plead such a defense in their Answer, *see* ECF No. 33 at 20–21 (listing affirmative defenses), nor, beyond this passing mention of the redistricting criteria, include such a defense in their pretrial briefing, *see* ECF No. 125.

569.     Nonetheless, the Court concludes that, even though it is not part of their affirmative burden on either of their intent claims, *Williams* Plaintiffs presented evidence that effectively disentangled race from politics. In *Alexander*, the Court recognized that it "may be difficult for challengers to find . . . evidence sufficient to show that race was the overriding factor" in the legislature's consideration; therefore, the Court explained that plaintiffs may disentangle race and politics "by showing that the legislature used 'race as a proxy' for 'political interest[s],'" 602 U.S. at 7 n.1 (quoting *Miller v. Johnson*, 515 U.S. 900, 914 (1995)), or that "the State's chosen map conflicts with traditional redistricting criteria" such as "compactness, contiguity, and core preservation," *id*. at 8. *Williams* Plaintiffs made both showings here.

570.     First, the fact that Blacks voters of all party affiliations were kept out of challenged Districts 6 and 14 and placed in CD 12 at higher rates than whites of all party affiliations, strongly suggests that race rather than partisanship was the criteria mapmakers used to make districting decisions. *See, e.g.*, WX1 at 12; Tr. 46:12–23 (Rodden). And multiple expert analyses also showed that race played an outsized and statistically significant role in the placement of voters even when controlling for party. *See supra* Section III.A.i (discussing Dr. Rodden's regressions), Section III.A.iii (discussing Dr. Trende's regressions).

571.     Even if race was used as a stand-in to create a strong Republican map, "intentionally targeting a particular race[] . . . because its members vote for a particular party, in a predictable manner, constitutes discriminatory purpose." *McCrory*, 831 F.3d

222–23. Moreover, additional evidence adduced at trial supports the claim that race was used as a proxy for political interests. Senator Hise testified that Black voters are more reliable Democrats than white voters and admitted general knowledge about where in North Carolina Black voters tend to be concentrated. *See supra* Section III.A.v. Several other witnesses corroborated the fact that Black voters in North Carolina are extremely reliable Democrats, making them an easy target for legislators interested in favoring Republicans. *See supra* Section III.A.ii (Rodden), Section III.A.v (Alford), Section IV.A (Palmer and Alford).

572. Moreover, several of Dr. Rodden's analyses disentangled race from politics, including his county envelope regressions and review of race-blind simulations, which demonstrated that the 2023 Plan was a racial outlier, especially in the Piedmont Triad and the Mecklenburg area, when compared against race-neutral pro-Republican simulated plans and the General Assembly's own draft plans. *See supra* Section III.A.i, ii.

573. This case is therefore unlike *Alexander* in which the Court criticized the district court for "provid[ing] no explanation why a mapmaker who wanted to produce a . . . safely Republican [map] would use data about voters' race rather than their political preferences." 602 U.S. at 22. The evidence shows that the General Assembly had good reason to target Black voters—they are strong and consistent Democrats, Tr. 875:16–876:24; 957:11–958:14 (Hise)—and Senator Hise was aware of that fact, Tr. 959:11–18, 911:4–10 (Hise). Indeed, in prior litigation, an expert for the State conceded that "in North Carolina, African-American race is a *better* predictor for voting Democratic than party

- 216 -

registration." *McCrory*, 831 F.3d at 225 (emphasis added); *see also id.* at 223 ("North Carolina's history of race discrimination" is "particularly relevant" to the intentional discrimination analysis).

574. Second, the 2023 Plan conflicts with traditional redistricting criteria, including "compactness, contiguity, and core preservation*," Alexander*, 602 U.S. at 8. For example, Dr. Rodden demonstrated that the 2023 Plan saw a marked decrease in compactness in CD-6, CD-9, CD-10, and CD-13, WX1 at 6–7; Tr. 35:4–22 (Rodden); an increase in county splits, WX1 at 8; Tr. 35:23–36:8 (Rodden); and an increase in municipality splits, including in each of the Triad's major cities Winston-Salem, High Point, and Greensboro. WX1 at 8, 14; Tr. 36:9–14 (Rodden). In the Mecklenburg area, Dr. Rodden showed that the 2023 Plan made CD-8, CD-12, and CD-14 less compact, WX1 at 6–7, 18–20; Tr. 73:19–74:3 (Rodden), and increased the number of county and municipal splits in the area. WX1 at 8; Tr. 74:4–74:14 (Rodden). And while Senator Hise suggested that the General Assembly prioritized these traditional redistricting principles, the evidence shows otherwise. Tr. 942:20–943:8 (Hise).

