# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

SHAUNA WILLIAMS, et al.,

     *Plaintiffs*,

    v.

REPRESENTATIVE DESTIN HALL, in his official capacity as Chair of the House Standing Committee on Redistricting, et al.,

     *Defendants*.

_____

NORTH CAROLINA STATE CONFERENCE OF THE NAACP, et al.,

     *Plaintiffs*,

    v.

PHILIP BERGER, in his official capacity as the President Pro Tempore of the North Carolina Senate, et al.,

     *Defendants.*

Civil Action No. 23 CV 1057

Civil Action No. 23 CV 1104

## NAACP PLAINTIFFS' FIRST SUPPLEMENTAL COMPLAINT

## INTRODUCTION

1.      In October of 2025, with breathtaking speed and disregard for tradition, public participation, and accountability, the North Carolina General Assembly took the unprecedented step of gratuitously redistricting two of its own hand-crafted U.S. Congressional districts. This rash action imposes the fifth new Congressional map in six years on North Carolinians. The 2025 redistricting was not prompted by the release of a decennial Census, a court order, a preference to replace a court-drawn map, or any other legitimate state interest or independent intervening cause. Rather, this extraordinary action was entirely discretionary and undertaken with precision to target Black voters in North Carolina's Northeastern Black Belt region who, at overwhelming rates in 2024, joined together to vote against the preferred candidates and policies of those leading the General Assembly.

2.      The changes in Senate Bill 249 (S.L. 2025-95) now supersede the configurations of Congressional Districts 1 and 3 in the General Assembly's prior 2023 Congressional Plan, S.L. 2023-145. The 2023 Congressional Plan was challenged in this matter as intentionally discriminatory against Black voters living in North Carolina's historic Black Belt Congressional District 1 as well as the Triad Congressional Districts 5, 6, and 10. In redrawing Congressional Districts 1 and 3 in 2025, Senator Ralph Hise (who represents nine counties in the far western part of the state and who led the map-drawing efforts) once again targeted Congressional District 1, further exacerbating the dilution of Black voting power already imposed by the 2023 Congressional Plan through a textbook cracking of the region's Black Voting Age Population ("BVAP").

2

3. In one fell swoop, the General Assembly wiped North Carolina's historic Black Belt Congressional District off the map, silencing Black voters by denying them any reasonable opportunity of electing their candidate of choice to the U.S. House of Representatives and thereby shutting them out completely from the electoral process for this office. This area of the state is historically significant and, since the election of Eva Clayton following the 1990 release of the U.S. Census, it has held a longstanding district that provided Black voters an opportunity to elect their candidate of choice. The area is also characterized by extreme racially polarized voting whereby White voters can easily overwhelm the will of Black North Carolinians. Yet, over the years, the General Assembly has intentionally decreased the number and percentages of Black voters in that district. The 2025 changes represent the culmination of this effort, with a decrease in the BVAP percentage by an insurmountable eight points.

4. By putting Congressional District 1 in their crosshairs once again in 2025, this time for even more dramatic dilution, Senator Hise and the General Assembly have unlawfully targeted Black voters in violation of the Voting Rights Act of 1965 and the Fourteenth and Fifteenth Amendments. As one Air Force Veteran testified during Senate Bill 249's rushed consideration: "You don't need to use racial data to see racial impact. When a district that has elected a Black representative for decades is redrawn so those voters can no longer elect a candidate of their choice, that's not balance, that's silence."[1]

---

[1] H. Redistricting Comm. Audio at 51:38–51:53, (N.C. Oct. 21, 2025) (statement of Gerald Givens, Jr.) https://webservices.ncleg.gov/ViewDocSiteFile/101177 (hereinafter "Oct. 21 H. Redistricting Comm. Audio").

5.     The General Assembly selected the historic Black Belt as its target when it elected to undertake redistricting yet again in 2025 and punish voters for their actual or imputed voting patterns in past election cycles, especially the 2024 presidential and Congressional elections, as well as for their litigation activity in challenging the prior Congressional maps. Senator Hise testified to utilizing 2024 electoral data specifically to redraw Congressional Districts 1 and 3, with the goal of hindering to the greatest extent possible any repeat of electoral outcomes he and other General Assembly majority leaders would find undesirable.

6.     This conduct is unlawful retaliation against these voters, including Plaintiffs, for their political speech and association, in violation of the First Amendment. The 2025 redistricting is unmoored from any legitimate state interest, such as the need to equalize populations, replace a court-ordered plan, or to comply with a court order, and thus presents an unprecedented set of circumstances. Absent relief from this Court, the General Assembly's actions in unilaterally initiating the redistricting process solely to punish voters will set a dangerous precedent and incentivize regularized, retaliatory redistricting following every federal election. It foreshadows a relentless game of whack-a-mole against voters, in which even a hint of dissent will cause the hammer to come down through targeted line-drawing against communities whose voters dare differ from the views of those in power.

7.     This system would create a troubling adversarial relationship between legislators and the people whom they purport to represent and in whom all political power is vested in this State. *See* N.C. Const. art. I, § 2 ("All political power is vested in and

derived from the people; all government of right originates from the people, is founded upon their will only, and is instituted solely for the good of the whole."). It would also fundamentally frustrate the core purpose of the U.S. House of Representatives, a body designed to represent "*the people*" and *not* the state. *See* 3 Records of the Federal Convention of 1787 (Max Farrand ed., 1911) 14, at 462 (emphasis in original, quoting William Samuel Johnson of Connecticut). This is not a matter of degree: the intended and effectuated harm is not reasonably in dispute nor ancillary to any legitimate state interest or redistricting criteria. Instead, the General Assembly's 2025 redistricting thus presents a bright-line-case of government action undertaken solely to punish dissenting political speech and discourage litigation protecting statutory and constitutional rights, and targeting a minority racial group (here, Black voters) to do so.

8.      Failure to restrain this oppressive government action will also violate the foundational ability of citizens to petition their government for a redress of grievances. Earlier this year, after two years of discovery and litigation on the challenge to the 2023 Congressional Plan, this Court presided over a full trial on the merits and heard the testimony of dozens of witnesses, including Plaintiffs from the historic Black Belt in Congressional District 1 and representatives from community organizations from the region.

9.      But with the result from the trial still pending, the General Assembly specifically targeted Congressional District 1 again, including those voters who stood up for their rights and challenged the prior unlawful round of redistricting in this Court, by making the very dilution that those voters experienced and challenged in court *even worse*.

5

In changing the maps while this case was *sub judice*, legislative leaders smeared Plaintiffs' actions in bringing this suit to protect their Constitutional and statutory rights as merely a politically motivated "sue-until-blue strategy," and vowed that the General Assembly would "not be sued into submission."[2] The targeting of Congressional District 1 threatens to block Plaintiffs mid-way through their efforts to petition a court for redress, and indeed seeks to punish and retaliate against them for doing so.

10.     Existing Plaintiffs North Carolina State Conference of the NAACP ("North Carolina NAACP"), Common Cause, Mitzi Reynolds Turner, Dawn Daly-Mack, Corine Mack, Calvin Jones, Linda Sutton, Syene Jasmin as well as new Plaintiffs Arthur Lee Johnson, Barbara Jean Sutton, and Courtney Patterson ("NAACP Plaintiffs" or "Plaintiffs"), file this First Supplemental Complaint pursuant to Rule 15(d) to the Federal Rules of Civil Procedure to set forth events that occurred after the filing of this action and the trial held in June and July of 2025, and to seek a preliminary and a permanent injunction against Senate Bill 249 ("S.B. 249"). This First Supplemental Complaint is filed in addition to and to supplement the allegations and causes of action within the NAACP Plaintiffs' First Amended Complaint, Doc. 105, all of which are realleged and reincorporated by reference herein.

---

[2] Senator Phil Berger (@SenatorBerger), X, (Sept. 24, 2025),
https://x.com/SenatorBerger/status/1971312679420821513; *H. Chamber Audio* at 1:34:12–1:34:18, (N.C. Oct. 22, 2025) (statement of Rep. Brenden Jones) https://webservices.ncleg.gov/ViewDocSiteFile/101215 (hereinafter "Oct. 22 H. Chamber Audio").

## SUPPLEMENTAL FACTUAL ALLEGATIONS

*Additional Plaintiff Allegations*

11.     Plaintiff Dawn Daly-Mack resides in 2025 Congressional District 1. In the 2024 election, she voted for congressional candidate Representative Don Davis and presidential candidate Kamala Harris.

12.     Plaintiff Calvin Jones resides in 2025 Congressional District 1. In the 2024 election, he voted for congressional candidate Representative Don Davis and presidential candidate Kamala Harris.

