# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

SHAUNA WILLIAMS, FLOR HERRERA-
PICASSO, MINERVA FREEMAN, VIOLA
RYALS FIGUEROA, DAVID JONES, JIMMY
COCHRAN, MAURA ACETO, JAVIER
LIMON, ARMENTA EATON, JAMES
ADAMS, LUCIANO GONZALEZ-VEGA,
CHENITA JOHNSON, PAMLYN STUBBS,
EARL JONES, ALLISON SHARI ALLEN,
LAURA MCCLETTIE, NELDA LEON,
GERMAN DE CASTRO, ALAN RENE OLIVA
CHAPELA, VIRGINIA KEOGH, and
NATALEE NANETTE NIEVES,

          Plaintiffs,

      v.

REPRESENTATIVE HUGH BLACKWELL,
in his official capacity as Chair of the House
Standing Committee on Elections;
REPRESENTATIVE SARAH STEVENS, in
her official capacity as Chair of the House
Standing Committee on Elections; SENATOR
WARREN DANIEL, in his official capacity as
Co-Chair of the Senate Standing Committee on
Redistricting and Elections; SENATOR
RALPH E. HISE, JR., in his official capacity
as Co-Chair of the Senate Standing Committee
on Redistricting and Elections; SENATOR
BRAD OVERCASH, in his official capacity as
Co-Chair of the Senate Standing Committee on
Redistricting and Elections;
REPRESENTATIVE DESTIN HALL, in his
official capacity as Speaker of the North
Carolina House of Representatives;
SENATOR PHILIP E. BERGER, in his
official capacity as President *Pro Tempore* of
the North Carolina Senate; THE NORTH
CAROLINA STATE BOARD OF
ELECTIONS; FRANCIS X. DE LUCA, in his
official capacity as Chair of the North Carolina
State Board of Elections; JEFF CARMON III,
in his official capacity as Member of the North

Civil Action No. 1:23-cv-01057-TDS-JLW

**SUPPLEMENTAL COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF**

Carolina State Board of Elections; STACY
EGGERS IV, in his official capacity as
Secretary of the North Carolina State Board of
Elections; SIOBHAN O'DUFFY MILLEN, in
her official capacity as Member of the North
Carolina State Board of Elections; and
ROBERT RUCHO, in his official capacity as
Member of the North Carolina State Board of
Elections,

Defendants.

## INTRODUCTION

1.    Over the course of just over 48 hours, the North Carolina General Assembly
enacted the state's fifth congressional plan in four years—an unnecessary, mid-decade redistricting
that targets a historic Black opportunity district that has elected a Black representative to Congress
for more than 30 years.

2.    North Carolina gained a congressional district after the 2020 Census, almost
entirely due to an increase in the state's minority population. But the General Assembly has gone
to great lengths to ensure that the increase in minority population does not translate into any
increase in minority electoral opportunity. In a series of successive redistricting maps, the General
Assembly has systemically rolled back minority voting strength across the state.

3.    Senate Bill 249 (the "2025 Plan") repeats the constitutional violations of the 2023
Plan—unconstitutionally diluting Black voting strength in the Piedmont Triad and Mecklenburg—
and then doubles down on them by further dismantling the First Congressional District ("CD-1"),
a historic Black opportunity district in the northeastern portion of the state.

4.    CD-1 is home to many heavily Black counties, including several that comprise
North Carolina's "Black Belt," which has played an outsized role in the state's civil rights history.
From Reconstruction through the mid-twentieth century, CD-1 was ground zero for Black North

- 2 -

Carolinians' fight for equal opportunity, including as the locus of numerous lawsuits that eliminated, among other things, the use of literacy tests to disenfranchise Black voters and discriminatory election methods that kept Black candidates out of local office.

5.      In 1992, CD-1 elected Eva Clayton to the U.S. House of Representatives—the first Black North Carolina congressperson in nearly 100 years. Voters in CD-1 have elected a Black representative in every election since: Representative Clayton was followed by Representative Frank Ballance, Representative G.K. Butterfield, and now Representative Don Davis.

6.      The 2025 Plan was designed to prevent that from happening again. The 2025 Plan dismantles the Black opportunity district in CD-1 by moving several counties with significant Black populations out of the district and into CD-3, trading them for several primarily white counties, diluting the Black vote in both districts. Under the 2025 Plan, Black voters are extremely unlikely to elect candidates of their choice in either district.

7.      This outcome was not a mere side effect of a partisan gerrymander. Whatever the General Assembly's partisan aims, they have—once again—chosen to target Black neighborhoods and communities to achieve them. The Fourth Circuit has made clear that while "[u]sing race as a proxy for party may be an effective way to win an election," a "state legislature acting on such a motivation engages in intentional racial discrimination in violation of the Fourteenth Amendment and the Voting Rights Act." *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 222–23 (4th Cir. 2016).

8.      Finally, the 2025 Plan is a per se violation of the First Amendment and Equal Protection Clause. Notwithstanding the particular configuration of the districts, the entire enterprise of a mid-decade revision to North Carolina's existing, legislatively-enacted congressional map is inherently unlawful, because it involves drawing districts that are knowingly

malapportioned based on their current populations, and it unnecessarily takes account of racial information and partisan politics without any legitimate justification. While Supreme Court precedent tolerates aspects of those infirmities when they are essential to mandatory decennial redistricting or necessary to remedy violations of law found by courts, it has never upheld their weaponization as part of a voluntary mid-decade revision to legislatively enacted districts of the sort that North Carolina has engaged in here.

9.      Plaintiffs therefore seek an order (i) declaring that the 2025 Plan intentionally discriminates against minority voters in violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution and Section 2 of the Voting Rights Act; (ii) declaring that the 2025 Plan necessarily violates Article I, Section 2 and the Fourteenth Amendment of the U.S. Constitution because it redraws districts that are knowingly malapportioned based on their current populations without sufficient justification; (iii) declaring that the 2025 Plan necessarily violates the First and Fourteenth Amendments to the U.S. Constitution because it considers and manipulates racial and partisan demographics during a voluntary, mid-cycle redistricting process without sufficient justification; (iv) enjoining the enforcement and application of the 2025 Plan; and (v) facilitating the adoption of a lawful congressional plan.

## PARTIES

### A.  Plaintiffs

10.      Plaintiff Shauna Williams is a Black Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Warrenton in Warren County. Ms. Williams's residence was located in Congressional District 1 under the map that was in place for the 2022 congressional election (the "2022 Plan"), in Congressional District 1 under the 2023 Plan, and is now in Congressional District 1 under the 2025 Plan.

- 4 -

11.     Plaintiff Flor Herrera-Picasso is a Latina Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Wilson in Wilson County. Ms. Herrera-Picasso's residence was located in Congressional District 1 under the 2022 Plan, in Congressional District 1 under the 2023 Plan, and is now in Congressional District 3 under the 2025 Plan.

12.     Plaintiff Minerva Freeman is a Black Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Fountain in Pitt County. Ms. Freeman's residence was located in Congressional District 1 under the 2022 Plan, in Congressional District 3 under the 2023 Plan, and is now in Congressional District 3 under the 2025 Plan.

13.     Plaintiff Viola Ryals Figueroa is a Black Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Goldsboro in Wayne County. Ms. Ryals Figueroa's residence was located in Congressional District 13 under the 2022 Plan, in Congressional District 1 under the 2023 Plan, and is now in Congressional District 3 under the 2025 Plan.

14.     Plaintiff David Jones is a Black Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Snow Hill in Greene County. Mr. Jones's residence was located in Congressional District 1 under the 2022 Plan, in Congressional District 1 under the 2023 Plan, and is now in Congressional District 3 under the 2025 Plan.

15.     Plaintiff Jimmy Cochran is a Black Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Kinston in Lenoir County. Mr. Cochran's residence was located in Congressional District 3 under the 2022 Plan, in Congressional District 1 under the 2023 Plan, and is now in Congressional District 3 under the 2025 Plan.

16.     Plaintiff Maura Aceto is a Latina Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Greenville in Pitt County. Ms. Aceto's residence was located in Congressional District 1 under the 2022 Plan, in Congressional District 3 under the 2023 Plan, and is now in Congressional District 3 under the 2025 Plan.

