# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| SHAUNA WILLIAMS, et al., | |
| *Plaintiffs*, | |
| v. | Civil Action No. 23 CV 1057 |
| REPRESENTATIVE DESTIN HALL, in his official capacity as Chair of the House Standing Committee on Redistricting, et al., | |
| *Defendants*. | |
| _____ | |
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP, et al., | |
| *Plaintiffs*, | |
| v. | Civil Action No. 23 CV 1104 |
| PHILIP BERGER, in his official capacity as the President Pro Tempore of the North Carolina Senate, et al., | |
| *Defendants.* | |

## NAACP PLAINTIFFS' MEMORANDUM IN SUPPORT OF THE
## MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................I

INTRODUCTION ........................................................................................................1

STATEMENT OF FACTS ............................................................................................2

    I.      Black Voters File Suit in this Court Challenging 2023 CD1 ................................2

    II.    The General Assembly Swiftly Redraws CD1 to Punish Voters .........................3

    III.   SB249 Inflicts Numerous Harms on Black Voters in and around CD1...............6

QUESTIONS PRESENTED ..........................................................................................8

LEGAL STANDARD....................................................................................................8

ARGUMENT.................................................................................................................8

    I.      Plaintiffs are Likely to Succeed on the Merits....................................................8

        A.   Defendants' Have Retaliated Against Voters In Violation of the First
           Amendment. ..........................................................................................8

        B.   Defendants have Violated Plaintiffs' Right to Petition ......................20

    II.    SB249 Will Cause Irreparable Harm. ................................................................23

    III.   The Equities and the Public Interest Favor Plaintiffs. .......................................24

CONCLUSION ...........................................................................................................25

## INTRODUCTION

Last week, the North Carolina General Assembly (the "NCGA") redrew the State's congressional districts *again.* In a virtually unprecedented move, the NCGA engaged in mid-decade redistricting entirely on its own initiative. No new Census compelled it. No intervening court order prompted it. No legitimate state interest justified it. The NCGA targeted Congressional District 1 in the redistricting process for one reason alone: to punish the voters in North Carolina's historic Black Belt, including Plaintiffs, who had challenged the previous districting plan in this Court and who exercised their political power to oppose the map-drawers' preferred candidates and policies in 2024.

Senate Bill 249 (S.L. 2025-95) ("SB249") targets the heart of the Black Belt—Congressional District 1 ("CD1"), already challenged in its prior configuration as intentionally discriminatory. SB249 exacerbates the already-demonstrated vote dilution in CD1 by massively reducing the district's Black voting-age population and eviscerating North Carolina's longstanding Black Belt district.

Plaintiffs seek a preliminary injunction on two grounds supported by Defendants' own statements preceding and during the legislative process: retaliation in violation of the First Amendment and frustrating Plaintiffs' right to petition the government for redress of grievances. SB249 is a paradigmatic act of retaliation, punishing Plaintiffs for their protected political expression, association, and petitioning activity, specifically their organizing, voting, and litigating in 2024. And by replacing the challenged 2023 map before this Court could rule in Plaintiffs' pending case, the NCGA has attempted to subvert

1

judicial review altogether, inviting an endless loop of un-remediable injury in violation of the First Amendment right to petition.

Because the Constitution does not permit the State to convert redistricting into a weapon of retaliation or a mechanism for evading federal judicial review, this Court should preliminarily enjoin SB249.

## STATEMENT OF FACTS

**I.    Black Voters File Suit in this Court Challenging 2023 CD1**

In 2023, the NCGA enacted a congressional plan that shifted the lines of CD1, diluting the voting power of Black voters in North Carolina's historic Black Belt district by removing high Black Voting Age Population ("BVAP") areas and replacing them with predominantly White counties. *See generally* Doc. 165 ¶¶219-41. Plaintiffs challenged this district, alleging intentional dilution in violation of Section 2 of the Voting Rights Act and intentional discrimination in violation of the Fourteenth and Fifteenth Amendments. Doc. 105 (Counts 7 and 9). In June and July 2025, this Court presided over a full trial on the merits.

As the trial record demonstrates, CD1 and northeastern North Carolina are characterized by extreme racially polarized voting. *E.g.*, Doc. 165 ¶¶273-85. These voting patterns reflect *racial*, and not merely partisan, divides. *See id.*; NAACPPX195 ¶¶4, 130-31. This extends to CD1 and the 2024 election in particular, as the expert analysis showed:

2



*NAACPPX208 at Figure 9*



*NAACPPX211 at Figure C-5*

In post-trial briefing, Defendants argued no dilution was proven because CD1 "performed in 2024 for Democrats whom Plaintiffs identified as the Black-preferred candidates," and that "Plaintiffs cannot credibly claim discriminatory effect where their candidates of choice prevailed," and where "the BVAP of these districts did not meaningfully change between plans." Doc. 164-1 ¶84.

