# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

SHAUNA WILLIAMS, et al.,

       *Plaintiffs*,

    v.

REPRESENTATIVE HUGH BLACKWELL, in his official capacity as Chair of the House Standing Committee on Elections, et al.,

       *Defendants*.

_____

NORTH CAROLINA STATE CONFERENCE OF THE NAACP, et al.,

       *Plaintiffs*,

    v.

PHILIP BERGER, in his official capacity as the President Pro Tempore of the North Carolina Senate, et al.,

       *Defendants*.

Civil Action No. 23 CV 1057

Civil Action No. 23 CV 1104

## *WILLIAMS* PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

BACKGROUND ..................................................................................................... 2

LEGAL STANDARD ............................................................................................. 4

ARGUMENT .......................................................................................................... 5

   I.   Plaintiffs are likely to succeed on the merits of their claims. ................... 5

     A.   The 2025 Plan intentionally discriminates against Black voters by targeting and dismantling the Black opportunity district in CD-1. ............................. 5

        i.   The 2025 Plan bears more heavily on Black voters than other members of the electorate.................................................................................................... 7

        ii.  The historical background and racial polarization further supports finding a discriminatory purpose.................................................................. 13

        iii.  The legislative history and sequence of events leading to S.B. 249 provide additional evidence of discriminatory intent. ................................. 15

        iv.  Senator Hise's self-serving statements cannot save the 2025 Plan. ................ 17

     B.   The 2025 Plan is unconstitutionally malapportioned........................................... 19

     C.   The General Assembly's intentional use of racial and partisan data in creating the 2025 Plan violates the First and Fourteenth Amendments................. 21

  II.  Black voters will suffer irreparable harm absent an injunction. ............................24

  III.  The balance of equities and the public interest favor an injunction.......................24

CONCLUSION...................................................................................................... 25

CERTIFICATE OF COMPLIANCE ................................................................... 27

CERTIFICATE OF SERVICE ............................................................................. 28

Case 1:23-cv-01057-TDS-JLW   Document 187   Filed 10/31/25   Page 2 of 30

# INTRODUCTION

Over the course of just over 48 hours, the North Carolina General Assembly enacted the state's fifth congressional plan in four years—an unnecessary, mid-decade redistricting plan that intentionally dismantles CD-1, a historic Black opportunity district that has elected a Black representative to Congress for more than 30 years. This targeted strike was accomplished by redistributing voters based on their race: not only does the 2025 Plan move several counties with significant Black populations out of the district while moving in primarily white counties from CD-3, Black voters were twice as likely as Democratic voters to be moved out of CD-1. Both the means and the ends are clear: once again, North Carolina has "intentionally target[ed] a particular race[] . . . because its members vote for a particular party, in a predictable manner," which "constitutes discriminatory purpose." *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 222-23 (4th Cir. 2016).

The General Assembly's voluntary, unnecessary, mid-decade revision of a legislatively-enacted congressional plan must also be enjoined as a per se violation of the U.S. Constitution, on at least two grounds. First, the use of five-year-old Census data results in present-day population deviations that are not otherwise justified by a legitimate state objective, in violation of Article I, Section 2 and the Fourteenth Amendment's one-person one-vote guarantee. The legal fiction that census data remains the same for the remainder of the decade is intended to *avoid* the need for constant redistricting, not to enable it. Second, the General Assembly's unnecessary and unjustified consideration of race and partisanship violates the First and Fourteenth Amendments. Any leeway states have to consider race and pursue partisan advantage in the course of mandatory post-census

redistricting falls away entirely when they engage in voluntary mid-cycle redistricting of a legislatively-enacted plan.

A preliminary injunction is necessary to ensure relief in advance of the 2026 midterm elections. If elections proceed under the 2025 Plan, Black voters in northeast North Carolina will be irreparably harmed, deprived of their fundamental constitutional rights to vote free from discrimination. Because all the relevant factors strongly favor a preliminary injunction, the Court should preliminarily enjoin the use of the 2025 Plan and reinstate the 2023 Plan pending resolution of Plaintiffs' Piedmont Triad and Mecklenburg claims on the existing trial record.

## BACKGROUND

CD-1 has historically encompassed North Carolina's Black Belt counties, along with several other counties with significant Black populations. In 1992, CD-1 elected North Carolina's first Black congressional representative since 1901; in every election since then, voters in CD-1 have sent a Black North Carolinian to Congress.[1] Ex. 3, Expert Rep. of Dr. Allan J. Lichtman, at 11.

