# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| SHAUNA WILLIAMS; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 23-CV-1057 |
| REPRESENTATIVE DESTIN HALL, in his official capacity as Chair of the House Standing Committee on Redistricting; *et al.*, | |
| *Defendants.* | |
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 23-CV-1104 |
| PHILIP BERGER, in his official capacity as the President Pro Tempore of the North Carolina Senate; *et al.*, | |
| *Defendants.* | |

## LEGISLATIVE DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

## NATURE OF THE MATTER BEFORE THE COURT

Supreme Court precedent is clear "that partisan gerrymandering claims present political questions beyond the reach of the federal courts." *Rucho v. Common Cause*, 588 U.S. 684, 718 (2019). That holding applies to all partisan gerrymandering claims, regardless of how they are packaged. Resisting that point, the two sets of challengers here (respectively, the "Williams Plaintiffs" and "NAACP Plaintiffs" and, collectively, "Plaintiffs") challenge North Carolina's 2025 congressional redistricting plan on the ground that the General Assembly "considered whether voters voted for or against President Trump and Republican congressional candidates in 2024." [D.E. 180 at 16 (¶ 41); *see also* D.E. 181 at 44 (¶ 172)]. While these claims bear different labels and rest on various indiscriminately cited constitutional provisions, they are in fact partisan gerrymandering claims that should be dismissed.

## STATEMENT OF FACTS

At issue in this motion are Counts 10 through 12 of the NAACP Supplemental Complaint, [D.E. 180 ("NAACP Suppl. Compl.") ¶¶ 78–121], and Counts III and IV of the Williams Supplemental Complaint, [D.E. 181 ("Williams Suppl. Compl.") ¶¶ 159–76]. Both sets of claims arise from North Carolina's 2025 redistricting. [*See* D.E. 169 at 1–2; D.E. 175 at 2]. In Senate Bill 249, the General Assembly altered two districts (CD1 and CD3) from the 2023 redistricting plan, trading six counties from former CD3 with four counties from CD1. [NAACP Suppl. Compl. ¶¶ 62–63]. Both sets of Plaintiffs allege that the General Assembly acted in "pursuit of partisan advantage," [Williams Suppl. Compl. ¶ 172], to "improve[] Republican political strength in eastern North

Carolina and . . . bring an additional Republican seat to North Carolina's congressional delegation," [NAACP Suppl. Compl. ¶ 56; *see also id.* ¶ 34]. The General Assembly is alleged to have conducted the redistricting pursuant to a 2025 "call" issued by President Trump "to bolster voting maps in favor of the Republican party." [*Id.* ¶ 26]. Plaintiffs allege that Senator Ralph Hise configured the 2025 plan and, in doing so, "considered whether voters voted for or against President Trump and Republican congressional candidates in 2024 and redrew the lines on that basis." [*Id.* ¶ 41.]

Because prior redistricting plans configured to equalize population had governed North Carolina's prior elections this decade, Plaintiffs refer to the 2025 redistricting as "[g]ratuitous mid-decade redistricting," [*id.* ¶120], and theorize that this "entirely optional" effort provides "no necessity [sic] justification for the legislature's . . . pursuit of partisan advantage," [Williams Suppl. Compl. ¶ 174]. Plaintiffs present variations of this theme in the above-noted claims, citing various First Amendment protections, the Equal Protection Clause, the Elections Clause of Article I, and North Carolina state constitutional provisions. [*See* NAACP Suppl. Comp. ¶¶ 78–121; Williams Suppl. Compl. ¶¶ 171–76]. Relatedly, the Williams Plaintiffs present a malapportionment claim, [Williams Suppl. Compl. ¶¶ 159–70], despite acknowledging implicitly that the 2025 plan equalizes district populations as measured by "2020 Census data," [*id.* ¶ 166]. The Williams Plaintiffs contend that the General Assembly should have disregarded the 2020 census results and made some

unspecified attempts to account for population shifts since then. [*Id.* ¶¶ 163–67]. For reasons articulated below, these claims should be dismissed.[1]

## STATEMENT OF QUESTIONS PRESENTED

1.    Are Plaintiffs' variously packaged challenges to alleged partisan redistricting objectives justiciable?

2.    Is a congressional redistricting plan that achieves perfect population equality across all districts according to the decennial census unconstitutionally malapportioned?

## LEGAL STANDARD

This motion is brought under Federal Rule of Civil Procedure 12(b)(1) and, in the alternative, Rule 12(b)(6).[2] A Rule 12(b)(1) motion should be granted "if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Balfour Beatty Infrastructure, Inc. v. Mayor & City Council of Baltimore*, 855 F.3d 247, 251 (4th Cir. 2017) (citation omitted). "To survive a motion to dismiss," under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Porter v. Bd. of Trs. of N.C. State Univ.*, 72 F.4th 573, 581 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 693 (2024) (citation omitted).

---

[1] Both sets of Plaintiffs also brought claims for intentional race-based discrimination. [Williams Suppl. Compl. ¶¶ 139–58 (Counts I and II); NAACP Suppl. Compl. ¶¶ 122–27 (Counts 13 and 14)]. Legislative Defendants dispute these claims and underlying allegations and will defend them on a full record according to the Court's forthcoming scheduling order. [*See* D.E. 179 at 3].

