# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| SHAUNA WILLIAMS; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 23-CV-1057 |
| REPRESENTATIVE DESTIN HALL, in his official capacity as Chair of the House Standing Committee on Redistricting; *et al.*, | |
| *Defendants.* | |
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 23-CV-1104 |
| PHILIP BERGER, in his official capacity as the President Pro Tempore of the North Carolina Senate; *et al.*, | |
| *Defendants.* | |

## LEGISLATIVE DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINITIFFS' MOTIONS FOR PRELIMINARY INJUNCTIONS

## NATURE OF THE MATTER BEFORE THE COURT

Before the Court are preliminary-injunction motions by the two sets of challengers (respectively, the "Williams Plaintiffs" and "NAACP Plaintiffs"). The NAACP Plaintiffs base their motion solely on First Amendment theories, [D.E. 183 at 1], and the Williams Plaintiffs raise similar First and Fourteenth Amendment and malapportionment theories, [D.E. 187 ("Mot.") at 1-2]. Legislative Defendants have explained that these theories cannot succeed, [*see* D.E. 193], and limit repetition here. This memorandum focuses on the Williams Plaintiffs' invidious racial discrimination and vote dilution claims. [Mot. 5-24]. This is a circumstantial-evidence-only case that faces a high bar the Williams Plaintiffs have no serious prospect of clearing. The motions should be denied.[1]

## STATEMENT OF FACTS

North Carolina's 2025 redistricting is part of a nationwide partisan redistricting arms race. In August, Texas passed a congressional plan aiming to add five Republican seats to the state's delegation, which triggered responses and counter-responses across states from California to Missouri to Maryland. [*See* Ex. 1, Oct. 27, 2025 Reuters article].

Leading North Carolina's role in those events, Senator Ralph Hise—"who drew the 2025 Plan," [Mot. 14]—explained that Democratic-controlled states had achieved more by gerrymandering than Republican-controlled states: in Illinois, where 43.5% of the 2024 vote went to President Trump, just 3 of 17 (17.6%) congressional members are Republican;

---

[1] The NAACP Plaintiffs do not seek preliminary relief on their intentional discrimination claim and cannot raise it for the first time on reply. *E.g.*, *M.B. v. Fairfax County School Board*, 660 F.Supp.3d 508, 526 (E.D. Va. 2023).

in New York, just 7 of 26 (26.9%) congressional seats went to Republicans, even though 40% of the 2024 vote went to Trump; New Mexico, Connecticut, and Massachusetts sent only Democrats to Congress, despite strong Republican vote shares. [Ex. 2, Oct. 21, 2025 Senate Session Tr. 8:7-9:12]. Senator Hise expressed a national sentiment that plans in Republican-controlled states were comparatively more generous to Democratic interests. [*Id.* at 11:17-22]. For example, under North Carolina's 2023 plan, nearly 29% of congressional seats went to Democratic members by comparison to a nearly 48% vote share for Kamala Harris. [*See* Ex. 3, 2024 Election Results].

On October 13, 2025, North Carolina's legislative leaders announced a plan "to block the efforts of blue state Democrats to take control of Congress from Republicans." [D.E. 184-5 at 2]. The release explained that "[p]icking up where Texas left off, we will hold votes in our October session to redraw North Carolina's congressional map to ensure Gavin Newsom doesn't decide the congressional majority." [*Id.*]. The new congressional map was released on October 16, 2025, [*see* D.E. 184-6], and President Trump publicly announced his support the next day. [*See* Ex. 4, Truth Social post].

The General Assembly made clear that its objectives were political, not racial. The 2025 criteria stated that the body "will not engage in discriminatory, race-based districting" and that "data identifying the race of individuals or voters shall not be used in the drafting of districts." [D.E. 184-10 at p.2]. It also indicated that "legislators" may "take partisan considerations into account" and announced its "principal legislative objective … to increase the Republican vote share of Congressional District 1 to outperform the same district in the 2023 Congressional plan." [*Id.*].

Case 1:23-cv-01057-TDS-JLW    Document 201    Filed 11/14/25    Page 3 of 27

That partisan goal was not difficult to achieve. CD1 in the 2023 map "was the least Democratic district held by a Democratic incumbent," and it neighbored CD3, "among the most safely Republican districts." [Ex. 5, Report of Dr. Barber ("Barber.Supp.") 12]. "[T]he reconfiguration of Districts 1 and 3 largely involved swapping entire counties," [D.E. 187-2 ("Rodden.Supp.") 4]. No counties swapped were majority-Black; nearly all were majority-*white*. [*Id.*]. The transfers brought Republican-leaning territory into CD1 without impairing Republican performance in CD3. [*See* Barber.Supp. 12-17]. This occurred without "spillover effect into other districts" and improved the altered districts' compactness and adherence to other traditional criteria. [*Id.* at 4-6, 12-14].

## STATEMENT OF QUESTIONS PRESENTED

1. Are Plaintiffs likely to show that partisan gerrymandering claims present justiciable controversies or that the decennial census is not the only basis for good-faith attempts to achieve population equality?

