**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| SHAUNA WILLIAMS, et al., | |
| *Plaintiffs,* | |
| v. | Civil Action No. 23 CV 1057 |
| REPRESENTATIVE DESTIN HALL, in his official capacity as Chair of the House Standing Committee on Redistricting, et al., | |
| *Defendants.* | |
| _____ | |
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP, et al., | |
| *Plaintiffs,* | |
| v. | Civil Action No. 23 CV 1104 |
| PHILIP BERGER, in his official capacity as the President Pro Tempore of the North Carolina Senate, et al., | |
| *Defendants.* | |

## <u>NAACP PLAINTIFFS' MEMORANDUM IN OPPOSITION TO LEGISLATIVE DEFENDANTS' MOTION TO DISMISS</u>

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 3

LEGAL STANDARD ................................................................................................ 4

ARGUMENT ............................................................................................................. 5

   I.    Plaintiffs Allege Justiciable Claims of Infringement on the Right to Petition. .... 5

      A.  Plaintiffs' Petition Clause Claims Are Not Encompassed by Rucho. ................. 6

      B.  Plaintiffs State a Violation of their Right to Petition the Courts. ......................... 7

      C.  Plaintiffs State a Violation of their Right to Petition Their Elected
           Representatives. ................................................................................................. 12

   II.   Plaintiffs Have Alleged a Justiciable Claim of First Amendment Retaliation. .. 14

      A.  Rucho and LULAC Do Not Control Because Plaintiffs Do Not Assert Partisan
           Gerrymandering Claims . .................................................................................. 14

      B.  Plaintiffs State a Claim for First Amendment Retaliation. ............................... 20

   III.  Dismissal of Plaintiffs' Novel Legal Claims Is Inappropriate. ........................... 22

CONCLUSION ....................................................................................................... 23

i

## INTRODUCTION

The circumstances of North Carolina's 2025 congressional redistricting are unprecedented, but the bedrock First Amendment principles supporting NAACP Plaintiffs' supplemental complaint, Doc. 180 ("Suppl. Compl."), are not.

In seeking to dismiss Counts 10, 11, and 12, Legislative Defendants ("Defendants") misapply *Rucho v. Common Cause*, 588 U.S. 684 (2018). Plaintiffs do not bring partisan gerrymandering claims. Plaintiffs allege that Defendants engaged in gratuitous, retaliatory redistricting to replace the legislature's own 2023 Congressional Plan for no other reason than to burden voters (including Plaintiffs) for their protected speech, association, and petitioning conduct. By removing Plaintiffs from their congressional districts, Defendants created concrete harm that chills Plaintiffs' associational and petitioning rights by disrupting their political association and advocacy and blocking final resolution of their pending challenge to Congressional District 1 ("CD1"). Plaintiffs ask this Court to strike down Senate Bill 249 (S.L. 2025-95) ("SB249") as unlawful retaliation (Count 10) and as a burden on their First Amendment rights to petition the courts (Count 11) and their congressional representatives (Count 12).

These claims do not rest on concepts of partisan "fairness" or implicate the concerns present in *Rucho* rendering those claims non-justiciable. Plaintiffs' allegations of harm do *not* require the Court to: (1) examine extrinsic metrics of partisan proportionality or fairness; (2) predict how districts will perform over many elections cycles (since legislators now assert power to redistrict *every two years* to quash disfavored speech); or (3) provide

1

a remedy apportioning political power because the appropriate relief is reversion to the legislature's prior plan.

Defendants' decision to redistrict is retaliatory, just as any government action aimed at chilling protected speech is retaliatory. A legislature cannot pursue gun regulation by targeting communities that support gun rights—whether by eliminating polling places or altering state services—simply because those voters advanced initiatives, elected pro-Second Amendment legislators, or filed lawsuits challenging gun restrictions. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024) (holding plaintiff stated First Amendment violation because defendant government officer "could not wield her power . . . to threaten enforcement actions against [government]-regulated entities in order to punish or suppress the NRA's gun-promotion advocacy."). That fundamental principle is no less true when the legislature claims that its rationale is "partisanship" rather than "public safety."

This principle holds when a legislature uses its power under the Elections Clause. While "the Elections Clause grants to the States broad power to prescribe the procedural mechanisms for holding congressional elections[,]" it is "not [] a source of power to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints." *Cook v. Gralike*, 531 U.S. 510, 523 (2001) (internal quotations omitted). Here, the procedural mechanism for congressional elections was *already prescribed* by legislative action: the 2023 Congressional Plan. And so when legislators made the decision to redistrict, they were *not* doing it to ensure that "some sort of order, rather than chaos, [accompanied] the democratic process[.]" *Id.* at 524 (internal quotations

2

omitted). Instead, it was solely to burden voters based upon their prior free speech and associational and petitioning activity. Dismissing these claims would turn redistricting into a First Amendment-free zone—something that *Rucho* never condoned—and would allow map drawers to use redistricting simply to "evade important constitutional restraints" protecting free speech, association, and the right to petition. *Id.* at 523.

