# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| SHAUNA WILLIAMS, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> REPRESENTATIVE DESTIN HALL, in his official capacity as Chair of the House Standing Committee on Redistricting, *et al.*, <br><br> *Defendants*, | Civil Action No. 23-cv-1057 |
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> PHILLIP BERGER, in his official capacity as President Pro Tempore of the North Carolina Senate, *et al.*, <br><br> *Defendants*, | Civil Action No. 23-cv-1104 |

## BRIEF OF *AMICUS CURIAE* NORTH CAROLINA BLACK ALLIANCE, REPAIRERS OF THE BREACH, BLACK VOTERS MATTER, THEODORE MCNEAL JR., MAYOR WILLIAM "MONDALE" ROBINSON, COMMISSIONER VIOLA HARRIS, GLENDORA BROTHERS AND WESLEY STOKES SUPPORTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION[1]

---

[1] No outside person or entities wrote any of this brief or contributed any money to support the briefs' preparation. LR 7.5(d).

**STATEMENT OF INTEREST**

Amici are organizations and individual voters spanning a wide array of ages, perspectives, and experiences, yet they are bound by their shared passion for fair representation and respect for the democratic process. Amici join together to urge this Court to immediately halt the discriminatory congressional map passed as Senate Bill 249 to prevent irreparable harm.

*Amici Curiae* North Carolina Black Alliance ("NCBA"), Repairers of the Breach ("ROTB") and Black Voters Matter ("BVM") (the Organizational Amici) are non-partisan, non-profit civil rights groups and racial justice organizations that engage in year-round civic engagement, voter outreach, voter education, and election protection activities across the state of North Carolina. They are all committed to promoting systemic policy change to assist marginalized communities, including Black voters. This includes significant civic engagement and voter education and mobilization work in Eastern North Carolina's historic Black Belt region. Achieving equal representation for the communities that the Organizational Amici serve depends on these voters living in a state which fairly draws its redistricting maps to ensure all citizens have an equal voice.

*Amici Curiae* Mayor William "Mondale" Robinson, Theodore McNeal Jr., Commissioner Viola Harris, Glendora Brothers, and Wesley Stokes (the Impacted Voters) are all Black residents of Congressional District 1 ("CD 1"), or former residents of CD 1 who have now been redistricted to Congressional District 3 ("CD 3"). They include seasoned North Carolina voters whose families have lived in the Black Belt for generations (Brothers Decl., Ex. 4) community organizers and civic leaders (McNeal Decl. Ex. 1; Stokes Decl., Ex. 3), as well as current and former elected officials (Robinson Decl., Ex. 6; Harris Decl., Ex. 5). They come from diverse backgrounds but

2

are united in their commitment to voting and to preserving the historic Black Belt in one Congressional district. Several Amici submitted oral testimony or written comments to the North Carolina General Assembly in opposition to the congressional map that was passed as Senate Bill 249 (S.L. 2025-95) on October 22, 2025 ("S.B. 249"), as well as in opposition to prior illegally gerrymandered maps, and others have already spent significant time educating their community about this gerrymander and preparing for the devastating impact it will have. Stokes Decl., Ex. 3, ¶ 19; Brothers Decl., Ex. 4, ¶ 9; Bass Decl., Ex. 7, ¶¶ 17-18.

The Impacted Voters and Organizational Amici (collectively, "Amici") are not advocating for or against any specific candidate for office. Rather, they seek to protect the fundamental right of every North Carolinian to vote free from discrimination, and the rights of Black voters to engage in protected First Amendment activity, including petitioning the government for redress free from unlawful retaliation. Amici submit this brief to illustrate for this Court the unique, persistent history of voter suppression targeting CD 1, as well as the severity of the harms that will arise from S.B. 249's extreme mid-decade racial gerrymander dangerously timed to evade judicial review if it is not immediately enjoined.

## INTRODUCTION

S.B. 249 was passed in a sudden, rushed, and widely opposed process over a breathtakingly short period from introduction to law – just over 48 hours – marking the first time in our state's history that the North Carolina General Assembly has *ever* engaged in mid-decade redistricting without a court order to do so. On its face, S.B. 249's Congressional map rises to the level of depriving Black voters in CD 1 of the constitutionally protected right to vote on equal terms as non-Black voters – a right the Organizational Amici have sought to protect for decades. If this

3

map is allowed to stand, the Black residents of CD 1, including the Impacted Voters, will be irreparably harmed.

