## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| SHAUNA WILLIAMS; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 23-CV-1057 |
| REPRESENTATIVE DESTIN HALL, in his official capacity as Chair of the House Standing Committee on Redistricting; *et al.*, | |
| *Defendants.* | |
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 23-CV-1104 |
| PHILIP BERGER, in his official capacity as the President Pro Tempore of the North Carolina Senate; *et al.*, | |
| *Defendants.* | |

## LEGISLATIVE DEFENDANTS' REPLY IN SUPPORT OF
## MOTION TO DISMISS

Plaintiffs allege that the General Assembly violated their First Amendment free-speech and petition rights, and the one-person, one-vote principle, by acting in "pursuit of partisan advantage," [Williams Supp. Compl. ¶ 172; *see also id.* ¶ 162], to "improve[] Republican political strength in eastern North Carolina and . . . bring an additional Republican seat to North Carolina's congressional delegation," [NAACP Supp. Compl. ¶ 56]. Plaintiffs also allege that Senator Ralph Hise "considered whether voters voted for or against" Republican candidates "and redrew the lines on that basis." [*Id.* ¶ 41]. Plaintiffs' wordsmithing cannot save these self-described "novel" claims from *Rucho*; each asserts "that legislators cannot take partisan interests into account when drawing district lines," *Rucho v. Common Cause*, 588 U.S. 684, 701 (2019), and should be dismissed.

## ARGUMENT

## I. Plaintiffs' Partisan-Gerrymandering Claims Are Foreclosed

### A. Mid-Decade Redistricting Does Not Give Rise to a Justiciable Partisan-Gerrymandering Claim

Plaintiffs contend "mid-decade" redistricting renders claims that would otherwise be non-justiciable susceptible to First Amendment review. [*See* D.E. 207 ("Williams.Opp.") at 12-16; D.E. 213 ("NAACP.Opp.") at 5-7]. Legislative Defendants anticipated this argument and demonstrated that it is both devoid of foundation and foreclosed. [D.E. 193 ("Mem.") at 6-10]. Plaintiffs have no compelling response.

1. Plaintiffs' arguments lack conceptual foundation. Plaintiffs do not dispute that congressional redistricting is "performed in accordance with the State's prescriptions

for lawmaking." *Moore v. Harper*, 600 U.S. 1, 25-26 (2023) (citation omitted); [*see* Mem. 8-10]. Just as the General Assembly may enact or amend any of the State's laws more than once per decade, it has the power to amend its congressional redistricting plan more than once per decade. The timing of its actions does not change the rules governing its actions. The General Assembly can "take partisan interests into account" in 2025 for the same reasons it could in 2023 and 2021. *Rucho*, 588 U.S. at 701.

The Elections Clause does not change this analysis.[1] [*Contra* NAACP.Opp. 2, 15, 21]. It authorizes state legislatures to promulgate "a complete code for congressional elections," including "in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). The General Assembly may amend any of these laws any time during the decade. Congressional redistricting is no different.

2.     The Williams Plaintiffs' convoluted discussion centers on the decennial redistricting cycle when the new census typically reveals existing plans to be unconstitutionally malapportioned. *Georgia v. Ashcroft*, 539 U.S. 461, 473 n.1 (2003); [Williams.Opp. 12-16]. But that doctrine limits when courts may compel redistricting, not when legislatures may conduct it. The Constitution sets a floor requiring states to adhere to a "reasonable plan for periodic revision of their apportionment schemes," such as

---

[1] Legislative Defendants explained that *Rucho* rejected a partisan-gerrymandering claim founded on the Elections Clause. [Mem. 17]. The NAACP Plaintiffs ignore this point. [NAACP.Opp. 2, 15, 21].

"decennial reapportionment." *Reynolds v. Sims*, 377 U.S. 533, 583 (1964). The Supreme Court has not "intimate[d] that more frequent reapportionment would not be constitutionally permissible." *Id.* That is because, when state legislatures redistrict, they exercise their own legislative power and need not remedy violations of federal law. *Voinovich v. Quilter*, 507 U.S. 146, 156 (1993). This has long been understood. "Mid-decade congressional redistricting was not uncommon during the 19th century," as some states redrew lines many times "unrelated to any population shifts." Sarah J. Eckman & L. Paige Whitaker, Cong. Rsch. Serv., IF13082, Mid-Decade Congressional Redistricting: Key Issues (2025), https://www.congress.gov/crs-product/IF13082.

