IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

SHAUNA WILLIAMS, et al.,

        *Plaintiffs*,

    v.

REPRESENTATIVE DESTIN HALL, in his official capacity as Chair of the House Standing Committee on Redistricting, et al.,

        *Defendants*.

1:23-CV-1057

_____

NORTH CAROLINA STATE CONFERENCE OF THE NAACP, et al.,

        *Plaintiffs*,

    v.

PHILIP BERGER, in his official capacity as the President Pro Tempore of the North Carolina Senate, et al.,

        *Defendants*.

1:23-CV-1104

## MEMORANDUM OPINION AND ORDER

These cases are before the Court on Plaintiffs' motions for a preliminary injunction. (Docs. 182, 186.)[1] In October 2025, the North Carolina General Assembly redrew two of the State's

_____

[1] Pursuant to the Court's order consolidating these cases, all citations are to case number 1:23-cv-1057 unless otherwise noted. (Doc. 34.)

1

federal congressional districts ("CD"), CD 1 and 3. <u>See</u> 2025 N.C. Sess. Laws 95. Plaintiffs in these consolidated cases filed supplemental complaints challenging the two reconfigured districts. (Docs. 180, 181.) They now ask the Court to preliminarily enjoin the State from using those reconfigured districts for the 2026 congressional elections. For the following reasons, Plaintiffs' motions are denied.

## I.   PROCEDURAL BACKGROUND

In 2023, the North Carolina General Assembly redrew the State's districts for electing representatives to the state Senate and federal Congress. Plaintiffs in these consolidated cases sued in December 2023, claiming certain portions of the 2023 maps violated the Fourteenth and Fifteenth Amendments to the United States Constitution and Section 2 of the Voting Rights Act of 1965 ("VRA"), codified at 52 U.S.C. § 10301. Eighteen black and Hispanic individuals sued in case number 1:23-cv-1057 ("Williams Plaintiffs"). The North Carolina State Conference of the NAACP, Common Cause, and six black voters sued in case number 1:23-cv-1104 ("NAACP Plaintiffs").[2] This Court held a bench trial on Plaintiffs' claims in late June and early July of 2025.

---

[2] Eight voters originally sued in case number 1:23-cv-1104, but the First Amended Complaint named only six.

2

After trial, but before we issued our final decision on Plaintiffs' challenges to the 2023 plans, the North Carolina General Assembly again revised two of the State's federal congressional districts. (See Doc. 184-19.) Passed by the General Assembly on October 22, 2025, the law that began as Senate Bill 249 ("S.B. 249") changed the borders of CD 1 and CD 3 in eastern North Carolina. (See Docs. 184-19, 184-26; Doc. 180 at 24.)[3] Specifically, S.B. 249 moved four counties out of CD 1 and into CD 3 while moving six counties and a small portion of another out of CD 3 and into CD 1. (See Doc. 180 at 24; Doc. 184-26.) All other congressional districts were left untouched. Compare 2025 N.C. Sess. Laws 95, with N.C. Gen. Stat. § 163-201(a).

We recently entered judgment for Defendants on all of Plaintiffs' claims challenging the 2023 plans, with the exception of their claims regarding CD 1. (See generally Doc. 209.) As we explained, S.B. 249 superseded Plaintiffs' challenges to CD 1.[4] (Id. at 5.) We therefore did "not address the lawfulness of CD 1 as it was previously configured in 2023." (Id.)

Following the enactment of S.B. 249, Plaintiffs received this Court's permission to file supplemental complaints challenging CD

---

[3] All "Doc." cites use the pagination generated by the ECF system.

[4] Plaintiffs did not challenge CD 3 as it was drawn in the 2023 congressional plan.

3

1 and 3 as newly configured.  (Doc. 179; <u>see</u> Docs. 180, 181.)  In their supplemental complaints, Plaintiffs allege S.B. 249 violates Article I, Section 2 of the United States Constitution as well as the First, Fourteenth, and Fifteenth Amendments to the Constitution and Section 2 of the VRA.[5]  (<u>See</u> Docs. 180, 181.)

Plaintiffs now move to enjoin S.B. 249 preliminarily—that is, before a trial on the merits of their claims.  Specifically, on the basis of some (but not all) of their supplemental claims, Plaintiffs ask the Court to enjoin the State from using the reconfigured borders of CD 1 and 3 for the upcoming 2026 congressional elections.  (<u>See</u> Docs. 182, 183, 184, 186, 187, 204, 206.)  Defendants oppose Plaintiffs' motions.  (Doc. 201.)  This Court held a hearing on Plaintiffs' motions on November 19, 2025.  Plaintiffs presented no witnesses, and Defendants called one witness, Senator Ralph Hise.  Otherwise the parties relied on documentary evidence, including expert reports, submitted with their motion papers.  The motions are now ripe for decision.

## II.  PRELIMINARY INJUNCTION STANDARD

"A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right.'"  <u>Starbucks Corp. v. McKinney</u>, 144 S. Ct. 1570, 1576 (2024) (quoting <u>Winter v. Nat.</u>

---

[5] In their supplemental complaints, Williams Plaintiffs and NAACP Plaintiffs each name three additional voters as plaintiffs. (<u>See</u> Doc. 169 at 3; Doc. 175 at 4.)

4

Res. Def. Council, Inc., 555 U.S. 7, 24 (2008)).  To obtain a preliminary injunction, Plaintiffs must make a "clear showing" that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of the equities tips in [their] favor," and (4) "an injunction is in the public interest."  Winter, 555 U.S. at 20, 22.  "[E]ach of these four [elements] must be satisfied" for a preliminary injunction to issue.  Henderson ex rel. Nat'l Lab. Rels. Bd. v. Bluefield Hosp. Co., 902 F.3d 432, 439 (4th Cir. 2018) (emphasis omitted) (citing Winter, 555 U.S. at 20).  Failure on any element, therefore, precludes preliminary injunctive relief.  Id.

Both parties claim weighty interests in this case.  Plaintiffs allege constitutional violations that, if proven, cannot be fully redressed after the upcoming elections.  See League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 247 (4th Cir. 2014) ("[D]iscriminatory voting procedures in particular are the kind of serious violation of the Constitution . . . for which courts have granted immediate relief" because "once the election occurs, there can be no do-over and no redress." (internal quotation marks omitted)).  At the same time, North Carolina has a "constitutional prerogative to draw [its] congressional map," a prerogative which similarly cannot be reclaimed after the fact.  Moore v. Harper, 142 S. Ct. 1089, 1091 (2022) (Alito, J., dissenting from the denial

5

of application for stay); see Abbott v. Perez, 138 S. Ct. 2305, 2324 n.17 (2018) ("[T]he inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State.").

Ultimately, as explained below, we find the likelihood-of-success element dispositive.  Because Plaintiffs at this point in the litigation have not made a clear showing that they are likely to succeed on the merits of any claim advanced in their motions, a preliminary injunction is unwarranted.

## III. LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiffs ask the Court to preliminarily enjoin S.B. 249 on several grounds.  We address each of their claims in turn.

### A.  Malapportionment

We begin with Williams Plaintiffs' contention that the 2025 plan is unconstitutionally malapportioned.  (See Doc. 187 at 21–23; Doc. 181 at Count III.)  "Article I, § 2, of the United States Constitution requires that Members of the House of Representatives 'be apportioned among the several States . . . according to their respective Numbers' and 'chosen every second Year by the People of the several States.'"  Tennant v. Jefferson Cnty. Comm'n, 567 U.S. 758, 759 (2012) (per curiam) (quoting U.S. Const. art. I, § 2).  The Supreme Court has derived from this provision a requirement that States apportion their congressional districts "to achieve population equality 'as nearly as is practicable.'"  Karcher v. Daggett, 462 U.S. 725, 730 (1983) (quoting Wesberry v. Sanders,

6

376 U.S. 1, 7-8 (1964)); see Evenwel v. Abbott, 578 U.S. 54, 59 (2016) ("States must draw congressional districts with populations as close to perfect equality as possible."). "[T]he 'as nearly as is practicable' standard does not require that congressional districts be drawn with 'precise mathematical equality,' but instead that the State justify population differences between districts that could have been avoided by 'a good-faith effort to achieve absolute equality.'" Tennant, 567 U.S. at 759 (quoting Karcher, 462 U.S. at 730).

Courts apply a "two-prong test to determine whether a State's congressional redistricting plan meets this standard." Id. at 760. "First, the parties challenging the plan bear the burden of proving the existence of population differences that 'could practicably be avoided.'" Id. (quoting Karcher, 462 U.S. at 734). Second, "[i]f they do so, the burden shifts to the State to 'show with some specificity' that the population differences 'were necessary to achieve some legitimate state objective.'" Id. (quoting Karcher, 462 U.S. at 741, 740).

Williams Plaintiffs have not made a "clear showing," Winter, 555 U.S. at 22, that they are likely to succeed in meeting the first prong of this test—i.e., proving that the 2025 plan's districts contain "population differences that could practicably be avoided." Tennant, 567 U.S. at 760 (internal quotation marks omitted). According to the 2020 census data that the General

7

Assembly used in enacting S.B. 249, the total population of North Carolina in 2020 was 10,439,388 people. (See Doc. 184-20 at 2.) North Carolina has 14 congressional districts. Based on these numbers, "[i]f population allocation in [North Carolina] were perfect, each district would have" 745,670.57 people. Abrams v. Johnson, 521 U.S. 74, 98 (1997).