575. That this map performs worse than the 2022 Plan on traditional redistricting criteria and cannot be explained by politics strongly supports the inference that race drove the districting lines. And this case is further unlike *Alexander*, in which the Court concluded that "the high priority that the legislature gave to its partisan goal provide[d] an entirely reasonable explanation for the subordination of other objectives such as the avoidance of county splits," 602 U.S. at 21, because here partisanship was *not* given the

- 217 -

highest priority but was instead subordinated to other goals, Tr. 943:9–18, which were themselves subordinated to race.

576. Finally, Legislative Defendants themselves offered evidence that the racial sorting apparent in the 2023 Plan was not necessary to achieve their professed partisan goals. For example, Dr. Barber produced numerous simulated plans that achieved the same ten Republican-leaning districts as the 2023 Plan. *See supra* Section III.A. However, the 2023 Plan's distribution of Black voters across districts—especially its unusual and narrow clustering of BVAP around 20% in 11 out of 14 districts, with an even narrower range in the Triad—never occurs in simulated plans that have a similar partisan breakdown to the 2023 Plan. WX2 at 20; Tr. 84:15–21 (Rodden).

577. Accordingly, even though *Alexander's* requirement that Plaintiffs disentangle race and politics does not apply to intentional vote dilution claims, and does not apply to the claims at issue here for the additional reason that Legislative Defendants failed to properly raise a partisan gerrymandering defense, for the reasons stated above, the Court finds that Plaintiffs have made a showing that disentangles race from politics, "ruling out the competing explanation that political considerations dominated the legislature's redistricting efforts*." Alexander*, 602 U.S. at 9–10.

## IX.  Irreparable Harm and the Equities Weigh in Favor of a Permanent Injunction

578. *Williams* Plaintiffs seek a permanent injunction barring Legislative Defendants from "enforcing or giving any effect to" the Plan and against "conducting any further congressional elections under" the Plan. *See* ECF No. 108 at 33–34 (Prayer for

Relief). "[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010). A plaintiff must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* at 156–57. The last two factors merge here "because the government's interest *is* the public interest." *See Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

579.    Here, all factors weigh in favor of granting *Williams* Plaintiffs' requested injunctive relief. The Supreme Court has recognized that voting is "a fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). "And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). *Williams* Plaintiffs have demonstrated that the Plan dilutes Black voting strength in the challenged districts in North Carolina. In particular, *Williams* Plaintiffs, who are Black voters that live and vote in current and former CD-6, CD-12, and CD-14, have demonstrated that the 2023 Plan cracks Black voters from former CD-6 among four disparate districts (CD-5, CD-6, CD-9, and CD-10), in which they can no longer elect candidates of their choice. Additionally, they

have demonstrated that the Plan dilutes the votes of Black North Carolinians in former CD-14, eliminating the opportunity to elect candidates of their choice in that district, and instead packs them into CD-12, a district in which Black voters were already comfortably able to elect candidates of their choice. *See Voinovich*, 507 U.S. at 154 ("'Dilution of racial minority group voting strength may be caused' either 'by the dispersal of [minorities] into districts in which they constitute an ineffective minority of voters or from the concentration of [minorities] into districts where they constitute an excessive majority.'").

580. "Courts routinely deem restrictions on fundamental voting rights irreparable injur[ies]." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (collecting cases); *see also, e.g., Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (similar). This is in part because "[o]nce an election occurs, there can be no do-over and no redress." *League of Women Voters of N.C.*, 769 F.3d at 247. The injury to the affected Black voters "is real and completely irreparable if nothing is done to enjoin" the law. *Id*. Therefore, as to the first and second injunction factors, the Court finds that *Williams* Plaintiffs have suffered an irreparable injury, the dilution of their voting strength, and that remedies at law are inadequate to compensate that injury.

581. On the last two factors, "[b]y definition, the public interest . . . favors permitting as many qualified voters to vote as possible." *Id*. (cleaned up). And "upholding constitutional rights serves the public interest." *Newsom v. Albemarle Cnty. Sch. Bd., 354 F.3d 249, 261 (4th Cir. 2003); *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (noting the public has a "strong interest in exercising the fundamental political right to vote." (citations

omitted)). Other courts have weighed the harm of vote dilution "against the harm that Defendants assert they will suffer—the administrative burden of drawing and implementing a new map, and upsetting candidates' campaigns"—and concluded that "the irreparable harm to . . . plaintiffs' voting rights is greater." *Singleton*, 582 F. Supp. 3d at 1027.

582. The Court concludes that all factors weigh in favor of an injunction. The requested permanent injunction of the 2023 Plan and the creation and adoption of a lawful redistricting plan is granted.

## X. Remedy

583. The Court hereby permanently enjoins Defendants from qualifying candidates and conducting any forthcoming elections under 2023 Plan.