13.     Plaintiff Arthur Lee Johnson is a Black citizen of the United States and of the State of North Carolina. He is a resident of Wilson County and a member of the NAACP. Mr. Johnson's residence was located in Congressional District 1 under the 2023 Congressional Plan and is now in 2025 Congressional District 3. Mr. Johnson is a registered voter who has regularly voted in the past and intends to vote in the future. In the 2024 election, he voted for congressional candidate Representative Don Davis and presidential candidate Kamala Harris.

14.     Plaintiff Barbara Jean Sutton is a Black citizen of the United States and of the State of North Carolina. She is a resident of Lenoir County and a member of the NAACP. Ms. Sutton's residence was located in Congressional District 1 under the 2023 Congressional Plan and is now in 2025 Congressional District 3. Ms. Sutton is a registered voter who has regularly voted in the past and intends to vote in the future. In the 2024 election, she voted for congressional candidate Representative Don Davis and presidential candidate Kamala Harris.

7

15. Plaintiff Courtney Patterson is a Black citizen of the United States and of the State of North Carolina. He is a resident of Lenoir County and a member of the NAACP. Mr. Patterson's residence was located in Congressional District 1 under the 2023 Congressional Plan and is now in 2025 Congressional District 3. Mr. Patterson is a registered voter who has regularly voted in the past and intends to vote in the future. In the 2024 election, he voted for congressional candidate Representative Don Davis and presidential candidate Kamala Harris.

16. The North Carolina State Conference of the NAACP has members who are registered voters self-identifying as Black or African American and whose residences are: (a) in the 2023 and 2025 configurations of Congressional District 1; and (b) in 2023 Congressional District 1 and 2025 Congressional District 3.

17. Common Cause has members who are registered voters self-identifying as Black or African American and whose residences are: (a) in the 2023 and 2025 configurations of Congressional District 1; and (b) in 2023 Congressional District 1 and 2025 Congressional District 3.

18. Plaintiffs have petitioned and will continue to petition their congressional representatives on issues of public concern. Specifically, Plaintiffs Calvin Jones, Barbara Jean Sutton, Arthur Lee Johnson, Courtney Patterson, and the North Carolina NAACP and its members have each communicated with Representative Don Davis about the needs and concerns of the Black community. For example, Plaintiff Courtney Patterson, life member and First Vice President of the North Carolina NAACP, testified before this Court on June 18, 2025, that he had interacted with Representative Davis about his votes in Congress and

about how to best meet the needs of the Black community he represents. Trial Tr. Vol. III at 600:10–14. Mr. Patterson highlighted advocacy around a sanctuary bill considered by Congress in 2025, and noted that many Black voters would not support Representative Davis in voting for the bill. *Id.* at 599:25–600:5.

19. The change in North Carolina Congressional Districts 1 and 3 has impaired and will continue to impair Plaintiffs' ability to petition their Congressional representatives by materially changing the communities to which these elected representatives answer. Plaintiff Courtney Patterson, with respect to the sanctuary bill, noted at trial that Representative Davis' "representation of African-Americans would be less than what it would be had he had a district that was more . . . like the previous district" and that "it's definitely been very difficult in terms of getting him to maybe see where the Black people that he represented issues needed to be met." *Id.* at 600:6–14. Plaintiff Calvin Jones also noted that when Pitt County was in his Congressional district, his community was better able to "work together" with Representative Davis and Pitt County, "and that definitely makes a difference." *See* Trial Tr. Vol. II at 357:4–16.

*2025 Trial Challenging the 2023 Congressional Plan*

20. In June and July of 2025, this Court presided over a full trial on the merits of Plaintiffs' claims challenging the 2023 Congressional Plan. Plaintiffs specifically challenged the configuration of Congressional Districts 1, 5, 6, and 10 as intentionally discriminatory against Black voters, including Plaintiffs, in violation of Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments. *See generally* NAACP Plaintiffs' Proposed Findings of Fact and Conclusions of Law, Doc. 165.

9

21.     As relevant here, extensive and unrebutted evidence adduced at trial proves that voting in North Carolina's Black Belt is extremely polarized along racial lines. Specifically, Plaintiffs' expert Dr. Kassra Oskooii estimated near-complete racial polarization in the 2024 Presidential and Congressional elections in Congressional District 1: an estimated 98.3% of Black voters supported Representative Don Davis compared to just 13% of White voters; an estimated 98.3% of Black voters supported presidential candidate Kamala Harris compared to just 9.1% of White voters. Both of these elections were racially contested, with White voters overwhelmingly supporting the White and White-preferred candidate and Black voters overwhelmingly supporting the Black and Black-preferred candidate.



Figure 9 (RxC 2024 Endogenous Election RPV Results, 2023 Enacted CLDs), from March 17, 2025 Supplemental Expert Report of Dr. Kassra A.R. Oskooii (Trial Ex. NAACPPX 208)



Figure C-5 (EI RxC 2024 Exogenous RPV Results, 2023 Enacted CLD 1), Appendix C to March 17, 2025 Supplemental Expert Report of Dr. Kassra A.R. Oskooii (Trial Ex. NAACPPX 211)

22.     Evidence adduced at trial also showed that the primary map-drawer of Congressional plans in 2023 and 2025, Senator Ralph Hise, has extensive knowledge of racial demographics in the state. *See, e.g.,* Doc. 165 at 176–78, 268–75. Thus, Senator Hise

was able to target Black voters in 2023's dilution of Congressional District 1, notwithstanding whether racial data was visible on any screen.

23.     At trial, Defendants argued that "no evidence reflects racially discriminatory effect in CD1" because it "performed in 2024 for Democrats whom Plaintiffs identified as the Black-preferred candidates." Doc. 164-1 at 37-38 (Legislative Defendants' Post-Trial Conclusions of Law). Defendants argued that "Plaintiffs cannot credibly claim discriminatory effect where their candidates of choice prevailed" and where "the BVAP of these districts did not meaningfully change between plans." *Id.* at 38.

24.     Post-trial briefing on the 2023 Congressional Plan challenge was completed on August 5, 2025.

*Lead-up to 2025 Redistricting Process*

25.     On September 25, 2025, Senator Phil Berger, the longtime leader of the state Senate, posted from a campaign-related account on the social media platform X, stating that "We have drawn four Congressional maps in the last six years in redistricting fights with Democrats because of their sue-until-blue strategy. If we have to draw one more map this year, we will. That said, I've never spoken to President Trump about this or an endorsement."[3]

26.     Then, on October 13, Senator Berger's office issued a press release announcing the General Assembly would convene the following week to consider new Congressional maps to answer Trump's call to bolster voting maps in favor of the

---

[3] Senator Phil Berger (@SenatorBerger), X, (Sept. 25, 2025), https://x.com/SenatorBerger/status/1971312679420821513.

Republican party, with Senator Berger stating: "President Trump delivered countless victories during his first term in office, and nine months into his second term, he continues to achieve unprecedented wins. We are doing everything we can to protect President Trump's agenda, which means safeguarding Republican control of Congress."[4]

27. Several other legislators also contributed to the same press release. Senate Redistricting Chairman Ralph Hise stated, "North Carolina was the target of the Democrats' sue-until-blue scheme, and we're prepared to bring forward a new Congressional map to defeat this new scheme." House Speaker Destin Hall stated: "President Trump earned a clear mandate from the voters of North Carolina and the rest of the country, and we intend to defend it by drawing an additional Republican Congressional seat." And House Redistricting Chairmen Brenden Jones and Hugh Blackwell stated: "We're stepping into this redistricting battle because California and the radical left are attempting to rig the system to handpick who runs Congress."

28. But the proposed changes to the 2023 Congressional Plan were not released at that time for public inspection. In fact, the draft map was not made available to the public until Thursday, October 16, a mere four days before the first vote on the maps and while the General Assembly was temporarily out of session.[5]

*2025 Legislative Process*

---

[4] Senator Berger Press Shop, *General Assembly Heeds President Trump's Call to Thwart Blue State Attempts to Take Congress*, Medium (Oct. 13, 2025), https://bergerpress.medium.com/general-assembly-heeds-president-trumps-call-to-thwart-blue-state-attempts-to-take-congress-4cecd10f5582.
[5] Senator Berger Press Shop, *Public Comment Period Open for Proposed Congressional Map*, Medium (Oct. 16, 2025), https://bergerpress.medium.com/public-comment-period-open-for-proposed-congressional-map-bbc2c3818816.