17.     Plaintiff Javier Limon is a Latino Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Winterville in Pitt County. Mr. Limon's residence was located in Congressional District 1 under the 2022 Plan, in Congressional District 3 under the 2023 Plan, and is now in Congressional District 3 under the 2025 Plan.

18.     Plaintiff Armenta Eaton is a Black Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Louisburg in Franklin County. Ms. Eaton's residence was located in Congressional District 1 under the 2022 Plan, in Congressional District 13 under the 2023 Plan, and is now in Congressional District 13 under the 2025 Plan.

19.     Plaintiff James Adams is a Black Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of High Point in Guilford County. Mr. Adams's residence was located in Congressional District 6 under the 2022 Plan, in Congressional District 6 under the 2023 Plan, and is now in Congressional District 6 under the 2025 Plan.

20.     Plaintiff Luciano Gonzalez-Vega is a Latinx Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Greensboro in Guilford County. Mx. Gonzalez-Vega's residence was located in Congressional District 6 under the 2022 Plan, in Congressional District 6 under the 2023 Plan, and is in Congressional District 6 under the 2025 Plan.

21.     Plaintiff Chenita Johnson is a Black Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Winston-Salem in Forsyth County. Ms.

Johnson's residence was located in Congressional District 6 under the 2022 Plan, in Congressional District 10 under the 2023 Plan, and is now in Congressional District 10 under the 2025 Plan.

22.     Plaintiff Pamlyn Stubbs is a Black Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Greensboro in Guilford County. Ms. Stubbs's residence was located in Congressional District 6 under the 2022 Plan, in Congressional District 5 under the 2023 Plan, and is now in Congressional District 5 under the 2025 Plan.

23.     Plaintiff Earl Jones is a Black Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Greensboro in Guilford County. Mr. Jones's residence was located in Congressional District 6 under the 2022 Plan, in Congressional District 5 under the 2023 Plan, and is now in Congressional District 5 under the 2025 Plan.

24.     Plaintiff Allison Shari Allen is a Black Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Charlotte in Mecklenburg County. Ms. Allen's residence was located in Congressional District 14 under the 2022 Plan, in Congressional District 12 under the 2023 Plan, and is now in Congressional District 12 under the 2025 Plan.

25.     Plaintiff Laura McClettie is a Black Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Charlotte in Mecklenburg County. Ms. McClettie's residence was located in Congressional District 14 under the 2022 Plan, in Congressional District 12 under the 2023 Plan, and is now in Congressional District 12 under the 2025 Plan.

26.     Plaintiff Nelda Leon is a Latina Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Charlotte in Mecklenburg County. Ms. Leon's residence was located in Congressional District 14 under the 2022 Plan, in Congressional District 12 under the 2023 Plan, and is in Congressional District 12 under the 2025 Plan.

27.     Plaintiff German De Castro is a Latino Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Charlotte in Mecklenburg County. Mr. De Castro's residence was located in Congressional District 14 under the 2022 Plan, in Congressional District 12 under the 2023 Plan, and is in Congressional District 12 under the 2025 Plan.

28.     Plaintiff Alan Rene Oliva Chapela is a Latino Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Gastonia in Gaston County. Mr. Oliva Chapela's residence was located in Congressional District 14 under the 2022 Plan, in Congressional District 14 under the 2023 Plan, and is now in Congressional District 14 under the 2025 Plan.

29.     Plaintiff Virginia Keogh is a Black Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Charlotte in Mecklenburg County. Ms. Keogh's residence was located in Congressional District 14 under the 2022 Plan, in Congressional District 14 under the 2023 Plan, and is now in Congressional District 14 under the 2025 Plan.

30.     Plaintiff Natalee Nanette Nieves is a Latina Citizen of the United States and of the State of North Carolina, a registered voter, and a resident of Gastonia in Gaston County. Ms. Nieves's residence was located in Congressional District 14 under the 2022 Plan, in Congressional District 14 under the 2023 Plan, and is in Congressional District 14 under the 2025 Plan.

**B. Defendants**

31.     Defendant Hugh Blackwell is a member of the North Carolina House of Representatives and currently serves as the co-Chair of the House Standing Committee on Election Law, which oversaw the creation of the 2025 Plan. Mr. Blackwell is sued in his official capacity only.

32.     Defendant Sarah Stevens is a member of the North Carolina House of Representatives and currently serves as the co-Chair of the House Standing Committee on Election

Law, which oversaw the creation of the 2025 Plan. Ms. Stevens is sued in her official capacity only.

33.     Defendant Warren Daniel is a member of the North Carolina Senate and currently serves as a co-Chair of the Senate Standing Committee on Redistricting and Elections, which oversaw the creation of the 2025 Plan. Mr. Daniel is sued in his official capacity only.

34.     Defendant Ralph E. Hise, Jr., is a member of the North Carolina Senate and currently serves as a co-Chair of the Senate Standing Committee on Redistricting and Elections, which oversaw the creation of the 2025 Plan. Mr. Hise is sued in his official capacity only.

35.     Defendant Brad Overcash is a member of the North Carolina Senate and currently serves as a co-Chair of the Senate Standing Committee on Redistricting and Elections, which oversaw the creation of the 2025 Plan. Mr. Overcash is sued in his official capacity only.

36.     Defendant Destin Hall is the Speaker of the North Carolina House of Representatives. Mr. Hall is sued in his official capacity only.

37.     Defendant Philip E. Berger is the President Pro Tempore of the North Carolina Senate. Mr. Berger is sued in his official capacity only.

38.     Defendant North Carolina State Board of Elections is the agency responsible for the regulation and administration of elections in North Carolina. It is tasked with "general supervision over the primaries and elections in the State," N.C. Gen. Stat. § 163-22(a), including elections for the U.S. House of Representatives.

39.     Defendant Francis X. De Luca is the Chair of the North Carolina State Board of Elections. Mr. De Luca is sued in his official capacity only.

40.     Defendant Jeff Carmon III is a member of the North Carolina State Board of Elections. Mr. Carmon is sued in his official capacity only.

41.     Defendant Stacy Eggers IV is the Secretary of the North Carolina State Board of Elections. Mr. Eggers is sued in his official capacity only.

42.     Defendant Siobhan O'Duffy Millen is a member of the North Carolina State Board of Elections. Ms. Millen is sued in her official capacity only.

43.     Defendant Robert Rucho is a member of the North Carolina State Board of Elections. Mr. Rucho is sued in his official capacity only.

## JURISDICTION AND VENUE

44.     Plaintiffs bring this action under the Fourteenth and Fifteenth Amendments to the U.S. Constitution, Article I, Section 2 of the U.S. Constitution, and Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

45.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1343, and 1357 because the matters in controversy arise under the Constitution and laws of the United States, as well as under 42 U.S.C. §§ 1983 and 1988.

46.     This Court has personal jurisdiction over Defendants, who are sued in their official capacities and reside within this state, pursuant to Fed. R. Civ. P. 4(k)(1)(A).

47.     Venue is proper because a substantial part of the events that give rise to Plaintiffs' claims have occurred, and will occur, in this District. 28 U.S.C. § 1391(b).

48.     A three-judge panel is requested pursuant to 28 U.S.C. § 2284(a), as this action challenges "the constitutionality of the apportionment of congressional districts."

49.     The Court has jurisdiction to grant declaratory and injunctive relief under Federal Rules of Civil Procedure 57 and 65 and 28 U.S.C. §§ 2201 and 2202.

## STATEMENT OF FACTS

### A. The 2021 Redistricting Process

50.    Typically, the task of drawing new district maps in North Carolina occurs once every 10 years. *See* U.S. Const. art. I, § 4; N.C. Const. art. II, §§ 3, 5. But due to the General Assembly majority's unflinching commitment to entrenching their party's political power at the expense of voters of color, North Carolina's congressional map has been redrawn no fewer than five times in the past four years.

51.    The first congressional map that the North Carolina General Assembly passed in 2021 (the "2021 Plan") was invalidated as the product of intentional partisan gerrymandering, which was, at that time, unlawful under the North Carolina Constitution. *See Harper v. Hall* ("*Harper I*"), 2022-NCSC-17, ¶ 194, 380 N.C. 317, 395, 868 S.E.2d 499, 554 (2022), *overruled on alternative grounds in later appeal*, 384 N.C. 292, 886 S.E.2d 393 (2023), *and aff'd sub nom.*, *Moore v. Harper*, 600 U.S. 1 (2023).