## II. The General Assembly Swiftly Redraws CD1 to Punish Voters

On October 13, 2025, unprompted by any court order or new release of Census data, and while this Court's trial ruling remained pending, Senator Phil Berger's office announced the legislature would convene to consider new congressional maps. Exhibit 4, Klein Declaration ("Klein Ex."). The release expressed an intent to draw an additional Republican seat and "safeguard[] Republican control of Congress" to "defeat" the efforts of "Democrats[ to] sue-until-blue." *Id.*

On October 16, Senator Berger's office announced the release of a draft congressional map, Klein Ex. 5, changing the configuration of CD1 and CD3 as shown below:



*Ex. A at Figure 1*

The Senate Committee on Elections scheduled a meeting for just four days later, October 20. Klein Ex. 6. The Committee listed the draft map as a proposed committee substitute for SB249, an unrelated campaign finance bill filed March 6, 2025, and first read on the Senate Floor on March 10. Klein Exs. 1-3, 7-8. There is no recent precedent for the NCGA's using this maneuver for apportionment bills.[1]

In the October 20 Committee meeting, Senator Ralph Hise disclosed himself as the sole map-drawer and stated that "the motivation behind this redraw is simple and singular:

---

[1] *See* ncleg.gov/redistricting (containing links to bill summaries indicating all filed versions of proposed plans post-2020 Census were originally filed as apportionment bills).

4

draw a new map that will bring an additional Republican seat to the North Carolina Congressional delegation," Klein Ex. 10 at 4:00-4:15; *see also* Klein Ex. 9 (written plan criteria stating this goal). Senator Hise explained the proposed change "moves NC District 1 from a district where President Trump earned 51% of the vote in 2024 to 55% of the vote," and accomplished this by "look[ing] at what the political outcome was of all the counties as well as the [Voting Tabulation Districts] in eastern North Carolina," Klein Ex. 10 at 9:29-10:01, 19:55-20:45, and the 2024 presidential election in particular. *Id.* at 25:41-26:12.

While Senator Hise disavowed using racial data to draw specific lines, he conceded his "general knowledge of the demographics of this state" including that "District 1 has a higher minority population." *Id.* at 44:30-45:46. Senator Hise also erroneously claimed Democrats had conducted mid-decade redistricting in a similar posture in 1967, *id.* at 53:49-54:10. In reality, that redistricting had been required by a court order. *See* Klein Ex. 20.

In Senate floor debate just hours later, all five proposed amendments to SB249 were either tabled or ruled out of order. *See generally* Klein Exs. 1, 11. Senator Berger moved to cut off debate, and the bill passed its second reading. Klein Ex. 11 at 2:21:07-2:32:12. A vote on the third reading was attempted but (following an objection) the Senate recessed until the next day. *Id.* at 2:27:45-2:42:02.

On October 21, another amendment was tabled, Klein Ex. 14, and the Senate voted to exclude a dissenting speech by Senator Garrett from the record, another unusual move. Klein Ex. 13 at 41:48-43:35. SB249 then passed the Senate and went to the House,

5

where it passed its first reading, received favorable reports from multiple committees, and was sent back to the full House for a floor vote, *all in one day*. Klein Exs. 1, 15, 16.

On October 22, the House debated SB249 for approximately an hour. Klein Ex. 17. SB249 then passed second and third readings and was adopted into law, just two days after its first consideration in a Senate Committee and less than a week after public disclosure. Klein Exs. 1, 18. In the few days between announcing the new plan and enacting it, the legislature received over 12,000 written public comments via an online portal indicating strong, near-unanimous opposition. Klein Ex. 21; Ex. J (J. Sailor Jones Decl.) ¶8. This level of opposition is consistent with recent polling indicating that supermajorities of North Carolinians across all political affiliations think voting districts in the State should fairly represent all communities and political viewpoints. Klein Ex. 27 at 8; Ex. J ¶13.

## III. SB249 Inflicts Numerous Harms on Black Voters in and around CD1.

CD1 has historically provided Black voters an opportunity to elect their candidate of choice and elected a Black representative since at least 1992. *See* Klein Ex. 22; NAACPPX 179 at 14, 65, 98 (Leloudis Rep.); NAACPPX 181 at 47 (Bagley Rep.); *see also* Exs. I (Maxwell Decl.) ¶7, J ¶6. But SB249 drastically decreases the BVAP of CD1 by 8%, causing a near-perfect division of BVAP between CD1 (32.34%) and CD3 (29.4%). Ex. A (Fairfax Rep. at Tables 1, 3).