On October 13, 2025, in response to public urging by President Trump, Republicans in the General Assembly announced that they would—once again—redraw North Carolina's congressional map, this time specifically and exclusively targeting CD-1. *Id.* at 6. The next week, Republican leaders introduced S.B. 249, which reconfigured districts in the northeast but left the rest of the 2023 map untouched. S.B. 249 was rushed from

---

[1] All exhibits are attached to the Declaration of Lalitha D. Madduri, filed concurrently with this motion.

introduction to passage in just over 48 hours, with almost no opportunity for public input or legislative debate.[2] Live public comment was limited to less than 90 minutes over two committee meetings in Raleigh, during which citizens were permitted to speak for just one minute each; no field hearings were held at all. *Id.* at 9. Every single person who spoke vehemently opposed the 2025 Plan, expressing outrage and frustration over the General Assembly's rushed and unnecessary redistricting, as well as the 2025 Plan's racially discriminatory intent and impact. *Id.* Similarly, nearly every one of the 12,000 comments received over an online portal decried the lack of public input, the rushed and opaque legislative process, and the "disenfranchis[ement of] Black voters." Exs. 4-5. Several legislators echoed the same sentiments, highlighting the 2025 Plan's disparate impact and discriminatory intent behind dismantling the state's longest standing Black opportunity district. Ex. 3 at 12. When they sought more time to debate and probe the map, legislative leadership cut off debate to hold a final vote just two days after S.B. 249 was introduced. Ex. 3 at 9; *see also id.* (Minority Leader Reives criticizing fact that public input was not "meaningfully considered," "call[ing] into question the integrity of the House and these proceedings").

During these truncated legislative hearings, Defendant Senator Hise announced that he drew the 2025 Plan without any assistance. While he disavowed the use of racial data,

---

[2] S.B. 249 was rushed through the Senate Elections Committee on October 20 (available at https://www.youtube.com/watch?v=67p7bbT8EYw); the Senate Floor on October 20 (available at Ex. 13); the Senate Floor on October 21 (available at Ex. 14); the House Select Committee on Redistricting on October 21 (available at https://www.youtube.com/watch?v=BX4SuqW0b5s); and the House Floor on October 22 (available at https://www.youtube.com/watch?v=JW2v_F1tZ0U).

- 3 -

he confirmed that he knew that CD-1 "has a higher minority population than the state average." *Id.* at 12. Indeed, several members observed that Senator Hise would not need to specifically consult racial data to purposefully dilute the Black vote in CD-1. As Representative Gloristine Brown explained, "every single member of this body knows about the [B]lack population in the northeastern part of" North Carolina. *Id.* Senator Gladys Robinson noted that, notwithstanding Senator Hise's statements that the map was "strictly about partisan politics," its achievement of partisan goals through the disenfranchisement of Black voters was squarely "about race." *Id.* Senator Kandie Smith similarly and succinctly described the 2025 Plan as a "political weapon" with Black voters as the "target" because it was "designed to fracture historic coalitions" and "diminish voter turnout." *Id.*

On October 22, after an unprecedented, two-day sprint from introduction to passage, the General Assembly enacted S.B. 249. *Id.* at 6. *Williams* Plaintiffs asked for leave to file a supplemental complaint the following day, asserting constitutional and statutory challenges to the 2025 Plan. ECF No. 169; Suppl. Compl., ECF No. 181. *Williams* Plaintiffs now seek an order enjoining enforcement of the 2025 Plan and reinstating the 2023 Plan while Plaintiffs' previous challenges remain pending.

## LEGAL STANDARD

"To win . . . a preliminary injunction, Plaintiffs must demonstrate that (1) they are likely to succeed on the merits; (2) they will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in their favor; and (4) the injunction is in the public interest." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (*LWV*) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

Though plaintiffs "must demonstrate that they are likely to succeed on the merits," they "need not show a certainty of success." *Id.* (citation omitted).

## ARGUMENT

**I.    Plaintiffs are likely to succeed on the merits of their claims.**

### A. The 2025 Plan intentionally discriminates against Black voters by targeting and dismantling the Black opportunity district in CD-1.

The Fourteenth Amendment's Equal Protection Clause "prohibits intentional vote dilution" by "minimizing or canceling out the voting potential of racial or ethnic minorities." *Abbott v. Perez*, 585 U.S. 579, 585-86 (2018) (citation modified). "'[D]ilution of racial minority group voting strength may be caused' . . . 'by the dispersal of [minorities] into districts in which they constitute an ineffective minority of voters . . . .'" *Voinovich v. Quilter*, 507 U.S. 146, 154 (1993) (quoting *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986)). "Intentions to achieve partisan gain and to racially discriminate are not mutually exclusive," *Veasey v. Abbott*, 830 F.3d 216, 241 n.30 (5th Cir. 2016) (en banc), and "intentionally targeting a particular race[] . . . because its members vote for a particular party, in a predictable manner, constitutes discriminatory purpose," *McCrory*, 831 F.3d at 222-23. Even if the ultimate goal is partisan gain, the "use of race as a proxy," for "political interests" is "prohibited." *Cooper v. Harris*, 581 U.S. 285, 291 n.1 (2017) (citation modified) (quoting *Miller v. Johnson*, 515 U.S. 900, 914 (1995)).