[2] To be precise, Counts 10 through 12 of the NAACP Supplemental Complaint and Count IV of the Williams Supplemental Complaint seem best suited for dismissal under Rule 12(b)(1) whereas Count III of the Williams Supplemental Complaint may be better suited for dismissal under Rule 12(b)(6).

Case 1:23-cv-01057-TDS-JLW    Document 193    Filed 11/04/25    Page 4 of 26

**ARGUMENT**

## I.    Plaintiffs' Partisan Gerrymandering Claims Are Foreclosed

The Court should dismiss Counts 10 through 12 of the NAACP Supplemental Complaint and Count IV of the Williams Supplemental Complaint because they are "partisan gerrymandering claims" that "present political questions beyond the reach of the federal courts." *Rucho*, 588 U.S. at 718. Each of these counts presents a variation of a challenge to "the pursuit of partisan advantage." [Williams Suppl. Compl. ¶ 172; *see also* NAACP Suppl. Compl. ¶¶ 87 (Count 10: "The General Assembly . . . initiated the redistricting process gratuitously, in the middle of the decade, with the sole purpose of diminishing (and effectively precluding) the ability of those voters to again associate with other voters to elect a Democratic candidate for Congress in the 2026 election"), 108 (Count 11: "Plaintiffs . . . were thus subject to mid-decade redistricting in a manner that frustrates their right to petition the government for redress of grievances"), 120 (Count 12: alleging the redistricting "frustrates Plaintiffs' opportunity to actually influence their legislators via petition")].

These claims are foreclosed. The Supreme Court has "made clear that a jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 9 (2024) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 551 (*Cromartie I*)). The Supreme Court has also warned courts to be "wary of plaintiffs who seek to transform federal courts into 'weapons of political warfare' that will deliver victories that eluded them 'in the political arena.'" *Id.* at 11

4

(citation omitted). It should not be difficult to decline Plaintiffs' express invitations to defy *Rucho* where the Supreme Court has warned of much more subtle efforts at that outcome. Here, "this wolf comes as a wolf." *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting).

Plaintiffs make superficial attempts to bypass *Rucho*, but these are meritless. In rejecting "partisan gerrymandering claims," *Rucho* rejected all such claims regardless of labeling. 588 U.S. at 718. This Court and others have had no trouble seeing past flimsy efforts to avoid *Rucho* by clever issue framing. *See, e.g.*, *Williams v. Hall*, No. 1:23-cv-1057, 2025 WL 1798333, at *3 (M.D.N.C. June 9, 2025) (rejecting claim that "is more akin to a partisan gerrymandering claim than a malapportionment claim"); *Jackson v. Tarrant County*, __F.4th__, 2025 WL 3019284, at *4–5, *12–14 (5th Cir. 2025) (finding *Rucho* foreclosed gerrymandering claims labeled "viewpoint discrimination" and "disenfranchisement" clams); *Banerian v. Benson*, 589 F. Supp. 3d 735, 736 (W.D. Mich. 2022) (three-judge court) (rejecting claim that plan "fragments the plaintiffs' 'communities of interest' more than it does such 'communities' of other voters" as "a blood relative of the claims of partisan gerrymandering that the Supreme Court found nonjusticiable in *Rucho*"); *McConchie v. Scholz*, 577 F. Supp. 3d 842, 885 (N.D. Ill. 2021) (three-judge court) (finding no justiciable controversy where the evidence "establishes that the Illinois mapmakers were motivated principally by partisan political considerations"). Plaintiffs' claims fare no better.

5

A.  **Mid-Decade Redistricting Does Not Give Rise to a Justiciable Partisan Gerrymandering Claim**

In their principal contention, Plaintiffs point to "North Carolina's mid-decade redistricting" as the circumstance that gives rise to a justiciable controversy. [Williams Suppl. Compl. ¶ 172; *see also* NAACP Suppl. Compl. ¶ 120 (complaining of "[g]ratuitous mid-decade redistricting")]. But *Rucho* recognizes no distinction among redistricting plans based on when they were enacted, and by the time it was decided, the Supreme Court had long since rejected that possibility. Plaintiffs' argument is both foreclosed and devoid of conceptual foundation.

1.  In *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006) (*LULAC*), the Supreme Court addressed and rejected an argument that "mid-decennial redistricting, when solely motivated by partisan objectives, violates equal protection and the First Amendment because it serves no legitimate public purpose and burdens one group because of its political opinions and affiliation." *Id.* at 416–17 (opinion of Kennedy, J.). Just like Plaintiffs here, the challengers in *LULAC* insisted that "the Texas Legislature voluntarily replaced a plan that itself was designed to comply with new census data" and "had 'no constitutional obligation to act at all.'" *Id.* at 417 (citation omitted); [*compare* Williams Suppl. Compl. ¶¶ 173–76; NAACP Suppl. Compl. ¶¶ 92, 120]. Justice Kennedy provided the narrowest ground for the judgment, explaining that "the fact of mid-decade redistricting alone is no sure indication of unlawful political gerrymanders." *LULAC*, 548 U.S. at 419. The opinion explained that "a successful claim attempting to identify unconstitutional acts of partisan gerrymandering must do what appellants' sole-motivation