2. Are the Williams Plaintiffs likely to show that the General Assembly acted with a purpose to achieve racial objectives?

3. Do equitable considerations justify the extraordinary request of a temporary, mandatory injunction?

## THE LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). "A preliminary injunction is

3

an 'extraordinary remedy' that 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024) (citation omitted). Plaintiffs "seek a particularly aggressive form of preliminary injunction," a "'mandatory' injunction" that would "alter[] the status quo before the case even begins'" by requiring the state to adopt a different redistricting configuration than the one currently in effect. *Id.* (citations omitted). Such injunctions are "'disfavored'" and "'warranted only in the most extraordinary circumstances.'" *Id.* (citations omitted).

## ARGUMENT

### I. Plaintiffs Are Unlikely to Succeed

Plaintiffs demonstrate no prospect of success. That is crystal clear for Counts 10 through 12 of the NAACP Supplemental Complaint and Counts III and IV of the Williams Supplemental Complaint. [*See* D.E. 193]. The NAACP Plaintiffs raise First Amendment and Elections Clause theories explicitly rejected in *Rucho v. Common Cause*, 588 U.S. 684 (2019). *See id.* at 713-14, 717. The Williams Plaintiffs attempt to evade *Rucho* by noting the circumstance of mid-decade redistricting, but the Supreme Court had already dismissed that argument, *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 416-19 (2006) (*LULAC*) (opinion of Kennedy, J.), and no exceptions can escape *Rucho*'s holding that "partisan gerrymandering claims present political questions beyond the reach of the federal courts," 588 U.S. at 718. The Williams Plaintiffs' related allegation that the 2025 plan is malapportioned under unspecified data postdating the decennial census ignores that "the census count ... is the only basis for good-faith attempts to achieve population equality,"

4

*Karcher v. Daggett*, 462 U.S. 725, 738 (1983). Their argument was, besides, rejected in *LULAC*. 548 U.S. at 421-22 (plurality opinion).

That leaves the Williams Plaintiffs' intentional discrimination and vote-dilution claims, which likewise show no promise. As previously explained, the Fourteenth and Fifteenth Amendments (and intent-based claims under Voting Rights Act (VRA) Section 2) do not condemn state decision-making because of racially disproportionate impact. [*See* D.E. 125 at 4-7, 9-10; D.E. 164-1 at 2-14]. Instead, the Williams Plaintiffs "must show that the State's districting plan 'has the purpose *and* effect' of diluting the minority vote." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 39 (2024) (citation omitted). An invidious objective must have been "a 'but for' motivation for the enactment" such that it "would not have been adopted ... in the absence of racially discriminatory motivation." *Hunter v. Underwood*, 471 U.S. 222, 231-32 (1985). "Whenever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State." *Abbott v. Perez*, 585 U.S. 579, 603 (2018) (citation omitted). "This rule takes on special significance in districting cases." *Id.*

Moreover, courts "must be wary of plaintiffs" who attempt to "repackage a partisan-gerrymandering claim as a racial-gerrymandering claim by exploiting the tight link between race and political preference." *Alexander*, 602 U.S. at 11, 21. Legislatures "may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact." *Id.* at 9 (citation omitted). "When partisanship and race correlate, it naturally follows that a map that has been gerrymandered to achieve a partisan end can look very similar to a

5

racially gerrymandered map." *Id.* Accordingly, a plaintiff "must 'disentangle race from politics.'" *Id.* (citation omitted). "If either politics or race could explain a district's contours, the plaintiff has not cleared its bar." *Id.* at 10.

## A. The Motion Rests on Erroneous Legal Contentions

The Williams Plaintiffs cannot meet the applicable standard because they ignore it. Citing lower-court decisions predating *Alexander* and *Abbott*, they first suggest they need not differentiate racial and political objectives because the two "are not mutually exclusive." [Mot. 5]. While precedent accounts for that possibility, *Cooper v. Harris*, 581 U.S. 285, 291 n.1 (2017), this neither changes the underlying legal precept that political gerrymandering is permissible "even if" the state is "*conscious*" that "the most loyal Democrats happen to be black Democrats" nor relaxes the requirement that challengers "disentangle race from politics." *Alexander*, 602 U.S. at 9 (citation omitted).

Next, the Williams Plaintiffs attempt to downplay the standard governing vote-dilution claims by noting that it imposes a but-for test, not a "sole or 'primary' motive" test." [Mot. 5]. But this standard remains sufficiently robust to foreclose liability based on mere awareness of racial impact. *See Alexander*, 602 U.S. at 37 ("there is nothing nefarious about his awareness of the State's racial demographics"). In fact, *Alexander* described the intentional vote-dilution standard as more demanding than the racial-gerrymandering predominance test, [*see* D.E. 164-1 at 4-5], because the vote dilution test requires proof that (1) the legislature intended, not merely racial goals, but to "minimize or cancel out the voting potential of racial or ethnic minorities" and (2) the challenged districts achieve that discriminatory impact. *Alexander*, 602 U.S. at 38-39; *see also Jackson v. Tarrant County*,

6

__F.4th__, 2025 WL 3019284, at *8 (5th Cir. Oct. 29, 2025) (noting that intentional-vote-dilution claims "are seldom pursued" because they are "difficult" (citation omitted)).