The relief Plaintiffs seek can be granted by straightforward application of First Amendment doctrine, providing a "limited and precise rationale" that is "clear, manageable, and politically neutral," *Rucho*, 588 U.S. at 703 (internal quotations omitted): When legislatures undertake redistricting as needed to legislatively prescribe the mechanisms for elections (*e.g.*, in response to a Census or court order or to replace a court-drawn plan), the degree of political advantage they consider, among other factors, is a nonjusticiable political question; however, legislators may not pick up the pen for purely retaliatory reasons to chill disfavored speech and expression—no matter the political valence of that expression. And they may not do so in a way designed to frustrate final judicial review of the districts used in any given election. Such adverse action is a clear violation of First Amendment protections on speech, association, and the right to petition. This Court should deny Defendants' motion to dismiss.

## STATEMENT OF FACTS

Earlier this year, the Court presided over a trial on the merits of Plaintiffs' challenge to the 2023 Congressional Plan, including allegations CD1 unlawfully diluted Black voting power. Suppl. Compl. ¶20. While those claims remained *sub judice* in October, Defendants took the unprecedented step of orchestrating a gratuitous, mid-decade redraw of CD1. *Id.*

3

¶¶25-61. The stated purpose was to "defeat" the "sue-until-blue scheme" in North Carolina, and to draw an "additional Republican Congressional seat," *id.* ¶27, a motivation that map-drawer Senator Hise stated was "simple and singular." *Id.* ¶34. He admitted he "did not identify any additional things that had to be remedied" with the existing 2023 Congressional Plan. *Id.* ¶40. In implementing this redraw, Senator Hise admitted to targeting CD1, redrawing districts in an area he acknowledged has a higher minority population than the state average, and dismantling a district that has historically provided Black voters with an opportunity to elect a candidate of their choice. *Id.* ¶¶34-35, 39, 3. Senator Hise stated that he used the 2024 electoral results, and especially voters' preferences in the presidential election, to redraw lines. *Id.* ¶41.

Plaintiffs filed a supplemental complaint on October 30 and sought a preliminary injunction the next day. *See* Docs. 180, 182-84. Defendants moved to dismiss supplemental Counts 10, 11, and 12. Doc. 192.

## LEGAL STANDARD

A Rule 12(b)(1) motion to dismiss should be granted "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Balfour Beatty Infrastructure, Inc. v. Mayor of Balt.*, 855 F.3d 247, 251 (4th Cir. 2017) (internal quotations omitted). A complaint may not be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) when it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A 12(b)(6) motion is not meant to "resolve contests surrounding the facts, the merits of a claim, or the

4

applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). When considering such a motion, courts "must accept as true all of the factual allegations contained in the complaint[,]" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and all reasonable inferences must be drawn in the non-moving party's favor. *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

## ARGUMENT

## I. Plaintiffs Allege Justiciable Claims of Infringement on the Right to Petition.

Defendants make a categorical error by collapsing all of Plaintiffs' First Amendment claims. In addition to their retaliation claim[1] (Count 10), Plaintiffs have advanced two distinct claims against North Carolina's unprecedented mid-decade redistricting under the Petition Clause: (1) Defendants' 2025 redistricting "attempts to initiate an impermissible 'infinity loop,' in which the General Assembly changes the district lines again and again to avoid a final [court] judgment on any one plan," frustrating the right to petition the courts (Count 11), Suppl. Compl. ¶107, and (2) this gratuitous mid-decade redistricting frustrates Plaintiffs' ability to petition their congressional representatives by preventing them from knowing what their electoral district will be from one election to the next, impairing their ability to petition their representatives with their fellow constituents (Count 12), Suppl. Compl. ¶¶109-21. While both claims are novel in this context, they state viable claims for relief.

---

[1] Plaintiffs allege that one of the activities for which Defendants retaliated against them was petitioning the courts in filing this lawsuit. That petition activity is one of the bases for retaliation alleged under Count 10. Plaintiffs also allege a freestanding violation of their right to petition the courts (Count 11). This does not make the claims the same.

### A. Plaintiffs' Petition Clause Claims Are Not Encompassed by Rucho.

Defendants' mischaracterization of Plaintiffs' Petition Clause claims as "partisan gerrymandering claims" (Doc. 193 ("Mot.") at 5[2]) fail on a plain reading of the Supplemental Complaint. *See* Suppl. Compl. ¶¶101-21. Plaintiffs' Petition Clause claims do not turn on (or even mention) any determination of partisan intent or partisan favoritism. Resolving them does not require considering partisanship. *Id.* As set forth below, both claims flow from principles and protections that are well-founded in the Petition Clause. Neither *Rucho*, nor any of the other cases Defendants reference (*see* Mot. at 11 n.4) considered claims under the Petition Clause. This alone is enough to deny Defendants' motion to dismiss Counts 11 and 12.