For decades, the North Carolina General Assembly has used every possible opportunity to adopt maps which substantially reduce the ability of Black voters to elect their candidates of choice, particularly in the heart of the historic Black Belt. Last month, the General Assembly took this one step further by dismantling CD 1, becoming the first Southern state to use gerrymandering to destroy a Black opportunity district that was previously covered by Section 5 preclearance – the North Carolina district which has consistently elected a Black representative since 1992. These most recent actions are also unprecedented in that the Legislature's brazen racial gerrymander retaliates against those who dared to challenge the 2023 maps and were building political power in response – before this court could even render a decision as to their constitutionality  – intentionally suppressing Black voters'  political activity and thwarting their right to redress  in CD1 and statewide.

The interests and will of the voters of North Carolina and the impacted communities were not considered in this warp-speed process by legislative leadership. Rather, in an unconstitutional race-driven process, Legislative Defendants sought to deliver the final blow to the Black voting bloc of CD 1 by any means necessary. The legislative record is replete with evidence that this map is racially discriminatory, that legislative leadership was on notice of the harm this map would inflict on Black voters, and that the demographics of the targeted area are so well known that knowledge of this cannot – and was not – denied by legislative leadership. The Constitution prohibits targeting Black voters in this way in order to gain a partisan advantage.

4

S.B. 249 is unconstitutional. This intentional dilution of Black voting power violates the Fourteenth and Fifteenth Amendments, Section 2 of the Voting Rights Act, and, in this unique case, the Petition Clause of the First Amendment, and requires swift action by this Court. To protect the tenets of the U.S. Constitution, this Court should enjoin S.B. 249 and at a minimum return to the status quo of the 2023 CD1 and CD3 maps pending an order of permanent relief against the 2023 Congressional Plan. As the Court considers this case and fashions an immediate remedy, all relevant evidence must be taken into consideration. This includes the history of cumulative harms of the attacks on Black political power in CD 1, Legislative Defendants' sequence of racially discriminatory actions to entrench their power, and the myriad of ways that S.B. 249 will have an immediate and devastating impact on Black voters of CD 1.

## ARGUMENT

### I. The North Carolina General Assembly's History of Persistent Voting Rights Violations Targeting Black Political Power in CD 1 is Relevant to this Court

North Carolina has an extensive history of race-based voting discrimination that is particularly prominent in regions of the state with large Black populations, including the historic Black Belt region. The legislative actions at issue here represent the most recent chapter in long-standing efforts by the North Carolina General Assembly to target the voting rights of Black voters, including numerous prior attempts to pack and crack Black voters in Eastern North Carolina to dilute their voting power. Many of the Amici here have deep familial ties to CD 1. They and their relatives have lived through much of what is detailed herein. Rev. Barber describes in his declaration "the long fight" against numerous tools of voter suppression in "the days before Eva Clayton," in an attempt to "create opportunity Districts for Black voters." Barber Decl., Ex. 8, ¶¶ 9-11. Mayor Robinson's family has been in CD 1 for generations and said that "[t]he trauma

5

caused by [those] racist actions and voter suppression runs deep and is a type of trauma that doesn't go away." Robinson Decl., Ex. 6, ¶ 9.

## A. Racial Polarization in Voting

It is well understood that North Carolina elections remain highly racially polarized and that race is a better predictor than anything else of someone's ultimate voting behavior in this state. *See N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 214 (4th Cir. 2016) (*quoting Thornburg v. Gingles*, 478 U.S. 30, 62 (1986)).[2] The Black Belt region experiences even higher-than-average rates of racial polarization in its elections, with over 98% of Black residents in CD 1 selecting the same candidates for President and U.S. Representative in the November 2024 general election.[3]

## B. Origins and Location of the Black Belt Region

CD 1 is in the northeast region of the state and covers many counties that are a part of the historic "Black Belt." The Black Belt was named for the region's dark fertile soil, as well as the high concentration of enslaved Black population before the Civil War.[4] North Carolina's Black Belt has long played a key role in Black cultural and political life. From Reconstruction through the present day, Black Belt residents have endured cycles of enfranchisement, followed by voter suppression, and then sought to build back their political power once again. Today's Black Belt

---

[2] In a 2019 expert report for *N.C. State Conf. of the NAACP v. Circosta*, Plaintiff's expert Barry Burden found that in the 2012 presidential election, 96% of Black voters in North Carolina voted for the Democratic candidate, as compared to 65 percent of white voters. No. 1:18-cv-01034, ECF 91-4, at 10 (M.D.N.C. 2019).

[3] Plaintiffs' expert Dr. Oskooii found that "an estimated 98.3% of Black voters supported Representative Don Davis compared to just 13% of White voters; an estimated 98.3% of Black voters supported presidential candidate Kamala Harris compared to just 9.1% of White voters." ECF No. 175-1, at 10.