The Williams Plaintiffs theorize that the decennial-redistricting mandate accounts for supposed differences in legal standards governing redistricting and other legislation. [Williams.Opp. 12-13]. Both parts of their syllogism fail. First, redistricting precedents have not tied their standards to timing of enactment. *Rucho* grounded its holding in "the Framers' decision to entrust districting to political entities" and the absence of a "standard for determining when partisan activity goes too far." 588 U.S. at 701, 714. The racial-gerrymandering standard has likewise been framed to account for "the complex interplay of forces that enter a legislature's redistricting calculus." *Miller v. Johnson*, 515 U.S. 900, 915-16 (1995) (recognizing redistricting as "the most vital of local functions"). None of this reasoning differs from 2021 to 2023 to 2025.

Second, the Williams Plaintiffs overstate both the degree to which redistricting standards differ from other standards and the relevance of those differences. As for racial considerations, the Supreme Court has treated "a racially gerrymandered districting

3

scheme[] like all laws that classify citizens on the basis of race," *Shaw v. Hunt*, 517 U.S. 899, 904 (1996), and a showing of discriminatory purpose and effect makes out a presumptive constitutional claim against a redistricting plan just as against any other legislation, [*see* D.E. 209 at 7-13]. Mere "consideration" of race does not create a constitutional violation in *any* setting, [Williams.Opp. 12]; *compare Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979), or else the Census Bureau could not collect racial data and government supervisors would have to wear blindfolds to avoid noticing their employees' race, *see Hunter v. Underwood*, 471 U.S. 222, 232 (1985) (describing but-for causation requirement). Courts are not letting legislatures off easy in policing racial motive in redistricting. [*See* D.E. 209 at 16-22]. Insofar as precedent requires courts to account for "special significance" of redistricting-specific factors, *Abbott v. Perez*, 585 U.S. 579, 603 (2018), it applies the cross-cutting demand for a "sensitive inquiry" into an alleged racial motivation that is fact-specific, *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

Likewise, "partisan considerations" do *not* condemn *any* election law, contrary to the Williams Plaintiffs' suggestion. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 203-04 (2008) (plurality opinion) (finding it irrelevant "that partisan considerations may have played a significant role in the decision to enact" a voter identification law). The constitutionality of a law depends on the "severity of a burden" on the franchise, not partisan intent. *Id.* at 191. *Rucho* found no manageable standard for assessing when a burden imposed by a redistricting plan becomes cognizable. *See* 588 U.S. at 705-09. Only

4

that holding—not a theory that "partisanship" is sometimes permitted and sometimes not [Williams.Opp. 12]— differentiates redistricting plans from other election laws.

3. The Supreme Court addressed and rejected all these arguments well before *Rucho*. Justice Kennedy explained in *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006) (*LULAC*), that the circumstance of mid-decade redistricting does not "show a burden, as measured by a reliable standard, on the complainants' representational rights." *Id.* at 418. Added to Justice Kennedy's *LULAC* vote were those of four other Justices who would have then interred all partisan-gerrymandering claims. 548 U.S. at 492 (opinion of Roberts, C.J., joined by Alito, J.); *id.* at 511 (opinion of Scalia, J., joined by Thomas, J.); *Marks v. United States,* 430 U.S. 188, 193 (1977). Because *Rucho* endorsed that broader view, and because mid-decade redistricting provides no more of a measure of burden here than in *LULAC*, Plaintiffs' position is moribund. [Mem. 6-8]. It is not "'novel.'" [NAACP.Opp. 22].

Plaintiffs' arguments rest on a distinction without difference in noting that the legislature in *LULAC* replaced a court-drawn plan. [Williams.Opp. 17; NAACP.Opp. 16-17]. The rationale of the controlling opinion was, as noted, the absence of a reliable standard for measuring a burden on representational rights. 548 U.S. at 418. Nothing in that rationale, and nothing in Justice Kennedy's discussion, turned on who drew the map being replaced. While Justice Kennedy noted that "there is nothing inherently suspect about a legislature's decision to replace mid-decade a court-ordered plan with one of its own," he went on to reason: "And *even if there were*, the fact of mid-decade redistricting alone is no sure indication of unlawful political gerrymanders." *Id.* at 419 (emphasis added). Plaintiffs

5

ignore this broader basis of the judgment. Meanwhile, the Williams Plaintiffs' assertion that the lines in *LULAC* were not drawn solely based on partisan motivation, [Williams.Opp. 17-18], misses that *LULAC* rejected a sole-intent standard, 548 U.S. at 418-19 (opinion of Kennedy, J.).[2]