Because the State's population is not divisible by the number of its congressional districts, "absolute population equality" among districts is not possible. Karcher, 462 U.S. at 731–732. There is no way to place 0.57 of a person into a district. So North Carolina did the next best thing. Under the 2025 plan, each district has either 745,670 or 745,671 people. (Doc. 184-20 at 2.) That is, the plan has an "[o]verall population deviation" of one person. See Abrams, 521 U.S. at 98 (explaining that "[o]verall population deviation is the difference in population between the two districts with the greatest disparity"). Williams Plaintiffs have identified no way the General Assembly could have avoided the one-person differences in the 2025 plan's congressional districts.[6] Thus, they have not shown that they are likely to succeed on their malapportionment claim. See Tennant, 567 U.S. at 760.

---

[6] Indeed, NAACP Plaintiffs' expert Anthony Fairfax opines that "[a]ll districts meet the criteria of strict equality required for congressional districts." (Doc. 183-2 at 6.)

Williams Plaintiffs resist this conclusion by asserting that the General Assembly could not rely on the 2020 census data, which no longer accurately reflects the State's population. (Doc. 187 at 22.) They cite more recent population estimates from a U.S. Census Bureau survey, which indicate that North Carolina's population has unevenly increased since 2020. (Id. (citing Docs. 187-12, 187-13).) According to Williams Plaintiffs, because S.B. 249 was "an unnecessary, mid-decade change to districts that had already been enacted by the state legislature," the General Assembly was barred from relying on the "legal fiction" that census data remains accurate for ten years and, without reliable data, could not redistrict at all. (Id.)

We are not persuaded. First, Williams Plaintiffs have presented no evidence showing the current population of the 2025 plan's congressional districts, much less any evidence that any population deviations are constitutionally severe. They submitted two exhibits to the Court, but neither purports to show the population distribution across North Carolina's congressional districts at the time the General Assembly enacted S.B. 249. (See Docs. 187-12, 187-13; Doc. 187 at 22.) Without evidence showing the population of those districts, Williams Plaintiffs have failed to support their claim that the districts are, in their words, "grossly and unjustifiably malapportioned." (Doc. 187 at 21.)

9

Second, and more fundamental, Supreme Court precedent cuts sharply against Williams Plaintiffs' argument that the General Assembly was not entitled to use the 2020 census data in enacting S.B. 249.  (See id. at 21–23.)  In Karcher, after acknowledging that census data is not perfect, the Supreme Court held that, "because the census count represent[ed] the 'best population data available,' it [was] the only basis for good-faith attempts to achieve population equality."  462 U.S. at 738 (emphases added) (quoting Kirkpatrick v. Preisler, 394 U.S. 526, 528 (1969)); see id. ("[T]he census data provide the only reliable—albeit less than perfect—indication of the districts' 'real' relative population levels.").  Any "[a]ttempts to explain population deviations" not reflected in the census data had to "be supported with a precision not achieved" in that case.  Id. (citing Kirkpatrick, 462 U.S. at 535); see Kirkpatrick, 462 U.S. at 535 (explaining that States "may properly consider" post-census population shifts only where they "can be predicted with a high degree of accuracy" and the related findings are "thoroughly documented and applied throughout the State in a systematic, not an ad hoc, manner").  And "before the new census, States operate under the legal fiction that even 10 years later, the plans [relying on the most recent decennial census] are constitutionally apportioned."  Georgia v. Ashcroft, 539 U.S. 461, 488 n.2 (2003).

Nothing in Karcher indicates, as Williams Plaintiffs would have it, that the Court's instruction to rely on official decennial census data depends on whether the redistricting plan at issue is "necessary" and enacted at the beginning of a decade, or "unnecessary" and enacted "mid-decade." (Doc. 187 at 22.) In fact, the plan in Karcher was voluntarily enacted two years after the census to replace an existing, legislatively enacted, post-census plan. See 462 U.S. at 727 (explaining that the congressional plan at issue in Karcher was enacted only because the plan enacted during the immediately preceding legislative session "occasioned significant dissatisfaction among those who felt it diluted minority voting strength in the city of Newark"). Yet the Supreme Court still held that the census data in that case was the "only basis" for good-faith attempts to achieve population equality. Id. at 738. The Court's holding in that factual circumstance is particularly apt here, where the General Assembly enacted S.B. 249 to replace existing, legislatively enacted, post-census districts for CD 1 and 3.

If Karcher leaves any doubt, the Supreme Court's decision in League of United Latin American Citizens v. Perry, 548 U.S. 399 (2006) (LULAC), squarely rejected Williams Plaintiffs' position. There, three years after the 2000 census, Texas replaced a "legal[,] court-drawn" congressional plan with one of its own. Id. at 421 (plurality opinion). Like Williams Plaintiffs here,

11

the plaintiffs in LULAC argued that the State's "mid-decade redistricting for exclusively partisan purposes violate[d] the one-person, one-vote requirement." Id. at 420–421. Their theory was that "because the population of Texas ha[d] shifted since the 2000 census, the 2003 redistricting, which relied on that census, created unlawful interdistrict population variances," which were not justified in the context of a "voluntary, mid-decade . . . redistricting." Id. at 421. In an argument Williams Plaintiffs echo here, the LULAC plaintiffs contended that the aforementioned "legal fiction" "should not provide a safe harbor for a legislature that enacts a voluntary, mid-decade plan," thereby "unnecessarily creating population variance when there was no legal compulsion to do so." Id. (internal quotation marks omitted).

The Supreme Court rejected their claim. As the Court explained, the plaintiffs' argument "turn[ed] not on whether a redistricting furthers equal-population principles but rather on the justification for redrawing a plan in the first place." Id. at 422. In that respect, the plaintiffs' malapportionment argument "merely restate[d] the question whether it was permissible for the Texas Legislature to redraw the districting map" mid-decade for partisan reasons. Id. And that question, in turn, was about "identifying unconstitutional political gerrymanders," which the Court found it lacked "reliable standard[s]" to adjudicate and which failed to state a claim of unconstitutional

12

malapportionment.[7]  Id. at 423.  In other words, the fact that Texas voluntarily redrew its congressional map mid-decade did not override the legal fiction that a map based on decennial census data is lawfully apportioned.

Given Karcher and LULAC, Williams Plaintiffs appear unlikely to succeed on their claim that the General Assembly impermissibly used the 2020 census data to craft CD 1 and 3 in 2025.  Under Karcher, the 2020 decennial census data was the "only basis" on which the General Assembly could rely to make "good-faith attempts to achieve population equality" in the 2025 plan.  462 U.S. at 738.  And LULAC rejected the exact argument that Williams Plaintiffs make here, which would require the General Assembly to justify its decision to undertake a voluntary, mid-decade redistricting "in the first place."  548 U.S. at 422 (plurality opinion).

_____

[7] A majority of the Court joined the plurality's disposition of the malapportionment claim.  Justice Kennedy wrote this portion of the LULAC opinion and was joined by Justice Souter and Justice Ginsburg.  See 548 U.S. at 406.  Chief Justice Roberts and Justice Alito "join[ed] the Court's disposition in [this part of the opinion] without specifying whether [the plaintiffs] ha[d] failed to state a claim on which relief [could] be granted, or ha[d] failed to present a justiciable controversy."  Id. at 493 (Roberts, C.J., concurring in part, concurring in the judgment in part, and dissenting in part).  Justice Scalia and Justice Thomas would have "simply dismiss[ed] [the plaintiffs'] claims as nonjusticiable."  Id. at 512 (Scalia, J., concurring in the judgment in part and dissenting in part).  After Rucho v. Common Cause, 139 S. Ct. 2484, 2506–2507 (2019), we know that partisan gerrymandering claims are nonjusticiable.

13

Williams Plaintiffs' attempts to distinguish LULAC are unconvincing. It is true, as Williams Plaintiffs point out, that LULAC dealt with Texas's replacement of a court-ordered plan and not, as is the case here, a legislatively enacted one. See id. at 421. But the Supreme Court's rejection of the plaintiffs' malapportionment challenge did not turn on whether the map being replaced had judicial or legislative origins. See id. at 420–423; see also League of United Latin Am. Citizens v. Abbott, No. 3:21-cv-00259, slip op. at 8 (W.D. Tex. Sept. 30, 2025) (order granting motion to dismiss) ("Despite the [LULAC] Court's fractured opinions, the Court did not call into question the 'basic principles' of 'how congressional districts are to be drawn,' including the fact that '[w]ith respect to a mid-decade redistricting to change districts drawn earlier in conformance with a decennial census, the Constitution and Congress state no explicit prohibition.'" (quoting LULAC, 548 U.S. at 414–415 (opinion of Kennedy, J.)).

We also acknowledge Williams Plaintiffs' observation that "[t]he Supreme Court has never [explicitly] applied th[e] legal fiction [that the census count remains accurate throughout the decade] to uphold a[ voluntary] change to districts that had already been enacted by the state legislature." (Doc. 187 at 22 (emphasis added).) But the converse is also true: Williams Plaintiffs identify no case in which the Supreme Court (or any

14

court) has invalidated a State's congressional map on the ground that it impermissibly relied on the most recent decennial census data.  We decline to chart that path here.

For these reasons, we conclude that Williams Plaintiffs have not made a clear showing that they are likely to succeed in proving that the 2025 plan is unconstitutionally malapportioned.  We therefore deny Williams Plaintiffs' request for a preliminary injunction on that claim.

**B. First Amendment Claims and Fourteenth Amendment Partisanship Claim**

We next turn to both sets of Plaintiffs' First Amendment claims and Williams Plaintiffs' Fourteenth Amendment "partisanship claim."[8]  (See Doc. 180 at Counts 10 and 11; Doc. 181 at Count IV.) The gist of Plaintiffs' claims is that the General Assembly violated the Constitution by engaging in mid-decade redistricting to punish them for being Democrats, and to favor Republicans, without a legitimate reason for doing so.  For their First Amendment claims, NAACP Plaintiffs argue that North Carolina's "mid-decade redistricting . . . retaliate[s] against voters . . .