584. When a plan is declared unlawful, a state is typically given the first opportunity to draw a plan that remedies the Section 2 and constitutional violations by enacting a new plan. However, the 2023 Plan represents the third time in as many years that North Carolina's congressional maps have been redrawn. And a District Court "has its own duty to cure illegally [drawn] districts through an orderly process in advance of elections." *Covington*, 585 U.S. at 977. Given the General Assembly's repeated failure to draw lawful maps, the Court declines to offer the legislature another bite at the apple. *See id.* (affirming the district court's determination that "'providing the [legislature] with a second bite at the apple' risked 'further draw[ing] out these proceedings and potentially interfer[ing] with the . . . election cycle'"); *Singleton v. Allen*, 690 F. Supp. 3d 1226, 1320

- 221 -

(N.D. Ala. 2023) (declining to provide the Alabama Legislature with a "second bite at the apple" after enjoining the plan at issue, and instead "directing [a] Special Master and his team to draw remedial maps" (quotation omitted)); *see also Common Cause v. Rucho*, 318 F. Supp. 3d 777, 943 (M.D.N.C. 2018), *vacated and remanded on other grounds*, 588 U.S. 684 (2019) ("When a court finds a remedial districting plan also violates the Constitution, courts generally do not afford a legislature a second 'bite-at-the-apple' to enact a constitutionally compliant plan.").

585.    The demonstrated discriminatory purpose behind the 2023 Plan further cautions against allowing the Legislature another opportunity to redraw the congressional map. "When discriminatory intent impermissibly motivates the passage of a law, a court may remedy the injury — the impact of the legislation — by invalidating the law." *McCrory*, 831 F.3d at 238. And "once a plaintiff has established the violation of a constitutional or statutory right in the civil rights area, . . . court[s] ha[ve] broad and flexible equitable powers to fashion a remedy that will fully correct past wrongs." *Id.* (quoting *Smith v. Town of Clarkton*, 682 F.2d 1055, 1068 (4th Cir. 1982)). "In other words, courts are tasked with shaping [a] remedial decree . . . to place persons who have been harmed by an unconstitutional provision in the position they would have occupied in the absence of [discrimination]." *Id.* (cleaned up). Allowing a legislature that has been proven to enact legislation with racially discriminatory intent to once again draw congressional districts would not constitute a complete remedy in this case. "That remedy must reflect our finding that the [2023 Plan was] motivated by an impermissible discriminatory intent and must

ensure that those provisions do not impose any lingering burden on African American voters." *Id.*

586.    The Court will appoint a special master pursuant to Federal Rule of Civil Procedure 53 to facilitate the creation of a lawful plan. *See, e.g.*, *Covington*, 585 U.S. at 977 (concluding "that the District Court's appointment of a Special Master" to "draw up an alternative remedial map" "was not an abuse of discretion"). If such a plan cannot be completed prior to December 1, 2025, the last date by which the North Carolina State Board of Elections has represented that it "would need to receive the new map" to allow the Board an opportunity to "timely complete the necessary administrative reassignment of voters to new districts," State Bd. Trial Br. at 3, ECF No. 126, the 2026 elections shall be administered under the 2022 Plan.

## CONCLUSION

For the foregoing reasons, *Williams* Plaintiffs respectfully request that the Court adopt these proposed findings of fact and conclusions of law on *Williams* Plaintiffs intentional discrimination and intentional vote dilution claims. *Williams* Plaintiffs request that the Court conclude that the 2023 Plan is unconstitutional in violation of the Fourteenth and Fifteenth Amendments and constitutes intentional vote dilution in violation of Section 2 of the VRA.

As a remedy, *Williams* Plaintiffs request that the Court enjoin Defendants and their agents and successors from implementing, enforcing, or giving any effect to the 2023 Plan,

- 223 -

and take all necessary action to appoint a special master to facilitate the creation of a lawful congressional plan in the State of North Carolina.

Dated: August 5, 2025

/s/ *Narendra K. Ghosh*
**PATTERSON HARKAVY LLP**

Narendra K. Ghosh, NC Bar No. 37649
100 Europa Drive, Suite 420
Chapel Hill, NC 27517
Phone: (919) 942-5200
nghosh@pathlaw.com

*Counsel for* Williams *Plaintiffs*

/s/ *Lalitha D. Madduri*
**ELIAS LAW GROUP LLP**

Lalitha D. Madduri*
Christina Ford*
Lucas Lallinger*
Qizhou Ge*
Mark Haidar*
250 Massachusetts Avenue, Suite 400
Washington, D.C. 20001
Phone: (202) 968-4490
Facsimile: (202) 968-4498
LMadduri@elias.law
CFord@elias.law
LLallinger@elias.law
AGe@elias.law
MHaidar@elias.law

Abha Khanna*
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
Phone: (206) 656-0177
Facsimile: (206) 656-0180
AKhanna@elias.law

* *Special Appearance pursuant to Local Rule 83.1(d)*

- 224 -