29.     On the afternoon of Thursday, October 16, the Senate Committee on Elections issued notice for a meeting to be held on Monday, October 20 at 10:00am. The notice shared that "[t]he Committee will consider and vote on the 2025 Congressional map." It included a link to "[d]ocuments related to the map," as well as a "public comment portal."

30.     On the afternoon of Sunday, October 19, the Senate Committee on Elections sent an updated notice for the meeting, adding a piece of legislation styled as S.B. 249 to the meeting agenda, with a note that a "[Proposed Committee Substitute] to S249 will be considered and voted."

31.     As filed on March 6, 2025, S.B. 249 was originally a piece of campaign finance legislation designed to exempt certain political party groups from campaign sales reporting requirements for the purchase price of goods or services. The legislation had passed its first reading in this form on March 10.[6]

32.     The reason for adding S.B. 249 to the agenda soon became clear. Rather than filing the proposed changes to the 2023 Congressional Plan as a new bill, they would be presented in the form of a "Proposed Committee Substitute" supplanting existing, unrelated legislation (*i.e.*, S.B. 249).  Using this maneuver, legislative leaders bypassed the Senate's required procedure mandating a first readings of newly filed bills.

---

[6] Legislative History, Realign Congressional Districts 2025, S.B. 249/S.L. 2025-95 (N.C. 2025), https://www.ncleg.gov/BillLookUp/2025/S249.

13

33.     On October 20, shortly after 10:00am, the Senate Elections Committee met to discuss the proposed map. At the start of the meeting, the committee members took a voice vote to consider the Proposed Committee Substitute to S.B. 249.

34.     Senator Hise was then called on to explain the bill. He stated that "the motivation behind this redraw is simple and singular: Draw a new map that will bring an additional Republican seat to the North Carolina congressional delegation."[7] He explained that "[t]he only districts that are changed in the new proposal are NC1 and NC3," with Greene, Lenoir, Wayne and Wilson counties being moved from Congressional District 1 to Congressional District 3, while Beaufort, Carteret, Craven, Dare, Hyde, and Pamlico counties would move from Congressional District 3 to Congressional District 1.[8] According to Senator Hise, the proposed change "moves NC District 1 from a district where President Trump earned 51% of the vote in 2024 to 55% of the vote," and "[t]he end result is a Congressional map that should perform to elect 11 Republicans."[9]

35.     This explanation was consistent with the published "Plan Criteria," which indicated that "[t]he principal legislative objective in the 2025 Congressional Plan is to increase the Republican vote share of Congressional District 1 to outperform the same district in the 2023 Congressional plan."[10]

---

[7] *S. Elections Comm. Audio* at 4:00–4:15, (N.C. Oct. 20, 2025). https://webservices.ncleg.gov/ViewDocSiteFile/101162 (hereinafter "Oct. 20 S. Elections Comm. Audio").
[8] Oct. 20 S. Elections Comm. Audio at 8:10–8:48.
[9] Oct. 20 S. Elections Comm. Audio at 9:29–10:01.
[10] 2025 Congressional Plan Criteria, N.C. General Assembly, https://webservices.ncleg.gov/ViewDocSiteFile/101156 (last visited Oct. 27, 2025).

14

36.    Throughout the meeting, Senator Hise repeatedly claimed to have been the one to have drawn the map, with "several members of central staff" and "pro tem staff" present.[11]

37.    When asked how the decision was made as to which counties would be moved between Congressional Districts 1 and 3, Senator Hise explained, "[w]e looked at what the political outcome was of all of the counties as well as the VTDs in eastern North Carolina as we were trying to balance the electoral outcomes of the two districts, so coming in and trying to move that margin from a, basically a 60-50 split closer to a 55 split."[12]

38.    Senator Hise also noted that this map split a precinct in Swansboro. When asked to further explain why the Swansboro precinct was chosen to be split, as opposed to any other option, Senator Hise explained that it was based on political considerations: "[A]fter you've shifted the counties and you have to balance population when, when you look at those borders, its political performance was most in line with trying to move the entire districts to the balance we were looking for."[13]

39.    Senator Hise repeatedly disavowed having used racial data in creating the proposed map and asserted yet again that no evidence of legally significant racially polarized voting was submitted during the last round of redistricting.[14] Senator Hise did admit that he has "general knowledge of the demographics of this state" and that he is "aware that District 1 has a higher minority population than the state average."[15] He

---

[11] *See, e.g.*, Oct. 20 S. Elections Comm Audio at 52:35–53:46.
[12] *Id.* at 19:55–20:45.
[13] *Id.* at 32:03–32:32.
[14] *See, e.g.*, *Id.* at 41:30–42:10.
[15] *Id.* at 44:30–45:46.

likewise confirmed that he was aware that North Carolina only has three Black Congressional representatives—which he identified as a "low number."[16] And he confirmed that he is "generally aware of where [incumbent] Representative Murphy and others"—namely Representative Don Davis—"live."[17]

40. When asked whether those involved in drawing the map "identif[ied] any other issues with the prior congressional map that you attempted to address," Senator Hise responded, "I did not identify any additional things that had to be remedied other than the breakdown of the districts within eastern North Carolina and how they would produce Republican representatives."[18]

41. When asked whether partisan performance data was used, Senator Hise explained that "[w]hat we looked at particularly were election outcomes" and further noted "[o]bviously, we focused most on, this does have the 2024 data, which we've not had in an opportunity to draw before. So there's a lot looking at the 2024, especially the presidential elections."[19] In other words, Senator Hise considered whether voters voted for or against President Trump and Republican congressional candidates in 2024 and redrew the lines on that basis.

42. When confronted by committee members about the rushed process and lack of opportunities for substantial public input, Senator Hise repeatedly dismissed the need for additional public comment.[20]

---

[16] Oct. 20 S. Elections Comm Audio at 36:42–36:57.
[17] *Id.* at 26:12–26:38.
[18] *Id.* at 25:12–25:38.
[19] *Id.* at 25:41–26:12.
[20] *Id.* at 49:35–50:51.

43. Senator Hise mistakenly claimed that mid-decade redistricting was undertaken in the 1960s by Democrats in a similar posture.[21] Senate Minority Leader Sydney Batch later corrected the record, noting that the prior redistricting in 1967 was undertaken to comply with new one-person, one-vote requirements following a Supreme Court decision and subsequent court orders.[22] Other than this one incorrect example, Senator Hise did not identify any instance in which the General Assembly had previously undertaken mid-decade redistricting absent a court order or an expiring court order that required redistricting.[23]

44. At the end of the meeting, the Senate Elections Committee voted in favor of S.B. 249.

45. After that meeting, the newly replaced S.B. 249 was briefly re-referred to the Committee on Rules and Operations of the Senate but then withdrawn from that committee without any meeting and instead placed on the Senate's floor calendar.[24]

46. Thus, just hours after it was discussed in committee, S.B. 249 proceeded to the Senate floor for consideration. Senator Hise was again called upon to explain the bill and again emphasized that "[t]he motivation behind this draw was to produce a new map

---

[21] Oct. 20 S. Elections Comm Audio at 53:49–54:10.
[22] *Id.* at 1:35:14–1:36:32; *see North Carolina Revises 11 Congressional Districts*, N.Y. Times (July 4, 1967), https://www.nytimes.com/1967/07/04/archives/north-carolina-revises-11-congressional-districts.html.
[23] *See* Senate Chamber Audio at 29:46-31:55 (Oct. 20, 2025), https://webservices.ncleg.gov/ViewDocSiteFile/101211.
[24] Legislative history, Realign Congressional Districts 2025, S.B. 249/S.L. 2025-95 (N.C. 2025). https://www.ncleg.gov/BillLookUp/2025/S249.

that will bring an additional Republican seat to North Carolina's congressional delegations."[25]

47. Five amendments were raised during the floor debate. For four of them, Senator Hise immediately moved for the amendment to lie upon the table, cutting off any debate on the amendments.[26] Among these amendments was proposed Amendment A3, which would have required the State Board of Elections to "notify every registered voter affected" by the redistricting, with the notice to include "congressional district number, a list of the counties included in that congressional district, contact information for the State Board of Elections, contact information for that registered voter's county board of elections, the signature of the Chair or the Executive Director of the State Board of Elections, and no other matter."[27]

48. Senator Lowe observed, "[t]his is a choice that was calculated to weaken the African American vote. . . . [Y]ou are not just redrawing lines on a map. You are redrawing the story of our people. You are breaking apart communities bound by faith, by history, and by shared struggle."[28] To Senator Lowe, "This is punishment. This punishes communities who dare to vote their conscience. It punishes the citizens who still believe that democracy means one person, one vote, not one party, all the power."[29]

---

[25] Oct. 20 S. Chamber Audio at 9:00–9:18.
[26] Oct. 20 S. Chamber Audio at 1:03:10–1:04:58, 1:17:35–1:18:59, 2:12:10–2:16:17. The other amendment was ruled out of order. *Id.* at 1:05:00–1:14:55.
[27] Amendment A3 – S.B. 249, Sen. Mohammed, N.C. General Assembly (2025), https://webservices.ncleg.gov/ViewBillDocument/2025/7602/0/S249-AST-34-V-3.
[28] Oct. 20 S. Chamber Audio at 2:09:26–2:10:15.
[29] *Id.* at 2:10:37–2:11:01.