52.    The 2021 process was shrouded in secrecy. Despite claims from the General Assembly that all map-drawing had occurred publicly, litigation later revealed that secret "concept maps" had been used—and then destroyed—in drawing North Carolina's 2021 map. The General Assembly also almost entirely ignored public pleas for a fair and open redistricting process.

53.    Senator Hise oversaw the drawing of the 2021 Plan. Senator Hise "testified several times under oath that [the General Assembly] had not used any partisan election data to draw any district lines in either the congressional plan or the Senate plan." Despite Senator Hise's disavowals, the North Carolina Supreme Court concluded that "[t]he General Assembly ha[d] substantially diminished the voting power of voters affiliated with one party on the basis of partisanship" and had "done so intentionally." *Id.* ¶ 194, 868 S.E.2d at 554. Though that opinion

- 11 -

was later reversed on justiciability grounds, the North Carolina Supreme Court did not disturb those factual findings.

54.     The Court struck down the 2021 Plan as an unlawful partisan gerrymander on February 4, 2022. *Id*.

55.     A court-appointed special master drew the congressional plan that North Carolina used for the 2022 elections, based on the General Assembly's remedial map and making changes necessary to bring the map into compliance with law.

56.     In early 2023, Legislative Defendants sought rehearing of the *Harper* decisions. *Harper*, 886 S.E.2d at 409. A newly-constituted North Carolina Supreme Court granted legislators' petition to rehear the partisan gerrymandering case in February 2023, and soon after held that "partisan gerrymandering claims present a political question that is nonjusticiable under the North Carolina Constitution." *Id*. at 300. The court also granted legislators' request to redraw the congressional and state legislative maps. *Id*. at 378.

**B. The 2023 Redistricting Process**

57.     The 2023 Process was even less transparent than the 2021 process. Before beginning work on the 2023 Plan, the General Assembly passed H.B. 259, a 625-page Appropriations Act, which included several provisions that ensured the 2023 and subsequent redistricting processes would be shielded from public scrutiny. In particular, the Appropriations Act repealed a 30-year old law that required redistricting materials to become public record after the passage of a redistricting plan and added a provision permitting members of the General Assembly and their staff to destroy records.

58.     The General Assembly waited to begin drawing the 2023 Plan until after it passed the Appropriations Act, ensuring the 2023 process would be almost entirely hidden from the

public. As a result, there are very few public records regarding the 2023 and 2025 redistricting processes.

59.    Before the 2023 redistricting process began in earnest, nonpartisan civil rights and voter advocacy organizations expressed their concern that the General Assembly would not have a "robust, transparent, and thoughtful process for receiving vital public input to draw new maps." These organizations requested "allow[ing] for at least two weeks of public comment and legislative hearings after draft maps are released and prior to a vote in the legislature," "buil[ding] in time to hold public comment hearings in each North Carolina Congressional district and each metropolitan and micropolitan area," and "provid[ing] a public written evaluation of the Congressional, state Senate, and state House plans following their release, explaining why the committees drew the districts in the way they did."[1]

60.    The General Assembly largely ignored all requests for transparency and public engagement. In the end, the General Assembly held only three public hearings during the 2023 redistricting process, and no draft maps or proposed redistricting criteria were shared in advance of any of the public hearings. No hearing provided a remote attendance option and all were held during business hours. None of these hearings were in Charlotte, Greensboro, Durham, or Winston-Salem, four of North Carolina's largest and most diverse population centers, and no hearings were held in the Black Belt counties.

61.    The 2023 redistricting process was further obfuscated by the General Assembly's use of an independent consultant in drafting the congressional map. The General Assembly hired Blake Springhetti, an out-of-state consultant to draw "concepts" of maps to use as a basis for the 2023 Plan. Even Mr. Springhetti was kept in the dark about the General Assembly's redistricting

---

[1] Williams Plaintiffs Proposed Findings of Fact and Conclusions of Law ("Williams FOFCOL") at 8, ECF No. 166.

process and decisionmaking. Over the course of his engagement, he was instructed by members of the redistricting committee to make various changes to the maps he drew, but he had no knowledge of the purpose of those changes, who requested the changes, or on what data they were based. After a series of revisions based on unknown criteria at the behest of unknown legislators, Mr. Springhetti provided his final draft maps to the General Assembly. Even then, Mr. Springhetti had no idea what criteria were ultimately considered or prioritized in the drawing of the 2023 Plan or how his "concepts" of maps were used in the creation of the 2023 Plan.

62.     Despite receiving comments from citizens and legislators concerned about racial vote dilution, Legislative Defendants did not conduct a racially polarized voting analysis prior to passing the 2023 Plan. Instead, Legislative Defendants gave the public an extremely limited window—a single business day—to submit racially polarized voting analyses to the General Assembly. Notwithstanding the condensed timeline, the Southern Coalition for Social Justice submitted a racially polarized voting analysis to Legislative Defendants by the deadline.

63.     The analysis examined 27 contested statewide elections in 2020 and 2022 and found definitive evidence of racially polarized voting patterns in North Carolina, including in the Northeast. A letter submitted with the analysis warned that there was "[e]xtreme racially polarized voting in North Carolina's Black Belt." It urged the General Assembly to "perform additional analysis" to "ensure[] that minority voters in North Carolina have an equal opportunity to elect candidates of their choice" and warned that the "[draft] maps and the process by which they are being considered run an alarming, unjustifiable risk of violating the VRA."[2]

64.     Senator Hise confirmed the committee chairs received and reviewed the letter but took no action in response. The committee chairs did not hire an expert to conduct the General

---

[2] Williams FOFCOL at 109–10, ECF No. 166.

- 14 -

Assembly's own racially polarized voting analysis, nor did they even allow the rest of the committee to vote on whether to conduct their own racially polarized voting analysis or raise the letter for debate.

65.     Senators Hise, Daniel, and Newton released a draft congressional plan on October 18, 2023 (Senate Bill 757), which ultimately became the enacted congressional plan with only minor modifications. Senator Hise was the primary drafter of the 2023 plan.

66.     On October 25, 2023—one week after the draft map was introduced—the General Assembly enacted the 2023 Plan. The map was not subject to gubernatorial veto.

67.     *Williams* Plaintiffs challenged the 2023 Plan as intentionally discriminatory in violation of the Fourteenth and Fifteenth Amendments, and as intentionally diluting the votes of Black voters under Section 2 of the Voting Rights Act. This Court held a trial over six days on June 16–18, June 20, and July 7–8, 2025.

68.     At trial, Plaintiffs presented extensive evidence of the 2023 Plan's discriminatory impact on Black voters in the Piedmont Triad and the Mecklenburg area. Multiple analyses demonstrated that Black voters were disproportionately carved out of CD-6 and spread across four districts in the Triad and disproportionately excluded from CD-14 and packed into CD-12, relative to white voters. And this racial sorting could not be explained by partisanship. Black Democrats, Republicans, and Independents were all more likely than their white co-partisans to be drawn outside of CD-6 and CD-14 and inside CD-12.

69.     The state's own experts' analyses repeatedly showed that the 2023 Plan treated Black voters differently than white voters in a statistically significant manner. And none of the state's experts could rule out race as a motivating factor behind the 2023 Plan.

- 15 -

70.     Evidence at trial also confirmed racially polarized voting in the state and in the challenged districts. Across all statewide contested partisan elections from 2016 through 2022, Black and white voters consistently supported different candidates. Statewide, white voters opposed Black-preferred candidates with more than 71% of the vote on average over this period.

71.     At trial, Legislative Defendants also leaned heavily on CD 1's "electoral history" as a justification for why "majority-black districts are not necessary in Northeastern North Carolina."[3] Legislative Defendants specifically boasted that "CD[]1 has been represented by an African American since 1992."[4]

72.     The trial on the 2023 Plan concluded on July 9, 2025. By August 5, 2025, the parties had submitted all post-trial briefing, and the cases were pending resolution. Eleven weeks later, before a decision was issued on the challenges to the 2023 Plan, the General Assembly enacted the 2025 Plan.

## C. The 2025 Congressional Redistricting Process

73.     On September 25, 2025, news reports surfaced that North Carolina State Senator Phil Berger was "expected to accept an endorsement from President Donald Trump" in his 2026 primary challenge, and that the endorsement "may come on any day in exchange for Berger redrawing Congressional District 1" in order to unseat Representative Don Davis.[5]

74.     On October 13, 2025, Republican leaders of the General Assembly announced plans for the General Assembly to consider a new Congressional map the following week.