SB249 thus dilutes the voting power of highly cohesive Black voting populations in this area, causing a "clear decline" in performance of Black-preferred candidates and, as indicated in the below table, making it highly unlikely that Black voters in either district

will have an opportunity to elect congressional candidates of choice. Ex. B (Oskooii Rep. ¶¶4-7).[2]

| Plan | Racial Composition of Districts | | Success of Black-Preferred Candidates by Election Year | | | | |
|---|---|---|---|---|---|---|---|
| 2025 Enacted | 2020 Census Voting Age Population (VAP) | | 2024 (15 Elections) | 2022 (7 Elections) | 2020 (20 Elections) | 2018 (4 Elections) | 2016 (18 Elections) |
| **CLD** | *% NH White* | *% Black* | *Win Rate* | *Win Rate* | *Win Rate* | *Win Rate* | *Win Rate* |
| 1 | 59.73% | 32.34% | 7% | 0% | 5% | 50% | 33% |
| 3 | 56.17% | 29.40% | 7% | 0% | 0% | 50% | 17% |

*Ex. B at Table 2*

Beyond electoral outcomes, these drastic changes to CD1 and CD3 will have other harmful consequences for voters, especially civically-engaged voters in the Black Belt like Plaintiffs. For example, Arthur Lee Johnson voted for Representative Davis in 2024 and has long conducted voter registration, education, and get-out-the-vote efforts in his community around congressional elections, including in Wilson County and neighboring Black Belt counties where he has deep ties and associations, like Edgecombe and Bertie (which, unlike Wilson County, will remain in CD1). *See* Ex. F (Johnson Decl.) ¶¶5-8, 12. Under SB249, Mr. Johnson has lost his status as a CD1 voter, will be unable to vote for or be represented by his preferred candidate, and will have to build new relationships for advocacy in CD3 from the "ground up." *Id*. ¶¶13-16. When SB249 passed, he was working to set up a town hall with Congressman Davis. *Id.* ¶11. Those efforts are now on hold. *Id.*

Mr. Johnson is not alone. Other individual and organizational plaintiffs will suffer similarly. *See, e.g.*, Exs. E (Calvin Jones Decl.) ¶¶8-13 (Mr. Jones can no longer leverage

---

[2] These win rates are consistent with the results in the NCGA's own "StatPacks" for SB249. Klein Ex. 21.

his full coalition of Black Belt farmers to advocate with his congressman; he has no connections in coastal counties added to CD1 and expects to be treated as a "telemarketer" reaching out to them); G (Sutton Decl.) ¶¶12-13 (Ms. Sutton's connections to community advocates in CD1 are now "severed"), H (Patterson Decl.) ¶¶8-9 (Mr. Patterson removed from CD1 after building successful lobbying efforts in his district); I ¶¶9-10 (NAACP will have to start from scratch to build chapters in coastal counties further away from its office added to CD1).

## QUESTIONS PRESENTED

Should a preliminary injunction against SB249 be granted to maintain the status quo for the 2026 elections?

## LEGAL STANDARD

To obtain a preliminary injunction, Plaintiffs "must demonstrate that (1) they are likely to succeed on the merits; (2) they will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in their favor; and (4) the injunction is in the public interest." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014).

## ARGUMENT

### I.      Plaintiffs are Likely to Succeed on the Merits.

#### A. *Defendants' Have Retaliated Against Voters In Violation of the First Amendment.*

Defendants initiated gratuitous mid-decade redistricting to retaliate against voters, including Plaintiffs, for voting a particular way, for associating with like-minded voters to

8

support candidates that would speak to common interests and values, and for petitioning their government against Defendants' redistricting initiatives.

Unlike the partisan gerrymandering disputes the Supreme Court has deemed nonjusticiable, this case concerns not *how* lines are drawn, but *whether* the decision to redraw the map was itself legitimate. While "a legislature may pursue partisan ends when it engages in redistricting," *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 6 (2024), it may not engage in redistricting gratuitously to punish citizens for exercising their First Amendment rights. This case presents a novel set of facts requiring no assessment of degree or balance among redistricting considerations: the harm here was straightforward, admittedly intended, and undisputably accomplished. Because Defendants engaged in impermissible retaliation, Plaintiffs are likely to prevail on their First Amendment challenge.

1. <u>Defendants Redrew the Congressional Map to Punish Voters for Exercising Their First Amendment Rights.</u>

The First Amendment prohibits laws "abridging the freedom of speech" or "the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. The government may not stop someone from exercising their First Amendment rights in advance, nor may it punish someone for exercising those rights "after the fact." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022).

To prevail on a First Amendment retaliation claim, Plaintiffs must establish "that (1) [they] engaged in protected activity, (2) the defendant took some action that adversely affected his constitutional rights, and (3) there was a causal relationship between his

9

protected activity and the defendant's conduct." *Williams v. Mitchell*, 122 F.4th 85, 89 (4th Cir. 2024). Plaintiffs are likely to meet that test and prevail on the merits.

*Protected Activity.* Plaintiffs engaged in protected First Amendment activity by voting and organizing in 2024 and by filing this lawsuit. The First Amendment protects political expression, including support for, affiliation with, and voting in favor of one's chosen candidate. *See Elrod v. Burns*, 427 U.S. 347, 356 (1976) (plurality opinion) ("[P]olitical belief and association constitute the core of those activities protected by the First Amendment."); *see also NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958) ("[F]reedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of . . . freedom of speech."). That expression includes "the freedom to join together in furtherance of common political beliefs." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000) (quoting *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214-15 (1986)); *see also Kusper v. Pontikes*, 414 U.S. 51, 56-57 (1973).

The First Amendment also safeguards the right "to petition the Government for a redress of grievances." U.S. Const. amend. I. That right "extends to all departments of the Government" and thus includes "[t]he right of access to the courts," such as by filing a lawsuit. *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) (citations omitted); *see also Borough of Duryea v. Guarnieri*, 564 U.S. 379, 397 (2011).