Thus, to succeed, Plaintiffs need not show that discrimination was the sole or "primary" motive for legislation, only that it was "*a* motivating factor." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977) (emphasis

- 5 -

added). Because "[o]utright admissions of impermissible racial motivation are infrequent," the Supreme Court has recognized that "plaintiffs often must rely upon other evidence." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999); *see also Rogers v. Lodge*, 458 U.S. 613, 618 (1982). Indeed, "[i]n this day and age[,] we rarely have legislators announcing an intent to discriminate based upon race, whether in public speeches or private correspondence." *Veasey*, 830 F.3d at 235. "To require direct evidence of intent would essentially give legislatures free rein to racially discriminate so long as they do not overtly state discrimination as their purpose" and would "ignore the reality that neutral reasons can and do mask racial intent." *Id.* at 235-36.[3]

 As a result, Plaintiffs may make their showing of discriminatory intent with any available "circumstantial and direct evidence of intent," including the five factors identified by the Supreme Court in *Arlington Heights*: (1) the discriminatory "impact of the official action"; (2) "the historical background" of the law; (3) "the specific sequence of events leading up" to the law; (4) any "departures from the normal procedural sequence"; and (5) the "legislative or administrative history" of the law. 429 U.S. at 252, 265-68 (cleaned up); *see also Washington v. Davis*, 426 U.S. 229, 242 (1976) ("[D]iscriminatory purpose may often be inferred from the totality of the relevant facts, including the fact . . . that the law bears more heavily on one race than another.").

---

[3] Notably, the Legislative Defendants here, and in particular Senator Hise, are seasoned litigants in combatting claims of discrimination. Likely because of this, just before beginning redistricting in 2023, the General Assembly effectively eliminated the possibility of obtaining direct evidence of discriminatory intent by repealing a longstanding law that made redistricting communications public and giving legislators the unilateral authority to delete their emails and destroy records. ECF No. 166 ¶¶ 255-63.

The *Arlington Heights* factors strongly support a finding that the 2025 Plan was motivated by discriminatory intent.

### i. The 2025 Plan bears more heavily on Black voters than other members of the electorate.

As the Supreme Court has held, "a jurisdiction that enacts a plan having a dilutive impact is more likely to have acted with a discriminatory intent to dilute minority voting strength than a jurisdiction whose plan has no such impact." *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 487 (1997). Courts have found this factor satisfied "beyond dispute" where a redistricting plan cracks Black voters out of a performing district "into districts in which [Black voters] constitute an ineffective minority of voters." *See, e.g.*, *Common Cause Fla. v. Byrd*, 726 F. Supp. 3d 1322, 1369 (N.D. Fla. 2024) (Jordan, J., concurring) (citation omitted).

That is precisely what the 2025 Plan does—it cracks Black voters out of a previously performing minority opportunity district (CD-1), dividing them across two districts (CD-1 and CD-3), leaving them extremely unlikely to elect their preferred candidates in either district. Ex. 1, Suppl. Expert Rep. of Dr. Jonathan Rodden, at 2-3. Such a "showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts . . . raise[s] serious questions under both the Fourteenth and Fifteenth Amendments." *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (plurality op.).

The 2025 Plan dilutes Black voting strength in CD-1 by moving Black communities out of former CD-1 and into CD-3. The Plan shifts heavily Black communities in Wilson (37.54% Black Voting Age Population (BVAP)), Greene (36.22%), Wayne (30.01%), and

Lenoir (39.15%) counties out of CD-1 and into CD-3. Ex. 1 at 4. It swaps these Black communities for heavily white counties formerly in CD-3, including Dare (1.81% BVAP), Beaufort (22.07%), Craven (19.37%), Pamlico (17.07%), and Carteret (4.72%) counties. *Id.* Figures 2 and 3 illustrate the Legislative Defendants' reshuffling of Black and white communities between CD-1 and CD-3 in the 2025 Plan (Figure 3) relative to the 2023 Plan (Figure 2).



**Ex. 1 Figure 2: Black Population Share, Counties of Eastern North Carolina under 2023 Plan**

- 8 -



**Ex. 1 Figure 3: Black Population Share, Counties of Eastern North Carolina under 2025 Plan**

As a result, the 2025 Plan decreased the BVAP of CD-1 by 8 percentage points, dropping from 40.42% in the 2023 Plan to 32.34% in the 2025 Plan. Ex. 1 at 9-10. In turn, while the BVAP in CD-3 increased by 8 percentage points, it was kept low enough to ensure Black voters still cannot elect their preferred candidates in CD-3. *Id.* at 10.