6

theory explicitly disavows: show a burden, as measured by a reliable standard, on the complainants' representational rights." *Id.* at 418. The mere fact of "mid-decennial legislation" did not meet this standard. *Id.*

Four other Justices concurred in the judgment. Two declined to "specify[] whether appellants have failed to state a claim on which relief can be granted, or have failed to present a justiciable controversy." *Id.* at 493 (opinion of Roberts, C.J., joined by Alito, J.). In other words, their rationale was at least as broad as Justice Kennedy's and possibly broader. Two additional Justices explicitly advanced the more sweeping view that "claims of unconstitutional partisan gerrymandering do not present a justiciable case or controversy." *Id.* at 512 (opinion of Scalia, J., joined by Thomas, J.). Because Justice Kennedy's opinion presents "the narrowest grounds" for the judgment, it is controlling. *Marks v. United States*, 430 U.S. 188, 193 (1977). Plaintiffs' challenge to mid-decade redistricting comes 19 years too late.

Indeed, *Rucho* ultimately adopted the broader view of Justices Scalia and Thomas, which makes the narrower view of Justice Kennedy all the more pedestrian. Because *all* partisan gerrymandering claims are non-justiciable, *Rucho*, 588 U.S. at 718, the subcategory of claims resting on a mid-decade theory is categorically barred. *Rucho* noted and reiterated *LULAC*'s holding about "mid-decade redistricting." *Id.* at 703. Accordingly, Plaintiffs have it backwards in suggesting mid-decade redistricting presents a complexity more difficult than what *Rucho* resolved. [*See* Williams Suppl. Compl. ¶ 172; NAACP Suppl. Compl. ¶ 120]. To the contrary, even when the Supreme Court believed *some* partisan gerrymandering claims might be justiciable, it ruled out a claim predicated on the

7

fact of a mid-decade redraw. *Compare LULAC*, 548 U.S. at 414 ("We do not revisit the justiciability holding"), *and id.* at 416–20 (opinion of Kennedy, J.) (rejecting mid-decade redistricting claim), *with Rucho*, 588 U.S. at 718 (rejecting all partisan gerrymandering claims). Simply put, Plaintiffs' claim is weaker—not stronger—than the one *Rucho* rejected.[3]

2.      In all events, Plaintiffs' claims fail in their basic concept. Plaintiffs theorize that "courts have been willing to tolerate . . . the pursuit of partisan advantage in redistricting because they are seen as essential to the necessary task of adjusting districts to reflect population changes after each decennial census." [Williams Suppl. Compl. ¶ 172; *see also* NAACP Suppl. Compl. ¶¶ 85, 92]. Not so. The pages of *Rucho* cited for that proposition say nothing like it; rather, they state that "the basic reason" that "[p]artisan gerrymandering claims have proved far more difficult to adjudicate" is that, "while it is illegal for a jurisdiction to depart from the one-person, one-vote rule . . . , 'a jurisdiction may engage in constitutional political gerrymandering.'" *Rucho*, 588 U.S. at 700–01; [*compare* Williams Suppl. Compl. ¶ 172 (citing these pages)]. Far from tying the permissibility of partisan gerrymandering to the equal-population requirement, *Rucho* decoupled the concepts. That much is clear from the next paragraph, which explains that "[t]o hold that legislators cannot take partisan interests into account when drawing district

---

[3] It is irrelevant that, in *LULAC*, the Texas legislature replaced a court-drawn plan. [*See* Williams Suppl. Compl. ¶ 167]. Justice Kennedy's *LULAC* opinion recognized "an important role for the courts when a districting plan violates the Constitution," 548 U.S. at 415, so the fundamental theory that a legislative redraw was unnecessary carried the same weight in that case as in this one. *Rucho* likewise affords this circumstance no legal significance.

lines would essentially countermand the Framers' decision to entrust districting to political entities." *Id.* at 701. In plain English, *Rucho* did not "tolerate" partisan redistricting "as essential to the necessary task of" remedying population inequality, [Williams Suppl. Compl. ¶ 172], but instead viewed the prerogative to draw lines for political reasons as implicit in the delegation of political power to political bodies. That holding does not depend on the timing of redistricting.