The Williams Plaintiffs then implicitly ask the Court to lighten their load because they think it unfair that "we rarely have legislators announcing an intent to discriminate based upon race." [Mot. 6 (citation omitted)]. This is, for one thing, incorrect. *See Alexander*, 602 U.S. at 8 ("Such concessions are not uncommon" and "can also be smoked out over the course of litigation"). More fundamentally, the Supreme Court has "never invalidated an electoral map in a case in which the plaintiff failed to adduce any direct evidence" and leaves that possibility open only "in theory." *Alexander*, 602 U.S. at 8. Put simply, the Supreme Court expects claims like the one brought here will lose.

Insofar as the Williams Plaintiffs rest on their previously stated view that *Alexander* "do[es] not apply here," [D.E. 166 at ¶ 552], it is unfounded. Supreme Court precedent cannot be discarded by clever labeling. Every reason for *Alexander*'s demand that race and politics be disentangled applies to vote dilution cases. *See Ramos v. Louisiana*, 590 U.S. 83, 104 (2020) (plurality opinion) ("It is usually a judicial decision's reasoning—its *ratio decidendi*—that allows it to have life and effect in the disposition of future cases."); Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. CHI. L. REV. 1175, 1177 (1989) ("[L]ower courts" are "'bound" not "merely by the outcome" of higher courts' decisions but also by their "mode of analysis")*.* Whereas *Alexander* explained that racially and politically motivated line-drawing can achieve "very similar" maps, 602 U.S. at 9, the same is true in a vote-dilution case. *Alexander* also reaffirmed, as already noted, "that a jurisdiction may engage in constitutional political gerrymandering, even if it so happens

7

that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact." *Id.* (citation omitted). That rule applies to *all* racial-intent claims. Under a but-for causation standard, discriminatory purpose "implies more than intent as volition or intent as awareness of consequences." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). In addition, *Alexander* warned courts to "be wary of plaintiffs who seek to transform federal courts into 'weapons of political warfare' that will deliver victories that eluded them 'in the political arena.'" 602 U.S. at 11. As this case proves, it is just as easy for plaintiffs to attempt this by claiming "vote dilution" as by claiming "racial gerrymandering."

In summary, Plaintiffs have no entitlement to a preliminary injunction where a series of legal errors underpin their motion.

### B. No Direct Evidence Even Suggests Invidious Intent

A showing of impermissible racial motive "can be made through some combination of direct and circumstantial evidence." *Alexander*, 602 U.S. at 8. Direct evidence is by far the most probative. *See id.* at 8-9 (indicating it is typically essential); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66, 270 (1977) (finding no liability where "statements" of decisionmakers reflected "almost exclusively" race-neutral goals). None supports the Williams Plaintiffs.

### 1. Direct Evidence Defeats the Allegations of Racial Motive

The direct evidence uniformly points to permissible political—not racial— objectives. As described above, the 2025 criteria forbade "race-based districting" and declared partisan goals. [D.E. 184-10 at p.2]. Both directives were implemented. Senator

8

Hise repeatedly confirmed during the 2025 process that racial data were not used. [*See* Ex. 6, Oct. 20, 2025 Senate Committee Tr. 5:1-6:20, 33:2-6, 41:19-23; Ex. 7, Oct. 20, 2025 Senate Session Tr. 9:18-11:5; Ex. 8, Oct. 21, 2025 House Committee Tr. 9:7-10]. Politics provided the but-for cause of the redistricting. Senator Hise explained that "President Trump has called on Republican-controlled states across the country to redraw congressional districts, and this map answers that call" and that "[t]he motivation behind this draw was to produce a new map that will bring an additional Republican seat to North Carolina's congressional delegation." [Ex. 7 at 9:5-17].

Political objectives also motivated the transfer of residents between districts. [*See* Ex. 6 at 4:1-5 (Senator Hise explaining "the motivation behind this redraw is simple and singular: Draw a new map that will bring an additional Republican seat to the North Carolina congressional delegation."); *id*. at 7:20-23; Ex. 2 at 11:10-11 ("The purpose of this map was to pick up a Republican seat.")]. Republican political performance of CD1 increased from 51% to 55% as measured by support for President Trump in 2024, and from 49.6% to 53.9% as measured by an exhaustive index of statewide elections from 2020 to 2024. [*See* Ex. 7 at 12:1-7; Barber.Supp. at 12]. The tradeoff was a decrease in political performance in CD3, from 60% to 56% by the Trump measure, and 59.2% to 54.7% by the index. [Ex. 7 at 12:8-12; *see also* Barber.Supp. at 12; Ex. 6 at 7:24-8:6]. These choices support a robust "partisan-gerrymandering defense." *Alexander*, 602 U.S. at 9. The plan also adheres to race-neutral traditional criteria. In fact, CD1 and CD3 improved by standard compactness measures. [*See* Ex. 6 at 8:9-10:7].