For similar reasons, Defendants' reliance on *Rucho*'s dicta addressing First Amendment harms (Mot. at 14) misses the point. The asserted First Amendment harms dismissed in *Rucho* did not involve the Petition Clause. *Compare* Suppl. Compl. ¶¶101-08 (describing harm to Plaintiffs' ability to petition the Court for a redress of grievances), ¶¶120-21 (describing harm to Plaintiffs' ability to petition representatives when "constituents in various congressional districts are also in flux" because of gratuitous mid-decade redistricting)*, with Rucho*, 588 U.S. 713-14 (describing difficulties arising out of lack of enthusiasm and indifference to voting caused by partisan vote dilution). *Rucho*'s dismissal of harms flowing from partisan unfairness do not control the nonpartisan harms alleged in Counts 11 and 12.

---

[2] Pages cited reflect ECF numeration.

Defendants' averment that the rights to petition and speech are "cognate" rights and were thus contemplated by *Rucho* despite this dissimilarity (Mot. at 15) ignores the Supreme Court's explicit instruction that "Courts should not presume there is always an essential equivalence in the two Clauses or that Speech Clause precedents necessarily and in every case resolve Petition Clause claims." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388 (2011). "There may arise cases where the special concerns of the Petition Clause would provide a sound basis for a distinct analysis; and if that is so, the rules and principles that define the two rights might differ in emphasis and formulation." *Id.* at 389. This is such a case.

### B. *Plaintiffs State a Violation of their Right to Petition the Courts.*

The right to petition "extends to all departments of the Government" and includes "[t]he right of access to the courts." *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). Most fundamentally, the right to petition the courts "allows individuals to pursue desired ends by direct appeal to government officials charged with applying the law." *Borough of Duryea*, 564 U.S. at 397. Where the government has frustrated this ability, the Petition Clause is violated.

Plaintiffs' first Petition Clause claim (Count 11) challenges the General Assembly's effort to transform redistricting into an infinity loop: each time the existing plan nears judicial resolution, the State redraws the lines again—resetting the clock, evading review, and denying Plaintiffs a final adjudication of their claims. Suppl. Compl. ¶¶101-08. This is precisely what happened here. The NCGA engaged in gratuitous mid-decade redistricting to amend congressional districts that were already *sub judice*, after this Court and the

7

parties made great efforts to ensure an orderly disposition of that challenge upon a full trial record, and mere weeks before candidate filing begins. *See generally* Suppl. Compl. ¶¶20-61. Left unchecked, this strategy allows the NCGA to perpetuate a redistricting plan's harms by repeatedly drawing new lines that maintain or exacerbate—rather than remedy—the very injuries under challenge. *Id.* ¶¶62-69.

These allegations, taken as true, establish interference with Plaintiffs' right to petition the courts. And that is so regardless of whether Plaintiffs were entitled to prevail on their already-tried claims. This is because "the text of the First Amendment" is not limited to "successful petitioning—it speaks simply of 'the right of the people . . . to petition the Government for a redress of grievances.'" *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 532 (2002) (quoting U.S. const. amend. I); *see also id.* at 532-33 (describing constitutional values served by "even unsuccessful" litigation); *Borough of Duryea*, 564 U.S. at 397.

Redistricting litigation raises particularly pressing Petition Clause concerns. When courts find liability in a redistricting case, they routinely exercise continued jurisdiction over remedial proceedings. "In the remedial posture, courts must ensure that a proposed remedial districting plan completely corrects—rather than perpetuates—the defects that rendered the original districts unconstitutional or unlawful." *Covington v. North Carolina*, 283 F. Supp. 3d 410, 431 (M.D.N.C.), *aff'd in relevant part,* 138 S. Ct. 2548 (2018). And this remedial process often must occur within a narrow timeframe. *See generally Purcell v. Gonzalez*, 549 U.S. 1 (2006). For this reason, requiring plaintiffs to re-establish liability against a legislature's proposed remedy would "depriv[e] Plaintiffs of the ability to

8

effectively challenge and the courts of the ability to remedy" unlawful redistricting plans. *Singleton v. Allen*, 690 F. Supp. 3d 1226, 1292 (N.D. Ala. 2023) (discussing cases). Otherwise a State, by making *any* change to district lines, could "put[] redistricting litigation in an infinity loop restricted only by the State's electoral calendar and terminated only by a new census." *Id.* Courts prevent this infinity loop by refusing to divorce "remedial proceedings in equity from liability proceedings in equity." *Id.* at 1291.

The Petition Clause similarly prevents legislatures from frustrating a final disposition on the merits in existing redistricting litigation. And that is precisely what the NCGA is alleged to have done here, by passing a new redistricting plan which perpetuates the *sub judice* alleged harms of old districts (and precludes full judicial review) mere weeks before candidate filing begins. Suppl. Compl. ¶¶62-77, 101-08. In the same way that legislatures cannot set remedial redistricting proceedings in an infinity loop, legislatures are not entitled to perpetually pass new maps just before any liability could attach and shortly before deadlines for each election cycle. This would render redistricting plans unreviewable, and require both litigants and courts to expend resources adjudicating redistricting claims that never reach final resolution.