[4] Candace Dantes, "7 Scarring Facts, Figures about America's Black Belt Region people," (Jan. 13, 2021), https://blackfarmersnetwork.com/7-scarring-facts-figures-about-americas-black-belt-region/#:~:text=%E2%80%9CSo%20far%20as%20I%20can,black%20people%20outnumber%20the%20white.%E2%80%9D.

is still home to many historically Black communities, as set forth in the chart below:



ECF No. 155, at 65.

After the adoption of the 1868 North Carolina constitution, which enfranchised African American males and removed the property requirement to vote, the state saw a sharp rise in Black political participation.[5] In 1872, the Democratic-controlled General Assembly created North Carolina's first Black-majority district, encompassing many of the state's black-majority counties in the northeastern region, which became known as the "Black Second."[6] The intention behind creating this district was "to neutralize the Republican threat in the state's eastern counties by grouping together as many of the state's eastern Republican voters into one district

---

[5] Dr. Jan Davidson, "When White Supremacists Overthrew a Government," (Oct. 23, 2024), https://www.pbs.org/wgbh/americanexperience/features/when-white-supremacists-overthrew-government/#:~:text=The%20Rise%20of%20the%20State,they%20appoint%20Democrats%20to%20office.
[6] "The Black Second Congressional District," 1872-1901, https://northcarolinahistory.org/encyclopedia/the-black-second-congressional-district-1872-1901/#:~:text=North%20Carolina's%20Second%20Congressional%20District,terms%20between%201874%20and%201898..

and spreading out other Republican-leaning counties into adjacent majority-Democratic districts." *Id*. The counties included in this district were: Craven, Edgecombe, Greene, Halifax, Jones, Lenoir, Northampton, Warren, Wilson and Wayne. *Id*. The district, as it remains today, was overwhelmingly rural. *Id*. With the consolidated Black voting power of this newly formed district, Republican voters went on to elect four African American congressmen for a total of seven terms: John A. Hyman (1875-1877), James E. O'Hara (1883-1887), Henry P. Cheatham (1889-1993) and George H. White (1897-1901). Though short-lived, the elections of these congressmen reflected the political strength of the Black Belt before the return of white-supremacist control at the turn of the century.

C. <u>North Carolina's Long History of Voter Suppression from Reconstruction to 2010</u>

Before the 1898 Wilmington *coup* and the 1899-1900 disenfranchisement amendments, Black North Carolinians registered and voted at exceptionally high rates. That changed when the State adopted a constitutional amendment imposing a literacy test and a poll tax, while a grandfather clause exempted most white voters.[7] From 1900 through the 1980s, North Carolina further diluted Black political power by using multi-member legislative districts that combined predominantly Black communities with substantially larger white populations. Between 1968 and 1982, only four Black individuals were elected to the General Assembly.

At the local level, Dr. G.K. Butterfield Sr. was one of the very few Black candidates to run in eastern North Carolina. Although previously elected, his tenure ended when the board shifted to at-large elections which sought to specifically weaken Black voting strength until it

---

[7] *Public Laws of North Carolina*, 1899–1900, ch. 218, §§ 4–5 (N.C. 1900). [See *NCpedia*- "Primary Source: The Suffrage Amendment" (detailing the literacy test, poll tax, and grandfather clause).]

was struck down as unconstitutional and in violation of the Voting Rights Act.[8] See *Thornburg v. Gingles*, 478 U.S. 30, 38–39 (1986).

After *Gingles*, Black political opportunity increased. The Department of Justice rejected the 1991 congressional plan for providing only one majority-minority district despite a statewide Black population of roughly 22%, leading to a 1992 remedial plan with two such districts. That year, Eva Clayton became the first Black North Carolinian elected to Congress since 1901, and CD-1 has been represented by Black members of Congress continuously since 1992 to the present. *See* ECF No. 169-1 at 4.

### D. Modern History of Gerrymandering of CD 1

The legislative actions of the last fifteen years represent the latest chapter in a persistent effort by the North Carolina General Assembly to undermine the political power of Black voters in the state's historic "Black Belt," particularly those residing in CD 1. For more than three decades, CD 1 has functioned as an effective opportunity district in which Black voters, often joined by white crossover voters, have successfully nominated and elected their preferred candidates. Even when the district has not been majority-Black, it has consistently enabled Black voters to elect their candidates of choice. Legislative leaders have long understood this demographic and electoral reality, and they have repeatedly sought to dismantle it. *See* NAACP FOF/COL ¶¶ 5–12, 43.