**B.      References to Miscellaneous Constitutional Provisions Do Not Create a Justiciable Controversy**

1.      Legislative Defendants demonstrated that *Rucho* cannot be avoided by vague references to the First Amendment's guarantees of free speech, free association, and the right to petition; the Elections Clause of Article I; unspecified protections of the Fourteenth Amendment; and even provisions of the North Carolina Constitution. [Mem. 10-18]. *Rucho* addressed *all* these provisions, and claims based on "any other First Amendment activities." 588 U.S. at 713. The NAACP Plaintiffs' effort to sweep these rulings away as "dicta" is hard to take seriously. [NAACP.Opp. 6]; *see Rucho*, 588 U.S. at 713-14 ("The District Courts also found partisan gerrymandering claims justiciable under the First Amendment . . . . The First Amendment test . . . provides no standard for determining when partisan activity goes too far.").

It is also difficult to follow the NAACP Plaintiffs' argument that their First Amendment claims are not partisan gerrymandering claims. [NAACP.Opp. 6-7, 14-15].

---

[2] Nor do the Supplemental Complaints plausibly allege that partisan aims drove "every line." 548 U.S. at 417. Indeed, their experts conceded that CD1 and CD3 were altered predominantly by swapping whole counties and became more compact. [D.E. 183-2 at 4, 8 (Fairfax); D.E. 187-2 at 2 (Rodden); D.E. 211-2 at 3 (Rodden)]. The Court may consider this evidence under Fed. R. Civ. P. 12(b)(1). *See Warren v. City of Greensboro*, 280 F. Supp. 3d 780, 785 (M.D.N.C. 2017).

6

The NAACP Plaintiffs allege that they "voted for and joined in association with other voters [in CD1] to elect a Democratic candidate for Congress who would oppose the agenda of the Republican candidate for President." [NAACP Supp. Compl. ¶ 86]. Now CD1 is likely to elect a Republican. [*e.g.*, *id.* ¶¶ 87, 99]. These allegations are indeed "partisan-specific." [NAACP.Opp. 18 n.5]. The NAACP Plaintiffs' basic "factual matter" supporting these claims, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007), is that Senator Hise "considered whether voters voted for or against President Trump and Republican congressional candidates in 2024 and redrew the lines on that basis." [NAACP Supp. Compl. ¶ 41]. But, if *Rucho* permits anything, it is the use of "refined, sub-precinct-level political data that accounted for voter turnout and electoral preferences" in moving voters among districts. *Alexander v. S. C. State Conf. of NAACP*, 602 U.S. 1, 22-23 (2024). In challenging this practice, the NAACP Plaintiffs bring a partisan gerrymandering claim. *Rucho*, 588 U.S. at 685.

2.      The NAACP Plaintiffs also attempt to distinguish *Rucho* by calling certain aspects of its reasoning inapplicable. [*See, e.g.*, NAACP.Opp. 15]. But *Rucho* advanced many rationales for its holding and thus cannot be so cavalierly negated. Most importantly, Plaintiffs do not address *Rucho*'s holding that redistricting plans place no "restrictions on speech, association, or any other First Amendment activities" because "[t]he plaintiffs are free to engage in those activities no matter what the effect of a plan may be on their district." 588 U.S. at 713-14.

Regardless, the NAACP Plaintiffs are wrong in claiming to have escaped even some parts of *Rucho*'s rationale. For example, their claim *does* rest on a "theory requiring a

7

'commensurate level of political power and influence'" by some standard. [NAACP.Opp. 15 (quoting *Rucho*, 588 U.S. at 704)]. They claim they could elect their preferred candidate (a Democrat) in the 2023 configuration of CD1 and that the 2025 plan must afford that same opportunity. [*Id.* at 18 n.5]. And that contention underpins *all* their claims: they would not have a good-faith claim of any kind if CD1 became more Democratic (and hence easier for Black-preferred candidates to win). [*See, e.g.*, *id.* at 11 (explaining that their right-to-petition claim depends on the fact that their prior injury was not "remedied" by the 2025 plan)]. Accordingly, the NAACP Plaintiffs' claims *do* (and must) depend on "a neutral baseline from which to measure how extreme a partisan gerrymander is." *Rucho*, 588 U.S. at 715.