---

[8] The section of Williams Plaintiffs' motion asserting that "[t]he General Assembly's intentional use of racial and partisan data in creating the 2025 Plan violates the . . . Fourteenth Amendment[]" is less than clear.  (Doc. 187 at 23–26.)  To the extent they are claiming intentional discrimination on the basis of race, we address that claim in Part III.C.  For now, we construe their argument as asserting that the use of partisanship data violates the Fourteenth Amendment's Equal Protection Clause.

15

for voting a particular way, for associating with like-minded voters to support candidates that would speak to common interests and values, and for petitioning their government against Defendants' redistricting initiatives." (Doc. 183 at 10–11.) They further contend that the State's "decision to redraw the map to stall and block resolution of Plaintiffs' 2023 redistricting challenge is also a standalone violation of the First Amendment's Petition Clause."[9] (Id. at 22.) Relatedly, Williams Plaintiffs claim that the General Assembly's use of partisanship data to draw the 2025 plan violates the First Amendment's prohibition on retaliation and viewpoint discrimination. (Doc. 187 at 25.) And lastly, Williams Plaintiffs assert (or at least imply) that the use of partisanship data also violates the Fourteenth Amendment's Equal Protection Clause. (Id. at 23–26.)

Plaintiffs have not made a clear showing that they are likely to succeed on the merits of any of these claims. Claims of excessive partisanship in redistricting present political

_____

[9] NAACP Plaintiffs' supplemental complaint alleges two counts under the First Amendment's Petition Clause. (See Doc. 180 at 38–43.) Count 11 asserts that Defendants violated the Petition Clause by enacting S.B. 249 to "avoid a final judgment" in Plaintiffs' lawsuit challenging to the 2023 plan. (Id. at 39.) Count 12 alleges that Defendants violated the Petition Clause by severing Plaintiffs from their previous congressional representatives and fellow constituents. (Id. at 43.) At the hearing, counsel confirmed that NAACP Plaintiffs are seeking a preliminary injunction only on Count 11, not Count 12.

16

questions not suitable for resolution in federal courts. Rucho, 139 S. Ct. at 2506-2507. And the Supreme Court has rejected the argument that a mid-decade redistricting undertaken for partisan reasons presents an exception to this rule. LULAC, 548 U.S. at 416-420 (opinion of Kennedy, J.); id. at 493 (Roberts, C.J., concurring in part, concurring in the judgment in part, and dissenting in part); id. at 511-512 (Scalia, J., concurring in the judgment in part and dissenting in part). As explained below, the Supreme Court's decisions in Rucho and LULAC present formidable obstacles to Plaintiffs' claims. In response, Plaintiffs have failed to show that their claims are not likely to be foreclosed by the Supreme Court's decisions on the ground that they are essentially complaints about partisan gerrymandering. In other words, Plaintiffs have not shown that their First Amendment claims and Fourteenth Amendment partisanship claim are likely to be justiciable, much less successful.

In Rucho, the Supreme Court considered whether "partisan gerrymanders" alleged to have "violated the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, the Elections Clause, and Article I, § 2, of the Constitution" presented a justiciable case or controversy under the Constitution. 139 S. Ct. at 2491. Despite the various stylings of the claims, the Court's holding was succinct: the plaintiffs' claims were essentially complaints about partisan gerrymandering, and

17

"partisan gerrymandering claims present political questions beyond the reach of the federal courts."  Id. at 2506–2507.

The Court explained that, over the decades, "[p]artisan gerrymandering claims have proved . . . difficult to adjudicate." Id. at 2497.  "The basic reason is that, while it is illegal for a jurisdiction to depart from," for example, "the one-person, one-vote rule, or to engage in racial discrimination in districting, 'a jurisdiction may engage in constitutional political gerrymandering.'" Id. (quoting Hunt v. Cromartie, 526 U.S. 541, 551 (1999)).  The question for partisan gerrymandering claims, thus, is not whether a state legislature may consider partisanship in redistricting.  It may.  See id. at 2497–2498; see also id. at 2502 ("A partisan gerrymandering claim cannot ask for the elimination of partisanship.").  Instead, "the question is one of degree: How to 'provid[e] a standard for deciding how much partisan dominance is too much.'" Id. at 2498 (emphasis added) (quoting LULAC, 548 U.S. at 420 (opinion of Kennedy, J.)); see also id. at 2497 ("The central problem . . . is determining when political gerrymandering has gone too far." (internal quotation marks omitted)).  And because there are no manageable standards for determining whether redistricting plans have gone too far in considering partisanship, the Court rejected all of the plaintiffs' claims, including those asserting First Amendment

18

violations, id. at 2504–2506, and intentional vote dilution in violation of the Fourteenth Amendment, id. at 2502–2504.

Rucho directly implicates Plaintiffs' claims. In essence, Plaintiffs take issue with the General Assembly enacting S.B. 249 to favor Republicans, which Plaintiffs claim retaliated and discriminated against them as Democrats. (See Doc. 183 at 12–15 (NAACP Plaintiffs emphasizing that the General Assembly was motivated by Plaintiffs' support for Democrats); Doc. 187 at 23–26 (Williams Plaintiffs objecting to the General Assembly's consideration of "partisanship data" and "dilut[ing] . . . the votes of members of the rival political group").) As the Supreme Court has held, such claims "present political questions beyond the reach of the federal courts." Rucho, 139 S. Ct. at 2506–2507; Alexander v. S.C. State Conf. of the NAACP, 144 S. Ct. 1221, 1233 (2024) ("[C]laims that a map is unconstitutional because it was drawn to achieve a partisan end are not justiciable in federal court.").

Plaintiffs cannot avoid Rucho by styling their claims as First and Fourteenth Amendment violations. To the extent that Williams Plaintiffs argue the General Assembly violated the Fourteenth Amendment by considering partisanship data to dilute the votes of Democratic voters, that claim is likely foreclosed by Rucho. (See Doc. 187 at 23–26.) Indeed, the Supreme Court in Rucho reversed a lower court's ruling that a state legislature had violated the

19

Fourteenth Amendment by drawing districts that "intentionally dilut[ed] the voting strength of Democrats." 139 S. Ct. at 2502. The Supreme Court found that the Fourteenth Amendment provided no manageable standards to judge when consideration of partisanship went too far. See id. at 2502-2504; see also id. at 2502-2503 ("[D]etermining that lines were drawn on the basis of partisanship does not indicate that the districting was improper. A permissible intent—securing partisan advantage—does not become constitutionally impermissible . . . when that permissible intent 'predominates.'").

Plaintiffs' First Amendment claims falter under Rucho as well. The Supreme Court considered First Amendment claims which, like Plaintiffs' claims here, alleged an "intent to burden individuals based on their voting history or party affiliation," a "burden on political speech or associational rights," and "retaliat[ion] against supporters of Democratic candidates on the basis of their political beliefs." Id. at 2492, 2504. Despite the First Amendment framing, the Court found these claims were nonjusticiable. As an initial matter, the Court explained that "there are no restrictions on speech, association, or any other First Amendment activities in the districting plans at issue." Id. at 2504. "The plaintiffs are free to engage in those activities no matter what the effect of a plan may be on their district." Id. Plaintiffs offer no reason that the same is not

20

true in this case. Further, the Court rejected the plaintiffs'
theory "that partisanship in districting should be regarded as
simple discrimination against supporters of the opposing party on
the basis of political viewpoint." Id. "Under that theory, any
level of partisanship in districting would constitute an
infringement of their First Amendment rights." Id. Such an
approach "provides no standard for determining when partisan
activity goes too far." Id. (emphasis added). Despite asserting
various harms from the 2025 plan, NAACP Plaintiffs offer no
convincing reason why Rucho does not foreclose reliance on the
First Amendment retaliation test they propose we follow here. (See
Doc. 183 at 10–19.)

Nor do NAACP Plaintiffs offer any basis for distinguishing
their First Amendment claim to the extent it alleges infringement
of the right to petition. (Doc. 183 at 22 ("The right to petition
works hand-in-hand with other First Amendment rights.").) True,
the Rucho Court did not have a Petition Clause claim before it.
(See Doc. 204 at 6.) But as NAACP Plaintiffs seem to acknowledge,
their Petition Clause claim seeks to vindicate typical First
Amendment interests. (Doc. 180 at 39 (asserting that the General
Assembly frustrated their ability to "contribut[e] . . . to the
ideas and beliefs of our society" and "facilitate . . . informed
public participation" through their lawsuit challenging the 2023
plans (internal quotation marks omitted)).) Just like the First

21

Amendment claims at issue in <u>Rucho</u>, however, NAACP Plaintiffs'
invocation of the First Amendment right to petition fails to
provide the requisite "standard for determining when partisan
activity goes too far."[10]  139 S. Ct. at 2504.