18

49. Eventually, Senator Berger moved to "call the question," thereby ending debate on the bill.[30] Ultimately, on "second" reading of the bill (though this was only the first time that the proposed redistricting bill had been brought to the Senate floor, as S.B. 249 was still a campaign finance bill at the time of its first reading), it passed on a 25-20 vote.[31]

50. Because Senator Batch objected to the bill's third reading during that floor session, the Senate took up S.B. 249 for its third reading vote the next morning, on Tuesday, October 21. Senator Hise was again called on to explain the bill, at which point he again stated that "[t]he purpose of this map was to pick up a Republican seat."[32]

51. During the debate, Senator Michael Garrett offered an amendment that would have called for a referendum to amend the state constitution to create an independent redistricting commission.[33] As with the previous day's proposed amendments, Senator Hise immediately moved to table the amendment and cut off any further debate on it.

52. The Senate ultimately voted 26-20 in favor of the bill, after which it was sent by "special message" to the House.

53. The bill next moved to the House Select Committee on Redistricting, where it was considered on that same Tuesday.

---

[30] *Id.* at 2:21:07–2:21:18.
[31] Legislative History, Realign Congressional Districts 2025, S.B. 249/S.L. 2025-95 (N.C. 2025). https://www.ncleg.gov/BillLookUp/2025/S249.
[32] *S. Chamber Audio* at 10:53–10:59 (N.C. Oct. 21, 2025), webservices.ncleg.gov/ViewDocSiteFile/101212 (hereinafter "Oct. 21 S. Chamber Audio").
[33] Amendment A6 – S.B. 249, Sen. Garrett, N.C. General Assembly (2025), https://webservices.ncleg.gov/ViewBillDocument/2025/7618/0/S249-A-NBC-16991.

19

54.     On that same day, the Committee on Rules, Calendar, and Operations of the House briefly considered the bill before voting 15-7 to move it forward. Representative Longest observed that "the majority party in the last session enacted a Congressional map that was intended to last the remainder of the decade" and if, "the reason for pursuing this change now is that the people of North Carolina have somehow supported the President's agenda, then I see no reason why the President and his party should not be able to run on that agenda and win in a competitive election in a competitive district."[34] The bill was placed on the House's Floor calendar for the next day, October 22.

55.     On October 22, despite starting the session about an hour late (11:30am rather than the initially scheduled 10:30am), Speaker Hall insisted that the House would wrap up debate at 12:30pm.[35] Sure enough, shortly before 12:30 pm, Representative Bell moved to proceed to a vote, at which point only Speaker Hall and Representative Reives would be permitted to speak before the vote was taken.[36] Ultimately, the House voted in favor of the proposed map on both its second reading (66-48) and third reading (via voice vote).[37]

56.     During the shortened House Floor debate, Representative Jones took time to explain again: "The motivation behind this new redistricting plan is straightforward. The new congressional map improves Republican political strength in eastern North Carolina and will bring an additional Republican seat to North Carolina's congressional

[34] H. Rules Comm. Audio at 02:27–03:08, (N.C. Oct. 21, 2025)
https://webservices.ncleg.gov/ViewDocSiteFile/101221 (hereinafter "Oct. 21 H. Rules Comm. Audio").
[35] Oct. 22 H. Chamber Audio at 1:57:02–1:57:20.
[36] *Id.* at 2:18:03–2:20:56.
[37] Legislative History, Realign Congressional Districts 2025, S.B. 249/S.L. 2025-95, , (N.C. 2025)https://www.ncleg.gov/BillLookUp/2025/S249.

20

delegation."[38] Representative Jones expressed "thanks" to "the left" for "poking that bear, giving us the playbook" so that they could "send[] another strong conservative to Washington." [39]

57. Throughout the process, numerous public comments and legislator statements highlighted the harms S.B. 249 would impose on Black North Carolinians and the General Assembly's refusal to adhere to its obligations under the U.S. Constitution and the Voting Rights Act. For example, Senator Kandie Smith explained that the General Assembly could "have made moves any other place, but we specifically chose that section in eastern North Carolina."[40] Similarly, Senator Jay Chaudhuri observed that "[f]or more than a decade our neighbors in the east have been pushed to the margins, forced to live under maps drawn to dilute their voices and divide their strength. You dared them to vote against you before when you created a 10-4 map. . . . And now you've effectively silenced their vote altogether."[41] Representative Pierce testified, "[t]his bill redraws Congressional District 1 in a way that doesn't just shift boundaries. It fractures communities."[42] Former Congresswoman Eva Clayton, who represented Congressional District 1 as the first Black Congresswoman from North Carolina, also testified. "For 91 years after 1901, no Black citizen represented North Carolina. I broke that banner, I was that person who was elected in 1992," she testified.[43] "This redistricting strips … the majority Black counties from the

---

[38] Oct. 22 H. Chamber Audio at 1:28:10–1:29:16.
[39] *Id.* at 1:35:02–1:35:19.
[40] Oct. 21 S. Chamber Audio at 17:00–17:10.
[41] Oct. 20 S. Chamber Audio at 56:59–57:23.
[42] Oct. 22 H. Chamber Audio at 1:38:04–1:38:11.
[43] Oct. 21 H. Redistricting Comm. Audio at 41:05–41:18.

First Congressional District and burie[s] them in a heavily Republican area."[44] Congresswoman Alma Adams described this redistricting effort as an attempt "to dismantle the district with the largest record of Black congressional leadership in North Carolina history."[45]

58.   The General Assembly's redistricting process in 2025 was unprecedented in its speed, manner, and brazen disregard for public input.

59.   Significant deviations from prior practice include, but are not limited to:

a.   The undertaking of mid-decade redistricting in North Carolina without the release of a new U.S. Census or a Court order for the first time ever;

b.   The unprecedented speed of adoption and short period between introduction and passage of S.B. 249—less than a week between disclosure of the plan and its enactment into law and passing both chambers in less than three legislative days;

c.   The filing of the amendments to Congressional Districts 1 and 3 as a committee substitute to a campaign finance bill, S.B. 249, instead of a new bill requiring a first reading on the Floor of the Senate and notwithstanding the requirement that any apportionment bill revising Congressional districts "shall be read three times in each house" before coming into law, N.C. Const. art. II, § 22(5);

d.   The fact that the map was drawn only by one Member of the General Assembly without the presence of or input from any other Members[46];

e.   Senator Berger's decision to "call the question" on the Senate Floor, thereby cutting off debate on the bill which, upon information and belief, he has never done in his time serving as president pro tempore;

---

[44] *Id.* at 41:43–41:53.
[45] *Id.* at 1:00:25–1:00:31.
[46] Senator Hise said "there were no other members present when I drew these maps" and "no input was given back to us on changes to the map . . . after I had completed the drawing. And so the development and drawing of the map was completely done by me as the only member." Oct. 21 H. Redistricting Comm. Audio at 21:52–22:23.

f.   The successful motion on the Senate Floor to exclude the comments of Senator Michael Garrett from being formally recorded in the Senate journal;

g.   The failure to hold *even one* public hearing to solicit input in advance of the redistricting process or the committee meetings that would debate the proposed plan.

60.   The process deprived the public of any meaningful opportunity to weigh on the proposed changes.  There were no committee meetings held outside of the Capitol to solicit public feedback and proposed maps were not made available to the public with time to provide analysis or material input to the redistricting process. Only three days were afforded by legislative leaders for both legislative houses to consider the proposed changes and vote on them.[47] Limited opportunities for public comment were afforded during the Senate and House Committee Hearings, and, upon information and belief, every member of the public who did comment opposed adoption of S.B. 249. The few members of the public who were allowed to speak were given half the time as members of the public were afforded during the 2023 hearings (one minute compared to two).