---

[3] Leg. Defs' Post-trial Findings of Fact at 144, ECF No. 163.

[4] *Id.*

[5] Deana Harley, *Senator Berger denies accepting potential Trump endorsement in exchange for redistricting, but says redrawing could happen*, CBS17 (updated Sep. 26, 2025), https://www.cbs17.com/news/capitol-report/nc-senate-leader-phil-berger-to-get-endorsement-from-president-donald-trump-in-exchange-for-redistricting-sources-say/.

- 16 -

75. The 2025 process was the most hurried and closed off redistricting process in the state's history. The 2025 Plan went from introduction to passage in just over 48 hours. On October 20, 2025, Republican legislative leaders introduced S.B. 249 in the Senate Elections Committee and two days later, on October 22, the General Assembly enacted S.B. 249 as North Carolina's new congressional map.

76. Just as the news reports leading up to the October General Assembly sessions predicted, S.B. 249 targeted and dismantled Don Davis's CD-1, home to North Carolina's Black Belt and a district that had elected a Black member to Congress since 1992.

77. The 2025 redistricting process stood in stark contrast to traditional redistricting cycles in North Carolina, which regularly included months of hearings in multiple cities across the state, at which the public had the opportunity to review and comment on draft maps and redistricting criteria. In passing S.B. 249, the General Assembly provided even less opportunity for public involvement than the unusually truncated 2023 redistricting process. There were no public hearings at all, and public comment was limited to a comment portal and just one hour and eleven minutes during legislative proceedings.

78. Before the Senate Redistricting Committee, Legislative Defendants permitted a total of 30 members of the public to speak, each for a maximum of 1 minute. Every person who spoke vehemently opposed S.B. 249. Several speakers criticized the process and lack of any meaningful consideration of the concerns of members of the public, others emphasized the lack of need for another mid-decade redistricting, and still others criticized the obvious racial impact and motivation behind the targeting of Representative Davis's Black Belt district. Not a single person testified in support of the bill. And many additional members of the public who were not allowed

to speak nonetheless attempted to make themselves heard in protest against S.B. 249, chanting "Racist maps make racist reps" as they were escorted out of the hearing.[6]

79.     The following day, on October 21, 2025, public comments before the House Committee were also limited to just one minute each. And just as before the Senate Committee, each of the 26 members of the public who were permitted to speak strongly opposed the General Assembly's secretive, rushed, and racially-targeted process.

80.     At the Senate Committee hearing, Senator Hise testified that he drew the 2025 Plan and that it was identical to the 2023 Plan except with respect to the district lines for CD-1 and CD-3. When Senator Hise was asked whether any effort was made to remedy the alleged legal violations in the 2023 map that were "challenged in court," he responded that he saw "nothing" that needed to be remedied.

81.     Senator Hise also claimed that he "elected not to use race in drawing these proposed districts strictly to protect the state from lawsuits alleging illegal racial gerrymandering."

82.     But Senator Hise acknowledged that the Committee had not done anything to verify compliance with the Voting Rights Act. They conducted no racially polarized voting analysis and had received no information "regarding specifically legally significant racially polarized voting" during the 2025 process. And despite having previously acknowledged receipt of a racially polarized voting analysis during the 2023 process, Senator Hise claimed, "I think the committee in multiple meetings over drawing the previous map, asked for [racially polarized voting analyses] on multiple occasions. Nothing was ever submitted and no, we've not received any information regarding race on this map."

---

[6] Jen Rice, *'Racist Maps Make Racist Reps': North Carolina Advances GOP's Latest Gerrymander*, Democracy Docket (Oct. 20, 2025), https://www.democracydocket.com/news-alerts/racist-maps-make-racist-reps-north-carolina-advances-gops-latest-gerrymander/.

83. While Senator Hise disclaimed the use of racial data to draw the 2025 Plan, Senator Hise admitted that he was well "aware that district 1 has a higher minority population than the state average."

84. Representative Gloristine Brown confirmed that the specific use of racial data was not necessary to target Black voters. As she explained, "every single member of this body knows about the Black population in the northeastern part of" North Carolina.

85. At the Senate Floor Session on October 20, 2025, Senator Kandie Smith explained exactly what was going on: The 2025 Plan was being used as a "political weapon" with Black voters as the "target" because it was "designed to fracture historic coalitions" and "diminish voter turnout." Senator Gladys Robinson echoed Senator Smith; notwithstanding Senator Hise's statements that the map was "strictly about partisan politics," its disenfranchisement of Black voters meant it was squarely "about race."

86. During the House Floor Session on October 22, 2025, legislators continued to express alarm over the impact the 2025 Plan would have on Black North Carolinians.

87. Representative Marcia Morey told the Assembly that the 2025 Plan "target[ed] [CD] 1, known as the Eastern Black Belt of North Carolina," by "dividing and diluting historically black" voters. And Representative Pricey Harrison noted that the plan "clearly carves up the Black Belt" and Senator Hise "knows the districts well enough to know that he was splitting up the Black Belt."

88. The General Assembly rushed S.B. 249 through the legislative process at warp speed, squelching legislative debate and shutting down legislators' attempts to probe the motivations and justifications behind the map. Before the House, the controlling committee

members cut debate short while legislators pressed to debate the bill further. Representative Robert Reives put it succinctly: "We were thinking we'd have a little time to debate. We don't."

89. In conjunction with the 2023 Appropriations Act, which allows for destruction and shielding of documents related to redistricting, the lack of any meaningful opportunity for debate resulted in an extremely truncated legislative record—a dream for a legislature attempting to obscure the basis for its districting decisions. *See, e.g.*, *McCrory*, 831 F.3d at 228 (finding that where the challenged bill was rushed through the legislative process in three days, the "hurried pace . . . strongly suggest[ed] an attempt to avoid in-depth scrutiny" and supported a finding of discriminatory intent).

## D. SB 249—The 2025 Congressional Plan

90. The 2025 Plan continues North Carolina's long tradition of enacting redistricting plans that pack and crack minority voters into districts designed to minimize their voting strength.

91. In the Piedmont Triad and Mecklenburg, the 2025 Plan dilutes minority voting strength in identical fashion as the 2023 Plan. In the Piedmont Triad, the 2025 Plan extracts Black voters out of former CD-6 and disperses them across four primarily white districts, destroying a Black opportunity district. In Mecklenburg, the 2025 Plan removes Black voters from CD-14 in what used to serve as a Black opportunity district, and packs them into CD-12, a district in which Black voters already comfortably elected candidates of their choice.

92. In the Northeast, the 2025 Plan dilutes Black voting strength in a new way. It shuffles around counties with significant Black populations between CD-1 and CD-3 in order to significantly weaken a functioning Black opportunity district in former CD-1.

93. In total, the 2025 Plan targets three functioning Black opportunity districts that existed in the 2022 Plan. Two of these districts, former CD-6 and CD-14, were eliminated by the 2023 Plan and kept in an identical configuration in the 2025 Plan.

94.     Black voting strength in CD-1 was weakened in the 2023 Plan by the shuffling around of Black voters. But in 2024, Black voters still managed to elect their candidate of choice, albeit by a smaller margin than under the previous configuration. The 2025 Plan doubles down on CD-1, severely weakening Black electoral opportunity in Northeast North Carolina by substantially reconfiguring CD-1 to prevent Black voters from electing their candidate of choice.

### The Northeast (Congressional Districts 1 and 3)

95.     Northeast North Carolina includes North Carolina's "Black Belt" counties, as well as other counties with significant Black populations, which together form a community of interest in this region.

96.     Under the 2022 Plan, the Black Belt was contained in CD-1, and the district had a Black Voting Age Population ("BVAP") of 41.23%, which afforded Black voters the opportunity to elect their preferred candidates. In the 2023 Plan, the General Assembly reduced the BVAP to 40.42%, but Black voters were still able to elect their candidate of choice in the district, Don Davis. The 2025 Plan completely reconfigures CD-1, decreasing the BVAP of CD-1 by more than eight additional percentage points to 32.34%, resulting in a district in which Black voters are effectively prevented from electing their candidates of choice.