A majority of voters in CD1, including Plaintiffs Dawn Daly-Mack, Calvin Jones, Arthur Lee Johnson, Barbara Sutton, and Courtney Patterson, engaged in protected activity in 2024 when they voted for and joined in association with other voters (including an estimated 98.3% of Black voters) to elect a candidate of their choice for Congress affiliated

10

with the Democratic party. *See* Exs. C, E-H; NAACPPX208 at Fig. 9. The vast majority of these voters, including these Plaintiffs (and an estimated 98.3% of Black voters) also voted in favor of a 2024 presidential candidate of their choice affiliated with the Democratic party. *See* Exs. C, E-H; NAACPPX211 at Fig. C-5.

Plaintiffs also engaged in protected petitioning activity when they filed this lawsuit challenging the 2023 configuration of CD1 as an intentional attempt to dilute their votes and those of other Black voters.

*Causal Relationship.* Defendants chose to engage in redistricting to retaliate against Plaintiffs for their protected speech and litigation activity. To establish the requisite causation, Plaintiffs must demonstrate that their protected First Amendment activity "was a 'substantial' or 'motivating' factor in the defendant[s'] decision to take action against [them]," in which case "the burden shifts to the defendant[s] . . . to show that [they] would have taken the same adverse action even in the absence of the protected [First Amendment activity]." *Gonzalez v. Trevino*, 602 U.S. 653, 662-63 (2024) (Alito, J., concurring) (quoting *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 287 (1977)).

By their own account, and as noted above, the NCGA and Senator Hise redrew CD1 and CD3 in 2025 because of how Plaintiffs voted in 2024, i.e., their joining with others in their community to support Representative Davis and Kamala Harris, candidates disfavored by the NCGA and Senator Hise, rather than President Trump. Defendants once again targeted the Black Belt (as opposed to other, Whiter Democratic-voting areas of the state) to crack a cohesive population of voters because in 2024 they engaged in constitutionally protected activity by organizing and voting for their preferred candidates.

Senator Hise testified to using the 2024 presidential election results in redrawing district lines. Klein Ex. 10 at 25:41-26:12. The NCGA and Senator Hise, by their own account, gratuitously initiated the redistricting process mid-decade, to diminish (and effectively preclude) the ability of voters who engaged in disfavored speech to elect a Congressman. In addition, Plaintiffs were also targeted for exercising their right to petition by filing this lawsuit, which legislative leaders branded a "sue-until-blue" tactic and now seek to punish with even deeper vote dilution. Klein Ex. 4.

To achieve this purpose, they targeted high-BVAP counties. For example, 39.14% BVAP Wilson County, the home county of Plaintiff Arthur Lee Johnson, was carried by both Representative Davis and presidential candidate Harris, candidates affiliated with the NCGA-disfavored Democratic party. Ex. A (Fairfax at Table 5); Klein Ex. 23. And in 40.47% BVAP Lenoir County, the home of Plaintiffs Barbara Sutton and Courtney Patterson, Rep. Davis came within 120 votes of carrying the county. Ex. A (Fairfax at Table 5); Klein Exs. 23, 24. Both counties were moved out of CD1, with counties of much lower BVAP population and where voters expressed viewpoints favored by the map-drawers moved in. Ex. A (Fairfax Rep. at Fig. 1, Table 5); Ex. B (Oskooii Rep. At 3-4).

Defendants cannot establish that they would have initiated the map-drawing process in the absence of Plaintiffs' First Amendment-protected activity. In other cases, the state legislators could point to some non-retaliatory reason for drawing new congressional maps. Those reasons may include (1) drawing a new map following the release of the Census (*e.g.*, *Gill v. Whitford*, 585 U.S. 48, 54-55 (2018)); (2) replacing a map that has been invalidated by a court (*e.g.*, *Rucho v. Common Cause*, 588 U.S. 684, 691 (2019)); or (3)

replacing a court-drawn map with a legislature-drawn map (*e.g.*, *LULAC v. Perry*, 548 U.S. 399, 412-13 (2006)). Here, though, Defendants cannot identify any valid, non-retaliatory reason to engage in the 2025 redistricting at all. They initiated the redistricting process *solely* to target voters in CD1, and punish them via line-drawing based upon voters' past political expression and litigation activity.

 *Adverse Action.* Finally, Defendants' retaliation has "adversely affected [Plaintiffs'] constitutional rights." *Williams v. Mitchell*, 122 F.4th 85, 89 (4th Cir. 2024); *see also Houston Cmty. Coll. Sys.*, 595 U.S. at 477-78. Because "there is no justification for" punishing people for exercising their constitutional rights, the adverse effect "need not be great" to be actionable. *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) (Posner, J.) (cited approvingly in *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005)). Indeed, "even minor retaliation" can support a retaliation claim so long as it has "a chilling effect on future expression." *Kirby v. City of Elizabeth*, 388 F.3d 440, 450 n.8 (4th Cir. 2004).