The reconfiguration of these two districts comes at the expense of traditional redistricting principles and historic communities of interest. In addition to picking off counties with significant Black populations from CD-1, the 2025 Plan breaks up key metropolitan areas, separating Black communities that had been united in CD-1 since Reconstruction. *Id.* at 2, 7. The U.S. Census Department identifies areas with strong economic ties and overlapping labor and media markets as Combined Statistical Areas

- 9 -

(CSAs). Northeast North Carolina is home to three such CSAs, each of which were kept together in the 2022 Plan and the 2023 Plan—and all of which are split by the 2025 Plan. *Id.* at 6-7. The Mount-Wilson-Roanoke Rapids CSA, which is heavily Black, accounted for almost 40 percent of CD-1's population under the 2023 Plan. *Id.* at 7. Under the 2025 Plan, however, Wilson County is carved into CD-3, separating it from Rocky Mount, Roanoke Rapids, and other Black Belt counties for the first time since Reconstruction. *Id.*

Additionally, in order to move coastal counties with large white populations into CD-1, the 2025 Plan splits the CSAs of Greenville-Washington and New Bern-Morehead City. *Id.*



**Ex. 1 Figure 4: Combined Statistical Areas, Race, and the 2023 Congressional Plan**



**Ex. 1 Figure 5: Combined Statistical Areas, Race, and the 2025 Congressional Plan**

The racial effects of the 2025 redraw cannot be explained by partisanship. *Id.* at 15. Based on the two-party vote share across statewide elections in 2024, CD-1's Democratic vote share dropped about 4 percentage points between the 2023 Plan and the 2025 Plan. *Id.* at 10. Its BVAP, by contrast, fell by 8 points—double the drop in the percentage of Democratic voters. *Id.* In other words, Black voters were disproportionately moved out of CD-1 and into CD-3, even when accounting for partisanship. The same patterns hold across registered Democrats, Republicans, and unaffiliated voters swapped between CD-1 and CD-3. In the 2025 Plan, Black voters of all partisan affiliations were moved out of CD-1 at higher rates than other voters, while White voters of all partisan affiliations were moved into CD-1 at higher rates than other voters. Ex. 1 at 2, 13-14. The significant racial differences among partisan groups does not indicate a purely partisan-driven approach. *Id.*

at 13.

The 2025 Plan thus builds on the 2023 Plan's disproportionate advantage for white voters at the expense of Black voters. Under the 2022 Plan, 61.2% of Black voters lived in a district where their preferred candidate won. Ex. 2, Second Suppl. Expert Rep. of Maxwell Palmer, at 5. That number dropped to 40.3% under the 2023 Plan, and now, under the 2025 Plan, only 32.0% of North Carolina's Black voters live in a district where their preferred candidate won. *Id.* By contrast, under the 2022 Plan, 59.5% of white voters lived in a district where their preferred candidate won, and this percentage grew to 68.5% under the 2023 Plan and 70.7% under the 2025 Plan. *Id.* Figure 4 below shows these disparate effects.



**Figure 4:** Differential Effects of Redistricting on Electing Preferred Candidate by Race, 2023 to 2025 Plans

Black voters like Plaintiffs Shauna Williams, Viola Ryals Figueroa, David Jones, and Jimmy Cochran lived in CD-1 and were able to elect their candidates of choice under the 2023 Plan but are extremely unlikely to do so under the 2025 Plan. Exs. 7-10. The indisputable "fact . . . that [S.B. 249] bears more heavily on one race than another" supports

- 12 -

an "infer[ence]" of "discriminatory purpose." *Davis*, 426 U.S. at 242.

> ii. **The historical background and racial polarization further supports finding a discriminatory purpose.**

"North Carolina's history of race discrimination and recent patterns of official discrimination, combined with the racial polarization of politics in the state" are "particularly relevant" to the second *Arlington Heights* factor. *McCrory*, 831 F.3d at 223. At trial, the Court heard extensive evidence of the state's "long history of race discrimination generally and race-based vote suppression in particular," which has continued "to the present day." *Holmes v. Moore*, 270 N.C. App. 7, 20-21, 23, 840 S.E.2d 244, 257-58 (2020) (quoting *McCrory*, 831 F.3d at 223, 225); *Williams* PFOFCOL, ECF No. 166 ¶¶ 312-69. As the Fourth Circuit has recently explained, "a prior legislature's discriminatory intent is appropriately considered as part of the *Arlington Heights* 'historical background' factor." *United States v. Sanchez-Garcia*, 98 F.4th 90, 99 (4th Cir. 2024).

Racial polarization is also a "critical" factor because a high degree of polarization "offers a political payoff for legislators who seek to dilute or limit the minority vote," *Holmes*, 270 N.C. App. at 22, 840 S.E.2d at 258 (internal quotation marks omitted): the higher the degree of polarization, the more that "[u]sing race as a proxy for party" becomes "an effective way to win an election"—and doing so "constitutes discriminatory purpose." *McCrory*, 831 F.3d. at 222. There is significant racially polarized voting in northeastern North Carolina. In all 63 statewide contested partisan elections from 2016 through 2024, Black voters in CD-1 and CD-3 were highly cohesive in supporting the Black-preferred candidate, with 96.5% of the vote in CD-1 and 97.5 % of the vote in CD-3, on average. Ex.