This rationale of *Rucho* fits neatly within the Supreme Court's broader corpus of redistricting precedent, which "teaches that redistricting is a legislative function, to be performed in accordance with the State's prescriptions for lawmaking." *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 808 (2015); *see also State of Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565, 569 (1916) (explaining that the power "of apportionment" is "part of the legislative power" to be accomplished by "the legislative authority of a state"); *Moore v. Harper*, 600 U.S. 1, 24–25 (2023). This answers the Williams Plaintiffs' mistaken assertion that a state must "justify" its decision to revise congressional districts. [Williams Suppl. Compl. ¶ 172; *see also id.* ¶¶ 174–75]. While "federal courts may not order the creation of" any specific types of "districts unless necessary to remedy a violation of federal law," "that does not mean that the State's powers are similarly limited." *Voinovich v. Quilter*, 507 U.S. 146, 156 (1993). "[B]ecause it is the domain of the States . . . to conduct apportionment in the first place," *id.*, the General Assembly could exercise its legislative power even if it did not need to remedy a violation of federal law, *see Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004) (plurality opinion) ("Laws promulgated by the Legislative Branch can be inconsistent, illogical, and ad hoc; law

9

pronounced by the courts must be principled, rational, and based upon reasoned distinctions."). Nothing in Supreme Court precedent limits legislative power to a presumed "given that the act of redistricting is necessary." [Williams Suppl. Compl. ¶ 174]. Plaintiffs' demand for justification states no claim where the law demands no justification.

## B. References to Miscellaneous Constitutional Provisions Do Not Create a Justiciable Controversy

Plaintiffs are also misguided in thinking they may avoid *Rucho* by indiscriminately spreading in their supplemental pleadings references to various constitutional provisions, such as the First Amendment's guarantees of free speech, free association, and the right to petition; the Elections Clause of Article I; unspecified protections of the Fourteenth Amendment; and even provisions of the North Carolina Constitution. [*See* NAACP Suppl. Compl. ¶¶ 81 (rights to speak and associate), 90 (North Carolina law), 91 (Elections Clause), 102 (right to petition), 115–20 (second right to petition theory); Williams Suppl. Compl. ¶¶ 171–76 (unspecified First and Fourteenth Amendment rights)]. Plaintiffs forget history. In the surge of suits leading to *Rucho*, litigants threw these same fistfuls of spaghetti at the proverbial wall,[4] but nothing stuck with the Supreme Court. In finding "that partisan gerrymandering claims present political questions beyond the reach of the federal

---

[4] *See Common Cause v. Rucho*, 318 F. Supp. 3d 777, 930–41 (M.D.N.C. 2018) (three-judge court) (First Amendment retaliation and Elections Clause theories adopted); *Ohio A. Philip Randolph Inst. v. Householder*, 373 F. Supp. 3d 978, 1162–63 (S.D. Ohio) (three-judge court) (same), *vacated and remanded sub nom. Householder v. Ohio A. Philip Randolph Inst.*, 589 U.S. 901 (2019); *Benisek v. Lamone*, 348 F. Supp. 3d 493, 513–24 (D. Md. 2018) (three-judge court) (First Amendment representational and associational rights theories adopted); *League of Women Voters of Michigan v. Benson*, 373 F. Supp. 3d 867, 934–56 (E.D. Mich.) (three-judge court) (same), *vacated sub nom. Chatfield v. League of Women Voters of Michigan*, 589 U.S. 1031 (2019).

10

courts," *Rucho* explicitly rejected theories under the First Amendment, Fourteenth Amendment, and Elections Clause. 588 U.S. at 718; *see id.* at 703–20. There is no room for Plaintiffs to revive the same claims *Rucho* rejected, and its holding is amply broad to defeat any shifting of theories even arguably afoot here.

1.    The Williams Plaintiffs' fuzzy reference to "the Equal Protection Clause," [Williams Suppl. Compl. ¶ 176; *see id.* ¶¶ 171–76], ignores that *Rucho* rejected an equal protection claim. *See Rucho*, 588 U.S. at 704–05, 710–13; *compare id.* at 731 (Kagan, J., dissenting) (contending that gerrymandering "implicates the Fourteenth Amendment's Equal Protection Clause"). In issuing this holding, *Rucho* rejected every strand of reasoning germane to the equal-protection analysis. *See Ramos v. Louisiana*, 590 U.S. 83, 104 (2020) (plurality opinion) ("It is usually a judicial decision's reasoning—its *ratio decidendi*—that allows it to have life and effect in the disposition of future cases."). The Court dispensed with the idea that partisan gerrymandering claims may implicate the "strictest scrutiny [reserved] for discrimination on the basis of race" by holding that "securing partisan advantage" is "[a] permissible intent." *Rucho*, 588 U.S. at 709, 711. The Court also differentiated equal protection claims based on denial or dilution of the fundamental right to vote, holding that "the idea that each vote must carry equal weight . . . . does not extend to political parties." *Id.* at 709. And the Court found no legal support for "the instinct that groups with a certain level of political support should enjoy a commensurate level of political power and influence." *Id.* at 704 (majority opinion). These rationales leave no room for the Williams Plaintiffs' contention that "partisan considerations" are impermissible. [Williams Suppl. Compl. ¶ 175]. As explained above (§ I.A), the

circumstance of mid-decade redistricting does not render permissible considerations impermissible.

The Williams Plaintiffs attempt to confuse matters by intermixing references to the "consideration of race" within their partisan gerrymandering claim. [Williams Suppl. Compl. ¶ 172; *see also id.* ¶¶ 173, 175]. Because *Rucho* drew a bright line between claims asserting racial gerrymandering and those asserting partisan gerrymandering, 588 U.S. at 710–11, the Williams Plaintiffs cannot save their barred partisan gerrymandering claim by conflating race and politics. Rather, they "must disentangle race and politics." *Alexander*, 602 U.S. at 6.