9

### 2. The Williams Plaintiffs' Quarrels With Direct Evidence Are Unavailing

Lacking competing direct evidence, the Williams Plaintiffs make flailing efforts to discredit Senator Hise, but the presumption of good faith applies to credibility determinations. *See Alexander*, 602 U.S. at 19-38.

**a**. The Williams Plaintiffs ask the Court to presume invidious intent because "of racially polarized voting," theorizing that "it makes sense that the General Assembly would target Black voters for partisan gains." [Mot. 14]. The Supreme Court has disagreed and required challengers to "answer" the "obvious question": "Why would [a mapmaker] have used racial data—with the associated legal risks—as a proxy for partisan data when he had access to refined, sub-precinct-level political data that accounted for voter turnout and electoral preferences?" *Alexander*, 602 U.S. at 22-23. Here, Senator Hise considered "election outcomes" when drawing, which were then made available in the General Assembly's "stat pack," [Ex. 6 at 23:1-9], with data from 30 election contests, [*see* D.E. 184-20 at pp.2-31]. It would not have made sense for the General Assembly to use racial data as a proxy for political characteristics where political data directly showed political characteristics.

For their contrary view, the Williams Plaintiffs cite two decisions predating *Abbott* and *Alexander*. [Mot. 14]. The first, *Perez v. Abbott*, 253 F. Supp. 3d 864 (W.D. Tex. 2017), was an order carried forward in *Perez v. Abbott*, 267 F. Supp. 3d 750 (W.D. Tex. 2017), which was reversed in *Abbott*. As for the second, *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016), Chief Justice Roberts identified procedural reasons why

10

certiorari was denied and explicitly expressed that the Supreme Court did not ratify the decision on the merits. *North Carolina v. N.C. State Conf. of NAACP*, 137 S. Ct. 1399, 1399-1400 (2017) (statement of Roberts, C.J.). Moreover, *McCrory* was not a redistricting case raising the issues addressed in *Abbott* or *Alexander*. In that case, "the legislature requested data on the use, by race, of a number of voting practices" and no political data would have addressed the same issues. 831 F.3d at 214. There is no analogy here.

   **b**.  The Williams Plaintiffs allege that Senator Hise must have acted with racial motive because "he was aware that CD-1 contained a higher minority population than the state average." [Mot. 18]. Their new expert, Dr. Lichtman, likewise alleges that "[i]t is inconceivable that …. Senator Hise did not know where the Black population was concentrated in the Black Belt in the northeastern part of the state." [D.E. 187-4, ("Lichtman Rep.") at 14-15]. But "[t]here is nothing nefarious about [a mapdrawer's] awareness of the State's racial demographics," as "'[r]edistricting legislatures will … almost always be aware of racial demographics.'" *Alexander*, 602 U.S. at 22, 37 (citation omitted).

   Besides, the Williams Plaintiffs do not allege that Senator Hise has anything like the granular knowledge of racial demographics needed to use race as a proxy for politics. They (and Dr. Lichtman) exclude important context from Senator Hise's statements, including that he has a "general knowledge of the demographics of the state, not specific memorized data that would be utilized for any of those purposes." [Ex. 6 at 40:16-19]. Yet the Williams Plaintiffs assign near-exclusive significance to the supposed fact that "the BVAP of CD-1 [decreased] by 8 percentage points" and "the BVAP in CD-3 increased by 8 percentage

11

points." [Mot. 9]. Just knowing CD1's "higher minority population than the state average," [*id.* at 18], would not enable Senator Hise to understand—let alone intend—that an 8% BVAP change would occur, as opposed to a 3%, 19%, or 27% BVAP change. By contrast, Senator Hise's dataset of dozens of partisan election outcomes would equip him to achieve refined partisan goals without consideration of race. *See Alexander*, 602 U.S. at 22-23.

      **c.**     The Williams Plaintiffs next ask the Court to apply a presumption of bad faith under the view that "the Legislative Defendants … are seasoned litigants in combatting claims of discrimination." [Mot. 6 n.3]. But, because "the presumption of legislative good faith [is] not changed by a finding of past discrimination," *Abbott*, 585 U.S. at 603, it certainly cannot be changed by the mere past defense of litigation. It is more relevant that the Williams Plaintiffs' counsel are seasoned redistricting litigators who formerly alleged Legislative Defendants acted with partisan motive and curiously changed tune when those claims became barred. *See Alexander*, 602 U.S. at 9, 11.