Importantly, Plaintiffs do *not* allege that the simple act of filing a lawsuit against a redistricting plan freezes that plan in place until final judicial resolution. Not all redistricting would perpetuate *sub judice* alleged harms or be timed in such a way as to foreclose final judicial review of those claims. Here, Defendants assert that Plaintiffs' existing challenges to CD1 were rendered moot by SB249 and that a "challenge to CD1 must be made in a new pleading." Doc. 173 at 2. Their subsequent proposal of a

9

"Reopening of the Existing Trial Record," affording none of the discovery Plaintiffs are entitled to (except a single, three-hour deposition), Doc. 189 at 5, is a tacit admission that their conduct prevents final resolution of Plaintiffs' challenge to CD1.

Defendants' claim that a "mountain of precedent" supports their actions and that Plaintiffs have recourse in the capable-of-repetition-but-evading-review exception to mootness, Mot. at 16-17, ignores their own admissions as well as the legal and factual realities of redistricting. Amendments to districts render prior districts obsolete. Courts cannot, as Defendants suggest, simply "adjudicate the underlying claim" against the previous district, Mot. at 16, because a district's configuration loses legal effect the moment it is replaced. *See* Doc. 209 at 5 (noting challenges to CD 1 "have been superseded by the General Assembly's 2025 enactment").

A claim against a distinct, superseded district is incapable of repetition. While the harms across different configurations may be similar, a district only causes (indeed, only can cause) injury in fact while it is legally in force. Even if litigation could proceed, a judgment against a previous district could not furnish any remedy against a superseding district. *Cf. Chestnut v. Merrill*, 446 F. Supp. 3d 908, 920 (N.D. Ala. 2020) (dismissing redistricting case as moot when "the court cannot offer effective relief, as a declaratory judgment will have no immediacy or reality" and would be "impermissibly advisory" concerning what obligations a legislature would have in future redistrictings).

This is a problem unique to redistricting. In most statutory contexts, a superseding law poses no barrier to adjudication: If a legislator's actions provide the "precise relief that petitioners requested" as in the case relied upon by Defendants, *New York State Rifle and*

10

*Pistol Ass'n, Inc. v. City of New York*, 590 U.S. 336, 338, the case generally ends. If not, the "ordinary practice" where the challenge is rendered moot but harms perpetuate, is to allow plaintiffs to "amend their pleadings or develop the record more fully." *Id.* at 339 (internal quotation omitted).

In redistricting cases amendment is required because a plaintiff's injury is "district specific[,]" and therefore impossible to perpetuate across different district configurations. *Gill v. Whitford*, 585 U.S. 48, 66-68 (2018). Two district iterations can inflict substantially similar harms to the same plaintiffs, yet any injuries-in-fact between them are legally distinct. *Id.* To accept that legislatures have the authority to force plaintiffs to litigate the endless myriad of possible districts illustrates the unacceptable infinity loop, and would serve to sanction indefinitely unreviewable redistricting.

Defendants' reliance on *Holloway v. City of Virginia Beach*, 42 F.4th 266, 273 (4th Cir. 2022), for the proposition that a legislature may change a redistricting scheme while it is *sub judice* is distinguishable. *Holloway* involved a challenge to an at-large districting system that was rendered moot only by the replacement of that system with a single-member districting system. *Id.* at 273-77. This permanently remedied the harm alleged by the *Holloway* plaintiffs, and thus permanently redressed their injuries flowing from the at-large redistricting scheme. *Id.* There, plaintiffs obtained final relief against the challenged redistricting scheme regardless of concerns that the new scheme "may itself violate" the law. *Id.* at 273. Here, Plaintiffs have obtained no relief for their original claims by the adoption of the NCGA's new districts. And, if Defendants can endlessly amend redistricting plans regardless of pending litigation, Plaintiffs may never be able to obtain relief.

11

Finally, Defendants' contention that Plaintiffs failed to adequately allege the legislature's intent to frustrate review, Mot. at 17, is both factually incorrect and irrelevant to Count 11. Plaintiffs set forth in detail the intentional actions of Defendants in orchestrating the 2025 redistricting process and characterizing this lawsuit as a "sue-until-blue" scheme, Suppl. Compl. ¶¶25-61, clearly alleging that the "2025 redistricting attempts to initiate an impermissible 'infinity loop,' in which the General Assembly changes the district lines again and again to avoid a final judgment on any one plan." *Id.* ¶107. More importantly, no determination of intent is required for Plaintiffs to prevail on Count 11, because the Petition Clause is infringed by the simple fact of the 2025 congressional districts upending this litigation at the eleventh hour, in a manner that perpetuates the already alleged harms of the 2023 congressional districts. It does not matter why the districts changed; it simply matters that the redistricting both frustrates final judicial review and perpetuates the alleged harms of the 2023 districts.

### C. *Plaintiffs State a Violation of their Right to Petition Their Elected Representatives.*

Plaintiffs' second Petition Clause claim alleges that North Carolina's gratuitous mid-decade redistricting unconstitutionally infringes their right to petition their elected representatives for a redress of grievances. *See* Suppl. Compl. ¶¶109-21 (Count 12). This is a question of first impression and thus wholly inappropriate for dismissal without further factual, legal, and historical development.[3] *See infra* Section III.