Like other Black opportunity districts across the Deep South, CD 1 has stood as both a lifeline and a target: the rare district where Black voters have exercised meaningful political power, and therefore one repeatedly subjected to efforts to erode that power. Over the last

---

[8] "G.K. Butterfield: From Grassroots Protests, the Courtroom, to Congress," (Aug. 5, 2024), https://ldfrecollection.org/stories/gk-butterfield-from-grassroots-protests-to-the-courtroom-to-congress/.

fifteen years and across four separate redistricting cycles and repeated court interventions, CD 1 has been redrawn repeatedly, each time under a different pretext but with the same effect: the steady erosion of Black voters' political strength.

### a. The 2011 Plan and *Harris v. McCrory*

Following the 2010 Census, the General Assembly adopted congressional maps that dramatically increased CD 1's Black Voting Age Population ("BVAP"), asserting that majority Black districts were required to comply with the Voting Rights Act. The three-judge court in *Harris v. McCrory*, 159 F.Supp.3d 600, 627 (M.D.N.C. 2016), found that legislators allowed race to drive the district's design beyond what any legitimate purpose could justify, rendering CD 1 an unconstitutional gerrymander. Later, the Supreme Court affirmed in *Cooper v. Harris*, 581 U.S. 285 (2017), concluding that the legislature's reliance on race to draw CD 1 and CD 12 violated the Equal Protection Clause.

Following *Harris*, the remedial map reduced CD 1's BVAP to approximately 42 percent. Even under that configuration, Black voters continued to elect Representative G.K. Butterfield, demonstrating that CD 1 remained a true opportunity district without requiring a numerical majority. *Covington v. North Carolina*, 316 F.R.D. 117, 127, 168 (M.D.N.C. 2016), *aff'd* 581 U.S. 1015 (2017); see also *Cooper v. Harris*, 581 U.S. 285, 299-300, 310-11 (2017). Rep. Butterfield went on to serve nearly two decades in Congress, providing senior leadership within the Congressional Black Caucus and championing voting protections nationwide.[9]

### b. The 2021 Gerrymander and 2022 Court-Ordered Map

Following the 2020 census, North Carolina gained one seat in the U.S. House of Representatives, as the state's population had risen almost 10% since the 2010 census. North

---

[9] Butterfield, G. K., Jr., *Biographical Directory of the United States Congress*, https://bioguide.congress.gov/search/bio/B001251 (last visited Nov. 14, 2025).

Carolina gained this seat "almost entirely due to an increase in the state's minority population." ECF No. 169-1, at 2. The 2021 plan once again altered CD 1, removing Greenville and most of Pitt County (both heavily Black and Democratic communities) to shift them to CD 2. This shift extracted thousands of Black voters from the district and diluted their influence. Evidence before the Court shows that legislative leaders could not articulate a neutral justification for these changes and that the exclusion of Pitt County "reduced compactness and removed core Black population centers." *See* NAACP FOF/COL ¶¶ 231–234 (finding that removal of Pitt County and inclusion of coastal counties lacked traditional redistricting rationale and decreased compactness).

The 2021 plan was later struck down as an unlawful partisan gerrymander, and court-approved interim maps were used for the 2022 election, under which Congressman Don Davis, a Black candidate, was elected to succeed Rep. Butterfield. *Id.* at ¶ 234.

### c. The 2023 Maps

In February 2022, in *Harper v. Hall*, the North Carolina Supreme Court struck down the state's congressional plan as an egregious and intentional partisan gerrymander designed to enhance Republican performance which gave a greater voice to those voters than to any others. The court ordered the creation of a remedial plan, which was used for the 2022 elections.

Early the next year, following changes in the court's composition, the North Carolina Supreme Court granted rehearing and reversed itself. In April 2023, it held that partisan gerrymandering claims were nonjusticiable under the state constitution, removing state court oversight from future redistricting. That decision cleared the way for the General Assembly to redraw districts again without meaningful judicial constraint.

Within months, legislative leaders introduced and enacted new maps in a rushed, unclear process. Despite explicit warnings, the General Assembly released its new plans and adopted them

within one week, allowing virtually no public comment. *See* PX047 ("October 22 Letter from the Southern Coalition for Social Justice attaching an expert report by Dr. Kassra Oskooii documenting severe racial polarization in voting"); Stipulated Facts ¶ 27.

The resulting 2023 Congressional Plan significantly reduced the ability of Black voters in northeastern North Carolina to elect their candidate of choice. Expert and lay testimony established that the plan "diminished the responsiveness of elections to Black voter preferences and reduced the likelihood of Black-preferred candidates winning office." *See* NAACP FOF/COL ¶¶ 235–241, 628 (finding 2023 plan intentionally diluted Black voting strength and increased White bloc voting in CD 1). The 2023 map thus continued the same pattern the courts had already condemned – a systematic weakening of the only district where Black voters could still elect their candidate of choice. Under the 2022 plan, CD 1 had a BVAP of 41.23%; and under the 2023 plan, the General Assembly reduced that to 40.42%.