Worse, the NAACP Plaintiffs' proposed baseline (the prior 2023 plan) is more problematic than those in *Rucho* because it is functionally a "retrogression" standard that "requires a comparison of a jurisdiction's new voting plan with its existing plan." *Ashcroft*, 539 U.S. at 478 (citation omitted). The Supreme Court disabled the *statutory* retrogression standard Congress fashioned to protect insular racial minority groups that have suffered past discrimination. *Shelby County v. Holder*, 570 U.S. 529 (2013). There is no merit in the NAACP Plaintiffs' claim to have discovered in the First Amendment a retrogression standard that protects supporters of major political parties.

3. The NAACP Plaintiffs' specific causes of action were repudiated in *Rucho*. The First Amendment retaliation claim was at issue and rejected. *Compare Common Cause v. Rucho,* 318 F. Supp. 3d 777, 927 (M.D.N.C. 2018) (three-judge court), *with Rucho*, 588

8

U.S. at 713-14. No amount of verbiage can talk the NAACP Plaintiffs out of that ruling. [*See* NAACP.Opp. 14-21 (ignoring that a retaliation claim was at issue in *Rucho*)].

The NAACP Plaintiffs' petition claims were equally rejected in *Rucho*'s holding that a redistricting plan imposes no burden on "any other First Amendment activities." 588 U.S. at 713; *see also id.* at 714 (noting that trial court's holding would reach "any First Amendment activity"). In all events, the Supreme Court has considered claims of burdens on the rights to speak and to petition as "essentially the same" and "generally subject to the same constitutional analysis." *Wayte v. United States*, 470 U.S. 598, 610 n.11 (1985); *McDonald v. Smith,* 472 U.S. 479, 482 (1985) ("The right to petition is cut from the same cloth as the other guarantees of t[he First] Amendment, and is an assurance of a particular freedom of expression."). While the NAACP Plaintiffs note that the analysis may in limited instances differ "in emphasis and formulation," *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 389 (2011), they do not say what difference matters here. [NAACP.Opp. 7].

Possibly, the scope of protected petitioning and speech may differ. But the question in *Rucho* was not whether protected activity was present but whether it was burdened (it was not). 588 U.S. at 713-14. The NAACP Plaintiffs do not say why a redistricting plan that cannot cognizably burden speech or association can cognizably burden petitioning. In analyzing alleged burdens, courts have applied the same test to both types of claims. *See Borough*, 564 U.S. at 393 ("Articulation of a separate test for the Petition Clause would aggravate potential harm to the government's interests by compounding the costs of compliance with the Constitution."); *Mirabella v. Villard*, 853 F.3d 641, 649-50 (3d Cir.

2017) (applying "person of ordinary firmness" test to retaliatory claim involving both speech and petition).

4. The NAACP Plaintiffs' claims based on petitioning in this very lawsuit (Count 11) fail for the same reason—and additional ones. Legislative Defendants did in fact address both petitioning theories in their prior brief, [*compare* Mem. 14-15, *with id.* at 15-17], and the NAACP Plaintiffs ignore that, if redistricting does not cognizably burden speech and association, it also cannot cognizably burden the right to petition through lawsuits, [*id.* at 15]. The NAACP Plaintiffs also fail to respond to Legislative Defendants' observation that their underlying theory of intent to forestall the lawsuit is not supported by well-pleaded allegations. [*Id.* at 16].

All that aside, the NAACP Plaintiffs have no support for their "infinity loop" theory. [NAACP.Opp. 9]. The Court can take judicial notice of its own partial final judgment adjudicating the NAACP Plaintiffs' claims. [D.E. 209]. The NAACP Plaintiffs *did* successfully petition the Court but failed to prove their case. After the 2025 redistricting, the NAACP Plaintiffs continue to petition the Court, as evidenced by their expedited preliminary-injunction motion, [D.E. 182], and the Court's scheduling order to adjudicate the claim to final judgment, [D.E. 198]. Nor will redistricting likely occur in infinity, given "that political gerrymandering is a self-limiting enterprise." *Davis v. Bandemer*, 478 U.S. 109, 152 (1986) (O'Connor, J., concurring in the judgment).

Finally, the NAACP Plaintiffs' proposed remedy would shoot their right-to-petition claim in the proverbial foot. The NAACP Plaintiffs exercised their right to petition by challenging the prior version of CD1—asking the Court to enjoin it. But now they want

10

that version of CD1 reinstated to *remedy* the supposed impingement on their right to petition. [D.E. 204 at 12]. That makes no sense.