Although Plaintiffs do not appear to advance a freestanding
claim that S.B. 249 violates the Elections Clause, NAACP Plaintiffs
would have us rely on <u>Cook v. Gralike</u>, 531 U.S. 510 (2001), for
the proposition that the Elections Clause is not a source of power

_____

[10] To the extent that NAACP Plaintiffs pursue preliminary
relief on a claim that, even apart from the legislature's allegedly
retaliatory partisan motive, S.B. 249 violates the Petition Clause
by stalling the final resolution of this lawsuit, they have failed
to show that they are likely to succeed on the merits of that
claim.  The First Amendment's Petition Clause prohibits laws
"abridging . . . the right . . . to petition the Government for a
redress of grievances."  U.S. Const. amend. I.  The Clause extends
to "the right of individuals to appeal to courts and other forums
established by the government for resolution of legal disputes."
<u>Borough of Duryea v. Guarnieri</u>, 564 U.S. 379, 387 (2011); <u>Bill
Johnson's Rests., Inc. v. NLRB</u>, 461 U.S. 731, 743 (1983)
(explaining that the Clause protects "[t]he filing and prosecution
of a well-founded lawsuit").  But NAACP Plaintiffs provide no
authority for their admittedly "novel" proposition that a State's
decision to amend a law that is the subject of a pending lawsuit
abridges the plaintiff's right to petition the courts when the
amendment stalls the final resolution of the plaintiff's claims.
(Doc. 213 at 7; <u>see</u> Doc. 183 at 22–25.)  The lack of supportive
authority is telling, given that state legislatures not
infrequently moot or otherwise affect pending challenges to state
statutes by amending those statutes after litigation commences.
<u>See, e.g.</u>, <u>N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New
York</u>, 140 S. Ct. 1525 (2020); <u>Holloway v. City of Va. Beach</u>, 42
F.4th 266 (4th Cir. 2024).  Courts have tools to address state
action that threatens to moot a plaintiff's claim or render final
judgment impossible before an election.  NAACP Plaintiffs cite no
case, however, that suggests striking down a redistricting map as
a violation of the Petition Clause is one of them.

"'to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints,'" which they allege the General Assembly did here. (Doc. 183 at 19 (quoting Cook, 531 U.S. at 523).) According to NAACP Plaintiffs, just like labeling ballots to put certain candidates "at a political disadvantage" is unlawful, Cook, 531 U.S. at 525, so too is redistricting based on voters' political leanings. (Doc. 183 at 20.)

However, Rucho again likely forecloses Plaintiffs' argument. In Rucho, the Supreme Court held that "neither § 2 nor § 4 of Article I 'provides a judicially enforceable limit on the political considerations that the States and Congress may take into account when districting.'" 139 S Ct. at 2506 (quoting Vieth v. Jubelirer, 541 U.S. 267, 305 (2004) (plurality opinion)). Cook did not concern redistricting, and we decline to read into Cook a principle that politically motivated redistricting exceeds the scope of the Elections Clause, which would directly contradict Rucho.

Plaintiffs attempt to avoid Rucho's broad holding that claims of excessive partisanship in redistricting are nonjusticiable by arguing that the "initial decision to redraw the map was itself illegitimate." (Doc. 183 at 20.) Plaintiffs' theory proceeds as follows: They acknowledge that, under Rucho, the General Assembly would ordinarily be able to consider partisanship in redistricting. (See Doc. 183 at 11; Doc. 187 at 24.) However,

23

they contend that, in order to do so, the General Assembly had to have a "valid, non-retaliatory reason to engage in the 2025 redistricting at all." (Doc. 183 at 15; see also Doc. 187 at 25 (arguing that there had to be a "legal necessity that either requires or permits the consideration of . . . partisanship to draw a new map").) As NAACP Plaintiffs put it, "this case concerns not how lines are drawn, but whether the decision to redraw the map was itself legitimate."[11] (Doc. 183 at 11.) Reapportioning districts after the decennial census and remedying a map invalidated by a court are legitimate reasons to engage in redistricting. (See id. at 14–15; Doc. 187 at 24–25.) But, according to Plaintiffs, voluntarily redrawing a map mid-decade for partisan advantage is not. (Doc. 183 at 20; Doc. 187 at 25.)

---

[11] We have doubts about the proposition that this case does not concern "how lines are drawn." (Doc. 183 at 11 (emphasis omitted).) NAACP Plaintiffs' motion lists a slew of "adverse actions" the 2025 plan imposes, including reassigning individual plaintiffs to different districts, "depriving Plaintiffs of representation by their longtime member of Congress," severing Plaintiffs' community ties, and "dismantling . . . the highly cohesive community of Black voters (including Plaintiffs) in the Black Belt." (Id. at 16–18.) All those harms occur by virtue of "how lines are drawn" in the 2025 plan. (Id. at 11.) Thus, contrary to their assertions, Plaintiffs' claims seem to stem from how the General Assembly drew the lines of CD 1 and 3. But even accepting NAACP Plaintiffs' representation that this case is about the General Assembly's decision to redistrict in the first place, they have not shown that this claim is likely to surmount the obstacles imposed by Rucho and LULAC.

24

In other words, partisanship has gone too far when it is the legislature's reason for redistricting in the first place.

This angle doesn't help Plaintiffs, because the Supreme Court in LULAC considered and rejected an argument almost identical to the one Plaintiffs make here. The plaintiffs there argued that a voluntary "mid-decennial redistricting, when solely motivated by partisan objectives," was unconstitutional. 548 U.S. at 416–417 (opinion of Kennedy, J.); see id. at 417 (emphasizing that the legislature had no "obligation to act at all" because the pre-existing plan "itself was designed to comply with new census data"). They urged "[a] rule, or perhaps a presumption, of invalidity when a mid-decade redistricting plan is adopted solely for partisan motivations," emphasizing that such a test "does not quibble with the drawing of individual district lines but challenges the decision to redistrict at all." Id.

The Supreme Court rejected the plaintiffs' claim. Writing for himself, Justice Kennedy explained that "a successful claim attempting to identify unconstitutional acts of partisan gerrymandering must do what [the plaintiffs'] sole-motivation theory explicitly disavows: show a burden, as measured by a reliable standard, on the complainants' representational rights."[12]

_____

[12] Two Justices joined Justice Kennedy's "disposition" of this claim "without specifying whether [the plaintiffs] ha[d] failed to state a claim on which relief [could] be granted, or ha[d] failed

25

Id. at 418.  The voluntary, mid-decade nature of the redraw did not supply a reliable standard, because "the fact of mid-decade redistricting alone is no sure indication of unlawful political gerrymanders."  Id. at 419.  Thus, even when the Supreme Court believed some partisan gerrymandering claims might be justiciable, it ruled out a claim predicated on the fact of a voluntary, mid-decade redraw.  And in Rucho, the Court subsequently held that all partisan gerrymandering claims are nonjusticiable, without making any distinction among redistricting plans based on when they were enacted.  See 139 S. Ct. at 2506-2507; see id. at 2498 (acknowledging that the LULAC Court "could not find a justiciable standard for resolving the plaintiffs' partisan gerrymandering claims" challenging "a mid-decade redistricting map").

LULAC severely undermines Plaintiffs' argument here, which similarly boils down to a rule "of invalidity when a mid-decade redistricting plan is adopted solely for partisan motivations." 548 U.S. at 417 (opinion of Kennedy, J.).  Plaintiffs offer no basis, either in case law or the Constitution, for such a rule.

---

to present a justiciable controversy."  548 U.S. at 492-493 (Roberts, C.J., joined by Alito, J., concurring in part, concurring in the judgment in part, and dissenting in part).  Another two Justices would have "dismiss[ed] [the plaintiffs'] claims as nonjusticiable."  Id. at 511-512 (Scalia, J., joined by Thomas, J., concurring in the judgment in part and dissenting in part).  A majority of the Court, therefore, rejected the plaintiffs' challenge to Texas's voluntary, partisan, mid-decade redistricting.

26

There is no question that a State "'may engage in constitutional political gerrymandering'" when drawing a congressional map. Rucho, 139 S. Ct. at 2497 (quoting Cromartie, 526 U.S. at 551). And Plaintiffs identify no authority limiting a State's power to redistrict mid-decade. See LULAC, 548 U.S. at 415 (opinion of Kennedy, J.) ("With respect to a mid-decade redistricting to change districts drawn earlier in conformance with a decennial census, the Constitution and Congress state no explicit prohibition."). If a State can (1) engage in partisan gerrymandering and (2) redistrict mid-decade, it follows that a State can engage in partisan gerrymandering mid-decade. The only question "is 'determining when political gerrymandering has gone too far.'" Rucho, 139 S. Ct. at 2497 (quoting Vieth, 541 U.S. at 296 (plurality opinion)); accord LULAC, 548 U.S. at 418 (opinion of Kennedy, J.). But that question, as the Supreme Court made clear in Rucho, is "beyond the reach of the federal courts." 139 S. Ct. at 2506–2507.

Plaintiffs attempt to distinguish LULAC on the ground that the Texas legislature was replacing a court-ordered plan and not, as is the case here, a legislatively enacted one. They note Justice Kennedy's observation that "if a legislature acts to replace a court-drawn plan with one of its own design, no presumption of impropriety should attach to the legislative decision to act." 548 U.S. at 416; accord id. at 418–419. From

27

this statement, Plaintiffs would have us hold that if a legislature replaces its _own_ map with a new one motivated solely by partisan concerns, then a presumption of invalidity _does_ attach. (See Doc. 183 at 20-21; Doc. 187 at 24-25.) But nothing in LULAC, or any other authority Plaintiffs identify, supports such a holding. As Justice Kennedy said, "the fact of mid-decade redistricting alone" is not a reliable indicator of an unlawful political gerrymander. 548 U.S. at 419. And as the Court subsequently clarified in Rucho, "no legal standards" exist for identifying unlawful partisanship in redistricting. 139 S. Ct. at 2507.

For all these reasons, we find that Plaintiffs have failed to make a clear showing that their First Amendment claims and Fourteenth Amendment partisanship claim are likely justiciable and likely to succeed on the merits. We therefore deny their motions for a preliminary injunction on those claims.