61.   By contrast, the one avenue that most North Carolinians had to provide input, the public portal, was utilized at unprecedented rates to oppose S.B. 249. Upon information and belief, over 12,000 public comments were submitted between when the portal first opened on Thursday, October 16, and when S.B. 249 was enacted into law on Wednesday, October 22, and those public comments were overwhelmingly and decisively opposed to this North Carolina General Assembly's enactment of this bill.

---

[47] Legislative history, Realign Congressional Districts 2025, S.B. 249/S.L. 2025-95, (N.C. 2025)https://www.ncleg.gov/BillLookUp/2025/S249.

*The 2025 Amendment to Congressional Districts 1 and 3*

62.    S.B. 249 amended Section 163-201(a) of the North Carolina General Statutes to change the configurations of Congressional Districts 1 and 3.[48]

63.    Specifically, and as illustrated in the figure below, S.B. 249 removed six counties from Congressional District 3 and added them to Congressional District 1 (Dare, Hyde, Beaufort, Craven, Pamlico, and Carteret) and removed four counties from Congressional District 1 and added them to Congressional District 3 (Wilson, Wayne, Greene, Lenoir).



---

[48] *See* Session Law 2025-95 / Senate Bill 249, N.C. General Assembly,
https://www.ncleg.gov/Sessions/2025/Bills/Senate/PDF/S249v4.pdf.

24

64.     This reconfiguration resulted in a severe dilution of Black voting power in Congressional District 1, lowering the BVAP percentage of the district by approximately 8 percentage points and executing a textbook cracking of the Black population in eastern North Carolina between Congressional Districts 1 and 3. The comparative racial demographics of the 2023 and 2025 configurations for Congressional Districts are set forth in the table below:

|         | 2023 BVAP | 2025 BVAP |
|---------|-----------|-----------|
| CD-1    | 40.42%    | 32.34%    |
| CD-3    | 21.35%    | 29.4%     |

65.     Additionally, North Carolina's 2024 voter file indicates that voters self-designated as Black or African American were perfectly cracked between these two Congressional Districts, with 26.7% in Congressional District 1 and 26.7% in Congressional District 3.

66.     The electoral performance impact of these changes on Black voters is severe. As noted above, there is severely racially polarized voting in this area of the state, with an estimated 98.3% of Black voters having supported Democratic Representative Don Davis in the 2024 general election in Congressional District 1 compared to just 13% of White voters, and an estimated 98.3% of Black voters in this district having supported Democratic presidential candidate Kamala Harris against President Trump compared to just 9.1% of White voters. The 2024 election results dramatically illustrate an extremely high degree of racially polarized voting, with Black voters overwhelmingly supporting the Black and

Democratic candidates for Congress and President, and White voters overwhelmingly supporting White and Republican candidates.

67.     The results in Congressional District 1 in the 2024 general election were extremely close. Representative Davis, who is Black and who was supported by Black voters, prevailed by approximately 6,000 votes, or less than 2%. In the presidential election, President Trump carried the district by a narrow margin.

68.     The 2025 redrawing of Congressional Districts 1 and 3 will make it extremely unlikely for either one of these districts to perform for Black-preferred candidates. The performance results over five election cycles illustrate the overwhelming likelihood that the redrawn configurations of these districts will completely shut Black voters out from any representation from the U.S. Congress in this area of the state:

| Plan | Racial Composition of Districts | | Success of Black-Preferred Candidates by Election Year | | | | |
|---|---|---|---|---|---|---|---|
| 2025 Enacted | 2020 Census Voting Age Population (VAP) | | 2024 (15 Elections) | 2022 (7 Elections) | 2020 (20 Elections) | 2018 (4 Elections) | 2016 (18 Elections) |
| **CLD** | *% NH White* | *% Black* | *Win Rate* | *Win Rate* | *Win Rate* | *Win Rate* | *Win Rate* |
| 1 | 59.73% | 32.34% | 7% | 0% | 5% | 50% | 33% |
| 3 | 56.17% | 29.40% | 7% | 0% | 0% | 50% | 17% |

* % Black VAP = Black alone or in Combination including Hispanics

69.     These results are supported by the statistical "Stat Pack" analysis generated of S.B. 249 by the General Assembly during the legislative process.[49]

---

[49] *See* S.L. 2025-143 Stat Pack, N.C. General Assembly, https://webservices.ncleg.gov/ViewBillDocument/2025/7665/0/SL%202025-95%20-%20StatPack%20Report.

*The Totality of the Circumstances Demonstrates that the 2025 Redistricting Will Deny Black North Carolinians Equal Opportunity to Participate in the Political Process on Account of Race.*

70.     North Carolina has a long history of official voting-related discrimination, which has grown out of the State's founding and history as a slave society. This racially discriminatory voter suppression and dilution is especially pervasive in regions with large Black populations, including North Carolina's historic Black Belt in the northeast. *See* Doc. 165 ¶¶ 256–72, 494–98.

71.     North Carolina, and especially the Black Belt, experiences extremely racially polarized elections. Furthermore, racial division is the antecedent to much of the partisan polarization observed today. *See* Doc. 165 ¶¶ 273–85, 499–501, 504–05.

72.     Contemporary barriers to voting have impacted Black voters in North Carolina through the use of, even recently, at-large voting systems and other vote dilution mechanisms. The 2024 general election, for example, was the first general election held in North Carolina under a new voter photo identification law. Under that law, Black voters were more likely than White voters to have their ballots rejected and their votes challenged. Black North Carolinians were also disproportionately challenged in a post-election protest seeking to invalidate tens of thousands of ballots cast in the 2024 general election. *See* Doc. 165 ¶¶ 286–90, 506–08.

73.     Black North Carolinians continue to bear the effects of the State's history of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process. *See* Doc. 165 ¶¶ 293–311, 512–14.

74.     There is also a longstanding pattern of overt and subtle racial appeals in North Carolina's elections, through which candidates rely on race as a means of appealing to voters. *See* Doc. 165 ¶¶ 313–37, 516–17.

75.     The long history of discriminatory election laws, the lasting effects of racial discrimination, and the ongoing use of racial appeals have largely been—and continue to be—successful in suppressing Black votes, such that Black candidates are rarely elected outside of opportunity districts with substantial BVAPs. *See* Doc. 165 ¶¶ 339–43, 518–20.

76.     The General Assembly has been largely unresponsive to the needs and concerns of Black North Carolinians, especially in the Black Belt. Indeed, legislators representing the Black Belt routinely push through policies that harm the Black communities, including measures to eliminate FEMA and SNAP benefits, policies that uphold disparities in USDA funding, access to healthy food and housing, and environmental hazards. *See* Doc. 165 ¶¶ 345–59, 524–56.

77.     The totality of the circumstances thus demonstrates that the 2025 redistricting will deny Black North Carolinians an equal opportunity to participate in the political process and elect candidates of choice in Congressional District 1 and the historic northeastern Black Belt area.

## SUPPLEMENTAL CLAIMS

### <u>Count 10</u>
*Retaliation for speech and/or petitioning in violation of the First Amendment*

78. Plaintiffs reallege and reincorporate by reference the allegations set forth above and in the First Amended Complaint, Doc. 105.

79. The First Amendment to the U.S. Constitution provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

80. The First Amendment is "applicable to the states," *Murdock v. Pennsylvania*, 319 U.S. 105, 108 (1943), and parties may challenge state government action as violating the First Amendment pursuant to 42 U.S.C. § 1983. *See, e.g.*, *Lindke v. Freed*, 601 U.S. 187, 193 (2024).

81. "[P]olitical belief and association constitute the core of those activities protected by the First Amendment." *Elrod v. Burns*, 427 U.S. 347, 356 (1976) (plurality opinion). Consistent with that fundamental precept, expressing one's beliefs by supporting, affiliating with, and voting for chosen candidates and issues through the formal processes of democracy are all acts that reside in the heartland of the First Amendment's protections. *See, e.g.*, *Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000) ("[T]he First Amendment protects 'the freedom to join together in furtherance of common political beliefs[.]'" (quoting *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214–15 (1986))); *Kusper v. Pontikes*, 414 U.S. 51, 56–57 (1973) ("[F]reedom to associate with others for the

29

common advancement of political beliefs and ideas is a form of 'orderly group activity' protected by the First and Fourteenth Amendments." (citations omitted); *see also Williams v. Rhodes*, 393 U.S. 23, 30–31 (1968); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958); *Reynolds v. Sims*, 377 U.S. 533, 555 (1964) ("The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government.").