97.     The dismantling of CD-1 was accomplished by extracting Black communities and counties with significant Black populations in former CD-1 and reassigning them to CD-3. For example, Wilson (37.5% BVAP), Greene (36.2%), Wayne (30.0%), and Lenoir (39.1%) Counties were moved out of CD-1 and into CD-3. In exchange, numerous predominantly white counties, including Dare (1.8% BVAP), Beaufort (22.1%), Craven (19.4%), Pamlico (17.1%), Carteret (4.7%), and small segment of Onslow (13.0%) Counties were moved out of CD-3 and into CD-1. This county exchange increased the BVAP of CD-3 by more than eight percentage points, from

- 21 -

21.35% under the 2023 Plan to 29.4% under the 2025 Plan. Despite this increase in BVAP, CD-3 in the 2025 Plan remains a district in which Black voters have no opportunity to elect their preferred candidates.

98.     The reshuffling of counties between CD-1 and CD-3 affected Black voters more than any partisan group. While the newly-configured CD-1 decreases the Democratic voter percentage by approximately 4 points, the BVAP in CD-1 fell more than 8 percentage points. In other words, 2025 Plan moved Black voters at a far greater rate than Democrats.

99.     The 2025 Plan's redistribution of Black voters from CD-1 to CD-3 comes at the expense of traditional districting principles, including respect for communities of interest and political subdivision and geographical boundaries. For example, CD-1 and CD-3 together contain more county splits under the 2025 Plan than they did under either the 2022 or 2023 Plans. Under the 2022 Plan, Granville, Onslow, and Sampson Counties were each wholly contained in single districts. And, under the 2023 Plan, Onslow County was entirely contained in a single district. Under the 2025 Plan, however, all of these counties are split. CD-1 reaches small tendrils into both Granville County and Onslow County, while CD-3 splits Sampson and Onslow Counties.

100.    Under the 2025 Plan, the Black Belt counties in the Northeast are newly combined with far-flung white communities in order to limit the influence of Black voters living in these counties. CD-1 starts with an oddly shaped appendage that reaches into a section of Granville County, grabbing Black populations there, and combines them with the Black Belt counties; but the district then reaches east and south to connect these communities with predominantly white counties along the coast. CD-1 now includes all of the coastal counties along the eastern shore and reaches south to include Carteret County and a tiny sliver of Onslow County.



*The Northeast in the 2023 Congressional Plan*



*The Northeast in the 2025 Congressional Plan*

101.    These changes to CD-1 and CD-3 unlawfully dilute the voting strength of Black voters in Northeast North Carolina, dismantling a Black opportunity district in CD-1 while ensuring that Black voters remain unable to elect candidates of their choice in CD-3 as well.

102.    Black voters were not placed in or removed from this district to comply with the Voting Rights Act. To the contrary, Black voters are now *less* able to elect candidates of their choice.

### The Piedmont Triad (Congressional Districts 5, 6, 9, and 10)

103.    The 2025 Plan's configuration of the Piedmont Triad is identical to the 2023 Plan's configuration of this region.

104.    The Piedmont Triad is a region and community of interest in north-central North Carolina centered around three major cities: Greensboro (in Guilford County), Winston-Salem (in Forsyth County), and High Point (spanning Guilford, Davidson, Randolph, and Forsyth Counties). The Piedmont Triad has a substantial Black population, especially in these three cities.

105.    In the 2022 Plan, CD-6 included much of the Black population in the Piedmont Triad, including the entire cities of Greensboro and High Point, and part of Winston-Salem.

106.    Under the 2022 Plan, CD-6 had a BVAP of 31.65% and performed as an effective opportunity district where Black voters could elect their preferred candidates. In the 2023 Plan (like the 2025 Plan), the BVAP of CD-6 dropped by more than 12 percentage points to 19.31%, resulting in a district (and surrounding districts) in which Black voters can no longer elect their candidates of choice.

- 24 -



***Piedmont Triad Region in the 2022 Congressional Plan***



***Piedmont Triad Region in the 2025 Congressional Plan***

107. Under the 2023 and 2025 Plans, Black voters in former CD-6 who live in the Piedmont Triad—and specifically in Greensboro, High Point, and Winston-Salem—were dispersed across four separate congressional districts (CD-5, CD-6, CD-9, and CD-10) that span from Ashe County, which borders Tennessee and Virginia, to Hoke County, near the South Carolina border.

- 25 -

108.    The 2023 and 2025 Plans' redistribution of Black voters across multiple districts comes at the expense of traditional districting principles, including respect for communities of interest, political subdivision and geographical boundaries, and compactness.

109.    As a result of the reconfiguration of the Piedmont Triad, the compactness of CD-6, CD-9, and CD-10 dropped significantly in the 2023 and 2025 Plans, both visually and numerically. All four districts contain appendages and tendrils to carve out pockets of Black voters in Winston-Salem, Greensboro, and High Point to pair them with far-flung white populations.

110.    The 2023 and 2025 Plans also increased the number of political subdivision splits across the region. Although the 2022 Plan had just one county split in the Triad, the 2023 and 2025 Plans have three (one split in Forsyth County and two splits in Guilford County), which divides Guilford County among three different districts. Municipal splits also increased; the 2022 Plan contained only two municipality splits in the Triad, while the 2025 Plan has nine total municipality splits, including in each of the major cities of Winston-Salem, High Point, and Greensboro.

111.    In short, the 2023 and 2025 Plans carved Black voters up and out of former CD-6 and paired them with distant white voters diluting their voting power and eliminating a functioning Black opportunity district.

### Mecklenburg Area (Congressional Districts 12 and 14)

112.    The 2025 Plan's configuration of the Mecklenburg area is identical to the 2023 Plan's configuration of this region.

113.    Under the 2022 Plan, CD-14 consisted of two adjacent counties, Mecklenburg and Gaston, combining Black voters in Gastonia with other proximate Black communities. CD-14 in the 2022 Plan had a BVAP of 20.68% and performed as an effective minority opportunity district where Black voters could elect their preferred candidates. Under the 2023 and 2025 Plans, Black

- 26 -

voters were moved from CD-14 into CD-12, a district in which Black voters were already electing their candidates of choice by significant margins, and BVAP decreased by nearly five percentage points to 15.93%. Consequently, CD-14 no longer performs as a district in which Black voters can elect their candidates of choice.

114.     Under the 2023 and 2025 Plans, Mecklenburg County—home to the state's largest Black population—is split three ways, rendering CD-12 and its surrounding districts significantly less compact than they were in the 2022 Plan. CD-12 concentrates urban Charlotte Black voters into a single district and includes many of Mecklenburg County's most racially diverse precincts, while excluding white voters in south Charlotte from the district.



*CD-12 and CD-14 in the 2022 Congressional Plan*

- 27 -



*CD-12 and CD-14 in the 2025 Congressional Plan*

115.    Black communities were carved out of CD-14 and placed into CD-12 to the detriment of traditional districting principles in both districts. The reconfiguration of the Mecklenburg area rendered CD-12 and CD-14 less compact under the 2023 and 2025 Plans than they were in the 2022 Plan, with CD-14 sprawling around three sides of CD-12. The 2023 and 2025 Plans also increased the number of political subdivision splits across the region. While CD-12 contains much of the Black population from Charlotte, the district boundary does not track the municipality boundary. Instead CD-12 contains numerous appendages and splits that closely correspond with racial lines.

**E.  Racial Discrimination and Voting in North Carolina**

116.    The 2025 Plan is hardly North Carolina's first racially discriminatory redistricting plan or voting practice. North Carolina, has "'a long history of race discrimination generally and race-based vote suppression in particular.'" *Holmes v. Moore*, 270 N.C. App. 7, 20–21, 840 S.E.2d 244, 257 (2020) (quoting *McCrory*, 831 F.3d at 223).

117.    Northeast North Carolina is emblematic of this history. Home to some of the longest-standing Black communities in the U.S., it has a centuries-long legacy of political

- 28 -

organizing in response to official discrimination. For example, Princeville, in Edgecombe County, is the oldest town chartered by African Americans in the country, formed at the end of the Civil War. During Reconstruction, towns like Princeville placed Northeast North Carolina at the heart of Black political power. Known as the "Black Second," the 1st District and its predecessor district elected three of the first Black people to serve in Congress: John Hyman of Warren County, James O'Hara of Halifax County, and Henry Cheatham of Vance County.