 It does not matter whether Plaintiffs have any legal entitlement to the benefit Defendants stripped away. The First Amendment prohibits retaliation not only when government burdens rights to which a plaintiff is entitled, but also when it withdraws discretionary benefits as a tool to punish protected expression. *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 72 (1990). The question is not whether the plaintiff has a right to the benefit; it is whether deprivation of the benefit will "chill the exercise of a constitutional right" such that "it would likely deter 'a person of ordinary firmness' from exercise in the future." *Mitchell*, 122 F.4th at 89-90 (quoting *Constantine*, 411 F.3d at 500). Thus, for

example, the government may not withhold unemployment benefits or tax exemptions to penalize protected activity—even though no one has a constitutional right to receive them in the first place. *See Sherbert v. Verner*, 374 U.S. 398, 404-05 (1963); *Speiser v. Randall*, 357 U.S. 513, 518 (1958).

Here, Defendants' gratuitous decision to undertake mid-decade redistricting gives rise to at least four independent adverse actions, each of which has chilled—and will continue to chill—Plaintiffs from exercising their rights to speak, associate, and petition for fear of being retaliated against again.

*First*, Defendants removed Plaintiffs including Arthur Lee Johnson, Barbara Sutton, and Courtney Patterson from CD1 and reassigned them to CD3, severing the relationship with their current representative and threatening their right to vote for—and be represented by—their current congressional representative. *See* Exs. F-H; *see also* Ex. A (Fairfax Rep. ¶13).

Voters have a First Amendment interest in casting ballots for candidates they want to vote for. *See, e.g.*, *Anderson v. Celebrezze*, 460 U.S. 780, 786-87 (1992); *see also Lubin v. Panish*, 415 U.S. 709, 716 (1974). And while Representative Davis has indicated he may run in either CD1 or CD3, *see* Klein Ex. 22, he will (regardless of which district) no longer appear on the ballot for thousands of his current constituents, including at least one individual Plaintiff here either still in—or moved out of—CD1. By depriving Plaintiffs of representation by their longtime member of Congress, Defendants signaled that disfavored speech or petitioning will be punished by separating Plaintiffs from their district and representative. That is impermissible retaliation.

*Second*, Defendants deprived Plaintiffs of the right to associate with neighboring voters and communities with whom they have longstanding ties and common political interests. An election is about more than just a candidate "attaining political office." *Illinois Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 186 (1979). It is "a means of disseminating ideas as well." *Id.* That is why the First Amendment "promises Americans the right not just to proclaim a political vision but to join with their compatriots and actually advance that vision." *6th Cong. Dist. Republican Comm. v. Alcorn*, 913 F.3d 393, 401 (4th Cir. 2019). That associational right "rank[s] among our most precious freedoms." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968). Democracy "is unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views." *Jones*, 530 U.S. at 574.

Here, Plaintiffs have spent decades strengthening community ties and building political power to advance their interests at the ballot box, often in association with groups like Plaintiff North Carolina NAACP. Plaintiff Arthur Johnson has worked across the Black Belt to register voters and encourage them to vote in congressional elections. Ex. F ¶¶6-8. But SB249 altered CD1, removing Black Belt counties that have been part of the district for decades, and adding coastal communities that have not. *Compare* Klein Ex. 25 (SB249 Map)*, with* Klein Ex. 26 (past congressional plans used in elections). Now in CD3, Mr. Johnson "ha[s] been removed from that network and community that [he] ha[s] spent years helping to build." Ex. F ¶13.

Other Plaintiffs, like Barbara Sutton, will have to "travel further to get to counties in the southern part of CD 3" to engage in the same organizing work, which is a "significant

barrier to mobilizing members of Kinston Lenoir NAACP Chapter," Ex. G. ¶14. The longer distance that Ms. Sutton will have to travel—and the additional time and energy the trips will entail—will chill her First Amendment rights. *See also*, Exs. H-J; *Rutan*, 497 U.S. at 73 (upholding retaliation claim of employees "denied transfers to workplaces reasonably close to their homes" in part because they "will feel a daily pressure from their long commutes"). Targeting Plaintiffs for their protected associational and civic activities—and forcing them to go to greater lengths to continue those activities—will chill the exercise of those rights in the future.

*Third*, by dismantling former CD1, Defendants have made it significantly harder for the highly cohesive community of Black voters (including Plaintiffs) in the Black Belt to again act collectively to actually elect candidates who represent their shared interests. *See* Ex. B ¶¶6-8; Ex. C (Daly-Mack Decl.) ¶11-12 (Ms. Daly-Mack expects that the changes to CD1 will result in CD1 being represented by someone like her current State Senator, Bobby Hanig, who is "not responsive to the needs of our community"); *see generally* Exs. E-F. In doing so, Defendants have "burden[ed] [Plaintiffs'] representational rights." *Vieth v. Jubelirer*, 541 U.S. 267, 315 (2004) (Kennedy, J., concurring in the judgment).