- 13 -

2 at 2-3. White voters, on the other hand, were extremely cohesive in opposition to the Black-preferred candidate, voting against that candidate with an average of 79.3% of the vote in CD-1 and 84.8% of the vote in CD-3 over the same time period. *Id.* Figure 2 below visualizes the stark and sustained racial polarization in the region.



**Figure 2:** Racially Polarized Voting Estimates by Region

Given the extent of racially polarized voting, it makes sense that the General Assembly would target Black voters for partisan gains. *See Perez v. Abbott*, 253 F. Supp. 3d 864, 946 (W.D. Tex. 2017) ("'[R]acially polarized voting may motivate politicians to entrench themselves through discriminatory elections laws' by targeting groups unlikely to vote for them." (quoting *McCrory*, 831 F.3d at 222)). Senator Hise, who drew the 2025 Plan, conceded at trial that he was aware that Black voters are strong and consistent Democrats. *Williams* PFOFCOL ¶ 573. Legislative Defendants' own expert analysis

confirmed the same, *id.* at ¶ 295, and in prior litigation, an expert for the State conceded that "in North Carolina, African-American race is a *better* predictor for voting Democratic than party registration," *McCrory*, 831 F.3d at 225 (emphasis added) (citation omitted). In short, North Carolina's extreme racial polarization provided legislators with the racial means to achieve their partisan ends.

### iii. The legislative history and sequence of events leading to S.B. 249 provide additional evidence of discriminatory intent.

The third, fourth, and fifth *Arlington Heights* factors examine the legislative history behind the law, including the "specific sequence of events leading up to the challenged decision," as well as "substantive" and "procedural" "[d]epartures from the normal . . . sequence." 429 U.S. at 267. Each supports a finding of discriminatory intent here.

First, CD-1's reconfiguration represents a significant substantive deviation from the State's congressional plans for the last 150 years. As described, the 2025 Plan cracks historic Black communities out of CD-1, many of which had been together since Reconstruction. Ex. 1 at 7.

Second, the unusual sequence of events leading to enactment of the 2025 Plan are indicative of a discriminatory purpose. This sequence includes the singular, express purpose of dismantling a historic Black opportunity district; the extraordinary speed with which the Plan was rushed through the legislative process; the lack of public input or opportunity for debate; turning a blind eye to racially polarized voting in the state and in CD-1 and CD-3; and the near uniform outcry among North Carolina voters against the map and the process. While these factors are "not dispositive on [their] own, [they] provide[]

- 15 -

another compelling piece of the puzzle of the General Assembly's motivation." *McCrory*, 831 F.3d at 229.

Even before the 2025 redistricting process began, legislators made no secret of their intent to dismantle CD-1. News outlets reported that State Senator Phil Berger was expected to accept President Trump's endorsement in Berger's upcoming primary campaign in exchange for dismantling the historic Black opportunity district. *See* Ex. 6. As Representative Brenden Jones later confirmed on the House floor, Legislative Defendants went into the process to "only adjust the boundaries of CD 1 and [CD] 3." Ex. 3 at 8.

In just over 48 hours, S.B. 249 was enacted in the quickest and most opaque legislative process of a congressional map in state history. While prior redistricting efforts were monthslong processes involving multiple public hearings (61 hearings in 2010, seven hearings in 2017, 13 hearings in 2021, and even three hearings in 2023), ECF No. 166 ¶ 271, the 2025 process proceeded at lightning speed with less than 90 minutes total allotted for public input. Ex. 3 at 9. Still, *every* citizen who was able to speak opposed the 2025 Plan, as did almost *all* of the more than 12,000 comments submitted to the General Assembly's online portal. Exs. 4-5. This "overwhelming opposition to the new map" included many who decried S.B. 249's "dilut[ion] [of] the Black vote." Ex. 4. Notwithstanding the concerns of their own constituents, the General Assembly plowed ahead.

Legislative leadership similarly suppressed legislative debate, cutting off any meaningful inquiry of the mapdrawer or examination of the Plan. *See* Ex. 3 at 9. As the Fourth Circuit has explained, "rush[ing] [a bill] through the legislative process" "strongly

suggests an attempt to avoid in-depth scrutiny," supporting an inference of discriminatory intent under *Arlington Heights*. *McCrory*, 831 F.3d at 228-29; *see also Veasey*, 830 F.3d at 238 (finding that "cutting debate short to enable a three-day passage [of the bill at issue]" "len[t] credence to an inference of discriminatory intent").

### iv. Senator Hise's self-serving statements cannot save the 2025 Plan.

Senator Hise's assurance that he did not consider race in drawing the 2025 Plan does not rebut the significant evidence of racially discriminatory intent.