Moreover, while strict scrutiny applies where "race predominated" or where "the State 'enacted a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities,'" *id.* at 38 (citation omitted), Count IV of the Williams Supplemental Complaint does not allege either standard is met. It instead vaguely suggests that even awareness of racial demographics or "the consideration of race" short of predominance or intentional discrimination violate the Constitution. [Williams Suppl. Compl. ¶¶ 172–173, 175]. The Supreme Court has rejected this theory many times. *See, e.g.*, *Shaw v. Reno*, 509 U.S. 630, 642 (1993) (*Shaw I*) ("[A]ppellants appear to concede that race-conscious redistricting is not always unconstitutional. That concession is wise: This Court never has held that race-conscious state decisionmaking is impermissible in all circumstances." (internal citation omitted)); *Miller v. Johnson*, 515 U.S. 900, 916 (1995) ("Redistricting legislatures will . . . almost always be aware of racial demographics."); *Alexander*, 602 U.S. at 22 (same). There is no legal basis for the Williams

12

Plaintiffs' suggestion that the racial-discrimination standards would changed based on when the redistricting occurs. [*See supra* § I.A.] Strict scrutiny applies only when a "racial classification" is alleged and ultimately proven, *Shaw I*, 509 U.S. at 642, and Count IV does not allege this.

2.       Equally unavailing are Plaintiffs' many references to the First Amendment. [Williams Suppl. Compl. ¶ 176; NAACP Suppl. Compl. ¶¶ 78–121]. In *Rucho*, "[t]he District Courts also found partisan gerrymandering claims justiciable under the First Amendment." 588 U.S. at 713. But the Supreme Court reversed and put to bed all possible First Amendment support for a partisan gerrymandering cause of action:

> To begin, there are no restrictions on speech, association, or *any other First Amendment activities* in the districting plans at issue. The plaintiffs are free to engage in those activities no matter what the effect of a plan may be on their district.

*Id.* at 713–14 (emphasis added). No amount of listing First Amendment-protected liberties, [*e.g.*, NAACP Suppl. Compl. ¶ 79], or citing First Amendment decisions, [*id.* ¶¶ 81–85], can get the NAACP Plaintiffs past *Rucho*. *See Jackson*, 2025 WL 2025 WL 3019284, at *4 (rejecting attempt "to sidestep *Rucho* by characterizing . . . claims as ones of viewpoint-based disenfranchisement rather than viewpoint-based vote dilution"). *LULAC* also rejected a First Amendment theory founded on the circumstance of mid-decade redistricting. 548 U.S. at 416–17 (opinion of Kennedy, J.).

A First Amendment claim requires well-pleaded allegations of an "actual burden" on protected activity, *Rucho*, 588 U.S. at 716, as where the government "punish[es] or suppress[es] disfavored expression," *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188

(2024). *Rucho*, however, rejected the theory "that partisanship in districting should be regarded as simple discrimination against supporters of the opposing party." *Rucho*, 588 U.S. at 714. This overrides the NAACP Plaintiffs' allegations to the effect that "redrawing electoral district lines" can create a cognizable burden on any First Amendment-protected liberty. [*E.g.*, NAACP Suppl. Compl. ¶ 85]. Likewise, in proposing that line drawing can be forbidden First Amendment "retaliation," [*id.* ¶ 95], the NAACP Plaintiffs overlook that the *Rucho* district court looked to "First Amendment retaliation cases" for manageable standards, *Common Cause*, 318 F. Supp. 3d at 927, to no avail, *see Rucho*, 588 U.S. at 713–14. The NAACP Plaintiffs also ignore that *Rucho* additionally rejected the view that "partisanship driving districting decisions" can be improper governmental motive under the First Amendment. *See id.* at 714–15 ("But the First Amendment analysis below offers no 'clear' and 'manageable' way of distinguishing permissible from impermissible partisan motivation."). Nothing the NAACP Plaintiffs plead about intent or effect can overcome this holding. [*See, e.g.*, NAACP Suppl. Compl. ¶¶ 94–100].

The NAACP Plaintiffs' invocation of the First Amendment's right to petition government, [*see id.* ¶¶ 101–21], fails to provide the requisite "standard for determining when partisan activity goes too far" that is missing from other parts of the First Amendment. *Rucho*, 588 U.S. at 714. The right-to-petition claims fit cleanly with *Rucho*'s holding that a redistricting plan places no cognizable burden on "any other First Amendment activities." *Id.* at 713–14. "[T]he rights of speech and petition share substantial common ground." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388 (2011) (citation omitted). They are "inseparable," "cognate rights." *Thomas v. Collins*, 323 U.S. 516, 530

(1945). Accordingly, congressional redistricting does not create an impermissible burden on the right to petition for the same reasons it does not impose an impermissible burden on speech and associational rights. "The plaintiffs are free to engage in those activities no matter what the effect of a plan may be on their district." *Rucho*, 588 U.S. at 713–14.