      Building on their proposed presumption of bad faith, the Williams Plaintiffs attempt to "impugn … Senator Hise's credibility" by falsely asserting that he has "been discredited by courts." [Mot. 19]. The only credibility the Williams Plaintiffs impugn here is their own. Setting aside that no allegation of "original sin" can "flip[] the evidentiary burden on its head," *Abbott*, 585 U.S. at 603-04, the judicial record amply supports Senator Hise's attestations, past and present. A federal district court applying federal evidentiary standards recently found that "Senator Hise credibly testified that he did not support" certain redistricting proposals because they were created "using racial data," "contrary to the requirements stated in the 2023 Senate criteria." *Pierce v. N.C. State Bd. of Elections*,

__F.Supp.3d__, 2025 WL 2841008, at *9 (E.D.N.C. Sept. 30, 2025). By comparison, the General Assembly admitted when it considered racial data in past redistricting. *See Cooper*, 581 U.S. at 299-300, 310, 314; *Covington v. North Carolina*, 316 F.R.D. 117, 130 (M.D.N.C. 2016), *aff'd*, 581 U.S. 1015 (2017). Subsequently, once the General Assembly appreciated the legal risks of racial considerations, and forbade them, no court found it to have used race. *See Harper v. Hall*, 868 S.E.2d 499, 511-12, 558 (N.C. 2022) (*Harper I*) (suggesting violation of state law in failure to consider race), *overruled* 886 S.E.2d 393 (N.C. 2023). Indeed, in one case Dr. Lichtman emphasizes, [Lichtman Rep. 16-17], the state court accepted that the General Assembly "did not use racial data in drawing the districts" and forbade a Voting Rights Act defense on that basis. *Common Cause v. Lewis*, No. 18 CVS 014001, 2019 WL 4569584, at *101 (N.C. Super. Sep. 03, 2019). In summary, Legislative Defendants' fact-based attestations concerning the use or non-use of racial data have proven reliable.[2]

In claiming courts have discredited Senator Hise, the Williams Plaintiffs offer only two state-court decisions. [Mot. 17-19]. Both were partisan-gerrymandering decisions overruled in *Harper v. Hall*, 886 S.E.2d 393 (N.C. 2023) (*Harper III*). Neither applied the presumption of good faith as articulated in *Alexander* and *Abbott*. Neither found anyone to have been less than candid about racial data. And neither discredited any legislative witness (let alone Senator Hise). The first, *Harper I*, accepted candid testimony of legislative

---

[2] Dr. Lichtman's attacks on Senator Hise's credibility, [*See* Lichtman Rep. 11-17], are inadmissible. *United States v. Lespier*, 725 F.3d 437, 449 (4th Cir. 2013) ("Rule 702 renders inadmissible expert testimony on issues of witness credibility").

13

members that, while publicly visible computer terminals lacked partisan data, a legislator (who was not Senator Hise) "viewed 'concept maps' created on an unknown computer" and that "no restrictions on the use of outside maps were ever implemented or enforced." *Harper I*, 868 S.E.2d at 513. The court inferred that political objectives had been achieved consistent with that testimony, not contrary to it, proving only that "political considerations are inseparable from districting," *Gaffney v. Cummings*, 412 U.S. 735, 753 (1973). The *Harper I* court did not deem Senator Hise lacking in credibility; its only reference to his testimony credited it. 868 S.E.2d at 513.

The *Common Cause* decision is even further afield. The since-discredited ruling made the puzzling choice to admit files of a *deceased* consultant over meritorious hearsay objections, and then found that redistricting plans were created earlier than filings *in a different court* had indicated. *See* 2019 WL 4569584, at \*\*11, 103-05. The *Common Cause* court did not discredit any witness based on its unsubstantiated speculation but found "unpersuasive" the argument that "Legislative Defendants … did not know at the time that [the consultant] was developing draft maps" because the court thought it "highly improbable that" the consultant "never mentioned his draft maps to *anyone connected with* Legislative Defendants." *Id.* at \*105 (emphasis added). The court deemed the consultant's knowledge and actions "attributable in full to Legislative Defendants" by operation of agency law and otherwise found it "unnecessary to delve further into [its] concerns." *Id.*; *see also id.* at \*11 ("the partisan intent … is attributable to Legislative Defendants inasmuch that Dr. Hofeller, at all relevant times, worked under the direction of, and in concert with, Legislative Defendants"). The *Common Cause* court did not discredit any

14

witness (let alone Senator Hise, who did not testify) based on its bizarre treatment of the record.

The remaining credibility assertions of the Williams Plaintiffs do not rest on court findings and make no sense. For example, they claim Senator Hise must have had "knowledge of racially polarized voting in northeast North Carolina" because of "the trial in this case." [Mot. 17]. But Senator Hise was present only the day he testified, and no expert testimony regarding racially polarized voting was then offered.

**d.** Dr. Lichtman looks for direct evidence among "Senator Hise's Democratic counterparts." [Lichtman Rep. 12]. But they acknowledged the majority's partisan objectives. [*See* Ex. 7 at 81:23-82:1 (Senator Everett commenting that "today we're told we must redistrict North Carolina to help Republicans secure congress and move President Trump's agenda forward.")]. Regardless, "[t]he Supreme Court has made it clear, however, that the views of legislative opponents carry little legal weight in characterizing legislation." *Page v. Va. State Bd. of Elections*, 2015 WL 3604029, at *13 (E.D. Va. June 5, 2015) (three-judge court) (collecting cases). "The rationale for this authority is patent: a bill's opponents have every incentive to place a competing label on a statute they find objectionable." *Id.*; *Shell Oil Co. v. Iowa Dep't of Revenue*, 488 U.S. 19, 29 (1988) ("This Court does not usually accord much weight to the statements of a bill's opponents."). If the law were otherwise, legislators opposing a bill could manufacture invidious intent merely by calling its supporters racists.