---

[3] Defendants' failure to address Plaintiffs' second Petition Clause claim with any degree of specificity in their Motion further counsels against dismissal.

The right to petition is deeply rooted in both the English and American legal traditions, tracing its origins from the Magna Carta and the Declaration of Independence. *See, e.g., Borough of Duryea*, 564 U.S. at 394-97 (recounting the history of the right to petition). The right to petition is so fundamental that the Supreme Court has described the right to assemble as flowing from the right to petition. "The grievances for redress of which the right to petition was insured, *and with it the right of assembly*, are not solely religious or political ones." *Thomas v. Collins*, 323 U.S. 516, 531 (1945) (emphasis added); *United States v. Cruikshank*, 92 U.S. 542, 552 (1875).

The Petition Clause protects Plaintiffs' ability to petition their congressional representatives. "In a representative democracy such as this, these branches of government act on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives." *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137 (1961). "The right to petition is in some sense the source of other fundamental rights, for petitions have provided a vital means for citizens to request recognition of new rights and to assert existing rights against the sovereign." *Duryea*, 564 U.S. at 397.

Plaintiffs' second Petition Clause claim alleges that North Carolina's mid-decade redistricting has unconstitutionally infringed their right to petition their representatives by gratuitously altering the electoral districts from which those representatives will be elected. Plaintiffs allege this violates their petition rights by: cutting short their relationships with their elected representatives not on the basis of election results, but by virtue of gratuitous redistricting; impairing their ability to assemble and petition with their fellow constituents

by constantly and arbitrarily shifting which residents will be represented in which districts; frustrating their ability to identify who their representatives' constituents will be in the future and thereby frustrating the ability to assemble with co-constituents for petition purposes; and, ultimately, impairing their ability to influence their representatives via petition to have concerns heard in Congress. *See* Suppl. Compl. ¶¶18-19, 47, 60-61, 109-21.

Defendants' only apparent argument for dismissal is that this claim "fails to provide the requisite 'standard for determining when partisan activity goes too far.'" Mot. at 14 (citing *Rucho*, 588 U.S. at 714). This argument fails for the simple reason that these allegations do not require consideration of any partisan intent or fairness. Instead, the claim turns on whether Plaintiffs' ability to petition their elected representatives for a redress of grievances, and the right to assemble with other residents of those districts for that purpose, is infringed by North Carolina's gratuitous mid-decade redistricting. That question is appropriate for factual development, not summary dismissal.

## II.     Plaintiffs Have Alleged a Justiciable Claim of First Amendment Retaliation.

### A.     Rucho *and* LULAC *Do Not Control Because Plaintiffs Do Not Assert Partisan Gerrymandering Claims.*

Defendants' motion mischaracterizes Plaintiffs' First Amendment retaliation claims as "partisan gerrymandering claims." *See, e.g.*, Mot. at 3, 4-10, 13-14.

"Partisan gerrymandering claims rest on an instinct that groups with a certain level of political support should enjoy a commensurate level of political power and influence." *Rucho*, 588 U.S. at 704. Adjudicating such claims could require federal courts to make

14

"their own political judgment about how much representation particular political parties deserve" at the liability stage, and then to "rearrange the challenged districts to achieve that end" at the remedial stage. *Id.* at 705 (emphasis omitted); *see also League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 418 (2006) (plurality op.) (*LULAC*) (partisan gerrymandering claims require some "reliable standard" for measuring the burden "on the complainants' representational rights"). Federal courts, the Supreme Court explained, are not "equipped" to assess such subjective, how-much-is-too-much political calculus or to referee the partisan jockeying that it engenders. *Rucho*, 588 U.S. at 705.

Plaintiffs' First Amendment retaliation claim does not implicate *Rucho*'s justiciability considerations. Supplemental Count 10 does not rest on any theory requiring a "commensurate level of political power and influence" or statewide proportionality between parties. *Id.* at 704. Thus, no assessment of whether SB249 makes it too difficult for one party to translate statewide support into legislative seats is required, unlike the case in *Rucho* and *LULAC*. Plaintiffs' allegations of First Amendment harm do not depend on *how* or *where* specific lines were drawn or whether those lines deny fair or proportional representation to any partisan group. Instead, Plaintiffs' First Amendment claims challenge *why* the NCGA decided to pick up the pen in the first place. *See* Suppl. Compl. ¶¶86-89, 94.  While the legislature does not have to affirmatively prove a legitimate purpose in exercising its Elections Clause powers, it cannot exercise those powers to "evade important constitutional restraints," *Cook*, 531 U.S. at 523, like those expressly protected in the First Amendment. Here they did.