On December 4, 2023, the Williams Plaintiffs filed suit challenging the 2023 Congressional Plan as intentionally discriminatory in violation of the Fourteenth and Fifteenth Amendments and intentionally diluting the votes of Black voters under Section 2 of the Voting Rights Act. And on December 19, 2023, the NAACP Plaintiffs filed suit challenging districts in the 2023 Senate Plan, the 2023 House Plan, and the 2023 Congressional Plan as racially discriminatory, dilutive of Black voting power, racial gerrymanders, and denying equal voting power in violation of Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments. Those matters were ultimately consolidated into the instant action, and this Court held a trial on June 16-18, June 20, and July 7-8, 2025. ECF No. 169-1, 16. A mere eleven weeks after the conclusion of this trial, and before this Court could issue its ruling, the General Assembly passed new Congressional maps once again with S.B. 249.

### d. The 2024 General Election

The 2024 general election revealed how fragile CD 1's remaining opportunity had become. Rep. Davis prevailed by fewer than 6,000 votes (less than two percent of the total), earning 49 percent of the vote compared with 52 percent in 2022. In the same cycle, the presidential candidate overwhelmingly favored by Black voters lost the district. These results demonstrate that the cumulative effect of the 2021 and 2023 gerrymanders had already pushed CD 1 to the brink of functional dilution. *See* NAACP FOF/COL ¶¶ 235–241.

### e. The 2025 Mid-Decade Gerrymander: A Retaliatory Strike

The fact that CD 1 has continued to elect Black-preferred candidates does not indicate the absence of discrimination. It underscores the extraordinary political cohesion and civic engagement of Black voters and their allies across the "Black Belt." High registration and turnout rates, robust grassroots networks, and decades of shared community identity have sustained CD 1's effectiveness despite relentless legislative interference. Each time lawmakers attempted to weaken the district, Black voters, including Amici, adapted. They expanded turnout operations, strengthened multiracial coalitions, and defended their right to representation. CD 1's continued success under duress is thus the product of voter determination, not legislative design.

The 2025 plan marks a fundamental escalation. For the first time, the legislature engaged in mid-decade redistricting while litigation over the 2023 maps was still pending, specifically targeting CD 1 for dismantlement. Senate Bill 249 removed long-standing Black Belt counties (Wilson – 37.5% BVAP, Wayne – 30% BVAP, Greene – 36.2% BVAP, Lenoir – 39.1%) and replaced them with whiter coastal counties (Dare – 1.8% BVAP, Beaufort – 22.1% BVAP, Craven – 19.4% BVAP, Pamlico – 17.1% BVAP and Carteret – 4.7% BVAP). ECF No. 169-1, at 21. This reconfiguration reduced CD 1's BVAP from 40.4 percent to 32.3 percent and split the Black

13

population of eastern North Carolina almost evenly between CD 1 and CD 3. *See* Fairfax Report at 8–10.



ECF No. 183, at 4.

Further, under the 2025 configuration, Black-preferred candidates would prevail in only 7 percent of statewide contests - a 40 percent drop from the 2023 map – representing a collapse so steep that it is "highly unlikely for either 2025 district to perform for Black-preferred candidates." *See* Oskooii Suppl. Rep. ¶¶ 5–7 & Figures A1–2. This decline mirrors a broader pattern across the South, where entrenched racial polarization ensures that even modest line changes can erase decades of progress in minority representation. Without sustained vigilance, the ability of Black voters to elect candidates of their choice in such regions quickly collapses. The repeated dismantling of CD 1 underscores why Congress's enforcement authority under the 15th Amendment remains essential. Sustained federal oversight prevents state actors from reviving through redistricting the very discrimination the Amendment prohibits.

14

It was clear to Amici that S.B. 249 was an intentional attack on Black voters. Commissioner Viola Harris said that this new map was "an attempt to erase Black people" and ensure that "there won't be enough Black voters to support [Rep. Davis] or any other candidate who would similarly advocate for the issues of the Black community." Harris Decl., Ex. 5. Mayor Robinson stated that "I can feel when there is a direct attack on Black political power, and this redistricting is an attack." Robinson Decl., Ex. 6, ¶ 9. Glendora Brothers said that she believes the General Assembly, in passing these maps, is "boldly telling us – in our faces – that they do not care about our vote." Brothers Decl., Ex. 4, ¶ 13. Dr. Barber stated that "it took Eastern NC over ninety years to get another Black representative elected," and now that "reality of being able to elect Black officials in CD1 – that has existed now for three decades – will be taken away from the people." Barber Decl., Ex. 8, ¶ 18.