## II.   The Williams Plaintiffs' Malapportionment Claim Is Foreclosed

Nothing the Williams Plaintiffs say about malapportionment can get around the rule that the decennial census provides "the only basis for good-faith attempts to achieve population equality." *Karcher v. Daggett*, 462 U.S. 725, 738 (1983). The Williams Plaintiffs dismiss *Karcher* as speaking only to the "context" of redistricting at the beginning of the decade. [Williams.Opp. 7]. But "only" means only. And *Karcher* reaffirmed the holding of *Kirkpatrick v. Preisler*, 394 U.S. 526 (1969), that "the best population data available to the legislature in *1967*" was "the 1960 United States census figures." *Id.* at 528 (emphasis added); *Karcher*, 462 U.S. at 738. Here, the 2020 figures were the best data available in 2025.

The Williams Plaintiffs' theory depends on a demand for "justification" for mid-decade redistricting. [Williams.Opp. 8]. But Justice Kennedy explained in *LULAC* that "this is a test that turns not on whether a redistricting furthers equal-population principles but rather on the justification for redrawing a plan in the first place." 548 U.S. at 422 (plurality opinion).[3] Asserting different arguments about justification (here, a difference in reasons for replacing a legislative versus court-configured plan) does not address this

---

[3] This view of three Justices is controlling because it is narrower than the concurring opinions' broader classification of this claim as a non-justiciable partisan gerrymandering claim. *Id.* at 511-12 (Scalia & Thomas, JJ.). The Williams Plaintiffs nonsensically suggest the other Justices simply did not participate in this aspect of the case. [*See* Williams.Opp. 11 n.3].

11

holding. A plan redrawn mid-decade for any reason is no more protective of the equality of voting strength than one left alone. *LULAC* therefore rejected the argument that "the legal fiction that … plans are constitutionally apportioned throughout the decade," "should not provide a safe harbor for a legislature that enacts a voluntary, mid-decade plan." *Id.* at 421 (plurality opinion). Plaintiffs' argument (aired most recently at the preliminary-injunction hearing) is indistinguishable from that discredited position. Because Plaintiffs' argument has no logical connection to "equal-population principles," *id.* at 422, it has no limiting principle, which explains why Plaintiffs' counsel could identify none at the hearing.

## CONCLUSION

The Court should dismiss Counts 10 through 12 of the NAACP Supplemental Complaint and Counts III and IV of the Williams Supplemental Complaint.

Respectfully submitted, this the 26th day of November, 2025.

**BAKER & HOSTETLER LLP**

By: /s/ Katherine L. McKnight
Richard B. Raile*
DC Bar No. 1015689
Katherine L. McKnight*
DC Bar No. 994456
Trevor Stanley*
DC Bar No. 991207
1050 Connecticut Ave. NW
Suite 1100
Washington, DC 20036
Ph: (202) 861-1500
rraile@bakerlaw.com
kmcknight@bakerlaw.com
tstanley@bakerlaw.com

Patrick T. Lewis*

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By: /s/ Phillip J. Strach
   Phillip J. Strach
   North Carolina State Bar No. 29456
   Alyssa M. Riggins
   North Carolina State Bar No. 52366
   Cassie A. Holt
   North Carolina State Bar No. 56505
   Jordan A. Koonts
   North Carolina State Bar No. 59363
   301 Hillsborough Street, Suite 1400
   Raleigh, North Carolina 27603
   Ph: (919) 329-3800
   phil.strach@nelsonmullins.com
   alyssa.riggins@nelsonmullins.com
   cassie.holt@nelsonmullins.com
   jordan.koonts@nelsonmullins.com

12

Ohio State Bar No. 0078314
Key Tower
127 Public Square, Suite 2000          *Attorneys for Legislative Defendants*
Cleveland, Ohio 44114
Ph: (216) 621-0200
plewis@bakerlaw.com

Erika D. Prouty*
Ohio State Bar No. 0095821
Anna Croyts*
Ohio State Bar No. 0104620
200 Civic Center Drive, Suite 1200
Columbus, Ohio 43215
Ph: (614) 462-4710
eprouty@bakerlaw.com
acroyts@bakerlaw.com


*\*Appeared via Special Notice*

13

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.3(d), I, Phillip J. Strach, hereby certify that the foregoing brief includes 3,122 words as indicated by Microsoft Word, excluding the caption, signature lines, and certificate of service.

This the 26th day of November, 2025.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

/s/ Phillip J. Strach
Phillip J. Strach
N.C. State Bar No. 29456

14

## CERTIFICATE OF SERVICE

I, Phillip J. Strach, hereby certify that I have this day electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will provide electronic notification to counsel of record.

This the 26th day of November, 2025.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

/s/ Phillip J. Strach
Phillip J. Strach
N.C. State Bar No. 29456