### C. Fourteenth Amendment Intentional Discrimination

We turn finally to Williams Plaintiffs' claim that S.B. 249 intentionally dilutes the voting strength of black North Carolinians living in CD 1 and 3 in violation of the Fourteenth Amendment's Equal Protection Clause.[13] (See Doc. 187 at 7-26; Doc.

---

[13] NAACP Plaintiffs do not move for a preliminary injunction based on their claims of intentional vote dilution in violation of the Fourteenth and Fifteenth Amendments or Section 2 of the VRA. (See Doc. 180 at Counts 13 and 14.)

181 at Count I.)  The Equal Protection Clause prohibits "enact[ing] a particular voting scheme as a purposeful device 'to minimize or cancel out the voting potential of racial or ethnic minorities.'" Miller v. Johnson, 515 U.S. 900, 911 (1995) (quoting Mobile v. Bolden, 446 U.S. 55, 66 (1980)).  To succeed on such a claim, a challenger "must show that the State's districting plan 'has the purpose and effect' of diluting the minority vote."  Alexander, 144 S. Ct. at 1252 (quoting Shaw v. Reno, 509 U.S. 630, 649 (1993) (Shaw I)).  Disparate impact alone is not enough.  See id.

In evaluating a State's intent, a court must begin with a "presumption of legislative good faith."  Abbott, 138 S. Ct. at 2324; see Miller, 515 U.S. at 915.  That presumption "directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions."  Alexander, 144 S. Ct. at 1235–1236.  This directive is particularly relevant "when race and partisan preference are highly correlated."  Id. at 1233.  "When partisanship and race correlate, it naturally follows that a map that has been gerrymandered to achieve a partisan end can look very similar to a racially [motivated] map."  Id. at 1235.  But "[a]s far as the Federal Constitution is concerned, a legislature may pursue partisan ends when it engages in redistricting."  Id. at 1233; see Rucho, 139 S. Ct. at 2497.  Given the "complex interplay of forces that enter a legislature's redistricting

29

calculus," we must "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." Miller, 515 U.S. at 915-916. And we must be careful of attempts to "infer a racial motive" from "the racial effects of a political gerrymander in a jurisdiction in which race and partisan preference are very closely correlated." Alexander, 144 S. Ct. at 1241-1242.

The plaintiff bears the "burden to overcome the presumption of legislative good faith" and show that the legislature "acted with invidious intent." Abbott, 138 S. Ct. at 2325. The intent inquiry proceeds in two steps. First, the plaintiff must demonstrate that racial discrimination—here, the discriminatory purpose to dilute the voting potential of a racial minority—was a "'substantial' or 'motivating' factor behind enactment of the law." Hunter v. Underwood, 471 U.S. 222, 228 (1985). The plaintiff need not prove that "the challenged action rested solely on racially discriminatory purposes." Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265 (1977). And direct evidence of discriminatory intent is not required. See Rogers v. Lodge, 458 U.S. 613, 618 (1982). Instead, discriminatory intent may "be inferred from the totality of the relevant facts." Washington v. Davis, 426 U.S. 229, 242 (1976).

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."

30

Arlington Heights, 429 U.S. at 266. To make that determination, courts often consider the four evidentiary sources the Supreme Court identified in its Arlington Heights decision: "(1) historical background; (2) the specific sequence of events leading to the law's enactment, including any departures from the normal legislative process; (3) the law's legislative history; and (4) whether the law 'bears more heavily on one race than another.'" N.C. State Conf. of the NAACP v. Raymond, 981 F.3d 295, 303 (4th Cir. 2020) (quoting Arlington Heights, 429 U.S. at 265-269); see also Brnovich v. Democratic Nat'l Comm., 141 S. Ct. 2321, 2349 (2021).

If the plaintiff proves discriminatory intent was a motivating factor, then at the second step of the inquiry "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without" racial discrimination. Hunter, 471 U.S. at 228. Only at this point, after "there is a proof that a discriminatory purpose has been a motivating factor in the decision," is judicial deference to the legislature "no longer justified." Arlington Heights, 429 U.S. at 265-266. At this step, a court "must 'scrutinize the legislature's actual nonracial motivations to determine whether they alone can justify the legislature's choices.'" Raymond, 981 F.3d at 303 (quoting N.C. State Conf. of NAACP v. McCrory, 831 F.3d 204, 221 (4th Cir.

31

2016)).  If the State cannot make such a showing, then discriminatory purpose has been established.

An intentional vote dilution claim also requires proof that "the State's districting plan 'has the . . . effect' of diluting the minority vote." Alexander, 144 S. Ct. at 1252 (quoting Shaw I, 509 U.S. at 649).  To prove a dilutive effect, a plaintiff must "produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice." White v. Regester, 412 U.S. 755, 766 (1973); see, e.g., Rogers, 458 U.S. at 622-627.  "[I]t is not enough that the racial group allegedly discriminated against has not had legislative seats in proportion to its voting potential." White, 412 U.S. at 765-766.

As discussed below, we conclude that Williams Plaintiffs, at this stage of the case, have failed to make a clear showing that the General Assembly likely enacted S.B. 249 with the intent to "minimize or cancel out the voting potential" of black North Carolinians living in CD 1 or 3.  Miller, 515 U.S. at 911 (internal quotation marks omitted).  We therefore deny their motion for a preliminary injunction on their Fourteenth Amendment intentional vote dilution claim.

32

## 1. Lack of Direct Evidence of Intent to Discriminate

We begin with the direct evidence concerning the General Assembly's motivation for enacting S.B. 249. Though not fatal to their claim, see Rogers, 458 U.S. at 618, Williams Plaintiffs have presented no direct evidence that the General Assembly enacted S.B. 249 to discriminate against black North Carolinians. Instead, the direct evidence shows that the 2025 redistricting was motivated by partisan purposes.

On October 13, 2025, Senator Phil Berger—the President Pro Tempore of the North Carolina Senate—announced that the General Assembly would redraw the State's congressional map to "safeguard[] Republican control of Congress." (Doc. 184-5 at 3.) In August, Texas had passed a congressional plan aiming to add five Republican seats to the State's congressional delegation, which triggered responses and counter-responses across States from California to Missouri to Maryland. (See Doc. 201-1.) Senator Ralph Hise, who drew North Carolina's 2025 congressional map, explained the Republican sentiment that, historically, Democratic-controlled States had achieved more by gerrymandering than Republican-controlled States. (Doc. 201-2 at 9:5-10:23; see Doc. 187 at 16; Doc. 205-1 at 33:5-6.) He encouraged the General Assembly "to respond to this environment and not let these tactics that have happened in blue states dominate the control of [C]ongress." (Doc. 201-2 at 10.) North Carolina's legislative

33

leaders similarly explained that "[p]icking up where Texas left off, we will hold votes in our October session to redraw North Carolina's congressional map to ensure Gavin Newsom [the Governor of California] doesn't decide the congressional majority." (Doc.184-5 at 3; see id. (describing North Carolina's plan "to block the efforts of blue state Democrats to take control of Congress from Republicans").)

The 2025 congressional plan criteria reflected the General Assembly's partisan intention. The criteria stated: "The principal legislative objective in the 2025 Congressional Plan is to increase the Republican vote share of Congressional District 1 to outperform the same district in the 2023 Congressional plan." (Doc. 184-10 at 2.) "In doing so, only the boundaries of Congressional District 1 and Congressional [District] 3 will be altered." (Id.) The criteria further stated that the General Assembly "will not engage in discriminatory, race-based districting" and that "data identifying the race of individuals or voters shall not be used in the drafting of districts in the 2025 Congressional Plan." (Id.)

Senator Hise has consistently represented that he followed the 2025 plan criteria in drawing the new map. When introducing the plan to the Senate Elections Committee, Senator Hise stated that "the motivation behind this redraw is simple and singular: Draw a new map that will bring an additional Republican seat to

34

the North Carolina congressional delegation." (Doc. 205-1 at 4:1-5.) He also assured the Committee that "absolutely no racial data was used in the creation of [the 2025] map." (Id. at 5:4-6.) He repeated that assurance before the Committee and multiple times on the Senate floor. (See id. at 33:2-6, 41:19-23; Doc. 205-2 at 9:21-22; Doc. 205-3 at 9:24-10:12.) Likewise, at the preliminary injunction hearing in this case, Senator Hise testified that he did not use any racial data in drawing the 2025 plan, that racial data was not loaded into the computers that were used to draw the plan, and that his sole goal in drawing the 2025 plan was to achieve partisan advantage for Republicans. We find Senator Hise's testimony credible.[14]

Senator Hise also explained the General Assembly's decision to focus on CD 1 and 3. Specifically, Senator Hise testified that he targeted CD 1 because that district was the least Democratic district in North Carolina (with a near 50% Republican vote share) that still performed for Democrats. At the same time, CD 3—immediately adjacent to CD 1—was one of the safest Republican districts, with Republican performance near 60%. The General

---

[14] We recently found Senator Hise's testimony about the 2023 redistricting process credible (Doc. 209 at 26), as did another district court, see Pierce v. N.C. State Bd. of Elections, No. 4:23-cv-193, 2025 WL 2841008, at *9 (E.D.N.C. Sept. 30, 2025). We find unconvincing Williams Plaintiffs' attempts to discredit Senator Hise based on attenuated inferences from different cases.

35

Assembly could thus swap Democrats in CD 1 with Republicans in CD 3, making two safe Republican districts, while avoiding spillover effects into other districts. Analysis from Defendants' expert Dr. Michael Barber confirms Senator Hise's description. (See Doc. 201-5 at 13 ("District 1 in the 2024 map was the least Democratic district held by a Democratic incumbent in the state while District 3 was among the most safely Republican districts under the 2024 map.").)