82. The First Amendment's protections also expressly include the right "to petition the Government for a redress of grievances." U.S. Const. amend. I. That right "extends to all departments of the Government" and thus includes "[t]he right of access to the courts," such as by filing a lawsuit. *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) (citing *Johnson v. Avery*, 393 U.S. 483, 485 (1969) & *Ex parte Hull*, 312 U.S. 546, 549 (1941)). Litigation "allows individuals to pursue desired ends by direct appeal to government officials charged with applying the law." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 397 (2011).

83. "[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions" for engaging in protected activity, including speech and petition. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). Government officials simply may not use "their power selectively to punish or suppress speech." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 198 (2024).

84. Courts typically apply a two-step framework for assessing whether government action involves impermissible retaliation to punish or suppress protected First Amendment activity. *See, e.g.*, *Gonzalez v. Trevino*, 602 U.S. 653, 662–63 (2024) (Alito,

J., concurring). "At the first step, the plaintiff must demonstrate that he engaged in protected [First Amendment activity] and that it was a "substantial" or "motivating" factor in the defendant's decision to take action against him." *Id.* (quoting *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 287 (1977)). "Once the plaintiff makes this showing, the burden shifts to the defendant at the second step to show that he would have taken the same adverse action even in the absence of the protected [First Amendment activity]." *Gonzalez*, 602 U.S. at 663; *accord Mt. Healthy*, 429 U.S. at 287.

85.     Just like with any other official government action, the Constitution forbids the government from redrawing electoral district lines in order "to punish or suppress speech." *Vullo*, 602 U.S. at 198. When redistricting is undertaken gratuitously, solely to punish certain voters for expressing a particular view or petitioning the government, courts can determine such adverse government action violates the First Amendment without any "political judgment about how much representation particular political parties *deserve*." *Rucho v. Common Cause*, 588 U.S. 684, 705 (2019) (emphasis in original). No complex metrics or subjective assessments of "partisanship" are required to prevent or remedy unconstitutional government action under such circumstances, especially where any Court injunction would revert elections to a pre-existing, legislatively-drawn plan (namely, the 2023 Congressional Plan).[50]

---

[50] Plaintiffs maintain their challenges to the 2023 Congressional Plan set forth in Counts 7, 8, and 9 of the First Amended Complaint, Doc. 105, and that any judgment finding this plan unconstitutional would require a remedial process.

86. Here, a majority of voters in Congressional District 1, including Plaintiffs Dawn Daly-Mack, Calvin Jones, Arthur Lee Johnson, Barbara Jean Sutton, and Courtney Patterson, engaged in protected speech when they voted in the 2024 election, and specifically when they voted for and joined in association with other voters to elect a Democratic candidate for Congress who would oppose the agenda of the Republican candidate for President. The majority of these voters, including these Plaintiffs, also voted in favor of Democratic electors for the office of the President in the 2024 general election— *i.e.*, against President Trump. For example, Wilson County, which is the home county of Plaintiff Arthur Lee Johnson, was carried by both Representative Davis and Democratic presidential candidate Kamala Harris.[51] And in Lenoir County, which is the home of Plaintiffs Barbara Jean Sutton and Courtney Patterson, Rep. Davis came within 120 votes of carrying the county.[52] Both counties, which have substantial Black populations, were moved out of Congressional District 1.

87. These voters' protected actions expressing their views at the ballot box in the 2024 election were at least a substantial and motivating factor in the decision of the North Carolina General Assembly and map-drawer Senator Hise to redraw Congressional Districts 1 and 3 in North Carolina in 2025. The General Assembly and Senator Hise, by their own account, moved voters, including Plaintiffs Arthur Lee Johnson, Barbara Jean Sutton, and Courtney Patterson, out of District 1 on the basis of how voters voted in 2024—

---

[51] *See* 11/05/2024 Official General Election Results – Wilson County, N.C. State Board of Elections, https://er.ncsbe.gov/?election_dt=11/05/2024&county_id=98&office=ALL&contest=0.
[52] *See* 11/05/2024 Official General Election Results – Lenoir County, N.C. State Board of Elections, https://er.ncsbe.gov/?election_dt=11/05/2024&county_id=54&office=ALL&contest=0.

*i.e.*, based on the speech of Plaintiffs and persons with whom they associated. The General Assembly and Senator Hise, by their own account, initiated the redistricting process gratuitously, in the middle of the decade, with the sole purpose of diminishing (and effectively precluding) the ability of those voters to again associate with other voters to elect a Democratic candidate for Congress in the 2026 election.

88. Likewise, Plaintiffs engaged in protected activity when they filed this action several years ago challenging the 2023 configuration of Congressional District 1 as an intentional attempt to dilute their votes and those of other Black voters in violation of their constitutional and statutory rights under the Voting Rights Act and the Fourteenth and Fifteenth Amendments.

89. Construing Plaintiffs' civil rights lawsuit as a "sue-until-blue" tactic, legislative leaders responded to Plaintiffs' lawsuit by targeting Congressional District 1 and Plaintiffs for even more extreme vote dilution.

90. Defendants' redrawing of Congressional Districts 1 and 3 cannot be justified as serving any legitimate (let alone compelling) government interest. The State of North Carolina has no legitimate interest in enacting laws that retaliate against voters for their speech and beliefs to favor one political party or viewpoint over another. To the contrary, the North Carolina Constitution forbids such behavior. *See* N.C. Const. art. I, § 12 ("The people have a right to assemble together to consult for their common good [and] to instruct their representatives . . . ."), § 14 ("Freedom of speech and of the press are two of the great bulwarks of liberty and therefore shall never be restrained . . . .").

33

91.     The federal Constitution also prohibits states from enacting electoral rules to retaliate against a group of voters. *See United States v. Windsor*, 570 U.S. 744, 770 (2013) (explaining that the government may not act with the "bare . . . desire to harm a politically unpopular group" (quoting *Dep't of Agric. v. Moreno*, 413 U.S. 528, 534–35 (1973))); *cf. Rucho*, 588 U.S. at 718 (drawing district lines to benefit one political party and punish another is "incompatible with democratic principles" (quoting *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 791 (2015))). The Elections Clause, which authorizes the States to regulate federal elections and conduct redistricting in the first place, likewise is "a grant of authority to issue procedural regulations, and not . . . a source of power to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints." *Cook v. Gralike*, 531 U.S. 510, 523 (2001) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 833–34 (1995)). Electoral rules that are designed to "place their targets at a political disadvantage" thus are "not authorized by the Elections Clause." *Id.* at 525–26.

92.     Nor can Defendants point to any non-retaliatory grounds for undertaking the 2025 districting in the first place. A state can establish such non-retaliatory grounds when it redistricts for necessary or legitimate reasons, including (1) to draw a new map following the release of the U.S. Census (*e.g., Gill v. Whitford*, 585 U.S. 48, 55 (2018)); (2) to replace a map that has been invalidated by a court (*e.g.*, *Rucho*, 588 U.S. at 691); or (3) to replace a court-drawn map with a legislature-drawn map (*e.g.*, *LULAC v. Perry*, 548 U.S. 399, 411–13 (2006) (opinion of Kennedy, J.)).

34

93. In those circumstances—*i.e.*, where a legislature has legitimate, non-retaliatory grounds *to engage in the redistricting process in the first place*—the legislature "may pursue partisan ends" as part of that process. *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 6 (2024). And once the legislature has redrawn district lines as part of a legitimately-initiated redistricting process, federal courts may be ill-equipped to review those lines to "decid[e] how much partisan dominance is too much." *Rucho*, 588 U.S. at 704 (quoting *LULAC*, 548 U.S. at 420 (opinion of Kennedy, J.)). Had the General Assembly drawn this map in response to the decennial Census, for example, it might have invoked its constitutional duty to equalize population as a legitimate, non-retaliatory justification for engaging in the redistricting process.

94. Here, though, Defendants had no valid, non-retaliatory reason to engage in the 2025 redistricting at all. They initiated the redistricting process *solely* to punish voters (by moving them out of their districts, burdening their associational rights and activities, and diminishing their political power) based upon their past political expression and petitioning activity. That constitutes impermissible First Amendment retaliation.

95. Defendants' retaliation has "adversely affected [Plaintiffs'] constitutional rights." *Williams v. Mitchell*, 122 F.4th 85, 89 (4th Cir. 2024); *see also Houston Comty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477–78 (2022). Defendants have redrawn the congressional map "in an intentional attempt to interfere with [Plaintiffs'] rights, which is exactly the kind of government conduct that would chill someone from exercising their constitutional rights in the future[.]" *Williams*, 122 F.4th at 90.

96.     Plaintiffs are adversely affected by the challenged retaliatory action in multiple ways, each of which independently supports a First Amendment retaliation claim here.