118.    The Redemption movement brought an end to Black representation in North Carolina's congressional delegation and made George Henry White, elected in 1898 from Tarboro, North Carolina, the last Black member of Congress from the South until 1972. During the early and mid-twentieth century, Blacks in the Northeast faced extreme discrimination, including the use of literacy tests to deny Blacks the ability to exercise the franchise. Indeed, when Congress enacted the Voting Rights Act, it looked to "North Carolina's pre-1965 history of pernicious discrimination" and made "[f]orty North Carolina jurisdictions," including several counties that make up and surround the districts challenged here, "covered" jurisdictions under Section 5 of the Voting Rights Act based on their use of "suspect prerequisites to voting, like literacy tests." *McCrory*, 831 F.3d at 215, 223.

119.    "[S]tate officials [have] continued in their efforts to restrict or dilute African American voting strength well after 1980 and up to the present day." *Holmes*, 270 N.C. App. at 23, 840 S.E.2d at 258 (quoting *McCrory*, 831 F.3d at 225).

**F.  Totality of the Circumstances**

120.    Along with North Carolina's history of discrimination, the following factors show that under the totality of the circumstances, Black North Carolinians are less able to participate in the political process than their white counterparts.

- 29 -

### 1. Ongoing Effects of North Carolina's History of Discrimination

121.    The long history of discrimination against Black North Carolinians has produced stark disparities in housing, education, employment, health, criminal justice, and other areas which persist to this day and limit Black North Carolinians' ability to participate in the political process.

122.    For example, Black North Carolinians are still less likely to complete high school and college than white North Carolinians. Whereas a third of white North Carolinians have at least a bachelor's degree, only about a fifth of Black North Carolinians have a similar level of educational attainment. Based on worse educational outcomes, Black North Carolinians are at a disadvantage relative to white North Carolinians in participating in the political process.

123.    Black households in North Carolina also have substantially lower incomes than those of their white counterparts, and Black North Carolinians are unemployed at more than twice the rate of other racial groups. Recent data from 2010 to 2022 shows that the Black unemployment rate (12%) averaged double that of the white unemployment rate (6%). Similar disparities exist in the areas of home ownership and educational attainment, where white North Carolinians lead their Black counterparts by double-digits.

124.    The significant income disparity between Blacks and whites in North Carolina has grown over time. In 2010, the Black median household income was approximately $31,000, while that for whites was approximately $48,000—a difference of $17,000. In 2022, the difference had grown to $25,000: approximately $50,000 for Black households, compared to approximately $75,000 for white. On average, over the same time period, the Black poverty rate was double that of the white poverty rate. Whereas a little over 24% of Black North Carolinians live below the poverty level, that number is a little over 12% for white North Carolinians.

### 2. Elections in North Carolina are Characterized by Racial Appeals

125. In addition to North Carolina's history of discrimination and the ongoing negative effects of that history, political campaigns in North Carolina have been characterized by both explicit and implicit racial appeals, historically and in recent election cycles.

126. The following examples illustrate the prevalence of racial appeals in North Carolina campaigns in the present day. In 2018, a Republican Party executive, Dallas Woodhouse, repeatedly attacked the 2018 Democratic nominee for the state Supreme Court, Justice Anita Earls, by attempting to associate Earls with violent criminals. Despite Justice Earls having no involvement defending or adjudicating the case of defendant Tilmon Golphin, a Black man who was convicted of murdering two Cumberland County law enforcement offices, Woodhouse tweeted: "Claiming it was racist to execute this cop killer @AnitaEarls got him off death row." *Id*

127. In 2022, ads attacking the Democratic candidate for U.S. Senate Cheri Beasley described her as "dangerously liberal" and interspersed images of Beasley with multiple images of mugshots of Black men. Linking former Justice Beasley with crime suggested that she would or could not protect white North Carolinians from Black criminals.

128. In 2023, the North Carolina Republican Party issued a tweet targeting state Democrats along racial lines. Democrats, who were hosting a "Rally to Raise the Wage," invited Senator Bernie Sanders and former state NAACP chairman and Moral Monday pioneer Rev. William Barber II to speak. In response, the Republican Party tweeted, "Socialist Bernie Sanders is teaming up with *poverty pimp* William Barber to hold a rally with NC Democrats in Durham today."

129. Mark Robinson's 2024 gubernatorial campaign was also dominated by racial appeals. For example, Robinson referred to former First Lady Michelle Obama as a man, claiming she spoke "ghetto" and "wookie," and called the former First Lady "an angry, anti-American

communist Black lady." These and many other racial appeals have come to characterize elections in North Carolina; they prime voters to think along racial lines and contribute to racially polarized voting in the state.

### 3. Racially Polarized Voting

130. Courts have recognized that voting in North Carolina, both historically and today, is racially polarized, which means that "the race of voters correlates with the selection of a certain candidate or candidates." *McCrory*, 831 F.3d at 214 (quoting *Thornburg v. Gingles,* 478 U.S. 30, 62 (1986)).

131. Recent election results demonstrate that racial polarization persists statewide. For example, across all 63 statewide contested partisan elections from 2016 through 2024—Black and white voters consistently supported different candidates. Black voters were highly cohesive in support of Black-preferred candidates, supporting them with an average of 97.6% of the Black vote, while white voters were cohesive in opposing the Black-preferred candidate, with only 28.2% supporting the Black-preferred candidate. Figure 2 below shows the racially polarized voting statewide from 2016–2022.



**Figure 2:** Racially Polarized Voting Estimates by Election — Statewide

132. Similar levels of racial polarization exist in the challenged districts. In the Piedmont Triad, over that same time period, Black voters supported their preferred candidates with an average of 97.5% of their vote, while more than 76% of white voters, on average, opposed Black preferred candidates. Similarly, in CD-14, Black voters supported their preferred candidates with an average of 93.2% of the vote, while more than 80% of white voters, on average, opposed the Black-preferred candidates. And in the Northeast, racial polarization was comparable, with an

- 33 -

average of 97.3% of Black voters supporting the Black-preferred candidate and more than 82% of white voters on average opposing it. Figure 3 below shows racially polarized voting estimates in the Piedmont Triad, Northeast, Mecklenburg and CD-14 in all statewide partisan elections from 2016–2022.



**Figure 3:** Racially Polarized Voting Estimates by Region

133. Ultimately, racial polarization in voting in North Carolina "offers a 'political payoff for legislators who seek to dilute or limit the minority vote.'" *Holmes*, 270 N.C. App. at 22, 840 S.E.2d at 258 (quoting *McCrory*, 831 F.3d at 222). The fact that "race and party are inexorably linked in North Carolina" creates an "incentive for intentional discrimination in the regulation of elections." *McCrory*, 831 F.3d at 222.

- 34 -

#### 4. Extent to Which Black North Carolinians Have Been Elected to Public Office

134.    As a consequence of stark racial polarization in voting and the state's history of racial discrimination, as well as its ongoing effects, Black North Carolinians have struggled to be elected to public office in the state.

135.    It took the creation of the state's first two majority-Black districts in the early 1990s—CD-1 and CD-12—for Black North Carolinians to win election to federal office in the 20th century. The citizens of CD-1 and CD-12 have elected a Black representative in every election since 1992. And for the first time in 2022, North Carolina elected three Black representatives to Congress, from CD-1, CD-12, and CD-4. The 2025 Plan's dismantling of CD-1, however, is likely to make it impossible for a Black representative to win election in CD-1.

136.    Black North Carolinians have historically fared poorly in statewide elections, too. Of the 69 governors and 57 United States' Senators in North Carolina state history, none have been Black.

137.    Black North Carolinians have also consistently been underrepresented in the North Carolina General Assembly over the last 30 years. From 1992 to 2024, comparing the share of seats held by Black representatives in the General Assembly with North Carolina's Black population share, reveals that Blacks have been represented at about 76% of their population share. By contrast, white North Carolinians have been consistently overrepresented in the General Assembly at approximately 112% of their population share over the same time period.

138.    Finally, when Black candidates have been elected in North Carolina, they have almost exclusively come from majority-minority districts. 78.9% of all of the Black state legislators in North Carolina have come from majority-minority districts, including districts created as a result of Section 2 litigation.