Targeting Plaintiffs in this manner constitutes an adverse action regardless of whether Plaintiffs have a freestanding constitutional right to any particular representation or degree of partisan fairness. Removing these Plaintiffs from a congressional district in which they had some (albeit a diminished) ability to elect candidates of their choosing, and intentionally placing them into new districts where they will almost certainly be unable to do so in retaliation for their speech and petitioning activity, constitutes a First Amendment

16

retaliatory harm. Indeed, on the unique and egregious facts of this case, the harm here stems solely from this unlawful retaliatory motive in targeting CD1 in the first place: diluting voters' voices. This was sole motivation prompting redistricting—not the Census, or a court order, or some need to address traditional redistricting criteria (already accounted for in 2023 and not substantively improved here, *see* Ex. A (Fairfax Rep. ¶¶10-12)).

*Finally*, this adverse action by Defendants will chill Plaintiffs from petitioning for a redress of grievances. Plaintiff Common Cause may reconsider litigation challenging redistricting in the future because its leaders fear that further litigation may prompt the General Assembly to target its members, which runs contrary to its mission of empowering voters. *See* Ex. J ¶15.

2.  Defendants Cannot Evade the First Amendment by Retaliating Through Redistricting.

Redistricting does not occur in a First Amendment-free zone.

The NCGA's authority to draw and redraw congressional maps comes from the federal Constitution's Elections Clause. U.S. Const. art. I, § 4; *see Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8-9 (2013). That authority is important but limited. It does not allow the NCGA "to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints." *Cook v. Gralike*, 531 U.S. 510, 523 (2001) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 833-34 (1995)).

*Cook* is instructive. There, Missouri altered its ballot design to single out congressional candidates who refused to support a proposed constitutional amendment imposing term limits. 531 U.S. at 514-15. Although "the precise damage the labels may

17

exact on candidates [was] disputed between the parties," the Court nonetheless struck down the law. *Id.* at 525-26. The reason was categorical: the labeling scheme went beyond "regulating the procedural mechanisms of elections" and instead "place[d] [its] targets at a political disadvantage to unmarked candidates." *Id.* at 525-26. As the Court explained, legitimate Elections Clause regulations concern only the procedural steps *necessary* to hold an election. *Id.* at 523-24.

The same is true of SB249. Regardless of "the precise damage [it] may exact on [Plaintiffs]," *Cook*, 531 U.S. at 525, the law does not regulate the procedural mechanisms necessary to conduct an election. Existing, legislatively drawn maps were already in place. The NCGA did not draw a new map to ensure that "'some sort of order, rather than chaos, [would] accompany the democratic process.'" *Id*. at 524 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). It did so simply to retaliate against voters, including Plaintiffs, for speaking out, associating with like-minded neighbors, voting a certain way, and petitioning government in ways officials disfavored. As explained, that initial decision to redraw the map was itself illegitimate. *See supra* pp. 12-13.

The partisan gerrymandering line of cases is entirely different. Those cases concerned *how* lines were drawn in the context of an otherwise validly initiated map-drawing process. *See supra* p. 13 (collecting cases). In *LULAC*, for example, the Texas legislature replaced a court-drawn map consistent with the Supreme Court's principle that "a lawful, legislatively enacted plan should be preferable to one drawn by the courts." 548 U.S. at 412, 416. The legislature viewed the court-drawn map as "a vestige of a Democratic gerrymander." Brief for Appellee at 32, *LULAC*, 548 U.S. 399 (2006) (Nos. 05-204, 05-

18

254, 05-276, 05-439), 2006 WL 284225. The Court concluded that "there is nothing inherently suspect about a legislature's decision to replace mid-decade a court-ordered plan with one of its own." *LULAC*, 548 U.S. at 418-19.

Because the decision to draw a new map in those cases was itself valid, the plaintiffs' challenges focused on *how* the lines were drawn, parsing out partisanship from other redistricting factors. Such claims necessarily implicate a question of "degree: How to 'provid[e] a standard for deciding how much partisan dominance is too much.'" *Rucho*, 588 U.S. at 704 (quoting *LULAC*, 548 U.S. at 420). Such standardless inquiries are "beyond the reach of the federal courts." *Id.* at 718.

This case is different. Plaintiffs do not bring a partisan gerrymandering claim. They do not suggest "that groups with a certain level of political support should enjoy a commensurate level of political power and influence." *Rucho*, 588 U.S. at 704. And they do not seek a remedy that would force this Court or the NCGA "to rearrange the challenged districts to achieve that end." *Id.* at 705.

Rather, this Court can resolve this claim by applying straightforward First Amendment retaliation principles. Just like with any other official government action, the Constitution forbids the government from redrawing electoral district lines in order "to punish or suppress speech," *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 198 (2024), or other protected First Amendment activity. No complex metrics or subjective assessments of "partisanship" are required to enjoin unconstitutional government action under such circumstances, especially where any Court injunction would simply revert the map to the

19

preexisting, legislatively drawn status quo (namely, the 2023 Congressional Plan). SB249 should thus be enjoined.