During the 2021 redistricting cycle, Senator Hise testified "several times under oath" that he had not used then-prohibited partisan data in drawing the 2021 maps, but the North Carolina Supreme Court was unconvinced, finding that the General Assembly "intentionally" used partisan data to "diminish[] the voting power of" North Carolina Democrats. ECF No. 166 ¶ 460 (quoting *Harper v. Hall*, 2022-NCSC-17, ¶ 194, 868 S.E.2d 499, 554, *overruled on other grounds*, 384 N.C. 292, 886 S.E.2d 393 (2023)). During the 2017 redistricting cycle, Senator Hise similarly claimed that racial data was not available to mapdrawers, yet every draft map on the mapdrawers' computers included racial data, including displays of BVAP of specific districts and racial data of draft districts in Excel spreadsheets. Ex. 3 at 17. Evidence also emerged that Senator Hise and other Legislative Defendants further deceived the court about when work commenced and the criteria governing a remedial plan. *Id.* 16-17.

More recently, during the October 20 Senate hearing, Senator Hise claimed not to have any knowledge of racially polarized voting in northeast North Carolina. But less than four months ago during the trial in this case, Senator Hise and the other Legislative

Defendants heard almost entirely unrebutted evidence of significant racially polarized voting in the Northeast, a fact their own experts agreed with. ECF No. 166 ¶¶ 109-10, 285-305. Senator Hise further claimed that he nor the committee ever "received [any] information regarding specifically legally significant racially polarized voting." Ex. 3 at 15. Not so. During the 2023 process, Senator Hise acknowledged receipt of a racially polarized voting analysis submitted by the Southern Coalition for Social Justice, which warned that there was "[e]xtreme racially polarized voting in North Carolina's Black Belt" and urged the General Assembly to "perform additional analysis." Trial Ex. NAACPPX47 (Oskooii Analysis); ECF No. 166 ¶¶ 279-83.

Senator Hise's statement that he and the committee had not "received any information regarding race on this map" is also directly belied by the numerous comments that citizens and legislators made during even the exceedingly rushed recent proceedings, in which they detailed the disproportionate negative impact that S.B. 249 would have on Black North Carolinians. For example, Representative Marcia Morey told the General Assembly that the 2025 Plan "target[ed] [CD] 1, known as the Eastern Black Belt of North Carolina," by "dividing and diluting historically black" voters. Ex. 3 at 12. Representative Pricey Harrison emphasized that the plan "clearly carves [up] the Black Belt" and that Senator Hise "knows the districts well enough to know that he was splitting up the Black Belt." *Id.* Senator Hise could not deny this; and, in the end, he *confirmed* that he was aware that CD-1 contained a higher minority population than the state average. *Id.* In fact, Senator Hise's expertise in the racial demographics of the northeast runs deep. He has been intimately involved in more than a half dozen redistricting plans, including during the 2010

cycle which involved extensive litigation over racial redistricting in CD-1. *Id.* at 14-17.

In short, Senator Hise is no stranger to North Carolina map drawing, to the state's racial demographics, or to redistricting litigation. His repeated insistence that he did not consider or know information that was demonstrably within his grasp has been discredited by courts before and should carry no weight here. And his extensive efforts to shroud North Carolina's redistricting process in secrecy, *see* ECF No. 166 ¶¶ 463-65, only underscore the extent to which his selective statements of purported intent are of no moment. All of these facts further impugn both Senator Hise's credibility and the newly-drawn districts. *See Holmes*, 270 N.C. App. at 22, 840 S.E.2d at 257 (explaining that it is the political cohesiveness of the minority groups that provides the "political payoff for legislators who seek to dilute or limit the minority vote." (quoting *McCrory*, 831 F.3d at 222)).

*Williams* Plaintiffs are likely to succeed on the merits of their Fourteenth Amendment intentional discrimination claim, because all of the *Arlington Heights* factors weigh in favor of a finding of intentional discrimination.

### B. The 2025 Plan is unconstitutionally malapportioned.

Even setting aside the district lines themselves, the 2025 Plan is unconstitutional as a matter of law because its districts are grossly and unjustifiably malapportioned. *See* Suppl. Compl. Count III. The Supreme Court has required states to "justify population differences between districts that could have been avoided by 'a good-faith effort to achieve absolute equality.'" *Tennant v. Jefferson Cnty. Comm'n*, 567 U.S. 758, 759 (2012) (per curiam) (quoting *Karcher v. Daggett*, 462 U.S. 725, 730 (1983)). Under the Court's "two-prong test," challengers bear the initial "burden of proving the existence of population

differences that could practicably be avoided." *Id.* at 760 (internal quotation marks omitted) (citation omitted). Then, "the burden shifts to the State to show with some specificity that the population differences were necessary to achieve some legitimate state objective." *Id.* (internal quotation marks omitted) (citation omitted).