3. The NAACP Plaintiffs make the adjunct assertion that the 2025 plan amounts to retaliation against them for filing this suit "by changing the district lines before this Court can render a determination following the trial held earlier this year." [NAACP Suppl. Compl. ¶ 106; *see id.* ¶¶ 101–08]. The contention fails many times over.

To begin, basing a claim on a different form of protected activity (filing a lawsuit rather than speech and association) misses the fundamental problem that a redistricting plan places no cognizable burden on *any* protected First Amendment activity. *Rucho*, 588 U.S. at 713–14. This claim also bypasses the problem that "there are no discernible and manageable standards for deciding whether there has been a violation." *Id.* at 708.

Meanwhile, the NAACP Plaintiffs' theory that a constitutional violation arises because the 2025 redistricting postpones "a final judgment on any one plan," [NAACP Suppl. Compl. ¶ 107], contravenes the mountain of precedent recognizing that state legislatures may moot (or restart) challenges to state statutes by amending them after litigation is filed. *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 590 U.S. 336, 338–39 (2020); *Holloway v. City of Virginia Beach*, 42 F.4th 266, 273 (4th Cir. 2022); *Esposito v. S.C. Coastal Council*, 939 F.2d 165, 171 (4th Cir. 1991). If a court believes a state does this to evade judicial review, its recourse would be to recognize an exception to mootness doctrine and adjudicate the underlying claim. *See N.Y. State Rifle*,

15

590 U.S. at 342, 351 (Alito, J., dissenting) (contending that suit should not be considered moot because New York officials "sprang into action to prevent us from deciding this case"). It would make no sense for a court instead—as the NAACP Plaintiffs propose—to *strike the new law down* by recasting the amendment as retaliation against the challengers who filed the lawsuit.

Besides, a complaint must plead "enough facts" to "nudge[] the[] claims across the line from conceivable to plausible," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), but no well-pleaded allegations show that the 2025 redistricting was intended to frustrate this Court's ability to issue a ruling in this case. Instead, the NAACP Plaintiffs allege that the 2025 redistricting occurred "to answer [President] Trump's call to bolster voting maps in favor of the Republican party." [NAACP Suppl. Compl. ¶ 26]. No one seriously thinks President Trump timed that request with court schedules in mind. Moreover, the NAACP Plaintiffs allege the 2025 redistricting altered only two congressional districts. [*Id.* ¶¶ 62–63]. Had the goal been to hinder final judgment, the General Assembly would have revised all challenged congressional districts to send the litigation back to square one for all of them.

Filings on this Court's docket confirm there is no gamesmanship. *See Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989) ("The most frequent use of judicial notice of ascertainable facts is in noticing the content of court records."); *Bolling v. Indian Mountain Coal Co.*, 836 F.2d 545, 1987 WL 30210, at *2 (4th Cir. 1987) (unpublished table decision) ("The Court takes judicial notice of its own docket"). Legislative Defendants did not oppose Plaintiffs' motions to amend challenges to the 2025 plan into

16

this case, [D.E. 173 at 5–6], and the Court is proceeding with the "intention to resolve all claims as expeditiously as possible," [D.E. 179 at 3]. Not only does the NAACP Plaintiffs' supplemental pleading fail to allege intent to hinder judicial review, but the undisputed facts affirmatively rule out any such assertion.

4.      The Court can make quick work of the NAACP Plaintiffs' reliance on the Elections Clause. [*See* NAACP Suppl. Compl. ¶ 91]. The lower court in *Rucho* adopted this theory in nearly the exact terms the NAACP Plaintiffs recycle now. *Compare id.* (quoting *Cook v. Gralike*, 531 U.S. 510, 523 (2001), and *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 833–34 (1995)), *with Common Cause*, 318 F. Supp. 3d at 831–32 (quoting *Cook* and *U.S. Term Limits*). The Supreme Court reversed on this point as well, holding "that neither § 2 nor § 4 of Article I 'provides a judicially enforceable limit on the political considerations that the States and Congress may take into account when districting.'" *Rucho*, 588 U.S. at 717. That resolves the NAACP Plaintiffs' argument based on the Elections Clause.

5.      At various points, the NAACP Plaintiffs suggest violations of North Carolina law. [*See* NAACP Suppl. Compl. ¶¶ 7, 90, 107]. If this represents an attempt to assert North Carolina law against organs and instrumentalities of State government, the Eleventh Amendment bars it. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) (holding *Ex parte Young* doctrine inapplicable "when a plaintiff alleges that a state official has violated *state* law"); *see also Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 293 (4th Cir. 2001). Any contention that the 2025 plain is deficient under state law must be brought in state court. *Moore v. Harper*, 600 U.S. 1, 37 (2023) ("State courts retain the

17

authority to apply state constitutional restraints when legislatures act under the power conferred upon them by the Elections Clause."). Besides, partisan gerrymandering claims are non-justiciable under North Carolina law, so the NAACP Plaintiffs have no state cause of action. *Harper v. Hall*, 886 S.E.2d 393 (2023) (*Harper III*). And the bar on mid-decade redistricting that the NAACP Plaintiffs cite applies to "*legislative* districts," not congressional districts. [NAACP Suppl. Compl. ¶ 107 (emphasis added)]; N.C. Const. art. II, §§ 3(4), 5(4). This final effort on Plaintiffs' part to talk their way out of *Rucho* falls with the others. The Court should dismiss Counts 10 through 12 of the NAACP Supplemental Complaint and Count IV of the Williams Supplemental Complaint.