## C. No Circumstantial Evidence Even Suggests Invidious Intent

Because no direct evidence points to racial intent, this is a "circumstantial-evidence-only case" that "is especially difficult," given the State's "partisan-gerrymandering defense." *Alexander*, 602 U.S. at 9. The Supreme Court has "never invalidated an electoral map in a case in which the plaintiff failed to adduce any direct evidence." *Id.* at 8. This case is unlikely to be the first. The Williams Plaintiffs present no "substitute map that shows how the State 'could have achieved its legitimate political objectives' in [a challenged district] while producing 'significantly greater racial balance.'" *Id.* at 34 (citation omitted). They labor against "an adverse inference," *id.*, that they cannot overcome.

### 1. Expert Analysis

As at trial in this case, the most probative expert analysis supports the "partisan-gerrymandering defense." *Alexander*, 602 U.S. at 9. Legislative Defendants' expert, Dr. Barber, shows that the stated goal was achieved: "the overall partisan balance of 2025 District 1 becomes more Republican while the partisan balance of District 3 becomes less Republican under the 2025 plan." [Barber.Supp. 12]. Incidental racial impacts point to correlation not causation. [*See id.* at 13-23].

Resisting that point, the Williams Plaintiffs rely on a supplemental report of Dr. Jonathan Rodden, but it only confirms he is the type of expert who selectively changes analyses "to suit the exigencies of the moment." *Pierce*, 97 F.4th at 215. Dr. Rodden hypothesized at trial in this case that CD1 may "potential[ly]" have been drawn in 2023 to hit "a racial target" because it was "significantly reconfigured" with no material BVAP change. [WX1 ("Rodden.Rep.") 3; *see also id.* at 26 ("it appears that care may have been

16

taken to avoid any major change to the district's racial statistics—even at the expense of drawing a more Republican district."). Now, in 2025, the district's BVAP *has* changed (as has the district's likely Republican performance), and Dr. Rodden finds new reasons to criticize the district. [Rodden.Supp. 2, 9-10]. Whatever happens, Dr. Rodden will find reasons to suspect racial intent. That is not a hallmark of credibility.

Raising further cause for suspicion, Dr. Rodden nixed some methods he previously employed and introduced new ones. Missing from the new report are county-envelope and racial-dislocation analyses, as well as compactness and county-split assessments, all of which he previously conducted. [*Compare* Rodden.Rep. 5-36 *with* Rodden.Supp. 2-15]. Outcomes may be one reason for this choice. For example, Dr. Rodden previously found it important "that the 2023 Plan reduced the compactness of the challenged districts," [Rodden.Rep. 2, *see also id.* at 6-7], but Dr. Barber shows that the compactness of CD1 and CD3 improved in 2025. [Barber.Supp. 5]. On cue, Dr. Rodden suddenly finds the topic uninteresting. Now, he finds new approaches, such as analyzing whether the plan splits Census Bureau-designated Combined Statistical Areas (CSAs)—which were not among the General Assembly's criteria—and changes in districts' demographic and partisan characteristics. [*See* Rodden.Supp. 6-9]. Dr. Rodden did not think those approaches useful until now. Even forms of analysis repeated in the supplemental report were conducted, or at least displayed, differently, such as the review of racial-depicted geography. [*Compare* Rodden.Rep. 14-15, 19-20, 24-25, *with* Rodden.Supp. 5-6].

In all events, Dr. Rodden's methods do not show racial intent. He never purports to find racial intent, and such an opinion would be surprising where he previously disclaimed

17

opinions about intent. [*See* D.E. 164-1 at 16-17]. Moreover, his report shows that the General Assembly reconfigured CD1 and CD3 without moving majority-Black counties. [Rodden.Supp. 4; *see also* Barber.Supp. 9]. While CD1 includes majority-Black counties in the northern part of the district, they were *not* moved. [Barber.Supp. 7-9]. The Williams Plaintiffs do not explain why a legislature intent on a "targeted strike … based on … Black populations" would have missed the majority-Black counties and hit the majority-white counties. [Mot. 1-2].

Dr. Rodden contends that "racial effects of the boundary changes are much larger than partisan effects." [Rodden.Supp. 12; *see also* Lichtman Rep. 13]. But no inference of racial motive follows from that. A map-maker does not ordinarily work by "isolating and moving Black Democrats," so one would not expect "a one-to-one correspondence between racial and partisan shifts" in the absence of "precise race-based sorting." [Barber.Supp. 13-14]. Here, "the reconfiguration of Districts 1 and 3 largely involved swapping entire counties," [Rodden.Supp. 4], which is an especially imprecise way of targeting any demographic group. The mere fact of a difference in BVAP change from Democratic vote-share change does not indicate that the BVAP change (rather than the Democratic vote-share change) motivated the alterations. Here, the stated political goal was actually achieved and presumptively was the actual basis of the redistricting choices. In simpler terms, Dr. Rodden still fails to "disentangle race from politics." *Alexander*, 602 U.S. at 17. The way to do that was an alternative plan which, if the Williams Plaintiffs' position had merit, would be "remarkably easy to produce." *Id.* at 36.