15

This theory of liability was never before the Court in *Rucho* or any pre-*Rucho* case Defendants cite (*see* Mot. at 11 n.4) because, in every one of those matters, the legislative body had a non-retaliatory reason to legislatively prescribe the districts for the next election, *i.e.*,: (1) following the release of the Census, *e.g.*, *Gill*, 585 U.S. at 54-55; *Ohio A. Philip Randolph Inst. v. Householder*, 373 F. Supp. 3d 978, 994-95 (S.D. Ohio 2019); *Benisek v. Lamone*, 348 F. Supp. 3d 493, 513-24 (D. Md. 2018) *League of Women Voters of Mich. v. Benson*, 373 F. Supp. 3d 867, 882-92 (E.D. Mich. 2019); *Benisek v. Lamone*, 348 F. Supp. 3d 493, 498 (D. Md. 2018); (2) pursuant to a court order, *e.g.*, *Common Cause v. Rucho*, 318 F. Supp. 3d 777, 805 (M.D.N.C. 2018); or (3) to replace a court-drawn map with a legislature-drawn map, *e.g.*, *LULAC*, 548 U.S. at 412-13. In these cases, courts rejected the policing of partisan interests of legislators "when drawing district lines," *i.e.*, when already engaging in redistricting. *Rucho*, 588 U.S. at 701.

Plaintiffs in those cases could not have brought the theory of liability alleged here because, in those cases, the legislature's non-retaliatory reason to redraw district lines in the first place severed any direct causal link between the redistricting decision and the plaintiffs' alleged injury. Without that link, the cases necessarily reduced to disputes over the particular political character of the legislature's map—*i.e.*, a nonjusticiable partisan gerrymandering challenge.

*LULAC*—on which Defendants heavily rely, Mot. at 7-9—illustrates the point. There, the legislature replaced a court-drawn map with their own map, a baseline legitimate purpose given that "a lawful, legislatively enacted plan should be preferable to one drawn by the courts" such that "no presumption of impropriety should attach to the legislative

16

decision to act" to redistrict under those circumstances. 548 U.S. at 416. In other words, the legislature was exercising its power to legislatively prescribe district lines to replace a non-legislative plan. And while legislators did have the goal of achieving a partisan majority, "partisan aims did not guide every line [drawn]" because "some contested district lines were drawn based on more mundane and local interests" and "a number of line-drawing requests by Democratic state legislators were honored." *Id.* at 417-18. Like in *Rucho*, this posed a fatal problem for the *LULAC* plaintiffs because "[e]valuating the legality of acts arising out of mixed motives can be complex, and affixing a single label to those acts can be hazardous, even when the actor is an individual performing a discrete act." *Id.* at 418. The same has not been alleged (and cannot be said) here.

Defendants' efforts to analogize this case to post-*Rucho* partisan gerrymandering claims similarly fail. *See* Mot. at 6. In each of those disputes, the map-drawers undertook redistricting in a completely different context: to replace a prior, Court-drawn plan in this matter, *Williams v. Hall*, No. 1:23-cv-1057, 2025 WL 1798333, at *1 (M.D.N.C. June 9, 2025); or following the release of the 2020 Census, *McConchie v. Scholz*, 577 F. Supp. 3d 842, 852 (N.D. Ill. 2021), *Banerian v. Benson*, 589 F. Supp. 3d 735, 737 (W.D. Mich. 2022), *Jackson v. Tarrant County*, No. 25-11055, 2025 WL 3019284, at *2 (5th Cir. 2025).[4] None of these cases involved First Amendment retaliation claims for gratuitous mid-decade redistricting as alleged here. *See Jackson*, 2025 WL 3019284, at *4 (alleging First Amendment "viewpoint discrimination" to cause vote dilution for "Democratic voters");

---

[4] Defendants in *Jackson* initially declined redistricting following the 2020 census but changed course in April of 2025 to adopt a county commissioner plan. *Jackson*, 2025 WL 3019284, at *2.

17

*Williams*, No. 1:23-cv-1057, 2025 WL 1798333, at *2 (dismissing one-person, one-vote claims); *McConchie v. Scholz,* 577 F. Supp. 3d 842, 853 (N.D. Ill. 2021) (three-judge court) (dismissing malapportionment, racial gerrymandering, and Voting Rights Act claims). By contrast, the NCGA's decision to trigger renewed redistricting was taken to burden voters they disagree with by removing them from their district, and is thus unconstitutional retaliation under well-established First Amendment principles.

For these reasons, Plaintiffs can and do allege concrete and personal associational injuries not at issue in those matters, reaching beyond electoral results and stemming directly from the decision to redistrict itself: being removed from their home district, stripped of their relationship with their representative, and forced into a distant district where their networks of civic engagement and association no longer function or are impaired. *See, e.g.*, Suppl. Compl. ¶¶97-98. Unlike the harm arising out of "lack of enthusiasm" and "indifference to voting" at issue in *Rucho*, 588 U.S. at 713, the harm alleged here concerns the raw chilling effect of being yanked out of one's district in a retaliatory attempt to burden speech and association.[5]

Because of the nature of the unique harm alleged, the passage Defendants rely on from *Rucho*—that the districting plans *at issue there* did not restrict anyone's right to vote, to speak, to assemble, or to engage in "any other First Amendment activities," Mot. at 14 (quoting *Rucho*, 588 U.S. at 713)—is inapposite. First, maps challenged in *Rucho* were

---

[5] While Plaintiffs also allege that Defendants' actions make it significantly harder to elect candidates who represent their shared interests, these allegations are not partisan-specific but rather address the ability of Plaintiffs and other Black voters to "elect a candidate of their choice," Suppl. Compl. ¶99, due to the dismantling of a district in which 98.3% of Black voters chose the same candidate of choice in 2024. *Id.* ¶21.