Unlike prior redistricting cycles, the 2025 map cannot be explained as a routine demographic adjustment or partisan realignment. It is a deliberate act of retaliation against the very voters who preserved representation in 2022 and 2024 and who exercised their constitutional right to challenge the 2023 plan in federal court as it intentionally dismantles the state's sole remaining Black opportunity district. *See* NAACP FOF/COL ¶¶ 43, 630–632.

## II. S.B. 249 Was Passed in a Sham Process and Intentionally Discriminates Based on Race

In October 2025, the General Assembly made the unprecedented decision to engage in mid-cycle redistricting that not only targets Black voters but also effectively destroys a long-standing and hard fought for Black opportunity district. On October 13, 2025, it was announced that the legislature would be convening to consider new congressional maps. A mere three days later, draft congressional maps were released, modifying congressional districts 1 and 3. On October 20 and 21, the Senate Committee on Elections held meetings in which the draft maps

were proposed as a committee substitute for S.B. 249, an unrelated campaign finance bill.[10] Finally, on October 22, just 9 days after the initial announcement, the new congressional maps were adopted into law as S.B. 249. *See* ECF No. 175-1, at 11-14. The entire process allowed less than 90 minutes for input from the public. ECF No. 187, at 3. The General Assembly sought to escape legal liability for these new maps by creating an extremely threadbare legislative record. Nearly every single written comment, including those submitted by Amici, and all of the oral comments, were opposed to the maps and the process in which they were being passed, with a clear message being sent to the General Assembly that this was an attack on Black voters. *See* ECF No. 175-1, at 23. Individuals protesting these bills and the secretive drafting process chanted "Racist maps make racist reps" in the legislative hearings. ECF No. 169-1, at 19.

This reconfiguration resulted in a severe dilution of Black voting power in CD 1, lowering the BVAP percentage of the district by approximately 8 percentage points and executing a textbook cracking of the Black population in eastern North Carolina between Congressional Districts 1 and 3, "with 26.7% [BVAP] in Congressional District 1 and 26.7% [BVAP] in Congressional District 3." ECF No. 175-1, at 25.

Although Senator Hise claimed he "elected not to use race in drawing these proposed districts strictly to protect the state from lawsuits alleging racial gerrymandering," he did admit that he "has general knowledge of the demographics of the state" and that he is "aware that District 1 has a higher minority population than the state average." ECF No. 175-1, at 15. He also stated that he was in fact aware that North Carolina only has three Black Congressional representatives—and he characterized this as a "low number." *Id*. As Rep. Pricey Harrison

---

[10] The maps were presented in this way, as a "proposed committee substitute," in order to avoid the requirement that newly filed bills must be presented for a first reading. ECF No. 175-1, at 13.

stated, Senator Hise "knows the districts well enough to know that he was splitting up the Black Belt."[11]

Courts have been clear that "[u]sing race as a proxy for party may be an effective way to win an election," but a "state legislature acting on such a motivation engages in intentional racial discrimination in violation of the Fourteenth Amendment and the Voting Rights Act." *McCrory*, 831 F. 3d at 222 – 23. Here, the changes made to CD1 and CD3 in S.B. 249 intentionally dilute the voting strength of Black voters in Northeastern North Carolina, effectively destroying the Black opportunity district of CD1 while also ensuring that Black voters in CD3 would be unable to elect a candidate of their choice.

### III. S.B. 249 Retaliates Against the Voters Who Built Political Power and Challenged the Prior Maps

As set forth in the extensive historical background above, including the recent history of gerrymandering targeting CD 1 over the last 15 years, it is no coincidence that this was the only district redrawn in S.B. 249. After the legislature sought to break up the Black political power of this district with the 2023 Congressional maps, citizens did not accept this fate and instead fought back against it in the courtroom, by building political power in their community, and by increasing their voter engagement and participation to achieve an incredibly narrow victory for their candidate of choice in 2024. Senator Hise even admitted that the data he used in order to redraw Congressional Districts 1 and 3 was the 2024 election data. ECF No. 175-1, at 4.

Plaintiffs in this case – and Black citizens of CD 1 on the whole, including the Impacted Voters – were ultimately retaliated against for using their freedoms of speech and association

---

[11] WRAL. "Legal Challenges against New NC Congressional Map in the Works as Davis Considers next Move." WRAL.Com, 23 Oct. 2025, https://www.wral.com/story/legal-challenges-against-new-nc-congressional-map-in-the-works/22211519/.