Senator Hise testified about the process for shifting the boundaries of CD 1 and 3. He focused on moving whole counties, not individuals. He assessed how the counties in CD 1 and 3 performed politically, mainly focusing on the results of the 2024 presidential race. His goal was to swap counties such that both CD 1 and CD 3 would be as close as possible to having a 55% Republican vote share. After moving whole counties, Senator Hise testified, he had to move approximately 4,800 individuals from Onslow County into CD 1 to achieve population equality between districts. (See Doc. 184-20 at 34.)

Both sides' experts agree that Senator Hise achieved the General Assembly's partisan goal. CD 1, a previously Democratic district, now leans Republican, and CD 3, a previously solid Republican district, also leans Republican, even if less so than before. (Doc. 201-5 at 4, 13, 18 (report of Defendants' expert Dr. Barber); Doc. 187-2 at 11 (report of Williams Plaintiffs'

36

expert Dr. Jonathan Rodden).) According to Dr. Barber, CD 1 went from having an average partisan index of 49.6% Republican under the 2023 plan to having an average partisan index of 53.9% Republican under the 2025 plan. (Doc. 201-5 at 13.) At the same time, CD 3 went from an average partisan index of 59.2% Republican under the 2023 plan to an average partisan index of 54.7% Republican under the 2025 plan. (Id.) That is, both districts are now safely Republican under the 2025 plan, which was the main objective for the 2025 redistricting. (Doc. 184-10 at 2.)

Williams Plaintiffs argue that Senator Hise's insistence that he did not consider race in drawing the 2025 plan "should carry no weight here" because he "is no stranger to North Carolina map drawing, to the state's racial demographics, [and] to redistricting litigation." (Doc. 187 at 21.) The evidence supports their contention that Senator Hise was likely aware that CD 1 contained a more significant minority population than the state average. However, "there is nothing nefarious about [a map drawer's] awareness of the State's racial demographics." Alexander, 144 S. Ct. at 1251. Indeed, "'redistricting legislatures will . . . almost always be aware of racial demographics.'" Id. at 1242 (quoting Miller, 515 U.S. at 916)). But "being aware of racial considerations" is different from "being motivated by them," and "[t]he former is permissible." Allen v. Milligan, 143 S. Ct. 1487, 1510 (2023) (internal quotation marks

37

omitted).  Thus, we will not discount Senator Hise's testimony because he is aware of the State's demographics.

As of now, the direct evidence shows that partisanship, not race, motivated the reconfiguration of CD 1 and 3.  Faced with a lack of direct evidence showing discriminatory intent, Williams Plaintiffs rely heavily on the Arlington Heights factors.  (Doc. 187 at 7–23.)  We turn to consider those now.

### 2.  Disparate Impact of the 2025 Plan

Whether and to what extent the 2025 plan "bears more heavily" on black voters can provide a relevant "starting point" in the search for circumstantial evidence of discriminatory intent. Arlington Heights, 429 U.S. at 266 (internal quotation marks omitted).  Though Williams Plaintiffs have produced evidence of a disparate effect, at this point the evidence does not support an inference that the legislature "acted with invidious intent." Abbott, 138 S. Ct. at 2325.

Williams Plaintiffs have shown that black-preferred candidates are likely to be less successful in CD 1 under the 2025 plan than they were under the 2023 plan.  Using an ecological inference model, Williams Plaintiffs' expert Dr. Maxwell Palmer found that black voters in CD 1 and 3 are highly cohesive.  In an analysis of 63 statewide elections from 2016 to 2024, Dr. Palmer found that an average of 97.2% of black voters "in the combined 1st and 3rd Congressional District area" supported the same

38

candidate. (Doc. 187-3 at 3-4.) Similar results followed when Dr. Palmer considered CD 1 and 3 individually. In CD 1 alone, an average of 96.5% of black voters supported the same candidate, and in CD 3 alone, an average of 97.5% of black voters supported the same candidate. (Id.)

Dr. Palmer assessed black-preferred candidates' performance in CD 1 and 3 under the 2023 and 2025 plans using the results of the 63 statewide elections. (Id. at 5-6.) In Dr. Palmer's analysis, under the 2023 plan, the black-preferred candidate in CD 1 won an average of 46 of the 63 elections, or 73% of contests. (Id. at 6.) Under the 2025 plan, however, the black-preferred candidate in CD 1 won only 7 of the 63 elections, or 11%. (Id.) In CD 3 under the 2023 plan, the black-preferred candidate won none of the 63 elections (0%), but under the 2025 plan, the black-preferred candidate won 3 of the 63 elections (4.8%). (Id.) In other words, based on the election data studied, the 2025 plan makes it less likely that black-preferred candidates will win in CD 1, while making it more likely that black-preferred candidates will win in CD 3. (See id.) But the likelihood of success for black-preferred candidates in either district is slim.

Dr. Palmer also compared black and white voters' respective ability to elect their preferred candidate in the 63 statewide elections he analyzed. (Id. at 6-7.) Under the 2023 plan, he estimated that an average of 40.3% of black voters lived in a

39

congressional district in which their preferred candidate won a majority of the vote, while an average of 68.5% of white voters lived in such a district. (Id. at 7.) Under the 2025 plan, however, the average percentage of black voters who lived in a district in which their preferred candidate won a majority of the vote dropped to 32.0% (a decrease of 8.3 percentage points), while the average percentage of white voters who lived in such a district increased to 70.7%. (Id. at 7.)

We do not doubt that these results—unrebutted by Defendants—show that the 2025 plan bears more heavily on black voters than it does on white voters in CD 1. See Arlington Heights, 429 U.S. at 266. However, we disagree with Williams Plaintiffs that the results indicate the General Assembly enacted S.B. 249 with discriminatory intent. Instead, the results are consistent with the General Assembly's admitted motivation "to increase the Republican vote share of Congressional District 1 to outperform the same district in the 2023 Congressional plan." (Doc. 184-10 at 2.) Dr. Palmer does not claim that the results in his report can show discriminatory intent. And as far as the Court can tell, the report shows the same trend that Dr. Palmer admitted his reports on the 2023 redistricting showed: "that . . . the electoral success of black-preferred candidates is, without exception, coextensive with the electoral success of Democrats." (Doc. 209 at 96–97.) Decreased success for black-preferred candidates,

40

therefore, is consistent with the General Assembly's stated intent to decrease the success of Democrats in CD 1.

Williams Plaintiffs' remaining arguments about disparate impact similarly do not suggest that the General Assembly enacted S.B. 249 with discriminatory intent. For example, Williams Plaintiffs emphasize that, according to the analysis of their expert Dr. Jonathan Rodden, the black voting-age population ("BVAP") of CD 1 decreased by about 8 percentage points from the 2023 plan to the 2025 plan. (Doc. 187 at 9–11 (citing Doc. 187-2 at 9–10).) Meanwhile, Democratic vote share in CD 1 dropped approximately 4 percentage points between the plans. Because the BVAP change in CD 1 is "double the drop in the percentage of Democratic voters," Williams Plaintiffs infer that the General Assembly did not undertake "a purely partisan-driven approach." (Id. at 13.)

At this stage, we are not convinced that the difference between the change in BVAP and the change in Democratic vote share shows that the General Assembly intentionally moved black voters (as opposed to Democrats) out of CD 1 and into CD 3. Dr. Barber opined that Williams Plaintiffs' experts' "expectation of a one-to-one correspondence between racial and partisan shifts" was unreasonable because, in drawing the 2025 plan, Senator Hise largely moved whole counties—not individuals. (Doc. 201-5 at 14–15.) Those counties are both "politically distinct" and

41

"demographically mixed." (Id. at 15.) For the change in BVAP to match the change in Democratic vote share, "a map drawer would have to specifically target Black Democrats and White Republicans for movement between the two districts." (Id.) But "[t]here does not appear to be evidence of that in the 2025 plan." (Id.)

In other words, Williams Plaintiffs' experts have not shown that the difference between the change in BVAP and the change in Democratic vote share is anything other than an unintentional artifact of political and racial geography in the region. We further note that none of the counties moved between CD 1 and 3 are majority black, and none belong to what Plaintiffs characterize as the Black Belt. (See Doc. 187-2 at 5-7.) Moving whole counties, as opposed to smaller blocks of voters, within this region does not raise an inference of racial targeting.

Williams Plaintiffs rely on Dr. Rodden's analysis of map simulations to allegedly "show that S.B. 249's extreme racial sorting was not necessary to achieve the General Assembly's professed partisan goals." (Doc. 206 at 7.) In his supplemental report, Dr. Rodden sought "to assess whether, in an approach to North Carolina redistricting that did not consider race, one would expect to see that the largest BVAP of a congressional district in Eastern North Carolina would be only 32.34 percent," i.e., the BVAP of CD 1 under the 2025 plan. (Doc. 187-2 at 14.) The implication is that if race-blind simulated maps overwhelmingly

42

produce a district with a higher BVAP than CD 1, then it is less likely that the General Assembly unintentionally drew CD 1 as it is under S.B. 249. Likewise, if the second-highest BVAP district in the race-blind simulated maps overwhelmingly has a lower BVAP than CD 3, the same implication applies.