97.     *First*, Defendants removed Plaintiffs Arthur Lee Johnson, Barbara Jean Sutton, and Courtney Patterson from Congressional District 1 and reassigned them to Congressional District 3, thereby depriving them of the right to vote for—and be represented by—their sitting congressional representative. *See Burdick v. Takushi*, 504 U.S. 428, 433–34 (1992) (affirming that voters' First Amendment rights are implicated when a state prevents them from casting ballot for a particular candidate); *Lubin v. Panish*, 415 U.S. 709, 716 (1974) ("[A] voter hopes to find on the ballot a candidate who comes near to reflecting his policy preferences on contemporary issues."); *see also Anderson v. Calebrezze*, 460 U.S. 780, 787–88 (1983) ("The exclusion of candidates also burdens voters' freedom of association[.]"). *Cf. Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960) (holding that voters are injured when the government "fenc[es]" them out of district "so as to deprive them of their pre-existing . . . vote"). Removing Plaintiffs Johnson, Sutton, and Patterson from their position as Congressional District 1 voters and constituents and reassigning them against their will to a new congressional district due to their speech activity and the speech of their associates constitutes First Amendment retaliation.

98.     *Second*, by changing the district configurations of Congressional Districts 1 and 3, Defendants burdened and deprived Plaintiffs, including Daly-Mack, Jones, Johnson, Sutton, and Patterson, of the right to associate with likeminded citizens in their neighboring communities. *See Jones*, 530 U.S. at 574 ("Representative democracy in any populous unit

36

of governance is unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views."); *Democratic Party of Va. v. Brink*, 599 F. Supp. 3d 346, 359 (E.D. Va. 2022) (recognizing an associational right "to recruit and register potential voters"); *see also Illinois Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 186 (1979) ("[A]n election campaign is a means of disseminating ideas as well as attaining political office."); *Elrod*, 427 U.S. at 355–56 (recognizing that the First Amendment guards an "individual's ability to act according to his beliefs and to associate with others of his political persuasion"). Removing voters (including Plaintiffs) from their prior Congressional Districts, where their associational activities as engaged citizens, organizers, and activists will be directed towards and in concert with the people and communities they know and live in proximity to, and forcing them to conduct those activities in unfamiliar and far-away places, due to their speech and petitioning activity and the speech and petitioning of their associates, constitutes First Amendment retaliation.

99.     *Third*, by dismantling former Congressional District 1, Defendants have made it significantly harder for Plaintiffs including Daly-Mack, Jones, Johnson, Sutton, and Patterson to act collectively to elect candidates who represent their shared interests. In doing so, Defendants have "burden[ed] [Plaintiffs'] representational rights." *Vieth v. Jubelirer*, 541 U.S. 267, 315 (2004) (Kennedy, J., concurring); *see also Baker v. Carr*, 369 U.S. 186, 206 (1962) ("[V]oters who allege facts showing disadvantage to themselves as individuals have standing to sue."). Placing Plaintiffs into new districts where they will almost certainly be unable to elect a candidate of their choice as part of an utterly gratuitous

37

redistricting process, due to their speech and petitioning activity and the speech and petitioning of their associates, constitutes First Amendment retaliation.

100. Accordingly, this matter presents a justiciable violation of the First Amendment requiring a remedy.

### Count 11
*Unlawful mid-decade redistricting in violation of the*
*Petition Clause of the First Amendment*

101. Plaintiffs reallege and reincorporate by reference the allegations set forth above and in the First Amended Complaint, Doc. 105.

102. The Petition Clause of the First Amendment guarantees the right "to petition the Government for a redress of grievances." U.S. Const., amend. I.

103. The First Amendment is "applicable to the states," *Murdock v. Pennsylvania*, 319 U.S. 105, 108 (1943), and parties may challenge state government action as violating the First Amendment pursuant to 42 U.S.C. § 1983. *See, e.g.*, *Lindke v. Freed*, 601 U.S. 187, 193 (2024).

104. "The right to petition is in some sense the source of other fundamental rights, for petitions have provided a vital means for citizens to request recognition of new rights and to assert existing rights against the sovereign." *Borough of Duryea*, 564 U.S. at 397.

105. The right to petition "extends to all departments of the Government" and thus includes "[t]he right of access to the courts," such as by filing a lawsuit. *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) (citing *Johnson v. Avery*, 393 U.S. 483, 485 (1969) & *Ex parte Hull*, 312 U.S. 546, 549 (1941)). Litigation "allows individuals to pursue desired ends by direct appeal to government officials charged with applying the

law." *Borough of Duryea*, 564 U.S. at 397. For example, "[i]n the context of the civil rights movement, litigation provided a means for 'the distinctive contribution of a minority group to the ideas and beliefs of our society.'" *Id.* (quoting *NAACP v. Button*, 371 U.S. 415, 431 (1963)). "Litigation on matters of public concern may facilitate the informed public participation that is a cornerstone of democratic society." *Borough of Duryea*, 564 U.S. at 379.

106. Plaintiffs exercised their right to petition in just this way when they filed this lawsuit challenging the legality of the 2023 Congressional Plan. But the 2025 redistricting seeks to frustrate that right by changing the district lines before this Court can render a determination following the trial held earlier this year.

107. The 2025 redistricting attempts to initiate an impermissible "infinity loop," in which the General Assembly changes the district lines again and again to avoid a final judgment on any one plan, perpetuating and compounding the harms of the 2023 Congressional Plan while preventing Plaintiffs' petitions from being decided and their grievances from being redressed. *Singleton v. Allen*, 690 F. Supp. 3d 1226, 1292–93 (N.D. Ala. 2023). And it does this in the face of North Carolina's own longstanding policy to retain stability in legislative districts between decennial apportionments. N.C. Const. art. II, §§ 3(4), 5(4); *see Granville Cnty. Comm'rs v. Ballard*, 69 N.C. 18, 20–21 (1873).

108. Plaintiffs Dawn Daly-Mack, Calvin Jones, Syene Jasmin, and the members of Plaintiffs North Carolina NAACP and Common Cause, were thus subject to mid-decade redistricting in a manner that frustrates their right to petition the government for redress of

grievances, in violation of the Petition Clause of the First Amendment, U.S. Const., amend.

I.

## Count 12
### *Unlawful mid-decade redistricting in violation of the Petition Clause of the First Amendment*

109.     Plaintiffs reallege and reincorporate by reference the allegations set forth above and in the First Amended Complaint, Doc. 105.

110.     The Petition Clause of the First Amendment guarantees the right "to petition the Government for a redress of grievances." U.S. Const., amend. I.

111.     The First Amendment is "applicable to the states," *Murdock v. Pennsylvania*, 319 U.S. 105, 108 (1943), and parties may challenge state government action as violating the First Amendment pursuant to 42 U.S.C. § 1983. *See, e.g.*, *Lindke v. Freed*, 601 U.S. 187, 193 (2024).

112.     The right to petition is deeply rooted in the Anglo-American legal tradition. "The right to petition traces its origins to the Magna Carta, which confirmed the rights of barons to petition the King." *Borough of Duryea*, 564 U.S. at 395 (citing W. McKechnie, Magna Carta: A Commentary on the Great Charter of King John 467 (rev. 2d ed. 1958)). "The Magna Carta itself was King John's answer to a petition from the barons." *Id.* (citing McKechnie, *Magna Carta: A Commentary on the Great Charter of King John* 30–38).

113.     "Petition, as a word, a concept, and an essential safeguard of freedom, is of ancient significance in the English law and the Anglo-American legal tradition." *Borough of Duryea*, 564 U.S. at 395 (citing 1 William Blackstone, Commentaries *143). "The right

to petition applied to petitions from nobles to the King, from Parliament to the King, and from the people to the Parliament, and it concerned both discrete, personal injuries and great matters of state." *Id.*

114.    This right has equally weighty origins in the American context. For example, the Declaration of Independence included in its list of grievances that, "'In every stage of these Oppressions We have Petitioned for Redress in the most humble terms: Our repeated Petitions have been answered only by repeated injury.'" *Borough of Duryea*, 564 U.S. at 396 (quoting The Declaration of Independence ¶ 30); *see also* Norman B. Smith, *"Shall Make No Law Abridging…": An Analysis of the Neglected, But Nearly Absolute, Right of Petition*, 54 U. Cin. L. Rev. 1153, 1182 (1986) (citing Bernard Schwartz, *The Bill of Rights: A Documentary History* 1093–94 (1971)).

115.    The right to petition extends to matters of all kinds, and depends not on the nature of the issue presented or the redress requested, but on the very act of communicating one's grievances to one's representatives. "In a representative democracy such as this, these branches of government act on behalf of the people and, to a very large extent, the whole concept of representation depends on the ability of the people to make their wishes known to their representatives." *E. R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137 (1961).