- 35 -

# CAUSES OF ACTION

## COUNT I
### 2025 Congressional Plan's violations of the Fourteenth and Fifteenth Amendments to the U.S. Constitution
### U.S. Const. amends. XIV and XV; 42 U.S.C § 1983
### (Intentional Discrimination)

139.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

140.    The Fourteenth Amendment guarantees racial and ethnic minorities equal protection of the laws. U.S. Const. amend. XIV. And the Fifteenth Amendment guarantees that their votes will not be denied or abridged on account of their race or color. U.S. Const. amend. XV.

141.    The Equal Protection Clause of the Fourteenth Amendment and the Fifteenth Amendment to the U.S. Constitution forbid states from enacting laws for which a racially discriminatory intent or purpose is a motivating factor.

142.    To establish intentional discrimination, a plaintiff need only show that discriminatory purpose was "a" motivating factor in the legislation—not the only, or even the predominant, factor. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

143.    "Intentions to achieve partisan gain and to racially discriminate are not mutually exclusive." *Veasey v. Abbott*, 830 F.3d 216, 241 n.30 (5th Cir. 2016) (en banc). As the Fourth Circuit has clarified, "intentionally targeting a particular race[] . . . because its members vote for a particular party, in a predictable manner, constitutes discriminatory purpose. This is so even absent any evidence of race-based hatred and despite the obvious political dynamics." *McCrory*, 831 F.3d at 222–23; *see also Washington v. Davis*, 426 U.S. 229, 242 (1976) ("[D]iscriminatory purpose

- 36 -

may often be inferred from the totality of the relevant facts, including the fact . . . that the law bears more heavily on one race than another.").

144.    The Supreme Court has identified the following non-exclusive list of factors that may tend to prove intentional discrimination: (1) "The impact of the official action—whether it bears more heavily on one race than another. . . . Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." (2) "The historical background of the decision . . . , particularly if it reveals a series of official actions taken for invidious purposes." (3) "The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes . . . , Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role." (4) "Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." (5) "The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Arlington Heights*, 429 U.S. at 266–68 (quotations omitted).

145.    When "a State intentionally dr[aws] district lines in order to destroy otherwise effective crossover districts, that [] raises[s] serious questions under both the Fourteenth and Fifteenth Amendments." *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (plurality op.).

146.    The 2025 Plan was adopted, at least in part, with a racially discriminatory intent to discriminate against Black voters in violation of the U.S. Constitution.

147.    The 2025 Plan will have a discriminatory impact on Black North Carolinians—a fact that was foreseeable when Defendants drafted and passed the Plan. The General Assembly

- 37 -

has limited Black voters' ability to elect or even influence elections through the purposeful cracking and packing of these voters.

148.    In particular, the 2025 Plan intentionally dismantles CD-1, CD-6, and CD-14, which were effective Black opportunity districts under the 2022 plan.

149.    Moreover, other circumstantial evidence raises a strong inference of a discriminatory purpose motivating the enactment of the 2025 Plan, including North Carolina's well-documented history and ongoing record of discrimination against Black North Carolinians in redistricting and other voting practices, the sequence of events and non-transparent process that led up to the enactment of the 2025 Plan, and the stark disparity between the robust demographic gains for minority populations and decreased electoral opportunities for minority voters.

150.    Plaintiffs have no adequate remedy at law other than the judicial relief sought in this case. The failure to enjoin the conduct of elections under the 2025 Plan and ordering of remedial maps will irreparably harm Plaintiffs by subjecting them to intentionally racially discriminatory districts until the end of the decade.

## COUNT II
### 2025 Congressional Plan's violations of Section 2 of the Voting Rights Act
### 52 U.S.C. § 10301; 42 U.S.C §1983
### (Intentional Vote Dilution)

151.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the count below as though fully set forth herein.

152.    Section 2 of the Voting Rights Act of 1965 prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that has the purpose or effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. 52 U.S.C. § 10301(a). Plaintiffs establish a violation when "the totality of circumstances" show that a state's "political processes . . . are not equally open to participation

- 38 -

by" members of a minority group "in that [they] have less opportunity . . . to participate in the political process and to elect representatives of their choice." *Id*. § 10301(b). A plaintiff establishes an intentional Section 2 vote dilution claim by demonstrating that the plan was enacted with a discriminatory intent and had a discriminatory effect. *See, e.g.*, *Harding v. County of Dallas*, 948 F.3d 302, 312–13 (5th Cir. 2020).

153. "Demonstrating discriminatory intent . . . 'does not require a plaintiff to prove that the challenged action rested *solely* on racially discriminatory purpose[].'" *Allen v. Milligan*, 599 U.S. 1, 37 (2023) (quoting *Arlington Heights*, 429 U.S. at 265). Plaintiffs may establish a redistricting plan's discriminatory intent through the *Arlington Heights* factors. *See, e.g.*, *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 687 (2021).

154. And to demonstrate a plan's discriminatory effect, courts have considered a variety of additional factors, principal among them preconditions 2 and 3 identified in *Gingles*, 478 U.S. at 30, and the factors set out in the Senate Report to the 1982 amendments to the VRA ("Senate Factors"). *Gingles* precondition 2 examines whether minority voters are "politically cohesive," and *Gingles* 3 directs courts to examine whether the "white majority votes sufficiently as a bloc to enable it usually . . . to defeat the minority's preferred candidate." *Id*. at 51. Together, these factors examine the existence of racially polarized voting in a jurisdiction.

155. The Senate factors provide additional evidence of a redistricting plan's discriminatory effect; these factors direct courts to examine: (1) the history of official voting-related discrimination in the state or political subdivision; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election

- 39 -

districts, majority-vote requirements, and prohibitions against bullet-voting; (4) the exclusion of members of the minority group from candidate slating processes; (5) the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; (6) the use of overt or subtle racial appeals in political campaigns; (7) the extent to which members of the minority group have been elected to public office in the jurisdiction; (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of members of the minority group; and (9) whether the policy underlying the state's practice or procedure is tenuous.

156.   The Senate Report and the cases interpreting it make clear that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1566 n.33 (11th Cir. 1984) (quoting S. Rep. No. 97-417, 97th Cong., 2nd Sess., at 29 (1982)); *see also id.* at 1566 ("The statute explicitly calls for a 'totality-of-the circumstances' approach and the Senate Report indicates that no particular factor is an indispensable element of a dilution claim.").

157.   Every relevant factor supports a finding of intentional vote dilution here. There is racially polarized voting in North Carolina and in the challenged districts, and the application of the Senate Factors in North Carolina provides additional evidence of the 2025 Plan's discriminatory effect. Among other things, there is a long history of official discrimination in North Carolina the effects of which are felt by Black North Carolinians in education, employment, income, health and in a host of other facets of life; Blacks have had limited electoral success in North Carolina; and campaigns in the state are characterized by racial appeals. The 2025 Plan violates Section 2 of the Voting Rights Act because under the totality of the circumstances, the

- 40 -

Plan has the purpose and effect of diluting the voting power of Black voters in CD-1, CD-6, CD-12, and CD-14, and Black voters have less opportunity than other members of the electorate to elect candidates of their choice.

158.     Plaintiffs seek relief and all available remedies under 42 U.S.C. § 1983 and Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

**COUNT III**
**2025 Congressional Plan's violations of the Fourteenth Amendment and Article I, § 2 of the U.S. Constitution**
**U.S. Const. amend. XIV; Article I § 2; 42 U.S.C § 1983**
**(Malapportionment)**

159.     Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

160.     "The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote." *Gray v. Sanders*, 372 U.S. 368, 381 (1963). When applied to congressional districts, pursuant to Article I, Section 2 of the Constitution, states must "draw congressional districts with populations as close to perfect equality as possible," *Evenwel v. Abbott*, 578 U.S. 54, 59 (2016), or in other words, "as nearly as is practicable." *Wesberry v. Sanders*, 376 U.S. at 1, 7–8 (1964). This requires states to make a "good-faith effort to achieve precise mathematical equality." *Kirkpatrick v. Preisler*, 394 U.S. 526, 530–31 (1969) (citing *Reynolds v. Sims*, 377 U.S. 533, 577 (1964)).

161.     When districts are not drawn to contain equal populations, voters in districts containing a larger population have their votes diluted in that they have less ability to influence the outcome of an election when compared to voters in districts that are not overpopulated. *See Kirkpatrick*, 394 U.S. at 531 ("Equal representation for equal numbers of people is a principle

- 41 -

designed to prevent debasement of voting power and diminution of access to elected representatives.").