### B. Defendants have Violated Plaintiffs' Right to Petition

Defendants' decision to redraw the map to stall and block resolution of Plaintiffs' 2023 redistricting challenge is also a standalone violation of the First Amendment's Petition Clause. The First Amendment right to petition encompasses the "right of access to the courts" to file a lawsuit challenging violations of federal law. *E.g.*, *Cal. Motor Transp.*, 404 U.S. at 510. And the right to petition for judicial redress is protected "whenever it is genuine, not simply when it triumphs." *BE & K Construction Co. v. NLRB*, 536 U.S. 516, 532 (2002).

The right to petition works hand-in-hand with other First Amendment rights. Courts have long recognized that litigation is "a vehicle for effective political expression and association," and a means to "facilitate the informed public participation that is a cornerstone of democratic society." *Borough of Duryea*, 564 U.S. at 397 (quoting *In re Primus*, 436 U.S. 412, 431 (1978)). In the civil-rights era, that role could not have been clearer: litigation served as the channel through which "the distinctive contribution of a minority group" could shape the Nation's ideas and ideals. *Id.* (citing *NAACP v. Button*, 371 U.S. 415, 431 (1963)). And the petition right does not turn on outcome. "[E]ven unsuccessful but reasonably based suits advance" First Amendment interests—both by testing and refining legal principles and by reinforcing the legitimacy of the judicial process itself. *BE & K Construction*, 536 U.S. at 532.

20

At its core, the right to petition safeguards the ability of individuals to seek—and, when warranted, to secure—judicial relief "by direct appeal to government officials charged with applying the law." *Borough of Duryea*, 564 U.S. at 397. Interpreting the Petition Clause requires fidelity to "the objectives and aspirations that underlie the right." *Id.* at 388. It thus protects not only the right to file a case, but also to litigate one's case (within the bounds of professional norms and the applicable procedural rules). *Cf. Bill Johnson's Rests. v. NLRB*, 461 U.S. 731, 743-44 (1983). And that protection reaches all the way to a remedy. *Cf. Trump v. CASA, Inc.*, 606 U.S. 831, 851-52 (2025) ("[T]he complete-relief principle has deep roots in equity[.]"). Government actors thus may not attempt to stymie the right to petition by strategically mooting out or injecting new facts into litigation in order to prevent judicial resolution and redress. *Cf. Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 661-62 (1993).

The risk of these types of Petitions Clause violations is especially acute in the redistricting context, where "[p]ractical considerations sometimes require courts to allow elections to proceed despite pending legal challenges." *Riley v. Kennedy*, 553 U.S. 406, 426 (2008). If a map is deemed unlawful too near an election, "the only reasonable option may be to use the plan one last time." *Abbott v. Perez*, 585 U.S. 579, 602 (2018). The ability of government defendants to try to delay or otherwise avoid redress even where a map is illegal makes redistricting cases a particularly tempting target for Petition Clause violations—such as where a legislature upends the status quo by passing a new map weeks before the candidate filing deadline.

Given these dynamics, the Supreme Court has rejected efforts to frustrate judicial review in redistricting cases. *E.g.*, *North Carolina v. Covington*, 585 U.S. 969 (2018). Were it otherwise, legislatures could "put[] redistricting litigation in an infinity loop[,]" enacting different plans *ad nauseum* whenever an election was impending and thereby extending the litigation and preventing Plaintiffs from ever obtaining a remedy. *Singleton v. Allen*, 690 F. Supp. 3d 1226, 1292-93 (N.D. Ala. 2023). That tactic "is inconsistent with the Article III judicial power because it allows the State to constrain (indeed, to manipulate) the Court's authority to grant equitable relief." *Id.* at 1292. It would create "an endless paradox that only [the State] can break, thereby depriving Plaintiffs of the ability to effectively challenge and the courts of the ability to remedy." *Id.*; *cf. Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (rejecting mootness argument where "a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends.")

That is happening here, now. With a fully tried challenge to CD1 still *sub judice,* the General Assembly waited until weeks before the December 1 candidate-filing deadline, and then hastily redrew CDs 1 and 3—asserting unlimited power to revise the lines again and again. A process in which Plaintiffs can never obtain a final adjudication of their claims (regardless of the preliminary relief this Court may grant) "produce[s] an illegal result, *viz.*, effectively barring respondents from access to the agencies and courts." *Cal. Motor Transp. Co.*, 404 U.S. at 513. It also risks a *de facto* superiority of state law each election, in violation of the Constitution's unambiguous proclamation that the "Constitution" and "Laws of the United States . . . shall be the supreme Law of the Land." U.S. const., art. VI,

22

cl. 2. If the General Assembly can forever redraw maps mid-litigation to evade final judgment, then the infinity loop will become a reality—and Plaintiffs' right "to pursue desired ends by direct appeal to government officials charged with applying the law" will be rendered a dead letter. *Borough of Duryea*, 564 U.S. at 397.