There is no question that 2025 Plan contains substantial population disparities. North Carolina's population grew by 605,000 between the 2020 census and 2024. Ex. 11. This growth has been uneven. Between July 2022 and 2023, 26 counties had higher population growth rates than North Carolina as a whole. Ex. 12. And while states generally "operate under the legal fiction" that plans remain constitutionally apportioned for ten years after they are adjusted for a given census, *Georgia v. Ashcroft*, 539 U.S. 461, 488 n.2 (2003), the entire purpose of that legal fiction is to "*avoid* constant redistricting, with accompanying costs and instability," as population patterns shift. *LULAC v. Perry*, 548 U.S. 399, 421 (2006) (plurality op.) (emphasis added). The Supreme Court has never applied that legal fiction to uphold an unnecessary, mid-decade change to districts that had already been enacted by the state legislature. *Cf. id.* at 416. To do so would perversely convert a protection against "constant redistricting" into a license for it. *See id.* at 422.

North Carolina cannot meet its burden to establish that "the[se] population differences were necessary to achieve some legitimate state objective." *Tennant*, 567 U.S. at 760 (internal quotation marks omitted) (quoting *Karcher*, 462 U.S. at 741). The mid-decade redistricting was not "necessary" at all. The disparities in the 2025 Plan "could have been avoided" by simply maintaining North Carolina's existing districts. *Id.* at 759. Courts "are willing to defer to . . . state legislative policies" that "require small differences in the

- 20 -

population of congressional districts" only "*so long as* they are consistent with constitutional norms." *Id.* at 760 (emphasis added) (quoting *Karcher*, 462 U.S. at 740). Because North Carolina can offer no legitimate justification for this unprecedented mid-decade redistricting, the 2025 Plan is unconstitutionally malapportioned.

### C. The General Assembly's intentional use of racial and partisan data in creating the 2025 Plan violates the First and Fourteenth Amendments.

*Williams* Plaintiffs are also likely to succeed on the merits of their additional First and Fourteenth Amendment claims. *See* Suppl. Compl. Count IV. Because North Carolina engaged in unnecessary mid-decade redistricting, it cannot consider race and partisanship in ways that might have been permitted when the state drew its constitutionally required map after the 2020 decennial census or after imposition of a court-ordered map. *See LULAC*, 548 U.S. at 416 ("[I]f a legislature acts to replace a court-drawn plan with one of its own design, no presumption of impropriety should attach to the legislative decision to Act.").

The Supreme Court has held that "redistricting differs from other kinds of state decisionmaking," *Shaw v. Reno*, 509 U.S. 630, 646 (1993), and has therefore granted legislatures some leeway to consider "racial demographics" in discharging the constitutional obligation to redistrict at the beginning of every decade, *Miller*, 515 U.S. at 916. "Redistricting legislatures will . . . almost always be aware of racial demographics," *id.*, but such "race consciousness does not lead inevitably to impermissible race discrimination," *Shaw*, 509 U.S. at 646. The asymmetry between the consideration of race in redistricting and "other kinds of state decisionmaking," *id.*, results from the "complex

- 21 -

interplay of forces that enter a legislature's redistricting calculus," *Miller*, 515 U.S. at 915-16, when it is required to redistrict following a decennial census.

Legislatures are also given significant leeway to pursue partisan advantage in decennial redistricting, even where it leads to "excessive partisan gerrymandering." *Rucho v. Common Cause*, 588 U.S. 684, 719 (2019). In *Rucho*, the Court reasoned that, because "politics and political considerations are inseparable from districting and apportionment," determining whether a particular set of districts goes "too far" in promoting partisan aims may present difficult—and therefore nonjusticiable—questions when a legislature is tasked with the mandatory duty of redrawing districts. *Id.* at 701, 714 (alteration omitted) (citation omitted) (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 296 (2004) (plurality op.)). This is true even though, as a general matter, "the First Amendment is plainly offended" when a legislature attempts to favor one particular viewpoint over another. *First Nat. Bank of Bos. v. Bellotti*, 435 U.S. 765, 785-86 (1978); *see also Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968) (holding First Amendment protects "the right of qualified voters, regardless of their political persuasion, to cast their votes effectively"). But because legislatures are *required* by the Constitution to redistrict after every census, and because some measure of partisan considerations are necessarily intrinsic in that process, the *Rucho* court found that banning pursuit of partisan interests when the legislature undertakes that duty might make it practically impossible for partisan legislatures to fulfill their constitutional duty of decennial redistricting. 588 U.S. at 700-01 (2019). The same considerations apply when a legislature is required to remedy a legal violation when a court invalidates a legislatively-

- 22 -

drawn map, or to allow a legislature to exercise its right to replace a prior court-drawn plan. *See LULAC*, 548 U.S. at 416.

But none of these legal necessities apply—and all of these justifications fall away—when a legislature voluntarily engages in a mid-decade redraw of a previously-enacted map. In *this* context, there is no legal necessity that either requires or permits the consideration of race or partisanship to draw a new map—because there is no need to draw a new map at all. And in this entirely voluntary undertaking, bedrock constitutional principles apply, including that government officials are prohibited from "subjecting an individual to retaliatory actions" on account of engaging in protected speech, *Hartman v. Moore*, 547 U.S. 250, 256 (2006), or expressly favoring "people whose views it finds acceptable," *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 96 (1972); *see also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (holding that the Equal Protection Clause requires "that all persons similarly situated . . . be treated alike").