## II.     The Williams Plaintiffs' Malapportionment Claim Is Foreclosed

The Court should also dismiss Count III of the Williams Supplemental Complaint, which claims "Malapportionment" and alleges "North Carolina did not make a good-faith effort to achieve mathematical equality across districts." [Williams Suppl. Compl. ¶¶ 159, 162]. The claim is baseless.

The Supreme Court has read Article I, § 2 to require that states "make a good-faith effort to achieve precise mathematical equality" in "apportioning congressional districts." *Karcher v. Daggett*, 462 U.S. 725, 730 (1983) (citation omitted). Compliance with this standard is "determined by uncorrected census counts." *Id.* at 738. In fact, binding precedent is absolutely clear that "the census data provide the *only* reliable—albeit less than perfect—indication of the districts' 'real' relative population levels." *Id.* (emphasis added). Here, undeniable census data show the populations of each of the 14 congressional districts in the 2025 plan to be either 745,671 or 745,670 individual residents—a deviation

of plus or minus one human being. *See* N.C. General Assembly Stat Pack at 1, available at https://webservices.ncleg.gov/ViewBillDocument/2025/7665/0/SL%202025-95%20-%20StatPack%20Report.[5] That is "absolute population equality" that cannot be any more perfect. *Karcher*, 462 U.S. at 732. The Williams Plaintiffs' contrary allegation that "North Carolina did not make a good-faith effort to achieve mathematical equality," [Williams Suppl. Compl. ¶ 162], is not well-pleaded, *Twombly*, 550 U.S. at 570. The Williams Supplemental Complaint does not, and could not, allege that the districts are unequal in population according to the decennial census.

Instead, the Williams Plaintiffs *criticize* the General Assembly for having "relied exclusively on 2020 Census data." [Williams Suppl. Compl. ¶ 167]. As explained, however, Supreme Court precedent *demands* that states use decennial census data, even though they "are not perfect" due to "the well-known restlessness of the American people," which renders the "population counts . . . outdated long before they are completed." *Karcher*, 462 U.S. at 731. Notwithstanding these limitations, in measuring district population equality, decennial census data are not everything; they are the "only" thing. *Id.* at 738; *see also id.* (stating a second time: "the census count . . . is the *only* basis for good-faith attempts to achieve population equality" (emphasis added)). The Williams Plaintiffs

---

[5] The Court may take judicial notice of the population data of S.B. 249 that is publicly available on the General Assembly's website. *See Hall v. Virginia*, 385 F.3d 421, 424, n.3 (4th Cir. 2004) (taking judicial notice of "[v]oting-age population statistics . . . available on the official redistricting website of the Virginia Division of Legislative Services"); *Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 571–72 (5th Cir. 2011) ("United States census data is an appropriate and frequent subject of judicial notice.").

cite no case—ever—where a court found a plan drawn to equality under decennial census data has been struck down. The Supreme Court rejected such an effort last decade, *see Evenwel v. Abbott*, 578 U.S. 54, 63–64 (2016), and a three-judge court in Texas recently dismissed a malapportionment claim just like what the Williams Plaintiffs present here, Ex. A, *League of United Latin Am. Citizens v. Abbott*, No. 21-CV-00259, Dkt. 1226, Mem. Op. & Order (W.D. Tex. Sept. 30, 2025).

The Williams Plaintiffs propose that Supreme Court precedent should not apply "when [states] choose to engage in unnecessary, mid-decade redistricting." [Williams Suppl. Compl. ¶ 167]. *Karcher*'s ironclad holding—"the only basis"—leaves no room for this contrived idea. Besides that, the Supreme Court considered this exact argument and dismissed it. In *LULAC*, the Court rejected the argument that the accuracy of decennial census data could not be presumed when "a legislature that enacts a voluntary, mid-decade plan." 548 U.S. at 421 (plurality opinion). Joined by Justices Souter and Ginsburg, *see id.* at 403–04, Justice Kennedy explained that this argument "turns not on whether a redistricting furthers equal-population principles but rather on the justification for redrawing a plan in the first place." *Id.* at 422. As of 2025, a plan drawn to achieve population equality in 2025 is no less protective of the equality of voting strength than one drawn to achieve population equality in 2021, 2022, or 2023. Accordingly, the "approach" of refusing the presumed accuracy of census data for mid-decade redistricting "merely restates the question whether it was permissible . . . to redraw the districting map," and the challenge to that decision "mirrors the[] attack on mid-decennial redistricting solely motivated by partisan considerations," which "is unsatisfactory for reasons . . . discussed."

20

*Id.* at 422–23; [*see supra* § I.A]. That is, this is yet another improper partisan gerrymandering claim.