18

Finally, Dr. Rodden looks to "Dr. Barber's redistricting simulations to assess whether, in an approach to North Carolina redistricting that did not consider race, one would expect to see that the largest BVAP of a congressional district in Eastern North Carolina would be only 32.34 percent." [Rodden.Supp. 13]. But, to be any good, a simulation method must "replicate the 'myriad considerations' that a legislature must balance as part of its redistricting efforts." *Alexander*, 602 U.S. at 24 (citation omitted); *see also id.* at 25-33. The simulations Dr. Barber previously prepared did not reflect the General Assembly's considerations (not in 2025 or even in 2023) but instead were meant to test Dr. Rodden's methods. [*See* D.E. 164-1 at 23; Barber.Supp. 22]. Besides, Dr. Rodden's data show that CD1 and CD3 are not outliers. [*See* Barber.Supp. 22-23]. Indeed, Dr. Rodden failed to disclose that CD3's BVAP is "extremely close to the median simulation" in the ensemble. [*Id.* at 23].

### 2.    Circumstantial Inferences

The Williams Plaintiffs also look to *Arlington Heights*, but no court has enjoined any voting district based only—or even primarily—on the factors it described. The Supreme Court did not even mention them in *Alexander* and afforded them virtually no weight in *Abbott*. *See* 585 U.S. at 603-04, 607-14. The Fifth Circuit recently rejected a vote-dilution claim predicated solely on these factors. *Jackson*, 2025 WL 3019284, at \*7-12. The Williams Plaintiffs fall well short of a "clear showing" of "likelihood of success." *Winter*, 555 U.S. at 20-22.

First, the "specific sequence of events leading up to the challenged decision" reveals partisan (not racial) "purposes." *Arlington Heights*, 429 U.S. at 267. As described, [*supra*

pp. 1-3], North Carolina's 2025 redistricting is part of a nationwide arms race, as the Williams Plaintiffs acknowledge, [*see* Mot. 2]. The Williams Plaintiffs ignore this critical context and focus myopically on legislative procedures, such as an alleged expedited process and supposed lack of opportunity for input. Setting aside that this view is a caricature—as the upcoming hearing will show—it would be "just as easily explained by a partisan motive as a racial motive." *Jackson*, 2025 WL 3019284, at \*12. "[P]artisan gerrymandering is unlikely to be popular, so it is understandable that a legislature engaging in it would want to avoid an extensive, public process." *Id.*; *see also Abbott*, 585 U.S. at 610 ("[w]e do not see how the brevity of the legislative process can give rise to an inference of bad faith—and certainly not an inference that is strong enough to overcome the presumption of legislative good faith"). It is for the same reason no surprise the General Assembly did not implement the views of many of the "more than 12,000 comments submitted" that opposed redistricting on partisan grounds. [Mot. 16; *see, e.g.*, D.E. 187-6 at p.22 (comment that "I am firmly against any redrawing of the district maps for partisan gains.")]. Plaintiffs also complain about mid-decade redistricting. [*See* Lichtman Rep. 7-8]. But that has nothing to do with race. This decision "is easily explained by a desire to reap partisan benefits in the 2026, 2028, and 2030 elections rather than waiting until 2030." *Jackson*, 2025 WL 3019284, at \*12.[3]

---

[3] The Williams Plaintiffs' argument about evidence of racially polarized voting, [Mot. 17], has no teeth where there is no allegation that the congressional districts violate VRA Section 2. *See Allen v. Milligan*, 599 U.S. 1, 25 ("we have reiterated that § 2 turns on the presence of discriminatory effects, not discriminatory intent"). Besides, the "preliminary" analysis presented in 2023 of two senate districts did not concern congressional districts or

Second, the Williams Plaintiffs identify nothing in the "historical background of the decision" equating to "official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267. They cite only the State's past "history of race discrimination," [Mot. 13], but, "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value." *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987). The analysis looks to the "historical background of the *decision*," *Arlington Heights*, 429 U.S. at 267 (emphasis added), not the history of *North Carolina*. Accordingly, North Carolina's "'long history of voting-related discrimination'" has no "logical bearing on" the discriminatory intent inquiry.[4] *Abbott*, 585 U.S. at 619 (citation omitted).

Third, as explained, nothing in the legislative history points to racial motive. *Arlington Heights*, 429 U.S. at 268. It shows that the General Assembly "made the laudable effort to disregard race altogether in the redistricting process." *Alexander*, 602 U.S. at 19 n.6.

Fourth, the Williams Plaintiffs identify no " clear pattern, unexplainable on grounds other than race." *Arlington Heights*, 429 U.S. at 266; *see Jackson*, 2025 WL 3019284, at *11. Any burden on minority voters is easily explained in partisan terms. [*See supra* § I.C.1]. The Williams Plaintiffs have not disentangled race from politics in their effects

---

show legally significant polarized voting. [D.E. 164-1 ¶¶ 78-79]; *see Pierce*, 97 F4th at 207 ("The Southern Coalition for Social Justice … did not request a majority-black district.").