18

redrawn for otherwise legitimate purposes: post-census in Maryland and post-court order in North Carolina. *See Rucho*, 588 U.S. at 723-26 (Kagan, J., dissenting). Accordingly, district lines in the districting plans "at issue" were going to shift no matter what. What *Rucho* held to be nonjusticiable was judicially parsing through all criteria influencing those redraws to determine whether any political gerrymandering had "gone too far." *Id.* at 701. The *Rucho* Court never considered the harm alleged here: the transfer of voters between districts mid-decade when, absent a retaliatory purpose, no lines would have changed at all.

Second, although SB249 does not strictly prohibit Plaintiffs from continuing to speak out, organize, or vote, it plainly *targets* them *for* doing so by shifting district lines to burden their speech. And by making those shifts, it is physically harder for Plaintiffs to speak out, organize, and vote going forward. Suppl. Compl. ¶98. The First Amendment protects against both the silencing of speech before it occurs and the punishment of speech after it happens. *See Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022). Defendants plainly would not have shifted district lines if they did not think it would burden the ability of voters' they disagree with to "join together in furtherance of common political beliefs" to "advance that [common] vision," not just express it. *See 6th Cong. Dist. Republican Comm. v. Alcorn,* 913 F.3d 393, 401 (4th Cir. 2019) (quoting *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214-15 (1986)).

This novel fact pattern means this case falls beyond the scope of *Rucho*. As a result, it does not implicate the same issues of justiciability that preclude the partisan redistricting claims brought in *Rucho* and its preceding cases. Instead, and as set forth below, the Court

19

can apply the clear and manageable standard applicable to First Amendment retaliation claims to enjoin SB249 here.

### B. Plaintiffs State a Claim for First Amendment Retaliation.

Properly characterized—as a genuine First Amendment retaliation claim—Plaintiffs' allegations readily state a claim for relief. To state a claim, Plaintiffs must plausibly allege that they engaged in protected activity; that Defendants took action that would deter a person of ordinary firmness from engaging in such activity again; and that their protected activity was a substantial or motivating factor behind Defendants' conduct. *Williams v. Mitchell*, 122 F.4th 85, 89-90 (4th Cir. 2024); *see also Gonzalez v. Trevino*, 602 U.S. 653, 662-63 (2024) (Alito, J., concurring) (quoting *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 287 (1977)).

Here, Plaintiffs adequately allege all three elements, as set forth in their motion for a preliminary injunction. *See* Doc. 183 at 11-19. Plaintiffs engaged in quintessentially protected conduct—organizing, voting, and bringing this very lawsuit against the 2023 Congressional Plan. Suppl. Compl. ¶¶86, 88. But when Plaintiffs turned to the courts, the NCGA turned on them, enacting a plan designed to punish those who dared to dissent. *Id.* ¶¶95-99. The message is unmistakable: support disfavored candidates, or organize against those wielding power, or sue to challenge unlawful maps, and risk being exiled from your district in gratuitous redistricting after every election that would not otherwise occur. That is textbook retaliation.

Defendants do not meaningfully contest causation. They concede that their only reason to pick up the pen was to bring an additional Republican seat to North Carolina's

20

congressional delegation. But instead of trying to achieve this under the district they drafted in 2023, by (for example) appealing to voters to earn their votes, they chose to redraw lines to ensure voters could not successfully associate together to elect a candidate of their choice again. In other words, they sought to chill the dissenting expression of voters they disagree with by using their redistricting power under the Elections Clause to "evade important constitutional restraints" protecting dissenting speech. *Cook*, 531 U.S. at 523.

In any event, the fact-sensitive issue of intent is not properly resolved at the motion-to-dismiss phase. Under the applicable framework, once Plaintiffs allege that their protected activity was a substantial or motivating factor behind Defendants' conduct, the burden shifts to defendants who must demonstrate that they would have taken the same action even absent the protected activity. *Gonzalez*, 602 U.S. at 662-63 (Alito, J., concurring) (quoting *Mt. Healthy*, 429 U.S. at 287). Such affirmative defenses are "best resolved at the summary judgment stage, when there is sufficient factual material from which to adequately scrutinize not only the challenged decisions but also the proffered reasons supporting them," *Nat'l Rifle Assoc. v. Vullo*, 144 F.4th 376, 388 n.2 (2d Cir. 2025)—or, failing that, at trial.

Plaintiffs allege that Defendants replaced their own presumptively lawful plan with SB249 to target voters in CD1 and punish them for their political expression and for challenging the prior plan in court. Such retaliatory use of government power violates the First Amendment.