17

afforded them by the First Amendment of our Constitution. Danielle Brown, National Field Co-Director of BVM, explained that "Black voters in CD 1 have been showing out in record numbers at the polls which ultimately made them the target of the state's legislature." Brown Decl., Ex. 2, ¶ 2. The Legislature is seeking to moot out Plaintiffs' pending challenge to the 2023 Congressional Maps, and to deliver a final blow to the remaining Black political power in CD 1.

## IV. S.B. 249 Will Cause Irreparable Harm if Not Enjoined

Plaintiffs' briefs in support of a preliminary injunction detail the numerous public comments and statements from legislators and members of the public about the harms that S.B. 249 will impose on the residents of the Black Belt, including the irreparable harm and indignity of voting in another election under illegal districts that deprive Black voters of the ability to equally exercise the fundamental right to vote free from racial discrimination. The affidavits of Organizational Amici and the Impacted Voters detail these and a myriad of other harms that will occur to those who live and work in CD 1 if S.B. 249 is allowed to stand. These include: educating this expansive, rural, poor community about this redistricting and how it will affect their Congressional representation; having to obtain the resources to expand their education and mobilization work to cover two Congressional districts, with communities of interest now artificially separated;  having to advocate their community's priorities to, and build relationships with, two congressional representatives unlikely to be Black voters' preferred candidates; the incredibly difficult task of convincing Black residents of CD 1 that their vote still matters; and even the potential for death as the result of the "policy violence" that could be inflicted on this region due to the reduction in Black political power.

Whether Amici are being moved from CD 1 to CD 3 or will have to stay in a fundamentally altered CD 1, they will suffer the effects of their community being split in two, and no longer being able to organize their full community coalition across the Black Belt region. Theodore McNeal Jr., an A. Phillips Randolph Institute organizer in Lenoir County who is being redistricted to CD 3, described the fusion movement success that the Black Belt region has had recently, and how that will come to an end as a result of the surgical separation caused by S.B. 249: "People in CD 1 have been coming together. Rep. Davis even gained support from unlikely people like farmers and poor white people who united and established relationships with Black voters. Our ability to come together and vote collectively for our interest will end as counties are moved from CD 1 into CD 3 and vice versa." McNeal Decl., Ex. 1, ¶ 8. *See also* Robinson Decl., Ex. 6 ("To effectively address the needs of our people, we must build coalitions...with our neighboring counties, which will now be even more difficult...We are suffering from the same problems, but now we are separated"); Bass Decl., Ex. 7, ¶ 17 ("Black voters are deeply limited in moving transformative political change when the collective power of their votes are diluted"). As Mayor Robinson explained, "What used to be a resounding scream from one district will become mere murmurs from two districts." Robinson Decl., Ex. 6, ¶ 15.

Amici further described that, if S.B. 249 is not enjoined, Black voters, as well as the organizations who advocate for policy reforms on their behalf, will no longer have an advocate who prioritizes or is responsive to the issues that impact their community – including public school funding, expanding internet access, working towards more environmentally friendly energy sources, and ensuring that CD 1 is still an attractive place for people to live. As Dr. Barber stated, "our communities will be deprived of the opportunity to elect someone in CD1 who will advocate for living wages, universal healthcare, fully funded public education and to fully protect the

Affordable Care Act – this could all be gone." Barber Decl., Ex. 8, ¶ 21. *See also* McNeal Decl., Ex. 1, ¶ 14; Harris Decl., Ex. 5; Robinson Decl., Ex. 6; Bass Decl., Ex. 7 (the passage of S.B. 249 "will adversely affect our ability to organize around issues unique to the Black Belt and Black rural voters... includ[ing] the lack of internet in many rural communities, education deserts, environmental injustices, and economic struggles"); Stokes Decl. Ex. 3 ("SB 249 places residents of CD 1 in the position of potentially being represented by individuals who have no connection to the lifestyles, livelihoods and policy concerns that they live with daily"); Stokes Decl., Ex. 3, ¶ 13. (describing how the "beach counties" which were added as part of S.B. 249 "intrinsically have different concerns and policy priorities than the counties typically associated with CD1").

Commissioner Viola Harris, a County Commissioner in Edgecombe County, stated that "voters need representatives who know their communities and how they live" and that "Rep. Davis is always accessible to me and the community, even when we disagree and voice complaints." Harris Decl., Ex.5, ¶9. Glendora Brothers, a lifelong resident of Pasquotank County, echoed this sentiment, stating that "I may not always agree with his decisions but [Rep. Davis] is more accessible and visible than most of the other representatives for this area." Brothers Decl., Ex. 4, ¶ 10. However, if S.B. 249 is allowed to stand, Commissioner Harris said that "Black voters will not have a voice or strong advocates to hear and address their issues." Harris Decl., Ex. 5.