To do this, Dr. Rodden began with 5,000 computer-generated congressional maps created by Dr. Barber during the earlier phase of this litigation addressing the 2023 redistricting. Dr. Rodden "identif[ied] those [maps] for which the counties covered by District 1 and District 3 are divided into 3 districts." (Id. at 15.) Dr. Rodden explained that he had to use those maps that divided CD 1 and 3 into three districts because there were none that divided them into two districts like the 2025 plan does. (Id.) Looking at the 942 maps that divided CD 1 and 3 into three districts, Dr. Rodden found that the simulations "typically produce one district with a BVAP higher than the 32.34 percent of CD1 in the 2025 Plan." (Id.) Specifically, "[o]nly around 12.5 percent of the simulated plans produce a district with a BVAP of 32.34 percent or less." (Id.) In other words, of the race-blind simulated maps, about 88% had a district with a BVAP higher than the BVAP of the 2025 version of CD 1, and 12% had a BVAP equal to or less than that of CD 1. (Id.) Dr. Rodden also opined that "the BVAP of District 3 is on the high end of the simulations" but he did not quantify the percentile for CD 3. (Id.) Overall, Dr.

43

Rodden concluded that "this means that Black voters are more dispersed across districts in the 2025 Plan than in the simulated plans." (Id.)

We give little weight to Dr. Rodden's analysis of Dr. Barber's 5,000 simulations. First, as Dr. Barber explains, there is a "structural mismatch" between the district configurations in the simulated maps and the actual 2025 map. (Doc. 201-5 at 23.) The simulated maps "did not consider partisanship," but partisanship was 2025 plan's main objective. (Id.) The simulations also divided the combined area of CD 1 and 3 into three districts, while the 2025 plan divides it into only two. (Id.) And the simulations did not keep all districts except CD 1 and 3 constant, which the General Assembly did when redrawing in 2025. (Id.) For these reasons, the simulated maps examined by Dr. Rodden "do[] not represent the range of possible configurations that the legislature could realistically have considered when drawing the 2025 plan while only changing Districts 1 and 3." (Id.)

Two additional problems are worth noting. Dr. Rodden did not attempt to separate race from partisanship by looking only at maps that "achieve[d] the same"—or even similar—"partisan objectives [of the 2025 plan] but through different racial configurations." (Id.) Indeed, Dr. Barber's review showed only 5 out of 5,000 maps in which the district with the highest BVAP had a Republican partisan index of 53% or more. (Id. at 23–24.) And, even setting

44

all those issues aside, Dr. Rodden nowhere explained why CD 1's 12th percentile BVAP or CD 3's 54th percentile BVAP should be considered outliers among the simulated maps. (See Doc. 187-2 at 15; Doc. 201-5 at 24 (Dr. Barber explaining that, based on his review of Dr. Rodden's data, "District 3 was at the 54th percentile of the simulations").)

Perhaps recognizing these flaws, Dr. Rodden implemented some of Dr. Barber's proposed changes in his corrected supplemental rebuttal report.[15] (See Doc. 211-2 at 11-14.) This time, he generated his own 5,000 race-blind simulations with "two-district arrangements." (Id. at 12.) He held all districts except for CD 1 and 3 constant and considered only those maps that split the area of CD 1 and 3 into two districts. (Id.) Analyzing this set, Dr. Rodden concluded that "a highest-ranked BVAP of 32.3 percent is quite unusual in the ensemble of race-blind plans. Only around 3.8 percent of all plans have a similar or lower BVAP in their highest-ranked district." (Id.) And "the BVAP is higher in the

---

[15] Dr. Rodden's supplemental rebuttal report was initially submitted on November 18, 2025. (See Doc. 206-4.) At the hearing on Plaintiffs' motions, counsel for Williams Plaintiffs informed the Court that the report contained errors in the section discussing the simulated maps. (See Doc. 212-1 (Dr. Barber explaining the errors in Dr. Rodden's simulations).) Williams Plaintiffs have since submitted a corrected report. (See Doc. 211-2.)

45

second-ranked district than in all but 4.1 percent of the plans." (Id.)

Those numbers, however, again did not account for the General Assembly's primary goal of increasing Republican partisan advantage. As Dr. Rodden acknowledged, "the simulations typically produce one Democratic-leaning district and one Republican-leaning district." (Id. at 14.) That is, they represent configurations that the General Assembly never would have enacted. Just like his initial simulations, then, there is a "structural mismatch" in that "many simulated maps are not comparable to the enacted plan." (Doc. 201-5 at 23.) For this reason, we place little weight on Dr. Rodden's conclusions. (See Doc. 211-2 at 12–13.)

When Dr. Rodden finally attempted to control for partisanship, his results were underwhelming. Of the 5,000 maps he generated, only 1,002 "produced two Republican districts" similar to the 2025 plan. (Id. at 14.) Of those maps, "812 (around 81 percent) had a BVAP in the higher-ranked district greater than the 2025 Plan's District 1's BVAP of 32.3 percent." (Id.) In other words, of the race-blind simulated maps that created two Republican districts, about 19% had a BVAP in the higher-ranked district lower than that of CD 1. Dr. Barber's follow-up analysis produced similar results: As the race-blind simulations came closer to achieving the partisan goals that the

46

General Assembly achieved in enacting S.B. 249, "the 2025 Map [began to] look more and more typical." (Doc. 212-2 at 3-4.)[16]

We fail to see how these results support an argument that CD 1 is such an outlier among the race-blind simulations that an inference of discriminatory intent is warranted. Of course, the results incorporating partisanship may show "that it was quite possible to meet the updated 2025 political goals of the [General Assembly]" without reducing CD 1's BVAP to what it is now. (Doc. 211-2 at 14 (emphasis added).) But the results also show that it was "quite possible"—indeed, quite unsuspicious—to draw the 2025 plan as it stands without considering race at all. (Id.; see also Doc. 212-2 at 4.) Dr. Rodden's simulations thus give us no reason to infer racial discrimination.

In addition, for substantially similar reasons, we find Dr. Rodden's reliance on the General Assembly's draft maps from September 2023 unavailing. (See Doc. 211-2 at 14.) Williams

---

[16] Dr. Barber critiques Dr. Rodden's simulations for defining "Republican leaning districts" as those being 50%+ Republican leaning. (Doc. 212-2 at 2-3.) According to Dr. Barber, it would be more accurate to compare the 2025 plan to simulated maps containing districts with a Republican partisan index the same as or higher than the partisan index of CD 1 and 3 as currently drawn: in Dr. Barber's opinion, about 54%. (Id. at 3; see also id. at 4 (showing that the 2025 plan becomes more typical if compared to simulated districts with higher Republican partisan indices).) Though we accept Dr. Barber's point, we find that it is ultimately unnecessary to our decision given the weaknesses in Dr. Rodden's analysis explained in this section.

47

Plaintiffs argue that Dr. Rodden's "analysis of the General Assembly's draft maps . . . show[s] partisan goals did not necessitate the unusually low BVAP in CD-1." (Doc. 206 at 7.) The main problem with this argument is that, as just discussed, Dr. Rodden's own simulations show that CD 1 does not have "an unusually low BVAP." (Id.; see Doc. 211-2 at 14.) So Williams Plaintiffs' argument is on shaky footing from the start. Moreover, Dr. Rodden's only point is that the maps show "that it is possible to achieve an 11-3 Republican-leaning configuration [of the State's 14 congressional districts] without resorting to the stark racial effects of minimizing the BVAP of CD-1 of the 2025 Plan." (Doc. 211-2 at 14 (referencing WX2 at 23–27).) But the possibility of drawing the entire congressional map differently does not give rise to an inference that S.B. 249 was drawn with racially discriminatory intent.

Because Williams Plaintiffs spend very little time on the rest of their experts' analyses, so do we. See Wheatley v. Wicomico Cnty., 390 F.3d 328, 335 (4th Cir. 2004) ("Lawyers have a duty not just to submit evidence, but to provide some focus to their argument."). As we recently explained with respect to Dr. Rodden's analysis of the 2023 redistricting, his core/in/out analysis "do[es] not reveal the legislature's motivation" in drawing the districts. (Doc. 209 at 92; see Doc. 187-2 at 12–14; Doc. 211-2 at 10.) And his underlying assumption that race and

48

party registration are "perfectly correlated" in this region appears unsupported and unreliable. (Doc. 187-2 at 14; see Doc. 201-5 at 21-22 (Dr. Barber analyzing the correlation between race and party registration to test this hypothesis).) As for Williams Plaintiffs' single mention of Dr. Rodden's racial dislocation analysis, it similarly does not raise an inference of discriminatory intent. (See Doc. 206 at 8-9; Doc. 211-2 at 4-10.)

In sum, though Williams Plaintiffs have shown a disparate impact on black voters, they have not demonstrated that this effect likely reflects discriminatory intent.

### 3. Historical Background and Racial Polarization

Williams Plaintiffs contend that "North Carolina's history of race discrimination and recent patterns of official discrimination, combined with the racial polarization of politics in the state" support a finding of discriminatory purpose. (Doc. 187 at 15 (internal quotation marks omitted).) We begin with history. Under Arlington Heights, "[t]he historical background" of the law under review can be probative in determining whether the law was enacted with discriminatory intent, "particularly if [the historical background] reveals a series of official actions taken for invidious purposes." 429 U.S. at 267.

As we recently explained in our opinion rejecting Plaintiffs' challenges to the 2023 redistricting plans, we find their historical argument unavailing in an effort to demonstrate

49

discriminatory intent. (Doc. 209 at 19-25.) Although courts found that the 2011 General Assembly configured districts predominantly based on race, those courts did not find that the legislature acted in bad faith or with discriminatory intent. See Covington v. North Carolina, 316 F.R.D. 117, 129 (M.D.N.C. 2016); Harris v. McCrory, 159 F. Supp. 3d 600, 604-605 (M.D.N.C. 2016). Moreover, since 2016 the General Assembly has implemented a policy forbidding the consideration of race in drafting its congressional redistricting plans. (Doc. 209 at 21.) And of course, "[a] legislature's past acts do not condemn the acts of a later legislature, which [courts] must presume acts in good faith." Raymond, 981 F.3d at 298.