116.    "The right to petition is in some sense the source of other fundamental rights, for petitions have provided a vital means for citizens to request recognition of new rights and to assert existing rights against the sovereign." *Borough of Duryea*, 564 U.S. 379, 397 (2011).

41

117.   The modern expression of the right to petition one's political representatives turns on the ability of constituents to inform those representatives, by a variety of means, of their concerns and grievances. "The right to petition allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives." *Borough of Duryea*, 564 U.S. at 388.

118.   In light of its unique history, the right to petition is influenced by, but not coextensive with, other First Amendment rights. "Courts should not presume there is always an essential equivalence in the two clauses or that Speech Clause precedents necessarily and in every case resolve Petition Clause claims." *Borough of Duryea*, 564 U.S. at 388.

119.   Nor is the right to petition wholly coextensive with the right to vote. While the right to vote is fundamental, the right to petition is distinct. Voting rights are "reserved only to certain members of society. But people can affect what their representatives do in another way: through their right to petition their representatives to voice their concerns and interests on particular issues." *Daly v. Hunt*, 93 F.3d 1212, 1226 (4th Cir. 1996). Indeed, the right to petition has played this role throughout American history. "Petitions allowed participation in democratic governance even by groups excluded from the franchise." *Borough of Duryea*, 564 U.S. at 397 (citing Gregory A. Mark, *The Vestigial Constitution: The History and Significance of the Right to Petition*, 66 Fordham L. Rev. 2153, 2182 (1998)).

120.   Gratuitous mid-decade redistricting strikes at the heart of the right to petition one's representatives. An elemental precondition of petitioning one's representatives is the

42

ability to know who to petition. Gratuitous mid-decade redistricting—that is, redistricting that, as here, has no legitimate rationale or limiting principle and could thus be repeated before each and every election cycle—frustrates the ability to petition in a variety of ways. It prevents Plaintiffs from knowing who their representative will be from one election cycle to the next. It prevents Plaintiffs from even knowing where their representative will be elected from in the future, and thus to whom their elected representative will be accountable. It impairs Plaintiffs' ability to assemble and petition in association with their fellow constituents, since their fellow constituents in various congressional districts are also in flux. Finally, by virtue of these structural barriers to petition, it frustrates Plaintiffs' opportunity to actually influence their legislators via petition—the most basic element of the right as the Framers conceived it.

121.    Senate Bill 249 harms Plaintiffs in precisely these ways. By subjecting Plaintiffs to gratuitous mid-decade redistricting, it severely frustrates Plaintiffs' right to petition, in violation of the Petition Clause of the First Amendment, U.S. const. amend. I.

### Count 13
***Intentional vote dilution in violation of § 2 of the Voting Rights Act:***
***2025 Congressional District 1***

122.    Plaintiffs reallege and reincorporate by reference the allegations set forth above and in the First Amended Complaint, Doc. 105.

123.    2025 Congressional District 1 was drawn to intentionally dilute the voting power of Black voters in North Carolina's Black Belt.

124.    S.B. 249 thus violates Section 2 of the Voting Rights Act, because under the totality of the circumstances, it has the purpose and effect of denying Black voters,

43

including Individual Plaintiffs Dawn Daly-Mack, Calvin Jones, Syene Jasmin, Arthur Lee Johnson, Barbara Jean Sutton, Courtney Patterson, and members of the Plaintiffs North Carolina NAACP and Common Cause, an equal opportunity to participate in the political process and elect representatives of their choice by diluting their voting strength.

125.    Plaintiffs have a right of action under Section 2 of the Voting Rights Act, 52 U.S.C. 101301 *et seq.*, as well as under 42 U.S.C. § 1983. *See Maine v. Thiboutot*, 448 U.S. 1, 4 (1980).

## <u>Count 14</u>
### *Intentional discrimination in violation of the Fourteenth and Fifteenth Amendments: 2023 Congressional Plan as amended by S.B. 249*

126.    Plaintiffs reallege and reincorporate by reference the allegations set forth above and in the First Amended Complaint, Doc. 105.

127.    The 2023 Congressional Plan as amended in S.B. 249 to alter Congressional Districts 1 and 3 was enacted with the intent to discriminate on the basis of race as a motivating factor in violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution by intentionally diminishing the voting power of Black voters and with the effect that these voters, including Individual Plaintiffs and members of Plaintiffs North Carolina NAACP and Common Cause, will have less of an opportunity to elect candidates of their choice.

44

## SUPPLEMENTAL PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray, in addition to the relief requested in the First Amended Complaint, Doc. 105, that this Court:

1. Issue a declaratory judgment that S.B. 249 (S.L. 2025-95) constitutes unlawful retaliation in violation of the First Amendment.

2. Issue a declaratory judgment that the adoption of S.B. 249 (S.L. 2025-95) violated the guaranteed right of Plaintiffs to petition government for a redress of grievances under the First Amendment.

3. Issue a declaratory judgment that North Carolina's S.B. 249 (S.L. 2025-95), was enacted with a discriminatory purpose in violation of the Fourteenth and Fifteenth Amendments and Section 2 of the Voting Rights Act.

4. Preliminarily and permanently enjoin Defendants from calling, holding, supervising, or certifying any elections under S.B. 249. Plaintiffs have no other adequate remedy at law other than the judicial relief sought herein and will be irreparably harmed through violation of their constitutional and statutory rights without this relief.

5. Because the 2023 Congressional Plan is also unlawful, as set forth in the First Amended Complaint, Doc. 105, issue an order setting forth a remedial process requiring, *inter alia*, the enactment of remedial redistricting plans sufficient to remedy the violations set forth herein and in the First Amended Complaint in time for use no later than the 2026 general election and beyond; that Defendants and the General Assembly have the first chance to enact such plans, pursuant to N.C.G.S. §

45

120-2.4; and that such plans change only those districts required to remedy the violations alleged herein.

6.    Award Plaintiffs their costs and reasonable attorneys' fees pursuant to Fed. R. Civ. P. 54, 42 U.S.C. § 1988, and 52 U.S.C. § 10310(e), and any other applicable provision providing such relief.

7.    Issue an order retaining jurisdiction over this matter until the Defendants, their agents, employees, and those persons acting in concert with them have complied with all orders and mandates of this Court; and

8.    Grant such other and further relief as it deems is proper and just.

Dated this 30th day of October, 2025.    Respectfully submitted,

/s/ *Hilary Harris Klein*

**HOGAN LOVELLS US LLP**

J. Tom Boer*
Olivia Molodanof*
Madeleine Bech*
4 Embarcadero Center, Suite 3500
San Francisco, CA 94111
Telephone: 415-374-2300
Facsimile: 415-374-2499
tom.boer@hoganlovells.com
olivia.molodanof@hoganlovells.com
madeleine.bech@hoganlovells.com

Jessica L. Ellsworth*
Misty Howell*
Odunayo Durojaye*
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: 202-637-5600
Facsimile: 202-637-5910
jessica.ellsworth@hoganlovells.com

**SOUTHERN COALITION FOR SOCIAL JUSTICE**

Hilary Harris Klein (State Bar #53711)
Jeffrey Loperfido (State Bar #52939)
Christopher Shenton (State Bar #60442)
Lily Talerman (State Bar #61131)
5517 Durham Chapel Hill Blvd.
Durham, NC 27707
Telephone: 919-794-4213
Facsimile: 919-908-1525
hilaryhklein@scsj.org
jeffloperfido@scsj.org
chrisshenton@scsj.org
lily@scsj.org

**ACLU FOUNDATION**

Ari J. Savitzky**
Ethan Herenstein**
Clayton Pierce**

46

misty.howell@hoganlovells.com
odunayo.durojaye@hoganlovells.com

Harmony Gbe*
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: 310-785-4600
Facsimile: 310-785-4601
harmony.gbe@hoganlovells.com

*Appearing in this matter by Special Appearance
pursuant to L-R 83.1(d)*

Sophia Lin Lakin**
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500
asavitzky@aclu.org
eherenstein@aclu.org
cpierce@aclu.org
slakin@aclu.org

**Applications to appear specially
forthcoming*

**ACLU OF NORTH CAROLINA
LEGAL FOUNDATION**

Jaclyn Maffetore (State Bar #50849)
Kristi L. Graunke (State Bar #51216)
P. O. Box 28004
Raleigh, NC 27611
(919) 354-5070
jmaffetore@acluofnc.org
kgraunke@acluofnc.org

47