162.    North Carolina did not make a good-faith effort to achieve mathematical equality across districts. Quite the opposite—North Carolina acted in bad faith by redrawing its districts without care for any of the population shifts that have occurred since the 2020 census—all in a race-based gambit to increase the number of Republican representatives from the state's congressional delegation at the expense of its own citizens.

163.    S.B. 249 fails to achieve anything close to precise mathematical equality in populations across North Carolina's districts. Because it is based on a census taken five years ago, S.B. 249 fails to take account of shifts in North Carolina's population. North Carolina's population grew by 605,000 between the 2020 census and 2024.[7] From July 1, 2023, to July 1, 2024, alone, North Carolina's population grew by 165,000 people—the fourth largest population gain in the nation.

164.    This growth has been uneven. Between July 2022 and 2023, twenty-six counties had higher population growth rates than North Carolina as a whole.[8]

165.    The trends of uneven growth continued between 2023 and 2024. For example, Brunswick County, one of North Carolina's fastest growing counties, increased by 4.54% in that time, while Hyde County's population decreased by 1.18%.[9]

---

[7] Michael Cline, *North Carolina Now Home to Over 11 Million People*, N.C. Off. of State Budget & Mgmt. (Dec. 20, 2024), https://www.osbm.nc.gov/blog/2024/12/20/north-carolina-now-home-over-11-million-people.

[8] Lisa Carlson, *75 NC counties have grown in population since 2022,* Carolina Demography (Mar. 18, 2024), https://carolinademography.cpc.unc.edu/2024/03/18/75-nc-counties-have-grown-in-population-since-2022/.

[9] U.S. Census Bureau, *County Population Totals and Components of Change: 2020-24* (Mar. 2025), https://www.census.gov/data/tables/time-series/demo/popest/2020s-counties-total.html.

166.    Senator Hise confirmed that the General Assembly relied exclusively on 2020 Census data in attempting to ensure that the 2025 Plan's districts were evenly apportioned.

167.    Although states generally "operate under the legal fiction" that plans remain constitutionally apportioned for ten years after they are adjusted for a given census, *Georgia v. Ashcroft*, 539 U.S. 461, 488 n.2 (2003), states should not get the benefit of that legal fiction when they choose to engage in unnecessary, mid-decade redistricting. The purpose of this legal fiction is to "*avoid* constant redistricting." *LULAC*, 548 U.S. at 421 (emphasis added). Extending the legal fiction to unnecessary, mid-decade redistricting would turn its purpose on its head, such that it would enable, rather than avoid, constant redistricting.

168.    Here, unlike in *LULAC v. Perry*, the prior map being replaced by mid-decade redistricting was itself a legislatively enacted map. As a result, a preference for legislatively enacted rather than court-drawn districts provides no justification for extending the legal fiction of equal population to cover North Carolina's voluntary choice in S.B. 249 to redraw its existing Congressional districts now.

169.    Plaintiff Armenta Eaton is among the voters injured by North Carolina's decision to enact mid-decade malapportioned maps. Armenta Eaton lives in CD-13, which under the 2025 Plan is overpopulated by thousands of residents according to recent ACS data. Armenta Eaton's vote is therefore diluted relative to the vote of other North Carolinians in other, underpopulated districts.

170.    By engaging in the acts and omissions alleged herein, Defendants have acted and continue to act to deny Plaintiffs rights guaranteed to them by the Fourteenth Amendment and Article I § 2 of the United States Constitution, enforceable under 42 U.S.C. § 1983. Defendants will continue to violate those rights absent relief from this Court.

- 43 -

## COUNT IV
## 2025 Congressional Plan's violations of the First and Fourteenth Amendments to the U.S. Constitution
## U.S. Const. amends. I, XIV; 42 U.S.C § 1983 (Freedom of Speech and Assembly and Equal Protection Clause – Racial Data and Partisan Advantage)

171.    Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

172.    Ordinarily, a state's consideration of race in lawmaking will be subject to strict scrutiny, but courts have been willing to tolerate the consideration of race and the pursuit of partisan advantage in redistricting because they are seen as essential to the necessary task of adjusting districts to reflect population changes after each decennial census. *See Miller v. Johnson*, 515 U.S. 900, 916 (1995); *Rucho v. Common Cause*, 588 U.S. 684, 700–01 (2019). But here, nothing about North Carolina's mid-decade redistricting is necessary, and the General Assembly is thus unable to justify consideration of race or any pursuit of partisan advantage in adopting those districts. The General Assembly's voluntary decision to revise previously enacted districts therefore violates the Constitution.

173.    In ordinary decennial redistricting, the Supreme Court has held that complaints about partisan gerrymandering are nonjusticiable in that context, because prohibiting pursuit of "partisan interests" in redistricting might make it impossible for partisan legislatures to draw districts at all. *Rucho*, 588 U.S. at 700–01. The Supreme Court has also emphasized that legislators will "almost always be aware of racial demographics" when they draw districts, and it has therefore imposed a higher standard before subjecting districts drawn with an awareness of race to strict scrutiny—otherwise, redistricting might be impossible. *Miller*, 515 U.S. at 916.

174.    Those rationales take as a given that the act of redistricting is necessary, or at least desirable. Absent a court order (and there is no such order here), mid-decade revision of previously

- 44 -

enacted districts is entirely optional, so there can be no necessity justification for the legislature's use of race or for its pursuit of partisan advantage.

175.    The North Carolina General Assembly's voluntary choice to make unnecessary mid-decade changes to the state's congressional districts eliminates any inevitability justification for the use of racial considerations or the pursuit of partisan advantage in the redistricting process. Even if racial and partisan considerations are an unavoidable part of redistricting, there is no need for legislatures to take those considerations into account more than once in a single decade, unprompted by a court order or the necessity of replacing a court-ordered map.

176.    As a result, the General Assembly's consideration of racial information and pursuit of partisan advantage as part of a voluntary, unnecessary mid-decade revision of legislatively enacted congressional plans violates the First Amendment and the Equal Protection Clause.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

a.    Declare that the 2025 Plan is unconstitutional because it was passed with discriminatory intent as a motivating factor in violation of the Fourteenth and Fifteenth Amendments;

b.    Declare that the 2025 Plan is intentionally discriminatory in violation of Section 2 of the Voting Rights Act;

c.    Declare that the 2025 Plan is unjustifiably malapportioned in violation of one person, one vote in Article I, § 2 of the U.S. Constitution and the Fourteenth Amendment;

d.    Declare that the 2025 Plan unnecessarily and unjustifiably considers racial and partisan demographics as part of a voluntary, mid-cycle redistricting in violation of the First and Fourteenth Amendments;

e.    Enjoin Defendants, as well as their agents and successors in office, from enforcing

- 45 -

or giving any effect to the boundaries of the congressional districts in the 2025 Plan, including an injunction barring Defendants from conducting any congressional elections under the 2025 Plan;

f. Hold hearings, consider briefing and evidence, and otherwise take actions necessary to order the adoption of a valid congressional plan in the State of North Carolina; and

g. Grant such other or further relief the Court deems appropriate, including but not limited to an award of Plaintiffs' attorneys' fees and reasonable costs.


Dated: October 31, 2025

**PATTERSON HARKAVY LLP**

By: /s/ *Narendra K. Ghosh*
Narendra K. Ghosh, NC Bar No. 37649
100 Europa Dr., Suite 420
Chapel Hill, NC 27517
(919) 942-5200
nghosh@pathlaw.com

*Counsel for Plaintiffs*

**ELIAS LAW GROUP LLP**

By: /s/ *Lalitha D. Madduri*
Lalitha D. Madduri*
Lucas Lallinger*
Qizhou Ge*
James J. Pinchak*
250 Massachusetts Ave., Suite 400
Washington, D.C. 20001
Phone: (202) 968-4490
Facsimile: (202) 968-4498
LMadduri@elias.law
LLallinger@elias.law
AGe@elias.law
JPinchak@elias.law

Abha Khanna*
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
Phone: (206) 656-0177
Facsimile: (206) 656-0180
AKhanna@elias.law

* *Special Appearance pursuant to Local Rule 83.1(d)*