## II.   SB249 Will Cause Irreparable Harm.

Unless enjoined, SB249 will cause Plaintiffs and other Black voters in North Carolina's historic Black Belt irreparable harm. "Courts routinely deem restrictions on fundamental voting rights irreparable injury" because "once the election occurs, there can be no do-over and no redress." *League*, 769 F.3d at 247. Monetary damages are also "inadequate to compensate . . . voters for the loss of their fundamental right to vote." *Griffin v. N.C. State Bd. of Elections*, 781 F. Supp. 3d 411, 453 (E.D.N.C. 2025). Similarly, injuries to First Amendment rights such as the right to speech, expression, association, and petition "unquestionably represent irreparable harm." *Stuart v. Huff*, 834 F. Supp. 2d 424, 427-28 (M.D.N.C. 2011); *accord Griffin*, 781 F. Supp. 3d at 453; *see also Elrod*, 427 U.S. at 373 (plurality opinion) ("The loss of First Amendment freedoms . . . unquestionably constitutes irreparable injury."); *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021).

Here, Plaintiffs are likely to succeed in establishing these harms as to SB249: Their right to petition has been thwarted, and they have been retaliated against in violation of their First Amendment rights.

23

### III. The Equities and the Public Interest Favor Plaintiffs.

The balance of equities and public interest—which merge when the government is the opposing party, *Nken v. Holder*, 556 U.S. 418, 435 (2009)—weigh in favor of an injunction. "Depriving voters of a fundamental right would result in significant hardship." *Griffin*, 781 F. Supp. 3d at 454; *accord Disability Rts. N.C. v. N.C. State Bd. of Elections*, No. 5:21-cv-361, 2022 WL 2678884, at *7 (E.D.N.C. July 11, 2022) ("The public interest is served by protecting federally guaranteed voting rights in North Carolina.").

No countervailing government interest alters that traditional calculus. If SB249 is enjoined, the status quo will fall back to a congressional plan that the NCGA enacted only two years ago.[3] *See, e.g.*, *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013) ("[A] state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional."); *Griffin*, 781 F. Supp. 3d at 454 ("Preventing the State . . . from implementing a process violative of constitutional rights would impose no hardship."). Nor does the election timeline move the needle. It does not matter that there may be "little time" before the qualifying deadlines for the 2026 election cycle begin, because here complying with an injunction of SB249 would mean simply "resurrect[ing]" the 2023 Congressional Plan for CD1 and CD3. *League*, 769 F.3d at 248.

---

[3] Plaintiffs maintain their challenge to the 2023 Congressional Plans, and the request for a permanent injunction following trial.

24

## CONCLUSION

For the reasons set forth above, Plaintiffs' motion should be granted and SB249 preliminarily enjoined.

Dated: October 31, 2025

Respectfully submitted,

_/s/ Hilary Harris Klein_
Hilary Harris Klein

**HOGAN LOVELLS US LLP**

J. Tom Boer*
Olivia Molodanof*
Madeleine Bech*
4 Embarcadero Center, Suite 3500
San Francisco, CA 94111
Telephone: 415-374-2300
Facsimile: 415-374-2499
tom.boer@hoganlovells.com
olivia.molodanof@hoganlovells.com
madeleine.bech@hoganlovells.com

Jessica L. Ellsworth*
Misty Howell*
Odunayo Durojaye*
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: 202-637-5600
Facsimile: 202-637-5910
jessica.ellsworth@hoganlovells.com
misty.howell@hoganlovells.com
odunayo.durojaye@hoganlovells.com

**ACLU OF NORTH CAROLINA
LEGAL FOUNDATION**

Jaclyn Maffetore (State Bar #50849)
Kristi L. Graunke (State Bar #51216)
P. O. Box 28004
Raleigh, NC 27611
Telephone: (919) 354-5070

**SOUTHERN COALITION FOR
SOCIAL JUSTICE**

Jeffrey Loperfido (State Bar #52939)
Hilary Harris Klein (State Bar #53711)
Christopher Shenton (State Bar #60442)
Mitchell D. Brown (State Bar #56122)
Lily Talerman (State Bar #61131)
5517 Durham Chapel Hill Blvd.
Durham, NC 27707
Telephone: 919-794-4213
Facsimile: 919-908-1525
hilaryhklein@scsj.org
jeffloperfido@scsj.org
chrisshenton@scsj.org
mitchellbrown@scsj.org
lily@scsj.org

**ACLU FOUNDATION**

Ari J. Savitzky**
Ethan Herenstein**
Clayton Pierce**
Sophia Lin Lakin**
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 549-2500
asavitzky@aclu.org
eherenstein@aclu.org
cpierce@aclu.org
slakin@aclu.org

25

jmaffetore@acluofnc.org
kgraunke@acluofnc.org

***Applications to appear specially forthcoming*

26

**WORD CERTIFICATION**

Pursuant to Local Rule 7.3(d)(1), the undersigned certifies that the word count for Memorandum in Support of Motion for Preliminary Injunction is 6230 words. The word count excludes the case caption, signature lines, cover page, and required certificates of counsel. In making this certification, the undersigned has relied upon the word count of Microsoft Word, which was used to prepare the brief.

*/s/ Hilary Harris Klein*
Hilary Harris Klein

**CERTIFICATE OF SERVICE**

I certify that on October 31, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Hilary Harris Klein*
Hilary Harris Klein

27