Accordingly, the General Assembly had no justification to consider either race or partisan gain in enacting the 2025 Plan. As explained, the evidence strongly suggests that race was a factor in drawing the 2025 Plan. But because S.B. 249 emerged from an unnecessary mid-decade redistricting, the General Assembly's consideration of race is not entitled to *any* presumption of propriety. *Cf. LULAC*, 548 U.S. at 416. Likewise, when a legislature voluntarily chooses to redraw its own prior districts mid-decade, and then engages in purposeful partisan favoritism that results in the dilution of the votes of members of the rival political group, courts need not engage in an exhaustive inquiry of "how much partisan dominance is too much," *Rucho*, 588 U.S. at 701 (citation omitted),

- 23 -

because the very decision to undertake an unnecessary redistricting alleviates any necessity justification for pursuing partisan advantage at all. "[I]n this context," it is entirely "clear what fairness"—and unfairness—"look[] like." *Id.* at 706.

## II. Black voters will suffer irreparable harm absent an injunction.

Without a preliminary injunction, Plaintiffs are "likely to suffer irreparable harm." *LWV*, 769 F.3d at 247. If the 2026 elections are allowed to proceed under the 2025 Plan, Black North Carolinians will have their voting rights diluted in breach of federal law—a violation of their fundamental rights for which there can be no adequate remedy after the election has occurred. "Courts routinely deem restrictions on fundamental voting rights irreparable injury." *Id.*; *see also, e.g.*, *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986). That is because "once the election occurs, there can be no do-over and no redress" for the voters whose rights were violated. *LWV*, 769 F.3d at 247. If elections are allowed to occur under S.B. 249, Black North Carolinians will have their rights to vote and to have their votes counted equally irreversibly and irreparably abridged. Time is of the essence, as the State Board has indicated it needs a plan by December 1, 2025.

## III. The balance of equities and the public interest favor an injunction.

The public interest and balancing of the equities also strongly favor injunctive relief. These two "factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Both factors are served by protecting the right of every North Carolinian to vote on equal footing. There is "tremendous public interest in safeguarding 'the integrity of our electoral processes,' which 'is essential to the functioning of our

- 24 -

participatory democracy.'" *Griffin v. N.C. State Bd. of Elections*, 781 F. Supp. 3d 411, 454 (E.D.N.C. 2025) (Myers, C.J.) (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)). And "it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (quoting *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011)). North Carolina "is in no way harmed by issuance of an injunction that prevents the state from enforcing [an] unconstitutional" statute. *Legend Night Club v. Miller*, 637 F.3d 291, 302-03 (4th Cir. 2011). Finally, because *Williams* Plaintiffs seek only to revert to the 2023 Plan, which is already in place and was used to conduct the 2024 elections, the relief sought here is minimally disruptive. *See LWV*, 769 F.3d at 248. A preliminary injunction of the 2025 Plan would bring the parties and the Court back to where they were two weeks ago: with Plaintiffs' challenges to the Piedmont Triad and Mecklenburg districts pending resolution before this Court to determine whether those districts should remain in place for 2026 congressional elections.

## CONCLUSION

The Court should preliminarily enjoin the use of S.B. 249's districts and order North Carolina to continue to use the 2023 Plan pending resolution of Plaintiffs' Piedmont and Mecklenburg claims on the trial record.

- 25 -

Dated: October 31, 2025

**PATTERSON HARKAVY LLP**

By: /s/ *Narendra K. Ghosh*
Narendra K. Ghosh, NC Bar No. 37649
100 Europa Dr., Suite 420
Chapel Hill, NC 27517
(919) 942-5200
nghosh@pathlaw.com

*Counsel for* Williams *Plaintiffs*

**ELIAS LAW GROUP LLP**

By: /s/ *Lalitha D. Madduri*
Lalitha D. Madduri*
Lucas Lallinger*
Qizhou Ge*
James J. Pinchak*
250 Massachusetts Ave., Suite 400
Washington, D.C. 20001
Phone: (202) 968-4490
Facsimile: (202) 968-4498
LMadduri@elias.law
LLallinger@elias.law
AGe@elias.law
JPinchak@elias.law

Abha Khanna*
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
Phone: (206) 656-0177
Facsimile: (206) 656-0180
AKhanna@elias.law

* *Special Appearance pursuant to
Local Rule 83.1(d)*

- 26 -

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.3(d), I hereby certify that this brief contains 6,180 words as indicated Microsoft Word, excluding the caption, signature lines, certificate of service, cover page, and tables.

This the 31st day of October, 2025.

<u>/s/ *Lalitha D. Madduri*</u>
Lalitha D. Madduri

- 27 -

**CERTIFICATE OF SERVICE**

On this 31st day of October, 2025, I electronically filed the foregoing using the Court's CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by that system.

/s/ *Lalitha D. Madduri*
Lalitha D. Madduri