This reasoning overrides the Williams Plaintiffs' view that the outcome should change where "the prior map being replaced by mid-decade redistricting was itself a legislatively enacted map." [Williams Suppl. Compl. ¶ 168]. That theory, too, "turns not on whether a redistricting furthers equal-population principles but rather on the justification for redrawing a plan in the first place." *LULAC*, 548 U.S. at 422 (plurality opinion)[6]; *see also Reynolds v. Sims*, 377 U.S. 533, 584 (1964) ("we do not mean to intimate that more frequent reapportionment would not be constitutionally permissible").

For similar reasons, the Williams Plaintiffs are simply wrong to say the "justification" for the presumed accuracy of census data is "a preference for legislatively enacted rather than court-drawn districts." [Williams Suppl. Compl. ¶ 168]. To the contrary, the Supreme Court has looked to the decennial census because it represents the "best population data available." *Karcher*, 462 U.S. at 738 (quoting *Kirkpatrick v. Preisler*, 394 U.S. 526, 528 (1969)). The decennial census is an "actual Enumeration" of nation's population, which the Census Bureau achieves by collecting information directly from every American household. *See Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 321, 337 (1999). Demographic information collected by other means (such as the Bureau's American Community Survey (ACS)) comes by "statistical sample," *Evenwel*,

---

[6] At least two other Justices viewed this outcome as swept into the broad view that the claim was "nonjusticiable," *LULAC*, 548 U.S. at 511–12 (Scalia and Thomas, JJ.), so Justice Kennedy's opinion is controlling on this point, *Marks*, 430 U.S. at 193.

578 U.S. at 64, which is less accurate than an actual enumeration, *Missouri State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 932 (8th Cir. 2018); *Benavidez v. Irving Indep. Sch. Dist.*, 690 F. Supp. 2d 451, 460 (N.D. Tex. 2010) ("Here, the use of the ACS data does not similarly meet the high standards and thorough coverage of the decennial census."). Accordingly, the Williams Plaintiffs' allegations "of uneven growth," [Williams Suppl. Compl. 165], are inherently undermined by inaccuracy in the statistical samplings they rely on. Looking to such information "would import a high degree of arbitrariness into the process of reviewing apportionment plans." *Karcher*, 462 U.S. at 732. Besides, even if the distance in time from the 2020 census called the accuracy of the results into question, that would be reason to *uphold* the 2025 plan not to strike it down. *See Abrams v. Johnson*, 521 U.S. 74, 100–01 (1997) ("These equitable considerations disfavor requiring yet another reapportionment to correct the deviation.").

## CONCLUSION

For the foregoing reasons, the Court should dismiss Counts 10 through 12 of the NAACP Supplemental Complaint and Counts III and IV of the Williams Supplemental Complaint.

Respectfully submitted, this the 4th day of November, 2025.

22

**BAKER & HOSTETLER LLP**

By: /s/ Katherine L. McKnight
Richard B. Raile*
DC Bar No. 1015689
Katherine L. McKnight*
DC Bar No. 994456
Trevor Stanley*
DC Bar No. 991207
1050 Connecticut Ave. NW
Suite 1100
Washington, DC 20036
Ph: (202) 861-1500
rraile@bakerlaw.com
kmcknight@bakerlaw.com
tstanley@bakerlaw.com

Patrick T. Lewis*
Ohio State Bar No. 0078314
Key Tower
127 Public Square, Suite 2000
Cleveland, Ohio 44114
Ph: (216) 621-0200
plewis@bakerlaw.com

Erika D. Prouty*
Ohio State Bar No. 0095821
Anna Croyts*
Ohio State Bar No. 0104620
200 Civic Center Drive, Suite 1200
Columbus, Ohio 43215
Ph: (614) 462-4710
eprouty@bakerlaw.com
acroyts@bakerlaw.com


*Appeared via Special Notice*

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By: /s/ Phillip J. Strach
   Phillip J. Strach
   North Carolina State Bar No. 29456
   Alyssa M. Riggins
   North Carolina State Bar No. 52366
   Cassie A. Holt
   North Carolina State Bar No. 56505
   Jordan A. Koonts
   North Carolina State Bar No. 59363
   301 Hillsborough Street, Suite 1400
   Raleigh, North Carolina 27603
   Ph: (919) 329-3800
   phil.strach@nelsonmullins.com
   alyssa.riggins@nelsonmullins.com
   cassie.holt@nelsonmullins.com
   jordan.koonts@nelsonmullins.com


*Attorneys for Legislative Defendants*

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.3(d), I, Phillip J. Strach, hereby certify that the foregoing brief includes 6,146 words as indicated by Microsoft Word, excluding the caption, signature lines, certificate of service, and case caption.

This the 4th day of November, 2025.

**NELSON MULLINS RILEY &
SCARBOROUGH LLP**

/s/ Phillip J. Strach
Phillip J. Strach
N.C. State Bar No. 29456

## <u>CERTIFICATE OF SERVICE</u>

I, Phillip J. Strach, hereby certify that I have this day electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will provide electronic notification to counsel of record.

This the 4th day of November, 2025.

**NELSON MULLINS RILEY &
SCARBOROUGH LLP**

/s/ Phillip J. Strach
Phillip J. Strach
N.C. State Bar No. 29456