[4] Nor does evidence of racially polarized voting. [*See* Mot. 13-15]. Polarization exists "to no one's great surprise," *Cooper*, 581 U.S. at 304 n.5; gives rise to a challenger's duty to disentangle race from politics, *Alexander*, 602 U.S. at 9; and, in this case, reflects partisan differences not racism in the electorate, [Ex. 9, Alford Report at 7-10].

analysis, such as by analyzing primary elections. *Cf. LULAC v. Abbott*, 601 F. Supp. 3d 147, 165 (W.D. Tex. 2022) ("giv[ing] little weight to" polarization analysis including only "general elections"). For the same reason, the only effect is a political one, which does not create a cognizable claim. [*See* D.E. 164-1 at 36-39].

## II. Equitable Factors Foreclose an Injunction

An injunction is unwarranted under equitable principles. *See Winter*, 555 U.S. at 20. Plaintiffs' request for a mandatory injunction is "disfavored." *Pierce*, 97 F.4th at 209. And "the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott*, 585 U.S. at 603 n.17.

The *Purcell* doctrine also undercuts the motions. "That name stands for the principle that 'federal courts ordinarily should not enjoin a state's election laws in the period close to an election,' and that when "lower federal courts contravene that principle,' the Supreme Court will stop them." *Pierce*, 97 F.4th at 226 (citation omitted). The State Board of Elections has identified relevant election deadlines, [*see* D.E. 189-1], and an injunction cannot be workably implemented, and a new plan configured, consistent with them. The timing of the redistricting does not alter the application of *Purcell*. In *Merrill v. Milligan*, 142 S. Ct. 879 (2022), the redistricting plan was enacted too late for an injunction to issue— even though the plaintiffs challenged it at the earliest possible moment. *See Singleton v. Merrill*, 582 F. Supp. 3d 924, 939 (N.D. Ala. 2022) (in decision stayed in *Milligan*, noting the claim was filed "[o]n the day" the plan was enacted). The Supreme Court nonetheless stayed the injunction for the 2022 elections. *Purcell* was dispositive, as became clear when the Supreme Court later affirmed the very same injunction, *see Allen v. Milligan*, 599 U.S.

1 (2023). The Court issued another order staying an injunction against a plan adopted on a similar time frame the following year. *See Robinson v. Callais*, 144 S. Ct. 1171 (2024); *see also Wise v. Circosta*, 978 F.3d 93, 98 (4th Cir. 2020) (en banc).

## CONCLUSION

For the foregoing reasons, the Court should deny the preliminary injunction motions in full.

Respectfully submitted, this the 14th day of November, 2025.

**BAKER & HOSTETLER LLP**

By: /s/ Katherine L. McKnight
Richard B. Raile*
DC Bar No. 1015689
Katherine L. McKnight*
DC Bar No. 994456
Trevor Stanley*
DC Bar No. 991207
1050 Connecticut Ave. NW
Suite 1100
Washington, DC 20036
Ph: (202) 861-1500
rraile@bakerlaw.com
kmcknight@bakerlaw.com
tstanley@bakerlaw.com

Patrick T. Lewis*
Ohio State Bar No. 0078314
Key Tower
127 Public Square, Suite 2000
Cleveland, Ohio 44114
Ph: (216) 621-0200
plewis@bakerlaw.com

Erika D. Prouty*
Ohio State Bar No. 0095821
Anna Croyts*

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By: /s/ Phillip J. Strach
Phillip J. Strach
North Carolina State Bar No. 29456
Alyssa M. Riggins
North Carolina State Bar No. 52366
Cassie A. Holt
North Carolina State Bar No. 56505
Jordan A. Koonts
North Carolina State Bar No. 59363
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina 27603
Ph: (919) 329-3800
phil.strach@nelsonmullins.com
alyssa.riggins@nelsonmullins.com
cassie.holt@nelsonmullins.com
jordan.koonts@nelsonmullins.com

*Attorneys for Legislative Defendants*

23

Ohio State Bar No. 0104620
200 Civic Center Drive, Suite 1200
Columbus, Ohio 43215
Ph: (614) 462-4710
eprouty@bakerlaw.com
acroyts@bakerlaw.com

*Appeared via Special Notice*

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.3(d), I, Phillip J. Strach, hereby certify that the foregoing brief includes 6,197 words as indicated by Microsoft Word, excluding the caption, signature lines, certificate of service, and case caption.

This the 14th day of November, 2025.

**NELSON MULLINS RILEY &
SCARBOROUGH LLP**

/s/ Phillip J. Strach
Phillip J. Strach
N.C. State Bar No. 29456

## CERTIFICATE OF SERVICE

I, Phillip J. Strach, hereby certify that I have this day electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will provide electronic notification to counsel of record.

This the 14th day of November, 2025.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

/s/ Phillip J. Strach
Phillip J. Strach
N.C. State Bar No. 29456

26