21

## III.  Dismissal of Plaintiffs' Novel Legal Claims Is Inappropriate.

Because Plaintiffs' invocation of the First Amendment in response to the NCGA's unprecedented actions raises novel legal issues, these claims are not appropriate for dismissal.[6]

District courts "should 'be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability' is 'novel' and thus should be 'explored.'" *Wright v. North Carolina*, 787 F.3d 256, 263 (4th Cir. 2015) (quoting 5B Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 1357 (3d ed.)). Indeed, "Rule 12(b)(6) dismissals are especially disfavored in cases where the complaint sets forth a novel legal theory that can best be assessed after factual development." *Id.* (cleaned up). In such cases, "plaintiffs should be given an opportunity to develop evidence before the merits are resolved." *Id.* (cleaned up); *see also Trujillo v. Landmark Media Enters., LLC*, 689 Fed. App'x 176, 178 (4th Cir. 2017) (reversing dismissal where the plaintiff's claim did "not fall within the four corners of our prior case law" and thus did not "justify dismissal under Rule 12(b)(6)") (quoting *Wright*, 787 F.3d at 263); *Davison v. Randall*, 912 F.3d 666, 691 (4th Cir. 2019); *Senderra RX Partners, LLC v. Blue Cross & Blue Shield of N.C.*, No. 1:18-cv-871, 2019 WL 9633642, at *5 (M.D.N.C. May 23, 2019) ("[T]he fact that the contours of this cause of action are unsettled militates against dismissal, not in favor of it.").[7] That principle applies here with force, where Defendants' never-before-seen gratuitous mid-

---

[6] The novelty of Plaintiffs' claims, however, do not foreclose the issuance of a preliminary injunction. *See Fish v. Kobach*, 189 F. Supp. 3d 1107 (D. Kan. 2016), *aff'd* 840 F.3d 710 (10th Cir. 2016) (Granting preliminary injunction on novel argument involving documentary-proof-of-citizenship requirements).
[7] Courts in other circuits agree. *See, e.g.*, *Berndsen v. North Dakota Univ. Sys.*, 7 F.4th 782, 790 n.7 (8th Cir. 2021) (collecting cases).

decade redistricting presents novel facts giving rise to claims that lack prior on-point judicial precedent.

The baseline assumption in *Rucho* was that districts would remain for several election cycles, thus introducing the difficulty for a court to assess whether the alleged vote dilution was likely to persist over several election cycles. *Rucho*, 588 U.S. at 711-13. Here, the opposite assumption must be made: that legislators will assert the right to continuously redistrict, thereby redrawing after every general election to target and burden those voters who express disfavored political speech. This unprecedented scenario threatens voters' fundamental constitutional rights, and Plaintiffs' supplemental claims present a straightforward application of First Amendment principles to state viable claims for relief.

## CONCLUSION

For the reasons above, Defendants' Motion to Dismiss, Doc. 192, should be denied.

Dated: November 21, 2025

Respectfully submitted,

*/s/ Hilary Harris Klein*
Hilary Harris Klein

**HOGAN LOVELLS US LLP**

J. Tom Boer*
Olivia Molodanof*
Madeleine Bech*
4 Embarcadero Center, Suite 3500
San Francisco, CA 94111
Telephone: 415-374-2300
Facsimile: 415-374-2499
tom.boer@hoganlovells.com
olivia.molodanof@hoganlovells.com
madeleine.bech@hoganlovells.com

Jessica L. Ellsworth*

**SOUTHERN COALITION FOR SOCIAL JUSTICE**

Jeffrey Loperfido (State Bar #52939)
Hilary Harris Klein (State Bar #53711)
Christopher Shenton (State Bar #60442)
Lily Talerman (State Bar #61131)
5517 Durham Chapel Hill Blvd.
Durham, NC 27707
Telephone: 919-794-4213
Facsimile: 919-908-1525
hilaryhklein@scsj.org
jeffloperfido@scsj.org
chrisshenton@scsj.org

23

Misty Howell*
Odunayo Durojaye*
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: 202-637-5600
Facsimile: 202-637-5910
jessica.ellsworth@hoganlovells.com
misty.howell@hoganlovells.com
odunayo.durojaye@hoganlovells.com

**ACLU OF NORTH CAROLINA**
**LEGAL FOUNDATION**

Jaclyn Maffetore (State Bar #50849)
Kristi L. Graunke (State Bar #51216)
P. O. Box 28004
Raleigh, NC 27611
Telephone: (919) 354-5070
jmaffetore@acluofnc.org
kgraunke@acluofnc.org

lily@scsj.org

**ACLU FOUNDATION**

Ari J. Savitzky*
Ethan Herenstein*
Clayton Pierce*
Sophia Lin Lakin*
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 549-2500
asavitzky@aclu.org
eherenstein@aclu.org
cpierce@aclu.org
slakin@aclu.org

* By special appearance

24

## WORD CERTIFICATION

Pursuant to Local Rule 7.3(d)(1), the undersigned certifies that the word count for Memorandum in Support of Motion for Preliminary Injunction is 6,230 words. The word count excludes the case caption, signature lines, cover page, and required certificates of counsel. In making this certification, the undersigned has relied upon the word count of Microsoft Word, which was used to prepare the brief.

*/s/ Hilary Harris Klein*
Hilary Harris Klein

## CERTIFICATE OF SERVICE

I certify that on November 21, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Hilary Harris Klein*
Hilary Harris Klein