Not having a representative who prioritizes the needs of this rural, poor community could have dire consequences – Mayor Robinson stated that "My people will die from redistricting and that is not hyperbole." Robinson Decl., Ex. 6, ¶ 12. Dr. Barber echoed this sentiment, stating that "Every piece of regressive policy has death involved in it. The death of representation in CD1 likely means actual death for the people who live in CD1." Barber Decl., Ex. 8, ¶ 26. Theodore

McNeal Jr. shared this concern as well, that "[t]he end result if people in eastern North Carolina cannot receive the medical care that they need, is death." McNeal Decl., Ex. 1, ¶ 16.

The Amici were also universally concerned about the voter deterrence, discouragement, and disillusionment that will result when the residents of CD 1 absorb that their historically Black Congressional District that they have fought so hard to maintain has been dismantled – and that the General Assembly didn't even pretend to consider how it would impact them. Amici described the fact that many people living in CD 1 are not even yet aware that this recent, mid-cycle redistricting has occurred. Harris Decl., Ex. 5, ¶ 6 ("Many residents of CD 1 were unaware of the proposed redistricting prior to my sharing"). Danielle Brown of BVM noted that "more resources will now be required to encourage and promote voter participation when voters know the challenges that Black candidates of choice face in the unlawful districts." Brown Decl., Ex. 2, ¶ 20. *See also* Brothers Decl., Ex. 4, ¶ 13 ("The events surrounding the latest redistricting plan have negatively affected my opinion of, and trust in, the voting system."). Mayor Robinson stated that this redistricting is "causing trauma and past traumas to resurface" and "[t]he danger here is that a voter will say 'to hell with politics' and stop participating in the process. Moving Black people among the districts like pawns is reminiscent of the enslavement auction block where our people were separated and could be bought, sold and sent anywhere." Robinson Decl., Ex. 6, ¶ 9.

## CONCLUSION

The 2025 Congressional Map passed in S.B. 249 cannot stand. Without justification, it intentionally dilutes Black voting power in our state. All North Carolinians deserve to participate equally in our democracy. With no court order, and on the eve of this Court's determination on the fate of the widespread 2023 gerrymander, the N.C. General Assembly rammed-through an

unprecedented mid-decade redistricting map dismantling CD1's historic Black Opportunity District, fully aware of the N.C. State Board's fast-approaching December candidate filing deadlines for the 2026 Elections. The General Assembly's effort to punish Black voters seeking legal redress for discrimination in voting by doubling-down and enacting new racially discriminatory voting legislation timed to strategically evade judicial review cannot be rewarded.

For all of the foregoing reasons, Amici respectfully request that this Court enjoin any election conducted under S.B. 249 discriminatory plan in 2026, and at a minimum return to the status quo 2023 CD1 and CD3 maps pending an order of permanent relief against the 2023 Congressional Plan to ensure that fair, constitutionally permitted maps govern the 2026 Primary and General elections.

Dated: November 14, 2025                    Respectfully submitted,

<div style="margin-left:50%">

*By: Kathleen E. Roblez*
Kathleen E. Roblez
NC Bar No. 57039
Caitlin A. Swain
NC Bar No. 57042
Ashley Mitchell
NC Bar No. 56889
**FORWARD JUSTICE**
P.O. Box 1932
Durham, NC 27721
Phone: (919) 323-3889
cswain@forwardjustice.org
kroblez@forwardjustice.org
amitchell@forwardjustice.org

*By: /s/ Penda D. Hair*
Penda D. Hair
DC Bar No. 335133
Janelle Bruce*
DC Bar No. 1017746
FORWARD JUSTICE
P.O. Box 42521

</div>

Washington, DC 20015
Phone: (202) 256-1976
phair@forwardjustice.org
jbruce@forwardjustice.org

Bradley Heard*
Sabrina Khan*
**Southern Poverty Law Center**
1101 17th Street, NW, Suite 550
Washington, DC 20036
(202) 579-4572
bradley.heard@splcenter.org
sabrina.khan@splcenter.org

Greta Kemp Martin*
**Southern Poverty Law Center**
111 East Capitol Street, Suite 280
Jackson, MS 39201
(601) 948-8884
greta.martin@splcenter.org

*Notice of special appearance pending

23

## WORD CERTIFICATION

Pursuant to Local Rule 7.3(d)(1), the undersigned certifies that the word count for Brief of *Amicus Curiae* is 6,119 words. The word count excludes the case caption, signature lines, cover page, and required certificates of counsel. In making this certification, the undersigned has relied upon the word count of Microsoft Word, which was used to prepare the brief.

*/s/ Kathleen Roblez*
Kathleen Roblez

## CERTIFICATE OF SERVICE

I certify that on November 14, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Kathleen Roblez*
Kathleen Roblez