Further, S.B. 249 traces its lineage to the relentless efforts of the North Carolina General Assembly to win the legal battle over the permissibility of partisan considerations in redistricting. As we recently explained (Doc. 209 at 21-24), the General Assembly pursued its case all the way to the United States Supreme Court in Rucho, which held for the first time that "partisan gerrymandering claims present political questions beyond the reach of the federal courts." Rucho, 139 S. Ct. at 2506-2507; see generally Common Cause v. Rucho, 279 F. Supp. 3d 587 (M.D.N.C. 2018). After that decision, the General Assembly fought for four more years before the North Carolina Supreme Court similarly held that partisan gerrymandering claims are "nonjusticiable, political questions under the North Carolina Constitution," just as they are

50

under the Federal Constitution.  Harper v. Hall, 886 S.E.2d 393, 416 (N.C. 2023).  This history suggests that the General Assembly, having vigorously contended for the right to consider partisan data in redistricting, intended to exercise that right.

Moving to polarization, Williams Plaintiffs argue that racially polarized voting provides an incentive for intentional discrimination.  (See Doc. 187 at 15–17; Doc. 206 at 5.)  Black voters in CD 1 and 3 consistently vote for the same candidate, so Williams Plaintiffs argue "it makes sense that the General Assembly would target Black voters for partisan gains."  (See Doc. 187 at 16.)  We find their logic lacking.  Just like the 2023 redistricting, racial data was not included in the computers used to draw CD 1 and 3 in 2025, but partisan election data was included. Williams Plaintiffs have again provided no reason, and we see none, why a mapmaker who wanted to produce safely Republican districts would use "racial data—with the associated legal risks—as a proxy for partisan data when he had access to refined, . . . precinct-level political data" from which to draw districts with partisan precision.  Alexander, 144 S. Ct. at 1243; (Doc. 209 at 98.)

For these reasons, we find that neither historical background nor racial polarization raises an inference that the General Assembly enacted S.B. 249 with discriminatory intent.

51

### 4. Legislative History and Sequence of Events Leading to the 2025 Plan

Williams Plaintiffs also contend that circumstantial evidence of discriminatory intent can be found in "[t]he legislative . . . history" of S.B. 249, "[t]he specific sequence of events leading up to" its passage, and procedural or substantive "[d]epartures from the normal . . . sequence" of events. Arlington Heights, 429 U.S. at 267–268; (Doc. 187 at 17–19.) However, this evidence, which Williams Plaintiffs address only briefly, appears consistent with the General Assembly's professed partisan intent.

First, Williams Plaintiffs argue that CD 1's "reconfiguration represents a significant substantive deviation from the State's congressional plans for the last 150 years" because it moves the city of Wilson out of CD 1 (along with all of Wilson County). (Doc. 187 at 17; see Doc. 187-2 at 7–8.) But separating cities that were previously grouped together in CD 1, even for a long time, does not necessarily raise an inference of discriminatory intent. As explained above, Senator Hise credibly testified that he targeted CD 1 because it presented a straightforward, plausible way to create an additional Republican district. At this stage, we are not convinced that race motivated Senator Hise's decisions in reconfiguring CD 1.

Next, Williams Plaintiffs assert that the 2025 plan performs worse than the 2023 plan on some traditional redistricting

52

principles. Namely, the 2025 plan "split one more county, [voter tabulation district], and municipality" than the 2023 plan, and "[t]here are two more splits within municipalities than in" the 2023 plan. (Doc. 183-2 at 8; Doc. 187-2 at 4.) The 2025 plan also splits three Combined Statistical Areas ("CSAs") that were intact in 2023.[17] (Doc. 187 at 12–13 (citing Doc. 187-2 at 9–10).)

At the same time, however, the 2025 plan performs as well or better than the 2023 plan regarding other traditional redistricting criteria. The 2025 plan's districts have equal population, and CD 1 and 3 are both more compact under the 2025 plan than they were under the 2023 plan. (Doc. 183-2 at 6–7.) Defendants also point out that when it comes to splitting populated areas of municipalities, the 2023 and 2025 plans perform equally. (Doc. 201-5 at 5–6 & n.3.)

Williams Plaintiffs do not explain how any of this evidence gives rise to an inference of intentional discrimination. As NAACP Plaintiffs' expert Anthony Fairfax confirmed, any changes in traditional districting principles between the 2023 and 2025 plans were slight. In his words: "Overall, the changes to CDs 1 and 3 in Senate Bill 249 are not substantially different in plan

---

[17] The 2025 map also moved into CD 3 the county in which CD 1 incumbent Representative Don Davis lives. (Doc. 183-2 at 9.) But members of Congress are not required to live in the districts they represent. And changing Democratic Representative Davis's district is entirely consistent with partisan motivations.

53

performance for the criteria I analyzed," even though they "do not show that the traditional redistricting criteria were improved under the 2025 configurations." (Doc. 183-2 at 9.) Williams Plaintiffs' assertion that the 2025 plan "comes at the expense of traditional redistricting principles" is thus overstated. (Doc. 187 at 11.) Moreover, maintenance of CSAs was not among the 2025 plan criteria, so it is hard to see how breaking them up constitutes a "[s]ubstantive departure" from the General Assembly's normal practice. <u>Arlington Heights</u>, 429 U.S. at 267.

As for procedure, Williams Plaintiffs point out the "extraordinary speed" with which the 2025 plan was passed and "the lack of public input or opportunity for debate." (Doc. 187 at 17–18.) The record shows that the General Assembly moved quickly to pass S.B. 249. The intention to redraw the 2023 congressional map was announced on Monday, October 13. (Doc. 184-5 at 2–4.) Senator Hise testified that the 2025 plan was released to the public on Thursday, October 16. It was then formally introduced in the Senate Elections Committee on Monday, October 20.[18] (Doc. 184-2 at 5.) That same day, the bill proceeded to the Senate floor. (<u>Id.</u> at 4.) The Senate passed the bill on October 21, and it was

---

[18] The 2025 plan was introduced in the Senate Elections Committee by committee substitute, meaning that the 2025 plan took the place of another bill already bearing the designation "S.B. 249." (<u>See</u> Doc. 184-2 at 5; Docs. 184-3, 184-4.)

54

sent to the House. (Id. at 3-4.) The House redistricting committee reported the bill favorably that day, and the full body debated and passed the bill on October 22. (Id. at 3.) It became law the same day. (Id.; accord Doc. 205 at 2-4.)

During this process, the General Assembly provided two opportunities for in-person public comment. Both were during Senate and House committee meetings in Raleigh, and speakers were limited to one minute each. (Doc. 187-4 at 9-10.) The General Assembly also maintained a public comment portal which received over 12,000 comments, most of which opposed S.B. 249. (Id.) This all contrasts with prior redistricting cycles, in which the General Assembly often took months to pass new districting maps and conducted public hearings in various locations across the State. (See Doc. 209 at 45.)

Williams Plaintiffs claim that the General Assembly's unusual speed in passing the 2025 plan gives rise to an inference of discriminatory intent. But they have offered no reason to believe that the speed of the 2025 process indicates an intent to discriminate on the basis of race. Nor do they explain what weight we are supposed to assign to what they call the "near uniform outcry among North Carolina voters against the map and the process." (Doc. 187 at 17-19.) As one court has put it, "partisan gerrymandering is unlikely to be popular, so it is understandable that a legislature engaging in it would want to avoid an extensive,

55

public process. While that may not be consistent with the best practices of good government, it is hardly suggestive of racial motivation." Jackson v. Tarrant Cnty., —F.4th—, 2025 WL 3019284, at *12 (5th Cir. Oct. 29, 2025). Without more, the "brevity of the legislative process" and limited opportunity for public input do not give us reason to draw "an inference of bad faith—and certainly not an inference that is strong enough to overcome the presumption of legislative good faith." Abbott, 138 S. Ct. at 2328–2329.

*   *   *

In sum, we find that Williams Plaintiffs have not made a clear showing that the General Assembly likely enacted S.B. 249 with the intent to "minimize or cancel out the voting potential" of black North Carolinians. Miller, 515 U.S. at 911 (internal quotation marks omitted). We therefore deny their motion for a preliminary injunction on their Fourteenth Amendment intentional vote dilution claim.[19]

---

[19] As a final argument in opposition to Plaintiffs' motions, Defendants intimate that an order preliminarily enjoining S.B. 249 at this point would violate the Purcell doctrine, "which stands for the principle that 'federal courts ordinarily should not enjoin a state's election laws in the period close to an election,' and that when 'lower federal courts contravene that principle,' the Supreme Court will stop them." Pierce v. N.C. State Bd. of Elections, 97 F.4th 194, 226 (4th Cir. 2024) (quoting Merrill v. Milligan, 142 S. Ct. 879, 879–880 (2022) (Kavanaugh, J., concurring in grant of applications for stays)); see Purcell v. Gonzalez, 549 U.S. 1, 4–6 (2006). Because we deny Plaintiffs' motions for a

56

## IV. CONCLUSION

Plaintiffs have not made a clear showing that they are likely to succeed on the merits of any of the claims advanced in their preliminary injunction motions. See Winter, 555 U.S. at 20, 22. Accordingly,

IT IS ORDERED that NAACP Plaintiffs' motion for a preliminary injunction (Doc. 182) and Williams Plaintiffs' motion for a preliminary injunction (Doc. 186) are DENIED.

/s/ Allison J. Rushing
United States Circuit Judge

/s/ Richard E. Myers, II
Chief United States District Judge

/s/ Thomas D. Schroeder
United States District Judge

November 26, 2025

---

preliminary injunction on other grounds, we do not address Purcell's application to this case.

57